# EXHIBIT

# B

SEGAL ROITMAN, LLP

| | COUNSELORS AT LAW | |
|---|---|---|
| DONALD J. SIEGEL | | ROBERT M. SEGAL (1915-1999) |
| PAUL F. KELLY | 33 HARRISON AVENUE | HAROLD B. ROITMAN (1913-2011) |
| IRA SILLS | SEVENTH FLOOR | |
| KATHRYN S. SHEA | BOSTON, MASSACHUSETTS 02111 | |
| ELIZABETH ARIENTI SLOANE | www.segalroitman.com | JOSEPH P. MCKENNA, JR., OF COUNSEL |
| NICOLE HORBERG DECTER* | | _____ |
| JAMES A.W. SHAW** | | |
| JOCELYN B. JONES | | *Also admitted to the |
| NATHANIEL P. GOLDSTEIN* | | New York Bar |
| NANCY J. SMITH | | **Also admitted to the |
| JASPER GRONER | | New Hampshire Bar |
| PAIGE W. MCKISSOCK | | |
| SASHA N. GILLIN | | |
| SOPHIE C. ESQUIER | | |
| RYAN MCGOVERN QUINN | | |

November 27, 2020

**E-FILED**
Tania Taveras, Administrative Assistant
Mass. Commission Against Discrimination
One Ashburton Place, Sixth Floor
Boston, MA 02108
bospositionstmts@mass.gov

> Re:   **Ginamarie Alongi and Rosemarie Alongi v. Int'l Union of Operating Engineers Local 4 Fringe Benefit Funds, et al**
>            **MCAD Docket No. 20BEM01708 (G. Alongi)**
>            **EEOC Charge No. 16C-2020-01968 (G. Alongi)**
>            **MCAD Docket No. 20BEM01709 (R. Alongi)**
>            **EEOC Charge No. 16C-20-01969 (R. Alongi)**

Dear Ms. Taveras:

I.    Introduction

The following Position Statement is filed in response to the joint complaint of discrimination and retaliation filed by Gina Alongi and Rosemarie Alongi against their former employer. They allege sexual harassment, retaliation, disability discrimination and associational discrimination.

To be frank, the Complaint is puzzling. The allegations of sexual harassment occurred more than two years before the charge was filed and are obviously time barred. As to the terminations, Gina Alongi was the top executive of an organization that provides health, pension, and annuity benefits to workers in the construction industry, and she was terminated for gross breaches of fiduciary duty, some of which constitute potential criminal violations under federal law. Rosemarie Alongi was an IT manager who was terminated for gross negligence after her mistakes facilitated a devastating and expensive ransomware attack on the employer.

The grounds for discharge are well documented, and their discharges had nothing to do whatsoever with discrimination or retaliation. Indeed, a subsequent review by a national legal expert on the management of such funds concluded that the employer had no choice but to terminate Gina's employment.

The Commission should find no probable cause and dismiss these charges in their entirety.

II.   <u>Factual Background</u>

A.   <u>Parties and Organizational Background</u>

Local 4 of the International Union of Operating Engineers ("Local 4" or "the Union") is a labor union that negotiates collective bargaining agreements with dozens of employers in Massachusetts who employ workers that operate heavy equipment such as cranes and bulldozers. It is based in Medway, Mass. (Local 4 is not a party to this case, but its role is material to understanding the relationships of the parties in the case.)

Because Local 4 members often work for several employers throughout the year, individual employers do not directly provide health, pension and other benefits. Instead, a collective bargaining agreement signed by dozens of employers requires each employer to contribute a certain amount of money per hour worked by their employees to several trust funds, which are then used to provide benefits to Local 4 members. The trust funds are Health & Welfare Fund (providing health benefits); Pension Fund (providing pension benefits); Annuity and Savings Fund (providing an annuity benefit); and Apprenticeship and Training (used to operate an apprenticeship training program). Employers contribute to an additional fund called the Labor Management Cooperation Trust Fund, which uses the money received to advance the industry competitiveness of union employers.

Each of these trust funds is a separate and distinct legal entity from the Union, and from each other. Each trust fund is governed by a board of trustees that is composed of equal numbers of representatives appointed by Local 4 and by the respective Employer Associations. Each trustee has an equal vote. <u>See</u> <u>generally</u> 29 U.S.C. § 186 ("Taft-Hartley Act"). The trust funds are strictly governed by federal law, specifically the Employee Retirement Income Security Act (ERISA), 29 U.S.C. s. 1101 *et seq*., the Internal Revenue Code, 26 U.S.C. s. 401 *et seq*., and the regulations and guidelines of the U.S. Dept. of Labor ("DOL") and the Internal Revenue Service (IRS). Under federal law, the Funds and their Administrator have a fiduciary duty to act "solely in the interest of the participants and beneficiaries and for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 28. U.S.C. § 1104(a). As such, a fiduciary "shall not (1) deal with the assets of the plan in his own interest or for his own account, (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b). If the trust funds or its fiduciaries breach these obligations, this can imperil their tax-exempt status. The Funds are periodically audited by both the DOL and the IRS.

Respondent William McLaughlin is the Business Manager of the Local 4 union. The position of Business Manager is the top leadership position within the Union. When former Local 4 Business Manager Lou Rasetta retired in July 2017, Mr. McLaughlin was elected as the new business manager by the Union's executive board (a vote that was ratified by the membership at large). Mr. McLaughlin was re-elected to a full three-year term directly by the membership at large in August 2018. As Business Manager, Mr. McLaughlin automatically serves on each of the Funds' Boards of Trustees as Chairman. However, because each trustee has equal voting power, Mr. McLaughlin is without authority to take any unilateral action.

The Health & Welfare, Pension, Annuity and Savings, and Labor Management Cooperation Trust Funds are administered at an office inside the building owned by Local 4 in Medway, Mass. These four founds use the same Administrator to oversee and manage their operations. They are often referred to as "the Funds." The Apprenticeship and Training Fund is run by a Coordinator at a separate site, but receives some administrative services from employees of the Funds; for example, the Funds receive apprenticeship benefit contributions from employers along with the other contributions and then remits the apprenticeship program's share to the apprenticeship program.

The Funds pay for common expenses through an Administrative Services Sharing Agreement ("ASSA"), which requires that all Funds Office employees keep track of the time they spend on their work for each of the Funds. An independent auditor annually calculates the proper allocation of common expenses among the Funds according to these time sheets (hereinafter referred to as "DOL time sheets"). All Funds Office employees are required to track their time so that each Fund pays only its share of Funds Office expenses and is not burdened with the expenses of other Funds and pay only those expenses that are both "reasonable and necessary" for that Fund. Failure to keep DOL time sheets would violate federal law, DOL regulations, and the ASSA, and would also constitute a breach of the Funds' fiduciary duties. A copy of the ASSA in effect during the events alleged in the Complaint is attached hereto as Exhibit A.

