# EXHIBIT C



60 State Street
6th Floor
Boston, MA 02109

Tel: 617.963.5975

www.fmglaw.com

**Jennifer Markowski**
Partner

Writer's Direct Access
617.807.8962

jmarkowski@fmglaw.com

February 2, 2021

**VIA ELECTRONIC MAIL (*candice.carrington@state.ma*)**

Candice J. Carrington, Compliance Officer
The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place
Boston, MA 02108

Re:     *Ginamarie Alongi and Rosemarie Alongi v. Int'l Union of Operating Engineers Local 4 Fringe Benefit Funds, et al.*
          *MCAD Docket No. 20BEM01708 (G. Alongi)*
          *EEOC Charge No. 16C-2020-01968 (G. Alongi)*
          *MCAD Docket No. 20BEM01709 (R. Alongi)*
          *EEOC Charge No. 16C-20-01969 (R. Alongi)*

Dear Ms. Carrington:

Please accept this letter as the Sur-reply of Respondents IUOE Local 4 Fringe Benefit Funds ("the Funds") and William D. McLaughlin ("Mr. McLaughlin"), (collectively, "Respondents"), in response to the allegations contained in the Rebuttal Statement ("Rebuttal") filed by Complainants Ginamarie Alongi ("Gina") and Rosemarie Alongi ("Rosemarie"), (collectively, "Complainants"), on December 18, 2020. Respondents rely upon the facts and arguments in their November 27, 2020 Position Statement, which are incorporated herein by reference. The Sur-reply does not necessarily address every claim and issue raised in the Rebuttal and any allegation not specifically and expressly admitted is hereby denied. As detailed herein, Respondents maintain that Complainants' claims for sexual harassment, retaliation, disability discrimination and associational discrimination are unfounded.

### **THE SEXUAL HARASSMENT CLAIMS ARE TIME-BARRED**

#### **Complainants Fail To Present Evidence That the Sexual Harassment/Hostile Work Environment Claims Were Timely Filed.**

As detailed in Respondents' Position Statement, the sexual harassment/hostile work environment claims are barred by the 300-day statute of limitations. See Position Statement, pp.



Candice J. Carrington, Compliance Officer
February 2, 2021
Page 2

16-17. Although Complainants state in their rebuttal that Mr. McLaughlin "continued to make inappropriate comments about women, including female employees and Gina herself" after the May 2018 "incident," the comment is unsupported by evidence. Gina herself does not identify any specific act or comment and the statements of Taylor Ryan and Rosemary Ortega do not describe any events after May 2018. In fact, Ms. Ortega's statement is dated May 2018 so on its face it is limited to events occurring before that point in time. Upon information and belief, Ms. Ryan's affidavit was obtained by Gina at or around the same time and references events that occurred well before May 2018, *e.g.*, the 2015 Superbowl game between the Patriots and the Seahawks. Neither statement substantiates the Complainants' claims that instances of sexual harassment occurred after May 2018.

Further, Gina makes a specious allegation in her charge that Mr. McLaughlin discussed a Funds Office employee's bout with breast cancer in an inappropriate manner. This is the only specific allegation that Gina makes of inappropriate conduct by Mr. McLaughlin after May 2018. However, according to a review of emails sent by this employee to Gina, this employee underwent surgery on or about June 19, 2019, and finished her treatments on or around August 16, 2019, at which time she would have been back in the office on a full-time basis. Therefore, even assuming the facts as presented by Gina as true, this inappropriate conversation would have occurred no later than August 16, 2019.

Here, Complainants filed their EEOC/MCAD complaint on September 3, 2020, meaning any challenge to conduct occurring prior to November 8, 2019 is time-barred. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 118 (2002) (in order for hostile work environment claim to be timely, plaintiff must file charge within correct number of days of at least one act that is a part of the claim). There is simply no evidence of acts occurring after November 8, 2019 and the claims are time-barred.

### The Allegations In the Employee Statements Are Largely Irrelevant As They Do Not Involve The Complainants.

Further, most of the allegations in the affidavits of Ms. Ryan and Ms. Ortega have no connection to Gina. In order for Gina to establish a claim of sexual harassment/hostile work environment, Gina has to demonstrate that the actions at issue were so severe and pervasive as to alter the conditions of her employment. Absent that threshold showing, whatever other employees may have experienced is irrelevant.

