# EXHIBIT

# G

COMMONWEALTH OF MASSACHUSETTS
SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

NORFOLK, SS.                                    CIVIL ACTION NO.

GINAMARIE ALONGI AND                    )
ROSEMARIE ALONGI,                        )
                                          )
              Plaintiffs,                 )
                                          )
                                          )
v.                                        )
                                          )
IUOE LOCAL 4 HEALTH & WELFARE FUND;      )
IUOE LOCAL 4 PENSION FUND; IUOE LOCAL    )
4 ANNUITY & SAVINGS FUND; HOISTING       )
AND PORTABLE ENGINEERS LOCAL 4
APPRENTICESHIP & TRAINING FUND; JOINT
LABOR-MANAGEMENT COOPERATION
TRUST; AND
WILLIAM D. MCLAUGHLIN, INDIVIDUALLY
AND IN HIS CAPACITY AS CHAIRMAN OF
THE BOARDS OF TRUSTEES,

              Defendants.

## **COMPLAINT AND JURY DEMAND**

### I.    **INTRODUCTION**

This is an action by two former employees, Ginamarie Alongi and Rosemarie Alongi,

twin sisters, for damages, both compensatory and punitive, against Defendants International

Union of Operating Engineers Local 4 Fringe Benefit Funds (the "Funds") and its Trustee

William D. McLaughlin ("Mr. McLaughlin"). Mr. McLaughlin, the Chairman of the Boards of

Trustees for the Funds, is a sexual predator. He has engaged in highly inappropriate sexual

conduct towards Plaintiffs and other Funds employees, conduct well known by the Funds'

outside counsel. Such conduct created a blatantly hostile workplace environment.

As a direct result of such conduct, Plaintiff Gina Alongi confronted Mr. McLaughlin in

an attempt to protect both herself and her employees and to prevent such conduct from

continuing into the future. Her efforts were met with a verbal attack by Mr. McLaughlin, an

assault so vicious that she (and other Funds employees) feared for Gina's physical safety. Following this assault, the harassment continued but was now further exacerbated by the fact that Gina feared for her physical safety. Shortly after that verbal attack, Gina was so traumatized by this assault that she sought advice from the Funds' outside counsel about how to respond. She was informed at this time that Mr. McLaughlin's conduct was neither severe nor pervasive enough to constitute either harassment or a hostile work environment.

Upon information and belief, the Trustees never even conducted an investigation into either the assault or Mr. McLaughlin's conduct towards the Funds' female employees. Gina was also informed that she would lose her job if she reported what had happened to her. Moreover, both Defendants thereafter engaged in a concerted effort to retaliate against Gina for having attempted to confront Mr. McLaughlin about his behavior by, among other things, taking away a number of reasonable accommodations previously granted to her for her disability (Diabetes), and micromanaging her job performance. She was then summarily dismissed on July 22, 2020 after a forty-two (42) year unblemished record of service working at the Funds. In her termination letter, the Funds provided no explanation for her termination, stating rather, that "[a]s you were an employee at will, it is not necessary to detail reasons for the Trustees' decision" and that "[w]e … trust that our separation with be courteous and respectful." Two weeks after Gina's termination, Rosemarie, Gina's twin sister, a seventeen (17) year employee with an unblemished employment record working at the Funds, was summarily dismissed by the Funds as well, in direct retaliation for her association as Gina's twin sister. Her termination letter used the same language that was contained in Gina's letter.

Following their unfounded terminations, Gina and Rosemarie asserted their statutory rights under M.G.L. c. 151B by filing a complaint at the Massachusetts Commission Against

Discrimination ("MCAD") on September 3, 2020. Not willing to countenance Gina's decision to stand up for her legal rights, the Funds have unleashed a baseless filing against her in federal court, replete with factual and legal errors, and brought only after Gina announced her intent to file this action in Superior Court. The timing and the utter lack of merit in the Funds' federal filing confirms that it is nothing more than an effort to further punish Gina for having the temerity to call out the Funds' unlawful behavior.

## II.   PARTIES AND VENUE

1. Plaintiff Gina M. Alongi ("Gina") is a Massachusetts resident who resides in Westborough, MA 01581.

2. Plaintiff Rosemarie Alongi ("Rosemarie") is a Massachusetts resident who resides in Westborough, MA 01581.

3. Gina and Rosemarie are twin sisters.

4. Defendant International Union of Operating Engineers Local 4 Health and Welfare Fund (the "Health and Welfare" Fund) is an "employee welfare benefit plan" within the meaning of §3(3) of ERISA, 29 U.S.C. §1002(3). It provides health, dental and prescription benefits and life insurance, accident insurance, and disability pay to participants. The Fund is administered at 16 Trotter Drive, Medway, Massachusetts, within this judicial district.

