UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| | ) Civil Action No. 1:21-cv-10163-FDS |
| v. | ) |
| | ) Leave to file granted on October 18, 2022 |
| GINA ALONGI, | ) ) |
| Defendant. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.  SUMMARY OF FACTS ........................................................................................2

III. ARGUMENT ........................................................................................................5

    A.   Summary Judgment Standard ...................................................................5

    B.   ERISA's Fiduciary Duties are the "Highest Known to Law"...................6

    C.   Alongi Acted as an ERISA Fiduciary While Taking Actions Described Herein ....8

    D.   The 2003-04 DOL Audit and the Shared Services Agreement............................11

    E.   Defendant Alongi's Termination and the Schultheis Audit...................15

    F.   Defendant Alongi's Work for the Coalition ............................................17

    G.   Defendant Alongi's Failure to Work Hours for Which She was Compensated ....22

    H.   Alongi's Direction of Certain Funds Office Staff to Work for the Coalition........23

        1.   Rosemarie Alongi's Work on Behalf of the Coalition.............................25

        2.   Laura Jean Hickey's Work on Behalf of the Coalition.............................28

        3.   Taylor Ryan's Work on Behalf of the Coalition........................................30

        4.   Rosemary Ortega's Work on Behalf of the Coalition................................31

    I.   Alongi Cashed Out Vacation Time to Which She was Not Entitled ...................32

IV.  CONCLUSION....................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. (1986) .......................................................... 5

*Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12 (1st Cir. 1998) ............................. 7, 8

*Boggs v. Boggs*, 520 U.S. 833 (1997) ............................................................................ 6

*Brink v. DaLesio*, 496 F.Supp. 1350 (D.Md.1980) ....................................................... 9

*Carranza v. Fraas*, 820 F.Supp.2d 118 (D.D.C. 2011) ............................................... 5

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 5

*Coll v. PB Diagnostic Sys.*, 50 F.3d 1115 (1st Cir.1995) ............................................. 5

*Donovan v. Bierwirth*, 680 F.2d 263 (2d Cir. 1982) ..................................................... 7

*Eaton v. D'Amato*, 581 F.Supp. 743 (D.D.C.1980) ...................................................... 9

*In re Fid. Erisa Fee Litig.*, 990 F.3d 50 (1st Cir. 2021) ................................................ 8

*In re GS Consulting, Inc.*, 414 B.R. 454 (N.D. Ind. 2009) ........................................... 8

*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134 (1985) ............................................ 6

*Mut. Life Ins. Co. of New York v. Yampol*, 840 F.2d 421 (7th Cir. 1988) ................... 9

*Noonan v. Staples, Inc.*, 556 F.3d 20 (1st Cir. 2009) .................................................... 5

*Pegram v. Herdrich*, 530 U.S. 211 (2000) .................................................................... 7

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983) ........................................................ 6

*Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 966 F. Supp. 2d 59 (D. Mass. 2012) ........... 5

## STATUTES

29 U.S.C. § 186 ............................................................................................................... 1

29 U.S.C. § 1001(a) ........................................................................................................ 6

29 U.S.C. § 1002(21)(A) .............................................................................................. 6, 8

29 U.S.C. § 1102(a)(2) .................................................................................................... 7

29 U.S.C. § 1002(21)(A) ................................................................. 6, 8, 21, 31, 34

29 U.S.C. § 1106(b), ..................................................................................................... 34

29 U.S.C. § 1104(a)(1) .................................................................................................... 7

29 U.S.C. § 1104(a)(1)(A) ...............................................................................7, 9, 21, 31, 34

29 U.S.C. § 1104(a)(1)(B) ............................................................................ 7, 21, 31, 34

29 U.S.C. § 1104(a)(1)(D) ................................................................................... 7, 15

29 U.S.C. § 1105 ........................................................................................................ 17

29 U.S.C. § 1106 ........................................................................................................ 14

29 U.S.C.  §  1106(b) ..................................................................................... 9, 21, 31, 34

29 U.S.C. § 1109 ........................................................................................................ 34

29 U.S.C. §1109(a) ...................................................................................................... 7

## OTHER AUTHORITIES

29 CFR 2510.3-16 ........................................................................................................ 7

120 Cong.Rec. 29932 (1974) ...................................................................................... 6

## RULES

Fed.R.Civ.P. 56 ........................................................................................................... 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| | ) Civil Action No. 1:21-cv-10163-FDS |
| v. | ) |
| | ) Leave to file granted on October 18, 2022 |
| GINA ALONGI, | ) ) |
| Defendant. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.     INTRODUCTION

This case involves the efforts of the Plaintiffs, IUOE Local 4 Pension Fund ("Pension Fund"), IUOE Local 4 Annuity & Savings Fund ("Annuity Fund"), IUOE Local 4 Health and Welfare Fund ("Welfare Fund"), and the Hoisting and Portable Engineers Apprenticeship & Training Fund ("Training Fund") and collectively as (the "Funds")[1] to recover amounts owed by former Administrator Gina Alongi ("Alongi") due to her commission of various breaches of the fiduciary duties she owed to the Plaintiff Funds.

The Funds are subject to the extensive and elaborate legal and regulatory framework found in the Employee Retirement Income Security Act of 1974 and its attendant regulations ("ERISA"), 29 U.S.C. 1001, *et. seq.*; the Funds are established and governed by each Fund's respective Agreement and Declaration of Trust, and each Fund is administered by a separate Board of Trustees comprised of an equal number of labor and management Trustees in accordance with the requirements of, *inter alia*, Section 302 of the Labor Management Relations Act, 29 U.S.C. §186.

---

[1] The IUOE Local 4 Labor-Management Cooperation Trust and IUOE Local 4 Social Action Committee are also Plaintiffs in this action.

Each of the plans administered by the Funds was established through collective bargaining between the International Union of Operating Engineers Local 4 ("Local 4") and employers who are bound to collective bargaining agreements negotiated with Local 4. The Funds provide retirement benefits, medical, surgical, prescription drug, and other related health benefits, and craft specific training benefits for participants and beneficiaries throughout Eastern New England. These benefits are financed by hourly employer contributions submitted on behalf of participants working under the terms of a Local 4 collective bargaining agreement.

## II.    SUMMARY OF FACTS

The Funds' respective Boards of Trustees are responsible for oversight of the Funds, and to that end they retain employees to administer the Funds on their behalf. (Concise Statement of Material Facts ("CSMF") ¶ 19). These employees carry out the day-to-day operations of the Funds, including but not limited to collecting, crediting, and allocating employer contributions, determining health and retirement benefit eligibility and calculating the requisite benefits owed, arranging for the timely payment of benefits, and paying reasonable administrative expenses incurred by the Funds. (*Id.*) Fund Office employees work out of an office leased by the Funds from Local 4 at 16 Trotter Drive, in Medway, MA ("Fund Office"). (CSMF ¶ 22). The normal business hours of the Funds Office run from 8:00 a.m. to 4:00 p.m. Monday through Friday. (CSMF ¶ 25). Each employee works under the direction of an executive employee with the title of "Administrator" who supervises the day-to-day operation of the Funds, while also serving as the primary liaison to the Trustees and professionals engaged by the Funds, as well as the various service providers, including health care providers and insurers on whom the Funds rely. (CSMF ¶¶ 26-29).

