UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOARD OF TRUSTEES OF THE IUOE LOCAL )
4 PENSION FUND, et al.,                )
                                       )
              Plaintiffs,              )
                                       )
       v.                              )   Civil Action No. 1:21-cv-10163-FDS
                                       )
GINA ALONGI,                           )
                                       )
              Defendant.               )

**PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS OF RECORD**

**TABLE OF CONTENTS**

**Page**

I.      The Parties……………………………………………………………………1

II.     The DOL Audit During the Period 2003-2004 and the Shared Services
        Agreement……………………………………………………………….8

III.    Defendant Alongi's Termination and the Schultheis & Panettieri LLP
        Audit………………………………………………………………………20

IV.     Defendant Alongi's Failure to Keep Timesheets Rendered the Funds' Annual
        Expense Allocations Inaccurate, in Violation of Federal Law and the Funds'
        Governing Documents, Policies, and Procedures……………………………..27

V.      Defendant Alongi's Work for the Coalition……………………………………..30

VI.     Defendant Alongi's Direction of Certain Funds Office Staff to Work for the
        Coalition……………………………………………………………………39

VII.    Cashing Out Vacation Time with Authorization by Trustees……………………54

VIII.   Defendant Alongi's Failure to Work Hours for Which She was Compensated…………58

IX.     Rent Attributable to the Coalition……………………………………………..63

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BOARD OF TRUSTEES OF THE IUOE LOCAL )
4 PENSION FUND, et al.,                              )
                                                                        )
                                    Plaintiffs,            )
                                                                        )
                          v.                                     )   Civil Action No. 1:21-cv-10163-FDS
                                                                        )
GINA ALONGI,                                               )
                                                                        )
                          Defendant.                   )

**PLAINTIFFS' CONCISE STATEMENT OF MATERIAL FACTS OF RECORD**

Through undersigned counsel, Plaintiffs, the  IUOE Local 4 Pension Fund ("Pension Fund"), the IUOE Local 4 Annuity & Savings Fund ("Annuity Fund"), the IUOE Local 4 Health and Welfare Fund ("Welfare Fund"), the Hoisting and Portable Engineers Apprenticeship & Training Fund ("Training Fund" and, together with the Pension, Health, and Annuity Funds "Funds"), the IUOE Local 4 Labor-Management Cooperation Trust, and the IUOE Local 4 Social Action Committee, hereby submit the following statement in accordance with Local Rule 56.1 in support of their Motion for Summary Judgment.

I.    **The Parties**

1.    The Pension Fund is a trust fund established in accordance with the requirements of Section 302(c) of the Labor Management Relations Act, 29 U.S.C. §186(c)(5), and is a multiemployer benefit plan, organized under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1102(a), 1002(37), (3), (2), (16), (21). (ECF No. 1, ¶¶ 2, 3; App. 017-25 (Ex. 2)).

2.    The Pension Fund was established and is maintained in accordance with, *inter alia*, the Trust Agreement of the International Union of Operating Engineers Local 4 and its Branches Pension Fund ("Pension Fund Trust Agreement") to provide retirement benefits through a defined

benefit program to participants who worked under collective bargaining agreements negotiated by IUOE Local 4 ("Local 4") with various employers and employer associations who work within the territorial jurisdiction of Local 4 within Massachusetts, New Hampshire, and Maine.  (ECF No. 1, ¶¶ 2, 3; App. 003 (Geiman Decl. ¶ 4); App. 017-25 (Ex. 2)).

3.     The Welfare Fund is a trust fund established in accordance with the requirements of Section 302(c) of the Labor Management Relations Act, 29 U.S.C. §186(c)(5), and is a multiemployer benefit plan, organized under the provisions of ERISA. 29 U.S.C. §§1102(a), 1002(37), (3), (1), (16), (21). (ECF No. 1, ¶¶ 6, 7; App. 027-36 (Ex. 3)).

4.     The Welfare Fund was established and is maintained in accordance with, *inter alia*, the Trust Agreement of the International Union of Operating Engineers Local 4 and its Branches Health and Welfare Fund ("Welfare Fund Trust Agreement") to provide that provides medical, surgical, hospitalization, prescription drug, dental, vision, hearing, accident and sickness, and death benefits to participants, their eligible beneficiaries, as well as eligible retirees through a program overseen by the Trustees. (ECF No. ¶¶ 6, 7; App. 004-05 (Geiman Decl. ¶ 6); App. 027-36 (Ex. 3)).

5.     The Annuity Fund is a trust fund established in accordance with the requirements of Section 302(c) of the Labor Management Relations Act, 29 U.S.C. §186(c)(5), and is a multiemployer benefit plan, organized under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1102(a), 1002(37), (3), (2), (16), (21). (ECF No. 1, ¶¶ 2, 3; App. 038-47 (Ex. 4)).

6.     The Annuity Fund was established and is maintained in accordance with, *inter alia*, the Trust Agreement of the International Union of Operating Engineers Local 4 and its Branches

Annuity Fund ("Annuity Fund Trust Agreement") to provide retirement benefits through a defined benefit program overseen by the Trustees. (ECF No. 1, ¶¶ 2, 3; App. 038-47 (Ex. 4)).

7.      The Annuity Fund is a defined contribution pension plan that also has a 401(k) wage deferral option in which participants in the Annuity Fund are immediately vested in both the contribution and wage deferral aspects of the Fund and are provided a menu of options in which to invest their individual benefit accounts. (App. 004 (Geiman Decl. ¶ 5)).

8.      The Pension, Welfare, and Annuity Fund's operations are governed by the respective Trust Agreements governing each Fund, each Fund's respective Plan of Benefits, and various policies and procedures adopted by the respective Board of Trustees of each Fund from time to time. (App. 004-05 (Geiman Decl. ¶¶ 4, 5, 6)).

9.      The Pension, Welfare, Annuity, and Training Funds are each financed by contributions made by employers who employ operating engineers pursuant to the terms of a written collective bargaining agreement with Local 4, and for each hour worked by such operating engineers, the employers pay a contractually required amount of contributions to the Pension Fund on a monthly basis, filing a remittance report with the Pension, Welfare, Annuity, and Training Funds showing the hours worked by each of its covered employees.. ((ECF No. 1, ¶ 10; App. 004-05 (Geiman Decl. ¶¶ 4, 5, 6, 7)).

10.     The Fund Office collects these contributions, deposits them, and records the hours of each such employee in order to grant them appropriate credit towards a possible pension, retirement benefits, or health and welfare eligibility and coverage. (App. 004-05 (Geiman Decl. ¶¶ 4, 5, 6)).

11.     As to the Annuity Fund, the employers pay the contributions detailed in Paragraph 9 herein on a monthly basis, and, additionally, covered employees may elect to defer some of their wages to the Annuity Fund's 401(k) component. (App. 004 (Geiman Decl. ¶ 5)).

12.     The Fund Office collects these contributions and wage deferrals, deposits them, and records the amounts received on their behalf, which are then forwarded to the Fund's record keeper to be allocated in the investment option chosen by the participants. (App. 004-05 (Geiman Decl. ¶¶ 4, 5, 6)).

13.     The Training Fund is a multiemployer plan as that term is defined in ERISA and an employee welfare benefit plan that provides training in the various machinery and processes necessary to perform the job of operating engineer, which includes such things as the operation of cranes, earth moving machines, bulldozers, backhoes, and other equipment. (ECF No. 1, ¶ 10; App. 005-06 (Geiman Decl. ¶ 7)).

14.     The Training Fund provides apprenticeship instruction to new entrants in the industry, by which they progress to the rank of journey worker through the completion of a combination of class work, practical skills acquisition, and required on-the-job training. (App. 005-06 (Geiman Decl. ¶ 7)).

15.     The Training Fund's operations are governed by a Restated Agreement and Declaration of Trust, its Apprenticeship Standards, training curriculum, and various policies and procedures adopted by its Board of Trustees from time to time, as well as its Training Director and Joint Apprenticeship Committee.  (App. 005-06 (Geiman Decl. ¶ 7)).

16.     Fund Office employees record the contributions payable to the Training Fund as detailed in Paragraph 12 herein, which are then made available to the Training Fund for use in

educating apprentices and journey workers in the craft of being an operating engineer.  (App. 005-06 (Geiman Decl. ¶ 7)).

17.     The Pension, Welfare, Annuity, and Training Funds are each governed by a separate Board of Trustees made up of an equal number of representatives by labor and management as required by law. (App. 006 (Geiman Decl. ¶ 8)).

18.     The Union Trustees are appointed by Local 4 and the Employer Trustees are appointed by employer associations with whom Local 4 engages in collective bargaining, and the Trustees receive no compensation from the Funds and each has a full time job working for entities other than the Funds.  (App. 005-06 (Geiman Decl. ¶ 7)).

19.     The Funds are collectively administered by employees retained on behalf of the Trustees to carry out their day-to-day operations, including the collection of employer contributions, the crediting of hours worked by participants, determinations if eligibility for benefits, and the payment of benefits and reasonable administrative expenses. (ECF No. 1, ¶ 11; App. 002 (Geiman Decl. ¶ 2)).

20.     The Fund Office employees are employed by the Welfare Fund, but perform work for each of the Funds and other plaintiffs pursuant to the terms of an Amended Agreement to Share Administrative Services and Office Space ("Shared Services Agreement"), which requires each Fund to reimburse the Welfare Fund for its proportionate share of such services. (ECF No. 1, ¶ 11; App. 006-07 (Geiman Decl. ¶ 9); App. 049-53 (Ex. 5)).

21.     The Fund Office employees additionally provide services to Local 4, Local 4's Social Action Committee, and the Local 4 Labor Management Cooperation Trust Fund, which are all charged their proportionate share of Funds Office services under the Shared Services Agreement. (ECF No. 1, ¶ 12; App. 006 (Geiman Decl. ¶ 9); App. 050-52 (Ex. 5)).

22.     Fund Office employees work out of an office leased by the Funds from the Union at 16 Trotter Drive, in Medway, Massachusetts 02053. (ECF No. 1, ¶ 13; App. 006 (Geiman Decl. ¶ 9); App. 050-52 (Ex. 5)).

23.     The employees who work for the Funds are all employed by the Welfare Fund, which issues their paychecks and W-2s, and provides their employee benefits. (App. 006 (Geiman Decl. ¶ 9)).

24.     There are typically about fifteen (15) full time employees employed by the Welfare Fund, many of whom provide services to the other Funds but, by law, each Fund is required to pay for its own expenses and must not subsidize the operations of the other affiliated Funds or related entities. (App. 006 (Geiman Decl. ¶ 9)).

25.     The Funds Office maintains normal business hours of 8:00 a.m. to 4:00 p.m., with a one-hour lunch break. (ECF No. 1, ¶ 22; App. 067 (Ex. 6)).

26.     The "Administrator" is appointed by the respective Boards of Trustees of the Funds and serves as the chief executive officer in charge of the day-to-day operations of the Funds.  (ECF No. 1, ¶ 15; App. 002 (Geiman Decl. ¶ 2)).

27.     The Administrator oversees all of the employees who are employed in the day-to-day provision of benefits to the participants and beneficiaries of the Funds and directs and supervises their activities on behalf of the Funds. (App. 002 (Geiman Decl. ¶ 2)).

28.     The Administrator also serves as the main liaison between the Funds and the various professionals retained by the Trustees to assist in their operations, including attorneys, actuaries, consultants, and auditors.  (App. 002 (Geiman Decl. ¶ 2)).

29.     The Administrator also acts as the point of contact for the various service providers retained by the Funds, be it investment managers, various health care providers such as insurers,

pharmaceutical benefit managers, as well as dental, vision and hearing care provider organizations, and others.  (App. 002 (Geiman Decl. ¶ 2)).

30.     The Trustees of each respective Fund meet quarterly (separately) to monitor Fund operations and receive reports from the Administrator, professional advisers, and service providers. (App. 006 (Geiman Decl. ¶ 8)).

31.     The Administrator organizes the meetings, prepares the agendas for the meetings, and provides and/or coordinates the provision of various reports regarding finances and other matters of interest. (App. 006 (Geiman Decl. ¶ 8)).

32.     The job of the Administrator is a demanding, full-time occupation. (App. 003 (Geiman Decl. ¶ 2)).

33.     Defendant Alongi served as the Administrator for the Funds during the period 1996 through July 21, 2020. (ECF No. 1, ¶ 14; App. 138 (Ex. 9, p. 27)).

34.     As Administrator for the Funds, Defendant Alongi was entrusted with overseeing the day-to-day operations of the Funds in accordance with plan documents and policies adopted by the Trustees, and for fulfilling the duties described in Paragraphs 27 through 32 herein. (ECF No. 1, ¶ 15; App. 002-03 (Geiman Decl. ¶¶ 2, 3)).

35.     Defendant Alongi testified as follows during her deposition in this matter:

Q.     Okay. Is it correct to say the administrator is in charge of the day-to-day operations of the fund?

A.     Yes.

(App. 146 (Ex. 9, p. 9)).

