UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| | ) Civil Action No. 1:21-cv-10163-FDS |
| v. | ) ) |
| GINA ALONGI, | ) ) |
| Defendant. | ) ) |

**APPENDIX IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Respectfully submitted,

Date: <u>November 7, 2022</u>

<u>s/ Jennifer L. Markowski</u>
Jennifer L. Markowski
**FREEMAN, MATHIS & GARY LLP**
60 State Street, Suite 600
Boston, Massachusetts 02109-1800
Telephone (617) 963-5975
jmarkowski@fmglaw.com
BBO# 655927

<u>s/ Charles W. Gilligan</u>
Charles W. Gilligan (admitted pro hac vice)
Jennifer Simon (admitted pro hac vice)
Daniel Keenan (admitted pro hac vice)
**O'DONOGHUE & O'DONOGHUE LLP**
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Telephone (202) 362-0041
Facsimile (202) 362-2640
cgilligan@odonoghuelaw.com
dkeenan@odonoghuelaw.com

## INDEX OF APPENDIX EXHIBITS

**Document**                                                                                                      **App.**

Exhibit 1:   Declaration of Greg Geima ..................................................................... 002-015

Exhibit 2:   Trust Agreement International Union of Operating Engineers Local 4
and Its Branches Pension Fund (Excerpts).......................................... 017-025

Exhibit 3:   Trust Agreement International Union of Operating Engineers Local 4
and Its Branches Health and Welfare Fund (Excerpts) .................................. 027-036

Exhibit 4:   Trust Agreement International Union of Operating Engineers Local 4
and Its Branches Annuity Fund (Excerpts) ...................................................... 038-047

Exhibit 5:   Shared Services Agreement..................................................................... 049-058

Exhibit 6:   International Union of Operating Engineers Local 4 Fringe Benefit
Funds Office Employee Handbook ................................................................ 060-076

Exhibit 7:   September 16, 2004 Correspondence from DOL ............................................ 078-081

Exhibit 8:   Schultheis & Panettieri LLP Forensic Audit ..................................................... 083-134

Exhibit 9:   Deposition of Gina Alongi (Excerpts)............................................................ 136-161

Exhibit 10:  July 25, 2003 Email from Defendant Alongi concerning DOL Audit ............. 163-165

Exhibit 11:  July 30, 2003 Email from Defendant Alongi concerning DOL Audit ............. 167-174

Exhibit 12:  July 31, 2003 Email from Defendant Alongi concerning DOL Audit ............. 176-180

Exhibit 13:  August 1, 2003 Email from Funds Counsel concerning DOL Audit ......................182

Exhibit 14:  August 4, 2003 Email from Defendant Alongi concerning DOL Audit .......... 184-185

Exhibit 15:  December 29, 2003 Email from Defendant Alongi circulating Time Sheet .... 187-190

Exhibit 16:  Minutes of Special Meeting of Trustees I.U.O.E. Local 4 Health and
Welfare Fund, July 21, 2020 ........................................................................ 192-195

Exhibit 17:  Coalition 2016 and 2019 IRS Form 990EZ Filing ........................................... 197-208

Exhibit 18:  Time Study Results and Common Expense Allocations, 2015-2017 ............. 210-212

Exhibit 19: Defendant Alongi's "Agreement Executive Director Massachusetts
Coalition of Taft-Hartley Trust Funds, Inc.".................................................... 214-224

Exhibit 20: Schedules of Coalition Meetings, 2017-2020 ................................................. 226-229

Exhibit 21: Illustrative Emails Establishing that Defendant Alongi participated
in telephone conferences and in-person meetings with Coalition
members, prospective members, and vendors during Fund Office
business hours, utilizing Fund Office resources.............................................. 231-249

Exhibit 22: Illustrative Emails Establishing that Defendant Alongi reviewed
documents, correspondence, and memos on behalf of the Coalition
during Fund Office business hours, utilizing Fund Office resources............... 251-284

Exhibit 23: Illustrative Emails Establishing that Defendant Alongi participated
in discussions and implemented surveys of Coalition members and
vendors during Fund Office business hours, utilizing Fund Office
resources ......................................................................................................... 286-287

Exhibit 24: Illustrative Emails Establishing that Defendant Alongi actively
sought out new members to collect membership applications and fees
from associate members and entities on behalf of the Coalition during
Fund Office business hours, utilizing Fund Office resources ......................... 289-318

Exhibit 25: Defendant Gina Alongi's Answers to Plaintiffs First Set of
Interrogatories (Excerpts)............................................................................... 320-324

Exhibit 26: Illustrative Email Establishing that Defendant Alongi directed
Laura-Jean Hickey to assign Coalition work to Fund Office
Employees .............................................................................................................326

Exhibit 27: January 15, 2015 Email Establishing that Rosemarie Alongi
designed the Coalition's website utilizing Funds resources....................................328

Exhibit 28: Illustrative Emails and corresponding timesheets establishing
that Rosemaire Alongi regularly performed work on behalf of the
Coalition during the Funds' regular business hours, utilizing Funds
resources, while concealing that work ............................................................ 330-349

Exhibit 29: Illustrative emails establishing that, at Defendant Alongi's direction,
Rosemarie Alongi applied pressure on prospective IT service providers
to join the Coalition and submit membership fees during the Funds'
regular business hours and utilizing the Funds' resources .............................. 351-360

Exhibit 30:  Illustrative email establishing that, at Defendant Alongi's direction,
work Ms. Hickey performed on behalf of the Coalition included
drafting, reviewing, and finalizing Coalition meeting and event agendas
and organizing and maintaining various Coalition documents and materials.. 362-370

Exhibit 31:  Illustrative email establishing that, at Defendant Alongi's direction,
work Ms. Hickey performed on behalf of the Coalition included
coordinating surveys among Coalition members and vendors .................................372

Exhibit 32:  Illustrative email establishing that, at Defendant Alongi's direction,
work Ms. Hickey performed on behalf of the Coalition included
scheduling and facilitating telephone conferences during regular
business hours with Coalition members, prospective members,
and service providers ...............................................................................................374

Exhibit 33:  Illustrative emails establishing that, at Defendant Alongi's direction,
work Ms. Hickey performed on behalf of the Coalition included
contacting event vendors and prospective venues and generally
planning and attending Coalition events, Wellness Fairs, and holiday
parties .......................................................................................................... 376-394

Exhibit 34:  Illustrative emails establishing that, at Defendant Alongi's direction,
work Ms. Ryan performed on behalf of the Coalition included seeking
and analyzing product information from vendors for Coalition events
and tracking address and contact information for Coalition members
and service providers ........................................................................................ 396-400

Exhibit 35:  Illustrative emails establishing that, at Defendant Alongi's direction,
work Ms. Ryan performed on behalf of the Coalition included
comprehensive, time-consuming projects ....................................................... 402-416

Exhibit 36:  Deposition of Taylor Ryan (Excerpts) ............................................................ 418-420

Exhibit 37:  Illustrative emails establishing that, at Defendant Alongi's direction,
Ms. Ortega performed on work behalf of the Coalition ................................... 422-433

Exhibit 38:  Deposition of Rosemary Ortega (Excerpts) .................................................... 435-438

Exhibit 39:  Affidavit of John J. Shaughnessy, Jr. (Excerpts) ............................................ 440-441

Exhibit 40:  Affidavit of Louis G. Rasetta (Excerpts) ......................................................... 443-445

Exhibit 41:  Deposition of Louis G. Rasetta (Excerpts) ...................................................... 447-451

Exhibit 42:  Deposition of John J. Shaughnessy, Jr. (Excerpts) .......................................... 453-457

Exhibit 43:  Affidavit of Jennifer Vachon .................................................................... 459-460

Exhibit 44:  Deposition of Jennifer Vachon (Excerpts) ................................................. 462-465

Exhibit 45:  Affidavit of Jennifer Dow (Excerpts) ........................................................467

Exhibit 46:  Deposition of Jennifer Dow (Excerpts) ...................................................... 469-475

Exhibit 47:  Photographs of Coalition property and material removed from the
             Fund Office following Defendant Alongi's termination .................................. 477-499

Exhibit 48:  Deposition of Greg Geiman (Excerpts) ........................................................ 501-511

# **Exhibit 1**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:21-cv-10163-FDS |
| GINA ALONGI, | ) ) | |
| Defendant. | ) ) | |

## DECLARATION OF GREGORY GEIMAN

I, Gregory Geiman, declare and state as follows:

1.   I currently serve as the Administrator of the IUOE Local 4 Pension Fund, the IUOE Local 4 Annuity and Savings Fund, the IUOE Local 4 Health and Welfare Fund, and the Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund. (Hereinafter "Local 4 Funds" or "Funds"). I make this Declaration from personal knowledge.

2.   I have been the Fund's Administrator since July 22, 2020. The Administrator is appointed by the respective Boards of Trustees of the Local 4 Funds and serves as the chief executive officer in charge of the day-to-day operations of the Funds. In that capacity, the Administrator oversees all of the employees who are employed in the day-to-day provision of benefits to the participants and beneficiaries of the Funds and directs and supervises their activities on behalf of the Funds. The Administrator also serves as the main liaison between the Funds and the various professionals retained by the Trustees to assist in their operations, including attorneys, actuaries, consultants, and auditors. The Administrator also acts as the point of contact for the various service providers retained by the Funds, be it investment managers, various health care providers such as insurers, pharmaceutical benefit managers, as well as dental, vision and hearing

<u>App.002</u>

care provider organizations, and others. The job of the Administrator is a demanding, full-time occupation.

3. Prior to becoming the Administrator of the Local 4 Funds, I served as in-house counsel to the Funds beginning on March 1, 2010 and also as Assistant Administrator beginning on or around March 1, 2011. I remained in these roles through the date of my becoming the Administrator. In that capacity, I worked directly for Gina Alongi, the Funds' longtime Administrator and the Defendant in this lawsuit. I assisted Ms. Alongi in the day-to-day running of the Funds, while also performing certain functions as an in-house counsel, including the legal pursuit of contributions owed to the Funds, the review of contracts and other legal documents, and working with outside counsel on matters of compliance with the many legal and regulatory requirements imposed upon the Funds by the Employee Retirement Income Security Act ("ERISA").

4. The IUOE Local 4 Pension Fund ("Pension Fund") is a defined benefit pension plan that provides retirement benefits to participants who worked under collective bargaining agreements negotiated by IUOE Local 4 ("Local 4") with various employers and employer associations who work within the territorial jurisdiction of Local 4 within Massachusetts, New Hampshire, and Maine. The Pension Fund's operations are governed by a Restated Agreement and Declaration of Trust, its Plan of Benefits, and various policies and procedures adopted by its Board of Trustees from time to time. The Fund is a multiemployer plan as that term is defined in ERISA and it is financed by contributions made by employers who employ operating engineers pursuant to the terms of a written collective bargaining agreement with Local 4. For each hour worked by such operating engineers, the employers pay a contractually required amount to the Fund. The employers pay such contributions on a monthly basis, filing a remittance report with the Fund

showing the hours worked by each of its covered employees. The Fund Office collects these contributions, deposits them, and records the hours of each such employee in order to grant them appropriate credit towards a possible pension.

5.     The IUOE Local 4 Annuity and Savings Fund ("Annuity Fund") is a defined contribution pension plan that also has a 401(k) wage deferral option. Participants in this Fund are immediately vested in both the contribution and wage deferral aspects of the Fund and are provided a menu of options in which to invest their individual benefit accounts. The Annuity Fund is financed as well by contributions made by employers who are signatory to collective bargaining agreements negotiated by Local 4. The Annuity Fund's operations are governed by a Restated Agreement and Declaration of Trust, its Plan of Benefits, and various policies and procedures adopted by its Board of Trustees from time to time. The Fund is also a multiemployer plan as that term is defined in ERISA and it is financed by contributions made by employers who employ operating engineers pursuant to the terms of a written collective bargaining agreement with Local 4.  For each hour worked by such operating engineers, the employers pay a contractually required amount to the Fund. The employers pay such contributions on a monthly basis, filing a remittance report with the Fund showing the hours worked by each of its covered employees. Additionally, these employees may elect to defer some of their wages to the Annuity Fund's 401(k) component. The Fund Office collects these contributions and wage deferrals, deposits them, and records the amounts received on their behalf, which are then forwarded to the Fund's record keeper to be allocated in the investment option chosen by the participants.

6.   The IUOE Local 4 Health and Welfare Fund ("Welfare Fund") is an employee welfare plan that provides medical, surgical, hospitalization, prescription drug, dental, vision, hearing, accident and sickness, and death to participants, their eligible beneficiaries, as well as eligible

3

retirees. These participants also work under collective bargaining agreements negotiated by Local 4. The Welfare Fund's operations are governed by a Restated Agreement and Declaration of Trust, its Plan of Benefits, and various policies and procedures adopted by its Board of Trustees from time to time. The Fund is a multiemployer plan as that term is defined in ERISA and it is financed by contributions made by employers who employ operating engineers pursuant to the terms of a written collective bargaining agreement with Local 4. For each hour worked by such operating engineers, the employers pay a contractually required amount to the Fund. The employers pay such contributions on a monthly basis, filing a remittance report with the Fund showing the hours worked by each of its covered employees. The Fund Office collects these contributions, deposits them, and records the hours of each such employee in order to grant them appropriate credit for determining their eligibility to receive health benefits under the Plan.

7.   The Hoisting and Portable Engineers Apprenticeship and Training Fund ("Training Fund") is an employee welfare benefit plan that provides training in the various machinery and processes necessary to perform the job of operating engineer, which includes such things as the operation of cranes, earth moving machines, bulldozers, backhoes, and other equipment. The Training Fund provides apprenticeship instruction to new entrants in the industry, by which they progress to the rank of journey worker through the completion of a combination of class work, practical skills acquisition, and required on-the-job training. The Training Fund's operations are governed by a Restated Agreement and Declaration of Trust, its Apprenticeship Standards, training curriculum, and various policies and procedures adopted by its Board of Trustees from time to time, as well as its Training Director and Joint Apprenticeship Committee. The Fund is a multiemployer plan as that term is defined in ERISA and it is financed by contributions made by employers who employ operating engineers pursuant to the terms of a written collective bargaining

4

agreement with Local 4. For each hour worked by such operating engineers, the employers pay a contractually required amount to the Fund. Fund Office employees record such contributions, which are then made available to the Training Fund for use in educating apprentices and journey workers in the craft of being an operating engineer.

8.     Each Fund is governed by a Board of Trustees made up of an equal number of representatives by labor and management as required by law. The Union Trustees are appointed by Local 4 and the Employer Trustees are appointed by employer associations with whom Local 4 engages in collective bargaining. The Trustees receive no compensation from the Funds and each has a full time job working for entities other than the Funds. The Trustees meet quarterly to monitor Fund operations and receive reports from the Administrator, professional advisers, and service providers. The Administrator organizes the meetings, prepares the agendas for the meetings, and provides and/or coordinates the provision of various reports regarding finances and other matters of interest.

9.     Fund Office employees work out of an office leased by the Funds from Local 4 at 16 Trotter Drive, Medway, MA 02053. The employees who work for the Local 4 Funds are all employed by the Welfare Fund, which issues their paychecks, W-2s, and provides their employee benefits. There are typically about fifteen full time employees employed by the Welfare Fund, many of whom provide services to the other Local 4 Funds. By law, each Fund is required to pay for its own expenses and to not subsidize the operations of the other affiliated Local 4 Funds. As a result, the Funds, along with Local 4 and certain non-ERISA Funds sponsored by Local 4, operate pursuant to an Administrative Shared Services Agreement ("Shared Services Agreement") which sets forth the manner in which the collective administrative expenses of the Local 4 Fund office

5

are allocated, such that the expense of each Fund employee is allocated among the entities who are part of this shared services arrangement.

10. The current Shared Services Agreement has its origins in the results of an audit conducted of the Funds' operations in 2003-2004 by the Employee Benefit Security Administration of the United States Department of Labor ("DOL"), which shares oversight of employee benefit plans like the Local 4 Funds, along with the Internal Revenue Service. During the 2003-2004 audit, the DOL expressed dissatisfaction with the scheme by which the collective Local 4 Funds were allocating administrative costs, due to a fear that some of the Funds were subsidizing the operations of others. As a result, it was agreed that all Fund employees would track their daily work for each Fund for whom they provided services in order to assure that the allocation of costs between the Funds was accurate and appropriate. The DOL resolved the issues in the audit based on, among other things, an agreement that time sheets would be kept by each Fund employee accounting for the work that they were doing for any of the specific Local 4 Funds throughout their workdays. The Trustees of the various Local 4 Funds and affiliated entities adopted the Administrative Shared Services Agreement, which, as a result, constitutes a governing plan document for each of the Funds.

11. Ms. Alongi was deeply involved in the discussions with DOL about how to address these concerns and was personally aware of the requirement in the Shared Services Agreement that all individuals employed in the Fund office keep track of their time, even going so far as to circulate a proposed time sheet for use by the staff. However, notwithstanding this fact, there is no record in the Local 4 Fund office of Ms. Alongi ever keeping such a time sheet.

12. As noted in paragraphs 4 through 8 of this Declaration, each of the Funds is governed by the terms of its applicable Trust Agreement. All of the respective Trust Agreements, including

that of the Local 4 Welfare Fund, the employer of the Fund office employees, provides that any action by the Fund can only be undertaken upon approval of a majority of the Trustees present at a meeting and that there must be at least four Trustees voting in order to constitute a quorum to take binding action.

13.    At no time did a requisite quorum of Local 4 Welfare Fund Trustees ever decide that Ms. Alongi was exempt from the time keeping requirement of the Shared Services Agreement. Nonetheless, it appears that she never kept such time sheets, despite the fact that as Administrator she provided services to all of the Funds and the fact that she was the highest paid, and hence, most expensive employee working for the Funds.

14.    The terms and conditions of employment of Fund employees are set forth in the Fund's Employee Handbook, which, among other things, delineates the amount of paid vacation to which employees, including the Fund Administrator, are entitled. The maximum vacation benefit provided to Fund employees is four weeks.

15.    Ms. Alongi has claimed that she was permitted to take six weeks of paid vacation in this litigation.   However, a review of Fund records shows no action by a required quorum of Trustees to approve paid vacation in excess of the aforementioned four week allotment provided for in the Employee Handbook.

16.    The Massachusetts Coalition of Taft-Hartley Funds ("Coalition") is a membership organization consisting of different union-sponsored multiemployer health and welfare plans in the New England area. The Coalition was organized to find ways to bring the combined purchasing power of its member health plans in the hopes of securing more favorable terms from various health care provider organizations – preferred provider organizations, health insurers, pharmaceutical benefit managers ("PBM"), dental and vision care providers – to combat the

increasing cost of funding health care benefits to the unions' memberships. The Coalition is financed by an annual level dues assessment paid by each of the participating health and welfare plans as well as the health vendors, consultants, and investment managers that also pay an annual assessment for access to the Coalition.

17. Coalition members may choose to adopt any of the Coalition negotiated arrangements with the classes of providers above noted but are not compelled to do so. Each participating plans' Trustees have the responsibility to decide whether such provider arrangements are in the best interests of their participants and beneficiaries. Entitlement to participate in any of the Coalition negotiated arrangements is a function of belonging to the Coalition. The IUOE Local 4 Health and Welfare Fund could have taken advantage of any of the negotiated programs by virtue of its membership in the Coalition, not because Gina Alongi served as the Executive Director of the Coalition.

18. The Coalition is a tax-exempt entity under Section 501(c)(3) of the Internal Revenue Code and is run by a Board of Directors and its Executive Director. It is not affiliated with or in any way related to the IUOE Local 4 Health and Welfare Fund or any of the other IUOE Local 4 Funds that are the Plaintiffs in the instant case. The only relationship between the Local 4 Funds and the Coalition is that for a period of time the Local 4 Welfare Fund was a dues paying member. (The Local 4 Welfare Fund ceased being a Coalition member as of December 31, 2020.)

19. Notwithstanding the absence of a relationship between the Local 4 Funds and the Coalition, Ms. Alongi, dedicated substantial portions of her workday and that of certain other Local 4 Fund Office employees to providing services to the Coalition. The Local 4 Funds received no compensation for the use of its personnel for Coalition business.

20. Moreover, notwithstanding the fact that all Local 4 Fund employees were required to track how they spent their workdays on time sheets, no records were kept of time devoted to Coalition work during normal business hours at the explicit or implicit direction of Ms. Alongi. In the case of Ms. Alongi, she unilaterally decided many years ago not to maintain time sheets of any of her activities even though such time sheets were required by the Funds' Administrative Shared Services Agreement, the Fund's Employee Handbook, and agreed-upon terms by which the Funds had resolved concerns raised by the United States Department of Labor uncovered during the course of an audit of the Funds in 2003-2004. As a result, the Funds have had to try to reconstruct the economic losses suffered by them resulting from this impermissible use of its personnel.

21. Ms. Alongi has throughout these proceedings attempted to justify her unilateral diversion of Fund-financed resources for the benefit of the Coalition based on the erroneous premise that the Welfare Fund received substantial benefits by means of the various Coalition-negotiated arrangements for which she takes sole credit. However, these claims simply lack all factual basis.

22. As noted above, the Fund was entitled to receive any such benefits by virtue of its membership in the Coalition and the payment of its dues thereto. All other Coalition member funds were able to receive these benefits without having to make similar commitments of their personnel.

23. More crucially, for the entirety of the time period relevant to this lawsuit, the Local 4 Welfare Fund did not use the Coalition sponsored Union Blue insurance product touted by the Defendant in various filings with the Court as justifying her diversion of Fund resources. That product was discontinued by Local 4 in 2014, at Ms. Alongi's recommendation, because it was cost prohibitive. The Local 4 Welfare Fund thereafter had its own arrangement with Blue Cross

Blue Shield of Massachusetts to provide medical, surgical, and hospitalization benefits to its participants. Moreover, at no time has the Fund used the pharmaceutical benefit manager arrangement negotiated by the Coalition to furnish prescription drug benefits to its participants, opting instead to obtain such coverage via an arrangement initially negotiated by the International Union of Operating Engineers, AFL-CIO, the parent union of IUOE Local 4. As set forth in further detail below, these two arrangements -- the provision of medical, surgical, and hospitalization costs and for those associated with the cost of providing prescription drugs – account for nearly all benefit costs borne by the Local 4 Welfare Fund. Thus, any benefits to the Local 4 Welfare Fund from its Coalition membership were miniscule at best and, again, stemmed from membership in the organization, not Ms. Alongi's role as Executive Director. It goes without saying that the Pension, Annuity, and Training Funds, all of which share costs with the Welfare Fund, received no benefit whatsoever from paying for employees to work for the Coalition.

24.    More specifically, in 2016, the Local 4 Welfare Fund had total claims expenses of $44,296,420, of which $33,530,710, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield, $6,971,162 in prescription drug claims paid through its PBM, $2,886,054 in dental claims, $364,243 for vision benefits, $44,200 for hearing benefits, and $429,651 for disability and death benefit claims. Of all of these classes of claims, the only ones for which the Local 4 Welfare Fund participant received coverage via a Coalition-negotiated provider was for vision and hearing. Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.92% of the Fund's overall claims costs.

25.    In 2017, the Local 4 Welfare Fund had total claims expenses of $53,032,811, of which $41,233,554, were attributable to the medical, surgical, and hospitalization benefits provided

through its own arrangement with Blue Cross Blue Shield, $7,510,098 in prescription drug claims paid through its PBM, $3,360,207 in dental claims, $380,228 for vision benefits, $16,536 for hearing benefits, and $465,423 for disability and death benefit claims.   Of all of these classes of claims, the only ones for which the Local 4 Welfare Fund participant received coverage via a Coalition-negotiated provider was for vision and hearing. Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.75% of the Fund's overall claims costs.

26.     In 2018, the Local 4 Welfare Fund had total claims expenses of $57,346,599, of which $44,989,792, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield, $7,304,380 in prescription drug claims paid through its PBM, $3,402,358 in dental claims, $375,885 for vision benefits, $48,194 for hearing benefits, and $480,703 for disability and death benefit claims.   Of all of these classes of claims, the only ones for which the Local 4 Welfare Fund participant received coverage via a Coalition-negotiated provider was for vision and hearing. Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.74% of the Fund's overall claims costs.

27.     In 2019, the Local 4 Welfare Fund had total claims expenses of $53,230,171, of which $43,332,746, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield, $5,381,702 in prescription drug claims paid through its PBM, $2,563,721 in dental claims, $395,697 for vision benefits, $27,297 for hearing benefits, and $503,408 for disability and death benefit claims. Of all of these classes of claims, the only ones for which the Local 4 Welfare Fund participant received coverage via a Coalition-negotiated provider was for vision and hearing. Thus, such Coalition-negotiated

benefit providers were responsible for the payment of just 0.79% of the Fund's overall claims costs.

28.     It is impossible to quantify how much of a savings the Local 4 Welfare Fund received, if any, from using the Coalition-negotiated vision and hearing providers. It is instructive, however, that in 2021 the Local 4 Welfare Fund terminated its relationship with the Coalition-negotiated vision provider and entered a new relationship with a different provider that resulted in an equivalent cost to the Fund and a much larger network of vision care centers for the participants and beneficiaries to use. A new hearing provider was retained in 2022, resulting in a cost savings to the Fund and the same level of benefits for participants and beneficiaries.

29.     In her Answers to the Plaintiffs' Interrogatories, Ms. Alongi, at Answer No. 8, listed a number of projects that she claimed "provided direct savings to Coalition members, including the Funds…." Of the projects listed for the relevant time period, only one item was negotiated through the Coalition and inured to the benefit of the Funds – a \$.30 per member per month administrative fee reduction in 2015-2017.  In real dollars, that would represent a savings to the Funds of approximately \$10,000 (3,000 participants x 12 months x \$.30) each year.

30.     By contrast, in the years 2016-2019, the Funds paid Ms. Alongi an average salary of \$242,000, contributed to two different defined benefit pension plans for her at an average cost each year of \$31,815, contributed to a defined contribution pension plan for her at a cost each year of 15,080, provided fully employer-paid health insurance at a cost each year of \$10,400, and an employer-provided Cadillac Escalade, and later a fully-loaded Ford Explorer, at an average cost each year of \$39,363, for a total average cost per year of \$338,658 to the Local 4 Funds. Thus, just the diversion of 3 percent of Ms. Alongi's time for the Funds to the Coalition would wipe out any of these purported savings she allegedly delivered by her work for the Coalition.  And, by her own

App.013

admission on the Coalition's annual Form 990 filed with the Internal Revenue Service, Ms. Alongi swore under penalty of perjury, that she was devoting 10 hours a week of her time to working for the Coalition during the period 2016 through 2020.

31.   In short, the Local 4 Funds provided uncompensated labor to the Coalition by several of its employees, including its most highly paid employee in the person of Ms. Alongi, receiving in return this *de minimis* savings, to which it was entitled simply by virtue of its membership in the Coalition.

32.   There is no record of a requisite quorum of the Local 4 Trustees ever being advised of this arrangement, much less one of them approving such a diversion of Local 4 Funds' assets for the benefit of a stranger entity.

33.   All such work done on behalf of the Coalition was at the behest of and direction of Ms. Alongi, not at the direction of the Funds' Trustees.

34.   Ms. Alongi claims in her Answer to Interrogatory number 8 propounded by the Funds that she somehow benefitted the Funds with other Coalition activities. This, however, is not the case.   For example, her work in February 2015 with the New York Health Care Alliance on its PBM project was time consuming for Ms. Alongi (and thus expensive for the Local 4 Funds) but in no way affected the Funds' relationship with its PBM through the IUOE.   Similarly, the March 8, 2017 bundled product discount that she touts, was provided by Blue Cross to the Funds directly and had nothing to do with the Coalition.   Her claim that the Fund received its prescription drug benefits through Blue Cross is simply incorrect.   The claimed emerging solutions "discounts" from September 8, 2018 and June 20, 2019, were in fact additional costs to the Fund for health solutions that were sold to Ms. Alongi, and then touted by her to the Coalition, that largely ended as expensive failures for the Local 4 Welfare Fund.   Of the four programs listed in Ms. Alongi's

13

Answers to Interrogatories, the Fund only maintains a relationship to this day with Hinge Health. In short, the copious activities and time spent on Coalition-related work by Ms. Alongi and the Fund employees under her direction did not, in any way, benefit the participants and beneficiaries of the Local 4 Funds.   They were projects aimed at Ms. Alongi's own self-aggrandizement and designed, seemingly, to help her obtain greater compensation from the Coalition, which, at the time of her dismissal by the Local 4 Funds, was paying her compensation in excess of $46,000 a year on top of her substantial compensation from the Local 4 Funds.

Pursuant to 28 U.S.C §1746, I declare under penalty of perjury this 7 day of November, 2022, that the foregoing is true and correct.

Gregory Geiman

# **Exhibit 2**

TRUST AGREEMENT

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 4 AND
ITS BRANCHES

PENSION FUND

This Agreement and Declaration of Trust made and entered into

this 18th day of December, 1959 and amended as of January 1, 1976

by and between Local 4 and its Branches of the International Union

of Operating Engineers, (hereinafter called the "Union") and the

Labor Relations Division of the Construction Industries of Massach-

usetts, the Building Trades Employers Association of Boston and

Eastern Massachusetts, Inc. and the Foundation & Marine Contractors

Association of New England, Inc. (hereinafter collectively called

the "Association").

WITNESSETH

Whereas, the Union and the Association have entered into col-

lective bargaining agreements providing for periodic contributions

by the Employers to a Fund for the purpose of providing pension

benefits for employees covered by said collective bargaining agree-

ments; and

Whereas, the Union and other Employers engaged in or servicing

the Building and Construction Industry have or hereafter will have

collective bargaining agreements providing for similar periodic con-

tributions to a Fund for the purpose of providing pension benefits

for employees covered by said collective bargaining agreements; and

Whereas, to accomplish the aforesaid purpose, it is desired to

establish a pension fund as a trust fund for receiving contributions

App.017

-1-

for all attorney's fees incurred in such proceedings, including pro-
ceedings to collect unpaid attorney's fees.

<div align="center">ARTICLE IV</div>

<div align="center">BOARD OF TRUSTEES</div>

Section 4.1  The Fund shall be administered by a Board of Trustees
which shall consist of three (3) trustees designated by the Union and
three (3) trustees designated by the Association (one (1) by each Em-
ployer Organization).  No person shall be appointed a Trustee or con-
tinue to serve as a Trustee following conviction for any crime as de-
fined in Section 411(a) of the Employee Retirement Income Security Act
of 1974.  The Trustees in their collective capacity shall be the "ad-
ministrator" and "named fiduciary" as such terms are used in the Act
with respect to the Fund and Plan.

Section 4.2  The Trustees designated by the Employer Organizations
shall be appointed in writing by each Employer Organization, which or-
ganizations are irrevocably designated by each Signatory Association
and Individual Employer as his or its attorneys-in-fact for the pur-
pose of appointing and removing such Trustees and successor Trustees.

Section 4.3  The Trustees designated by the Union shall be appointed
by an instrument in writing signed by the Business Manager of the Union.

Section 4.4  The Trustees so appointed shall execute a written ac-
ceptance in a form satisfactory to the Trustees and thereby shall be
deemed to have accepted the Trust created and established by this
Trust Agreement and to have consented to act as Trustees and to have
agreed to administer the Trust Fund as provided herein.

<div align="right">App.018</div>

Union and Employer Organizations, respectively, are to be determined exclusively by the Union and Employer Organizations.

## ARTICLE V

## FUNCTIONS AND POWERS OF THE BOARD OF TRUSTEES

Section 5.1   The Board of Trustees shall have the power to administer the Fund and to administer and maintain the Pension Plan in effect, having and performing all powers and duties reasonably necessary to maintain and operate the Plan in such a way as to accomplish its objectives.   The detailed basis on which pension benefits are to be paid shall be established by the Trustees and be set forth in a document designated as the Pension Plan of the  International Union of Operating Engineers Local 4 Pension Fund.   .   The Plan may provide differing amounts of benefits based upon differing rates of contributions.   The Board of Trustees may at any time, and from time to time, amend or modify such Pension Plan, except that no amendment or modification may reduce any benefits payable to Employees who retire prior to such amendment or modification so long as funds are available for payment of such benefits.   In no event shall any amendment or modification of the Plan cause or result in any portion of the Fund reverting to, or being recoverable by, the Association, any Signatory Association, any Individual Employer, the Union, or cause or result in the diversion of any portion of the Fund to any purpose other than the exclusive benefit of Employees, Retired Employees or their beneficiaries under the Plan and the payment of the reasonable administrative expenses of the Fund and the Plan.

Section 5.2   All contributions to the Pension Plan or the Fund shall be received and held by the Board of Trustees subject App.019

-12-

the Trustees and of the Trust Fund, while engaged in business and
related activities for and on behalf of the Trust Fund (1) with
respect to liability to others as a result of acts, errors or omis-
sions of such Trustee or Trustees, employees or agents, respectively,
provided such insurance policy shall provide recourse by the insurer
against Trustees as may be required by law and (2) with respect to
injuries received or property damage suffered by them.  The cost of
the premiums for such policies of insurance shall be paid out of the
Trust Fund.

   Section 5.8  Without limitation of the provisions of Section 1.1
of this Article, the Board of Trustees shall have power:

   A)  To pay or cause to be paid out of the Fund the reasonable ex-
penses incurred in the establishment of the Fund and the Pension Plan.

   B)  To establish and accumulate such reserve funds as may be ad-
equate to provide for administration expenses and other obligations of
the Fund, including the maintenance in effect of the Pension Plan.

   C)  To employ such executive, consultant, actuarial, administra-
tive, clerical, secretarial and legal counsel (who may be counsel for
the Union, Association or Employer) and other employees and assistants,
as may be necessary in connection with the administration of the Fund
and the Pension Plan and to pay or cause to be paid, out of the Fund,
the compensation and necessary expenses of such personnel and assis-
tants and the cost of office space, furnishings and supplies and other
essentials required in such administration.

   D)  To incur and pay or cause to be paid out of the Fund any other
expenses reasonably incidental to the administration of the Fund or
the Pension Plan including the cost of defense in litigation arising
out of the Trusteeship of this Trust Fund, to the extent permitted by
law.

App.020

-15-

merger, consolidation, amalgamation, joinder or any similar situation or to prepare and enter into agreements to consummate the same.   Any arrangement or merger entered into pursuant to this Section shall be subject to the provisions of the Employee Retirement Income Security Act of 1974.

<div align="center">

ARTICLE VI

MEETINGS AND DECISIONS OF TRUSTEES

</div>

Section 6.1   The Board of Trustees shall determine the time and place for regular periodic meetings of the Board.   Either the Chairman or the Secretary-Treasurer, or any two (2) members of the Board, may call a special meeting of the Board by giving written notice to all other Trustees of the time and place of such meeting at least seven (7) days before the date set for the meeting; provided, however, the notice shall contain an agenda of the items to be discussed and the special meeting shall be confined to the discussion of such items. Any such notice of special meeting shall be sufficient if sent by ordinary mail or by wire addressed to the Trustees at their addresses as shown in the records of the Board.   Any meeting at which all Trustees are present, or concerning which all Trustees have waived notice in writing, shall be a valid meeting without the giving of any notice.

Section 6.2   The Board shall keep minutes of all meetings but such minutes need not be verbatim.   Copies of the minutes shall be sent to all Trustees.

Section 6.3   To constitute a quorum for the transaction of business not less than two (2) Employer Trustees and two (2) Union Trustees shall be present in person.   The Board shall not take any action or

App.021

make any decision on any matter coming before it or presented to it for consideration or exercise any power or right given or reserved to it or conferred upon it by this Trust Agreement except upon the concurrence of at least two (2) Union Trustees and two (2) Employer Trustees.

Section 6.4   Upon any matter which may properly come before the Board of Trustees, the Board may act in writing without a meeting, provided such action has the concurrence of all of the Trustees.

Section 6.5   In the event of a deadlock between the Trustees on any matter arising in connection with the administration of the Fund or the Plan, an impartial umpire empowered to resolve the dispute shall be selected by the concurrence of all of the Trustees. A deadlock shall be deemed to exist when the Trustees, at two consecutive meetings, have considered a proposal and at least two Union Trustees and at least two Employer Trustees have not concurred in the disposition to be made of such proposal or because a decision cannot be made because of lack of a quorum at two successive meetings. In the event that the Trustees are unable to select an impartial umpire within fourteen days after the date of the deadlock, an impartial umpire shall be appointed, on the petition of any one or more of the Trustees, by the American Arbitration Association. The decision of the impartial umpire shall be final, valid and enforceable in accordance with its terms and shall be adopted by the Trustees. The reasonable expenses of any such arbitration, including any necessary court proceedings to secure the appointment of an umpire or the enforcement of the arbitration award (excluding the fees and expenses of witnesses called by the parties and the cost of

App.022

performing work coming within the jurisdiction of the Union may

become a party to this Trust Agreement by executing in writing his

or its acceptance of any of the Collective Bargaining Agreements or

of this Trust Agreement in a form acceptable to the Board.

Section 9.2   Any Individual Employer who executes any such written

acceptance, or who in fact makes one or more contributions to the Fund

assumes and shall be bound by all of the obligations imposed by this

Trust Agreement upon the Individual Employer.

## ARTICLE X

### AMENDMENT AND TERMINATION

Section 10.1   The provisions of this Agreement may be amended

by the Trustees by an instrument in writing duly executed by the

Trustees.

Section 10.2   The provisions of this Trust Agreement shall con-

tinue in effect during the term of the Collective Bargaining Agree-

ments, and any amendments, modifications, renewals or extensions

thereof with respect to such Collective Bargaining Agreements as

provided for the continuation of payments into the Fund and of the

Pension Plan.

Section 10.3   This Trust Agreement and the trust herein pro-

vided may be terminated by the Association and the Union by an in-

strument in writing executed by mutual consent at any time, subject

to the provision of Section 10.4 of this Article.   Upon the termina-

tion of such trust, any monies remaining in the Fund after the pay-

ment of all expenses and obligations of the trust shall be paid or

used for the continuance of one or more pension benefits in accordance

App.023

with the provisions of the Pension Plan, until such Fund is exhausted.

Section 10.4   In no event shall any amendment or modification of this Trust Agreement, or the termination of this Trust Agreement, cause or result in any portion of the Fund reverting to, or being recoverable by, the Association, any Signatory Association, any Individual Employer the Union, or cause or result in the diversion of any portion of the Fund to any purpose other than the exclusive benefit of Employees, Retired Employees or their beneficiaries under the Plan and the payment of the administrative expenses of the Fund and the Plan.

Executed as of the day and year first above written.

ASSOCIATION:

LABOR RELATIONS DIVISION OF THE CONSTRUCTION
INDUSTRIES OF MASSACHUSETTS

Name _John L. Elliott_____   Title _Chairman_____

BUILDING TRADES EMPLOYERS ASSOCIATION OF BOSTON
AND EASTERN MASSACHUSETTS, INC.

Name _____   Title _Exec Director_____

FOUNDATION & MARINE CONTRACTORS ASSOCIATION
OF NEW ENGLAND, INC.

Name _____   Title _Pres._____

UNION:

LOCAL 4 AND ITS BRANCHES OF THE INTERNATIONAL
UNION OF OPERATING ENGINEERS

Name _____   Title _Bus Mgr_____   App.024

-32-

**Resolution of the Board of Trustees**
**IUOE Local 4 and its Branches Pension Fund**

Be it resolved, this 15th day of October, 2015, the Board of Trustees of the IUOE Local 4 and its Branches Pension Fund hereby authorizes and empowers Fund Administrator Gina M. Alongi to sign the 2015 IRS Forms 5500 and 8955 on behalf of the Board of Trustees. This Resolution shall be continuing in nature and shall be considered as full authorization for Administrator Alongi to sign IRS Forms 5500 and 8955 on behalf of the Board of Trustees for other years.

**IN WITNESS WHEREOF**, the Trustees have caused this Resolution to be executed this 15th day of October, 2015.

Union Trustee

Union Trustee

Union Trustee

Employer Trustee

Employer Trustee

Employer Trustee

App.025

# Exhibit 3



## TRUST AGREEMENT

*Master*

## INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 4 AND ITS BRANCHES

## HEALTH AND WELFARE FUND

This Agreement and Declaration of Trust made and entered into this 8th day of July, 1957 and amended as of January 1, 1976 by and between Local 4 and its Branches of the International Union of Operating Engineers, (hereinafter called the "Union") and the Labor Relations Division of the Construction Industries of Massachusetts, the Building Trades Employers Association of Boston and Eastern Massachusetts, Inc. and the Foundation & Marine Contractors Association of New England, Inc. (hereinafter collectively called the "Association").

### WITNESSETH

Whereas, the Union and the Association have entered into collective bargaining agreements providing for periodic contributions by the Employers to a Fund for the purpose of providing health and welfare benefits for employees covered by said collective bargaining agreements; and

Whereas, the Union and other Employers engaged in or servicing the Building and Construction Industry have or hereafter will have collective bargaining agreements providing for similar periodic contributions to a Fund for the purpose of providing health and welfare benefits for employees covered by said collective bargaining agreements; and

Whereas, to accomplish the aforesaid purpose, it is desired to establish a health and welfare fund as a trust fund for receiving contributions

App.027

and providing benefits for eligible employees; and

Whereas, it is desired to set forth the terms and conditions under which the said fund is to be established and administered; and

Whereas, this trust is being created and the Health and Welfare plan implemented, each of which shall at all times conform to the applicable requirements of the Labor-Management Relations Act of 1947, as amended, the Employee Retirement Income Security Act of 1974 and be qualified pursuant to the applicable provisions of the Internal Revenue Code, as amended for all available exemptions and immunities;

Now, Therefore, in consideration of the foregoing, and of the mutual promises hereinafter provided the parties agree as follows:

## ARTICLE 1

### DEFINITIONS

Section 1.1  The term "Collective Bargaining Agreement" means any collective bargaining agreement, participation agreement or other written agreement between the Union and any individual employer or employer association which provides for the making of employer contributions to this Fund.

Section 1.2  The term "Individual Employer" means any individual employer (including any individual, partnership, corporation, contractor, joint venture, or other entity) who is required by any of the Collective Bargaining Agreements to make contributions to this Fund or who in fact makes one or more contributions to the Fund. The term "Individual Employer" shall also include the Union, or an Employee Benefit Plan which makes contributions to the Fund on behalf

-2-

App.028

for all attorney's fees incurred in such proceedings, including proceedings to collect unpaid attorney's fees.

## ARTICLE IV

## BOARD OF TRUSTEES

Section 4.1   The Fund shall be administered by a Board of Trustees which shall consist of three (3) trustees designated by the Union and three (3) trustees designated by the Association (one (1) by each Employer Organization).   No person shall be appointed a Trustee or continue to serve as a Trustee following conviction for any crime as defined in Section 411(a) of the Employee Retirement Income Security Act of 1974.   The Trustees in their collective capacity shall be the "administrator" and "named fiduciary" as such terms are used in the Act with respect to the Fund and Plan.

Section 4.2   The Trustees designated by the Employer Organizations shall be appointed in writing by each Employer Organization, which organizations are irrevocably designated by each Signatory Association and Individual Employer as his or its attorneys-in-fact for the purpose of appointing and removing such Trustees and successor Trustees.

Section 4.3   The Trustees designated by the Union shall be appointed by an instrument in writing signed by the Business Manager of the Union

Section 4.4   The Trustees so appointed shall execute a written acceptance in a form satisfactory to the Trustees and thereby shall be deemed to have accepted the Trust created and established by this Trust Agreement and to have consented to act as Trustees and to have agreed to administer the Trust Fund as provided herein.

App.029

Union and Employer Organizations, respectively, are to be determined exclusively by the Union and Employer Organizations.

## ARTICLE V

## FUNCTIONS AND POWERS OF THE BOARD OF TRUSTEES

Section 5.1  The Board of Trustees shall have the power to administer the Fund and to administer and maintain the Health and Welfare Plan in effect, having and performing all powers and duties reasonably necessary to maintain and operate the Plan in such a way as to accomplish its objectives. The detailed basis on which benefits are to be paid shall be established by the Trustees and be set forth in a document designated as the Health and Welfare Plan of the International Union of Operating Engineers Local 4 and its Branches Health and Welfare Fund. The Plan may provide differing amounts of benefits based upon differing rates of contributions. The Board of Trustees may at any time, and from time to time, amend or modify such Health and Welfare Plan. In no event shall any amendment or modification of the Plan cause or result in any portion of the Fund reverting to, or being recoverable by, the Association, any Signatory Association, any Individual Employer, the Union or cause or result in the diversion of any portion of the Fund to any purpose other than the exclusive benefit of Employees, Retired Employees or their beneficiaries under the Plan and the payment of the reasonable administrative expenses of the Fund and the Plan.

Section 5.2  All contributions to the Health and Welfare Plan or the Fund shall be received and held by the Board of Trustees subject to t

App.030

the Trustees and of the Trust Fund, while engaged in business and re-
lated activities for and on behalf of the Trust Fund (1) with respect
to liability to others as a result of acts, errors or omissions of
such Trustee or Trustees, employees or agents, respectively, provided
such insurance policy shall provide recourse by the insurer against
Trustees as may be required by law and (2) with respect to injuries
received or property damage suffered by them.  The cost of the premiums
for such policies of insurance shall be paid out of the Trust Fund.

Section 5.8  Without limitation of the provisions of Section 5.1
of this Article, the Board of Trustees shall have power:

A)  To pay or cause to be paid out of the Fund the reasonable
expenses incurred in the establishment of the Fund and the Plan.

B)  To establish and accumulate such reserve funds as may be
adequate to provide for administation expenses and other obligations of
the Fund, including the maintneance in effect of the Plan.

C)  To employ such executive, consultant, actuarial, administrative,
clerical, secretarial amd legal counsel (who may be counsel for the Union,
Association or Employer) and other employees and assistants, as may
be necessary in connection with the administration of the Fund and the
Plan and to pay or cause to be paid, out of the Fund, the compensation
and necessary expenses of such personnel and assistants and the cost
of office space, furnishings and supplies and other essentials required
in such administration.

D)  To incur and pay or cause to be paid out of the Fund any other
expenses reasonably incidental to the administration of the Fund or the
Plan including the cost of defense in litigation arising out of the
Trusteeship of this Trust Fund, to the extent permitted by law.

App.031

- 15 -

merger, consolidation, amalgamation, joinder or any similar situation or to prepare and enter into agreements to consummate the same.  Any arrangement or merger entered into pursuant to this Section shall be subject to the provisions of the Employee Retirement Income Security Act of 1974.

## ARTICLE VI

### MEETINGS AND DECISIONS OF TRUSTEES

Section 6.1  The Board of Trustees shall determine the time and place for regular periodic meetings of the Board.  Either the Chairman or the Secretary-Treasurer, or any two (2) members of the Board, may call a special meeting of the Board by giving written notice to all other Trustees of the time and place of such meeting at least seven (7) days before the date set for the meeting; provided, however, the notice shall contain an agenda of the items to be discussed and the special meeting shall be confined to the discussion of such items. Any such notice of special meeting shall be sufficient if sent by ordinary mail or by wire addressed to the Trustees at their addresses as shown in the records of the Board.  Any meeting at which all Trustees are present, or concerning which all Trustees have waived notice in writing, shall be a valid meeting without the giving of any notice.

Section 6.2  The Board shall keep minutes of all meetings but such minutes need not be verbatim.  Copies of the minutes shall be sent to all Trustees.

Section 6.3  To constitute a quorum for the transaction of business not less than two (2) Employer Trustees and two (2) Union Trustees shall be present in person.  The Board shall not take any action or

<u>App.032</u>

make any decision on any matter coming before it or presented to it for consideration or exercise any power or right given or reserved to it or conferred upon it by this Trust Agreement except upon the concurrence of at least two (2) Union Trustees and two (2) Employer Trustees.

Section 6.4   Upon any matter which may properly come before the Board of Trustees, the Board may act in writing without a meeting, provided such action has the concurrence of all of the Trustees.

Section 6.5   In the event of a deadlock between the Trustees on any matter arising in connection with the administration of the Fund or the Plan, an impartial umpire empowered to resolve the dispute shall be selected by the concurrence of all of the Trustees. A deadlock shall be deemed to exist when the Trustees, at two consecutive meetings, have considered a proposal and at least two Union Trustees and at least two Employer Trustees have not concurred in the disposition to be made of such proposal or because a decision cannot be made because of lack of a quorum at two successive meetings.  In the event that the Trustees are unable to select an impartial umpire within fourteen days after the date of the deadlock, an impartial umpire shall be appointed, on the petition of any one or more of the Trustees, by the American Arbitration Association. The decision of the impartial umpire shall be final, valid and enforceable in accordance with its terms and shall be adopted by the Trustees.  The reasonable expenses of any such arbitration, including any necessary court proceedings to secure the appointment of an umpire or the enforcement of the arbitration award (excluding the fees and expenses of witnesses called by the parties and the cost of

App.033

performing work coming within the jurisdiction of the Union may

become a party to this Trust Agreement by executing in writing his

or its acceptance of any of the Collective Bargaining Agreements or

of this Trust Agreement in a form acceptable to the Board.

Section 9.2   Any Individual Employer who executes any such written

acceptance, or who in fact makes one or more contributions to the Fund

assumes and shall be bound by all of the obligations imposed by this

Trust Agreement upon the Individual Employer.

## ARTICLE X

### AMENDMENT AND TERMINATION

Section 10.1   The provisions of this Agreement may be amended

by the Trustees by an instrument in writing duly executed by the

Trustees.

Section 10.2   The provisions of this Trust Agreement shall con-

tinue in effect during the term of the Collective Bargaining Agree-

ments, and any amendments, modifications, renewals or extensions

thereof with respect to such Collective Bargaining Agreements as

provided for the continuation of payments into the Fund.

Section 10.3   This Trust Agreement and the trust herein pro-

vided may be terminated by the Association and the Union by an in-

strument in writing executed by mutual consent at any time, subject

to the provision of Section 10.4 of this Article. Upon the termina-

tion of such trust, any monies remaining in the Fund after the pay-

ment of all expenses and obligations of the trust shall be paid or

used for the continuance of one or more benefits in accordance

App.034

Section 10.4   In no event shall any amendment or modification of this Trust Agreement, or the termination of this Trust Agreement, cause or result in any portion of the Fund reverting to, or being recoverable by, the Association, any Signatory Association, any Individual Employer, the Union, or cause or result in the diversion of any portion of the Fund to any purpose other than the exclusive benefit of Employees, Retired Employees or their beneficiaries under the Plan and the payment of the administrative expenses of the Fund and the Plan.

Executed as of the day and year first above written.

ASSOCIATION:

LABOR RELATIONS DIVISION OF THE CONSTRUCTION
INDUSTRIES OF MASSACHUSETTS

Name _John L. Elliott_____     Title _Chairman_____

BUILDING TRADES EMPLOYERS' ASSOCIATION OF BOSTON
AND EASTERN MASSACHUSETTS, INC.

Name _____     Title _Exec Director_____

FOUNDATION & MARINE CONTRACTORS ASSOCIATION
OF NEW ENGLAND, INC.

Name _____     Title _PRES._____

UNION:

LOCAL 4 AND ITS BRANCHES OF THE INTERNATIONAL
UNION OF OPERATING ENGINEERS

Name _____     Title _Bus. Mgr._____

-32-

## ACCEPTANCE OF OFFICE BY TRUSTEES

The undersigned hereby accept office as trustees appointed pursuant to the foregoing agreement and agree to act under and subject to all terms amd conditions of said agreement.

Dated as of July 14, 1977.

ASSOCIATION TRUSTEES

Robert J Berry

Paul G. Wilking

UNION TRUSTEES

James W Callins

James J Conway

Charles A Budi

# **Exhibit 4**

TRUST AGREEMENT

INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 4 AND
ITS BRANCHES

ANNUITY FUND

This Agreement and Declaration of Trust made and entered
into this _1ST_ day of _DEC_ 1987 by and between Local 4 and its
Branches of the International Union of Operating Engineers,
(hereinafter called the "Union") and the Labor Relations
Division of the Construction Industries of Massachusetts, the
Building Trades Employers Association of Boston and Eastern
Massachusetts, Inc. and the Foundation & Marine Contractors
Association of New England, Inc. (hereinafter collectively
called the "Association").


WITNESSETH


Whereas, the Union and the Association have entered into
collective bargaining agreements providing for periodic
contributions by the Employers to a Fund for the purpose of
providing retirement benefits for employees covered by said
collective bargaining agreements; and

Whereas, the Union and other Employers engaged in or
servicing the Building and Construction Industry have or
hereafter will have collective bargaining agreements providing
for similar periodic contributions to a Fund for the purpose of
providing retirement benefits for employees covered by said
collective bargaining agreements; and

Whereas, to accomplish the aforesaid purpose, it is
desired to establish an annuity fund as a trust fund for

receiving contributions and providing benefits for eligible employees; and

Whereas, it is desired to set forth the terms and conditions under which the said fund is to be established and administered; and

Whereas, this trust is being created and the annuity plan implemented, each of which shall at all times conform to the applicable requirements of the Labor-Management Relations Act of 1947, as amended, the Employee Retirement Income Security Act of 1974, as amended, and be qualified pursuant to the applicable provisions of the Internal Revenue Code, as amended for all available exemptions and immunities;

Now, Therefore, in consideration of the foregoing, and of the mutual promises hereinafter provided the parties agree as follows:

## ARTICLE I

### DEFINITIONS

Section 1.1  The term "Collective Bargaining Agreement" means any collective bargaining agreement, participation agreement or other written agreement between the Union and any individual employer or employer association which provides for the making of employer contributions to this Fund.

Section 1.2  The term "Individual Employer" means any individual employer (including any individual, partnership, corporation, contractor, joint venture, or other entity) who is required by any of the Collective Bargaining Agreements to make App.039 contributions to this Fund or who in fact makes one or more

-9-

monies due to the Trustees from the date when the payment was due to the date when payment is made together with all expenses of collection incurred by the Trustees, including attorney's fees and an administration fee in such amount as may be determined by the Trustees.  The Trustees may take any action necessary to enforce payment of such amounts due hereunder, including, but not limited to, proceedings at law or in equity or in bankruptcy, and the Employer shall be liable for all attorney's fees incurred in such proceedings, including proceedings to collect unpaid attorney's fees.

## ARTICLE IV

### BOARD OF TRUSTEES

Section 4.1   The Fund shall be administered by a Board of Trustees which shall consist of three (3) trustees designated by the Union and three (3) trustees designated by the Association (one (1) by each Employer Organization).  No person shall be appointed a Trustee or continue to serve as a Trustee following conviction for any crime as defined in Section 411(a) of the employee Retirement Income Security Act of 1974.  The Trustees in their collective capacity shall be the "administrator" and "named fiduciary" as such terms are used in the Act with respect to the Fund and Plan.

Section 4.2   The Trustees designated by the Employer Organizations shall be appointed in writing by each Employer Organization, which organizations are irrevocably designated by each Signatory Association and Individual Employer as his or its attorneys-in-fact for the purpose of appointing and

App.040

Section 4.9   Any Trustee who resigns or is otherwise separated from office shall forthwith turn over to the Chairman or Secretary-Treasurer of the Board of Trustees at the principal office of the Fund, any and all records, books, documents, monies and other properties in his possession or under his control which belong to the Fund or which were received by him in his capacity as such Trustee.

Section 4.10   The powers of the remaining Trustees to act as herein provided shall not be impaired or limited in any way pending the designation of a successor trustee to fill any vacancy.

Section 4.11   The procedures through which the Union Trustees and Association Trustees are to be appointed, removed or replaced by the Union and Employer Organizations, respectively, are to be determined exclusively by the Union and Employer Organizations.

ARTICLE V

FUNCTIONS AND POWERS OF THE BOARD OF TRUSTEES

Section 5.1   The Board of Trustees shall have the power to administer the Fund and to administer and maintain the Plan in effect, having and performing all powers and duties reasonably necessary to maintain and operate the Plan in such a way as to accomplish its objectives.  The detailed basis on which benefits are to be paid shall be established by the Trustees and be set forth in a document designated as the Annuity Plan of the International Union of Operating Engineers Local 4 Annuity Fund.  The Board of Trustees may at any time,

-13-

·and from time to time, amend or modify such Annuity Plan,
except that no amendment or modification may reduce any
benefits payable to Employees who retire prior to such
amendment or modification so long as funds are available for
payment of such benefits.  In no event shall any amendment or
modification of the Plan cause or result in any portion of the
Fund reverting to, or being recoverable by, the Association,
any Signatory Association, any Individual Employer, the Union,
or cause or result in the diversion of any portion of the Fund
to any purpose other than the exclusive benefit of Employees,
Retired Employees or their beneficiaries under the Plan and the
payment of the reasonable administrative expenses of the Fund
and the Plan.

    <u>Section 5.2</u>  All contributions to the Fund shall be
received and held by the Board of Trustees subject to the trust
established by this Trust Agreement and all the terms and
provisions hereof.  The acceptance and cashing of any checks
for such contributions, and the disposition of the monies
covered thereby in accordance with this Trust Agreement, shall
not release or discharge the Individual Employer from his or
its obligation under the Collective Bargaining Agreement for
hours worked under said Agreement for which no contribution has
actually been received, notwithstanding any statement,
restriction or qualification appearing on the check or any
attachment thereto.

    <u>Section 5.3</u>  The Trustees shall have the power to
determine all questions of coverage and eligibility, methods of
providing or arranging for benefits and all other related

Notwithstanding any other provisions of this Agreement and
Declaration of Trust, subject only to the requirements of
applicable law, the Trustees shall not be liable for any act or
omission of any person or business organization to whom such
fiduciary responsibility is allocated or delegated,,provided
that the Trustees have acted prudently and in the interests o
the employees and beneficiaries in selecting and retaining such
person or business organization.

Section 5.6   The Trustees shall obtain from an authorized
surety company such bonds as may be required by law, covering
such persons and in such amounts (but not less than required by
law) as the Trustees, in their discretion, may determine.   The
cost of premiums for such bonds shall be paid out of the Trust
Fund.

Section 5.7   The Trustees may in their discretion obtain
and maintain policies of insurance, to the extent permitted by
law, to insure themselves, the Trust Fund as such, as well as
employees or agents of the Trustees and of the Trust Fund,
while engaged in business and related activities for and on
behalf of the Trust Fund (1) with respect to liability to
others as a result of acts, errors or omissions of such Trustee
or Trustees, employees or agents, respectively, provided such
insurance policy shall provide recourse by the insurer against
Trustees as may be required by law and (2) with respect to
injuries received or property damage suffered by them.   The
cost of the premiums for such policies of insurance shall be
paid out of the Trust Fund.

Section 5.8   Without limitation of the provisions of
Section 1.1 of this Article, the Board of Trustees shall have

App 043

power:

A)   To pay or cause to be paid out of the Fund the reasonable expenses incurred in the establishment of the Fund and the Annuity Plan.

B)   To establish and accumulate such reserve funds as may be adequate to provide for administration expenses and other obligations of the Fund, including the maintenance in effect of the Annuity Plan.

C)   To employ such executive, consultant, actuarial, administrative, clerical, secretarial and legal counsel (who may be counsel for the Union, Association or Employer) and other employees and assistants, as may be necessary in connection with the administration of the Fund and the Plan and to pay or cause to be paid, out of the Fund, the compensation and necessary expenses of such personnel and assistants and the cost of office space, furnishings and supplies and other essentials required in such administration.

D)   To incur and pay or cause to be paid out of the Fund any other expenses reasonably incidental to the administration of the Fund or the Plan including the cost of defense in litigation arising out of the Trusteeship of this Trust Fund, to the extent permitted by law.

E)   To extend the time of payment of any obligation owing to the Fund, to compromise, settle or release claims or demands in favor of or against the Fund on such terms and conditions as the Board may deem desirable.

F)   To invest and reinvest such portion of the Trust Fund as in the sole judgment of the Trustees is not required for current expenditures in such properties or securities as

App.044

-22-

such merger, consolidation, amalgamation, joinder or any
similar situation or to prepare and enter into agreements to
consummate the same.  Any arrangement or merger entered into
pursuant to this Section shall be subject to the provisions of
the Employee Retirement Income Security Act of 1974.

ARTICLE VI

MEETINGS AND DECISIONS OF TRUSTEES

Section 6.1  The Board of Trustees shall determine the
time and place for regular periodic meetings of the Board.
Either the Chairman or the Secretary-Treasurer, or any two (2)
members of the Board, may call a special meeting of the Board
by giving written notice to all other Trustees of the time and
place of such meeting at least seven (7) days before the date
set for the meeting; provided, however, the notice shall
contain an agenda of the items to be discussed and the special
meeting shall be confined to the discussion of such items.  Any
such notice of special meeting shall be sufficient if sent by
ordinary mail or by wire addressed to the Trustees at their
addresses as shown in the records of the Board.  Any meeting at
which all Trustees are present, or concerning which all
Trustees have waived notice in writing, shall be a valid
meeting without the giving of any notice.

Section 6.2  The Board shall keep minutes of all meetings
but such minutes need not be verbatim.  Copies of the minutes
shall be sent to all Trustees.

Section 6.3  To constitute a quorum for the transaction
of business not less than two (2) Employer Trustees and two (2)

App.045

Union Trustees shall be present in person.  The Board shall not take any action or make any decision on any matter coming before it or presented to it for consideration or exercise any power or right given or reserved to it or conferred upon it by this Trust Agreement except upon the concurrence of at least two (2) Union Trustees and two (2) Employer Trustees.

Section 6.4  Upon any matter which may properly come before the Board of Trustees, the Board may act in writing without a meeting, provided such action has the concurrence of all of the Trustees.

Section 6.5  In the event of a deadlock between the Trustees on any matter arising in connection with the administration of the Fund or the Plan, an impartial umpire empowered to resolve the dispute shall be selected by the concurrence of all of the Trustees.  A deadlock shall be deemed to exist when the Trustees, at two consecutive meetings, have considered a proposal and at least two Union Trustees and at least two Employer Trustees have not concurred in the disposition to be made of such proposal or because a decision cannot be made because of lack of a quorum at two successive meetings.  In the event that the Trustees are unable to select an impartial umpire with fourteen days after the date of the deadlock, an impartial umpire shall be appointed, on the petition of any one or more of the Trustees, by the American Arbitration Association.  The decision of the impartial umpire shall be final, valid and enforceable in accordance with its terms and shall be adopted by the Trustees.  The reasonable expenses of any such arbitration, including any necessary court proceedings to secure the appointment of an umpire or the

App.046

## **AMENDMENT**

The Agreement and Declaration of Trust of the International Union of Operating

Engineers Local 4 Annuity Fund is hereby amended by striking the name International Union of

Operating Engineers Local 4 Annuity Fund wherever it is found in the Agreement and

Declaration of Trust and substituting therefor the name "International Union of Operating

Engineers Local 4 Annuity and Savings Fund".

Dated this 17th day of November, 1997.

AJF/tr
gen./amend.doc

<u>App.047</u>

# **Exhibit 5**

## AMENDED AGREEMENT TO SHARE ADMINISTRATIVE SERVICES AND OFFICE SPACE

This Administrative Services Agreement, entered into effective December 1, 2003, and amended effective July 1, 2006, between the IUOE Local 4 Health & Welfare Fund; IUOE Local 4 Pension Fund; IUOE Local 4 Annuity & Savings Fund; Hoisting and Portable Engineers Local 4 Apprenticeship & Training Fund; IUOE Local 4 Labor-Management Cooperation Trust ("LMCT"); IUOE Local 4 ("Local Union" or "Local 4"), the IUOE Local 4 Social Action Committee and Political Action Committee ("SAC") (collectively the "Organizations").

WHEREAS, under the Agreements and Declaration of Trust establishing the various Funds and Committees which are parties to this Agreement, the Boards of Trustees of the Funds have authority to obtain administrative services, equipment, furniture, supplies, and office space necessary for the proper administration of the Funds and Plan;

WHEREAS, Prohibited Transaction Class Exemptions 76-1 and 77-10 specifically permit related multiemployer plans to share administrative services, equipment, furniture, and supplies and office space with each other and with related employee organizations on a pro rata basis with respect to each party's use of such services, equipment, furniture, supplies and office space;

WHEREAS, it is the intent of this Agreement that the Health and Welfare Fund will provide administrative services, equipment, computer services, furniture, and supplies to the other parties to this Agreement on a pro rata basis on the following conditions;

NOW, THEREFORE, in consideration of the mutual promises of the parties hereto, it is agreed:

1. All of the administrative functions for the Pension Fund, Health and Welfare Fund, and Annuity & Savings Fund are performed at the Fund Office, currently located at 16 Trotter Drive, P.O. Box 680, Medway, MA 02053. The administrative functions of the LMCT are administered primarily at the Fund Office, and but some functions are performed at a separate location utilizing a separate staff. The administrative functions performed for the Local Union, Apprenticeship & Training Fund, and SAC are performed primarily at separate locations utilizing separate staff. The Fund Office performs certain common tasks for these Organizations; that is, it collects and remits dues for Local 4 and it collects and remits contributions and collects delinquencies for the SAC, and the Apprenticeship & Training Funds. The Fund Office also performs occasional ministerial duties associated with the investment of monies of the Apprenticeship & Training Plan.

2. The Health and Welfare Fund will provide to the other parties hereto at the Fund Office the administrative staff (salaries and benefits), as well as overhead expenses, including but not limited to rent, utilities, telephones, computers, other equipment, office furniture, filing cabinets, general postage, professional services and office supplies necessary to perform services described in Paragraph 1. The Health and Welfare Fund will properly maintain the equipment and furniture provided by the Heath and Welfare Fund. The expenses will be allocated among the parties as described in this Agreement.

3. The amount of staff time of employees of the Fund Office devoted to each Organization will be used as the basis for determining the allocable portion of general administrative expenses,

2

App.050

staff salary, taxes and benefits, and common overhead expenses, including but not limited to office space, utilities, professional fees and computer costs. The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization by each employee of the Fund Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each Organization.

    4.     The percentage allocation of administrative expenses to each Organization will be determined as follows:

    A.     The percentage of staff time (hours of time divided by total hours of fulltime equivalents (FTE)) allocable to each Organization spent by staff performing tasks related to the processing of contributions, general administrative functions and any tasks specifically attributable to the Organization, plus

    B.     The percentage of staff time (hours divided by FTE) devoted to delinquency collection tasks weighted by the percentage of contributions to each organization; divided by

    C.     The total percentage of the staff time for all shared functions determined by Organization and multiplied times total compensation of employees performing shared functions.

    D.     The resulting percentage of staff time allocated respectively to the Organizations will be used to determine the percentage of payroll and common overhead expenses attributable to each of these Organizations. This is referred to as the "Fund Office Payroll Percentage." The Fund Office Payroll percentage will initially be determined by an independent analysis conducted by a certified public accountant.

In the event that any Organization provides services to any other Organization or Organizations, the documented value of such services may be considered in any review or

3

App.051

adjustment. The allocation will be reviewed and adjusted at the six month intervals set forth in Paragraph 5.

5.   Each Organization will pay its respective share of shared administrative expenses on a monthly basis as provided in this Agreement. The monthly payments by each Organization will be adjusted effective each January 1 and July 1 based upon the average of the "Fund Office Payroll Percentages" allocated to each Organization for the immediately preceding 6 month periods ending December 31 and June 30 respectively. Effective July 1, 2006, the allocation will be prospective, based on a three-month time study. The July 1 allocation will be based on a time study for the period January 1 to March 31. The January 1 allocation will be based on a time study for the period July 1 to September 30.

6.   The Pension Fund, Annuity and Savings Fund, Apprenticeship & Training, Local 4, SAC, and LMCT will each pay to the Health & Welfare Fund each month a sum equal to the applicable share, based on the Fund Office Payroll Percentage, of total salary and benefits for the Fund Office Staff determined by the Fund Office.

7.   The shared administrative expenses, equipment, furniture, and supplies of the Fund Office will be allocated to the Pension Fund, Annuity and Savings Fund, Apprenticeship & Training, Local 4, SAC, and LMCT on the basis of the Fund Office Payroll Percentage. The Pension Fund, Annuity and Savings Fund, and the LMCT will pay to the Health & Welfare Fund per month a sum equal to the Fund Office Payroll Percentage for that Organization times the shared administrative expenses, equipment, furniture, and supplies

8.   The payments due under Paragraphs 5, 6, and 7 will be due by the first business day of each month except that the payments for each January 1, and July 1 will be payable within five (5)

4

App.052

business day of the determination of the adjusted Fund Office Payroll Percentage.

9. Each Organization will be responsible for administrative expenses and equipment, furniture, and supplies, if any, directly attributed to that Organization such as fees for investment managers and investment advisor, actuarial consultant, attorney, accountant, trustees and printing of booklets, forms and stationery.

10. This Agreement will be effective January 1, 2004 to December 31, 2004. Thereafter, this Agreement will be extended automatically for one year periods without further action by any party unless, at least thirty (30) days prior to the end of any such period a written notice of termination or modification is delivered by any party to the other parties. Any party may withdraw from this Agreement upon sixty (60) days advance written notice to the other parties. The Agreement may be revised any time without advance notice by agreement of all of the parties.

IUOE Local 4 Health & Welfare Fund

5

IUOE Local 4 Pension Fund

_Louis G. Rasetta_

_David F. Fantini_

_Kevin P. Bennett_

IUOE Local 4 Annuity and Savings Fund

7

Hoisting and Portable Engineers Local 4 Apprenticeship & Training Fund

8

Labor-Management Cooperation Trust

_Ronald C. Burning_

_William S. McJall_

_Norman A. Ted_

_Lou J. Rautte_

_J. D. O'Dally_

_C. Joseph Nielle_

_[signature]_

_Justin Cardarelli_

9

IUOE Local 4

Business Manager

Social Action Committee

Business Manager

L:\MSullivan\3113\Policy and Procedures\Adminservicessharing\amended agreement.doc

App.058

**<u>Exhibit 6</u>**

# International Union of Operating Engineers Local 4 Fringe Benefit Funds Office



EXHIBIT 105
ALONGI
06/22/2022   BG



# Employee Handbook

Employee Signature: _____

Date Signed: _____

**Introduction** ........................................................................................................................... **3**

**Service to Participants and Beneficiaries** ......................................................................... **3**

**Employee Responsibilities and Funds Office Rules** ......................................................... **3**

**Weekly Timesheet** .................................................................................................................. **4**

**Sexual Harassment** ................................................................................................................ **4**

**Equal Employment Opportunity** ......................................................................................... **7**

**Safety** ...................................................................................................................................... **8**

**Attendance & Punctuality** ..................................................................................................... **8**

**Personal Appearance** ............................................................................................................. **8**

**Working Hours / Lunch / Break Periods** ............................................................................ **8**

**Pay Period** ............................................................................................................................. **10**

**Overtime Pay** ........................................................................................................................ **10**

**Comp Time** ............................................................................................................................ **10**

**Direct Deposit** ....................................................................................................................... **10**

**Inclement Weather** ............................................................................................................... **10**

**Sick/Vacation/Personal Time** ............................................................................................. **11**
    Sick Time – Hourly (Non-Exempt Employees) ................................................................. 11
    Sick Time – Salary ............................................................................................................. 11
    Loss of Time ...................................................................................................................... 11
    Vacation Policy .................................................................................................................. 11
    Personal Days ..................................................................................................................... 12

**Holidays** ................................................................................................................................ **12**

**Tuition Reimbursement** ....................................................................................................... **12**

**Educational Training and Seminars** .................................................................................. **13**

**Bereavement** ......................................................................................................................... **14**

**Leave of Absence** .................................................................................................................. **14**

**Maternity/Adoption Leave** .................................................................................................. **15**

**Jury Duty** .............................................................................................................................. **15**

**Complaints** ............................................................................................................................ **15**

**Smoking** ................................................................................................................................. **15**

**Performance Reviews** ........................................................................................................... **15**

**Employment Records** ........................................................................................................... **16**

**Bulletin Boards** ..................................................................................................................... **16**

**Health & Welfare Plan Benefits** ......................................................................................... **16**

**Pension Plan Benefits** .......................................................................................................... **17**

**Annuity and Savings Plan Benefits** .................................................................................... **17**

**Funds Office Management** ................................................................................................... **17**

App.061

IUOE4 FED 5022

**Introduction**

This handbook is prepared solely for the information and guidance of our employees. It describes some basic operating practices, benefits and personnel policies at IUOE Local 4 Fringe Benefit Funds Office (the Funds), and is intended to answer many employee questions.

This handbook may be used as a guide, but is **not intended as a contract of employment**. Employment with the Funds is **at-will** and as such is terminable by the employee or the Funds at any time and for any reason.

The Funds reserve the right to unilaterally change or rescind any of the provisions in this handbook, with or without notice.

Employees with questions or concerns regarding policy and procedures should consult with Gina M. Alongi, Administrator, or Laura-Jean Hickey, Assistant Administrator.

**Service to Participants and Beneficiaries**

Satisfied participants and their families are what we strive for. Employee actions and attitudes have an immediate and lasting impact upon the membership. As an employee of the Funds, all actions are a direct reflection of the office. Each employee has the responsibility to provide courteous service and act in a manner consistent with ethical business practices.

**Employee Responsibilities and Funds Office Rules**

In order to maintain a fair and productive working environment, the Funds have established rules of conduct which are consistent with the practices mature people expect from each other. They are based on the consideration of rights, privileges and responsibilities of all individuals and are designed to protect the Funds from careless and abusive conduct.

To ensure the general welfare of all employees and to maintain a harmonious atmosphere, we have developed a set of guidelines that will be followed. These guidelines are subject to change at any time. Violation of any of these guidelines may result in disciplinary steps up to and including discharge:

1. Excessive absenteeism;

2. Habitual tardiness;

3. Unsatisfactory work performance;

4. Use, possession, sale/distribution or being under the influence of an illegal substance while on company premises or while otherwise engaged in Funds business;

5. Insubordination;

6. Falsification of records, dishonesty or fraud;

3

<u>App.062</u>

IUOE4 FED 5023

7.   Negligent or unauthorized use of the Funds' property;

8.   Disrespectful behavior or physical or verbal abuse of Funds employees, Union Hall employees, participants and beneficiaries, and/or their dependents, or visitors;

9.   Erratic behavior on the job;

10. Disclosure of confidential information to unauthorized person(s) and/or failure to abide by HIPAA and/or Massachusetts Data Regulation guidelines; and

11. Violation of the Funds' rules or policies.

**Note:  This list is not intended to be all-inclusive.**

### Weekly Timesheet

All employees (exempt or non-exempt) that work under the jurisdiction of more than one (1) Fund must complete a weekly timesheet (located in the Funds Public Drive > TimeSheet) to be turned in every Friday by 4 p.m.  Timesheets are used to break down employees' hours, (all hours, including overtime), spent on particular Funds.  Employees with questions or concerns regarding this policy and procedure should consult with the Accounting Department.

### Sexual Harassment

It is a goal of the Funds to promote a workplace that is free of sexual harassment.  Sexual harassment of employees occurring in the workplace or in other settings in which employees may find themselves in connection with their employment is unlawful and will not be tolerated by the organization.  Further, any retaliation against an individual who has complained about sexual harassment or retaliation against individuals for cooperating with an investigation of a sexual harassment complaint is similarly unlawful and also will not be tolerated.  To achieve our goal of providing a workplace free from sexual harassment, the conduct that is described in this policy will not be tolerated and we have provided a procedure by which inappropriate conduct will be dealt with, if encountered by employees.

Because the Funds take allegations of sexual harassment seriously, we will respond promptly to complaints of sexual harassment.  If and when it is determined that such inappropriate conduct has occurred, we will act promptly to eliminate the conduct and impose such corrective action as is necessary, including disciplinary action where appropriate.

Please note that while this policy sets forth the Funds' goals of promoting a workplace that is free of sexual harassment, this policy is not designed or intended to limit our authority to discipline or take remedial action for workplace conduct which we deem unacceptable, regardless of whether that conduct meets the definition of sexual harassment.

### I.  Definition of Sexual Harassment

In the Commonwealth of Massachusetts, the legal definition of sexual harassment is: "Sexual harassment" means sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature when:

4

App. 063

IUOE4 FED 5024

    a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; or

    b) such advances, requests of conducts have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

Under these definitions, direct or implied request by a supervisor for sexual favors in exchange for actual or promised job benefits such as favorable reviews, salary increases, promotions, increased benefits, or continued employment also constitutes sexual harassment.

The legal definition of sexual harassment is broad. In addition to the examples outlined above, other sexually oriented conduct (intended or not) is unwelcome and or has the effect of creating a workplace environment that is hostile, offensive, intimidating, or humiliating to male or female workers may also constitute sexual harassment.

While it is not possible to list all those additional circumstances that may constitute sexual harassment, the following are some examples of conduct which if unwelcome, may constitute sexual harassment depending upon the totality of the circumstances including the severity of the conduct and its persuasiveness:

- Unwelcome sexual advances—whether they involve physical touching or not;
- Sexual epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life, comment on an individual's body, comment about an individual's sexual activity, deficiencies or prowess;
- Displaying sexually suggestive objects, pictures, cartoons, emails;
- Unwelcome leering, whistling, brushing against the body, sexual gestures, suggestive or insulting comments;
- Inquiries into one's sexual experiences; or,
- Discussion of one's sexual activities.

All employees should take special note that, as stated above, retaliation against an individual who has complained about sexual harassment, and retaliation against individuals for cooperating with an investigation or a sexual harassment complaint is unlawful and will not be tolerated by this organization.

## II.  **Complaints of Sexual Harassment**

If any of the Funds' employees believes that he or she has been subjected to sexual harassment, the employee has the right to file a complaint with the IUOE Local 4 Fringe Benefit Funds Office. This may be done in writing or orally.

If an employee would like to file a complaint, they may do so by either notifying Gina M. Alongi, Administrator: Local 4 Funds Office, (508) 533-1400 x111 or by contacting Ms. Kathryn S. Shea, Esq, 33 Harrison Ave, 7th Floor, Boston, MA 02111. Attorney Shea will also be available to discuss any concerns an employee may have and provide information about the Funds' policy on sexual harassment as well as the complaint process.

App.064

IUOE4 FED 5025

### III.  Sexual Harassment Investigation

If and when the Funds Office receives a complaint, it will promptly investigate the allegation in a fair and expeditious manner. The investigation will be conducted in such a way as to maintain confidentiality to the extent practicable under the circumstances. The investigation will include a private interview with the person filing the complaint as well as with any witnesses. The Funds will also interview the person alleged to have committed the act(s) of sexual harassment. When the investigation is completed, the Funds will, to the extent appropriate, inform the person filing the complaint and the person alleged to have committed the conduct, of the results of the investigation.

If it is determined that inappropriate conduct has occurred, the Funds will act promptly to eliminate the offending conduct, and where it is appropriate, will also impose disciplinary action.

### IV.  Disciplinary Action

If it is determined that inappropriate conduct has been committed by one of the Funds employees, the office will take such action as is appropriate under the circumstances.  Such action may range from counseling to termination of employment, but not limited to other forms of disciplinary action as deemed appropriate under the circumstances.

### V.  State and Federal Remedies

In addition to the above, if an employee believes they have been subjected to sexual harassment, they may file a formal complaint with either or both of the government agencies set forth below. Using the Funds' complaint process does not prohibit an employee from filing a complaint with these agencies. Each of the agencies has a short time period for filing a claim:

1) **The United States Equal Employment Opportunity Commission (EEOC)**
   *Period in which to report claim: 300 days in most cases (subject to change; please check applicable laws)*

   John F. Kennedy Federal Building
   475 Government Center
   Boston, MA 02203
   Phone: (800) 669-4000
   Fax: (617) 565-3196
   www.eeoc.gov

2) **The Massachusetts Commission Against Discrimination (MCAD)**
   *Period in which to report claim: 300 days (subject to change; please check applicable laws)*

   | **Boston Office:** | **Worcester Office:** |
   |---|---|
   | One Ashburton Place | Worcester City Hall |
   | 6th Fl, Rm 601 | 484 Main St, Rm 320 |
   | Boston, MA 02108 | Worcester, MA 01608 |
   | Ph: (617) 994-6000 | Ph: (508) 453-9630 |

<u>App.065</u>

6

IUOE4 FED 5026

**Springfield Office:**
436 Dwight St
2nd Fl, Rm 220
Springfield, MA 01103
Ph: (413) 739-2145

**New Bedford Office:**
800 Purchase St, Rm 501
New Bedford, MA 02740
Ph: (508) 990-2390

**More information is available at: www.mass.gov/mcad**

**Note**: **This policy applies to all employees**.

**Equal Employment Opportunity**

The Funds Office is an Equal Opportunity employer and it is our policy:

1. To recruit, hire, train and promote persons in all job classifications without regard to race, color, religion, age, sex, gender identity, national origin, ancestry, military or veteran status, sexual orientation, pregnancy, parental or maternity status, genetics, or disability;

2. To base decisions on employment so as to further the principles of equal employment opportunities;

3. To ensure that promotion decisions are in accord with the principles of equal employment opportunities;

4. To ensure that all personnel actions, such as compensation, benefits, transfers, terminations, layoffs and returns, sponsored training, educational tuition assistance, social and recreational programs are administered without regard to race, color, religion, age, sex, gender identity, national origin, ancestry, military or veteran status, sexual orientation, pregnancy, parental or maternity status, genetics, or disability; and

5. To ensure that all of our employees are aware of this policy.

It is a goal of the Funds to promote a workplace that is free of discrimination. Discrimination in the workplace or in other settings in which employees may find themselves in connection with their employment is unlawful and will not be tolerated by the organization. Further, any retaliation against an individual who has complained about discrimination or retaliation against individuals for cooperating with an investigation of a discrimination complaint is similarly unlawful and also will not be tolerated. To achieve our goal of providing a workplace free from discrimination, we have provided a procedure by which inappropriate conduct will be dealt with, if encountered by employees. If any of the Funds' employees believes that he or she has been subjected to discrimination, the employee has the right to file a complaint with the IUOE Local 4 Fringe Benefit Funds Office. This may be done in writing or orally. If an employee would like to file a complaint, they may do so by either notifying Gina M. Alongi, Administrator: Local 4 Funds Office, (508) 533-1400 x111 or by contacting Ms. Kathryn S. Shea, Esq, 33 Harrison Ave, 7th Floor, Boston, MA 02111. Attorney Shea will also be available to discuss any concerns an employee may have and provide information about the Funds' policy on discrimination as well as the complaint process.

7

App.066

## Safety

It is important that employees observe all office and common sense rules that apply to safety, for themselves, as well as for others.  Accidents, unsafe conditions and injuries should be reported immediately to Laura-Jean Hickey, Assistant Administrator or Greg Geiman, Associate Administrator/In-House Counsel.

## Attendance & Punctuality

As an employee of the Funds Office, all are expected to:

     (a) Report to work regularly and on time;
         Schedule personal commitments around the workday.

     (b) Notify the appropriate person(s) if unable to report to work, will be late or need to leave early, as soon as reasonably possible.  Reporting to a co-worker is not acceptable; and

     (c) In the event that an employee is tardy, missed time must always be made up (see "Working Hours / Lunch / Break Periods").

***Excessive absence or tardiness will result in disciplinary action.***

## Personal Appearance

In general, all employees must present a neat and professional appearance.  During business hours or when representing the Funds, you are expected to present a neat, tasteful appearance according to the requirements of your position and accepted social standards.  The minimum standard for dress at the Funds is Business Casual.   Casual business wear means clean, neat and pressed professional clothing.  Shirt, dress and skirt length should be at a length at which you can sit comfortably in public, and mini-skirts, beach dresses, or any comparable clothing would be inappropriate for the office.

Fridays have been designated as dressed-down days when the dress code can be relaxed.  Attire on Fridays can include jeans providing they are neat, clean and not tattered. Employees will not take advantage of the casual dress designation by wearing unprofessional clothing, i.e. sweatpants, graphic t-shirts & sweatshirts, yoga apparel, lounge wear, etc.

Please note that even though summer clothing can be more informal due to warm temperatures, employees must maintain a professional look.  Dress sandals are acceptable providing they are not open backs or flip flops.

## Working Hours / Lunch / Break Periods

The regular working hours of the Funds Office are 8:00 a.m. – 4:00 p.m.  The work week is Monday through Friday and normally consists of 37.5 hours.  In the course of doing what fits into an employee's job description, overtime work may be necessary and must be <u>pre-approved</u> by his/her Manager.  In addition, all employees are authorized a lunch period during the normal workday.

8

All employees are expected to take only the amount of time set aside for such purposes unless arrangements have been made in advance with their respective Manager.  In all cases, scheduling should be done so that there is always adequate coverage.

Morning and afternoon breaks are encouraged and should be done so in a manner not to distract the office.  During a typical workday, each employee is limited to a one-hour lunch period (assuming a 30-minute lunch and two 15-minute breaks).  Most employees choose to combine the lunch and breaks to take a one hour lunch.

Employees that are absent from the office during the normal work hours of 8:00 a.m. to 4:00 p.m. (excepting normal break times) may be allowed to "make up" the missed time only by the end of the pay period during which the work was missed.  Such time may be made up by working during normal break times and/or before or after normal work hours in pay period the time was missed.  Such an allowance is to be supervised by the employee's Manager.

However, it is office policy that such absences must be (1) inconsistent and irregular and (2) less than one-half of a normal work day.  Any absences that exceed one-half of a normal work day must be taken by the employee as personal, sick, or vacation time.

Further, employees may be allowed to work through their allotted break time and leave the office at 3:00 p.m.  Such an allowance is at the discretion of, and to be supervised by, the employee's Manager, and it is office policy that such an allowance must be irregular.

**Enter Policy** - All employees will be given a key fob programmed for access to the Funds Office back door between 7:30 a.m. and 4:00 p.m.  If an employee needs to enter the building outside these times they must get their Manager's approval and the fob will be temporarily modified.  Managers will be issued a unique alarm code and will have full access to the building.

**Exit Policy** - If an employee needs to stay in the building after 4:00 p.m. there must be a Manager in the office.  Managers must be sure all employees have exited the building upon departure.

## Privacy and Security Policy

The Funds is committed to safeguarding participants' privacy by providing protection against unauthorized access or use of confidential information.

The Funds maintain administrative, physical and technical safeguards that comply with the Health Insurance Portability and Accountability Act (HIPAA) and the Massachusetts Data Regulations, 201 CMR 17, to protect participants' confidential information against unauthorized access.

As an employee of the Funds you are required to follow a code of ethics and adhere to our internal policies to protect the confidentially of participant information.  The Funds will maintain, and will continue to provide training on, prudent privacy and security standards and procedures to protect confidential information. Failure to abide by the Funds' internal policies can sometimes result in termination.  Standards and consequences are detailed in the HIPAA Compliance Sanction Policy which are available in Onbase under "Employee Information."

App.068

IUOE4 FED 5029

## Pay Period

All employees are paid each Tuesday. The Funds Office is required by law to make payroll deductions for Federal and State Income Tax as well as Social Security Tax. Each employee may also authorize other deductions such as Savings or 401(k). See the Accounting Department for details.

## Overtime Pay

Overtime pay will be paid to non-exempt employees at the rate of one and one half times the regular rate of pay for all hours worked in excess of 7.5 hours per day. Overtime pay is paid for periods of hours worked which are documented and approved by each Manager.

*Prior authorization is required for all overtime pay.*

## Comp Time

Exempt employees are not eligible for comp time unless they receive prior authorization from the Administrator or Associate/Assistant Administrators. Such authorizations will normally be limited to special projects.

Non-exempt employees are not eligible for comp time. Make up time must be discussed and pre-approved with an employee's Manager (see Working Hours Lunch/Break Periods).

## Direct Deposit

Direct Deposit is available for our employees' convenience. See the Accounting Manager for forms and details.

## Inclement Weather

When the winter season arrives we must be prepared for weather that may impact our ability to conduct business or affect personal safety. The office will remain open during bad weather days.

Due to severe weather, we may need to close before the end of the business day or declare closure prior to the start of work. There also may be times when bad weather or road conditions influence employees' decisions not to come to work when the office is open.

Employees should call the Funds Office Snow Emergency Line at 508-533-1400 x101 after 6:30 a.m. for a report. During bad weather employees should not leave early until they have checked the snow emergency message. The message will be changed between 6:00 a.m. and 6:30 a.m.

Whenever weather or road conditions impact your personal safety, we urge you to use your own best judgment in making the decision to travel to the office or leave work before closing time.

Everyone's circumstances are different, and family issues as well as commuting distances and local road conditions are all variables.

- **If you do not come into the office on an inclement weather day (and office is declared "open") you will have to take a personal day or vacation day.**

App.069

10

IUOE4 FED 5030

- **Employees who make the commitment to come in during inclement weather may be entitled to additional personal time off at the Administrator or Associate/Assistant Administrator's discretion.**

- **If you do not show up or you are on vacation during any office closure you will not be entitled to additional personal time to the extent it was given and you will be charged accordingly with the use of vacation or personal time.**

In all circumstances, employees must inform their Manager when they are unable to come to work or need to leave early.

There will be no public announcements on radio or television in regard to this matter.

<u>**Sick/Vacation/Personal Time**</u>

**Sick Time – Hourly (Non-Exempt Employees)**
All hourly employees will earn, at a rate of two (2) days at the beginning of each quarter, a total of eight (8) sick days annually. Unused sick days will be bought back annually for non-exempt (hourly) employees.  If an employee is out of work for three (3) or more days, a Doctor's note may be required for payment of wages.

*Unused sick time cannot be carried into the next calendar year.  Sick days are not vacation days and should only be used when needed, i.e., when you (or your child, spouse, parent or spouse's parent) are ill or injured or have a routine medical appointment; or to deal with domestic violence involving yourself or your children.  Excessive absences or patterns of absence could be grounds for disciplinary action.*

**Sick Time – Salary**

Salaried employees accumulate sick days at the rate of two (2) days per quarter, which will accumulate towards a sick time bank.  Salaried employees will not be reimbursed annually and can only accumulate hours up to the 26 weeks available under the Loss of Time benefit.

**Loss of Time**

If an employee is unable to work because of a non-work related disabling illness or injury, she or he may receive weekly accident and sickness benefits.  Weekly accident and sickness benefits provide employees with a continuing source of income while disabled.  Short-term sick days must be used first, followed by a 7-day waiting period for Loss of Time benefits to begin.  (No waiting period is required if illness is due to an accidental injury).

Benefits, if approved, will be provided at a rate of $500.00 (gross pay) per week for up to 26 weeks.  During this time, eligibility for health benefits will also continue.

**Vacation Policy**

1. Employee is hired prior to July 1:       One (1) week that year
2. Employee is hired after July 1:         No vacation that year
3. After first full year:                 Two (2) weeks

App.070

IUOE4 FED 5031

| **4.** | After five full years: | Three (3) weeks |
| **5.** | Sixth through tenth year: | One (1) additional day per year |
| | After six years: | 16 days |
| | After seven years: | 17 days |
| | After eight years: | 18 days |
| | After nine years: | 19 days |
| | After ten years: | Four (4) weeks (maximum vacation time allowable) |

A maximum of five (5) unused vacation days may be carried over into the next calendar year. Unused vacation days, (in excess of five), will be bought back annually.

In order to allow for adequate coverage, employees are encouraged to request vacation/personal time off no less than two weeks in advance of the planned time off. It is up to each department Manager to coordinate coverage with his/her employees.

**Personal Days**

Each employee earns one (1) personal day for every six months of employment (January through June and July through December). A maximum of five (5) personal days may be accumulated. Unused personal days, (in excess of five), will be bought back annually.

**Holidays**

The following are paid holidays:

| January | New Year's Day |
| February | President's Day |
| April | Patriot's Day |
| May | Memorial Day |
| July | 4th of July |
| September | Labor Day |
| October | Columbus Day |
| November | Veteran's Day |
| November | Thanksgiving |
| December | Christmas |

**Tuition Reimbursement**

Our tuition reimbursement program provides financial assistance to employees who wish to further their education in regard to their job function with the Funds Office.

To be eligible for reimbursement, certain conditions must be met. Courses must be taken at an accredited educational institution; an employee must have prior approval from the Administrator; the courses elected must be directly related to their job; and a grade of "B" or better must be received. If the course or exam is "pass or fail," then a "pass" grade is required for reimbursement. Reimbursable expenses include tuition, exam fees, and books and will not exceed $1,000.00 in a calendar year.

*Employees should take the responsibility to ascertain the tax status of all reimbursed money by contacting their own financial advisors.*

App.071

IUOE4 FED 5032

## Educational Training and Seminars

From time to time the Funds Office will provide training and resources to teach new skills which is designed to strengthen employee performance.  Some training will be held in-house, while a number of seminars may be conducted at other sites within the Commonwealth.  When appropriate opportunities are offered or discussed, we encourage each employee to participate in them.  Attendance at such seminars must be directly related to an employee's job function.

## Electronic Communications Policy

The Funds Office infrastructure ("Infrastructure") consists of network servers, desktop and laptop computers, smart phone devices, Internet access, e-mail, voicemail.  The Infrastructure is the property of the Funds and access is given to employees to facilitate and enhance business communications, job performance and productivity.

Limited personal use of the Funds' electronic resources is permissible, so long as it is in fact reasonably limited in terms of time, cost, and is not for an unlawful or inappropriate purpose. The Funds Office would like to rely on the good judgment and good citizenship of its employees to manage usage but reserves the right to track any and all electronic usage and will implement measures that encourage or enforce good citizenship.

Limited personal use of the Funds' Infrastructure is permissible for:

- Research, reading and limited personal e-mail as long as it is in fact reasonably limited in terms of time, and takes place on personal time.

- Under no circumstances are employees allowed to use the Funds' resources for an unlawful or inappropriate purpose, for individual personal financial gain or for any purpose which interferes with, harms or puts at risk the Benefit Funds, their employees and beneficiaries, IUOE Local 4, or contributing employers.

Use of the Infrastructure is not permissible for:

- Using, sending or posting confidential information or protected health information (PHI) for non-business use.

- Accessing systems not authorized to access.

- Unauthorized use, installation, copying or distribution of copyrighted, trademarked or patented materials or software.

- Sharing, sending or obtaining pornographic, sexually explicit, profane, harassing, discriminatory, or disparaging materials.

- Harassing, making fun of, or showing disrespect to fellow employees, participants, beneficiaries, contributing employers, or IUOE Local 4.

- Using another person's e-mail or network account without his or her express permission, or misrepresenting the identity of the sender of any message, (e.g., sending mail under someone else's e-mail account without permission of that person).

- Electronic forgery.

- Downloading music onto employees' smartphone, iPod or other portable music devices.

- Playing or downloading music from internet sites, (e.g., Pandora).

**App.072**

IUOE4 FED 5033

The Funds reserve the right to access and review any information that is stored in any fashion on the Funds' Infrastructure. The Funds also reserve the right to screen, intercept and delete stored materials and will take any and all appropriate disciplinary action. The Funds reserve the right to monitor incoming and outgoing telephone usage. To ensure quality member service, the Funds have the right to record employee phone conversations, with an announcement to the caller and receiver of the recording. Social Networking sites are prohibited in the office.

The Funds track and store information on employee usage of Internet utilization and provide these reports to Funds management.

The policies and procedures can be located in Onbase under "Employee Information."

## Bereavement

In the event of the death of an immediate family member, each employee will be allowed three (3) days off with pay, up to and including the day of the funeral. A member of the immediate family is a spouse, spousal equivalent, child, mother, father, sister, brother or parent-in-law.

Each employee will be entitled to one (1) day off with pay to attend the funeral of a daughter-in-law or son-in-law, grandchild, grandparent, or other legal relative.

Individual consideration is given in the case of a death of another not listed above. If time is allowed, it will generally be to attend services and then return to work.

## Leave of Absence

On February 5, 1993, the Family and Medical Leave Act of 1993 (FMLA) was signed into law. In general, the law requires employers with 50 or more employees to offer up to 12 weeks of unpaid leave, during any 12-month period, to eligible employees for the birth or adoption of a child, to care for a sick family member or for the employee's own illness.

Although the Funds is not required to comply with the provisions of FMLA there will be, on occasion, circumstances which will necessitate extended absences from work.

An employee must apply for a leave of absence in writing, with final approval determined by Gina M. Alongi, Administrator. Leaves of Absence must be for a specified period of time and will be without pay. The continuation of employee benefits is determined by the type and duration of the approved leave.

If an employee fails to return to work on the date indicated on the approved leave request, and arrangements have not been made to extend the leave, the employee will be considered to have voluntarily terminated their own employment.

Upon an employee's return from a leave of absence, the Funds Office is committed to making a reasonable effort to re-establish the employee's original job or a position of similar status and pay, as business conditions permit.

App.073

IUOE4 FED 5034

## Maternity/Adoption Leave

Every full-time non-probationary employee is entitled to eight (8) weeks of unpaid maternity/paternity leave for the purpose of the birth of a child or the adoption of a child under 18 years of age (or under 23 years of age if the child is mentally or physically disabled). While on maternity or paternity leave, the employee will be eligible for Loss of Time Benefits.

The employee is expected to give two (2) weeks notice to the Funds of their expected departure and a notice of an approximate date of return to their position.

The Funds will provide reasonable accommodations on request for employees who are pregnant or nursing.

## Jury Duty

Jury Duty is a civil obligation of all citizens. If an employee is required to serve as a juror, the Funds will pay the first three (3) days of jury duty at the employee's normal pay. If the case lasts longer than three (3) days, then upon receipt of a jury slip or court summons, The Funds will pay the difference between the base rate of pay and the fees received from the courts. An employee must notify their Manager in advance of their absence.

## Complaints

In all organizations there is the possibility that misunderstandings occur. This may result in an employee feeling she or he has been treated unfairly. If an employee feels this has happened or is happening, there is a need to alert someone. The Funds recognize the need for a definite procedure for all employees to follow in order to facilitate the proper and timely handling of complaints. This is not to be confused with an effort to change or establish company policy or procedure.

All complaints and suggestions should be directed to Laura-Jean Hickey, Assistant Administrator.

## Smoking

The Massachusetts Smoke-Free Workplace Law mandates that enclosed workplaces with one or more employees must be smoke-free. The intent of the law is to protect workers from secondhand smoke. Although it would appear that neither the state nor the town mandate that smokers stand a specific distance away from the building, the purpose of the state law is to avoid having smoke migrate back into the workplace. To ensure compliance with the law and to be respectful to co-workers, it is Funds policy that anyone who chooses to smoke must exit the back of the building and go across the parking lot to stand near the Training Center fence.

## Performance Reviews

The Administrator or Associate/Assistant Administrators will review employees' performance informally on a continuing basis. In addition, at least once per calendar year, a formal review will be conducted. Performance reviews are conducted to assess an employee's progress and commitment to their role(s) within the Funds Office. Reviews are, but not limited to, a critical

15

tool to set goals for the upcoming year, to recognize positive efforts and to communicate any and all professional struggles or accomplishments. Ultimately, reviews affect salary, promotions, transfers and disciplinary considerations. Each employee will receive a Performance Review Summary which will be reviewed with their respective Manager. The summary will be discussed, agreed or disagreed upon, and finally, signed by both parties. In the event of a disagreement with any part of the review, a second review will be done within five business days. This Funds Office procedure allows for both parties to gather additional and necessary detailed information regarding the dispute. The Performance Review becomes part of the employee's permanent personnel file.

### Employment Records

The Funds Office believes in the right to privacy and assures each employee of that right, (inside or outside the office), unless circumstances warrant otherwise. Each employee has the right to review and make copies of their personnel file during normal business hours, upon written request to Gina M. Alongi, Administrator.

### Reference Policy

Any and all professional reference requests must be directed to Gina M. Alongi, Administrator. Under no circumstances may another employee of the Funds Office act as an agent of the organization and provide a professional reference for a current or former employee.

### Bulletin Boards

Bulletin boards are a means of informing employees of information regarding changes and/or general information. The bulletin board is located in the open area outside the Administrator's Office for employee convenience.

### Benefits

As an employee of the Funds, each employee and their families are eligible to receive the same benefits provided to the membership of Local 4. These benefits are designed to protect employees and provide for their family's financial security through a broad range of unexpected events and extraordinary expenses.

### Health & Welfare Plan Benefits

Effective January 1, 1999, coverage begins the first day of the month following the commencement of employment. Effective January 1, 2014, continued eligibility for a newly hired Office Employee of the Funds under the Basic Benefits Plan is contingent upon the Office Employee working 150 or more credited hours in a calendar month, until such time as the Office Employee has worked 1,800 hours or more in a calendar year. Once the newly-hired Office Employee has worked the required 1,800 or more hours in a calendar year, the Office Employee will be eligible for benefits under the Basic Eligibility Rule for the 12-month period beginning the following March 1 through February 28 (or February 29 during a leap year). Further continued eligibility after termination of employment will be based on the Health and Welfare Fund's eligibility rules and in accordance with the applicable provisions of the Plan Document. ***Please refer to the Summary Plan Description (SPD) for details of the Plan of Benefits.***

App.075

IUOE4 FED 5036

## Pension Plan Benefits

The Funds Office provides two Pension Plans in order to provide employees with the greatest possible income during their eventual retirement years.  Participation in these Plans is effective with date of hire and is non-contributory.

*IUOE Local 4 Pension Plan (Defined Benefit Plan)* – The Funds contributes monthly contributions on each employee's behalf, which entitles them to a pension benefit upon vesting. The number of years of service entitles employees to pension credit, which is multiplied by a determined accrual rate. Upon vesting, benefits are paid at the Normal Retirement age of 62, Early Retirement age of 52, or a Disability retirement at any age.

*General Pension Plan* – The second source of retirement income is from the General Pension Plan.  The Funds makes a contribution in an amount equal to 17.5% (2015) of an employee's salary (contributions are capped at $100,000.00).

Under both of these Plans, employees are fully vested after 5 years of continuous employment with the Funds Office and will be eligible for Pension benefits at a regular, early or disability retirement.  ***Please refer to the Summary Plan Description (SPD) for details of the Plan of Benefits.***

## Annuity and Savings Plan Benefits

The Annuity and Savings Plan is designed to supplement the aforementioned Pension Fund.  The Funds Office contributes to each employee's account for every hour worked.  The Plan is participant directed.

Participation in the 401(k) Plan is voluntary and contributions are made on a pre-tax basis.  Each employee is eligible to participate after one Hour of Service.  Investments in the 401(k) are a mirror image of investments in the Annuity Plan. ***Please refer to the Summary Plan Description (SPD) for more details on the Plans outlined above.***

## Funds Office Management

For pointed questions or concerns regarding any of the above policies or procedures, employees should contact one of the following Managers:

| | | | |
|---|---|---|---|
| Gina M. Alongi | Administrator | x111 | galongi@local4funds.org |
| Greg Geiman | Associate Administrator/In-House Counsel | x140 | ggeiman@local4funds.org |
| Laura-Jean Hickey | Assistant Administrator | x116 | lhickey@local4funds.org |
| Rebecca Zaccardi | Accounting Manager | x120 | rzaccardi@local4funds.org |
| Jennifer Dow | Eligibility Coordinator | x126 | jdow@local4funds.org |

17

**App.076**

IUOE4 FED 5037

# Exhibit 7

**U.S. Department of Labor**

Employee Benefits Security Administration
J.F. Kennedy Federal Building, Room 575
Boston, MA 02203
Phone: (617) 565-9600
Telefax: (617) 565-9666



SEP 16 2004

IUOE Local 4 Health & Welfare Plan
177 Bedford Street
Lexington, MA 02420
Att:   Mr. William Ryan, Trustee
       Mr. John C. Panaro, Trustee
       Mr. Rodney A. Gillespie, Trustee
       Mr. Bruce Wood, Trustee
       Mr. John J. Shaughnessy, Jr., Trustee
       Mr. Peter White, Trustee
       Ms. Gina M. Alongi, Fund Administrator

**EXHIBIT 95**
**ALONGI**
06/22/2022   BG

RE:                        IUOE Local 4 Health & Welfare Plan
EBSA Case Number:          31-026923(48)

Dear Plan Fiduciaries:

I have received your letters dated September 26, 2003, November 7, 2003, November 25, 2003, December 16, 2003 and March 8, 2004 concerning the IUOE Local 4 Health and Welfare Fund that were in response to my letter dated August 28, 2003. I understand that you have held numerous teleconferences with Senior Investigator Muench in order to settle the issues raised by the Department.

As I pointed out in my previous letter, the Department of Labor has responsibility for the enforcement of Title I of the Employee Retirement Income Security Act of 1974 (ERISA). Title I establishes standards governing the operation of employee benefit plans such as the IUOE Local 4 Health and Welfare Fund (the "H & W Plan").

As I noted, Senior Investigator Muench has concluded her investigation of the Plan and of your activities as its Plan Administrator & Trustees. Based on the facts gathered during that investigation it appeared that, as Plan fiduciaries, you violated your fiduciary obligations to the Plan and violated several provisions of ERISA. The specific actions taken by you that we believe violated ERISA were detailed in my previous letter.

The Department understands that the fiduciaries have taken corrective action regarding the following issues:

**I. & II. The Fund Office Failed to Properly Allocate Salary & Common Expenses**

App.078

We understand that the Fund Office retained the firm of Manzi & Associates, CPA to conduct an independent time and function study of the operations of the Fund Office; resolved to update the time and function study at six month intervals to ensure that the allocation remains objective and accurate; adopted a formal Administrative Services Agreement and requested and received reimbursement from both the SAC and Fair Funds for administrative expenses for the period 1997 to the date that the new time/function study allocation is implemented.

The amount owed by the SAC & PAC and Fair Funds through December 2002 together with interest was calculated to be $44,626.14 and $42,052.32, respectively. Additional amount due for the 2003 plan year have been calculated for the SAC & PAC and Fair Funds in the amounts of $9,751.20 and $6,432.21, respectively and paid. The amount recouped was divided among the Funds in accordance with the allocation percentages assigned at the time. Amounts repaid to the H & W Plan for the period 1997-2003 total $44,340.55.

Since December 2004, amounts due for administrative expenses from the SAC, PAC and Fair Funds have been deducted monthly from their respective contributions.

## III.    Failure to Properly Allocate the Crime Policy Expense

We understand that the $11,620 amount for the 2002 crime policy was incorrectly booked 100% to the Health and Welfare Fund. According to Plan Administrator Alongi, this error has been subsequently corrected. The correction resulted in $7,204.40 being repaid to the H & W Plan.

## IV.    In-Office Massages

Imprudent or prohibited in-office "Chair Massage" expenses apportioned among the various plans have been repaid in the amount of $4,922.00. These repaid expenses were apportioned back to the fund in the proportion that they were originally charged. The Health & Welfare Plan received $4,116.00. The practice of offering in-office "Chair Massages" to the Fund Staff and at the expense of the ERISA funds has been discontinued.

## V.    Petty Cash

The Petty Cash account was reimbursed in the amount of $6,346. These repaid expenses were apportioned back to the fund in the proportion that they were originally charged. The Health & Welfare Plan received $2,411.48. An unpaid amount of $1,461.00 has recently been remitted for payment under the ULICO policy. A copy of that request has been received. Once the Department receives proof of this repayment, it is prepared to close the investigation.

## VI.    Failure to Account for Services Rendered Under Legal Retainers

After the production of further information by the Fund's counsel, the Department is satisfied that the Plan paid fair value for the legal services received. However, going forward, the Department understands that the Board of Trustees will better document its legal expense review.

2

### VII.   Travel Expenses-Repaid

We acknowledge receipt of ULICO check and allocation schedule that documents a repayment of $637.93 on behalf of Atty. Flamm for imprudent travel expenses to this Plan.

We are also in receipt of cancelled checks in the amount of $4,224.56 from Segal, Roitman & Coleman that represents repaid imprudent travel expenses; all of which have been allocated back to the health plan.

### VIII.   HIPAA Violations:

#### 1. Failure to Comply with and Notify Participants of Special Enrollment Rights under HIPAA

The Department has reviewed the terms of the Plan and concluded that it is not necessary to have a special enrollment notice because enrollment is automatic.

#### 2. Failure to Comply with Certain HIPAA Pre-Existing Condition Exclusion Provisions

We understand that your Plan does not operate with any pre-existing conditions. However, during Senior Investigator Muench's initial visit to the fund office on February 27, 2003 she determined that the Plan contained four pre-existing condition exclusions. We understand that the Board of Trustees amended the plan document, effective March 11, 2003, to remove the language. A copy of the Seventeenth Amendment has been received.

#### 3. Failure to Comply with Mental Health Parity Act (MHPA)

We understand that your Plan does provide mental health benefits. However, the Plan Document does contain language that violates the MHPA. Senior Investigator Muench brought this issue to your attention during her initial visit to the fund office on February 27, 2003. We note that the Eighteenth Amendment to the Plan Document has been executed, effective March 11, 2003 to correct the plan language. A copy of the Eighteenth Amendment has been received.

#### 4. Failure to Comply with the Women's Health & Cancer Rights Act (WHCRA)

We understand that your Plan does provide mastectomy benefits, however, the Plan Document did not contain any of the required language. Senior Investigator Muench brought this issue to your attention during her initial visit to the fund office on February 27, 2003. We note that the Nineteenth Amendment to the Plan Document has been executed, effective March 11, 2003 to insert the required plan language.

The Department understands that the plan fiduciaries are still pursuing corrective action on the following issues:

### IX.   Travel Expenses –Pending

App.080

Imprudent or prohibited expenses charged to the Plan as a travel expense have not been repaid. Fund Counsel has informed the Department that instead of billing the responsible trustees, as originally agreed, the Fund Office has recently decided to submit a claim under their insurance carrier for reimbursement. A copy of the ULICO claim has been received in this office. Also, a new travel policy has been adopted which addresses the issues involved. Once the Department receives proof of these repayments, it is prepared to close the investigation.

The amounts at issue for all of the funds are as follows:

| | |
|---|---|
| 1997-1998 | $5,283.08 |
| 1999-2000 | $4,940.38 |
| 2001-2002 | $1,947.00 |

X.    American Express Charges, "Miscellaneous" and "Other" Expenses

An agreement has been reached regarding imprudent or prohibited expenses charged to the Fund's American Express and apportioned as expenses among the various plans. A claim has been submitted to the Fund's insurance carrier for repayment in the amount of $5,420.00. These repaid expenses will be apportioned back to the fund in the proportion that they were originally charged. Once the Department receives proof of these repayments, it is prepared to close the investigation.

XI.    Two Eligibility Provisions are not Adequately Disclosed: Month to Month and Buy-In Provisions are not listed in Plan Document, nor are they discussed in the SPD.

The Plan Document and SPD have been combined into one document currently in draft form. Until the document is produced and distributed to participants, this issue will remain unresolved.

Upon receipt of documentation of all of the corrective actions I proposed with respect to the specific violations detailed in my letter of August 28, 2003, the Department will take no further action with respect to these matters. You are cautioned, however, that by agreeing to take no further action with regard to these issues, the Department commits only itself and cannot in any way restrain any other individual or governmental agency from taking any further action it may deem appropriate with respect to either these or other matters.

Sincerely yours,

James M. Benages
Regional Director

# Exhibit 8



**IUOE LOCAL 4 BENEFIT FUNDS**
**AGREED-UPON PROCEDURES**

IUOE LOCAL 4 BENEFIT FUNDS

AGREED-UPON PROCEDURES

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Independent Accountant's Report on Applying Agreed-Upon Procedures |  | 1 – 6 |

Supplemental supporting schedules:

| Exhibit | Description |  |
|---|---|---|
| A-1 | Weekly salary analysis 2017-2020 | 7 - 10 |
| A-2 | Analysis of G. Alongi and R. Alongi vacation payouts | 11 |
| A-3 | Analysis of G. Alongi vacation/sick time taken | 12 - 14 |
| B-1 | Analysis of Fund Office employee fringe benefits | 15 - 18 |
| C-1 | Analysis of employee reimbursements | 19 |
| D-1 | Analysis of credit card charges | 20 - 40 |
| E-1 | Analysis of reimbursements from the Massachusetts Coalition of Taft-Hartley Trust Funds, Inc. | 41 |
| F-1 | Analysis of Annuity distributions to G. Alongi and R. Alongi | 42 |
| G-1 | Analysis of G. Alongi office entry times | 43 |
| G-2 | Analysis of G. Alongi outgoing phone calls | 44 |
| G-3 | Analysis of G. Alongi outgoing email activity | 45 |
| G-4 | Analysis of G. Alongi office entry times, outgoing phone calls and outgoing email activity | 46 |
| G-5 | Analysis of G. Alongi cell phone usage | 47 |
| G-6 | Allocation of G. Alongi payroll, taxes and benefits | 48 |
| G-7 | Analysis of employees cost allocation to the Coalition | 49 |
| G-8 | Analysis of rent attributed to the Coalition | 50 |

IUOE4 FED 0025



**Schultheis & Panettieri** LLP
—— Accountants and Consultants ——

**Please Reply to:**
450 Wireless Boulevard
Hauppauge, NY 11788
Telephone:  (631) 273-4778
Fax:          (631) 273-3488

21 Vernon Street
Floral Park, NY 11001
Telephone:  (516) 216-5695

485A US Route 1 South
Suite 360
Iselin, NJ 08830
Telephone:  (732) 268-1301

http://www.snpcpa.com

PARTNERS
Carol Westfall, CPA
Vincent F. Panettieri, CPA
Max Capone, CPA
James M. Heinzman, CPA
Donna Panettieri, CPA
Peter M. Murray, CPA
Sharon M. Haddad, CPA
Gary Waldren, CPA
Alexander Campo, CPA.CITP
Jennifer Evans, CPA
Richard B. Silvestro, CPA
Jamie L. Krainski, CPA
Vincent A. Gelpi, CPA

DIRECTORS
Stephen Bowen
Anthony Sgroi
William R. Shannon
William Austin
Kimberly Miller
Michael Fox
Viorel Kuzma

**INDEPENDENT ACCOUNTANT'S REPORT
ON APPLYING AGREED-UPON PROCEDURES**

Boards of Trustees
IUOE Local 4 Benefit Funds
16 Trotter Drive
Medway, MA 02053

We have performed the procedures enumerated, which were agreed to by management of the IUOE Local 4 Pension, Health and Welfare, Annuity and Savings Plan, Cooperative Trust, and Apprenticeship and Training Funds (collectively, the "Funds") solely to assist management of the Funds in evaluating whether or not inappropriate transactions occurred under the supervision of the former Fund Administrator, Gina Alongi.  The period subject to analysis was January 1, 2017 through June 30, 2020.  Where applicable, periods were expanded or contracted based on consultation with management.  This agreed-upon procedures engagement was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants.  Management of the Funds is responsible for the books and records, tax filings, internal controls, and the sufficiency of the procedures.  Consequently, we make no representation regarding the sufficiency of the procedures described below either for the purpose for which this report has been requested or for any other purpose.

A. **Procedure:**  Prepare an analysis of wages paid to the former Fund Administrator and all Fund Office employees under the supervision of the former Fund Administrator including, but not limited to, an analysis of any additional payments made.

**Findings:** Exceptions were found as a result of applying the procedure. See attached Exhibit A-1 detailing wages paid to all Fund Office employees for the period January 1, 2017 through June 30, 2020.  2020 rate increases appeared consistent to amounts approved by the Boards of Trustees; however, we were unable to confirm individual increases to documented Trustee approval for the years 2018 and 2019.

During our interviews and analysis of payroll, we noted the following inconsistencies in vacation buyouts and additional paid time of the former Fund Administrator and her sister resulting in excess payments totaling $53,490 as follows (see Appendix A-2):

> Commencing in 2013, the former Fund Administrator received an additional two weeks' vacation per year for which we were unable to obtain documented Trustee approval.

From 2015 through 2019, the former Fund Administrator granted her sister 36 hours additional paid time off for which we were unable to obtain documented Trustee approval.

From 2015 through 2019, the former Fund Administrator's sister received 38.5 hours additional vacation buyouts as a result of spreadsheet errors.

The Fund Office Employee Handbook states that unused vacation days will be bought back annually. From 2015 through 2020, we noted ten (10) instances where partial vacation buyouts to the former Fund Administrator and her sister were paid during the year, rather than at the end of the calendar year when other Fund Office employees' vacation buyouts were processed. It is our understanding that these payments were directed by the former Fund Administrator and only the former Fund Administrator and her sister were granted this opportunity.

During our analysis of vacation and sick time taken by the former Fund Administrator, we noted numerous instances where it appears probable that all vacation, sick, and personal time was not recorded on the Funds' "Employee Absence Tracking" reports, thereby resulting in incorrect amounts reported for sick time taken and potentially resulting in excess vacation buyouts (see Appendix A-3). Due to the lack of records available, we remain unable to quantify potential vacation buyout overpayments.

B. **Procedure:** Prepare an analysis of benefit fund contributions paid on behalf of the former Fund Administrator and all Fund Office employees under the supervision of the former Fund Administrator.

**Findings:** Exceptions were found as a result of applying the procedure.

We noted minimal variances in Annuity Fund contributions for individuals who work less than 40 hours per week (see Exhibit B-1). We have notified the current Fund Administrator of our findings and have been informed that applicable agreements will be updated accordingly.

C. **Procedure:** Prepare an analysis of expense reimbursements to the former Fund Administrator and all Fund Office employees under the supervision of the former Fund Administrator.

**Findings:** No exceptions were found as a result of applying the procedure.

We noted reimbursements totaling $15,421, all of which appeared reasonable (see Exhibit C-1). We also noted, however, the unusual practice of the Funds' independent auditor reviewing, approving, and directing payment for reimbursements. Independent auditors are prohibited from being part of the internal controls for an entity they audit as doing so may impair their independence. Furthermore, we noted a reimbursement for airfare made in connection with a conference which was not held due to COVID-19 and remain uncertain whether a credit remains.

D. **Procedure**:   Prepare an analysis of credit card charges incurred by the former Fund Administrator and all Fund Office employees under the supervision of the former Fund Administrator.

**Findings**:  No significant exceptions were noted as result of applying the procedure (see Exhibit D-1) with specific items "of interest" noted.

E. **Procedure**:  Prepare an analysis of expenditures made on behalf of, and reimbursements received from, the Massachusetts Coalition of Taft-Hartley Trust Funds, Inc. (the "Coalition").

**Findings**:  No exceptions were noted as a result of applying the procedure. The Fund Office provided copies of all invoices to the Coalition.  Amounts received from the Coalition were minimal and consisted primarily of rent and postage reimbursements (See Exhibit E-1).  We were unable to determine if additional costs were incurred and not allocated and/or invoiced properly.

F. **Procedure**:  Review benefits and claims paid by the Funds on behalf of the former Fund Administrator and former IT Director for compliance with benefit plan provisions.

**Findings**:  We analyzed the medical (including major medical, prescription drug, and dental) claims for the former Fund Administrator and former IT Director for which no exceptions were noted.

We reviewed the Annuity Fund loan and benefits paid to the former Fund Administrator and former IT Director noting the following items:

> It is our understanding that the former Fund Administrator did not normally approve benefit and loan applications; however, we noted several instances where the former Fund Administrator approved her own applications and those of her sister (the former IT Director).   Furthermore, we noted unusual hardship distributions and inconsistent application of notarization and approval protocols (See Exhibit F-1).

G. **Procedure**:  Perform employee interviews as necessary to determine reasonableness of salary and benefit allocations to the Coalition.

**Findings**:  Exceptions were found as a result of applying the procedure. We noted significant weaknesses in controls surrounding cost allocations to the Coalition, where the former Fund Administrator also served as the Executive Director.

In 2004, the former Fund Administrator received correspondence from the U.S. Department of Labor which stated that she (as Fund Administrator) and the Trustees had violated their fiduciary obligations for failure to properly allocate salaries and common expenses.  We noted that it appears the Funds have an adequate system to track and request reimbursement for postage (for which an identifying code is entered in the postage machine whenever mail is processed on behalf of the Coalition); however, the Funds do not have an adequate system to track labor, related taxes, and benefit costs incurred on behalf of the Coalition.  In fact, timesheets were designed in a manner in which Fund Office employees were unable to allocate time to the Coalition.  Furthermore, Fund Office employees were tacitly directed not to allocate time to the Coalition. Finally, the former Fund Administrator, whose allocation would be most significant and most sensitive, did not maintain a timesheet as required of all other employees.

Based on our interviews and analysis of Fund Office employees' emails, it is apparent that the Coalition's operations were tightly integrated with the Fund Office and many of the Fund Office employees performed duties for the Coalition with no reimbursement.  It appears Fund Office employees' Coalition efforts increased gradually to 2020, at which time significant Fund Office resources were being directed to the Coalition's inaugural "Wellness Fair" for which no time was tracked, allocated, or invoiced to the Coalition.

It appears four (4) Fund Office employees received some compensation directly from the Coalition (the Assistant Administrator, the Accounting and Operations Manager, the former IT Director, and the former Fund Administrator).

> The Assistant Administrator indicated that she received compensation for twenty (20) hours per month (at a reduced rate of $25-$30 per hour) for her Coalition efforts and used her best efforts to make up any time performing Coalition duties during lunch and before or after normal business hours (8:00AM to 4:00PM) but estimated that an additional 30% of her efforts for the Coalition occurred during normal business hours for which she received compensation and benefits from the Funds with no reimbursement from the Coalition.

> The Accounting and Operations Manager indicated that she received less than $600 per year from the Coalition for which she performed few duties, and although some of her Coalition duties were performed during lunch, most (estimated at 1%) were performed during normal business hours for which she received compensation and benefits from the Funds with no reimbursement from the Coalition.

> During our analysis of documents included in emails, we noted monthly payments of $500 from the Coalition to "Alongi Associates" for "Web Maintenance" and noted correspondence indicating these services were performed during normal business hours. During our interviews, we verified that these were, in fact, payments to Rosemarie Alongi for IT services which appear to have been performed during normal business hours for which she received compensation and benefits from the Funds with no reimbursement from the Coalition.

> By 2019, in addition to the $329,000 of wages, taxes, and benefits received from the Funds, the former Fund Administrator was receiving $46,000 a year in compensation from the Coalition and repeatedly represented on the Coalition's Forms 990 that she spent 10 hours per week performing duties on behalf of the Coalition.  To evaluate if these efforts were performed during normal business hours (for which she received compensation and benefits from the Funds with no reimbursement from the Coalition) or outside of normal business hours, we analyzed incoming and outgoing calls from the former Fund Administrator's office phone, entry times from the former Fund Administrator's key fob noting times she entered the Fund Office, and cell phone calls from February 11, 2020 through July 23, 2020.  Based on the following analyses, it appears the former Fund Administrator worked significantly less than the required seven hours per day and performed her duties as Executive Director of the Coalition during the reduced hours she was at the Fund Office.

There is no record of the former Fund Administrator entering the Fund Office prior to 8:00AM from 2015 through 2019. It appears she began arriving at 8:00AM in January 2020 when requested to do so (See Exhibit G-1 for an analysis of building entry times for the period September 2015 through March 2020).

> For the period September 2016 through July 2020, incoming and outgoing calls to and from the former Fund Administrator's office phone were commonly between the hours of 9:30AM and 4:00PM until January 2020 at which time they occurred between 8:00AM and 4:00PM (See Exhibit G-2 for an analysis of outgoing office telephone calls for the period September 2016 through July 2020).

> For the period September 2015 through July 2020, the former Fund Administrator's outgoing email activity followed a similar pattern as the outgoing phone calls whereby most of the activity occurred between 10:00AM and 4:00PM. Our analysis also revealed numerous emails during that time with a subject line referencing the Coalition, a very large majority of which occurred during times when the former Fund Administrator was receiving compensation from the Funds (See Exhibit G-3 for an analysis of outgoing emails for the period September 2015 through July 2020).

> Entry times were consistent with the former Fund Administrator's outgoing email and phone activity, thereby validating the data used in the analysis (See Exhibit G-4 for a comparison of telephone records, email activity, and entry times for the period October 2015 through July 2020). Our findings are consistent with representations made during discussions with other Fund Office employees.

> Analysis of the former Fund Administrator's cell phone records for the period February 11, 2020 through July 23, 2020 (the only period for which data was accessible) indicated that (1) there were very few business phone calls made to/from the former Fund Administrator's cell phone prior to the COVID-19 pandemic and (2) a large majority of business calls made and received by the former Fund Administrator were most commonly during normal business hours (See Exhibit G-5 for an analysis of cell phone calls for the period February 11, 2020 through July 23, 2020).

Absent contemporaneous timesheets, consideration of the former Fund Administrator's apparent failure to work seven-hour days, and her apparent performance of Coalition duties while employed by the Funds yields an estimated balance due from the former Fund Administrator of $280,408 for work not performed and an estimated value of $460,704 for Coalition work performed while engaged by the Funds (See Exhibit G-6).

We reviewed hundreds of emails documenting Coalition work performed by various persons during normal Fund Office business hours. Work performed included scheduling and planning all Coalition events and meetings, preparing all meeting materials, performing surveys on behalf of the Coalition, maintaining the books and records of the Coalition, maintaining the Coalition's website and continuously updating service provider and membership data, and orchestrating the inaugural Wellness Fair. Additionally, we interviewed several Fund Office employees who validated our findings. It appears eight (8) Fund Office employees (other than the former Fund Administrator) regularly performed functions on behalf of the Coalition with no reimbursement received. Absent contemporaneous timesheets, based on our analysis of emails and employee interviews, it appears payroll, taxes, and related benefit costs incurred by the Funds for the period January 1, 2015 through June 30, 2020 amounted to $688,173 (See Exhibit G-7).

IUOE4 FED 0030

The Coalition was charged rent at a rate of $47.81 per month based on the assumption that only one office cubicle (63.75 square feet) was being occupied by the Coalition, when in fact, it appears there was an entire office being used by the Coalition and there was no consideration for rent associated with the several persons who regularly performed duties for the Coalition. Furthermore, it appears the rate per square foot was not updated when the Fund Office leases were renewed. Occupancy analysis for the period January 1, 2015 through June 30, 2020 indicates that actual rent paid on behalf of the Coalition was approximately $24,457 greater than amounts invoiced and received (See Exhibit G-8 for an analysis of rent attributed to the Coalition for the period January 1, 2015 through June 30, 2020).

### Other Items:

During our interviews, Fund Office employees alleged several questionable events of the former Fund Administrator. Such events included directing Fund Office employees to return personal internet purchases, make family dinner reservations, purchase undergarments, and tend to a horse at the former Fund Administrator's barn. Additionally, the former Fund Administrator allegedly directed a Fund Office employee to rig a wellness raffle to ensure that she herself would "win" an Apple watch purchased by the IUOE Local 4 Health and Welfare Fund and directed several Fund Office employees to misreport a celebratory lunch, paid for by the Funds, for a newly married staff member as a "Vitech Super Users Meeting". Furthermore, the former Fund Administrator allegedly kept gift cards from Funds' service providers (from Ruth Chris Steak House and Blue Cross) and utilized American Express award points for her personal benefit.

We were not engaged to and did not conduct an examination or review engagement, the objective of which would be the expression of an opinion or conclusion, respectively, on the extent of questionable transactions, payments, expenditures, misappropriation and/or other irregularities that may have occurred. Accordingly, we do not express such an opinion or conclusion. Had we performed additional procedures, other matters might have come to our attention that would have been reported to you.

This report is intended solely for the information and use of the management of the Funds and is not intended and should not be used by anyone other than those specified parties.

*Schultheis & Panettieri LLP*

SCHULTHEIS & PANETTIERI, LLP
Hauppauge, New York

REPORT DATE: April 21, 2021

EXHIBIT A-1

IUOE LOCAL 4 BENEFIT FUNDS
WEEKLY SALARY ANALYSIS 2017-2020

| Employee | Weekly increase from 2019 to 2020 | Weekly increase from 2018 to 2019 | Weekly increase from 2017 to 2018 | 2020 Weekly Wage $ | Comments |
|---|---|---|---|---|---|
| Alongi, Gina | 3.00% | 5.00% | 6.60% | 4,784 | |
| Alongi, Rosemarie | 3.00% | 4.00% | 4.00% | 2,199 | |
| Ayala (Rivera), Yerania | 22.53% | 8.52% | 5.51% | 1,346 | |
| Batchelder, Wendy | 3.02% | 4.99% | 5.01% | 1,114 | |
| Berardi, Terri | 2.99% | 8.02% | 4.49% | 942 | |
| Blenkhorn, Debra | 3.00% | 3.03% | #DIV/0! | 671 | New Hire 2018 |
| Boisvert, Amy | 2.98% | 3.02% | 10.03% | 738 | |
| Burns, James | 3.00% | #DIV/0! | #DIV/0! | 1,585 | New Hire 2019 |
| Cerqueira, Danielle | 14.74% | 8.50% | 14.85% | 885 | |
| Christy, Donald | 3.00% | 4.00% | 5.00% | 1,729 | |
| Dow, Jennifer | 3.00% | 3.00% | 4.50% | 1,281 | |
| Geiman, Gregory | 3.00% | 5.00% | 16.72% | 3,744 | |
| Hickey, Laura-Jean | 3.00% | 4.39% | 2.50% | 1,958 | |
| Johnson, Amanda | #DIV/0! | -100.00% | -51.43% | - | Ceased Employment 2018 |
| Koufos, Alan | -100.00% | 2.00% | 2.00% | - | Ceased Employment 2020 |
| Kurtz, Alice | 0.00% | 0.00% | 0.00% | 1,930 | Part Time after 2017 |
| Lynch, Laurie | -100.00% | 2.00% | 2.49% | - | Ceased Employment 2019 |
| Mc Goldrick, Sheila | 3.00% | 2.50% | 3.00% | 1,809 | |
| Ortega, Rosemary | 3.00% | 3.02% | 4.48% | 1,094 | |
| Ryan, Taylor | 2.97% | 3.01% | 7.00% | 766 | |
| Vachon, Jennifer | 2.99% | 2.01% | 3.50% | 1,060 | |
| Zaccardi, Rebecca | 3.00% | 6.50% | 5.00% | 2,403 | |
| Total W-3 | | 2.59% | 5.75% | | |

2020 - January 2020 Trustee meeting - approval of 3% increase plus one week holiday bonus.
2019 - January 2019 Trustee meeting - approval of overall budget request for salary increases.
2018 - April 2018 Trustee meeting - approval of $44,000 increase to staff and increases to
Administrator and Associated Administrator as discussed.

IUOE4 FED 0032

App.091

EXHIBIT A-1

IUOE LOCAL 4 BENEFIT FUNDS
WEEKLY SALARY ANALYSIS 2017-2020

**2019**

| Employee | Weekly | Salary | Overtime | Employer FMLA | Personal Use Auto | Vacation | Sick | Bonus | Retro | W-2 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alongi, Gina | $ 4,644 | $ 235,750 | $ - | $ 57 | $ 1,964 | $ 4,644 | $ 4,644 | $ 4,644 | $ 1,106 | $ 252,809 |
| Alongi, Rosemarie | 2,135 | 110,586 | - | 19 | - | 2,134 | - | 2,135 | 410 | 115,284 |
| Ayala (Rivera), Yerania | 1,099 | 56,704 | 286 | 10 | - | - | 1,428 | 1,099 | 430 | 59,957 |
| Batchelder, Wendy | 1,081 | 55,962 | 951 | 9 | - | 584 | - | 1,081 | 257 | 58,845 |
| Berardi, Terri | 914 | 42,630 | 271 | 8 | - | - | - | 914 | 342 | 44,165 |
| Blenkhorn, Debra | 651 | 33,756 | 169 | 7 | - | 1,137 | 694 | 651 | 95 | 36,509 |
| Boisvert, Amy | 716 | 37,140 | 172 | 6 | - | - | 287 | 716 | 104 | 38,425 |
| Burns, James | 1,538 | 32,308 | - | 13 | - | 1,096 | - | 1,538 | - | 34,956 |
| Cerqueira, Danielle | 771 | 39,790 | 15 | 7 | - | - | 540 | 771 | 301 | 41,424 |
| Christy, Donald | 1,679 | 86,974 | - | 21 | 821 | 1,931 | - | 1,679 | 323 | 91,748 |
| Dow, Jennifer | 1,244 | 64,494 | - | 10 | - | - | - | 1,244 | 181 | 65,929 |
| Geiman, Gregory | 3,635 | 188,135 | - | 37 | - | 11,268 | - | 3,635 | 865 | 203,940 |
| Hickey, Laura-Jean | 1,901 | 98,436 | - | 16 | - | - | - | 1,901 | 410 | 100,762 |
| Johnson, Amanda | - | - | - | - | - | - | - | - | - | - |
| Koufos, Alan | 2,520 | 125,771 | - | 11 | - | - | - | 2,520 | 247 | 128,550 |
| Kurtz, Alice | 1,930 | 12,651 | - | 2 | - | - | - | - | - | 12,653 |
| Lynch, Laurie | 1,356 | 65,262 | 380 | 3 | - | - | - | 1,356 | 133 | 67,134 |
| Mc Goldrick, Sheila | 1,757 | 91,129 | - | 18 | - | 5,270 | - | 1,757 | 214 | 98,389 |
| Ortega, Rosemary | 1,062 | 55,068 | 276 | 10 | - | 850 | 1,062 | 1,062 | 155 | 58,483 |
| Ryan, Taylor | 744 | 38,579 | 171 | 7 | - | 303 | 575 | 744 | 108 | 40,487 |
| Vachon, Jennifer | 1,029 | 53,407 | 247 | 10 | - | 1,029 | 823 | 1,029 | 101 | 56,646 |
| Zaccardi, Rebecca | 2,333 | 120,611 | - | 20 | - | 700 | - | 2,333 | 712 | 124,376 |
| Total W-3 | | $ 1,645,145 | $ 2,939 | $ 300 | $ 2,785 | $ 30,946 | $ 10,054 | $ 32,809 | $ 6,495 | $ 1,731,472 |

IUOE4 FED 0033

8

App.092

EXHIBIT A-1

IUOE LOCAL 4 BENEFIT FUNDS
WEEKLY SALARY ANALYSIS 2017-2020

### 2018

| Employee | Weekly | Salary | Overtime | Employer FMLA | Personal Use Auto | Vacation | Sick | Bonus | Retro | W-2 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alongi, Gina | $ 4,423 | $ 232,232 | $ - | $ - | $ 2,093 | $ 15,039 | $ - | $ 4,423 | $ 2,191 | $ 255,978 |
| Alongi, Rosemarie | 2,052 | 108,148 | - | | | | | 2,052 | 632 | 110,832 |
| Ayala (Rivera), Yerania | 1,013 | 53,240 | 314 | | | 709 | 1,418 | 1,013 | 422 | 57,114 |
| Batchelder, Wendy | 1,030 | 54,184 | 515 | | | 515 | 439 | 1,030 | 392 | 57,075 |
| Berardi, Terri | 846 | 44,567 | 322 | | | - | 1,016 | 846 | 292 | 47,042 |
| Blenkhorn, Debra | 632 | 27,171 | 139 | | | 758 | 758 | 632 | - | 29,458 |
| Boisvert, Amy | 695 | 36,341 | 167 | | | 774 | 788 | 695 | 506 | 39,271 |
| Burns, James | - | - | - | | | - | - | - | - | - |
| Cerqueira, Danielle | 711 | 35,773 | 171 | | | - | 711 | 711 | 388 | 37,753 |
| Christy, Donald | 1,614 | 84,939 | - | | 833 | 2,744 | - | 1,614 | 615 | 90,745 |
| Dow, Jennifer | 1,208 | 63,583 | - | | | - | - | 1,208 | 416 | 65,207 |
| Geiman, Gregory | 3,462 | 179,495 | - | | | 11,077 | - | 3,462 | 3,967 | 198,000 |
| Hickey, Laura-Jean | 1,821 | 96,145 | - | | | 1,240 | - | 1,821 | 355 | 99,561 |
| Johnson, Amanda | 383 | 8,033 | - | | | - | - | - | - | 8,033 |
| Koufos, Alan | 2,471 | 130,573 | - | | | - | - | 2,471 | 388 | 133,431 |
| Kurtz, Alice | 1,930 | 14,465 | - | | | - | - | - | - | 14,465 |
| Lynch, Laurie | 1,330 | 70,219 | 545 | | | 807 | 957 | 1,330 | 259 | 74,117 |
| Mc Goldrick, Sheila | 1,714 | 90,430 | - | | | 2,399 | - | 1,714 | 399 | 94,942 |
| Ortega, Rosemary | 1,031 | 54,283 | 247 | | | 825 | 1,031 | 1,031 | 355 | 57,772 |
| Ryan, Taylor | 722 | 37,901 | 154 | | | 462 | 1,156 | 722 | 378 | 40,773 |
| Vachon, Jennifer | 1,009 | 53,191 | 242 | | | 908 | 807 | 1,009 | 273 | 56,429 |
| Zaccardi, Rebecca | 2,191 | 115,274 | - | | | 1,534 | - | 2,191 | 835 | 119,833 |
| Total W-3 | | $ 1,590,185 | $ 2,815 | $ - | $ 2,926 | $ 39,790 | $ 9,080 | $ 29,973 | $ 13,062 | $ 1,687,833 |

9

3 of 4

IUOE4 FED 0034

App.093

EXHIBIT A-1

IUOE LOCAL 4 BENEFIT FUNDS
WEEKLY SALARY ANALYSIS 2017-2020

### 2017

| Employee | Weekly | Salary | Overtime | Employer FMLA | Personal Use Auto | Vacation | Sick | Bonus | Retro | W-2 |
|---|---|---|---|---|---|---|---|---|---|---|
| Alongi, Gina | $ 4,149 | $ 214,969 | $ - | $ - | $ 2,258 | $ 14,107 | $ - | $ 4,149 | $ 790 | $ 236,274 |
| Alongi, Rosemarie | 1,974 | 102,318 | - | - | - | 1,974 | - | 1,974 | 304 | 106,569 |
| Ayala (Rivera), Yerania | 960 | 49,601 | 221 | - | - | 768 | 1,343 | 960 | 301 | 53,193 |
| Batchelder, Wendy | 981 | 50,916 | 981 | - | - | - | 248 | 981 | 77 | 53,203 |
| Berardi, Terri | 810 | 41,880 | 203 | - | - | - | 832 | 810 | 240 | 43,964 |
| Blenkhorn, Debra | - | - | - | - | - | - | - | - | - | - |
| Boisvert, Amy | 632 | 32,715 | 152 | - | - | - | 632 | 632 | 143 | 34,274 |
| Burns, James | - | - | - | - | - | - | - | - | - | - |
| Cerqueira, Danielle | 619 | 24,008 | 149 | - | - | - | 495 | 619 | - | 25,270 |
| Christy, Donald | 1,537 | 79,678 | - | - | 916 | 1,383 | - | 1,537 | 265 | 83,780 |
| Dow, Jennifer | 1,156 | 59,889 | - | - | - | - | - | 1,156 | 199 | 61,243 |
| Geiman, Gregory | 2,966 | 153,814 | - | - | - | 10,973 | - | 2,966 | 401 | 168,153 |
| Hickey, Laura-Jean | 1,776 | 90,822 | - | - | - | 1,776 | - | 1,776 | 730 | 95,106 |
| Johnson, Amanda | 788 | 8,663 | - | - | - | - | - | 788 | - | 9,450 |
| Koufos, Alan | 2,423 | 125,780 | - | - | - | 2,180 | - | 2,423 | 190 | 130,573 |
| Kurtz, Alice | 1,930 | 100,063 | - | - | - | 5,018 | - | 1,930 | 297 | 107,308 |
| Lynch, Laurie | 1,298 | 67,319 | 363 | - | - | 484 | 415 | 1,298 | 151 | 70,030 |
| Mc Goldrick, Sheila | 1,664 | 86,326 | - | - | - | 4,326 | - | 1,664 | 194 | 92,510 |
| Ortega, Rosemary | 987 | 51,012 | 237 | - | - | 987 | 987 | 987 | 292 | 54,501 |
| Ryan, Taylor | 675 | 5,940 | - | - | - | - | - | 675 | - | 6,615 |
| Vachon, Jennifer | 975 | 50,567 | 234 | - | - | 780 | 780 | 975 | 114 | 53,448 |
| Zaccardi, Rebecca | 2,086 | 108,172 | - | - | - | - | - | 2,086 | 321 | 110,580 |
| Total W-3 | | $ 1,504,451 | $ 2,538 | $ - | $ 3,174 | $ 44,756 | $ 5,732 | $ 30,383 | $ 5,009 | $ 1,596,043 |

APPENDIX A-2

**IUOE LOCAL 4 BENEFIT FUNDS**
**ANALYSIS OF G. ALONGI AND R. ALONGI VACATION PAYOUTS**
**2015-2000**

### R. ALONGI

| Year | AWARDED | JAN TAKEN | JAN PAID | FEB TAKEN | FEB PAID | MAR TAKEN | MAR PAID | APR TAKEN | APR PAID | MAY TAKEN | MAY PAID | JUN TAKEN | JUN PAID | JUL TAKEN | JUL PAID | AUG TAKEN | AUG PAID | SEP TAKEN | SEP PAID | OCT TAKEN | OCT PAID | NOV TAKEN | NOV PAID | DEC TAKEN | DEC PAID | TOTAL TAKEN | TOTAL POINT(IBU) | TOTAL | PROOF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | 173.5 | (4.0) | | (16.0) | | | | (8.0) | | (8.0) | | | | (40.0) | | | | | | (48.0) | | (8.0) | | (12.0) | | (104.0) | (80.0) | (184.0) | (4.5) |
| 2016 | 176.0 | (8.0) | | (16.0) | | (16.0) | | | | (48.0) | | (8.0) | | (48.0) | | | | (32.0) | | (8.0) | | | | (8.0) | | (176.0) | | (176.0) | (32.0) |
| 2017 | 176.0 | | | | | | | (40.0) | | (8.0) | | (40.0) | | (44.5) | | (48.0) | | | | | | | | (12.0) | | (168.0) | (40.0) | (208.0) | (208.0) |
| 2018 | 176.0 | (16.0) | | (16.0) | | (8.0) | | (8.0) | | (12.0) | | (8.0) | | (14.5) | | | | | | 4.0 | | (4.0) | | (16.0) | | (174.5) | | (176.0) | 1.5 |
| 2019 | 177.5 | (64.0) | | (4.0) | | | | (4.0) | | (28.0) | | (8.0) | | (4.0) | | | | (2.0) | | | | | | 8.0 | (40.0) | (134.0) | (40.0) | (174.0) | 3.5 |
| 2020 | 181.5 | | | | | | | | | | (80.0) | | (137.5) | | | | | | | | | | | | | (4.0) | (177.5) | (181.5) | |

### G. ALONGI

| Year | AWARDED | JAN TAKEN | JAN PAID | FEB TAKEN | FEB PAID | MAR TAKEN | MAR PAID | APR TAKEN | APR PAID | MAY TAKEN | MAY PAID | JUN TAKEN | JUN PAID | JUL TAKEN | JUL PAID | AUG TAKEN | AUG PAID | SEP TAKEN | SEP PAID | OCT TAKEN | OCT PAID | NOV TAKEN | NOV PAID | DEC TAKEN | DEC PAID | TOTAL TAKEN | TOTAL PUBLISHED HRS | TOTAL | PROOF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2015 | 256.0 | | | | | | | (8.0) | | (12.0) | | | | (56.0) | | (16.0) | | | | (48.0) | | | | (12.0) | | (76.0) | (160.0) | (256.0) | (256.0) |
| 2016 | 240.0 | | | (16.0) | | | | (40.0) | | (16.0) | | (24.0) | | (44.0) | | | | (8.0) | | 8.0 | | | | (76.0) | | (124.0) | (116.0) | (240.0) | (240.0) |
| 2017 | 256.0 | | | | | (8.0) | | (40.0) | | (80.0) | | | | (40.0) | (40.0) | | | (8.0) | | (12.0) | | | | (56.0) | | (120.0) | (136.0) | (256.0) | (256.0) |
| 2018 | 256.0 | | | | | | | (4.0) | | | | (16.0) | | (20.0) | | (36.0) | | | | 120.0 | | | | (56.0) | | (120.0) | (136.0) | (256.0) | (256.0) |
| 2019 | 256.0 | (8.0) | | (16.0) | | (16.0) | | | | (80.0) | | (24.0) | | (28.0) | (80.0) | (32.0) | | (24.0) | | (8.0) | (40.0) | (12.0) | | (40.0) | | (176.0) | (80.0) | (256.0) | (256.0) |
| 2020 | 256.0 | | | (42.0) | | | | | | | | | | (2.0) | | | | | | | | | | (40.0) | | (68.0) | (188.0) | (256.0) | (256.0) |

Legend (highlighted cells):
VACATION BUYOUTS PAID EARLY
2 PERSONAL DAYS ACCIDENTALLY OMITTED

### R. ALONGI

| DATE | HOURS | COMMENT |
|---|---|---|
| 10/1/2015 | 8.00 | EXTRA PTO DAY PAID |
| 10/1/2015 | 8.00 | EXTRA PTO DAY PAID |
| 10/1/2015 | 8.00 | EXTRA PTO DAY PAID |
| 12/31/2015 | 4.50 | EXCESS VACATION TIME PAID AT YEAR END |
| 12/31/2017 | 32.00 | ADDITIONAL HOURS PAID AS A RESULT OF SPREADSHEET ERROR |
| 10/4/2019 | 4.00 | EXTRA PTO DAY PAID |
| 9/1/2019 | 2.00 | ADDITIONAL HOURS PAID IN 2020 AS A RESULT OF SPREADSHEET ERROR |
| 12/7/2019 | 8.00 | EXTRA PTO DAY PAID |

### G. ALONGI

| DATE | HOURS | COMMENT |
|---|---|---|
| 2015 | 80 | 2 ADDITIONAL WEEKS VACATION UNAPPROVED |
| 2016 | 64 | 2 ADDITIONAL WEEKS VACATION UNAPPROVED (ADJUSTED FOR SPREADSHEET ERROR) |
| 2017 | 80 | 2 ADDITIONAL WEEKS VACATION UNAPPROVED |
| 2018 | 80 | 2 ADDITIONAL WEEKS VACATION UNAPPROVED |
| 2019 | 80 | 2 ADDITIONAL WEEKS VACATION UNAPPROVED |
| 2020 | 80 | 2 ADDITIONAL WEEKS VACATION UNAPPROVED |

### ESTIMATED LOSS

| WEEKLY | HOURLY | AMOUNT |
|---|---|---|
| $1,840.00 | $46.00 | $368 |
| 1,840.00 | 46.00 | 368 |
| 1,840.00 | 46.00 | 368 |
| 1,840.00 | 46.00 | 207 |
| 1,974.00 | 49.35 | 1,579 |
| 2,135.00 | 53.38 | 214 |
| 2,135.00 | 53.38 | 110 |
| 2,199.00 | 54.98 | 110 |
| 2,135.00 | 53.38 | 427 |
| 3,763.00 | 94.08 | 7,526 |
| 3,952.00 | 98.80 | 6,323 |
| 4,149.00 | 103.73 | 8,206 |
| 4,423.00 | 110.58 | 8,846 |
| 4,664.00 | 116.10 | 9,288 |
| 4,784.00 | 119.60 | 9,568 |
| Total | | $ 53,490 |

IUOE4 FED 0036

App.095

EXHIBIT A-3

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF G. ALONGI VACATION/SICK TIME TAKEN

| Date | Day | Time | Description | Entry | # of office calls | Outgoing office phone start times | # of speaker phone calls | Speaker phone times | Vacation time taken | Sick time taken |
|---|---|---|---|---|---|---|---|---|---|---|
| 01/05/17 | Thursday | Unknown | Doctor | 12:51 PM | 2 | 2:09 PM - 2:25 PM | 2 | 2:12 PM | No | No |
| 01/09/17 | Monday | 1:00PM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 02/23/17 | Thursday | Unknown | Sign purch agr for Cape | 11:12 AM | 1 | 3:22 PM | - | N/A | No | No |
| 02/24/17 | Friday | 10:30AM | Doctor | 1:03 PM | 1 | 1:24 PM | 4 | 2:36 PM - 2:55 PM | No | No |
| 03/09/17 | Thursday | Unknown | Doctor | 12:00 PM | 1 | 1:24 PM | 1 | 2:05 PM | No | No |
| 03/30/17 | Thursday | 10:00AM | Doctor | 11:49 AM | 8 | 1:29 PM - 4:44 PM | 2 | 4:09 PM - 4:37 PM | No | No |
| 04/03/17 | Monday | Unknown | Vet at barn | 11:45 AM | - | N/A | - | N/A | No | No |
| 04/27/17 | Thursday | Unknown | Vet at barn | 10:27 AM | - | N/A | - | N/A | No | No |
| 05/22/17 | Monday | 2:00PM | Doctor | 10:03 AM | 5 | 11:27AM-3:31PM | 2 | 3:42 PM | No | No |
| 05/25/17 | Thursday | Unknown | Personal delivery at Cape | N/A | - | N/A | - | N/A | No | No |
| 05/26/17 | Friday | Unknown | Personal delivery at Cape | N/A | - | N/A | - | N/A | No | No |
| 06/13/17 | Tuesday | Unknown | Doctor | N/A | - | N/A | - | N/A | No | No |
| 06/14/17 | Wednesday | Unknown | Doctor | N/A | - | N/A | - | N/A | No | No |
| 07/13/17 | Thursday | Unknown | Doctor | 10:20AM & 10:11AM | - | N/A | - | N/A | No | No |
| 08/01/17 | Tuesday | 3:30PM | Doctor | 10:37 AM | 1 | 1:40 PM | 1 | 11:47 AM | No | No |
| 08/14/17 | Monday | 3:00PM | Doctor | 10:18 AM | 2 | 1:19 PM - 1:40 PM | - | N/A | No | No |
| 08/23/17 | Wednesday | 2:30PM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 10/10/17 | Tuesday | 3:30PM | Doctor | 10:20 AM | 5 | 1:28 PM - 2:58 PM | - | N/A | No | No |
| 10/25/17 | Wednesday | 2:00PM | Doctor | N/A | 2 | 12:00 PM - 12:50 PM | 4 | 12:44 PM - 12:51 PM | No | No |
| 11/07/17 | Tuesday | N/A | Float Day | N/A | - | N/A | - | N/A | No | No |
| 11/17/17 | Friday | 3:30PM | Doctor | 10:27 AM | 2 | 11:43 AM - 2:47 PM | 9 | 10:31 AM - 1:49 PM | No | No |
| 11/20/17 | Monday | 7:30AM-9:30AM | Vet | N/A | 1 | 11:39 AM | 3 | 9:28 AM - 11:15 AM | No | No |
| 11/27/17 | Monday | 7:30AM | Vet | 9:48 AM | 7 | 11:52 AM - 4:05 PM | 1 | 3:57 PM | No | No |
| 12/04/17 | Monday | 2:30PM | Doctor | 10:17 AM | - | N/A | - | N/A | No | No |
| 12/07/17 | Thursday | 10:00AM | Doctor | 10:44 AM | 5 | 11:06 AM - 3:38 PM | 6 | 12:17 PM - 1:36 PM | No | No |
| 12/12/17 | Tuesday | 7-7:30AM | Vet | 8:36 AM | 4 | 9:31 AM - 1:22 PM | 1 | 11:52 AM | No | No |
| 12/14/17 | Thursday | 8:00AM-12:00PM | Scheduled home maint | 9:52 AM | - | N/A | - | N/A | No | No |
| 12/15/17 | Friday | 10:30AM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 12/19/17 | Tuesday | 3:00PM | Personal delivery | 9:55 AM | 2 | 10:58 AM & 3:14 PM | 2 | 10:28 AM - 11:50 AM | No | No |
| 12/28/17 | Thursday | 2:30PM | Doctor | N/A | 2 | 2:15 PM - 2:52 PM | - | N/A | No | No |
| 02/28/18 | Wednesday | 10:30AM | Doctor | 12:27 PM | 3 | 1:13 PM - 3:56 PM | 1 | 3:31 PM | No | No |
| 03/19/18 | Monday | Unknown | Doctor | 11:32 AM | - | N/A | 1 | 3:36 PM | No | No |
| 03/26/18 | Monday | 3:00PM | Doctor | 9:55 AM | - | N/A | 1 | 12:03 PM | No | No |
| 04/02/18 | Monday | Unknown | Vet | 10:49 AM | 1 | 3:01 PM | 1 | 2:55 PM | No | No |
| 04/06/18 | Friday | 1:00PM | Doctor | N/A | 2 | 9:59 AM - 10:17 AM | 1 | 10:26 AM | No | No |
| 05/04/18 | Friday | 10:00AM | Vet | 12:20 PM | 5 | 12:19 PM - 2:54 PM | - | N/A | No | No |
| 05/08/18 | Tuesday | 3:30PM | Leave early 3:30PM | 9:44 AM | 1 | 11:55 AM | - | N/A | No | No |
| 06/01/18 | Friday | 12:30PM | Vet | N/A | - | N/A | - | N/A | No | No |
| 06/07/18 | Thursday | 2:00PM | Doctor | 8:51 AM | 9 | 11:28 AM - 1:25 PM | - | N/A | No | No |
| 06/08/18 | Friday | Unknown | Doctor | 9:49 AM | 2 | 12:34 PM - 3:12 PM | - | N/A | No | No |

IUOE4 FED 0037

12

App 096

EXHIBIT A-3

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF G. ALONGI VACATION/SICK TIME TAKEN

| Date | Day | Time | Description | Entry | # of office calls | Outgoing office phone start times | # of speaker phone calls | Speaker phone times | Vacation time taken | Sick time taken |
|---|---|---|---|---|---|---|---|---|---|---|
| 07/23/18 | Monday | 2:15PM | Doctor | 9:07 AM | 2 | 8:54 AM - 9:27 AM | 3 | 9:03 AM - 12:05PM | No | No |
| 07/30/18 | Monday | Unknown | Private | 1:01 PM | 4 | 2:04 PM | 2 | 2:35 PM - 2:38 PM | No | No |
| 09/13/18 | Thursday | Unknown | Home maintenance | N/A | 2 | 9:56 AM - 11:13 AM | - | N/A | No | No |
| 09/24/18 | Monday | Unknown | Private | N/A | - | N/A | - | N/A | No | No |
| 11/21/18 | Wednesday | Unknown | 1/2 Vacation Day | N/A | - | N/A | - | N/A | No | No |
| 12/13/18 | Thursday | 4:00PM | Personal appointment | 9:30 AM | 6 | 12:19 PM - 2:54 PM | 8 | 9:21 AM - 2:54 PM | No | No |
| 01/03/19 | Thursday | 11:00AM | Doctor | 1:34 PM | - | N/A | 1 | 1:15 PM | No | No |
| 01/08/19 | Tuesday | 2:00PM | Doctor | 9:56 AM | - | N/A | - | N/A | No | No |
| 01/16/19 | Wednesday | 3:30PM | Personal appointment | 9:42 AM | 5 | 9:50 AM - 11:33 AM | - | N/A | No | No |
| 01/17/19 | Thursday | 10:00AM | Doctor | 11:51 AM | 3 | 12:48 PM - 3:10 PM | 2 | 12:12 AM - 1:59 PM | No | No |
| 01/25/19 | Friday | 4:00PM | Doctor | 10:13 AM | 2 | 11:38 AM - 12:40 PM | - | N/A | No | No |
| 01/29/19 | Tuesday | 4:00PM | Personal appointment | 9:20 AM | 2 | 12:12 PM - 3:03 PM | 3 | 9:27 AM - 2:03 PM | No | No |
| 02/19/19 | Tuesday | 2:00PM | Doctor | 9:33 AM | 1 | 9:18 AM | - | N/A | No | No |
| 03/11/19 | Monday | Unknown | Home delivery in Cape | 10:08 AM | 5 | 10:26 AM - 3:28 PM | - | N/A | No | No |
| 03/12/19 | Tuesday | 11:00AM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 03/13/19 | Wednesday | 3:30PM | Personal appointment | N/A | 4 | 10:44 AM - 2:46 PM | - | N/A | No | No |
| 04/04/19 | Thursday | 2:30PM | Doctor | N/A | - | N/A | 3 | 10:08 AM - 2:27 PM | No | No |
| 04/12/19 | Friday | Unknown | Home maintenance | N/A | 2 | 1:55 PM - 3:26 PM | 1 | 2:30 PM | No | No |
| 04/24/19 | Wednesday | 10:30AM-1:00PM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 04/26/19 | Friday | Unknown | Vacation Day | N/A | - | N/A | - | N/A | No | Yes |
| 04/29/19 | Monday | Unknown | Home maintenance | N/A | 1 | 10:18 AM | 2 | 2:12 PM - 2:25 PM | No | No |
| 05/14/19 | Tuesday | 3:00PM | Doctor | N/A | 2 | 11:15 AM - 12:54 PM | - | N/A | No | No |
| 05/29/19 | Wednesday | 4:00PM | Personal appointment | 9:35 AM | 5 | 9:37 AM - 3:11 PM | 4 | 10:07 AM - 2:01 PM | No | No |
| 06/27/19 | Thursday | 12:00PM | Doctor | N/A | 1 | 3:36 PM | - | N/A | No | No |
| 07/08/19 | Monday | Unknown | Doctor | 9:53 AM | 1 | 9:59 AM | 1 | 1:24 PM | No | No |
| 07/10/19 | Wednesday | Unknown | Home maintenance | N/A | - | N/A | - | N/A | No | No |
| 07/25/19 | Thursday | 3:30PM | Personal appointment | N/A | - | N/A | - | N/A | No | No |
| 07/30/19 | Tuesday | 2:30PM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 09/03/19 | Tuesday | Unknown | Home maintenance | N/A | - | N/A | - | N/A | No | No |
| 10/01/19 | Tuesday | 11:00AM | Home maintenance | 9:47 AM | 4 | 12:54 PM - 4:28 PM | 3 | 3:39 PM - 4:11 PM | No | No |
| 10/08/19 | Tuesday | 2:00PM | Doctor | 9:32 AM | 1 | 9:41 AM | - | N/A | No | No |
| 10/15/19 | Tuesday | 3:30PM | Doctor | 9:51 AM | 2 | 10:41 AM - 11:45 AM | - | N/A | No | No |
| 10/23/19 | Wednesday | 9:00AM | Doctor | 10:05 AM | 2 | 9:58 AM - 10:33 AM | 1 | 12:13 PM | No | No |
| 10/24/19 | Thursday | 11:00AM | Personal appointment | N/A | - | N/A | - | N/A | No | No |
| 10/30/19 | Wednesday | 3:00PM | Doctor | 9:37 AM | 3 | 9:49 AM - 1:59 PM | - | N/A | No | No |
| 11/01/19 | Tuesday | 3:45PM | Doctor | 9:45 AM | 3 | 10:40 AM - 12:14 AM | - | N/A | No | No |
| 11/07/19 | Thursday | 8:00AM | Home maintenance | N/A | - | N/A | - | N/A | No | No |
| 11/22/19 | Wednesday | 3:30PM | Doctor | 9:49 AM | 2 | 10:03 AM - 12:06 PM | 2 | 10:58 AM - 2:01 PM | No | No |
| 12/13/19 | Friday | 11:00AM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 01/08/20 | Wednesday | Unknown | Personal appointment | 8:04 AM | 1 | 2:10 PM | - | N/A | No | No |

App. 097

IUOE4 FED 0038

13

EXHIBIT A-3

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF G. ALONGI VACATION/SICK TIME TAKEN

| Date | Day | Time | Description | Entry | # of office calls | Outgoing office phone start times | # of speaker phone calls | Speaker phone times | Vacation time taken | Sick time taken |
|---|---|---|---|---|---|---|---|---|---|---|
| 01/23/20 | Thursday | 2:30PM | Doctor | 11:46 AM | 2 | 10:24 AM - 11:01 AM | - | N/A | No | No |
| 01/30/20 | Thursday | 9:00AM | Vet | 8:30 AM | 7 | 9:08 AM - 3:45 PM | 7 | 8:56 AM - 3:27 PM | No | No |
| 02/04/20 | Tuesday | Unknown | Doctor | 10:58 AM | 2 | 2:04 PM - 2:25 PM | 1 | 2:32 PM | No | No |
| 02/13/20 | Thursday | 3:00PM | Doctor | 8:02 AM | - | N/A | - | N/A | No | No |
| 02/20/20 | Thursday | N/A | Personal Day | N/A | - | N/A | - | N/A | No | No |
| 02/28/20 | Friday | 9:30AM & 4:00PM | Doctor & Personal app | 11:23 AM | 4 | 1:20 PM - 2:33 PM | 1 | 1:57 PM | No | No |
| 03/02/20 | Monday | 1:30PM | Vet | N/A | - | N/A | - | N/A | No | No |
| 03/03/20 | Tuesday | 1:30-4:30 | Doctor | N/A | - | N/A | - | N/A | No | No |
| 03/13/20 | Friday | 8:00AM | Doctor | 8:48 AM | 1 | 3:12 PM | - | N/A | No | No |
| 03/18/20 | Wednesday | 2:45PM | Doctor | 11:01 AM | 3 | 12:09 PM - 12:19 PM | 3 | 2:03 PM - 3:02 PM | No | No |
| 04/10/20 | Friday | 9:00AM-10:30AM | Home maintenance | N/A | - | N/A | - | N/A | No | No |
| 04/14/20 | Tuesday | 7:00AM-1:00PM | Personal appointment | N/A | - | N/A | - | N/A | No | No |
| 04/16/20 | Thursday | Unknown | Doctor | N/A | - | N/A | - | N/A | No | No |
| 05/06/20 | Wednesday | 10:00AM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 05/07/20 | Thursday | Unknown | Home maintenance | N/A | - | N/A | - | N/A | No | No |
| 05/11/20 | Monday | 12:00PM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 05/21/20 | Thursday | 2:00PM | Doctor | N/A | - | N/A | - | N/A | No | No |
| 05/22/20 | Friday | 12:00-5:00PM | Home maintenance | N/A | - | N/A | - | N/A | No | No |
| 06/24/20 | Wednesday | Unknown | Doctor | N/A | - | N/A | - | N/A | No | No |
| 07/10/20 | Friday | 2:00PM & 3:00PM | Personal appointment | N/A | - | N/A | - | N/A | No | No |
| 07/13/20 | Monday | 2:30PM | Doctor | N/A | 7 | 8:08 AM - 3:11 PM | - | N/A | No | No |

3 of 3

IUOE4 FED 0039

14

App.098

EXHIBIT B-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF FUND OFFICE EMPLOYEE FRINGE BENEFITS
JANUARY 1, 2017 THROUGH JUNE 30, 2020

| Employee | Hours | Salary $ | Per Fund Office | | | | Recalculated | | | | Variance | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ | H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ | H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ |
| ALONGI, GINA MARIE | 2,080 | 214,989 | 10,400 | 14,040 | 15,080 | 17,500 | 8,720 | 10,400 | 14,040 | 15,080 | 17,500 | 8,720 | - | - | - | - | - |
| ALONGI, ROSEMARIE | 2,080 | 102,318 | 10,400 | 14,040 | 6,760 | 17,500 | 2,080 | 10,400 | 14,040 | 6,760 | 17,500 | 2,080 | - | - | - | - | - |
| AYALA, YERANIA | 1,966 | 49,601 | 9,829 | 13,269 | 6,788 | 8,680 | 5,920 | 9,829 | 13,269 | 6,389 | 8,680 | 5,920 | - | - | 399 | - | - |
| BATCHELDER, WENDY A | 1,957 | 50,916 | 9,785 | 13,210 | 6,882 | 8,910 | 2,080 | 9,785 | 13,210 | 6,360 | 8,910 | 2,080 | - | - | 522 | - | - |
| BERARDI, TERRI ANN | 1,956 | 41,880 | 9,781 | 13,205 | 6,790 | 7,329 | 10,640 | 9,781 | 13,205 | 6,358 | 7,329 | 10,640 | - | - | 433 | - | - |
| BOISVERT, AMY J | 1,956 | 32,715 | 9,780 | 13,203 | 6,789 | 5,725 | 4,160 | 9,780 | 13,203 | 6,357 | 5,725 | 4,160 | - | - | 432 | - | - |
| CERQUEIRA, DANIELLE | 1,386 | 24,008 | 6,930 | 9,356 | 4,813 | 4,201 | 1,520 | 6,930 | 9,356 | 4,505 | 4,201 | 1,600 | - | - | 309 | - | (80) |
| CHRISTY, DONALD R | 2,080 | 79,678 | 10,400 | 14,040 | 6,760 | 13,944 | - | 10,400 | 14,040 | 6,760 | 13,944 | - | - | - | - | - | - |
| DOW, JENNIFER | 2,080 | 59,889 | 10,400 | 14,040 | 6,760 | 10,480 | 2,080 | 10,400 | 14,040 | 6,760 | 10,480 | 2,080 | - | - | - | - | - |
| GEIMAN, GREGORY A | 2,080 | 153,814 | 10,400 | 14,040 | 6,760 | 17,500 | 18,000 | 10,400 | 14,040 | 6,760 | 17,500 | 18,000 | - | - | - | - | - |
| HICKEY, LAURA -JEAN | 2,080 | 90,822 | 10,400 | 14,040 | 6,760 | 15,894 | 2,080 | 10,400 | 14,040 | 6,760 | 15,894 | 2,080 | - | - | - | - | - |
| JOHNSON, AMANDA ROSE | 413 | 8,663 | 2,063 | 2,784 | 1,430 | 1,516 | 360 | 2,063 | 2,784 | 1,341 | 1,516 | 360 | - | - | 89 | - | - |
| KOUFOS, ALAN PAUL | 2,080 | 125,780 | 10,400 | 14,040 | 6,760 | 17,500 | 21,360 | 10,400 | 14,040 | 6,760 | 17,500 | 21,360 | - | - | - | - | - |
| KURTZ, ALICE SUSAN | 2,080 | 100,063 | 10,400 | 14,040 | 6,760 | 17,500 | 24,000 | 10,400 | 14,040 | 6,760 | 17,500 | 24,000 | - | - | - | - | - |
| LYNCH, LAURIE SIMMONS | 1,956 | 67,319 | 9,780 | 13,203 | 6,794 | 11,781 | 480 | 9,780 | 13,203 | 6,357 | 11,781 | 480 | - | - | 437 | - | - |
| MCGOLDRICK, SHEILA L | 2,080 | 86,326 | 10,400 | 14,040 | 6,760 | 15,107 | 12,480 | 10,400 | 14,040 | 6,760 | 15,107 | 12,480 | - | - | - | - | - |
| ORTEGA, ROSEMARY A | 1,956 | 51,012 | 9,780 | 13,203 | 6,789 | 8,927 | 480 | 9,780 | 13,203 | 6,357 | 8,927 | 480 | - | - | 432 | - | - |
| RYAN, TAYLOR C | 330 | 5,940 | 1,650 | 2,228 | 1,168 | 1,040 | 80 | 1,650 | 2,228 | 1,073 | 1,040 | 80 | - | - | 96 | - | - |
| VACHON, JENNIFER A | 1,956 | 50,567 | 9,780 | 13,203 | 6,789 | 8,849 | - | 9,780 | 13,203 | 6,357 | 8,849 | - | - | - | 432 | - | - |
| ZACCARDI, REBECCA | 2,080 | 108,172 | 10,400 | 14,040 | 6,760 | 17,500 | 8,120 | 10,400 | 14,040 | 6,760 | 17,500 | 8,120 | - | - | - | - | - |
| 2017 | 36,632 | 1,504,451 | 183,158 | 247,263 | 130,954 | 227,384 | 124,160 | 183,158 | 247,263 | 127,372 | 227,384 | 124,240 | - | - | 3,582 | - | (80) |

1 OF 4

IUOE4 FED 0040                15

App.099

EXHIBIT B-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF FUND OFFICE EMPLOYEE FRINGE BENEFITS
JANUARY 1, 2017 THROUGH JUNE 30, 2020

| Employee | Hours | Salary $ | Per Fund Office H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ | Recalculated H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ | Variance H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALONGI, GINA MARIE | 2,120 | 232,232 | 10,600 | 14,840 | 15,320 | 17,500 | 6,360 | 10,600 | 14,840 | 15,370 | 17,500 | 6,360 | - | - | (50) | - | - |
| ALONGI, ROSEMARIE | 2,120 | 108,148 | 10,600 | 14,840 | 6,890 | 17,500 | 2,120 | 10,600 | 14,840 | 6,890 | 17,500 | 2,120 | - | - | - | - | - |
| AYALA, YERANIA | 1,993 | 53,240 | 9,966 | 13,953 | 6,899 | 9,317 | 8,080 | 9,966 | 13,953 | 6,478 | 9,317 | 8,080 | - | - | 421 | - | - |
| BATCHELDER, WENDY A | 1,994 | 54,184 | 9,968 | 13,955 | 6,900 | 9,482 | 2,120 | 9,968 | 13,955 | 6,479 | 9,482 | 2,120 | - | - | 421 | - | - |
| BERARDI, TERRI ANN | 1,994 | 44,567 | 9,968 | 13,955 | 6,900 | 7,799 | 14,200 | 9,968 | 13,955 | 6,479 | 7,799 | 14,200 | - | - | 421 | - | - |
| BLENKHORN, DEBRA E | 1,618 | 27,171 | 8,090 | 11,326 | 5,599 | 4,755 | 1,680 | 8,090 | 11,326 | 5,259 | 4,755 | 1,680 | - | - | 340 | - | - |
| BOISVERT, AMY J | 1,994 | 36,341 | 9,968 | 13,955 | 6,900 | 6,360 | 5,720 | 9,968 | 13,955 | 6,479 | 6,360 | 5,720 | - | - | 421 | - | - |
| CERQUEIRA, DANIELLE | 1,994 | 35,773 | 9,968 | 13,955 | 6,900 | 6,260 | 2,120 | 9,968 | 13,955 | 6,479 | 6,260 | 2,120 | - | - | 421 | - | - |
| CHRISTY, DONALD R | 2,120 | 84,939 | 10,600 | 14,840 | 6,890 | 14,864 | - | 10,600 | 14,840 | 6,890 | 14,864 | - | - | - | - | - | - |
| DOW, JENNIFER | 2,120 | 63,583 | 10,600 | 14,840 | 6,890 | 11,127 | 2,120 | 10,600 | 14,840 | 6,890 | 11,127 | 2,120 | - | - | - | - | - |
| GEIMAN, GREGORY A | 2,120 | 179,495 | 10,600 | 14,840 | 6,890 | 17,500 | 18,500 | 10,600 | 14,840 | 6,890 | 17,500 | 18,500 | - | - | - | - | - |
| HICKEY, LAURA -JEAN | 2,120 | 96,145 | 10,600 | 14,840 | 6,890 | 16,825 | 2,120 | 10,600 | 14,840 | 6,890 | 16,825 | 2,120 | - | - | - | - | - |
| JOHNSON, AMANDA ROSE | 383 | 8,033 | 1,913 | 2,678 | 1,316 | 1,406 | 400 | 1,913 | 2,678 | 1,243 | 1,406 | 400 | - | - | 73 | - | - |
| KOUFOS, ALAN PAUL | 2,120 | 130,573 | 10,600 | 14,840 | 6,890 | 17,500 | 24,500 | 10,600 | 14,840 | 6,890 | 17,500 | 24,500 | - | - | - | - | - |
| KURTZ, ALICE SUSAN | 309 | 14,465 | 1,544 | 2,161 | 1,555 | 2,531 | 2,000 | 1,544 | 2,161 | 1,003 | 2,531 | 2,000 | - | - | 552 | - | - |
| LYNCH, LAURIE SIMMONS | 1,996 | 70,219 | 9,981 | 13,974 | 6,914 | 12,288 | - | 9,981 | 13,974 | 6,488 | 12,288 | - | - | - | 426 | - | - |
| MCGOLDRICK, SHEILA L | 2,120 | 90,430 | 10,600 | 14,840 | 6,890 | 15,825 | 14,440 | 10,600 | 14,840 | 6,890 | 15,825 | 14,440 | - | - | - | - | - |
| ORTEGA, ROSEMARY A | 1,994 | 54,283 | 9,968 | 13,955 | 6,900 | 9,499 | - | 9,968 | 13,955 | 6,479 | 9,499 | - | - | - | 421 | - | - |
| RYAN, TAYLOR C | 1,993 | 37,901 | 9,964 | 13,950 | 6,899 | 6,633 | 2,120 | 9,964 | 13,950 | 6,477 | 6,633 | 2,120 | - | - | 422 | - | - |
| VACHON, JENNIFER A | 1,994 | 53,191 | 9,968 | 13,955 | 6,900 | 9,308 | - | 9,968 | 13,955 | 6,479 | 9,308 | - | - | - | 421 | - | - |
| ZACCARDI, REBECCA | 2,120 | 115,274 | 10,600 | 14,840 | 6,890 | 17,500 | 12,240 | 10,600 | 14,840 | 6,890 | 17,500 | 12,240 | - | - | - | - | - |
| 2018 | 39,333 | 1,590,185 | 196,663 | 275,328 | 141,020 | 231,781 | 120,840 | 196,663 | 275,328 | 136,311 | 231,781 | 120,840 | - | - | 4,710 | - | - |

IUOE4 FED 0041

16

2 OF 4

App.100

EXHIBIT B-1

**IUOE LOCAL 4 BENEFIT FUNDS**
**ANALYSIS OF FUND OFFICE EMPLOYEE FRINGE BENEFITS**
**JANUARY 1, 2017 THROUGH JUNE 30, 2020**

| Employee | Hours | Salary $ | Per Fund Office H&W $ | Pension $ | Annuity $ | GP $ | 401(K) $ | Recalculated H&W $ | Pension $ | Annuity $ | GP $ | 401(K) $ | Variance H&W $ | Pension $ | Annuity $ | GP $ | 401(K) $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ALONGI, GINA MARIE | 2,080 | 235,750 | 10,400 | 14,560 | 14,280 | 17,500 | 11,520 | 10,400 | 14,560 | 15,080 | 17,500 | 11,400 | - | - | (800) | - | 120 |
| ALONGI, ROSEMARIE | 2,080 | 110,586 | 10,400 | 14,560 | 6,760 | 17,500 | 2,080 | 10,400 | 14,560 | 6,760 | 17,500 | 2,080 | - | - | - | - | - |
| AYALA, YERANIA | 1,963 | 56,701 | 9,813 | 13,738 | 6,790 | 9,923 | 8,320 | 9,813 | 13,738 | 6,378 | 9,923 | 8,320 | - | - | 412 | - | - |
| BATCHELDER, WENDY A | 1,965 | 55,962 | 9,825 | 13,755 | 6,804 | 9,793 | 2,080 | 9,825 | 13,755 | 6,386 | 9,793 | 2,080 | - | - | 418 | - | - |
| BERARDI, TERRI ANN | 1,775 | 42,630 | 8,873 | 12,422 | 6,009 | 7,460 | 13,160 | 8,873 | 12,422 | 5,767 | 7,460 | 13,160 | - | - | 242 | - | - |
| BLENKHORN, DEBRA E | 1,963 | 33,756 | 9,813 | 13,738 | 6,790 | 5,907 | 2,080 | 9,813 | 13,738 | 6,378 | 5,907 | 2,080 | - | - | 412 | - | - |
| BOISVERT, AMY J | 1,962 | 37,140 | 9,810 | 13,734 | 6,789 | 6,500 | 5,800 | 9,810 | 13,734 | 6,377 | 6,500 | 5,800 | - | - | 413 | - | - |
| BURNS, JAMES M III | 840 | 32,308 | 4,200 | 5,880 | 2,730 | 5,654 | - | 4,200 | 5,880 | 2,730 | 5,654 | - | - | - | - | - | - |
| CERQUEIRA, DANIELLE | 1,951 | 39,790 | 9,753 | 13,654 | 6,761 | 6,963 | 600 | 9,753 | 13,654 | 6,339 | 6,963 | 120 | - | - | 422 | - | 480 |
| CHRISTY, DONALD R | 2,080 | 86,974 | 10,400 | 14,560 | 6,760 | 15,220 | - | 10,400 | 14,560 | 6,760 | 15,220 | - | - | - | - | - | - |
| DOW, JENNIFER | 2,080 | 64,494 | 10,400 | 14,560 | 6,760 | 11,286 | 2,080 | 10,400 | 14,560 | 6,760 | 11,286 | 2,080 | - | - | - | - | - |
| GEIMAN, GREGORY A | 2,080 | 188,135 | 10,400 | 14,560 | 6,760 | 17,500 | 18,720 | 10,400 | 14,560 | 6,760 | 17,500 | 18,720 | - | - | - | - | - |
| HICKEY, LAURA JEAN | 2,080 | 98,436 | 10,400 | 14,560 | 6,760 | 17,226 | 2,080 | 10,400 | 14,560 | 6,760 | 17,226 | 2,080 | - | - | - | - | - |
| KOUFOS, ALAN PAUL | 2,000 | 125,771 | 10,000 | 14,000 | 6,500 | 17,500 | 24,000 | 10,000 | 14,000 | 6,500 | 17,500 | 24,000 | - | - | - | - | - |
| KURTZ, ALICE SUSAN | 262 | 12,651 | 1,311 | 1,835 | 852 | 2,214 | 2,200 | 1,311 | 1,835 | 852 | 2,214 | 2,200 | - | - | - | - | - |
| LYNCH, LAURIE SIMMONS | 1,808 | 65,262 | 9,040 | 12,656 | 6,287 | 11,421 | 16,000 | 9,040 | 12,656 | 5,876 | 11,421 | 16,360 | - | - | 411 | - | (360) |
| MCGOLDRICK, SHEILA L | 2,080 | 91,129 | 10,400 | 14,560 | 6,760 | 15,948 | - | 10,400 | 14,560 | 6,760 | 15,948 | - | - | - | 0 | - | - |
| ORTEGA, ROSEMARY A | 1,963 | 55,068 | 9,813 | 13,738 | 6,790 | 9,637 | 2,080 | 9,813 | 13,738 | 6,378 | 9,637 | 2,080 | - | - | 412 | - | - |
| RYAN, TAYLOR C | 1,962 | 38,579 | 9,808 | 13,731 | 6,788 | 6,751 | - | 9,808 | 13,731 | 6,375 | 6,751 | - | - | - | 413 | - | - |
| VACHON, JENNIFER A | 1,962 | 53,407 | 9,810 | 13,734 | 6,789 | 9,346 | - | 9,810 | 13,734 | 6,377 | 9,346 | - | - | - | 413 | - | - |
| ZACCARDI, REBECCA | 2,080 | 120,611 | 10,400 | 14,560 | 6,760 | 17,500 | 10,560 | 10,400 | 14,560 | 6,760 | 17,500 | 10,560 | - | - | - | - | - |
| 2019 | 39,013 | 1,645,145 | 195,066 | 273,092 | 138,280 | 238,751 | 123,360 | 195,066 | 273,092 | 135,113 | 238,751 | 123,120 | - | - | 3,167 | - | 240 |

App.101

EXHIBIT B-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF FUND OFFICE EMPLOYEE FRINGE BENEFITS
JANUARY 1, 2017 THROUGH JUNE 30, 2020

| Employee | Hours | Salary $ | Per Fund Office | | | | | Recalculated | | | | | Variance | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ | H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ | H&W $ | Pension $ | Annuity $ | GP $ | 401(k) $ |
| ALONGI, GINA MARIE | 1,040 | 124,373 | 5,200 | 7,280 | 6,740 | 17,500 | 6,240 | 5,200 | 7,280 | 7,540 | 17,500 | 6,240 | | | (800) | | |
| ALONGI, ROSEMARIE | 1,040 | 59,361 | 5,200 | 7,280 | 3,380 | 10,388 | 1,040 | 5,200 | 7,280 | 3,380 | 10,388 | 1,040 | | | | | |
| AYALA, YERANIA | 1,001 | 34,675 | 5,005 | 7,007 | 3,462 | 6,068 | 4,160 | 5,005 | 7,007 | 3,253 | 6,068 | 4,160 | | | 209 | | |
| BATCHELDER, WENDY A | 1,018 | 30,861 | 5,089 | 7,124 | 3,502 | 5,401 | 1,040 | 5,089 | 7,124 | 3,308 | 5,401 | 1,040 | | | 195 | | |
| BERARD, TERRI ANN | 989 | 25,019 | 4,946 | 6,925 | 3,443 | 4,378 | 7,280 | 4,946 | 6,925 | 3,215 | 4,378 | 7,280 | | | 228 | | |
| BLENKHORN, DEBRA E | 799 | 15,582 | 3,993 | 5,590 | 2,763 | 2,727 | 840 | 3,993 | 5,590 | 2,595 | 2,727 | 880 | | | 167 | | (40) |
| BOISVERT, AMY J | 975 | 19,179 | 4,875 | 6,825 | 3,380 | 3,356 | 2,080 | 4,875 | 6,825 | 3,169 | 3,356 | 2,080 | | | 211 | | |
| BURNS, JAMES M III | 1,040 | 42,784 | 5,200 | 7,280 | 3,380 | 7,487 | - | 5,200 | 7,280 | 3,380 | 7,487 | - | | | | | |
| CERQUEIRA, DANIELLE | 975 | 22,275 | 4,875 | 6,825 | 3,380 | 3,898 | - | 4,875 | 6,825 | 3,169 | 3,898 | - | | | 211 | | |
| CHRISTY, DONALD R | 1,040 | 44,958 | 5,200 | 7,280 | 3,380 | 7,868 | - | 5,200 | 7,280 | 3,380 | 7,868 | - | | | | | |
| DOW, JENNIFER | 1,040 | 33,308 | 5,200 | 7,280 | 3,380 | 5,829 | 1,040 | 5,200 | 7,280 | 3,380 | 5,829 | 1,040 | | | | | |
| GEIMAN, GREGORY A | 1,040 | 97,335 | 5,200 | 7,280 | 3,380 | 17,034 | 10,360 | 5,200 | 7,280 | 3,380 | 17,034 | 10,360 | | | | | |
| HICKEY, LAURA JEAN | 1,040 | 50,900 | 5,200 | 7,280 | 3,380 | 8,908 | 1,040 | 5,200 | 7,280 | 3,380 | 8,908 | 1,040 | | | | | |
| KURTZ, ALICE SUSAN | 184 | 8,892 | 922 | 1,290 | 599 | 1,556 | 1,200 | 922 | 1,290 | 599 | 1,556 | 1,200 | | | 0 | | |
| MCGOLDRICK, SHEILA L | 440 | 23,521 | 2,200 | 3,080 | 1,430 | 4,116 | 3,760 | 2,200 | 3,080 | 1,430 | 4,116 | 3,760 | | | | | |
| ORTEGA, ROSEMARY A | 975 | 28,441 | 4,875 | 6,825 | 3,380 | 4,977 | 240 | 4,875 | 6,825 | 3,169 | 4,977 | 240 | | | 211 | | |
| RYAN, TAYLOR C | 789 | 16,395 | 3,945 | 5,523 | 2,732 | 2,869 | - | 3,945 | 5,523 | 2,564 | 2,869 | - | | | 168 | | |
| VACHON, JENNIFER A | 975 | 27,554 | 4,875 | 6,825 | 3,380 | 4,822 | - | 4,875 | 6,825 | 3,169 | 4,822 | - | | | 211 | | |
| ZACCARDI, REBECCA | 1,040 | 62,481 | 5,200 | 7,280 | 3,380 | 10,934 | 4,160 | 5,200 | 7,280 | 3,380 | 10,934 | 4,160 | | | | | |
| 2020 | 17,440 | 767,894 | 87,199 | 122,078 | 61,851 | 130,116 | 44,480 | 87,199 | 122,078 | 60,839 | 130,116 | 44,520 | | | 1,012 | | (40) |

App.102

IUOE4_FED 0043

EXHIBIT C-1

**IUOE LOCAL 4 BENEFIT FUNDS**
**ANALYSIS OF EMPLOYEE REIMBURSEMENTS**
**JANUARY 1, 2017 THROUGH JUNE 30, 2020**

| Employee | Period | Approved by | Total | Mileage | Parking | Taxis/Train | Hotel | Meals | Airfare | Postage | Recalc | Description | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Ayala, Yeraina | 6/6 - 6/8/18 | Manzi | $ 760.11 | $ 40.98 | $ 36.00 | $ - | $ 627.76 | $ 55.37 | $ - | $ - | - | Vitech Users Conference | Missing but approved by Manzi |
| Batcheider, Wendy | 5/21 - 6/24/20 | GMA | 165.00 | - | - | - | - | - | - | 165.00 | - | Postage for demand letters and AP | Reasonable |
| Balavert, Amy | 3/27 - 7/22/20 | GMA | 757.44 | 312.99 | - | - | - | - | - | 444.45 | - | Postage and mileage | No receipts for postage |
| Christy, Don | 6/6 - 6/8/18 | Manzi | 1,114.92 | - | 75.00 | 184.20 | 627.76 | - | 227.96 | - | - | Vitech Users Conference | Reasonable |
| Christy, Don | 6/6 - 6/8/18 | Manzi | 1,228.64 | - | - | 224.27 | 672.76 | - | 331.61 | - | - | Vitech Users Conference | Reasonable |
| Gelman, Gregory | 1/1 - 9/30/17 | Manzi | 262.98 | 228.98 | 34.00 | - | - | - | - | - | - | Mileage to Pension retreat, IUOE Conf & Mtg w/ SPS | Reasonable |
| Gelman, Gregory | 5/8 - 5/10/18 | GMA | 62.46 | 62.46 | - | - | - | - | - | - | - | Education Conf. at Harvard Med School | Reasonable |
| Gelman, Gregory | 6/13 - 6/14/19 | GMA | 172.06 | 148.06 | 24.00 | - | - | - | - | - | - | Travel to Deposition | Reasonable |
| Hickey, Laura-Jean | 7/13 - 7/19/17 | Manzi | 204.35 | 31.03 | 38.00 | - | - | 135.32 | - | - | - | IFEBP Fraud Prevention, Chicago, IL | Reasonable |
| Hickey, Laura-Jean | 4/9 - 4/12/19 | Manzi | 68.25 | 33.29 | - | - | - | 34.96 | - | - | - | CVS Health Forum | Reasonable |
| Koulos, Alan | 10/12/2017 | GMA | 355.08 | 25.08 | 27.00 | 64.00 | - | - | 240.40 | - | (0.40) | Meeting with Vitech to perform Escrow Agreement | Reasonable |
| Zaccardi, Rebecca | 5/9 - 5/13/17 | Manzi | 1,799.68 | - | 68.00 | 135.97 | 1,182.05 | 141.91 | 329.88 | - | - | AICPA Employee Benefit Plan Conference (Nashville) | Reasonable |
| Zaccardi, Rebecca | 12/4 - 12/5/17 | Manzi | 985.49 | - | 32.00 | 49.82 | 447.72 | 220.72 | 267.96 | - | - | AICPA Employee Benefit Plan Conference (Wash DC) | Reasonable |
| Zaccardi, Rebecca | 5/14 - 5/18/18 | Manzi | 2,281.54 | - | 92.00 | 208.59 | 1,323.81 | 81.23 | 617.96 | - | - | AICPA Employee Benefit Plan Conference (Las Vegas) | Reasonable |
| Zaccardi, Rebecca | 6/6 - 6/8/18 | Manzi | 1,397.57 | - | 35.00 | 84.05 | 672.76 | 295.33 | 217.95 | - | - | Vitech Users Conference | Reasonable |
| Zaccardi, Rebecca | 5/4 - 5/10/19 | Manzi | 1,895.30 | - | 30.00 | 192.80 | 1,113.44 | 277.05 | 281.98 | - | - | AICPA Employee Benefit Plan Conference (New Orleans) | Reasonable |
| Zaccardi, Rebecca | 11/13 - 11/15/19 | Manzi | 1,275.45 | - | 21.00 | 140.37 | 627.76 | 40.00 | 405.32 | - | - | Vitech Users Conference | Reasonable |
| Zaccardi, Rebecca | 5/3 - 5/8/20 | Manzi | 634.80 | - | - | - | - | - | 524.80 | 110.00 | - | Reimbursed airfare but never went to Conf | Possible credit for airfare |
| Total | | | $ 15,421.10 | $ 882.87 | $ 511.60 | $ 1,284.07 | $ 7,295.82 | $ 1,281.89 | $ 3,445.80 | $ 719.45 | $ (0.40) | | |

App.103

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 04/12/17 | ALONGI, GINA | AIRFARE | AMEX | 18.99 | | | |
| 04/12/17 | ALONGI, GINA | AIRFARE | AMEX | 5.75 | ✓ | | |
| 04/05/18 | ALONGI, GINA | AIRFARE | AMEX | 18.99 | ✓ | | |
| 04/05/18 | ALONGI, GINA | AIRFARE | AMEX | 18.99 | | | |
| 04/05/18 | ALONGI, GINA | AIRFARE | AMEX | 5.75 | ✓ | | |
| 04/05/18 | ALONGI, GINA | AIRFARE | AMEX | 5.75 | ✓ | | |
| 12/13/17 | ALONGI, GINA | AMEX ANNUAL FEE | AMEX | 175.00 | ✓ | | INSURANCE PREMIUM |
| 12/13/18 | ALONGI, GINA | AMEX ANNUAL FEE | AMEX | 175.00 | ✓ | | INSURANCE PREMIUM |
| 12/13/19 | ALONGI, GINA | AMEX ANNUAL FEE | AMEX | 175.00 | ✓ | | INSURANCE PREMIUM |
| 01/02/17 | ALONGI, GINA | AUTO - CAR WASH | AMEX | 16.00 | ✓ | | INSURANCE PREMIUM |
| 01/28/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | ✓ | | INSURANCE PREMIUM |
| 02/20/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | ✓ | | INSURANCE PREMIUM |
| 04/08/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | ✓ | | |
| 05/22/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | ✓ | | |
| 08/04/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | ✓ | | |
| 08/19/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | ✓ | | |
| 10/07/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | ✓ | | |
| 11/03/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 11/25/17 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 01/20/18 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 9.95 | | | |
| 03/10/18 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 04/08/18 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 05/24/18 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 07/13/18 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 08/24/18 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 11/09/18 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 18.00 | | | |
| 01/04/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 01/12/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 03/23/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 06/06/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 07/24/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 08/30/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 09/20/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 10/25/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 12/06/19 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 01/16/20 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 03/03/20 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 16.00 | | | |
| 06/13/20 | ALONGI, GINA | AUTO - CAR WASH | CAR WASH & DETAILING | 8.00 | | | |
| 02/02/17 | ALONGI, GINA | AUTO - MAINTENANCE | EXXON | 3.71 | ✓ | | |
| 04/24/17 | ALONGI, GINA | AUTO - MAINTENANCE | MEINEKE | 72.74 | ✓ | | |
| 06/01/17 | ALONGI, GINA | AUTO - MAINTENANCE | LONG CADILLAC | 300.64 | ✓ | | |
| 07/17/17 | ALONGI, GINA | AUTO - MAINTENANCE | DENNIS CAR CARE CNTR | 370.47 | ✓ | | |
| 09/12/17 | ALONGI, GINA | AUTO - MAINTENANCE | MEINEKE | 99.04 | ✓ | | |
| 11/18/17 | ALONGI, GINA | AUTO - MAINTENANCE | EXXON | 70.00 | ✓ | | |
| 12/22/17 | ALONGI, GINA | AUTO - MAINTENANCE | EXXON | 3.75 | ✓ | Y | 2 INSPECTION STICKERS |
| 02/10/18 | ALONGI, GINA | AUTO - MAINTENANCE | EXXON | 3.71 | ✓ | | |
| 03/18/18 | ALONGI, GINA | AUTO - MAINTENANCE | EXXON | 3.71 | ✓ | | |
| 05/07/18 | ALONGI, GINA | AUTO - MAINTENANCE | MEINEKE | 102.23 | ✓ | | |

App.104

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 09/12/18 | ALONGI, GINA | AUTO - MAINTENANCE | LONG CADILLAC | 1,928.47 | Y | | REPAIRS AND MAINTENANCE |
| 04/10/19 | ALONGI, GINA | AUTO - MAINTENANCE | EXXON | 35.00 | Y | | |
| 10/10/19 | ALONGI, GINA | AUTO - MAINTENANCE | EXXON | 23.90 | Y | | |
| 11/07/19 | ALONGI, GINA | AUTO - MAINTENANCE | MEINEKE | 34.04 | Y | | INSPECTION |
| 07/09/20 | ALONGI, GINA | AUTO - MAINTENANCE | EXXON | 35.00 | Y | | |
| 12/20/16 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 14.15 | | | |
| 01/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 2.20 | | | |
| 02/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.75 | | | |
| 04/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 4.25 | | | |
| 05/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.00 | | | |
| 06/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 6.65 | | | |
| 07/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 24.35 | Y | | |
| 08/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.75 | | | |
| 09/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 4.15 | | | |
| 10/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 0.75 | | | |
| 11/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 2.00 | | | |
| 12/20/17 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 9.90 | | | |
| 01/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 6.65 | | | |
| 02/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.75 | | | |
| 03/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 4.25 | | | |
| 04/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 4.25 | | | |
| 05/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 5.90 | Y | | |
| 06/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.00 | | | |
| 08/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 7.15 | | | |
| 09/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.25 | | | |
| 10/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 17.30 | | | |
| 11/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 3.50 | | | |
| 12/20/18 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 4.40 | | | |
| 01/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 7.65 | | | |
| 02/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 3.00 | | | |
| 03/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 3.50 | | | |
| 04/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 8.15 | | | |
| 05/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 3.50 | | | |
| 06/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 5.65 | | | |
| 07/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 6.40 | | | |
| 08/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 6.50 | | | |
| 09/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 9.40 | | | |
| 10/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 17.80 | | | |
| 11/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 7.90 | | | |
| 12/20/19 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.00 | | | |
| 01/20/20 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 11.55 | | | |
| 02/20/20 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 3.50 | | | |
| 03/20/20 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 4.95 | | | |
| 04/20/20 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.25 | | | |
| 06/20/20 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 0.50 | | | |
| 07/20/20 | ALONGI, GINA | AUTO - TOLLS | EZ PASS MA | 1.00 | | | |
| 06/20/20 | ALONGI, GINA | AUTO-GAS | EXXON | 59.39 | Y | | |
| 12/15/16 | ALONGI, GINA | AUTO-GAS | EXXON | 52.91 | Y | | |
| 12/24/16 | ALONGI, GINA | | | | | | |

App.105

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 01/01/17 | ALONGI, GINA | AUTO-GAS | SHELL | 41.26 | Y | | |
| 01/06/17 | ALONGI, GINA | AUTO-GAS | EXXON | 59.52 | Y | | |
| 01/14/17 | ALONGI, GINA | AUTO-GAS | EXXON | 57.26 | Y | | |
| 01/28/17 | ALONGI, GINA | AUTO-GAS | EXXON | 55.72 | Y | | |
| 01/29/17 | ALONGI, GINA | AUTO-GAS | EXXON | 50.00 | Y | | |
| 02/02/17 | ALONGI, GINA | AUTO-GAS | EXXON | 42.36 | Y | | |
| 02/08/17 | ALONGI, GINA | AUTO-GAS | EXXON | 56.00 | Y | | |
| 02/17/17 | ALONGI, GINA | AUTO-GAS | EXXON | 56.31 | Y | | |
| 02/22/17 | ALONGI, GINA | AUTO-GAS | EXXON | 55.47 | Y | | |
| 03/04/17 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 59.23 | Y | | |
| 03/08/17 | ALONGI, GINA | AUTO-GAS | SUNOCO | 21.20 | Y | | |
| 03/11/17 | ALONGI, GINA | AUTO-GAS | EXXON | 60.26 | Y | | |
| 03/21/17 | ALONGI, GINA | AUTO-GAS | EXXON | 61.14 | Y | | |
| 03/27/17 | ALONGI, GINA | AUTO-GAS | EXXON | 55.73 | Y | | |
| 03/31/17 | ALONGI, GINA | AUTO-GAS | EXXON | 59.18 | Y | | |
| 04/05/17 | ALONGI, GINA | AUTO-GAS | EXXON | 61.00 | Y | | |
| 04/15/17 | ALONGI, GINA | AUTO-GAS | SHELL | 53.02 | Y | | |
| 04/22/17 | ALONGI, GINA | AUTO-GAS | EXXON | 58.24 | Y | | |
| 04/30/17 | ALONGI, GINA | AUTO-GAS | SAVE ON | 51.54 | Y | | |
| 05/07/17 | ALONGI, GINA | AUTO-GAS | EXXON | 56.53 | Y | | |
| 05/13/17 | ALONGI, GINA | AUTO-GAS | EXXON | 49.51 | Y | | |
| 05/20/17 | ALONGI, GINA | AUTO-GAS | EXXON | 40.22 | Y | | |
| 05/24/17 | ALONGI, GINA | AUTO-GAS | EXXON | 58.13 | Y | | |
| 05/30/17 | ALONGI, GINA | AUTO-GAS | SHELL | 57.71 | Y | | |
| 06/08/17 | ALONGI, GINA | AUTO-GAS | EXXON | 57.7 | Y | | |
| 06/11/17 | ALONGI, GINA | AUTO-GAS | EXXON | 58.40 | Y | | |
| 06/17/17 | ALONGI, GINA | AUTO-GAS | EXXON | 55.00 | Y | | |
| 06/24/17 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 50.25 | Y | | |
| 06/29/17 | ALONGI, GINA | AUTO-GAS | SHELL | 52.58 | Y | | |
| 07/07/17 | ALONGI, GINA | AUTO-GAS | EXXON | 50.18 | Y | | |
| 07/11/17 | ALONGI, GINA | AUTO-GAS | EXXON | 64.91 | Y | | |
| 07/19/17 | ALONGI, GINA | AUTO-GAS | EXXON | 56.03 | Y | | |
| 07/25/17 | ALONGI, GINA | AUTO-GAS | SHELL | 59.70 | Y | | |
| 08/03/17 | ALONGI, GINA | AUTO-GAS | EXXON | 51.01 | Y | | |
| 08/11/17 | ALONGI, GINA | AUTO-GAS | EXXON | 58.59 | Y | | |
| 08/16/17 | ALONGI, GINA | AUTO-GAS | EXXON | 63.45 | Y | | |
| 08/23/17 | ALONGI, GINA | AUTO-GAS | EXXON | 55.00 | Y | | |
| 08/29/17 | ALONGI, GINA | AUTO-GAS | EXXON | 60.00 | Y | | |
| 09/05/17 | ALONGI, GINA | AUTO-GAS | EXXON | 64.64 | Y | | |
| 09/15/17 | ALONGI, GINA | AUTO-GAS | EXXON | 67.88 | Y | | |
| 09/21/17 | ALONGI, GINA | AUTO-GAS | EXXON | 66.31 | Y | | |
| 09/25/17 | ALONGI, GINA | AUTO-GAS | EXXON | 65.81 | Y | | |
| 10/03/17 | ALONGI, GINA | AUTO-GAS | EXXON | 69.35 | Y | | |
| 10/08/17 | ALONGI, GINA | AUTO-GAS | EXXON | 45.04 | Y | | |
| 10/13/17 | ALONGI, GINA | AUTO-GAS | SHELL | 51.30 | Y | | |
| 10/17/17 | ALONGI, GINA | AUTO-GAS | EXXON | 62.25 | Y | | |
| 10/24/17 | ALONGI, GINA | AUTO-GAS | EXXON | 62.18 | Y | | |
| 11/02/17 | ALONGI, GINA | AUTO-GAS | EXXON | 62.30 | Y | | |
| | ALONGI, GINA | AUTO-GAS | EXXON | 62.19 | Y | | |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|------|----------|-----------------|--------|--------|---------|-------------|----------|
| 11/10/17 | ALONGI, GINA | AUTO-GAS | EXXON | 68.30 | Y | | |
| 11/16/17 | ALONGI, GINA | AUTO-GAS | EXXON | 69.65 | Y | | |
| 11/25/17 | ALONGI, GINA | AUTO-GAS | EXXON | 69.15 | Y | | |
| 12/02/17 | ALONGI, GINA | AUTO-GAS | SHELL | 62.35 | Y | | |
| 12/07/17 | ALONGI, GINA | AUTO-GAS | EXXON | 59.25 | Y | | |
| 12/15/17 | ALONGI, GINA | AUTO-GAS | EXXON | 68.96 | Y | | |
| 12/19/17 | ALONGI, GINA | AUTO-GAS | EXXON | 24.09 | Y | | |
| 12/22/17 | ALONGI, GINA | AUTO-GAS | EXXON | 67.20 | Y | | |
| 12/29/17 | ALONGI, GINA | AUTO-GAS | EXXON | 51.02 | Y | | |
| 01/03/18 | ALONGI, GINA | AUTO-GAS | EXXON | 60.38 | Y | | |
| 01/13/18 | ALONGI, GINA | AUTO-GAS | EXXON | 69.53 | Y | | |
| 01/20/18 | ALONGI, GINA | AUTO-GAS | EXXON | 65.40 | Y | | |
| 01/31/18 | ALONGI, GINA | AUTO-GAS | EXXON | 69.33 | Y | | |
| 02/05/18 | ALONGI, GINA | AUTO-GAS | EXXON | 63.61 | Y | | |
| 02/10/18 | ALONGI, GINA | AUTO-GAS | EXXON | 35.29 | Y | | |
| 02/16/18 | ALONGI, GINA | AUTO-GAS | EXXON | 53.45 | Y | | |
| 02/22/18 | ALONGI, GINA | AUTO-GAS | EXXON | 66.19 | Y | | |
| 03/01/18 | ALONGI, GINA | AUTO-GAS | EXXON | 49.40 | Y | | |
| 03/09/18 | ALONGI, GINA | AUTO-GAS | EXXON | 67.00 | Y | | |
| 03/14/18 | ALONGI, GINA | AUTO-GAS | WALLEX GULF | 61.30 | | | |
| 03/18/18 | ALONGI, GINA | AUTO-GAS | EXXON | 70.05 | Y | Y | RECEIPT IS FOR $52.58, DIFF 'WILL BE MADE UP' |
| 03/25/18 | ALONGI, GINA | AUTO-GAS | EXXON | 69.01 | Y | | |
| 04/03/18 | ALONGI, GINA | AUTO-GAS | EXXON | 63.09 | Y | | |
| 04/11/18 | ALONGI, GINA | AUTO-GAS | EXXON | 65.14 | Y | | |
| 04/18/18 | ALONGI, GINA | AUTO-GAS | EXXON | 66.90 | Y | | |
| 04/28/18 | ALONGI, GINA | AUTO-GAS | EXXON | 70.55 | Y | | |
| 05/02/18 | ALONGI, GINA | AUTO-GAS | EXXON | 69.73 | Y | | |
| 05/13/18 | ALONGI, GINA | AUTO-GAS | EXXON | 71.33 | Y | | |
| 05/21/18 | ALONGI, GINA | AUTO-GAS | EXXON | 69.68 | Y | | |
| 05/26/18 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 54.10 | Y | | |
| 05/31/18 | ALONGI, GINA | AUTO-GAS | EXXON | 71.83 | Y | | |
| 05/31/18 | ALONGI, GINA | AUTO-GAS | SAVE ON | 67.71 | Y | | |
| 06/16/18 | ALONGI, GINA | AUTO-GAS | SPEEDWAY | 65.02 | Y | | |
| 05/22/18 | ALONGI, GINA | AUTO-GAS | CIRCLE K | 60.97 | Y | | |
| 06/29/18 | ALONGI, GINA | AUTO-GAS | EXXON | 70.40 | Y | | |
| 07/05/18 | ALONGI, GINA | AUTO-GAS | EXXON | 73.41 | Y | | |
| 07/13/18 | ALONGI, GINA | AUTO-GAS | EXXON | 60.13 | Y | | |
| 07/18/18 | ALONGI, GINA | AUTO-GAS | EXXON | 70.68 | Y | | |
| 07/23/18 | ALONGI, GINA | AUTO-GAS | EXXON | 66.05 | Y | | |
| 07/29/18 | ALONGI, GINA | AUTO-GAS | EXXON | 66.56 | Y | | |
| 08/04/18 | ALONGI, GINA | AUTO-GAS | EXXON | 61.18 | Y | | |
| 08/10/18 | ALONGI, GINA | AUTO-GAS | EXXON | 68.49 | Y | | |
| 08/14/18 | ALONGI, GINA | AUTO-GAS | EXXON | 68.64 | Y | | |
| 08/20/18 | ALONGI, GINA | AUTO-GAS | EXXON | 67.53 | Y | | |
| 08/26/18 | ALONGI, GINA | AUTO-GAS | EXXON | 40.08 | Y | | |
| 08/30/18 | ALONGI, GINA | AUTO-GAS | EXXON | 76.49 | Y | | |
| 09/06/18 | ALONGI, GINA | AUTO-GAS | EXXON | 70.06 | Y | | |

App.107

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 09/16/18 | ALONGI, GINA | AUTO-GAS | EXXON | 54.98 | ✓ | | |
| 09/23/18 | ALONGI, GINA | AUTO-GAS | EXXON | 70.08 | ✓ | | |
| 09/29/18 | ALONGI, GINA | AUTO-GAS | SHELL | 50.10 | | | |
| 10/05/18 | ALONGI, GINA | AUTO-GAS | EXXON | 65.08 | ✓ | | |
| 10/10/18 | ALONGI, GINA | AUTO-GAS | EXXON | 74.00 | ✓ | | |
| 10/13/18 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 60.00 | ✓ | | |
| 10/19/18 | ALONGI, GINA | AUTO-GAS | EXXON | 73.55 | ✓ | | |
| 10/25/18 | ALONGI, GINA | AUTO-GAS | EXXON | 71.26 | ✓ | | |
| 11/03/18 | ALONGI, GINA | AUTO-GAS | EXXON | 72.20 | ✓ | | |
| 11/09/18 | ALONGI, GINA | AUTO-GAS | SHELL | 57.06 | ✓ | | |
| 11/18/18 | ALONGI, GINA | AUTO-GAS | SHELL | 68.45 | ✓ | | |
| 11/24/18 | ALONGI, GINA | AUTO-GAS | SHELL | 62.75 | ✓ | | |
| 12/03/18 | ALONGI, GINA | AUTO-GAS | SHELL | 53.76 | ✓ | | |
| 12/09/18 | ALONGI, GINA | AUTO-GAS | EXXON | 65.06 | ✓ | | |
| 12/14/18 | ALONGI, GINA | AUTO-GAS | EXXON | 63.64 | ✓ | | |
| 12/22/18 | ALONGI, GINA | AUTO-GAS | EXXON | 73.35 | ✓ | | |
| 12/27/18 | ALONGI, GINA | AUTO-GAS | EXXON | 63.84 | ✓ | | |
| 01/04/19 | ALONGI, GINA | AUTO-GAS | EXXON | 71.23 | ✓ | | |
| 01/08/19 | ALONGI, GINA | AUTO-GAS | EXXON | 67.00 | ✓ | | |
| 01/14/19 | ALONGI, GINA | AUTO-GAS | EXXON | 60.54 | ✓ | | |
| 01/22/19 | ALONGI, GINA | AUTO-GAS | EXXON | 67.20 | ✓ | | |
| 01/30/19 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 33.04 | ✓ | | |
| 02/04/19 | ALONGI, GINA | AUTO-GAS | EXXON | 66.93 | ✓ | | |
| 02/08/19 | ALONGI, GINA | AUTO-GAS | EXXON | 58.14 | ✓ | | |
| 02/15/19 | ALONGI, GINA | AUTO-GAS | EXXON | 57.74 | ✓ | | |
| 02/23/19 | ALONGI, GINA | AUTO-GAS | EXXON | 53.06 | ✓ | | |
| 03/01/19 | ALONGI, GINA | AUTO-GAS | EXXON | 61.14 | ✓ | | |
| 03/10/19 | ALONGI, GINA | AUTO-GAS | EXXON | 72.00 | ✓ | | |
| 03/18/19 | ALONGI, GINA | AUTO-GAS | EXXON | 68.46 | ✓ | | |
| 03/22/19 | ALONGI, GINA | AUTO-GAS | EXXON | 66.35 | ✓ | | |
| 03/28/19 | ALONGI, GINA | AUTO-GAS | EXXON | 68.01 | ✓ | | |
| 04/03/19 | ALONGI, GINA | AUTO-GAS | EXXON | 45.00 | ✓ | | |
| 04/10/19 | ALONGI, GINA | AUTO-GAS | EXXON | 40.16 | ✓ | | |
| 04/14/19 | ALONGI, GINA | AUTO-GAS | EXXON | 47.50 | ✓ | | |
| 04/19/19 | ALONGI, GINA | AUTO-GAS | EXXON | 46.14 | ✓ | | |
| 04/25/19 | ALONGI, GINA | AUTO-GAS | EXXON | 50.28 | ✓ | | |
| 05/02/19 | ALONGI, GINA | AUTO-GAS | EXXON | 53.70 | ✓ | | |
| 05/06/19 | ALONGI, GINA | AUTO-GAS | EXXON | 43.35 | ✓ | | |
| 05/11/19 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 47.00 | ✓ | | |
| 05/14/19 | ALONGI, GINA | AUTO-GAS | EXXON | 41.56 | ✓ | | |
| 05/18/19 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 45.10 | ✓ | | |
| 05/26/19 | ALONGI, GINA | AUTO-GAS | EXXON | 45.31 | ✓ | | |
| 05/30/19 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 40.90 | ✓ | | |
| 06/04/19 | ALONGI, GINA | AUTO-GAS | EXXON | 32.83 | ✓ | | |
| 06/08/19 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 41.06 | ✓ | | |
| 06/17/19 | ALONGI, GINA | AUTO-GAS | EXXON | 36.72 | ✓ | | |
| 06/19/19 | ALONGI, GINA | AUTO-GAS | EXXON | 43.37 | ✓ | | |
| 06/22/19 | ALONGI, GINA | AUTO-GAS | EXXON | 50.01 | ✓ | | |
| 06/27/19 | ALONGI, GINA | AUTO-GAS | EXXON | | | | |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 07/02/19 | ALONGI, GINA | AUTO-GAS | EXXON | 49.80 | Y | | |
| 07/15/19 | ALONGI, GINA | AUTO-GAS | EXXON | 45.38 | Y | | |
| 07/20/19 | ALONGI, GINA | AUTO-GAS | EXXON | 49.79 | Y | | |
| 07/24/19 | ALONGI, GINA | AUTO-GAS | GULF SERVICE STATION | 40.57 | Y | | |
| 07/28/19 | ALONGI, GINA | AUTO-GAS | SPEEDWAY | 38.96 | Y | | |
| 08/02/19 | ALONGI, GINA | AUTO-GAS | EXXON | 49.93 | Y | | |
| 08/06/19 | ALONGI, GINA | AUTO-GAS | EXXON | 42.15 | Y | | |
| 08/11/19 | ALONGI, GINA | AUTO-GAS | EXXON | 42.90 | Y | | |
| 08/15/19 | ALONGI, GINA | AUTO-GAS | EXXON | 49.69 | Y | | |
| 08/21/19 | ALONGI, GINA | AUTO-GAS | EXXON | 48.30 | Y | | |
| 08/25/19 | ALONGI, GINA | AUTO-GAS | EXXON | 43.24 | Y | | |
| 08/30/19 | ALONGI, GINA | AUTO-GAS | EXXON | 32.30 | Y | | |
| 09/02/19 | ALONGI, GINA | AUTO-GAS | CIRCLE K | 35.41 | Y | | |
| 09/07/19 | ALONGI, GINA | AUTO-GAS | EXXON | 51.35 | Y | | |
| 09/14/19 | ALONGI, GINA | AUTO-GAS | EXXON | 49.70 | Y | | |
| 09/21/19 | ALONGI, GINA | AUTO-GAS | EXXON | 40.25 | Y | | |
| 09/27/19 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 40.26 | Y | | |
| 09/30/19 | ALONGI, GINA | AUTO-GAS | SHELL | 34.57 | Y | | |
| 10/04/19 | ALONGI, GINA | AUTO-GAS | EXXON | 40.47 | Y | | |
| 10/10/19 | ALONGI, GINA | AUTO-GAS | EXXON | 49.74 | Y | | |
| 10/14/19 | ALONGI, GINA | AUTO-GAS | CITGO | 37.01 | Y | | |
| 10/19/19 | ALONGI, GINA | AUTO-GAS | EXXON | 40.00 | Y | | |
| 10/21/19 | ALONGI, GINA | AUTO-GAS | EXXON | 41.71 | Y | | |
| 10/25/19 | ALONGI, GINA | AUTO-GAS | EXXON | 45.90 | Y | | |
| 10/29/19 | ALONGI, GINA | AUTO-GAS | EXXON | 44.27 | Y | | |
| 11/04/19 | ALONGI, GINA | AUTO-GAS | EXXON | 50.28 | Y | | |
| 11/09/19 | ALONGI, GINA | AUTO-GAS | SHELL | 41.03 | Y | | |
| 11/14/19 | ALONGI, GINA | AUTO-GAS | SHELL | 51.81 | Y | | |
| 11/19/19 | ALONGI, GINA | AUTO-GAS | EXXON | 39.57 | Y | | |
| 11/25/19 | ALONGI, GINA | AUTO-GAS | EXXON | 40.56 | Y | | |
| 12/05/19 | ALONGI, GINA | AUTO-GAS | EXXON | 45.90 | Y | | |
| 12/08/19 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 41.58 | Y | | |
| 12/12/19 | ALONGI, GINA | AUTO-GAS | EXXON | 48.67 | Y | | |
| 12/16/19 | ALONGI, GINA | AUTO-GAS | SUNOCO | 40.59 | Y | | |
| 12/19/19 | ALONGI, GINA | AUTO-GAS | EXXON | 41.70 | Y | | |
| 12/27/19 | ALONGI, GINA | AUTO-GAS | EXXON | 49.93 | Y | | |
| 01/04/20 | ALONGI, GINA | AUTO-GAS | EXXON | 47.80 | Y | | |
| 01/05/20 | ALONGI, GINA | AUTO-GAS | SESUIT FILLING | 18.55 | Y | | |
| 01/10/20 | ALONGI, GINA | AUTO-GAS | EXXON | 43.94 | Y | | |
| 01/17/20 | ALONGI, GINA | AUTO-GAS | EXXON | 47.93 | Y | | |
| 01/24/20 | ALONGI, GINA | AUTO-GAS | EXXON | 43.38 | Y | | |
| 01/27/20 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 44.11 | Y | | |
| 02/03/20 | ALONGI, GINA | AUTO-GAS | EXXON | 38.84 | Y | | |
| 02/13/20 | ALONGI, GINA | AUTO-GAS | QUICK SHOP | 36.88 | Y | | |
| 02/21/20 | ALONGI, GINA | AUTO-GAS | EXXON | 40.57 | Y | | |
| 02/28/20 | ALONGI, GINA | AUTO-GAS | EXXON | 46.11 | Y | | |
| 03/03/20 | ALONGI, GINA | AUTO-GAS | EXXON | 38.61 | Y | | |
| 03/07/20 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 38.00 | Y | | |

6 OF 21

IUOE4 FED 0050

25

App.109

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | INTEREST | OF COMMENTS |
|---|---|---|---|---|---|---|---|
| 03/11/20 | ALONGI, GINA | AUTO-GAS | EXXON | 47.50 | Y | | |
| 03/19/20 | ALONGI, GINA | AUTO-GAS | EXXON | 46.00 | Y | | |
| 04/09/20 | ALONGI, GINA | AUTO-GAS | EXXON | 41.35 | Y | | |
| 04/29/20 | ALONGI, GINA | AUTO-GAS | EXXON | 44.00 | Y | | |
| 05/07/20 | ALONGI, GINA | AUTO-GAS | EXXON | 50.57 | Y | | |
| 05/16/20 | ALONGI, GINA | AUTO-GAS | EXXON | 32.01 | Y | | |
| 05/17/20 | ALONGI, GINA | AUTO-GAS | SHELL | 18.65 | | | |
| 05/31/20 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 30.58 | | | |
| 06/08/20 | ALONGI, GINA | AUTO-GAS | EXXON | 42.50 | | | |
| 06/21/20 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 22.00 | | | |
| 07/01/20 | ALONGI, GINA | AUTO-GAS | EXXON | 45.81 | | | |
| 07/12/20 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 29.03 | | | |
| 07/17/20 | ALONGI, GINA | AUTO-GAS | EXXON | 35.38 | | | |
| 07/18/20 | ALONGI, GINA | AUTO-GAS | EXXON | 33.00 | | | |
| 07/20/20 | ALONGI, GINA | AUTO-GAS | MARTY'S 1ST STOP | 33.00 | | | |
| 01/06/18 | ALONGI, GINA | AUTO-GAS | CUMBERLAND FARMS | 36.73 | | | |
| 02/06/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.73 | | | |
| 03/09/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.73 | | | |
| 04/08/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.71 | | | |
| 05/07/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.71 | | | |
| 05/31/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.71 | | | |
| 07/07/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.71 | | | |
| 08/06/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.71 | | | |
| 09/08/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.71 | | | |
| 10/06/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.75 | | | |
| 11/06/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.75 | | | |
| 12/11/18 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.75 | | | |
| 01/07/19 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 36.75 | | | |
| 02/07/19 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 37.25 | | | |
| 03/08/19 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 37.25 | | | |
| 04/06/19 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 37.23 | | | |
| 05/06/19 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 37.23 | | | |
| 06/06/19 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 37.23 | | | |
| 07/08/19 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 37.33 | | | |
| 07/13/19 | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | 37.33 | Y | | |
| | ALONGI, GINA | AUTO-ONSTAR | ONSTAR | (23.12) | | | |
| 12/19/16 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/19/16 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/27/16 | ALONGI, GINA | COLLECTION | COURT | 20.00 | Y | | COURT FILING FEE |
| 12/27/16 | ALONGI, GINA | COLLECTION | COURT | 3.50 | Y | | COURT FILING FEE |
| 01/23/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 02/08/17 | ALONGI, GINA | COLLECTION | COURT | 67.00 | Y | | COURT FILING FEE |
| 02/21/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 04/20/17 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 04/20/17 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 05/08/17 | ALONGI, GINA | COLLECTION | COURT | 65.30 | Y | | COURT FILING FEE |
| 05/09/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 07/12/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 07/26/17 | ALONGI, GINA | COLLECTION | UNION LEADER CORP. | 360.00 | Y | | LEGAL NOTICE ADVERTISEMENT |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 08/08/17 | ALONGI, GINA | COLLECTION | COURT | 45.30 | Y | | COURT FILING FEE |
| 08/21/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 08/21/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 08/30/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 09/19/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 09/19/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 09/19/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 09/19/17 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 10/13/17 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 10/13/17 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 10/13/17 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 10/13/17 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 11/02/17 | ALONGI, GINA | COLLECTION | UNION LEADER CORP. | 432.00 | Y | | LEGAL NOTICE ADVERTISEMENT |
| 11/27/17 | ALONGI, GINA | COLLECTION | PACER | 41.50 | Y | | PUBLIC ACCESS TO COURT ELEC. REC. |
| 11/29/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/07/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/08/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/19/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/19/17 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 01/19/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 01/22/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 02/07/18 | ALONGI, GINA | COLLECTION | PACER | 96.00 | Y | | PUBLIC ACCESS TO COURT ELEC. REC. |
| 02/21/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | FILING FEE |
| 02/22/18 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 02/22/18 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 03/19/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | FILING FEE |
| 03/27/18 | ALONGI, GINA | COLLECTION | COURT | 20.00 | Y | | COURT FILING FEE |
| 03/27/18 | ALONGI, GINA | COLLECTION | COURT | 3.50 | Y | | COURT FILING FEE |
| 05/02/18 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | COURT FILING FEE |
| 05/02/18 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 05/02/18 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 05/02/18 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 05/02/18 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 05/02/18 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 05/08/18 | ALONGI, GINA | COLLECTION | COURT | 109.90 | Y | | COURT FILING FEE |
| 06/19/18 | ALONGI, GINA | COLLECTION | COMM NEWS ADVERT. | 1,160.64 | Y | | LEGAL NOTICE PUBLICATION |
| 07/23/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 08/02/18 | ALONGI, GINA | COLLECTION | COMM NEWS ADVERT. | 343.20 | Y | | LEGAL NOTICE PUBLICATION |
| 08/03/18 | ALONGI, GINA | COLLECTION | UNION LEADER CORP. | 169.56 | Y | | LEGAL NOTICE ADVERTISEMENT |
| 08/08/18 | ALONGI, GINA | COLLECTION | PACER | 18.40 | Y | | PUBLIC ACCESS TO COURT ELEC. REC. |
| 08/20/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 09/19/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 10/24/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 11/09/18 | ALONGI, GINA | COLLECTION | PACER | 103.00 | Y | | PUBLIC ACCESS TO COURT ELEC. REC. |
| 11/19/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 11/20/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 11/26/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 11/26/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |

App.111

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 11/26/18 | ALONGI, GINA | COLLECTION | COURT | (400.00) | | | COURT FILING FEE |
| 12/04/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/13/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/18/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/27/18 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 01/02/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 01/14/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 01/22/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 02/07/19 | ALONGI, GINA | COLLECTION | PACER | 107.00 | | | PUBLIC ACCESS TO COURT ELEC REC. |
| 02/19/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 02/25/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 02/26/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 03/07/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 03/20/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 04/25/19 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 04/25/19 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 04/29/19 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 04/29/19 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 05/02/19 | ALONGI, GINA | COLLECTION | THE VALLEY BREEZE | 1,098.00 | Y | | LEGAL NOTICE ADVERTISEMENT |
| 05/08/19 | ALONGI, GINA | COLLECTION | PACER | 87.40 | | | PUBLIC ACCESS TO COURT ELEC REC. |
| 05/24/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 05/24/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 05/31/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 06/27/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 06/27/19 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 08/07/19 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 09/20/19 | ALONGI, GINA | COLLECTION | PACER | 59.10 | | | PUBLIC ACCESS TO COURT ELEC REC. |
| 10/03/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 10/21/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 10/21/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 10/21/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 10/21/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 11/08/19 | ALONGI, GINA | COLLECTION | PACER | 144.10 | | | PUBLIC ACCESS TO COURT ELEC REC. |
| 11/14/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 11/19/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 11/19/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 11/19/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 12/26/19 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 01/08/20 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 01/08/20 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 01/14/20 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 01/14/20 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 01/14/20 | ALONGI, GINA | COLLECTION | SEC OF MA | 20.00 | Y | | FILING FEE |
| 01/14/20 | ALONGI, GINA | COLLECTION | SEC OF MA | 3.50 | Y | | FILING FEE |
| 02/03/20 | ALONGI, GINA | COLLECTION | COURT | 400.00 | Y | | COURT FILING FEE |
| 02/06/20 | ALONGI, GINA | COLLECTION | PACER | 151.60 | | | PUBLIC ACCESS TO COURT ELEC REC. |
| 05/07/20 | ALONGI, GINA | COLLECTION | PACER | 36.20 | | | PUBLIC ACCESS TO COURT ELEC REC. |
| 05/09/20 | ALONGI, GINA | COLLECTION | AMAZON | 179.67 | | | NO RECEIPT |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 05/10/20 | ALONGI, GINA | COLLECTION | AMAZON | 42.38 | | | NO RECEIPT |
| 07/05/20 | ALONGI, GINA | COLLECTION | COURT | 22.13 | Y | | COURT FILING FEE |
| 03/24/17 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | DROPBOX | 6,240.00 | Y | | BOARD MATERIALS |
| 04/24/17 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | 360 WEB SEC SITELOCK | 488.00 | Y | | NETWORK PROTECTION |
| 05/22/17 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | NETWORK SOLUTIONS | 350.90 | Y | | DOMAIN RENEWAL - 2 YEAR |
| 12/14/17 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | CSS - COMODO GRP | 899.85 | Y | | PREMIUM SSL WILDCARD CERTIFICATE |
| 03/24/18 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | DROPBOX | 6,240.00 | Y | | BOARD MATERIALS |
| 04/24/18 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | 360 WEB SEC SITELOCK | 488.00 | Y | | NETWORK PROTECTION |
| 03/24/19 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | DROPBOX | 6,240.00 | Y | | BOARD MATERIALS |
| 04/24/19 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | 360 WEB SEC SITELOCK | 488.00 | Y | | NETWORK PROTECTION |
| 06/26/19 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | HP | 99.00 | Y | | ANNUAL HP SUPPORT |
| 07/17/19 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | GODADDY.COM | 319.98 | Y | | SSL CERTIFICATE |
| 07/31/19 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | LOGMEIN | 350.63 | Y | | ANNUAL LICENSE |
| 12/18/19 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | MALWARE BYTES | 106.36 | Y | | MALWARE PROTECTION - 3 YEAR |
| 03/24/20 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | DROPBOX | 6,690.00 | Y | | BOARD MATERIALS |
| 04/24/20 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | 360 WEB SEC SITELOCK | 518.50 | Y | | NETWORK PROTECTION |
| 07/30/20 | ALONGI, GINA | COMPUTER - LICENSES & SUPPORT | LOGMEIN | 350.63 | | | ANNUAL LICENSE |
| 03/16/17 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 267.72 | Y | | (2) ASUS 25" MONITORS |
| 04/06/17 | ALONGI, GINA | COMPUTER - EQUIPMENT | APPLE | 349.56 | Y | | IPAD - DIMINICO |
| 04/06/17 | ALONGI, GINA | COMPUTER - EQUIPMENT | APPLE | 349.56 | Y | | IPAD - REGER |
| 05/02/17 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 339.36 | Y | | WORKSTATION - YERANIA |
| 05/02/17 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 31.99 | Y | | WORKSTATION - YERANIA |
| 09/20/17 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 530.42 | Y | | (4) COMPUTER MONITORS |
| 10/11/17 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 2,013.80 | Y | | (2) HP ELITE DESKTOP COMPUTERS |
| 10/11/17 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 332.35 | Y | | |
| 01/29/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 3,327.90 | Y | | (3) LENOVO LAPTOPS |
| 02/02/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | BEST BUY | 4,143.72 | Y | | (3) LENOVO LAPTOPS |
| 03/12/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 748.50 | Y | | HP DESKTOP COMPUTER |
| 03/12/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 155.08 | Y | | ASUS MONITOR |
| 03/12/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | HP | 1,339.33 | Y | | HP ELITE DESKTOP TOWER |
| 03/14/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | HP | (66.97) | | | CREDIT |
| 06/12/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 244.41 | Y | | (3) HARD DRIVES |
| 06/15/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 256.72 | Y | | (2) ASUS MONITORS |
| 10/12/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 580.13 | Y | | (3) HARD DRIVES |
| 11/06/18 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 503.86 | Y | | (4) ASUS MONITORS |
| 01/14/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | DELL | 1,807.54 | Y | | (2) COMPUTERS |
| 03/06/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | STAPLES | 1,254.46 | Y | | DELL DESKTOP COMPUTER |
| 03/16/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | STAPLES | (228.43) | | | WINDOWS PRO RETURN |
| 03/22/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | STAPLES | (367.30) | | | RETURN |
| 03/25/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 296.86 | Y | | INTERNAL GAMING SSD |
| 07/16/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 682.88 | Y | | |
| 07/20/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 993.42 | Y | | |
| 08/19/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 136.10 | Y | | ASUS MONITOR |
| 08/20/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 150.85 | Y | | ASUS MONITOR |
| 08/21/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | LENOVUS | 2,442.83 | Y | | THINKPAD - "FOR JIM" |
| 09/06/19 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 7,219.64 | Y | | (4) NETGEAR PRO SWITCHES |
| 04/14/20 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 222.05 | Y | | MONITOR - ZACCARDI |
| 05/06/20 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 222.05 | Y | | MONITOR - LJH |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | INTEREST OF | COMMENTS |
|---|---|---|---|---|---|---|---|
| 06/26/20 | ALONGI, GINA | COMPUTER - EQUIPMENT | AMAZON | 1,845.57 | Y | | (3) DELL LAPTOPS |
| 03/30/17 | ALONGI, GINA | COMPUTER - SOFTWARE | PARTITION WIZARD | 423.94 | Y | | PARTITION WIZARD SOFTWARE |
| 02/09/18 | ALONGI, GINA | COMPUTER - SOFTWARE | MICROSOFT | 106.24 | Y | | WINDOWS 10 PRO - D. CHRISTY |
| 02/12/18 | ALONGI, GINA | COMPUTER - SOFTWARE | MICROSOFT | 106.24 | Y | | WINDOWS 10 PRO - ZACCARDI |
| 02/12/18 | ALONGI, GINA | COMPUTER - SOFTWARE | MICROSOFT | 106.24 | Y | | WINDOWS 10 PRO - HICKEY |
| 03/24/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 31.85 | Y | | ADOBE - ROSEMARY AND WENDY |
| 04/27/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | Y | | PHOTOSHOP APPLICATION |
| 05/27/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 06/27/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 07/27/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 08/27/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 09/08/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 09/11/18 | ALONGI, GINA | COMPUTER - SOFTWARE | DRI VICE VERSA PRO | 191.25 | Y | | ANNUAL LICENSE |
| 09/27/18 | ALONGI, GINA | COMPUTER - SOFTWARE | MICROSOFT | 185.73 | Y | | (4) WINDOWS 10 LICENSES |
| 10/28/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 11/27/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 12/27/18 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 01/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 02/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 03/11/19 | ALONGI, GINA | COMPUTER - SOFTWARE | MICROSOFT | 105.19 | Y | | WINDOWS PRO |
| 03/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 04/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 05/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 06/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 07/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 08/07/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 255.00 | Y | | PHOTOSHOP APPLICATION |
| 08/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 09/19/19 | ALONGI, GINA | COMPUTER - SOFTWARE | MICROSOFT | 394.03 | Y | | WINDOWS 365 |
| 09/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 10/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 11/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 12/27/19 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 01/27/20 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 02/27/20 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 03/27/20 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 04/27/20 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 05/27/20 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 05/27/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 272.00 | Y | | (10) PACK DATA STORAGE |
| 06/27/20 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 07/27/20 | ALONGI, GINA | COMPUTER - SOFTWARE | ADOBE | 10.61 | | | PHOTOSHOP APPLICATION |
| 04/09/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 142.19 | Y | | WIFI RANGE FINDER AND VIDEO CARD |
| 09/24/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 90.31 | Y | | DISK DRIVE |
| 10/17/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 25.96 | Y | | (2) HDMI CABLES |
| 10/19/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 17.98 | Y | | (2) HDMI CABLES |
| 11/16/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 149.03 | Y | | CABLES AND SUPPLIES |
| 11/16/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 19.52 | Y | | CABLES AND SUPPLIES |
| 12/07/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 59.99 | Y | | TABLET REPAIR KIT |
| 12/07/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 44.37 | Y | | WIRELESS MOUSE |

IUOE4 FED 0055

30

App.114

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 12/26/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 240.00 | Y | | (10) PACK DATA STORAGE |
| 12/26/17 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 67.88 | Y | | WIRELESS MOUSE |
| 01/05/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 80.10 | Y | | INK CARTRIDGES |
| 01/12/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 101.28 | Y | | INK CARTRIDGES |
| 02/08/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 78.40 | Y | | (4) WIRELESS MOUSES |
| 02/15/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 294.96 | Y | | DOCKING STATION AND HUB |
| 02/21/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 34.99 | Y | | WIRELESS KEYPAD |
| 02/26/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 31.65 | Y | | WIRELESS KEYBOARD |
| 03/12/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 116.99 | Y | | |
| 03/14/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 18.54 | Y | | HDMI CABLES |
| 03/19/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 65.86 | Y | | WIRELESS KEYBOARD |
| 04/02/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 257.06 | Y | | RETURNED |
| 04/08/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | (257.06) | | | |
| 04/09/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 131.71 | Y | | INK CARTRIDGES |
| 04/09/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 125.35 | Y | | INK CARTRIDGES |
| 04/26/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 67.94 | Y | | (2) BLUETOOTH MOUSES |
| 05/01/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 53.00 | Y | | SUPPLIES |
| 06/12/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 160.60 | Y | | SUPPLIES |
| 06/29/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 22.98 | Y | | CABLES |
| 07/06/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 49.36 | Y | Y | MISSING RECEIPT FROM ALAN |
| 08/15/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 99.46 | Y | | SUPPLIES |
| 08/31/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 116.00 | Y | | (2) HARD DRIVES |
| 10/26/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 579.99 | Y | | SUPPLIES |
| 10/30/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 489.08 | Y | | SUPPLIES |
| 11/07/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 25.48 | Y | | CABLES |
| 11/30/18 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 118.40 | Y | | SUPPLIES |
| 01/09/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 7.43 | Y | | SUPPLIES |
| 01/11/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 11.69 | Y | | SUPPLIES |
| 01/17/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 23.36 | Y | | CABLES |
| 01/30/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 16.98 | Y | | SUPPLIES |
| 02/05/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 62.66 | Y | | SUPPLIES |
| 03/21/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 24.95 | Y | | SUPPLIES |
| 03/22/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 12.72 | Y | | CABLES |
| 05/04/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 60.55 | Y | | SUPPLIES |
| 05/08/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 123.91 | Y | | SUPPLIES |
| 05/12/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 35.58 | Y | | SUPPLIES |
| 05/13/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | (43.90) | | | |
| 07/06/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 23.97 | Y | | SUPPLIES |
| 07/06/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 39.99 | Y | | SUPPLIES |
| 08/22/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 29.99 | Y | | POWER ADAPTER |
| 08/26/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 188.96 | Y | | DOCKING STATION |
| 08/28/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 65.80 | Y | | CABLES |
| 09/09/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 53.36 | Y | | SUPPLIES |
| 09/11/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 182.74 | Y | | SUPPLIES |
| 09/16/19 | ALONGI, GINA | COMPUTER - SUPPLIES | NETWORK TIGERS | 80.18 | Y | | NETWORK SWITCH |
| 10/25/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 187.84 | Y | | REPLACEMENT BATTERIES |
| 11/15/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 17.87 | Y | | SUPPLIES |
| 11/15/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | | | | SUPPLIES |
| 11/26/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 13.42 | Y | | CABLE |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 12/18/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 144.40 | Y | | HARD DRIVES |
| 12/27/19 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 128.85 | Y | | TONER CARTRIDGES |
| 01/02/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 73.56 | Y | | SUPPLIES |
| 01/11/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 42.45 | Y | | SUPPLIES |
| 01/12/20 | ALONGI, GINA | COMPUTER - SUPPLIES | STAPLES | 42.45 | Y | | SUPPLIES |
| 01/22/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 124.15 | Y | | VIDEO CARD |
| 01/29/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 116.81 | Y | | HP PRINTER |
| 01/31/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | (12.75) | | | RETURN |
| 03/06/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 84.99 | Y | | SUPPLIES |
| 03/06/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 53.54 | Y | | SUPPLIES |
| 03/06/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 35.05 | Y | | BLUETOOTH HEADSET |
| 03/09/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 31.86 | Y | | SUPPLIES |
| 03/19/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 318.74 | Y | | PRINTER/SCANNER - YERANIA |
| 03/19/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 84.88 | Y | | PRINTER |
| 03/19/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 46.42 | Y | | INK CARTRIDGES |
| 03/24/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 140.33 | Y | | PRINTER, INK, PAPER - GINA ALONGI |
| 04/13/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 203.45 | Y | | INK - GINA ALONGI |
| 04/13/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 97.78 | Y | | INK - ROSEMARIE |
| 04/14/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 106.24 | Y | | PRINTER - ZACCARDI |
| 04/21/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 30.65 | Y | | CABLE - ZACCARDI |
| 04/21/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 21.01 | Y | | CABLE - ZACCARDI |
| 05/06/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 116.86 | Y | | PRINTER - LJH |
| 05/08/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 55.24 | Y | | KEYBOARD - LJH |
| 05/08/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 18.92 | Y | | CABLE - LJH |
| 05/21/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 252.00 | Y | | PRINTER & INK - BURNS |
| 06/02/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 239.05 | Y | | SUPPLIES |
| 06/04/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 127.50 | Y | | SUPPLIES |
| 06/04/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 99.90 | Y | | SUPPLIES |
| 06/04/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 51.00 | Y | | SUPPLIES |
| 06/04/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 50.95 | Y | | SUPPLIES |
| 06/09/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 152.85 | Y | | SUPPLIES |
| 06/10/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 217.75 | Y | | SUPPLIES |
| 06/10/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 43.68 | Y | | SUPPLIES |
| 06/10/20 | ALONGI, GINA | COMPUTER - SUPPLIES | AMAZON | 42.40 | Y | | SUPPLIES |
| 06/23/20 | ALONGI, GINA | COMPUTER - SUPPLIES | STAPLES | 75.95 | Y | | NO RECEIPT |
| 04/10/17 | ALONGI, GINA | CONFERENCE - AIRFARE | JETBLUE | 387.39 | Y | | FRAUD CONFERENCE - LJH |
| 04/03/18 | ALONGI, GINA | CONFERENCE - AIRFARE | EXPEDIA | 1.50 | Y | | CONFERENCE AIRFARE - YERANIA AYALA |
| 04/03/18 | ALONGI, GINA | CONFERENCE - AIRFARE | FRONTIER | 70.20 | Y | | CONFERENCE AIRFARE - YERANIA AYALA |
| 04/03/18 | ALONGI, GINA | CONFERENCE - AIRFARE | JETBLUE | 118.98 | Y | | CONFERENCE AIRFARE - YERANIA AYALA |
| 04/03/18 | ALONGI, GINA | CONFERENCE - HOTEL | JETBLUE | 280.83 | Y | | DIMINICO |
| 05/27/17 | ALONGI, GINA | CONFERENCE - HOTEL | HILTON | 280.83 | Y | | NCCMP CONFERENCE - DEPOSIT - FANTINI |
| 05/27/17 | ALONGI, GINA | CONFERENCE - HOTEL | HILTON | 452.66 | Y | | CONFERENCE - LJH |
| 07/26/17 | ALONGI, GINA | CONFERENCE - HOTEL | FAIRMONT HOTEL CH | 150.00 | Y | | HOTEL DEPOSIT - DIMINICO |
| 10/11/18 | ALONGI, GINA | CONFERENCE - HOTEL | SLS LAS VEGAS HOTEL | 678.01 | Y | | HOTEL DEPOSIT - DIMINICO |
| 10/16/18 | ALONGI, GINA | CONFERENCE - HOTEL | VEGAS.COM MOBILE | 89.57 | Y | | HOTEL - DMINICO |
| 01/14/19 | ALONGI, GINA | CONFERENCE - HOTEL | SLS LAS VEGAS HOTEL | 311.80 | Y | | HOTEL - DEPOSIT - DIMINICO |
| 07/30/19 | ALONGI, GINA | CONFERENCE - HOTEL | BELLAGIO | 226.76 | Y | | DEPOSIT |
| 02/28/20 | ALONGI, GINA | CONFERENCE - HOTEL | CAESARS PALACE | (226.76) | | | CREDIT P. Diminico Travel |
| 03/18/20 | ALONGI, GINA | CONFERENCE - HOTEL | CAESARS PALACE | 29.00 | Y | | CONFERENCE MATERIALS - FOGARTY |
| 08/23/17 | ALONGI, GINA | CONFERENCE - MATERIALS | IFEBP MILWAUKEE | | | | |

13 OF 21

32

App.116

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 12/04/18 | ALONGI, GINA | CONFERENCE - MATERIALS | IFEBP MILWAUKEE | 94.00 | ✓ | | CONFERENCE MATERIALS |
| 05/10/18 | ALONGI, GINA | CONFERENCE - MEALS | HMS CAFE | 10.75 | | | RECEIPT |
| 02/01/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | AICPA | 1,120.00 | ✓ | | ZACCARDI |
| 04/12/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | IFEBP MILWAUKEE | 1,545.00 | ✓ | | FRAUD CONFERENCE - LJH |
| 07/10/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | NE EMP BENEFITS CNCL | (4.00) | | | CONFERENCE REGISTRATION - ZACCARDI |
| 07/10/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | NE EMP BENEFITS CNCL | (4.00) | | | CONFERENCE REGISTRATION - HICKEY |
| 07/10/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | NE EMP BENEFITS CNCL | 199.00 | | | CONFERENCE REGISTRATION - KURTZ |
| 07/10/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | NE EMP BENEFITS CNCL | 199.00 | | | CONFERENCE REGISTRATION - ZACCARDI |
| 07/10/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | NE EMP BENEFITS CNCL | 199.00 | | | CONFERENCE REGISTRATION - HICKEY |
| 07/10/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | NE EMP BENEFITS CNCL | 199.00 | | | CONFERENCE REGISTRATION - KURTZ |
| 09/25/17 | ALONGI, GINA | CONFERENCE - REGISTRATION | AICPA | 895.00 | ✓ | | ZACCARDI |
| 03/15/18 | ALONGI, GINA | CONFERENCE - REGISTRATION | AICPA | 1,140.00 | ✓ | | ZACCARDI |
| 03/15/18 | ALONGI, GINA | CONFERENCE - REGISTRATION | IFEBP MILWAUKEE | 4,995.00 | ✓ | | IFEBP - GMA |
| 03/15/18 | ALONGI, GINA | CONFERENCE - REGISTRATION | IFEBP MILWAUKEE | 4,995.00 | ✓ | | IFEBP - GG |
| 06/18/18 | ALONGI, GINA | CONFERENCE - REGISTRATION | IFEBP MILWAUKEE | 1,875.00 | ✓ | | FOGARTY |
| 10/10/18 | ALONGI, GINA | CONFERENCE - REGISTRATION | WILMINGTON | 347.50 | ✓ | | CONFERENCE REGISTRATION - DIMINICO |
| 03/05/19 | ALONGI, GINA | CONFERENCE - REGISTRATION | AICPA | 1,200.00 | ✓ | | ZACCARDI |
| 03/21/19 | ALONGI, GINA | CONFERENCE - REGISTRATION | IFEBP MILWAUKEE | 4,995.00 | ✓ | | CONFERENCE - REGISTRATION - ALONGI |
| 03/21/19 | ALONGI, GINA | CONFERENCE - REGISTRATION | IFEBP MILWAUKEE | 4,995.00 | ✓ | | CONFERENCE - REGISTRATION - GEIMAN |
| 06/04/19 | ALONGI, GINA | CONFERENCE - REGISTRATION | AICPA | 119.00 | ✓ | | CPE - ETHICS - ZACCARDI |
| 08/06/19 | ALONGI, GINA | CONFERENCE - REGISTRATION | WILMINGTON | 695.00 | ✓ | | CONFERENCE REGISTRATION - DIMINICO |
| 09/26/19 | ALONGI, GINA | CONFERENCE - REGISTRATION | WILMINGTON | (695.00) | | | CONFERENCE REGISTRATION - DIMINICO |
| 02/28/20 | ALONGI, GINA | CONFERENCE - REGISTRATION | AICPA | 1,225.00 | ✓ | | ZACCARDI |
| 08/29/18 | ALONGI, GINA | CONFERENCE - REG. & HOTEL | IFEBP MILWAUKEE | 1,965.00 | ✓ | | FANTINI |
| 07/14/17 | ALONGI, GINA | CONFERENCE - TRANSPORTATION | GO AIRPORT EXPRESS | 80.10 | ✓ | | AIRPORT - LJH |
| 07/17/17 | ALONGI, GINA | CONFERENCE - TRANSPORTATION | GO AIRPORT EXPRESS | (0.47) | | | AIRPORT - LJH |
| 05/20/19 | ALONGI, GINA | CONFERENCE - TRANSPORTATION | BOSTON TOWN CAR | 139.23 | ✓ | | AIRPORT - GINA ALONGI |
| 05/22/19 | ALONGI, GINA | CONFERENCE - TRANSPORTATION | BOSTON TOWN CAR | 139.23 | ✓ | | AIRPORT - GINA ALONGI |
| 06/23/17 | ALONGI, GINA | DUES & SUBSCRIPTIONS | AICPA | 265.00 | ✓ | | MEMBERSHIP FEE |
| 09/28/18 | ALONGI, GINA | DUES & SUBSCRIPTIONS | AICPA | 275.00 | ✓ | | MEMBERSHIP FEE |
| 07/17/19 | ALONGI, GINA | DUES & SUBSCRIPTIONS | AICPA | 285.00 | ✓ | | MEMBERSHIP FEE |
| 02/28/20 | ALONGI, GINA | DUES & SUBSCRIPTIONS | AMAZON | 179.00 | ✓ | | ANNUAL PRIME MEMBERSHIP |
| 04/28/17 | ALONGI, GINA | EDUCATION | NOT-IERN ESSEX CC | 95.00 | ✓ | | ACADEMIC COURSE - ZACCARDI |
| 05/08/19 | ALONGI, GINA | EDUCATION | CNTR FOR PROF EDU | 199.00 | ✓ | | CPE - ZACCARDI |
| 06/11/19 | ALONGI, GINA | EDUCATION | CNTR FOR PROF EDU | 149.00 | ✓ | | CPE - ZACCARDI |
| 10/11/19 | ALONGI, GINA | EDUCATION | CLEAR LAW INSTITUTE | 199.00 | ✓ | | ANTI-HARASSMENT TRAINING |
| 03/24/20 | ALONGI, GINA | EDUCATION | CNTR FOR PROF EDU | 319.20 | | | CPE - ZACCARDI |
| 03/24/20 | ALONGI, GINA | EDUCATION | CNTR FOR PROF EDU | 299.00 | | | CPE - ZACCARDI |
| 04/02/20 | ALONGI, GINA | EDUCATION | CNTR FOR PROF EDCU | 335.20 | | | CPE - ZACCARDI |
| 07/07/20 | ALONGI, GINA | EDUCATION | CNTR FOR PROF EDCU | 239.20 | | | CPE - ZACCARDI |
| 10/15/18 | ALONGI, GINA | EDUCATION | CNTR FOR PROF EDU | 169.00 | | | RETURNED |
| 10/15/18 | ALONGI, GINA | EQUIPMENT | AMAZON | 316.63 | | | |
| 10/21/18 | ALONGI, GINA | EQUIPMENT | AMAZON | (316.63) | | | |
| 11/26/18 | ALONGI, GINA | EQUIPMENT | HP | 1,647.70 | ✓ | | CREDITED ON 2/14/19 |
| 12/21/18 | ALONGI, GINA | EQUIPMENT | FLOWERS | 53.22 | ✓ | | RETIREMENT FLOWERS |
| 02/14/19 | ALONGI, GINA | EQUIPMENT | HP | (1,647.70) | | | PURCHASED ON 11/26/18 |
| 10/30/18 | ALONGI, GINA | GIFTS | TAVERN | 75.00 | | ✓ | RELATED ILLNESS |
| 03/24/20 | ALONGI, GINA | INTERNET | COMCAST BOSTON | 848.42 | | | MONTHLY INTERNET |

33

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | INTEREST OF | COMMENTS |
|---|---|---|---|---|---|---|---|
| 05/01/20 | ALONGI, GINA | INTERNET | COMCAST BOSTON | 424.21 | Y | | MONTHLY INTERNET |
| 12/20/16 | ALONGI, GINA | MEETING - TRUSTEES | WHOLE FOODS | 355.55 | Y | | TRUSTEE MEETING - H&W |
| 12/22/16 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 128.72 | Y | | TRUSTEE MEETING - H&W |
| 02/13/17 | ALONGI, GINA | MEETING - TRUSTEES | WEQUASSETT RESORT | 3,100.00 | Y | | TRUSTEE MEETING - DEPOSIT |
| 03/31/17 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 1,885.06 | Y | | TRUSTEE MEETING - P&A |
| 04/04/17 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 1,525.92 | Y | | TRUSTEE MEETING - H&W |
| 05/23/17 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 153.09 | Y | | MEETING |
| 05/23/17 | ALONGI, GINA | MEETING - TRUSTEES | WHOLE FOODS | 131.57 | Y | | MEETING |
| 05/31/17 | ALONGI, GINA | MEETING - TRUSTEES | PLEASANT BAY VILLAGE | 159.07 | Y | Y | HOTEL ROOM - SEGAL, MARCO |
| 06/14/17 | ALONGI, GINA | MEETING - TRUSTEES | VIERA | 883.48 | | | CANCELLED BUT NO REFUND |
| 07/21/17 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 1,245.30 | Y | | TRUSTEE MEETING - P&A |
| 04/12/18 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 1,689.92 | Y | | TRUSTEE MEETING - H&W |
| 09/28/17 | ALONGI, GINA | MEETING - TRUSTEES | WEQUASSETT RESORT | 5,400.00 | Y | | TRUSTEE MEETING - DEPOSIT |
| 10/13/17 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 1,834.00 | Y | | TRUSTEE MEETING - DEPOSIT |
| 10/26/17 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | (61.28) | | | |
| 12/21/17 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 162.90 | Y | | TRUSTEE MEETING - H&W - BREAKFAST |
| 04/12/18 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 187.02 | Y | | TRUSTEE MEETING - H&W - LUNCH |
| 04/12/18 | ALONGI, GINA | MEETING - TRUSTEES | WHOLE FOODS | 130.34 | Y | | TRUSTEE MEETING - H&W |
| 05/22/18 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 152.61 | Y | | TRUSTEE MEETING - P&A |
| 05/22/18 | ALONGI, GINA | MEETING - TRUSTEES | WHOLE FOODS | 130.34 | Y | | TRUSTEE MEETING - H&W |
| 07/18/18 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 1,967.42 | Y | | TRUSTEE MEETING - H&W |
| 07/26/18 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 164.80 | Y | | TRUSTEE MEETING - P&A - BREAKFAST |
| 10/04/18 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 1,843.72 | Y | | TRUSTEE MEETING - P&A |
| 10/22/18 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 140.22 | Y | | COLLECTIONS MEETING - BREAKFAST |
| 11/30/18 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 146.79 | Y | | COLLECTIONS MEETING - P&A - BREAKFAST |
| 01/10/19 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 149.29 | Y | | TRUSTEE MEETING - H&W - BREAKFAST |
| 01/31/19 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 112.05 | Y | | SUB-COMMITTEE MEETING - PENSION |
| 04/18/19 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 29.20 | Y | | GREG |
| 04/25/19 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 1,911.88 | Y | | TRUSTEE MEETING - P&A |
| 05/09/19 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 130.34 | Y | | TRUSTEE MEETING - H&W - LUNCH |
| 05/17/19 | ALONGI, GINA | MEETING - TRUSTEES | WEQUASSETT RESORT | 3,220.00 | Y | | TRUSTEE MEETING - DEPOSIT |
| 05/21/19 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 132.30 | Y | | TRUSTEE MEETING - H&W - BREAKFAST |
| 08/29/19 | ALONGI, GINA | MEETING - TRUSTEES | RUTHS STEAKHOUSE | 2,396.91 | Y | | TRUSTEE MEETING - P&A |
| 10/02/19 | ALONGI, GINA | MEETING - TRUSTEES | WHOLE FOODS | 177.95 | Y | | COLLECTIONS MEETING - LUNCH |
| 11/14/19 | ALONGI, GINA | MEETING - TRUSTEES | WEQUASSETT RESORT | 4,650.00 | Y | | TRUSTEE MEETING DEPOSIT - FOR JUNE 2020 - ASSUMING RESCHEDULED |
| 12/11/19 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 155.87 | Y | | TRUSTEE MEETING - H&W - BREAKFAST |
| 01/07/20 | ALONGI, GINA | MEETING - TRUSTEES | PANERA | 143.78 | Y | | TRUSTEE MEETING - P&A - BREAKFAST |
| 02/13/20 | ALONGI, GINA | MEETINGS | WHOLE FOODS | 95.25 | Y | | OFFICE HOLIDAY DESSERT - GINA |
| 12/15/16 | ALONGI, GINA | MEETINGS | TAVOLINO | 784.36 | Y | | REIMBURSED $20 FOR PERSONAL ITEMS |
| 12/16/16 | ALONGI, GINA | MEETINGS | MICK MORGANS | 39.68 | Y | | OFFICE HOLIDAY LUNCHEON |
| 02/23/17 | ALONGI, GINA | MEETINGS | ARTUROS RISTORANTE | 100.00 | Y | | BILL O'NEIL RETIREMENT DINNER |
| 03/17/17 | ALONGI, GINA | MEETINGS | WHOLE FOODS | 43.03 | Y | | DEPOSIT - MASSMUTUAL MEETING |
| 04/19/17 | ALONGI, GINA | MEETINGS | TST RESTAURANT | 63.27 | Y | | OWNER/OPERATOR MEETING |
| 05/31/17 | ALONGI, GINA | MEETINGS | HONEY DEW DONUTS | 20.56 | Y | | GMA MEETING - NO DESCRIPTION |
| 11/09/17 | ALONGI, GINA | MEETINGS | SUPREME PIZZA | 86.97 | Y | Y | BREAKFAST MEETING - NO DESCRIPTION EMPLOYEE MEETING |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 11/28/17 | ALONGI, GINA | MEETINGS | PANERA | 127.31 | Y | | MEETING |
| 12/12/17 | ALONGI, GINA | MEETINGS | TST RESTAURANT | 249.79 | Y | | LUNCH |
| 12/15/17 | ALONGI, GINA | MEETINGS | RUTHS STEAKHOUSE | 3,968.88 | Y | | CHRISTMAS LUNCHEON |
| 07/25/18 | ALONGI, GINA | MEETINGS | PANERA | 21.34 | Y | | ANNUITY TARGET RESEARCH MEETING |
| 09/07/18 | ALONGI, GINA | MEETINGS | MANDARIN RSTRNT | 42.29 | Y | | COMPUTER TRAINING - LUNCH |
| 09/12/18 | ALONGI, GINA | MEETINGS | PANERA | 29.51 | Y | | MEETING WITH FUND COUNSEL |
| 04/01/19 | ALONGI, GINA | MEETINGS | PANERA | 60.87 | Y | | PENSION MEETING - LUNCH |
| 08/20/19 | ALONGI, GINA | MEETINGS | CHOP HOUSE | 380.42 | Y | | LUNCH |
| 10/01/19 | ALONGI, GINA | MEETINGS | PANERA | 30.35 | Y | | PENSION - INV MGR LUNCH |
| 10/29/19 | ALONGI, GINA | MEETINGS | GERARDO'S EUROPEAN B | 32.59 | Y | | H&W VENDOR MEETING |
| 11/08/19 | ALONGI, GINA | MEETINGS | ROCCOS DOUGHNUT | 39.23 | Y | | EMPLOYEE MEETING |
| 06/11/17 | ALONGI, GINA | MISC. | LUKE'S SUPER LIQUOR | 105.94 | Y | | LIQUOR |
| 06/23/17 | ALONGI, GINA | MISC. | LUKE'S SUPER LIQUOR | (105.94) | Y | | REIMBURSED |
| 07/07/19 | ALONGI, GINA | MISC. | VALUE MART | 42.19 | | | NO RECEIPT |
| 07/26/19 | ALONGI, GINA | MISC. | GINA | (53.08) | | | |
| 08/31/19 | ALONGI, GINA | MISC. | HORIZONS BEV DEST | 36.06 | | | NO RECEIPT |
| 03/25/20 | ALONGI, GINA | MISC. | AMAZON | 36.11 | Y | Y | CHARGING STATION - SAYS TO BE REIMBURSED BY GINA ALONGI |
| 12/17/16 | ALONGI, GINA | OFFICE | STORYLEATHER | 139.98 | | Y | MONOGRAMMED LEATHER IPHONE CASE |
| 12/26/16 | ALONGI, GINA | OFFICE | STORYLEATHER | (10.00) | | Y | MONOGRAMMED LEATHER IPHONE CASE |
| 02/01/18 | ALONGI, GINA | OFFICE | AMAZON | 37.70 | Y | | RETURNED |
| 02/08/18 | ALONGI, GINA | OFFICE | AMAZON | (37.70) | Y | | |
| 01/12/20 | ALONGI, GINA | OFFICE | STAPLES | (53.07) | Y | | |
| 01/12/20 | ALONGI, GINA | OFFICE | STAPLES | 53.07 | Y | | RETURNED |
| 03/23/20 | ALONGI, GINA | OFFICE | AMAZON | 7.18 | Y | | PAPER |
| 03/24/20 | ALONGI, GINA | OFFICE | AMAZON | 129.76 | Y | | PAPER & INK |
| 03/25/20 | ALONGI, GINA | OFFICE | AMAZON | 21.20 | Y | | FOLDERS |
| 03/31/20 | ALONGI, GINA | OFFICE | AMAZON | 53.11 | Y | | RETURNED |
| 04/03/20 | ALONGI, GINA | OFFICE | AMAZON | 97.52 | Y | | INK - GINA ALONGI |
| 04/06/20 | ALONGI, GINA | OFFICE | AMAZON | 38.88 | Y | | RETURNED |
| 04/08/20 | ALONGI, GINA | OFFICE | AMAZON | 189.30 | Y | | INK - ROSEMARIE |
| 04/08/20 | ALONGI, GINA | OFFICE | AMAZON | 58.00 | Y | | INK - BERARDI |
| 04/08/20 | ALONGI, GINA | OFFICE | AMAZON | 21.24 | Y | | FOLDERS |
| 04/13/20 | ALONGI, GINA | OFFICE | AMAZON | 49.16 | Y | | SUPPLIES |
| 04/14/20 | ALONGI, GINA | OFFICE | AMAZON | 90.30 | Y | | INK - ZACCARDI |
| 04/15/20 | ALONGI, GINA | OFFICE | AMAZON | 9.81 | Y | | PAPER - ZACCARDI |
| 04/17/20 | ALONGI, GINA | OFFICE | AMAZON | (53.11) | Y | | |
| 05/02/20 | ALONGI, GINA | OFFICE | AMAZON | (38.88) | Y | | |
| 05/06/20 | ALONGI, GINA | OFFICE | AMAZON | 18.92 | | | CABLE - LJH |
| 05/07/20 | ALONGI, GINA | OFFICE | AMAZON | 19.62 | Y | | PAPER - LJH |
| 05/08/20 | ALONGI, GINA | OFFICE | AMAZON | 42.38 | Y | | INK - LJH |
| 05/11/20 | ALONGI, GINA | OFFICE | AMAZON | 44.51 | Y | | INK - ZACCARDI |
| 05/21/20 | ALONGI, GINA | OFFICE | AMAZON | 233.72 | Y | | INK |
| 05/22/20 | ALONGI, GINA | OFFICE | AMAZON | 74.36 | Y | | INK |
| 06/29/20 | ALONGI, GINA | OFFICE | AMAZON | 129.18 | Y | | TONER CARTRIDGES |
| 06/30/20 | ALONGI, GINA | OFFICE | AMAZON | 22.30 | Y | | SUPPLIES |
| 07/01/20 | ALONGI, GINA | OFFICE | AMAZON | 42.38 | Y | | INK CARTRIDGES |
| 07/10/20 | ALONGI, GINA | OFFICE | AMAZON | 169.52 | Y | | INK CARTRIDGES |

App.119

IUOE LOCAL 4 BENEFIT FUNDS
ANALYIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 07/13/20 | ALONGI, GINA | OFFICE | AMAZON | 98.83 | Y | | PAPER AND INK |
| 07/13/20 | ALONGI, GINA | OFFICE | AMAZON | 84.76 | Y | | SUPPLIES |
| 07/14/20 | ALONGI, GINA | OFFICE | AMAZON | 29.74 | Y | | SUPPLIES |
| 08/09/20 | ALONGI, GINA | OFFICE | AMAZON | 30.70 | Y | | SUPPLIES |
| 09/14/17 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 10/14/17 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 11/14/17 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 12/14/17 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 01/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 02/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 03/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 04/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 05/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 06/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 07/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 08/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 09/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 10/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 11/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 12/14/18 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 01/14/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 02/14/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 03/14/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 04/14/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 05/14/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 06/14/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 08/28/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 09/28/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | 19.00 | Y | | SUBSCRIPTION |
| 10/07/19 | ALONGI, GINA | ONLINE FORMS | JOTFORM | (19.00) | | | SUBSCRIPTION |
| 12/27/16 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 446.65 | Y | | USAGE FEE |
| 01/16/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 44.63 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 01/23/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 59.95 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 02/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 42.50 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 03/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 44.63 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 04/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 36.13 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 05/24/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 326.91 | Y | | USAGE FEE |
| 05/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 34.00 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 06/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 31.88 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 07/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 27.63 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 08/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 38.25 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 09/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 19.13 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 10/04/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 138.11 | Y | | W-2S |
| 10/06/17 | ALONGI, GINA | PAYROLL SERVICE | UNION | 744.49 | Y | | CHECKS |
| 10/26/17 | ALONGI, GINA | PAYROLL SERVICE | UNION | (744.49) | | | UNION REIMBURSED FUND |
| 10/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 21.25 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 11/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 29.75 | Y | | USAGE FEE |
| 12/27/17 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 444.13 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 01/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 21.25 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 02/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 31.88 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 03/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 25.50 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 03/28/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 531.20 | Y | | QB PRO 2018 |
| 04/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 19.13 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 05/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 23.38 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 06/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 14.88 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 07/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 29.75 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 08/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 36.13 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 09/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 38.25 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 10/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 36.13 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 11/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 105.18 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 11/08/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 36.13 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 12/27/18 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 503.63 | Y | | USAGE FEE |
| 01/27/19 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 23.38 | Y | | MONTHLY PER EMPLOYEE USAGE FEE |
| 02/08/19 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 366.54 | Y | | VOUCHERS AND CHECK ENVELOPES |
| 09/28/19 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | (2.13) | Y | | |
| 12/27/19 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | 478.13 | Y | | |
| 01/16/20 | ALONGI, GINA | PAYROLL SERVICE | INTUIT | (478.13) | Y | | |
| 04/11/17 | ALONGI, GINA | RAFFLE & GIFTS/PRIZES | CITY CYCLE | 400.00 | Y | | |
| 04/11/17 | ALONGI, GINA | RAFFLE & GIFTS/PRIZES | GORHAM BIKE & SKI | 400.00 | Y | | |
| 10/04/17 | ALONGI, GINA | RAFFLE & GIFTS/PRIZES | STUBHUB | 986.90 | Y | | |
| 11/23/18 | ALONGI, GINA | RAFFLE & GIFTS/PRIZES | BEST BUY | 23,058.61 | Y | Y | |
| 10/17/17 | ALONGI, GINA | TELEPHONE | VERIZON | 80.00 | Y | Y | |
| 07/27/18 | ALONGI, GINA | TELEPHONE | ASURION WIRELESS | 149.00 | Y | | REPLACEMENT PHONE - DEDUCTIBLE |
| 09/06/19 | ALONGI, GINA | TELEPHONE | BEST BUY | 33.99 | Y | | PHONE ACCESSORIES |
| 09/06/19 | ALONGI, GINA | TELEPHONE | BEST BUY | 31.86 | Y | | PHONE ACCESSORIES |
| 01/28/19 | ALONGI, GINA | TRANSPORTATION | AMTRAK | 68.40 | Y | | TRANSPORTATION TO AND FROM |
| | | | | | | | TRANSPORTATION TO AND FROM |
| 09/25/18 | ALONGI, GINA | TRANSPORTATION - REIMBURSED | BOSTON CITY RIDE | 86.00 | Y | | AIRPORT - REIMBURSED |
| | | | | | | | TRANSPORTATION TO AND FROM |
| 09/29/18 | ALONGI, GINA | TRANSPORTATION - REIMBURSED | BOSTON CITY RIDE | 86.00 | Y | | AIRPORT - REIMBURSED |
| 10/22/18 | ALONGI, GINA | TRANSPORTATION - REIMBURSED | GINA | (182.00) | Y | | TRANSPORTATION TO AIRPORT - KOJFOS |
| 05/09/18 | GEIMAN, GREG | AUTO-GAS | SHELL | 28.78 | Y | | AIRPORT - REIMBURSED |
| 10/10/19 | GEIMAN, GREG | COLLECTION | SEC OF MA | 20.00 | Y | | REIMBURSED BY GINA ALONGI |
| 10/22/19 | GEIMAN, GREG | COLLECTION | SEC OF MA | 3.50 | Y | | |
| 10/10/19 | GEIMAN, GREG | COLLECTION | SEC OF MA | 20.00 | Y | | |
| 10/22/19 | GEIMAN, GREG | COLLECTION | SEC OF MA | 3.50 | Y | | |
| 01/17/20 | GEIMAN, GREG | COLLECTION | SEC OF MA | 20.00 | Y | | |
| 01/17/20 | GEIMAN, GREG | COLLECTION | SEC OF MA | 3.50 | Y | | |
| 05/10/18 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 31.85 | Y | | FILING FEE |
| 05/31/18 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 31.85 | Y | | FILING FEE |
| 07/10/18 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 31.85 | Y | | FILING FEE |
| 08/10/18 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 31.85 | Y | | FILING FEE |
| 09/10/18 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 31.85 | Y | | FILING FEE |
| 10/10/18 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 31.85 | Y | | FILING FEE |
| 11/10/18 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 31.85 | Y | | FILING FEE |
| 02/11/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 47.78 | Y | | FILING FEE |
| 03/10/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 47.78 | Y | | FILING FEE |

The following row (GIFT CARDS) and others appear in the OF INTEREST / COMMENTS:

| 09/29/18 | ALONGI, GINA | | | | | | GIFT CARDS |
| 10/22/18 | ALONGI, GINA | | | | | | GIFT CARDS |

App.121

EXHIBIT D-1

**IUOE LOCAL 4 BENEFIT FUNDS**
**ANALYSIS OF CREDIT CARD CHARGES**
**JANUARY 1, 2015 THROUGH JUNE 30, 2020**

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 04/10/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 54.16 | Y | | |
| 05/10/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 54.16 | Y | | |
| 06/10/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 72.21 | Y | | |
| 09/10/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 72.21 | Y | | |
| 09/11/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | BEST BUY | 24.43 | Y | | |
| 10/10/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 72.21 | Y | | |
| 11/10/19 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 72.21 | Y | | |
| 01/10/20 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 72.21 | Y | | |
| 02/10/20 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 72.21 | Y | | |
| 03/10/20 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 90.26 | Y | | |
| 06/10/20 | GEIMAN, GREG | COMPUTER - SOFTWARE | ADOBE | 90.26 | Y | | |
| 05/31/18 | GEIMAN, GREG | MEETING | SUPREME PIZZA | 84.64 | Y | | |
| 05/08/18 | GEIMAN, GREG | PARKING | PARKING | 30.00 | Y | | |
| 05/09/18 | GEIMAN, GREG | PARKING | CHILDRENS PARKING | 27.00 | Y | | |
| 05/10/18 | GEIMAN, GREG | PARKING | CHILDRENS PARKING | 27.00 | Y | | |
| 07/09/19 | GEIMAN, GREG | PARKING | LA2 PARKING | 38.00 | Y | | |
| 07/10/19 | GEIMAN, GREG | PARKING | LA2 PARKING | 38.00 | Y | | |
| 07/11/19 | GEIMAN, GREG | PARKING | LA2 PARKING | 38.00 | Y | | |
| 11/20/19 | GEIMAN, GREG | PARKING | MARINA PARK DRIVE | 30.00 | Y | | |
| 11/13/19 | GEIMAN, GREG | PROFESSIONAL LICENSE | PAYPAL | 309.27 | Y | | |
| 11/12/19 | GEIMAN, GREG | PROFESSIONAL LICENSE | PAYPAL | 309.27 | Y | | |
| 10/11/18 | GEIMAN, GREG | RAFFLE & GIFTS/PRIZES | STUBHUB | 694.52 | Y | | |
| 10/11/18 | GEIMAN, GREG | RAFFLE & GIFTS/PRIZES | STUBHUB | 610.96 | Y | | |
| 09/25/19 | GEIMAN, GREG | RAFFLE & GIFTS/PRIZES | STUBHUB | 858.10 | Y | | |
| 03/27/19 | HICKEY, LAURA-JEAN | AIRFARE | AMERICAN EXPRESS | 18.99 | Y | | INSURANCE PREMIUM |
| 03/27/19 | HICKEY, LAURA-JEAN | AIRFARE | AMERICAN EXPRESS | 5.75 | Y | | INSURANCE PREMIUM |
| 06/06/20 | HICKEY, LAURA-JEAN | AIRFARE | AMERICAN EXPRESS | 18.99 | Y | | INSURANCE PREMIUM |
| 06/06/20 | HICKEY, LAURA-JEAN | AIRFARE | AMERICAN EXPRESS | 5.75 | Y | | INSURANCE PREMIUM |
| 06/27/20 | HICKEY, LAURA-JEAN | COMPUTER - SOFTWARE | ADOBE | 10.61 | Y | | PHOTOSHOP APPLICATION |
| 04/27/18 | HICKEY, LAURA-JEAN | COMPUTER - SOFTWARE | MAGAZINE AG | 107.00 | Y | | WEBSITE NEWSLETTER SOFTWARE |
| 05/31/18 | HICKEY, LAURA-JEAN | COMPUTER - SOFTWARE | MAGAZINE AG | 107.00 | Y | | WEBSITE NEWSLETTER SOFTWARE |
| 11/23/18 | HICKEY, LAURA-JEAN | COMPUTER - SOFTWARE | MAGAZINE AG | 107.00 | Y | | WEBSITE NEWSLETTER SOFTWARE |
| 10/26/18 | HICKEY, LAURA-JEAN | COMPUTER - SUPPLIES | AMAZON | 55.20 | Y | | MONITOR |
| 11/07/18 | HICKEY, LAURA-JEAN | COMPUTER - SUPPLIES | AMAZON | 54.98 | Y | | LAPTOP COVER |
| 02/13/19 | HICKEY, LAURA-JEAN | COMPUTER - SUPPLIES | AMAZON | 21.24 | Y | | |
| 02/15/19 | HICKEY, LAURA-JEAN | COMPUTER - SUPPLIES | AMAZON | 21.24 | Y | | |
| 03/12/20 | HICKEY, LAURA-JEAN | COMPUTER - SUPPLIES | BEST BUY | 1,575.60 | Y | | COVID-19 CONTINGENCY PLAN SUPPLIES |
| 03/19/20 | HICKEY, LAURA-JEAN | COMPUTER - SUPPLIES | LOGMEIN | 158.31 | Y | | IT REMOTE WORKING TOOL |
| 05/18/19 | HICKEY, LAURA-JEAN | COMPUTER - SUPPLIES | LOGMEIN | 158.31 | Y | | IT REMOTE WORKING TOOL |
| 10/16/19 | HICKEY, LAURA-JEAN | COMPUTER - SUPPORT | MALWARE BYTES | 3,286.92 | Y | | 1 YEAR MALWARE PROTECTION |
| 02/20/19 | HICKEY, LAURA-JEAN | COMPUTER - SUPPORT | MALWARE BYTES | 350.90 | Y | | MALWARE PROTECTION |
| 03/04/20 | HICKEY, LAURA-JEAN | COMPUTER - SUPPORT | WEB NETWORK SOL | 397.20 | Y | | WEB HOSTING |
| 06/04/20 | HICKEY, LAURA-JEAN | CONFERENCE - AIRFARE | AMERICAN AIRLINES | 22.47 | Y | | CONFERENCE - AIRFARE - ALAN KOUFOS |
| 03/25/19 | HICKEY, LAURA-JEAN | CONFERENCE - AIRFARE | AMERICAN AIRLINES | 365.95 | Y | | CONFERENCE - AIRFARE - ALAN KOUFOS |
| 06/12/20 | HICKEY, LAURA-JEAN | CONFERENCE - HOTEL | JETBLUE | 617.75 | Y | | CONFERENCE - HOTEL - ALAN KOUFOS |
| 07/24/19 | HICKEY, LAURA-JEAN | CONFERENCE - MEALS | DOUBLETREE | 11.27 | Y | | BREAKFAST - LJH |
| 04/12/19 | HICKEY, LAURA-JEAN | CONFERENCE - MEALS | ACTON COFFEE HOUSE | 89.09 | Y | | CONFERENCE - LJH |
| 04/12/19 | HICKEY, LAURA-JEAN | CONFERENCE - MEALS | HYATT REGENCY | 13.70 | Y | | CONFERENCE - LJH |
| | | | NEW ORLEANS AIRPORT | | | | CONFERENCE - LJH |

19 OF 21

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|---|---|---|---|---|---|---|---|
| 07/23/19 | HICKEY, LAURA-JEAN | CONFERENCE - MEALS | WEGMANS NATICK | 17.45 | Y | | LUNCH - LJH |
| 05/12/20 | HICKEY, LAURA-JEAN | EQUIPMENT | AMAZON | 21.45 | Y | | 1ST AID KIT |
| 02/13/20 | HICKEY, LAURA-JEAN | EQUIPMENT | NAT'L BIZ FURNITURE | 319.19 | Y | | OFFICE FURNITURE |
| 08/30/19 | HICKEY, LAURA-JEAN | EQUIPMENT | CASEBUDDY USA | 219.55 | Y | Y | (4) LEATHER IPHONE CASES |
| 09/19/18 | HICKEY, LAURA-JEAN | EVENT - SUPPLIES | STAPLES | 112.54 | Y | | |
| 05/28/20 | HICKEY, LAURA-JEAN | INTERNET | COMCAST BOSTON | 424.21 | Y | | MONTHLY INTERNET |
| 09/07/19 | HICKEY, LAURA-JEAN | MEETING | MANDARIN RSTRNT | 322.42 | Y | | TRAINING LUNCH |
| 07/25/18 | HICKEY, LAURA-JEAN | MEETING | PANERA | 38.85 | Y | | TRAINING LUNCH |
| 08/29/18 | HICKEY, LAURA-JEAN | MEETING | PREZO GRILLE & BAR | 139.11 | Y | | ANNUITY TARGET RESEARCH MEETING |
| 12/14/18 | HICKEY, LAURA-JEAN | MEETING | PREZO GRILLE & BAR | 199.67 | Y | Y | TRAINING LUNCH |
| 08/27/18 | HICKEY, LAURA-JEAN | MEETING | WHOLE FOODS | 201.37 | Y | | HOLIDAY STAFF LUNCH |
| 10/04/18 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 203.38 | Y | | TRAINING LUNCH |
| 11/30/18 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 178.17 | Y | | TRUSTEE MEETING - P&A |
| 01/10/19 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 185.33 | Y | | COLLECTIONS TRUSTEE MEETING - LUNCH |
| 01/31/19 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 187.02 | Y | | TRUSTEE MEETING - P&A - LUNCH |
| 04/18/19 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 159.33 | Y | | TRUSTEE MEETING - H&W - LUNCH |
| 05/17/19 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 181.02 | Y | | TRUSTEE MEETING - P&A - LUNCH |
| 08/29/19 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 171.62 | Y | | TRUSTEE MEETING - P&A - LUNCH |
| 02/13/20 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 191.44 | Y | | DELINQUENCY TRUSTEE MEETING - LUNCH |
| 04/11/19 | HICKEY, LAURA-JEAN | MEETING - TRUSTEE | WHOLE FOODS | 180.63 | Y | | TRUSTEE MEETING - H&W - LUNCH |
| 06/14/19 | HICKEY, LAURA-JEAN | MISC. | HC FORD OF WESTB | 49.43 | Y | Y | FLOOR MATS |
| 09/15/19 | HICKEY, LAURA-JEAN | MISC. | WEQUASSETT RESORT | 3.65 | Y | Y | PAID BY LAURA CH#470 |
| | HICKEY, LAURA-JEAN | MISC. | WEQUASSETT RESORT | | Y | Y | PAID BY LAURA CH#471 |
| 11/08/18 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 279.99 | Y | | STANDING DESK |
| 12/31/18 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 42.46 | Y | | STANDING DESK |
| 04/28/19 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 316.94 | Y | | MONITOR STAND |
| 07/15/19 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 33.99 | Y | | DISINFECTANT WIPES |
| 05/07/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 107.19 | Y | | PPE MASKS |
| 05/08/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 82.86 | Y | | LATEX GLOVES |
| 05/09/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 28.55 | Y | | DISINFECTANT WIPES |
| 05/14/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 28.10 | Y | | |
| 05/14/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 55.30 | Y | | |
| 05/20/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 36.10 | Y | | |
| 05/20/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 10.60 | Y | | |
| 05/23/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 118.88 | Y | | RETURNED |
| 05/27/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | 27.61 | Y | | |
| 05/15/20 | HICKEY, LAURA-JEAN | OFFICE | AMAZON | (118.88) | Y | | RETURNED |
| 01/22/20 | HICKEY, LAURA-JEAN | OFFICE | CHEMICAL GUYS | 201.55 | Y | | HAND SANITIZER |
| 05/07/20 | HICKEY, LAURA-JEAN | OFFICE | OFFICE DEPOT | 201.39 | Y | | PAPER FOR 1099S |
| 04/24/20 | HICKEY, LAURA-JEAN | OFFICE | OFFICE DEPOT | 84.96 | Y | | PPE MASKS |
| 05/30/20 | HICKEY, LAURA-JEAN | OFFICE | READY REFRESH | 131.79 | Y | | WATER |
| 10/18/18 | HICKEY, LAURA-JEAN | OFFICE | READY REFRESH | 11.68 | Y | | WATER |
| 07/25/18 | HICKEY, LAURA-JEAN | OFFICE | SHUTTERSTOCK | 229.00 | Y | | PHOTOGRAPHY EQUIP |
| 10/25/18 | HICKEY, LAURA-JEAN | OFFICE | STAPLES | 10.61 | Y | | MERCH & SUPPL / WHOLESALE |
| 10/26/18 | HICKEY, LAURA-JEAN | OFFICE | STAPLES | 33.99 | Y | | |
| 08/28/19 | HICKEY, LAURA-JEAN | OFFICE | STAPLES | 89.14 | Y | | |
| | HICKEY, LAURA-JEAN | OFFICE | STAPLES | 22.30 | Y | | |
| 05/13/19 | HICKEY, LAURA-JEAN | PARKING | PARKWHIZ INC | 30.49 | Y | | |
| 05/29/20 | HICKEY, LAURA-JEAN | POSTAGE | USPS | 13.90 | Y | | BUSINESS MAILING |
| 10/19/18 | HICKEY, LAURA-JEAN | RAFFLE & GIFTS/PRIZES | AMEXGIFTCARD | 227.85 | Y | Y | RECEIVED CHECK FROM BCBS |
| 05/31/18 | HICKEY, LAURA-JEAN | RAFFLE & GIFTS/PRIZES | BEST BUY | 296.44 | Y | Y | APPLE WATCH |
| 06/12/18 | HICKEY, LAURA-JEAN | RAFFLE & GIFTS/PRIZES | BEST BUY | 296.44 | Y | Y | APPLE WATCH |
| 10/25/18 | HICKEY, LAURA-JEAN | RAFFLE & GIFTS/PRIZES | BEST BUY | 455.81 | Y | Y | RECEIVED CHECK FROM BCBS |

EXHIBIT D-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF CREDIT CARD CHARGES
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| DATE | EMPLOYEE | TYPE OF EXPENSE | VENDOR | AMOUNT | RECEIPT | OF INTEREST | COMMENTS |
|------|----------|-----------------|--------|--------|---------|-------------|----------|
| 05/28/20 | HICKEY, LAURA-JEAN | TELEPHONE | HILLTOP TECH | 560.00 | Y | | TELEPHONE COMM |
| 05/28/20 | HICKEY, LAURA-JEAN | TELEPHONE | VERIZON | 1,264.25 | Y | | |
| 05/28/20 | HICKEY, LAURA-JEAN | TELEPHONE | VERIZON | 295.51 | Y | | |
| 05/28/20 | HICKEY, LAURA-JEAN | TELEPHONE | VERIZON | 100.00 | Y | | |

21 OF 21

App.124

EXHIBIT E-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF REIMBURSEMENTS FROM
THE MASSACHUSETTS COALITION OF TAFT-HARTLEY TRUST FUNDS, INC.
JANUARY 1, 2017 THROUGH AUGUST 17, 2020

| Invoice Date | Category | Description | Amount |
|---|---|---|---|
| 04/25/17 | Office | Office - Reimb binders purchased by Local 4 Funds in error | $ 154.01 |
| 01/18/17 | Postage | Postage - 01/01/16-12/31/16 | 388.56 |
| 01/17/18 | Postage | Postage - 01/01/17-12/31/17 | 435.15 |
| 08/20/18 | Postage | Postage - 01/01/18-08/14/18 | 206.16 |
| 01/07/19 | Postage | Postage - 08/15/18-12/31/18 | 17.20 |
| 08/17/20 | Postage | Postage - 01/01/20-08/17/20 | 895.20 |
| 01/18/17 | Rent | Rent - 10/2016-9/2017 | 573.72 |
| 01/17/18 | Rent | Rent - 10/2017-9/2018 | 573.75 |
| 01/06/19 | Rent | Rent - 10/2018-9/2019 | 573.72 |
| 02/26/20 | Rent | Rent - 10/2019-9/2020 | 573.72 |
| Total | | | $ 4,391.19 |

IUOE4 FED 0066

41

App.125

EXHIBIT F-1

**IUOE LOCAL 4 BENEFIT FUNDS**
**ANALYSIS OF ANNUITY DISTRIBUTIONS TO G. ALONGI AND R. ALONGI**
**FOR FORMER ADMINISTRATOR AND FORMER**
**IT DIRECTOR**

| Ref | Date | Participant | Type | Loan # | Amount | Term | Marital Status Per Application | Comment | Spousal Consent | Signed Application | Notarized | Fund Office Approval | Notes | Proc Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 7/1/2008 | G. Alongi | Loan | 1 | $35,000.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | No - See B | G. Alongi | GMA approved her own distribution | Yes per FO |
| 2 | 8/14/2008 | G. Alongi | Loan | 2 | 10,000.00 | 5 years | Unanswered | S/B "Divorced" | N/A | Yes | No - See C | S. McGoldrick | Marital status and certain dates blank | Yes per FO |
| 3 | 9/8/2009 | G. Alongi | Loan | 3 | 5,500.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | No - See C | S. McGoldrick | Loan amount not completed, no dates with GMA's signature | Yes per FO |
| 4 | 4/30/2012 | G. Alongi | Loan | 4 | 50,000.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | Yes | G. Alongi | GMA approved her own distribution | Yes per FO |
| 5 | 10/10/2012 | G. Alongi | Loan | 5 | 15,000.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | No - See A | G. Alongi | GMA approved her own distribution | Yes per FO |
| 6 | 5/28/2013 | G. Alongi | Loan | 6 | 12,000.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | No - See D | G. Alongi | GMA approved her own distribution | Yes per FO |
| 7 | 2/7/2017 | G. Alongi | Loan | 7 | 31,000.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | Yes | G. Alongi | GMA approved her own distribution | Yes per FO |
| 8 | 5/2/2017 | G. Alongi | Loan | 8 | 9,000.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | Yes | Alice Kurtz | GMA approved her own distribution | Yes per FO |
| 9 | 9/18/2017 | G. Alongi | Loan | 9 | 10,800.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | Yes | G. Alongi | GMA approved her own distribution | Yes per FO |
| 10 | 10/7/2019 | G. Alongi | Loan | 10 | 11,950.00 | 5 years | Divorced | | N/A | Yes | Yes | G. Alongi | GMA approved her own distribution | Yes per FO |
| 11 | 2/13/2020 | G. Alongi | Loan | 11 | 15,145.23 | 5 years | Never Married | S/B "Divorced" | N/A | Yes | Yes | G. Alongi | GMA approved her own distribution | Yes per FO |
| 12 | 6/26/2008 | R. Alongi | Loan | 1 | 26,500.00 | 5 years | Single | S/B "Divorced" | N/A | Yes | No - See B | G. Alongi | GMA approved her sister's distribution | Yes per FO |
| 13 | 3/23/2009 | R. Alongi | Loan | 2 | 2,000.00 | 5 years | Single | | Blank | Yes | No - See B | S. McGoldrick | | Yes per FO |
| 14 | 8/27/2010 | R. Alongi | Hardship Dist - Funeral | N/A | 10,033.75 | N/A | Single | | Blank | Yes | No - Signed by Rosemarie "OK PER GINA in Notary spot" | G. Alongi | No dates, no notary or other; backup indicates funeral was already paid by V/o Alongi | N/A |
| 15 | 4/27/2012 | R. Alongi | Hardship Dist - Eviction | N/A | 2,145.28 | N/A | Single | | Blank | Yes | Yes | A. Kurtz | Application not notarized | N/A |
| 16 | 6/25/2012 | G. Alongi | Hardship Dist - Eviction | N/A | 9,788.97 | N/A | S/B "Divorced" | | N/A | Yes | No | G. Alongi | Application not notarized | N/A |
| 17 | 9/1/2020 | G. Alongi | Retirement | N/A | 225k+74m | N/A | Divorced 1991 | | N/A | Yes | Yes | None noted | No Fund Office approval noted | N/A |
| 18 | 10/1/2020 | R. Alongi | Retirement | N/A | 30k+4K/M | N/A | Single | | N/A | Yes | Yes | None noted | Includes witness to single status | N/A |
| A | Witnessed by Fund Office employee C. Hurley | | | | | | | | | | | | | |
| B | Appears G. Alongi signed as notary and D. Gilbert initialed | | | | | | | | | | | | | |
| C | No notary - Signed by D Gilbert | | | | | | | | | | | | | |
| D | Per Kim at MM, application was witnessed by Fund Office employee | | | | | | | | | | | | | |

EHXBIT F-1

1 OF 1

App.126



EXHIBIT G-1

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF G. ALONGI OFFICE ENTRY TIMES
SEPTEMBER 2015 - MARCH 2020

Page 1 of 1

IUOE4 FED 0068

App.127

EXHIBIT G-2

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF G. ALONGI OUTGOING PHONE CALLS
SEPTEMBER 2016 - JULY 2020

Outgoing Calls



IUOE4 FED 0069

1 of 1

App.128



EXHIBIT G-3

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF G. ALONGI OUTGOING EMAIL ACTIVITY
SEPTEMBER 2015 - JULY 2020

Outgoing Email   Mass. Coalition Related Email

Page 1 of 1

IUOE4 FED 0070

45

App.129

EXHIBIT G-4

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF G. ALONGI OFFICE ENTRY TIMES, OUTGOING PHONE CALLS AND OUTGOING EMAIL ACTIVITY
OCTOBER 2015 - JULY 2020



EXHIBIT G-5

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF G. ALONGI CELL PHONE USAGE
FEBRUARY 11 - JULY 23, 2020



App.131

EXHIBIT G-6

IUOE LOCAL 4 BENEFIT FUNDS
ALLOCATION OF G. ALONGI PAYROLL, TAXES AND BENEFITS
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| | G. Alongi Wages & Benefits Paid by Local 4 Benefit Funds | | | | | % Attributed to GMA | | Attributed to Coalition | |
| Year | Wages | Taxes | Benefits | Auto * | Total | %** | Total | %*** | Total |
|---|---|---|---|---|---|---|---|---|---|
| 2015 | $ 219,633 | $ 17,571 | $ 53,000 | $ 19,935 | $ 310,139 | 25.00% | $ 77,535 | 25.00% | $ 77,535 |
| 2016 | 223,511 | 17,881 | 56,800 | 19,935 | 318,127 | 21.43% | 68,175 | 25.00% | 79,532 |
| 2017 | 236,274 | 18,902 | 57,020 | 20,437 | 332,633 | 17.86% | 59,408 | 25.00% | 83,158 |
| 2018 | 255,978 | 20,478 | 58,260 | 21,432 | 356,148 | 10.71% | 38,143 | 25.00% | 89,037 |
| 2019 | 252,809 | 20,225 | 56,740 | 17,069 | 346,843 | 10.71% | 37,147 | 25.00% | 86,711 |
| 2020 | 124,373 | 9,950 | 36,720 | 7,884 | 178,927 | 0.00% | - | 25.00% | 44,732 |
| Total | $ 1,312,578 | $ 105,007 | $ 318,540 | $ 106,692 | $ 1,842,817 | | $ 280,408 | | $ 460,704 |

* Auto estimated based on annual lease values and other known costs
** Percentage attributed to G. Alongi based on estimated start and departure times as noted below
*** Allocated to Coalition based on representations on Coalition Form 990 at 10hrs/week of 40 hour week

| | | | Allocation of time charged to G. Alongi | | | | |
| Year | Average Entry Time (See Exhibits G 1-4) | Estimated Start Time | Estimated Leave Time (See Exhibits G 1-4) | Estimated Hours Worked | Required Hours Worked | Hours Short of Required | % Hours Short of Required |
|---|---|---|---|---|---|---|---|
| 2015 | 10:58 AM | 10:45 AM | 4:00 PM | 5.25 | 7.00 | 1.75 | 25.00% |
| 2016 | 10:41 AM | 10:30 AM | 4:00 PM | 5.50 | 7.00 | 1.50 | 21.43% |
| 2017 | 10:28 AM | 10:15 AM | 4:00 PM | 5.75 | 7.00 | 1.25 | 17.86% |
| 2018 | 9:55 AM | 9:45 AM | 4:00 PM | 6.25 | 7.00 | 0.75 | 10.71% |
| 2019 | 9:50 AM | 9:45 AM | 4:00 PM | 6.25 | 7.00 | 0.75 | 10.71% |
| 2020 | 8:19 AM | 8:00 AM | 4:00 PM | 7.00 | 7.00 | - | 0.00% |

IUOE4 FED 0073

48

App.132

EXHIBIT G-7

IUOE LOCAL 4 BENEFIT FUNDS
ANALYSIS OF EMPLOYEES COST ALLOCATION TO THE COALITION
JANUARY 1, 2015 THROUGH JUNE 30, 2020

| Employee | 2020 | 2019 | 2018 | 2017 | 2016 | 2015 | Total | Allocation to Coalition* | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Wages, taxes, and benefits paid from IUOE Local 4 Benefit Funds | | | | | % | Amount |
| Alongi, Rosemarie | $ 90,358 | $ 173,727 | $ 169,529 | $ 163,795 | $ 157,099 | $ 153,971 | $ 908,479 | 30.0% | $ 272,544 |
| Berardi, Terri | 46,713 | 82,730 | 89,860 | 84,951 | 80,683 | 52,528 | 437,466 | 1.0% | 4,375 |
| Blenkhorn, Debra | 33,754 | 76,160 | 61,985 | - | - | - | 171,899 | 0.0% | - |
| Boisvert, Amy | 37,296 | 78,557 | 80,108 | 76,551 | 41,171 | - | 313,683 | 1.0% | 3,137 |
| Hickey, Laura-Jean | 79,740 | 158,043 | 157,279 | 150,557 | 143,685 | 136,934 | 826,238 | 30.0% | 247,871 |
| Ortega, Rosemary | 50,773 | 103,737 | 103,326 | 98,171 | 93,102 | 88,605 | 537,714 | 12.5% | 67,214 |
| Ryan, Taylor | 32,778 | 81,138 | 81,983 | 13,348 | - | - | 209,246 | 38.0% | 79,514 |
| Trefry, Bettyann | - | - | - | - | 33,903 | 67,887 | 101,790 | 4.0% | 4,072 |
| Zaccardi, Rebecca | 94,273 | 183,546 | 179,250 | 168,126 | 163,312 | 156,138 | 944,644 | 1.0% | 9,446 |
| Total | $ 465,685 | $ 937,638 | $ 923,320 | $ 755,499 | $ 712,955 | $ 656,063 | $ 4,451,160 | | $ 688,173 |

* Allocation to Coalition based on estimates from current Fund Office employees knowledgeable in such matters, with representations consistent to email correspondence reviewed.

1 OF 1

App.133

EXHIBIT G-8

## IUOE LOCAL 4 BENEFIT FUNDS
## ANALYSIS OF RENT ATTRIBUTED TO THE COALITION
## JANUARY 1, 2015 THROUGH JUNE 30, 2020

| | | |
|---|---|---|
| Total rent attributed to Coalition (see below) | $ | 27,614 |
| Total rent paid by Coalition ($573.72/yr) | | (3,157) |
| Estimated additional rent due from Coalition | $ | 24,457 |

### Rent analysis based on estimated Fund Office efforts

| Employee | % Appl to MC | Sq Ft Appl to MC |
|---|---|---|
| Total count of Fund Office Employees | | 20.00 |
| Alongi, Gina | 0.25 | - |
| Alongi, Rosemarie | 0.30 | - |
| Berardi, Terri | 0.01 | - |
| Blenkhorn, Debra | - | - |
| Boisvert, Amy | 0.01 | - |
| Hickey, Laura-Jean | 0.30 | - |
| Ortega, Rosemary | 0.13 | - |
| Ryan, Taylor | 0.38 | - |
| Trefry, Bettyann | 0.04 | - |
| Zaccardi, Rebecca | 0.01 | - |
| | 1.43 | |
| | 7.15% | |
| Total estimated square feet attributed to Coalition | | |
| Total Fund Office rent paid 2015-2020 | | 386,208 |
| Estimated Fund Office rent attributable to Coalition | $ | 27,614 |

### Rent Analysis Based on Sq Ft

| Employee | Dimensions | Sq Ft | % Appl to Coalition | Sq Ft Appl to Coalition |
|---|---|---|---|---|
| Alongi, Gina | 12  36 | 432 | 25% | 108 |
| Alongi, Rosemarie | 9  9 | 81 | 30% | 24 |
| Berardi, Terri | 9  9 | 81 | 1% | 1 |
| Blenkhorn, Debra | 9  9 | 81 | 0% | - |
| Boisvert, Amy | 9  9 | 81 | 1% | 1 |
| Hickey, Laura-Jean | 12  16 | 192 | 30% | 58 |
| Ortega, Rosemary | 9  9 | 81 | 13% | 10 |
| Ryan, Taylor | 9  9 | 81 | 38% | 31 |
| Trefry, Bettyann | 9  9 | 81 | 4% | 3 |
| Zaccardi, Rebecca | 9  9 | 81 | 1% | 1 |
| Spare Office (storage) | 12  11 | 132 | 100% | 132 |
| Total estimated square feet attributed to Coalition | | | | 368 |
| Total square feet rented | | | | 6,200 |
| Total percentage of rent attributable to Coalition | | | | 5.94% |
| Total Fund Office rent paid 2015-2020 | | | $ | 386,208 |
| Estimated direct Fund Office rent attributable to Coalition | | | | 22,953 |
| Estimated common space attributable to Coalition (deemed reasonable) | | | | 4,661 |
| Total estimated Coalition rent | | | $ | 27,614 |

IUOE4 FED 0075

50

App.134

# **Exhibit 9**

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Gina Marie Alongi Vol I*

*May 24, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Confidential

Gina Marie Alongi
May 24, 2022

Page 3

```
 1          COMMONWEALTH OF MASSACHUSETTS
 2   Norfolk, ss.        Superior Court
 3            Civil Action No. 2182CV00125
 4   *****************************************************
 5   GINAMARIE ALONGI AND ROSEMARIE ALONGI,      *
 6     Plaintiffs                      *
 7     vs.                        *
 8   IUOE LOCAL 4 HEALTH & WELFARE FUND; IUOE LOCAL 4 *
 9   PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS   *
10   FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4  *
11   APPRENTICESHIP & TRAINING FUND; JOINT LABOR-   *
12   MANAGEMENT COOPERATION TRUST; AND WILLIAM D.  *
13   MCLAUGHIAN, INDIVIDUALLY AND IN HIS CAPACITY  *
14   AS CHAIRMAN OF THE BOARDS OF TRUSTEES,      *
15     Defendants              *
16   *****************************************************
17          DEPOSITION OF:  GINA MARIE ALONGI
18             BOWDITCH & DEWEY, LLP
19            200 Crossing Boulevard
20            Framingham, Massachusetts
21          May 24, 2022  9:45 a.m.
22              Volume I
23            Kristen M. Edwards
24             Court Reporter
```

Page 2

```
 1   APPEARANCES:
 2
 3   Representing the Plaintiffs:
 4      BOWDITCH & DEWEY, LLP
 5      200 Crossing Boulevard, Suite 300
 6      Framingham, MA 01702
 7      BY:  TIMOTHY P. VAN DYCK, ESQ.
 8         JACOB A. TOSTI, ESQ.
 9      (617) 757-6537  fax (508) 929-3137
10      E-mail:  tvandyck@bowditch.com
11
12   Representing the Defendants:
13      FREEMAN, MATHIS & GARY LLP
14      60 State Street, Suite 600
15      Boston, MA 02109-1800
16      BY:  JENNIFER L. MARKOWSKI, ESQ.
17         CHRISTOPHER REDD, ESQ.
18      (617) 963-5975
19      E-mail:  jmarkowski@fmglaw.com
20
21
22
23
24
```

Page 3

```
 1   APPEARANCES (Continued):
 2
 3   Representing the Defendants:
 4      O'DONOGHUE & O'DONOGHUE LLP
 5      5301 Wisconsin Avenue, NW, Suite 800
 6      Washington, DC 20015
 7      BY:  CHARLES W. GILLIGAN, ESQ.
 8         DANIEL KEENAN, ESQ.
 9      (202) 362-0041
10      E-mail:  cgilligan@odonoghuelaw.com
11
12   In Attendance:  William D. McLaughlin
13         Greg Geiman
14         Rosemarie Alongi
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
 1            I N D E X
 2
 3   WITNESS:              GINA MARIE ALONGI
 4
 5   EXAMINATION BY:               PAGE:
 6   Ms. Markowski              5
 7
 8
 9   EXHIBIT:                 PAGE:
10    (none offered)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

App.137

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.
Confidential
Gina Marie Alongi
May 24, 2022

Page 25

1  and employer remittance processing, who were you
2  reporting to?
3      A.   John Donahey.
4      Q.   What was your next role after that?
5      A.   Eligibility.
6      Q.   What were your responsibilities in
7  connection with eligibility?
8      A.   Certifying eligibility.
9      Q.   Certifying eligibility for benefits?
10     A.   Yes.
11     Q.   For how long did you have that role?
12     A.   I don't recall.
13     Q.   When you had that role, did you continue
14 to report to John Donahey?
15     A.   Yes.
16     Q.   What was your next role at the Funds?
17     A.   Accounting.
18     Q.   What was your position or your title?
19     A.   I would gather all of the general ledger
20 entries, you know --
21     Q.   Your title, did you have a title when you
22 were involved with accounting?
23     A.   I don't recall.
24     Q.   And, I think, you started to talk about

Page 26

1  your responsibilities when you were working in
2  accounting.  What were you responsible for?
3      A.   Accounts payable.
4      Q.   Is there like collections?
5      A.   Not collections.  Preparing general
6  ledger entries.  We had an outside accountant at the
7  time that I would have to give that information to.
8      Q.   Any other responsibilities in that role?
9      A.   I don't recall.
10     Q.   And you continued to report to John
11 Donahey?
12     A.   Yes.
13     Q.   And do you recall roughly the time period
14 that you were involved in accounting for the Funds?
15     A.   I don't recall.
16     Q.   What was your next role after that?
17     A.   I was handling the pensions, processing
18 pensions, processing pension payments, calculating
19 benefits.
20     Q.   Did you have a title when you were doing
21 that?
22     A.   I don't recall what it was.
23     Q.   Did you continue to report to John
24 Donahey?

Page 27

1      A.   Yes.
2      Q.   What was your next role within the Funds?
3      A.   Office manager.
4      Q.   When did you become office manager?
5      A.   I don't recall.
6      Q.   For how long did you serve as office
7  manager?
8      A.   I don't recall.
9      Q.   Who did you report to when you were the
10 office manager?
11     A.   John Donahey.
12     Q.   And for the entire time you reported to
13 John Donahey, was he the administrator?
14     A.   Yes.
15     Q.   And what was your next role at the Funds?
16     A.   I don't recall, but I believe that was it
17 once I got to office manager.
18     Q.   And then you became the administrator
19 after that?
20     A.   Yes, in 1996.
21     Q.   And you replaced John Donahey?
22     A.   Yes, he retired.
23     Q.   And how did it come to be that you
24 stepped into the role of administrator?

Page 28

1      A.   Well, I had the most experience.  I was
2  loyal.
3      Q.   Did the Funds look -- do you know if the
4  Funds looked outside of?
5      A.   No.
6      Q.   So when you say you had the most
7  experience, you mean within the Funds you had the most
8  experience.
9      A.   Yes.
10     Q.   Did anyone recommend you to be the next
11 administrator?
12     A.   John Donahey.
13     Q.   Anybody else?
14     A.   There may have been consultants I was
15 dealing with at the time.
16     Q.   Anybody --
17     A.   With The Health and Welfare Fund.
18     Q.   Anybody you can recall by name?
19     A.   Al Brightman.
20     Q.   Anybody else?
21     A.   John Cotton.
22     Q.   Anybody else?
23     A.   That's all I can remember at this point.
24     Q.   Was there a process that you went through

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Confidential

Gina Marie Alongi
May 24, 2022

Page 77

1    A.   She was a receptionist.
2    Q.   And for the Funds?
3    A.   Yes.
4    Q.   When was she a receptionist?
5    A.   I don't recall.
6    Q.   During the time that you worked there?
7    A.   Yes.
8    Q.   Did you ever hear that Lou had had sex
9  with Christine Walsh?
10   A.   No.
11   Q.   Did you ever hear that Lou and Christine
12 Walsh were dating?
13   A.   Never heard that.
14   Q.   Never from anybody in the office?
15   A.   No.
16   Q.   Did you ever witness anything between
17 them that appeared to you to be flirting?
18   A.   No.
19   Q.   Did anyone in the office ever talk about
20 them dating?
21   A.   No.
22   Q.   At some point did you fire Christine
23 Walsh?
24   A.   Yes.

Page 78

1    Q.   Why did you fire Christine Walsh?
2    A.   Because she was disrespectful towards me.
3    Q.   How so?
4    A.   I was on a conference call for several
5  hours and I reached out to the receptionist to get me a
6  bottle of water, which was Christine at the time.  As I
7  was on the conference call, I put the person on hold
8  and she told me to get my own fucking water.
9    Q.   What happened next?
10   A.   After I got off the conference call, I
11 went out to the reception area, sat down and I said,
12 "What did you say?"  She said, "Get your own fucking
13 water."  And I said, "Go find your own fucking job."
14   Q.   So you fired her on the spot.
15   A.   I had Greg fire her.
16   Q.   Why did you have Greg fire her?
17   A.   He was in charge of that.
18   Q.   But hadn't you told her to go find her
19 own fucking job?
20   A.   After I told her that, I told Greg to
21 escort her out.
22   Q.   So you fired her.
23   A.   Yes.
24   Q.   That's what that meant when you said "go

Page 79

1  get your own fucking job."
2    A.   Yes.
3    Q.   And approximately when did you fire her?
4    A.   I don't recall.
5    Q.   Did Lou Rasetta ever sexually harass
6  Laura-Jean Hickey?
7        MR. VAN DYCK:  Objection.  You may
8  answer.
9        THE WITNESS:  There was a memo written by
10 Greg in 2014 that Laura-Jean complained to Greg
11 about Lou kissing her.
12   Q.   (By Ms. Markowski)  So my question to you
13 was:  Did Lou Rasetta ever sexually harass Laura-Jean
14 Hickey?
15       MR. VAN DYCK:  It's what you know.  Not
16 what you heard.  What do you know?
17       THE WITNESS:  Laura-Jean claimed it and
18 then took it back, so I don't know what that is.
19   Q.   (By Ms. Markowski)  Let's just back up
20 for a minute.  You say Laura-Jean claimed it.  Did
21 Laura-Jean speak to you about the fact she believed Lou
22 Rasetta had sexually harassed her?
23   A.   She never spoke to me about it.
24   Q.   So how did you come to learn that she --

Page 80

1    A.   Greg.
2    Q.   Greg told you that the complaint had been
3  made.
4    A.   Yes.
5    Q.   Who was in charge of investigating
6  complaints of sexual harassment at that time?
7    A.   They would have come to me or Kate Shea.
8    Q.   You would agree with me that you're
9  identified in the employee handbook for the Funds as
10 one of the people that individuals who feel they have
11 been sexually harassed can go to and make a report to;
12 is that fair to say?
13   A.   Yes.
14   Q.   So when you were told that Laura-Jean
15 Hickey believed that Lou Rasetta had sexually harassed
16 her, what did you do to figure out if that was true?
17       MR. VAN DYCK:  Objection as to form.  You
18 may answer.
19       THE WITNESS:  I told Greg when Greg
20 mentioned it to me that I was concerned, and
21 that we needed to call Kate Shea.
22   Q.   (By Ms. Markowski)  Did you speak to
23 Laura-Jean?
24   A.   No.

App.139

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Confidential

Gina Marie Alongi
May 24, 2022

Page 97

1 would invite Local 4 folks to?

2     A.    For a time -- for a period of time, maybe

3 a couple of parties a year.

4     Q.    And did you have those parties at your

5 house in Westborough?

6     A.    Yes, I did.

7     Q.    And you said for a period of time.  From

8 when to when did you have a couple of parties a year?

9     A.    I don't recall the dates.

10     Q.    Was it before or after you became

11 administrator when you first started having the

12 parties?

13     A.    I don't recall.  Actually, I'm sorry, I

14 moved into the house in 2001, became administrator in

15 1996, so it was after I became administrator.

16     Q.    And is the first time you had a party for

17 Fund employees, was that after you moved into the house

18 in Westborough?

19     A.    Several years later.

20     Q.    And you said a couple of times a year.

21 What were the occasions that you would have parties;

22 was it like a summertime celebration, Christmas

23 celebration?

24     A.    I had a pig roast just to have a pig

Page 98

1 roast and invited my neighbors and some Local 4 Fund

2 office employees.

3     Q.    Did you invite everybody in the office or

4 just some employees?

5     A.    Everyone.

6     Q.    What other occasions did you have?  You

7 mentioned you had a pig roast.  What were the others?

8     A.    I believe I had a retirement party for

9 Bill Ryan when he retired.

10     Q.    And did Lou Rasetta attend any of the

11 parties you had?

12     A.    Yes.

13     Q.    And during any one of the parties that

14 you had, was that a time you and Lou were either dating

15 or having some kind of a sexual relationship?

16     A.    I don't remember.

17     Q.    Lou Rasetta also sat on the board; is

18 that right?

19     A.    He was the chairman.

20     Q.    And as chairman of the board, did he make

21 any decisions that impacted your benefits?

22         MR. VAN DYCK:  Objection.  You may

23     answer.

24         THE WITNESS:  My benefits?

Page 99

1     Q.    (By Ms. Markowski)  Well, let's start

2 with compensation.  Did he ever make decisions that

3 impacted your compensation?

4     A.    Yes.

5     Q.    And how was Lou involved in setting your

6 compensation?

7     A.    Typically the procedure was that Lou and

8 I would sit down and I would have a recommendation on

9 payroll increases, and I would have to get his approval

10 first and then I would go to senior management trustee,

11 Jack Shaughnessy, to have it approved and then we would

12 have their decision ratified by the full board at the

13 next meeting.

14     Q.    So did you sit down with Lou on a yearly

15 basis?

16     A.    Yes.

17     Q.    Did that begin when he became business

18 manager?

19     A.    Yes.

20     Q.    And you spoke about all Fund employees'

21 compensation, including your own?

22     A.    Yes.

23     Q.    And then you said you went to Jack

24 Shaughnessy after that?

Page 100

1     A.    Yes.

2     Q.    And why did you go to Jack Shaughnessy?

3     A.    He was senior management trustee.  We had

4 to have a vote by both parties.

5     Q.    And would you tell Lou Rasetta what you

6 thought your increase in compensation should be?

7     A.    Would I tell him?

8     Q.    Yes.

9     A.    I wouldn't tell him what I thought I

10 should get.  I would wait for him to tell me.

11     Q.    So he would suggest the number to you?

12     A.    Right.  I would have percentages for each

13 of the employees so he could clearly see, and I was

14 always the last person to be discussed.

15     Q.    Would you have a percentage for yourself?

16     A.    Would I have a recommendation for

17 percentage?

18     Q.    Yes.

19     A.    No.

20     Q.    Only for the other employees.

21     A.    Yes.

22     Q.    * And during the time that you were

23 either dating or in some kind of a sexual relationship

24 with Lou, was there ever one of these sit-down meetings

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Gina Marie Alongi Vol II*

*May 25, 2022*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



Ginamarie Alongi, et al. vs      Confidential      Gina Marie Alongi
Iuoe Local 4 Health & Welfare Fund, et al.      May 25, 2022

Page 3

1       COMMONWEALTH OF MASSACHUSETTS

2 NORFOLK, SS.          SUPERIOR COURT

3       CIVIL ACTION NO.: 2182CV00125

4

5 ***********************************************

6 GINAMARIE ALONGI AND ROSEMARIE ALONGI,    *

7       Plaintiffs      *

8 vs.           *

9 IUOE LOCAL 4 HEALTH & WELFARE FUND, et al,   *

10       Defendants     *

11 ***********************************************

12

13

14

15     CONT'D DEPOSITION OF: GINA MARIE ALONGI

16          VOLUME II

17        BOWDITCH & DEWEY, LLP

18        200 Crossing Boulevard

19      Framingham, Massachusetts  010702

20 May 25, 2022       10:22 a.m.

21

22

23       Brenda M. Ginisi

24       Court Reporter

Page 3

Page 3

1 APPEARANCES CONT'D:

2 Also present:

3    Daniel Keenan, Esq.

4    Christopher J. Redd, Esq.

5    Jacob Tosti, Esq.

6    Rose Marie Alongi

7    William D. McLaughlin

8    Gregory Geimen

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 2

1 APPEARANCES:

2 Representing the Plaintiffs:

3    BOWDITCH & DEWEY, LLP

4    200 Crossing Boulevard

5    Framingham, Massachusetts  010702

6    BY:  TIMOTHY P. VAN DYCK, ESQ.

7    (617) 757-6536

8    E-mail: tvandyck@bowditch.com

9 Representing the Defendants:

10    FREEMAN MATHIS & GARY LLP

11    60 State Street, Suite 600

12    Boston, Massachusetts  02109

13    BY:  JENNIFER L. MARKOWSKI, ESQ.

14    (617) 963-5975

15    E-mail: jmarkowski@fmglaw.com

16 Representing the Defendants:

17    O'DONOGHUE & O'DONOGHUE LLP

18    5301 Wisconsin Avenue, NW, Suite 800

19    Washington, DC  20015

20    BY:  CHARLES W. GILLIGAN, ESQ.

21    (202) 362-0041

22    E-mail: cgilligan@odonoghuelaw.com

23

24

Page 4

1        I N D E X

2

3 WITNESS:          GINA MARIE ALONGI

4

5 EXAMINATION BY:         PAGE:

6 Ms. Markowski       4

7

8

9 EXHIBITS:          PAGE:

10 Exhibit 9, Notes....................74

11 Exhibit 10, E-mail................79

12 Exhibit 11, Handwritten Notes.....................93

13 Exhibit 12, Statement, Taylor Ryan.................97

14 Exhibit 13, Statement, Rosemary Ortega.............97

15 Exhibit 14, E-mail................107

16 Exhibit 15, Handwritten Notes.....................110

17 Exhibit 16, Organization Chart....................129

18 Exhibit 17, Notes.................157

19 Exhibit 18, ASSA Agreement........................198

20 Exhibit 19, Text Messages.........................228

21

22 (Exhibits retained by Ms. Markowski)

23

24              App.142

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Confidential

Gina Marie Alongi
May 25, 2022

Page 181

1       MS. MARKOWSKI:  I just don't agree with
2   that.  But, you know, that's okay.
3       MR. VAN DYCK:  Well, you didn't disagree
4   with it earlier when I said.
5       MS. MARKOWSKI:  I just want to keep
6   going.
7       MR. VAN DYCK:  But no, I don't because
8   then we have a long time.  And so, I'm trying to
9   figure out from you how much longer you have.
10      MS. MARKOWSKI:  I recommend we go until
11  five and see if we can finish it.
12      MR. VAN DYCK:  Do you think you can?
13      MS. MARKOWSKI:  I cannot say --
14      MR. VAN DYCK:  I'm not saying there's
15  hard cutoff.  Five, 5:15.  But if this thing is
16  going to keep going until six or seven at night,
17  let's stop now.
18      MS. MARKOWSKI:  I'd like to try to get it
19  done by, you know, maybe, a little after five.
20  I think five is aggressive but I'd like to try
21  to get it done.  But we have to come back for
22  another day, Tim, because other people have to
23  ask questions --
24      MR. VAN DYCK:  No, no.  I'd like to

Page 182

1   finish up with you today, if we can.  If you
2   think you can finish around five, then, we'll
3   keep going, and I think I hear you saying that.
4       MS. MARKOWSKI:  I'm going to try to do
5   it.  But I'm not making any promises, Tim.
6   That's the best I can do.
7       MR. VAN DYCK:  You drive a hard bargain.
8   Well, I think, then, we should keep going.  You
9   know, ask the witness, you know, whether she
10  needs a break.
11      THE WITNESS:  Can we take a break?
12      MS. MARKOWSKI:  We can take a break.
13  Absolutely.
14
15      (A recess was taken)
16
17  Q.   (By Ms. Markowski) At some point, did
18  Mr. McLaughlin speak with you about your hours and when
19  you needed to be in the office?
20  A.   Yes.
21  Q.   When did that occur?
22  A.   January -- I'm sorry.  I forget the
23  month.
24  Q.   Okay.  Do you remember the year?

Page 183

1   A.   I forget.  But he did.
2   Q.   Was that 2020?
3   A.   I thought it was January of 2020.
4   Sometime around that period of time.
5   Q.   All right.  And was that part of a
6   discussion during a meeting with Mr. McLaughlin?
7   A.   Yes.
8   Q.   And what did he say to you about your
9   hours?
10  A.   That I need to start coming in at
11  eight o'clock in the morning.
12  Q.   And in January of 2020, when did the
13  funds office open?
14  A.   Eight o'clock.  Eight to four.
15  Q.   And were the other fund employees
16  expected to be in at 8:00 a.m.?
17  A.   Yes.  But we had flex hours, flex time
18  for some people.
19  Q.   Who had flex hours?
20  A.   Greg, because he had to get his kids on
21  the school bus.
22  Q.   So what time did Mr. Geiman arrive; what
23  time was he expected to arrive?
24  A.   So as soon as they got the kids on the

Page 184

1   bus.
2   Q.   Okay.
3   A.   You know, I don't know.  You know, it was
4   different each day.  So, you know, he would come in
5   whenever he wanted.
6   Q.   And prior to you coming in at
7   eight o'clock, Mr. Geiman was usually at the office
8   before you?
9   A.   No, because he had to put the kids on the
10  bus.
11  Q.   Okay.  And again, just focusing on the
12  time period, not after when Mr. McLaughlin asked you to
13  come in at 8:00 a.m. in the morning, but prior to that,
14  when you were coming in later in the morning.  I
15  thought -- and I don't wan to revisit it -- but I
16  thought your testimony, yesterday, was that most days
17  Mr. Geiman was, in fact, in the office before you.
18  A.   After a certain period of time.  I think,
19  once the kids started -- I think they were being home
20  schooled so he was able to get in earlier.  I'm not
21  sure about that.  But when Billy said that he wanted
22  everyone in the office at eight, it was like an oh shit
23  from Greg.  Like, how am I going to do this.  But I
24  will try and do it, try and get in at eight.

App.143

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Gina Alongi Vol III*

*June 22, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 2

```
1          COMMONWEALTH OF MASSACHUSETTS
2  NORFOLK, SS.           SUPERIOR COURT
3          CIVIL ACTION NO.: 2182CV00125
4
5  ***********************************************
6  GINAMARIE ALONGI AND ROSEMARIE ALONGI,    *
7            Plaintiffs       *
8  vs.                    *
9  IUOE LOCAL 4 HEALTH & WELFARE FUND, et al,  *
10           Defendants       *
11 ***********************************************
12
13
14
15     CONT'D DEPOSITION OF: GINA MARIE ALONGI
16           VOLUME III
17        BOWDITCH & DEWEY, LLP
18         200 Crossing Boulevard
19      Framingham, Massachusetts  010702
20    June 22, 2022        10:00 a.m.
21
22
23         Brenda M. Ginisi
24         Court Reporter
```

Page 2

```
1  APPEARANCES:
2  Representing the Plaintiffs:
3     BOWDITCH & DEWEY, LLP
4     200 Crossing Boulevard
5     Framingham, Massachusetts  010702
6     BY:  TIMOTHY P. VAN DYCK, ESQ.
7     (617) 757-6536
8     E-mail: tvandyck@bowditch.com
9  Representing the Defendants:
10    FREEMAN MATHIS & GARY LLP
11    60 State Street, Suite 600
12    Boston, Massachusetts  02109
13    BY:  JENNIFER L. MARKOWSKI, ESQ.
14    (617) 963-5975
15    E-mail: jmarkowski@fmglaw.com
16 Representing the IUOE LOCAL 4:
17    O'DONOGHUE & O'DONOGHUE LLP
18    5301 Wisconsin Avenue, NW, Suite 800
19    Washington, DC  20015
20    BY:  CHARLES W. GILLIGAN, ESQ.
21    (202) 362-0041
22    E-mail: cgilligan@odonoghuelaw.com
23
24
```

Page 3

```
1  APPEARANCES CONT'D:
2  Also present:
3     Daniel Keenan, Esq.
4     Christopher J. Redd, Esq.
5     Jacob Tosti, Esq.
6     Rose Marie Alongi
7     William D. McLaughlin
8     Gregory Geiman, Esq.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1            I N D E X
2
3  WITNESS:            GINA MARIE ALONGI
4
5  EXAMINATION BY:           PAGE:
6  Mr. Gilligan            6
7
8
9  EXHIBITS:            PAGE:
```

```
10 Exhibit 95, Letter, September 6, 2004...............41
11 Exhibit 96, E-mail.................................46
12 Exhibit 97, E-mail.................................53
13 Exhibit 98, E-mail, July 31, 2003.................55
14 Exhibit 99, E-mail, August 1, 2003................60
15 Exhibit 100, E-mail, August 4, 2003...............63
16 Exhibit 101, Agenda................................68
17 Exhibit 102, Meeting Minutes.......................70
18 Exhibit 103, E-mail................................73
19 Exhibit 104, E-mail, December 29, 2003.............77
20 Exhibit 105, Handbook..............................96
21 Exhibit 106, Time Study...........................114
22 Exhibit 107, Time Study...........................117
23 Exhibit 108, Time Study...........................119
24 Exhibit 109, Agreements...........................125
```

App.145

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 9

1    Q.    Did you ever try and create a job
2 description at any point?
3    A.    Well, recently, when we were talking
4 about -- and this is going back to -- prior to my
5 termination.  All of a sudden a couple of job
6 descriptions appeared.
7    Q.    When you say they appeared, do you know
8 their origins?
9    A.    I think fund counsel created them.  You
10 know, sent them to me, you know, when we were talking
11 about the employment agreement.
12    Q.    You think that you're not sure, though?
13    A.    I'm not sure.
14    Q.    Okay.  Is it correct to say the
15 administrator is in charge of the day-to-day operations
16 of the fund?
17    A.    Yes.
18    Q.    Okay.  And did all of the fund's
19 employees, ultimately, report to you?
20    A.    Could you specify the time period?
21    Q.    Let's say, in the last five years that
22 you were the administrator, so 2015 to 2020?
23    A.    The only employees that reported directly
24 to me was Greg and Laura-Jean.

Page 10

Page

1    Q.    No one else?
2    A.    No one else.
3    Q.    Would you say, though, that you, as the
4 administrator, were ultimately responsible for the work
5 of all the employees?
6    A.    Ultimately, yes.
7    Q.    Okay.  And how many employees,
8 approximately, did the fund office have between 2015
9 and 2020?
10    A.    It fluctuated.
11    Q.    Can you give me a ballpark?
12    A.    Ten to 15.
13    Q.    Okay.
14    A.    I'm not really sure.
15    Q.    Okay.  All right.  And as the
16 administrator, what were your responsibilities with
17 respect to the board of trustees?
18    A.    My responsibilities?
19    Q.    Yes.
20    A.    To report to them.  You know, financial
21 status of the plan, any issues with service providers,
22 any recommendations that I had.
23        What we would do is, we would have, you
24 know, service providers come in.  You know, if there

Page 11

Page

1 were particular issues with them they would go in front
2 of board, you know, if there was a need to terminate
3 them.
4        I would, basically, review any and all
5 negotiations I did on behalf of the funds.  You know,
6 specifically for the health & welfare fund, the pension
7 fund.  You know, investment managers.  We had a whole
8 roster full of investment managers that constantly
9 changed.
10        For the annuity plan, you know, it was a
11 DC plan, a defined contribution plan, which, ultimately
12 was converted to a profit-sharing plan that allowed a
13 401K component.
14    Q.    Okay.
15    A.    First 401K plan in the multiemployer
16 environment.
17    Q.    And you said it was -- became a
18 self-directed plan as well?
19    A.    It was participant-directed before we
20 added the profit-sharing feature.  You know, it wasn't
21 easy to convert that to a profit-sharing plan and add
22 the 401K feature, and to monitor all the various
23 selections by the membership and the employers.
24    Q.    Did you have a recordkeeper for the

Page 12

Page

1 annuity/401K?
2    A.    Yes.  When it was a straight DC plan,
3 KPMG was the recordkeeper.  They were -- I think we
4 were the first multiemployer plan that KPMG
5 administered a DC plan for.
6        And then, they went out of business.  You
7 know, they didn't do the recordkeeping anymore, so we
8 had to find someone else.  So that's when we went to
9 Putnam Investments.
10    Q.    So you had Putnam as recordkeeper?
11    A.    And then, MassMutual.  Putnam had some
12 issues, you know, in the press.  And we felt obligated
13 to terminate them.
14    Q.    All right.  I take it, being the
15 administrator's a full-time job?
16    A.    It's more than a full-time job.
17    Q.    And at the time of your termination, do
18 you recall your annual compensation?
19    A.    Approximately, 258.
20    Q.    And in addition to that salary, did you
21 receive any benefits?
22    A.    Yes.
23    Q.    Can you detail those benefits for me?
24    A.    Health & welfare, pension, contrib... **App. 146**

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 57

Page

1  was?
2      A.    Social Action Committee.
3      Q.    Do you know what that is?
4      A.    It was a small contribution, I believe,
5  of two cents per hour, at the time.  You know,
6  voluntarily on the part of a Local 4 member.  And it
7  was a political fund for the union.
8      Q.    And Ms. Alongi, looking at these -- if
9  you can read on page three -- it looks to me like the
10  allocations are set forth in percentages that go out a
11  couple spots right at the decimal point; is that
12  correct?
13      A.    I can't see it.  I can't read it.  So I'm
14  assuming you're correct.
15      Q.    If you look -- let's look at the very
16  first -- where it indicates "unrounded 47.11 percent";
17  does that look right to you?
18      A.    Yes.
19      Q.    Okay.  And was that something that
20  Department of Labor was insisting upon, that level of
21  precision?
22      A.    I believe so.
23      Q.    Okay.  And maybe the -- to make this a
24  slightly easier exercise -- turning back to the first

Page 58

Page

1  page of Exhibit 98, the second paragraph.  I see a
2  indication that, "Oh by the way, Roberta rounded the
3  SAC and the Fair to .45 percent versus .4444 percent?
4      A.    Mm-hmm.
5      Q.    Is that indicative of the
6  investigators -- the level of detail they wanted in
7  these allocations?
8      A.    It was.  But I think they just had it out
9  for the non-ERISA funds, the union funds, to be honest
10  with you.
11      Q.    What makes you say that?
12      A.    Well, because they just -- I don't think
13  they really liked us administering the benefit.
14  Administering those funds, I thought, in my opinion.
15      Q.    Was there anything, in particular, that
16  leads you to that conclusion?
17      A.    That they should -- the union should be
18  doing it themselves.
19      Q.    Did you have any discussions directly
20  with Ms -- is it Munch (phonetically)?
21      A.    Muench.
22      Q.    Muench.  Did you have any direct
23  discussions with her regarding that issue?
24      A.    About the dues?

Page 59

Page

1      Q.    Yes.
2      A.    Handling it?
3      Q.    Yeah.
4      A.    I believe she had asked a lot of the --
5  you know, why they weren't handling it themselves.  Her
6  experience showed that a lot of unions, basically, you
7  know, handled their own dues checkoff.
8      Q.    Did you speak often with Ms. Muench,
9  during this process?
10      A.    I don't recall.
11      Q.    With respect to the fund's interest, were
12  you the primary spokesperson, in terms of dealing with
13  the Department of Labor during this particular
14  investigation?
15           MR. VAN DYCK:  Objection as to form.  You
16  may answer.
17           THE WITNESS:  As I said earlier,
18  Laura-Jean would get the documents together.  I
19  would share them with special counsel.
20  Mary Sullivan would review them.  We would go to
21  the trustees, and we would make the submission.
22      Q.    (By Mr. Gilligan)  In terms of, though,
23  the interaction with the Department of Labor
24  investigator, who would speak to her on the Local 4

Page 60

Page

1  funds behalf?
2      A.    Other than initially when this was going
3  on, you know, when I was dealing with her, I think what
4  happened was she was interacting with special counsel
5  and Mary Sullivan directly.
6      Q.    None of the trustees were interacting
7  with her, were they?
8      A.    No, not at all.
9      Q.    And Laura-Jean wasn't interacting with
10  them?
11      A.    No.
12      Q.    Okay.  Thank you.
13
14           (Exhibit 99, E-mail, August 1, 2003,
15           marked)
16
17      Q.    (By Mr. Gilligan)  Ms. Alongi, have you
18  had an opportunity to review what's been marked
19  Exhibit 99?
20      A.    Yes.
21      Q.    Can you identify that document for me?
22      A.    It's a letter -- an e-mail to
23  Roberta Muench from special counsel, Joyce Mader, dated
24  August 1, 2003 with a cc to me and Mary Sullivan

App. 147

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

---

Page 61

Page

1    MR. GILLIGAN:  And by the way, for the
2  record, that is the spelling of Ms. Muench's
3  name M-U-E-N-C-H.
4    Q.    (By Mr. Gilligan)  Correct?
5    A.    Yes.
6    Q.    Okay.  There you go.  I'd like to turn
7  your attention to the third paragraph of Ms. Mader's
8  e-mail.  And specifically, the second sentence thereof.
9  It says, "Gina and Mary are concerned that the
10  allocation does not take into account the considerable
11  time spent on HIPAA compliance for the welfare fund."
12  Do you know what Ms. Mader's alluding to there?
13    A.    I don't.  I can say that, you know, when
14  HIPAA was enacted, you know, there was a lot of
15  correspondence that we had to send and comply with for
16  the health & welfare fund.  So maybe, you know, for
17  that specific period of time that the allocation had to
18  be tinkered with for the health & welfare fund only.
19    Q.    So you were concerned, is a fair
20  assessment, you were concerned about the possibility
21  that the allocation for the welfare fund was being
22  skewed by regulatory activity like HIPAA compliance?
23    A.    Yes.  Any major change to one of the
24  funds.

---

Page 62

Page

1    Q.    So, to you, this was indicative of the
2  fact that activity for any given fund might be
3  substantially different year to year, based on
4  regulatory or legal compliance?
5    A.    Well, I wouldn't say substantially.  I
6  would say, that, depending upon who's working on it,
7  how many people, employees, and what the allocation is.
8    Q.    But it's fair to say, that the enactment
9  by Congress of a new statute or the enactment of -- by
10  Department of Labor or one of the regulatory agencies
11  of new regulations can impact the amount of work done
12  on a given fund from year to year?
13    A.    Again, depending upon what's involved,
14  you know, if that he is a mailing or if it's more than
15  that.  Depends on what the enactment is and the work
16  that's involved, and who's doing it.
17    Q.    So it would directly correlate to how
18  much employee activity was generated by the given law
19  or regulation?
20    A.    Yes.
21    Q.    Okay.  And how would that be captured?
22    A.    In the time sheets.
23    Q.    Thank you.
24    A.    Currently.  So at this period of time

---

Page 63

Page

1  there were time sheets, pre-Department of Labor.
2    Q.    Okay.  Very good.  And do you know when
3  time sheets -- well, you know, let's wait on that for a
4  minute.  One more thing.
5        Exhibit 99, the second paragraph,
6  Ms. Mader indicates, "Next week, while I'm gone, please
7  copy any correspondence to Gina and Mary so that they
8  may start working on it immediately"; do you know what
9  she's referring to there?
10    A.    No, I don't.
11    Q.    Okay.
12
13        (Exhibit 100, E-mail, August 4, 2003,
14         marked)
15
16    Q.    (By Mr. Gilligan)  Ms. Alongi, you've
17  been handed what's been marked Exhibit 100.  Have you
18  had a chance to review that?
19    A.    Yes.
20    Q.    And can you identify that document for
21  me?
22    A.    It's an e-mail to Mary Sullivan from me,
23  copied to special counsel, Joyce Mader, dated
24  August 4, 2003.

---

Page 64

Page

1    Q.    And what's the subject matter of that?
2    A.    Outstanding issues from the DOL audit.
3    Q.    And this is at list of 14 items you say
4  are ongoing on this audit at the time?
5    A.    That were outstanding, yes.
6    Q.    I see a reference in the first bullet
7  point to admin. allocation.  And it's -- there's a
8  parenthetical indicating "Manzi time study."  Can you
9  tell me what that is?
10    A.    Manzi & Associates did the admin.
11  allocation so I don't know, specifically, what the
12  reference is, the outstanding issue.  But they,
13  previously, did the percentages for the allocation.
14    Q.    And do you know how they were doing that
15  particular time study?
16    A.    The Manzi time study?
17    Q.    Yes.
18    A.    This is before the time sheets, correct?
19    Q.    I can't answer that for you.
20    A.    Okay.  Well, I'm assuming -- well --
21    Q.    Don't assume.  You're going to get in
22  trouble.
23    A.    I know.  Well, I can't answer the
24  question either until I get further clarification

App.148

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 77

Page

1  if I was heavily involved.  But I was involved
2  as everyone else was.
3      Q.    (By Mr. Gilligan)  Well, "as everyone
4  else was."  When you say "everyone else," who are you
5  referencing?
6      A.    Mary Sullivan and special counsel,
7  Joyce Mader.
8      Q.    So other than the two attorneys, who are
9  handling this for a legal perspective, would there have
10  been any one else who was more involved in this process
11  than you?
12     A.    On the calculation end,
13  Manzi & Associates?
14     Q.    Anyone else.
15     A.    In-house accountant -- CPA.
16     Q.    But from the a Local 4 funds perspective,
17  you were the point person on this, correct?
18     A.    Yes.
19     Q.    Okay.  Very good.
20
21          (Exhibit 104, E-mail, December 29, 2003,
22          marked)
23
24     Q.    (By Mr. Gilligan)  Ms. Alongi, if you

Page 78

Page

1  take a minute and examine what has been marked
2  Exhibit 104, which is a four-page document.  And I'd
3  ask you to look at all those pages.  And when you've
4  finished that, let me know?
5      A.    Done.
6      Q.    Okay.  Can you identify what's been
7  marked Exhibit 104?
8      A.    It's an e-mail to Mary Sullivan from me,
9  copied to Ed Manzi, Joyce Mader, December dated
10  December 29, 2003.
11     Q.    And can you tell me the subject matter of
12  that e-mail?
13     A.    There is no subject matter.
14     Q.    Okay.  Could you tell me what the e-mail
15  discusses?
16     A.    The proposed time sheet that we would
17  give to the fund employees.
18     Q.    And who developed that time sheet?
19     A.    Excuse me.
20     Q.    Who developed that time sheet?
21     A.    I'm not sure who developed it.
22     Q.    Is it you -- you're transmitting this
23  time sheet, correct, to the other -- to other
24  professionals; is that right?

Page 79

Page

1      A.    Yes, it was a draft.
2      Q.    Okay.  And you were seeking their
3  feedback on this?
4      A.    Yes.
5      Q.    So having done that, is this a time sheet
6  that you created?
7          MR. VAN DYCK:  Objection.  Asked and
8  answered.  You can answer it again.
9          THE WITNESS:  I don't know who created
10  it.
11     Q.    (By Mr. Gilligan)  Do you recall asking
12  anyone to create it -- possibly create the time sheet
13  for you?
14     A.    I'm not sure who I asked.  If it was --
15  if it came from our accountant, or if it came from
16  Rose, Laura-Jean.  I'm not sure who I asked to do it.
17     Q.    Turning to the last page of the
18  Exhibit 104, I see some bold lettering saying,
19  "proposed time sheet solution."  Do you recognize that
20  particular aspect of this document?
21     A.    I don't.
22     Q.    Have you seen this before?
23     A.    Well, I've seen it.  But I don't recall,
24  specifically, who did it, what we did with it, if it

Page 80

Page

1  was changed, if the trustees adopted it.  I don't know
2  the specific details of it.
3      Q.    Okay.  Did you create this document, or
4  did you ask someone to create it for you?
5      A.    I think you asked me that question.
6          MR. VAN DYCK:  I think he's referring
7      just to this page.
8      Q.    (By Mr. Gilligan)  I'm sorry.  This
9  particular aspect of Exhibit 104, the fourth page with
10  the heading "Proposed Time Sheet Solution"?
11     A.    This does not look like a document I
12  created.
13     Q.    Okay.  Is it a document you may have
14  asked someone else to create?
15     A.    I just can't recall who did it and if I
16  asked someone.
17     Q.    Okay.  That is fine.  No don't -- I
18  mean --
19     A.    I'm --
20          MR. VAN DYCK:  You don't need to
21      apologize for not remembering.
22     Q.    (By Mr. Gilligan)  So you're not sure if
23  this particular time sheet or this particular
24  methodology was ultimately adopted; is that right? App. 149

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 81

**Page**

1  testimony?
2      A.    Some form of it was.  I don't know if it
3  was adopted verbatim what's on here.  But yes.
4      Q.    Okay.  So whether it was this specific
5  method or time sheet, at some point, time sheets were
6  implemented for the fund office employees?
7      A.    Yes.
8      Q.    And would it have been right around this
9  time, the beginning of 2004?
10     A.    I don't recall.
11     Q.    So sometime around the beginning of 2004,
12  is it fair to say, all fund employees were instructed
13  to begin filling out daily time sheets?
14     A.    Yes.
15     Q.    Okay.  Did everyone in the office fill
16  out those time sheets?
17     A.    Yes.
18     Q.    How about you?
19     A.    I did for period of time.
20     Q.    Do you know what time period you would
21  have done that?
22     A.    I don't recall.
23     Q.    Do you have a sense of for how long a
24  period of time you may have filled out a daily time

Page 82

**Page**

1  sheet?
2      A.    I don't recall.
3      Q.    Do you recall when you -- the way you've
4  indicated that, or the way you've testified, makes me
5  believe at some point you ceased filling out a time
6  sheet; is that correct?
7      A.    Yes.
8      Q.    Do you have any sense of when that may
9  have occurred?
10     A.    My best estimate is sometime in 2008.
11  And that's just an estimate.
12     Q.    What are you basing that estimate on?
13     A.    That, you know, Manzi & Associates
14  determined, around that time, that the numbers or the
15  percentages to the funds allocation, based on time
16  sheets, did not change significantly.
17     Q.    And so, what was the consequence of that
18  finding by Manzi?
19     A.    Could you further explain your question?
20     Q.    Yeah, sure.  So you said Manzi was
21  finding there wasn't significant change from year to
22  year; is that what you're saying?
23     A.    Right.
24     Q.    Did anyone else cease filling out a time

Page 83

**Page**

1  sheet, as of 2008, other than yourself?
2      A.    No.
3      Q.    Why not?
4      A.    They were required to do it.
5      Q.    Weren't you required to do it?
6      A.    My time had been consistent, unless there
7  was a specific project that we were working on.  And we
8  did make an adjustment for that year, when we
9  dismantled the claims operation, I believe, in 2015.
10  You know there was a increase, at some point, in that
11  allocation to the health & welfare fund.
12          So when I stopped doing time sheets, the
13  allocation was reviewed by Manzi and the trustees.  And
14  no one made a comment with respect to me doing time
15  sheets.
16     Q.    Back up for a minute.  As the
17  administrator, you provide services to all of the funds
18  in the Local 4 fund office?
19     A.    Yes.
20     Q.    And, also, to some degree, to the various
21  non-ERISA entities?
22     A.    To some degree.
23     Q.    Is that a fairly small part of your time?
24     A.    Fairly small.

Page 84

**Page**

1      Q.    Okay.  In the absence of time sheets, how
2  was your costs to the various funds going to be
3  allocated?
4      A.    Because my job consisted of, basically,
5  doing the same thing, you know, every day.  With
6  respect to these funds, you know, I knew -- okay, with
7  the health & welfare fund, how much time, you know, was
8  allocated.
9          I had a whole claims operation that was
10  doing the majority of the work.  So my role was
11  somewhat limited to, you know, the trustees and
12  preparing for trustees meetings.
13          You know, for the pension fund, you know,
14  was a little bit more involved with respect, you know,
15  there was a whole host of investment managers.  And the
16  annuity fund somewhat limited.  And the dues and the
17  SAC, same thing, issuing a check monthly.
18     Q.    Well, didn't you testify earlier, that
19  things like HIPAA could skew the amount of effort
20  you're putting in for a given fund in any given year?
21     A.    Absolutely.
22     Q.    And how about something like the Pension
23  Protection Act of 2006?
24     A.    As the administrator, I would -- you App.150

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

---

Page 85

Page

1  know, if there was a mailing or whatever the
2  responsibility was for the administration, I had a
3  staff.  The staff recorded their time involved, if
4  there was a specific mailing.
5      Q.    Okay.  You're referencing mailings.  But
6  with respect to a statute like the Pension Protection
7  Act, isn't there more to it than mailings; there was,
8  kind of, a host of change as to how pension plans
9  operated following that legislation, correct?
10     A.    Correct.  And that's why we had plan
11 professionals.
12     Q.    But wouldn't you, as the administrator,
13 have to, kind of, amp up your level of interaction with
14 the professionals in order to implement policies that
15 comply with this new statute.
16         MR. VAN DYCK:  Objection.  You may
17 answer.
18         THE WITNESS:  It would be the same as
19 with the health & welfare fund and any of the
20 other funds.  You know, it would be limited time
21 that I spent.
22     Q.    (By Mr. Gilligan)  I mean, wouldn't you
23 be given -- and again, let's use the example the
24 Pension Protection Act.  Wouldn't you be reviewing

---

Page 86

Page

1  memoranda and -- from counsel -- about what steps the
2  fund had to take to comply with the -- with the new
3  statute?
4      A.    Well, you know, we had a fund counsel.  I
5  had compliance attorney working.  You know, so that was
6  some something that they would review.
7      Q.    Right.  I understand counsel is playing a
8  role.  But aren't you, as the administrator,
9  interacting with counsel and working with them to make
10 sure the fund is in compliance with the new statute?
11     A.    Well, can you give me an example?
12     Q.    Sure.  Weren't there a variety of new
13 notices that would go out with the Pension Protection
14 Act?
15     A.    To whom?
16     Q.    To the participants.
17     A.    So that would be a mailing.
18     Q.    Yeah, that's a mailing.  But that's not
19 just a mailing that -- let me ask you this, I mean, the
20 mailings's not creating itself, right; there's got to
21 be some discussion of what has to go in the mailing?
22     A.    Okay.  So that would be a draft of the
23 correspondence that was being mailed?
24     Q.    Yep.

---

Page 87

Page

1      A.    Okay.  So if the consultants/actuary,
2  whomever sent that to legal counsel, you know, so it
3  would be a document that I would review, or in-house
4  counsel, or our compliance attorney at the time would
5  review.  So what would it be, you know, a few-minute
6  review of a document and then turned over to, you know,
7  the clerical staff to send out.
8      Q.    And some of these statutes, I think, are
9  pretty complex, we'd all agree.  And wouldn't review of
10 what hoops the fund was jumping through, you know,
11 entail a couple minutes of your time?
12     A.    Well, I'm not sure what I would do versus
13 the paid professionals, the actuaries and consultants,
14 were doing with respect to the Pension Protection Act.
15     Q.    Let's move to a different legislative
16 example, then.  The Affordable Care Act, you're
17 familiar with it?
18     A.    Mm-hmm.
19     Q.    That was a rather substantial piece of
20 legislation, in terms of the operation of your health &
21 welfare fund, correct?
22     A.    Mm-hmm.
23     Q.    And again, didn't that entail a host of
24 compliance steps that the fund had to take?

---

Page 88

Page

1      A.    Well, again, mailings, correspondence
2  from the consultants.
3      Q.    Changes to benefits?
4      A.    Which would be a mailing, right?
5      Q.    But didn't the Affordable Care Act impose
6  a number of requirements on funds, in terms of changes
7  to eligibility, changes to benefits?  Things of that
8  sort.
9      A.    Well, that's why we paid the consultants,
10 to advise the trustees.  The trustees, probably, were
11 advised at the time and, you know, it was on the
12 agenda.
13     Q.    Okay.  But the consultants don't
14 administer the fund, right?
15     A.    No.  But at the end of the day, whatever
16 was decided with respect to communication material, you
17 know, would go out.
18     Q.    And wouldn't you be involved in that
19 process?
20     A.    Reviewing the documents.
21     Q.    Okay.  And would you also be reviewing
22 implementation steps?
23     A.    With the change in the eligibility rules
24 or a benefits change?

App.151

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 89

Page

1    Q.    Sure.  So, for instance, all the children
2    of the members up to the age of 26 are now eligible for
3    benefits, correct?
4         A.    Right.
5    Q.    So that's a big change, correct?
6         A.    But what did I specifically have to do
7    with that, though?
8    Q.    Well, wouldn't you, as the administrator,
9    be assuring that plan documents were updated, notices
10   given, all the other steps to actually implement this
11   legal change?
12        A.    That's why I had two in-house attorneys.
13   Q.    And who were those?
14        A.    Greg Geiman and Alice Kurtz.
15   Q.    And are you testifying that your
16   activities, vis-a-vis, each fund, wouldn't change in
17   any respect with the passage of something as
18   significant as the Affordable Care Act?
19        A.    I understand that it was significant.
20   But so was the Pension Protection Act.
21   Q.    Okay.
22        A.    You know so...
23   Q.    So wouldn't it be fair to say, that the
24   year that the Pension Protection Act was passed, your

Page 90

Page

1    time allotment to the pension fund would be greater;
2    and in the year in which the Affordable Care Act was
3    passed, your allotment of time for the health & welfare
4    fund would have been increased?
5         MR. VAN DYCK:  Objection as to form.  You
6    can answer.
7         THE WITNESS:  No.
8    Q.    (By Mr. Gilligan)  No?
9         A.    Because of the professional people that I
10   had working under me and the outside actuaries,
11   consultants and counsel.
12   Q.    So if you cease filling out these time
13   sheets, how was the allocation to the various funds for
14   your time determined?
15        A.    The accounting firm, whether it was
16   Ed Manzi or Jeannie, would meet with me at the end of
17   the year.  And we would determine whether there were
18   any significant changes in the allocation.
19        You know, as I mentioned earlier, you
20   know, we had one change, which was significant, when I
21   made the recommendation in 2015 to the board of
22   trustees of the health & welfare fund to dismantle the
23   the health & welfare fund claims adjudication --
24   Q.    Okay.

Page 91

Page

1         A.    -- in house.
2    Q.    What was the process you went through
3    with Manzi to allocate your time?
4         A.    They would do the spreadsheet, you know,
5    which was consistent with the prior year.  Asked me if
6    there were any adjustments and whether it was --
7    whether any changes had to be made to it.
8    Q.    And you said they did this once a year?
9         A.    Well, for a period of time we were
10   resetting the admin. allocation every six months.
11   Q.    Okay.
12        A.    And then we went to annually.
13   Q.    And when you're having these discussions
14   -- let's back up one second.  So at this point, Manzi
15   has become the funds auditors; is that correct?  This
16   is 2008.
17        A.    Yes. I don't know what period of time.
18   Q.    I mean, you're confident Manzi was --
19        A.    Oh definitely.
20   Q.    Okay.  And when you had these either
21   twice a year or annual discussions with them, did those
22   occur in person or over the phone?
23        A.    I believe both.  If they happened to be
24   doing the audit at the time, in the office, they would

Page 92

Page

1    question me.
2    Q.    And when they questioned you, how long
3    did that process take?
4         A.    I don't recall.
5    Q.    Was it a day-long interview?  What it,
6    you know, 15 minutes?  An hour?  Best estimate of that?
7         A.    I can't remember.
8    Q.    And who would conduct that conversation
9    with you, was it Ms. Mikal?
10        A.    Yes.
11   Q.    But you have no idea the amount of the
12   amount of time in your day it would take for you to
13   have that conversation?
14        A.    No.
15   Q.    Particularly at the point where this is
16   be done once a year, how can you recall the volume of
17   day-to-day work you were doing for each specific fund?
18        A.    Because my job didn't change.  You know,
19   unless, of course, you know, it was one of those
20   legislative changes.  But, basically, I would do the
21   same thing, same time of month every day.
22   Q.    How can that be, that your months are
23   static year after year; that done seem possible to me?
24        MR. VAN DYCK:  Objection as to form.

App. 152

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 93

Page

1    may answer.
2         THE WITNESS:  Well, you know, I know my
3    job.  You know, I obviously did it well.  And,
4    you know, my responsibilities didn't change.
5         Q.   (By Mr. Gilligan) So you were involved
6    in this Department of Labor process, the end product of
7    which is the administrator shared services agreement
8    and agreement for people to maintain time sheets to
9    allocation expenses, correct?
10        A.   Right.
11        Q.   Was it the essence of the dispute with
12   the Department of Labor and the resolution that
13   specific data was needed regarding the work for each
14   specific fund so no fund was subsidizing the other
15   fund?
16        A.   Right.
17        MR. VAN DYCK:  Objection.
18        Q.   (By Mr. Gilligan) Okay.  So you concur
19   on that.  And my question is, given that framework, why
20   would you have ceased keeping time sheets?
21        MR. VAN DYCK:  Objection.  Asked and
22   answered.  You can answer.
23        THE WITNESS:  Basically, you know, I must
24   have had a discussion with someone along the

Page 94

Page

1    lines of, you know, whether it was necessary
2    because it was time-consuming.
3         You know, these time sheets that the
4    employees were completing weren't very accurate,
5    okay, because things were getting allocated to
6    certain buckets, which is a way of just
7    recording time.  You know, so we had to change
8    the time sheet form to make it more specific,
9    you know, in the later years.  So when, you
10   know, we first -- or when I first started doing
11   it the numbers weren't changing.
12        Q.   (By Mr. Gilligan) You indicate you must
13   have had a discussion with someone about this.  Do you
14   recall such a conversation?
15        A.   I don't.
16        Q.   So you probably, then, don't recall with
17   whom that conversation would have occurred, or do you?
18        A.   I don't.
19        Q.   Okay.  Did you ever have a conversation
20   with the trustees regarding your ceasing to keep time
21   sheets?
22        A.   I don't recall.
23        Q.   Do you ever recall bringing it up in any
24   trustees' meeting, or have the board act on or approve

Page 95

Page

1    such a change?
2         A.   We would have the change in the admin.
3    allocation brought to the board every six months, so
4    annually, for them to approve it.
5         Q.   So you would bring the new allocation to
6    the board for their approval.  Was there a discussion
7    with the board regarding the method by which those
8    numbers were arrived at?
9         A.   They never asked, no.
10        Q.   Okay.  And to the board's knowledge,
11   everyone was filling out time sheets in accordance with
12   the agreement with Department of Labor, correct?
13        MR. VAN DYCK:  Objection as to form.
14        THE WITNESS:  I'm not sure board knew that
15   time sheets were being done.  The accounting
16   firm, typically, calculated the admin.
17   allocation for this fund and other funds that
18   they service.  So I'm not sure if the board knew
19   that there were time sheets.
20        Q.   (By Mr. Gilligan) I mean, weren't the
21   time sheets a significant aspect of the resolution
22   reached for the Department of Labor and the audit?
23        MR. VAN DYCK:  Objection as to form.
24        THE WITNESS:  I don't know if it was

Page 96

Page

1    significant.  I think, in one of last e-mails
2    you showed me from Attorney Mader, she said, my
3    recommendation would be.  It was her
4    recommendation that we implement a time sheet
5    system.
6         Q.   (By Mr. Gilligan) And such a time sheet
7    system was, in fact, adopted, correct?
8         A.   Yes.
9         Q.   Okay.  And, in fact, you produced, at
10   some point, or circulated a proposed time sheet in a
11   proposed manner in which time would be kept in the
12   office, correct?
13        A.   Yes.
14        Q.   And isn't it true that the Administrative
15   Shared Service Agreement requires that each employee
16   account for their time across funds?
17        MR. VAN DYCK:  Objection as to form.
18        THE WITNESS:  Yes.
19        Q.   (By Mr. Gilligan) * Okay.  And is that
20   also true that that is required as per the employee
21   handbook for Local 4 fund employees?
22        MR. VAN DYCK:  Objection as to form.
23        You can answer, if you know.
24        THE WITNESS:  What was the question?

App. 153

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

---

Page 97

Page

1    MR. GILLIGAN:  Can you read the question
2    back, please?
3
4          * (Question read)
5
6          (Exhibit 105, Handbook, marked)
7
8    Q.    (By Mr. Gilligan)  Ms. Alongi, you've
9    been handed what's been marked Exhibit 105.  I was
10   wondering if you could identify that document for me?
11   A.    This is the fund office employee
12   handbook.
13   Q.    And if you would, please, would you turn
14   to page four of Exhibit 105.  And if you look at --
15   toward the top third of the -- page four -- there's a
16   heading Weekly Time Sheet.
17   A.    Mm-hmm.
18   Q.    And am I correct, that it indicates
19   there, under all employees, exempt or nonexempt, that
20   work under the jurisdiction of more than one fund must
21   complete a weekly time sheet located in the fund's
22   public drive."
23   A.    I see that.
24   Q.    And that indicates all employees,

---

Page 98

Page

1    correct?
2    A.    Yes.
3    Q.    Okay.  And you were an employee of the
4    Local 4 funds, correct?
5    A.    Yes.
6    Q.    And you were an employee who worked for
7    more than one fund, correct?
8    A.    Yes.
9    Q.    So based on that, why would you not then
10   be filling out such a time sheet?
11   A.    Because my job duties didn't change.
12   And, you know, in the job descriptions that were
13   prepared, nothing said anything about time sheets in
14   those two job descriptions.  You know, this employee
15   handbook was prepared for my office staff.  We had
16   nothing, you know, for the the employees.  So this is
17   basically -- was done for the benefit of the employees.
18   Q.    But weren't you one of the employees?
19   A.    I was.
20   Q.    Okay.  And you reference job
21   descriptions.  What are you alluding it there?
22   A.    There were two job descriptions that were
23   prepared.  One, the content was pretty involved with
24   respect to my roles.  And the other one, a summary of

---

Page 99

Page

1    my job responsibilities and duties.  And nowhere, in my
2    specific job responsibility, was there a creation of a
3    time sheet.
4    Q.    Okay.
5    A.    A time sheet.
6    Q.    Those job descriptions, am I right that
7    those were circulated in conjunction with discussions
8    of your getting an employment contract with the Local 4
9    funds?
10   A.    Yes.
11   Q.    And when did that take place?
12   A.    I'm not sure.
13   Q.    Well, would it have been on or after
14   May 1st of 2018?
15   A.    Possibly.
16   Q.    Well, let me see if I can refresh your
17   recollection.  Those discussions occurred after you and
18   Mr. McLaughlin had the blowup on May 1, 2018; does
19   that --
20   A.    Yes.
21   Q.    -- ring a bell?  And following that, you
22   were looking for the security of an employment
23   contract; is that correct?
24   A.    Yes.

---

Page 100

1    Q.    Okay.  Were those -- well, number one,
2    what that employment contract ever entered into?
3    A.    No.
4    Q.    And were those job descriptions ever
5    officially adopted by the funds?
6          MR. VAN DYCK:  Objection as to form.
7          THE WITNESS:  Adopted by the funds or the
8    trustees or --
9    Q.    (By Mr. Gilligan)  The trustees.
10   A.    No, because we didn't enter into an
11   agreement.  But those two job description documents
12   have been around for a while.
13   Q.    You're saying, they were not created in
14   conjunction with the discussions about an employment
15   contract for you?
16   A.    I think they were edited.
17   Q.    Do you know when those job descriptions
18   were created, initially?
19   A.    My best estimate is, when we did a series
20   of compensation studies, the staff or I had to do job
21   descriptions.  And I think, one or both of them,
22   documents, in part, were created at some point and then
23   edited later.
24   Q.    You said a job study.

App.154

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 105

1  management letters?
2       A.   Yes, they did.
3       Q.   And when they did that, they didn't
4  present those to the trustees in person?
5       A.   No.  They would give me the management
6  rep. letter.  And then, I would take it to the specific
7  boards and point out anything that was of concern.
8       Q.   So, basically, you would present any
9  management letters.  And would you present the audit to
10  the trustees?
11       A.   I would.
12       Q.   Okay.  Was that true with KPMG as well?
13       A.   Based on my memory, I never saw KPMG.
14  They never came in the office.  And the reports that
15  they distributed, I believe that was the same process.
16  That they would send the reports in multiple cartons,
17  and I would distribute them to the trustees and do the
18  report.
19       Q.   You, yourself, you're not a CPA, correct?
20       A.   No, I'm not.  But I do have a CPA that
21  works for me.  And I spend hours and hours analyzing
22  the financial statements and did take classes at
23  Bentley on managerial accounting.  So I'm pretty
24  comfortable with balance sheets and income statements

Page 106

1  and what to look for.
2       Q.   Fair to say, you were the highest paid
3  person working for the funds when you were there,
4  correct?
5       A.   Yes.
6       Q.   And is it also fair to say, your salary
7  and benefits constitute a significant part of the funds
8  collective over all administrative expenses?
9            MR. VAN DYCK:  Objection.
10            THE WITNESS:  Yes.
11       Q.   (By Mr. Gilligan)  And I want -- I want
12  to just be crystal clear on a point.  Was the issue of
13  your not -- discontinuing filling out time sheets --
14  ever presented to the trustees at a meeting?
15       A.   I never presented it.
16       Q.   Who else would have, if anyone; you would
17  be the only person who'd present such a thing, right?
18       A.   It would have been in the management
19  letter or the audit.
20       Q.   Do you recall, specifically, at any time,
21  that there was a management letter or a reference in
22  the annual audit to your ceasing to do daily time
23  sheets?
24       A.   I don't recall.

Page 107

1            MR. GILLIGAN:  Can we take five minutes?
2            MR. VAN DYCK:  Yeah.  Lunch is not here
3  yet.
4
5            (A recess was taken)
6
7       Q.   (By Mr. Gilligan)  Back on.  So
8  Ms. Alongi, it's my understanding that in 2011, 2012,
9  the annuity fund had an issue with the IRS; do you
10  recall that?
11       A.   I'm trying to recall it.  But my mind is
12  blank right now.
13       Q.   Let me see if I can jog your memory.  Was
14  there an IRS audit, possibly, of the annuity fund?
15       A.   Give me a little more, please.
16       Q.   Was there ever an issue with respect to
17  the manner in which the annuity fund was providing
18  hardship distributions?
19       A.   I'm sorry, my mind is blank.
20       Q.   Okay.  Try to be even more specific.  My
21  understanding of the annuity fund, is it has a employer
22  contribution component?
23       A.   Yes.
24       Q.   Okay.

Page 108

1       A.   Oh I remember it now.
2       Q.   Okay.  Based on what we've discussed, can
3  you characterize what the issue was for me?
4       A.   I believe the hardship distributions were
5  coming out of the wrong bucket source.
6       Q.   Okay.
7       A.   That it was coming out of the annuity
8  versus the 401K.
9       Q.   And do you recall -- and that's
10  impermissible, right?
11       A.   Yes, yes.
12       Q.   What you're referring to, the annuity,
13  that's strictly employer contribution --
14       A.   The employer source versus the employee
15  source.
16       Q.   And the 401K component is a wage deferral
17  that's elective for the employee?
18       A.   Yes.
19       Q.   And it's your understanding that any
20  hardship distributions must come from that 401K bucket,
21  correct?
22       A.   Yes.
23       Q.   Okay.  So can you tell me with that as,
24  sort of, background, what the issue was with the fund --

App. 155

Ginamarie Alongi, et al. vs                                                                                  Gina Alongi
Iuoe Local 4 Health & Welfare Fund, et al.                                                               June 22, 2022

---

Page 113

1    A.    The suspension of benefits issue?
2    Q.    Yeah. With Slevin & Hart?
3    A.    I don't remember. If you can give me
4  some more information, I'll remember. But I --
5         MR. VAN DYCK: It's okay, if you don't
6  remember.
7    Q.    (By Mr. Gilligan) Do you recall the fund
8  having to pay additional benefits to people, as a
9  result of this particular mishap?
10   A.    Yes.
11   Q.    Okay.
12   A.    I remember that.
13   Q.    And do you recall the magnitude of that
14 correction?
15   A.    I know the amount was substantial. I
16 don't know what the exact amount was.
17   Q.    Would something on the order of
18 16 million sound correct to you?
19   A.    Yes.
20   Q.    Okay. And with that, sort of, by way of
21 background, do you recall dealing with Mr. Endick on
22 the issue and its resolution?
23   A.    My mind is blank.
24   Q.    Okay. And that wouldn't have changed the

---

Page 114

1  amount of time in a given year you spent on the pension
2  fund versus the other funds?
3    A.    Again, I had consultants in-house
4  counsel, two attorneys, and, you know, an assistant
5  that did the majority of the work.
6    Q.    And who was the assistant?
7    A.    Laura-Jean.
8    Q.    Okay. So Ms. Alongi, I'm looking at some
9  time allocations that Manzi has produced to us, which
10 have been shared with your counsel. And it looks to me
11 like 2014, the last quarter of 2014, September through
12 November 2014, you're attributing 29 percent of your
13 time to the health & welfare fund; 48.7776 percent of
14 your time to the pension fund; and 12.4667 percent of
15 your time to the annuity fund; does that sound
16 plausible?
17        MR. VAN DYCK: I just -- the witness
18        doesn't have the document in front of her.
19        MR. GILLIGAN: Yeah, no. Let's put it in
20        front of her. Let's mark this as --
21        MR. VAN DYCK: I'm sure you're accurately
22        representing --
23        MR. GILLIGAN: Yeah. No, no. Why don't
24        we get that marked.

---

Page 115

1         (Exhibit 106, Time Study, marked)
2
3    Q.    (By Mr. Gilligan) And again, Ms. Alongi,
4  could you identify Exhibit 106; have you ever seen this
5  document before?
6    A.    Yes.
7    Q.    Okay. And can you tell me what that
8  document is?
9    A.    It's a time study prepared by, I think,
10 Becky Zaccardi did the first pass at the calculation,
11 and then would send it over to Nancy to calculate it
12 further.
13   Q.    How would Becky Zacardi take the first
14 pass at this -- coming up with these calculations?
15   A.    From the time sheets.
16   Q.    And this is a period of time when you've
17 ceased doing time sheets yourself, correct?
18   A.    I don't know when that was.
19   Q.    Well, do you think you were keeping time
20 sheets in September through November 2014?
21   A.    I don't remember.
22   Q.    I believe you've testified you think you
23 stopped keeping the time sheets, maybe, in 2008; does
24 that jog your memory?

---

Page 116

1    A.    When Manzi said that there were small
2  adjustments to the admin. allocation percentages, in
3  2008, I believe.
4    Q.    Was there any correspondence on that, or
5  anything in writing that you recall from that period?
6    A.    From Manzi?
7    Q.    From Manzi?
8    A.    Saying that?
9    Q.    Yes.
10   A.    I thought there was something. I just
11 don't know where it is or what it was. I thought I
12 read something.
13   Q.    All right. So when Becky Zaccardi would
14 do this, would she talk to you at all; did she
15 interview you at all, about the distribution of your
16 time?
17   A.    No. She didn't interview me. But she
18 knew I wasn't doing time sheets.
19   Q.    My question is directed at how would
20 Becky have known how to apportion your time.
21   A.    I think what she did was she looked at
22 the prior -- was it a three-month or six-month study?
23 And then, once it went to Jeannie, you know, that's
24 when things would start being questioned. App. 156

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 117

1      Q.    And do you know what that process was
2  between Becky and Jeannie, or were you privy to that?
3      A.    No.  The only thing I actually received,
4  you know, because they'd go back and forth with it, the
5  only thing I received was the final, or what was
6  considered to be the final for review.
7      Q.    And when you got the final, was there any
8  conversation had with you, by either Becky Zaccardi or
9  Jeannie Mikal, about your time allocation?
10     A.    Well, you know, it was either Becky
11  and/or Jeannie depending upon when.  They would say,
12  does this look accurate, does this reflect.
13     Q.    And then, how would you make that
14  determination yourself?
15     A.    Based on the allocation to the other
16  funds.  You know, whether it's consistent, you know, in
17  the prior years.
18        MR. GILLIGAN:  Let's mark this 107.
19
20        (Exhibit 107, Time Study, marked)
21
22     Q.    (By Mr. Gilligan)  And Ms. Alongi, I'd
23  ask you to keep 106 handy as well.  I'm handing you
24  what's been marked Exhibit 107.  And I'd ask if you

Page 118

1  could identify that document?
2      A.    It's a time study done for April through
3  September, to be allocated the first of the year, 2016.
4      Q.    And let me draw your attention to the
5  allocation of your time in Exhibit 107 versus the same
6  thing in Exhibit 106.  Do you know notice the
7  difference?
8      A.    Mm-hmm.
9      Q.    And what is that difference?
10     A.    The pension plan went up almost
11  10 percent.
12     Q.    And was there a change on any of the
13  other funds of that similar magnitude?
14     A.    That health & welfare fund.
15     Q.    And what happened with the health &
16  welfare fund?
17     A.    It went down the 10 percent.
18     Q.    And to what do you attribute that?
19     A.    I think what happened was, in 2015, we
20  dismantled the health & welfare fund claims office.
21     Q.    Okay.
22     A.    So because I spent a lot of time, you
23  know, doing that particular responsibility, in 2015, we
24  increased the health & welfare fund, you know, by that

Page 119

1  10 percent.
2      Q.    Well, did you increase it in Exhibit 106,
3  or decrease it in Exhibit 107, I guess, is my question?
4      A.    Well, it was decreased in 107 to 19
5  percent.
6      Q.    Yes.
7      A.    From 29 percent.
8      Q.    Right.  And you're saying the elimination
9  of the claims payment department accounts for that?
10  I'm not trying to put words in your mouth.
11     A.    I believe so.  You know, in 2015, you
12  know, is when we dismantled the claims operation.
13     Q.    And is it true, that, when you dismantled
14  the claims operation, you also got rid of your health &
15  welfare manager?
16     A.    Yes.
17     Q.    So wouldn't it actually stand to reason
18  that your responsibilities might have increased because
19  the work that the health & welfare manager was doing is
20  no longer being done?
21     A.    No.
22     Q.    No?
23     A.    Because at that same period of time Greg
24  and Laura-Jean had asked to be promoted to assist me in

Page 120

1  some of these duties, because we lost the health &
2  welfare manager.
3
4        (Exhibit 108, Time Study, marked)
5
6      Q.    (By Mr. Gilligan)  Ms. Alongi, you've
7  been handed what's been marked as Exhibit 108.  Can you
8  identify that document?
9      A.    It's a time study for the period
10  June 2016 through October 2016 to be allocated
11  January 1st of 2017.
12     Q.    So that the allocation from that study
13  period is going to be used to determine a
14  administrative expense distribution for the entirety of
15  the next calendar year, correct, right?
16     A.    Yes.
17     Q.    Okay.  And looking at your own
18  allocations, Exhibit 108 is identical to Exhibit 107,
19  correct?
20     A.    Yes.
21     Q.    And these calculations, I mean, they
22  are -- with respect to, say, the pension fund, they are
23  very detailed.  58.7776 percent.  You see that?
24     A.    Mm-hmm.

App.157

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 129

1  meetings, how often were those held?
2      A.    Maybe, the same.  I can't really recall.
3  But, maybe, three or four a year.
4      Q.    In the duties that are set forth or
5  services, subpart B indicates "advise the members of
6  coalition of legislation events and issues of
7  importance to them."
8      A.    Yes.
9      Q.    How would you do that?
10     A.    We might have a presentation from Segal
11  or another firm.  For example, you know, on Cadillac
12  tax, you know, Pension Protection Act.  Whatever the
13  subject was, we would have an outside professional come
14  in.
15     Q.    And I see one of the other -- we skip to
16  D, for some reason.  But "to educate legislative and
17  executive federal and statement governments on matters
18  of importance," did you do that?
19     A.    What I would do is, you know, go to
20  the -- I worked closely with Frank Callahan from the
21  Mass. building trades.  And what we would do is, if he
22  was having a conference, I made sure I was there,
23  reported back to the coalition members, if it was any
24  topic of significance.  I'd have Frank Callahan come in

Page 130

1  to the coalition meetings and discuss these legislative
2  updates.
3      Q.    And then, you would -- you were also
4  charged with arranging for scheduled speakers of
5  interest coalition, did you to that?
6      A.    Yes.
7      Q.    And then, "represent the coalition on all
8  matters requested by the executive board," what would
9  that entail?
10     A.    If the executive board had a specific
11  project, you know, we discussed, you know, this big
12  wellness event, which, you know, wasn't the first.  We
13  had done many events in the past.  But a subject like
14  that, the executive board would discuss it first, make
15  the decision financially, if we had the money in the
16  budget.  And then, bring it to the regular board to
17  review.
18     Q.    Did you maintain the records of the
19  coalition; did you do that?
20     A.    Laura-Jean did that.
21     Q.    Laura-Jean did that.  Did the coalition
22  have an agreement with Laura-Jean?
23     A.    No.
24     Q.    So is it fair to say, you're the one who

Page 131

1  assigned that work to Laura-Jean?
2      A.    Yes.
3            MR. VAN DYCK:  Objection.
4      Q.    (By Mr. Gilligan)  "Filed required
5  reports with regulatory agencies."  Did you to that?
6      A.    I didn't do it specifically.
7      Q.    Who did?
8      A.    Rebecca Zacardi.
9      Q.    And do you know what those reports were?
10     A.    It was the Form 990.
11     Q.    And Rebecca Zaccardi is a Local 4 fund
12  office employee?
13     A.    CPA, yes.
14     Q.    She's a CPA.  But she works with the
15  Local 4 funds?
16     A.    Yes.
17     Q.    And, of course, Laura-Jean Hickey also
18  works for Local 4 funds?
19     A.    Yes.
20     Q.    And as far as Ms. Hickey maintaining the
21  records of the coalition at your discretion, those
22  records were kept where?
23     A.    At the fund office.
24     Q.    The Local 4 fund office, correct?

Page 132

1      A.    Yes.
2      Q.    Okay.  Did the coalition have office
3  space anywhere?
4      A.    The coalition had office space,
5  throughout the years prior to me taking over in 2007,
6  Lou Malzone from Local SEIU, Stationary Engineers Local
7  operating engineers -- or Stationary Engineers Local
8  877 was the executive director, there was an office
9  somewhere?
10           Prior to Lou Malzone, it was
11  Dave McGinnis from the plumbers was the executive
12  director of the coalition.
13           So, you know, going back in history, you
14  know, each fund administrator, you know, maintained an
15  office with coalition records in the trust fund.
16     Q.    So in your case, these records were kept
17  in the Local 4 fund office?
18     A.    Yes.
19     Q.    And turning to paragraph four of the
20  agreement, this was -- indicates you are being paid
21  20,000 annually for that work?
22     A.    Yes.
23     Q.    And looking at paragraph six, this
24  agreement was, as we've discussed, a three-App. 158

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Gina Marie Alongi Vol IV*

*July 14, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Page 3

1    COMMONWEALTH OF MASSACHUSETTS
2  NORFOLK, SS.          SUPERIOR COURT
3         CIVIL ACTION NO.: 2182CV00125
4
5  ***********************************************
6  GINAMARIE ALONGI AND ROSEMARIE ALONGI,       *
7         Plaintiffs        *
8  vs.                      *
9  IUOE LOCAL 4 HEALTH & WELFARE FUND, et al,  *
10        Defendants        *
11 ***********************************************
12
13
14
15    CONT'D DEPOSITION OF: GINA MARIE ALONGI
16         VOLUME IV
17       BOWDITCH & DEWEY, LLP
18      200 Crossing Boulevard
19    Framingham, Massachusetts  010702
20  July 14, 2022       10:08 a.m.
21
22
23      Brenda M. Ginisi
24      Court Reporter

Page 3

1  APPEARANCES CONT'D:
2  Also present:
3      Daniel Keenan, Esq.
4      Christopher J. Redd, Esq.
5      Jacob Tosti, Esq.
6      Rose Marie Alongi
7      Gregory Geiman, Esq.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 2

1  APPEARANCES:
2  Representing the Plaintiffs:
3      BOWDITCH & DEWEY, LLP
4      200 Crossing Boulevard
5      Framingham, Massachusetts  010702
6      BY:  TIMOTHY P. VAN DYCK, ESQ.
7      (617) 757-6536
8      E-mail: tvandyck@bowditch.com
9  Representing the Defendants:
10     FREEMAN MATHIS & GARY LLP
11     60 State Street, Suite 600
12     Boston, Massachusetts  02109
13     BY:  JENNIFER L. MARKOWSKI, ESQ.
14     (617) 963-5975
15     E-mail: jmarkowski@fmglaw.com
16 Representing the IUOE LOCAL 4:
17     O'DONOGHUE & O'DONOGHUE LLP
18     5301 Wisconsin Avenue, NW, Suite 800
19     Washington, DC  20015
20     BY:  CHARLES W. GILLIGAN, ESQ.
21     (202) 362-0041
22     E-mail: cgilligan@odonoghuelaw.com
23
24

Page 4

1         I N D E X
2
3  WITNESS:          GINA MARIE ALONGI
4
5  EXAMINATION BY:          PAGE:
6  Mr. Gilligan          5
7
8  EXHIBITS:          PAGE:
9  Exhibit 170, E-mail, July 12, 2017..................6
10 Exhibit 171, E-mail, August 19, 2016................9
11 Exhibit 172, E-mail, October 19, 2016..............13
12 Exhibit 173, Email, February 28,2019...............15
13 Exhibit 174, E-mail, July 22, 2015.................17
14 Exhibit 175, E-mail, April 25, 2016................22
15 Exhibit 176, E-mail, July 3, 2019..................24
16 Exhibit 177, E-mail, October 16, 2019..............28
17 Exhibit 178, E-mail, January 21, 2020..............31
18 Exhibit 179, E-mail, January 23, 2020..............34
19 Exhibit 180, Letter................................36
20 Exhibit 181, E-mail, January 30, 2020..............41
21 Exhibit 182, Trust Agreement.......................63
22 Exhibit 183, Time Sheet............................94
23 Exhibit 184, E-mail, April 23, 2018...............111
24 (Mr. Tosti retained exhibits)

App.160

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Confidential

Gina Marie Alongi
July 14, 2022

---

Page 69

**Page**

1    A.   Yes.

2         Q.   Okay.  Do you recall ever putting a trust

3    amendment on the agenda for any health & welfare fund

4    meetings?

5         A.   I remember putting it on one of the

6    agendas.  I don't know what fund.  And I know it was

7    based on a conversation I had with fund counsel,

8    Kate Shea, about oh we need to do an amendment for

9    this.

10        Q.   Okay.  Do you have an approximate time

11   frame?

12        A.   I don't.  And I think it could have been

13   more than one amendment over the years.

14        Q.   Did the amendment, in any way that you're

15   thinking of, alter the provisions of article six of the

16   health & welfare trust?

17        A.   I don't recall.

18        Q.   But as you sit here today, the vacation

19   time, to your knowledge, was never presented to the

20   full board of trustees, correct?

21             MR. VAN DYCK:  Objection.

22             THE WITNESS:  I don't recall it could

23        have.  I don't recall specifically.

24        Q.   (By Mr. Gilligan)  Well, if it was, it

---

Page 70

**Page**

1    would have been captured in minutes of a meeting,

2    correct?

3             MR. VAN DYCK:  Objection.  You may

4        answer.

5             THE WITNESS:  Yes.  But as I said

6        earlier, back in 2013, during that period of

7        time, it was just either Bill Ryan and

8        Jack Shaughnessy or Lou and Jack Shaughnessy,

9        who approved the increases.  So I'm not sure

10       whether it was ratified by the full board.

11        Q.   (By Mr. Gilligan)  And in 2013, it

12   wouldn't have been Bill Ryan, right; it would have been

13   Lou Rasetta?

14        A.   Yes.  But prior to 2013 it would have

15   been Bill Ryan.  This was a practice that was going on

16   prior to Lou.

17        Q.   And Bill Ryan ceased being the business

18   manager of Local 4 approximately when?

19        A.   I don't recall.

20        Q.   Would it have been around 2004, perhaps?

21        A.   Now that you said that, I think Lou came

22   in in 2005.

23        Q.   Okay.  Just to give you a frame of

24   reference, am I correct you became the executive

---

Page 71

**Page**

1    director of the Mass. coalition in 2007?

2        A.   Yes.

3        Q.   And to your knowledge, was Mr. Rasetta

4    already the business manager of Local 4 at that time?

5        A.   Yes.

6        Q.   Okay.

7        A.   Because, you know, he was proud of my

8    appointment.

9        Q.   Okay.  That is consistent with what I

10   thought so -- okay.  And you've testified, previously,

11   you and Mr. Rasetta had a sexual relationship?

12        A.   Yes.

13        Q.   And how long were you in a sexual

14   relationship with Mr. Rasetta?

15             MR. VAN DYCK:  Objection.  Asked and

16        answered.  You may answer again.

17             THE WITNESS:  Can I get clarification

18        with respect to that?

19        Q.   (By Mr. Gilligan)  Sure.  I'll try within

20   the realms of, you know, my own embarrassment level.

21   But no absolutely.  What can I clarify for you?

22        A.   When you say "sexual relationship," you

23   know, at one point we had a personal relationship and

24   it just didn't turn into a sexual relationship.  It was

---

Page 72

**Page**

1    more than a personal that went to the next stage but it

2    wasn't sexual.  So try and answer that one.

3        Q.   I shutter to think.  Were you, at any

4    point, having sex with Mr. Rasetta?

5        A.   I answered that question.  And I said

6    there were a few times that we went away together after

7    he was divorced.  And it was for three months or so

8    that we were in a personal to sexual relationship.

9        Q.   So you're saying it was three months not

10   a matter of years?

11        A.   We've been friends since he was the -- a

12   business agent and prior to that.

13        Q.   And you seem to indicate that -- and I'd

14   like to not belabor this but kind of need some clarity

15   on it.  You've indicated that a sexual relationship

16   involved going away to different places.  Would you

17   also have sex with Mr. Rasetta at your residence?

18        A.   No.

19             MR. VAN DYCK:  Objection.  These

20        questions have been asked and answered.  You may

21        answer again.

22             MR. GILLIGAN:  Okay.

23             MR. VAN DYCK:  But I just want the record

24        to be clear that she's already been through

App. 161

---

# **Exhibit 10**

EXHIBIT 96
ALONGI
06/22/2022   BG

| | |
|---|---|
| **From:** | Gina Alongi <galongi@Local4.org> |
| **Sent:** | Friday, July 25, 2003 5:05 PM |
| **To:** | Joyce Mader |
| **Cc:** | Mary Sullivan \(E-mail\); emanzi@emanziassociates.com; Susan Leblanc |
| **Subject:** | Allocation Adjustment |
| **Attachments:** | ADMIN-ADJ-DOL.XLS |

Joyce,

We finished our analysis of the admin allocation adjustment.  Attached please find the results, before this is released to Roberta let's talk about it.

Roberta was correct in her assumption on day 1 that the pension plan was owed 100K.  Sue will check with KPMG on whether we need to file amended 5500's.  We will get KPMG opinion in writing.

Joyce does the DOL plan on assessing any penalties for the prohibited transaction?   Also, what about excise tax that may be due?


*Gina M. Alongi*
*Administrator*
*Local 4 Fund Office*
*Tel: 781-861-1600 X11*
*Fax: 781-863-1719*

*This transmission contains information that may be confidential and privileged. Unless you are the intended recipient of this message (or authorized to receive it for the intended recipient), you may not copy, forward, or otherwise use it, or disclose its contents to anyone else. If you have received this transmission in error, please notify us immediately and delete it from your system.*

App.163

IUOE4 FED 7604

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | *UNROUNDED* | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | *ROUNDED* | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | *USED* | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | *Difference* | -0.11% | 1.00% | -0.44% | 0.56% | -0.22% | -0.44% | 0.11% | -0.44% | 0.00% |
| Total Common Exp. | *$8,070,727.82* | (8,967.48) | 80,707.28 | (35,869.90) | 44,837.38 | (17,934.95) | (35,869.90) | 8,967.48 | (35,869.90) | - |
| Interest | *26%* | (2,286.71) | 20,580.36 | (9,146.82) | 11,433.53 | (4,573.41) | (9,146.82) | 2,286.71 | (9,146.82) | - |
| Grand Total | | (11,254.18) | 101,287.63 | (45,016.73) | 56,270.91 | (22,508.36) | (45,016.73) | 11,254.18 | (45,016.73) | - |

**Total Interest**    **$34,300.59**

IUOE4 FED 7605

App. 164

IUOE LOCAL 4
SUMMARY OF COMMON EXPENSES

| | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | |
|---|---|---|---|---|---|---|---|
| TOTAL REALLOCATION SALARIES | 514,911.03 | 504,636.67 | 383,933.23 | 328,111.27 | 320,770.98 | 293,846.79 | |
| ALL REALOCATED PAYROLL TAXES | 280,817.71 | 261,397.54 | 201,918.38 | 213,639.85 | 218,774.52 | 170,648.46 | |
| GENERAL PENSION REALLOCATED | 67,287.87 | 38,494.59 | 44,684.25 | 62,693.82 | 59,429.68 | 56,305.68 | |
| FRINGES REALLOCATED | 257,460.85 | 250,891.17 | 197,679.48 | 167,954.77 | 166,372.43 | 206,346.32 | |
| COMMON EXPENSES | 467,764.50 | 562,985.98 | 506,661.00 | 567,693.00 | 385,344.00 | 311,272.00 | |
| GRAND TOTAL | 1,588,241.96 | 1,618,405.95 | 1,334,876.34 | 1,340,092.71 | 1,150,691.61 | 1,038,419.25 | 8,070,727.82 |

IUOE4 FED 7606

App.165

# **Exhibit 11**

| | |
|---|---|
| **From:** | Gina Alongi <galongi@Local4.org> |
| **Sent:** | Wednesday, July 30, 2003 10:34 PM |
| **To:** | Joyce Mader |
| **Cc:** | msullivan@segalroitman.com; mtsandfam@aol.com |
| **Subject:** | Allocation Calculations with Interest |
| **Attachments:** | Local4Interestcalc.XLS |



Joyce,

Attached please find the calculations using both approaches Mary identified earlier. <<Local4Interestcalc.XLS>>

The spreadsheet named "allocation adj by years (2)", appears to be the best approach.  Could you please clarify with Roberta if this is what she wants.

What time would be good for me to call you tomorrow?

Gina

*This transmission contains information that may be confidential and privileged. Unless you are the intended recipient of this message (or authorized to receive it for the intended recipient), you may not copy, forward, or otherwise use it, or disclose its contents to anyone else. If you have received this transmission in error, please notify us immediately and delete it from your system.*

App.167

IUOE4 FED 7607

KPMG Rounding Applied to all Years

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **1997** | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1997 | $1,038,419.25 | 1,153.80 | (10,384.19) | 4,615.20 | (5,769.00) | 2,307.60 | 4,615.20 | (1,153.80) | 4,615.20 | - |
| **1998** | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1998 | $1,150,691.61 | 1,278.55 | (11,506.92) | 5,114.18 | (6,392.73) | 2,557.09 | 5,114.18 | (1,278.55) | 5,114.18 | - |
| **1999** | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1999 | $1,340,092.71 | 1,488.99 | (13,400.93) | 5,955.97 | (7,444.96) | 2,977.98 | 5,955.97 | (1,488.99) | 5,955.97 | - |

IUOE4 FED 7608

App.168

KPMG Rounding Applied to all Years

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 2000 | $1,334,876.34 | 1,483.20 | (13,348.76) | 5,932.78 | (7,415.98) | 2,966.39 | 5,932.78 | (1,483.20) | 5,932.78 | - |
| 2001 | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 2001 | $1,618,405.95 | 1,798.23 | (16,184.06) | 7,192.92 | (8,991.14) | 3,596.46 | 7,192.92 | (1,798.23) | 7,192.92 | - |
| 2002 | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 2002 | $1,588,241.96 | 1,764.71 | (15,882.42) | 7,058.85 | (8,823.57) | 3,529.43 | 7,058.85 | (1,764.71) | 7,058.85 | - |
| GRAND TOTAL | $8,070,727.82 | 8,967.48 | (80,707.28) | 35,869.90 | (44,837.38) | 17,934.95 | 35,869.90 | (8,967.48) | 35,869.90 | - |

(    ) denotes monies owed to a Fund.

IUOE4 FED 7609

App.169

KPMG Rounding Applied to all Years

| H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|-----|-----|-----|-----|------|-----|-------|------|-------|

IUOE4 FED 7610

**Interest Allocation adjustment by Year**
**KPMG  Rounding applied to all years**

| | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **1997** principal due | 1,153.80 | (10,384.20) | 4,615.20 | (5,769.00) | 2,307.60 | 4,615.20 | (1,153.80) | 4,615.20 | 0.00 |
| interest | 308.56 | (2,777.01) | 1,234.23 | (1,542.79) | 617.11 | 1,234.23 | (308.56) | 1,234.23 | 0.00 |
| total due | 1,462.36 | (13,161.21) | 5,849.43 | (7,311.79) | 2,924.71 | 5,849.43 | (1,462.36) | 5,849.43 | 0.00 |
| | **H&W** | **PEN** | **ANN** | **A&T** | **DUES** | **SAC** | **CO-OP** | **FAIR** | **TOTAL** |
| **1998** principal due | 1,278.55 | (11,506.90) | 5,114.18 | (6,392.73) | 2,557.09 | 5,114.18 | (1,278.55) | 5,114.18 | 0.00 |
| interest | 274.61 | (2,471.46) | 1,098.43 | (1,373.04) | 549.21 | 1,098.43 | (274.61) | 1,098.43 | 0.00 |
| total due | 1,553.16 | (13,978.36) | 6,212.61 | (7,765.77) | 3,106.30 | 6,212.61 | (1,553.16) | 6,212.61 | 0.00 |
| | **H&W** | **PEN** | **ANN** | **A&T** | **DUES** | **SAC** | **CO-OP** | **FAIR** | **TOTAL** |
| **1999** principal due | 1,488.99 | (13,400.93) | 5,955.97 | (7,444.96) | 2,977.98 | 5,955.97 | (1,488.99) | 5,955.97 | 0.00 |
| interest | 244.67 | (2,202.08) | 978.70 | (1,223.37) | 489.35 | 978.70 | (244.67) | 978.70 | 0.00 |
| total due | 1,733.66 | (15,603.01) | 6,934.67 | (8,668.33) | 3,467.33 | 6,934.67 | (1,733.66) | 6,934.67 | 0.00 |
| | **H&W** | **PEN** | **ANN** | **A&T** | **DUES** | **SAC** | **CO-OP** | **FAIR** | **TOTAL** |
| **2000** principal due | 1,483.20 | (13,348.75) | 5,932.78 | (7,415.98) | 2,966.39 | 5,932.78 | (1,483.20) | 5,932.78 | 0.00 |
| interest | 171.99 | (1,547.91) | 687.96 | (859.95) | 343.98 | 687.96 | (171.99) | 687.96 | 0.00 |
| total due | 1,655.19 | (14,896.66) | 6,620.74 | (8,275.93) | 3,310.37 | 6,620.74 | (1,655.19) | 6,620.74 | 0.00 |
| | **H&W** | **PEN** | **ANN** | **A&T** | **DUES** | **SAC** | **CO-OP** | **FAIR** | **TOTAL** |
| **2001** principal due | 1,798.23 | (16,184.08) | 7,192.92 | (8,991.14) | 3,596.46 | 7,192.92 | (1,798.23) | 7,192.92 | 0.00 |
| interest | 125.17 | (1,126.48) | 500.66 | (625.83) | 250.33 | 500.66 | (125.17) | 500.66 | 0.00 |
| total due | 1,923.40 | (17,310.56) | 7,693.58 | (9,616.97) | 3,846.79 | 7,693.58 | (1,923.40) | 7,693.58 | 0.00 |
| | **H&W** | **PEN** | **ANN** | **A&T** | **DUES** | **SAC** | **CO-OP** | **FAIR** | **TOTAL** |
| **2002** principal due | 1,764.71 | (15,882.41) | 7,058.85 | (8,823.57) | 3,529.43 | 7,058.85 | (1,764.71) | 7,058.85 | 0.00 |
| interest | 44.43 | (399.85) | 177.71 | (222.14) | 88.86 | 177.71 | (44.43) | 177.71 | 0.00 |
| total due | 1,809.14 | (16,282.26) | 7,236.56 | (9,045.71) | 3,618.29 | 7,236.56 | (1,809.14) | 7,236.56 | 0.00 |
| **Grand Total P&I to be paid/owed** | 10,136.91 | (91,232.06) | 40,547.59 | (50,684.50) | 20,273.79 | 40,547.59 | (10,136.91) | 40,547.59 | 0.00 |
| **Principal due** | 8,967.48 | (80,707.27) | 35,869.90 | (44,837.38) | 17,934.95 | 35,869.90 | (8,967.48) | 35,869.90 | 0.00 |
| **Interest Due** | 1,169.43 | (10,524.79) | 4,677.69 | (5,847.12) | 2,338.84 | 4,677.69 | (1,169.43) | 4,677.69 | 0.00 |
| | 10,136.91 | (91,232.06) | 40,547.59 | (50,684.50) | 20,273.79 | 40,547.59 | (10,136.91) | 40,547.59 | 0.00 |

princ    (134,512.13)
intere   (17,541.34)
         (152,053.47)

IUOE4 FED 7611

App.171

KPMG rounding applied to 1997 to June 2001, SAC and Fair charged 1% each, with monies distributed to all funds.

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| **1997** | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1997 | $1,038,419.25 | 1,153.80 | (10,384.19) | 4,615.20 | (5,769.00) | 2,307.60 | 4,615.20 | (1,153.80) | 4,615.20 | - |
| **1998** | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1998 | $1,150,691.61 | 1,278.55 | (11,506.92) | 5,114.18 | (6,392.73) | 2,557.09 | 5,114.18 | (1,278.55) | 5,114.18 | - |
| **1999** | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1999 | $1,340,092.71 | 1,488.99 | (13,400.93) | 5,955.97 | (7,444.96) | 2,977.98 | 5,955.97 | (1,488.99) | 5,955.97 | - |
| **2000** | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 2000 | $1,334,876.34 | 1,483.20 | (13,348.76) | 5,932.78 | (7,415.98) | 2,966.39 | 5,932.78 | (1,483.20) | 5,932.78 | - |
| **JAN-JUNE 2001** | | | | | | | | | | |
| | UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.46% | 1.89% | 0.44% | 100.00% |
| | ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| | USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| | Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Tot Jan -June 2001 | $734,399.66 | 816.00 | (7,344.00) | 3,264.00 | (4,080.00) | 1,632.00 | 3,264.00 | (816.00) | 3,264.00 | - |
| | Difference | -0.33% | -0.33% | -0.33% | -0.33% | -0.33% | 1.00% | -0.33% | 1.00% | 0.00% |
| Total Jul-Dec 2001 | $884,006.29 | (2,946.69) | (2,946.69) | (2,946.69) | (2,946.69) | (2,946.69) | 8,840.06 | (2,946.69) | 8,840.06 | 0.00% |
| | Difference | -0.33% | -0.33% | -0.33% | -0.33% | -0.33% | 1.00% | -0.33% | 1.00% | 0.00% |
| Total 2002 | $1,588,241.96 | (5,294.14) | (5,294.14) | (5,294.14) | (5,294.14) | (5,294.14) | 15,882.42 | (5,294.14) | 15,882.42 | - |
| GRAND TOTAL | $8,070,727.82 | 926.39 | (61,278.94) | 19,587.99 | (36,396.00) | 7,146.93 | 40,764.55 | (11,514.67) | 40,764.55 | - |

( ) denotes monies owed to a fund

IUOE4 FED 7612

Interest Allocation adjustment by Year
KPMG  Rounding applied to 1997 to June 2001, SAC and Fair charged 1% each

|  |  | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
|  | 1997 principal due | 1,153.80 | (10,384.20) | 4,615.20 | (5,769.00) | 2,307.60 | 4,615.20 | (1,153.80) | 4,615.20 | 0.00 |
|  | interest | 308.56 | (2,777.01) | 1,234.23 | (1,542.79) | 617.11 | 1,234.23 | (308.56) | 1,234.23 | 0.00 |
|  | total due | 1,462.36 | (13,161.21) | 5,849.43 | (7,311.79) | 2,924.71 | 5,849.43 | (1,462.36) | 5,849.43 | 0.00 |
|  | 1998 principal due | 1,278.55 | (11,506.90) | 5,114.18 | (6,392.73) | 2,557.09 | 5,114.18 | (1,278.55) | 5,114.18 | 0.00 |
|  | interest | 274.61 | (2,471.46) | 1,098.43 | (1,373.04) | 549.21 | 1,098.43 | (274.61) | 1,098.43 | 0.00 |
|  | total due | 1,553.16 | (13,978.36) | 6,212.61 | (7,765.77) | 3,106.30 | 6,212.61 | (1,553.16) | 6,212.61 | 0.00 |
|  | 1999 principal due | 1,488.99 | (13,400.93) | 5,955.97 | (7,444.96) | 2,977.98 | 5,955.97 | (1,488.99) | 5,955.97 | 0.00 |
|  | interest | 244.67 | (2,202.08) | 978.70 | (1,223.37) | 489.35 | 978.70 | (244.67) | 978.70 | 0.00 |
|  | total due | 1,733.66 | (15,603.01) | 6,934.67 | (8,668.33) | 3,467.33 | 6,934.67 | (1,733.66) | 6,934.67 | 0.00 |
|  | 2000 principal due | 1,483.20 | (13,348.75) | 5,932.78 | (7,415.98) | 2,966.39 | 5,932.78 | (1,483.20) | 5,932.78 | 0.00 |
|  | interest | 171.99 | (1,547.91) | 687.96 | (859.95) | 343.98 | 687.96 | (171.99) | 687.96 | 0.00 |
|  | total due | 1,655.19 | (14,896.66) | 6,620.74 | (8,275.93) | 3,310.37 | 6,620.74 | (1,655.19) | 6,620.74 | 0.00 |
| Jan-June | 2001 principal due | 816.00 | (7,344.00) | 3,264.00 | (4,080.00) | 1,632.00 | 3,264.00 | (816.00) | 3,264.00 | 0.00 |
|  | interest | 75.51 | (679.59) | 302.04 | (377.55) | 151.02 | 302.04 | (75.51) | 302.04 | 0.00 |
|  | total due | 891.51 | (8,023.59) | 3,566.04 | (4,457.55) | 1,783.02 | 3,566.04 | (891.51) | 3,566.04 | 0.00 |
| Jul-Dec | 2001 principal due | (2,946.69) | (2,946.69) | (2,946.69) | (2,946.69) | (2,946.69) | 8,840.07 | (2,946.69) | 8,840.07 | 0.00 |
|  | interest | (205.10) | (205.10) | (205.10) | (205.10) | (205.10) | 615.30 | (205.10) | 615.30 | 0.00 |
|  | total due | (3,151.79) | (3,151.79) | (3,151.79) | (3,151.79) | (3,151.79) | 9,455.37 | (3,151.79) | 9,455.37 | 0.00 |
|  | 2002 principal due | (5,294.14) | (5,294.14) | (5,294.14) | (5,294.14) | (5,294.14) | 15,882.42 | (5,294.14) | 15,882.42 | 0.00 |
|  | interest | (133.29) | (133.29) | (133.29) | (133.29) | (133.29) | 399.87 | (133.29) | 399.87 | 0.00 |
|  | total due | (5,427.43) | (5,427.43) | (5,427.43) | (5,427.43) | (5,427.43) | 16,282.29 | (5,427.43) | 16,282.29 | 0.00 |

Grand Total P&I to be paid/owed

|  | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
|  | (1,283.34) | (74,242.05) | 20,604.27 | (45,058.59) | 6,012.51 | 54,921.15 | (15,875.10) | 54,921.15 | 0.00 |
| Principal due | (2,020.29) | (64,225.61) | 16,641.30 | (39,343.50) | 4,200.23 | 49,604.62 | (14,461.37) | 49,604.62 | 0.00 |
| Interest Due | 736.95 | (10,016.44) | 3,962.97 | (5,715.09) | 1,812.28 | 5,316.53 | (1,413.73) | 5,316.53 | 0.00 |
|  | (1,283.34) | (74,242.05) | 20,604.27 | (45,058.59) | 6,012.51 | 54,921.15 | (15,875.10) | 54,921.15 | 0.00 |

princ      (120,050.77)
interest    (16,408.31)
           (136,459.08)

IUOE4 FED 7613

IUOE LOCAL 4
SUMMARY OF COMMON EXPENSES

|  | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 |  |
|---|---|---|---|---|---|---|---|
| TOTAL REALLOCATION SALARIES | 514,911.03 | 504,636.67 | 383,933.23 | 328,111.27 | 320,770.98 | 293,846.79 |  |
| ALL REALOCATED PAYROLL TAXES | 280,817.71 | 261,397.54 | 201,918.38 | 213,639.85 | 218,774.52 | 170,648.46 |  |
| GENERAL PENSION REALLOCATED | 67,287.87 | 38,494.59 | 44,684.25 | 62,693.82 | 59,429.68 | 56,305.68 |  |
| FRINGES REALLOCATED | 257,460.85 | 250,891.17 | 197,679.48 | 167,954.77 | 166,372.43 | 206,346.32 |  |
| COMMON EXPENSES | 467,764.50 | 562,985.98 | 506,661.00 | 567,693.00 | 385,344.00 | 311,272.00 |  |
| GRAND TOTAL | 1,588,241.96 | 1,618,405.95 | 1,334,876.34 | 1,340,092.71 | 1,150,691.61 | 1,038,419.25 | 8,070,727.82 |

IUOE4 FED 7614

# **<u>Exhibit 12</u>**

EXHIBIT 98

ALONGI

06/22/2022    BG

**From:** Gina Alongi [mailto:galongi@Local4.org]
**Sent:** Thursday, July 31, 2003 4:34 PM
**To:** Joyce Mader <jmader@odonoghuelaw.com>
**Cc:** Mary Sullivan \(E-mail\) <msullivan@segalroitman.com>; mtsandfam@aol.com
**Subject:** Admin Calculations

Joyce,

The attached represents what Roberta proposed in her July 31, 2003 letter.  Maybe we should send this tomorrow after Mary gets a chance to review it.   The numbers for the Non-Erisa Funds have changed considerable since the earlier calculations.  The Dues Fund now owes $50,624.45, SAC $44,626.08 and Fair $42,052.32.

Oh by the way, Roberta rounded the SAC and the Fair to .45% vs .4444%.  Just for the record, no one is perfect.

1

<u>App.176</u>

IUOE4 FED 7432

**Gina M. Alongi**
**Administrator**
**Local 4 Fund Office**
Tel: 781-861-1600 X11
Fax: 781-863-1719

*This transmission contains information that may be confidential and privileged. Unless you are the intended recipient of this message (or authorized to receive it for the intended recipient), you may not copy, forward, or otherwise use it, or disclose its contents to anyone else. If you have received this transmission in error, please notify us immediately and delete it from your system.*

2

App.177
IUOE4 FED 7433

KPMG rounding applied to 1997 to June 2001, SAC and Fair charged 1% each, with monies distributed to all fund

| | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **1997** | | | | | | | | | |
| UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1997 $1,038,419.25 | 1,153.80 | (10,384.19) | 4,615.20 | (5,769.00) | 2,307.60 | 4,615.20 | (1,153.80) | 4,615.20 | - |
| **1998** | | | | | | | | | |
| UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1998 $1,150,691.61 | 1,278.55 | (11,506.92) | 5,114.18 | (6,392.73) | 2,557.09 | 5,114.18 | (1,278.55) | 5,114.18 | - |
| **1999** | | | | | | | | | |
| UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 1999 $1,240,092.71 | 1,488.99 | (13,400.93) | 5,955.97 | (7,444.96) | 2,977.98 | 5,955.97 | (1,488.99) | 5,955.97 | - |
| **2000 \*\*** | | | | | | | | | |
| UNROUNDED | 47.11111% | 43.0000% | 5.44444% | 0.44444% | 1.22222% | 0.4444% | 1.88889% | 0.44% | 100.00% |
| ROUNDED | 47% | 43.00% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Total 2000 $1,334,876.34 | 1,483.20 | (13,348.76) | 5,932.78 | (7,415.98) | 2,966.39 | 5,932.78 | (1,483.20) | 5,932.78 | - |
| **JAN-JUNE 2001** | | | | | | | | | |
| UNROUNDED | 47.11% | 43.00% | 5.44% | 0.44% | 1.22% | 0.44% | 1.89% | 0.44% | 100.00% |
| ROUNDED | 47% | 43% | 5% | 0% | 1% | 0% | 2% | 0% | 100% |
| USED | 47% | 44% | 5% | 1% | 1% | 0% | 2% | 0% | 100% |
| Difference | 0.11% | -1.00% | 0.44% | -0.56% | 0.22% | 0.44% | -0.11% | 0.44% | 0.00% |
| Tot Jan-June 2001 $734,399.66 | 816.00 | (7,344.00) | 3,264.00 | (4,080.00) | 1,632.00 | 3,264.00 | (816.00) | 3,264.00 | - |
| UNROUNDED | 35.70% | 34.10% | 12.10% | 4.20% | 5.40% | 0.60% | 7.40% | 0.50% | 100.00% |
| ROUNDED | 38% | 38% | 8% | 4% | 4% | 0% | 8% | 0% | 100% |
| USED | 38% | 38% | 8% | 4% | 4% | 0% | 8% | 0% | 100% |
| Difference | -2.30% | -3.90% | 4.10% | 0.20% | 1.40% | 0.60% | -0.60% | 0.50% | 0.00% |
| Total Jul-Dec 2001 $884,006.29 | (20,332.14) | (34,476.25) | 36,244.26 | 1,768.01 | 12,376.09 | 5,304.04 | (5,304.04) | 4,420.03 | - |
| UNROUNDED | 35.70% | 34.10% | 12.10% | 4.20% | 5.40% | 0.60% | 7.40% | 0.50% | 100.00% |
| ROUNDED | 38% | 38% | 8% | 4% | 4% | 0% | 8% | 0% | 100% |
| USED | 38% | 38% | 8% | 4% | 4% | 0% | 8% | 0% | 100% |
| Difference | -2.30% | -3.90% | 4.10% | 0.20% | 1.40% | 0.60% | -0.60% | 0.50% | 0.00% |
| Total 2002 $1,588,241.96 | (36,529.57) | (61,941.44) | 65,117.92 | 3,176.48 | 22,235.39 | 9,529.45 | (9,529.45) | 7,941.21 | - |
| GRAND TOTAL $8,070,727.82 | (60,641.18) | (152,402.48) | 126,244.31 | (26,168.17) | 47,052.54 | 39,715.62 | (21,054.03) | 37,243.37 | - |

( ) denotes monies owed a fund
\*\* Unrounded

IUOE4 FED 7434

App.178

Interest Allocation adjustment by Year

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1997 | principal due | 1,153.80 | (10,384.20) | 4,615.20 | (5,769.00) | 2,307.60 | 4,615.20 | (1,153.80) | 4,615.20 | 0.00 |
| | interest | 308.56 | (2,777.01) | 1,234.23 | (1,542.79) | 617.11 | 1,234.23 | (308.56) | 1,234.23 | 0.00 |
| | total due | 1,462.36 | (13,161.21) | 5,849.43 | (7,311.79) | 2,924.71 | 5,849.43 | (1,462.36) | 5,849.43 | 0.00 |

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | principal due | 1,278.55 | (11,506.90) | 5,114.18 | (6,392.73) | 2,557.09 | 5,114.18 | (1,278.55) | 5,114.18 | 0.00 |
| | interest | 274.61 | (2,471.46) | 1,098.43 | (1,373.04) | 549.21 | 1,098.43 | (274.61) | 1,098.43 | 0.00 |
| | total due | 1,553.16 | (13,978.36) | 6,212.61 | (7,765.77) | 3,106.30 | 6,212.61 | (1,553.16) | 6,212.61 | 0.00 |

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1999 | principal due | 1,488.99 | (13,400.93) | 5,955.97 | (7,444.96) | 2,977.98 | 5,955.97 | (1,488.99) | 5,955.97 | 0.00 |
| | interest | 244.67 | (2,202.08) | 978.70 | (1,223.37) | 489.35 | 978.70 | (244.67) | 978.70 | 0.00 |
| | total due | 1,733.66 | (15,603.01) | 6,934.67 | (8,668.33) | 3,467.33 | 6,934.67 | (1,733.66) | 6,934.67 | 0.00 |

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | principal due | 1,483.20 | (13,348.75) | 5,932.78 | (7,415.98) | 2,966.39 | 5,932.78 | (1,483.20) | 5,932.78 | 0.00 |
| | interest | 171.99 | (1,547.91) | 687.96 | (859.95) | 343.98 | 687.96 | (171.99) | 687.96 | 0.00 |
| | total due | 1,655.19 | (14,896.66) | 6,620.74 | (8,275.93) | 3,310.37 | 6,620.74 | (1,655.19) | 6,620.74 | 0.00 |

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | principal due | 816.00 | (7,344.00) | 3,264.00 | (4,080.00) | 1,632.00 | 3,264.00 | (816.00) | 3,264.00 | 0.00 |
| Jan-Jun | interest | 75.51 | (679.59) | 302.04 | (377.55) | 151.02 | 302.04 | (75.51) | 302.04 | 0.00 |
| | total due | 891.51 | (8,023.59) | 3,566.04 | (4,457.55) | 1,783.02 | 3,566.04 | (891.51) | 3,566.04 | 0.00 |

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | principal due | (26,332.14) | (34,476.25) | 36,244.26 | 1,768.01 | 12,376.09 | 5,304.04 | (5,304.04) | 4,420.03 | 0.00 |
| Jul-Dec | interest | (1,415.21) | (2,399.72) | 2,522.77 | 123.06 | 861.44 | 369.19 | (369.19) | 307.66 | 0.00 |
| | total due | (21,747.35) | (36,875.97) | 38,767.03 | 1,891.07 | 13,237.53 | 5,673.23 | (5,673.23) | 4,727.69 | 0.00 |

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| 2002 | principal due | (36,529.57) | (61,941.43) | 65,117.92 | 3,176.48 | 22,335.39 | 9,529.45 | (9,529.45) | 7,941.21 | 0.00 |
| | interest | (919.67) | (1,559.44) | 1,639.41 | 79.97 | 559.80 | 239.91 | (239.91) | 199.93 | 0.00 |
| | total due | (37,449.24) | (63,500.87) | 66,757.33 | 3,256.45 | 22,795.19 | 9,769.36 | (9,769.36) | 8,141.14 | 0.00 |

| | | H&W | PEN | ANN | A&T | DUES | SAC | CO-OP | FAIR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|
| Grand Total P&I to be paid/owed | | (51,900.71) | (166,039.67) | 134,707.85 | (31,331.85) | 50,624.45 | 44,626.08 | (22,738.47) | 42,052.32 | 0.00 |
| | Principal due | (50,641.17) | (152,402.46) | 126,244.31 | (26,158.18) | 47,052.54 | 39,715.62 | (21,054.03) | 37,243.37 | 0.00 |
| | Interest Due | (1,259.54) | (13,637.21) | 8,463.54 | (5,173.67) | 3,571.91 | 4,910.46 | (1,684.44) | 4,808.95 | 0.00 |
| | | (51,900.71) | (166,039.67) | 134,707.85 | (31,331.85) | 50,624.45 | 44,626.08 | (22,738.47) | 42,052.32 | 0.00 |

| | | |
|---|---|---|
| princ | (250,255.84) | |
| interest | (21,754.86) | |
| | (272,010.70) | |

IUOE4 FED 7435

App.179

IUOE LOCAL 4
SUMMARY OF COMMON EXPENSES

|  | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | |
|---|---|---|---|---|---|---|---|
| TOTAL REALLOCATION SALARIES | 514,911.03 | 504,636.67 | 383,933.23 | 328,111.27 | 320,770.98 | 293,846.79 | |
| ALL REALOCATED PAYROLL TAXES | 280,817.71 | 261,397.54 | 201,918.38 | 213,639.85 | 218,774.52 | 170,648.46 | |
| GENERAL PENSION REALLOCATED | 67,287.87 | 38,494.59 | 44,684.25 | 62,693.82 | 59,429.68 | 56,305.68 | |
| FRINGES REALLOCATED | 257,460.85 | 250,891.17 | 197,679.48 | 167,954.77 | 166,372.43 | 206,346.32 | |
| COMMON EXPENSES | 467,764.50 | 562,985.98 | 506,661.00 | 567,693.00 | 385,344.00 | 311,272.00 | |
| GRAND TOTAL | 1,588,241.96 | 1,618,405.95 | 1,334,876.34 | 1,340,092.71 | 1,150,691.61 | 1,038,419.25 | 8,070,727.82 |

IUOE4 FED 7436

# **Exhibit 13**

EXHIBIT 99

ALONGI

06/22/2022   BG

**From:**      Joyce Mader <jmader@odonoghuelaw.com>
**Sent:**      Friday, August 1, 2003 1:42 PM
**To:**        Roberta Muench
**Cc:**        galongi@Local4.org; MSullivan@SegalRoitman.com
**Subject:**   IUOE Local 4

Roberta,

Gina reminded that the Trustees she has provided to you are the current Trustees.  If, in addition,  you want the names of former Trustees, please let her know.

Next week while I am gone, please copy any correspondence to Gina and Mary so that they may start working on it immediately.

We will be providing you with the results of the reallocation for your review.  Gina and Mary are concerned that the allocation does not take into account the considerable time spent on HIPAA compliance for the welfare fund.  They want you to see and be comfortable with the results of the reallocation before the assets are transferred.

I will be here the rest of the day and will be checking my voice mails next week.

Joyce A. Mader
O'Donoghue & O'Donoghue
4748 Wisconsin Avenue, N.W.
Washington, DC 20016
Phone:    (202) 362-0041
Facsimile: (202) 362-2640
E-Mail:  jmader@odonoghuelaw.com

App.182
IUOE4 FED 7827

# **Exhibit 14**



**From:** Gina Alongi [mailto:galongi@Local4.org]
**Sent:** Monday, August 4, 2003 6:22 PM
**To:** Mary Sullivan \(E-mail\) <msullivan@segalroitman.com>
**Cc:** Joyce Mader <jmader@odonoghuelaw.com>; emanzi@manziassociates.com
**Subject:** Outstanding Issues from DOL Audit

<u>App.184</u>

IUOE4 FED 7448

Mary/Joyce

The following is a list of items we have outstanding to date:


1. Admin Allocation ( Manzi Time Study)
2. Adjustments to Allocation (How often, Timesheets, Etc)
3. 401K Delinquency Issue
4. Interest Calculation and Collection
5. ADP Testing Annuity Plan (Revise all Participation Agreements)
6. DOL Penalties IRS Excise Tax ??
7. Trustee Exp. Reimbursement Policy
8. Admin Sharing Agreement (Common Expenses)
9. Alcohol Policy
10. American Express Policy
11. Petty Cash Policy
12. Admin Budget - Bagels, B-Cakes, Etc.
13. Review Fiduciary Liability Policy
14. Sign off on the Financial Statements


Am I missing anything.



**Gina M. Alongi**
**Administrator**
**Local 4 Fund Office**
Tel: 781-861-1600 X11
Fax: 781-863-1719



*This transmission contains information that may be confidential and privileged. Unless you are the intended recipient of this message (or authorized to receive it for the intended recipient), you may not copy, forward, or otherwise use it, or disclose its contents to anyone else. If you have received this transmission in error, please notify us immediately and delete it from your system.*

App.185

IUOE4 FED 7449

# **Exhibit 15**



**From:** Gina Alongi [mailto:galongi@Local4.org]
**Sent:** Monday, December 29, 2003 12:33 PM
**To:** msullivan@segalroitman.com
**Cc:** emanzi@manziassociates.com; Joyce Mader <jmader@odonoghuelaw.com>
**Subject:**

Mary,

Attached please find the proposed time sheet for implementation January 5, 2004 to
record our employees time.  I would appreciate your comments


Gina

1

App.187

IUOE4 FED 7452

*Gina M. Alongi*
*Administrator*
*Local 4 Health and Welfare, Pension, and Annuity Funds*
*177 Bedford Street*
*Lexington, MA. 02420*
*781-861-1600 X11*



*This transmission contains information that may be confidential and privileged. Unless you are the intended recipient of this message (or authorized to receive it for the intended recipient), you may not copy, forward, or otherwise use it, or disclose its contents to anyone else. If you have received this transmission in error, please notify us immediately and delete it from your system.*

App. 188

IUOE4 FED 7453

*Local 4 Fund Office*

*Weekly Timesheet*

*By Fund*

Name: _____

| Date | Time in .25 .50 .75 1 | Brief Description | Enter code - ALL,HW, PEN, ANN, AT, CO, SAC,FAIR,DUES |
|------|----------------------|-------------------|------------------------------------------------------|
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |
|      |                      |                   |                                                      |

App.189

IUOE4 FED 7454



**Proposed**
**Time Sheet Solution**

### *Effective January 5, 2004*

Starting January 5, 2004, all employees that work on more than one fund must account for their time. To make this process easy for the employee and to ensure we have accurate data to report to the auditors, the timesheets must be located in a central file. My recommendation for this process is as follows:

A modified version of the timesheet will be created and placed beside each employee's workstation. (Example 1, file attachment) During the day as the employee works on different funds, they will be responsible to track their time in .15 minute intervals on the "paper" form. At the end of each week it will be up to each employee to give their timesheet to Laura-Jean for data entry into the master timesheet database (Example 2.) Laura-Jean will hold each employee accountable to turn the timesheet in with a reminder e-mail on each Friday. If an individual does not turn in their timesheet, Laura-Jean will be instructed to notify the administrator for appropriate action.

Example 2. *Online Access database located on Laura-Jean's desktop*

The Access database will have the attached example 1 timesheet format with the exception of the "enter code" field. This field will be a drop down box with each fund. This will make it more user friendly to key from the paper timesheet into the database. At the end of the week Laura-Jean will be responsible to enter the data into the database.

When Laura- Jean opens the Access database it will give her a menu with the following options:

1. Enter timesheet data
2. Create report by fund
3. Create report by name
4. etc.
5. Exit

Upon request reports will be generated from this database based upon the above.

IUOE4 FED 7455

**Exhibit 16**

DONALD J. SIEGEL
PAUL F. KELLY
KATHRYN S. SHEA
ELIZABETH ARIENTI SLOANE
NICOLE HORBERG DECTER*
JAMES A. W. SHAW**
JOCELYN B. JONES
NATHAN P. GOLDSTEIN*
NANCY J. SMITH
JASPER GRONER
PAIGE W. McKISSOCK
SASHA N. GILLIN
SOPHIE C. ESQUIER

# SEGAL ROITMAN, LLP

COUNSELLORS AT LAW
33 HARRISON AVENUE
SEVENTH FLOOR
BOSTON, MASSACHUSETTS 02111
www.segalroitman.com

ROBERT M. SEGAL (1915-1999)
HAROLD B. ROITMAN (1913-2011)

JOSEPH P. McKENNA, JR., OF COUNSEL

*Also admitted to the
New York Bar
**Also admitted to the
New Hampshire Bar



## MINUTES OF SPECIAL MEETING OF TRUSTEES
## I.U.O.E. LOCAL 4 HEALTH & WELFARE FUND

### July 21, 2020

A special meeting of the Trustees of the I.U.O.E Local 4 Health and Welfare Fund was
called to order beginning at 2:00 p.m. These minutes are to be held in confidence unless permission
is obtained from the subcommittee of Trustees.

*Those Trustees present were:*

**William D. McLaughlin, Chairman**      **James Reger**
**David Fantini**                        **Angelo Colasante**
**Paul Diminico**                        **David Marr, Jr.**

*Also present was:*

**Kathryn S. Shea**                      **Segal Roitman, LLP, Fund Counsel**

A special meeting of the Board of Trustees by videoconference was called to order to
discuss the work performance of Fund Administrator Gina M. Alongi.

The Trustees reviewed the Administrator's work performance and found that it has been
unsatisfactory. Recent events have disclosed serious problems of which the Trustees had not
previously been aware.

Since the start of the shutdown due to the COVID-19 pandemic, Administrator Alongi has
been working from home. After the Fund Office reopened, some of the Fund staff have continued
to work remotely. Those employees submit weekly reports of the work they do at home.
Administrator Alongi's reports were sent to the Chairman. Her reports included work for the
Coalition of Taft Hartley Funds ("Coalition"), of which she is a director and receives a salary. She
is supposed to do that work on her own time, not on the Funds' time.

The Chairman inquired further and found that Administrator Alongi spends a significant
portion of the Funds' regular business day on Coalition business, particularly in the weeks leading

App.192

up to Coalition networking events. In particular, she spends a lot of time on the telephone on Coalition business during regular Fund hours. Administrator Alongi directs staff members to do Coalition work during regular business hours at the Fund Office, including work on Coalition event planning, Coalition website, and Coalition financial accounting. Although the Trustees were aware that Administrator Alongi served as a director of the Coalition and was paid by the Coalition, they were unaware of the magnitude of Coalition work that was performed by Administrator Alongi and her staff during regular business hours at the Fund Office. The only payment by the Coalition to the Funds is a $400 annual "rent."

The Chairman also learned that Administrator Alongi had committed $30,000 of the Local 4 Health Plan's wellness credit from Blue Cross Blue Shield to a Coalition wellness event to be held in March 2020. The payment from the Local 4 Health Plan was to help defray the costs of various tables and vendors that had been invited to the Coalition event. Administrator Alongi did not inform the Trustees or seek the Trustees' approval of this $30,000 payment. Due to the COVID-19 pandemic shutdown, the Coalition event was cancelled and the payment was not made.

The Trustees discussed that their meeting materials did not include the check register which the Administrator had represented was submitted to the Board at each Trustees' meeting. Administrator Alongi did submit certain expenses to the Trustees for approval, but upon inquiry it appears that not all expenses were submitted to the Trustees for approval.

The Trustees also learned that Administrator Alongi did not fill out daily time sheets, as every other Fund employee does, to keep track of the amount of time spent on work for the different funds. These time sheets provide the basis for the Funds' independent auditor to calculate the allocation of common Fund Office expenses among the different funds. Without any time sheets from Administrator Alongi, the auditor's allocation of expenses may not have been accurate. Administrator Alongi's failure to fill out time sheets or account for her time in any other way was not known to the Trustees until after the COVID-19 pandemic shutdown.

The Trustees discussed the cyber security problems that arose on May 23, 2020. The Funds' cyber liability insurer Beazley provided special counsel, forensic experts, and reimbursement of the Funds' expenses related to the cyber security issues. The forensic experts investigated the issues and determined that there had been no breach of confidential information of any kind.

From the outset, special counsel advised everyone to keep the information confidential until after the forensic investigation to avoid making any inaccurate representations. However, early in the investigation, Administrator Alongi disclosed details to a Fund administrator of her acquaintance. In a conference call on May 29, 2020 attended by special counsel, forensic experts, Fund staff, and Fund counsel, Administrator Alongi said she had a "confession" to make and admitted that she told her acquaintance that Local 4 Funds had experienced a ransomware attack. On July 21, 2020, Administrator Alongi made a second unauthorized disclosure of the cyber security issues.

The cyber security investigation disclosed Administrator Alongi's lack of oversight of the Fund Office. Administrator Alongi had hired her sister Rosemarie Alongi to be the Funds' security officer in 2005 and promoted her to be manager of the Funds' I.T. Department in 2019. In late 2019, Administrator Alongi and her sister were fighting and not speaking. Their fight continued and they were still not speaking until after the COVID-19 shutdown. As a result, Administrator

Alongi had essentially no oversight of the Funds' I.T. Department from late 2019 through July 20, 2020. The Trustees were not aware of this situation between Administrator Alongi and her sister.

The Trustees had approved the expense of using a cyber security monitoring service called Rapid7. Without any disclosure to or approval by the Trustees, in early 2020, Rosemarie Alongi changed the Funds' monitoring service from Rapid7 to Managed Engine, a less robust service. Managed Engine did not detect the threat actor that had entered the system in April 2020 and was not discovered until the threat actor disabled the system on May 23, 2020.

During the COVID-19 shutdown, Fund Office staff worked remotely using Fund laptops and other Fund equipment. Rosemarie Alongi set up everyone's remote access using single factor authentication (username and password). Single factor authentication is vulnerable to hacking by brute force attack and other means.

In a discussion with the forensic expert and special counsel, the Chairman was informed that the threat actor's entry into the system would likely have been prevented by multi-factor authentication and would have been discovered quickly by a more robust monitoring service such as Carbon Black. On the advice of the forensic experts, multi-factor authentication was implemented and Carbon Black monitoring service was engaged.

As it turned out, there was no breach of confidential information. However, the Funds' computer system was unavailable for approximately four weeks. At the start, Administrator Alongi told Vitech, the Funds' data service provider, that the Funds had been hit by a ransomware attack and had all their data encrypted. Vitech immediately cut off the Funds' access to the Funds' data in Vitech. Remittance reports could not be electronically submitted by employers and eligibility data had to be obtained by phone calls to Vitech personnel who would perform searches upon request. There was enormous disruption to Fund operations for approximately four weeks.

Administrator Alongi had given her sister the responsibility for designing the Funds' disaster recovery set up. The disaster recovery set up was unavailable and did not provide any disaster relief.

Cyber security problems can occur with the best-designed systems. However, the Administrator's failure to oversee the I.T. Department and request the Trustees' approval of the change from Rapid7 to Managed Engine demonstrates poor management.

During the COVID-19 pandemic shutdown, Trustee Fogarty was contacted by a participant whose daughter needed surgery. The participant had earned his 500 hours towards eligibility under the Supplemental Plan, but it was five days' short of the first of the month after the month in which he reached 500 hours and technically the surgery would not be covered. This was brought to the attention of Associate Administrator Gregory Geiman. Associate Administrator Geiman discussed various possible solutions with the Administrator and Fund counsel, including an appeal and/or plan amendment. The Trustees were in favor of a plan amendment to address this situation and any similar situations. Administrator Alongi became adamant that the participant would have to make some payment to the Fund. She presented the Trustees with an amendment requiring payment by the participant. The Trustees were unaware that payment was not a necessary condition and that it was being required by Administrator Alongi. Upon inquiry, the Chairman learned that no payment was necessary, and the plan amendment, which had been voted on, was changed and required a

3

second vote. Withholding information and not giving the Trustees a chance to review all the options shows a lack of judgment and an incorrect understanding of her role.

The Trustees discussed their responsibility as fiduciaries of the Fund to make prudent decisions in the best interests of the Fund's participants and beneficiaries. The Trustees reviewed Administrator Alongi's work performance, the waste and potential waste of Plan assets ($30,000 wellness credit, Coalition business during regular Fund work hours), mismanagement of the Fund Office (failure to fill out time sheets for proper expense allocation, failure to oversee I.T. Department), breach of confidentiality (premature cyber security disclosures), and withholding information from Trustees (failure to submit check registers, failure to inform Trustees of plan amendment options). The Trustees agreed that such serious problems mandate termination of Administrator Alongi's employment and her removal as Fund Administrator.

> **A MOTION was made, was seconded, and UNANIMOUSLY carried to terminate the employment of Gina Alongi and remove her as Fund Administrator, effective July 21, 2020, and authorize a subcommittee of the Board of Trustees of the Health & Welfare Plan to communicate to Ms. Alongi the Trustees' decision after taking all prudent steps to secure Fund assets and systems.**

The Trustees then discussed the best way to ensure proper administration of the Fund. The Trustees discussed the qualifications and long service of Associate Administrator Gregory A. Geiman to succeed Ms. Alongi as Fund Administrator. Associate Administrator Geiman is well known to the Trustees. The Trustees expressed their trust and confidence in his managerial abilities, his work ethic, his knowledge of the Trust and Plan documents, and the good judgment and discretion he has shown over his ten years of service to the Funds.

> **A MOTION was made, was seconded, and UNANIMOUSLY carried to appoint Gregory A. Geiman to be the Fund Administrator, effective immediately, at his current salary, which will be reviewed at the next regular meeting of the Health & Welfare Plan.**

> **A MOTION was made, was seconded, and UNANIMOUSLY carried to adjourn the meeting.**

Respectfully submitted,

/s/ Kathryn S. Shea
Kathryn S. Shea
Segal Roitman, LLP
33 Harrison Avenue, 7th Floor
Boston, MA 02111
kshea@segalroitman.com
Cell phone 617-851-4350

4

App.195

# **Exhibit 17**

EXHIBIT 110
ALONGI
06/22/2022   BG

Form **990-EZ**

**Short Form**
**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public.

▶ Information about Form 990-EZ and its instructions is at *www.irs.gov/form990*.

Department of the Treasury
Internal Revenue Service

OMB No 1545-1150

**2016**

**Open to Public Inspection**

**A** For the 2016 calendar year, or tax year beginning _____ , 2016, and ending _____ , 20 _____

| **B** Check if applicable | **C** Name of organization | **D** Employer identification number |
|---|---|---|
| ☐ Address change | MASSACHUSETTS COALITION OF TAFT-HARTLEY TRUST FUNDS | 04-3214282 |
| ☐ Name change | Number and street (or P O box, if mail is not delivered to street address)       Room/suite | **E** Telephone number |
| ☐ Initial return | PO BOX 680 | 508-533-1400 |
| ☐ Final return/terminated | City or town, state or province, country, and ZIP or foreign postal code | **F** Group Exemption |
| ☐ Amended return | MEDWAY, MA 02053 | Number ▶ |
| ☐ Application pending | | |

**G** Accounting Method   ☐ Cash   ☑ Accrual   Other (specify) ▶ _____

**H** Check ▶ ☑ if the organization is **not** required to attach Schedule B (Form 990, 990-EZ, or 990-PF).

**I** Website: ▶

**J** Tax-exempt status (check only one) — ☐ 501(c)(3)   ☑ 501(c) ( 6 ) ◀ (insert no )   ☐ 4947(a)(1) or   ☐ 527

**K** Form of organization   ☑ Corporation   ☐ Trust   ☐ Association   ☐ Other

**L** Add lines 5b, 6c, and 7b to line 9 to determine gross receipts. If gross receipts are $200,000 or more, or if total assets (Part II, column (B) below) are $500,000 or more, file Form 990 instead of Form 990-EZ . . . . . . . . . . ▶ $

**Part I**   **Revenue, Expenses, and Changes in Net Assets or Fund Balances** (see the instructions for Part I)

Check if the organization used Schedule O to respond to any question in this Part I . . . . . . . . . ☑

| | | | |
|---|---|---|---:|
| **Revenue** | 1 | Contributions, gifts, grants, and similar amounts received . . . . . . . . . . . **1** | |
| | 2 | Program service revenue including government fees and contracts . . . . . . . **2** | |
| | 3 | Membership dues and assessments . . . . . . . . . . . . . . . . **3** | 134,613 |
| | 4 | Investment income . . . . . . . . . . . . . . . . . . . . . **4** | 1,794 |
| | 5a | Gross amount from sale of assets other than inventory . . . . **5a** | |
| | b | Less: cost or other basis and sales expenses . . . . . . **5b** | |
| | c | Gain or (loss) from sale of assets other than inventory (Subtract line 5b from line 5a) . . . . **5c** | |
| | 6 | Gaming and fundraising events | |
| | a | Gross income from gaming (attach Schedule G if greater than $15,000) . . . . . . . . . . . . . . . **6a** | |
| | b | Gross income from fundraising events (not including $ _____ of contributions from fundraising events reported on line 1) (attach Schedule G if the sum of such gross income and contributions exceeds $15,000) . . **6b** | |
| | c | Less: direct expenses from gaming and fundraising events . . **6c** | |
| | d | Net income or (loss) from gaming and fundraising events (add lines 6a and 6b and subtract line 6c) . . . . . . . . . . . . . . . . . . . . . . . **6d** | |
| | 7a | Gross sales of inventory, less returns and allowances . . . . **7a** | |
| | b | Less: cost of goods sold . . . . . . . . . . **7b** | |
| | c | Gross profit or (loss) from sales of inventory (Subtract line 7b from line 7a) . . . . **7c** | |
| | 8 | Other revenue (describe in Schedule O) . . . . . . . . . . . . . . . **8** | |
| | 9 | **Total revenue.** Add lines 1, 2, 3, 4, 5c, 6d, 7c, and 8 . . . . . . . . ▶ **9** | 136,407 |
| **Expenses** | 10 | Grants and similar amounts paid (list in Schedule O) . . . . . . . . . . . **10** | |
| | 11 | Benefits paid to or for members . . . . . . . . . . . . . . . . . **11** | |
| | 12 | Salaries, other compensation, and employee benefits . . . . . . . . . . . **12** | |
| | 13 | Professional fees and other payments to independent contractors . . . . . . . **13** | 83,405 |
| | 14 | Occupancy, rent, utilities, and maintenance . . . . . . . . . . . . . . **14** | 574 |
| | 15 | Printing, publications, postage, and shipping . . . . . . . . . . . . . **15** | 2,519 |
| | 16 | Other expenses (describe in Schedule O) . . . . . . . . . . . . . . . **16** | 86,840 |
| | 17 | **Total expenses.** Add lines 10 through 16 . . . . . . . . . . . . ▶ **17** | 173,338 |
| **Net Assets** | 18 | Excess or (deficit) for the year (Subtract line 17 from line 9) . . . . . . . . **18** | -36,931 |
| | 19 | Net assets or fund balances at beginning of year (from line 27, column (A)) (must agree with end-of-year figure reported on prior year's return) . . . . . . . . . . . **19** | 117,040 |
| | 20 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . **20** | 2,410 |
| | 21 | Net assets or fund balances at end of year. Combine lines 18 through 20 . . . . ▶ **21** | 82,519 |

For Paperwork Reduction Act Notice, see the separate instructions.          Cat No 10642I          Form **990-EZ** (2016)

App.197

Form 990-EZ (2016)                                                                                                    Page **2**

### Part II    Balance Sheets (see the instructions for Part II)

Check if the organization used Schedule O to respond to any question in this Part II . . . . . . . . . . ☐

| | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|
| 22 | Cash, savings, and investments . . . . . . . . . . . . . . . | 117,040 | **22** | 82,519 |
| 23 | Land and buildings . . . . . . . . . . . . . . . . . . . . | | **23** | |
| 24 | Other assets (describe in Schedule O) . . . . . . . . . . . | | **24** | |
| 25 | **Total assets** . . . . . . . . . . . . . . . . . . . . . | 117,040 | **25** | 82,519 |
| 26 | **Total liabilities** (describe in Schedule O) . . . . . . . . | | **26** | |
| 27 | **Net assets or fund balances** (line 27 of column (B) **must** agree with line 21) . . | 117,040 | **27** | 82,519 |

### Part III    Statement of Program Service Accomplishments (see the instructions for Part III)

Check if the organization used Schedule O to respond to any question in this Part III . . ☐

What is the organization's primary exempt purpose?  **LOWER MEDICAL COST FOR MEMBERS**

Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. In a clear and concise manner, describe the services provided, the number of persons benefited, and other relevant information for each program title.

**Expenses**
(Required for section 501(c)(3) and 501(c)(4) organizations, optional for others )

| | | |
|---|---|---|
| **28** | CONTINUED CONTRACT AND PHARMACY INITIATIVES TO REDUCE MEDICAL AND PRESCRIPTION COSTS FOR MEMBERS | |
| | (Grants $ _____ ) If this amount includes foreign grants, check here . . . . ▶ ☐ | **28a** |
| **29** | | |
| | (Grants $ _____ ) If this amount includes foreign grants, check here . . . . ▶ ☐ | **29a** |
| **30** | | |
| | (Grants $ _____ ) If this amount includes foreign grants, check here . . . . ▶ ☐ | **30a** |
| **31** | Other program services (describe in Schedule O) . . . . . . . . . . . . . . | |
| | (Grants $ _____ ) If this amount includes foreign grants, check here . . . . ▶ ☐ | **31a** |
| **32** | **Total program service expenses** (add lines 28a through 31a) . . . . . . . . . . . . ▶ | **32** |

### Part IV    List of Officers, Directors, Trustees, and Key Employees (list each one even if not compensated—see the instructions for Part IV)

Check if the organization used Schedule O to respond to any question in this Part IV . . . . . . . . . . ☐

| (a) Name and title | (b) Average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) (if not paid, enter -0-) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| GINA ALONGI EXECUTIVE DIRECTOR | 10 | 36,660 | | |
| LOUIS MALZONE PRESIDENT | 5 | | | |
| VERONICA DYER VICE PRESIDENT | 5 | | | |
| CAROL BLANCHARD SECRETARY | 5 | | | |
| ROGER GILL TREASURER | 5 | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

App.198

Form **990-EZ** (2016)

IUOE4 FED 4985

Form 990-EZ (2016)                                                                 Page **3**

| **Part V** | **Other Information** (Note the Schedule A and personal benefit contract statement requirements in the instructions for Part V) Check if the organization used Schedule O to respond to any question in this Part V . . ☐ | | | |
|---|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| 33 | Did the organization engage in any activity not previously reported to the IRS? If "Yes," provide a detailed description of each activity in Schedule O . . . . . . . . . . . . . . . . | **33** | | ✓ |
| 34 | Were any significant changes made to the organizing or governing documents? If "Yes," attach a conformed copy of the amended documents if they reflect a change to the organization's name. Otherwise, explain the change on Schedule O (see instructions) . . . . . . . . . . . . . . . . . | **34** | | ✓ |
| 35a | Did the organization have unrelated business gross income of $1,000 or more during the year from business activities (such as those reported on lines 2, 6a, and 7a, among others)? . . . . . . . . | **35a** | | ✓ |
| b | If "Yes," to line 35a, has the organization filed a Form 990-T for the year? If "No," provide an explanation in Schedule O | **35b** | | |
| c | Was the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization subject to section 6033(e) notice, reporting, and proxy tax requirements during the year? If "Yes," complete Schedule C, Part III . . . | **35c** | | ✓ |
| 36 | Did the organization undergo a liquidation, dissolution, termination, or significant disposition of net assets during the year? If "Yes," complete applicable parts of Schedule N . . . . . . . . . . | **36** | | ✓ |
| 37a | Enter amount of political expenditures, direct or indirect, as described in the instructions ▶ | **37a** | | |
| b | Did the organization file Form 1120-POL for this year? . . . . . . . . . . . . . . | **37b** | | ✓ |
| 38a | Did the organization borrow from, or make any loans to, any officer, director, trustee, or key employee or were any such loans made in a prior year and still outstanding at the end of the tax year covered by this return? . | **38a** | | ✓ |
| b | If "Yes," complete Schedule L, Part II and enter the total amount involved . . . . | **38b** | | |
| 39 | Section 501(c)(7) organizations. Enter: | | | |
| a | Initiation fees and capital contributions included on line 9 . . . . . . . . | **39a** | | |
| b | Gross receipts, included on line 9, for public use of club facilities . . . . . . | **39b** | | |
| 40a | Section 501(c)(3) organizations. Enter amount of tax imposed on the organization during the year under: section 4911 ▶ _____ ; section 4912 ▶ _____ ; section 4955 ▶ _____ | | | |
| b | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations. Did the organization engage in any section 4958 excess benefit transaction during the year, or did it engage in an excess benefit transaction in a prior year that has not been reported on any of its prior Forms 990 or 990-EZ? If "Yes," complete Schedule L, Part I | **40b** | | |
| c | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations. Enter amount of tax imposed on organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 . . . . . . . . . . . . . . . . . . . . . . ▶ _____ | | | |
| d | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations. Enter amount of tax on line 40c reimbursed by the organization . . . . . . . . . . . . . . . ▶ _____ | | | |
| e | All organizations. At any time during the tax year, was the organization a party to a prohibited tax shelter transaction? If "Yes," complete Form 8886-T . . . . . . . . . . . . . . . . . | **40e** | | ✓ |
| 41 | List the states with which a copy of this return is filed ▶ | | | |
| 42a | The organization's books are in care of ▶ GINA ALONGI          Telephone no. ▶ 508-533-1400 | | | |
| | Located at ▶ 16 TROTTER DRIVE, MEDWAY MA          ZIP + 4 ▶ 02053 | | | |
| b | At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **42b** | Yes | No ✓ |
| | If "Yes," enter the name of the foreign country: ▶ | | | |
| | See the instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | |
| c | At any time during the calendar year, did the organization maintain an office outside the United States? . | **42c** | | ✓ |
| | If "Yes," enter the name of the foreign country: ▶ | | | |
| 43 | Section 4947(a)(1) nonexempt charitable trusts filing Form 990-EZ in lieu of **Form 1041**—Check here . . . . . ▶ ☐ and enter the amount of tax-exempt interest received or accrued during the tax year . . . . . ▶ | **43** | | |

| | | | Yes | No |
|---|---|---|---|---|
| 44a | Did the organization maintain any donor advised funds during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ . . . . . . . . . . . . . . . . . | **44a** | | ✓ |
| b | Did the organization operate one or more hospital facilities during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ . . . . . . . . . . . . . . . . . | **44b** | | ✓ |
| c | Did the organization receive any payments for indoor tanning services during the year? . . . . . . | **44c** | | ✓ |
| d | If "Yes" to line 44c, has the organization filed a Form 720 to report these payments? If "No," provide an explanation in Schedule O . . . . . . . . . . . . . . . . . . . . | **44d** | | ✓ |
| 45a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? . . . . . . | **45a** | | ✓ |
| b | Did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? If "Yes," Form 990 and Schedule R may need to be completed instead of Form 990-EZ (see instructions) . . . . . . . . . . . . . . . . . . . . | **45b** | | ✓ |

App. 199

Form **990-EZ** (2016)

IUOE4 FED 4986

Form 990-EZ (2016)                                                                                    Page **4**

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| 46 | Did the organization engage, directly or indirectly, in political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I . . . . . . . . . . . . . . | | | | 46 | | ✓ |

**Part VI**  **Section 501(c)(3) organizations only**

All section 501(c)(3) organizations must answer questions 47–49b and 52, and complete the tables for lines 50 and 51.

Check if the organization used Schedule O to respond to any question in this Part VI . . . . . . . . . ☐

| | | Yes | No |
|---|---|---|---|
| 47 | Did the organization engage in lobbying activities or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II . . . . . . . . . . . . . . . . . . . . **47** | | |
| 48 | Is the organization a school as described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E . . . **48** | | |
| 49a | Did the organization make any transfers to an exempt non-charitable related organization? . . . . . **49a** | | |
| b | If "Yes," was the related organization a section 527 organization? . . . . . . . . . . . . **49b** | | |

50 Complete this table for the organization's five highest compensated employees (other than officers, directors, trustees, and key employees) who each received more than $100,000 of compensation from the organization. If there is none, enter "None."

| (a) Name and title of each employee | (b) Average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

f Total number of other employees paid over $100,000 . . . . ▶ _____

51 Complete this table for the organization's five highest compensated independent contractors who each received more than $100,000 of compensation from the organization. If there is none, enter "None."

| (a) Name and business address of each independent contractor | (b) Type of service | (c) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

d Total number of other independent contractors each receiving over $100,000 . . ▶ _____

52 Did the organization complete Schedule A? **Note:** All section 501(c)(3) organizations must attach a completed Schedule A . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ Yes ☐ No

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | Signature of officer | | Date 3/3/17 |
|---|---|---|---|
| | **GINA ALONGI EXECUTIVE DIRECTOR** Type or print name and title | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
| | Firm's name ▶ | | | Firm's EIN ▶ | |
| | Firm's address ▶ | | | Phone no | |

May the IRS discuss this return with the preparer shown above? See instructions . . . . . . . . . . ▶ ☐ Yes ☐ No

Form **990-EZ** (2016)

App.200

**SCHEDULE O**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.

▶ Attach to Form 990 or 990-EZ.
▶ Information about Schedule O (Form 990 or 990-EZ) and its instructions is at *www.irs.gov/form990.*

OMB No 1545-0047

**2016**

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| MASSACHUSETTS COALITION OF TAFT-HARTLEY TRUST FUNDS | 04-3214282 |

PART 1 LINE 16:

CONFERENCES AND MEETINGS $70,083

INSURANCE $2,586

OFFICE EXPENSE $6,171

SCHOLARSHIPS $8,000

TOTAL: 86,840

PART 1 LINE 20:

UNREALIZED GAIN ON INVESTMENT $2,410

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.     Cat No 51056K     Schedule O (Form 990 or 990-EZ) (2016)

App.201

IUOE4 FED 4988

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93492128002180 |
|---|---|---|

Form **990EZ**

**Short Form**
## Return of Organization Exempt From Income Tax
Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

OMB No 1545-1150

**2019**

Department of the Treasury
Internal Revenue Service

▶ Do not enter social security numbers on this form as it may be made public.
▶ Go to www.irs.gov/Form990EZ for instructions and the latest information.

**Open to Public Inspection**

**A** For the 2019 calendar year, or tax year beginning 01-01-2019 , and ending 12-31-2019

**B** Check if applicable
☐ Address change
☐ Name change
☐ Initial return
☐ Final return/terminated
☐ Amended return
☐ Application pending

**C** Name of organization
Mass Coalition of Taft-Hartley Trust Funds
% Gina Alongi
Number and street (or P O box, if mail is not delivered to street address) Room/suite

City or town, state or province, country, and ZIP or foreign postal code

**D** Employer identification number

**E** Telephone number
(508) 533-1400

**F** Group Exemption Number ▶

**G** Accounting Method ☐ Cash ☒ Accrual Other (specify) ▶ _____

**H** Check ▶ ☒ if the organization is **not** required to attach Schedule B (Form 990, 990-EZ, or 990-PF)

**I** Website: ▶ _____

**J** Tax-exempt status (check only one) — ☐ 501(c)(3) ☒ 501(c) ( 6 ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527

**K** Form of organization ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶ _____

**L** Add lines 5b, 6c, and 7b to line 9 to determine gross receipts If gross receipts are $200,000 or more, or if total assets (Part II, column (B) below) are $500,000 or more, file Form 990 instead of Form 990-EZ . . . . . . . . . . . . . . . ▶ $ 137,628

### Part I Revenue, Expenses, and Changes in Net Assets or Fund Balances (see the instructions for Part I)
Check if the organization used Schedule O to respond to any question in this Part I . . . . . . . . . . ☒

| | | | | |
|---|---|---|---|---|
| **Revenue** | **1** Contributions, gifts, grants, and similar amounts received . . . . . . . | **1** | | |
| | **2** Program service revenue including government fees and contracts . . . | **2** | | |
| | **3** Membership dues and assessments . . . . . . . . . . . . | **3** | | 134,728 |
| | **4** Investment income . . . . . . . . . . . . . . . . | **4** | | 2,900 |
| | **5a** Gross amount from sale of assets other than inventory . . . . . . | **5a** | | |
| | **b** Less cost or other basis and sales expenses . . . . . . . | **5b** | | |
| | **c** Gain or (loss) from sale of assets other than inventory (Subtract line 5b from line 5a) . . . . . | **5c** | | 0 |
| | **6** Gaming and fundraising events | | | |
| | **a** Gross income from gaming (attach Schedule G if greater than $15,000) | **6a** | | |
| | **b** Gross income from fundraising events (not including $ _____ of contributions from fundraising events reported on line 1) (attach Schedule G if the sum of such gross income and contributions exceeds $15,000) . | **6b** | | |
| | **c** Less direct expenses from gaming and fundraising events . . . | **6c** | | |
| | **d** Net income or (loss) from gaming and fundraising events (add lines 6a and 6b and subtract line 6c) . | **6d** | | |
| | **7a** Gross sales of inventory, less returns and allowances . . . . . . | **7a** | | |
| | **b** Less cost of goods sold . . . . . . . . . . . . | **7b** | | |
| | **c** Gross profit or (loss) from sales of inventory (Subtract line 7b from line 7a) . . . . . . . . . . . | **7c** | | 0 |
| | **8** Other revenue (describe in Schedule O) . . . . . . . . . . | **8** | | |
| | **9** **Total revenue.** Add lines 1, 2, 3, 4, 5c, 6d, 7c, and 8 . . . . . . ▶ | **9** | | 137,628 |
| **Expenses** | **10** Grants and similar amounts paid (list in Schedule O) . . . . . . . | **10** | | |
| | **11** Benefits paid to or for members . . . . . . . . . . . . | **11** | | |
| | **12** Salaries, other compensation, and employee benefits . . . . . . . | **12** | | |
| | **13** Professional fees and other payments to independent contractors . . . | **13** | | 61,269 |
| | **14** Occupancy, rent, utilities, and maintenance . . . . . . . . . | **14** | | 574 |
| | **15** Printing, publications, postage, and shipping . . . . . . . . . | **15** | | 493 |
| | **16** Other expenses (describe in Schedule O) . . . . . . . . . | **16** | | 119,079 |
| | **17** **Total expenses.** Add lines 10 through 16 . . . . . . . . ▶ | **17** | | 181,415 |
| **Net Assets** | **18** Excess or (deficit) for the year (Subtract line 17 from line 9) . . . . | **18** | | -43,787 |
| | **19** Net assets or fund balances at beginning of year (from line 27, column (A)) (must agree with end-of-year figure reported on prior year's return) . . . . . . . . . . | **19** | | 127,059 |
| | **20** Other changes in net assets or fund balances (explain in Schedule O) . . | **20** | | 8,093 |
| | **21** Net assets or fund balances at end of year Combine lines 18 through 20 . . . . . . . ▶ | **21** | | 91,365 |

For Paperwork Reduction Act Notice, see the separate instructions. Cat No 10642I Form **990-EZ** (2019)

App.202

Form 990-EZ (2019)                                                                                                    Page **2**

## Part II — Balance Sheets (see the instructions for Part II)

Check if the organization used Schedule O to respond to any question in this Part II . . . . . . . . . . . . . . . ☐

| | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|
| **22** Cash, savings, and investments . . . . . . . . . . . . . . . . | | 127,059 | **22** | 91,365 |
| **23** Land and buildings . . . . . . . . . . . . . . . . | | | **23** | |
| **24** Other assets (describe in Schedule O) . . . . . . . . . . . | | | **24** | |
| **25** Total assets . . . . . . . . . . . . . . . . . . . . | | 127,059 | **25** | 91,365 |
| **26** Total liabilities (describe in Schedule O) . . . . . . . . . . . . | | | **26** | |
| **27** Net assets or fund balances (line 27 of column (B) **must** agree with line 21) | | 127,059 | **27** | 91,365 |

## Part III — Statement of Program Service Accomplishments (see the instructions for Part III)

Check if the organization used Schedule O to respond to any question in this Part III . . ☐

|  | Expenses |
|---|---|
| What is the organization's primary exempt purpose? | (Required for section 501(c) (3) and 501(c)(4) organizations, optional for others ) |
| To lower medical costs to members | |

Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses In a clear and concise manner, describe the services provided, the number of persons benefited, and other relevant information for each program title

**28**
See Additional Data Table

| | | |
|---|---|---|
| (Grants $ ) If this amount includes foreign grants, check here . . . ▶ ☐ | **28a** | |
| **29** | **29a** | |
| (Grants $ ) If this amount includes foreign grants, check here . . . ▶ ☐ | | |
| **30** | **30a** | |
| (Grants $ ) If this amount includes foreign grants, check here . . . ▶ ☐ | | |
| **31** Other program services (describe in Schedule O) . . . . . . . . . . . . . | | |
| (Grants $ ) If this amount includes foreign grants, check here . . . ▶ ☐ | **31a** | |
| **32** Total program service expenses (add lines 28a through 31a) . . . . . . . . . . . ▶ | **32** | |

## Part IV — List of Officers, Directors, Trustees, and Key Employees (list each one even if not compensated — see the instructions for Part IV)

Check if the organization used Schedule O to respond to any question in this Part IV. . . . . . . . . . . . . . . . ☐

| (a) Name and title | (b) Average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) (if not paid, enter -0-) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| Gina Alongi | 10 00 | 46,000 | | |
| Executive Director | | | | |
| Roger Gill | 5 00 | 0 | | |
| President | | | | |
| Carol Blanchard | 5 00 | 0 | | |
| Vice President | | | | |
| Marybeth Porter | 5 00 | 0 | | |
| Secretary | | | | |
| Veronica Dyer | 5 00 | 0 | | |
| Treasurer | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

App.203

Form **990-EZ** (2019)

Form 990-EZ (2019)                                                                                      Page **3**

**Part V**   **Other Information**  (Note the Schedule A and personal benefit contract statement requirements in the
instructions for Part V ) Check if the organization used Schedule O to respond to any question in this Part V  . . . . . . .  ☐

|  |  | Yes | No |
|---|---|---|---|
| **33** | Did the organization engage in any significant activity not previously reported to the IRS? If "Yes," provide a detailed description of each activity in Schedule O  . . . . . . . . . . . . . . .  **33** |  | No |
| **34** | Were any significant changes made to the organizing or governing documents? If "Yes," attach a conformed copy of the amended documents if they reflect a change to the organization's name  Otherwise, explain the change on Schedule O  See instructions  **34** |  | No |
| **35a** | Did the organization have unrelated business gross income of $1,000 or more during the year from business activities (such as those reported on lines 2, 6a, and 7a, among others)?  . . . . . . . . . .  **35a** |  | No |
| **b** | If "Yes," to line 35a, has the organization filed a Form 990-T for the year? If "No," provide an explanation in Schedule O  **35b** |  |  |
| **c** | Was the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization subject to section 6033(e) notice, reporting, and proxy tax requirements during the year? If "Yes," complete Schedule C, Part III  **35c** |  | No |
| **36** | Did the organization undergo a liquidation, dissolution, termination, or significant disposition of net assets during the year? If "Yes," complete applicable parts of Schedule N  . . . . . . . . . .  **36** |  | No |

**37a** Enter amount of political expenditures, direct or indirect, as described in the instructions ▶ | **37a** |

|  |  | Yes | No |
|---|---|---|---|
| **b** | Did the organization file **Form 1120-POL** for this year?  . . . . . . . . . . . . . .  **37b** |  | No |
| **38a** | Did the organization borrow from, or make any loans to, any officer, director, trustee, or key employee or were any such loans made in a prior year and still outstanding at the end of the tax year covered by this return?  . .  **38a** |  | No |

**b** If "Yes," complete Schedule L, Part II and enter the total amount involved  .  | **38b** |

**39**  Section 501(c)(7) organizations  Enter

**a** Initiation fees and capital contributions included on line 9  . . . . . . . .  | **39a** |

**b** Gross receipts, included on line 9, for public use of club facilities  . . . . .  | **39b** |

**40a** Section 501(c)(3) organizations  Enter amount of tax imposed on the organization during the year under

section 4911 ▶ _____ , section 4912 ▶ _____ , section 4955 ▶ _____

|  |  | | |
|---|---|---|---|
| **b** | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations  Did the organization engage in any section 4958 excess benefit transaction during the year, or did it engage in an excess benefit transaction in a prior year that has not been reported on any of its prior Forms 990 or 990-EZ? If "Yes," complete Schedule L, Part I  **40b** |  |  |

**c** Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations  Enter amount of tax imposed on organization
managers or disqualified persons during the year under sections4912, 4955, and 4958  ▶ _____

**d** Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations  Enter amount of tax on line 40c reimbursed
by the organization  ▶ _____

|  |  | | No |
|---|---|---|---|
| **e** | All organizations  At any time during the tax year, was the organization a party to a prohibited tax shelter transaction? If "Yes," complete Form 8886-T .  . . . . . . . . . . . . . . .  **40e** |  | No |

**41**  List the states with which a copy of this return is filed ▶ _____

**42a** The organization's books are in care of ▶ Gina Alongi _____  Telephone no ▶ (508) 533-1400

Located at ▶ ██████████████████████████ _____  ZIP + 4 ▶ ████████

|  |  | Yes | No |
|---|---|---|---|
| **b** | At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)?  **42b** |  |  |

If "Yes," enter the name of the foreign country ▶ _____

See the instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial
Accounts (FBAR)

|  |  | | |
|---|---|---|---|
| **c** | At any time during the calendar year, did the organization maintain an office outside the U S ?  **42c** |  |  |

If "Yes," enter the name of the foreign country ▶ _____

**43**  Section 4947(a)(1) nonexempt charitable trusts filing Form 990-EZ in lieu of **Form 1041** - Check here  . . . . . .  ▶ ☐

and enter the amount of tax-exempt interest received or accrued during the tax year  . . . ▶ | **43** |

|  |  | Yes | No |
|---|---|---|---|
| **44a** | Did the organization maintain any donor advised funds during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ  . . . . . . . . . . . . . . . . . . . . . . . . .  **44a** |  | No |
| **b** | Did the organization operate one or more hospital facilities during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ  . . . . . . . . . . . . . . . . . . . . . .  **44b** |  | No |
| **c** | Did the organization receive any payments for indoor tanning services during the year?  . . . . . . .  **44c** |  | No |
| **d** | If "Yes," to line 44c, has the organization filed a Form 720 to report these payments? If "No," provide an explanation in Schedule O  **44d** |  |  |
| **45a** | Did the organization have a controlled entity within the meaning of section 512(b)(13)?  . . . . . . .  **45a** |  | No |
| **45b** | Did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? If "Yes," Form 990 and Schedule R may need to be completed instead of Form 990-EZ (see instructions) .  . . . . . . . . . . . . . . . . . . . . .  **45b** |  | No |

|  |  | Yes | No |
|---|---|---|---|
| 46 | Did the organization engage, directly or indirectly, in political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I . . . . . . . . . . . . . .    **46** |  | No |

### Part VI   Section 501(c)(3) Organizations Only

All section 501(c)(3) organizations must answer questions 47- 49b and 52, and complete the tables for lines 50 and 51.
Check if the organization used Schedule O to respond to any question in this Part VI . . . . . . . . . . . . . . . . . . ☐

|  |  | Yes | No |
|---|---|---|---|
| 47 | Did the organization engage in lobbying activities or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II   . . . . . . . . . . . . . . . . . .    **47** |  |  |
| 48 | Is the organization a school as described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E   . .    **48** |  |  |
| 49a | Did the organization make any transfers to an exempt non-charitable related organization?   . . . . .    **49a** |  |  |
| b | If "Yes," was the related organization a section 527 organization?   . . . . . . . . . . .    **49b** |  |  |

**50** Complete this table for the organization's five highest compensated employees (other than officers, directors, trustees and key employees) who each received more than $100,000 of compensation from the organization  If there is none, enter "None "

| (a) Name and title of each employee | (b) Average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| NONE |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**f**   Total number of other employees paid over $100,000   . . . . . . . . . . . . . ▶

**51** Complete this table for the organization's five highest compensated independent contractors who each received more than $100,000 of compensation from the organization  If there is none, enter "None "

| (a) Name and business address of each independent contractor | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**d**   Total number of other independent contractors each receiving over $100,000.   . . . . . . . . ▶

**52** Did the organization complete Schedule A? **NOTE.** All section 501(c)(3) organizations must attach a completed Schedule A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐ Yes ☐ No

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | . . . . . .   Signature of officer | | 2020-05-07   Date |
|---|---|---|---|
|  | Gina Alongi  Executive Director   Type or print name and title | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|---|
|  | Firm's name ▶ | | | Firm's EIN ▶ | |
|  | Firm's address ▶ | | | Phone no | |

App.205

**Additional Data**

**Software ID:** 19009905

**Software Version:** V1.0

**EIN:** ████████

**Name:** Mass Coalition of Taft-Hartley Trust Funds

**Form 990EZ, Part III - Statement of Program Service Accomplishments**

| Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses. In a clear and concise manner, describe the services provided, the number of persons benefited, and other relevant information for each program title. | Expenses (Required for section 501 (c)(3) and 501(c)(4) organizations; optional for others.) | |
| --- | --- | --- |
| 28 Continued contract and pharmacy initiatives to reduce medical and prescription costs for members | **28a** | 0 |
| If this amount includes foreign grants, check here . . . . ▲ ☐ | | |
| (Grants $ ) | | |

| efile GRAPHIC print - DO NOT PROCESS | As Filed Data - | DLN: 93492128002180 |

**SCHEDULE O**
**(Form 990 or 990-EZ)**

Department of the Treasury

## Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Go to *www.irs.gov/Form990* for the latest information.

OMB No 1545-0047

**2019**

**Open to Public Inspection**

Name of the organization
Mass Coalition of Taft-Hartley Trust Funds

Employer identification number

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| Part I, line 16 | Other Expenses . Amount | Meetings Insurance Office expense, $119079| |

App.207

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| Part I, line 20 | Explanation , Amount | Unrealized Gain/Loss on Investments, $8093] |

# **Exhibit 18**

| | Time Study | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | September 2014 - November 2014 | | | | | | | |
| | To be Allocated Jan 1, 2015 - Dec 31, 2015 | | | | | | | |
| | | | | | | | | |
| International Union of Operating Engineers Local 4 Health and Welfare, Pension, and Annuity Funds | | | | | | | | |
| *Percentage of time spent on common task weighted based on salaries* | | | | | | | | |
| | | | | | | | | |
| | **H&W** | **Pension** | **Annuity** | **A&T** | **Coop** | **SAC** | **Dues** | |
| Alongi, Gina | 29.0000% | 48.7776% | 12.4667% | 4.3686% | 4.2457% | 0.0440% | 1.0974% | 100.0000% |
| Alongi, Rosemarie | 33.4142% | 15.5125% | 15.5055% | 11.9598% | 11.9527% | 0.0000% | 11.6553% | 100.0000% |
| Christy, Don | 38.7074% | 36.9162% | 16.2310% | 2.4083% | 1.5161% | 0.1459% | 4.0751% | 100.0000% |
| Fontes, Rebecca | 0.1102% | 0.8776% | 98.6818% | 0.1102% | 0.1101% | 0.0000% | 0.1102% | 100.0000% |
| Geiman, Greg | 38.1449% | 33.5958% | 21.6266% | 1.9855% | 1.3297% | 0.1072% | 3.2104% | 100.0000% |
| Hickey, Laura-Jean | 34.5746% | 22.6801% | 29.7807% | 5.4187% | 4.0692% | 0.0122% | 3.4643% | 100.0000% |
| Koufas, Alan | 22.7086% | 31.5715% | 11.8712% | 11.2711% | 11.2253% | 0.0061% | 11.3461% | 100.0000% |
| Kurtz, Alice | 0.5141% | 46.8295% | 52.5278% | 0.0428% | 0.0428% | 0.0000% | 0.0428% | 100.0000% |
| Lynch, Laurie | 31.2991% | 30.7884% | 14.6633% | 5.6400% | 7.2864% | 1.9515% | 8.3713% | 100.0000% |
| McGoldrick, Sheila | 0.0000% | 98.5615% | 1.4385% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 100.0000% |
| Ortega, Rosemary | 38.6588% | 24.5500% | 20.4685% | 5.3123% | 4.9915% | 0.1548% | 5.8641% | 100.0000% |
| Rivera, Yerania | 13.2655% | 63.2218% | 14.1156% | 3.0654% | 2.8762% | 0.0295% | 3.4260% | 100.0000% |
| Zaccardi, Rebecca | 35.6761% | 33.0339% | 19.3588% | 3.6150% | 3.8273% | 0.0821% | 4.4069% | 100.0000% |
| Dow, Jennifer | 100.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 100.0000% |
| Kasprzyk, Malle | 100.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 100.0000% |
| Trefry, Bettyann | 89.2969% | 5.0867% | 5.0866% | 0.1698% | 0.1655% | 0.0164% | 0.1781% | 100.0000% |
| Vachon, Jennifer | 46.5362% | 23.3255% | 11.2732% | 5.2849% | 4.1150% | 3.1333% | 6.3320% | 100.0000% |
| | | | | | | | | |
| | 651.9067% | 515.3284% | 345.0959% | 60.6524% | 57.7536% | 5.6831% | 63.5799% | 1700.0000% |
| % of time spent on common tasks | **38.3475%** | **30.3134%** | **20.2998%** | **3.5678%** | **3.3973%** | **0.3343%** | **3.7400%** | **100.0000%** |
| | | | | | | | | |
| | | | | | | | | |
| **Final Common Overhead Expense** | **H&W** | **Pension** | **Annuity** | **A&T** | **Coop** | **SAC** | **Dues** | **Total** |
| **Allocation Percentage** | **32.3939%** | **34.7769%** | **20.4113%** | **4.1400%** | **3.9540%** | **0.2655%** | **4.0584%** | **100.0000%** |

| Time Study | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| April 2015 - September 2015 | | | | | | | | |
| To be Allocated Jan 1, 2016 - Dec 31, 2016 | | | | | | | | |
| | | | | | | | | |
| International Union of Operating Engineers Local 4 Health and Welfare, Pension, and Annuity Funds | | | | | | | | |
| *Percentage of time spent on common task weighted based on salaries* | | | | | | | | |
| | | | | | | | | |
| | | **H&W** | **Pension** | **Annuity** | **A&T** | **Coop** | **SAC** | **Dues** |
| Alongi, Gina | | 19.0000% | 58.7776% | 12.4667% | 3.0919% | 4.2457% | 0.4440% | 1.9741% | 100.0000% |
| Alongi, Rosemarie | | 23.0008% | 19.1452% | 19.1377% | 13.0812% | 13.0736% | 0.0000% | 12.5614% | 100.0000% |
| Berardi, Terri | | 40.6192% | 20.5629% | 15.6489% | 8.5872% | 6.4363% | 0.9693% | 7.1763% | 100.0000% |
| Christy, Don | | 36.7129% | 37.8610% | 15.9789% | 2.8540% | 2.0073% | 0.1362% | 4.4497% | 100.0000% |
| Dow, Jennifer | | 100.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 100.0000% |
| Fontes, Rebecca | | 0.0377% | 0.0377% | 99.8115% | 0.0377% | 0.0377% | 0.0000% | 0.0377% | 100.0000% |
| Geiman, Greg | | 39.1725% | 37.3035% | 15.7900% | 1.8460% | 2.1955% | 0.0957% | 3.5967% | 100.0000% |
| Hickey, Laura-Jean | | 50.7387% | 23.2482% | 15.0211% | 3.7631% | 3.6359% | 0.0012% | 3.5917% | 100.0000% |
| Kasprzyk, Malle | | 100.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 100.0000% |
| Koufas, Alan | | 25.4637% | 28.4139% | 12.0713% | 11.3359% | 11.2813% | 0.0077% | 11.4261% | 100.0000% |
| Kurtz, Alice | | 5.7704% | 61.0109% | 32.5958% | 0.2077% | 0.2075% | 0.0000% | 0.2077% | 100.0000% |
| Lynch, Laurie | | 32.2814% | 33.2379% | 15.0505% | 4.0782% | 7.2906% | 0.3062% | 7.7552% | 100.0000% |
| McGoldrick, Sheila | | 0.0766% | 96.7060% | 2.9875% | 0.0766% | 0.0766% | 0.0000% | 0.0766% | 100.0000% |
| Ortega, Rosemary | | 40.2337% | 25.5022% | 18.0354% | 5.2951% | 4.9827% | 0.0498% | 5.8831% | 100.0000% |
| Rivera, Yerania | | 3.1369% | 58.1572% | 34.6986% | 1.3201% | 1.2740% | 0.0073% | 1.4058% | 100.0000% |
| Trefry, Bettyann | | 98.9328% | 0.2135% | 0.2134% | 0.2135% | 0.2134% | 0.0000% | 0.2135% | 100.0000% |
| Vachon, Jennifer | | 52.5239% | 25.7134% | 10.8155% | 2.9011% | 2.1190% | 1.1468% | 4.7803% | 100.0000% |
| Zaccardi, Rebecca | | 32.0757% | 33.6272% | 16.2514% | 5.1786% | 4.9447% | 0.3834% | 7.5389% | 100.0000% |
| | | | | | | | | |
| | | 699.7771% | 559.5364% | 336.5741% | 63.8679% | 64.0219% | 3.5477% | 72.6749% | 1800.0000% |
| % of time spent on common tasks | | **38.8765%** | **31.0854%** | **18.6986%** | **3.5482%** | **3.5568%** | **0.1971%** | **4.0375%** | **100.0000%** |
| | | | | | | | | |
| | | | | | | | | |
| **Final Common Overhead Expense** | | **H&W** | **Pension** | **Annuity** | **A&T** | **Coop** | **SAC** | **Dues** | **Total** |
| **Allocation Percentage** | | **32.9383%** | **36.7503%** | **17.5199%** | **3.9952%** | **4.1522%** | **0.1853%** | **4.4588%** | **100.0000%** |
| | | | | | | | | |
| *The first section of this chart details the percentage of time spent on common task broken out by employee by Fund.* | | | | | | | | |
| | | | | | | | | |
| *The Final Common Overhead Expense Allocation Percentage is derived by taking the percentage of time spent on common task* | | | | | | | | |
| *and applying these percentages to the total salary package per employee per Fund.* | | | | | | | | |

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
|  | Time Study |  |  |  |  |  |  |  |
|  | June 2016- Oct 2016 |  |  |  |  |  |  |  |
|  | To be Allocated Jan 1, 2017 - Dec 31, 2017 |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
| International Union of Operating Engineers Local 4 Health and Welfare, Pension, and Annuity Funds |  |  |  |  |  |  |  |  |
| *Percentage of time spent on common task weighted based on salaries* |  |  |  |  |  |  |  |  |
|  |  | **H&W** | **Pension** | **Annuity** | **A&T** | **Coop** | **SAC** | **Dues** |  |
| Alongi, Gina |  | 19.0000% | 58.7776% | 12.4667% | 3.0919% | 4.2457% | 0.4440% | 1.9741% | 100.0000% |
| Alongi, Rosemarie |  | 17.4516% | 16.9679% | 16.9044% | 16.2476% | 16.2379% | 0.0000% | 16.1905% | 100.0000% |
| Batchelder Wendy |  | 32.9332% | 33.8647% | 16.1074% | 5.4595% | 4.7705% | 0.1105% | 6.7542% | 100.0000% |
| Berardi, Terri |  | 33.3195% | 31.0614% | 13.9545% | 6.0687% | 4.7253% | 3.5980% | 7.2727% | 100.0000% |
| Boisvert, Amy |  | 52.4371% | 17.1681% | 15.8266% | 4.8508% | 4.8404% | 0.0012% | 4.8758% | 100.0000% |
| Christy, Don |  | 37.2700% | 38.4500% | 15.9600% | 2.4700% | 1.6000% | 0.1400% | 4.1100% | 100.0000% |
| Dow, Jennifer |  | 100.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 100.0000% |
| Geiman, Greg |  | 37.9475% | 33.4937% | 18.3911% | 2.8750% | 3.2795% | 0.0895% | 3.9237% | 100.0000% |
| Hickey, Laura-Jean |  | 42.5731% | 24.8476% | 22.5739% | 3.3131% | 3.4064% | 0.0000% | 3.2859% | 100.0000% |
| Koufas, Alan |  | 29.7735% | 19.8310% | 13.5519% | 12.2542% | 12.1629% | 0.0135% | 12.4129% | 100.0000% |
| Kurtz, Alice |  | 0.5013% | 54.6989% | 43.2960% | 0.5013% | 0.5010% | 0.0000% | 0.5013% | 100.0000% |
| Lynch, Laurie |  | 33.5358% | 34.5391% | 15.4288% | 3.9766% | 6.3281% | 0.1281% | 6.0636% | 100.0000% |
| McGoldrick, Sheila |  | 0.0254% | 98.1952% | 1.7031% | 0.0254% | 0.0254% | 0.0000% | 0.0254% | 100.0000% |
| Ortega, Rosemary |  | 34.2985% | 26.1655% | 20.5377% | 6.2563% | 6.0339% | 0.0352% | 6.6729% | 100.0000% |
| Rivera, Yerania |  | 3.9096% | 23.9916% | 70.4956% | 0.5345% | 0.5342% | 0.0000% | 0.5345% | 100.0000% |
| Vachon, Jennifer |  | 100.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 0.0000% | 100.0000% |
| Zaccardi, Rebecca |  | 34.1728% | 31.3370% | 15.8378% | 5.4300% | 5.6119% | 0.2165% | 7.3940% | 100.0000% |
|  |  |  |  |  |  |  |  |  |
|  |  | 609.1488% | 543.3894% | 313.0355% | 73.3550% | 74.3031% | 4.7766% | 81.9915% | 1700.0000% |
| % of time spent on common tasks |  | **35.8323%** | **31.9641%** | **18.4139%** | **4.3150%** | **4.3708%** | **0.2810%** | **4.8230%** | **100.0000%** |
|  |  |  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |  |  |
| **Final Common Overhead Expense** | **H&W** | **Pension** | **Annuity** | **A&T** | **Coop** | **SAC** | **Dues** | **Total** |
| **Allocation Percentage** | **32.5141%** | **35.1416%** | **17.9106%** | **4.5395%** | **4.7370%** | **0.2271%** | **4.9301%** | **100.0000%** |

*The first section of this chart details the percentage of time spent on common task broken out by employee by Fund.*

*The Final Common Overhead Expense Allocation Percentage is derived by taking the percentage of time spent on common task*

  *and applying these percentages to the total salary package per employee per Fund.*

App.212

# **Exhibit 19**

**From:** Laura-Jean Hickey <LHickey@local4funds.org>
**Sent:** Wednesday, August 28, 2013 1:44 PM
**To:** Gina Alongi
**Subject:** RE: Coalition expenses.xlsx
**Attachments:** GMA Agreement_2007-2010.pdf; GMA Ex Director Agmt 10-2010.pdf; GMA Ex Director Agmt 10-2012.pdf; GMA Ex Dir Retro Increases_Oct 2012.pdf

Attached:

- 10/2007-9/2010 Agreement
- 10/2010-9/2012 Agreement
- 10/2012-9/2015 Agreement
- 10/2012 Retro Increase document



**From:** Gina Alongi
**Sent:** Wednesday, August 28, 2013 1:33 PM
**To:** Laura-Jean Hickey
**Subject:** Re: Coalition expenses.xlsx

Can you send me a copy of my agreement.

Sent from my iPhone

App.214
IUOE4 FED 8852

<u>**AGREEMENT**</u>

<u>**EXECUTIVE DIRECTOR**</u>

<u>**MASSACHUSETTS COALITION OF TAFT-HARTLEY TRUST FUNDS, INC.**</u>

AGREEMENT made this 1st day of October, <u>2007</u>, by and between the Massachusetts Coalition of Taft-Hartley Trust Funds, Inc. (the "Coalition") and Gina M. Alongi ("Alongi").

In consideration of the mutual covenants herein contained, the Coalition does hereby retain Alongi, and Alongi agrees to provide services to the Coalition upon the following terms and conditions:

1.      Alongi is hereby engaged to provide consulting services to the Coalition. Alongi shall perform these services as an independent contractor and Alongi shall be paid by the Coalition as an independent contractor. In said capacity, Alongi shall perform the following services:

        a.     Prepare an agenda of the meetings of the Executive Board and Regular Meeting;

        b.     Advise the members of the Coalition of legislation, events and issues of importance to them;

        d.     To educate legislative and executive federal and state governments on matters of importance to the Coalition members;

        e.     Arrange for the schedule speakers to discuss topics of interest to Coalition members;

        f.     Represent the Coalition on all matters requested by the Executive Board;

        g.     Maintain the records of the Coalition;

        h.     File required reports with regulatory agencies;

        i.     To develop and propose better methods of providing and paying for health care, including investigation of possible arrangements with providers and other groups with a view to negotiating favorable rates for the Coalition members for such provider services or insurance and evaluate and develop the same for defined benefit and defined contribution plans.

And to perform such other reasonable services as may be requested by the President or Executive Board from time to time.

2.      Alongi shall perform the services contemplated to be performed by the Agreement during the duration of the Agreement. This Agreement between the parties shall terminate on _April 30, 2010_ unless renewed by mutual agreement between the parties.

3.      During the term of this Agreement, Alongi shall devote so much of her time, skill and attention to providing the services required by this Agreement as may be necessary to perform properly such services.

4.      During the term of this Agreement, the Coalition shall pay Alongi for such services, effective October 1, 2007, $20,000.00 annually, payable monthly. Such payment shall constitute the sole and exclusive amount payable by the Coalition to Alongi for such consulting services.

5.      The Coalition shall also reimburse Alongi for all reasonable and necessary expenses incurred in the performance of her services with approval and upon submission of approved documentation and receipts.

6.      The Coalition shall have the right with or without cause to terminate this Agreement prior to _April 30, 2010_ by giving written notice to Alongi at least thirty (30) days in advance of the termination date. Alongi shall have the right, with or without cause, to terminate this Agreement prior to _April 30, 2010_ by giving written notice to the Coalition at least thirty (30) days in advance of the termination date. In the event this Agreement is terminated by either party, Alongi shall not be eligible to receive any amount payable after the effective date of termination, except any amount or expenses accrued prior to the effective date of termination shall be paid to Alongi for services rendered to the Coalition prior to the effective date of termination.

7.      This contract constitutes the entire Agreement between the parties and contains all the Agreements between them with respect to the subject matter hereof. It also supersedes any and all other agreements or contract, either oral or written, between the parties with respect to the subject matter hereof.

8.      Except as otherwise specifically provided, the terms and conditions of this contract may be amended at any time by mutual agreement of the parties, provided that before any amendment shall be valid or effective it shall have been reduced to writing and signed by the parties to this Agreement.

9.      The invalidity or unenforceability of any particular provision of this Agreement shall not affect its other provisions, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision has been omitted.

IUOE4 FED 8854

10.     This Agreement shall be construed and enforced under an in accordance with the laws of the Commonwealth of Massachusetts.

11.     This Agreement shall be binding upon the parties hereto and their heirs, successors and assigns.

**IN WITNESS WHREOF** the Coalition and Alongi have hereunto set their hands and seals to this instrument in duplicate on the day and year first above written.

**MASSACHUSETTS COALITION OF TAFT-HARTLEY FUNDS, INC.**

BY: _____
President

BY: _____
Treasurer

**GINA M. ALONGI**

_____

## AGREEMENT

## EXECUTIVE DIRECTOR

## MASSACHUSETTS COALITION OF TAFT-HARTLEY TRUST FUNDS, INC.

AGREEMENT made this 1st day of October, 2010, by and between the Massachusetts Coalition of Taft-Hartley Trust Funds, Inc. (the "Coalition") and Gina M. Alongi ("Alongi").

In consideration of the mutual covenants herein contained, the Coalition does hereby retain Alongi, and Alongi agrees to provide services to the Coalition upon the following terms and conditions:

1.      Alongi is hereby engaged to provide consulting services to the Coalition. Alongi shall perform these services as an independent contractor and Alongi shall be paid by the Coalition as an independent contractor. In said capacity, Alongi shall perform the following services:

a.      Prepare an agenda of the meetings of the Executive Board and Regular Meeting;

b.      Advise the members of the Coalition of legislation, events and issues of importance to them;

d.      To educate legislative and executive federal and state governments on matters of importance to the Coalition members;

e.      Arrange for the schedule speakers to discuss topics of interest to Coalition members;

f.      Represent the Coalition on all matters requested by the Executive Board;

g.      Maintain the records of the Coalition;

h.      File required reports with regulatory agencies;

i.      To develop and propose better methods of providing and paying for health care, including investigation of possible arrangements with providers and other groups with a view to negotiating favorable rates for the Coalition members for such provider services or insurance and evaluate and develop the same for defined benefit and defined contribution plans.

IUOE4 FED 8856

And to perform such other reasonable services as may be requested by the President or Executive Board from time to time.

2.      Alongi shall perform the services contemplated to be performed by the Agreement during the duration of the Agreement. This Agreement between the parties shall terminate on September 30, 2013 unless renewed by mutual agreement between the parties.

3.      During the term of this Agreement, Alongi shall devote so much of her time, skill and attention to providing the services required by this Agreement as may be necessary to perform properly such services.

4.      During the term of this Agreement, the Coalition shall pay Alongi for such services, effective October 1, 2010, $24,000.00 and October 1, 2011, $25,000 annually, payable monthly. The increase for October 1, 2012 will be review by the Executive Board.

 Such payment shall constitute the sole and exclusive amount payable by the Coalition to Alongi for such consulting services.

5.      The Coalition shall also reimburse Alongi for all reasonable and necessary expenses incurred in the performance of her services with approval and upon submission of approved documentation and receipts.

6.      The Coalition shall have the right with or without cause to terminate this Agreement prior to September 30, 2012  by giving written notice to Alongi at least thirty (30) days in advance of the termination date. Alongi shall have the right, with or without cause, to terminate this Agreement prior to September 30, 2012 by giving written notice to the Coalition at least thirty (30) days in advance of the termination date. In the event this Agreement is terminated by either party, Alongi shall not be eligible to receive any amount payable after the effective date of termination, except any amount or expenses accrued prior to the effective date of termination shall be paid to Alongi for services rendered to the Coalition prior to the effective date of termination.

7.      This contract constitutes the entire Agreement between the parties and contains all the Agreements between them with respect to the subject matter hereof. It also supersedes any and all other agreements or contract, either oral or written, between the parties with respect to the subject matter hereof.

8.      Except as otherwise specifically provided, the terms and conditions of this contract may be amended at any time by mutual agreement of the parties, provided that before any amendment shall be valid or effective it shall have been reduced to writing and signed by the parties to this Agreement.

9.      The invalidity or unenforceability of any particular provision of this Agreement shall not affect its other provisions, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision has been omitted.

10.     This Agreement shall be construed and enforced under an in accordance with the laws of the Commonwealth of Massachusetts.

11.     This Agreement shall be binding upon the parties hereto and their heirs, successors and assigns.

        **IN WITNESS WHREOF** the Coalition and Alongi have hereunto set their hands and seals to this instrument in duplicate on the day and year first above written.

**MASSACHUSETTS COALITION OF TAFT-HARTLEY FUNDS, INC.**

BY: _____
     President

BY: _____
     Treasurer

**GINA M. ALONGI**

_____

## AGREEMENT

### EXECUTIVE DIRECTOR

### MASSACHUSETTS COALITION OF TAFT-HARTLEY TRUST FUNDS, INC.

AGREEMENT made this 1st day of October, 2012, by and between the Massachusetts Coalition of Taft-Hartley Trust Funds, Inc. (the "Coalition") and Gina M. Alongi ("Alongi").

In consideration of the mutual covenants herein contained, the Coalition does hereby retain Alongi, and Alongi agrees to provide services to the Coalition upon the following terms and conditions:

1.      Alongi is hereby engaged to provide consulting services to the Coalition. Alongi shall perform these services as an independent contractor and Alongi shall be paid by the Coalition as an independent contractor. In said capacity, Alongi shall perform the following services:

      a.     Prepare an agenda of the meetings of the Executive Board and Regular Meeting;

      b.     Advise the members of the Coalition of legislation, events and issues of importance to them;

      d.     To educate legislative and executive federal and state governments on matters of importance to the Coalition members;

      e.     Arrange for the schedule speakers to discuss topics of interest to Coalition members;

      f.     Represent the Coalition on all matters requested by the Executive Board;

      g.     Maintain the records of the Coalition;

      h.     File required reports with regulatory agencies;

      i.     To develop and propose better methods of providing and paying for health care, including investigation of possible arrangements with providers and other groups with a view to negotiating favorable rates for the Coalition members for such provider services or insurance and evaluate and develop the same for defined benefit and defined contribution plans.

IUOE4 FED 8859

And to perform such other reasonable services as may be requested by the President or Executive Board from time to time.

**2.**     Alongi shall perform the services contemplated to be performed by the Agreement during the duration of the Agreement. This Agreement between the parties shall terminate on September 30, 2015 unless renewed by mutual agreement between the parties.

**3.**     During the term of this Agreement, Alongi shall devote so much of her time, skill and attention to providing the services required by this Agreement as may be necessary to perform properly such services.

**4.**     During the term of this Agreement, the Coalition shall pay Alongi for such services, effective October 1, 2012, $30,000.00 thru September 30, 2014.  Any increase for the remainder of the agreement beginning October 1, 2014 will be reviewed  by the Executive Board.

 Such payment shall constitute the sole and exclusive amount payable by the Coalition to Alongi for such consulting services.

**5.**     The Coalition shall also reimburse Alongi for all reasonable and necessary expenses incurred in the performance of her services with approval and upon submission of approved documentation and receipts.

**6.**     The Coalition shall have the right with or without cause to terminate this Agreement prior to September 30, 2015  by giving written notice to Alongi at least thirty (30) days in advance of the termination date. Alongi shall have the right, with or without cause, to terminate this Agreement prior to September 30, 2015 by giving written notice to the Coalition at least thirty (30) days in advance of the termination date. In the event this Agreement is terminated by either party, Alongi shall not be eligible to receive any amount payable after the effective date of termination, except any amount or expenses accrued prior to the effective date of termination shall be paid to Alongi for services rendered to the Coalition prior to the effective date of termination.

**7.**     This contract constitutes the entire Agreement between the parties and contains all the Agreements between them with respect to the subject matter hereof. It also supersedes any and all other agreements or contract, either oral or written, between the parties with respect to the subject matter hereof.

**8.**     Except as otherwise specifically provided, the terms and conditions of this contract may be amended at any time by mutual agreement of the parties, provided that before any amendment shall be valid or effective it shall have been reduced to writing and signed by the parties to this Agreement.

9.     The invalidity or unenforceability of any particular provision of this Agreement shall not affect its other provisions, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision has been omitted.

10.    This Agreement shall be construed and enforced under an in accordance with the laws of the Commonwealth of Massachusetts.

11.    This Agreement shall be binding upon the parties hereto and their heirs, successors and assigns.

        IN WITNESS WHREOF the Coalition and Alongi have hereunto set their hands and seals to this instrument in duplicate on the day and year first above written.

MASSACHUSETTS COALITION OF TAFT-HARTLEY FUNDS, INC.

BY: _____
        President

BY: _____
        Treasurer

GINA M. ALONGI

_____  5/8/13

October 3, 2012

Executive Board voted to increase Executive Director Alongi's compensation from $25,000 to $30,000/yr for the next two years. The third year will be discussed at a later date.

October 1, 2012 – September 30, 2013 $30,000/yr or $2,500/month
October 1, 2013 – September 30, 2014 $30,000/yr or $2,500/month
October 1, 2014 – September 30, 2015 compensation TBD

**Retro increases to be completed:**

October 1, 2012 payment done 8/1/12 at $2,083.34 – Retro increase of $416.66 done 10/5/12

November 1, 2012 payment done 9/4/12 at $2,083.34 – Retro increase of $416.66 done 10/31/12

December 1, 2012 payment done 10/1/12 at $2,083.34 – Retro increase of $416.66 done 10/31/12

# **Exhibit 20**

## Massachusetts Coalition of Taft-Hartley Trust Funds
## 2017 Schedule of Meetings

**Regular Member Meetings**

| Day | Date | Time | Location / Fund |
|---|---|---|---|
| Wednesday | January 11, 2017 | 10:00 AM | IUOE Local 4: Medway |
| Wednesday | March 8, 2017 | 10:00 AM | NE Carpenters: Wilmington |
| Monday | June 12, 2017 | 11:00 AM | Wequassett: Chatham |
| Wednesday | September 20, 2017 | 10:00 AM | Teamsters 170: Worcester |
| Wednesday | November 8, 2017 | 10:00 AM | IUOE Local 4: Medway |

**Executive Board Meetings**

| Day | Date | Time | Location |
|---|---|---|---|
| Wednesday | March 8, 2017 | 1:00 PM | NE Carpenters: Wilmington |
| Wednesday | August 23, 2017 | 11:30 AM | Venezia: Dorchester, MA |
| Wednesday | November 8, 2017 | 11:30 AM | IUOE Local 4: Medway |

**Associate / Regular Member Meetings**

| Day | Date | Time | Location |
|---|---|---|---|
| Tuesday | June 13, 2017 | 12:30 PM | Wequassett: Chatham, MA |
| Wednesday | June 14, 2017 | 7-9 AM | Wequassett (Breakfast Only) |
| Wednesday | December 6, 2017 | 12:00 PM | Cafe Escadrille: Burlington, MA |

View up-to-date info on our website: **www.macoalthtf.org**



EXHIBIT 111
ALONGI
06/22/2022   BG

## Massachusetts Coalition of Taft-Hartley Trust Funds
## 2018 Schedule of Meetings

**Regular Member Meetings**

| Day | Date | Time | Location / Fund |
|---|---|---|---|
| Wednesday | January 10, 2018 | 10:00 AM | IUOE Local 4: Medway, MA |
| Tuesday | April 10, 2018 | 10:00 AM | Laborers': Burlington, MA |
| Monday | June 4, 2018 | 11:00 AM | Wequassett: Chatham, MA |
| Wednesday | September 19, 2018 | 10:00 AM | NE Carpenters: Wilmington, MA |
| Wednesday | November 14, 2018 | 10:00 AM | Teamsters 170 H&W: Worcester, MA |

**Executive Board Meetings**

| Day | Date | Time | Location |
|---|---|---|---|
| Tuesday | April 10, 2018 | 9:00 AM | Laborers': Burlington, MA |
| Wednesday | August 22, 2018 | 11:00 AM | Luciano's: Wrentham, MA |
| Wednesday | October 10, 2018 | 11:00 AM | CANCELLED |

**Associate / Regular Member Meetings**

| Day | Date | Time | Location |
|---|---|---|---|
| Tuesday | June 5, 2018 | 12:30 PM | Wequassett: Chatham, MA |
| Wednesday | June 6, 2018 | 7-9 AM | Wequassett (Breakfast Only) |
| Wednesday | December 5, 2018 | 12:00 PM | Venezia: Dorchester, MA |

**Misc. Meetings**

| Day | Date | Time | Location | |
|---|---|---|---|---|
| **Wellness Event Subcommittee** | | | | |
| Thursday | January 18, 2018 | 11:30 AM | Ruth's Chris, Waltham, MA | |
| Thursday | September 20, 2018 | 10:00 AM | Conference Call | |
| Wednesday | October 10, 2018 | 11:30 AM | Ruth's Chris, Waltham, MA | |
| **Coalition / NCCMP** | | | | |
| Thursday | April 26, 2018 | 11:00 AM | Plumbers Local 12: Boston, MA | |
| **Pension Reform** | | | | |
| Wednesday | December 5, 2018 | 11:00 AM | Venezia: Dorchester, MA | |

## Massachusetts Coalition of Taft-Hartley Trust Funds
## 2019 SCHEDULE OF MEETINGS

**Regular Member Meetings**

| Day | Date | Time | Location / Fund |
|---|---|---|---|
| Wednesday | January 9, 2019 | 10:00 AM | IUOE Local 4: Medway, MA |
| Wednesday | March 6, 2019 | 10:00 AM | MA Laborers: Burlington, MA |
| Monday | June 10, 2019 | 11:00 AM | Wequassett: Chatham, MA |
| Wednesday | September 18, 2019 | 10:00 AM | NE Carpenters: Wilmington, MA |
| Wednesday | November 6, 2019 | 10:00 AM | Teamsters 170 H&W: Worcester, MA |

**Executive Board Meetings**

| Day | Date | Time | Location |
|---|---|---|---|
| Wednesday | January 9, 2019 | 9:00 AM | Cancelled |
| Wednesday | March 6, 2019 | 9:00 AM | MA Laborers: Burlington, MA |
| Monday | April 8, 2019 | 2:00 PM | Conference Call |
| Monday | June 10, 2019 | 10:00 AM | Wequassett: Chatham, MA |
| Wednesday | August 21, 2019 | 11:30 AM | Luciano's: Wrentham, MA |
| Tuesday | November 12, 2019 | 10:00 AM | MA Laborers: Burlington, MA |

**Associate / Regular Member Meetings**

| Day | Date | Time | Location |
|---|---|---|---|
| Tuesday | June 11, 2019 | 12:30 PM | Wequassett: Chatham, MA |
| Wednesday | June 12, 3019 | 7-9 AM | Wequassett (Breakfast Only) |
| Wednesday | December 4, 2019 | 12:00 PM | Encore Boston Harbor |

**Misc. Meetings**

| Day | Date | Time | Location |
|---|---|---|---|
| **MA PMFLA** | | | |
| Thursday | April 25, 2019 | 12:00 PM | IUOE Local 4: Medway, MA |
| **BCBS/Coalition** | | | |
| Tuesday | November 12, 2019 | 11:00 AM | MA Laborers: Burlington, MA |
| **Wellness Event Subcommittee** | | | |
| Wednesday | April 3, 2019 | 11:30 AM | Lombardo's: Randolph, MA/Legal Seafood, Braintree, MA |
| Wednesday | August 7, 2019 | 11:30 AM | Legal Seafood: Braintree, MA |
| Thursday | November 21, 2019 | 10:00 AM | Conference Call |
| Wednesday | December 11, 2019 | 10:00 AM | Conference Call |

## Massachusetts Coalition of Taft-Hartley Trust Funds
## 2020 SCHEDULE OF MEETINGS

**Regular Member Meetings**

| Day | Date | Time | Location / Fund |
|---|---|---|---|
| Wednesday | January 8, 2020 | 10:00 AM | IUOE Local 4: Medway, MA |
| Wednesday | March 4, 2020 | 10:00 AM | Boston Plasterers: Boston, MA |
| Monday | June 8, 2020 | 11:00 AM | CANCELLED |
| Friday | August 7, 2020 | 10:00 AM | VIRTUAL |
| Wednesday | September 16, 2020 | 10:00 AM | TBD |
| Wednesday | November 4, 2020 | 10:00 AM | TBD |

**Executive Board Meetings**

| Day | Date | Time | Location |
|---|---|---|---|
| Wednesday | March 4, 2020 | 9:00 AM | Boston Plasterers: Boston, MA |
| Friday | June 26, 2020 | 11:00 AM | CONFERENCE CALL |
| Wednesday | August 19, 2020 | 11:30 AM | TBD |
| Wednesday | November 4, 2020 | 9:00 AM | TBD |

**Associate / Regular Member Networking Events**

| Day | Date | Time | Location |
|---|---|---|---|
| Tuesday | June 9, 2020 | TBD | CANCELLED |
| TBD | TBD | TBD | TBD |

**Labor Health & Financial Wellness Fair**

| Day | Date | Time | Location |
|---|---|---|---|
| Tuesday | February 4, 2020 | 2:30 PM | CONFERENCE CALL |
| Monday | March 9, 2020 | 10:00 AM | CONFERENCE CALL |
| Sunday | March 22, 2020 | 11 AM-4 PM | CANCELLED |

IUOE4 FED 5015

# **Exhibit 21**



EXHIBIT 181
ALONGI
07/14/2022  BG

| | |
|---|---|
| **From:** | Laura-Jean Hickey <LHickey@local4funds.org> |
| **Sent:** | Thursday, January 30, 2020 3:34 PM |
| **To:** | Gina Alongi |
| **Subject:** | FW: Mass. Coalition Labor Health & Financial Wellness Fair Committee Call |

MassMutual = Silver Sponsor!!!

**From:** Carmignani, Joseph <jcarmignani@massmutual.com>
**Sent:** Thursday, January 30, 2020 3:33 PM
**To:** Laura-Jean Hickey <lhickey@macoalthtf.org>
**Subject:** RE: Mass. Coalition Labor Health & Financial Wellness Fair Committee Call

**Warning:** External Sender

Hi Laura-Jean,

As of right now I'm open between 11AM-1PM and 1:30-3PM on Tuesday, 2/4.

Also, MassMutual will be contributing $10,000 towards the event on March 22nd (Silver Sponsor).

Please let me know if you have any questions.

Thanks,

Joe

**Joseph C. Carmignani**
**Head of Mid & Institutional Relationship Management, Taft-Hartley and Government**
**Client Management | Workplace Solutions**

T: (413) 744-0315
C: (508) 440-9978

**MassMutual**
100 Bright Meadow Blvd | MIP M354 | Enfield, CT 06082

**MassMutual.com | RetireSmart | Facebook | Twitter | LinkedIn**



Massachusetts Mutual Life Insurance Company (MassMutual) Springfield, MA 01111-0001
and its affiliated US insurance companies.

**From:** Laura-Jean Hickey <lhickey@macoalthtf.org>
**Sent:** Thursday, January 30, 2020 2:43 PM
**To:** Laura-Jean Hickey <lhickey@macoalthtf.org>
**Subject:** [EXTERNAL]Mass. Coalition Labor Health & Financial Wellness Fair Committee Call

Good Afternoon,

Gina and I have a lot to update everyone on regarding the March 22nd Fair. We have been very busy with securing sponsorship, lining up exhibitors and getting the word out. I've attached the updated poster that 617MediaGroup has prepared for the event.

I will be meeting with our Diamond Sponsor - Blue Cross Blue Shield of Massachusetts - along with the Red Cross and Carol Blanchard (Teamsters 25) at Lombardo's for a walk-though on Monday afternoon. Later today I will also be sending out a message to those that have not yet responded with respect to their intentions to support the fair.

We would like to have a conference call on Tuesday, February 4th to bring everyone up to speed and to discuss where we need assistance. Please let me know if any of these times on Tuesday, February 4th work for your schedule. I will confirm a call with a calendar invite based upon availability. Thank you in advance for your help!

10am
10:30am
11am
11:30am
12pm
12:30pm
1pm
1:30pm
2pm
2:30pm
3pm
3:30pm

Thank you so very much!
Laura-Jean


Laura-Jean Hickey
Coalition Coordinator
Massachusetts Coalition of Taft-Hartley Trust Funds, Inc. | P.O. Box 680 | Medway, MA 02053-0680
Phn: 508.533.1400 x116 | Fax: 508.533.1425
lhickey@macoalthtf.org
Visit us: http://www.macoalthtf.org


This e-mail transmission may contain information that is proprietary, privileged and/or confidential and is intended exclusively for the person(s) to whom it is addressed. Any use, copying, retention or disclosure by any person other than the intended recipient or the intended recipient's designees is strictly prohibited. If you are not the intended recipient or their designee, please notify the sender immediately by return e-mail and delete all copies.

Registered Representative of MML Investors Services, LLC, Member SIPC and a MassMutual subsidiary.

| Message | |
|---|---|
| **From:** | Gina Alongi [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=223FA34EA3164842A1CC55A2AAC89790-GINA ALONGI] |
| **Sent:** | 1/7/2020 7:30:36 PM |
| **To:** | Clark, Lynn [Lynn.Clark@bcbsma.com]; Laura-Jean Hickey [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=7e79e0a81ab44203a2e69e5177a75cc7-Laura-Jean] |
| **CC:** | Conte, Maureen [Maureen.Conte@bcbsma.com] |
| **Subject:** | RE: Mass Labor Coalition Event - planning discussion |

Lynn,

Happy New Year!

We're available Thursday or Friday of this week.   Do you have a specific time that works?

Thank you,
Gina

---

**From:** Clark, Lynn <Lynn.Clark@bcbsma.com>
**Sent:** Tuesday, January 7, 2020 2:23 PM
**To:** Gina Alongi <GAlongi@local4funds.org>; Laura-Jean Hickey <LHickey@local4funds.org>
**Cc:** Conte, Maureen <Maureen.Conte@bcbsma.com>
**Subject:** Mass Labor Coalition Event - planning discussion

**Warning**: External Sender

Hi Gina and Laura-Jean

Happy New Year!

I work in the Health Engagement department of Blue Cross Blue Shield of Massachusetts and have been participating on committee calls for planning the Labor Coalition Event. Maureen and I were hoping to find a time later this week that we could talk through some of the logistics of the event, ideas we have and sponsorship.  Would you be able to provide some times that you are free?

Thank you and we look forward to talking with you.
Lynn

**Lynn Clark, M.S. | Manager, Health Engagement | Blue Cross Blue Shield of MA**
101 Huntington Avenue | Suite 1300 | Mail Stop 01/10 | Boston, MA 02199
phone 617-246-4865 | fax 617-246-4486 | email: lynn.clark@bcbsma.com

*PLEASE NOTE:  We ask that you do not alter any attached/enclosed file(s) in any way.  Any change in the text of any attached/enclosed BCBSMA items is strictly prohibited without written consent from BCBSMA.  We also ask that you do not share these materials without the consent of BCBSMA.*

App.234

Message

---

**From:**      Gina Alongi [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
               (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=223FA34EA3164842A1CC55A2AAC89790-GINA ALONGI]
**Sent:**      10/18/2016 3:32:17 PM
**To:**        Heather Gasser [hgasser@swiftmd.com]
**Subject:**   RE: MA Coalition of Taft-Hartley Trust Funds

---

Talk soon.

---

**From:** Heather Gasser [mailto:hgasser@swiftmd.com]
**Sent:** Tuesday, October 18, 2016 11:30 AM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Absolutely!  We will call you at 2:30 on the number provided.

Thank you so much for your flexibility – it is much appreciated!

**Heather L. Gasser, Sales Consultant**
**Connect with me on LinkedIn**



**801 Springdale Drive**
**Exton, PA 19341**
**484.875.3085 (Office)**
**610.283.1681 (Mobile)**
**hgasser@swiftmd.com**
**www.swiftmd.com**

This message and any included attachments originate from Telemedicine Management, Inc. dba SwiftMD and are for the sole use of
the intended recipient(s). This email and any attachments are confidential and may contain privileged information. Unauthorized
forwarding, printing, copying, distribution, or use of such information is strictly prohibited and may be unlawful. If you are not the
addressee, please promptly delete this message and please notify the sender of the delivery error by e-mail or call SwiftMD at 484-
875-3085.

---

**From:** Gina Alongi [mailto:GAlongi@local4funds.org]
**Sent:** Tuesday, October 18, 2016 11:27 AM
**To:** Heather Gasser <hgasser@swiftmd.com>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Heather,

No problem.   Can you talk tomorrow at 2:30?

<u>App.235</u>

CONFIDENTIAL                                                                FUNDS012832

**From:** Heather Gasser [mailto:hgasser@swiftmd.com]
**Sent:** Tuesday, October 18, 2016 9:17 AM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Gina,

I am so sorry to ask this but is there any way we can re-schedule for another day this week?  I am unexpectedly out of the office today!  I sincerely apologize.

We can do tomorrow between 9 and 10:30 or from 2:30 to 5.  Or any time Thursday or Friday at this point.

**Heather L. Gasser, Sales Consultant**
**Connect with me on LinkedIn**



**801 Springdale Drive**
**Exton, PA 19341**
**484.875.3085 (Office)**
**610.283.1681 (Mobile)**
**hgasser@swiftmd.com**
**www.swiftmd.com**

This message and any included attachments originate from Telemedicine Management, Inc. dba SwiftMD and are for the sole use of the intended recipient(s). This email and any attachments are confidential and may contain privileged information. Unauthorized forwarding, printing, copying, distribution, or use of such information is strictly prohibited and may be unlawful. If you are not the addressee, please promptly delete this message and please notify the sender of the delivery error by e-mail or call SwiftMD at 484-875-3085.

**From:** Gina Alongi [mailto:GAlongi@local4funds.org]
**Sent:** Monday, October 17, 2016 3:58 PM
**To:** Heather Gasser <hgasser@swiftmd.com>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

1-508-533-1400 X111

**From:** Heather Gasser [mailto:hgasser@swiftmd.com]
**Sent:** Monday, October 17, 2016 3:51 PM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Great!  Thank you!  What is best number to call you?

**Heather L. Gasser, Sales Consultant**
**Connect with me on LinkedIn**

<u>App.236</u>

CONFIDENTIAL



**801 Springdale Drive**
**Exton, PA 19341**
**484.875.3085 (Office)**
**610.283.1681 (Mobile)**
**hgasser@swiftmd.com**
**www.swiftmd.com**

This message and any included attachments originate from Telemedicine Management, Inc. dba SwiftMD and are for the sole use of the intended recipient(s). This email and any attachments are confidential and may contain privileged information. Unauthorized forwarding, printing, copying, distribution, or use of such information is strictly prohibited and may be unlawful. If you are not the addressee, please promptly delete this message and please notify the sender of the delivery error by e-mail or call SwiftMD at 484-875-3085.

---

**From:** Gina Alongi [mailto:GAlongi@local4funds.org]
**Sent:** Monday, October 17, 2016 3:47 PM
**To:** Heather Gasser <hgasser@swiftmd.com>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Sure.

---

**From:** Heather Gasser [mailto:hgasser@swiftmd.com]
**Sent:** Monday, October 17, 2016 3:40 PM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Any chance we can do a 12:00?  I have an 11:00 and I am afraid it won't end in 30 minutes.

**Heather L. Gasser, Sales Consultant**
**Connect with me on LinkedIn**



**801 Springdale Drive**
**Exton, PA 19341**
**484.875.3085 (Office)**
**610.283.1681 (Mobile)**
**hgasser@swiftmd.com**
**www.swiftmd.com**

This message and any included attachments originate from Telemedicine Management, Inc. dba SwiftMD and are for the sole use of the intended recipient(s). This email and any attachments are confidential and may contain privileged information. Unauthorized

App. 237

FUNDS012834

forwarding, printing, copying, distribution, or use of such information is strictly prohibited and may be unlawful. If you are not the addressee, please promptly delete this message and please notify the sender of the delivery error by e-mail or call SwiftMD at 484-875-3085.

---

**From:** Gina Alongi [mailto:GAlongi@local4funds.org]
**Sent:** Monday, October 17, 2016 2:59 PM
**To:** Heather Gasser <hgasser@swiftmd.com>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Does 11:30 work?

---

**From:** Heather Gasser [mailto:hgasser@swiftmd.com]
**Sent:** Monday, October 17, 2016 2:56 PM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Hi, Gina.  I definitely have some flexibility tomorrow.  What time is good for you?

**Heather L. Gasser, Sales Consultant**
**Connect with me on LinkedIn**



**801 Springdale Drive**
**Exton, PA 19341**
**484.875.3085 (Office)**
**610.283.1681 (Mobile)**
**hgasser@swiftmd.com**
**www.swiftmd.com**

This message and any included attachments originate from Telemedicine Management, Inc. dba SwiftMD and are for the sole use of the intended recipient(s). This email and any attachments are confidential and may contain privileged information. Unauthorized forwarding, printing, copying, distribution, or use of such information is strictly prohibited and may be unlawful. If you are not the addressee, please promptly delete this message and please notify the sender of the delivery error by e-mail or call SwiftMD at 484-875-3085.

---

**From:** Gina Alongi [mailto:GAlongi@local4funds.org]
**Sent:** Monday, October 17, 2016 2:52 PM
**To:** Heather Gasser <hgasser@swiftmd.com>
**Subject:** RE: MA Coalition of Taft-Hartley Trust Funds

Heather,

Are you available to talk tomorrow?

Gina                                                              App.238

CONFIDENTIAL                                                      FUNDS012835

**From:** Heather Gasser [mailto:hgasser@swiftmd.com]
**Sent:** Friday, October 14, 2016 1:57 PM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** MA Coalition of Taft-Hartley Trust Funds

Gina,

Hope this finds you well!

I wanted to know if you and I could set up a time to talk about your role on the Executive Board of the Massachusetts Coalition of Taft-Hartley Trust Funds.  I know that IUEO Local 4 has tele-medicine but I would love an opportunity to learn more about the group and where SwiftMD can fit in.

I am making wonderful strides with the Taft-Hartley market and would love to tell you about it!

I look forward to hearing from you!

Heather

**Heather L. Gasser, Sales Consultant**
**Connect with me on LinkedIn**



**801 Springdale Drive**
**Exton, PA 19341**
**484.875.3085 (Office)**
**610.283.1681 (Mobile)**
**hgasser@swiftmd.com**
**www.swiftmd.com**

This message and any included attachments originate from Telemedicine Management, Inc. dba SwiftMD and are for the sole use of the intended recipient(s). This email and any attachments are confidential and may contain privileged information. Unauthorized forwarding, printing, copying, distribution, or use of such information is strictly prohibited and may be unlawful. If you are not the addressee, please promptly delete this message and please notify the sender of the delivery error by e-mail or call SwiftMD at 484-875-3085.

Confidentiality Requirement: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email and delete the message from your system.

Confidentiality Requirement: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email and delete the message from your system.

App.239

Confidentiality Requirement: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email and delete the message from your system.

Confidentiality Requirement: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email and delete the message from your system.

Confidentiality Requirement: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email and delete the message from your system.

App.240

CONFIDENTIAL
FUNDS012837

Message
___

| | |
|---|---|
| **From**: | Gina Alongi [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=223FA34EA3164842A1CC55A2AAC89790-GINA ALONGI] |
| **Sent**: | 11/1/2016 6:27:18 PM |
| **To**: | Charles Gustafson [cgustafson@bestdoctors.com] |
| **Subject**: | RE: Best Doctors / Mass Coalition |

I thought we were talking on the phone?

---

**From:** Charles Gustafson [mailto:cgustafson@bestdoctors.com]
**Sent:** Tuesday, November 01, 2016 2:26 PM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Cc:** Laura-Jean Hickey <LHickey@local4funds.org>
**Subject:** RE: Best Doctors / Mass Coalition

Excellent. I will see you then. Thanks, Charlie

**Charles Gustafson** | Vice President, Business Development

**Best Doctors**
M: 860-983-5025 | 60 State Street, Suite 600, Boston, MA 02109
www.BestDoctors.com

---

**From:** Gina Alongi [mailto:GAlongi@local4funds.org]
**Sent:** Tuesday, November 01, 2016 2:14 PM
**To:** Charles Gustafson
**Cc:** Laura-Jean Hickey
**Subject:** RE: Best Doctors / Mass Coalition

The 10th at 11:00 works for me.

Gina

---

**From:** Charles Gustafson [mailto:cgustafson@bestdoctors.com]
**Sent:** Monday, October 31, 2016 4:00 PM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Cc:** Laura-Jean Hickey <LHickey@local4funds.org>
**Subject:** RE: Best Doctors / Mass Coalition

Gina, great. 11/9, 10 or 11 will work great. Say 11:00 am on any of those days? Thanks, Charlie

**Charles Gustafson** | Vice President, Business Development

**Best Doctors**
M: 860-983-5025 | 60 State Street, Suite 600, Boston, MA 02109
www.BestDoctors.com

---

**From:** Gina Alongi [mailto:GAlongi@local4funds.org]
**Sent:** Monday, October 31, 2016 1:56 PM
**To:** Charles Gustafson
**Cc:** Laura-Jean Hickey
**Subject:** RE: Best Doctors / Mass Coalition

<u>App.241</u>

CONFIDENTIAL

FUNDS013695

Charles,

Thank you for the email.

Please send me some dates that you're available to talk over the next few weeks.


Thank you,
Gina

---

**From:** Charles Gustafson [mailto:cgustafson@bestdoctors.com]
**Sent:** Monday, October 24, 2016 1:55 PM
**To:** galongi@macoalthtf.org
**Subject:** Best Doctors

Gina, hope all is well. It has been a while since I touched base. As you know we are now an endorsed vendor of the National Labor Alliance and have negotiated fees and a defined product set that you and your Funds, I believe, will find of interest. Also, for members with a Cancer diagnosis we now have an exclusive arrangement with IBM Watson for their Oncology Tools (Watson Oncology Advisor, Watson Clinical Trials and Watson Genomics). Because we are an eco-system partner I was thinking that you and the major Funds of the Mass.Coaltion might find it interesting to take a tour of the Watson Health headquarters in Cambridge, Ma. We can take groups of 10-15 at a time. It is fascinating to see how this Artificial Intelligence/Cognitive Technology will change health care delivery and costs.

In any event, love to get together in the coming weeks and talk in more detail about the changes here at Best Doctors. I recognize that coverage for Local 4 members has or is about to lapse and it would be helpful to get your feedback.

Thanks again and please let me know about getting together. I can be reached at (860) 983-5025 (or e-mail is fine as well) when you get chance. Thanks, Charlie

**Charles Gustafson** | **Vice President, Business Development**

**Best Doctors**
M: 860-983-5025 |60 State Street, Suite 600, Boston, MA 02109
www.BestDoctors.com

Confidentiality Requirement: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email and delete the message from your system.
Confidentiality Requirement: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email and delete the message from your system.

App.242

Message

| | |
|---|---|
| **From:** | Gina Alongi [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=223FA34EA3164842A1CC55A2AAC89790-GINA ALONGI] |
| **Sent:** | 11/30/2018 7:43:27 PM |
| **To:** | Barilotti, Joe [barilotti@chartwellip.com] |
| **Subject:** | RE: Next week |

Joe,

Hope you are well and had a wonderful Thanksgiving also.

Does 12:30 on Tuesday work for you?

Gina



Gina M. Alongi
Administrator
Local 4 Benefit Funds
16 Trotter Drive
Medway, MA 02053
Tel: (508) 533-1400 ext.111
www.local4funds.org

---

**From:** Barilotti, Joe <barilotti@chartwellip.com>
**Sent:** Friday, November 30, 2018 10:28 AM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** Next week

Hi Gina,

I hope you are well, and had a great Thanksgiving.  I'm looking forward to seeing everyone at the Coalition Holiday party next week.  I am coming up to Boston on Tuesday, and was hoping I could stop by and say hello if you're available.  Are you around on Tuesday afternoon, for a few minutes?

Best regards,

Joe Barilotti




Joseph A. Barilotti, Jr.
Vice President
Client Services & Marketing
1205 Westlakes Drive | Suite 100
Berwyn, PA 19312
T: 610·407·4822
F: 610·296·1430
C: 610·247·3900
E: barilotti@chartwellip.com

<u>App.243</u>

CONFIDENTIAL                                                                 FUNDS014344

The information in this e-mail, and any attachment therein, is confidential and for use by the addressee only. If you are not the intended recipient, please return the e-mail to the sender and delete it from your computer. The views expressed in the included interview/commentary/investment report represent the opinions of Chartwell Investment Partners and are not intended as a forecast or guarantee of future results. These views are as of the date of this publication and are subject to change based on subsequent developments. All information contained herein is for informational purposes only and should not be construed as investment advice, it does not constitute an offer, solicitation or recommendation to purchase or sell any security. References to specific securities should not be construed as recommendations. Portfolio holdings are subject to change at any time. Any discussion of past performance is no guarantee of future results. A list of all recommendations for the past year is available upon request by contacting info@chartwellip.com. Indices are unmanaged and not available for direct investment. All information was obtained from sources believed to be accurate and reliable. Chartwell Investment Partners is an SEC-registered investment adviser, offering an array of investment strategies

App.244

Message

| From: | Gina Alongi [/O=FIRST ORGANIZATION/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=GALONGI] |
|-------|---------------------------------------------------------------------------------------------|
| Sent: | 6/15/2016 3:20:16 PM |
| To: | Adam Ain [adam@iorahealth.com] |
| Subject: | RE: Next steps from Wednesday's meeting |

Adam,

Sounds good.

Thank you,
Gina

**From:** Adam Ain [mailto:adam@iorahealth.com]
**Sent:** Wednesday, June 15, 2016 12:07 AM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** Re: Next steps from Wednesday's meeting

Hi Gina,

Great. I just sent an invite for Monday, June 27 from 2-3 pm.

Based on our emails, it seems like the agenda is:
1) Hear Taft Hartley Fund's current thinking around healthcare for pensioners
2) Share Iora care / recruitment approach to Carpenters pensioners

Please let me know if there are additional items you'd like to cover.

Looking forward to talking,

Adam

---

**Adam Ain** • Northeast Market Operations Director for Iora Health
p. 617.651.2120 • adam@iorahealth.com • www.iorahealth.com

On Tue, Jun 14, 2016 at 1:52 PM, Gina Alongi <GAlongi@local4funds.org> wrote:

Adam,

The 27th or the 30th works for me.

Gina

**From:** Adam Ain [mailto:adam@iorahealth.com]
**Sent:** Tuesday, June 14, 2016 8:49 AM

**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** Re: Next steps from Wednesday's meeting

<u>App.245</u>

Hi Gina,

Do any of the following times work for a call? I may make the trip out to Medway, but Jeff will not:

24th between 10-11am or 2-3pm
27th: 2-3pm
28th: 9-10am
29th: the morning is opened
30th: 10am-12pm

Thanks,

Adam

---

**Adam Ain •** Northeast Market Operations Director for Iora Health
p. 617.651.2120 • adam@iorahealth.com • www.iorahealth.com

On Fri, Jun 10, 2016 at 11:33 AM, Adam Ain <adam@iorahealth.com> wrote:

Oh wow, Gina. I'm so sorry to hear that. Is it feeling any better now? I had a pinched nerve back in high school but it only periodically pinched. That would be so painful if it was constant

I'll talk w Jeff and share our availability for later this month. Should we plan to come to Medway for an in person meeting or are you ever closer to Boston? An initial call may also make sense

I'll get back to you. Best,

Adam

Sent from my iPhone

On Jun 9, 2016, at 12:32 PM, Gina Alongi <GAlongi@local4funds.org> wrote:

Adam,

I'm sorry for not responding to your email.   I pinched a nerve in my neck two weeks ago and have been in agony ever since.   I'm just returning back to the office.

What does your schedule look like towards the end of the month.

App.246

CONFIDENTIAL                                                                 FUNDS015384

Thank you,

Gina

**From:** Adam Ain [mailto:adam@iorahealth.com]
**Sent:** Monday, May 30, 2016 7:52 PM
**To:** Gina Alongi <GAlongi@local4funds.org>
**Subject:** Re: Next steps from Wednesday's meeting

Hi Gina,

I hope you've had a nice long weekend.

Do you have any availability on Wednesday, 6/8 in the morning? I need to be in the city by 1 pm, but Jeff and I are available to come out to Medway before then.

Alternatively, do you have any days you already have planned to be in the Boston or Wilmington areas?

Thanks,

Adam

---

**Adam Ain** • Northeast Market Operations Director for Iora Health
p. 617.651.2120 • adam@iorahealth.com • www.iorahealth.com

On Tue, May 24, 2016 at 4:35 PM, Gina Alongi <GAlongi@local4funds.org> wrote:

Hi Adam,

Definitely lets schedule a day to re-open the conversation.    Over the past several months we have been doing our due diligence with respect to interviewing other firms.    I'm not sure we made any progress.

When are you and Jeff available?

Thank you,

Gina

**From:** Adam Ain [mailto:adam@iorahealth.com]
**Sent:** Monday, May 23, 2016 3:01 PM

App.247

CONFIDENTIAL

FUNDS015385

**To:** Gina Alongi <GAlongi@local4funds.org>
**Cc:** Jeff Werner <jwerner@carpentersfund.org>; Duncan Reece <duncan@iorahealth.com>
**Subject:** Re: Next steps from Wednesday's meeting

Hi Gina,

I hope all is well with you and that you're enjoying the warmer weather.

I wanted to follow-up after our conversation with the Taft Hartley coalition back in January. As a refresher, I think we all left that meeting with a shared interest in exploring how our new Iora practices could benefit the coalition's retired constituents. However, there was an interest in seeing how it works with the Carpenters pensioners first.

Jeff and I thought now might be a good time to re-open the conversation. Since that meeting, we have widely disseminated information about the practices, hosted some open houses, enrolled some members, and explored ways to use Iora to help support members as they age out of Fund benefits.

Jeff and I thought a good next step might be to set up a meeting with the three of us to discuss what we did in more details and to hear what's currently of interest to the coalition. Does that make sense to you, Gina? If so, when in the next few weeks would work for you to talk?

Best,

Adam

---

**Adam Ain** • Northeast Market Operations Director for Iora Health
p. 617.651.2120 • adam@iorahealth.com • www.iorahealth.com

On Thu, Jan 21, 2016 at 5:29 PM, Adam Ain <adam@iorahealth.com> wrote:

Hi Gina,

Thank you again for inviting us to attend Wednesday's coalition meeting. Our impression was it was a good meeting overall and people were fairly engaged in the process and intrigued by the idea of communicating this new opportunity to their members.

The clearest next step we tracked was for us to share the communication materials we're creating with Jeff this week and next for the Carpenters population to see if people would be interested in doing something similar as a coalition. Do you think it makes sense to set up another call with you in ~2 weeks once that work is final and continue from there? Would love to hear your thoughts.

App.248

Thanks,

Adam

_____

**Adam Ain** • **Northeast Market Operations Director for Iora Health**

p. [617.651.2120](tel:617.651.2120) • [adam@iorahealth.com](mailto:adam@iorahealth.com) • [www.iorahealth.com](http://www.iorahealth.com)

This transmission contains information that may be confidential and privileged. Unless you are the intended recipient of
this message, (or authorized to receive it for the intended recipient), you may not copy, forward, or otherwise use it,
or disclose its contents to anyone else. If you have received this transmission in error, please notify us immediately and
delete it from your system.

This transmission contains information that may be confidential and privileged. Unless you are the intended recipient of
this message, (or authorized to receive it for the intended recipient), you may not copy, forward, or otherwise use it,
or disclose its contents to anyone else. If you have received this transmission in error, please notify us immediately and
delete it from your system.

This transmission contains information that may be confidential and privileged. Unless you are the intended recipient of
this message, (or authorized to receive it for the intended recipient), you may not copy, forward, or otherwise use it,
or disclose its contents to anyone else. If you have received this transmission in error, please notify us immediately and
delete it from your system.

App.249