UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| GINA ALONGI, | ) ) |
| Defendant. | ) ) ) |

Civil Action No. 1:21-cv-10163-FDS

## OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

*"Kate [the Funds outside legal counsel] told me her concern that if Gina's accusations were not "tamped down"…. Billy [McLaughlin] would seek to have her fired for insubordination. ….  I spoke to Kate by telephone on May 22 … She told me she was concerned that Gina dropped her sexual harassment concerns because she was worried about being fired, which Kate admitted was in contravention of the law."*

-- Internal memo from the Funds' in-house counsel to himself, dated May 24, 2018 –

Defendant Gina Alongi ("Ms. Alongi") opposes the Motion for Partial Summary Judgment[1] that the plaintiffs (collectively, the "Funds") have filed.  In support of this Opposition, Ms. Alongi relies on and incorporates by reference, as if fully set forth herein, her Responses to the Funds' Statement of Material Facts ("RSOF") and her Counterstatement of Material Facts in Opposition to Motion for Summary Judgment ("DSOF") filed herewith.

Ms. Alongi formerly worked for the Funds, but her 42 years of loyal and dedicated service to the Funds ended abruptly -- and without any prior notice -- in July 2020 when the Trustees of the Funds summarily terminated her employment.  The Funds gave no explanation whatsoever for why they fired her; instead, the Funds simply stated in relevant part: "As you were an employee at will, it is not necessary to detail the reasons for the Trustees' decision…. We …. trust that our separation will be courteous and respectful."[2]

Discovery has revealed the "reasons for the Trustees' decision."  The Funds fired Ms. Alongi because their Business Manager and Chairman of the Boards of Trustees, William McLaughlin, wanted her gone.  And Mr. McLaughlin wanted her gone because Ms. Alongi had called  him out for being a sexual predator who created a blatantly hostile work environment by frequently engaging in highly inappropriate sexual conduct toward Ms. Alongi, her sister, and several other female employees in the Fund Office from start of his tenure as Business Manager and Chairman in August 2017 through 2020.

In May 2018, Ms. Alongi confronted Mr. McLaughlin directly about his repulsive, sexually-charged behavior in an attempt to protect both herself and her employees and to prevent

---

[1] In their Motion for Partial Summary Judgment, the Funds move only for summary judgment on the issue of liability, not damages.

[2] Ms. Alongi was not the only victim of the Funds' capricious behavior: the Funds also fired her twin sister (who was employed by the Funds for 17 years) in identical fashion a mere two weeks later, also without receiving any prior notice or reasoning from the Funds.

such conduct from continuing into the future.  However, her efforts were met with a verbal attack by Mr. McLaughlin, an assault so vicious that she and other Funds employees who were present for the barrage feared for their physical safety.  Following this assault, the harassment continued but was now further exacerbated by the fact that Ms. Alongi feared for her physical safety.  Shortly after that verbal attack, Ms. Alongi was so traumatized that she sought advice from the Funds' outside counsel about how to respond.  Rather than making any effort to help, the Funds' outside counsel encouraged Ms. Alongi to "tamp down" (to use the contemporaneous, written words of the Funds' in-house counsel memorializing his conversation with outside counsel) her sexual harassment allegations to avoid termination for "insubordination."  Undisputed is the fact that the Funds never conducted any investigation into either the assault or Mr. McLaughlin's conduct toward the Funds' female employees. Mr. McLaughlin thereafter engaged in a concerted effort to retaliate against Ms. Alongi for having dared to confront him about his abhorrent behavior by, among other things, taking away a number of reasonable accommodations previously granted to her for her disability (Diabetes), and micromanaging her job performance. This effort culminated in Ms. Alongi's unlawful termination (as well as that of her sister).

Following their unfounded terminations, the Alongi twins asserted their statutory rights under M.G.L. c. 151B by filing a complaint at the Massachusetts Commission Against Discrimination in September 2020.  Not willing to countenance Gina's decision to stand up for her legal rights, the Funds abandoned their "courteous and respectful" facade and instead began threatening Gina with criminal prosecution and seven-figure damages for alleged "breaches of fiduciary duty" which, tellingly, the Funds never mentioned before Ms. Alongi chose to pursue her rights under M.G.L. c. 151B.  When Ms. Alongi refused to kowtow to the Funds' bully tactics, the Funds filed the instant, baseless lawsuit against Ms. Alongi.

This action is nothing short of a shameless and misguided attempt by a billion-dollar organization to beat a single former, female employee into submission[3] for having had the temerity to pursue her legal rights both against a man who harassed and retaliated against her  and against an employer who chose to ignore Ms. Alongi's complaints about Mr. McLaughlin and instead unceremoniously terminated *her* with no prior notice or reasoning after a 42-year unblemished record of service.

The thrust of the Trustees' claim is that Ms. Alongi somehow breached her fiduciary duty of loyalty by working part-time for the Massachusetts Coalition of Taft Hartley Funds, Inc. (the "Coalition") – a trade organization -- purportedly without the Trustees' knowledge, while she was also employed as the Funds' Administrator.  However, the notion that the Trustees were unaware of the nature of Ms. Alongi's work for the Coalition, where the Funds were a member of the Coalition for the entirety of her employment as Administrator, and where Ms. Alongi worked as the Coalition's Executive Director for 13 years, from 2007 through 2020, is patently ridiculous and is flatly contradicted by the record evidence.  The Funds were well aware of Ms. Alongi's work for the Coalition, and in fact the Trustees openly expressed their approval to Ms. Alongi of this work during her employment.  Moreover, Ms. Alongi's work for the Coalition, far from harming the Funds, helped the Funds to reap significant financial benefits. The Coalition is a 501(c)(6) non-profit business association whose only members are multi-employer funds (like the Funds), and whose mission is to promote and advance the common benefit of its member funds. During Ms. Alongi's tenure as Executive Director of the Coalition, she worked to advance interest

---

[3] Indeed, the Funds' litigation strategy appears to have been to gin up costs for Ms. Alongi at every opportunity; fact discovery was both extensive and exhaustive, with 15 depositions taken, with many taken over numerous days (the Funds took four days to complete Ms. Alongi's deposition, in particular). And the Funds carried their strategy through to the instant motion -- which it accompanied with a 303-paragraph statement of "facts," -- many of which flatly contradict the clear record evidence.

of the Funds – as a member of the Coalition – and attained millions of dollars in savings in health care costs for the Funds as a result of her personal efforts.

This action is not about any breach of fiduciary duty.  Rather, it is a sham that reeks of retaliation. For the reasons set forth below, this court should deny the Funds Motion for Partial Summary Judgment.

## Argument[4]

Summary judgment is appropriate only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Roach* v. *Green*, 2016 WL 1254236, at *2 (D. Mass. 2016) (quoting *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  This Court "must accept the properly documented facts in the light most favorable to the nonmovant, resolving all genuine conflicts in [her] favor." *Ring* v. *Sokolove*, 2014 WL 1117859, at *1 (D. Mass. 2014) (quoting *Conward* v. *Cambridge Sch. Comm.*, 171 F.3d 12, 18 (1st Cir. 1999)) (internal quotation marks omitted).  Accordingly, "[a]t the summary judgment stage, the nonmoving party is entitled to have the credibility of [her] evidence as forecast assumed, [her] version of all that is in genuine dispute accepted, and all internal conflicts in the evidence resolved favorably to [her]." *Blanchard* v. *Peerless Insurance Company*, 958 F.2d 483, 489 (1st Cir.1992).

