UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al. | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:21-cv-10163-FDS |
| v. | ) ) | |
| GINA ALONGI, | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT GINA ALONGI'S**
**COUNTERSTATEMENT OF MATERIAL FACTS**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, defendant Gina Alongi ("Ms. Alongi"), in Opposition to the Motion for Partial Summary Judgment filed by the plaintiffs (collectively. The "Funds"), submits the Counterstatement of Material Facts ("DSOF").   In addition to the specific responses set forth herein, Ms. Alongi references and incorporates fully herein her Responses to the Funds' Statement of Material Facts ("RSOF") filed herewith. Exhibits submitted by the Defendant are attached to the Appendix of Exhibits in Support of Defendant's Opposition to Motion for Partial Summary Judgment ("D.App.") filed herewith.

**I.      MS. ALONGI'S WORK AS ADMINISTRATOR FOR THE FUNDS - GENERAL.**

1.      Following her graduation from Framingham North High School, Ms. Alongi began her employment with the Funds in 1978 in a clerical position, and was promoted throughout the years.  *See* Exhibit 1, Affidavit of Gina Alongi, ("Alongi Aff."), ¶ 2 (D.App. 002)

2.      Throughout her employment, Ms. Alongi was an exemplary employee, and in 1996 the Funds ultimately promoted her to the position of Administrator.  *See* Alongi Aff., ¶ 3 (D.App. 002).

3.      As the Funds' Administrator, Ms. Alongi worked under the direction and control of the Boards of Trustees of the Funds.  *See* Alongi Aff., ¶ 4 (D.App. 002).

4.      On a day-to-day basis, she reported directly to the Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees of the Funds (positions that were held simultaneously by one individual during Ms. Alongi's tenure as Administrator). *See* Alongi Aff., ¶ 4 (D.App. 002).

5.      Accordingly, from 1996 to 2004, Ms. Alongi reported directly to William Ryan, who held the position of Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees of the Funds during that time.  *See* Alongi Aff., ¶ 5 (D.App. 002).

6.      From 2004 to August 2017, Ms. Alongi reported directly to Louis Rasetta, who was Mr. Ryan's successor as Business Manager and Chairman.  *See* Alongi Aff., ¶ 6 (D.App. 003).

7.      From August 2017 through her termination in July 2020, Ms. Alongi reported directly to William McLaughlin, who was Mr. Rasetta's successor as Business Manager and Chairman. *See* Alongi Aff., ¶ 7 (D.App. 003).

8.      From 2015 through her termination in 2020, Ms. Alongi only had two direct reports as Administrator:   the Funds' Assistant Administrator (and in-house counsel) Greg Geiman and Laura-Jean Hickey.  *See* Alongi Aff., ¶ 8 (D.App. 003); *see also* <u>Exhibit 2</u>, Deposition of Gina Alongi (Excerpts) ("Alongi Dep."), Vol. III, p. 9 (D.App. 018)

9.      Between 2015 and 2020 Ms. Alongi did not directly supervise the work of any Fund Office employees other than Mr. Geiman and Ms. Hickey.  *See* Alongi Aff., ¶ 8 (D.App. 003).

10.     During the entirety of her tenure as Administrator, the employees in the Fund office performed purely administrative functions for the Funds, within a framework of policies,

interpretations, rules, practices and procedures approved by the Trustees, not Ms. Alongi. *See* Alongi Aff., ¶ 9 (D.App. 003).

11.     In her role as Administrator, Ms. Alongi presented information to the Trustees at quarterly board meetings and made recommendations to the Trustees for decisions with respect to plan administration, subject to the Trustees' review and approval.   *See* Alongi Aff., ¶ 10 (D.App. 003).

12.     Ms. Alongi had no authority to make -- and never made --  any decisions on such essential matters as benefit changes and beneficiary appeals for the Health & Welfare, Pension Funds, and Annuity and Savings Funds, and decisions regarding the Funds' engagement or termination of investment managers or healthcare providers:   these decisions were all made solely by the Trustees.  *See* Alongi Aff., ¶ 11 (D.App. 003).

13.     During Ms. Alongi's tenure as Administrator, employee compensation was set exclusively by the Trustees.  In particular. the Trustees established a subcommittee consisting of the Chairman and the Senior Management Trustee (the "Subcommittee") and the Subcommittee made decisions on behalf of the Trustees concerning Funds' office employee compensation.  *See* Alongi Aff., ¶ 12 (D.App. 003).

14.     From 2013 through August 2017, the Trustees' Subcommittee consisted of Business Manager/Chairman Louis Rasetta and Senior Management Trustee John Shaughnessy. *See* Alongi Aff., ¶ 13 (D.App. 004).

15.     From August 2017 until Mr. Shaughnessy's retirement as a Trustee in 2019, the Subcommittee consisted of Business Manager/Chairman Mr. McLaughlin and Mr. Shaughnessy. *See* Alongi Aff., ¶ 14 (D.App. 004).

16.     After Mr. Shaughnessy's retirement in 2019 through Ms. Alongi's termination in July 2020, the Subcommittee consisted of Mr. McLaughlin and Senior Management Trustee James Reger.   *See* Alongi Aff., ¶ 15 (D.App. 004).