Complainant Gina Alongi was the administrator of the Health & Welfare, Pension, and Annuity and Savings Funds from 1996 until 2020. Until 2020, her performance was generally acceptable to the Trustees, but her record was not unblemished. For example, in the 2012-2014 time period, she was found to have operated the Pension Fund in a manner inconsistent with plan provisions, failing to send out notices to certain participants, which ultimately caused the IRS to require the Fund to pay millions of dollars to pensioners who had not received the proper notices. For another example, a DOL audit that concluded in 2004 took issue with many of Ms. Alongi's expenses and required her to return money to the Funds that she had spent unlawfully. Ms. Alongi was technically an employee of the Health & Welfare Fund, though the cost of employing her was subsidized by the other trust funds as described above through the ASSA.

Complainant Rosemarie Alongi is Gina's[1] twin sister and was employed by the Funds from 2005 to 2020 in information technology roles until her employment was terminated for gross negligence.

B.   Gina and Rosemarie Alongi Were Terminated For Gross Misconduct and Performance Failures

In summary, the Covid-19 pandemic forced employees to begin working from home. This required some additional recordkeeping for employees, and it quickly disclosed several substantial management failures by Gina Alongi that rose to the level of illegal breaches of fiduciary duty.

During this period, the employer also suffered a ransomware attack, which a professional forensic response revealed would have been likely prevented had Gina adequately supervised her twin sister, Rosemarie, who had taken grossly negligent actions that likely allowed the ransomware attack to succeed.

For example, it was discovered that Gina had falsified records of the Funds by using identical time allocations year after year regardless of the actual time she spent working for the Funds. She worked a second job while on the clock for the Funds, thus accepting her employer's salary while working for another organization. She failed to provide necessary oversight of the IT department, which resulted in a dramatic cyber security ransomware attack that risked exposing confidential data of the Funds' participants and rendered the Funds' data unusable for a month. Gina mismanaged Fund expenses. Gina failed to serve the Board of Trustees in a transparent manner, providing them with neither full financial disclosure nor all the information they needed to make informed decisions. These were not the only serious failures discovered by the Trustees that resulted in Gina's termination as administrator.

1.   The Trustees learned that Gina worked a second job while on the clock for the Funds

At the onset of the Covid-19 pandemic, the Funds' employees started working from home, including Gina. After the office reopened according to the Governor's guidance, certain employees, including Gina, were allowed to continue to work from home on an either full- or part-time basis. Those employees were asked to submit weekly summaries of their work so the Funds could demonstrate to the DOL that they were acting with prudence and due diligence as required under ERISA and not wasting plan assets.

The work summaries Gina prepared of her own work disclosed that she was performing work on behalf of the Mass. Coalition of Taft Hartley Funds ("Coalition"). The Coalition is a group of regional trust funds that, like the Local 4 Funds, provide health and welfare benefits through multiemployer benefit plans. Ostensibly, the Coalition allows plan professionals to share ideas and concerns for the benefit of their respective organizations, although it also includes a number of golf and holiday outings sponsored by vendors seeking to do business with the various Funds.

---

[1] The Employer here uses the convention of first names for the complainants, as was used in their Complaint itself. This is meant for clarity and readability and is not intended to convey any disrespect.

Gina holds the title of Executive Director of the Coalition. In 2018, the Coalition reported to the IRS that Gina was paid $42,000 to work 10 hours per week. Attached as Exhibit B is the From 990 that the Coalition filed with the IRS in 2019, covering the period of 2018. (This is the most recent document available.) In 2017, she was paid $40,000 for 10 hours of work, and in 2016 was paid $36,600 for 10 hours per week. See Exs. C and D (Form 990s for the two years prior.) However, while she was employed by the Funds, she was required to perform Coalition work on her own time. It would be wholly inappropriate, and indeed illegal, for Gina to accept her Funds' salary in order to perform work for the Coalition. 29 U.S.C. § 1106(b).

Upon seeing Gina's reference to the Coalition on her work summaries, further inquiry showed that Gina spent significant amounts of time on Coalition work or talking to Coalition members, particularly in the weeks leading up to Coalition networking events. It was also learned that Gina had directed Funds staff to perform work on behalf of the Coalition. Other than Gina, the Coalition does not employ any of the Funds staff. Gina required her assistant administrator and other clerical staff do the Coalition's event planning, the Funds' bookkeeper to perform the Coalition's accounting, and her sister Rosemarie to maintain the Coalition's website. This work was entirely or largely performed during the Funds' workday and while being paid by the Funds. The only payment from the Coalition to the Funds was a $400 annual rent payment. After Gina's termination, the scope of the work diverted to the Coalition came into full focus: 30 boxes of Coalition papers were found in the Funds Office, requiring a moving truck to return them to the Coalition.

2. Gina attempted to spend $30,000 in plan assets on the Coalition

In March 2020, Gina attempted to divert $30,000 of plan assets toward a Coalition event. The Funds had received the $30,000 as a "wellness credit" from Blue Cross Blue Shield, which was intended for the use of the Health & Welfare Fund and its participants. However, Gina had attempted to spend this credit to defray the cost of tables for vendors that had been invited to a Coalition event. Gina never informed the Trustees, nor did she seek Trustee approval. Fortunately, due to the Covid-19 pandemic, the event was cancelled, and the scheduled payment was not finalized.

3. Gina failed to keep time records in violation of the law and the ASSA

After Gina's work summaries disclosed substantial work for the Coalition, a review of Gina's DOL time sheets was undertaken to see if it could be determined how much time she had spent on Coalition work. It turned out that Gina had failed to keep DOL time sheets, in violation of DOL requirements and the Funds' ASSA. As explained in more detail above, the DOL time sheets are used to allow auditors to make an annual allocation of salary and other expenses between the various trust funds. However, it was discovered that Gina had used the exact same numbers year after year, even though these numbers would obviously change yearly. Indeed, the only time that Gina's reported time varied was in 2014, a year in which the Funds outsourced the processing of health claims and thus she lowered the amount of time she claimed to work on behalf of the Health & Welfare Fund. This static reporting of hours was false, and it violated the

ASSA and DOL rules, with the result being that some trust funds paid too much, others too little, for their share of Gina's salary and benefits.[2]

In her Complaint, Gina maintains that the work-from-home summaries were something new. She states that "No such requirement had ever been imposed on Gina prior to that time." Compl., ¶ 47. Although the work-from-home summaries were new insofar as Covid-19 was new, Gina had always been required to keep DOL time sheets. As with all Funds Office employees, this was her fiduciary obligation under ERISA and under the ASSA, a serious obligation that she breached.

4. <u>Gina falsified records as to the Trustees' review of expenses</u>

Under federal law, the trustees of the various trust funds must determine that all expenses of the funds are reasonable and necessary. 29 U.S.C. § 1104(a) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and-- (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"). However, further inquiry showed that Gina had been failing to provide the various trustees with check registers that showed the expenses of each Fund, which therefore prevented the trustees from fulfilling their statutory duty.