### The Complainants Indisputably Misrepresent The Genesis Of Gregory Geiman's "Harassment Memorandum."

Complainants rather bizarrely challenge Gregory Geiman's contention that around the time of the May 2018 incident Gina instructed him to memorialize talking points related to her sexual harassment complaint. Gina gave the instruction on or about May 16, 2018 and requested Mr.



Candice J. Carrington, Compliance Officer
February 2, 2021
Page 3

Geiman draft the summary in preparation for her anticipated meeting with attorney Kate Shea. From the contents of the email it is clear the information contained therein came from Gina, not Mr. Geiman. For example, the email states "Gina was assaulted." Mr. Geiman did not witness any assault and the only reason the information is contained within the email is because Gina told him that is what occurred. Mr. Geiman is quite clear that the only physical contact he witnessed during the May 1, 2018 incident was Gina poking Mr. McLaughlin in the chest. The email also notes concerns about Gina's stress levels; those concerns would reasonably be Gina's, not Mr. Geiman's. The sole purpose of drafting the email was to help Gina gather her thoughts concerning what she believed was evidence of sexual harassment.

Similarly, Mr. Geiman did not, as the Complainants alleged, routinely maintain records of workplace harassment. The only instance of his documenting potential harassment occurred in 2014 when allegations were reported directly to him and he was involved in resolving the incident with the alleged harasser. See Tab C of Rebuttal. The 2014 memorandum simply summarized the accuser's allegations and did not reflect Mr. Geiman's personal observations.

### GINA'S FLAWED ATTEMPTS TO CHALLENGE THE LEGITIMACY OF THE RESPONDENTS' DECISION-MAKING PROCESS ARE INSUFFICIENT EVIDENCE OF PRETEXT.

Much of the Rebuttal is focused on attacking the basis for the Funds' decision to terminate the Complainants. As discussed herein, the challenges raised by the Complainants fall short of presenting evidence of pretext. As outlined in the Position Statement, there is overwhelming evidence that Gina committed multiple serious breaches of fiduciary duty, that Rosemarie was grossly negligent in her oversight of the IT Department, and that Gina's lack of attention facilitated a serious ransomware cyberattack in May 2020. The failures of both Gina and Rosemarie are amply documented and it is not a fact finder's province to "sit as [a] super personnel department[], assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 825 (1st Cir. 1991), cert. denied, 504 U.S. 985 (1992); see also Sullivan v. Liberty Mut. Ins. Co., 444 Mass. 34, 56-57 (2005) (same, and affirming judgment for employer in discrimination case); Loeb v. Textron, Inc., 600 F.2d 1003 (1st Cir. 1979); Medlock v. United Parcel Serv., Inc., 608 F.3d 1185, 1193 (10th Cir. 2010) (noting deference to the employer's business decisions, and stating: "[W]e are asked to second-guess a classic (and facially plausible) business judgment … The law does not permit, much less require, us to do so").



Candice J. Carrington, Compliance Officer
February 2, 2021
Page 4

### Although The Respondents Knew Gina Worked For the Coalition, They Did Not Know She Was Doing So On Respondents' Time Or Diverting Respondents' Resources.

The Respondents were well aware that Gina worked for the Massachusetts Coalition of Taft-Hartley Funds (the "Coalition"). The Respondents did not know that she was regularly working for the Coalition during business hours. Between the hours of 8:00 a.m. and 4:00 p.m., Gina was supposed to be working exclusively for the benefit of the Funds, yet the Funds came to learn that she was actually devoting much of that time to Coalition work. Although Gina claims she performed work for the Coalition during her breaks, her own work summaries contradict this claim. It is also clear that Gina was rarely even in the office for full days as she routinely arrived well after the start of the workday. The Funds can pinpoint her arrival time because she had utilized an electronic key. Data from the key shows that her average arrival time for the five years preceding her termination was as follows:

- 2015:  10:58 AM
- 2016:  10:41 AM
- 2017:  10:28 AM
- 2018:  9:55 AM
- 2019:  9:50 AM
- 2020:  8:19 AM

Additionally, from telephone and email records it is equally clear that little Fund or Coalition activity occurred prior to her actual arrival at the office, after 4:00 p.m., or on weekends. Thus, time spent on Coalition matters – for which she was separately compensated by the Coalition – necessarily ate into her already abbreviated days in the office.