5. Defendant International Union of Operating Engineers Local 4 Pension Fund (the "Pension" Fund) is an "employee pension benefit plan" within the meaning of §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A). It provides participants with a defined pension benefit. The Fund is administered at 16 Trotter Drive, Medway, Massachusetts, within this judicial district.

6. Defendant International Union of Operating Engineers Local 4 Annuity and Savings Fund (the "Annuity and Savings" Fund) provides participant directed individual accounts including a 401(k). The International Union of Operating Engineers Local 4 Annuity and Savings Fund is an "employee pension benefit plan" within the meaning of §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A). The Fund is administered at 16 Trotter Drive, Medway, Massachusetts, within this judicial district.

7. Defendant Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund (the "Apprenticeship and Training" Fund) trains apprentices and journey workers on the construction industry. The Apprenticeship and Training Fund is an "employee welfare benefit plan" within the meaning of §3(1) of ERISA, 29 U.S.C. §1002(1). The Fund is administered at One Engineers Way, Canton, Massachusetts, within this judicial district.

8. Defendant Joint Labor-Management Cooperation Trust is established pursuant to §302(c)(9) of the National Labor Relations Act, as amended, 29 U.S.C. §186(c)(9). The Trust is administered at 16 Trotter Drive, Medway, Massachusetts, within this judicial district.

9. The Health and Welfare, Pension, Annuity and Savings, Apprenticeship and Training, and Labor Management Cooperation Trust Funds are hereinafter collectively referred to as the "International Union of Operating Engineers Local 4 Fringe Benefit Funds," or the "Funds."

10. Defendant William D. McLaughlin is an individual who, upon information and belief, resides in Norton, Massachusetts. He is also the Chairman of the Boards of Trustees of the Funds and, at all relevant times, had supervisory authority over Plaintiffs.

11. Venue is proper in this court because the events giving rise to the allegations in this complaint occurred in this district.

12. Plaintiffs have previously filed with the Massachusetts Commission Against Discrimination and have fulfilled their administrative prerequisites before removing to this court.

### III.   FACTUAL BACKGROUND

Gina's Employment History

13. Gina began her employment with the Funds in 1978 in a clerical position and was promoted throughout the years.

14. Throughout her employment, Gina was an exemplary employee.

15. In 1996, Gina was promoted to the position of Administrator of the Funds. In this role, Gina was responsible for all aspects of management, strategic planning, business and financial operations, and organizational administration as determined by the Boards of Trustees.   She oversaw each of the individual trust funds comprising the Funds in accordance with respective trust agreements and plan documents adopted by the Boards of Trustees.

16. As the Funds' Administrator, Gina worked under the direction and control of the Boards of Trustees of the Funds and, beginning in 2017, she reported directly to Mr. McLaughlin.

17. Gina was extremely well-respected in the industry and served on numerous boards and committees related to her work including the New England Employee Benefits Council.

18. Gina also served as the Executive Director of the Massachusetts Coalition of Taft-Hartley Plans which represents over 150,000 individuals through its twenty-six member funds.

In her role as Executive Director, she was responsible for developing better methods of providing and paying for health care.  Gina negotiated favorable discounts which directly and positively impacted the financial position of the Funds.

19. The Funds were well aware of Gina's work for the Coalition from the beginning and the Business Manager would ask Gina about her Coalition work as part of an annual determination of her Funds salary. Gina made no efforts to hide her Coalition work from the Funds.

20. Gina frequently attended and presented at local and national conferences relating to health care benefits and worked closely with the U.S. Department of Labor to educate Administrators of other Taft Hartley Trust Funds on ERISA compliance.

21. In 2015, Gina was selected as a recipient of the Cushing-Gavin Boyle Award in recognition of her excellence and dedication to public service. This prestigious award was recognized by President Barack Obama.

<u>Rosemarie's Employment History</u>

22. Rosemarie began her employment with the Funds in 2003 working in the Information Technology Department.

23. Throughout the course of her employment, Rosemarie received excellent performance reviews.

24. Rosemarie worked alongside Alan Koufos, Manager of the IT Department, and reported directly to then Assistant Administrator Greg Geiman. Upon Mr. Koufos' retirement in January 2020, Rosemarie assumed the role of Acting Director of the IT department. Rosemarie did not receive a formal promotion or any increase in compensation.

25. On or about August 1, 2017, Mr. McLaughlin was appointed Business Manager of the IUOE Local 4 Union and automatically served as Chairman of the Boards of Trustees of the Funds. As Chairman, Mr. McLaughlin had the authority to make final decisions regarding the terms and conditions of Plaintiffs' employment.

26. From the beginning of his tenure as Chairman, Mr. McLaughlin routinely made highly inappropriate and sexually charged comments in the workplace to both Plaintiffs and to other female employees.

27. For example, Mr. McLaughlin routinely visited Gina's office to discuss his sexual desires and fantasies, how he felt about the women in the office, and what he would like to do to them sexually.