Each employee is employed by the Welfare Fund, but many of them perform services for the Pension, Annuity, and/or Training Funds, as well as performing some administrative tasks that benefit Local 4 and certain non-ERISA entities established by Local 4. (CSMF ¶¶ 19-24). Each of the Funds, as well as Local 4, is party to a shared services agreement – referred to as "The Amended Agreement to Share Administrative Services and Office Space" ("Shared Services Agreement") – designed to ensure that no one Fund is subsidizing the operating costs of another Fund, consistent with the strictures of ERISA and the negotiated resolution to an audit of the Funds that the Employee Benefits Security Administration of the Department of Labor ("DOL") conducted in 2003-2004. (CSMF ¶¶ 20, 39-51). Thus, each Fund is required to reimburse the Welfare Fund for its proportionate share of employee services and for related expenses. (CSMF ¶¶ 76-78). The services for which reimbursements must be submitted to the Welfare Fund include, but are not limited to, time employees spend working on behalf of each Fund.[2]

Alongi served as the Administrator of the Funds during the period 1996 through July 2020. (CSMF ¶¶ 33-37). In that capacity, she oversaw the operations of the Funds as described above and was responsible for ensuring that the Funds were administered in accordance with the terms of their governing plan documents and the policies adopted by the Boards of Trustees. (CSMF ¶¶ (CSMF ¶¶ 33-37, 26-29). During her employment as Administrator, Alongi received a substantial compensation package which averaged $338,658 during each year within the period 2016-2019, comprised of the following: an average salary of $242,000; contributions to two different defined benefit pension plans at an average annual cost of $31,815; contributions to a defined contribution pension plan at an annual cost of $15,080; fully employer-paid health insurance at an annual cost

---

[2] Fund Office employees also provide services to Local 4, the IUOE Local 4 Labor-Management Cooperation Trust ("LMCT") and IUOE Local 4 Social Action Committee Local 4's Social Action Committee ("SAC"). Each reimburses the Welfare Fund pursuant to the terms of the Shared Services Agreement.

of $10,400; and an employer-provided Cadillac Escalade, and later a fully-loaded Ford Explorer, at an average cost each year of $39,363. (ECF No. 1, ¶¶ (CSMF ¶¶ 36, 175)). Additionally, Alongi was also entitled to an annual maximum of four weeks of paid vacation and a generous allotment of paid sick leave. (CSMF ¶¶ 245). As one might imagine for a position that commands such compensation, the position of Administrator is a full-time job and the Trustees expected that the Administrator would be present in the office during the normal business hours and would devote her full working hours to the operations of the Funds. (CSMF ¶¶ 265, 266).

As set forth below, Alongi impermissibly exercised discretion over the use of the Funds' assets and made independent decisions regarding the use of Funds resources in a manner contrary to federal law and the Funds' governing plan documents and policies. When these breaches of fiduciary duty were uncovered, special meetings of the respective Boards of Trustees of the Pension Fund, Welfare Fund, and Annuity Fund were held on July 21, 2020 at which the Boards voted unanimously to terminate Alongi's employment. (CSMF ¶¶ 96-108). These revelations also led the Trustees to engage the accounting firm of Schultheis & Panettieri LLP ("Schultheis")  to review Alongi's activities during the period January 2015 through July 2020 to determine the degree to which she may have damaged the Funds due to, *inter alia*, her failure to properly allocate her time and her diversion of plan assets for the benefit of The Massachusetts Coalition of Taft-Hartley Funds (the "Coalition"), an entity for which she was also receiving compensation as its Executive Director. (CSMF ¶¶ 109-110). The findings and data resulting from these Agreed Upon Procedures with Schultheis (the "Audit") are also discussed *infra* in the context of the specific transgressions and fiduciary breaches that the Audit exposed[3].  The Funds subsequently filed a

---

[3] The Schultheis Audit was derived from a review of business records kept in the ordinary course of business by the Funds and is thus admissible as a Summary of Content under Rule 1006 of the Federal Rules of Evidence.

Complaint in this Court on January 29, 2021 to recover damages resulting from Alongi's breaches of the fiduciary duty.  (ECF No. 1).

### III.   ARGUMENT

#### A.   Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment should be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The First Circuit has noted that "[e]ssentially, Rule 56[] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Coll v. PB Diagnostic Sys*., 50 F.3d 1115, 1121 (1st Cir.1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In making that determination, of course, the Court views "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor[,]" *Noonan v. Staples, Inc*., 556 F.3d 20, 25 (1st Cir. 2009), but, critically, when "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)). Thus, "[t]he non-moving party may not simply 'rest upon mere allegation or denials of his pleading,' but instead must 'present affirmative evidence.'" *Vander Luitgaren v. Sun Life Assur. Co. of Canada*, 966 F. Supp. 2d 59, 63 (D. Mass. 2012), on reconsideration, 2013 WL 4058916 (D. Mass. Aug. 9, 2013), aff'd, 765 F.3d 59 (1st Cir. 2014) (citing *Anderson*, 477 U.S. at 256–57). If the evidence presented by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. The non-moving

party may not create a genuine issue of material fact or foreclose the granting of summary judgment by citing to its own self-serving statements, particularly where they are undermined by other evidence. *See Carranza v. Fraas*, 820 F.Supp.2d 118, 124 (D.D.C. 2011).

### B.       ERISA's Fiduciary Duties are the "Highest Known to Law"

Prior to the passage of ERISA in 1974, Congress spent years reviewing retirement security in the United States and concluded that although "the continued wellbeing and security of millions of employees and their dependents are directly affected by [retirement] plans," employees had insufficient protections to ensure access to promised benefits. 29 U.S.C. §1001(a). Accordingly, "[t]he principal object of the statute is to protect plan participants and beneficiaries," *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (citing *Shaw v. Delta Air Lines, Inc*., 463 U.S. 85, 90 (1983)), and in that context the "crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators." *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 140 n. 8 (1985). Thus, "[t]he floor debate also reveals that…ERISA was designed to prevent these abuses in the future." *Id*. (citing 120 Cong.Rec. 29932 (1974) ("[T]he legislation imposes strict fiduciary obligations on those who have discretion or responsibility respecting the management, handling, or disposition of pension or welfare plan assets") (remarks of Sen. Williams)). To achieve these ends and provide the greatest possible protection to employees with an expectation that their promised, and earned, retirement benefits would be paid in due course, Congress incorporated fiduciary duties of loyalty and prudence in the statute. ERISA provides that:

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets … or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. §1002(21)(A). ERISA explicitly and exactingly requires the following from a fiduciary:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. §1104(a)(1)(A), (B) (internal citations omitted). Thus, as the First Circuit has recognized, an ERISA fiduciary "must employ within the defined domain 'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use.'" *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (1st Cir. 1998) *citing* 29 U.S.C. §1104(a)(1)(B). As such, "[t]he fiduciary should act 'solely in the interest of the participants and beneficiaries,' and his overarching purpose should be to 'provid[e] benefits to the participants and their beneficiaries' and to 'defray reasonable expenses of administering the plan.'" *Id.*, *citing* 29 U.S.C. §1104(a)(1). ERISA fiduciaries, like Alongi in this case, are additionally responsible for conducting themselves in accordance with the documents and instruments governing the Funds' operations, including written policies and practices adopted by the respective Trustees. Indeed, ERISA Section 404 further provides as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter[.]

29 U.S.C. §1104(a)(1)(D). An ERISA fiduciary must adhere to these obligations and must fulfill their duties with an "eye single" to the interests of the participants and beneficiaries. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (citing *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)). Should an ERISA fiduciary fail to fulfill these responsibilities, that individual is "personally liable to make good to [the] plan any losses to the plan resulting from...such breach." *Beddall*, 137 F.3d 12, 18 (1st Cir. 1998) *Id.*, *citing* 29 U.S.C. §1109(a).

7

### C.   **Alongi Acted as an ERISA Fiduciary While Taking Actions Described Herein**

As noted, the Trustees of the Plaintiff Funds are the "named fiduciaries" as that term is defined in ERISA. 29 U.S.C. §§ 1102(a)(2), 29 CFR 2510.3-16. As the First Circuit has observed, however, "[a] person not named as a plan fiduciary may nevertheless become a 'functional fiduciary' depending on his relationship with the plan." *In re Fid. Erisa Fee Litig.*, 990 F.3d 50, 55 (1st Cir. 2021). Thus, "a person is a functional fiduciary with respect to a plan," to the extent:

(i)   he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii)   he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii)   he has any discretionary authority or discretionary responsibility in the administration of such plan.

*Id. (*citing 29 U.S.C. §1102(21)(A)). Indeed, "[t]he key determinant of whether a person qualifies as a functional fiduciary is whether that person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets (such as by rendering investment advice)." *Beddall*, 137 F.3d at 18. Though "the mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status," such status "is not an all or nothing proposition; the statutory language indicates that a person is a plan fiduciary 'to the extent' that he possesses or exercises the requisite discretion and control." *Id*. at 18 (citing 29 U.S.C. §1002(21)(A)). Accordingly, "[i]n every case charging breach of ERISA fiduciary duty…the threshold question is…whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *In re Fid. Erisa Fee Litig.*, 990 F.3d at 55 (quoting *Pegram*, 520 U.S. at 225).