36.     During the period relevant to this matter, from January 1, 2015 through July 21, 2020, Defendant Alongi received a substantial annual compensation package from the Funds was

7

worth in excess of $300,000 per year in all years. (ECF No. 1, ¶ 21; App. 013-14 (Geiman Decl. ¶ 30)).

37.    For her role as Administrator, Defendant Alongi was also compensated via four weeks of paid vacation per year. (ECF No. 1, ¶ 21; App. 008 (Geiman Decl. ¶ 14); App. 070-71 (Ex. 6)).

## II.    The DOL Audit During the Period 2003-2004 and the Shared Services Agreement

38.    The Funds are subject to the legal and regulatory framework found in ERISA and its attendant regulations, and are accordingly subject to periodic review of their operations by both the Internal Revenue Service and the Department of Labor ("DOL"). (ECF No. 1, ¶ 18; App. 078-81 (Ex. 7)).

39.    The Employee Benefit Security Administration of the DOL, which shares oversight of employee benefit plans like the Funds, along with the Internal Revenue Service, conducted an audit of the Funds in 2003-2004. (ECF No. 1, ¶ 19; App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7)).

40.    The audit conducted by the DOL during 2003-2004 investigated the Funds, all Plaintiffs herein, to, *inter alia*, determine whether the Funds properly allocated time and expenses among themselves and other non-ERISA covered entities related to Local 4. (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7)).

41.    During the 2003-2004 audit, the DOL expressed dissatisfaction with the scheme by which the collective Funds were allocating administrative costs, due to a fear that some of the Funds were subsidizing the operations of others, and the Department determined that the method the Funds used to allocate expenses – a retrospective time study – was insufficient. (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7)).

42.    In that audit, the DOL uncovered a number of violations related to the administration of the Funds and the allocation of administrative expenses, and it ultimately determined that the Funds failed to properly allocate expenses for the cost of employee time spent working on behalf of each of the Funds to the appropriate Fund. (App. 007 (Geiman Decl. ¶ 10); App. 078-79 (Ex. 7)).

43.    At the conclusion of the audit it conducted in 2003-2004, the DOL sent the Fund Trustees and Defendant Alongi correspondence on September 16, 2004, in which the Department ultimately ruled as follows:

> As I noted, Senior Investigator Roberta Muench has concluded her investigation of the Plan and of your activities as its Plan Administrator & Trustees. Based on the facts gathered during that investigation it appeared that, as Plan fiduciaries, you violated your fiduciary obligations to the Plan and violated several provisions of ERISA.

(App. 078 (Ex. 7)).

44.    The findings and data resulting from these Agreed Upon Procedures conducted by the certified public accountants at Schultheis & Panettieri LLP ("Audit"), which is detailed *infra*, presented to the Boards of Trustees following Defendant Alongi's termination neatly summarized that DOL audit and the findings thereof as follows:

> In 2004, the former Fund Administrator received correspondence from the U.S. Department of Labor which stated that she (as Fund Administrator) and the Trustees had violated their fiduciary obligations for failure to properly allocate salaries and common expenses.

(App. 087 (Ex. 8)).

45.    To resolve the 2003-2004 audit, the DOL required reforms to the manner in which the Funds allocate shared expenses for, among other things, the cost of each employee. (ECF No. 1, ¶ 19; (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7)).

46.     The DOL noted in the September 16, 2004 correspondence to Defendant Alongi and certain Funds Trustees that "[t]he Department understands that the fiduciaries have taken corrective action regarding the following issues," which included the DOL's finding that the Fund Office failed to properly allocate salary and common expenses. (App. 078-79 (Ex. 7)).

47.     In the September 16, 2004 correspondence, the DOL described one such "corrective action" as follows:

> We understand that the Fund Office retained the firm of Manzi & Associates, CPA to conduct an independent time and function study of the operations of the Fund Office; resolved to update the time and function study at six month intervals to ensure that the allocation remains objective and accurate; adopted a formal Administrative Services Agreement and requested and received reimbursements from both the SAV an Fair Funds for administrative expenses for the period 1997 to the date that the new time/function study allocation is implemented.

(App. 079 (Ex. 7)).

48.     The DOL resolved the issues in the audit based on, among other things, an agreement that time sheets would be kept by each Fund employee accounting for the work that they were doing for any of the specific Funds and related entities throughout their workdays. (App.007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7); App. 049-53 (Ex. 5)).

49.     As a result, it was agreed that all Fund employees would track their daily work for each Fund for whom they provided services in order to assure that the allocation of costs between the Funds was accurate and appropriate. (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7); App. 050-52 (Ex. 5)).

50.     To that end, and to ensure the proper allocation of shared expenses among the Funds and related entities, Defendant Alongi and counsel retained by the Funds negotiated an Agreement to Share Administrative Services and Office Space with the DOL substantially similar to the

Shared Services Agreement that remains in effect today. (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7); App. 049-53 (Ex. 5)).

51.     At all times relevant to this matter, the Shared Services Agreement negotiated with the DOL and still in effect today requires each Funds employee to maintain contemporaneous time records providing an allocation of the time they spend working on behalf of each Fund or Local 4 related entity throughout each day. (App.007 (Geiman Decl. ¶ 10); App. 078-79, 081 (Ex. 7); App. 050-52 (Ex. 5)).

52.     During the audit process, Defendant Alongi was the primary representative of the Funds in communications with the DOL and the outside professionals retained by the Funds to resolve the audit. Regarding her involvement in the Department of Labor audit conducted during the period 2003 – 2004, Defendant Alongi testified as follows:

> Q.     But from the a Local 4 funds perspective, you were the point person on this, correct?
>
> A.     Yes.

(App. 149 (Ex. 9, p. 77)).

53.     Defendant Alongi served as the Administrator for the Funds at the time that the audit was conducted, was the primary representative of the Funds in communications with the Department of Labor and the outside professionals retained by the Funds to resolve the audit, and was well aware that this reform was agreed to with the DOL as a crucial aspect of the resolution of that governmental audit. (ECF No. 1, ¶ 19; App. 007 (Geiman Decl. ¶ 11)).

54.     Defendant Alongi testified that she was the Funds' primary contact for the Department of Labor during the 2003 – 2004 audit:

> Q.     (By Mr. Gilligan) In terms of, though, the interaction with the Department of Labor investigator, who would speak to her on the Local 4 funds behalf?

> A.    Other than initially when this was going on, you know, when I was dealing with her, I think what happened was she was interacting with special counsel and Mary Sullivan directly.
>
> Q.    None of the trustees were interacting with her, were they?
>
> A.    No, not at all.
>
> Q.    And Laura-Jean wasn't interacting with them?
>
> A.    No.

(App. 147 (Ex. 9, p. 59-60)).

55.    On July 25, 2003, Defendant Alongi wrote an email to the Funds' former special counsel Joyce Mader regarding the Department of Labor audit, and copied the Funds' counsel and the Funds' former accountant. The subject line of the July 25, 2003 email was "Allocation Adjustment," and a document including a calculation of administrative expenses allocable to each Funds and related entities serviced out of the Fund Office was attached thereto. (App. 163-65 (Ex. 10)).

56.    In that July 25, 2003 email, Defendant Alongi wrote to former Funds' special counsel Joyce Made as follows:

> We finished our analysis of the admin allocation adjustment. Attached please find the results, before this is released to [DOL Investigator Roberta Muench] let's talk about it.
>
> Robert was correct in her assumption on day 1 that the pension plan was owed 100K. Sue will check with KPMG on whether we need to file amended 5500's. we will get KPMG opinion in writing.
>
> Joyce does the DOL plan on assessing any penalties for the prohibited transaction? Also, what about excise tax that maybe due?

(App. 163 (Ex. 10)).

57.    In a subsequent email on July 30, 2003, Defendant Alongi wrote to the Funds' former special counsel Joyce Mader regarding the DOL audit, and copied the Funds' counsel. The

subject line of the email was "Allocation Calculations with Interest," and a document including a calculation of administrative expenses misallocated and owed to each of the Funds and related entities serviced out of the Fund Office – with interest – during the years 1997 through 2002 was attached thereto. (App. 167-74 (Ex. 11)).

58.     The calculations, numbers, and totals in the "Allocation Calculations with Interest" document are very specific, and many run to the second decimal point. (App. 167-74 (Ex. 11)).

59.     In an email on July 31, 2003, Defendant Alongi wrote to the Funds' former special counsel Joyce Mader regarding the DOL audit, and copied the Funds' counsel. The subject line of the email was "Admin Calculations," and a document including a calculation of administrative expenses allocable to each of the Funds and related entities serviced out of the Fund Office was attached thereto. (App. 176-80 (Ex. 12)).

60.     The calculations, numbers, and totals in the "Admin Calculations" document include calculations of the principal and interest due to various Funds from other Funds or related entities serviced out of the Fund Office during the years 1997 – 2002. (App. 176-80 (Ex. 12)).

61.     Again, the numbers are very specific and run to at least two decimal places and, as Defendant Alongi notes in her cover email, the allocation numbers attributable to each Fund or related entity change "considerably" based on a slight change in the rounding of the numbers, much less a substantial change in the allocation. (App. 176 (Ex. 12)).

62.     Regarding the level of specificity required of the DOL for administrative cost allocations, Defendant Alongi testified as follows:

> Q.     If you look -- let's look at the very first -- where it indicates "unrounded 47.11 percent"; does that look right to you?
>
> A.     Yes.

> Q.      Okay. And was that something that Department of Labor was insisting upon, that level of precision?
>
> A.      I believe so.

(App. 147 (Ex. 9, p. 57)).

63.      On August 1, 2003, former special Funds' counsel Joyce Mader wrote an email to

the Senior Investigator handling the DOL audit and, among other things, noted to her that:

> We will be providing you with the results of the reallocation for your review. Gina and Mary are concerned that the allocation does not take into account the considerable time spent on HIPAA compliance for the welfare fund. They want you to see and be comfortable with the results of the reallocation before the assets are transferred.

(App. 182 (Ex. 13)).

64.      Regarding the August 1, 2003 email and the concern on her part that Ms. Mader

relayed to the DOL, Defendant Alongi testified as follows:

> Q.      Okay. There you go. I'd like to turn your attention to the third paragraph of Ms. Mader's e-mail. And specifically, the second sentence thereof. It says, "Gina and Mary are concerned that the allocation does not take into account the considerable time spent on HIPAA compliance for the welfare fund." Do you know what Ms. Mader's alluding to there?
>
> A.      I don't. I can say that, you know, when HIPAA was enacted, you know, there was a lot of correspondence that we had to send and comply with for the health & welfare fund. So maybe, you know, for that specific period of time that the allocation had to be tinkered with for the health & welfare fund only.
>
> Q.      So you were concerned, is a fair assessment, you were concerned about the possibility that the allocation for the welfare fund was being skewed by regulatory activity like HIPAA compliance?
>
> A.      Yes. Any major change to one of the funds.

(App. 148 (Ex. 9, p. 61)).

65.     In an email on August 4, 2003, Defendant Alongi wrote to the Funds' counsel and cced the Funds' former special counsel Joyce Mader regarding the DOL audit, and copied the Funds' counsel. The subject line of the email was "Outstanding Issues from DOL Audit," and among the issues Defendant Alongi lists as "outstanding," the following topics are listed first and second among a total of fourteen: "1. Admin Allocation (Manzi Time Study)" and "2. Adjustments to Allocation (How often, Timesheets, Etc)." (App. 184-85 (Ex. 14)).

66.     Defendant Alongi additionally testified that, following the DOL audit in 2003-2004, time sheets were the method by which employee time or activity spent on behalf of a certain Fund or related entity related to a new statue or enactment by the DOL or a regulatory agency:

> Q.     So it would directly correlate to how much employee activity was generated by the given law or regulation?
>
> A.     Yes.
>
> Q.     Okay. And how would that be captured?
>
> A.     In the time sheets.

(App. 148 (Ex. 9, p. 62)).

67.     An email from Defendant Alongi to the Funds' counsels and former accountant on December 29, 2003 circulated a timesheet for use in the Fund Office. Defendant Alongi described the document as follows:

> Attached please find the proposed time sheet for implementation January 5, 2004 to record our employees time. I would appreciate your comments.

(*sic*) (App. 187 (Ex. 15)).

68.     A document attached to the December 29, 2003 email from Defendant Alongi is titled "Local 4 Fund Office Weekly Timesheet By Fund" and includes the following categories for

15

Funds employees' completion: "Name," "Date," "Time in .25 .50 .75 1," "Brief Description," and "Enter code – ALL, HW, PEN, ANN, AT, CO, SAC, FAIR, DUES." (App. 189 (Ex. 15)).

69.    A second document attached to the December 29, 2003 email from Ms. Alongi is titled "Proposed Time Sheet Solution Effective January 5, 2004." (App. 190 (Ex. 15)).