To prevail on their Motion for Summary Judgment, the Funds must demonstrate that the three-hundred and three (303) alleged statements of fact filed with their Motion are in fact undisputed and that they are otherwise entitled to judgment as a matter of law.  The Funds fall far short of this standard.  Not only are many of their alleged "facts" disputed, but they also are

---

[4] On May 23, 2022, all parties, through their respective counsel, entered into a Confidentiality Agreement which set forth specific protocols for filing with the court documents, deposition testimony and other materials which had been designated as 'confidential'.  Both the Funds and Mr. McLaughlin completely ignored their obligations under the Agreement and went ahead and filed their summary judgment pleadings (along with deposition testimony that Ms. Alongi's counsel had clearly designated as 'confidential') without even attempting to initiate discussions with Ms. Alongi's counsel about appropriate protocols, as specifically contemplated under the Agreement.  In light of this, Ms. Alongi believes that any corresponding reciprocal obligations on her part have been waived.

demonstrably untrue in many respects.  At a minimum, the voluminous record reflects several disputed questions of fact which preclude the Funds' Motion for Summary Judgment because a reasonable factfinder could return a verdict for Ms. Alongi on the Funds' claims.

## I.    DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF WHETHER MS. ALONGI QUALIFIES AS AN ERISA FIDUCIARY

As an initial matter, the Funds are not entitled to summary judgment on the threshold issue of whether Ms. Alongi acted as an ERISA fiduciary when engaging in the conduct at issue in this case.  A claim for breach of fiduciary duty under ERISA, of course, lies only against an individual or entity that qualifies as an ERISA fiduciary.  *See Pegram* v. *Herdrich*, 530 U.S. 211, 226 (2000). "Nonfiduciaries acting unilaterally and even negligently are not liable under [ERISA.]"  *Spalding* v. *Reliance Standard Life Ins. Co.*, 835 F. Supp. 23, 32 (D. Mass. 1993).  There are two means by which fiduciary status may be attributed to a person or entity under ERISA.  *W.E. Aubuchon Co.* v. *BeneFirst, LLC*, 661 F. Supp. 2d 37, 48–49 (D. Mass. 2009).  First, that person can be a *named* fiduciary—that is, in accordance with statutory requirements, the entity is named as a fiduciary in the plan documents.  *Id.*; *see* 29 U.S.C. § 1102(a)(1).  Second, that person can be a *functional* fiduciary—that is, fiduciary status can arise from the conduct of a party.  *Id.*; *see* 29 U.S.C. § 1002(21).  In this case, it is undisputed that Ms. Alongi is not a named fiduciary; the Funds concede that the Trustees are the Funds' named fiduciaries.  *See* Memorandum in Support of Summary Judgment ("Memo"), p. 8; *see also* RSOF, ¶ 19.  Accordingly, the Funds must prove that Ms. Alongi acted as a functional fiduciary. They cannot.

A functional fiduciary of an ERISA plan is one who "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan."  *Livick* v. *Gillette Co.*, 492 F. Supp. 2d 1, 7 (D. Mass. 2007), *aff'd sub nom.*, 524 F.3d 24 (1st Cir. 2008) (quoting 29 U.S.C. §

1002(21)(A)).[5]   Importantly, a person is a functional fiduciary "only 'to the extent' that he possesses or exercises the requisite discretion or control." *Beddall* v. *State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (emphasis added).   "Because the definition's 'to the extent' limitation requires some nexus between the alleged ERISA violation and the actions or functions that have created fiduciary status, fiduciary liability arises in specific increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad, general terms." *Golden Star, Inc.* v. *Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 79 (D. Mass. 2014) (quoting *Beddall*, 137 F.3d at 18) (internal quotation marks omitted).   Thus, in any case where a plaintiff alleges a violation of ERISA's fiduciary duty or prohibited transaction provisions, "the threshold question is whether the defendant was acting as a fiduciary when taking the action subject to complaint." *Id.* (quoting *Pegram,* 530 U.S. at 226) (internal quotation marks and alterations omitted).   The record evidence here demonstrates that Ms. Alongi did not act as a fiduciary when engaging in the conduct relevant to the Funds' accusations, and therefore the Funds are not entitled to summary judgement   on this threshold issue.

### A.   AT A MINIMUM, MATERIAL ISSUE OF FACT EXISTS AS TO WHETHER MS. ALONGI WAS A FIDUCIARY   WHEN PERFORMING WORK FOR THE COALITION

In their Motion, the Funds contend that Ms. Alongi breached her fiduciary duty by occasionally performing   Coalition work   as its Executive Director, at certain times between the Funds' business hours of 8:00 am to 4:00 pm on weekdays.   *See* Memorandum in Support of Summary Judgment ("Memo"), p. 21.   The Funds claim that Ms. Alongi acted as a fiduciary in connection with her Coalition work because, "as Administrator, she was responsible for overseeing

---

[5] "While the statutory language about functional fiduciaries is expansive, in practice courts construing that statutory language often construe it quite narrowly." *W.E. Aubuchon Co.*, 661 F. Supp. 2d at 50 (Saylor, J.); *see, e.g.*, *Beddall* v. *State St. Bank & Tr. Co.*, 137 F.3d 12, 32 (1st Cir. 1998) (referring to "ERISA's somewhat narrow fiduciary provisions").

all work performed in the Fund Office [including her own work]."  *See id.*  In other words, the Funds assert that because Ms. Alongi supervised work performed by the Funds' office, Ms. Alongi was a fiduciary of the Funds with respect to all work performed by all employees in the Fund office (including herself), during Fund office business hours.  The Funds' position is both legally and factually flawed.

First, the Funds grossly mischaracterize the nature of Ms. Alongi's Administrator position and its responsibilities. The undisputed evidence shows that at all times relevant to the Funds' claims—from 2015 to 2020—only two out of the (on average) 15 employees of the Funds reported directly to Ms. Alongi:  the Assistant Administrators Greg Geiman and Laura-Jean Hickey.  *See* DSOF ¶, 8.  Ms. Alongi did not directly supervise the work of any other employees.  *Id.*, at ¶ 9. Further, while Ms. Alongi had some degree of indirect oversight and control over the work of other Fund office employees—by virtue of the fact that certain Fund office employees were directly supervised by Mr. Geiman and Ms. Hickey, who in turn reported 'up the chain' to Ms. Alongi— that mere fact does not make her a functional fiduciary of the Funds:  the "mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status. . . .Without more, mechanical administrative responsibilities. . .are insufficient to ground a claim of fiduciary status." *Beddall*, 137 F.3d at 18, 20.

Indeed, courts repeatedly have found that plan administrators are not functional fiduciaries under ERISA where they perform administrative functions within a framework of policies, practices, procedures, or rules made by others, and themselves lack power to make decisions as to the plan policies, practices, or rules.  *See*, *e.g.*, *Livick* v. *Gillette Co.*, 524 F.3d 24, 29 (1st Cir.2008) (citing 29 C.F.R. § 2509.75–8 D–2) ("a person who performs purely ministerial functions within a framework of policies, interpretations, rules, practices and procedures made by other persons is

not a fiduciary."); *Toomey*, 855 F. Supp. 19, 24 (D.Mass.1994) ("It is undisputed that the majority of [administrator's] services, at least, were in the nature of claims processing, communications with employees and calculation similarly, of benefits. As such, the bulk of [administrator's] responsibilities to the Plan were unquestionably non-fiduciary.").  And similarly, the Department of Labor has released guidance stating that:

> a person who performs purely ministerial functions such as the types described above [i.e., calculation of benefits, collection and application of contributions, processing of claims, and "making recommendations to others for decisions with respect to plan administration", among other duties listed in the guidance] . . .within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan, does not exercise any authority or control respecting management or disposition of the assets of the plan, and does not render investment advice with respect to any money or other property of the plan and has no authority or responsibility to do so.