17.     During her tenure as Administrator, Ms. Alongi made recommendations regarding employee compensation to the Business Manager/Chairman, but had no authority to (and never did) make any binding decision regarding employee compensation.   *See* Alongi Aff., ¶ 16 (D.App. 004).

18.     Once Mr. McLaughlin became Business Manager of the Union ad Chairman of the Boards of Trustees of the Funds in August 2017, he took it upon himself to assume even greater control and authority over the day-to-day operations of the Funds.   *See* Alongi Aff., ¶ 17 (D.App. 004).  For example, handwritten notes taken by Mr. McLaughlin himself from a meeting he had with Ms. Alongi demonstrate Mr. McLaughlin exercising virtual complete authority and control over the Fund office operations:  (1) he stated that there would be no delays for inclement weather in the office "unless he deems necessary" ; he told Ms. Alongi that he was "the only person authorized to make that decision;" (3) he demanded that Ms. Alongi work in the Funds office between the hours of 8:00 am to 4:00 pm and notify him directly if she would be out of the office, (4) he informed  Ms. Alongi that he required "weekly updates" from her regarding various matters relating to the Funds operations so that, to use his own words, *he* could "properly manage the business of. . . the Fund;" and (5)  he exercised complete control over matters of compensation in the Funds office, by proclaiming, unilaterally,  that there would be "a 3% maximum increase—across the board" for the year 2020.   *See* Exhibit 3, McLaughlin Meeting Notes (D.App. 017-025); Exhibit 4, Deposition of William McLaughlin (Excerpt) ("McLaughlin Dep."), Vol. III, p. 27 (D.App. 052)*; see also* Alongi Aff., ¶ 17 (D.App. 004).

## II.  MS. ALONGI'S VACATION TIME BETWEEN 2013 AND 2020.

19.  In 2013, Messrs. Rasetta and Shaughnessy jointly granted two additional weeks of vacation time for Ms. Alongi to use each year or cash out annually, in addition to the four weeks of vacation time that Ms. Alongi received prior to that grant.  *See* Alongi Aff., ¶ 18 (D.App. 004); Exhibit 5, Affidavit of Louis Rasetta ("Rasetta Aff."), ¶ 20 (D.App. 056); Exhibit 6, Affidavit of John Shaughnessy ("Shaughnessy Aff."), ¶ 6 (D.App. 060); Exhibit 7, Deposition of John Shaughnessy (Excerpt) ("Shaughnessy Dep."), p. 37 (D. App. 066).

20.  Neither the Subcommittee nor any of the other Trustees ever revoked this grant of vacation time to Ms. Alongi.  *See* Alongi Aff., ¶ 19 (D.App. 004).

## III.  THE COALITION AND MS. ALONGI'S COALITION WORK – GENERAL.

21.  During Ms. Alongi's entire tenure as Administrator, from 1996 through 2020, the Funds were a member of the Massachusetts Coalition of Taft-Hartley Funds, Inc. (the "Coalition").  *See* Alongi Aff., ¶ 20 (D.App. 005).

22.  The Coalition is a voluntary, non-profit business league exempt from taxation under Section 501(c)(6), which is comprised solely of multi-employer trust funds, including the Funds at all times relevant to this matter.  *See* Alongi Aff., ¶¶ 21, 22 (D. App. 005); *see also* Exhibit 8, Coalition By-Laws, at Art. I, Sec. 2; Art. 2, Secs. 1-2 (D.App. 070).

23.  According to the Coalition's by-laws, its specific objectives are:

(a) To educate the Governor, General Court and agencies, subdivisions, instrumentalities and officers of the Commonwealth of Massachusetts (collectively, the "State Government"), the President, Congress and agencies and officers of the United States of America (collectively the "Federal Government"), the general public and the Coalition's members and participants, as to the crises and developments affecting Taft-Hartley Trust Funds including, but not limited to, health and welfare and pension issues;

(b) To secure, analyze and disseminate statistical data and information regarding the health care and pension industry to the federal and state government, the general public, and the Coalition's members;

(c) To develop and propose better methods of providing and paying for health care;

(d) To promote harmonious relations with the health care industry and other industries affecting Taft-Hartley Funds; and

(e) To promote the financially sound continued long term survival of Taft-Hartley Trust Funds.

*See* Alongi Aff., ¶ 22 (D.App. 022); Exhibit 8, at Art. I, Sec. 2 (D.App. 070).

24.     At all times during Ms Alongi's employment as Administrator of the Funds, the Trustees of the Funds knew that the Funds were a dues-paying Coalition member and never took any action to remove the Funds as a member.  *See* Alongi Aff., ¶ 23 (D.App. 005).

25.     The Coalition is governed by a Board of Directors referred to as the "Executive Board" made up of 5 directors who are elected by the Coalition's member funds; each Board member is required to be either an officer, director or duly authorized representative of a member fund.  *See* Alongi Aff., ¶ 24 (D.App. 005); Exhibit 8, at Art. III, Sec. 1 (D.App. 073-074).