Gina prepared the agendas for each of the various trustee meetings, and these agendas indicated that she was providing the check registers. In 2012, Kathryn Shea, counsel to the Fund, asked Gina about why there were no check registers included in the packet supplied to Attorney Shea with the agenda. Gina replied that she did not provide the registers to counsel, only to the Trustees. However, it later turned out that that was not true (meaning the agendas themselves were inaccurate). Trustees were not in fact given check registers, only a summary of expenses by general category that hid the specific expenses paid by each Fund. Her subordinates were aware of the omission but were unable to countermand Gina.

This was not a minor or technical failure. For example, when Gina personally received the Cushing-Gavin Boyle award in 2015 (see compl., ¶ 13), Gina personally charged the Health & Welfare Fund the cost of a hotel room for one night at the Ritz Carlton in Boston for herself, her niece and Mr. Rasetta (then business manager of Local 4). Had Gina disclosed these expenses to the trustees, the trustees undoubtedly would not have found them "reasonable and necessary" to the Plan's operation, and therefore should have, and likely would have, required Gina to pay back this money to the Fund.[3]

5. <u>Gina misled Fund Trustees about how to handle a participant's medical emergency</u>

Participants in the Funds' health care plan earn eligibility by working a certain number of hours in a year. During the Covid-19 pandemic, a business agent for the Union (Chris Fogarty) was contacted by a plan participant whose daughter needed surgery. This member contacted Mr.

---

[2] In 2020, Gina's annual salary was $248,745; her benefits cost $57,540 per year; and her annual vehicle cost was $24,515. Those costs were required to be accurately apportioned among the various Funds.

[3] Ironically, Mr. McLaughlin won the exact same award in 2014. He did not charge or attempt to charge any of the trust funds the cost of any expenses related to this award.

Fogarty because, although he had met the minimum hours requirement for benefit eligibility, his daughter needed the surgery five days before the eligibility would kick in. In other words, although this member had worked enough hours to be eligible, a fluke of timing meant his daughter's surgery would not be covered.

Mr. Fogarty brought the member's concern to the attention of Attorney Gregory Geiman, the Funds' Associate Administrator and In-House Counsel. Attorney Geiman had been with the Funds' Office since 2010 and worked under Gina's supervision, direction, and control. Attorney Geiman discussed possible solutions with Gina and Elizabeth Sloane, counsel to the Health & Welfare Fund. The Trustees were in favor of making a plan amendment without cost to the member because the member had already worked the necessary number of hours. Gina was adamant that the worker would have to make some kind of financial payment to the Health Fund before his daughter's surgery could be covered. Gina misled the Trustees into believing that this payment was legally required, and the Trustees approved a plan amendment requiring a payment. Fortunately, upon further inquiry, the Trustees learned that Gina had misled them, and they took a second vote to amend the Plan, which allowed the worker and his daughter to receive the health benefits he had already worked enough hours to have earned without additional cost.

The fact that Gina had withheld information and misled the Trustees, denying them the chance to explore all available options, showed poor judgment and a misunderstanding of her role as Administrator. The Administrator's job is to manage day-to-day operations and provide recommendations when requested. It is the Trustees who are charged by federal law with making plan amendment decisions.

6. Gina abdicated her supervisory responsibilities over the IT Department resulting in a ransomware cyberattack; Rosemarie was grossly negligent in managing the IT department

On May 25, 2020, the Funds learned they were the victim of a ransomware cyberattack. This required the Funds to hire outside cyber security professionals and counsel. The attack rendered inaccessible the Funds' data, including data about plan participants, and required the Funds to pay a ransom to a German crime conglomerate in order to regain access to the data. The Funds' backups were useless due to the poor design of the network. Gina's twin sister, complainant Rosemarie Alongi, was in charge of IT for the Funds. The breach also required Rosemarie's assistant to rebuild the Funds' network.

In the meantime, the Funds' operations were essentially shut down and some employees were forced to find cumbersome workarounds to perform basic tasks; other employees were unable to work at all.

A thorough review ensued, and it showed that Gina had failed to effectively oversee the Funds' critical IT infrastructure. As background, Gina had hired Rosemarie as the Funds' security officer in 2005. In 2019, Gina promoted Rosemarie to be the manager of the Funds' IT department. Shortly thereafter, a rift developed between the sisters, and they stopped speaking to each other. This continued until after the Covid-19 shutdown and was not known to the Trustees. In effect, Gina provided little to no supervision of the IT department.

In 2018, the Trustees had purchased a cyber security monitoring service called Rapid7, which monitored all the Funds' network endpoints (servers, desktops, remote laptops). In early 2020, without any disclosure to or approval by the Trustees, Rosemarie changed the Funds' monitoring service from Rapid7 to Managed Engine, a less robust service that focused on the firewall but not the endpoints.

Managed Engine did not detect the bad actor that had entered the system in April 2020 via one of the endpoints and disabled malware protection. Indeed, this was not discovered by Managed Engine even after the ransom demand on May 23, 2020. As to Gina, she was either aware of Rosemarie's unauthorized and irresponsible decision and took no action to stop it (perhaps because she was not on speaking terms with her sister and supervisee), or else she was not paying close enough attention. Either way, this was dereliction of duty by Gina. The Health, Pension, and Annuity Funds together have over $1.3 billion in plan assets and consequently need robust protection and monitoring at every level.

During the Covid-19 shutdown, the Funds' office staff worked remotely using Funds laptops and other Funds equipment. Rosemarie set up employees' remote access using only single factor authentication, which is vulnerable to hacking by brute force attack and other means. The Funds' outside cyber security experts explained that multifactor authentication is the expected standard of care for an organization like the Funds, and had Rosemarie employed this standard of care, the ransomware attack would likely have been prevented. The Funds also learned that the Rapid7 endpoint monitoring that the Trustees had previously approved also likely would have prevented the attack.

The ransomware attack also disclosed that certain public folders contained Excel spreadsheets, some decades old, that were kept in these public folders although they contained private confidential information about thousands of plan participants such as name, birthdate, social security number, and address. Needless to say, Rosemarie should not have kept such confidential information in public folders. The cyber security experts were able to determine that the Excel program had not been opened by the bad actor (though the bad actor could have done so), so wholesale notifications to plan participants were avoided.

Gina and Rosemarie had previously been given the responsibility for putting in place a disaster recovery protocol, and they did so at considerable expense, but they carelessly used the identical password for disaster recovery, so it was encrypted along with all the other files.[4]

Although the cyber security experts were able to determine there was no breach requiring notification to the government or the plan participants, the Funds' computer system and files were rendered unavailable for about four weeks. This caused enormous disruption to the Funds operations. For example, employers could no longer send in electronic reports showing their contributions to the Funds, and data could only be obtained by telephoning a third-party vendor.

---

[4] This public folder problem and the disaster recovery failure were not discussed by the Trustees in their July 21 meeting at which they terminated Gina's employment, but they formed part of the basis for the later decision to terminate Rosemarie's employment. That decision was made by Mr. Geiman, who would replace Gina after she was fired.