Further, the Respondents also discovered that Gina had been utilizing the Funds' staff for Coalition work, again, during working hours. Her improper diversion of staff time was noted in the July 21, 2020 Board minutes which indicated that staff were working on Coalition event planning, the Coalition website, and Coalition financial accounting without another prior authorization. See Exhibit E to Position Statement, Minutes of Special Meeting of Trustees - I.U.O.E. Local 4 Health & Welfare Fund dated July 21, 2020. Gina herself does not dispute this contention. The diversion of the Funds' resources to the Coalition to complete work for which Gina was being compensated was a serious breach of her fiduciary duties as Administrator. The serious breach more than supported the termination decision.

### Gina Committed Funds Credits To The Coalition Without The Funds' Approval



Candice J. Carrington, Compliance Officer
February 2, 2021
Page 5

In addition to diverting manpower, Gina attempted to divert the $30,000 the Funds received as a "wellness credit" from Blue Cross Blue Shield for the benefit of a March 22, 2020 Coalition event. Gina contradicts herself in the Rebuttal by arguing both that the credit was not a Funds' asset because it could not be redeemed in cash but then acknowledges that the credits were "typically applied towards the costs of hosting health challenges at Local 4 events." In other words, the credits were for use by Local 4. Nevertheless, Gina committed the credits to be used at the March 22, 2020 Coalition event without seeking the required Board of Trustees approval. Gina's contention that she had not sought approval because the event had been canceled is implausible. The event was canceled on March 8, 2020, less than two weeks ahead of the scheduled date. Had Gina intended to seek approval, she should have started the process much earlier. In fact, as of February 18, 2020, Gina had emailed the Blue Cross Blue Shield wellness coordinator and informed her that the Local 4 Funds had approved utilization of the wellness credit for the Coalition event. See Exhibit L, Email between Gina and Amanda, dated February 18, 2020. Gina did not seek the approval of the Health and Welfare Board of Trustees at its January 7, 2020 regular meeting, nor did she subsequently seek approval by the Board via a vote-by-email, which was a customary substitute for in-person votes.

### Gina Was Legally Obligated To Keep Time Records

With regard to recording time, whatever Gina may have discussed with the Funds' accountants is irrelevant. Gina was a highly compensated Administrator who owed fiduciary duties to the Funds she oversaw. The plain language of Local 4's Administrative Services Sharing Agreement ("ASSA") as well as a prior DOL agreement required Gina to document the time she spent on each Fund so that costs and expenses could be properly allocated between Funds. Although every other Fund employee kept proper time records, Gina apparently did not do so. The Respondents were unaware that she had not been keeping contemporaneous time records or that she had sought and/or obtained approval from the Funds' accountants to disregard the requirement. Even if the accountants advised Gina she did not need to document her time, the Trustees believed at the time of her termination and today that Gina was legally required to document her time using time sheets, like every other employee. The Trustees' view was memorialized by the Board in its July 21, 2020 meeting minutes. See Exhibit E to Position Statement, Minutes of Special Meeting of Trustees - I.U.O.E. Local 4 Health & Welfare Fund dated July 21, 2020.

### Gina Fails To Understand The Improprieties With The Check Registers

Gina either ignores or fails to grasp why her actions with regard to the check registers were problematic. Despite the fact that the agendas Gina prepared for the Trustee meetings represented



Candice J. Carrington, Compliance Officer
February 2, 2021
Page 6

that she had provided the check registers to the Trustees, she did not do so. When Fund counsel, Kate Shea, questioned Gina about the absence of the check registers, Gina told Attorney Shea that although Ms. Shea's package did not include the registers, the Trustees' did. This representation turned out to be false as Gina had never provided the check registers to the Trustees. Attorney Shea asked the question from a legal and compliance perspective, *i.e.*, how could the Trustees approve expenditures when they did not have full details. For reasons that remain unclear, Gina told Attorney Shea she was giving copies of the check registers to the Trustees. This representation was false and, as reflected in the July 21, 2020 Minutes, it was Gina's misrepresentation about the matter that was objectionable. See Exhibit E to Position Statement, Minutes of Special Meeting of Trustees - I.U.O.E. Local 4 Health & Welfare Fund dated July 21, 2020.