28. On more than one occasion, Mr. McLaughlin also stated to Gina that he could not concentrate during a Trustees meeting because he could not take his eyes off her and that Gina "looked so good" and that he "wanted" her and had "such a crush" on her.

29. When Mr. McLaughlin engaged in this conduct, Gina told Mr. McLaughlin to stop and stated that he was going to get in trouble. Gina informed Mr. McLaughlin several times that if his wife ever found out about his behavior that she would divorce him. Mr. McLaughlin laughed and stated that he was "the boss" and that therefore he could "get away with it."

30. Mr. McLaughlin also frequently told Gina about his "need for sex," and stated that his wife was not "taking care of" him. Mr. McLaughlin made statements to the effect that he was a "pig" and that "all men are pigs," and that "all men think about is sex."

31. Similarly, Mr. McLaughlin would visit Rosemarie's office on a regular basis, making sexual comments about the women in the office, discussing his sexual desires, and stating that he was unhappy being married.

32. On one occasion, Rosemarie reminded Mr. McLaughlin that he was married, and that his behavior was inappropriate. Mr. McLaughlin replied that he could not help himself around women.

33. Indeed, upon information and belief, Mr. McLaughlin has had at least one inappropriate sexual relationship with another Funds employee, a fact well known to the Defendants as evidenced by a May 17, 2017 letter from the then Assistant Administrator, Mr. Greg Geiman, to Gina in which he references "recent concerns [he has] about Laura-Jean's association with [Mr. McLaughlin] and the resulting lack of deference and communication with you,…".

34. A true and accurate copy of this letter is attached hereto as Exhibit A.

<u>The May 1st Incident</u>

35. On May 1, 2018, Gina requested that Mr. McLaughlin meet with her in her office to discuss, among other things, Mr. McLaughlin's inappropriate conduct and comments in the workplace as well as ways in which he had been passing up Gina in favor of male employees.

36. As Gina began providing Mr. McLaughlin some examples of how his behavior had made her uncomfortable, Mr. McLaughlin started to pace in front of Gina and yell obscenities and words to the effect of "you do not respect me, I am the manager!" Mr. McLaughlin continued to yell and swear at Gina for approximately 10 minutes to the point where other Funds employees were fearful for Gina's physical safety; indeed, upon information

and belief, one Funds employee had already dialed in 911 on her phone and was ready to call the police. Mr. McLaughlin was so loud that employees having lunch in the Funds kitchen (on the opposite side of the building) could hear him shouting. Mr. McLaughlin only stopped when Rosemarie and Mr. Geiman entered Gina's office and physically extricated Mr. McLaughlin from Gina.

37. Immediately following this verbal assault, Mr. McLaughlin attempted to apologize to Gina by hugging her and attempting to kiss her on the lips. He also told her that the fight had gotten him "excited" and that he had come close to getting an erection as a result of the attack.

38. A few weeks after the altercation, in mid-May 2018, Gina interviewed several female Funds staff members regarding their experiences with Mr. McLaughlin. Each reported feeling uncomfortable with the way that Mr. McLaughlin looked at, talked to, or touched them. In particular, one employee reported that Mr. McLaughlin regularly entered her office to give her unprompted massages which made her uncomfortable, but she did not feel she could ask him to stop as he was the boss. Another employee stated that Mr. McLaughlin called her "sexy" on more than one occasion and would make comments to the effect that he wanted her sexually.

39. In response to these events, Gina requested to meet with Ms. Kate Shea, a partner at Segal Roitman and outside counsel to the Funds, and did so on or about May 21, 2018. Gina told Attorney Shea about the May 1st incident and about how severe Mr. McLaughlin's constant bullying and sexual harassment was. Attorney Shea informed Gina that this conduct did not rise to the level of sexual harassment and that in order to

claim sexual harassment, the conduct would have to be pervasive or "widespread." Attorney Shea told Gina that she had "no case."

40. Mr. Greg Geiman, then Assistant Administrator for the Funds (and now Gina's replacement), apparently disagreed with Attorney Shea's assessment. One May 16th, 2018 (5 days earlier), Mr. Geiman wrote an email to Gina which stated, in part:

> "5.   Inappropriate language and discussion ... and unwanted touching....
> [Attorney Shea] needs to make a determination as to whether this constitutes
> sexual harassment for which there may be liability and whether the Trustees
> should be notified and a Joint Board Meeting held.
> 6.  Gina was assaulted.  People in the office are uncomfortable and feel unsafe.
> 'There was violence in [Mr. McLaughlin's] voice.' ... [Attorney Shea] also needs
> to decide whether this information should be shared with the Joint Board."