8

The Seventh Circuit has held that an individual need not have "complete discretion" over management of a fund to function as an ERISA fiduciary:

> The Director does not, of course, have complete discretion over the management and disposition of the assets of the Trust, but the fact that a court oversees and must approve many of the Director's decisions does not bely the fact that the Director negotiates, solicits, drafts contracts and acts in general as the manager of the Trust. An individual is a fiduciary to the extent that he exercises *any* discretionary authority or control respecting management of a plan or the disposition of its assets.

*Mut. Life Ins. Co. of New York v. Yampol*, 840 F.2d 421, 425 (7th Cir. 1988) (emphasis in original). That decision also cited with approval cases where a fiduciary was under "tight supervision and control" by trustees, *id*. (citing *Eaton v. D'Amato*, 581 F.Supp. 743, 745–46 (D.D.C.1980)), and where a fiduciary's work required trustee approval but the fiduciary "performed a significant portion of the work and the trustees relied heavily on his judgment," *id*. (citing *Brink v. DaLesio*, 496 F.Supp. 1350, 1374 (D.Md.1980) (*aff'd in part, rev'd in part on other grounds*).

Despite her denials, the record evidence clearly shows that throughout her tenure as Administrator, Alongi exercised discretionary authority and control with respect to management of Fund assets in manners both known and unknown to the Trustees. (CSMF ¶¶ 108, 11, 112, 195, 218, 230, 236, 250, 264, 266). Further, the undisputed facts plead in this matter and established through discovery show that Alongi engaged in a course of conduct that harmed the Funds through the use of Fund resources and personnel to benefit an outside entity in which she had a pecuniary interest. (CSMF ¶¶ 205, 150, 141). These undisputed facts and those discussed *infra* establish that Alongi violated 29 U.S.C. §§1104(a)(1)(A) and 1106(b), which provides:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

> (3) receive any consideration for his own personal account from any party dealing
> with such plan in connection with a transaction involving the assets of the plan.

As discussed more fully below, Alongi violated each of these enumerated prohibitions by causing

plan assets, in this case Fund personnel and resources, to be deployed to benefit the Coalition, a

third-party whose interests were adverse to the Funds, while personally benefitting from ever

increasing compensation that she was receiving from the Coalition.[4] As set forth below, this was

a knowing violation by Alongi, who had deep familiarity with the prohibition on any ERISA Fund

subsidizing the operations of another entity.

Specifically, the Funds have been subject to periodic audits and operational reviews by

both the Internal Revenue Service ("IRS") and the DOL. One such audit occurred during the period

2003-2004. (CSMF ¶¶ 40-44). In that audit, the DOL uncovered a number of violations related to

the administration of the Funds and the allocation of administrative expenses, and it ultimately

determined, critically pertinent to the present matter, that the Funds failed to properly allocate

expenses for the cost of employee time spent working on behalf of each of the Funds to the

appropriate Fund. (CSMF ¶¶ 40-43, 45, 47). The Audit presented to the Boards of Trustees

following Alongi's termination in 2020, neatly summarized that DOL audit, the findings thereof,

and the DOL's determination that Alongi acted as a fiduciary, as follows:

> In 2004, the former Fund Administrator received correspondence from the U.S.
> Department of Labor which stated that she (as Fund Administrator) and the
> Trustees had violated their fiduciary obligations for failure to properly allocate
> salaries and common expenses.

(CSMF ¶ 44).[5]

---

[4] Additionally, Alongi violated subsection (1) of this provision by cashing out vacation leave to which she was not entitled and by failing to work the requisite hours upon which her compensation was based.

[5] Indeed, correspondence the DOL sent on September 16, 2004 detailing fiduciary breaches uncovered in the course of that audit was explicitly addressed to several Trustees of the Funds *and* to "Ms. Gina M. Alongi, Fund Administrator," and the DOL ultimately found as follows:

D.     **The 2003-04 DOL Audit and the Shared Services Agreement**

As noted, the DOL conducted an investigation of the Funds in 2003-2004 that uncovered various breaches of fiduciary duty on the part of the then Trustees and Alongi. (CSMF ¶¶ 40-43, 45, 47). Alongi served as the Administrator throughout the duration of the DOL's audit process and was the primary representative of the Funds in communications with the DOL and the outside professionals retained by the Funds to resolve the audit. (CSMF ¶¶ 52-65). Notably, discovery and deposition testimony in this matter establish beyond all dispute that Alongi was well aware of the bases for the DOL's findings, and that she was intimately involved in the negotiations leading up to the implementation of the Shared Services Agreement, the requirement that all Fund employees keep daily timesheets, and the development and implementation of a policy to review the shared expenses allocable to each specific Fund for which work was performed in the Fund Office on an annual basis. (CSMF ¶¶ 66-79). Among other things cited *supra*, an email from Alongi to the Funds' regular counsel, special counsel, and accountant detailing outstanding issues to address with the DOL during the audit process establishes her intimate familiarity with the process. (CSMF ¶ 65).

As indicated *supra*, the DOL ultimately concluded that the Fund Office failed to properly allocate salary and common expenses among the various Funds and entities related to Local 4 that are serviced out of the Fund Office. (CSMF ¶¶ 43, 47). To resolve the audit and the fiduciary breaches uncovered therein – including Alongi's - the DOL required reforms to the manner in which the Funds allocated shared expenses for, among other things, the cost of each employee.

---

Based on the facts gathered during that investigation it appeared that, *as Plan fiduciaries*, you violated your fiduciary obligations to the Plan and violated several provisions of ERISA.

(CSMF ¶ 43) (emphasis added). Thus, DOL appears to have explicitly acknowledged Alongi's fiduciary status while serving as Administrator.

(CSMF ¶¶ 47-50). To that end, the DOL noted in the September 16, 2004 correspondence to Alongi

and certain Funds Trustees that "[t]he Department understands that the fiduciaries have taken

corrective action regarding the following issues," which included the DOL's finding that the Fund

Office failed to properly allocate salary and common expenses. In that same correspondence, the

DOL described one such "corrective action" as follows:

> We understand that the Fund Office retained the firm of Manzi & Associates, CPA
> to conduct an independent time and function study of the operations of the Fund
> Office; resolved to update the time and function study at six month intervals to
> ensure that the allocation remains objective and accurate; adopted a formal
> Administrative Services Agreement and requested and received reimbursements
> from both the SAV and Fair Funds for administrative expenses for the period 1997
> to the date that the new time/function study allocation is implemented.

(CSMF ¶ 47). The reforms in the manner in which expenses were allocated were required so the

Funds would comply with the requirements of Prohibited Transaction Exemption 77-10, which

requires a pro rata allocation of such expenses, and the DOL resolved the issues in the audit based

on, among other things, an agreement that time sheets would be kept by each Fund employee

accounting for the work that they were doing for any of the specific Funds and related entities

throughout their workdays in order to assure that the allocation of costs between the Funds was

accurate and appropriate. (CSMF ¶¶ 48-50).

To that end, Alongi and special counsel retained by the Funds negotiated the Shared

Services Agreement with the DOL, which was entered effective December 1, 2003 by the Funds,

Union, LMCT, and SAC as a necessary and essential component of the resolution of the DOL

audit and investigation. (CSMF ¶¶ 50, 51). The Shared Services Agreement has been amended

from time to time, but the terms relevant to this matter have remained unaltered and in full force

and effect from the implementation of the Agreement through present, and the Agreement still in

effect today requires each Funds employee to maintain contemporaneous time records providing

an allocation of the time they spend working on behalf of each Fund or Local 4 related entity throughout each day. (CSMF ¶¶ 70, 76-79). The Shared Services Agreement provides, in pertinent part:

> The amount of staff time of employees of the Fund Office devoted to each Organization will be used as the basis for determining the allocable portion of general administrative expenses, staff salary, taxes and benefits, and common overhead expenses, including but not limited to office space, utilities, professional fees and computer costs. The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization be each employee of the Fund Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.
>
> Each Organization will pay its respective share of shared administrative expenses on a monthly basis as provided in this Agreement.

(CSMF ¶ 77). Additionally, the Funds' Employee Handbook includes this requirement, and to that end, provides as follows:

> All employees (exempt and non-exempt) that work under the jurisdiction of more than one (1) Fund must complete a weekly timesheet (located in the Funds Public Drive > TimeSheet) to be turned in every Friday by 4 p.m. Timesheets are used to break down employees' hours (all hours, including overtime), spent on particular Funds. Employees with questions or concerns regarding this policy and procedure should consult with the Accounting Department.