70.    The document titled "Proposed Time Sheet Solution Effective January 5, 2004" which was attached to the email Defendant Alongi drafted and circulated to the Funds' counsels and former accountant provides that:

> Starting January 5, 2004, all employees that work on more than one fund must account for their time. To make this process east for the employee and to ensure we have accurate data to report to the auditors, the timesheets must be located in a central file.

(ECF No. 1, ¶ 27; App. 190; (Ex. 15)).

71.    The document titled "Proposed Time Sheet Solution Effective January 5, 2004" which was attached to the email Defendant Alongi drafted and circulated to the Funds' counsels and former accountant also includes recommendations regarding the implementation of the "Time Sheet Solution" at the Funds Office. (App. 187-90; (Ex. 15)).

72.    Defendant Alongi, while employed as Administrator, was a Fund employee and was subject to the same policies as other Fund employees, including the obligation to track her time so that the cost of her services could be appropriately allocated among the Funds, the Union, Labor Management Cooperation Trust, and the Social Action Committee. (ECF No. 1, ¶ 20; App. 050-52 (Ex. 5); App. 063 (Ex. 6)).

73.    As noted *supra*, the Shared Services Agreement sets forth the manner in which the collective administrative expenses of the Fund Office are allocated, such that the expense of each Fund employee is allocated among the entities who are part of this shared services arrangement. (App. 006-07 (Geiman Decl. ¶ 9); App. 050-52 (Ex. 5); App. 063 (Ex. 6)).

16

74.    The Trustees of the various Funds and affiliated entities adopted the Shared Services Agreement, which, as a result, constitutes a governing plan document for each of the Funds. (App. 007 (Geiman Decl. ¶ 10); App. 049-58 (Ex. 5)).

75.    Defendant Alongi, being deeply involved in the discussions with the DOL about how to address these concerns, and was personally aware of the requirement in the Shared Services Agreement that all individuals employed in the Fund office keep track of their time. (App. 007 (Geiman Decl. ¶ 11)).

76.    The Shared Services Agreement has been amended from time to time, but the terms relevant to this matter have remained unaltered and in full force and effect from the implementation of the Agreement through Defendant Alongi's termination. (App. 049-53 (Ex. 5); App. 063 (Ex. 6)).

77.    The Shared Services Agreement requires all employees to keep track of their time and, to the extent that they worked for Funds other than the Welfare Fund, to keep records of the time they devoted to each specific Fund or "Organization" as the Agreement terms it. The Shared Services Agreement provides, in part, that:

> The amount of staff time of employees of the Fund Office devoted to each Organization will be used as the basis for determining the allocable portion of general administrative expenses, staff salary, taxes and benefits, and common overhead expenses, including but not limited to office space, utilities, professional fees and computer costs. The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization be each employee of the Fund Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.
>
> …
>
> Each Organization will pay its respective share of shared administrative expenses on a monthly basis as provided in this Agreement.

(ECF No. 1, ¶ 27; App. 050-51, 052 (Ex. 5)).

78.     The Funds' Employee Handbook also includes this requirement. It provides as
follows:

> **All employees (exempt and non-exempt)** that work under the
> jurisdiction of more than one (1) Fund must complete a weekly
> timesheet (located in the Funds Public Drive > TimeSheet) to be
> turned in every Friday by 4 p.m. Timesheets are used to break down
> employees' hours (all hours, including overtime), spent on particular
> Funds. Employees with questions or concerns regarding this policy
> and procedure should consult with the Accounting Department.

(App. 063 (Ex. 6)) (emphasis added).

79.     Defendant Alongi - like any other Fund employee - was required to personally
adhere to the Funds' policies. Accordingly, Defendant Alongi was required to keep a daily time
sheet to track her time so the cost of her services could be appropriately allocated among the Funds,
the Union, the Labor Management Cooperation Trust, and the Social Action Committee. (App.
050-52 (Ex. 5); App. 063 (Ex. 6)). Regarding this issue, Defendant Alongi testified as follows:

> Q.     And am I correct, that it indicates there, under all employees, exempt or nonexempt,
> that work under the jurisdiction of more than one fund must complete a weekly
> time sheet located in the fund's public drive.
>
> A.     I see that.
>
> Q.     And that indicates all employees, correct?
>
> A.     Yes.
>
> Q.     Okay. And you were an employee of the Local 4 funds, correct?
>
> A.     Yes.
>
> Q.     And you were an employee who worked for more than one fund, correct?
>
> A.     Yes.

(App. 154 (Ex. 9, pp. 97-98)).

80.     Defendant Alongi failed to maintain accurate records of her working time despite the requirements of the Shared Services Agreement and despite the fact that she provided at least some services to each of the constituent Funds and related entities serviced in the Fund Office and that a she was the highest paid, and hence, most expensive employee working for the Funds. (ECF No. 1, ¶ 28; App. 008 (Geiman Decl. ¶ 13)).

81.     In fact, there is no record in the Fund Office of Defendant Alongi ever keeping such a time sheet, though Defendant Alongi testified under oath that she initially kept timesheets, only to abandon the process at a time she could not specify, but which was prior to the time period covered by this litigation. (App. 007 (Geiman Decl. ¶ 11); App. 155-57 (Ex. 9, pp. 106-17)).

82.     As noted *supra* herein, each of the Funds is governed by the terms of its applicable Trust Agreement. Each of the respective Trust Agreements, including that of the Welfare Fund, the employer of the Fund Office employees, provides that any action by the Fund can only be undertaken upon approval of a majority of the Trustees present at a meeting and that there must be at least four Trustees voting in order to constitute a quorum to take binding action. (App. 007-08 (Geiman Decl. ¶ 12); App. 021-22 (Ex. 2); App. 032-33 (Ex. 3)).

83.     At no time did a requisite quorum of Welfare Fund Trustees ever decide that Defendant Alongi was exempt from the time keeping requirement of the Shared Services Agreement. (App. 008 (Geiman Decl. ¶ 13)).

84.     Accurate reporting of work performed on behalf of each Fund by each employee through submission of the required timesheets, and the timesheets themselves, provide the basis for the Funds to allocate expenses attributable to each specific Fund in accordance with the explicit requirements of the Shared Services Agreement. (App. 050-52 (Ex. 5)).

85.     In accordance with the terms of the Shared Services Agreement, the allocations are ultimately used to determine a total percentage allocation that applies to expense charges and reimbursements for the next following year. (App. 050-52 (Ex. 5)).

86.     Instead of filling out the required daily time sheets, Defendant Alongi simply recycled from year to year earlier allocations of time that she had spent working for each Fund. (ECF No. 1, ¶ 28; App. 210-12 (Ex. 18)).

III.     **Defendant Alongi's Termination and the Schultheis & Panettieri LLP Audit**

87.     The Massachusetts Coalition of Taft-Hartley Funds ("Coalition") is an organization consisting of multiemployer health and welfare funds in the New England region.  (ECF No. 1, ¶ 30; App. 008-09 (Geiman Decl. ¶ 16)).

88.     The Coalition was organized to find ways to bring the combined purchasing power of its member health plans in the hopes of securing more favorable terms from various health care provider organizations – preferred provider organizations, health insurers, pharmaceutical benefit managers ("PBM"), dental and vision care providers – to combat the increasing cost of funding health care benefits to the unions' memberships. (ECF No. 1, ¶ 30; App. 008-09 (Geiman Decl. ¶ 16)).

89.     The Coalition is financed by an annual level dues assessment paid by each of the participating health and welfare plans on the basis of a monthly per capita assessment levied on the basis of the number of covered participants in the respective member plans, as well as the health vendors, consultants, and investment managers that also pay an annual assessment for access to the Coalition. (ECF No. 1, ¶ 30; App. 008-09 (Geiman Decl. ¶ 16)).

90.     The Coalition is a tax-exempt entity under Section 501(c)(3) of the Internal Revenue Code and is run by a Board of Directors and its Executive Director. (App. 008-09 (Geiman Decl. ¶ 16)).

91.     It is not affiliated with or in any way related to the Welfare Fund or any of the other Funds that are the Plaintiffs in the instant case; the only relationship between the Funds and the Coalition is that for a period of time the Welfare Fund was a dues paying member. App. 008-09 (Geiman Decl. ¶ 16)).

92.     Defendant Alongi served as the Executive Director of the Coalition during all times relevant to this matter, 2015 through July 21, 2020. (ECF No. 1, ¶ 31; App. 138 (Ex. 9, p. 27)).

93.     Coalition members may choose to adopt any of the Coalition negotiated arrangements with the classes of providers above noted but are not compelled to do so. (App. 008-09 (Geiman Decl. ¶ 16)).

94.     Each of the Coalition's participating plans' Trustees have the responsibility to decide whether such provider arrangements are in the best interests of their participants and beneficiaries. (App. 008-09 (Geiman Decl. ¶ 16)).

95.     Entitlement to participate in any of the Coalition negotiated arrangements is a function of belonging to the Coalition, such that the Welfare Fund could have taken advantage of any of the negotiated programs by virtue of its membership in the Coalition, not because Defendant Alongi served as the Executive Director of the Coalition. (App. 008-09 (Geiman Decl. ¶ 16)).

96.     After the Covid-19 pandemic took hold in March 2020, the Trustees closed the Funds Office and allowed employees to work from home. (App. 192 (Ex. 16); App. 503 (Ex. 48, p. 8)).

97.     By June of 2020, however, some of the Funds' key employees returned to the office, while others with significant health concerns, such as Defendant Alongi, were allowed to continue working from home. (App. 503 (Ex. 48, p. 8)).

98.     Although the employees were working at home, many employees fulfill time sensitive functions such as tracking and allocating reports of participant hours worked generated and submitted by employers to determine ongoing benefit eligibility, or determining whether a participant or beneficiary is entitled to a certain pharmaceutical or medical benefit or coverage.

99.     William McLaughlin, the Business Manager of Local 4 and Chairman of the various Boards of Trustees, implemented a procedure in which all Fund employees were required to keep a timesheet describing the work performed throughout the day. (App. 192 (Ex. 16); App. 503 (Ex. 48, p. 8)).

100.    These timesheets, which were similar to but separate from the timesheets required pursuant to the terms of the Shared Services Agreement and the Employee Handbook, were submitted on a monthly basis to Assistant Administrator Greg Geiman for review. (App. 192 (Ex. 16); App. 503 (Ex. 48, p. 8)).

101.    Due to her position as Administrator, however, Defendant Alongi's timesheets were submitted directly to Mr. McLaughlin to prevent her subordinate, Mr. Geiman, from having to track his immediate supervisor's productivity and work performance. (App. 192 (Ex. 16); App. 503 (Ex. 48, p. 8)).

102.    In early July 2020, Defendant Alongi submitted her timesheets to Mr. McLaughlin. He reviewed those timesheets and noted that in several entries Defendant Alongi logged work performed either on behalf of the Coalition or with individuals whom Mr. McLaughlin did not

recognize or knew to be individuals associated with benefit funds other than the Funds or the Coalition. (App. 192 (Ex. 16); App. 503-04 (Ex. 48)).

103.    Mr. McLaughlin was taken aback that the Funds Administrator was detailing work performed on behalf of a third-party entity during the Funds' regular business hours, and he asked Mr. Geiman for clarification or more context. Mr. McLaughlin and Mr. Geiman also shared this concern with Fund Counsel Kate Shea. (App. 192-93 (Ex. 16); App. 503-06 (Ex. 48)).

104.    Mr. Geiman spoke with fellow Assistant Administrator Laura-Jean Hickey, who served as Coalition Coordinator under Defendant Alongi's supervision.  In addition to providing clarification on the amount of work that had been performed by herself and other Fund employees during the workday, Ms. Hickey confirmed that Defendant Alongi had unilaterally promised a $30,000 wellness credit that the Welfare Fund received from Blue Cross Blue Shield, for the benefit of Local 4's participants and beneficiaries, to the Coalition for use at its wellness fair.  In the end, the fair was cancelled due to Covid-19, and the promised transfer of the Fund's asset to the Coalition was never consummated.  (App. 193 (Ex. 16); App. 507 (Ex. 48, p. 24)).

105.    Attorney Shea opined that best course of action in determining how much Coalition work Defendant Alongi performed during the workday would be to cross reference the entries of concern with Defendant Alongi's separate, DOL timesheets. When Rebecca Zaccardi, the Funds' inhouse accountant, was asked for those timesheets, she advised Mr. Geiman that Defendant Alongi did not keep or submit DOL timesheets. (App. 508-09 (Ex. 48, pp. 28-29); App. 007 (Geiman Decl. ¶ 11)).

106.    This revelation set off a chain of events – the Trustees had to grapple with the fact that the Funds' chief executive had not been complying with an important policy, that Fund resources and employee time had been improperly diverted to the Coalition, a stranger entity that

was not compensating the Funds at all for the use of these resources, and that the Funds' allocation of shared expenses was now known to be inaccurate since the most highly compensated individual working for the Funds had been revealed to have not kept required time records and was, in fact, devoting a substantial amount of her time to an entity outside of the Local 4 family of benefit Funds. (App. 192-95 (Ex. 16); App. 503-09 (Ex. 48)).