*See* 29 CFR § 2509.75-8.   That is exactly the situation here:  the employees in the Fund office performed purely administrative functions for the Funds, within a framework of policies, interpretations, rules, practices and procedures approved by the Trustees, not Ms. Alongi.  *See* DSOF, ¶ 10.  In her role as Administrator, Ms. Alongi presented information to the Trustees at quarterly board meetings and made recommendations to the Trustees for decisions with respect to plan administration, subject to their review and approval; she did not exercise discretionary control or authority over the Funds' operations.  *See* DSOF, ¶ 11.  For example, Ms. Alongi had no authority to make any decisions on such essential matters as benefit changes and beneficiary appeals for the Health & Welfare, Pension Funds, and Annuity and Savings Funds, and decisions

regarding the Funds' engagement or termination of investment managers or healthcare providers: these decisions were all made solely by the Trustees.  *Id.* at ¶ 12.

Further, contrary to the Funds' allegations: Ms. Alongi never exercised any discretionary authority or control over Funds' office employee compensation.  During her entire tenure as Administrator, employee compensation was set exclusively by the Trustees.  The Trustees established a subcommittee consisting of the Chairman and the Senior Management Trustee (the "Subcommittee") and the Subcommittee made decisions on behalf of the Trustees concerning Funds' office employee compensation.  *Id.* at ¶ 13.  Ms. Alongi made recommendations regarding employee compensation to the Chairman, but had no authority to (and never did) make any binding decision regarding employee compensation.  *Id.* at ¶ 17.

Moreover, once Mr. McLaughlin became Business Manager of the Union and Chairman of the Boards of Trustees of the Funds in August 2017, he took it upon himself to assume even greater control and authority over the day-to-day operations of the Funds.  *See* DSOF, ¶ 18.  For example, handwritten notes taken by Mr. McLaughlin himself from a meeting he had with Ms. Alongi demonstrate Mr. McLaughlin exercising virtual complete authority and control over the Fund office operations:  (1) he stated that there would be no delays for inclement weather in the office "unless he deems necessary" ; (2) he told Ms. Alongi that he was "the only person authorized to make that decision;" (3) he demanded that Ms. Alongi work in the Funds office between the hours of 8:00 am to 4:00 pm and notify him directly if she would be out of the office; (4) he informed  Ms. Alongi that he required "weekly updates" from her regarding various matters relating to the Funds operations so that, to use his own words, *he* could "properly manage the business of. . . the Fund;" and (5)  he  unilaterally exercised complete control over matters of compensation in the Funds office, by proclaiming, unilaterally,  that there would be "a 3%

maximum increase—across the board" for the year 2020. *See id.* Given all of this, there exists a genuine dispute of material fact which precludes summary judgment on the issue of whether Ms. Alongi was a functional fiduciary with respect to the work she performed in the Funds office.

In addition, by attempting to impute such broad fiduciary duties to Ms. Alongi, the Funds ignore the limited nature of the 'functional fiduciary' definition, and ignore the requirement that they identify a specific nexus between the alleged ERISA violation (*i.e.*, Ms. Alongi's Coalition work) and the supposed actions or functions that allegedly created Ms. Alongi's fiduciary status. Instead, the Funds attempt to assign fiduciary liability to Ms. Alongi in "broad, general terms," the precise theory that the First Circuit already has rejected. *See Beddall*, 137 F.3d at 18. With respect to her performance of Coalition work in particular, Ms. Alongi did not act as a fiduciary of the Funds for the simple reason that the Coalition's work did not involve control or authority over Funds' assets: the Coalition is a separate entity that used its own assets to compensate its employees and accomplish its mission. *See DSOF, ¶ 28.*

### B.   MS. ALONGI DID NOT ACT AS A FIDUCIARY OF THE FUNDS WITH RESPECT TO HER VACATION TIME

In addition, Ms. Alongi did not act as a functional fiduciary in connection with her use of two additional weeks of vacation time between 2013 and 2020. In 2013, Business Manager/Chairman Louis Rasetta and Senior Management Trustee Shaughnessy jointly approved an additional two weeks of vacation time for Ms. Alongi to use or cash out annually; they have stated this under oath. *See DSOF, ¶ 19.* Further, there is evidence that the Funds' Business Manager and Senior Management Trustee – which were the positions held by Messrs. Shaughnessy and. Rasetta – formed a Subcommittee that jointly made decisions concerning employee compensation matters on behalf of the Funds. *See DSOF, ¶¶ 13-16.* Accordingly, Ms. Alongi did not act as a fiduciary in connection with her vacation time: the Funds approved her vacation time, and therefore she did

not act with discretionary authority or control over Fund assets in connection with her vacation time.

## II.    DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF WHETHER MS. ALONGI BREACHED ANY FIDUCIARY DUTY

Even assuming (despite the material disputes of fact identified above) that Ms. Alongi did act as a 'functional' fiduciary, this Court should still deny summary judgment because there are genuine disputes of material fact regarding whether Ms. Alongi breached any such duty.  In their Motion, the Funds argue that, in connection with her Coalition work, her work hours for the Funds, and her receipt of additional vacation time, Ms. Alongi breached ERISA's duty of loyalty, which requires that a fiduciary "discharge [her] duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A); *see* Memo, pp. 9-10.  Relatedly, the Funds contend that in connection with the above conduct, Ms. Alongi engaged in the 'prohibited transactions' set forth in 29 U.S.C.A. § 1106(b), which provides that a fiduciary with respect to a plan shall not "(1) deal with the assets of the plan in [her] own interest or for [her] own account, (2) in [her] individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or (3) receive any consideration for [her] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan."  *See* Memo, pp. 9-10. However, the Funds are simply not entitled to summary judgment on those fact-intensive claims on the record before this Court.

To prevail on their breach of duty of loyalty claim, the Funds must show, by a preponderance of evidence, that Ms. Alongi harmed the Funds by failing to act in the best interest

of the Funds' participants and beneficiaries. *Bunch I*, 532 F. Supp. 2d at 291 (quoting 29 U.S.C. § 1104(a)(1)(A)). In making this inquiry, the Court must consider the "totality of circumstances." *See Bunch* v. *W.R. Grace & Co. (Bunch II)*, 555 F.3d 1, 7 (1st Cir. 2009). Importantly, the Court "must take into account the fiduciary's subjective motivation in making a decision for the plan." *Moitoso* v. *FMR LLC*, 451 F. Supp. 3d 189, 204 (D. Mass. 2020). "[T]he duty of loyalty is grounded in the motivation driving a fiduciary's conduct, and liability will not lie where a fiduciary's decisions were motivated by what is best for the [plan], even if those decisions also incidentally benefit the fiduciary." *See Perez* v. *First Bankers Tr. Servs., Inc.*, 210 F. Supp. 3d 518, 534 (S.D.N.Y. 2016); *see also Brotherston* v. *Putnam Invs., LLC,* 907 F.3d 17, 40 (1st Cir. 2018) ("in reviewing ERISA duty of loyalty claims, we have asked whether the fiduciary's 'operative motive was to further its own interests.'"). As set forth below, several disputes of material fact preclude the Funds from receiving summary judgment on any of their breach of fiduciary duty allegations under this standard.