26.     The Executive Board has the power to employ an "Executive Director" who serves as the administrative officer of the Coalition and who works under the immediate supervision of the President and the Executive Board. *See* Exhibit 8, at Art. IV, Secs. 1, 6 (D.App. 074).

27.     In 2007, the Executive Director position became vacant; Ms. Alongi applied for and was hired for the position (which was a part-time position).  She held the position for 14 years, between 2007 and 2021.  *See* Alongi Aff., ¶ 25 (D.App. 005).

28.     The Coalition is an entity separate from the Funds that used its own assets to compensate its employees and accomplish its mission.  *See* Alongi Aff., ¶ 26 (D.App. 005).

**IV.     THE TRUSTEES KNEW OF AND APPROVED OF MS. ALONGI'S WORK FOR THE COALITION, AND HER WORK FOR THE COALITION DIRECTLY AND POSITIVELY IMPACTED THE FINANCIAL POSITION OF THE FUNDS.**

29.     The Funds were well aware of Ms. Alongi's work for the Coalition, from the beginning of her part-time work for the Coalition in 2007 through the entire remaining 13 years of Ms. Alongi's employment with the Funds.  *See* Alongi Aff., ¶ 27 (D.App. 027).

30.     In fact, Messrs. Rasetta and Shaughnessy both testified unequivocally that they knew Ms. Alongi was employed as the Executive Director of the Coalition beginning in 2007 and that they approved of her performing work in that position.   *See* Rasetta Aff., ¶¶ 8-19 (D. App. 055-56); Shaughnessy Aff., ¶¶ 8-12 (D.App. 060-061); Shaughnessy Dep.., pp. 47-49 (D. App. 067 -068); Deposition of Louis Rasetta (Excerpt) ("Rasetta Dep."), at p. 107 (D. App. 081)

31.     Mr. McLaughlin acknowledged that he knew that Ms. Alongi was employed as the Executive Director of the Coalition, during his tenure as Business Manager of the Funds and Chairman of the Boards of Trustees.  *See* McLaughlin Dep. Vol II, pp. 145-48 (D.App. 047).

32.     During Ms. Alongi's 13 years working part-time for the Coalition in addition to working for the Funds, neither Mr. McLaughlin nor any other Trustee ever once told Ms. Alongi that they had any issue with her working part-time for the Coalition.  *See* Alongi Aff., ¶ 28 (D.App. 006).

33.     Further, Mr. Rasetta and the Trustees specifically took into account Ms. Alongi's Coalition salary when determining her yearly salary as the Funds' Administrator.  *See* Rasetta Aff. at ¶¶ 16-17 (D. App. 056); Rasetta Dep., pp. 149-150 (D.App. 082)

34.     Along these same lines, in 2015 the Labor Guild (an agency of the Archdiocese of Boston) honored Ms. Alongi with their prestigious "Boyle Award" for excellence in labor-management relations, expressly in connection with her work for both the Funds and the Coalition.   *See* Alongi Aff., ¶ 29 (D.App. 006); Rasetta Aff. ¶ 26 (D.App. 057); Rasetta Dep., p. 157 (D.App. 083); <u>Exhibit 12</u>, Cushing Gavin Award Brochure (Excerpt), (D.App. 110-114).

35.     The Trustees were well aware of this award:  Mr. McLaughlin, among others, even attended the award ceremony.  *See* Alongi Aff., ¶ 30 (D.App. 006); Rasetta Aff. ¶ 26 (D.App. 057); Rasetta Dep., p. 157 (D.App. 083).

36.     During Ms. Alongi's entire 13-year tenure as Executive Director of the Coalition – from 2007 through 2020 - the Coalition rented office space at the Funds' office.  *See* Alongi Aff., ¶ 31 (D.App. 006).     The Funds were, of course, aware of this use of their own office space, as confirmed by their 30(b)(6) representative Mr. Geiman at his deposition.  *See* Exhibit 10 Deposition of Gregory Geiman (Excerpt) ("Geiman Dep."), Vol. I. pp. 6, 68-69 (D.App. 086-089).

37.     In her role as Executive Director of the Coalition, Ms. Alongi developed better methods of providing and paying for health care, and personally negotiated favorable discounts which directly and positively impacted the Funds' financial position.  *See* Alongi Aff., ¶ 32 (D.App. 006).

38.      In fact, both Messrs. Rassetta and Shaughnessy testified that as a direct result of Ms. Alongi's work coordinating and overseeing the work of the Coalition, and by utilizing the Coalition's collective bargaining power, the Funds were able to reap significant benefits by negotiating more favorable contract terms with third-party vendors.  *See* Rasetta Aff., ¶¶ 10-14 (D.App. 056-057); Shaughnessy Aff. ¶¶ 8-9 (D.App. 050) (D. App. 060-061).

39.     For example, during her tenure as Executive Director, Ms. Alongi negotiated with Blue Cross Blue Shield over how they paid out benefits to plan participants and redesigned the way the Funds were run to help contain healthcare costs for the benefit of the Funds and its members.  *See* Alongi Aff., ¶ 33 (D.App. 006); Shaughnessy Aff., ¶ 9 (D.App. 061); Rasetta Aff., ¶¶ 24-25 (D.App. 057).  It is uncontroverted that this new way of doing business with Blue

Cross Blue Shield wound up saving the Funds millions of dollars (and, in turn, savings for its members on healthcare costs). *See id.*; Geiman Dep., Vol. II, pp. 32-34 (D.App. 103-104); Alongi Aff. ¶ 34 (D. App. 006).