Because the cyber security attack was sensitive and the facts surrounding the attack were not yet known, all Funds employees and counsel were instructed to hold information about the attack in the strictest confidence. Certain Funds employees were not even told of the attack until August 2020 due to the sensitive and evolving nature of the problem. On or about May 29, 2020, in a conference call with the special counsel, forensic experts, Funds staff and Funds counsel, Gina said she had a "confession" to make and admitted that she had improperly disclosed the ransomware attack to a third party. Then, on or about July 21, 2020, Gina made yet another unauthorized (and apparently inaccurate) disclosure of the cyber security event which she termed a "breach," an inaccurate and potentially harmful characterization.

7.  The Trustees of the Funds terminate Gina's employment

After learning of the myriad fiduciary breaches by Gina, the Boards of Trustees had no choice but to terminate her as Administrator. The boards of trustees of the Health & Welfare Fund, Pension Fund, and Annuity and Savings Fund met on July 21, 2020 to review Gina's work performance. They reviewed in detail the gross neglect and malfeasance described above. All three Boards of Trustees voted unanimously to terminate Gina as their administrator and to appoint Attorney Geiman as the new administrator. As a result, Gina's employment by the Health Fund was terminated. Attached as Exhibits E, F and G are the minutes of the various trust funds.

Below is a list of the Trustees who voted to terminate Gina Alongi as Administrator. Some Trustees served on multiple Boards. Mr. McLaughlin served on all three Boards because he is the Business Manager of Local 4. In total, nine separate Trustees concurred in the decision. Of those nine, five had been appointed by the Union, and four by Employer Associations. All six Trustees of the Health Fund were present and voted unanimously to terminate Gina's employment and position as Administrator. All five Trustees of the Pension and Annuity Funds were present and voted unanimously to terminate Gina as Administrator. A sixth Trustee of the Pension and Annuity Funds had not yet been appointed. The two Management Trustees of the Pension and Annuity Funds (Trustees Foley and Marr) voted their full complement of votes, that is, one-half of the voting power of the Board, to terminate Gina's position as administrator. [5]

|  | Health & Welfare | Pension | Annuity & Savings |
|---|---|---|---|
| William McLaughlin (union) | X | X | X |
| David Fantini (union) | X |  |  |
| Paul Diminico (union) | X |  |  |
| James Reger (management) | X |  |  |
| Angelo Colasante (management) | X |  |  |

---

[5] At the time of this decision, none of the management-appointed trustees were aware of the events of May 2018 alleged in the Complaint and discussed below, nor were they aware of any complaints about sexual harassment.

| David Marr, Jr. (management) | X | X | X |
| David Shea (union) | | X | X |
| Christopher Fogarty (union) | | X | X |
| Michael Foley (management) | | X | X |

8. <u>The Trustees' Fiduciary Responsibility to Terminate Their Administrator</u>

One of the country's most renowned experts on the ERISA fiduciary duties of Trustees and Administrators, Attorney Joyce Mader, has reviewed the minutes of the July 21, 2020 meeting of the Boards of Trustees. The Trustees had asked her to evaluate the severity of the failures of Gina Alongi. Her opinion and credentials are attached hereto as Exhibit H.

In summary, Attorney Mader concluded that Gina Alongi was a "fiduciary" for purposes of ERISA, and that she had breached that duty by working for the Coalition on Funds' time; directing Funds staff to work on coalition business; attempting to divert the $30,000 wellness credit to Coalition business; failing to submit all plan expenses to the Trustees for approval, thus concealing expenses; failing to complete her ASSA/DOL time sheets; making unauthorized disclosures about the ransomware attack; and withholding information from the Trustees. In some cases, Attorney Mader opines that these breaches could be violations of federal criminal law. Attorney Mader further points out that the Trustees may be in a position where they will be required to seek financial recovery from Gina for her fiduciary breaches. Moreover, her failure to keep DOL/ASSA timesheets may result in a need to make amended filings to the government, which could trigger an expensive government audit (the cost of which should be covered by Gina).

As Attorney Mader concluded:

These facts present a record of breaches, mismanagement, and poor judgment so egregious that in my opinion the Trustees had no choice but to immediately terminate the employment of Ms. Alongi. To permit her to have any continued authority or control with respect to the Funds, would, in my opinion have been a breach of the Trustees' fiduciary duties. The Trustees acted appropriately to protect the Funds from further damage from Ms. Alongi.

9. <u>Rosemarie's Employment Termination for Gross Negligence</u>

Following his appointment as administrator, Attorney Geiman allowed Rosemarie a two-week paid leave for him to formally assess her work. He then terminated her employment for the reasons described above. Attorney Geiman documented the reasons for his decision in a note to file. See Ex. I attached hereto.[6]

---

[6] Gina's niece continues to be employed at the Fund Office.

C. <u>The allegations of sexual harassment and disability discrimination are misleading at best and fabricated at worst</u>

1. <u>The Funds maintains a robust anti-discrimination, anti-harassment and anti-retaliation policy</u>

During the employment of both Complainants, the Funds maintained an aggressive policy prohibiting discrimination, sexual harassment, and retaliation. Attached as Exhibit J is the Employee Handbook including these policies.

In particular, the policy states that "All employees should take special note that, as stated above, retaliation against an individual who has complained about sexual harassment, and retaliation against individuals for cooperating with an investigation or a sexual harassment complaint is unlawful and will not be tolerated by this organization." Ex. J, pg. 5. It also provides contact information for the MCAD and notes that short 300-day statute of limitations to file a claim. Pgs. 5-6.

2. <u>Mr. McLaughlin is falsely accused of making inappropriate comments</u>

The complainants, primarily Gina, have spun a fantastical tale of sexual harassment and retaliation. However, the story is a gross misrepresentation of reality at best, and an utter fabrication at worst.

Gina and Rosemarie accuse Mr. McLaughlin of coming into their offices to make inappropriate comments, related to sex. These accusations are simply false.

In paragraph 26, the charge suggests that Mr. McLaughlin had a sexual relationship with an employee named Laura-Jean Hickey. This is patently false and is an unfair allegation not only as to Mr. McLaughlin but also as to Ms. Hickey. Moreover, Gina claims outrageously that this alleged knowledge was shared by Attorney Geiman and is supported by a letter he wrote. However, the quoted letter (Exhibit A to the Complaint) made no reference to a sexual relationship, and Attorney Geiman had and has no reason to believe that there was ever a sexual relationship. In fact, Attorney Geiman's statement was in relation to and response to Gina's frequently stated concern that Mr. McLaughlin and Ms. Hickey were friendly, leading Gina to be concerned and jealous that Mr. McLaughlin would address questions to Ms. Hickey rather than herself. After Mr. McLaughlin was elected Business Manager in 2017, Gina attempted to convince Attorney Geiman that he needed to be wary of both Mr. McLaughlin and Ms. Hickey due to their friendly relationship.