### **Gina, Not Greg Geiman, Oversaw The IT Department**

Gina incorrectly claims that Mr. Geiman was responsible for supervision of the IT Department. The Funds' Organizational Chart demonstrates that Mr. Geiman served as the In-house Counsel & Privacy Officer and that the IT Department fell under Gina. See Exhibit M, Local 4's Organizational Chart as of April 1, 2016. The leadership of the IT Department did not change until Gina's termination. As the Administrator, Gina was in charge of making decisions regarding the utilization of plan resources and the expenditures of Plan assets, with the advice and consent of the Board of Trustees. Thus, decisions relating to the switch from Rapid7 to PC Connection/Managed Engine ultimately fell to Gina.

### **RESPONDENTS' LEGITIMATE, NON-DISCRIMINATORY BUSINESS REASONS FOR TERMINATING ROSEMARIE ARE NOT A PRETEXT FOR DISCRIMINATORY ANIMUS.**

Like Gina, Rosemarie cites to numerous, unsubstantiated allegations to support her claim that Respondents' reasons for terminating her were pretextual. Rosemarie's termination was based, in part, on her ill-conceived idea to transition from Rapid7 to PC Connection/Managed Engine. As the organizational chart shows, Rosemarie reported to Gina, not Mr. Geiman. Given the familial relationship between Gina and Rosemarie, Gina directed Mr. Geiman to conduct Rosemarie's performance reviews, but the only matters Mr. Geiman and Rosemarie worked on together involved HIPAA compliance.

The decision to switch from Rapid7 to PC Connection/Managed Engine undeniably fell under the purview of both Gina and Rosemarie. As illustrated in a November 15, 2019 string of emails between Rosemarie and Gina, Rosemarie constructed the comparison and Gina expressed approval based on cost savings. See Exhibit N, Emails between Gina and Rosemarie, dated



Candice J. Carrington, Compliance Officer
February 2, 2021
Page 7

November 15, 2019. Mr. Geiman, who has no training on IT systems, had no input into the decision to switch systems. Mr. Geiman was asked to review the Rapid7 agreement and to advise Rosemarie on how much notification needed to be provided for the termination of the agreement. Notably, although Rosemarie contends Mr. Koufos was involved in the decision, she did not include him on the email exchange. The email unequivocally demonstrates that the decision to switch systems rested on the shoulders of Gina and Rosemarie.

Rosemarie nonsensically claims she told Mr. Geiman the network did not have the capability to enable multifactor authentication and Mr. Geiman failed to take action. Mr. Geiman has no IT experience and would not have been in a position to opine on the matter. As the IT Director in March 2020, Rosemarie owns the decision to permit employees to work remotely on their home networks without the provision of multi-factor authentication. If she'd had concerns about the safety of the Funds' network in light of her failure to provide multi-factor authentication, she had an obligation to present those concerns to the Administrator, her sister, and to work to find a resolution.

The forensic auditing team at Kroll that was retained by the Funds' insurer to handle the aftermath of the ransomware attack observed that Local 4 Funds' computer network was likely vulnerable to a brute force attack, in part, because it had not implemented multifactor authentication for user accounts authorized to access the system remotely. Nor did the Local 4 Funds have an advanced endpoint detection and response solution in place that "could have been leveraged to identify and detect the external, foreign RDP login and the unauthorized activity that followed." These failings, which are the responsibility of Rosemarie and Gina, were verbally conveyed to Mr. Geiman, by Kroll, in meetings that preceded his decision to terminate Rosemarie in August 2020.

Rosemarie's attempts to divert the blame from herself to Alan Koufos ("Mr. Koufos" and Jim Burns ("Mr. Burns") is similarly misguided. As of August 2019 (not January 1, 2020), Rosemarie was the Director of the IT Department and, as such, was ultimately responsible for the shortcomings of her department. The ransomware attack occurred on or about May 25, 2020, well after Rosemarie assumed responsibility for the department. Mr. Koufos, on the other hand, retired at least five months before the attack. If, as she alleges, she had concerns relating to Mr. Koufos' shortcomings in maintaining the system, she failed to timely address them. Rosemarie herself seems to acknowledge that she was not up the task of serving as Director of IT in that she readily admitted in the Rebuttal that she "did not have the technical skills to make changes to the network and assumed that Mr. Burns had knowledge of the Funds' network due to his work with Mr. Koufos." The fact that Gina placed her twin sister in such a critical role within the organization



Candice J. Carrington, Compliance Officer
February 2, 2021
Page 8

and Rosemarie accepted it knowing she was not qualified called into serious question the judgment of both Gina and Rosemarie.