41. A true and accurate copy of this May 16, 2018 email from Mr. Geiman to Gina is attached hereto as Exhibit B.

42. Mr. Geiman also forwarded another email to Gina that same day detailing inappropriate communications that Mr. McLaughlin had had with another Funds employee, Rosemary Ortega.  In that email, Mr. Geiman stated, among other things, that "[Ms. Ortega] told me that [Mr. McLaughlin] comes into the office and speaks inappropriately to her [and others].  Will speak about women he's slept with on the road, sexual positions he likes...."

43. A true and accurate copy of this email from Mr. Geiman is attached hereto as Exhibit C.

44. In mid-May, 2018, Attorney Shea met with Mr. McLaughlin and then with Mr. Geiman. Gina was then instructed to meet with Attorney Shea and Mr. McLaughlin in his office. Attorney Shea, on behalf of the Funds, informed Gina that she could be terminated for insubordination. Attorney Shea stated again to Gina that Mr. McLaughlin's conduct did not rise to the level of sexual harassment and that if Gina kept quiet about her allegations

of sexual harassment, Mr. McLaughlin would apologize, and Gina would not be terminated.

45. Although Gina continued to feel that Mr. McLaughlin's actions were wrong, the combination of Attorney Shea's purported legal assessment that she did not have a viable sexual harassment claim, the specter of an apology from Mr. McLaughlin, and Gina's fear that she would be terminated if she did file one induced Gina not to file a complaint at that time.

<u>Mr. McLaughlin Continues to Harass and Retaliate Against Plaintiffs</u>

46. Following these meetings with Attorney Shea, Mr. McLaughlin continued to subject Gina, Rosemarie, and other female employees to frequent sexual comments well into 2020.

47. Mr. McLaughlin continued to visit Gina's office, each time to make statements about sex and women's bodies. On one such occasion in the last quarter of 2019, Mr. McLaughlin entered Gina's office and told Gina that he knew about one of Gina's younger employees who was struggling with breast cancer. Mr. McLaughlin asked Gina "are her boobs any good?" and "do you think she will show me them?" or words to that effect. Afterwards, Gina told Mr. Geiman about Mr. McLaughlin's comments. Mr. Geiman responded with words to the effect, "I'm so sorry you have to deal with all of this." When Mr. McLaughlin said something inappropriate to Gina, Gina would frequently tell Mr. Geiman who would respond that Mr. McLaughlin "is never going to learn," that Attorney Shea did not do a good job with him, and that Mr. McLaughlin was "the boss" so he can get away with it because no one was doing anything about it.

48. Mr. McLaughlin also specifically began to retaliate against Gina because of her prior attempt to get him to stop harassing her and other female employees.

49. For example, on or around November 9, 2018, Mr. McLaughlin informed Gina that her service animal, who was trained to detect Gina's low blood sugar levels, would no longer be permitted in the office. When Gina requested an ADA accommodation in order to bring her service dog with her to the office on days that she felt ill, Mr. McLaughlin stated "no dogs in the office, including yours. I do not care what the law says" or words to that effect.  He provided Gina with no explanation for the change in the policy.

50. In or around early January 2020, Gina was once again called into a meeting with Mr. McLaughlin, this time with Attorney Shea present. At that meeting, Mr. McLaughlin instructed Gina that from that point forward, he expected Gina would report to work by 8 am every day.

51. Prior to Mr. McLaughlin's request, Gina would take the first of her two types of daily insulin shots at 8:30 am and be at work by 9:15 am. Gina would then skip lunch or stay later during the day and often worked on weekends.

52. Gina reminded Mr. McLaughlin of her Type 1 Diabetes and explained that her current work schedule allowed her to take insulin and change her continuous glucose monitor at specific and uniform times of the day as required. Gina requested that Mr. McLaughlin grant her an accommodation and permit her to continue working on her usual work schedule to allow her to manage her health condition. Mr. McLaughlin replied "no accommodation is granted" or words to that effect. Attorney Shea said nothing at this meeting and kept her head down.

53. Following this meeting, Gina immediately began reporting to work beginning at 8 am which caused her to be off her insulin schedule, thereby causing her to experience serious health issues.

54. In addition, after Gina's attempt to get Mr. McLaughlin to stop his harassing behavior, the Business Agents who had previously called Gina for assistance no longer contacted her and instead called Mr. Geiman if they had questions.

55. Mr. McLaughlin's inappropriate sexual behavior continued throughout Plaintiffs' employment. Rosemarie observed that he would continue to visit female employees' offices on a regular basis to discuss which women in the office he found particularly attractive. Mr. McLaughlin only ceased this behavior when Funds employees began to work remotely due to the COVID-19 pandemic.

56. In March 2020, the Funds permitted its employees over the age of 65 or affected with a health condition to work from home due to the global COVID-19 pandemic. Although Gina was permitted to work remotely due to her diabetes, Mr. McLaughlin continued to alter the terms and conditions of her employment.