(CSMF ¶ 78). Alongi designed, implemented, and circulated the daily time sheet that each Fund employee was required to keep in the wake of the DOL audit and that remains in use today. (CSMF ¶¶ 67-71). Following the resolution, by virtue of her position as Administrator, Alongi was responsible for overseeing all Fund employees and assuring compliance with all Fund policies, including those policies and procedures implemented to resolve the DOL audit. (CSMF ¶¶ 26-30, 77, 78, 274). Alongi, like any other Fund employee, was required to personally adhere to those same policies. (CSMF ¶ 72). Accordingly, Alongi was required to keep a daily time sheet to track her time so the cost of her services could be appropriately allocated among the Funds. (CSMF ¶¶ 77, 78, 274).

13

Accurate reporting of work performed on behalf of each Fund by each employee through submission of the required timesheets employee is critical; the timesheets provide the basis for the Funds to allocate expenses attributable to each specific Fund in accordance with the explicit requirements of the Shared Services Agreement. (CSMF ¶¶ 84-85). The allocations are ultimately used to determine a total percentage allocation that applies to expense charges and reimbursements for the following year. (CSMF ¶¶ 84-85). As noted, in addition to providing a crucial basis for resolution of the DOL audit, the Shared Services Agreement still in effect today is required to satisfy the requirements of DOL Prohibited Class Exemption 76-1, as amended by Exemption 77-10, which collectively require that records be maintained for a specified period to demonstrate compliance with the pro rata allocation requirement imposed on an ERISA fund that shares services with other funds or related entities. (CSMF ¶¶ 43, 47). Indeed, Prohibited Class Exemption 77-10 provides that:

> This exemption, which complements a class exemption issued in March, 1976 []
> enables a multiple employer plan to share office space and administrative services
> …to another multiple employer plan, provided certain conditions are met.

The strict constraints placed upon ERISA funds which prohibit, *inter alia*, the "sale or exchange, or leasing, of any property between the plan and a party in interest, [and/or] the furnishing of goods, services, or facilities between the plan and a party in interest," which are codified as "Prohibited Transactions" in ERISA at 29 U.S.C. §1106, "shall not apply to the sharing of office space, administrative services or goods or the leasing of office space or the provision of administrative services … to another such multiple employer plan to the plan or which it is related by virtue of having common trustees, provided that the following conditions are met[.]" PTCE 77-10, Sec. I. Those conditions are as follow:

> With respect to the sharing of office space, administrative services and goods, the costs of securing such space, services and goods are assessed and paid on a prorate basis with respect to each party's use of such place, services and goods.

*Id*. at Sec. I(a). The Shared Services Agreement is also considered a "plan document" under ERISA since it constitutes an adopted plan procedure. As noted *supra*, ERISA requires fiduciaries such as Alongi to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with the documents and instruments governing the plan[.]" 29 U.S.C. §1104(a)(1)(D). Failure to do so is itself a breach of fiduciary duty.

### E.   Defendant Alongi's Termination and the Schultheis Audit

The Coalition is a membership organization consisting of different union-sponsored multiemployer health and welfare plans in the New England area which was organized to attempt to bring the combined purchasing power of its member health plans to secure more favorable terms from various health care provider organizations – preferred provider organizations, health insurers, pharmaceutical benefit managers ("PBM"), dental and vision care providers. (CSMF ¶¶ 87-88). During all times relevant to the litigation, Alongi served as the Executive Director of the Coalition. (CSMF ¶ 92). The Coalition is financed by dues paid by a per participant per month charge on each participating health plan. (CSMF ¶ 89). Under Alongi's leadership, the Coalition also raised money by attracting various Taft-Hartley service providers to be "associate members," a status that afforded them access to Coalition members. (CSMF ¶¶ 150, 207-223).

After the Covid-19 pandemic took hold in March 2020, the Trustees closed the Funds Office and allowed employees to work from home. (CSMF ¶ 96). By June of 2020, however, some of the Funds' key employees returned to the office, while others with health concerns, such as Alongi, were allowed to continue working from home. (CSMF ¶ 97). Although the employees were working at home, many employees fulfill time sensitive functions such as tracking and

allocating reports of participant hours worked generated and submitted by employers to determine ongoing benefit eligibility or determining whether a participant or beneficiary is entitled to a certain pharmaceutical or medical benefit or coverage. Accordingly, William McLaughlin, the Chairman of the various Boards of Trustees, implemented a procedure in which all Fund employees were required to keep a timesheet describing the work performed throughout the day. (CSMF ¶ 99). These timesheets, which were similar to but separate from the DOL timesheets, were submitted on a monthly basis to Assistant Administrator Greg Geiman for review. (CSMF ¶ 100). Due to her position as Administrator, however, Alongi's timesheets were submitted directly to Mr. McLaughlin to prevent her subordinate, Mr. Geiman, from having to track his immediate supervisor's productivity and work performance. (CSMF ¶ 101).

In early July 2020, Alongi submitted her timesheets to Mr. McLaughlin. (CSMF ¶ 102). He reviewed those timesheets and noted that in several entries Alongi logged work performed either on behalf of the Coalition or with individuals whom Mr. McLaughlin did not recognize or knew to be individuals associated with the Coalition or benefit funds other than the Local 4 Funds. (CSMF ¶ 102). Mr. McLaughlin was taken aback that the Administrator was detailing work performed on behalf of a third-party entity during the Funds' regular business hours, and he asked Mr. Geiman – who was present in the Funds Office - for clarification or more context. (CSMF ¶¶ 102-103). Mr. Geiman and Funds counsel Kathryn Shea opined that best course of action would be to cross reference the entries of concern with Alongi's separate, DOL timesheets. (CSMF ¶ 105). When Rebecca Zacardi, the Funds' inhouse accountant, was asked for those timesheets, she advised Mr. Geiman that Alongi did not keep or submit DOL timesheets. (*Id*.). This revelation set off a chain of events – the Trustees had to grapple with the fact that the Funds' chief executive had not been complying with an important policy, that Fund resources and employee time had been

improperly diverted to the Coalition, a stranger entity that was not compensating the Funds at all for the use of these resources, and that the Funds' allocation of shared expenses was now known to be inaccurate since the most highly compensated individual working for the Funds had been revealed to have not kept required time records and was, in fact, devoting a substantial amount of her time to an entity outside of the Funds. (CSMF ¶¶ 106-109). These revelations were brought to the attention of all of the Funds' Trustees and outside counsel, all of whom were unaware that these things were occurring. (*Id*.). These revelations caused the respective Trustees of the Funds to unanimously voted to terminate Alongi on July 21, 2020 and further caused the Trustees to engage Schultheis to conduct a review of the time that Alongi was actively working during the period January 2015 through July 2020 to determine the degree to which she may have damaged the Funds due to her failure to properly allocate her time and her diversion of plan assets for the benefit of the Coalition, an entity for which she was also receiving compensation as its Executive Director. (CSMF ¶¶ 106-109). Critically, the Trustees potentially faced co-fiduciary liability for any such breaches of the nature described herein, under 29 U.S.C. §1105.

This review of Alongi's work activities included a review of her arrival times at the office by means of ascertaining when she entered the Fund office via electronic key fob, her email activity on her Fund-provided email account, and call activity on both her office landline and Fund-provided cellular phone. (CSMF ¶ 110). The findings and specific data points that resulted from the Audit are discussed *infra* in the context of Alongi's specific fiduciary breaches.

## F.    Defendant Alongi's Work for the Coalition

Facts that came to light after Alongi's termination established that Alongi breached her fiduciary duty by performing work for the Coalition during the Funds normal business hours, utilizing the Funds' equipment and resources, while she collected compensation from the Funds

despite working for the benefit of a third-party entity, as opposed to for the sole and exclusive benefit of the Funds and their participants and beneficiaries. (CSMF ¶¶ 111, 112, 124, 143-151).

Alongi served as the Executive Director of the Coalition during all times relevant to the litigation. (CSMF ¶ 33). During 2019, the last year for which a Form 990 for the Coalition was publicly available at the time the Complaint was filed, Alongi reported and averred that she was paid $46,000 per year in exchange for performing ten hours of work per week. (CSMF ¶ 141). Indeed, all Form 990s dating back to at least 2013 included the averment, under penalty of perjury, that Alongi worked ten hours per week for the Coalition.