107.    The revelations described in Paragraphs 102-106 were brought to the attention of all of the Funds' Trustees, all of whom were unaware that these things were occurring. (App. 192-95 (Ex. 16); App. 503-510 (Ex. 48)).

108.    On July 21, 2020, Special Meetings of the respective Boards of Trustees of the Pension Fund, Health and Welfare Fund, and Annuity Fund were held, and the Boards voted unanimously to terminate Defendant Alongi's employment due to the egregious nature of the failure to maintain DOL time sheets and the inappropriate and unauthorized diversion of Fund assets to the Coalition. (ECF No. 1, ¶ 34; App. 192-95 (Ex. 16)).

109.    The Trustees additionally engaged the accounting firm Schultheis & Panettieri LLP to conduct the Audit of the time that Defendant Alongi was actively working during the period January 1, 2015 through July 21, 2020 to determine the degree to which Defendant Alongi may have damaged the Funds due to her failure to properly allocate her time and her diversion of plan assets for the benefit of the Coalition. (App. 083-134 (Ex. 8)).

110.    The Audit of Defendant Alongi's work activities included a review of her arrival times at the office by means of ascertaining when she entered the Fund Office via electronic key fob, her email activity on her Fund-provided email account, and call activity on both her office landline and Fund-provided cellular phone. (ECF No. 1, ¶ 34; App. 089, 127-31 (Ex. 8)).

111.    The Audit found that, at the Fund Office while Defendant Alongi served as Administrator, there were "significant weaknesses in controls surrounding cost allocations to the Coalition, where the former Fund Administrator also served as the Executive Director." (App. 087 (Ex. 8)).

112.    Based on the certified public accountants' review of the documents and data in this matter, as well as interviews with Funds employees, the Audit further determined as follows:

> We noted that it appears the Funds have an adequate system to track and request reimbursement for postage (for which identifying code is entered in the postage machine whenever mail is processed on behalf of the Coalition); however, the Funds do not have an adequate system to track labor, related taxes, and benefit costs incurred on behalf of the Coalition. In fact, timesheets were designed in a manner in which Fund Office employees were unable to allocate time to the Coalition. Furthermore, Fund Office employees were tacitly directed not to allocate time to the Coalition. Finally, the former Fund Administrator, whose allocation would be most significant and most sensitive, did not maintain a timesheet as required of all other employees.

(App. 087 (Ex. 8)).

113.    The certified public accountants that conducted the Audit analyzed a number of sets of data to determine whether Defendant Alongi's work on behalf of the Coalition occurred during regular Funds' business hours without making that time up by working for the benefit of the Funds outside of normal business hours:

> To evaluate if these efforts were performed during normal business hours (for which she received compensation and benefits from the Funds with no reimbursement from the Coalition) or outside of normal business hours, we analyzed incoming and outgoing calls from the former Fund Administrator's office phone, entry times from the former Fund Administrator's key fob noting time she entered the Fund Office, and cell phone calls from February 11, 2020 through July 23, 2020. Based on the following analyses, it appears the former Fund Administrator worked significantly less than the required seven hours per day and performed her duties as Executive Director of the Coalition during the reduced hours she was at the Fund Office.

(App. 088 (Ex. 8)).

114.     The analysis by Schultheis & Panettieri LLP found that during the period January 1, 2015 through July 21, 2020, Defendant Alongi was seldom at the Funds office when it opened at 8:00 a.m. and routinely arrived hours after the established start of the workday. (ECF No. 1, ¶ 35; App. 089, 127-31 (Ex. 8)).

115.     Defendant Alongi's average arrival time to the Funds Office for the years in question were as follows: 2015: 10:58 a.m.; 2016: a.m.; 2017: 10:28 a.m.; 2018: 9:55 a.m.; 2019: 9:50 a.m.; and 2020: 8:19 a.m. (ECF No. 1, ¶ 35; App. 089, 127-31 (Ex. 8)). A chart derived from the Fund Office entry key data demonstrating Defendant Alongi's arrival times is included in the Audit. (ECF No. 4; App. 127-31 (Ex. 8)).

116.     The forensic analysis of Defendant Alongi's computer, emails, and land and cellular phones shows that on the vast majority of days, her work activities ceased at or around 4:00 p.m. (ECF No. 1, ¶ 36; App. 088-89, 127-31 (Ex. 8)). A chart derived from Defendant Alongi's office phone data demonstrating and a chart derived from Defendant Alongi's cell phone data demonstrating this fact are included in the Audit. (ECF No. 4; App. 127-31 (Ex. 8)).

117.     Further analysis of Defendant Alongi's email and phone activity during the period in question demonstrate that she performed little or no work during weekends or after normal business hours during this time period. (ECF No. 1, ¶ 36; App. 088-89, 127-31 (Ex. 8)).

118.     There were very few outgoing calls made from Defendant Alongi's office phone after 4:00 p.m. (ECF No. 1, ¶ 36; App. 089, 127-31 (Ex. 8)).

119.     During the pandemic between March and July 2020, when Defendant Alongi did not have access to her office phone, the vast majority of calls made after 4:00 p.m. on her work-issued cell phone were to family or friends. (ECF No. 1, ¶ 37; App. 089, 127-31 (Ex. 8)).

120.    Over 95% of Defendant Alongi's emails during the period January 1, 2015 through July 21, 2020 were sent between the hours of 9:30 a.m. and 4:30 p.m. (ECF No. 1, ¶ 38; App. 089, 127-31 (Ex. 8)).

121.    Of the emails referenced in Paragraph 120, many were personal and Coalition-related emails sent from her Funds email account. (ECF No. 1, ¶ 38; App. 089, 127-31 (Ex. 8)).

122.    Of the total 22,000 emails sent during the period January 1, 2015 through July 21, 2020, only 523 were sent prior to 9:30 a.m. (roughly 2% of the total), and of those 523, 348 were sent in 2020 when she was largely working from home. (ECF No. 1, ¶ 38; App. 089, 127-31 (Ex. 8)).

123.    Defendant Alongi's email activity on weekends during the period January 1, 2015 through July 21, 2020 was even more scant, with only 69 emails sent, most of which appeared to be personal in nature. (ECF No. 1, ¶ 38; App. 089, 127-31 (Ex. 8)).

124.    If Defendant Alongi was performing ten (10) hours of work per week for the Coalition as she reported under penalty of perjury on the Form 990s, Defendant Alongi was spending in excess of 25% of her work time performing work for the Coalition rather than the Funds. (ECF No. 1, ¶ 39; App. 197-208 (Ex. 17)).

125.    Defendant Alongi unilaterally and in an *ultra vires* fashion diverted plan assets for her own benefit and that of a party unrelated to the Funds by whom she was employed. (ECF No. 1, ¶ 40; App. 085-134 (Ex. 8); App. 197-208 (Ex. 17)).

**IV.    Defendant Alongi's Failure to Keep Timesheets Rendered the Funds' Annual Expense Allocations Inaccurate, in Violation of Federal Law and the Funds' Governing Documents, Policies, and Procedures**

126.    The Shared Services Agreement provides that the Funds turn the data required to calculate the allocation of expenses applicable to each Fund and entity – including employee timesheets - over to their outside accountant on an annual basis. (App. 050-52 (Ex. 5)).

27

127.    The accountant calculates the amount of employee time spent working on each Fund during a specific period in the preceding year, and attributes a percentage of each employee's work to each Fund for which that employee performed work. (App. 050-52 (Ex. 5)); App. 210-12 (Ex. 18)).

128.    Those percentages are used to calculate the amount of the employees' salaries that will be paid by each respective Fund over a twelve-month period. (App. 050-52 (Ex. 5); App. 210-12 (Ex. 18)).

129.    For example, a time study conducted covering work performed during the months September 2014 through November 2014 was used to calculate the employee expense allocations for the period January 2015 through December 2015. (App. 050-52 (Ex. 5); App. 210-12 (Ex. 18)).

130.    The shared expenses allocations are extremely specific, running to four decimal places. (App. 210-12 (Ex. 18)).

131.    The shared expenses allocations for each and every Fund employee – with the exception of Defendant Alongi – applicable to each requisite Fund or entity experience shifts from year to year during the years 2015, 2016, and 2017 down to the fourth decimal point. (App. 210-12 (Ex. 18)).

132.    Every Funds employees' percentage allocation – save Defendant Alongi's – is derived from each respective employee's daily timesheets. (App. 156 (Ex. 9, p. 115); App. 050-52 (Ex. 5); App. 063 (Ex. 6); App. 210-12 (Ex. 18)).

133.    During the years 2015 through 2019 however, Defendant Alongi's shared expenses allocations remained exactly the same, save in 2016, when 10.0000% of her time was reallocated from the Health Fund to the Pension Fund.  (App. 210-12 (Ex. 18)).

134.    Accordingly, Defendant Alongi's shared expenses allocation percentage of work on behalf of seven separate entities – down to the fourth decimal point – remained *exactly* the same in 2016 and 2017, with *one* exception for 2015. (App. 210-12 (Ex. 18)).

135.    Upon further investigation after Defendant Alongi's work on behalf of the Coalition during regular Fund Office business hours came to light, it was determined that Defendant Alongi simply directed the Funds' inhouse accountant to advise Manzi & Associates, the Funds' outside accountant responsible for producing the allocation, that her time allocation had not changed because her duties vis a vis each of the Funds remained consistent. (App. 156-57 (Ex. 9, pp. 116-20)).

136.    Defendant Alongi, the most highly compensated Funds employee, by far – was having her services and compensation attributable to one Fund subsidized by another. (App. 049-52 (Ex. 5); App. 063 (Ex. 6); App. 210-12 (Ex. 18)).

137.    Defendant Alongi's supposed allocations to each of the Funds and related entities for work performed during the period 2015 through 2017 were as follows:

| Year | H&W | Pension | Annuity | A&T | Coop | SAC | Dues | Total |
|------|-----|---------|---------|-----|------|-----|------|-------|
| 2015 | 29.0000% | 48.7776% | 12.4667% | 4.3686% | 4.2457% | 0.0440% | 1.0974% | 100.0000% |
| 2016 | 19.000% | 58.7776% | 12.4667% | 3.0919% | 4.2457% | 0.4440% | 1.0974% | 100.0000% |
| 2017 | 19.0000% | 58.7776% | 12.4667% | 3.0919% | 4.2457% | 0.440% | 1.9741% | 100.0000% |

(App. 210-12 (Ex. 18)).

138.    Defendant Alongi testified that these allocations were in fact accurate, because the tasks she performed on behalf of these Funds and entities resulted in her performing the *exact* same number of hours of work for each of those Funds and entities – *to the fourth decimal point* – year in and year out. (App. 150-54 (Ex. 9, pp. 82-98)).

139.    Defendant Alongi testified that she did not spend *one hour* more working on matters for the Health Fund in the years following the passage of the Affordable Care Act and its implementing regulations than she had in prior years. (App. 150-54 (Ex. 9, pp. 82-98)).

140.    Defendant Alongi finalized and executed the Forms 5500 on behalf of the Funds, thereby averring to the federal government these false allocations. (App. 025 (Ex. 2)).

## V.    Defendant Alongi's Work for the Coalition

141.    During 2019, the last year for which a Form 990 for the Coalition was publicly available at the time the Complaint in this matter was filed, Defendant Alongi was paid $46,000 per year for her work for the Coalition, and she reported and averred that she performed ten hours of work per week in return for this compensation. (ECF No. 1, ¶ 31; App. 197-208 (Ex. 17)).

142.    All Form 990s dating back to at least 2013 contain this same report and averment that she worked ten hours per week for the Coalition. (ECF No. 1, ¶ 31; App. 197-208 (Ex. 17)).

143.    Defendant Alongi was regularly performing work for the Coalition during the Funds' standard workday of 8:00 a.m. to 4:00 p.m., a period of time for which she was supposed to be working for the sole and exclusive benefit of the Funds and their participants and beneficiaries and for which she was receiving total compensation in excess of $300,000 per year. (ECF No. 1, ¶ 33; App. 087-89 (Ex. 8)).

144.    During the time Defendant Alongi served as the Executive Director of the Coalition, she was party to a series of employment contracts titled "Agreement Executive Director Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." (App. 214-224 (Ex. 19)).

145.    The Agreement executed in October 2012 defines Defendant Alongi's responsibilities as the Executive Director. They include the following:

   a.    Prepare an agenda of the meetings of the Executive Board and Regular Meeting;

30

b.      Advise the members of the Coalition of legislation, events and issues of importance to them;

d.      To educate legislative and executive federal and state governments on matters of importance to the Coalition members;

e.      Arrange for the schedule of speakers to discuss topics of interest to Coalition members;

f.      Represent the Coalition on all matters requested by the Executive Board;

g.      Maintain the records of the Coalition;

h.      File require reports with regulatory agencies;

i.      To develop and propose better methods of providing and paying for health care, including investigation of possible arrangements with providers and other groups with a view to negotiating favorable rats for the Coalition members for such provider services or insurance and evaluate and develop the same for defined benefit and defined contribution plans.