### A. Ms. Alongi did not breach any fiduciary duty of Loyalty to the Funds in connection with Her Coalition Work

Ms. Alongi did not breach any fiduciary duty of loyalty to the Funds in connection with the work she performed for the Coalition. As an initial matter, the Funds' recounting of history concerning Ms. Alongi's employment history and termination, the work Ms. Alongi performed for the Coalition, and what the Trustees of the Funds knew about that work is a matter of genuine dispute.

i. Ms. Alongi's General Employment History and Summary of Her Work for the Coalition.

Following her graduation from Framingham North High School, Ms. Alongi began her employment with the Funds in 1978 in a clerical position, and was promoted throughout the years. *See* DSOF, ¶ 1. Throughout her employment, Ms. Alongi was an exemplary employee, and in

1996  the Funds ultimately promoted her   to the position of Administrator of the Funds.  *Id.*, at ¶ 2.  As the Funds' Administrator, Ms. Alongi worked under the direction and control of the Boards of Trustees of the Funds.  *Id.*, at ¶ 3.  On a day-to-day basis, she reported directly to the Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees of the Funds (positions that were held simultaneously by one individual during Ms. Alongi's tenure as Administrator).  *Id.*, at ¶ 4.  Accordingly, from around 2004 to August 2017, she reported directly to Louis Rasetta, who held the Business Manager and Chairman positions, and from August 2017 through her termination in July 2020, she reported directly to Mr. McLaughlin McLaughlin, who was Mr. Rasetta's successor as Business Manager and Chairman.  *Id.*, at ¶¶ 6-7.

During Ms. Alongi's entire tenure as Administrator, from 1996 through 2020, the Funds were a   Coalition member.  *Id.*, at ¶ 21.  The Coalition is a voluntary, non-profit business league exempt from taxation under Section 501(c)(6),[6] which is comprised solely of multi-employer trust funds, including the Funds at all times relevant to this matter.  *Id.*, at ¶ 22.  By virtue of its status as a Section 501(c)(6) tax-exempt business league, the IRS has determined that the Coalition is "an association of persons having some common business interest, the purpose of which is to promote such common interest and not to engage in a regular business of a kind ordinarily carried on for profit."  *See* 26 C.F.R. § 1.501(c)(6)–1; *see also MIB, Inc.* v. *Comm'r,* 734 F.2d 71, 72, n. 1 (1st Cir. 1984).  In addition, again by virtue of its 501(c)(6) status, the IRS has determined that the Coalition's activities are "directed to improving business conditions of one or more lines of business," and that the interests of its members (in this case, the multi-employer fund members of the Coalition) will be advanced by the association.  *See* 26 C.F.R. § 1.501(c)(6)–1; *see also MIB,*

---

[6] The Funds erroneously claim in their Motion that the Coalition is a 501(c)(3) exempt organization.  *See* RSOF, ¶ 90.

*Inc.,* 734 F.2d at 78.  More specifically, according to the Coalition's by-laws, its specific objectives

are:

> (a) To educate the Governor, General Court and agencies, subdivisions, instrumentalities
> and officers of the Commonwealth of Massachusetts (collectively, the "State
> Government"), the President, Congress and agencies and officers of the United States of
> America (collectively the "Federal Government"), the general public and the Coalition's
> members and participants, as to the crises and developments affecting Taft-Hartley Trust
> Funds including, but not limited to, health and welfare and pension issues;

> (b) To secure, analyze and disseminate statistical data and information regarding the health
> care and pension industry to the federal and state government, the general public, and the
> Coalition's members;

> (c) To develop and propose better methods of providing and paying for health care;

> (d) To promote harmonious relations with the health care industry and other industries
> affecting Taft-Hartley Funds; and

> (e) To promote the financially sound continued long term survival of Taft-Hartley Trust
> Funds.

*Id.*, at ¶ 23.  As such, the sole purpose of the Coalition is to benefit its member multi-employer

trust funds.  *Id.*  At all times during Ms. Alongi's employment as Administrator, the Trustees of

the Funds knew that the Funds were a dues-paying Coalition member and never took any action

to remove the Funds as a member.  *Id.*, at ¶ 24.

The Coalition is governed by a Board of Directors referred to as the "Executive Board"

made up of 5 directors who are elected by the Coalition's member funds; each Board member is

required to be either an officer, director or duly authorized representative of a member fund.  *Id.*,

at ¶ 25.  The Executive Board has the power to employ an "Executive Director" who serves as the

administrative officer of the Coalition and who works under the immediate supervision of the

President and the Executive Board.  *Id.*  In 2007, the Executive Director position became vacant;

Ms. Alongi applied for the position and held the position for 14 years, between 2007 and 2021. *Id.*, at ¶ 26.

> ii. The Trustees Knew and Approved of Ms. Alongi's Work for the Coalition, And Her Work For the Coalition Directly and Positively Impacted the Financial Position of the Funds.

The Funds were well aware of Ms. Alongi's work for the Coalition, from the beginning of her part-time work for the Coalition in 2007 through the entire remaining 13 years of Ms. Alongi's employment with the Funds. *Id.*, at ¶ 29. In fact, Messrs. Rasetta and Shaughnessy both testified unequivocally that they knew Ms. Alongi was employed as the Executive Director of the Coalition beginning in 2007 and that they approved of her performing work in that position. *Id.*, at ¶ 30. Mr. McLaughlin acknowledged that he knew that Ms. Alongi was employed as the Executive Director of the Coalition, and notably, during Ms. Alongi's 13 years working part-time for the Coalition in addition to working for the Funds, neither Mr. McLaughlin nor any other Trustee ever once told Ms. Alongi that they had any issue with her working part-time for the Coalition. *Id.*, at ¶¶ 31-32. Further, Mr. Rasetta and the Trustees specifically took into account Ms. Alongi's Coalition salary when determining her yearly salary as the Funds' Administrator. *Id.*, at ¶ 33. This fact alone demonstrates that the Trustees not only knew about but endorsed Ms. Alongi's Coalition work.

Along these same lines, in 2015 the Labor Guild (an agency of the Archdiocese of Boston) honored Ms. Alongi with their prestigious "Boyle Award" for excellence in labor-management relations, expressly in connection with her work for both the Funds and the Coalition. *Id.*, at ¶ 34. The Trustees were well aware of this award (Mr. McLaughlin, among others, even attended the award ceremony), and as such their claim to be ignorant of Ms. Alongi's work for the Coalition is patently false. *Id.*, at ¶ 35.

Moreover, during Ms. Alongi's entire 13-year tenure as Executive Director of the Coalition – from 2007 through 2020 - the Coalition rented office space at the Funds' office.  The Funds were, of course, aware of this use of their own office space, as confirmed by their 30(b)(6) representative Mr. Geiman at his deposition.  *Id.*, at ¶ 36.  That the Funds agreed to allow the Coalition to rent space in the Funds' own office creates a presumption that it knew that Ms. Alongi would be performing some Coalition work during normal business hours.