40.     Furthermore, that was far from the only benefit Ms. Alongi personally had a hand in obtaining for the Funds through the Coalition.   For example, from 2015 through her termination in 2020 (and earlier), the Trustees repeatedly chose to use Coalition-negotiated providers for vision and hearing insurance.  As Executive Director of the Coalition, Ms. Alongi led projects that involved collecting and analyzing prescription coverage and pricing for each of the Coalition's members.  At around the same time, she also served on an committee for the International Union of Operating Engineers that was also reviewing prescription drug pricing for the Union.  Her work for the Coalition benefitted the Funds, because she and the committee were able to use the Coalition data to verify that the Union was getting the best pricing for prescription drugs.   Alongi Aff. ¶¶ 35-36 (D. App. 006-007).  Examples of projects Ms. Alongi worked on that benefited the Funds are also set out in her Answers to Interrogatories (Answer No. 8).  *See* Exhibit 13, Gina Alongi Answers to Interrogatories ("Alongi Int. Answers"), pp. 11-13 (D.App. 126-129).

41.     Moreover, the benefit that inured to the Funds through Ms. Alongi's work as Executive Director for the Coalition was not just limited to the millions in dollars of savings she provided to the Funds; as noted in her Answers to Interrogatories (Answer No. 8), she personally worked to choose and facilitate dozens of presentations and educational sessions held by the Coalition that were available to – and actually attended by – employees of the Funds (including Mr. Geiman and Ms. Hickey, who were regular attendees) for educational purposes.  Alongi Aff. ¶¶ 35-36 (D. App. 006-007); Alongi Int. Answers, pp. 11-13 (D.App. 126-129).

42.     While working for the Coalition, Ms. Alongi was not motivated by personal greed or any desire to enrich herself at the expense of the Funds (or the Coalition):  to the contrary, her sole motivation was to use her position of influence in the Coalition—an organization formed for the express purpose of providing common benefit to its multi-employer fund members—to improve both the financial and lobbying position of the Funds and all other multi-employer fund members with which the Funds shared a common interest.  Alongi Aff. ¶ 38 (D. App. 007).

43.     The Funds' accusation that Ms. Alongi somehow personally benefitted from service providers signing up as "associate members" of the Coalition is specious.  There was no personal benefit:  the Coalition used the dues paid by its "associate members" to pay for expenses for those members' attendance at Coalition events; the dues were not used to pay Ms. Alongi's salary and she received no personal benefit of any kind.   Alongi Aff. ¶ 39 (D. App. 007).

## V.  MR. MCLAUGHLIN AND MS. ALONGI

44.     On or about August 1, 2017, Mr. McLaughlin was appointed Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees of the Funds.  Alongi Aff. ¶ 17 (D. App. 004).

45.     From the beginning of his tenure as Chairman, Mr. McLaughlin routinely made highly inappropriate and sexually charged comments in the workplace to Ms. Alongi and other female employees.  Alongi Aff. ¶ 40 (D. App. 008).

46.     For example, he routinely visited Ms. Alongi's office to discuss his sexual desires and fantasies, how he felt about the women in the office, and what he would like to do to them sexually.  Alongi Aff. ¶ 41 (D. App. 008).

47.      On more than one occasion, Mr. McLaughlin also stated to Ms. Alongi he could not concentrate during a Trustees meeting because he could not take his eyes off her and that Ms.

Alongi "looked so good" and that he "wanted" her and had "such a crush" on her.  Alongi Aff. ¶ 42 (D. App. 008).   Mr. Geiman recorded Ms. Alongi's complaints regarding this incident (and earlier comments made by Mr. McLaughlin "regarding his sex life and women in the office that he found attractive") in a memorandum to himself sent on May 14, 2018.  *See* Exhibit 14, Geiman Memo, 5.24.18 and 5.14.18 (D. App. 144-145).

48.     When Mr. McLaughlin engaged in this conduct, Ms. Alongi told Mr. McLaughlin to stop and stated that he was going to get in trouble.  Alongi Aff. ¶ 43 (D. App. 008).

49.      Ms. Alongi informed Mr. McLaughlin several times that if his wife ever found out about his behavior that she would divorce him.  Alongi Aff. ¶ 43 (D. App. 008).

50.     Mr. McLaughlin laughed and stated that he was "the boss" and that therefore he could "get away with it."  Alongi Aff. ¶ 43 (D. App. 008).

51.     Mr. McLaughlin also frequently told Ms. Alongi about his "need for sex," and stated that his wife was not "taking care of" him. Mr. McLaughlin made statements to the effect that he was a "pig" and that "all men are pigs," and that "all men think about is sex."  Alongi Aff. ¶ 44 (D. App. 008).