Apparently in an attempt to circumvent the statute of limitations, Gina alleges that Mr. McLaughlin's comments continued into 2019, citing a sole example in paragraph 39 about a Fund employee's breast cancer. This is a fabrication, and is frankly not believable on its face.

Gina's charge attributes comments to Attorney Geiman that would appear to support her fabrications, but which do not. Attorney Geiman was Gina's subordinate, compelled to listen to her frequent complaints and suspicions for the sake of his job. Attorney Geiman knew from experience that any countering of Gina, or any deviation from her objectives, would result in anger, exclusion, and threats of termination. Attorney Geiman tried to be soothing and

understanding, but he did not agree with Gina. Gina would complain to him about almost everyone: Union employees, Funds employees, her sister Rosemarie, her niece Laura-Jean, her boyfriends, her houses, her neighbors, her doctors, even her hairdresser, friends, horses, and gardens. Gina would complain during the workday when Attorney Geiman was trying to work, and she would complain on the phone to him after work hours. Attorney Geiman never concurred with Gina's allegations that Mr. McLaughlin sexually harassed anyone at any time.

### 3.   There was an incident on May 1, 2018, but it was not about sexual harassment

Gina claims that she called a meeting with Mr. McLaughlin on May 1, 2018, allegedly to discuss "Mr. McLaughlin's inappropriate conduct and comments in the workplace as well as ways in which he had been passing up Gina in favor of male employees." Compl., ¶ 27.

This is false. At this meeting, Gina intended to discuss with Mr. McLaughlin what she perceived as slights to her authority on Union matters. For example, Gina was upset that Mr. McLaughlin had hired a Union organizer without telling her, even though she had no role in the Union's business. Gina was also upset that she was not included in Union contract negotiations, as she had been in the past when Lou Rasetta served as Business Manager. However, Gina did not work for or represent the Union and there was no actual role for her at negotiations. Gina was also upset she had been excluded from a group photo with the Union's business agents. She also wanted to discuss moving the benefit funds out of the Medway office complex. Gina discussed her intentions for this conversation with Attorney Geiman before the meeting, and he tried to convince her that it was a bad idea. She told Attorney Geiman, "I have a plan. Don't try to stop me."

In the meeting, Mr. McLaughlin did not touch Ms. Alongi as claimed in paragraph 28. In fact, it was Gina who was physically poking Mr. McLaughlin angrily and aggressively in the chest. The meeting was heated, and both individuals were shouting. At one point, Rosemarie entered the glass-walled office and also shouted at Mr. McLaughlin, referring to her sister and saying repeatedly, "She will destroy you." After May 2018, Mr. McLaughlin did not enter the Funds Office except for limited times and purposes about specific work matters.

### 4.   In the Complaint, Gina falsely attributes *her own words* to Mr. Geiman in an effort to bolster her baseless allegations

On May 16, 2018, Gina decided to arrange a meeting with Attorney Shea. This meeting happened on May 21, 2018. In the evening of May 16, Gina contacted Attorney Geiman and outlined to him a number of talking points that she intended to use in her conversation with Attorney Shea. Gina instructed Attorney Geiman to draft and send her an email that reflected back her own talking points. She said she felt that Attorney Geiman's words would sound more professional. This request was not unusual, as Gina is not a good writer and frequently requested that Attorney Geiman prepare and send emails and other written documents for her use. Gina's talking points were based on a sham "investigation" (see below), her personal concerns, and legal advice she had received from Attorney Jeff Endick of the firm of Slevin and Hart. The talking points are reflected in Exhibit B to the Complaint. The complaint falsely states that the words in Exhibit B are Attorney Geiman's. As Gina knows and knows well, these are her own words, and she is falsely attributing them to Mr. Geiman in an effort to bolster her baseless allegations.

5.  <u>Gina meets with Attorney Shea on May 21, 2018</u>

At Gina's request, Attorney Kathryn Shea met with her at a coffee shop on May 21, 2018 prior to a scheduled meeting at the Funds Office.

At the coffeeshop, Gina reported that she had had an argument with Mr. McLaughlin on May 1, 2018. Attorney Shea inquired as to the details. Gina said Mr. McLaughlin did not respect her authority, and that she wanted him to treat her the way the previous Business Manager Lou Rasetta had treated her. Gina's description of the reasons for her meeting with Mr. McLaughlin in Gina's office and her description of their argument did not include anything about inappropriate behavior or sexual harassment except for her description of events immediately after the argument ended. Gina told Attorney Shea that after their argument Mr. McLaughlin hugged her, said he loved her, and tried to kiss her. Gina also claimed that on another occasion Mr. McLaughlin had told her that he could not concentrate at a Trustees' Meeting because she looked so hot or words to that effect. Gina did not describe any other instances of inappropriate behavior directed to her.

Gina further claimed she had performed an "investigation" in the weeks after May 1, 2018. She said she went around to various Funds employees and leadingly asked them to tell her about times that Mr. McLaughlin had sexually harassed them. This was not an effort at a bona fide investigation, but rather an employer attempting to use her position to extract answers she wanted. One employee told Gina that Mr. McLaughlin had walked behind her chair, put his hands on her shoulders, massaged her shoulders, and asked her how she was doing. Another employee allegedly told Gina that Mr. McLaughlin had complimented her appearance in an inappropriate way. Other employees had separate instances of an inappropriate comment or compliment by Mr. McLaughlin. Gina did not describe any employee as subjectively offended or afraid.[7]

Attorney Shea asked Gina if she was aware of any other instances of inappropriate comments or behavior. She had a notepad, and Attorney Shea gestured to it and asked if she had any other information in there. Gina said she did not. She felt she had already described severe and pervasive sexual harassment of her personally.

Attorney Shea never told Gina that she had "no claim" or that she should keep quiet. Gina said she expected Attorney Shea to be more sympathetic, and Attorney Shea said that it was her job to ask questions. Gina then asked what Attorney Shea planned to do. Attorney Shea said that she was going to meet with Mr. McLaughlin. Gina endorsed this course of action and also requested that Attorney Shea discuss the matter with Attorney Geiman, who Gina said would corroborate her allegations.

---

[7] Gina claims that "each" of the employees with whom she spoke reported feeling uncomfortable by Mr. McLaughlin's behavior. That is false. Attorney Geiman spoke with one of the employees after Gina spoke with her, out of concern for this young employee, and she indicated very clearly to Attorney Geiman that she was confused by Gina's inquiry and was worried that she had done something wrong. She had nothing negative to report about Mr. McLaughlin.