## AS THERE IS NO EVIDENCE GINA REQUESTED AN ACCOMMODATION HER DISABILITY CLAIM FAILS.

Gina's claim for disability discrimination fails for the basic reason that she never requested an accommodation. *See Ocean Spray*, 441 Mass. 632, 649 n.21 (2002) (holding that "[a]n employee's obligation to request an accommodation stems from the basic principle that an employer is not required to accommodate a need that it does not know exists."); *Conway v. Boston Edison Co.*, 745 F. Supp. 773, 783 (D. Mass. 1990) ("Employers cannot be required to accommodate needs they do not know exist. This must be so, because employers risk liability for discrimination when they unilaterally decide to treat a handicapped person differently from anyone else."); MCAD Guidelines Employment Discrimination on the Basis of Handicap at 4 ("An employer is obligated to provide reasonable accommodation only to the known handicaps of an applicant or employee. An employer need not offer or provide reasonable accommodation where it has no knowledge or reason to know of the individual's need for an accommodation. Unless a handicap and the need for accommodation are known to the employer, it is the responsibility of the individual to inform the employer that an accommodation is needed") (emphasis added).

Here, it was common knowledge that Gina had diabetes. She regularly injected herself with insulin and made no attempt to take her insulin shots in private. She administered the insulin shots to herself in her office, which was surrounded by windows and abutted a well-travelled common area of the Funds Office. Gina did not ask people to leave her office when she gave herself shots and, when they asked, SHE consistently advised co-workers there was no need to leave. Under the circumstances, there is no logical basis for Gina's claim that she was terminated because of her disability. Her public treatment of the disease throughout her tenure at the Funds belies any such claim as there is no basis to conclude the Respondents suddenly developed an aversion to her disability after years of working with it.

Similarly, there is no evidence that she was denied a reasonable accommodation. First and foremost, Gina herself does not even contend she requested an accommodation for her alleged service dog. The policy in question states, in relevant part: "If you require a reasonable accommodation per the Americans With Disabilities Act, please contact Business Manager, Bill McLaughlin." See Exhibit K to Position Statement, Local 4 Notice dated November 9, 2018. Gina never informed the Respondents that her dog was a service animal or asked for an exception to the policy. Nonetheless, Gina has yet to establish that her dog is indeed a service animal and, given the selective nature of when she would bring her dog into the office, it is questionable whether the



Candice J. Carrington, Compliance Officer
February 2, 2021
Page 9

dog was actually necessary to assist her in addressing her diabetes as she now contends. Emails from Gina suggest that she brought her dog to the office on Fridays for the purpose of heading straight to the Cape after work. <u>See</u> <u>Exhibit O</u>, Email between Gina and Monique Albert, dated September 21, 2017; <u>See</u> <u>Exhibit P</u>, Email between Gina and Monique Albert, dated April 26, 2017. Gina has presented no evidence that her dog was trained as a service dog, that she required him to be at work with her, that she brought the dog to work on days other than Fridays, or that she requested an accommodation relative to her dog that was denied.

Further, Gina has not produced evidence that she ever requested a schedule change to accommodate her diabetes or even adequately explained why her condition required her to have a modified work schedule. It is clear from the evidence that Gina had a history of arriving at the office well after the start of the day – in at least one year arriving around 11:00 a.m. on an average day. There is no documentation that a later start time was requested for medical reasons as opposed to her showing up when she wanted. Further, the evidence shows that she did not make up those hours later in the day, at night, or on weekends. In 2020, Mr. McLaughlin simply requested that Gina show up on time for work. Gina may not have wanted to do so, but she did not express that she needed a later start time as a medical accommodation.

## **CONCLUSION**

Based on the foregoing, and the information contained within Respondents' prior Position Statement, IUOE Local 4 Fringe Benefit Funds and William D. McLaughlin respectfully request the Commission issue a lack of probable cause finding as to all claims set forth in Ginamarie Alongi's and Rosemarie Alongi's Charge of Discrimination. If you require any further information or assistance, please do not hesitate to contact me.

Very truly yours,

*Jennifer L. Markowski*
Jennifer L. Markowski

JMH/km
cc:   Timothy Van Dyck, Esq.
       Jennawe M. Hughes, Esq.

CA | CT | FL | GA | KY | MA | NJ | NY | PA | RI