57. In late April 2020, Mr. McLaughlin stated to Mr. Geiman in the Funds hallway that "Gina should be in the office" and that he did not care about her medical condition.

58. By June 2020, Mr. McLaughlin required that Gina account for her time in 15-minute increments for the sole purpose of finding a pretext to terminate Gina's employment. Gina began tracking her time in this manner on June 15, 2020 and submitted these timesheets directly to Mr. McLaughlin at his request. No such requirement had ever been imposed on Gina prior to that time. On June 26, 2020, Mr. Geiman stated to Gina that

-13-

Mr. McLaughlin "came in today and said he was not interested in anyone's timesheet other than yours and that he's waiting for it."

59. Gina asked Mr. Geiman repeatedly whether Mr. McLaughlin met with him to discuss the summary of the staff's timesheets. Mr. Geiman consistently stated that Mr. McLaughlin never discussed any other employee's timesheet.

The Virtually Simultaneous and Retaliatory Terminations of Plaintiffs

60. After 42 years of loyal and dedicated service to the Funds, Gina was summarily terminated on July 22, 2020. Her July 23rd termination letter provided her with no explanation whatsoever for why she was fired, but simply stated, in part: "As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision…. We …. trust that our separation will be courteous and respectful."

61. A true and accurate copy of Gina's termination letter is attached hereto as Exhibit D.

62. Also on July 22, 2020, Rosemarie, Gina's twin sister, was placed on a two-week paid suspension.

63. After seventeen (17) years of loyal and dedicated service to the Funds, Rosemarie was summarily terminated on August 5, 2020, without receiving any prior notice or reasoning from the Funds.

64. In addition, she received a very similar termination letter as did her twin sister, Gina, which provided no explanation whatsoever for why she was terminated.

65. A true and accurate copy of Rosemarie's termination letter is attached hereto as Exhibit E.

66. Despite the fact that Gina and Rosemarie had worked for the Funds for decades, the very first time they learned of their purported "performance issues" was after filing their complaint at the Massachusetts Commission Against Discrimination ("MCAD").

### The Funds Continue to Intimidate and Retaliate Against Gina

67. After their terminations, Gina and Rosemarie asserted their statutory rights under M.G.L. c. 151B by filing a complaint at the MCAD on September 3, 2020.

68. In November 2020, months after the Funds had already terminated Gina and Rosemarie, the Funds hired an "expert," Joyce Mader, to create an air of legitimacy to the terminations. Attorney Mader did not conduct an independent investigation into the terminations of Gina and Rosemarie's employment, but rather formed her opinion based only on a review of the Funds' notes regarding the terminations well after the fact.

69. In December 2020, Gina and Rosemarie informed the Funds that they intended to withdraw their complaint from the MCAD and file a complaint in state court.

70. On January 29, 2021, the Funds filed a baseless complaint in federal court against Gina for purported breach of fiduciary duty in a transparent attempt to intimidate Gina out of pursuing her claims.

## IV.    CLAIMS FOR RELIEF

### COUNT 1

### (Hostile Work Environment; M.G.L. c. 151B)

71. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 71 of this Complaint as though separately set forth herein.

72. Throughout the course of Mr. McLaughlin's tenure as Chairman, Mr. McLaughlin regularly subjected Plaintiffs to highly inappropriate and sexually offensive remarks in the workplace, and also engaged in unwanted touching.

73. Mr. McLaughlin's sexual comments and unwanted touching were unsolicited and unwelcome. At separate times, Plaintiffs each asked Mr. McLaughlin to stop his inappropriate behavior.

74. Mr. McLaughlin's behavior created an intimidating, hostile, humiliating, or sexually offensive work environment for Plaintiffs.

75. Mr. McLaughlin's behavior unreasonably interfered with Plaintiffs' work performance and altered the terms and conditions of their employment.

76. Mr. McLaughlin's inappropriate behavior consisted of ongoing and continued violations throughout his tenure as Chairman.

77. The Funds is liable for the conduct of Mr. McLaughlin as a person with supervisory authority over Plaintiffs and because the Funds knew or should have known of Mr. McLaughlin's conduct and failed to remedy it.

## COUNT II

### (Quid Pro Quo Sexual Harassment; M.G.L. c. 151B)

78. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 71 of this Complaint as though separately set forth herein.

79. Mr. McLaughlin made regular sexual advances towards Gina, for example, stating that he could not concentrate the entire Trustees meeting because he could not take his eyes off her and that Gina "looked so good" and that he "wanted" her and had "such a crush" on her.

80. Mr. McLaughlin would also state to Rosemarie that Gina "looks hot."

81. Mr. McLaughlin's comments and advances were unwelcome.

82. Gina regularly rejected Mr. McLaughlin's advances and asked Mr. McLaughlin to stop his behavior.

83. Attorney Shea, on behalf of the Funds, and Mr. McLaughlin expressly instructed Gina to keep her sexual harassment allegations to herself in exchange for keeping her job.