Emails and other evidence reviewed by Schultheis and produced in discovery in this matter establish beyond dispute that the work Alongi routinely performed on behalf of the Coalition included: Alongi scheduling and participating in telephone conferences with Coalition members, prospective members, and vendors (CSMF ¶ 147); travelling to and from and attending Coalition general membership and Executive Board meetings (CSMF ¶ 146); reviewing documents, correspondence, and memos on behalf of the Coalition (CSMF ¶ 148); participating in discussions and implementing various surveys of Coalition members (CSMF ¶ 149); and actively seeking out new Coalition members and collecting membership applications and fees from so-called associate members, entities, particularly investment management firms, that performed services within the universe of Taft-Hartley benefit funds and were promised access to fund administrators conditioned upon their joining the Coalition (CSMF ¶¶ 150, 207-223), a rather blatant and distasteful "pay to play" scheme. Though the performance of each of these types of work on behalf of a third-party entity is egregious and constitutes a breach of fiduciary duty, Alongi's transparent efforts to increase Coalition membership to collect an ever-increasing number of fees – commensurate with her ever-increasing negotiated salary - were pervasive. Discovery uncovered

a significant number of emails between Alongi, various investment managers and vendors, and Funds employees Laura-Jean Hickey and Rosemarie Alongi in which Alongi explicitly ties manager and vendor opportunities to present to the Coalition to becoming associate members. (CSMF ¶¶ 150, 207-223). The Audit noted that Alongi *routinely* sent these emails and performed this work using Fund resources during normal business hours:

> Our analysis also revealed numerous emails during that time with a subject line referencing the Coalition, a very large majority of which occurred during times when the former Fund Administrator was receiving compensation from the Funds.

(CSMF ¶ 151). The fact that Alongi performed all of this work during the Funds' normal business hours without accounting for the time she spent on behalf of the Coalition implicates the sensitive employee time allocation issues outlined *infra*. (CSMF ¶¶ 126-140). In fact, the Audit uncovered "significant weaknesses in controls surrounding cost allocations to the Coalition, where the former Fund Administrator also served as the Executive Director." (CSMF ¶ 111). Based on the review of the documents and data in this matter, as well as interviews with Funds employees, the Audit further determined as follows:

> We noted that it appears the Funds have an adequate system to track and request reimbursement for postage (for which identifying code is entered in the postage machine whenever mail is processed on behalf of the Coalition); however, the Funds do not have an adequate system to track labor, related taxes, and benefit costs incurred on behalf of the Coalition. **In fact, timesheets were designed in a manner in which Fund Office employees were unable to allocate time to the Coalition**. Furthermore, Fund Office employees were tacitly directed not to allocate time to the Coalition. Finally, the former Fund Administrator, whose allocation would be most significant and most sensitive, did not maintain a timesheet as required of all other employees.

(CSMF ¶ 112 – emphasis added). The Audit analyzed a number of sets of data to determine whether Alongi's work on behalf of the Coalition occurred during regular Funds' business hours without making that time up by working for the benefit of the Funds outside of normal business hours:

To evaluate if these efforts were performed during normal business hours (for which she received compensation and benefits from the Funds with no reimbursement from the Coalition) or outside of normal business hours, we analyzed incoming and outgoing calls from the former Fund Administrator's office phone, entry times from the former Fund Administrator's key fob noting time she entered the Fund Office, and cell phone calls from February 11, 2020 through July 23, 2020. Based on the following analyses, it appears the former Fund Administrator worked significantly less than the required seven hours per day and performed her duties as Executive Director of the Coalition during the reduced hours she was at the Fund Office.

(CSMF ¶ 113). During the period at issue in this litigation, Alongi seldom arrived at the Fund office before or at the time it opened at 8:00 a.m.; instead, the Audit uncovered that she routinely arrived *hours* after the established start of the workday. In fact, Alongi's average arrival time to the Fund office in the years at issue were as follows: 2015: 10:58 a.m.; 2016: 10:41 a.m.; 2017: 10:28 a.m.; 2018: 9:55 a.m.; 2019: 9:50 a.m.; 2020: 8:19 a.m. (CSMF ¶ 115). In addition to her consistent failure to commence working when required, a review of Alongi's computer, email, and land and cellular phones underlying the Audit revealed that on the vast majority of days, her work activities ceased at or around 4:00 p.m. (CSMF ¶ 116). Indeed, there were very few outgoing calls made from Alongi's office phone after 4:00 p.m., and the records establish that Alongi performed little or no work after normal business hours or during weekends.[6] (CSMF ¶¶ 117-119).

During the period January 1, 2015 through the date of her termination, Alongi sent 95% of her emails – including a great number of Coalition emails - between the hours of 9:30 a.m. and 4:30 p.m. (CSMF ¶ 120-121). Of those 22,000 emails sent during this period, only 523 of those emails (about 2%) were sent prior to 9:30 a.m., and of those 523, the gross majority – 348 – were sent in 2020, when Alongi spent much of her time working from home. (CSMF ¶ 122). On weekends, Alongi sent a mere 69 emails during this period, and all of those weekend emails

---

[6] During the pandemic between March and July 2020, when Alongi did not have access to her office phone, the vast majority of calls made after 4:00 p.m. on her work-issued cell phone were to family or friends.

appeared to be personal in nature. (CSMF ¶ 123). Accordingly, if, as she reported under penalty of perjury on the Forms 990 and as the email and telephone traffic evidencing Coalition work establish, Alongi was performing at least ten hours per week working for the Coalition, she was spending in excess of 25% of her work time performing work *for the Coalition*, rather than the Funds. (CSMF ¶¶ 124-125). By so doing, Alongi unilaterally and in an *ultra vires* fashion diverted plan assets for her own benefit and that of a party unrelated to the Funds by whom she was employed. (CSMF ¶ 125). The Audit accounted for the possibility that Alongi may have been making up time worked on behalf of the Coalition during the Funds' regular workday but found no evidence that she was. (CSMF ¶¶ 116-118, 280).

The facts cited *infra* establish beyond factual dispute that Alongi knowingly diverted her time to the benefit of a third-party entity unrelated to the Funds, utilizing Funds' resources, while being paid by the Funds to perform critical work as Administrator *for the Funds*. In so doing, Alongi breached her fiduciary duty to the Funds by depriving the Funds of the expected value of her services and improperly diverting plan assets in a manner other than for the sole and exclusive benefit of the participants and beneficiaries of the Funds, in explicit violation of ERISA. While so doing, Alongi acted as an ERISA fiduciary because, as she admitted under oath, she, as Administrator, was responsible for overseeing all work performed in the Fund Office. This, of course, includes her own work; she was intimately aware of that as a result of decades of experience, the explicit terms of Funds documents, and her involvement in the DOL audit conducted in 2003-2004. Thus, Plaintiffs are entitled to judgment as a matter of law that Alongi breached her fiduciary duty to the Funds as a result of this course of conduct. 29 U.S.C. §§ 1002(21)(A); 1104(a)(1)(A), (B); 1106(b).[7]

---

[7] It is anticipated that Alongi will argue that the Funds somehow benefitted from her activities on behalf of the Coalition and specifically some of the provider arrangements that Ms. Alongi allegedly negotiated on behalf of

### G.     __Defendant Alongi's Failure to Work Hours for Which She was Compensated__

The Audit determined that, in addition to the time impermissibly spent on Coalition work, Alongi consistently and routinely failed to work anything even resembling a full-time schedule during the period January 1, 2015 through December 31, 2019. As provided at p. 21 above, Alongi routinely arrived to work *hours* after the commencement of the Funds' regular business hours at 8:00 a.m.[8] (CSMF ¶¶ 115, 278-279). The Funds' Employee Handbook provides that "[t]he regular working hours of the Funds Office are 8:00 a.m. – 4:00 p.m. (CSMF ¶ 277). Indeed, the Audit determined that "[t]here is no record of the former Fund Administrator entering the Fund Office prior to 8:00AM from 2015 through 2019." (CSMF ¶ 279). As previously noted, the Audit further found that Alongi did not make up for these late arrivals by working past the 4:00 p.m. closing time or by working on the weekends. (CSMF ¶¶ 116-118, 280).