(App. 221 (Ex. 19)) (*sic*).

146.   Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi travelling to and from and attending Coalition general membership and Executive Board meetings. (App. 226-29 (Ex. 20)). The Audit established that Defendant Alongi did not take paid time off from the Funds when she was engaged in travel for the Coalition, thereby getting paid by both organizations at the same time.  (App. 085-90 (Ex. 8)).

147.   Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi scheduling and participating in telephone conferences and in-person meetings with Coalition members, prospective members, and vendors during Fund Office business hours, utilizing Fund Office resources. (App. 231-49 (Ex. 21)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and

31

produced in discovery in this matter which evidence Defendant Alongi's actions outlined in this Paragraph.

148.    Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi reviewing documents, correspondence, and memos on behalf of the Coalition. (App. 251-84 (Ex. 22)). In several of the attached emails, Defendant Alongi forwards information, tasks, or work to Ms. Hickey for completion. (App. 251, 253, 260, 262, 276, 282-84 (Ex. 22)). In one attached email, Defendant Alongi also forwards Coalition work to Fund Office employee Rebecca Zaccardi for completion. (App. 281 (Ex. 22)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Defendant Alongi's actions outlined in this Paragraph.

149.    Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi participating in discussions and implementing various surveys of Coalition members and vendors. (App. 286-87 (Ex. 23); App. 402-06 (Ex. 35)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Defendant Alongi's actions outlined in this Paragraph.

150.    Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi actively seeking out new Coalition members and collecting membership applications and fees from so-called associate members and entities, particularly investment management firms, that performed services within the universe of Taft-

Hartley benefit funds and were promised access to fund administrators conditioned upon their payment of associate member dues to the Coalition. (App. 289-318 (Ex. 24)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Defendant Alongi's actions outlined in this Paragraph, and these emails also include illustrative examples of Defendant Alongi directing Ms. Hickey to perform work on behalf of the Coalition. The individual email chains are marked due to their use in depositions in this matter. (App. 289-318 (Ex. 24)).

151.    The Audit found that Defendant Alongi sent these emails and performed this work on behalf of the Coalition utilizing the Funds' resources during Fund Office normal business hours:

> Our analysis also revealed numerous emails during that time with a subject line referencing the Coalition, a very large majority of which occurred during times when the former Fund Administrator was receiving compensation from the Funds.

(App. 089 (Ex. 8)).

152.    Defendant Alongi has throughout these proceedings attempted to justify her unilateral diversion of Funds-financed resources for the benefit of the Coalition based on the erroneous premise that the Welfare Fund received substantial benefits by means of the various Coalition-negotiated arrangements for which she takes sole credit. (App. 321-24 (Ex. 25); App. 010 (Geiman Decl. ¶ 21)).

153.    The Funds received no more benefit from Defendant Alongi serving as Executive Director of the Coalition than they would have received had she simply been an unpaid participant at the Coalition's meetings because the Fund was entitled to receive any such benefits by virtue of its membership in the Coalition and the payment of its dues thereto.  (ECF No. 1, ¶ 32; App. 010 (Geiman Decl. ¶ 22)).

154. All other Coalition member funds were able to receive these benefits without having to make similar commitments of their personnel and resources. (App. 010 (Geiman Decl. ¶ 22)).

155. It has been many years since the Funds derived any discernible pecuniary benefit from the Coalition's agreements as the Welfare Fund ceased using many of the Coalition's preferred vendors and products. (ECF No. 1, ¶ 32; App. 010 (Geiman Decl. ¶ 21)).

156. More crucially, for the entirety of the time period relevant to this lawsuit, the Welfare Fund did not use the Coalition sponsored Union Blue insurance product touted by the Defendant in various filings with the Court as justifying her diversion of Fund resources; that product was discontinued by the Funds in 2014, at Defendant Alongi's recommendation, because it was cost prohibitive. (App. 010-11 (Geiman Decl. ¶ 23)).

157. After the Funds discontinued the Union Blue insurance product in 2014, the Welfare Fund had its own arrangement with Blue Cross Blue Shield of Massachusetts to provide medical, surgical, and hospitalization benefits to its participants. (App. 010-11 (Geiman Decl. ¶ 23)).

158. Moreover, at no time has the Welfare Fund used the pharmaceutical benefit manager arrangement negotiated by the Coalition to furnish prescription drug benefits to its participants, opting instead to obtain such coverage via an arrangement initially negotiated by the International Union of Operating Engineers, AFL-CIO, the parent union of IUOE Local 4. (App. 010-11 (Geiman Decl. ¶ 23)).

159. The arrangements outlined in Paragraphs 155-158 -- the provision of medical, surgical, and hospitalization costs and for those associated with the cost of providing prescription

drugs – account for nearly all benefit costs borne by the Welfare Fund. (App. 010-11 (Geiman Decl. ¶ 23)).

160.    In 2016, the Welfare Fund had total claims expenses of $44,296,420, which were comprised of the following:

- o  $33,530,710, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield;

- o  $6,971,162 in prescription drug claims paid through its PBM;

- o  $2,886,054 in dental claims;

- o  $364,243 for vision benefit;

- o  $44,200 for hearing benefits; and

- o  $429,651 for disability and death benefit claims.

(App. 011 (Geiman Decl. ¶ 24)).

161.    Of all of the classes of claims outlined in Paragraph 160, the only ones for which the Welfare Fund participants received coverage via a Coalition-negotiated provider was for vision and hearing. (App. 011 (Geiman Decl. ¶ 24)).

162.    Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.92% of the Fund's overall claims costs in 2016. (App. 011 (Geiman Decl. ¶ 24)).

163.    In 2017, the Welfare Fund had total claims expenses of $53,032,811, which were comprised of the following:

- o  $41,233,554, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield;

- o  $7,510,098 in prescription drug claims paid through its PBM;

- o  $3,360,207 in dental claims;

- o  $380,228 for vision benefits;

o   $16,536 for hearing benefits; and

o   $465,423 for disability and death benefit claims.

(App. 011-12 (Geiman Decl. ¶ 25)).

164.    Of all of these classes of claims outlined in Paragraph 163, the only ones for which

the Welfare Fund participants received coverage via a Coalition-negotiated provider was for vision

and hearing. (App. 011-12 (Geiman Decl. ¶ 25)).

165.    Thus, such Coalition-negotiated benefit providers were responsible for the payment

of just 0.75% of the Welfare Fund's overall claims costs in 2017. (App. 011-12 (Geiman Decl. ¶

25)).

166.    In 2018, the Welfare Fund had total claims expenses of $57,346,599, which were

comprised of the following:

o   $44,989,792, were attributable to the medical, surgical, and hospitalization benefits
    provided through its own arrangement with Blue Cross Blue Shield;

o   $7,304,380 in prescription drug claims paid through its PBM;

o   $3,402,358 in dental claims;

o   $375,885 for vision benefits;

o   $48,194 for hearing benefits; and

o   $480,703 for disability and death benefit claims.

(App. 012 (Geiman Decl. ¶ 26)).

167.    Of all of these classes of claims, the only ones for which the Welfare Fund

participant received coverage via a Coalition-negotiated provider was for vision and hearing. (App.

012 (Geiman Decl. ¶ 26)).

168.    Thus, such Coalition-negotiated benefit providers were responsible for the payment

of just 0.74% of the Fund's overall claims costs in 2018. (App. 012 (Geiman Decl. ¶ 26)).

36

169.    In 2019, the Welfare Fund had total claims expenses of $53,230,171, which were comprised of the following:

- o $43,332,746, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield;

- o $5,381,702 in prescription drug claims paid through its PBM;

- o $2,563,721 in dental claims;

- o $395,697 for vision benefits;

- o $27,297 for hearing benefits; and

- o $503,408 for disability and death benefit claims.

(App. 012-13 (Geiman Decl. ¶ 27)).

170.    Of all of these classes of claims, the only ones for which the Welfare Fund participants received coverage via a Coalition-negotiated provider was for vision and hearing. (App. 012-13 (Geiman Decl. ¶ 27)).

171.    Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.79% of the Fund's overall claims costs in 2019. (App. 012-13 (Geiman Decl. ¶ 27)).

172.    In her Answers to the Plaintiffs' Interrogatories, Defendant Alongi, at Answer No. 8, listed a number of projects that she claimed "provided direct savings to Coalition members, including the Funds…." (App. 321-24 (Ex. 25); App. 013 (Geiman Decl. ¶ 29)).

173.    Of the projects listed at Answer No. 8 for the relevant time period, only one item was negotiated through the Coalition and inured to the benefit of the Funds – a $.30 per member per month administrative fee reduction in 2015-2017. (App. 321-24 (Ex. 25); App. 013 (Geiman Decl. ¶ 29)).

174.    In real dollars, that would represent a savings to the Funds of approximately $10,000 (3,000 participants x 12 months x $.30) each year. (App. 013 (Geiman Decl. ¶ 29)).

175.   In the years 2016-2019, the Funds paid Defendant Alongi a total average compensation costs per year of cost per year of $338,658, which was comprised of the following averages:

- o   An average salary of $242,000;

- o   Contributions to two different defined benefit pension plans for her at an average cost each year of $31,815;

- o   Contributed to a defined contribution pension plan for her at a cost each year of $15,080;

- o   Fully employer-paid health insurance at a cost each year of $10,400; and

- o   An employer-provided Cadillac Escalade, and later a fully-loaded Ford Explorer, at an average cost each year of $39,363.

(ECF No. 1, ¶ 21; App. 013-14 (Geiman Decl. ¶ 30)).

176.   Thus, just the diversion of 3 percent of Defendant Alongi's time for the Funds to the Coalition would wipe out any of these purported savings she allegedly delivered by her work for the Coalition. (App. 013-14 (Geiman Decl. ¶ 30)).

177.   In her Answers to the Plaintiffs' Interrogatories, Defendant Alongi additionally asserts that she was engaged in other Coalition activities that somehow benefitted the Funds. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

178.   In February 2015, Defendant Alongi was involved in a time-consuming project (that was thus expensive for the Funds) with the New York Health Care Alliance on its PBM project that in no way affected the Funds' relationship with its PBM through the IUOE. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

179.   The March 8, 2017 bundled product discount that Defendant Alongi cites in her Answers to the Plaintiffs' Interrogatories was provided by Blue Cross to the Funds directly and had nothing to do with the Coalition. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

180.    Her assertion that the Fund received its prescription drug benefits through Blue Cross is incorrect.  (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

181.    The claimed emerging solutions "discounts" from September 8, 2018 and June 20, 2019 that Defendant Alongi cites in her Answers to the Plaintiffs' Interrogatories were in fact *additional* costs to the Fund for health solutions that were sold to Defendant Alongi, and then presented by her to the Coalition, that largely ended as expensive failures for the Welfare Fund. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

182.    Of the four programs listed in Defendant Alongi's Answers to Interrogatories, the Fund only maintains a relationship to this day with Hinge Health. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

183.    The Welfare Fund ceased being a Coalition member as of December 31, 2020. (App. 008-09 (Geiman Decl. ¶ 16)).

184.    In 2021 the Welfare Fund terminated its relationship with the Coalition-negotiated vision provider and entered a new relationship with a different provider that resulted in an equivalent cost to the Fund and a much larger network of vision care centers for the participants and beneficiaries to use.  (App. 013 (Geiman Decl. ¶ 28)).

185.    A new hearing provider was retained in 2022, resulting in a cost savings to the Fund and the same level of benefits for participants and beneficiaries. (App. 013 (Geiman Decl. ¶ 28)).

186.    The Pension, Annuity, and Training Funds, all of which share costs with the Welfare Fund, received no benefit whatsoever from paying for employees to work for the Coalition. (App. 010-11 (Geiman Decl. ¶ 23)).

## VI.    Defendant Alongi's Direction of Certain Funds Office Staff to Work for the Coalition

187.    Defendant Alongi directed Fund employees to perform work and provide services to the Coalition while being compensated by the Funds, while working within the Funds Office, using Fund resources and equipment. (ECF No. 1, ¶ 45; App. 087-89 (Ex. 8)).

188.    Interviews with Fund employees conducted by certified public accountants at Schultheis & Panetierri LLP and an analysis by the auditors of how these employees spent their time show that a substantial portion of the Funds' payroll expenses were in fact diverted to the benefit of the Coalition. (ECF No. 1, ¶ 47; App. 088-89 (Ex. 8)).

189.    All such work done on behalf of the Coalition was at the behest of and direction of Defendant Alongi, not at the direction of the Funds' Trustees. (App. 014 (Geiman Decl. ¶ 33); App. 231-32, 234, 241 (Ex. 21); App. 251, 253, 260, 262, 276, 281, 282-84 (Ex. 22); App. 286-87 (Ex. 23); App. 289-318 (Ex. 24)).