In her role as Executive Director of the Coalition, Ms. Alongi developed better methods of providing and paying for health care, and personally negotiated favorable discounts which directly and positively impacted the Funds' financial position. *Id.*, at ¶ 37.  In fact, both  Messrs. Rassetta and Shaughnessy testified that as a direct result of Ms. Alongi's work coordinating and overseeing the work of the Coalition, and by utilizing the Coalition's collective bargaining power, the Funds were able to reap significant benefits by negotiating more favorable contract terms with third-party vendors, and would not have received the same benefits but for Ms. Alongi's  Coalition work.  *Id.*, at ¶ 38.

For example, during her tenure as Executive Director, Ms. Alongi negotiated with Blue Cross Blue Shield over how they paid out benefits to plan participants and redesigned the way the Funds were run to help contain healthcare costs for the benefit of the Funds and its members.  *Id.*, at ¶ 39.  It is uncontroverted that this new way of doing business with Blue Cross Blue Shield wound up saving the Funds millions of dollars (and, in turn, savings for its members on healthcare costs).  *Id.*  Further, despite the Funds' claims to the contrary, there is evidence that Ms. Alongi's other work for the Coalition identified in her Interrogatory Answers resulted in material benefit to the Funds.  *Id.*, at ¶¶ 40-41.

In their Motion, the Funds baldly assert that they would have received the same benefits they received from the Coalition by virtue of their being a member of the Coalition, even if Ms. Alongi had not been its Executive Director. But they have not adduced a shred of evidence supporting this conclusory statement, and there is hard, record evidence belying their claim: as Executive Director, Ms. Alongi was personally involved with, and responsible for, negotiating the deals and arrangements with insurance companies that indisputably led to direct cost savings for the Funds. *Id.*, at ¶ 42. The Funds has not – and cannot – point to any evidence to support their speculative (and hypothetical) claim that if someone else had been Executive Director of the Coalition, those same deals and cost savings would have been negotiated.

Further, while working for the Coalition, Ms. Alongi was not motivated by personal greed or any desire to enrich herself at the expense of the Funds (or the Coalition): to the contrary, her sole motivation was to use her position of influence in the Coalition—an organization formed for the express purpose of providing common benefit to its multi-employer fund members—to improve both the financial and lobbying position of the Funds and all other multi-employer fund members with which the Funds shared a common interest. *Id.*, at ¶ 42. There is no evidence to the contrary.[7]

In light of the above, the Funds are not entitled to summary judgment on their claim that Ms. Alongi breached any fiduciary duty of loyalty she had to the Funds by working for the Coalition  Accordingly, this Court should deny the Funds' Motion for Summary Judgment  as to their claim that Ms. Alongi breached her fiduciary duty  by performing  Coalition work.

---

[7] The Funds' accusation that Ms. Alongi somehow personally benefitted from service providers signing up as "associate members" of the Coalition is specious. There was no personal benefit:  the Coalition used the dues paid by its "associate members" to pay for accommodation-related expenses for those members' attendance at Coalition events; the dues were not used to pay Ms. Alongi's salary and she received no personal benefit of any kind. *Id.*, at ¶ 43.

       iii.   <u>A Material Issue of Fact Exists As To The Issue of the Trustees' Knowledge and Approval of Ms. Alongi's Coalition Work During Regular Business Hours</u>

In support of their claim that Ms. Alongi breached her fiduciary duty by performing work for the Coalition, the Funds additionally assert that prior to reviewing her timesheets in or around June 2020, Mr. McLaughlin was somehow blissfully unaware of the fact that Ms. Alongi occasionally performed Coalition work during the hours of 8:00 am to 4:00 pm on weekdays, and that this discovery led to her termination. *See* RSOF at ¶ 103. However, the Funds' claims regarding Mr. McLaughlin's (and the Trustees') knowledge of her Coalition work, and the reason for Ms. Alongi's termination, are far from undisputed: genuine disputes of material fact exist regarding these issues that preclude the entry of summary judgment in the Funds' favor.

By way of background, on or about August 1, 2017, Mr. McLaughlin was appointed Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees of the Funds. *Id.*, at ¶ 44. From the beginning of his tenure as Chairman, Mr. McLaughlin routinely made highly inappropriate and sexually charged comments in the workplace to Ms. Alongi and other female employees. *Id.*, at ¶ 45. For example, he routinely visited Ms. Alongi's office to discuss his sexual desires and fantasies, how he felt about the women in the office, and what he would like to do to them sexually. *Id.*, at ¶ 46. On more than one occasion, Mr. McLaughlin also stated to Ms. Alongi he could not concentrate during a Trustees meeting because he could not take his eyes off her and that Ms. Alongi "looked so good" and that he "wanted" her and had "such a crush" on her. *Id.*, at ¶ 47.

When Mr. McLaughlin engaged in this conduct, Ms. Alongi told Mr. McLaughlin to stop and stated that he was going to get in trouble. *Id.*, at ¶ 48. Ms. Alongi informed Mr. McLaughlin several times that if his wife ever found out about his behavior that she would divorce him. *Id.*, at

¶ 49. Mr. McLaughlin laughed and stated that he was "the boss" and that therefore he could "get away with it." *Id.*, at ¶ 50. Mr. McLaughlin also frequently told Ms. Alongi about his "need for sex," and stated that his wife was not "taking care of" him. Mr. McLaughlin made statements to the effect that he was a "pig" and that "all men are pigs," and that "all men think about is sex." *Id.*, at ¶ 51. Along these same lines, there is also evidence that Mr. McLaughlin has had at least one inappropriate romantic or sexual relationship with another Funds employee, a fact known to the Funds as evidenced by a May 17, 2017 letter from the then Assistant Administrator (and in-house counsel), Mr. Greg Geiman, to Ms. Alongi in which he references "recent concerns [he has] about Laura-Jean's association with [Mr. McLaughlin] and the resulting lack of deference and communication with you,…" *Id.*, at ¶ 52.

Ms. Alongi was deeply (and understandably) disturbed by Mr. McLaughlin's highly sexually-charged workplace behavior, and she decided to confront Mr. McLaughlin about it. On May 1, 2018, Ms. Alongi requested that Mr. McLaughlin meet with her in her office to discuss, among other things, Mr. McLaughlin's inappropriate conduct and comments in the workplace as well as ways in which he had been passing up Ms. Alongi in favor of male employees. *Id.*, at ¶ 53. As Ms. Alongi began providing Mr. McLaughlin some examples of how his behavior had made her uncomfortable, Mr. McLaughlin started to pace in front of Ms. Alongi and yell obscenities and words to the effect of "you do not respect me, I am the manager!" *Id.*, at ¶ 54. Mr. McLaughlin continued to yell and swear at Ms. Alongi for approximately 10 minutes to the point where other Funds employees feared for Ms. Alongi's physical safety; indeed, one Funds employee testified that she had already dialed in 911 on her phone and was ready to call the police. *Id.*, at ¶ 55. Mr. McLaughlin was so loud that employees having lunch in the Funds kitchen (on the opposite side of the building) could hear him shouting. *Id.*, at ¶ 56. Mr. McLaughlin only

stopped when Ms. Alongi's sister, Rosemarie, and Mr. Geiman, the Funds' own in-house lawyer, entered Ms. Alongi's office and physically extricated Mr. McLaughlin from Ms. Alongi. *Id.*, at ¶ 57. Immediately following this verbal assault, Mr. McLaughlin attempted to apologize to Ms. Alongi by hugging her and trying to kiss her on the lips. *Id.*, at ¶ 58. While doing so, he also told her that the fight had gotten him "excited" and that he had come close to getting an erection as a result of his assault on her. *Id.*, at ¶ 59.