52.     Along these same lines, there is also evidence that Mr. McLaughlin has had at least one inappropriate romantic or sexual relationship with another Funds employee, a fact known to the Funds as evidenced by a May 17, 2017 letter from the then Assistant Administrator (and in-house counsel), Mr. Greg Geiman, to Ms. Alongi in which he references "recent concerns [he has] about Laura-Jean's association with [Mr. McLaughlin] and the resulting lack of deference and communication with you,…"  *See* Alongi Aff. ¶ 45 (D. App. 008).; Exhibit 15, Geiman 2017 Letter (D. App. 148-149).  Mr. Shaughnessy also testified he observed that "Mr. McLaughlin and Laura-Jean Hickey were flirtatious with each other and interacted with each

other in a manner that did not appear to be completely professional," and that Mr. Geiman "informed [him]. . .that Mr. McLaughlin was having an inappropriate relationship with Ms. Hickey." *See* Shaughnessy Aff., ¶ 13 (D.App. 050).

53.     Ms. Alongi was deeply disturbed by Mr. McLaughlin's highly sexually-charged workplace behavior, and she decided to confront Mr. McLaughlin about it.  On May 1, 2018, Ms. Alongi requested that Mr. McLaughlin meet with her in her office to discuss, among other things, Mr. McLaughlin's inappropriate conduct and comments in the workplace as well as ways in which he had been passing up Ms. Alongi in favor of male employees.   Alongi Aff. ¶ 46 (D. App. 008-009).

54.     As Ms. Alongi began providing Mr. McLaughlin some examples of how his behavior had made her uncomfortable, Mr. McLaughlin started to pace in front of Ms. Alongi and yell obscenities and words to the effect of "you do not respect me, I am the manager!" Alongi Aff. ¶ 47 (D. App. 009).

55.     Mr. McLaughlin continued to yell and swear at Ms. Alongi for approximately 10 minutes to the point where other Funds employees feared for Ms. Alongi's physical safety; indeed, one Funds employee testified that she had already dialed in 911 on her phone and was ready to call the police.  Alongi Aff. ¶ 47 (D. App. 009).

56.     Mr. McLaughlin was so loud that employees having lunch in the Funds kitchen (on the opposite side of the building) could hear him shouting.  *See* Exhibit 16, Deposition of Rosemary Ortega (Excerpt) ("Ortega Dep."), pp. 48-49 (D.App. 154-155).

57.     Mr. McLaughlin only stopped when Ms. Alongi's sister, Rosemarie, and Mr. Geiman, the Funds' own in-house lawyer, entered Ms. Alongi's office and physically extricated Mr. McLaughlin from Ms. Alongi.  Alongi Aff. ¶ 48 (D. App. 009).

58.     Immediately following this verbal assault, Mr. McLaughlin attempted to apologize to Ms. Alongi by hugging her and trying to kiss her on the lips.  Alongi Aff. ¶ 49 (D. App. 009).

59.     While doing so, he also told her that the fight had gotten him "excited" and that he had come close to getting an erection as a result of his assault on her.  Alongi Aff. ¶ 49 (D. App. 009).

60.     Mr. McLaughlin's egregious behavior during this altercation (as well as his prior and subsequent sexually-charged and predatory behavior in the office) is not only supported by Ms. Alongi's testimony and the affidavits and witness statements of several other female Fund office employees in this record; it is also expressly corroborated by Mr. Geiman's own testimony and contemporaneous (and highly detailed) notes which he recorded in the immediate aftermath of, and in the few weeks following, Mr. McLaughlin's violent outburst. *See* Exhibit 14 (D.App. 145-146); Exhibit 17, Geiman Memo – 5.24.18, 10 (D.App. 157); Exhibit 18, Geiman Memo – 5.24.18 (D.App. 159-160); Geiman Dep., Vol. I, pp. 171-205 (D.App. 90-99); Exhibit 19, Affidavit of Jennifer Dow ("Dow Aff.") (D.App. 162-163); Exhibit 20, Affidavit of Jennifer Vachon ("Vachon Aff.") (D.App. 165-166); Exhibit 21, Statement of Taylor Ryan (D.App. 168-171); Exhibit 22, Statement of Rosemary Ortega (D.App. 173-176)

61.     Shortly after the altercation, in mid-May 2018, Ms. Alongi interviewed several female Funds staff members regarding their experiences with Mr. McLaughlin.  Alongi Aff. ¶ 50 (D. App. 009).

62.     Each reported feeling uncomfortable with the way that Mr. McLaughlin looked at, talked to, or touched them.  Alongi Aff. ¶ 50 (D. App. 009).

63. One employee, in particular, reported that Mr. McLaughlin regularly entered her office to give her unprompted massages which made her uncomfortable, but she did not feel she could ask him to stop as he was the boss. Alongi Aff. ¶ 51 (D. App. 009); Vachon Aff., ¶ 7 (D.App. 165-166).

64. Another employee stated that Mr. McLaughlin called her "sexy" on more than one occasion and would make comments to the effect that he wanted her sexually. Alongi Aff. ¶ 52 (D. App. 009).

65. In response to learning of these events, Ms. Alongi requested to meet with Ms. Kathyrn Shea, a partner at Segal Roitman and outside counsel to the Funds, and did so on or about May 21, 2018. Alongi Aff. ¶ 53 (D. App. 009).