Attorney Shea met with Mr. McLaughlin and then met with Attorney Geiman. Mr. McLaughlin was shocked, and denied the allegations of sexual harassment, though he readily admitted he had shouted at Gina in their May 1, 2018 meeting. When Attorney Shea met with Attorney Geiman, he did not corroborate Gina's allegations of sexual harassment. Attorney Geiman had worked in the Funds Office since 2010 and was in daily contact with most of the Funds' employees. He did not substantiate any of Gina's claims against Mr. McLaughlin. He told Attorney Shea that Gina sent him to speak with one (and only one) Funds employee, Rosemary Ortega, to hear from her that Mr. McLaughlin had made inappropriate comments in her presence, but Ms. Ortega did not express any subjective concern about it. Attorney Geiman also told Attorney Shea that he had witnessed part of the shouting scene on May 1, which took place in Gina's glass-walled office. He did not see Mr. McLaughlin touch Gina in any way but did see Gina poking Mr. McLaughlin in the chest. Rosemarie was already in Gina's office shouting at Mr. McLaughlin that Gina would destroy him. At that point, Attorney Geiman entered Gina's office and worked to diffuse the situation.

The charge does indicate that Gina had instructed Attorney Geiman to speak with Ms. Ortega. Compl., ¶ 34. Attorney Geiman did draft the email referenced in the Complaint but did so at Gina's direction. He did not independently assess the accuracy of the information, particularly with regard to whether the alleged behavior, if it occurred, was unwelcome or offensive. Ms. Ortega is a friend of both Gina and Rosemarie, and she socialized with them outside the office (playing poker, for example). When Gina and Rosemarie were working at the Funds Office, Ms. Ortega would run personal errands and perform personal tasks for both Alongi sisters (while on the clock). Ms. Ortega has not made any complaint since May 2018, and she continues to work for the Funds Office. In this light, it is telling that Ms. Ortega would be the only employee with whom Gina would ask Mr. Geiman to speak. None of the other employees referenced by Ms. Ortega has ever come forward or made any complaints to Attorney Geiman.

6. <u>Gina recants her allegations on May 21, 2018</u>

On the afternoon of May 21, 2018, there was a meeting in Mr. McLaughlin's office with Attorney Shea, Attorney Geiman, and Gina. Contrary to her claim, Gina was never "instructed" to attend. Compl., ¶ 36. Earlier that day, Attorney Geiman had met with Mr. McLaughlin and Attorney Shea and offered to see if Gina would be willing to meet and see if the issues could be resolved. Mr. McLaughlin agreed, so Attorney Geiman asked Gina to participate and expressed his view that it would be a good idea. She agreed.

Unlike the May 1 meeting, everyone's mood was tempered and calm. Mr. McLaughlin apologized for shouting at the May 1 meeting. Mr. McLaughlin commented to Gina that he does not sexually harass anyone. Gina nodded agreement, looked down, and said "I know, Billy." She said she was concerned that he might hold what she had said against her. Mr. McLaughlin told her she was a good administrator, he valued her work, and he did not want her to worry about her job. It was understood by all in the room that Gina had recanted her allegations of sexual harassment.

Because Gina had expressed concern about her job security, Mr. McLaughlin reached out to the senior Management Trustee of the Health & Welfare Fund (that Fund was technically Gina's employer) for permission to offer Gina a written contract with a just cause clause. Gina was an at-will employee, and both the senior Union Trustee and the senior Management Trustee

thought that she might like a written contract with a just cause clause. Gina rejected the proposed agreement they had given her, offering her own version with a four-year term instead of a one-year term. The Trustees did not agree to the four-year term. As a result, Gina remained an at-will employee.[8]

Shortly after the May 21 meeting, she met with an attorney in Rhode Island. She was interested in learning whether she could bring a successful suit for sexual harassment. Gina disclosed this meeting to Attorney Geiman, and also disclosed to him in detail the legal advice she had received. Gina revealed that the Rhode Island attorney advised her that she did not have a viable case and that the attorney had declined to represent her. Gina attempted to secure another attorney well into the summer of 2018, but without success. She eventually began to tell Attorney Geiman that she intended to stay on as Administrator for as long as she wanted and that there was nothing Mr. McLaughlin could do about it. She complained to Attorney Geiman that the Trustees did not continue to approve her having an $80,000 Cadillac Escalade at the Funds' expense, traded in every two years, and instead substituted a Ford Explorer Limited Edition. She said that she would do the bare minimum and that if Mr. McLaughlin ever ran afoul of her, she would "destroy him."

In May 2018, Gina's annual salary was $230,000, and her salary was substantially increased each year thereafter by unanimous vote of the Health Fund Board of Trustees, including Mr. McLaughlin. At the time her employment was terminated, her salary was $248,745. She also retained her six weeks of paid vacation.

7. _Gina's claims about reasonable accommodations are fabricated_

The Funds' business hours are 8 a.m. to 4 p.m. When Lou Rasetta was the Business Manager, Gina would not start work until 10:30 or 11 a.m. When Mr. McLaughlin was elected Business Manager, Gina would arrive closer to 9:30 or 10 a.m. She would rarely stay past 4 p.m., and would sometimes even leave early, especially on Fridays.

In January 2020, Mr. McLaughlin met with Gina, with Attorney Shea present, and told her that she would need to report to work during the actual business hours of the operation she was in charge of overseeing. Compl., ¶ 42. In that meeting, Gina agreed to report to work on time in the future. She did not ask for an accommodation of any kind.

She now claims in her charge that she claimed she needed a modified work schedule because she is an insulin-dependent diabetic who must inject insulin at certain times of the day. Compl., ¶ 42. She alleges that the requirement that she be at work during business hours caused her to be off her insulin schedule and suffer serious health issues. This is false. In fact, Gina worked in an office environment that allowed her to inject insulin whenever she needed to. Indeed, Gina did frequently inject insulin in her thigh at work, often in the presence of others, including Attorney Geiman. Insulin injection had nothing to do with why she came to work late.

Moreover, during the Covid-19 pandemic and during the ransomware attack, Gina worked from home and adapted her work to her personal schedule. This created problems. For

[8] Even had there been a just cause provision, however, Gina's gross breach of fiduciary duty, as described herein, would have mandated her termination.

example, during an important cyber security telephone conference call on a Monday, Gina's cell phone kept dropping the call because she was driving back from her second home on Cape Cod. On another occasion, Gina had a Funds employee reschedule a conference call about the cyberattack with forensic and legal experts to the following week so that she could keep an appointment with her hairdresser. Everyone else on the call had cleared their schedules because of the paramount importance of the call.

8. Gina only brought her dog to work on Fridays so she could take the dog with her to Cape Cod after work

The Union owns the building complex where the Funds offices are. In 2018, Mr. McLaughlin implemented a building-wide policy that banned dogs from the building. The policy is attached as Exhibit J. Mr. McLaughlin implemented this policy in response to multiple employees in the building who had been bringing to dogs to work, including one dog that needed to be muzzled for the safety of others. Employees had complained to him that the dogs smelled and were unpleasant. One employee, whose office was next to Gina's, had an allergic reaction to dogs, which Gina knew about. The muzzled dog presented a safety concern as well as concern about a lack of professionalism.

Contrary to Gina's allegation, this policy was not directed toward her or her diabetes-related service dog. Compl., ¶ 41. Notably, Gina only brought her dog to work from time to time, particularly on Fridays as a convenience so she could travel directly to Cape Cod. If her dog truly is a "service animal," the Employer was unaware of that, although the proposition seems unlikely or else Gina would have brought the dog to work every day.