## COUNT III

### (Retaliation; M.G.L. c. 151B, § 4(4))

84. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 71 of this Complaint as though separately set forth herein.

85. Gina engaged in protected activity including, but not limited to: requesting Mr. McLaughlin cease his inappropriate behavior; reporting the harassment she faced to Attorney Shea; conducting her own investigation when the Funds would not help her; requesting a reasonable accommodation to bring her medical service dog to the office; and requesting a reasonable schedule accommodation to maintain a regular insulin schedule.

86. The Funds knew of Gina's protected activity and acted adversely against her when, among other things, Mr. McLaughlin prohibited Gina from bringing her service animal to the office, altered Gina's schedule despite her request for an accommodation for her disability, requested that she account for her time in 15-minute increments, and ultimately terminated her employment.

87. These adverse actions were in direct response to Gina's protected activity.

88. The timing of Rosemarie's suspension and ultimate termination, immediately following
    Gina's termination, shows that Rosemarie was terminated unlawfully solely because of
    her close familial association with Gina.

### COUNT IV

### (Failure to Accommodate)

89. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 71
    of this Complaint as though separately set forth herein.

90. Gina has Type 1 diabetes, a chronic health condition which requires consistent daily
    management.

91. On January 3, 2020, Mr. McLaughlin requested that Gina meet with him and Attorney
    Shea for an unscheduled meeting. At this meeting, Mr. McLaughlin informed Gina that
    he was altering Gina's work schedule, "effective immediately," to require that Gina be in
    the office by 8 am every morning.

92. Gina reminded Mr. McLaughlin of her medical condition and explained that she needed
    to take insulin and change her continuous glucose monitor at specific and uniform times
    of the day. Throughout the course of her employment, Gina would take her morning
    insulin shot at 8:30 am and be at work by 9:15 am. Gina would then skip lunch or stay
    later during the day and often worked on weekends.

93. Gina requested that Mr. McLaughlin permit her to continue working on her usual work
    schedule to allow her to manage her health condition.

94. Mr. McLaughlin, in the presence of Attorney Shea, refused to accommodate Gina's
    reasonable request, and provided no explanation for why he was refusing it.

95. Following this meeting, Gina immediately began reporting to work beginning at 8 am which caused her to be off her insulin schedule, causing serious health issues.

## COUNT V

### (Interference with Rights; M.G.L. c. 151B, § 4(4A))

96. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1 through 71 of this Complaint as though separately set forth herein.

97. The Funds further retaliated against Gina by filing a federal court claim against her in direct response to notice that Gina and Rosemarie were planning to assert their statutorily protected rights in state court.

98. Throughout her tenure as Administrator of the Funds, Gina was an exemplary employee and was never given any notice of any performance issues.

99. The Funds were aware of the purported "performance issues" that allegedly formed the basis of Gina's termination since at least July 22, 2020.

100.    Gina filed her Charge of Discrimination at the MCAD on September 3, 2020.

101.    In December 2020, Gina informed the Funds that she intended to remove her complaint to state court.

102.    The Funds waited until January 29, 2021 to file their meritless complaint against Gina in federal court for conduct dating back decades only after Gina gave notice of her intent to file in this Court.

## PLAINTIFFS REQUEST A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

1. Enter judgment against Defendants, jointly and individually;

2.  Attorneys' fees and costs;

3.  Compensatory damages for emotional distress;

4.  Punitive damages pursuant to M. G. L. c. 151B, § 9;

5.  Pre-Judgment and Post-Judgment Interest; and

6.  Such other relief as the Court deems just and fair.

By Their Attorneys,

Timothy P. Van Dyck (BBO #548347)
Robert Young (BBO # 650541)
Sherelle Wu (BBO #706007)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard
Suite 300
Framingham, MA 01702
Telephone:  617-757-6536
Facsimile:  508-929-3136
Email:   tvandyck@bowditch.com
            ryoung@bowditch.com
            swu@bowditch.com

Date:  February 10, 2021

# Exhibit A

May 17, 2017

Dear Gina,

I am writing because I feel as though the Funds Office has reached a crossroads. As you know, Lou will be departing shortly and Billy's emergence as Business Manager will create uncertainty and opportunities for disruption or insubordination by members of your office staff that may have alternative agendas. Now is the time to shore up your staff and to ensure that the lines of authority and communication are clear to those within and without the office. I believe that it is important for such a transition to be finalized while Lou is still in office because Billy's loyalties and priorities remain unclear.

It is important to me that you, as Administrator, are treated with the respect and deference that you have earned. I hope that my commitment to the Funds and my loyalty to you are beyond question. You have provided me with a dynamic career and a strong foundation for my family. I have proudly served as your assistant for over six years. In that time you have provided me with the opportunity and trust to learn and become involved in all aspects of the Funds. I have helped with the oversight and implementation of Health and Welfare plans, tackled difficult Pension Plan issues, reviewed contracts, worked on the benefits software RFP, served as Privacy Officer, and helped with longstanding projects such as withdrawal liability and the owner/operator matter.