Thus, all records indicate that, instead, Alongi would simply work an abbreviated day on top of performing the ten hours of work for the Coalition during the week. The Audit concluded that Alongi worked substantially less than the required 7 hours per day, instead averaging the following work hours during each year at issue herein: 2015: 5.25 hours; 2016: 5.5 hours; 2017: 5.75 hours; 2018: 6.25 hours; and 2019: 6.25 hours. (CSMF ¶¶ 115, 277-280). In so doing, Alongi deprived the Funds of the reasonably expected hours of service, leading to her being substantially overpaid for the limited time she actually spent working as the Administrator. These totals do not

---

Coalition members. However, as set forth in the CSMF at ¶¶ 155-186 the Local 4 Welfare Fund would have been entitled to any such benefit on the basis of its membership, not the donation of the labor of its highest paid employee and others. Moreover, during all times relevant to this litigation, the Local 4 Welfare Fund was not benefitting from these Coalition-negotiated arrangements in any meaningful way, and certainly not at a level that came close to the costs associated with the impermissible use of its employees.

[8] Once Louis Rasetta retired as Business Manager of Local 4 and Chairman of the respective Boards of Trustees and William McLaughlin assumed those positions, Mr. McLaughlin requested that Alongi arrive at the Fund Office on time, at the beginning of the workday. Following that request, Alongi began arriving between 8:00 a.m. and 9:30 a.m. on most workdays.

account for the 2.0 hours Alongi avers under penalty of perjury that she was working per day for the Coalition. (CSMF ¶ 124). The Audit took the possibility of Defendant Alongi working from home into account, but ultimately found that:

> For the period September 2016 through July 2020, incoming and outgoing calls to and from the former Fund Administrator's office phone were commonly between the hours of 9:30AM and 4:00PM until January 2020 at which time they occurred between 8:00AM and 4:00PM.

(CSMF ¶¶ 294, 296-297). The Audit also accounted for Alongi's cell phone use and determined that there were very few business calls made to or from her cell phone from to the Covid-19 pandemic, and that "a large majority of business calls made and received by the former Fund Administrator were most commonly during normal business hours."[9] (CSMF ¶ 295). Thus, it has been established that Alongi did not place or receive telephone calls at the Funds Office before or after the Funds' regular business hours and that, in fact, she did not place or receive calls during at least the first hour and half of the workday. Her email activity corresponded to this timeframe. Indeed, the Audit determined the following regarding Alongi's email traffic:

> For the period September 2015 through July 2020, the former Fund Administrator's outgoing email activity followed a similar pattern as the outgoing phone calls whereby most of the activity occurred between 10:00AM and 4:00PM.

(CSMF ¶ 296). Lastly, Alongi's entry times at the Funds Office neatly corresponded to her phone and email activity, "thereby validating the data used in the analysis." (CSMF ¶ 297).

The findings were also "consistent with representations made during discussions with other Fund Office employees." (CSMF ¶ 298).

### H.   Alongi's Direction of Certain Funds Office Staff to Work for the Coalition

---

[9] The only data available to the auditors regarding Alongi's cell phone covered the roughly six-month period prior to her termination.

The undisputed facts also establish that Alongi breached her fiduciary duty by directing Fund employees to perform Coalition work during normal business hours, while these employees were collecting compensation from the Funds to perform work *for the Funds*. Thus, unbeknownst to the Trustees, the Funds were paying not only Alongi, *but other Fund employees*, for time spent working for an unrelated entity. The Trustees learned about this through the Audit, which noted:

> Based on our interviews and analysis of Fund Office employees; email, it is apparent that the Coalition's operations were tightly integrated with the Fund Office and many of the Fund Office employees performed duties for the Coalition with no reimbursement. It appears Fund Office employees' Coalition efforts increased gradually to 2020, at which time significant Fund Office resources were being directed to the Coalition's inaugural "Wellness Fair" for which no time was tracked, allocated, or invoiced to the Coalition.

(CSMF ¶ 191). Alongi directed Funds staff to perform work for the Coalition during normal business hours, and further directed Laura-Jean Hickey to do the same. (CSMF ¶ 192). Alongi, as Administrator, had the unilateral authority to hire, fire, promote, and demote Fund Office employees. (CSMF ¶ 193). Additionally, Alongi admitted in sworn testimony that during her tenure as Administrator, there were certain periods during which she largely determined the allocation of wage or salary raises to specific Fund Office employees at her discretion, which also constitutes further evidence of her status as a fiduciary. (CSMF ¶ 194). It is wholly implausible that Fund employees would question Alongi's direction to do this work or, conversely, would undertake this work without her knowledge and approval.

Indeed, the Audit determined that a substantial portion of the Funds' overall payroll expenses were diverted for the benefit of the Coalition:

> We reviewed hundreds of emails documenting Coalition work performed by various persons during normal Fund Office business hours. Work performed included scheduling and planning all Coalition events and meetings, preparing all meeting materials, performing surveys on behalf of the Coalition, maintaining the books and records of the Coalition, maintaining the Coalition's website and continuously updating service provider and membership data, and orchestrating the

24

inaugural Wellness Fair. Additionally, we interviewed several Fund Office employees who validated our findings.

(CSMF ¶ 195). The Audit determined that the following Fund employees devoted these estimated percentages of their time working for the Coalition during business hours: Rosemarie Alongi: 30%; Laura-Jean Hickey: 30%; Taylor Ryan: 38%; Rosemary Ortega: 12.5%; Bettyann Trefry: 4%; Terri Berardi: 1%; Amy Boisvert: 1%; and Rebecca Zaccardi: 1%. (CSMF ¶ 195).

### 1.   Rosemarie Alongi's Work on Behalf of the Coalition

Alongi hired Rosemarie Alongi, her twin sister, to work in the Funds' IT Department. Emails produced in discovery establish that Rosemarie Alongi designed, maintained, and routinely updated the Coalition's website. (CSMF ¶¶ 200-206). These emails also further establish that, at Alongi's direction, Rosemarie pressured prospective IT service providers to join the Coalition and submit membership fees. (CSMF ¶¶ 207-223). All of the work Rosemarie performed for the Coalition occurred during the Funds' regular business hours, on the Funds' computer and software, while Rosemarie was being paid by the Funds, and the Audit uncovered that:

> During our analysis of documents included in emails, we noted monthly payments of $500 from the Coalition to 'Alongi Associates' for 'Web Maintenance' and noted correspondence indicating these services were performed during normal business hours. During our interviews, we verified that these were, in fact, payments to Rosemarie Alongi for IT services which appear to have been performed during normal business hours for which she received compensation and benefits from the Funds with no reimbursement from the Coalition.

(CSMF ¶ 201). In addition to establishing that Rosemarie was performing work on behalf of the Coalition using Fund resources, the email in which she sends Alongi a screenshot image of her design of a website for the Coalition demonstrates that the work was done at Alongi's direction, and that Rosemarie required her permission and approval to perform work for the Coalition. (CSMF ¶¶ 202-204). Significant numbers of subsequent emails that demonstrate Rosemarie's performance of work on behalf of the Coalition during the Funds' regular business hours were

25

uncovered by the Audit and in discovery in this matter. (CSMF ¶¶ 200-206). Notably, Rosemarie Alongi *never* listed time worked on behalf of the Coalition on her timesheets. (CSMF ¶¶ 200-206).

Besides the work Rosemarie routinely performed on behalf of the Coalition utilizing Funds resources, she was directed by Alongi to use her position and resources with the Funds to extract membership fees from an IT service provider on behalf of the Coalition. (CSMF ¶¶ 207-223). An email chain outlined in the CSMF establishes as much beyond factual dispute. (CSMF ¶¶ 207-223). First, the Senior Director of CMIT Solutions, an IT service provider, emailed Alongi and, after noting that CMIT Solutions had "been active with members of the Coalition ensuring their IT Infrastructure support for workstation, servers, and more," asserted that she thought she "would circle back with you specifically to see if perhaps it is timely for Local 4 to look at CMIT's IT support for your own office infrastructure." (CSMF ¶ 208). To that end, the Senior Director asks "[m]ight there be an opportunity to schedule a call to check in on your current needs?" (*Id*.). In response, Alongi forwards the email to Rosemarie, and asks her whether she "[w]ould be willing to call her?" (CSMF ¶ 210). Rosemarie responded that she would do so – as Alongi was her boss – but she noted that "the services they offer we already have in place throughout the infrastructure." (CSMF ¶ 211). Nonetheless, and without providing any basis or detail, Alongi responded as thus: "She's very nice. Maybe you can meet with her." (CSMF ¶ 212). Put simply, this email chain establishes and provides just one example of Alongi's transparent willingness to put her interests and the interests of the Coalition above those of the Funds. (CSMF ¶¶ 150, 207-223). It cannot be disputed that Alongi directed a Fund employee to spend time she should have been working for the Funds and was being paid to do so to entertain a bid and attend a meeting for IT service provider work – after the Fund employee opined that there was no need to do so – solely because the

inquiring service provider was a member of the Coalition. (CSMF ¶ 208). In so doing, Alongi breached her fiduciary duty to the Funds.