190.    The Funds received no compensation for the use of its personnel for Coalition business. (App. 088-90 (Ex. 8); App. 008-09 (Geiman Decl. ¶ 16)).

191.    In the Audit, the certified public accountants at Schultheis & Panettieri, LLP found as follows regarding this issue:

> Based on our interviews and analysis of Fund Office employees; email, it is apparent that the Coalition's operations were tightly integrated with the Fund Office and many of the Fund Office employees performed duties for the Coalition with no reimbursement. It appears Fund Office employees' Coalition efforts increased gradually to 2020, at which time significant Fund Office resources were being directed to the Coalition's inaugural "Wellness Fair" for which no time was tracked, allocated, or invoiced to the Coalition.

(App. 088 (Ex. 8)).

192.    In addition to Defendant Alongi directing Funds staff to perform work for the Coalition during normal business hours, she further directed Laura-Jean Hickey, the Funds' Assistant Administrator, to do the same and participate in directing Funds staff to perform work

for the Coalition during normal business hours. (App. 014 (Geiman Decl. ¶ 33); App. 231-32, 234, 241 (Ex. 21); App. 251, 253, 260, 262, 276, 282-84 (Ex. 22); App. 286-87 (Ex. 23); App. 289-318 (Ex. 24); App. 326 (Ex. 26)).

193.    Defendant Alongi, as Administrator, had the authority to hire, fire, promote, and demote Fund office employees. (App. 139 (Ex. 9, pp. 77-78)).

194.    Defendant Alongi testified that during her tenure as Administrator she recommended the allocation of wage or salary raises to specific Funds office employees at her discretion. (App. 140 (Ex. 9, p. 99)).

195.    The Audit determined that a substantial portion of the Funds' overall payroll expenses were diverted for the benefit of the Coalition; the Audit concluded as follows:

> We reviewed hundreds of emails documenting Coalition work performed by various persons during normal Fund Office business hours. Work performed included scheduling and planning all Coalition events and meetings, preparing all meeting materials, performing surveys on behalf of the Coalition, maintaining the books and records of the Coalition, maintaining the Coalition's website and continuously updating service provider and membership data, and orchestrating the inaugural Wellness Fair. Additionally, we interviewed several Fund Office employees who validated our findings.

(App. 089 (Ex. 8)).

196.    The following Fund Office employees provided services to the Coalition at Defendant Alongi's direction and devoted the noted estimated percentage of their time to such activities during the time covered by the Audit, rather than for the sole benefit of the Funds, their participants and beneficiaries, during the Funds' regular business hours, utilizing the Funds' resources: Rosemarie Alongi: 30%; Laura Jean Hickey: 30%; Taylor Ryan: 38%; Rosemary Ortega: 12.5%; Bettyann Trefry: 4%; Terri Berardi: 1%; Amy Boisvert: 1%; Rebecca Zaccardi: 1%. (ECF No. 1, ¶ 48; App. 088-89, 132-33 (Ex. 8)).

197.    Notwithstanding the fact that all Fund Office employees were required to track how they spent their workdays on time sheets, no records were kept of time devoted to Coalition work during normal business hours at the explicit or implicit direction of Defendant Alongi. (App. 087 (Ex. 8); App. 010 (Geiman Decl. ¶ 20)).

198.    As a result, the Funds have had to try to reconstruct the economic losses suffered by them resulting from this impermissible use of its personnel. (App. 084-90, 132-33 (Ex. 8); App. 010 (Geiman Decl. ¶ 20)).

199.    Rosemarie Alongi, Defendant Alongi's twin sister, worked in the Funds' IT Department. (App. 088 (Ex. 8)).

200.    Emails reviewed by Schultheis & Panettieri, LLP and produced in discovery in this matter establish that Rosemarie Alongi routinely updated and maintained the Coalition's website during the Funds' regular business hours, utilizing the Funds' resources, while being paid by the Funds. (App. 088 (Ex. 8)).

201.    In the Audit, the certified public accountants at Schultheis & Panettieri, LLP uncovered the following:

> During our analysis of documents included in emails, we noted monthly payments of $500 from the Coalition to 'Alongi Associates' for 'Web Maintenance' and noted correspondence indicating these services were performed during normal business hours. During our interviews, we verified that these were, in fact, payments to Rosemarie Alongi for IT services which appear to have been performed during normal business hours for which she received compensation and benefits from the Funds with no reimbursement from the Coalition.

(App. 088 (Ex. 8)).

202.    In January 2015, Rosemarie Alongi designed the Coalition's website utilizing Fund resources. (App. 328 (Ex. 27)). Rosemarie Alongi, from her Funds provided email account,

42

emailed an image of the Coalition's website to Defendant Alongi on her own Funds provided email account at 3:10 p.m. on Thursday, January 15, 2015. (App. 328 (Ex. 27)).

203.    In the subject line of that email, Rosemarie Alongi asks Defendant Alongi: "do you like it so far?" (App. 328 (Ex. 27)).

204.    Defendant Alongi subsequently replied that the Coalition's website designed by Funds employee Rosemarie Alongi, which was sent to her during Funds Office regular business hours from a Funds provided email account "Looks good". (App. 328 (Ex. 27)).

205.    Significant numbers of subsequent emails that demonstrate Rosemarie's performance of work on behalf of the Coalition during the Funds' regular business hours – along with contemporaneous DOL timesheets concealing that work – were uncovered by the Audit and in discovery in this matter. The work Rosemarie Alongi performed for the Coalition during the Funds' regular business hours and utilizing the Funds' resources included maintaining and updating the Coalition's website and adding new members, events, or announcements. (App. 330-49 (Ex. 28)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Rosemarie Alongi's actions outlined in this Paragraph. The individual email chains, and accompanying DOL timesheets that result in calculation of a full day's work but do not include reference to or a time deduction for the work performed for the Coalition, are marked due to their use in depositions in this matter. (App. 330-49 (Ex. 28)).

206.    Notably, Rosemarie Alongi never listed time worked on behalf of the Coalition on the timesheets she was required to keep in accordance with the Shared Services Agreement and the Funds' Employee Handbook, despite the fact that emails establish that she was performing that work during the Funds' normal business hours. (App. 330-49 (Ex. 28)).

207.    Emails reviewed by Schultheis & Panettieri, LLP and produced in discovery in this matter further established that, at Defendant Alongi's direction, Rosemarie applied pressure on prospective IT service providers to join the Coalition and submit membership fees during the Funds' regular business hours and utilizing the Funds' resources. (App. 351-60 (Ex. 29)). The individual email chains are marked due to their use in depositions in this matter.

208.    The Senior Director of CMIT Solutions, an IT service provider, emailed Defendant Alongi and, after noting that CMIT Solutions had "been active with members of the Coalition ensuring their IT Infrastructure support for workstation, servers, and more," asserted that she wanted to "circle back with you specifically to see if perhaps it is timely for Local 4 to look at CMIT's IT support for your infrastructure." (App. 352 (Ex. 29)).

209.    To that end, the Senior Director of CMIT Solutions asks "[m]ight there be an opportunity to schedule a call to check in on your current needs?" (App. 352 (Ex. 29)).

210.    In response, Defendant Alongi forwarded the email to Rosemarie Alongi, and asked Rosemarie whether she "[w]ould be willing to call her?" (App. 352 (Ex. 29)).

211.    Rosemarie responded that she would do so, but she noted that "the services they offer we already have in place throughout the infrastructure." (App. 353 (Ex. 29)).

212.    Nonetheless, and without providing any basis or detail, Defendant Alongi responded to Rosemarie Alongi as thus: "She's very nice. Maybe you can meet with her." (App. 353 (Ex. 29)).

213.    During the period prior to and for about a year following August 24, 2018, a company named Rapid 7 provided IT services to the Funds. On Friday, August 24, 2018, at 1:40 p.m., Rosemarie Alongi sent an email form her Funds provided email account to Rapid 7 and conveyed the following information and request:

Gina asked me if Rapid 7 would have interest in becoming an associate member with the Mass. Coalition. There is an opening to present in September at the Carpenters Union and it would be a great opportunity for Rapid 7 to pick up some other Fund Offices.

The cost is 1500 annually –> [hyperlink provided]

More information –> [hyperlink provided]

Let me know asap if you have interest so Gina can schedule you for the meeting.

(App. 356 (Ex. 29)).

214.    Later that same day, an individual from Rapid 7 responded to Rosemarie Alongi's

email as follows:

Thanks for passing this along! That's an impressive list of associate members. I sent this information to my Director and will let you know if it's something that we can do.

(App. 356 (Ex. 29)).

215.    The same individual from Rapid 7 sent a follow up email in which he observed and

asked the following:

There are a ton of really good names on the list of members. Question for you (and maybe Gina/Greg?) – if we were to present our Managed Detection & Response service to thar audience, would it be interesting/impactful to them? Typically what title of folks attend those meetings? (ie CEO, CFO, CISO, CTO, General Counsel etc).

(App. 355 (Ex. 29)).

216.    Rosemarie Alongi subsequently emailed Defendant Alongi on Monday, August 27,

2018 at 10:03 a.m. from her Funds provided email account and asked: "Did you respond to [the

individual from Rapid 7]?" Defendant Alongi responded that same day, Monday, August 27, 2018

at 10:59 a.m. – from her Funds provided email account via iPhone – and said, "[n]ot yet can we

call him?"  (App. 355 (Ex. 29)).

217.     Rosemarie Alongi responded, again from her Funds provided email account during the Funds' regular working hours, that "I would send him an email and ask to see that time he is available." (App. 354 (Ex. 29)).

218.     Defendant Alongi responded shortly thereafter, again during the Funds' normal business hours and from her Funds provided email account, this time on a computer, and instructed Rosemarie Alongi to do so herself. She wrote: "Can you see if he's available at 11:30". (*sic*) (App. 354 (Ex. 29)). Rosemarie complied with Defendant Alongi's directive. (App. 354 (Ex. 29)).

219.     Rosemarie Alongi emailed the individual from Rapid 7 that same day, during the Funds' normal business hours and from her Funds provided email account, and asked whether the individual was "available for at 11:30 for a quick call with Gina?" (App. 358 (Ex. 29)). The individual from Rapid 7 responded that he was unavailable at the requested time, but that he could be available later that same week for a telephone conference with Defendant Alongi. (App. 358 (Ex. 29)).

220.     Rosemarie Alongi responded to that email as follows:

Let me check with Gina regarding Wednesday. By the way, I received an invoice from Rapid 7 today and they charged us tax on the invoice. I sent an email to the person it came from and he said he would make an adjustment and never received another invoice?

(App. 358 (Ex. 29)).

221.     On Friday, September 7, 2018 at 2:00 p.m., Rosemarie Alongi sent the same individual from Rapid 7 an email during the Funds' normal business hours, utilizing her Funds provided email account. The subject line of the email was "Follow up" and Rosemarie's email read: "Gina asked me if I heard from you regarding the Coalition she is trying to finalize the agenda." (App. 360 (Ex. 29)). On September 11, 2018 at 11:42 a.m., Rosemarie Alongi sent the same individual from Rapid 7 an email during the Funds' normal business hours, utilizing her

Funds provided email account. The email forwarded the previously sent September 7, 2018 email and provided the following in bold:

> Good morning!
>
> I hope you are doing well [emoji] can you please respond to the below email so we know if Rapid 7 has interest.
>
> Thank you.

(*sic*) (App. 359 (Ex. 29)).

222.     The individual from Rapid 7 sent a responsive email shortly thereafter on that same day, and advised Rosemarie Alongi as follows:

> Hi Rosemarie – thanks for reaching out! I spoke with my management and unfortunately our marketing dollars have already been spent for the year. They've made a note to try to include it in next years budget.

(*sic*) (App. 359 (Ex. 29)).

223.     Rosemarie Alongi responded to the same individual from Rapid 7 during the Funds' normal business hours, utilizing her Funds provided email account, and notified the individual that she would "inform Gina so she can finalize the agenda." (App. 359 (Ex. 29)).

224.     Laura-Jean Hickey served as Assistant Administrator of the Funds under Ms. Alongi. In addition to working for the Funds, Ms. Hickey served as "Coordinator" for the Coalition at Defendant Alongi's request. (App. 158 (Ex. 9, pp. 130-31)).

225.     For serving as Coordinator, Ms. Hickey received compensation at a rate of $25 to $30 per hour during the period January 1, 2015 through July 21, 2020, and was required to complete all work assigned by Defendant Alongi, while being instructed to not to exceed twenty hours of work per month. (App. 088 (Ex. 8)).