Mr. McLaughlin's egregious behavior during this altercation (as well as his prior and subsequent sexually-charged and predatory behavior in the office) is not only supported by Ms. Alongi's testimony and the affidavits and witness statements of several other female Fund office employees in this record; it is also expressly corroborated by Mr. Geiman's own testimony and contemporaneous (and highly detailed) notes which he recorded in the immediate aftermath of, and in the few weeks following, Mr. McLaughlin's violent outburst.[8] *Id.*, at ¶ 60.

Shortly after the altercation, in mid-May 2018, Ms. Alongi interviewed several female Funds staff members regarding their experiences with Mr. McLaughlin. *Id.*, at ¶ 61. Each reported feeling uncomfortable with the way that Mr. McLaughlin looked at, talked to, or touched them. *Id.*, at ¶ 62. One employee, in particular, reported that Mr. McLaughlin regularly entered her office to give her unprompted massages which made her uncomfortable, but she did not feel she could ask him to stop as he was the boss. *Id.*, at ¶ 63. Another employee stated that Mr. McLaughlin called her "sexy" on more than one occasion and would make comments to the effect that he wanted her sexually. *Id.*, at ¶ 64. In response to learning of these events, Ms. Alongi requested to

---

[8] Incredibly, this internal Funds memo (along with others corroborating Ms. Alongi's account of her encounters with Mr. McLaughlin), authored by Mr. Geiman, were produced literally minutes before the start of Mr. Geiman's deposition, more than two months after the close of written discovery, and over one year after Mr. Geiman had handed over these memos to its outside counsel. Even Mr. Geiman testified that there was no credible explanation for the delay in producing these documents to counsel for Ms. Alongi. *See* Defendants' Appendix for Opposition to Motion for Partial Summary Judgment ("D.App.") filed herewith, at Exhibit 10, deposition pages 171-177.

meet with Ms. Kathyrn Shea, a partner at Segal Roitman and outside counsel to the Funds, and did so on or about May 21, 2018. *Id.*, at ¶ 65. Ms. Alongi informed  Attorney Shea about the May 1st incident and about how severe Mr. McLaughlin's constant bullying and sexual harassment was. *Id.*, at ¶ 66. Remarkably (and incorrectly), Attorney Shea informed Ms. Alongi at this time that this conduct did not rise to the level of sexual harassment and that in order to claim sexual harassment, the conduct would have to be pervasive or "widespread."  Attorney Shea told Ms. Alongi that she had "no case." *Id.*, at ¶ 67.

Shortly following her meeting with Ms. Alongi, Attorney Shea met with Mr. McLaughlin and next with Mr. Geiman. Ms. Alongi was then instructed to meet with Attorney Shea and Mr. McLaughlin in his office. Attorney Shea, on behalf of the Funds, informed Ms. Alongi at this time that she (not Mr. Mclaughlin) could be terminated for insubordination. *Id.*, at ¶ 68.  Attorney Shea stated again to Ms. Alongi that Mr. McLaughlin's conduct did not rise to the level of sexual harassment and that if Ms. Alongi kept quiet about her allegations of sexual harassment, Mr. McLaughlin would apologize, and Ms. Alongi would not be terminated. *Id.*.  Although Ms. Alongi continued to feel that Mr. McLaughlin's actions were wrong, the combination of Attorney Shea's purported legal assessment that she did not have a viable sexual harassment claim, the specter of an apology from Mr. McLaughlin, and Ms. Alongi's newly found fear that she would be shown the door if she did make any further complaints about Mr. McLaughlin induced Ms. Alongi not to pursue the matter further at that time. *Id.*, at ¶ 69.

Following these meetings with Attorney Shea (and now knowing that there would be no consequences for his behavior), Mr. McLaughlin continued to subject Ms. Alongi, her sister, and other female employees to frequent sexual comments well into 2020. *Id.*, at ¶ 70. Mr. McLaughlin continued to visit Ms. Alongi's office, each time to make statements about sex and women's

bodies. *Id.*, at ¶ 71. On one such occasion in the last quarter of 2019, Mr. McLaughlin entered Ms. Alongi's office and told Ms. Alongi that he knew about one of Ms. Alongi's younger employees who was struggling with breast cancer. *Id.* Mr. McLaughlin asked Ms. Alongi "are her boobs any good?" and "do you think she will show me them?" or words to that effect. *Id.*

Mr. McLaughlin also specifically began to retaliate against Ms. Alongi because of her prior attempt to get him to stop harassing her and other female employees. *Id.*, at ¶ 72. For example, on or around November 9, 2018, Mr. McLaughlin informed Ms. Alongi that her service animal, who was trained to detect Ms. Alongi's low blood sugar levels, would no longer be permitted in the office. When Ms. Alongi requested an ADA accommodation in order to bring her service dog with her to the office on days that she felt ill, Mr. McLaughlin stated "no dogs in the office, including yours. I do not care what the law says" or words to that effect, and he provided Ms. Alongi with no explanation for the change in the policy. *Id.*

In or around early January 2020, Ms. Alongi was once again called into a meeting with Mr. McLaughlin, this time with Attorney Shea present. *Id.*, at ¶ 73. At that meeting, Mr. McLaughlin instructed Ms. Alongi that from that point forward, he expected Ms. Alongi to report to work by 8 am every day. *Id.*, at ¶ 74. Prior to Mr. McLaughlin's request, Ms. Alongi would take the first of her two types of daily insulin shots at 8:30 am and be at work by 9:15 am. Ms. Alongi would then skip lunch or stay later during the day and often worked on weekends. *Id.*, at ¶ 75.

Ms. Alongi reminded Mr. McLaughlin of her Type 1 Diabetes and explained that her current work schedule allowed her to take insulin and change her continuous glucose monitor at specific and uniform times of the day as required. *Id.*, at ¶ 76. Ms. Alongi requested that Mr. McLaughlin grant her an accommodation and permit her to continue working on her usual work schedule to allow her to manage her health condition. *Id.*, at ¶ 77. Mr. McLaughlin replied "no

accommodation is granted" or words to that effect. *Id.* Attorney Shea said nothing at this meeting and kept her head down. *Id.* Following this meeting, Ms. Alongi immediately began reporting to work beginning at 8 am which caused her to be off her insulin schedule, thereby causing her to experience serious health issues. *Id.*, at ¶ .