66. Ms. Alongi informed Attorney Shea about the May 1st incident and about how severe Mr. McLaughlin's constant bullying and sexual harassment was. Alongi Aff. ¶ 54 (D. App. 010).

67. Remarkably (and incorrectly), Attorney Shea informed Ms. Alongi at this time that this conduct did not rise to the level of sexual harassment and that in order to claim sexual harassment, the conduct would have to be pervasive or "widespread." Attorney Shea told Ms. Alongi that she had "no case." Alongi Aff. ¶ 54 (D. App. 010). Relatedly, at around the same time – in May 2018 - Attorney Shea told Mr. Geiman "her concern was that if Gina's accusations were not 'tamped down,' given that they were not actionable, Billy would seek to have her fired for insubordination." Mr. Geiman recorded this conversation in contemporaneous and detailed notes that he wrote to himself on May 24, 2018. *See* Exhibit 18, Geiman Memo – 5.24.18 (D. App. 159).

68.     Shortly following her meeting with Ms. Alongi, Attorney Shea met with Mr. McLaughlin and next with Mr. Geiman. Ms. Alongi was then instructed to meet with Attorney Shea and Mr. McLaughlin in his office. Attorney Shea, on behalf of the Funds, informed Ms. Alongi at this time that she (not Mr. Mclaughlin) could be terminated for insubordination. Alongi Aff. ¶ 55 (D. App. 010).   Attorney Shea stated again to Ms. Alongi that Mr. McLaughlin's conduct did not rise to the level of sexual harassment and that if Ms. Alongi kept quiet about her allegations of sexual harassment, Mr. McLaughlin would apologize, and Ms. Alongi would not be terminated. *Id.*

69.     Although Ms. Alongi continued to feel that Mr. McLaughlin's actions were wrong, the combination of Attorney Shea's purported legal assessment that she did not have a viable sexual harassment claim, the specter of an apology from Mr. McLaughlin, and Ms. Alongi's newly found fear that she would be shown the door if she did make any further complaints about Mr. McLaughlin induced Ms. Alongi not to pursue the matter at that time. Alongi Aff. ¶ 55 (D. App. 010).

70.     Following these meetings with Attorney Shea, Mr. McLaughlin continued to subject Ms. Alongi, her sister, and other female employees to frequent sexual comments well into 2020.  Alongi Aff. ¶ 56 (D. App. 010).

71.     Mr. McLaughlin continued to visit Ms. Alongi's office, each time to make statements about sex and women's bodies.   On one such occasion in the last quarter of 2019, Mr. McLaughlin entered Ms. Alongi's office and told Ms. Alongi that he knew about one of Ms. Alongi's younger employees who was struggling with breast cancer.  Mr. McLaughlin asked Ms. Alongi "are her boobs any good?" and "do you think she will show me them?" or words to that effect.   Alongi Aff. ¶ 57 (D. App. 010).

72.     Mr. McLaughlin also specifically began to retaliate against Ms. Alongi because of her prior attempt to get him to stop harassing her and other female employees.  For example, on or around November 9, 2018, Mr. McLaughlin informed Ms. Alongi that her service animal, who was trained to detect Ms. Alongi's low blood sugar levels, would no longer be permitted in the office.  When Ms. Alongi requested an ADA accommodation in order to bring her service dog with her to the office on days that she felt ill, Mr. McLaughlin stated "no dogs in the office, including yours. I do not care what the law says" or words to that effect, and he provided Ms. Alongi with no explanation for the change in the policy.  Alongi Aff. ¶ 58 (D. App. 011).

73.     In or around early January 2020, Ms. Alongi was once again called into a meeting with Mr. McLaughlin, this time with Attorney Shea present.  Alongi Aff. ¶ 59 (D. App. 011).

74.     At that meeting, Mr. McLaughlin instructed Ms. Alongi that from that point forward, he expected Ms. Alongi to report to work by 8 am every day.  Alongi Aff. ¶ 59 (D. App. 011).

75.     Prior to Mr. McLaughlin's request, Ms. Alongi would take the first of her two types of daily insulin shots at 8:30 am and be at work by 9:15 am. Ms. Alongi would then skip lunch or stay later during the day and often worked on weekends.  Alongi Aff. ¶ 59 (D. App. 011).

76.     Ms. Alongi reminded Mr. McLaughlin of her Type 1 Diabetes and explained that her current work schedule allowed her to take insulin and change her continuous glucose monitor at specific and uniform times of the day as required.  Alongi Aff. ¶ 60 (D. App. 011).

77.     Ms. Alongi requested that Mr. McLaughlin grant her an accommodation and permit her to continue working on her usual work schedule to allow her to manage her health condition.  Mr. McLaughlin replied "no accommodation is granted" or words to that effect.

Attorney Shea said nothing at this meeting and kept her head down.  Alongi Aff. ¶ 60 (D. App. 011).

78.     Following this meeting, Ms. Alongi immediately began reporting to work beginning at 8 am which caused her to be off her insulin schedule, thereby causing her to experience serious health issues.  Alongi Aff. ¶ 60 (D. App. 011).