III.    Legal Arguments

A.   The Hostile Environment Claims in Counts I and II Are Time Barred

Under Chapter 151B, there is a 300-day statute of limitations. The charge was filed on September 3, 2020, and the statute of limitations therefore extends only back to November 8, 2019.

As noted above, Gina Alongi has provided an extravagantly falsified version of events from May 2018. However, there is no need for the Commission to wade its way through these false claims, because the hostile environment claim is time barred even if true. The incidents from May 2018 occurred 18 months before the earliest date that could be captured by her charge. The statute of limitations would have run in March 2019.

The Complaint does allege, generically, that "Mr. McLaughlin's inappropriate sexual behavior continued throughout Complainant's employment. Towards the end of 2019, Rosemarie observed that he would continue to visit female employees' offices on a regular basis to discuss which women in the office he found particularly attractive." Compl., ¶ 44. Again, the statute of limitations stretches back to November 8, 2019. What is meant by "toward the end of 2019" is unclear, and also unclear is whether this conduct as alleged even relates to either Complainant.

The statute of limitations applies regardless of whether an employee knows of the limitation. See G.L. c. 151B, § 5; cf. Kale v. Combined Ins. Co. of Am., 861 F.2d 746, 752 (1st

Cir. 1988) ("an employee's ignorance of his statutory rights, in itself, will not toll a statute of limitations"). However, in this case, the employee handbook made it perfectly clear to both Complainants that there was a statute of limitations, and Gina had sought and received legal advice about her claims, and therefore any argument they might offer concerning equitable tolling must therefore be rejected. See Mercado v. Ritz-Carlton San Juan Hotel, Spa & Casino, 410 F.3d 41, 48-49 (1st Cir. 2005) (equitable tolling unavailable where employee "becomes generally aware that he possesses a legal right to be free from the type of discrimination he has alleged. …Constructive knowledge, meanwhile, would be presumed if the employer had complied with its statutory obligation to post the EEOC notices in conspicuous locations, and it also is presumed when an employee has retained an attorney-in both instances, regardless of whether the plaintiff in fact is aware of his rights."). Gina and Rosemarie were well aware of their rights and obligations under the anti-discrimination laws but failed to act in a timely fashion.

B.   Even if Timely, the Hostile Environment Claims Fail Because They Are Premised on Obvious Falsehoods

As explained above, there was no hostile work environment. Gina and Rosemarie have provided false information. The Funds cannot be liable for things that never occurred. The Funds encourage the Commission to contact any or all of the employees of the Funds to review independently the veracity of the claims made by the Alongis.

In Count II, the Alongis allege "quid pro quo" sexual harassment, which occurs when a "supervisor conditions tangible job benefits on submission to sexual demands or harassment." Coll.-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination, 400 Mass. 156, 163 (1987). Nowhere does the Complaint describe any such allegations. The allegations in paragraphs 62 to 67 simply restate a claim for a hostile environment without sufficient basis. The Complaint does allege that Attorney Shea "expressly instructed" Gina to keep quiet about her allegations in exchange for keeping her job. Compl., ¶ 67. Not only is the assertion simply false, but Attorney Shea was not Gina's supervisor. Moreover, Gina sought and received legal advice from an attorney in Rhode Island, which would countermand any hypothetical instruction to keep quiet.[9]

C.   Gina Alongi Fails To Make Out a Prima Facie Case of Retaliation

To establish a prima facie case of retaliation, Gina Alongi would need to show that she (1) engaged in protected conduct; (2) suffered an adverse employment action; and (3) there is a causal connection between the adverse action and the protected conduct. Psy-Ed Corp. v. Klein, 459 Mass. 697, 707 (2011). She fails to establish a prima facie case because (1) she lacked a good faith reasonable belief that the employer violated the law, and (2) even if she engaged in protected conduct, she has failed to allege a causal connection between the two.

First, to succeed on a retaliation claim, Gina "must prove that she reasonably and in good faith believed that the [employer] was engaged in wrongful discrimination." Tate v. Dep't of Mental Health, 419 Mass. 356, 364 (1995). Because she has fabricated many of the allegations in

---

[9] Of course, Gina's attorney advised her that she had no viable legal claims, and Gina's decision to "keep quiet" was almost certainly the product of that advice.

her complaint, she fails to meet this requirement. Roche Bros., 2015 WL 182255, at *4 (Waxman, H.O. 2015) (failing to meet prima facie case where the "claim of sexual harassment in this case is utterly lacking in credibility"); C.F. Motorfreight, 2003 WL 21802108, at *8 (Waxman, H.O. 2003) (case fails because "circumstances provide a compelling reason for Complainant to fabricate a story about sexual harassment").

Second, because Gina does not allege any direct evidence of a retaliatory motive, she must provide evidence sufficient to infer the motive, "for example, where 'adverse action is taken against a satisfactorily performing employee in the immediate aftermath of the employer's becoming aware of the employee's protected activity.'" Mole v. University of Mass., 442 Mass. 582, 592 (2004) (emphasis added). Her alleged protected activity was in 2018, and her termination occurred two years later. Because a span of two of years falls far short of satisfying the "immediate aftermath" rule, no inference of causation can be drawn. She therefore fails to establish a prima facie case. See Dube v. Middlesex Corp., 59 Mass. App. Ct. 734, 740-74, n.3 (2003) (nine-month gap between the protected activity and the adverse action was too tenuous to support inference of discrimination); Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) (without other evidence of causation, "a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action"); cf. Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close…," and finding that 20 months is too long).

Even if Gina could make out a prima facie case, her claims would fail. At that point, the burden would shift to the Employer to articulate a legitimate reason for its action. Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 681 (2016). As noted above, Gina Alongi engaged in a substantial breach of her fiduciary duties. Indeed, the scope and severity of her allegations are overwhelming.

Having articulated a legitimate reason, the burden shifts back to Gina to demonstrate pretext. Bulwer, 473 Mass. at 681. This she cannot do. She accepted a salary in excess of $40,000 per year from the Coalition to work 10 hours per week, while accepting a salary from an ERISA-governed organization whose assets are strictly regulated. She failed to manage the IT department because of a feud with her twin sister, with the result being an enormous, dangerous, and expensive ransomware attack. She misspent some money of the Funds and attempted to misappropriate other funds. She failed to track her time as the DOL and ASSA required. Each of Gina's failings are well documented, and severe. Attorney Mader concluded that Gina's termination was the only prudent action that could be taken. Given the strict regulatory environment in which the Funds operate, the employer effectively had no choice but to fire Gina for her extensive misconduct. The Trustees would have been derelict in their duties if they had failed to do so.