It has been, and remains, the honor of my professional life to learn from you and to serve you and the Funds in this capacity. However, given the uncertainties from the upcoming Union transition and my own progress as your assistant, I am hopeful that you may agree that now is the right time to transition the office for the next few years. I hope to continue my work as collections counsel for as long as you and the Trustees will allow me, but I am ready and willing to take on any additional tasks that you may provide me as your assistant.

Laura-Jean is an important asset to this office and serves an important role for you. I understand and respect that. However, I do not believe that she is able to serve you in the same substantive manner as I do, and she has provided ample cause over the years for her loyalties and her intentions to be questioned. After six years of observing our abilities and our production, and in light of the recent concerns about Laura-Jean's association with Billy and the resulting lack of deference and communication with you, I respectfully ask that you "promote" me as your sole assistant and reassign Laura-Jean.

As your assistant, I would largely continue serving you in the capacities in which I currently serve, although I would hope to take a more active role in overseeing the matters of Pension and Annuity Plan compliance that Alice has handled, once she retires. I can assure you that you would never need to worry about my loyalties or my intentions, and the lines of communication and authority would be cleared up. I would ensure, as always, that everything goes through you and that your authority is paramount. I would never overstep my bounds or impede on the strong working relationship that I hope you and Billy will create. I would exist to serve you, to learn from you, and to make your life at the office less stressful. Period.

Laura-Jean has the skill set and the work ethic to become a strong office manager for you. It is a role she already largely serves. She could continue organizing your files, helping to transfer funds, dealing with H.R. issues, and anything else that would help the office - or you - to function smoothly. Of course, she would also continue her work for you at the Coalition. In effect, nothing very dramatic would change in the office. But such a transition would serve a number of vital purposes. First, as stated, it would clear up lines of authority and communication. Second, it would resolve concerns regarding Laura-Jean's association with Billy. Third, it would solve the longstanding problem of managing expectations as to what matters I should be involved in versus what matters Laura-Jean should be involved in. Finally, it would put me in a position to continue learning and to better serve you in the years to come without constant fear of "stepping on toes" or reprisals from Laura-Jean.

I have additional thoughts about how staff could be reassigned to best help you, and pieces of Laura-Jean's current role that could be retained in order to ease the transition, but I will save those thoughts for a future conversation.

I hope you understand my concerns and know that I am approaching you with only the best of intentions and after a tremendous amount of thought. I know that reassigning Laura-Jean would be difficult for you, but I truly believe that it is the best thing for this office and for you (and me), and that now is the right time to do it. I fear that the window will soon be closed and the current situation will go unchanged.

Thank you, Gina.

Yours respectfully,

Greg Geiman

# Exhibit B

**Gina Alongi**

| | |
|---|---|
| From: | Gregory A. Geiman |
| Sent: | Wednesday, May 16, 2018 10:30 PM |
| To: | Gina Alongi |
| Subject: | Fwd: Gina |

Sent from my iPhone

Begin forwarded message:

> **From:** Greg Geiman <greggeiman4@gmail.com>
> **Date:** May 16, 2018 at 9:52:50 PM EDT
> **To:** gueiman@local4funds.org
> **Subject:** Gina
>
> 1. Kate knows the history.  We trusted her advice after the 2014 allegation and did not bring the matter to the Trustees.  However, she took no action to ensure that similar behavior would not occur in the future, such as by conducting training.
>
> 2. Not only was the Union not trained until four years later, the Funds Office was never trained (not only to not engage in sexual harassment, but also to be able to recognize when it was happening),
>
> 3. By not taking action after the 2014 allegations, it was akin to condoning this type of behavior.  It was given additional room to grow, and Billy is the result.
>
> 4. The past is done, and there have been no specific allegations of sexual harassment to date (since 2014).  But we know that there is a climate of inappropriate language and actions that at least border on sexual harassment (if not worse) and could create liability.
>
> 5. Inappropriate language and discussion (Gina, Rose, Taylor, Rosemary, Jenn D, Jenn V, Amy, Danielle) and unwanted touching (Gina, Jenn V).  Kate needs to make a determination as to whether this constitutes sexual harassment for which there may be liability and whether the Trustees should be notified and a Joint Board meeting held.
>
> 6. Gina was assaulted.  People in the office are uncomfortable and feel unsafe.  "There was violence in his voice."  Multiple people were concerned that Billy would strike Gina and were close to calling 911.  Second incident of which we are aware that an innocent conversation devolved quickly into extreme anger by Billy.  Such incidents can also create liability for the Funds.  Kate also needs to decide whether this information should be shared with the Joint Board.
>
> 7. Extreme tension between Union and Funds.  Necessary work is not getting done and the stress is terrible.  Gina has an illness and this level of stress is unhealthy for her.