In this same vein, during the period prior to and for about a year following August 24, 2018, Rapid 7 provided firewall protection services to the Funds after being hired with specific approval by the Boards of Trustees. On August 24th of that year, Rosemarie Alongi sent an email to Rapid 7 and conveyed the following information and request:

> Gina asked me if Rapid 7 would have interest in becoming an associate member with the Mass. Coalition. There is an opening to present in September at the Carpenters Union and it would be a great opportunity for Rapid 7 to pick up some other Fund Offices.
>
> The cost is 1500 annually –> [hyperlink provided]
>
> More information –> [hyperlink provided]
>
> Let me know asap if you have interest so Gina can schedule you for the meeting.

(CSMF ¶ 213). As the email chains outlined in the CSMF demonstrate, Rosemarie subsequently requested that Rapid 7 join the Coalition and remit membership fees, and Alongi requested to be on a telephone conference to discuss the same. (CSMF ¶¶ 213-223). Ultimately, Rapid 7 declined to join the Coalition after several nudges from Alongi via Rosemarie. (CSMF ¶¶ 213-223). Within a year, Alongi terminated Rapid 7 as a Fund service provider without Trustee knowledge *or* approval, selecting and hiring their replacement without Trustee input or approval. Shortly thereafter, a crippling ransomware attack brought Fund operations to a standstill for several weeks and resulted in the Fund having to pay a ransom to regain control of its computer system. (CSMF ¶ 108). These communications conferences occurred at Alongi's direction, during the Funds' regular business hours, on the Funds' computer and software, while both she and Rosemarie were being paid by the Funds. (CSMF ¶¶ 207-223). In engaging in these activities during those time periods and utilizing those resources, Alongi breached her fiduciary duty to the Funds.

27

### 2.     Laura Jean Hickey's Work on Behalf of the Coalition

Laura-Jean Hickey is a longtime Funds employee, and she worked closely and directly for Alongi during all times relevant in this litigation. In addition to working for the Funds as Alongi's Assistant Administrator, Ms. Hickey served as "Coordinator" for the Coalition at Alongi's request. (CSMF ¶ 224). For this position, she received compensation at a rate of $25 to $30 per hour and was required to complete all work assigned by Alongi, while being instructed to not to exceed twenty hours of work per month. (CSMF ¶ 225). Alongi, as Executive Director of the Coalition, was fully aware of the work Ms. Hickey was performing and, as her immediate supervisor, was further aware that Ms. Hickey was performing work on behalf of the Coalition at the Funds office during regular business hours. (CSMF ¶ 226). Ms. Hickey advised the certified public accountants conducting the Audit that, although she "used her best efforts to make up any time performing Coalition duties during lunch and before or after normal business hours, she estimated that 30% of her efforts for the Coalition occurred during normal business hours for which she received compensation and benefits from the Funds." (CSMF ¶ 227).

During deposition testimony in this matter, Alongi frequently attempted to lay the blame for her multitude of fiduciary breaches at Ms. Hickey's feet in an absurd fashion. Alongi insisted that Ms. Hickey and other Funds employees "volunteered" to perform work on behalf of the Coalition or testified that she was unaware that Ms. Hickey was performing work on behalf of the Coalition during normal business hours. Of course, contemporaneous emails establish that besides being fully aware of Ms. Hickey's Coalition work and the time during which she was performing the same, Alongi routinely directed Ms. Hickey to perform that very work during the Funds regular business hours. (CSMF ¶¶ 226-232). The work Alongi directed Ms. Hickey to perform on behalf of the Coalition included, but was not limited to, drafting, reviewing, and finalizing Coalition

28

meeting and event agendas and organizing and maintaining various Coalition documents (CSMF ¶ 228); coordinating surveys among Coalition members and vendors (CSMF ¶ 229); scheduling and facilitating telephone conferences during regular business hours with Coalition members, prospective members, and service providers (CSMF ¶ 230); contacting event vendors and prospective venues and generally planning and attending Coalition events, Wellness Fairs, and holiday parties (CSMF ¶ 231); and directing other Funds employees to perform work on behalf of the Coalition (CSMF ¶ 232).

The Audit and discovery in this matter uncovered instances in which Ms. Hickey would email other Funds employees to request that they perform work on behalf of the Coalition. (CSMF ¶ 226). As noted above, Alongi was Ms. Hickey's immediate supervisor, and she was fully aware of the manner in which the work on behalf of the Coalition was being completed but attempted throughout discovery to pin responsibility for the performance of Coalition work at the Funds office by Funds employees on Ms. Hickey. In support, Alongi has asserted that because Ms. Hickey served as the Coalition Coordinator, she was acting of her own volition and recruiting Funds office personnel to complete her work. This attempt at a defense fails for two reasons. Emails uncovered in discovery establish that Alongi explicitly directed Ms. Hickey to assign work Coalition work to other Funds office staff. (CSMF ¶¶ 249-250). Additionally, unlike Alongi, Ms. Hickey had no contract or written agreement with the Coalition. (CSMF ¶¶ 144-145, 233-235). During the time Alongi served as the Executive Director of the Coalition, she was party to a series of employment contracts titled "Agreement Executive Director Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." (CSMF ¶¶ 144-145). The Agreements were rarely altered, with the exception of Alongi's ever increasing compensation derived therefrom. (CSMF ¶¶ 144-145). The Agreement executed in October 2012 clearly defines the comprehensive nature of Alongi's

responsibilities as the Executive Director. Thus, Alongi, by contract, accepted *each and every responsibility* that she now attempts to foist upon Ms. Hickey. It is clear that responsibility for completing this work on behalf of the Coalition starts, stops, and ends with Alongi. (CSMF ¶¶ 144-145, 233-235). Her attempt to throw a subordinate under the bus when her commandeering of the Fund Office employees was uncovered must not be seriously considered.

### 3.   Taylor Ryan's Work on Behalf of the Coalition

Funds employee Taylor Ryan was tasked with seeking and analyzing product information from various vendors and rental services for purposes of preparing for Coalition events and the Coalition's Health Fair. (CSMF ¶ 236). Ms. Ryan was additionally tasked with tracking address and contact information for, and sending various communications to, Coalition members and service providers on behalf of the Coalition. (CSMF ¶ 236). In addition to routinely providing administrative services for the Coalition as described above, Ms. Ryan was also tasked with comprehensive, time-consuming projects. By way of example, Ms. Ryan was instructed to review the zip codes for thousands of participants and beneficiaries of other New England multiemployer fringe benefit funds for purposes of advising the appropriate members of Congress regarding a lobbying effort undertaken by the Coalition. (CSMF ¶¶ 237-241). The hundreds of pages of .excel data including thousands of zip codes are omitted for ease of reference, but pertinent emails and an example of the format of the zip code data is outlined in the CSMF. (CSMF ¶¶ 237-241). According to Ms. Ryan during deposition testimony, this "Zip Code Project" was "a big thing ... [l]ike a big time-consuming project." (CSMF ¶ 240). Indeed, she testified that work *on just that one project alone* resulted in her working for the Coalition in the Fund Office for more than a week, and "maybe" more than a month. (CSMF ¶¶ 241-242). This work occurred during the Funds' regular hours while Ms. Ryan was being paid by the Funds. (CSMF ¶ 242).

### 4.    Rosemary Ortega's Work on Behalf of the Coalition

Rosemary Ortega was tasked with, *inter alia*, purchasing materials on behalf of the Coalition (CSMF ¶ 243); reviewing, compiling, organizing, preparing binders of materials for Coalition meetings and mailings (CSMF ¶ 244); leaving the Fund office during regular work hours to pick up and arrange lunches required for Coalition meetings (CSMF ¶ 245); and inputting Coalition tasks, meetings, etc. into Alongi's calendar (CSMF ¶ 246). All of this work was performed at Alongi's direction and with her knowledge. (CSMF ¶¶ 243, 247, 248-250). Throughout her deposition testimony, Ms. Ortega transparently attempted to testify for Alongi's benefit. Indeed, Ms. Ortega plays poker with the Alongi sisters, has traveled to Alongi's house on Cape Cod, and the Alongi sisters hosted a private "retirement" luncheon for Ms. Ortega when she left employment with the Funds. (App. 437, Ortega Dep., p. 43). Nonetheless, when Ms. Ortega was presented with exhibit after exhibit demonstrating the frequency of her work on behalf of the Coalition and was asked whether she performed work for the Coalition, "as assigned by Gina" she testified as follows: "Well, sir, I didn't initially. But now after seeing all these emails, yes, I did." (CSMF ¶ 251). She further testified that Alongi was aware of – and assigned - that work (CSMF ¶ 251), and that she never worked more than the seven hours per day required by the Funds.