226.     Defendant Alongi, as Executive Director of the Coalition, was fully aware of the work Ms. Hickey was performing and, as her immediate supervisor, she was further aware that

Ms. Hickey was performing work on behalf of the Coalition at the Funds office during regular business hours, and she was directing her to do so. (App. 014 (Geiman Decl. ¶ 33); App. 231-32, 234, 241 (Ex. 21); App. 251, 253, 260, 262, 276, 282-84 (Ex. 22); App. 286-87 (Ex. 23); App. 289-318 (Ex. 24)). Defendant Alongi admitted in sworn testimony that she assigned Ms. Hickey the work she performed on behalf of the Coalition:

> Q.      Did you maintain the records of the coalition; did you do that?
>
> A.      Laura-Jean did that.
>
> Q.      Laura-Jean did that. Did the coalition have an agreement with Laura-Jean?
>
> A.      No.
>
> Q.      So is it fair to say, you're the one who assigned that work to Laura-Jean?
>
> A.      Yes.

(App. 158 (Ex. 9, pp. 130-31)).

227.    Ms. Hickey advised the certified public accountants at Schultheis & Panettieri LLP conducting the Audit that, although she "used her best efforts to make up any time performing Coalition duties during lunch and before or after normal business hours (8:00AM to 4:00PM) she estimated that 30% of her efforts for the Coalition occurred during normal business hours for which she received compensation and benefits from the Funds." (App. 088 (Ex. 8)).

228.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included drafting, reviewing, and finalizing Coalition meeting and event agendas and organizing and maintaining various Coalition documents and materials. (App. 362-70 (Ex. 30)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

229.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included coordinating surveys among Coalition members and vendors. (App. 372 (Ex. 31)). The email attached hereto is just an example of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

230.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included scheduling and facilitating telephone conferences during regular business hours with Coalition members, prospective members, and service providers. (App. 374 (Ex. 32)). The email attached hereto is just an example of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

231.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included contacting event vendors and prospective venues and generally planning and attending Coalition events, Wellness Fairs, and holiday parties. (App. 376-94 (Ex. 33)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

232.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included Ms. Hickey's directing other Funds employees to perform administrative work on behalf of the Coalition. (App. 326 (Ex. 26)). The email attached hereto is just an example of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

233.    Although Ms. Hickey served as the Coalition "Coordinator" at Defendant Alongi's request, unlike Defendant Alongi, Ms. Hickey did not have a written agreement or contract with the Coalition. (App. 214-24 (Ex. 19); App. 158 (Ex. 9, pp. 130-31)).

234.    Ms. Hickey is not a party to any contract with the Coalition, and no document places responsibility for these tasks on her shoulders. (App. 214-24 (Ex. 19)).

235.    Responsibility for completing the work on behalf of the Coalition listed in the "Agreement Executive Director Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." started, stopped, and ended with Defendant Alongi. (App. 221-23 (Ex. 19); App. 158 (Ex. 9, pp. 130-31)).

236.    Funds employee Taylor Ryan was tasked with seeking and analyzing product information from various vendors and rental services for purposes of preparing for Coalition events and the Coalition's Health Fair and with tracking address and contact information for, and sending various communications to, Coalition members and service providers on behalf of the Coalition. (App. 396-400 (Ex. 34)). Additionally, Defendant Alongi assigns Coalition work to Ms. Ryan by forwarding the same to Ms. Ryan, without comment or a subject line in the email, and Ms. Ryan completes the same. (App. 396-400 (Ex. 34)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Ryan's actions outlined in this Paragraph.

237.    In addition to routinely providing administrative services for the Coalition as described above, Ms. Ryan was also tasked comprehensive, time-consuming projects. (App. 402-16 (Ex. 35)).

238.    Ms. Ryan was instructed to review the zip codes for thousands of participants and beneficiaries of other New England multiemployer fringe benefit funds for purposes of advising

the appropriate members of Congress regarding a lobbying effort undertaken by the Coalition that participants and beneficiaries of Coalition member funds could be adversely impacted by proposed regulations pending before the federal government. (App. 402-16 (Ex. 35)). The hundreds of pages of .excel data including thousands of zip codes are omitted for ease of reference, but pertinent emails and an example of the format of the zip code data are included in the attached Appendix at Exhibit 35. (App. 402-16 (Ex. 35)).

239.    The emails establish that Ms. Ryan was reviewing thousands of zip codes and compiling data regarding the same for separate multiemployer fringe benefit funds affiliated with the following local unions located in New England: the "Massachusetts Laborers", Local Union 223, affiliated with the International Brotherhood of Electrical Workers, and a local union affiliated with the "Iron Workers" during the Funds' regular business hours, utilizing the Funds' resources. (App. 402-16 (Ex. 35)).

240.    As Ms. Ryan testified during deposition testimony, this "Zip Code Project" was "a big thing ... [l]ike a big time-consuming project." (App. 420 (Ex. 36, p. 148)).

241.    Ms. Ryan testified as follows regarding the amount of time she worked on behalf of the Coalition on the Funds' time, utilizing Funds resources:

A.    I've told you as much as I remember. I remember doing a spreadsheet performing some tasks pertaining to ZIP codes while at Local 4.

Q.    Do you remember how long it took?

A.    A very long time.

Q.    More than a day?

A.    Yes.

Q.    More than a week?

A.    Probably.

Q.      More than a month?

A.      Maybe. I don't remember.

Q.      But it took more than a week?

A.      Yes.

(App. 420 (Ex. 36, p. 145)).

242.    All of this work occurred during time that Ms. Ryan was being paid by the Funds, to perform work on behalf of the Funds. (App. 402-16 (Ex. 35); App. 420 (Ex. 36)).

243.    Funds employee Rosemary Ortega was tasked with purchasing materials on behalf of the Coalition at Defendant Alongi's direction, during the Funds' normal business hours, while being paid to work for the Funds. (App. 422-33 (Ex. 37)).

244.    Ms. Ortega was also tasked with reviewing, compiling, organizing, preparing binders of materials for Coalition meetings and mailings at Defendant Alongi's direction, during the Funds' normal business hours, while being paid to work for the Funds. (App. 422-33 (Ex. 37)).

245.    Ms. Ortega was also tasked with leaving the Fund office during the Funds' normal business hours to pick up and arrange lunches required for Coalition meetings. (App. 425 (Ex. 37)).

246.    Ms. Ortega was also tasked with inputting Coalition tasks, meetings, and events into Defendant Alongi's calendar during the Funds' normal business hours, while being paid to work for the Funds. (App. 422-33 (Ex. 37)).

247.    This work on behalf of the Coalition was performed at Defendant Alongi's direction and with her knowledge. (App. 326 (Ex. 26)).

248.    On June 9, 2015, Ms. Hickey sent an email to the Coalition's "Scholarship Committee Members," which included Defendant Alongi, and forward a number of documents related to scholarship applications received by the Coalition. (App. 326 (Ex. 26)).

249.    Defendant Alongi replied to Ms. Hickey on Wednesday, June 17, 2015 at 11:17 a.m., during the Funds' normal business hours, and instructed as follows:

> Can you have Rosemary print all the scholarships for me to read this evening.
>
> Thank you.

(*sic*) (App. 326 (Ex. 26)).

250.    Ms. Hickey responded as follows:

> I'll have Terri do it since Rosemary is on book duty. You'll have a binder made up for your reading pleasure!

(App. 326 (Ex. 26)).

251.    When Ms. Ortega was presented with exhibit after exhibit demonstrating the frequency of her work on behalf of the Coalition, she testified as follows when asked "[w]ell, sitting here today, would you say that your performed a lot of work for Laura-Jean as assigned by Gina?":

A.      Well, sir, I didn't initially. But now after seeing all these emails, yes, I did.

Q.      So Gina is ultimately assigning this Coalition work?

A.      I think that she is dealing with Laura-Jean to get the work done, and Laura-Jean is dealing with me to help her get the work done.

Q.      Based on the e-mails, you would say that Gina was aware of that, wouldn't you?

A.      Yes.

(App. 438 (Ex. 38, p. 159)).

## VII.    Cashing Out Vacation Time without Authorization by Trustees

252.    The terms and conditions of employment of Fund employees are set forth in the Welfare Fund's Employee Handbook, which, among other things, delineates the amount of paid vacation to which employees, including the Fund Administrator, are entitled. (App. 070-71 (Ex. 6); App. 008 (Geiman Decl. ¶ 14)).

253.    As part of her compensation package, Defendant Alongi was permitted to take four weeks of paid vacation each year. (ECF No. 1, ¶ 53; App. 070-71 (Ex. 6); App. 008 (Geiman Decl. ¶ 14)).

254.    Pursuant to the Funds' Employee Handbook, four weeks of paid vacation constitutes the "maximum vacation time allowable." (ECF No. 1, ¶ 53; App. 071 (Ex. 6)).

255.    Starting in 2013, unbeknownst to the Trustees and without proper approval from them, Defendant Alongi began taking an additional two weeks of vacation over and above the allotment of four to which she was entitled. (ECF No. 1, ¶ 54; App. 085-86, 096-98 (Ex. 8)).

256.    During the period January 1, 2015 through July 21, 2020, Defendant Alongi engaged in a practice of cashing out this additional two weeks of vacation in the middle of the year, in effect, awarding herself, in a unilateral and *ultra vires* fashion, an extra two weeks of salary. (ECF No. 1, ¶ 55; App. 085-86, 096-98 (Ex. 8)).

257.    In the Audit, the certified public accountants at Schultheis & Panettieri LLP uncovered that "[c]ommencing in 2013, the former Fund Administrator received an additional two weeks' vacation per year for which we were unable to obtain documented Trustee approval." (App. 085-86 (Ex. 8)).

258.    During the period January 1, 2015 through July 21, 2020, Defendant Alongi engaged in the practice of "cashing out" this additional two weeks of vacation *in the middle of*

*the year*, in effect awarding herself, in an *ultra vires* fashion, an extra two weeks of salary. In the

Audit, the certified public accountants at Schultheis & Panettieri LLP determined as follows:

> The Fund Office Employee Handbook states that unused vacation days will be
> bought back annually. From 2015 through 2020, we noted ten (10) instances where
> partial vacation buyouts to the former Fund Administrator and her sister were paid
> during the year, rather than at the end of the calendar year when other Fund office
> employees' vacation buyouts were processed. It is our understanding that these
> payments were directed by the former Fund Administrator and only the former
> Fund Administrator and her sister were granted this opportunity.

(App. 085-86 (Ex. 8)).

259.    In 2015, 2017, 2018, 2019, and 2020, Defendant Alongi received an additional 80

hours each year, of compensation in this fashion. (ECF No. 1, ¶ 56; App. 085-86, 096-98 (Ex. 8)).

260.    In 2016, Defendant Alongi received an additional 64 hours of compensation in this

fashion. (ECF No. 1, ¶ 56; App. 085-86, 096-98 (Ex. 8)).

261.    Defendant Alongi ordered Fund Office staff to issue her a check for these vacation

hours without withholding for taxes in each of the years 2015, 2016, 2017, 2018, 2019, and 2020

at a total cost to the Funds of $49,849.20. (ECF No. 1, ¶ 57; App. 085-86, 096-98 (Ex. 8)).

262.    John J. Shaughnessy, Jr., a former management Trustee of the Health and Welfare,

Pension, and Annuity & Savings Funds executed an Affidavit in support of Defendant Alongi in

which he asserted that "[i]n or around 2013, I specifically recall that then Business Manager Lou

Rasetta and I approve an additional two weeks of vacation time for Ms. Alongi to use or cash out

annually." (App. 440 (Ex. 39)).

263.    Former Union Business Manager and Chairman of the Boards of Trustees Louis

Rasetta executed a substantially similar Affidavit in which he claimed that "[i]n or around 2013, I

suggested giving Defendant Alongi an additional two weeks of vacation time to use or cash out

annually because of her dedication, work ethic and her performance as Administrator for the Funds." (App. 443-45 (Ex. 40)).

264.    Both Mr. Rasetta and Defendant Alongi admitted in deposition testimony that, during a period of disputed or uncertain length prior to 2013, they engaged in a sexual relationship. (App. 161 (Ex. 9, pp. 71-72); App. 449-50 (Ex. 41, pp. 36-37)).

265.    Mr. Shaughnessy testified under oath that he was not aware of the fact that Mr. Rasetta and Defendant Alongi engaged in a sexual relationship. (App. 457 (Ex. 42, 67-68)).

266.    The Health Fund Trust Agreement, the document that serves to establish and govern the Welfare Fund, provides, in pertinent part, as follows:

Section 4.1 The Fund shall be administrated by a Board of Trustees which shall consist of three (3) trustees designated by the Union and three (3) trustees designated by the Association (one (1) by each Employer Organization).

Section 5.1 The Board of Trustees shall have the power to administer the Fund and to administer and maintain the Health and Welfare Plan in effect, having and performing all powers and duties reasonably necessary to maintain and operate the Plan in such a way to accomplish its objectives.

Section 5.8 (C) Without limitation of the provisions of Section 5.1 of this Article, the Board of Trustees shall have the power: [t]o employ such executive, consultant, actuarial, administrative, clerical, secretarial and legal counsel (who may be counsel for the Union, Association or Employer) and other employees and assistants, as may be necessary in connection with the administration of the Fund and the Plan and to pay or cause to be paid, out of the Fund, the compensation and necessary expenses of such personnel and assistants and the cost of office space, furnishing and supplies and other essentials required in such administration.