Mr. McLaughlin's inappropriate behavior continued throughout Ms. Alongi's employment. *Id.*, at ¶ 79. In March 2020, the Funds permitted its employees over the age of 65 or affected with a health condition to work from home due to the global COVID-19 pandemic. *Id.* Although Ms. Alongi was permitted to work remotely due to her diabetes, Mr. McLaughlin continued to alter the terms and conditions of her employment. *Id.* In late April 2020, Mr. McLaughlin told Mr. Geiman in the Funds hallway that "Ms. Alongi should be in the office" and that he did not care about her medical condition. *Id.* By June 2020, Mr. McLaughlin required that Ms. Alongi account for her time in 15-minute increments for the purpose of finding a pretext to terminate Ms. Alongi's employment due to her opposition to Mr. McLaughlin's inappropriate conduct. Ms. Alongi began tracking her time in this manner on June 15, 2020 and submitted these timesheets directly to Mr. McLaughlin at his request. *Id.*, at ¶ 80. No such requirement had ever been imposed on Ms. Alongi prior to that time. *Id.*[9]

Shortly thereafter, after 42 years of loyal and dedicated service to the Funds, Ms. Alongi was summarily and without any warning terminated on July 22, 2020. *Id.*, at ¶ 81. Ms. Alongi's termination letter provided her with no explanation whatsoever for why she was fired – and did

---

[9] Mr. McLaughlin's blatant animus towards Ms. Alongi was palpable throughout his deposition. At one point, he described her as a "selfish, fucking bitch" and as "bipolar." *See* D.App., Exhibit 4, Vol. I, deposition page 145, Vol. II., deposition pages 8-9, p. 40. In addition, and presumably at the request of her client, Mr. McLaughlin's outside counsel (in Mr. McLaughlin's presence,) grilled Ms. Alongi about her sexual life at her deposition, including asking her questions about men with whom she had had romantic relations going back decades. *See* D.App., Exhibit 1, Vol. II, deposition pages 213-218 . How such questioning could have any possible relevance to the instant litigation is baffling.

not even suggest any alleged or suspected breach of fiduciary duty – but simply stated, in part: "As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision…. We …. trust that our separation will be courteous and respectful." *Id.*, at ¶ 82.

Thereafter, Ms. Alongi filed a complaint with the MCAD, alleging that her termination had been unlawful. It was not until after Ms. Alongi filed that complaint that the Funds ever raised <u>any</u> allegations that she had breached her fiduciary duty. *Id.*, at ¶ 83.

In their Motion, the Funds claim that Ms. Alongi was terminated for working for the Coalition during Funds' business hours after Mr. McLaughlin suddenly discovered (and was not previously aware) that Ms. Alongi occasionally performed Coalition work between the hours of 8:00 am to 4:00 pm on weekdays. However, Mr. McLaughlin's sworn deposition testimony that he knew Ms. Alongi worked as the Coalition's Executive Director for years, *see id.*, at ¶ 31, combined with the evidence of Mr. McLaughlin's close monitoring and supervision of Fund office work, point to the opposite conclusion. They also call into question whether Mr. McLaughlin's (and the Trustees') self-serving claims regarding their purported ignorance and approval of Ms. Alongi's Coalition work are even remotely credible. Of course, reasonable doubts and issues of credibility must be resolved in favor of the non-moving party at the summary judgment stage. *See Marcano-Martinez* v. *Cooperativa de Seguros Multiples de Puerto Rico*, 991 F.3d 336, 338 (1st Cir. 2021) The Funds' Motion for Summary Judgment should be denied.

### A. MS. ALONGI DID NOT BREACH ANY FIDUCIARY DUTY OF LOYALTY TO THE FUNDS IN CONNECTION WITH HER WORK HOURS FOR THE FUNDS

The Funds also erroneously claim that Ms. Alongi breached her fiduciary duty to the Funds by "failing to work the requisite hours upon which her compensation was based." As an initial matter, Ms. Alongi testified that she worked *more* than full-time hours as the Funds' Administrator, and principally only performed Coalition work during Funds' work hours during the one-hour

lunch break afforded to her each day pursuant to the Funds' policy.  *Id.*, at ¶¶ 84-85.  The fact that the Audit Report commissioned by Schultheis & Panettieri (the "Schultheis Report") reaches a different conclusion does not permit summary judgment to enter in the Funds' favor, but rather -- at best -- creates a fact issue which should be resolved  at trial.  This is particularly true considering the several obvious and egregious flaws in the conclusions reached by the Schultheis Report based on the data it claims to have used.   One fundamental flaw, for example, is that the Schultheis Report relies on the misguided assumption that Ms. Alongi only performed work for the Funds when she was either sending e-mails or on her cell phone, and relies on that data to somehow conclude that she rarely worked outside of business hours.  *Id.*, at ¶ 86.  But this data is far from conclusive:  as even the Schultheis Report's author admitted at his deposition, the fact that Ms. Alongi was not sending e-mails or calling someone on her phone does not mean that she was not working.  *Id.*.  Ms. Alongi's position as Administrator required her to perform countless tasks that could be completed after-hours, which would not require the use of e-mail or a cell phone call. For example, she was responsible for preparing and presenting separate reports to each individual Board of Trustees on a quarterly basis for Trustee board meetings, and in connection with that duty Ms. Alongi   routinely  analyzed  reports  prepared  by  the  Funds'  consultants  and  in-house accountants, including financial statements, expense reports, payroll reports, investment reports, and other general healthcare and pension-related material.  *Id.*, at ¶ 87.   Ms. Alongi performed much of this work after business hours, when she had time to read, process, and prepare this information undisturbed; she often spent her time during  business hours communicating with members, Union employers, and her direct reports at the Fund Office.[10]  *Id.*, at ¶ 88.  The e-mail and cell-phone data used by Schultheis to try to recreate Ms. Alongi's work hours obviously (and

---

[10] Ms. Alongi also often performed tasks such as drafting letters and reviewing proposed budgets during non-business hours. *Id.*, at ¶ 88.

incorrectly) leads to a 'conclusion' that she only worked during business hours, because those are the hours during which Ms. Alongi -- and most office workers generally -- communicated by e-mail or phone.  *Id.*

Other glaring errors contained in the Schultheis Report's conclusions abound: the Report makes projections about Ms. Alongi's work hours for a period of five years using cell phone data from only a 6 month period in 2020, which of course is blatantly speculative --not to mention skewed by a worldwide pandemic -- and the Report's data concerning Ms. Alongi's supposed office entry times (which show an average entry time of 10:30 a.m. or later for some years), is directly contradicted by not only Ms. Alongi's testimony, but by the deposition testimony of several of her co-workers, who testified that prior to 2020 (when she started to come into the office at 8:00 am at the insistence of Mr. McLaughlin) Ms. Alongi typically arrived at the office between 9:00am and 10:00am.  *Id.*, at ¶¶ 89-90.  Additional evidence also calls the office entry data into question:  several of Ms. Alongi's co-workers testified that they would open the office door for her on occasion (without her using her office pass), which of course would incorrectly lead to a conclusion that Ms. Alongi arrived at times later than she actually arrived.  *Id.*, at ¶ 91.  And on top of all of this, it is undisputed that Schultheis & Panettieri were paid by the Funds to produce the Report only *after* Ms. Alongi filed her discrimination claims against the Funds, and that the Funds (conveniently) engaged Schultheis & Panettieri to perform accounting work for them *after* the Report was authored.  *Id.*, at ¶ 92.[11]  In short, there are, at best, significant material disputes of

---

[11] The glaring deficiencies contained in the Schultheis Report, coupled with its timing and inherent bias, bring to mind Shakespeare's oft-quoted line, "Me thinks thou dost protest too much."  Hamlet, Act III, Scene ii.

fact that must be resolved at trial concerning Ms. Alongi's actual work hours and the reliability of the Schultheis Report.[12]

### B. MS. ALONGI DID NOT BREACH ANY FIDUCIARY DUTY OF LOYALTY TO THE FUNDS IN CONNECTION WITH WORK FOR THE COALITION PERFORMED BY OTHER FUNDS EMPLOYEES