79.     In March 2020, the Funds permitted its employees over the age of 65 or affected with a health condition to work from home due to the global COVID-19 pandemic.  Although Ms. Alongi was permitted to work remotely due to her diabetes, Mr. McLaughlin continued to alter the terms and conditions of her employment.  In late April 2020, Mr. McLaughlin told Mr. Geiman in the Funds hallway that "Ms. Alongi should be in the office" and that he did not care about her medical condition.  Alongi Aff. ¶ 62 (D. App. 012).

80.     By June 2020, Mr. McLaughlin required that Ms. Alongi account for her time in 15-minute increments for the purpose of finding a pretext to terminate Ms. Alongi's employment due to her opposition to Mr. McLaughlin's inappropriate conduct. Ms. Alongi began tracking her time in this manner on June 15, 2020 and submitted these timesheets directly to Mr. McLaughlin at his request.  No such requirement had ever been imposed on Ms. Alongi prior to that time. Alongi Aff. ¶ 62 (D. App. 012).

81.     Shortly thereafter, after 42 years of loyal and dedicated service to the Funds, Ms. Alongi was summarily and without any warning terminated on July 22, 2020.  Alongi Aff. ¶ 64 (D. App. 012).

82.     Ms. Alongi's  termination letter provided her with no explanation whatsoever for why she was fired – and did not even suggest any alleged or suspected breach of fiduciary duty – but simply stated, in part: "As you were an employee at will, it is not necessary to detail reasons

for the Trustees' decision…. We …. trust that our separation will be courteous and respectful."
Alongi Aff. ¶ 64 (D. App. 012); <u>Exhibit 23</u>, G. Alongi Termination Letter (D.App. 178).    Ms.
Alongi's twin sister – who was also an employee of the Funds – was terminated a mere two
weeks later in similar fashion – with no reason provided for her termination.  *See* <u>Exhibit 24</u>, R
Alongi Termination Letter (D.App. 180).

83.    Thereafter, Ms. Alongi filed a complaint with the MCAD, alleging that her
termination had been unlawful.  It was not until after Ms. Alongi filed that complaint that the
Funds ever raised <u>any</u> allegations that she had breached her fiduciary duty.    Alongi Aff. ¶ 65 (D.
App. 012).

## VI.    MS. ALONGI'S WORK HOURS FOR THE FUNDS

84.    Ms. Alongi regularly worked more than 40 hours per week for the Funds during
her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds
– including working early mornings, late nights, and weekends.  Alongi Aff. ¶ 66 (D. App. 012).
Her position as Administrator required her to perform many tasks that she regularly completed
outside the hours of 8:00am to 4:00pm.    *Id.*

85.    Ms. Alongi primarily only performed Coalition work during Funds' work hours
during the one-hour break period afforded to her each day pursuant to the Funds' policy.  Alongi
Aff. ¶ 67 (D. App. 012).

86.    The Schultheis Report relies on the misguided assumption that Ms. Alongi only
performed work for the Funds when she was either sending e-mails, or her work office phone, or
on her cell phone, and relies on that data to somehow conclude that she rarely worked outside of
business hours.  *See* ECF Docket No. 54, Funds Exhibit 8, Schultheis Report, App. 086.

87.    However, as even the Schultheis Report's author admitted at his deposition, the
fact that Ms. Alongi was not sending e-mails or calling someone on her phone does not mean

that she was not working.  *See* Exhibit 25, Deposition of James Heinzman (Excerpt) ("Heinzman Dep."), pp. 20, 113 (D.App. 187-188).   Ms. Alongi's position as Administrator required her to perform countless tasks that could be completed after-hours, which would not require the use of e-mail or a cell phone call.  For example, she was responsible for preparing and presenting separate reports to each individual Board of Trustees on a quarterly basis for Trustee board meetings, and in connection with that duty Ms. Alongi routinely analyzed reports prepared by the Funds' consultants and in-house accountants, including financial statements, expense reports, payroll reports, investment reports, and other general healthcare and pension-related material. Alongi Aff. ¶ 66 (D. App. 012-013).

88.     Ms. Alongi performed much of this work after business hours, when she had time to read, process, and prepare this information undisturbed, and also often performed tasks such as drafting letters and reviewing proposed budgets during non-business hours; she often spent her time during business hours communicating with members, Union employers, and her direct reports at the Fund Office.  The e-mail and cell-phone data used by Schultheis to try to recreate Ms. Alongi's work hours obviously (and incorrectly) leads to a 'conclusion' that she only worked during business hours, because those are the hours during which Ms. Alongi -- and most office workers generally -- communicated by e-mail or phone.  Alongi Aff. ¶ 66 (D. App. 012-013).

89.     Other glaring errors contained in the Schultheis Report's conclusions abound: the Report makes projections about Ms. Alongi's work hours for a period of five years using cell phone data from only a 6-month period in 2020, which of course is blatantly speculative --not to mention skewed by a worldwide pandemic.  *See* ECF Docket No. 54, Funds Exhibit 8, Schultheis Report, App. 088.