Key to Gina's theory is that Mr. McLaughlin sought to get back at Ms. Alongi for her complaints roughly two years before. However, the decision to terminate Gina was shared by nine separate individuals, who are the trustees of three different funds. The employer-side trustees were not even aware of the events of May 2018, and therefore could not have been motivated by them. The Trustees reviewed the recently disclosed circumstances and acted quickly and responsibly in response. Put differently, even if Mr. McLaughlin hypothetically

harbored a grudge against Gina,[10] she cannot demonstrate that this caused her discharge in these circumstances. "[I]f the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action …, then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." Staub v. Proctor Hosp., 562 U.S. 411, 421 (2011). Here, the reasons for Gina's discharge had nothing whatsoever to do with the events of May 2018. Moreover, judicial interpretation of Chapter 151B requires that "in indirect evidence cases the plaintiff must prove that the defendant's discriminatory animus was the determinative cause." Lipchitz v. Raytheon Co., 434 Mass. 493, 504 (2001). Here, Gina has not presented any evidence that her alleged protected activity played any role whatsoever in her termination.

Gina was fired because of gross failures of management that were uncovered in serial fashion in 2020. Rosemarie was fired because her negligent work performance had led to a serious and expensive data cyber attack that could have been avoided had she performed her duties as expected. The Respondents can conceive of no credible basis upon which to contradict these serious performance issues. The reasons for the termination are well documented, and frankly incontrovertible. Indeed, according to Attorney Mader, some of Gina's actions might constitute criminal actions under federal law and may lead the Trustees to seek financial recovery from Gina. It is a mess to be sure, but entirely a mess of Gina's own making.[11]

D. Rosemarie's Claim of Associational Retaliation Is Meritless

In Count III, Rosemarie alleges she was fired "solely because of her close familial association with Gina." Compl., ¶ 72. In Massachusetts, the "term 'associational discrimination' refers to a claim that a plaintiff, although not a member of a protected class himself or herself, is the victim of discriminatory animus directed toward a third person who is a member of the protected class and with whom the plaintiff associates." Flagg v. AliMed, Inc., 466 Mass. 23, 27 (2013). However, in Flagg, the claim was that the employer had discriminated against an employee because the employee was associated with a disabled spouse who required costly medical treatment. In other words, the husband-employee was punished so that the employer could avoid medical costs, and it was therefore punishing the disabled person by punishing the spouse with whom she was associated. Here, the theory appears to be that the Employer is punishing Rosemarie because she is related to Gina, which falls outside the Flagg paradigm.

---

[10] Of course, it was Mr. McLaughlin who facilitated Gina being offered a contract with "just cause" protections, which should negate any inference that Mr. McLaughlin harbored any animus toward Gina. After all, why would Mr. McLaughlin offer job security to Gina if he was interested in removing her from the position.

[11] The Alongis might respond that their termination letters did not include an explanation, but this was done as a professional courtesy to two long-time employees. Both Alongis were well aware of the reasons for their respective discharges, as the reasons had been provided to them. Moreover, Gina had been rewarded with offered contractual job protections (which she declined) and regular and substantial raises. Rosemarie had been promoted. These actions are the opposite of a retaliating employer.

In any event, even if this theory were legally viable, Rosemarie still needs to show under the <u>McDonnell Douglas</u> framework that the reason the employer offered for her termination is pretextual, an impossible task for her given the overwhelming weight of the evidence of her negligence in the workplace. It is true that the timing of the two discharges is close in time, but the reason for that is obvious. Gina was fired for dereliction of her duties, including her failure to supervise the IT department, which was headed up by her twin sister. The failure to supervise IT was disclosed by a massive and ransomware attack on the Funds that was largely due to Rosemarie's negligence. In other words, the two terminations are close in time because they involve the same event.

E.   <u>There Was No Failure To Accommodate</u>

Gina alleges that the Employer failed to accommodate her disability, but the claim fails on both the facts and the law.

Under Chapter 151B, a qualified handicapped person is entitled to a reasonable accommodation that will enable her to perform the essential functions of her job, so long as the accommodation does not place an undue burden or hardship on the employer. <u>Godfrey v. Globe Newspaper Co.</u>, 457 Mass. 113, 119–20 (2010). Further,

> The employee bears the initial burden of producing some evidence that an accommodation that would allow him or her to perform the essential functions of the position would be possible, and therefore that he or she is a 'qualified handicapped person.' Once an employee makes at least a facial showing that reasonable accommodation is possible, the burden of proof (of both production and persuasion) shifts to the employer to establish that a suggested accommodation would impose an undue hardship. If the accommodation proposed by the employee appears unduly onerous, the employer has an obligation to work with the employee to determine whether another accommodation is possible.

<u>Id.</u> (internal quotations and citations omitted).

The Employer agrees that diabetes is a disability under the law. However, the claim otherwise fails. Gina has provided no reason why her insulin schedule would be hampered by arriving at work on time. Moreover, even if she did not desire to change the schedule, there was no reason provided as to why she could not simply take insulin at work, as she did at other times (in front of others, no less), and as many employees do. Gina's position was in an office setting, where she had her own office. She could simply inject her insulin and change her glucose monitor there.

The reason that Gina was asked to come to work on time was to ensure that the Employer got the full value of the hefty salary it was paying to Gina. In fact, Gina did not stay late in the office, and she did not work weekends. When Mr. Rasetta was Business Manager, Gina would report to work at about 10:30 a.m. every day and be gone by 4 p.m. on most days. After Mr. McLaughlin became Business Manager, Gina would arrive somewhat earlier but still more than an hour after all of the other Funds Office employees had arrived. Her arrival time was not a question of attending to her medical needs but arranging her personal schedule as she saw fit regardless of proper management and operation of the Funds Office.

Finally, the decision to ban dogs from the workplace had nothing to do with Gina. It was a blanket policy due to unprofessional circumstances that had developed in the office, including the presence of a dog that required a muzzle. Gina did not usually bring her dog to work, and did so generally on the days when she sought to make a quick Friday escape to the Cape. It is also unlikely that the dog was a service dog who sniffed out low blood sugar, given that she usually did not bring the dog to work (or if the dog had that ability, it was apparently not medically necessary or else she would have brought the dog every day).

IV.    Conclusion

For the above-stated reasons, the Complaint must be dismissed in its entirety.


Sincerely,

James A.W. Shaw


**CERTIFICATE OF SERVICE**

I hereby certify that this document is filed on this, the 27th day of November, 2020, and served on counsel for the Complainants at the following email addresses:

Timothy Van Dyck (tvandyck@bowditch.com)
Robert Young (ryoung@bowditch.com)
Sherelle Wu (swu@bowditch.com)

I will send a paper copy only upon request of the above counsel, as some attorneys have requested recently that I not send a paper copy of documents.

James A.W. Shaw

## **Affirmation of Gregory Geiman**

I, Gregory Geiman, hereby affirm under the pains and penalties of perjury that the above-stated facts are true and accurate to the best of my knowledge and belief.


Gregory Geiman

Dated: 11/25/2020

## Affirmation of William McLaughlin

I, William McLaughlin, hereby affirm under the pains and penalties of perjury that the above-stated facts are true and accurate to the best of my knowledge and belief.

William McLaughlin

Dated: 11/25/2020