1

8. Kate owns this.  Kate needs to fix it.  The problems have all been related to the close proximity between the Union and Funds.  Separation is needed to end the harassment and the hostility and to secure Gina's health and the emotional well-being of her staff.

9. The answer for the future is that the Funds must move to a new office location.  Kate's assistance is needed as Funds counsel to negotiate the breaking of our lease with the Union and to assist in our relocation as needed.

# Exhibit C

## Gina Alongi

**From:** Greg Geiman <greggeiman4@gmail.com>
**Sent:** Sunday, May 20, 2018 5:58 PM
**To:** Gina Alongi
**Subject:** Fwd: 5/16 conversation with Rosemary Ortega

---------- Forwarded message ---------
From: Greg Geiman <greggeiman4@gmail.com>
Date: Wed, May 16, 2018 at 11:45 AM
Subject: 5/16 conversation with Rosemary Ortega
To: Greg Geiman <greggeiman4@gmail.com>

Rosemary told me that Billy comes into the office and speaks inappropriately to her, Amy, Jennifer D, Jennifer V, and Danielle. Will speak about women he's slept with on the road, sexual positions he likes. Will make jokes; when asked "What's up?" will respond with sexual double entendres. Such as, "You know what's up. You want me to show you?"

Rosemary said that sometimes the women are willing participants in the talk but other times she thinks it's more a matter of being afraid to tell the boss that he's going too far.

Rosemary also told me that she has spoken with Billy and told him that he's going to get in trouble with the way he speaks to women in the office. He has responded that she's right, that he knows, but his behavior has not changed.

1

Exhibit D



**International Union of Operating Engineers**
**LOCAL 4**
**Health and Welfare, Pension, and Annuity Funds**

July 23, 2020

By Hand

Gina M. Alongi
4 Orchard Hill Drive
Westborough, MA 01581

Dear Gina:

This letter is intended to follow our telephone call regarding the termination of your employment at the International Union of Operating Engineers Local 4 Fringe Benefit Funds ("Funds"). As we said on the phone, the Boards of Trustees of the Health & Welfare, Pension, and Annuity & Savings Funds voted to terminate your employment as Administrator. As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision.

You have held a position of high trust and confidence, and all business of the Funds to which you have been privy remains confidential to the Funds. We would like to express the Trustees' appreciation for the work you have done over the course of your career at the Funds and trust that our separation will be courteous and respectful.

You will receive your accrued vacation pay by direct deposit on or about July 29, 2020, and you will remain eligible on the Basic Health Plan through February of 2021. You continue to be a participant in the Funds with access to your individual Annuity & Savings account at MassMutual.

Upon receipt of this letter, you are expected to return all Funds' laptops, tablets, or other computers that are in your possession. The service to your cell phones will be disconnected on Friday, July 24, 2020 and should thereafter be returned. Please return your vehicle and any other equipment or property of the Funds before Friday, July 31, 2020.

Thank you.

Sincerely,

William D. McLaughlin

James Reger

cc:     Trustees

        Gregory A. Geiman, Esq.

16 Trotter Drive
P.O. Box 680
Medway, MA 02053-0680

TEL (508) 533-1400
FAX (508) 533-1425
1-888-486-3524

www.local4funds.org



# Exhibit E



INTERNATIONAL UNION OF OPERATING ENGINEERS
**LOCAL 4**
**Health and Welfare, Pension, and Annuity Funds**

August 5, 2020

By Hand

Rosemarie Alongi
23 Kay Street
Westborough, MA 01581

Dear Rosemarie:

We do not have your current contact information except for your address, so we will not have a chance to talk before you receive this letter.

Your employment at the Funds Office as Security Officer and Director of the I.T. Department will be terminated effective today. As you were an employee at will, it is not necessary to detail reasons for the decision. If you would like to contact me about this, please give me a call on the office number, 508-533-1400, extension 140.

You will received your remaining accrued vacation pay by direct deposit on or about August 11, 2020. You will remain eligible on the Basic Health Plan through February of 2021. You continue to be a participant in the Funds with access to your individual Annuity & Savings account at MassMutual.

If you continue to hold any remaining property of the Funds such as paper or electronic files, or your IPhone, please return them to the Funds Office in Medway before Friday, August 7, 2020. Also, please provide us with the credentials for access to the Funds' website, which were deleted from the Funds' laptop that was returned two weeks ago.

Thank you.

Sincerely

Gregory A. Geiman, Esq.
Fund Administrator

16 Trotter Drive
P.O. Box 680
Medway, MA 02053-0680

TEL (508) 533-1400
FAX (508) 533-1425
1-888-486-3524

www.local4funds.org