The facts cited *infra* establish beyond factual dispute that Alongi knowingly directed and permitted Fund Office staff to perform work for an unrelated third-party entity utilizing Funds' resources while the Funds were contemporaneously paying those same employees to perform work for the Funds. In so doing, Alongi breached her fiduciary duty to the Funds by unlawfully depriving the Funds of the expected value of these employees' service and improperly diverting their labor in a manner other than for the sole and exclusive benefit of Fund participants. While so doing, Alongi acted as an ERISA fiduciary because, as she admitted under oath, as Administrator, she

31

was responsible for overseeing all work performed in the Fund Office and had unliteral authority

to hire, fire, promote and demote employees. (CSMF ¶ 193). She was intimately aware that Funds

assets, including employee services, could not be diverted to the benefit of an unrelated entity. The

Plaintiffs are entitled to judgment as a matter of law that Alongi breached her fiduciary duty to the

Funds in this regard. 29 U.S.C. §§ 1002(21)(A); 1104(a)(1)(A), (B); and 1106(b).

### I.      Alongi Cashed Out Vacation Time to Which She was Not Entitled

Pursuant to the Funds' Employee Handbook, four weeks of paid vacation constitutes the

"maximum vacation time allowable" for all employees. (CSMF ¶ 254). Starting in 2013,

unbeknownst to the Trustees and without approval from them, Alongi began taking an additional

two weeks of vacation over and above the allotment of four weeks to which she was entitled.

Indeed, the Audit submitted to the Trustees uncovered that "[c]ommencing in 2013, the former

Fund Administrator received an additional two weeks' vacation per year for which we were unable

to obtain documented Trustee approval." (CSMF ¶¶ 255-257).

During the period at issue in this matter, Alongi engaged in the practice of "cashing out"

this additional two weeks of vacation in the middle of the year, in effect awarding herself, in an

*ultra vires* fashion, with an extra two weeks of salary. (CSMF ¶ 256). On this score, the Audit

determined as follows:

> The Fund Office Employee Handbook states that unused vacation days will be
> bought back annually. From 2015 through 2020, we noted ten (10) instances where
> partial vacation buyouts to the former Fund Administrator and her sister were paid
> during the year, rather than at the end of the calendar year when other Fund office
> employees' vacation buyouts were processed. It is our understanding that these
> payments were directed by the former Fund Administrator and only the former
> Fund Administrator and her sister were granted this opportunity.

(CSMF ¶ 258). The Audit uncovered that Alongi received an additional 80 hours of compensation

in this fashion in 2015, 2017, 2018, 2019, and 2020. (CSMF ¶¶ 258-259). In 2016, she received

an additional 64 hours of compensation. (CSMF ¶¶ 258, 260). Alongi ordered the Funds staff to

issue her a check or wire transfer for these vacation hours in each of these years, without holding

taxes, to the tune of $49,849.20. (CSMF ¶¶ 258, 261). John Shaughnessy, a former management

trustee, submitted an Affidavit in support of Alongi in which he asserts that "[i]n or around 2013,

I specifically recall that then Business Manager Louis Rasetta and I approved an additional two

weeks of vacation time for Alongi to use or cash out annually," (CSMF ¶ 262); and former Local

4 Business Manager and Chairman of the Boards of Trustees Rasetta executed a substantially

similar Affidavit in which he claims that "[i]n or around 2013, I suggested giving Alongi an

additional two weeks of vacation time to use or cash out annually because of her dedication, work

ethic and her performance as Administrator for the Funds." (CSMF ¶ 263). The Trust Agreement

of the Welfare Fund, its governing document, provides, in pertinent part, as follows:

> <u>Section 4.1</u> The Fund shall be administrated by a Board of Trustees which shall consist of three (3) trustees designated by the Union and three (3) trustees designated by the Association (one (1) by each Employer Organization).
>
> **<u>Section 6.3</u> To constitute a quorum for the transaction of business not less than two (2) Employer Trustees and two (2) Union Trustees shall be present in person. The Board shall not take any action or make any decision on any matter coming before it or presented to it for consideration or exercise any power or right given or reserve to it or conferred upon it by this Trust Agreement except upon the concurrence of at least two (2) Union Trustees and two (2) Employer Trustees.**

(CSMF ¶¶ 266, 267) (*emphasis added*). Mr. Rasetta and Mr. Shaughnessy each provided

deposition testimony that shattered any notion that this "grant" of additional compensation was in

anyway appropriate or above board. Mr. Rasetta testified *that he unilaterally granted this unearned*

*compensation to Alongi*, and that the compensation was granted *on a one-time basis* for 2013

33

only.[10] (CSMF ¶ 268). For his part, Mr. Shaughnessy admitted that the Trustees were never presented with, and never approved, this additional compensation to Alongi. (CSMF ¶ 269).

Alongi breached her fiduciary duty by cashing out this unearned and unapproved compensation on a subsequent *annual basis*. (CSMF ¶¶ 258, 270-272). She knew the amounts were not approved by the Trustees, and she exercised discretionary control over these Funds' assets when instructing Fund staff to issue the payments, *as well as untimely vacation buyout payments to her twin sister Rosemarie*, outside of the timeframe permitted for such buyouts to which Funds employees were actually entitled. (CSMF ¶¶ 258, 270-272). By so doing, Alongi acted as an ERISA fiduciary, and by diverting plan assets for her own benefit without proper notification to or authorization from the Trustees, she breached her fiduciary duty and is liable to make the Funds whole for any losses resulting from her breach. 29 U.S.C. §§1002(21)(A), 1106(b), and 1109.

## IV.   CONCLUSION

The Plaintiffs respectfully submit that the undisputed facts established herein show that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law pursuant to, *inter alia*, ERISA, 29 U.S.C. §§ 1002(21)(A); 1104(a)(1)(A), (B).

Respectfully submitted,

Date: <u>November 7, 2022</u>

s/ Jennifer L. Markowski
Jennifer L. Markowski
**FREEMAN, MATHIS & GARY LLP**
60 State Street, Suite 600
Boston, Massachusetts 02109-1800
Telephone (617) 963-5975

---

[10] Here, an essential fact in this case that illuminates the history of certain relevant individuals and a basis for Alongi's ability to run the Funds Office as she deemed appropriate – often transparently for her personal gain – must be noted. During discovery in this matter, it was established that Mr. Rasetta and Alongi engaged in a sexual relationship (they each admitted so under oath) – unbeknownst to other Trustees, *including* Mr. Shaughnessy – for a disputed period of time that beyond dispute commenced prior to 2013. (CSMF ¶¶ 264, 265). For purposes of this matter, this fact is relevant because *two* Trustees, as opposed to the required *four* to create a quorum, inappropriately and in violation of governing Funds documents granted allegedly Alongi an additional two weeks of compensation to which she was not entitled. (CSMF ¶¶ 266-270). Alongi had, or was having, a sexual relationship with one of those Trustees. (CSMF ¶¶ 264, 265).

jmarkowski@fmglaw.com
BBO# 655927

s/ Charles W. Gilligan
Charles W. Gilligan (admitted pro hac vice)
Jennifer Simon (admitted pro hac vice)
Daniel Keenan (admitted pro hac vice)
**O'DONOGHUE & O'DONOGHUE LLP**
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Telephone (202) 362-0041
Facsimile (202) 362-2640
cgilligan@odonoghuelaw.com
dkeenan@odonoghuelaw.com

## CERTIFICATE OF SERVICE

I, Charles W. Gilligan, hereby certify that I have, on this 7th day of November, 2022, served a copy of the foregoing document, by causing a copy thereof, to be sent electronically, through the ECF system, to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF).

*Charles W. Gilligan*
Charles W. Gilligan