Section 6.2 The Board shall keep Minutes of all meetings but such minutes need not be verbatim. Copies of the minutes shall be sent to all Trustees.

Section 6.3 To constitute a quorum for the transaction of business not less than two (2) Employer Trustees and two (2) Union Trustees shall be present in person. The Board shall not take any action or make any decision on any matter coming before it or presented to it for consideration or exercise any power or right given or reserve to it or conferred upon it by this Trust Agreement except upon the concurrence of at least two (2) Union Trustees and two (2) Employer Trustees.

(App. 027-33 (Ex. 3)).

267.    Thus, at least four (4) Trustees are required to constitute a quorum, and Trustees are forbidden from "tak[ing] any action or mak[ing] any decision on any matter coming before it or presented to it for consideration" without such a quorum. (App. 027-33 (Ex. 3)).

268.    Despite his written testimony in his Affidavit, Mr. Rasetta testified under oath that he unilaterally granted this unearned compensation to Defendant Alongi, and that the compensation was granted *on a one-time basis* in 2013:

Q.:    So it wasn't in lieu of cash. She was given two weeks vacation. She could either take two extra weeks of vacation that she could either take as vacation or take as cash, right?

A.:    Right.

Q.:    You didn't seek any board approval for doing that?

A.:    No.

Q.:    And you didn't discuss that with anyone else?

A.:    No.

Q.:    So she just started getting an extra two weeks of vacation?

A.:    One two-week vacation.

Q.:    Just in the year 2013?

A.:    Yes.

(App. 451 (Ex. 41, p. 154)).

269.    Mr. Shaughnessy testified under oath in his deposition that the Board of Trustees were never presented with, and never approved, this grant of additional compensation to Defendant Alongi. (App. 455-56 (Ex. 42)).

270.    A review of Fund records shows no action by a required quorum of Trustees to approve paid vacation in excess of the aforementioned four-week allotment provided for in the Employee Handbook.  (App. 008 (Geiman Decl. ¶ 15)).

271.    Defendant Alongi subsequently cashed out this unearned and unapproved compensation on a subsequent annual basis. (App. 085-86, 096-98 (Ex. 8); App. 008 (Geiman Decl. ¶ 15)).

272.    Defendant Alongi knew the amounts were not approved by the Trustees, and she exercised discretionary control over the Funds' assets when she instructed Funds' staff to issue the untimely payments in violation of the Funds' Employee Handbook, as well as untimely vacation buyout payments to her twin sister Rosemarie. (App. 070-71 (Ex. 6); App. 085-86, 096-98 (Ex. 8)).

**VIII.   Defendant Alongi's Failure to Work Hours for Which She was Compensated**

273.    As befits a highly compensated executive, the Trustees hired Defendant Alongi to be a full-time employee and to be present at the Fund office and devote at least 35 hours per week to overseeing the operations of the Funds and to supervise its employees in the performance of their tasks for the participants and beneficiaries of the Funds. (ECF No. 1, ¶ 61; App. 146 (Ex. 9, p. 12); App. 002 (Geiman Decl. ¶ 2)).

274.    The respective Boards of Trustees employed Defendant Alongi to be a full-time employee and to be present at the Funds office to oversee the operations of the Funds and to supervise the Funds employees in the performance of their tasks for the participants and beneficiaries. (App. 002 (Geiman Decl. ¶ 2)). Defendant Alongi testified as follows during her deposition:

> Q.    Would you say, though, that you, as the administrator, were ultimately responsible for the work of all the employees?

58

A.      Ultimately, yes.

(App. 146 (Ex. 9, p. 10)).

275.    The Audit conducted by Schultheis & Panettieri LLP shows that, in addition to the time impermissibly spent on Coalition business, Defendant Alongi routinely failed to work anything like a full-time schedule during the period January 1, 2015 through December 31, 2019. (ECF No. 1, ¶ 62; App. 089, 127-31 (Ex. 8)).

276.    Only after the Chairman of the Boards of Trustees directed Defendant Alongi to be in the office by the start of the business day in January 2020, did Defendant Alongi commence working closer to full days for the Funds. (ECF No. 1, ¶ 62; App. 089, 127-31 (Ex. 8); App. 143 (Ex. 9, p. 183)).

277.    The Funds' Employee Handbook provides that "[t]he regular working hours of the Funds Office are 8:00 a.m. – 4:00 p.m." (App. 067 (Ex. 6)).

278.    As established in Paragraph 115 herein, Defendant Alongi routinely arrived to work hours after the Funds' 8:00 AM business hours commenced. (ECF No. 1, ¶ 63; App. 089, 127-31 (Ex. 8)).

279.    In the Audit, the certified public accountants at Schultheis & Panettieri LLP uncovered that "[t]here is no record of the former Fund Administrator entering the Fund Office prior to 8:00AM from 2015 through 2019." (App. 089, 127-31 (Ex. 8)).

280.    Defendant Alongi did not make up for this late arrival by either working past the closing time of 4:00 p.m. or on weekends; all records indicate that she simply worked an abbreviated day on top of performing the ten (10) hours of work for the Coalition during the week. (ECF No. 1, ¶ 64; App. 089, 127-31 (Ex. 8)).

281.    The Audit conducted by Schultheis & Panettieri LLP provides that during the period January 1, 2015 through December 31, 2019, Defendant Alongi worked substantially less than a seven (7) hour day. (ECF No. 1, ¶ 65; App. 089, 127-31 (Ex. 8)).

282.    Instead, Defendant Alongi worked an average of the following hours per day, during the requisite years listed below: 2015: 5.25; 2016: 5.5; 2017: 5.75; 2018: 6.25; 2019: 6.25. (ECF No. 1, ¶ 65; App. 089, 127-31 (Ex. 8)).

283.    The total hours per day outlined in Paragraph 274 include the two (2) hours per day that Defendant Alongi averred, under penalty of perjury in the Form 990s, to have worked for the Coalition during those years. (ECF No. 1, ¶ 65; App. 089, 127-31 (Ex. 8); App. 197-208 (Ex. 17)).

284.    Defendant Alongi deprived the Funds of their reasonably expected hours of service, leading to her being substantially overpaid for the limited time that she actually spent on her job as Administrator. (ECF No. 1, ¶ 66; App. 089-135 (Ex. 8)).

285.    By virtue of so doing, Defendant Alongi received excess compensation in the amount of $282,152 during the period January 1, 2015 through December 31, 2019. (ECF No. 1, ¶ 67; App. App. 089-135 (Ex. 8)).

286.    Former Funds employee Jennifer Vachon signed an Affidavit in support of Defendant Alongi in which she provided that she would:

> [T]ypically arrive at the office around 7 a.m. My office was located near the center of the main office space (and near Gina's office). I witnessed Gina arrive at the office approximately 9:15 on a regular basis. I would frequently open the Funds door for Gina when she arrived because she had her arms full.

(App. 460 (Ex. 43)).

287.    9:15 a.m. is one and a quarter hour after the commencement of the Funds' regular business hours and the time at which the Fund Office opened for business. (App. 067 (Ex. 6)).

288.    When asked during deposition testimony, however, Ms. Vachon testified as follows:

> Q.:    Okay. What do you mean by, "frequently"?
>
> A.:    If I was going to the ladies' room and I saw her coming to the door, I would let her in.
>
> Q.:    Okay. How often did that occur that you happened to be passing by the door and Gina was coming in at the same time so you'd let her in?
>
> A.    I'd say four times a year.

(App. 465 (Ex. 44, p. 77)).

289.    Ms. Vachon further testified that she only saw Defendant Alongi enter the office, at most, two times per week. (App. 464 (Ex. 44, p. 76)).

290.    Former Funds employee Jennifer Dow also signed an Affidavit in support of Defendant Alongi, in which Ms. Dow provided that she:

> [T]ypically arrived at the office around 7 am. On most mornings, I observed Gina Alongi arrive at the office around 9:15 am. Jennifer Vachon, Rosemary Ortega, and I would each routinely open the door for her on a because she often arrived carrying briefcases, boxes, or other work materials.

(*sic*) (App. 467 (Ex. 45)).

291.    When asked during deposition testimony, however, Ms. Dow testified that she may have opened the door for Defendant Alongi a handful of times throughout Ms. Dow's years of employment at the Funds Office, and that she and other Funds employees did that for any number of individuals – not just Defendant Alongi. (App. 472 (Ex. 46, pp. 81-83)).

292.    Ms. Dow further testified during her deposition testimony that she never saw Ms. Alongi "arrive[] carrying briefcases, boxes, or other work materials." (App. 474 (Ex. 46, pp. 90-92)).

293.    Instead, Ms. Dow testified as follows:

Q.:    Okay. So just based on what you were observing. So Gina Alongi comes in and you – you didn't ever assist her with carrying things?

A.:    No.

Q.:    And you said it didn't ever appear that she needed assistance carrying things; is that right?

A.:    That's correct.

(App. 474 (Ex. 46, p. 92)).

294.    The certified public accountants at Schultheis & Panetierri LLP that conducted the Audit found that Defendant Alongi did not work hours on behalf of the Funds at home during the mornings or evenings or over the weekends to make up for this lost time:

> For the period September 2016 through July 2020, incoming and outgoing calls to and from the former Fund Administrator's office phone were commonly between the hours of 9:30AM and 4:00PM until January 2020 at which time they occurred between 8:00AM and 4:00PM.

(App. 089 (Ex. 8)).

295.    The certified public accountants at Schultheis & Panetierri LLP had access to Defendant Alongi's cell phone data in the roughly six-month period prior to her termination, and a review of that data uncovered that very few business calls were made to or from Defendant Alongi's cell phone, and that "a large majority of business calls made and received by the former Fund Administrator were most commonly during normal business hours." (App. 089 (Ex. 8)).

296.    The certified public accountants at Schultheis & Panetierri LLP determined in the Audit that:

> For the period September 2015 through July 2020, the former Fund Administrator's outgoing email activity followed a similar pattern as the outgoing phone calls whereby most of the activity occurred between 10:00AM and 4:00PM.

(App. 089 (Ex. 8)).

297.    The certified public accountants at Schultheis & Panetierri LLP determined in the Audit that Defendant Alongi's entry times at the Funds Office corresponded to her phone and email activity, "thereby validating the data used in the analysis." (App. 089 (Ex. 8)).

298.    In the Audit, the certified public accountants at Schultheis & Panetierri LLP noted that the findings regarding the hours Defendant Alongi worked on behalf of the Funds were also "consistent with representations made during discussions with other Fund Office employees." (App. 089 (Ex. 8)).

## IX.    <u>Rent Attributable to the Coalition</u>

299.    The Coalition paid nominal annual rent to the Funds of $574 for limited storage of documents related to its operations. (ECF No. 1, ¶ 49; App. 090 (Ex. 8)).

300.    A substantial portion of the workforce employed within the Fund Office devoted significant portions of their time to Coalition business. (ECF No. 1, ¶ 49; App. 088-90 (Ex. 8)).

301.    At the time of Defendant Alongi's termination, the Funds were forced to hire movers to ship at least 40 large boxes of Coalition documents from the Funds Office premises. (ECF No. 1, ¶ 49; App. 477-99 (Ex. 47)).

302.    The fair market value of the office space used for Coalition business based on 1.43 full time employees occupying 7.15% of the office space as determined via the Audit was estimated to have been $27,614 during the period January 1, 2015 through July 21, 2020, rather than the $3,157 actually paid for the Coalition. (ECF No. 1, ¶ 49; App. 090, 134 (Ex. 8)).

303.    The Funds were shortchanged by $24,457 for the office space provided to the Coalition as a result of Defendant Alongi's unilateral and *ultra vires* actions. (ECF No. 1, ¶ 49; App. 090, 134 (Ex. 8)).

Respectfully submitted,

Date: <u>November 7, 2022</u>

<u>s/ Jennifer L. Markowski</u>
Jennifer L. Markowski
**FREEMAN, MATHIS & GARY LLP**
60 State Street, Suite 600
Boston, Massachusetts 02109-1800
Telephone (617) 963-5975
jmarkowski@fmglaw.com
BBO# 655927

<u>s/ Charles W. Gilligan</u>
Charles W. Gilligan (admitted pro hac vice)
Jennifer Simon (admitted pro hac vice)
Daniel Keenan (admitted pro hac vice)
**O'DONOGHUE & O'DONOGHUE LLP**
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Telephone (202) 362-0041
Facsimile (202) 362-2640
cgilligan@odonoghuelaw.com
dkeenan@odonoghuelaw.com

## CERTIFICATE OF SERVICE

I, Charles W. Gilligan, hereby certify that I have, on this 7th day of November, 2022, served a copy of the foregoing document, by causing a copy thereof, to be sent electronically, through the ECF system, to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF).

*Charles W. Gilligan*
Charles W. Gilligan