Further, contrary to the Funds' assertions, Ms. Alongi did not breach any fiduciary duty of loyalty to the Funds in connection with work for the Coalition performed by other Funds employees, particularly Laura-Jean Hickey, Taylor Ryan, Rosemary Ortega, and Rosemarie Along (Ms. Alongi's sister).   As an initial matter, deposition testimony contradicts the Funds' claim that the Trustees were unaware that Ms. Hickey performed work for the Coalition:  Mr. Rasetta specifically testified that he knew that Ms. Hickey performed Coalition work, and there is also evidence of Ms. Hickey e-mailing Mr. McLaughlin himself about her performance of Coalition work during business hours (specifically related to the posting of flyers).  *Id.*, at ¶¶ 93-94.  Further, regarding Taylor Ryan's work, Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project" referenced in the Funds' Motion during business hours, and it is undisputed that Ms. Hickey (who the Funds have *not* fired despite her paid Coalition work) directly assigned this work to Ms. Ryan.  *Id.*, at ¶ 95.  Similarly, the Coalition-related work cited by the Funds given to Ms. Ortega and Rosemarie Alongi was assigned directly by Ms. Hickey, not Ms. Alongi.  *Id.*, at ¶¶ 96-97.

Even assuming that Ms. Alongi directed all of the Coalition work performed by Ms. Hickey, Ms. Ortega, and Rosemarie Alongi, there are still material disputes of fact that preclude

---

[12] The Funds have a penchant for engaging heavily biased and conflicted third parties to 'support' Ms. Alongi's pretextual termination.  Aside from hiring Schultheis, they also engaged an attorney from their own litigation counsel's firm – Joyce Mader – to provide an 'expert report' on Ms. Alongi's alleged fiduciary breaches, in response to the MCAD complaint.  At her deposition, Attorney Mader made no attempt to conceal her obvious bias and personal animus against Ms. Alongi.  For example, when asked for her thoughts about Ms. Alongi's retaliation claim, Attorney Mader referred to it as a "pile of shit."  *See* D.App., Exhibit 11, deposition pages 86-87.

summary judgment.  As already set forth above, there is undisputed testimony that the Funds' work for the Coalition resulted in millions of dollars of direct financial benefit – not harm – to the Funds. *Id.*, at ¶¶ 37-41.  Further, as discussed above, there is a material dispute of fact as to whether these employees performing work for the Coalition—which again, was created for the purpose of benefitting its members, including the Funds—can be considered a breach of the fiduciary duty of loyalty, which requires some evidence of an improper motive.  Here, there exists none.

### C.  MS. ALONGI DID NOT BREACH ANY FIDUCIARY DUTY OF LOYALTY TO THE FUNDS IN CONNECTION WITH HER RECEIPT OF ADDITIONAL VACATION TIME

Nor did Ms. Alongi breach any fiduciary duty in connection with her receipt of additional vacation time.  As already discussed above in Section I.B., both Messrs. Rasetta and Shaughnessy affirmed under oath that they jointly approved an additional two weeks of vacation time for Ms. Alongi to use or cash out annually in 2013.  *See id.*, ¶ 19.    Further, there is evidence that the Funds' Chairman and Senior Management Trustee – the positions held by Mr. Shaughnessy and Mr. Rasetta – formed a subcommittee of the Boards of Trustees that jointly made and approved decisions on behalf of the Funds concerning employee compensation generally (and Ms. Alongi's vacation pay specifically).  *Id.*, at ¶¶ 13, 19.  Accordingly, material disputes of fact exist as to whether Ms. Alongi's use of this additional vacation time was approved by the Trustees.

### D.  MS. ALONGI DID NOT BREACH ANY FIDUCIARY DUTY TO THE FUNDS IN CONNECTION WITH THE ALLOCATION OF HER WORK TIME

Finally, the Funds are not entitled to summary judgment on their claim that Ms. Alongi somehow breached her fiduciary duty by failing to fill out daily "DOL timesheets" containing allocations of her weekly time spent working for each fund which the Funds claim was required by the 2004 "Shared Services Agreement."  As an initial matter, the weekly entry of time is purely an administrative function, and as such Ms. Alongi was not acting as a 'functional fiducary' in connection with these time entries.  *See, e.g., Livick* v. *Gillette Co.*, 524 F.3d 24, 29 (1st Cir.2008)

(citing 29 C.F.R. § 2509.75–8 D–2) ("a person who performs purely ministerial functions within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary."); *see also id.*, at ¶ 98.  Furthermore, and in any event, the "Shared Services Agreement" by its express terms, does not even require Ms. Alongi or any other individual employee to fill out contemporaneous daily time sheets.  The Agreement states in pertinent part:

> The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization by each employee of the Fund Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.

*Id.*, at ¶ 99.    Nothing in this language requires Ms. Alongi, or other any individual employee, to record and report their own time on a daily basis.  *Id.* It simply states that the Fund Office Staff will "maintain records of. . .the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization."  *Id.* The fact that an attorney may have recommended that the Funds use daily time sheets to fulfill this requirement does not mean that the completion of daily time sheets is a requirement contained in any ERISA "plan document."  Yet, that is precisely the argument the Funds would like this Court to entertain here.

Moreover, according to Ms. Alongi's uncontroverted testimony, she complied with this provision of the Shared Services Agreement.    *Id.*, at ¶ 100.  Ms. Alongi testified that she did initially fill out daily time sheets, but in or around 2008, the Funds' own accountants at Manzi & Asssociates ("Manzi") determined and informed her that since 2004, based on the data Manzi reviewed from Ms. Alongi's and other employees' time sheets, there was no significant change in fund percentage allocations from year to year.  *Id.*, at ¶ 101.  Accordingly, since that time, in lieu of recording her time on a daily basis, a representative of Manzi would meet and interview Ms.

Alongi at the end of each calendar year to estimate Ms. Alongi's time allocation.  *Id*., at ¶ 102. As Ms. Alongi testified, her job duties and time allocation did not generally vary over the course of a typical year unless there was some significant change to the Funds' operations in that given year. *Id*., at ¶ 103.   In the event that there was a significant change – such as in 2015 when the Trustees dismantled the Health & Welfare Fund claims adjudication system – Manzi did alter Ms. Alongi's allocation after conferring with her, as demonstrated by the relevant data.  *Id*., at ¶ 104.  However, absent any such significant changes, Ms. Alongi's allocation -- as determined and approved by the Funds' own outside accounting firm -- would remain static for the simple reason that her job duties with respect to each Fund remained virtually unchanged.  *Id*., at ¶ 105.  As such, by following the advice of the Funds' own accountants regarding this manner of reporting her time, Ms. Alongi did not breach any fiduciary duty to the Funds.

<u>**Conclusion**</u>

For the foregoing reasons, Defendant Gina Alongi, by her attorneys, respectfully requests that the Court deny  the Funds' Motion for Partial Summary in its entirety and grant her such other and further relief as the Court deems appropriate.
 .

GINA ALONGI
By Her Attorneys,


*/s/ Timothy P. Van Dyck*
Timothy P. Van Dyck (BBO #548347)
Jacob A. Tosti (BBO #704007)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard, Suite 300
Framingham, MA  01702
(617) 757-6537
tvandyck@bowditch.com
December 12, 2022          jtosti@bowditch.com