90.     The Report's data concerning Ms. Alongi's supposed office entry times (which show an average entry time of 10:30 a.m. or later for some years), is directly contradicted by not only Ms. Alongi's testimony, but by the deposition testimony of several of her co-workers, who testified that prior to 2020 (when she started to come into the office at 8:00 am at the insistence of Mr. McLaughlin) Ms. Alongi typically arrived at the office between 9:00am and 10:00am. *See* Alongi Aff. ¶ 59 (D. App. 011); Alongi Dep., Vol. I, pp. 111-118 (D.App. 018-021); Exhibit 26, Deposition of Jennifer Vachon ("Vachon Dep."), pp. 70-72 (D.App. 192-193); Exhibit 27, Deposition of Jennifer Dow ("Dow Dep."), pp.. 86-88 (D. App. 196-197); Vachon Aff., ¶ 13 (D.App. 163); Dow Aff.. ¶ 6 (D.App. 165).

91.     Additional evidence also calls the office entry data into question:  several of Ms. Alongi's co-workers testified that they would open the office door for her on occasion without her using her office pass), which of course would incorrectly lead to a conclusion that Ms. Alongi arrived at times later than she actually arrived.  Vachon Aff., ¶ 13 (D.App. 166); Dow Aff.. ¶ 6 (D.App. 162); Ortega Dep., pp. 24-27 (D.App. 153).

92.     And on top of all of this, it is undisputed that Schultheis & Panettieri were engaged by the Funds to conduct the Audit produce the Report in December 2020 only *after* Ms. Alongi filed her discrimination claims against the Funds in September 2020, and that the Funds (conveniently) engaged Schultheis & Panettieri to perform general auditing accounting work for them *after* the Report was authored.  *See* Heinzman Dep., pp. 9-11 (D.App. 185).

## VII.    COALITION WORK PERFORMED BY OTHER FUNDS EMPLOYEES

93.     Deposition testimony contradicts the Funds' claim that the Trustees were unaware that Ms. Hickey performed work for the Coalition:  Mr. Rasetta specifically testified that he knew that Ms. Hickey performed Coalition work.  *See* Rasetta Aff., ¶ 18 (D.App. 56)

94.     There is also evidence of Ms. Hickey e-mailing Mr. McLaughlin himself about her performance of Coalition work during business hours (specifically related to the posting of flyers).  *See* Exhibit 29, Hickey Coalition Poster E-Mails, (D.App. 232).

95.     Further, regarding Taylor Ryan's work, Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project" referenced in the Funds' Motion during business hours, and it is undisputed that Ms. Hickey (who the Funds have *not* fired despite her Coalition work) directly assigned this work to Ms. Ryan.  *See* Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt) ("Ryan Dep."), pp. 155-156 (D.App. 236-237).

96.     Similarly, the Coalition-related work cited by the Funds given to Ms. Ortega was assigned directly by Ms. Hickey, not Ms. Alongi.  *See* ECF Docket No. 35, Funds Exhibit 37, App. 422-433.

## VIII.   DOL TIME SHEETS

97.     The entry of time for 'DOL time sheets' is purely an administrative function.  *See* Alongi Aff. ¶¶ 69-70 (D. App. 013).

98.     The "Shared Services Agreement" by its express terms, does not require Ms. Alongi or any other individual employee to fill out contemporaneous daily time sheets.  The Agreement states in pertinent part

> The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization by each employee of the Fund Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.

Nothing in this language requires Ms. Alongi, or other any individual employee, to record and report their own time on a daily basis.  *See* ECF Docket No. 54, Funds Exhibit 5, Shared Services Agreement, App. 086.

99.     Moreover, according to Ms. Alongi's uncontroverted testimony, she complied with this provision of the Shared Services Agreement.     *See* Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

100.     Ms. Alongi testified that she did initially fill out daily time sheets, but in or around 2008, the Funds' own accountants at Manzi & Asssociates ("Manzi") determined and informed her that since 2004, based on the data Manzi reviewed from Ms. Alongi's and other employees' time sheets, there was no significant change in fund percentage allocations from year to year.  *See* Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

101.     Accordingly, since that time, in lieu of recording her time on a daily basis, a representative of Manzi would meet and interview Ms. Alongi at the end of each calendar year to estimate Ms. Alongi's time allocation.  *See* Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

102.     As Ms. Alongi testified, her job duties and time allocation did not generally vary over the course of a typical year unless there was some significant change to the Funds' operations in that given year.  *See* Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

103.     In the event that there was a significant change – such as in 2015 when the Trustees dismantled the Health & Welfare Fund claims adjudication system – Manzi did alter Ms. Alongi's allocation after conferring with her, as demonstrated by the relevant data.  *See* Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

104.     However, absent any such significant changes, Ms. Alongi's allocation -- as determined and approved by the Funds' own outside accounting firm -- would remain static for

the simple reason that her job duties with respect to each Fund remained largely unchanged.  *See*

Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

> GINA ALONGI
> By Her Attorneys,
>
>
> */s/ Jacob A. Tosti*
> Timothy P. Van Dyck (BBO #548347)
> Jacob A. Tosti (BBO #704007)
> BOWDITCH & DEWEY, LLP
> 200 Crossing Boulevard, Suite 300
> Framingham, MA  01702
> (617) 757-6537
> tvandyck@bowditch.com
> jtosti@bowditch.com

December 13, 2022

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jacob A. Tosti