UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al. | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:21-cv-10163-FDS |
| v. | ) ) | |
| GINA ALONGI, | ) ) | |
| Defendant. | ) ) | |

**APPENDIX OF EXHIBITS IN SUPPORT OF**
**DEFENDANT'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

GINA ALONGI
By Her Attorneys,

*/s/ Jacob A. Tosti*
Timothy P. Van Dyck (BBO #548347)
Jacob A. Tosti (BBO #704007)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard, Suite 300
Framingham, MA  01702
(617) 757-6537
tvandyck@bowditch.com
December 13, 2022                                  jtosti@bowditch.com

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jacob A. Tosti

**INDEX**

**Document**                                                                      **D. App.**

Exhibit 1:  Affidavit of Gina Alongi .................................................................. 1-14

Exhibit 2:  Deposition of Gina Alongi (Excerpt) .............................................. 15-28

Exhibit 3:  William McLaughlin Meeting Notes ................................................ 29-38

Exhibit 4:  Deposition of William McLaughlin (Excerpt) ................................. 39-53

Exhibit 5:  Affidavit of Louis Rasetta .............................................................. 55-58

Exhibit 6:  Affidavit of John Shaughnessy ....................................................... 59-62

Exhibit 7:  Deposition of John Shaughnessy (Excerpt) .................................... 63-68

Exhibit 8:  Coalition By-Laws ........................................................................... 69-77

Exhibit 9:   Deposition of Louis Rasetta (Excerpt) ........................................... 78-83

Exhibit 10:  Deposition of Gregory Geiman (Excerpt) ................................... 84-104

Exhibit 11:  Deposition of Joyce Mader (Excerpt) ....................................... 105-108

Exhibit 12:  Cushing Gavin Boyle Award Brochure ..................................... 109-114

Exhibit 13:  Gina Alongi's Answers to Interrogatories ................................. 115-143

Exhibit 14:  Geiman Memo – 5.24.18 and 5.14.18 ........................................ 144-146

Exhibit 15:  Geiman 2017 Letter ................................................................... 147-149

Exhibit 16:  Deposition of Rosemary Ortega (Excerpt) ................................ 150-155

Exhibit 17:  Geiman Memo – 5.24.18 (10 PM) ............................................. 156-157

Exhibit 18:  Geiman Memo – 5.24.18 (4 PM) ............................................... 158-160

Exhibit 19:  Affidavit of Jennifer Dow ......................................................... 161-163

Exhibit 20:  Affidavit of Jennifer Vachon ..................................................... 164-166

Exhibit 21:  Taylor Ryan Statement ............................................................... 167-171

Exhibit 22:  Rosemary Ortega Statement ....................................................... 172-176

Exhibit 23:  G. Alongi Termination Letter ..................................................... 177-178

Exhibit 24:  R. Alongi Termination Letter.........................................................................179-180

Exhibit 25:  Deposition of James Heinzman (Excerpt) ........................................................181-188

Exhibit 26:  Deposition of Jennifer Vachon (Excerpt) .........................................................189-193

Exhibit 27:  Deposition of Jennifer Dow (Excerpt) .............................................................194-197

Exhibit 28:  Alongi MCAD Complaint................................................................................198-230

Exhibit 29:  Hickey Coalition Poster E-Mails ....................................................................231-232

Exhibit 30:  Deposition of Taylor Ryan (Excerpt)...............................................................233-237

Exhibit 31:  Alongi MCAD Sur-Reply (verified by Ms. Alongi)......................................238-268

# TAB 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al. | ) ) ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) ) |
| GINA ALONGI, | ) ) |
| Defendant. | ) ) ) |

Civil Action No. 1:21-cv-10163-FDS

### AFFIDAVIT OF GINA ALONGI

I, Gina Alongi, under oath, do hereby depose and state as follows:

1.      I am the defendant in this matter.  I make the following statements based on my own personal knowledge.

2.      Following my graduation from Framingham North High School, I began my employment with the IUOE Local 4 Fringe Benefit Funds (the "Funds") in 1978 in a clerical position, and was promoted throughout the years.

3.      Throughout my employment, I was an exemplary employee, and in 1996, the Funds ultimately promoted me to the position of Administrator.

4.      As the Funds' Administrator, I worked under the direction and control of the Boards of Trustees of the Funds.  On a day-to-day basis, I reported directly to the Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees of the Funds (these two positions – Business Manager and Chairman – were always held simultaneously by one person during my tenure as Administrator).

5.      Accordingly, from 1996 to around 2004, I reported directly to William Ryan, who held the position of Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees of the Funds during that time.

4862-5095-2259.3

6.      From around 2004 to August 2017, I reported directly to Louis Rasetta, who was Mr. Ryan's successor as Business Manager and Chairman.

7.      From August 2017 through my termination in July 2020, I reported directly to William McLaughlin, who was Mr. Rasetta's successor as Business Manager and Chairman.

8.      From 2015 until the time of my termination in 2020, I only had two direct reports while serving in the position of Administrator:  Assistant Administrator (and in-house counsel) Gregory Geiman and Associate Administrator Laura-Jean Hickey.  During that time, I did not directly supervise the work of any other Fund Office employees.

9.      During the entirety of my tenure as Administrator, the employees in the Fund Office performed administrative functions for the Funds, within a framework of policies, interpretations, rules, and practices approved by the Trustees, not myself.

10.      In my role as Administrator, I presented information to the Trustees at quarterly board meetings and made recommendations to the Trustees for decisions with respect to plan administration, subject to the Trustees' review and approval.

11.      I had no authority to make -- and never made --  any decisions on such essential matters as benefit changes and beneficiary appeals for the Health & Welfare, Pension Funds, and Annuity and Savings Funds, and decisions regarding the Funds' engagement or termination of investment managers or healthcare providers:  these decisions were all made solely by the Trustees.

12.      During my tenure as Administrator, employee compensation was set exclusively by the Trustees.  In particular, the Trustees established a subcommittee consisting of the Chairman and the Senior Management Trustee (the "Subcommittee") and the Subcommittee made decisions on behalf of the Trustees concerning Funds' office employee compensation.

D. App. 003

13.     From 2013 through August 2017, the Trustees' Subcommittee consisted of Business Manager/Chairman Louis Rasetta and Senior Management Trustee John Shaughnessy.

14.     From August 2017 until Mr. Shaughnessy's retirement as a Trustee in 2019, the Subcommittee consisted of Business Manager/Chairman Mr. McLaughlin and Mr. Shaughnessy.

15.     After Mr. Shaughnessy's retirement in 2019 through my termination in July 2020, the Subcommittee consisted of Mr. McLaughlin and Senior Management Trustee James Reger.

16.     During my tenure as Administrator, I made recommendations regarding employee compensation to the Business Manager/Chairman, but had no authority to (and never did) make any binding decision regarding employee compensation.

17.     Once Mr. McLaughlin became Business Manager of the Union ad Chairman of the Boards of Trustees of the Funds in August 2017, he took it upon himself to assume even greater control and authority over the day-to-day operations of the Funds.  For example, in a meeting he had with me in early 2020:  (1) he stated that there would be no delays for inclement weather in the office "unless he deems necessary" ; he told me that he was "the only person authorized to make that decision;" (3) he demanded that I work in the Funds office between the hours of 8:00 am to 4:00 pm and notify him directly if I would be out of the office, (4) he informed me that he required "weekly updates" from me regarding various matters relating to the Funds operations so that, to use his own words, *he* could "properly manage the business of. . . the Fund;" and (5)  he exercised complete control over matters of compensation in the Funds office, by proclaiming, unilaterally,  that there would be "a 3% maximum increase—across the board" for the year 2020.

18.     In 2013, Messrs. Rasetta and Shaughnessy jointly granted two additional weeks of vacation time for me to use each year or cash out annually, in addition to the four weeks of vacation time that I received prior to that grant.

D. App. 004

19.     Neither the Subcommittee nor any of the other Trustees ever revoked this grant of vacation time to me.

20.     During my entire tenure as Administrator, from 1996 to 2020, the Funds were a member of the Massachusetts Coalition of Taft-Hartley Funds, Inc. (the "Coalition").

21.     The Coalition is a voluntary, non-profit business league exempt from taxation under Section 501(c)(6), and its membership is comprised solely of multi-employer trust funds.

22.     A true copy of the By-Laws of the Coalition, which were adopted in, 2013, are attached to the appendix filed with my Opposition to the Plaintiffs' Motion for Partial Summary Judgment at Exhibit 8.

23.     At all times during my employment as Administrator of the Funds, the Trustees of the Funds knew that the Funds were a dues-paying Coalition member and never took any action to remove the Funds as a member.

24.     The Coalition is governed by a Board of Directors referred to as the "Executive Board," made up of 5 directors who are elected by the Coalition's member funds; each Board member is required to be either an officer, director, or duly authorized representatives

25.     In 2007, the Executive Director position at the Coalition became vacant; I applied and was hired for the position (which was a part-time position).  I held the position for 14 years, between 2007 and 2021.

26.     The Coalition is an entity separate from the Funds that used its own assets to compensate its employees and accomplish its mission.

27.     The Trustees of the Funds were well aware of my work as Executive Director for the Coalition, from the beginning of that part-time work in 2007 through the entire remaining 13 years of my employment with the Funds.

28.     During my 13 years working part-time for the Coalition in addition to working for the Funds, neither Mr. McLaughlin nor any other Trustee ever once told me that they had any issue with me working part-time for the Coalition.

29.     In 2015, the Labor Guild, (an agency of the Archdiocese of Boston) honored me with their prestigious "Boyle Award" for excellence in labor-management relations, expressly in connection with my work for both the Funds and the Coalition.

30.     The Trustees were well aware of this award:  Mr. McLaughlin, among others, even attended the award ceremony.

31.     During my entire 13-year tenure as Executive Director of the Coalition – from 2007 through 2020 - the Coalition rented office space at the Funds' office.  The Funds were, of course, aware of this use of their own office space.

32.     In my role as Executive Director of the Coalition, I developed better methods of providing and paying for health care, and personally negotiated favorable discounts which directly and positively impacted the Funds' financial position.

33.     For example, during my tenure as Executive Director, I personally negotiated with Blue Cross/Blue Shield regarding how benefits were paid out to plan participants, and redesigned the way the Funds were run to help contain healthcare costs for the benefit of the Funds and its members.

34.     This new way of doing business with Blue Cross Blue Shield wound up saving the Funds millions of dollars (and, in turn, savings for its members on healthcare costs).

35.     Furthermore, that was far from the only benefit I personally had a hand in obtaining for the Funds through the Coalition.  For example, from 2015 through my termination in 2020 (and

5

earlier), the Trustees repeatedly chose to use Coalition-negotiated providers for vision and hearing insurance.

36.     As Executive Director of the Coalition, I led projects that involved collecting and analyzing prescription coverage and pricing for each of the Coalition's members.  At around the same time, I also served on an committee for the International Union of Operating Engineers that was also reviewing prescription drug pricing for the Union.  My work for the Coalition benefitted the Funds, because I and the committee were able to use the Coalition data to verify that the Union was getting the best pricing for prescription drugs.

37.     Moreover, the benefit that inured to the Funds through my work as Executive Director for the Coalition was not just limited to the millions in dollars of savings I provided to the Funds;  as noted in my Answers to Interrogatories (Answer No. 8), I personally worked to choose and facilitate dozens of presentations and educational sessions held by the Coalition that were available to – and actually attended by – employees of the Funds (including Mr. Geiman and Ms. Hickey, who were regular attendees) for educational purposes.

38.     While working for the Coalition, I was not motivated by personal greed or any desire to enrich myself at the expense of the Funds (or the Coalition), or to harm the Funds in any way.  My motivation was to use my position of influence in the Coalition to advance and promote the common interest of the Funds and the Coalition's other multi-employer fund

39.     I did not personally benefit from service providers signing up as "associate members" of the Coalition.  I never solicited any service provider to become an "associate member" of the Coalition, and in any event, the Coalition used the dues paid by its "associate members" to pay for expenses for those associate members' attendance at Coalition events; the dues were not used in any way to enhance the compensation paid to me by the Coalition.

D. App. 007

40.     From the beginning of his tenure as Chairman, Mr. McLaughlin routinely made highly inappropriate and sexually charged comments in the workplace to me and other female employees.

41.     For example, he routinely visited my office to discuss his sexual desires and fantasies, how he felt about the women in the office, and what he would like to do to them sexually.

42.     On more than one occasion, Mr. McLaughlin also stated to me that he could not concentrate during a Trustees meeting because he could not take his eyes off her and that I "looked so good" and that he "wanted" me and had "such a crush" on me.

43.     When Mr. McLaughlin engaged in this conduct, I told him to stop and stated that he was going to get in trouble.   I informed him several times that if his wife ever found out about his behavior that she would divorce him.  He laughed and stated that he was "the boss" and that therefore he could "get away with it."

44.     Mr. McLaughlin also frequently told me about his "need for sex," and stated that his wife was not "taking care of" him. Mr. McLaughlin made statements to the effect that he was a "pig" and that "all men are pigs," and that "all men think about is sex."

45.      In a May 17, 2017 letter from the then Assistant Administrator (and in-house counsel), Mr. Greg Geiman, to myself,  Mr. Geiman references "recent concerns [he has] about Laura-Jean's association with [Mr. McLaughlin] and the resulting lack of deference and communication with you,…"

46.     I was deeply disturbed by this unlawful and highly sexually-charged workplace behavior by my boss, and decided to confront Mr. McLaughlin about it.   On  May 1, 2018,  I requested that Mr. McLaughlin meet with me in my office to discuss, among other things, his

D. App. 008

inappropriate conduct and comments in the workplace as well as ways in which he had been passing me up in favor of male employees.

47.   As I began providing Mr. McLaughlin some examples of how his behavior had made me uncomfortable, Mr. McLaughlin started to pace in front of me and yell obscenities and words to the effect of "you do not respect me, I am the manager!"

48.   Mr. McLaughlin continued to yell and swear at me for approximately 10 minutes. He McLaughlin only stopped when my sister, Rosemarie, and Mr. Geiman, the Funds' own in-house lawyer, entered my office and physically extricated Mr. McLaughlin from me.

49.   Immediately following this verbal assault, Mr. McLaughlin attempted to apologize to me by hugging me and trying to kiss me on the lips.  While doing so, he also told me that the fight had gotten him "excited" and that he had come close to getting an erection as a result of his assault on me.

50.   Shortly after the altercation, in mid-May 2018, I interviewed several female Funds staff members regarding their experiences with Mr. McLaughlin.  Each reported feeling uncomfortable with the way that Mr. McLaughlin looked at, talked to, or touched them.

51.   One employee, in particular, reported that Mr. McLaughlin regularly entered her office to give her unprompted massages which made her uncomfortable, but she did not feel she could ask him to stop as he was the boss.

52.   Another employee stated that Mr. McLaughlin called her "sexy" on more than one occasion and would make comments to the effect that he wanted her sexually.

53.   In response to learning of these events, I requested to meet with Ms. Shea, a partner at Segal Roitman and outside counsel to the Funds, and did so on or about May 21, 2018.

54.     I informed Attorney Shea about the May 1st incident and about how severe Mr. McLaughlin's constant bullying and sexual harassment was.  Attorney Shea informed me at this time that this conduct did not rise to the level of sexual harassment and that in order to claim sexual harassment, the conduct would have to be pervasive or "widespread."  Attorney Shea told me that I had "no case."

55.     Shortly following my one-on-one meeting with Attorney Shea, I was instructed to meet with Attorney Shea and Mr. McLaughlin in his office. Attorney Shea, on behalf of the Funds, informed me at this time that I could be terminated for insubordination.  Attorney Shea stated again to me that Mr. McLaughlin's conduct did not rise to the level of sexual harassment and that if I kept quiet about my allegations of sexual harassment, Mr. McLaughlin would apologize, and I would not be terminated.

56.     Although I continued to feel that Mr. McLaughlin's actions were wrong, the combination of Attorney Shea's purported legal assessment that I did not have a viable sexual harassment claim, the specter of an apology from Mr. McLaughlin, and my newly found fear that I would be fired if I did make any further complaints about Mr. McLaughlin induced me not to file a complaint at that time.

57.     Following these meetings with Attorney Shea, Mr. McLaughlin continued to subject me, to frequent sexual comments well into 2020.  Mr. McLaughlin continued to visit my office, each time to make statements about sex and women's bodies.  On one such occasion in the last quarter of 2019, Mr. McLaughlin entered my office and told me that he knew about one of my younger employees who was struggling with breast cancer.  Mr. McLaughlin asked me "are her boobs any good?" and "do you think she will show me them?" or words to that effect.

D. App. 010

58.     Mr. McLaughlin also specifically began to retaliate against me because of my prior attempt to get him to stop harassing me and other female employees.  For example, on or around November 9, 2018, Mr. McLaughlin informed me that my service animal, who was trained to detect my low blood sugar levels, would no longer be permitted in the office. When I requested an ADA accommodation in order to bring my service dog with me to the office on days that I felt ill, Mr. McLaughlin stated "no dogs in the office, including yours. I do not care what the law says" or words to that effect, and he provided me with no explanation for the change in the policy.

59.     In or around early January 2020, I was once again called into a meeting with Mr. McLaughlin, this time with Attorney Shea present.  At that meeting, Mr. McLaughlin instructed me that from that point forward, he expected me to report to work by 8 am every day.  Prior to Mr. McLaughlin's request, I would take the first of her two types of daily insulin shots at 8:30 am and be at work by 9:15 am. I would then skip lunch or stay later during the day and often worked on weekends.

60.     I reminded Mr. McLaughlin of my Type 1 Diabetes and explained that my current work schedule allowed me to take insulin and change my continuous glucose monitor at specific and uniform times of the day as required.   I requested that Mr. McLaughlin grant me an accommodation and permit me to continue working on my usual work schedule to allow me to manage my health condition.  Mr. McLaughlin replied "no accommodation is granted" or words to that effect.  Attorney Shea said nothing at this meeting and kept her head down.  Following this meeting, I immediately began reporting to work beginning at 8 am which caused me to be off my insulin schedule, thereby causing me to experience serious health issues.

61.     Mr. McLaughlin's inappropriate behavior continued throughout my employment.

10

62.     In March 2020, the Funds permitted its employees over the age of 65 or affected with a health condition to work from home due to the global COVID-19 pandemic.

63.     Although I was permitted to work remotely due to my diabetes, Mr. McLaughlin continued to alter the terms and conditions of my employment.  By June 2020, Mr. McLaughlin required that I account for my time in 15-minute increments for the purpose of finding a pretext to terminate my employment due to my opposition to Mr. McLaughlin's inappropriate conduct. I began tracking my time in this manner on June 15, 2020 and submitted these timesheets directly to Mr. McLaughlin at his request.  No such requirement had ever been imposed on me prior to that time.

64.     Shortly thereafter, after 42 years of loyal and dedicated service to the Funds, I was summarily and without any warning terminated on July 22, 2020.   My termination letter provided me with no explanation whatsoever for why I was fired – and did not even suggest any alleged or suspected breach of fiduciary duty – but simply stated, in part: "As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision…. We …. trust that our separation will be courteous and respectful."

65.     Thereafter, I filed a complaint with the MCAD, alleging that my termination had been unlawful.  It was not until after I filed that complaint that the Funds ever raised <u>any</u> allegations that I breached any fiduciary duty.

66.     I regularly worked more than 40 hours per week for the Funds for my entire career at the Funds (including but not limited to my tenfg including work on early mornings, late nights, and weekends.   Indeed, my position as Administrator required me to perform many tasks that I regularly completed outside the hours of 8:00am to 4:00pm.  For example, I was responsible for preparing and presenting separate reports to each individual Board of Trustees on a quarterly basis

for Trustee board meetings, and in conenction with that duty I routinely analyzed reports prepared by the Funds' consultants and in-house accounts, including financial statements, expense reports, payroll reports, investment reports, and other general healthcare and pension-related material.  I performed much of this work after 'business hours,' when I had time to read, process, and prepare the information undisturbed.  I often spent time during business hours communicating with members, Union employers, and my direct reports at the Funds' office.

67.     Further, I primarily only performed Coalition work during Funds' work hours during the one-hour lunch break afforded to her each day pursuant to the Funds' policy.

68.     Regarding Coalition work performed by other Funds' office employees, I never instructed Taylor Ryan to perform any "comprehensive, time-consuming projects" for the Funds. In particular, I never asked Ms. Ryan to "review the zip codes for thousands of participants and beneficiaries of other New England multiemployer fringe benefit funds for purposes of advising the appropriate members of Congress regarding a lobbying effort undertaken by the Coalition," and I was never aware of Ms. Ryan ever performing such work during my employment at the Funds.

69.     Regarding "DOL time sheets," I did initially fill out daily time sheets, but in or around 2008, the Funds' own accountants at Manzi & Asssociates ("Manzi") determined and informed me that since 2004, based on the data Manzi reviewed from my and other employees' time sheets, there was no significant change in fund percentage allocations from year to year. Accordingly, since that time, in lieu of recording my time on a daily basis, a representative of Manzi would meet and interview me at the end of each calendar year to estimate my time allocation.

12

70.     With respect to my time allocation, my job duties and time allocation did not generally vary over the course of a typical year unless there was some significant change to the Funds' operations in that given year.  In the event that there was a significant change – such as in 2015 when the Trustees dismantled the Health & Welfare Fund claims adjudication system – Manzi did alter my allocation after conferring with her, as demonstrated by the relevant data, However, absent any such significant changes, my allocation -- as determined and approved by the Funds' own outside accounting firm -- would remain static for the simple reason that my job duties with respect to each Fund remained largely unchanged.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 12th  DAY OF December 2022.

*/s/ Gina Alongi*

_____
Gina Alongi

13

# TAB 2

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Gina Marie Alongi Vol I*

*May 24, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs                    Confidential                    Gina Marie Alongi
Iuoe Local 4 Health & Welfare Fund, et al.                                     May 24, 2022

Page 1

1          COMMONWEALTH OF MASSACHUSETTS
2   Norfolk, ss.          Superior Court
3          Civil Action No. 2182CV00125
4   ***************************************************
5   GINAMARIE ALONGI AND ROSEMARIE ALONGI,          *
6     Plaintiffs                          *
7     vs.                                *
8   IUOE LOCAL 4 HEALTH & WELFARE FUND; IUOE LOCAL 4 *
9   PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS     *
10  FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4    *
11  APPRENTICESHIP & TRAINING FUND; JOINT LABOR-     *
12  MANAGEMENT COOPERATION TRUST; AND WILLIAM D.     *
13  MCLAUGHIAN, INDIVIDUALLY AND IN HIS CAPACITY     *
14  AS CHAIRMAN OF THE BOARDS OF TRUSTEES,           *
15    Defendants                         *
16  ***************************************************
17        DEPOSITION OF: GINA MARIE ALONGI
18            BOWDITCH & DEWEY, LLP
19            200 Crossing Boulevard
20            Framingham, Massachusetts
21            May 24, 2022  9:45 a.m.
22                Volume I
23            Kristen M. Edwards
24            Court Reporter

Page 2

1   APPEARANCES:
2
3   Representing the Plaintiffs:
4        BOWDITCH & DEWEY, LLP
5        200 Crossing Boulevard, Suite 300
6        Framingham, MA 01702
7        BY: TIMOTHY P. VAN DYCK, ESQ.
8            JACOB A. TOSTI, ESQ.
9        (617) 757-6537  fax (508) 929-3137
10       E-mail:  tvandyck@bowditch.com
11
12  Representing the Defendants:
13       FREEMAN, MATHIS & GARY LLP
14       60 State Street, Suite 600
15       Boston, MA 02109-1800
16       BY: JENNIFER L. MARKOWSKI, ESQ.
17           CHRISTOPHER REDD, ESQ.
18       (617) 963-5975
19       E-mail:  jmarkowski@fmglaw.com
20
21
22
23
24

Page 3

1   APPEARANCES (Continued):
2
3   Representing the Defendants:
4        O'DONOGHUE & O'DONOGHUE LLP
5        5301 Wisconsin Avenue, NW, Suite 800
6        Washington, DC 20015
7        BY:  CHARLES W. GILLIGAN, ESQ.
8            DANIEL KEENAN, ESQ.
9        (202) 362-0041
10       E-mail:  cgilligan@odonoghuelaw.com
11
12  In Attendance:  William D. McLaughlin
13          Greg Geiman
14          Rosemarie Alongi
15
16
17
18
19
20
21
22
23
24

Page 4

1             I N D E X
2
3   WITNESS:              GINA MARIE ALONGI
4
5   EXAMINATION BY:                PAGE:
6   Ms. Markowski              5
7
8
9   EXHIBIT:                 PAGE:
10    (none offered)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Confidential

Gina Marie Alongi
May 24, 2022

Page 109

1    Q.    What about Lou Rasetta, did he call you
2 to talk about work stuff after hours?
3    A.    Not typically.
4    Q.    You mentioned Greg and Laura-Jean.  Did
5 anybody else call you to talk about work stuff after
6 hours, any Fund employees call you?
7    A.    No.
8    Q.    What about your sister, Rose?
9    A.    She would call.
10   Q.    About work stuff?
11   A.    Yes.
12   Q.    So, I think, I was asking -- I had asked
13 you why you might not come into the office at 8:00, and
14 then you talked about how I would work every night.  I
15 would work on the weekends.  So is that your way of
16 saying that you were -- you had sort of flexible hours
17 you would come in when you wanted to come in?
18   A.    I would come in -- if I was traveling,
19 traveling was always a problem, you know.  As people
20 travel you get stuck in airports.  You have a lot of
21 time that's wasted, and I was doing a lot of traveling.
22 And at some points, you know, I wouldn't get home until
23 10, 11:00 at night.  I think it justified me going in
24 late in the morning.  I had meetings off site, whatever

Page 110

1 the case may have been, you know.  I was, you know,
2 longtime employee and I didn't feel it was necessary
3 for me to go in at 8:00 in the morning when I was
4 working and on call all the time.
5    Q.    You said you were traveling a lot.  Was
6 that throughout the time that you were administrator?
7    A.    Yes.
8    Q.    And how often did you travel?
9    A.    Well, it was prior to 2017.  Two, three
10 times a year.
11   Q.    I'm sorry, you said prior to 2017 it was
12 two to three times a year?
13   A.    Yes.
14   Q.    And then what about from 2017 on?
15   A.    I only remember going away once in 2019
16 to the training center in Texas.
17   Q.    Just so I'm clear on it.  So prior to
18 2017, you were traveling two to three times per year
19 and then after 2017 you can recall one trip, the one
20 that you discussed in Texas; is that right?
21   A.    Mm-hmm.
22   Q.    Was there some other traveling that you
23 were doing or was that it?
24   A.    Pre or post-2017?

Page 111

1    Q.    Pre-2017.  Does that describe the extent
2 of your traveling?
3    A.    Yes.
4    Q.    And we covered post-2017, okay.  So the
5 reasons you would come in at different hours, other
6 than the start time you mentioned, the traveling that
7 you were doing, was there any other reason why you
8 would come in after the typical eight a.m. start time?
9    A.    Well, there was a number of reasons.
10 That being one.  Number two, I was working.  I was a
11 dedicated employee working on my assignments that I
12 couldn't do during the course of the day because of all
13 the distractions and interruptions.  So, you know, in
14 addition to, you know, I was diagnosed with a medical
15 condition, you know, where sometimes I had to take care
16 of the issue at hand before I went into the office.
17   Q.    And in terms of logging onto the system
18 at night, how often did you do that, like once a week
19 or...
20   A.    I didn't need the computer to work.  So I
21 very seldom went through the VPN.  I had bags of
22 briefcases with work in it.
23   Q.    So you would bring briefcases and bags
24 back and forth to the office?

Page 112

1    A.    Yes.
2    Q.    But rarely did you log into the VPN?
3    A.    I did occasionally if I had gotten a call
4 after hours, because I was checking my voice mail.  If
5 it was from a member on eligibility and I needed to go
6 into the VPN at some point to check eligibility, maybe
7 I went in for a quick second.
8    Q.    And what about on the weekends?
9    A.    Same thing.  You know, I would work out
10 of my briefcases.
11   Q.    And what things did you bring home with
12 you in the briefcases?
13   A.    I would bring all my financial reports to
14 review every aspect of the financial condition of the
15 plan.  I would bring reading material that sometimes is
16 hours to read.  I would bring investment managers'
17 reports to look at the performance of the pension fund
18 as far as reading material.  As far as work, you know,
19 if I had a number of distractions all day long, which
20 was a typical day of people in and out of my office, I
21 could not get much done in the course of the day.  So I
22 would have to take all that work home with me to do.
23 If it was memos to employees or the office staff in
24 general, whatever was in my briefcase I got done by the

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Confidential

Gina Marie Alongi
May 24, 2022

Page 113

1 end of the night.
2 **Q.   And does that adequately summarize the**
3 **kinds of work you'd bring home?**
4 A.   It's an example.
5 **Q.   Can you think of anything else as you sit**
6 **here today?**
7 A.   Reviewing auditors' reports.  I would
8 always get drafts of auditors' reports that I would
9 physically have to go through, you know, management
10 letters that I would have to review from the
11 accountants for the annuity fund because it was
12 participant directed.  I would go through all of the
13 reports, the investment reports, the funds in the
14 lineup, you know, look at their performance.  I mean,
15 these were things that I just couldn't do during the
16 course of the day.
17 **Q.   Why couldn't you do it during the day?**
18 A.   Because of the distractions and
19 interruptions all day long.
20 **Q.   What kind of distractions and**
21 **interruptions?**
22 A.   Greg, Billy, office employees.
23 **Q.   And what do you mean by distractions;**
24 **were they coming in to talk to you about work stuff;**

Page 114

1 **what were -- why did you view those as distractions?**
2 A.   Well, Greg would be waiting at my door
3 before I got in in the morning.  Hi boss, and then it
4 was all over.
5 **Q.   Did Greg typically arrive at the office**
6 **before you?**
7 A.   Not necessarily.  Greg was late every
8 morning too.
9 **Q.   But did he typically arrive before you?**
10 A.   Yes, some days he was late.
11 **Q.   Most days did he arrive before you?**
12 A.   Yes.
13 **Q.   So he would be at your office wanting to**
14 **talk to you about work stuff?**
15 A.   Not necessarily.
16 **Q.   How about most of the time, was he there**
17 **to talk about work stuff?**
18 A.   Eventually.
19 **Q.   Are those the kinds of conversations that**
20 **you viewed as distracting?**
21 A.   Yes, because they took hours.
22 **Q.   Even though you were talking about work**
23 **stuff.**
24 A.   Eventually work stuff, personal stuff,

Page 115

1 work stuff.  That's an hour.  Then I would have
2 Laura-Jean come in and sit right there for another
3 hour, you know.  It's giving me -- it always starts
4 personal but the personal is half an hour to an hour,
5 then it gets into the work, which might be another
6 hour.  So between Greg and Laura-Jean, it could have
7 been three hours of my day being wasted and then of
8 course Billy.
9 **Q.   And you didn't talk about your personal**
10 **stuff during those interactions?**
11 A.   Of course I did.
12 **Q.   So it wasn't just them sharing their**
13 **personal information.  You were talking about your**
14 **personal stuff too.**
15 A.   Someone would say, "How was your
16 weekend?" I would respond.
17 **Q.   Did you felt you couldn't refocus the**
18 **conversation and talk about work stuff?**
19 A.   When we were done discussing what we were
20 talking about personally, we would get into the work
21 stuff.
22 **Q.   Who else in the office distracted you**
23 **from your work?**
24 A.   I had an open-door policy, so anyone and

Page 116

1 everyone was able to come into my office.
2 **Q.   Did, generally speaking, all the Funds**
3 **employees distract you from the work you were doing?**
4 A.   Yes.  Because even if they were walking
5 by, they'd come in to say hi.  The hi always turned
6 into something.  I never had my door shut.
7 **Q.   And so one of the reasons that you would**
8 **come in later to the office, if I'm hearing you**
9 **correctly, is you felt distracted at the office?**
10 A.   Yes.
11 **Q.   And at the point you took over as**
12 **administrator, what was your typical arrival time at**
13 **the office?**
14 A.   I don't recall.
15 **Q.   Was it before noon?**
16 A.   I don't remember.
17 **Q.   Did you have any kind of a morning**
18 **routine?**
19 A.   Excuse me?
20 **Q.   Did you have any kind of a regular**
21 **morning routine?**
22 A.   Yes.
23 **Q.   What was your morning routine?**
24 A.   What period of time?

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Confidential

Gina Marie Alongi
May 24, 2022

Page 117

1      Q.    At the point you took over as
2  administrator.
3      A.    In 1996?
4      Q.    Yes, if you recall that.
5      A.    I don't recall that.
6      Q.    Let's work backwards.  Pre-pandemic in
7  2019 what was your regular morning routine?
8      A.    I would get up at 4:00 in the morning.  I
9  would do my thing, housework, whatever, walk my dog.
10  Do you want me to be this specific; is that what your
11  question is?
12     Q.    I just want to know what your -- a lot of
13  people have morning routines.  What was your morning
14  routine?
15     A.    Have my breakfast, walk my dog and then
16  be home at a certain time to take some medication
17  before work.
18     Q.    Then you would head to the office?
19     A.    Yes.
20     Q.    But you don't recall what time you would
21  get into the office?
22     A.    Before 9:30.
23     Q.    Was there ever a time when you were
24  routinely in the office after 9:30?

Page 118

1      A.    After 9:30?
2      Q.    Yes.
3      A.    I don't recall.
4      Q.    So there could have been a time when you
5  were routinely in the office after 9:30?
6      A.    Depends on if I was off site at a
7  meeting, if I was traveling.
8      Q.    Regular routine.  Were you more often
9  than not you were in the office after 9:30?
10     A.    Yes, I would say yes.
11     Q.    You would say that occurred?
12     A.    During the period of time.
13     Q.    And when was that?
14     A.    Maybe 2018 and '19.
15     Q.    So in 2018 and '19, you were routinely
16  coming into the office after 9:30?
17         MR. VAN DYCK:  Objection as to form.  You
18  may answer.
19         THE WITNESS:  To the best of my
20  knowledge, as I recall, that's what I believe I
21  was doing.
22     Q.    (By Ms. Markowski) But prior to the --
23  prior to 2018, though, you were not coming in that
24  late?

Page 119

1      A.    Not coming in that late?
2      Q.    Yes.  You were coming in earlier, before
3  9:30; is that fair to say?
4      A.    I don't recall.
5      Q.    But you specifically recall the 2018 to
6  2019 period?
7      A.    Well, there was a period with my
8  medication that it was pretty consistent on what I was
9  doing and when I was leaving.  So I knew when I was
10  taking this medication, what time I would take it and
11  then how long it would take me to get to the office.
12  So I knew there was a period of time where I was in at
13  a certain hour.
14     Q.    And the medication you were taking at
15  that point in time, what was that for?
16     A.    My diabetes.
17     Q.    When were you diagnosed with diabetes?
18     A.    In 2012 I was diagnosed as a type two
19  diabetic from Mass. General.
20     Q.    Was the first time you had been
21  diagnosed as a type two diabetic?
22     A.    Yes.
23     Q.    And had you previously been diagnosed
24  with type one diabetes?

Page 120

1      A.    No, subsequently.
2      Q.    And when was that?
3      A.    I was getting sicker and sicker, and it
4  was tough for me to go into Boston.  So I started going
5  to UMass, which was closer to my home.  They did what
6  was called a Peptide-C test on me and determined I was
7  not a type two diabetic as Mass. General diagnosed.  I
8  was a type one.
9      Q.    When did that diagnosis occur?
10     A.    2015.
11     Q.    And as a result of that diagnosis, did
12  the treatment that you were receiving change in any
13  way?
14     A.    Yes.  I went from being on pills,
15  Metformin, to being on insulin.
16     Q.    That started in 2015?
17     A.    Yes.
18     Q.    Did you have a routine with regard to the
19  insulin?
20     A.    I did.
21     Q.    What was that routine?
22     A.    I take two different types of insulin.
23  One that's called Basal, which is a long acting all day
24  insulin and the other one is called a Bolus, which is a

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Gina Alongi Vol III*

*June 22, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 2

1     COMMONWEALTH OF MASSACHUSETTS
2  NORFOLK, SS.          SUPERIOR COURT
3         CIVIL ACTION NO.: 2182CV00125
4
5  ************************************************
6  GINAMARIE ALONGI AND ROSEMARIE ALONGI,    *
7            Plaintiffs    *
8  vs.              *
9  IUOE LOCAL 4 HEALTH & WELFARE FUND, et al,  *
10           Defendants      *
11 ************************************************
12
13
14
15     CONT'D DEPOSITION OF: GINA MARIE ALONGI
16           VOLUME III
17       BOWDITCH & DEWEY, LLP
18       200 Crossing Boulevard
19    Framingham, Massachusetts  010702
20   June 22, 2022        10:00 a.m.
21
22
23       Brenda M. Ginisi
24       Court Reporter

Page 2

1  APPEARANCES:
2  Representing the Plaintiffs:
3      BOWDITCH & DEWEY, LLP
4      200 Crossing Boulevard
5      Framingham, Massachusetts  010702
6      BY:  TIMOTHY P. VAN DYCK, ESQ.
7      (617) 757-6536
8      E-mail: tvandyck@bowditch.com
9  Representing the Defendants:
10     FREEMAN MATHIS & GARY LLP
11     60 State Street, Suite 600
12     Boston, Massachusetts  02109
13     BY:  JENNIFER L. MARKOWSKI, ESQ.
14     (617) 963-5975
15     E-mail: jmarkowski@fmglaw.com
16 Representing the IUOE LOCAL 4:
17     O'DONOGHUE & O'DONOGHUE LLP
18     5301 Wisconsin Avenue, NW, Suite 800
19     Washington, DC  20015
20     BY:  CHARLES W. GILLIGAN, ESQ.
21     (202) 362-0041
22     E-mail: cgilligan@odonoghuelaw.com
23
24

Page 3

1  APPEARANCES CONT'D:
2  Also present:
3    Daniel Keenan, Esq.
4    Christopher J. Redd, Esq.
5    Jacob Tosti, Esq.
6    Rose Marie Alongi
7    William D. McLaughlin
8    Gregory Geiman, Esq.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          I N D E X
2
3  WITNESS:         GINA MARIE ALONGI
4
5  EXAMINATION BY:          PAGE:
6  Mr. Gilligan          6
7
8
9  EXHIBITS:            PAGE:
10 Exhibit 95, Letter, September 6, 2004...............41
11 Exhibit 96, E-mail................................46
12 Exhibit 97, E-mail................................53
13 Exhibit 98, E-mail, July 31, 2003.................55
14 Exhibit 99, E-mail, August 1, 2003................60
15 Exhibit 100, E-mail, August 4, 2003...............63
16 Exhibit 101, Agenda...............................68
17 Exhibit 102, Meeting Minutes......................70
18 Exhibit 103, E-mail...............................73
19 Exhibit 104, E-mail, December 29, 2003.............77
20 Exhibit 105, Handbook.............................96
21 Exhibit 106, Time Study..........................114
22 Exhibit 107, Time Study..........................117
23 Exhibit 108, Time Study..........................119
24 Exhibit 109, Agreements..........................125

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 9

1    Q.    Did you ever try and create a job
2  description at any point?
3    A.    Well, recently, when we were talking
4  about -- and this is going back to -- prior to my
5  termination.  All of a sudden a couple of job
6  descriptions appeared.
7    Q.    When you say they appeared, do you know
8  their origins?
9    A.    I think fund counsel created them.  You
10  know, sent them to me, you know, when we were talking
11  about the employment agreement.
12    Q.    You think that you're not sure, though?
13    A.    I'm not sure.
14    Q.    Okay.  Is it correct to say the
15  administrator is in charge of the day-to-day operations
16  of the fund?
17    A.    Yes.
18    Q.    Okay.  And did all of the fund's
19  employees, ultimately, report to you?
20    A.    Could you specify the time period?
21    Q.    Let's say, in the last five years that
22  you were the administrator, so 2015 to 2020?
23    A.    The only employees that reported directly
24  to me was Greg and Laura-Jean.

Page 10

Page

1    Q.    No one else?
2    A.    No one else.
3    Q.    Would you say, though, that you, as the
4  administrator, were ultimately responsible for the work
5  of all the employees?
6    A.    Ultimately, yes.
7    Q.    Okay.  And how many employees,
8  approximately, did the fund office have between 2015
9  and 2020?
10    A.    It fluctuated.
11    Q.    Can you give me a ballpark?
12    A.    Ten to 15.
13    Q.    Okay.
14    A.    I'm not really sure.
15    Q.    Okay.  All right.  And as the
16  administrator, what were your responsibilities with
17  respect to the board of trustees?
18    A.    My responsibilities?
19    Q.    Yes.
20    A.    To report to them.  You know, financial
21  status of the plan, any issues with service providers,
22  any recommendations that I had.
23         What we would do is, we would have, you
24  know, service providers come in.  You know, if there

Page 11

Page

1  were particular issues with them they would go in front
2  of board, you know, if there was a need to terminate
3  them.
4         I would, basically, review any and all
5  negotiations I did on behalf of the funds.  You know,
6  specifically for the health & welfare fund, the pension
7  fund.  You know, investment managers.  We had a whole
8  roster full of investment managers that constantly
9  changed.
10         For the annuity plan, you know, it was a
11  DC plan, a defined contribution plan, which, ultimately
12  was converted to a profit-sharing plan that allowed a
13  401K component.
14    Q.    Okay.
15    A.    First 401K plan in the multiemployer
16  environment.
17    Q.    And you said it was -- became a
18  self-directed plan as well?
19    A.    It was participant-directed before we
20  added the profit-sharing feature.  You know, it wasn't
21  easy to convert that to a profit-sharing plan and add
22  the 401K feature, and to monitor all the various
23  selections by the membership and the employers.
24    Q.    Did you have a recordkeeper for the

Page 12

Page

1  annuity/401K?
2    A.    Yes.  When it was a straight DC plan,
3  KPMG was the recordkeeper.  They were -- I think we
4  were the first multiemployer plan that KPMG
5  administered a DC plan for.
6         And then, they went out of business.  You
7  know, they didn't do the recordkeeping anymore, so we
8  had to find someone else.  So that's when we went to
9  Putnam Investments.
10    Q.    So you had Putnam as recordkeeper?
11    A.    And then, MassMutual.  Putnam had some
12  issues, you know, in the press.  And we felt obligated
13  to terminate them.
14    Q.    All right.  I take it, being the
15  administrator's a full-time job?
16    A.    It's more than a full-time job.
17    Q.    And at the time of your termination, do
18  you recall your annual compensation?
19    A.    Approximately, 258.
20    Q.    And in addition to that salary, did you
21  receive any benefits?
22    A.    Yes.
23    Q.    Can you detail those benefits for me?
24    A.    Health & welfare, pension, contributions

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 81

**Page**

1  testimony?

2      A.    Some form of it was.  I don't know if it

3  was adopted verbatim what's on here.  But yes.

4      **Q.    Okay.  So whether it was this specific**

5  **method or time sheet, at some point, time sheets were**

6  **implemented for the fund office employees?**

7      A.    Yes.

8      **Q.    And would it have been right around this**

9  **time, the beginning of 2004?**

10     A.    I don't recall.

11     **Q.    So sometime around the beginning of 2004,**

12  **is it fair to say, all fund employees were instructed**

13  **to begin filling out daily time sheets?**

14     A.    Yes.

15     **Q.    Okay.  Did everyone in the office fill**

16  **out those time sheets?**

17     A.    Yes.

18     **Q.    How about you?**

19     A.    I did for period of time.

20     **Q.    Do you know what time period you would**

21  **have done that?**

22     A.    I don't recall.

23     **Q.    Do you have a sense of for how long a**

24  **period of time you may have filled out a daily time**

Page 82

**Page**

1  sheet?

2      A.    I don't recall.

3      **Q.    Do you recall when you -- the way you've**

4  **indicated that, or the way you've testified, makes me**

5  **believe at some point you ceased filling out a time**

6  **sheet; is that correct?**

7      A.    Yes.

8      **Q.    Do you have any sense of when that may**

9  **have occurred?**

10     A.    My best estimate is sometime in 2008.

11  And that's just an estimate.

12     **Q.    What are you basing that estimate on?**

13     A.    That, you know, Manzi & Associates

14  determined, around that time, that the numbers or the

15  percentages to the funds allocation, based on time

16  sheets, did not change significantly.

17     **Q.    And so, what was the consequence of that**

18  **finding by Manzi?**

19     A.    Could you further explain your question?

20     **Q.    Yeah, sure.  So you said Manzi was**

21  **finding there wasn't significant change from year to**

22  **year; is that what you're saying?**

23     A.    Right.

24     **Q.    Did anyone else cease filling out a time**

Page 83

**Page**

1  sheet, as of 2008, other than yourself?

2      A.    No.

3      **Q.    Why not?**

4      A.    They were required to do it.

5      **Q.    Weren't you required to do it?**

6      A.    My time had been consistent, unless there

7  was a specific project that we were working on.  And we

8  did make an adjustment for that year, when we

9  dismantled the claims operation, I believe, in 2015.

10  You know there was a increase, at some point, in that

11  allocation to the health & welfare fund.

12         So when I stopped doing time sheets, the

13  allocation was reviewed by Manzi and the trustees.  And

14  no one made a comment with respect to me doing time

15  sheets.

16     **Q.    Back up for a minute.  As the**

17  **administrator, you provide services to all of the funds**

18  **in the Local 4 fund office?**

19     A.    Yes.

20     **Q.    And, also, to some degree, to the various**

21  **non-ERISA entities?**

22     A.    To some degree.

23     **Q.    Is that a fairly small part of your time?**

24     A.    Fairly small.

Page 84

**Page**

1      **Q.    Okay.  In the absence of time sheets, how**

2  **was your costs to the various funds going to be**

3  **allocated?**

4      A.    Because my job consisted of, basically,

5  doing the same thing, you know, every day.  With

6  respect to these funds, you know, I knew -- okay, with

7  the health & welfare fund, how much time, you know, was

8  allocated.

9         I had a whole claims operation that was

10  doing the majority of the work.  So my role was

11  somewhat limited to, you know, the trustees and

12  preparing for trustees meetings.

13         You know, for the pension fund, you know,

14  was a little bit more involved with respect, you know,

15  there was a whole host of investment managers.  And the

16  annuity fund somewhat limited.  And the dues and the

17  SAC, same thing, issuing a check monthly.

18     **Q.    Well, didn't you testify earlier, that**

19  **things like HIPAA could skew the amount of effort**

20  **you're putting in for a given fund in any given year?**

21     A.    Absolutely.

22     **Q.    And how about something like the Pension**

23  **Protection Act of 2006?**

24     A.    As the administrator, I would -- you

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 85

Page

1 know, if there was a mailing or whatever the
2 responsibility was for the administration, I had a
3 staff.  The staff recorded their time involved, if
4 there was a specific mailing.
5     Q.    Okay.  You're referencing mailings.  But
6 with respect to a statute like the Pension Protection
7 Act, isn't there more to it than mailings; there was,
8 kind of, a host of change as to how pension plans
9 operated following that legislation, correct?
10     A.    Correct.  And that's why we had plan
11 professionals.
12     Q.    But wouldn't you, as the administrator,
13 have to, kind of, amp up your level of interaction with
14 the professionals in order to implement policies that
15 comply with this new statute.
16         MR. VAN DYCK:  Objection.  You may
17 answer.
18         THE WITNESS:  It would be the same as
19 with the health & welfare fund and any of the
20 other funds.  You know, it would be limited time
21 that I spent.
22     Q.    (By Mr. Gilligan)  I mean, wouldn't you
23 be given -- and again, let's use the example the
24 Pension Protection Act.  Wouldn't you be reviewing

Page 86

Page

1 memoranda and -- from counsel -- about what steps the
2 fund had to take to comply with the -- with the new
3 statute?
4     A.    Well, you know, we had a fund counsel.  I
5 had compliance attorney working.  You know, so that was
6 some something that they would review.
7     Q.    Right.  I understand counsel is playing a
8 role.  But aren't you, as the administrator,
9 interacting with counsel and working with them to make
10 sure the fund is in compliance with the new statute?
11     A.    Well, can you give me an example?
12     Q.    Sure.  Weren't there a variety of new
13 notices that would go out with the Pension Protection
14 Act?
15     A.    To whom?
16     Q.    To the participants.
17     A.    So that would be a mailing.
18     Q.    Yeah, that's a mailing.  But that's not
19 just a mailing that -- let me ask you this, I mean, the
20 mailings not creating itself, right; there's got to
21 be some discussion of what has to go in the mailing?
22     A.    Okay.  So that would be a draft of the
23 correspondence that was being mailed?
24     Q.    Yep.

Page 87

Page

1     A.    Okay.  So if the consultants/actuary,
2 whomever sent that to legal counsel, you know, so it
3 would be a document that I would review, or in-house
4 counsel, or our compliance attorney at the time would
5 review.  So what would it be, you know, a few-minute
6 review of a document and then turned over to, you know,
7 the clerical staff to send out.
8     Q.    And some of these statutes, I think, are
9 pretty complex, we'd all agree.  And wouldn't review of
10 what hoops the fund was jumping through, you know,
11 entail a couple minutes of your time?
12     A.    Well, I'm not sure what I would do versus
13 the paid professionals, the actuaries and consultants,
14 were doing with respect to the Pension Protection Act.
15     Q.    Let's move to a different legislative
16 example, then.  The Affordable Care Act, you're
17 familiar with it?
18     A.    Mm-hmm.
19     Q.    That was a rather substantial piece of
20 legislation, in terms of the operation of your health &
21 welfare fund, correct?
22     A.    Mm-hmm.
23     Q.    And again, didn't that entail a host of
24 compliance steps that the fund had to take?

Page 88

Page

1     A.    Well, again, mailings, correspondence
2 from the consultants.
3     Q.    Changes to benefits?
4     A.    Which would be a mailing, right?
5     Q.    But didn't the Affordable Care Act impose
6 a number of requirements on funds, in terms of changes
7 to eligibility, changes to benefits?  Things of that
8 sort.
9     A.    Well, that's why we paid the consultants,
10 to advise the trustees.  The trustees, probably, were
11 advised at the time and, you know, it was on the
12 agenda.
13     Q.    Okay.  But the consultants don't
14 administer the fund, right?
15     A.    No.  But at the end of the day, whatever
16 was decided with respect to communication material, you
17 know, would go out.
18     Q.    And wouldn't you be involved in that
19 process?
20     A.    Reviewing the documents.
21     Q.    Okay.  And would you also be reviewing
22 implementation steps?
23     A.    With the change in the eligibility rules
24 or a benefits change?

Ginamarie Alongi, et al. vs                                    Gina Alongi
Iuoe Local 4 Health & Welfare Fund, et al.                     June 22, 2022

---

Page 89

Page

1    Q.   Sure.  So, for instance, all the children
2  of the members up to the age of 26 are now eligible for
3  benefits, correct?
4    A.   Right.
5    Q.   So that's a big change, correct?
6    A.   But what did I specifically have to do
7  with that, though?
8    Q.   Well, wouldn't you, as the administrator,
9  be assuring that plan documents were updated, notices
10 given, all the other steps to actually implement this
11 legal change?
12   A.   That's why I had two in-house attorneys.
13   Q.   And who were those?
14   A.   Greg Geiman and Alice Kurtz.
15   Q.   And are you testifying that your
16 activities, vis-a-vis, each fund, wouldn't change in
17 any respect with the passage of something as
18 significant as the Affordable Care Act?
19   A.   I understand that it was significant.
20 But so was the Pension Protection Act.
21   Q.   Okay.
22   A.   You know so...
23   Q.   So wouldn't it be fair to say, that the
24 year that the Pension Protection Act was passed, your

---

Page 90

Page

1  time allotment to the pension fund would be greater;
2  and in the year in which the Affordable Care Act was
3  passed, your allotment of time for the health & welfare
4  fund would have been increased?
5          MR. VAN DYCK:  Objection as to form.  You
6    can answer.
7          THE WITNESS:  No.
8    Q.   (By Mr. Gilligan)  No?
9    A.   Because of the professional people that I
10 had working under me and the outside actuaries,
11 consultants and counsel.
12   Q.   So if you cease filling out these time
13 sheets, how was the allocation to the various funds for
14 your time determined?
15   A.   The accounting firm, whether it was
16 Ed Manzi or Jeannie, would meet with me at the end of
17 the year.  And we would determine whether there were
18 any significant changes in the allocation.
19        You know, as I mentioned earlier, you
20 know, we had one change, which was significant, when I
21 made the recommendation in 2015 to the board of
22 trustees of the health & welfare fund to dismantle the
23 the health & welfare fund claims adjudication --
24   Q.   Okay.

---

Page 91

Page

1    A.   -- in house.
2    Q.   What was the process you went through
3  with Manzi to allocate your time?
4    A.   They would do the spreadsheet, you know,
5  which was consistent with the prior year.  Asked me if
6  there were any adjustments and whether it was --
7  whether any changes had to be made to it.
8    Q.   And you said they did this once a year?
9    A.   Well, for a period of time we were
10 resetting the admin. allocation every six months.
11   Q.   Okay.
12   A.   And then we went to annually.
13   Q.   And when you're having these discussions
14 -- let's back up one second.  So at this point, Manzi
15 has become the funds auditors; is that correct?  This
16 is 2008.
17   A.   Yes. I don't know what period of time.
18   Q.   I mean, you're confident Manzi was --
19   A.   Oh definitely.
20   Q.   Okay.  And when you had these either
21 twice a year or annual discussions with them, did those
22 occur in person or over the phone?
23   A.   I believe both.  If they happened to be
24 doing the audit at the time, in the office, they would

---

Page 92

Page

1  question me.
2    Q.   And when they questioned you, how long
3  did that process take?
4    A.   I don't recall.
5    Q.   Was it a day-long interview?  What it,
6  you know, 15 minutes?  An hour?  Best estimate of that?
7    A.   I can't remember.
8    Q.   And who would conduct that conversation
9  with you, was it Ms. Mikal?
10   A.   Yes.
11   Q.   But you have no idea the amount of the
12 amount of time in your day it would take for you to
13 have that conversation?
14   A.   No.
15   Q.   Particularly at the point where this is
16 be done once a year, how can you recall the volume of
17 day-to-day work you were doing for each specific fund?
18   A.   Because my job didn't change.  You know,
19 unless, of course, you know, it was one of those
20 legislative changes.  But, basically, I would do the
21 same thing, same time of month every day.
22   Q.   How can that be, that your months are
23 static year after year; that done seem possible to me?
24        MR. VAN DYCK:  Objection as to form.  You

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

Page 93

Page

1 may answer.
2      THE WITNESS: Well, you know, I know my
3 job. You know, I obviously did it well. And,
4 you know, my responsibilities didn't change.
5      Q.   (By Mr. Gilligan) So you were involved
6 in this Department of Labor process, the end product of
7 which is the administrator shared services agreement
8 and agreement for people to maintain time sheets to
9 allocation expenses, correct?
10     A.   Right.
11     Q.   Was it the essence of the dispute with
12 the Department of Labor and the resolution that
13 specific data was needed regarding the work for each
14 specific fund so no fund was subsidizing the other
15 fund?
16     A.   Right.
17     MR. VAN DYCK: Objection.
18     Q.   (By Mr. Gilligan) Okay. So you concur
19 on that. And my question is, given that framework, why
20 would you have ceased keeping time sheets?
21     MR. VAN DYCK: Objection. Asked and
22 answered. You can answer.
23     THE WITNESS: Basically, you know, I must
24 have had a discussion with someone along the

Page 94

Page

1 lines of, you know, whether it was necessary
2 because it was time-consuming.
3      You know, these time sheets that the
4 employees were completing weren't very accurate,
5 okay, because things were getting allocated to
6 certain buckets, which is a way of just
7 recording time. You know, so we had to change
8 the time sheet form to make it more specific,
9 you know, in the later years. So when, you
10 know, we first -- or when I first started doing
11 it the numbers weren't changing.
12     Q.   (By Mr. Gilligan) You indicate you must
13 have had a discussion with someone about this. Do you
14 recall such a conversation?
15     A.   I don't.
16     Q.   So you probably, then, don't recall with
17 whom that conversation would have occurred, or do you?
18     A.   I don't.
19     Q.   Okay. Did you ever have a conversation
20 with the trustees regarding your ceasing to keep time
21 sheets?
22     A.   I don't recall.
23     Q.   Do you ever recall bringing it up in any
24 trustees' meeting, or have the board act on or approve

Page 95

Page

1 such a change?
2      A.   We would have the change in the admin.
3 allocation brought to the board every six months, so
4 annually, for them to approve it.
5      Q.   So you would bring the new allocation to
6 the board for their approval. Was there a discussion
7 with the board regarding the method by which those
8 numbers were arrived at?
9      A.   They never asked, no.
10     Q.   Okay. And to the board's knowledge,
11 everyone was filling out time sheets in accordance with
12 the agreement with Department of Labor, correct?
13     MR. VAN DYCK: Objection as to form.
14     THE WITNESS: I'm not sure board knew that
15 time sheets were being done. The accounting
16 firm, typically, calculated the admin.
17 allocation for this fund and other funds that
18 they service. So I'm not sure if the board knew
19 that there were time sheets.
20     Q.   (By Mr. Gilligan) I mean, weren't the
21 time sheets a significant aspect of the resolution
22 reached for the Department of Labor and the audit?
23     MR. VAN DYCK: Objection as to form.
24     THE WITNESS: I don't know if it was

Page 96

Page

1 significant. I think, in one of last e-mails
2 you showed me from Attorney Mader, she said, my
3 recommendation would be. It was her
4 recommendation that we implement a time sheet
5 system.
6      Q.   (By Mr. Gilligan) And such a time sheet
7 system was, in fact, adopted, correct?
8      A.   Yes.
9      Q.   Okay. And, in fact, you produced, at
10 some point, or circulated a proposed time sheet in a
11 proposed manner in which time would be kept in the
12 office, correct?
13     A.   Yes.
14     Q.   And isn't it true that the Administrative
15 Shared Service Agreement requires that each employee
16 account for their time across funds?
17     MR. VAN DYCK: Objection as to form.
18     THE WITNESS: Yes.
19     Q.   (By Mr. Gilligan) * Okay. And is that
20 also true that that is required as per the employee
21 handbook for Local 4 fund employees?
22     MR. VAN DYCK: Objection as to form.
23     You can answer, if you know.
24     THE WITNESS: What was the question?

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gina Alongi
June 22, 2022

---

Page 97

Page

1   MR. GILLIGAN:  Can you read the question
2   back, please?
3
4        * (Question read)
5
6        (Exhibit 105, Handbook, marked)
7
8        Q.    (By Mr. Gilligan)  Ms. Alongi, you've
9   been handed what's been marked Exhibit 105.  I was
10  wondering if you could identify that document for me?
11       A.    This is the fund office employee
12  handbook.
13       Q.    And if you would, please, would you turn
14  to page four of Exhibit 105.  And if you look at --
15  toward the top third of the -- page four -- there's a
16  heading Weekly Time Sheet.
17       A.    Mm-hmm.
18       Q.    And am I correct, that it indicates
19  there, under all employees, exempt or nonexempt, that
20  work under the jurisdiction of more than one fund must
21  complete a weekly time sheet located in the fund's
22  public drive."
23       A.    I see that.
24       Q.    And that indicates all employees,

---

Page 98

Page

1   correct?
2        A.    Yes.
3        Q.    Okay.  And you were an employee of the
4   Local 4 funds, correct?
5        A.    Yes.
6        Q.    And you were an employee who worked for
7   more than one fund, correct?
8        A.    Yes.
9        Q.    So based on that, why would you not then
10  be filling out such a time sheet?
11       A.    Because my job duties didn't change.
12  And, you know, in the job descriptions that were
13  prepared, nothing said anything about time sheets in
14  those two job descriptions.  You know, this employee
15  handbook was prepared for my office staff.  We had
16  nothing, you know, for the the employees.  So this is
17  basically -- was done for the benefit of the employees.
18       Q.    But weren't you one of the employees?
19       A.    I was.
20       Q.    Okay.  And you reference job
21  descriptions.  What are you alluding it there?
22       A.    There were two job descriptions that were
23  prepared.  One, the content was pretty involved with
24  respect to my roles.  And the other one, a summary of

---

Page 99

Page

1   my job responsibilities and duties.  And nowhere, in my
2   specific job responsibility, was there a creation of a
3   time sheet.
4        Q.    Okay.
5        A.    A time sheet.
6        Q.    Those job descriptions, am I right that
7   those were circulated in conjunction with discussions
8   of your getting an employment contract with the Local 4
9   funds?
10       A.    Yes.
11       Q.    And when did that take place?
12       A.    I'm not sure.
13       Q.    Well, would it have been on or after
14  May 1st of 2018?
15       A.    Possibly.
16       Q.    Well, let me see if I can refresh your
17  recollection.  Those discussions occurred after you and
18  Mr. McLaughlin had the blowup on May 1, 2018; does
19  that --
20       A.    Yes.
21       Q.    -- ring a bell?  And following that, you
22  were looking for the security of an employment
23  contract; is that correct?
24       A.    Yes.

---

Page 100

1        Q.    Okay.  Were those -- well, number one,
2   what that employment contract ever entered into?
3        A.    No.
4        Q.    And were those job descriptions ever
5   officially adopted by the funds?
6        MR. VAN DYCK:  Objection as to form.
7        THE WITNESS:  Adopted by the funds or the
8   trustees or --
9        Q.    (By Mr. Gilligan)  The trustees.
10       A.    No, because we didn't enter into an
11  agreement.  But those two job description documents
12  have been around for a while.
13       Q.    You're saying, they were not created in
14  conjunction with the discussions about an employment
15  contract for you?
16       A.    I think they were edited.
17       Q.    Do you know when those job descriptions
18  were created, initially?
19       A.    My best estimate is, when we did a series
20  of compensation studies, the staff or I had to do job
21  descriptions.  And I think, one or both of them,
22  documents, in part, were created at some point and then
23  edited later.
24       Q.    You said a job study.

---

# TAB 3

⑤ Good Morning / Happy New Year.
Gina

EXHIBIT
McLaughlin
156
7/12/22 (KF

H+W
I Know We Have The Motions to go

over And Perhaps the Yearly increases to

Discuss — So lets do That Now. / The

Motions Anyway.


After which I want to Address

Some items, concerns, And Pending

Issues that Need Attention."


( After the Motions)

CONFIDENTIAL

① Winter Schedule For Inclement
        WEATHER !

Hour of Operation Are As
        Follows!

Mon. - Friday / 8am - 4pm
        Period !!!

Unless A Substancial Snowfall
Occurs - Then The Fund Office
and Engineers Training Ctr.
Will be Notified.

I Am The Only Person Authorized
To Make that decision.

CONFIDENTIAL

THEREFOR ! THERE WILL be
" NO " 2 Hour delays etc...

or <ins>EARLY</ins> dismissals — Unless I

deem Necessary.

(NOW)

IF AN Employee feels UnSAFE
~~Commuting~~ Commuting to or FROM the

office — THEN THEY NEED to

Refer to the Employee Handbook

AND EITHER TAKE A "Sick" or

VACATION DAY "

We ARE ONe ORGANIZATION —

AND THEREFOR — We NEED to be

ConsistANT with this Protocol.

CONFIDENTIAL

(2) My Next Concern is "Your"

Working Hours. Tardiness is The

Main Issue. Our Office Hours

ARE 8am - 4pm. And My

Expectations ARE that You Adhere

to these Hours. In Addition,

if you Happen to be "Out of the

Office" - You MUST INform me

of Your Schedule.

For Example -

1. Out Sick

2. Vacation Time

3. off Site Meeting.

CONFIDENTIAL

(3) My Next Concern or Topic
to discuss is " Lack of
Communication ",

There are Many Issues that
I have To be Informed of
in Order to Manage Business —
And My Preference is communication A
" Weekly Update ".

There are Several Pending
Items with-in Our H+W Plan,
+ Annuity
Pension, Plan And other
Categories that I Need to
Know.

34

( For - Example )

H + W

1. Updates W/ New Consulting Firm
   Willis Towers Watson.

2. Potential Changes + benefits that
   " Attorneys May Provide "

3. Mass Family and Medical Leave
   Law. Updates.

4. HealthLinx Audit w/ CVS

ect etc. etc..

3b.           Pension And Annuity.

1.   Working w Segal Ruitman on.

A/ Summary Plan Descriptions.

b/ MASS Mutual Aggment.

2. American Century Target date
   Fund Updates.

3. details of Discussions w/
   Commack Larustte on improving
   Benefit Options.

4  New MASS Mutual Educational
   Information

            etc.  etc  etc ...

(4)

ALL OF These Issues

ARE Very Important to

Me And I ~~need~~ Need

Your Cooperation, in Order

to Properly Manage The

Business of This Local

Union. And The Fund

CONFIDENTIAL

(5) With Regards to the

discussion of Increases For

2020.

THERE . Will be A 3%

MAXIMUM INCREASE —

Across The Board.

FUNDS0809

# TAB

# 4

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*William Dennis McLaughlin Vol I*

*June 08, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
June 08, 2022

Page 3

1  COMMONWEALTH OF MASSACHUSETTS
2  Norfolk, ss.          Superior Court
3            Civil Action No. 2182CV00125
4  ****************************************************
5  GINAMARIE ALONGI AND ROSEMARIE ALONGI,      *
6    Plaintiffs                        *
7    vs.                               *
8  IUOE LOCAL 4 HEALTH & WELFARE FUND; IUOE LOCAL 4 *
9  PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS    *
10 FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4   *
11 APPRENTICESHIP & TRAINING FUND; JOINT LABOR-    *
12 MANAGEMENT COOPERATION TRUST; AND WILLIAM D.    *
13 MCLAUGHLIAN, INDIVIDUALLY AND IN HIS CAPACITY   *
14 AS CHAIRMAN OF THE BOARDS OF TRUSTEES,          *
15   Defendants                       *
16 ****************************************************
17   DEPOSITION OF:  WILLIAM DENNIS MCLAUGHLIN
18         BOWDITCH & DEWEY, LLP
19         200 Crossing Boulevard
20         Framingham, Massachusetts
21       June 8, 2022  10:10 a.m.
22             Volume I
23         Kristen M. Edwards
24          Court Reporter

Page 2

1  APPEARANCES:
2
3  Representing the Plaintiffs:
4     BOWDITCH & DEWEY, LLP
5     200 Crossing Boulevard, Suite 300
6     Framingham, MA 01702
7     BY:  TIMOTHY P. VAN DYCK, ESQ.
8         JACOB A. TOSTI, ESQ.
9     (617) 757-6537  fax (508) 929-3137
10    E-mail:  tvandyck@bowditch.com
11
12 Representing the Defendants:
13    FREEMAN, MATHIS & GARY LLP
14    60 State Street, Suite 600
15    Boston, MA 02109-1800
16    BY:  JENNIFER L. MARKOWSKI, ESQ.
17        CHRISTOPHER REDD, ESQ.
18    (617) 963-5975
19    E-mail:  jmarkowski@fmglaw.com
20
21
22
23
24

Page 3 (continued)

1  APPEARANCES (Continued):
2
3  Representing the Defendants:
4     O'DONOGHUE & O'DONOGHUE LLP
5     5301 Wisconsin Avenue, NW, Suite 800
6     Washington, DC 20015
7     BY:  CHARLES W. GILLIGAN, ESQ.
8         DANIEL KEENAN, ESQ.
9     (202) 362-0041
10    E-mail:  cgilligan@odonoghuelaw.com
11
12 In Attendance:  Gina Marie Alongi
13         Greg Geiman
14         Rosemarie Alongi
15
16
17
18
19
20
21
22
23
24

Page 4

1          I N D E X
2
3  WITNESS:        WILLIAM DENNIS MCLAUGHLIN
4
5  EXAMINATION BY:                PAGE:
6  Mr. Van Dyck              5
7
8
9  EXHIBIT:              PAGE:
10 Exhibit 20, position statement....................71
11 Exhibit 21, letter................................107
12 Exhibit 22, interrogatories.......................108
13 Exhibit 23, interrogatories.......................135
14 Exhibit 24, employee handbook.....................150
15 Exhibit 25, memo..................................167
16 Exhibit 26, letter................................179
17
18 (Exhibits retained by Attorney Van Dyck)
19
20
21
22
23
24

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
June 08, 2022

---

Page 145

1 business representatives are all members so we did not
2 appreciate that.
3    Q.   Anything else you can recall?
4    A.   Yes.  I recall her the way she thought
5 certain things were funny in the workplace, like dirty
6 jokes, things like that, lewd behavior, comments like
7 that.  She had a tendency to think that was fun when
8 certain people would engage in that stuff, and then she
9 would find it insulting if anyone else did.  So this
10 bipolar personality was concerning to us because here
11 we have a Fund administrator with this type of
12 behavior.  It was offensive to us.
13    Q.   Anything else?
14    A.   I'm sure there were others.  I can't
15 remember anymore right now.
16    Q.   Are you aware of any documents or
17 anything else that would refresh your memory about
18 those discussions you had with these folks?
19    A.   No.
20    Q.   Again, all of what you just described to
21 me occurred before you became the business manager in
22 2017?
23    A.   Not exclusively to me being prior to
24 business manager.

---

Page 146

1    Q.   I'm only looking for things that you said
2 about Gina's performance, work ethic prior to your
3 becoming business manager.
4    A.   Yes.
5    Q.   Have I got it all?
6    A.   Yes.  Well, to the best of my knowledge,
7 yes.
8    Q.   So how does that jive with the
9 representation you made under oath that generally
10 speaking you were pleased with her performance until
11 2020?
12    A.   Generally.
13    Q.   Oh, I see.  The word "generally"?
14    A.   Yes.
15    Q.   Fair enough.
16    A.   Yes.
17    Q.   Now, you mentioned the phrase "country
18 club style."
19    A.   Yes.
20    Q.   What do you mean by that?
21    A.   All of which I described.  The terrible
22 work ethic, not responding to phone calls, getting back
23 to people two days later, doing what she wanted, you
24 know, just not being where she should be.  You know,

---

Page 147

1 we're all in that building early in the morning.  We
2 have to wait until Gina Alongi gets into work to bring
3 up concerns, issues, items that our Fund administrators
4 should be addressing, we have to wait?  Those aren't
5 acceptable.  That's country club style to me.
6    Q.   So you also testified a few minutes ago
7 about the way she ran the Funds office in a
8 disrespectful manner.  What did you mean by that?
9    A.   Talking down to people, coworkers.  It's
10 lousy.
11    Q.   Do you recall anything specific?
12    A.   Yes, just dismissive with people, one
13 being Laura-Jean Hickey.  I remember her mistreating
14 her before.
15    Q.   Anything else you recall?
16    A.   Yes.  I recall her thinking it was funny
17 when Mr. Lou Rasetta, my predecessor, would engage in
18 sexual banter, dirty jokes, things like that.  I felt
19 it was unacceptable and so didn't others that were
20 witness to it.
21    Q.   How many times did you witness it?
22    A.   Several.
23    Q.   Several being more than 10?
24    A.   Yes.

---

Page 148

1    Q.   More than 20?
2    A.   No, several.
3    Q.   Between 10 and 20?
4    A.   Possibly.
5    Q.   Anything specific you can recall?
6    A.   Not specifically.
7    Q.   How would you describe your relationship
8 with Rose Alongi prior to your becoming business
9 manager?
10    A.   Okay.
11    Q.   Fair to medium.  Did you have any issues
12 with Rose, again, prior to becoming business manager?
13    A.   No.
14    Q.   So you became business manager when in
15 2017?
16    A.   August.
17    Q.   August.  And as of that time, how would
18 you describe your relationship with Gina?
19    A.   As of that, you mean leading up to that?
20    Q.   As of the time you became business
21 manager.  Was it the same as you've already just
22 described or did it change?
23    A.   Yes, it wasn't great.
24    Q.   Didn't change?

---

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*William Dennis McLaughlin Vol II*

*June 09, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Case 1:21-cv-10163-FDS   Document 64   Filed 12/13/22   Page 47 of 271

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
June 09, 2022

Page 3

| | |
|---|---|
| 1 | COMMONWEALTH OF MASSACHUSETTS |
| 2 | Norfolk, ss.        Superior Court |
| 3 |           Civil Action No. 2182CV00125 |
| 4 | ************************************************** |
| 5 | GINAMARIE ALONGI AND ROSEMARIE ALONGI,        * |
| 6 |   Plaintiffs                        * |
| 7 |   vs.                            * |
| 8 | IUOE LOCAL 4 HEALTH & WELFARE FUND; IUOE LOCAL 4 * |
| 9 | PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS    * |
| 10 | FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4   * |
| 11 | APPRENTICESHIP & TRAINING FUND; JOINT LABOR-    * |
| 12 | MANAGEMENT COOPERATION TRUST; AND WILLIAM D.   * |
| 13 | MCLAUGHLIN, INDIVIDUALLY AND IN HIS CAPACITY    * |
| 14 | AS CHAIRMAN OF THE BOARDS OF TRUSTEES,        * |
| 15 |   Defendants                      * |
| 16 | ************************************************** |
| 17 |    DEPOSITION OF:  WILLIAM DENNIS MCLAUGHLIN |
| 18 |          BOWDITCH & DEWEY, LLP |
| 19 |          200 Crossing Boulevard |
| 20 |          Framingham, Massachusetts |
| 21 |          June 9, 2022  10:10 a.m. |
| 22 |             Volume II |
| 23 |          Kristen M. Edwards |
| 24 |           Court Reporter |

Page 3

| | |
|---|---|
| 1 | APPEARANCES (Continued): |
| 2 | |
| 3 | Representing the Defendants: |
| 4 |    O'DONOGHUE & O'DONOGHUE LLP |
| 5 |    5301 Wisconsin Avenue, NW, Suite 800 |
| 6 |    Washington, DC 20015 |
| 7 |    BY:  CHARLES W. GILLIGAN, ESQ. |
| 8 |       DANIEL KEENAN, ESQ. |
| 9 |    (202) 362-0041 |
| 10 |    E-mail:  cgilligan@odonoghuelaw.com |
| 11 | |
| 12 | In Attendance:  Gina Marie Alongi |
| 13 |       Greg Geiman |
| 14 |       Rosemarie Alongi |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 2

| | |
|---|---|
| 1 | APPEARANCES: |
| 2 | |
| 3 | Representing the Plaintiffs: |
| 4 |    BOWDITCH & DEWEY, LLP |
| 5 |    200 Crossing Boulevard, Suite 300 |
| 6 |    Framingham, MA 01702 |
| 7 |    BY:  TIMOTHY P. VAN DYCK, ESQ. |
| 8 |       JACOB A. TOSTI, ESQ. |
| 9 |    (617) 757-6537  fax (508) 929-3137 |
| 10 |    E-mail:  tvandyck@bowditch.com |
| 11 | |
| 12 | Representing the Defendants: |
| 13 |    FREEMAN, MATHIS & GARY LLP |
| 14 |    60 State Street, Suite 600 |
| 15 |    Boston, MA 02109-1800 |
| 16 |    BY:  JENNIFER L. MARKOWSKI, ESQ. |
| 17 |       CHRISTOPHER REDD, ESQ. |
| 18 |    (617) 963-5975 |
| 19 |    E-mail:  jmarkowski@fmglaw.com |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |

Page 4

| | |
|---|---|
| 1 |        I N D E X |
| 2 | |
| 3 | WITNESS:        WILLIAM DENNIS MCLAUGHLIN |
| 4 | |
| 5 | EXAMINATION BY:              PAGE: |
| 6 | Mr. Van Dyck            5 |
| 7 | |
| 8 | |
| 9 | EXHIBIT:              PAGE: |
| 10 | Exhibit 27, affidavit of John Shaughnessy...........12 |
| 11 | Exhibit 28, affidavit of Jennifer Vachon...........16 |
| 12 | Exhibit 29, affidavit of Jennifer Dow...............37 |
| 13 | Exhibit 30, e-mail..............................54 |
| 14 | Exhibit 31, e-mail..............................103 |
| 15 | Exhibit 32, e-mail..............................132 |
| 16 | Exhibit 33, July 21, 2020 minutes.................144 |
| 17 | Exhibit 34, e-mail..............................169 |
| 18 | Exhibit 35, e-mail..............................174 |
| 19 | Exhibit 36, bulletin.............................175 |
| 20 | |
| 21 | QUESTION MARKED: |
| 22 | Page 177, Line 3 |
| 23 | |
| 24 | (Exhibits retained by Attorney Van Dyck) |

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
June 09, 2022

---

Page 5

1      WILLIAM DENNIS MCLAUGHLIN, Deponent, having
2  first been satisfactorily identified and duly sworn,
3  deposes and states as follows:
4
5
6      EXAMINATION BY MR. VAN DYCK:
7
8      Q.   Good morning.
9      A.   Morning.
10     Q.   Yesterday at the end of your deposition,
11  at the end of yesterday's deposition, we were
12  discussing this letter that Mr. Geiman had written to
13  Gina on May 17, 2017.  Do you recall that?
14     A.   I do.
15     Q.   And, I think, you indicated in your
16  testimony yesterday that you had had a discussion with
17  Mr. Geiman about this letter?
18     A.   Yes.
19     Q.   And as a result of that discussion, you
20  were led to believe that Gina had actually had
21  Mr. Geiman prepare this letter, correct?
22     A.   I said that, but I was confusing it with
23  a previous piece.
24     Q.   Okay.  That's what I thought.  So when

---

Page 6

1  you say the "previous piece," do you mean another
2  letter?
3      A.   Yes, there was another letter somewhere.
4      Q.   So it wasn't this letter, correct?
5      A.   Correct.
6      Q.   Have you had any discussions with just
7  Mr. Geiman between yesterday and today?
8      A.   About this letter?
9      Q.   About this letter.
10     A.   No.
11     Q.   So do you recall any discussions with
12  Mr. Geiman about this letter?  And by this letter, I'm
13  referring to Exhibit 26.
14     A.   I don't remember.
15     Q.   You don't remember or --
16     A.   Could you repeat the question?
17     Q.   Do you recall ever having any discussions
18  with Mr. Geiman about Exhibit 26, the May 17th letter?
19  You're making me reach today.
20     A.   It was a long time ago, so I don't
21  recall.
22     Q.   It's possible that you may have but you
23  just don't recall?
24     A.   May have, may not have.  I don't recall.

---

Page 7

1      Q.   Fair enough.  Yesterday at the beginning
2  of your deposition you indicated that you had not
3  reviewed any documents in preparation for your
4  deposition.  Do you recall that?
5      A.   I don't.
6      Q.   Okay.  Well, the record will speak for
7  itself.  Did you, in fact, review any documents in
8  preparation for your deposition?
9      A.   Today, yesterday?
10     Q.   Either, both.
11     A.   Yes.
12     Q.   What documents did you review?
13     A.   Any documents that were given to me, my
14  own.  I have some of my own.
15     Q.   Do you recall --
16     A.   Any prepared by my legal team.
17     Q.   Do you recall what any of those documents
18  were?
19     A.   There were several.  No, I can't.  I
20  don't recall.
21     Q.   Did you review them on Tuesday when you
22  met with your counsel?
23     A.   Perhaps, yes, maybe a couple of them.
24     Q.   Today is Thursday.

---

Page 8

1      A.   I don't remember which ones.
2      Q.   You have no idea sitting here today which
3  documents you reviewed in preparation for your
4  deposition today?
5      A.   No, not to the best of my knowledge.
6      Q.   You also testified yesterday that you
7  thought Gina Alongi was bipolar.  Do you recall that?
8      A.   Yes.
9      Q.   When did you come to the conclusion that
10  you thought Ms. Alongi was bipolar?
11     A.   Many years ago.
12     Q.   Can you be any more specific?
13     A.   I really can't.
14     Q.   Was it before you became business
15  manager?
16     A.   Maybe.
17     Q.   Maybe, maybe not?
18     A.   Could have been.
19     Q.   Did you ever have any discussions with
20  anybody about this issue?
21     A.   No, my own assessment.
22     Q.   Your own assessment.  And I take it you
23  never raised the issue with Ms. Alongi?
24     A.   No.  And I say that because of these

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
June 09, 2022

---

Page 9

1  frequent mood swings, disposition, sometimes nice,
2  sometimes not.
3      Q.   Any other basis for your conclusion that
4  you thought Ms. Alongi was bipolar?
5      A.   No, no, just the frequent mood swings.
6      Q.   Got it, thank you.
7      A.   You're welcome.
8           MR. VAN DYCK:  Next exhibit.
9      Q.   (By Mr. Van Dyck)  While we are waiting
10 for the exhibit, you also testified yesterday that you
11 witnessed Gina Alongi engaging in lewd behavior.  Do
12 you recall that?
13     A.   Yes.
14     Q.   Please provide me with as many examples
15 as you can recall about what kind of lewd behavior Ms.
16 Alongi engaged in.
17     A.   Well, in the presence of my predecessor,
18 Mr. Lou Rasetta, Gina and Lou would often engage in
19 inappropriate behavior such as dirty jokes, a lot of
20 sexual dialogue to their relationship out in public,
21 amongst me anyways, I can say that, all in the
22 workplace, all within the Fund office, very
23 unprofessional as I see it.  So there were times where
24 she would engage in this type of behavior.  That is the

---

Page 10

1  environment that was fostered between the two.
2      Q.   Are you finished?
3      A.   Now I'm finished.
4      Q.   Okay.  I'm really not interested in your
5  opinions.  I'm really interested in what you actually
6  observed, witnessed.  You mentioned inappropriate
7  behavior, dirty jokes, sexual dialogue.  What exactly
8  did you observe?
9      A.   Her referencing, you know, Lou having a
10 big cock.
11     Q.   Anything else?
12     A.   There was a common banter between the two
13 about him bragging about his -- the size of his
14 genitalia and her liking the discussion, so they would
15 engage in that type of behavior.
16     Q.   Anything else you can recall?
17     A.   A lot of that particular.
18     Q.   When you say "a lot," how many times did
19 you, yourself, observe?
20     A.   Several.
21     Q.   More than 10?
22     A.   Could be.  I don't have the exact number.
23     Q.   I'm not asking for an exact number.  I'm
24 asking for an estimate or a range.

---

Page 11

1      A.   Several.
2      Q.   Beyond several you can't give me any kind
3  of further estimate or range?
4      A.   Roughly six, 10, 12, somewhere in there.
5      Q.   Any other, besides what you described for
6  me, any other inappropriate behavior, dirty jokes,
7  sexual dialogue that you observed Ms. Alongi engaging
8  in?
9      A.   Not to the best of my knowledge.
10     Q.   Did you ever raise this issue with
11 anybody?
12     A.   No.
13     Q.   Did you ever participate in the sexual
14 dialogue?
15     A.   No.
16     Q.   So you were just a --
17     A.   Observer.
18     Q.   An observer, a passive observer who
19 overheard this dialogue?
20     A.   I didn't overheard.  I was in the
21 accompany of it.
22     Q.   And you never complained to anybody about
23 it?
24     A.   No, it was none of my business.  It was

---

Page 12

1  between them two.
2           MR. VAN DYCK:  So why don't we mark this
3           as 27.
4
5           (Exhibit 27, affidavit of John
6           Shaughnessy, marked for identification)
7
8      Q.   (By Mr. Van Dyck)  Mr. McLaughlin, I'm
9  showing you what has been marked for identification as
10 Exhibit 27, which is the affidavit of John Shaughnessy.
11          Have you reviewed this document before
12 today?
13     A.   I have, yes.
14     Q.   Do you recall when the last time was that
15 you reviewed it?
16     A.   Week ago.
17     Q.   So he was a trustee with you, correct?
18     A.   Yes.
19     Q.   And he was on the management side?
20     A.   Yes.
21     Q.   And during the time that you and he were
22 both trustees, how would you describe your
23 relationship?
24     A.   Not a close relationship whatsoever.

---

Case 1:21-cv-10163-FDS   Document 64   Filed 12/13/22   Page 50 of 271

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
June 09, 2022

Page 37

1  That's an extreme issue.  You can't steal money from
2  the organization like that.
3      Q.    I guess my question for the moment is
4  whether you have any reason to believe that paragraph
5  17 is inaccurate?
6      A.    Again, I don't know if she was written up
7  or penalized over this issue.
8      Q.    Again, you don't know one way or the
9  other, correct?
10     A.    Correct.
11     Q.    Fair enough.  And with respect to this
12 purported check that she cut for her boyfriend, when
13 did you become aware of that?
14     A.    I believe in and around the time in which
15 it happened somewhere in early September.
16     Q.    And do you have any reason to believe
17 that that played any role in her termination?
18     A.    I don't believe so.  Several years later,
19 four years later, I don't believe so.
20           MR. VAN DYCK:  Why don't we go to the Dow
21 affidavit.
22
23           (Exhibit 29, affidavit of Jennifer Dow,
24           marked for identification)

Page 38

1      Q.    (By Mr. Van Dyck)  Why don't I take those
2  from you so we can keep the table clean, thanks.
3      A.    You're welcome.
4      Q.    I'm showing you what has been marked for
5  identification as Exhibit 29, the affidavit of Jennifer
6  Dow.  Have you seen this document before today?
7      A.    I have.
8      Q.    And when is the last time you reviewed
9  this document?
10     A.    Approximately a week ago.
11     Q.    You worked with Jennifer Dow?
12     A.    Yes.
13     Q.    And do you recall approximately for how
14 long you worked with her?
15     A.    Well, I became business representative,
16 as I stated yesterday, in 2014.  So from that point
17 forward -- I'm sorry, 2004, my bad.
18     Q.    That's all right.  How would you describe
19 your working relationship with Ms. Dow during that
20 time?
21     A.    Good, friendly.
22     Q.    Professional?
23     A.    Pretty much.
24     Q.    Did you and she ever socialize outside of

Page 39

1  work?
2      A.    No.
3      Q.    Have you ever had sexual relations, any
4  kind of sexual relations with any Fund employee?
5      A.    No.
6      Q.    In paragraph nine, Ms. Dow states, quote,
7  "In addition, just before the Funds 2019 Christmas
8  party, Mr. McLaughlin came to my office doorway and
9  told me that, quote, Gina is a selfish fucking bitch,"
10 end quote.  Do you recall making that statement?
11     A.    Not particularly, no.
12     Q.    I don't know what you mean by "not
13 particularly."  Is it that you don't -- that you could
14 have made that statement but you just don't recall or
15 that --
16     A.    I don't recall.
17     Q.    So it's possible you may have made that
18 statement.
19     A.    I really don't recall that.
20     Q.    Do you recall saying any words to that
21 effect?
22     A.    No.
23     Q.    If you had said those words, would you
24 agree they would have been inappropriate?

Page 40

1      A.    If I had said those, do I feel they would
2  have been inappropriate?
3      Q.    Yes.
4      A.    Yes.
5      Q.    Now, as of December 2019, did you believe
6  that Gina was a selfish fucking bitch?
7      A.    Yes.
8      Q.    And why so?
9      A.    Again, as I explained yesterday, that the
10 way she took advantage of the operating engineers Local
11 4 with her need to take care of her first.  See, Gina
12 is not a member.  She doesn't know what it's like to be
13 a member of Local 4 where this temple, this temple of
14 organized labor is very near and dear to us.  She used
15 this as her little cash cow, coming and going whenever
16 she wanted to, her lavish spending, you know, the way
17 she -- you know, it's not necessary to have two cell
18 phones.  Why do you have two cell phones paid for by
19 the local union?  Why do you drive around in a Cadillac
20 Escalade on the backs of the members?  It's their
21 money.  So her behavior would indicate such.  So that's
22 my opinion, yes.
23     Q.    So, again, just to be clear, as of
24 December 2019, you thought Gina was a selfish fucking

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
June 09, 2022

---

Page 41

1  bitch.
2      A.   No, I thought she was selfish.
3      Q.   The record is going to speak for itself.
4  You just said it.
5      A.   That's fine, good.
6          MS. MARKOWSKI:  Objection.
7      Q.   (By Mr. Van Dyck)  Good that you just
8  said it?
9          MR. VAN DYCK:  That's a question.
10         MS. MARKOWSKI:  Objection.
11         MR. VAN DYCK:  Objection noted.
12         MS. MARKOWSKI:  That's fine.  I'm just
13  objecting to it.
14     Q.   (By Mr. Van Dyck)  Do you feel good that
15  you said it?
16     A.   Come again?
17     Q.   Do you feel good that you just called
18  Gina a selfish fucking bitch?
19         MS. MARKOWSKI:  Objection.
20         THE WITNESS:  I speak the truth.
21     Q.   (By Mr. Van Dyck)  So, I guess, is it
22  fair to say that as of December 2019 you wanted Gina
23  gone?
24         MS. MARKOWSKI:  Objection.

---

Page 42

1          THE WITNESS:  Not necessarily.
2      Q.   (By Mr. Van Dyck)  Even though you
3  thought she was --
4      A.   I put up with a lot of stuff.  None rose
5  to the level of termination at that point.  Selfish,
6  yes.  Coming and going, didn't think it was right.
7  Again, nothing -- at that point I tolerated an awful
8  lot.  But at that point, nothing rose to the level of
9  termination.  I dealt with it.
10     Q.   So in paragraph 11 of Ms. Dow's affidavit
11  she states, "On multiple occasions around the time of
12  when she would go to Aruba, Mr. McLaughlin asked me
13  whether I wore a one-piece bathing suit or a two-piece
14  bathing suit."  Does that refresh your recollection at
15  all about whether you have made those statements to
16  her?
17     A.   So, again, she made a comment about her
18  annual trip to Aruba and mentioned she wasn't eating
19  the sugary sweets, cookies, chocolates that were
20  available in the common area and she said, "I'm not
21  having any of those because I am preparing to go to
22  Aruba, and I have to get into my two-piece bathing
23  suit."
24     Q.   And so you testified already about that,

---

Page 43

1  and you think it was just one conversation or could it
2  have been more?
3      A.   Could have been more.  This was an
4  annual.  So this was her bragging about, you know, my
5  trip and, you know, I gotta get ready for my trip.
6      Q.   In paragraph 12 of Ms. Dow's affidavit,
7  she states, on many occasions Mr. -- I'm sorry, strike
8  that.
9          In paragraph 12 of her affidavit, Ms. Dow
10  states, "Mr. McLaughlin also told me that when he
11  worked with my husband on a job around 2004 he saw my
12  husband, a member of the carpenter's union,
13  quote/unquote, checking out women on the job site."  Do
14  you recall that?
15     A.   Yes.
16     Q.   Do you think it might have happened?
17     A.   I don't think so.
18     Q.   So you think she's lying here.
19     A.   That's correct.
20     Q.   In paragraph 13 Ms. Dow states under
21  oath, "On many occasions Mr. McLaughlin would talk to
22  me about other peoples' sexual activity in graphic
23  detail."  Is that statement true?
24     A.   It's not.

---

Page 44

1      Q.   Do you ever recall talking to Ms. Dow
2  about other peoples' sexual activity?
3      A.   I don't.
4      Q.   Do you think she's lying in paragraph --
5      A.   Yes.
6      Q.   I'm sorry, you need to let me finish.
7          Do you believe she's lying in paragraph
8  13 of her affidavit?
9      A.   Yes.
10     Q.   And, I believe, we went over this
11  yesterday but I'm going to just make sure I covered my
12  --
13     A.   I will grab a glass of water.
14     Q.   Please, take your time.
15         MS. MARKOWSKI:  Tim, at some point in the
16  next five or ten minutes.
17         MR. VAN DYCK:  That's fine.
18         THE WITNESS:  Thank you.
19     Q.   (By Mr. Van Dyck)  In paragraph 15 of her
20  affidavit Ms. Dow states, "I frequently overheard
21  Mr. McLaughlin refer to Ms. Hickey as a, quote/unquote,
22  fire crotch because she has red hair."  Does that
23  refresh your recollection at all as to whether you may
24  have done that?

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
June 09, 2022

Page 145

1  is that correct?

2  A.   Yes.

3  Q.   Have you reviewed this document?

4  A.   Yes.

5  Q.   And have you reviewed it in preparation

6  for today's deposition?

7  A.   I did.

8  Q.   And did you believe the statements

9  contained in this document were true and accurate?

10  A.   Yes.

11  Q.   So we're going to spend a lot of time on

12  this document.  But right now I'd just like to draw

13  your attention to page two, okay.  At the very top

14  paragraph, it states in the third sentence, "Although

15  the trustees were aware that administrator Alongi

16  served as director for the coalition and was paid by

17  the coalition, they were unaware of the magnitude of

18  coalition work that was performed by administrator

19  Alongi and her staff during regular business hours at

20  the office Fund."  Have I read that correctly?

21  A.   Yes.

22  Q.   Does this refresh your recollection as to

23  whether you were aware of the fact that Gina Alongi

24  served as director of the coalition?

Page 146

1  A.   I was aware she was director of

2  coalition.

3  Q.   And that she was getting paid by the

4  coalition?

5  A.   I was aware of that, but she wasn't

6  supposed to be doing them during Local 4 work hours

7  between eight to four.

8  Q.   I get all that.  Believe me, you can say

9  that until you are blue in the face.  But you said

10  earlier, literally two minutes ago, that you weren't

11  aware of the fact that she was doing any work for the

12  coalition up until the time you got her time sheets.

13  Are you now changing that testimony?

14  MS. MARKOWSKI:  Objection.

15  THE WITNESS:  No.

16  Q.   *  (By Mr. Van Dyck)  So even though

17  Exhibit 33 states that the trustees were aware that

18  Gina did serve as director of the coalition and was

19  paid by the coalition, you didn't know any of that

20  until you got her time sheets?  I'm pretty sure there's

21  a question pending.  Are you waiting to have it

22  repeated or are you waiting to give a reply?

23  MS. MARKOWSKI:  Do you know what the

24  question is?  She can read back the question.

Page 147

1  THE WITNESS:  Please.

2

3  *  (Question read)

4

5  THE WITNESS:  I know Gina worked for the

6  coalition.  I know she was paid by the

7  coalition, but I was unaware that Gina was doing

8  it during work hours.

9  Q.   (By Mr. Van Dyck)  You're repeating

10  yourself, and that really wasn't my question.  My

11  question -- I think you testified -- I don't want to

12  beat a dead horse, but I just want to make sure I've

13  got this clear.  You testified to me now repeatedly

14  that you were not aware of the fact that Gina was doing

15  any coalition work until you got her time sheets.  Are

16  you now changing that testimony?

17  MS. MARKOWSKI:  Objection.

18  THE WITNESS:  I was not aware that Gina

19  Alongi was doing coalition and being paid by the

20  coalition to perform those duties of the

21  coalition during the work hours from eight to

22  four.

23  Q.   (By Mr. Van Dyck)  So am I correct then

24  that -- please.

Page 148

1  A.   Those were supposed to be coalition

2  hours, to the best of my knowledge, that were supposed

3  to be done nights, weekends, away from the Local 4

4  office.

5  Q.   So then are you now saying that you were

6  aware of the fact that she was doing coalition work,

7  putting aside when, but that she was doing coalition

8  work prior to when you saw her time sheets?

9  A.   Yes.

10  Q.   Okay.  Got it, thank you.

11  A.   You're welcome.

12  Q.   Appreciate it.  I'm about to show you

13  another exhibit.  Before we get to that, I do have a

14  couple of more questions for you about Exhibit 33.

15  There was a job description that was part of Exhibit

16  33.  It was at the end, the last four pages.  I think

17  you are on the wrong exhibit.

18  A.   It's 32.

19  Q.   Then I'm wrong.  It happens so

20  infrequently.  It was 32, the employment agreement.

21  MS. MARKOWSKI:  Do you need the question

22  back?

23  Q.   (By Mr. Van Dyck)  I don't think there

24  was a question.  I'm just really asking you to focus on

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*William Dennis McLaughlin*

*July 13, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
July 13, 2022

Page 3

1    APPEARANCES (Continued):

2

3    Representing the Defendants:

4        O'DONOGHUE & O'DONOGHUE LLP

5        5301 Wisconsin Avenue, NW, Suite 800

6        Washington, DC 20015

7        BY:  CHARLES W. GILLIGAN, ESQ.

8            DANIEL KEENAN, ESQ.

9        (202) 362-0041

10       E-mail:  cgilligan@odonoghuelaw.com

11

12   In Attendance:  Rosemarie Alongi

13       Gina Marie Alongi

14       Greg Geiman

15

16

17

18

19

20

21

22

23

24

---

Page 1

1            COMMONWEALTH OF MASSACHUSETTS

2    Norfolk, ss.        Superior Court

3            Civil Action No. 2182CV00125

4    ****************************************************

5    GINAMARIE ALONGI AND ROSEMARIE ALONGI,        *

6        Plaintiffs                                *

7        vs.                                       *

8    IUOE LOCAL 4 HEALTH & WELFARE FUND; IUOE LOCAL 4 *

9    PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS   *

10   FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4  *

11   APPRENTICESHIP & TRAINING FUND; JOINT LABOR-    *

12   MANAGEMENT COOPERATION TRUST; AND WILLIAM D.   *

13   MCLAUGHIAN, INDIVIDUALLY AND IN HIS CAPACITY   *

14   AS CHAIRMAN OF THE BOARDS OF TRUSTEES,          *

15       Defendants                                 *

16   ****************************************************

17       DEPOSITION OF:  WILLIAM DENNIS MCLAUGHLIN

18            BOWDITCH & DEWEY, LLP

19            200 Crossing Boulevard

20            Framingham, Massachusetts

21            July 13, 2022  10:10 a.m.

22            Volume III

23            Kristen M. Edwards

24            Court Reporter

---

Page 4

1                I N D E X

2

3    WITNESS:            WILLIAM DENNIS MCLAUGHLIN

4

5    EXAMINATION BY:                    PAGE:

6    Mr. Van Dyck                  5

7

8    EXHIBITS:                    PAGE:

9    Exhibit 156, notes...................27

10   Exhibit 157, e-mail....................64

11   Exhibit 158, e-mails....................65

12   Exhibit 159, e-mails....................66

13   Exhibit 160, memorandum............................88

14   Exhibit 161, e-mail....................101

15   Exhibit 162, letter....................131

16   Exhibit 163, complaint..................140

17   Exhibit 164, report....................144

18   Exhibit 165, memo....................149

19   Exhibit 166, letter....................151

20   Exhibit 167, minutes..................153

21   Exhibit 168, notes....................153

22   Exhibit 169, minutes....................167

23

24   (Exhibits retained by Attorney Van Dyck)

---

Page 2

1    APPEARANCES:

2

3    Representing the Plaintiffs:

4        BOWDITCH & DEWEY, LLP

5        200 Crossing Boulevard, Suite 300

6        Framingham, MA 01702

7        BY:  TIMOTHY P. VAN DYCK, ESQ.

8            JACOB A. TOSTI, ESQ.

9        (617) 757-6537  fax (508) 929-3137

10       E-mail:  tvandyck@bowditch.com

11

12   Representing the Defendants:

13       FREEMAN, MATHIS & GARY LLP

14       60 State Street, Suite 600

15       Boston, MA 02109-1800

16       BY:  JENNIFER L. MARKOWSKI, ESQ.

17           CHRISTOPHER REDD, ESQ.

18       (617) 963-5975

19       E-mail:  jmarkowski@fmglaw.com

20

21

22

23

24

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
July 13, 2022

Page 25

1    Q.    You may.

2    A.    I'm not sure.

3    Q.    Did you have any discussion with the
4  building committee about what the effective date should
5  be?

6    A.    I can't recall.

7    Q.    Do you ever recall having a conversation
8  with Gina in November of 2018 about her dog?

9    A.    What I remember about that conversation
10  was that there was the building -- we met with the
11  building committee, and they were going to draft up a
12  no animal policy. That's what I remember.

13    Q.    Are you telling me now about a
14  conversation that you had with Gina?

15    A.    I had a conversation -- let's see. So
16  the building committee, I believe, we met after someone
17  got startled by one of these dogs that had a muzzle on.
18  I remember that. Called James Shaw, asked him for some
19  help. I believe I did have a discussion with Gina
20  about the implementation of this pet policy. I believe
21  so.

22    Q.    And do you recall what you or she said?

23    A.    I don't.

24    Q.    Do you ever recall her telling you that

Page 26

1  her dog, Drambuie, could detect low blood sugar levels?

2    A.    I don't.

3    Q.    Do you recall her asking if she could
4  continue to bring her dog into the building when she
5  felt ill?

6    A.    No. But I do think if she asked for an
7  accommodation, I would have remembered that, so the
8  answer is no.

9    Q.    Well, do you recall saying words to the
10  effect that there are no dogs allowed in the office,
11  including yours, I don't care what the law says?

12    A.    I don't recall. I don't remember that.

13    Q.    Do you think anyone else was in this
14  meeting besides you and Gina?

15    A.    I don't think it was a meeting. I think
16  it was a conversation over the telephone.

17    Q.    Do you recall when it occurred?

18    A.    I don't.

19    Q.    Do you recall anything else about this
20  conversation that you had with Gina about the pet
21  policy other than what you said?

22    A.    I don't.

23

24

Page 27

1        (Exhibit 156, notes, marked for
2        identification)

3

4    Q.    Mr. McLaughlin, I'm showing what has been
5  marked as identification as Exhibit 156, which appear
6  to be nine handwritten pages of notes. Are those your
7  notes?

8    A.    Yes.

9    Q.    And the document is not dated. But do
10  you think these are notes that you prepared in
11  anticipation of a conversation you were going to have
12  with Gina in January of 2020?

13    A.    Correct.

14    Q.    And did anyone help you prepare these
15  notes?

16    A.    No.

17    Q.    Did you discuss with anybody the fact
18  that you were going to have this conversation with
19  Gina?

20    A.    Yes.

21    Q.    Who?

22    A.    Kate Shea.

23    Q.    And what did you and Kate Shea discuss?

24    A.    I just informed Kate Shea that I would be

Page 28

1  having a scheduled meeting with Gina to reestablish
2  some guidelines, because I didn't like what was going
3  on with Gina's performance. I described in that
4  meeting that we had to lead by example as department
5  heads. It was unacceptable that she could make her own
6  hours and come in whenever she wanted to. So there was
7  an hours of operation discussion as stated in this
8  exhibit.

9    Q.    Right. For now I just want to hear
10  everything you and Kate Shea talked about.

11    A.    Okay.

12    Q.    You may be doing that. I just want to
13  make sure.

14    A.    Okay, yes. I asked Kate to be there with
15  me when I did this.

16    Q.    So this was -- do you recall anything
17  else about your meeting with Kate Shea?

18    A.    I don't.

19    Q.    Did you show her your notes before the
20  meeting?

21    A.    Not sure.

22    Q.    But as far as you know, she didn't help
23  to draft these notes at all.

24    A.    No.

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

William Dennis McLaughlin
July 13, 2022

Page 81

1    Q.   Well, I don't think it is hard to say.
2         Is it fair to say that she wasn't
3    provided with an opportunity to give you an explanation
4    for these time entries before she was terminated?
5         MS. MARKOWSKI: Objection. You can
6    answer.
7         THE WITNESS: She could have described
8    it.
9    Q.   (By Mr. Van Dyck) You never asked her
10   about them, correct?
11   A.   Correct.
12   Q.   In fact, the first time she became aware
13   of this issue was after she was terminated, correct?
14        MS. MARKOWSKI: Objection. You can
15   answer.
16        THE WITNESS: Could you repeat that,
17   please?
18   Q.   (By Mr. Van Dyck) Is it fair to say that
19   the first time Gina became aware that the time entries
20   were an issue was after she was terminated?
21        MS. MARKOWSKI: Objection. You can
22   answer.
23        THE WITNESS: I believe so.
24   Q.   (By Mr. Van Dyck) And you knew that the

Page 82

1    Coalition was renting space in the Fund office,
2    correct?
3    A.   I don't think I knew.
4    Q.   When did you become aware of that?
5    A.   When all these concerns came up, I went
6    on a fact-finding mission. That's when I found out.
7    Q.   Do you recall when that was?
8    A.   I don't.
9    Q.   When you say you went on a fact-finding
10   mission, did you personally --
11   A.   No.
12   Q.   -- go on a fact-finding mission or did
13   you delegate that to Mr. Geiman?
14   A.   I delegated that.
15   Q.   To Mr. Geiman?
16   A.   Yes, and other Fund employees.
17   Q.   Who else?
18   A.   Well, I delegated it to Greg. I believe
19   he used the resources of some other Fund employees.
20   Q.   Do you know who he used?
21   A.   I don't, I don't recall.
22   Q.   But would it be fair to say that
23   Mr. Geiman was your primary point person for this
24   fact-finding mission?

Page 83

1    A.   Primary, you could call it primary.
2    Q.   And what was the purpose of the
3    fact-finding mission?
4    A.   I believe it was to -- at this point my
5    concerns were growing. They were snowballing. And, I
6    believe, it started with -- I wanted to see, I believe,
7    if my memory serves correct, I wanted to see if Gina's
8    DOL time sheets said anything about Coalition work.
9    Then I realized there are no DOL time sheets. That
10   raised another concern. And all these concerns kept
11   building up and building up. So that's why, as I
12   peeled back the onion, there were concerns growing and
13   growing and growing.
14   Q.   So this was a fact-finding mission to
15   find out -- to get information about these growing
16   concerns that you had?
17   A.   This was a fact-finding mission stemming
18   from me noticing Coalition work on these time sheets.
19   I wanted to compare with them with DOL time sheets.
20   Q.   Understood. Would it be fair to say that
21   your decision to have this fact-finding mission take
22   place started because you saw references to Coalition
23   work in her time sheets?
24   A.   Correct.

Page 84

1    Q.   And did you exchange any e-mails with
2    Mr. Geiman about this fact-finding mission?
3    A.   I don't remember.
4    Q.   Do you think you may have exchanged any
5    text messages with Mr. Geiman about this fact-finding
6    mission?
7    A.   I don't think so.
8    Q.   Besides you, did anyone else raise any
9    concerns about the fact that Gina was doing some
10   Coalition work during business hours at the time that
11   this fact-finding mission was taking place?
12        MS. MARKOWSKI: Object to form. You can
13   answer.
14        THE WITNESS: Hard to say. Don't
15   remember.
16   Q.   (By Mr. Van Dyck) You did clearly,
17   right?
18   A.   Yes.
19   Q.   But you don't remember anyone else
20   raising a concern about it?
21   A.   Again, I don't remember. Excuse me one
22   second.
23        MR. VAN DYCK: Off the record.
24

# TAB

# 5

### AFFIDAVIT OF LOUIS G. RASETTA

I, Louis G. Rasetta, on oath, depose and state as follows to the best of my knowledge and understanding:

1. I have been a member of the IUOE Local 4 Union (the "Union") for approximately 51 years. In or around 1992, I became a Business Agent and was elected as Business Manager in 2004. I served as Business Manager until 2017 when I retired.

2. By virtue of serving as Business Manager, I also served as Chairman of the various Boards of Trustees of the IUOE Local 4 Benefit Funds (the "Funds"). In that capacity, I attended trustee meetings to act on behalf of plan participants.

3. The Business Manager of a Union has significant sway with the other Labor and Management Trustees on the various Boards of Trustees. Trustees rarely vote in opposition to the Business Manager on matters requiring a vote. To the best of my knowledge, in my 13 years as Business Manager I cannot remember an instance in which any trustee voted in opposition to me.

4. In or around 2017, I selected William McLaughlin as my replacement for Business Manager in anticipation of my retirement. The Executive Board of the Union then voted to approve my selection.

5. As Chairman, I worked closely with Gina Alongi, the Administrator of the Local 4 Benefit Funds, on the smooth operation of the Union and Funds.

6. For example, when the Union went through its collective bargaining processes, Ms. Alongi and I regularly collaborated in the allocation process to designate as much money from the hourly wage increase to the various Benefit Funds.

7. I also requested that Ms. Alongi attend negotiations with the various employer associations with me.

8. I was fully aware of the fact that Ms. Alongi took on the role of Executive Director of the Massachusetts Coalition of Taft-Hartley Funds (the "Coalition") in 2007. In fact, I recall telling her that I was proud of her for getting this position.

9. The Union had been a dues paying member of the Coalition since well before I became Business Manager and I believed that Ms. Alongi's increased involvement with the Coalition would be a great benefit to both the Union and Funds.

10. Indeed, Ms. Alongi was able to negotiate significant savings to the Health & Welfare Fund as a result of her work with the Coalition.

1

11. For example, as Director of the Coalition, Ms. Alongi consistently negotiated reduced administrative fees from Blue Cross Blue Shield which ultimately saved the Health & Welfare Fund millions of dollars in costs throughout the years.

12. Similarly, the Funds were able to increase benefits for its members' medical, hearing, vision, and dental benefits and secure significant discounts on stop-loss insurance premiums due to Ms. Alongi's zealous negotiations.

13. On more than one occasion, I told Union members that I was proud of Ms. Alongi for her work with the Coalition and discussed the savings that Ms. Alongi had secured through the Coalition at monthly Union Body Meetings.

14. As part of my role as Business Manager, I oversaw annual compensation for Funds staff. Towards the beginning of my tenure as Business Manager, the Trustees commissioned a Compensation Study to determine average pay rates for administrative staff. I used these rates to determine a baseline for pay raises, taking into account inflation and performance.

15. To the best of my memory, during my tenure as Business Manager, Mr. McLaughlin and I attended almost every one of Ms. Alongi's Coalition holiday networking events together.

16. I was well aware of the fact that Ms. Alongi was being compensated for her work with the Coalition. This did not seem unusual or inappropriate to me as the Coalition's prior Executive Director had also been compensated by the Coalition while he served as the Administrator of another Taft-Hartley Fund (IUOE Local 877).

17. I also knew how much Ms. Alongi was being paid by the Coalition and took that into account in determining her annual compensation from the Funds at the end of each year.

18. I was also aware that other Funds employees, such as Laura Jean Hickey, also performed paid work for the Coalition.

19. A Compensation Study commissioned by the Funds in or around 2005 showed that Ms. Alongi was paid less than or the same as Administrators of comparable multi-employer Funds in relation to the number of Funds she managed and administered, taking into account the compensation she received from both the Coalition and the Funds.

20. In or around 2013, I suggested giving Ms. Alongi an additional two weeks of vacation time to use or cash out annually because of her dedication, work ethic and her performance as Administrator for the Funds.

21. In my 13 years as Business Manager, I had no concerns about Ms. Alongi's management of the Funds. To the contrary, she was an excellent Administrator who worked extremely hard to provide premium benefits for the members and their families.

2

D. App. 056

22.  For example, prior to Ms. Alongi's tenure as Administrator, the Health & Welfare Fund was on the verge of bankruptcy; indeed, it was in such dire straits that, in or around 2004, the Union transferred $1 million to the Health & Welfare Fund to cover the costs of its medical claims. By the time I retired in 2017, the Health & Welfare Fund had almost 3 years of costs in reserves. This financial performance is extraordinary in the industry and was due in large part to Ms. Alongi's excellent management of the Fund throughout her years of service.

23.  Similarly, through Ms. Alongi's management, the Pension Fund was able to stay in the "green zone" every year under the Pension Protection Act since the enactment of the Act. This is extraordinarily rare in multiemployer pension funds and attributable primarily to Ms. Alongi's diligence.

24.  In or around 2005, Ms. Alongi played a key role in establishing a claims sharing mechanism with Blue Cross Blue Shield, called "Union Blue", which allowed the Health & Welfare Fund to continue to self-administer its plan while taking advantage of hospital discounts. The Funds were then able to sell the product to other members of the Coalition, reducing the per member per month administrative fee and saving millions of dollars for the Health & Welfare Fund.

25.  In or around 2015, Ms. Alongi decided to dismantle the Health & Welfare Fund's internal claims operations to continue to build the reserves. By taking this action, the Health & Welfare Fund saved millions of dollars per year in administrative fees, wages, fringe benefits, and software development costs.

26.  I personally nominated Ms. Alongi for the 2015 Cushing Gavin Boyle Award based on her exemplary work for both the Funds and the Coalition. I also served on the selection committee for the award which was composed of past recipients of Cushing Gavin Awards.

27.  Typically, voting for Cushing Gavin Awards takes several rounds of negotiations, but Ms. Alongi was selected by a unanimous vote in the first round due to her stellar reputation in the labor community. She was the first Taft-Hartley Fund Administrator to win the award. It is my belief that Ms. Alongi was widely known in the labor community as the best Administrator in the country.

28.  All statements contained in this affidavit are made to the best of my knowledge and understanding.

Sworn to under the pains and penalties of perjury this _6_ day of May, 2021.


Louis G. Rasetta

# TAB
# 6

## AFFIDAVIT OF JOHN J. SHAUGHNESSY, JR.

I, John J. Shaughnessy, Jr., on oath, depose and state as follows:

1. I am the former Senior Management Trustee of the Health & Welfare, Pension, and Annuity & Savings Funds of the IUOE Local 4 Benefit Funds (the "Funds"). I served as Trustee for approximately 30 years until 2019. I was the sole Management Trustee who served on all of the aforementioned Funds.

2. All statements contained in this affidavit are made of my own personal knowledge.

3. As Senior Management Trustee, I worked closely with both the Business Managers and Administrators of the Funds to support the operation of the Funds including William McLaughlin and Gina Alongi.

4. My duties as Trustee included attending Trustee meetings, approving extraordinary Fund expenses, employee compensation, and in general terms assisting in the implementation of all policy changes to the Funds.

5. As Senior Trustee, I was at the Funds' Medway office more than any other Trustee and regularly approved Funds matters jointly with the Business Manager.

6. In or around 2013, I specifically recall that then-Business Manager Lou Rasetta and I approved an additional two weeks of vacation time for Ms. Alongi to use or cash out annually. Additionally, we gave her a generous car "allowance"

7. Throughout her tenure as Administrator, Ms. Alongi was an exemplary employee and consistently went above and beyond in service of her duties at the Funds.

8. Ms. Alongi was appointed to the Massachusetts Coalition of Taft Hartley Funds (the "Coalition") as the Executive Director in or around 2007. As a direct result of Ms. Alongi's work, coordinating and overseeing the work of the Coalition, and by utilizing the Coalition's collective bargaining power, the Funds were able to reap significant benefits by negotiating more favorable contract terms with third party vendors. In short, the Funds would not have received the same benefits if not for Ms. Alongi's work at the Coalition.

4839-5007-7664.3

9.   For example, approximately 10-15 years ago, Ms. Alongi negotiated with Blue Cross Blue Shield over how they paid out benefits to plan participants; she redesigned the way the Funds was run to help to contain healthcare costs for the benefit of the Funds and its members. This revolutionary new way of doing business with Blue Cross Blue Shield not only wound up saving the Funds millions of dollars (and, in turn, savings its members on healthcare costs), but it also wound up helping to secure more favorable terms for other Taft Hartley funds and their members. In short, Ms. Alongi's work on behalf of the Coalition (of which I was fully aware) had a direct and positive financial impact on the Funds.

10.   In 2004, the DOL identified a number of issues, including the administrative allocation, and  minor "improper" expenses from which Ms. Alongi would, for example, purchase bagels and birthdays cakes to the office for all staff and  host office Christmas parties  Ms. Alongi made me aware of her efforts to improve office morale by doing so and I took no issue with her use of funds for this purpose.

11.   Around 2012, Ms. Alongi discovered an error with a notice requirement for the pension fund.  She immediately informed the Trustees and spent a significant amount of time fixing the problem.  This was the direct result from not getting the proper advice from the Plan's outside consultants and attorneys; this was not caused in any way by Ms. Alongi. In fact, Ms. Alongi took it upon herself to negotiate a $500,000 settlement from one of the outside consultants, which was then paid directly to the pension fund.

12.   Ms Alongi's oversight and direction of the Pension Fund garnered a consistent "green zone" rating for the Fund over the last decade, which was very unusual in the Taft Hartley world; another testament to her diligence and professionalism.

13.   During my time as a Trustee, I observed Mr. McLaughlin's behavior around women in the Funds office.  In particular, I observed that Mr. McLaughlin and Laura-Jean Hickey were flirtatious with each other and interacted with each other in a manner that did not appear to be completely professional. Both Ms. Alongi and Mr. Greg Geiman informed me separately that Mr. McLaughlin was having an inappropriate relationship with Ms. Hickey.

14.   In or around May 2018, I received a telephone call from Ms. Alongi. She informed me that she had been assaulted by Mr. McLaughlin in her office. She was distraught and told me that at one point she was worried Mr. McLaughlin would physically assault her. I specifically remember being so astounded by what she was telling me that I could not focus on driving and had to pull my car off to the side of the road to continue the discussion.

15. During this call, I recall Ms. Alongi also telling me that she was very concerned about retaliation if she reported this incident. At some point later, I also recall her telling me that Ms. Kate Shea, the Funds' outside counsel, had counseled her that Mr. McLaughlin's behavior was not illegal. Given this, I decided not to discuss this incident with any of the other Trustees. Ms Alongi informed me that her intent was to attempt to co-exist with Mr. McLaughlin until she reached retirement age.

Sworn to under the pains and penalties of perjury this _31st_ day of March 2021.

John J. Shaughnessy, Jr.

# TAB
# 7

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*John J. Shaughnessy, Jr.*

*July 25, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

John J. Shaughnessy, Jr.
July 25, 2022

Page 3

1          COMMONWEALTH OF MASSACHUSETTS
2  NORFOLK, SS.          SUPERIOR COURT
3          CIVIL ACTION NO.: 2182CV00125
4
5  ************************************************
6  GINAMARIE ALONGI AND ROSEMARIE ALONGI,     *
7          Plaintiffs          *
8  vs.                        *
9  IUOE LOCAL 4 HEALTH & WELFARE FUND, et al,  *
10          Defendants          *
11  ************************************************
12
13
14
15      DEPOSITION OF: JOHN J. SHAUGHNESSY, JR.
16          APPEARING REMOTELY FROM:
17          HINGHAM, MASSACHUSETTS
18      July 25, 2022    10:01 a.m.
19
20
21
22
23          Brenda M. Ginisi
24          Court Reporter

Page 3

1  REMOTE APPEARANCES CONT'D:
2  Representing IUOE LOCAL 4:
3      O'DONOGHUE & O'DONOGHUE LLP
4      5301 Wisconsin Avenue, NW, Suite 800
5      Washington, DC  20015
6      BY:  CHARLES W. GILLIGAN, ESQ.
7      and DANIEL KEENAN, ESQ.
8      (202) 362-0041
9      E-mail: cgilligan@odonoghuelaw.com
10  Representing the John J. Shaughnessy, Jr.:
11      LAW OFFICES OF ROBERT PHILIP HILSON
12      175 Derby Street, Suite 12
13      Hingham, Massachusetts  02043
14      BY:  ROBERT P. HILSON, ESQ.
15      (781) 740-4118
16      E-mail: hilsonrp@yahoo.com
17  Also present:
18      Gina Marie Alongi
19      Rose Marie Alongi
20      Gregory Geiman, Esq.
21
22
23
24

Page 2

1  REMOTE APPEARANCES:
2  Representing the Plaintiffs:
3      BOWDITCH & DEWEY, LLP
4      200 Crossing Boulevard
5      Framingham, Massachusetts  010702
6      BY:  TIMOTHY P. VAN DYCK, ESQ.
7      and JACOB TOSTI, ESQ.
8      (617) 757-6536
9      E-mail: tvandyck@bowditch.com
10  Representing the Defendants:
11      FREEMAN MATHIS & GARY LLP
12      60 State Street, Suite 600
13      Boston, Massachusetts  02109
14      BY:  JENNIFER L. MARKOWSKI, ESQ.
15      and CHRISTOPHER J. REDD, ESQ.
16      (617) 963-5975
17      E-mail: jmarkowski@fmglaw.com
18
19
20
21
22
23
24

Page 4

1          I N D E X
2
3  WITNESS:          JOHN J. SHAUGHNESSY, JR.
4
5
6  EXAMINATION BY:          PAGE:
7  Mr. Gilligan          6
8
9
10  EXHIBITS:          PAGE:
11
12  (none offered)
13
14
15
16
17
18
19
20
21
22
23
24

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

John J. Shaughnessy, Jr.
July 25, 2022

Page 37

Page

1   Q.   Would it have been counsel?
2   A.  I don't know.
3   Q.   Are you familiar with the welfare funds
4 trust document?
5   A.   I know that there is one, yes.  I'm sure,
6 that, over the years -- I've read it or referred to it
7 on numerous occasions, so yes I'm familiar with it.
8   Q.   Can you explain to me, as best you can,
9 what the purpose of the trust document is?
10   A.   The trust document would be the
11 guidelines by which the trustees and the administrator
12 and the administrative staff operate.
13   Q.   I'll tell you what, I would like to get
14 the trust document up on the screen for Mr. Shaughnessy
15 to look at.  And specifically a couple of sections of
16 it 6.3 and 6.4.  And I'd ask why don't we do this, why
17 don't we take a five-minute break.
18      And would it be best if my colleague
19 shared it with you, Brenda, and you can put it on the
20 scree,n, or how do you propose we handle this?
21      THE COURT REPORTER:  Can we go off the
22 record for a moment?
23      MR. GILLIGAN:  Yeah, let's go off the
24 record.

Page 38

Page

1
2      (Off record discussion)
3
4      MR. GILLIGAN:  Why don't we take five and
5 come back about 11 o'clock and we'll resume.  Is
6 that good for everyone?
7      THE WITNESS:  Yes.
8
9      (A recess was taken)
10
11   Q.   (By Mr. Gilligan)  Mr. Shaughnessy, can
12 you see what's been put up on the screen?
13      MR. GILLIGAN:  Someone help me out on
14 this.  But I believe this has been previously
15 distributed in this case as Exhibit 182; is that
16 correct?
17      MR. VAN DYCK:  Correct, Chuck.
18      MR. GILLIGAN:  Okay.  Thank you.
19   Q.   (By Mr. Gilligan)  Mr. Shaughnessy, do
20 you recognize that document?
21   A.   I do.
22   Q.   Oak.  And can you tell me what it is?
23   A.   It's the trust agreement for the health &
24 welfare fund.

Page 39

Page

1   Q.   I'm going to ask you to take a look at --
2 first at Section 6.3 of that document.
3      MR. KEENAN:  And Mr. Shaughnessy, please
4 don't hesitate to let us know if you need the
5 text to be larger or smaller, et cetera, just
6 let us know.
7      THE WITNESS:  Smaller?  You shittin' me?
8      MR. KEENAN:  You need it to be larger?
9      THE WITNESS:  Get to 6-3 for me, please.
10      MR. KEENAN:  6-3.  You got this, sir?
11      THE WITNESS:  Okay.  I can see it.
12   Q.   (By Mr. Gilligan)  Okay.
13 Mr. Shaughnessy, if you would take a minute to review
14 Section 6.3.  I have a question thereto and I'm going
15 to ask you about that.  And just let me know when
16 you've had a chance to read it.
17   A.   Okay.
18   Q.   Mr. Shaughnessy, is it your testimony
19 that you and Mr. Rasetta had the authority, between the
20 two of you, to grant additional vacation to Ms. Alongi?
21   A.   Yes.
22      MR. VAN DYCK:  Objection as to form.
23   Q.   (By Mr. Gilligan)  And what is the basis
24 of your contention?

Page 40

Page

1   A.   Was that to me or whoever just objected?
2   Q.   That is to you.
3   A.   It's because that's how -- that's how
4 these items were handled.  And, typically, with the
5 business agent and the senior management trustee, which
6 was me, because I was the only one to serve on both
7 funds.  And then, typically, these decisions would have
8 been shared with the entire board.
9   Q.   Well, would they have been shared with
10 the entire board, or would the entire board have to
11 vote upon --
12   A.   I don't know.
13   Q.   Looking at Section 6.3 --
14   A.   Yep.
15   Q.   It indicates --
16   A.   I see it.
17   Q.   And so, the two of you would not
18 constitute a quorum, for purposes of transacting
19 business for the fund; isn't that true?
20   A.   According to Section 6.3, that would be
21 correct.
22   Q.   And the discussion that you had with
23 Mr. Rasetta and Ms. Alongi, about additional vacation
24 time, did that occur in the course of a ordinary

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

John J. Shaughnessy, Jr.
July 25, 2022

---

Page 45

Page

1  advisers.  One was an actuarial matter.
2      She recovered millions of dollars for
3  that fund, that a lesser administrator would
4  have had no concept about how to go after and
5  resolve these issues, including bringing in your
6  firm and Joyce Mader at God knows how many
7  hundreds of thousand of dollars an hour to
8  negotiate one of them from us.
9      And I can go on and on with the things
10  that she did to make Local 4 a better place for
11  their employees.  And my dad was a trustee for
12  many -- many, many years on the teamsters health
13  & welfare fund.  And I had some knowledge of how
14  they operated.  And it gave me a basis to
15  compare what was going on within Local 4.  And
16  it, certainly, had nothing to do with what I did
17  or the other two management trustees, or the
18  three union trustees.
19      Everything started with Gina and her
20  staff.  She did all the work.  She came into the
21  meeting.  She told us what was going on.  And
22  we, basically, ratified everything that she came
23  up with, whether it was tweaks to the health &
24  welfare or the pension plan.  I could go on

---

Page 46

Page

1      forever but...
2      Q.    (By Mr. Gilligan)  Okay.  Yeah, that's
3  fine.  I appreciate it, sir.
4          You've made reference to your father's
5  experience as a trustee with some teamster funds.  Did
6  you, yourself, serve as trustee for any other funds, or
7  were you strictly a Local 4 fund trustee?
8      A.    If you're talking about health-welfare
9  pension type of funds, this was it for me.
10     Q.    Okay.  Thanks.
11     A.    It's --
12     Q.    Go ahead.  I'm sorry.
13     A.    It's more work than -- more work than
14  should be expected of a management trustee.
15     Q.    I understand and I concur.  You familiar
16  with the Massachusetts Coalition for Taft-Hartley
17  Funds?
18     A.    Yep.
19     Q.    Do I have your attention there?  Okay.
20     A.    I said, yeah.
21     Q.    Okay.  I'd ask that you refrain from
22  looking at your phone.  We won't be much longer.  But
23  it would be helpful to have your full attention.
24     A.    You have my full attention, Counselor.

---

Page 47

Page

1      Q.    All right.  Thank you.  Can you tell me
2  what the Mass. Coalition is?
3      A.    It's a consortium of some number of local
4  unions that administrators that meet on a fairly
5  regular basis, as far as I know, to compare notes on
6  how their funds are being run and exchange ideas, and
7  get thoughts on who's doing what right, who's doing
8  what wrong.
9          And more importantly and significantly,
10  to use their group purchases power, for lack of a
11  better word, to negotiate better deals for each of
12  their individual unions.
13     Q.    Over the years, did you attend any
14  coalition meetings or events?
15     A.    No.
16     Q.    No.  Okay.  Would you consider
17  Gina Alongi spending 10 hours a week on coalition
18  business during Local 4 fund office hours reasonable?
19     A.    Yes.
20     MR. VAN DYCK:  Objection as to form.
21     Q.    (By Mr. Gilligan)  And what's your basis
22  for your testimony there?
23     A.    Because of the benefits that Local 4's
24  funds derived from her -- from her position with the

---

Page 48

Page

1  coalition and what that brought to our funds, and what
2  it saved us over the years.  It's a drop in the bucket
3  compared to 10 hours a week.  If you told me it was two
4  hours a week or 20 hours a week, I couldn't tell you
5  which one was closer to the truth.  But neither would
6  surprise me, neither would bother me.  Would have.  In
7  the past.
8      Q.    You've testified to benefits the Local 4
9  funds, by virtue of Ms. Alongi serving as the executive
10  director and of the Mass. Coalition.  Can you tell me
11  who those benefits were?
12     A.    What benefits we gained?
13     Q.    Yes.
14     A.    The biggest one would have been through
15  the deal that we had with Blue Cross Blue Shield and
16  the millions, literally, millions of dollars that we
17  saved in premiums over the years.
18          On a much smaller scale, it would have
19  been things like prescription glasses or drugs, because
20  when you go to negotiate a deal with an eyeglass
21  provider, and you go and you say I'm going to give you
22  6,000 bodies from Local 4, or I'm going to give you
23  60,000, and I'm just picking these numbers out of thin
24  air, don't hold me to it, you're going to get a much

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

John J. Shaughnessy, Jr.
July 25, 2022

Page 49

Page

1 better deal from that prescription glass provider when
2 you go with 60,000 bodies than you do with 6,000.
3 That's what the coalition did. Same with dental
4 service. I mean, it's not rocket science.
5    Q.    Well, wouldn't the Local 4 welfare fund
6 have been entitled to these benefits simply by virtue
7 of them being a member of the coalition, as opposed to
8 it being dependent on Ms. Alongi being the executive
9 director?
10    A.    I never said --
11    MR. VAN DYCK: Objection.
12    Q.    (By Mr. Gilligan) I'm sorry. Go ahead,
13 sir.
14    A.    Me?
15    Q.    Yes.
16    A.    I never said it was dependent upon Gina
17 being the executive director. I just question or
18 wonder who else asked have done that good of a job at
19 handling -- handling negotiations of that type,
20 especially, given what I know about her cohorts that
21 had similar jobs at other unions.
22    Q.    (By Mr. Gilligan) Who are you
23 referencing there, other fund administrators?
24    A.    Correct.

Page 50

Page

1    Q.    Okay.
2    A.    I'm not naming anyone in particular. I'm
3 saying, from what I know about how other funds were
4 run, whether it was through my late dad's experience or
5 my brother's experience with another Taft-Hartley fund,
6 or talking to guys that I know in the industry that may
7 have sat on a pipefitter or plumber's fund, and knowing
8 a little bit about the types of administrators that
9 they employed versus what Gina did for us in the 30
10 years that I was there, I can't imagine that there
11 would have been somebody else that could have handled
12 that type of a role as diligently and professionally as
13 she did.
14    Q.    You referenced in your testimony, and you
15 refer in paragraph nine of your affidavit, to savings
16 that the Local 4 welfare fund received from Blue Cross,
17 as a result of Ms. Alongi's work with the coalition.
18       Are you referring there to the so-called
19 Union Blue program?
20    A.    Correct.
21    Q.    Okay. Are you aware that the Local 4
22 welfare funds ceased to participate in Union Blue in
23 2014?
24    A.    I don't recall.

Page 51

Page

1    Q.    Are you aware -- you reference
2 prescription drug benefits in your previous answer.
3 Are you aware that Local 4 welfare funds did not use
4 the coalition's pharmaceutical benefit manager but, in
5 fact, used the international union's pharmaceutical
6 benefit manager?
7    A.    Not aware.
8    Q.    Do you have a sense, as a longtime
9 trustee, how much of the funds claims are derived from
10 either the medical-surgical physician benefits and the
11 pharmaceutical benefits?
12    MR. HILSON: Objection. You can answer.
13    THE WITNESS: Over time in a specific
14 year? Specific quarter? Could you be --
15    Q.    (By Mr. Gilligan) Generally.
16    A.    No.
17    Q.    Wouldn't you -- no idea. If I told you
18 they're, roughly, 90 percent, would that strike you as
19 correct?
20    A.    I said, I have no idea.
21    Q.    Okay.
22    A.    I've been retired three plus years now.
23    Q.    Okay. You referred, both in paragraph 10
24 of your affidavit and in one of your prior answers, to

Page 52

Page

1 the Department of Labor audit that took place in 2003
2 or 2004; do you recall that?
3    A.    I don't think that I specifically said it
4 was a Department of Labor audit. But that would have
5 been what I was referring to, yes.
6    Q.    You referenced the fund retaining my
7 former partner, Joyce Mader. And is it with respect to
8 that audit you're referring?
9    A.    That's correct.
10    Q.    Okay. And you reference, in paragraph 10
11 of your affidavit, the issue of Ms. Alongi providing
12 bagels to the staff and doing other things geared to
13 the morale of the employees, correct?
14    A.    That is what it says.
15    Q.    And I take it from that you were -- you
16 were not enamored of the Department of Labor focus in
17 some respects?
18    A.    Who, in their right mind, would be; it's
19 what every company in the world does.
20    Q.    You thought those things were trivial,
21 correct?
22    A.    Petty.
23    Q.    Yeah. Okay. But is it true as well,
24 that the audit focused on the failure to properly

# TAB
# 8

## ARTICLE I: NAME AND OBJECTIVES

SECTION 1: **Name.** This Corporation shall be called the "Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." (the "Coalition").

SECTION 2: **Objectives.** The general objective of the Coalition shall be to operate always as a business league entitled to exemption from taxation under Section 501(c) (6) of the Internal Revenue Code. The Coalition shall be a charitable corporation within the meaning of Sections 4(a) and 4(j) of Chapter 180 of the Massachusetts General Laws ("M.G.L."). Subject to the foregoing, the specific objectives of the Coalition shall be:

(a) To educate the Governor, General Court and agencies, subdivisions, instrumentalities and officers of the Commonwealth of Massachusetts (collectively, the "State Government"), the President, Congress and agencies and officers of the United States of America (collectively the "Federal Government"), the general public and the Coalition's members and participants, as to the crises and developments affecting Taft-Hartley Trust Funds including, but not limited to, health and welfare and pension issues;

(b) To secure, analyze and disseminate statistical data and information regarding the health care and pension industry to the federal and state government, the general public, and the Coalition's members;

(c) To develop and propose better methods of providing and paying for health care;

(d) To promote harmonious relations with the health care industry and other industries affecting Taft-Hartley Funds; and

(e) To promote the financially sound continued long term survival of Taft-Hartley Trust Funds.

## ARTICLE II: MEMBERSHIP

SECTION 1: **Qualifications.** It shall be a qualification for membership in the Coalition that the member or proposed member be a Taft-Hartley trust fund engaged in providing employee benefits for its participants and beneficiaries. Additional qualifications for membership may be adopted by the Board of Directors from time to time. Any member which fails to continue to meet any qualification for membership shall be deemed to have withdrawn from membership immediately upon the failure to continue to meet the qualifications. Upon again becoming qualified, any member deemed to have withdrawn pursuant to this Section may petition the Executive Board for readmission to membership in the Coalition.

SECTION 2: **Admission.** Any Taft Hartley Trust Fund possessing the qualifications for membership set forth in Section 1 may apply for membership in the Coalition. All applications for membership shall be in writing in the form prescribed by the Executive Board. The application shall be considered by the Executive Board at its next meeting. Any applicant found by the affirmative vote of a majority of all of the members of the Executive Board to meet the qualifications for membership set forth in Section 1 shall be admitted to membership; provided that any applicant which was previously a member but which resigned or withdrew from membership from the Coalition for any reason shall be

considered for membership again only upon paying in full all of its share of the expenses of the Coalition in accordance with Section 4 below for the period of its earlier period of membership plus interest to the date of its application for re-admittance at the prime rate of interest equal to the prime rate of interest of the State Street Bank and Trust Company, or any successor thereto, as of the date of such applicant's earlier resignation or withdrawal from the Coalition.

SECTION 3: **Duration of Membership.** Each member may terminate its membership in the Coalition by written notice to the Executive Board of Coalition. Such termination of membership shall be effective upon receipt of such notice by the Executive Board of the Coalition. Additionally, members may be deemed to have withdrawn from membership as provided in Section 1 above and Section 4 below. All of a member's rights and privileges as a member of the Coalition shall cease immediately upon the effectiveness of the member's resignation or withdrawal.

SECTION 4: **Expenses.** Members may be required to pay such initiation fee or annual dues or assessments as the Executive Board may set from time to time. Members shall also share in the responsibility for the payment of the Coalition's expenses. The Executive Board shall develop criteria for the equitable sharing of the Coalition's expenses among the members and the methods for the payment of such expenses, and the Executive Board shall be the final arbiter of such criteria. Any member which is three (3) months in arrears in the payment of its share of the Coalition's expenses may be suspended from membership rights and privileges by the Executive Board following notice of such failure. Membership rights and privileges shall continue to be suspended until the member brings its share of the Coalition's expenses current or until the member is deemed to have withdrawn from membership in accordance with the next following sentence, as the case may be. Any member which is six (6) months in arrears in the payment of its share of the Coalition's expenses shall be deemed to have tendered its resignation from membership to the Executive Board and, upon notice from the Executive Board, to have withdrawn from membership.

SECTION 5: **Votes.** Each member of the Coalition shall have one vote on all matters put before the members at each meeting of the members. Such votes shall be cast by the duly authorized representative of each member (or a group of members, as the case may be). Each member shall provide the Secretary of the Coalition with a duly executed proxy or other written evidence of its duly authorized representative which will remain in effect unless prior to any meeting of the Coalition, or concurrently with the delivery of any written consent to membership action or vote by mail on any membership action, the member amends said proxy or other writing by a writing filed with the Secretary of the Coalition.

SECTION 6: **Annual Meetings.** The annual membership meeting shall be held each year during the Spring. If the annual meeting is not, or can not be, held at that time, it may be called at any other time as a special meeting of the members. At the annual member meeting, elections for Executive Board positions will be conducted. Nominations for positions on the Executive Board may be submitted to the Nominating Committee, during the preceding 60 days. Each elected Board member will serve a three year term which will begin the following July 1.

**SECTION 7: Regular Meetings.** Regular meetings of the members shall be held whenever and wherever the members may specify by resolution. No notice of regular meetings need by given, but if no resolution is in effect, regular meetings shall be called in the same manner as special meetings of the members.

**SECTION 8: Special Meetings.** Special meetings of the members may be called by the President or the Executive Board, and shall be called by the Secretary. Upon written request of members representing at least ten percent of the smallest quorum of members required for a vote upon any matter at the annual meeting, the Secretary shall call a meeting. If the President does not call a meeting within fifteen (15) days of the request, the meeting may be called by the members making the request. At least seven (7) days notice of any special meeting shall be given to each member. Notice need not be given to any member who attends the meeting or who waives notice in a writing executed and filed with the Secretary of the Coalition either before or after the meeting. The Secretary shall file any such writing with the records of the meeting.

**SECTION 9: Quorum and Voting Requirements.** At least five (5) members entitled to vote and present by their duly authorized representatives at any meeting shall be a quorum; provided that, if membership in the Coalition shall ever consist of fewer than five (5) members, then presence of all members entitled to vote by their duly authorized representatives shall constitute as quorum. Membership action shall generally require the affirmative vote of a majority of the members voting on the matter, so long as the foregoing quorum requirements are satisfied.

**SECTION 10: Transaction of Business Without Meeting.** Any action which can be authorized at a meeting of the members may be taken without a meeting if all the members consent in writing to the action before or after the action is taken. The Secretary of the Coalition shall file these consents with the minutes of the meetings of the members. In addition, if so provided in the Coalition's Articles of Organization, membership action on any matter may be voted on by mail, and the vote by mail of the number of members necessary for action on such matter if the matter were submitted to a meeting of the members shall be controlling, subject to the quorum and voting requirements specified in Section 9 above.

**SECTION 11: Duly Authorized Representative.** A member Fund must appoint a representative to attend Coalition meetings and to possess the authority to cast votes on behalf of the Fund. A Fund representative must be an employee or Trustee of the Fund. A Fund's representative shall provide the Secretary of the Coalition a duly executed proxy or written evidence of the person's authority to represent the Fund.

**SECTION 12: Associate Members.** Associate Members are invited to attend biannual meeting with no voting privileges.

## ARTICLE III: EXECUTIVE BOARD

**SECTION 1: Make-up; Term of Office.** The Coalition shall have a board of directors referred to as the Executive Board. The Executive Board shall consist of five (5) directorships. The directorships shall be filled by the President, Vice-President, Treasurer, Secretary and the immediate past President of the Coalition. Each director shall hold office for so long as he

or she holds the position giving rise to his or her being a director, except as otherwise provided in this Section 1. With respect to the directorship to be filled by the immediate past President of the Coalition, the directorship shall initially be filled by the individual selected by the Coalition's incorporators at the time of the adoption of these By-Laws. Beginning with the first annual meeting of the members at which the members elect the Executive Offices and directors, this directorship shall be filled by the Coalition's immediate past President, or, if such individual is unwilling or unable to serve, then by the next preceding past President and so on until the directorship is filled. If no past President is available and willing to serve as a director of the Coalition, then the members shall elect an individual to fill the fifth directorship by majority vote of all of the members. The members shall at all times have the right to remove any director with or without cause and with or without notice or hearing, at any meeting of the members, by a majority vote of all of the members. If the members shall remove any director, they shall fill the vacancy for the unexpired term by a majority vote of all of the members.

SECTION 2: **Annual Meetings.** The annual meeting of the Executive Board shall be held each year during the Spring immediately following the annual meeting of the members. If the annual meeting is not, or cannot be, held at that time, it may be called at any other time as a special meeting of the Executive Board.

SECTION 3: **Regular Meetings.** Regular meetings of the Executive Board shall be held whenever and wherever the Executive Board may specify by resolution. No notice of regular meetings need be given, but if no resolution is in effect, regular meetings shall be called in the same manner as special meetings of the Executive Board. At least one (1) regular meeting shall be held each year between annual meetings of the Executive Board.

SECTION 4: **Special Meetings.** Special meetings of the Executive Board may be called by the President. Any two (2) directions, excluding the President, may request in writing that the President call a special meeting of the Executive Board. If the President does not call a meeting within fifteen (15) days of the request, the directors making the request may call the meeting. At least seven (7) days notice of any special meeting shall be given to each director. Notice need not be given to any director who attends the meeting or who waives notice in a writing executed and filed with the Secretary either before or after the meeting. The Secretary shall file any such writing with the records of the meeting.

SECTION 5: **Quorum and Voting Requirements.** A majority of the directorships shall be a quorum. The affirmative vote of directors holding a majority of the directorships shall be required for every action by the Executive Board unless a greater proportion of directors' votes is required by the Articles of Organization or these By-Laws.

SECTION 6: **Powers.** Subject to the Articles of Organization and these By-Laws with respect to the rights, powers and duties of the members and officers, the Executive Board shall manage the property and business of the Coalition. The Executive Board may do anything which is not prohibited by law, the Articles of Organization or these By-Laws. In particular and without limiting the foregoing, the Executive Board shall be the final interpreter of these By-Laws during the interim between meetings of the members and shall make regulations as necessary to carry out the purposes and intent of these By-Laws, and it shall at least

annually review the condition (financial and otherwise) of the Coalition. No appropriation of Coalition funds shall be made except as authorized by the Executive Board.

SECTION 7: **Transaction of Business Without Meeting.** Any corporate action which can be authorized at a meeting of the Executive Board may be taken without a meeting, so long as quorum requirements are met, if all the directors' consent in writing to the action before or after the action is taken. The Secretary shall file these consents with the minutes of the meetings of the Executive Board.

SECTION 8: Indemnification and Reimbursement. The Coalition shall indemnify the directors, officers, employees and other agents of the Coalition for liability arising out of their service to or employment by the Coalition, to the extent permitted by applicable law. The Coalition shall have the authority to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or other agent of the corporation.

## ARTICLE IV: OFFICERS

SECTION 1: **Title, Election and Duties.** The members shall elect, by a majority vote of all the members, a President, a Vice President, a Treasurer and a Secretary (collectively, the "Executive Officers"), and they may elect other officers whenever they determine that other officers are desirable; provided that the initial Executive Officers shall be the individuals selected by the Coalition's incorporator at the time of the adoption of these By-Laws. Other officers may also be elected by the Executive Board. Each Executive Officer shall be an officer, director or the duly authorized representative of a member. No individual may hold two (2) or more Executive Officer positions at the same time. The duties of each of the foregoing officers shall be the duties prescribed by these By-Laws and those prescribed by the members or the Executive Board. In addition, the Executive Board shall appoint an Executive Director who shall have the duties prescribed by these By-Laws and the Executive Board.

SECTION 2: **President.** The President shall preside at all meetings of the members and of the Executive Board. As more particularly described in Section 8 below, the President shall appoint the members of all committees of the Coalition and shall be an ex-officio member (with voting rights, and to be counted for quorum purposes, except with respect to the Nominating Committee) of all committees by reason of being President. The President shall possess such other powers and perform such other duties as maybe directed by the members or the Executive Board or as may be incidental to the office of President and not contrary to the Coalition's Articles of Organization or these By-Laws.

SECTION 3: **Vice President.** The Vice President shall assist the President in the performance of the President's duties and shall carry out the duties of the President whenever the President is unable or unwilling to perform them.

SECTION 4: **Treasurer.** The Treasurer shall oversee the Executive Director in keeping the fiscal accounts of the Coalition, including an account of all monies received or paid out. At least as often as twelve (12) months, the Treasurer shall cause to be prepared a balance sheet showing the financial condition of the Coalition as of a date not more than four (4) months earlier than the date of completion of the balance sheet. The Treasurer shall also cause to

be prepared a profit and loss statement for the twelve months ended on the date of the balance sheet. The Treasurer may endorse checks, notes and other obligations on behalf of the Coalition, but only for deposit in the Coalition's account, unless otherwise expressly authorized by the Executive Board. T he Treasurer shall deposit them and all monies and valuables in the name of and to the credit of the Coalition, in the banks and depositories designated by the Executive Board. The Treasurer shall have custody of stock, securities or other investment instruments owned by the Coalition, and shall have the power to endorse them for transfer on behalf of the Coalition.

SECTION 5: **Secretary.** The Secretary shall keep the minutes of the meetings of the members and of the Executive Board and shall give notice of these meetings when notice is required by these By-Laws. The Secretary shall keep all books, records and papers of the Coalition except those kept by the Treasurer or another person authorized to keep them by resolution of the Executive Board.

SECTION 6: **Executive Director.** The Executive Board shall have the power to employ an Executive Director. If so employed, the Executive Director shall be the administrative officer of the Coalition and shall be generally under the immediate supervision of the President and the Executive Board. The Executive Director shall also be under the immediate supervision of the Treasurer with respect to the matters contemplated by Section 4 above. The Executive Director's duties shall include, without limitation: giving notices for and keeping minutes of the proceedings of the Coalition's committees; conducting all Coalition correspondence and carrying into effect all orders, votes and resolutions of the members and the Executive Board not otherwise committed to another officer; preparing, under the direction of the Executive Board and the Treasurer, annual budgets and annual reports of the transactions and condition (financial and otherwise) of the Coalition; and generally devoting his or her best efforts to forwarding and advancing the Coalition's interests. The Executive Director shall generally have complete supervision over the work, hiring and discharge and compensation of all Coalition employees.

SECTION 7: **Term of Office.** Each Executive Officer shall serve for a term of three (3) years and thereafter until his or her respective successor is elected and qualified. There shall be no limitation on the number of terms that any individual may serve as an Executive Officer; provided, however, that no individual may hold the same Executive Officer position for three (3) consecutive full three (3) year terms. Any Executive Officer or other officer may be removed by the members at any time, with or without cause and with or without notice or a hearing; provided that Executive Officers may be removed only by the vote of a majority of all of the members. In addition, any Executive Officer who misses three (3) consecutive meetings of the Executive Board without written excuse acceptable to the remainder of the Executive Board in its reasonable discretion shall be deemed to have resigned as an Executive Officer. The Executive Director and any non-Executive Officer may maybe removed by the Executive Board at any time, with or without cause and with or without notice or a hearing. Vacancies among Executive Officers and other officers arising for any reason shall be filled by the Executive Board, except as otherwise provided in Section 1 of Article III above.

SECTION 8: **Committees.** The Executive Board may form one or more committees, and may appoint two (2) or more duly authorized representatives of member or other persons to serve on these committees. Except as provided in Section 9 below with respect to the Nominating Committee, the President shall be an ex-officio member of all committees, shall be counted in determining whether a quorum of such committee exists and shall have the right to vote. The Executive Board shall define the powers to be held by each committee, and each committee may exercise those, and only those, powers. The President shall appoint a Committee Chair who shall keep minutes of the proceedings of each Committee and shall report them to the Executive Board.

SECTION 9: **Nominating Committee.** The President shall, at least sixty (60) days prior to each annual meeting of the members at which Executive Officers are to be elected, appoint a Nomination Committee of three (3) individuals, one of whom shall serve as chairman. One member of the Nominating Committee shall be an Executive Officer other than the President, one shall be a participant and one of the members who is not otherwise an officer of the Coalition, and one shall be the director holding office by reason of being the immediate past President of the Coalition, or if such individual is unable or unwilling to serve, another past President of the Coalition, or if no past President of the Coalition is available and willing to serve, then such individual as shall be selected by the President with the consultation of the remainder of the Executive Board. The President shall be a member ex-officio of the Nominating Committee and may participate in its meetings, but shall not be counted in determining a quorum of the Nominating Committee or have the right to vote. The sole power of the Nominating Committee is to determine if the nominated individuals are qualified to hold the respective office. The committee shall insure that the representative's Fund is in good standing by meeting the qualifications for membership and is current with Coalition Dues. The Committee will insure that the nominee meets the qualifications under Section 7. All nominations meeting the above qualifications shall present to the full membership for a vote.

## ARTICLE V: DISTRIBUTION OF ASSETS

SECTION 1: **Generally.** None of the income or assets of the Coalition shall ever be distributed to its members, officers or directors. Except for the Executive Director, if any, none of the officers or directors shall be compensated for their services as officers and directors; provided that the Coalition may reimburse any of the officers and directors for reasonable and necessary expenses actually incurred by them in performance of their duties as officers and directors of the Coalition. The Executive Director's compensation shall be set by the Executive Board.

SECTION 2: **Dissolution.** If the Coalition is dissolved, any assets remaining after payment of all its liabilities and obligations shall be distributed to the members at the time of such dissolution. This distribution shall be according to a formula determined by the Executive Board and such distributions shall be in the amount or a percentage of the amount actually contributed by that member. In no instance shall an amount in excess of the amount actually contributed by a member be distributed to that member upon dissolution.

**ARTICLE VI: AMENDMENTS AND MISCELLANEOUS**

SECTION 1: **By-Laws.** These By-Laws may be amended at any time by the two-thirds (2/3) vote of the members present, as stated in Article II section 9. Each member and the Executive Board shall have the right to propose amendments to these By-Laws by filing a copy of the proposed amendment with the Secretary. Proposals for amendments shall be considered at meetings of the members properly called for that purpose. No change shall be made in these By-Laws which will affect the exempt status of the Coalition as a business league under Code Section 501 (c) (6) or the status of the Coalition as a charitable corporation under Chapter 180 of the Massachusetts General Laws.

SECTION 2: **Record of Changes.** Whenever a By-Law is amended or repealed or a new By-Law is adopted, that action and the date on which it was taken shall be noted on the original By-Laws in the appropriate place, or a new set of By-Laws shall be prepared incorporating those changes.

SECTION 3: **Procedure for Meetings.** The Executive Board shall determine the order of business for all annual meetings of the members and of the Executive Board. If any dispute shall arise with respect to the procedures for the operation of any meeting of the members, the Executive Board or any committee, then the procedures set forth in the most recent edition of Roberts Rules of Order at the time of such dispute shall govern.

SECTION 4: **Inconsistencies with Articles of Organization.** If any provisions of these By-Laws shall be found to be inconsistent with any provisions of the Coalition's Articles of Organization, as presently existing or as amended, the Articles of Organization shall be the controlling authority.

SECTION 5: **Code References.** Any reference in these By-Laws to the Code is to the Internal Revenue Code of 1986, as amended, and any successor provisions of like force and effect. Any reference in these By-Laws to a Section of the Code shall refer to that Section of the Code as it is written at the time of adoptions of these By-Laws and as it may be hereafter amended, and shall include any other provision of similar purpose which may then or later becomes applicable to the Coalition and all applicable regulations under the Code.

Certified by the Secretary of the Coalition as the By-Laws adopted by written Consent to Incorporators' Actions dated March 13, 2013.

# TAB 9

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Louis Rasetta*

*July 15, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Louis Rasetta
July 15, 2022

---

Page 3

```
 1       COMMONWEALTH OF MASSACHUSETTS
 2  Norfolk, ss.        Superior Court
 3  - - - - - - - - - - - - - - - - - - - x
 4  GINAMARIE ALONGI and ROSEMARIE
 5  ALONGI,
 6            Plaintiffs,     Civil Action
 7  v.              No. 2182-CV-00125
 8  IUOE LOCAL 4 HEALTH & WELFARE FUND;
 9  IUOE LOCAL 4 PENSION FUND; IUOE LOCAL
10  4 ANNUITY & SAVINGS FUND; HOISTING
11  AND PORTABLE ENGINEERS LOCAL 4
12  APPRENTICESHIP & TRAINING FUND;
13  JOINT LABOR-MANAGEMENT COOPERATION
14  TRUST; and WILLIAM D. MCLAUGHLIN
15  INDIVIDUALLY AND IN HIS CAPACITY
16  AS CHAIRMAN OF THE BOARDS OF TRUSTEES,
17            Defendants.
18  - - - - - - - - - - - - - - - - - - - x
19       DEPOSITION OF LOUIS RASETTA
20       July 15, 2022 * 10:00 a.m.
21       Freeman, Mathis & Gary, LLP
22            60 State Street
23            Boston, Massachusetts
24       Reporter:  Nancy L. LaCivita
```

---

Page 4

```
 1  APPEARANCES CONTINUED:
 2
 3    KENNEY & KENNEY, ATTORNEYS AT LAW
 4    By Stephen J. Kenney, Esquire
 5    181 Village Street
 6    Medway, Massachusetts 02053
 7    (508) 570-2063
 8    Counsel for Deponent
 9
10  ALSO PRESENT:
11    Greg Geiman
12    William McLaughlin
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 2

```
 1  APPEARANCES:
 2    BOWDITCH & DEWEY, LLP
 3    By Jacob A. Tosti, Esquire
 4    200 Crossing Boulevard
 5    Suite 300
 6    Framingham, Massachusetts 01702
 7    (617) 757-6536
 8    Counsel for the Plaintiffs
 9
10    FREEMAN MATHIS & GARY, LLP
11    By Jennifer L. Markowski, Esquire
12    60 State Street
13    Suite 600
14    Boston, Massachusetts 02109
15    (617) 807-8953
16    Counsel for the Defendants
17
18    O'DONOUGH & O'DONOUGH, LLP
19    By Charles W. Gilligan, Esquire
20    By Daniel Keenan, Esquire
21    Three Park Place, Suite 301
22    Annapolis, Maryland 21401
23    (410) 263-6474
24    Counsel for the Defendants
```

---

Page 4

```
 1         I N D E X
 2  EXAMINATION OF:              PAGE
 3  LOUIS RASETTA
 4
 5  Direct Examination by Ms. Markowski      5
 6  Cross-Examination by Mr. Tosti         235
 7  Cross-Examination by Mr. Gilligan      239
 8
 9
10       E X H I B I T S
11  NO.                    PAGE
12
13  Exhibit No. 185  Affidavit of Louis
14       G. Rasetta          19
15  Exhibit No. 186  Article/Milford
16       Daily News        224
17
18
19
20
21
22
23
24  *Original exhibits returned to Jennifer Markowski.
```

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Louis Rasetta
July 15, 2022

Page 105

1 you about getting more involved in the coalition?
2    A. I don't recall.
3    Q. You don't recall if she went to you or
4 you suggested it to her?
5    A. I don't recall.
6    Q. Do you think you might have suggested it
7 to her?
8    A. No. I wasn't familiar with, you know --
9    Q. What do you recall her telling you in
10 terms of what she wanted you to do to become more
11 involved in the coalition?
12    A. Anything that was beneficial to Local 4.
13    Q. In what way did she want to become more
14 involved with the coalition?
15    A. I can't tell you that. I can tell you
16 what day she did become involved, but initially I
17 don't know what she said to me, why she wanted to
18 be there except she thought she could help Local 4
19 and that was my intention and her intention.
20    Q. Your memory of the conversation, the
21 initial conversation anyway, she wanted to become
22 more involved in the coalition and she thought it
23 would benefit the fund?
24    A. Yes.

Page 106

1    Q. Do you recall anything else she told you
2 about how they could benefit?
3    A. Not at that time.
4    Q. Had you participated prior to that in any
5 coalition events?
6    A. Not that I can remember.
7    Q. At some point, they had a holiday party?
8    A. I don't believe so.
9    Q. You didn't go to any social events?
10    A. I don't recall any.
11    Q. What do you recall Ms. Alongi -- what do
12 you recall her involvement being? She ultimately
13 held the position with the coalition; is that
14 right?
15    A. Yes.
16    Q. And she became executive director?
17    A. Yes.
18    Q. At some point, did she tell you that is
19 what she wanted to do, she wanted to become the
20 executive director?
21    A. I don't think so.
22    Q. Did you learn about it after she became
23 the executive director?
24    A. Possibly. I don't recall.

Page 107

1    Q. So you don't recall her coming to you and
2 seeking approval or your blessing or anything
3 along those lines?
4    A. No. I was happy, as a matter of fact,
5 that she got that. I thought we could really have
6 some stroke with that company -- with that
7 association.
8    Q. Okay. So she became the executive
9 director without consulting you?
10    A. I'm not sure if she did or not.
11    Q. You said you were happy she became the
12 executive director?
13    A. Yes.
14    Q. You previously had no involvement with
15 the coalition, did you?
16    A. I didn't.
17    Q. So everything you learned about the
18 coalition, you learned through Gina?
19    A. No. Other people were in the coalition,
20 other tradesmen, and I would overhear them talking
21 about the coalition. Mostly that Gina had done a
22 good job.
23    Q. That she has done a good job before she
24 was involved in it?

Page 108

1    A. No, while she was involved in it.
2    Q. That's what I'm trying to figure out,
3 what you knew about the coalition before Gina got
4 involved in it.
5    A. I knew that it was an association put
6 together to help all the trades to get better
7 rates, to get lower co-pays and to help the
8 membership. That is what my understanding of it
9 was.
10    Q. Okay. How did you come to have that
11 understanding?
12    A. Just word of mouth, people talking about
13 it, hearing about it. Gina may have mentioned it.
14 I'm not saying she didn't. I knew she was a
15 member of -- that we had been a member for many
16 years and I knew the prior director of it.
17    Q. Do you recall encouraging Gina to become
18 the executive director of the coalition?
19    A. I don't recall.
20    Q. You know she did, at some point, become
21 the executive director; is that right?
22    A. Yes.
23    Q. What did she do -- at that point in time,
24 you were a trustee, correct?

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Louis Rasetta
July 15, 2022

Page 149

1 paragraph 17 that you knew how much Ms. Alongi was
2 being paid by the coalition and you took that into
3 account in determining our annual compensation
4 from the funds at the end of each year. Do you
5 see that?
6    A. Mm-hmm.
7    Q. Is that a yes?
8    A. Yes.
9    Q. Why did you take into account what she
10 was being separately paid to do for separate work?
11    A. I wanted to make sure that she was
12 adequately compensated for her work. I thought
13 she did great work for us, benefited us. My
14 intention was to benefit Local 4.
15        I thought Gina did good work for us,
16 and I wanted to make sure she was compensated
17 correctly. I was happy that she was compensated
18 correctly.
19    Q. What do you mean by you took into account
20 what she was being paid by the coalition?
21    A. To see that she was getting paid fairly,
22 I took it into account.
23    Q. Well, she was being separately paid for
24 the coalition?

Page 150

1    A. Right.
2    Q. So what did that have to do with how she
3 got paid for her work in the funds?
4    A. All together, she was being paid well for
5 her position with Local 4 and with the coalition.
6    Q. Well, you understand those are two
7 totally separate positions, right?
8    A. Yes.
9    Q. Two separate organizations?
10    A. Right.
11    Q. So the fund would not compensate
12 Ms. Alongi for the work she did for the coalition?
13    A. Right. The members would be benefiting.
14    Q. Okay. But the funds were not paying --
15 supposed to be paying Ms. Alongi for her coalition
16 work, right?
17    A. Not directly, no.
18    Q. They were not supposed to pay her any
19 money for the work she did for the coalition,
20 right?
21    A. Right.
22    Q. And you were aware from year to year, I
23 gather, how much Gina Alongi was being paid by the
24 coalition, right?

Page 151

1    A. Yes.
2    Q. How did you learn that?
3    A. She told me.
4    Q. Did she present that to the board every
5 year?
6    A. No.
7    Q. She just told you separately?
8    A. Mm-hmm, I believe.
9    Q. So you're aware at some point she was
10 earning upwards of $40,000 per year for the
11 coalition work, correct?
12    A. Yes.
13    Q. You would agree what she earned from the
14 coalition did not impact what she earned at Local
15 4 -- at the Local 4 funds, correct?
16        MR. KENNEY: Objection.
17    A. Right.
18    Q. In paragraph 19, you reference the
19 compensation study. Is that the study that you
20 were referencing earlier where you reach out to a
21 third-party vendor to obtain information, data
22 about what other administrators were --
23    A. I believe so.
24    Q. So that was done in or around 2005; is

Page 152

1 that right?
2    A. I believe so.
3    Q. Paragraph 20, you say "In or around 2013,
4 you suggested giving Ms. Alongi an additional two
5 weeks of vacation time to use or cash out annually
6 because of her dedication, work ethic and her
7 performance as administrator for the funds." Do
8 you see that?
9    A. Yes.
10    Q. Who did you suggest that to?
11    A. Nobody.
12    Q. Why did you say I suggested it?
13    A. I might have suggested it to her that she
14 should be given this in lieu of cash for her
15 dedication and her work ethic and the benefit to
16 the funds.
17        I suggested that she take two weeks
18 vacation. I knew also she was ill and I said
19 maybe get rejuvenated and feel better and things
20 will work out.
21    Q. Did Gina Alongi ask you for that two
22 weeks?
23    A. No.
24    Q. You suggested it all on your own?

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Louis Rasetta
July 15, 2022

Page 157

1 performance?

2    A. Yes.

3    Q. You, yourself, personally nominated Gina
4 Alongi in 2015 for the Cushing Gavin Boyle award;
5 is that right?

6    A. Right.

7    Q. And you actually served on the selection
8 committee, right?

9    A. I had been a recipient.

10    Q. You had previously been a recipient and
11 you were able to vote on --

12    A. Yes.

13    Q. And you nominated Gina Alongi, correct?

14    A. Yes.

15    Q. And was that the first time that an
16 administrator had ever been chosen for that
17 particular award?

18    A. I think so. I'm not sure.

19    Q. And you say "Typically voting for Cushing
20 Gavin awards takes several rounds of negotiations,
21 but Ms. Alongi was selected by a unanimous vote in
22 the first round due to her stellar reputation in
23 the labor community." Do you see that?

24    A. Yes.

Page 158

1    Q. You participated in the voting?

2    A. Yes.

3    Q. For how many years had you served on that
4 committee?

5    A. Ten maybe.

6    Q. Ten years prior to her nomination?

7    A. No, all together. I won the award
8 myself, as I told you. I nominated a number of
9 people Mr. McLaughlin and other people I
10 nominated I thought were worthy of the award.

11    Q. And Mr. McLaughlin also won the award?

12    A. Yes, he did.

13    Q. And Ms. Alongi -- you went to the award
14 ceremony for that, right?

15    A. Yes.

16    Q. And you sat with Ms. Alongi?

17    A. Yes.

18    Q. And she mentioned you specifically in her
19 speech as being someone of importance. Do you
20 recall that?

21    A. No.

22    Q. You don't recall her mentioning you in
23 her speech, you and Jack Shaughnessy?

24    A. Pardon me?

Page 159

1    Q. You and Jack Shaughnessy.

2    A. I don't remember.

3    Q. Do you remember her saying "I've had the
4 privilege of working with a tremendous group of
5 trustees at Local 4."

6        And the two trustees she mentions
7 she says, "including Local 4 business manager, Lou
8 Rasetta and Jack Shaughnessy of Shaughnessy &
9 Ahern Company."

10        Do you recall her saying that in her
11 speech?

12    A. No.

13    Q. You're familiar with the term sexual
14 harassment?

15    A. Yes.

16    Q. How are you familiar with it?

17    A. Harassment. I know what the word means.
18 Sexual harassment.

19    Q. Through Local 4, did you ever go through
20 any training on sexual harassment?

21    A. I don't recall ever being trained in it.

22    Q. Do you recall receiving a handbook from
23 Local 4 that talked about sexual harassment?

24    A. No.

Page 160

1    Q. Do you recall Local 4 had a handbook?

2    A. No.

3    Q. Do you recall the fund had a handbook?

4    A. I don't.

5    Q. Do you recall ever seeing a written
6 policy?

7    A. I don't recall seeing it.

8    Q. I'm going to show you a document that was
9 marked in an earlier exhibit as Exhibit No. 24.

10    A. 24, where would that be?

11    Q. It's on the first page.

12    A. Okay.

13    Q. And I understand that this particular
14 document is dated March 1st, 2019.

15    A. Okay.

16    Q. Which was after your time as business
17 manager, correct?

18    A. Right.

19    Q. Do you recall when you were business
20 manager having any kind of a handbook?

21    A. Having a what?

22    Q. Any kind of an employee handbook.

23    A. I don't recall, no.

24    Q. And you don't recall ever seeing anything

# TAB
# 10

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Gregory Geiman Vol I*

*June 13, 2022*

---

*68 Commercial Wharf ● Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Case 1:21-cv-10163-FDS   Document 64   Filed 12/13/22   Page 89 of 271

Ginamarie Alongi, et al. vs                                    Gregory Geiman
Iuoe Local 4 Health & Welfare Fund, et al.                      June 13, 2022

Page 3

1          COMMONWEALTH OF MASSACHUSETTS

2  NORFOLK, SS.          SUPERIOR COURT

3          CIVIL ACTION NO.: 2182CV00125

4

5  ************************************************

6  GINAMARIE ALONGI AND ROSEMARIE ALONGI,       *

7          Plaintiffs        *

8  vs.                  *

9  IUOE LOCAL 4 HEALTH & WELFARE FUND, et al,   *

10         Defendants        *

11 ************************************************

12

13

14      DEPOSITION OF: GREGORY GEIMAN

15          VOLUME I

16      BOWDITCH & DEWEY, LLP

17      200 Crossing Boulevard

18      Framingham, Massachusetts  010702

19      June 13, 2022        10:15 a.m.

20

21

22

23      Brenda M. Ginisi

24      Court Reporter

---

Page 2

1  APPEARANCES:

2  Representing the Plaintiffs:

3      BOWDITCH & DEWEY, LLP

4      200 Crossing Boulevard

5      Framingham, Massachusetts  010702

6      BY:  TIMOTHY P. VAN DYCK, ESQ.

7      (617) 757-6536

8      E-mail: tvandyck@bowditch.com

9  Representing the Defendants:

10     FREEMAN MATHIS & GARY LLP

11     60 State Street, Suite 600

12     Boston, Massachusetts  02109

13     BY:  JENNIFER L. MARKOWSKI, ESQ.

14     (617) 963-5975

15     E-mail: jmarkowski@fmglaw.com

16 Representing the IUOE LOCAL 4:

17     O'DONOGHUE & O'DONOGHUE LLP

18     5301 Wisconsin Avenue, NW, Suite 800

19     Washington, DC  20015

20     BY:  CHARLES W. GILLIGAN, ESQ.

21     (202) 362-0041

22     E-mail: cgilligan@odonoghuelaw.com

23

24

---

Page 3

1  APPEARANCES CONT'D:

2  Also present:

3      Daniel Keenan, Esq.

4      Christopher J. Redd, Esq.

5      Jacob Tosti, Esq.

6      Rose Marie Alongi

7      Gina Marie Alongi

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 4

1              I N D E X

2

3  WITNESS:              GREGORY GEIMAN

4

5

6  EXAMINATION BY:              PAGE:

7  Mr. Van Dyck              5

8

9  EXHIBITS:              PAGE:

10  Exhibit 78, E-mail..................137

11  Exhibit 79, E-mails.................139

12  Exhibit 80, E-mails.................144

13  Exhibit 81, E-mails.................146

14  Exhibit 82, E-mail..................149

15  Exhibit 83, E-mail..................151

16  Exhibit 84, E-mails.................152

17  Exhibit 85, E-mail Note.............170

18  Exhibit 86, E-mail Note.............186

19  Exhibit 87, Notes...................198

20

21  (Exhibits retained by Mr. Geiman)

22

23

24

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

---

Page 5

1    GREGORY GEIMAN, Deponent, having first been
2  satisfactorily identified and duly sworn, deposes and
3  states as follows:
4
5
6        EXAMINATION BY MR. VAN DYCK:
7
8    Q.   Good morning, Mr. Geiman.
9    A.   Good morning.
10   Q.   As I'm sure you know, my name is
11 Tim Van Dyck and I represent both Gina and Rose Alongi
12 in both the state court litigation, as well as a
13 federal court litigation.
14       MR. VAN DYCK:  Before we get started,
15 Jennifer, I'm assuming the same stipulations?
16       MS. MARKOWSKI:  Same stipulations.
17       MR. VAN DYCK:  Okay.  So read and sign,
18 waive notarization, reserve all objections
19 except as to form, including motions to strike
20 until trial, and 30 days to read and sign.
21   Q.   (By Mr. Van Dyck)  Mr. Geiman, could you
22 please state your full name for the record?
23   A.   Yes.  Gregory Alan Geiman.
24   Q.   And you understand that you're here to

---

Page 6

1  have your deposition taken with respect to the
2  complaint in the superior court action that Gina and
3  Rose Alongi have filed against the IUOE Local Funds and
4  William McLaughlin, correct?
5    A.   Yes.  The IUOE Local 4 funds, yes.
6    Q.   Just for brevity sake, I'll be referring
7  to that as the funds, during the course of the
8  deposition; are you okay with that?
9    A.   I am.
10   Q.   All right.  And you also understand that
11 you're here to have your deposition taken with respect
12 to a complaint that the funds that have filed against
13 Gina Alongi in the federal court?
14   A.   I do.
15   Q.   And I also understand you have been
16 designated by the funds as the 30(b)(6) designee,
17 correct?
18   A.   Yes.
19   Q.   All right.  Fine.  You've probably heard
20 these instructions now several times so I'll try to
21 keep them brief.  You understand that you need to
22 answer my questions verbally, correct?
23   A.   I do.
24   Q.   And is there any reason why you think you

---

Page 7

1  will not be able to testify truthfully and accurately
2  today?
3    A.   No.  No reason.
4    Q.   Okay.  Have you taken any medications
5  that could, in any way, affect your ability to answer
6  my questions truthfully?
7    A.   No.
8    Q.   Decent night's sleep last night?
9    A.   Yes.
10   Q.   Okay.  Any hearing problems I should be
11 aware of?
12   A.   None.
13   Q.   If for any reason you don't understand
14 one of my questions, let me know that before you answer
15 and I'll try to rephrase it in such a way that you do
16 understand it.  If, for some reason, you don't
17 understand one of my questions, I can either repeat it
18 or we can have our lovely court reporter read it back
19 to you.  Okay?
20   A.   Okay.
21   Q.   Again, there's a tendency in these
22 depositions for people to interrupt each other.  And
23 I'll do my best not to interrupt you when you're
24 speaking.  And I would simply ask that you try your

---

Page 8

1  best not to interrupt while I speak.  And I do pause
2  sometimes before I finish a question, so just give me
3  some time.
4    A.   I will do my best to give you that
5  courtesy.
6    Q.   Thank you.  What is your date of birth?
7    A.   May 15, 1976.
8    Q.   And where were you born?
9    A.   Middletown, New York.
10   Q.   And are you currently married?
11   A.   I am.
12   Q.   And to whom?
13   A.   Jaime, J-A-I-M-E.  Same last name.
14   Q.   Any children?
15   A.   Two.
16   Q.   Age?
17   A.   Twins.  Fourteen.
18   Q.   Were you married previously?
19   A.   No.
20   Q.   And where do you live?
21   A.   4 Primrose Lane, Westborough,
22 Massachusetts.
23   Q.   How close is that to Gina and
24 Rose Alongi?

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

Page 65

Page

1 the board. I don't remember when that was,
2 chronologically, if it was before that decision or
3 after it.
4    Q.   Would a vote have been taken?
5    A.   A vote would have been taken, yes.
6    Q.   Do you know whether the vote was
7 unanimous?
8    A.   It was.
9    Q.   Okay. Anything else you can recall about
10 the discussions concerning the Alongis or the
11 litigation, in any of these board of trustees meetings?
12    A.   I remember the seriousness or the
13 soberness, if you will, of the conversation with the
14 trustees, about filing suit against Gina. It generated
15 a tremendous amount of discussion. There was,
16 certainly, across the board, hesitance about taking
17 what I think everybody perceived rightfully to be a
18 very serious step, and one that we couldn't turn back
19 from. And I do -- I do recall that. But nothing more
20 than that.
21    Q.   Was there any discussion, among any of
22 the trustees, about the notion that there could at
23 least be a perception created that taken such a step
24 could be perceived as retaliatory?

Page 66

Page

1    A.   I don't believe so. I wouldn't be able
2 to tell you that the word was never raised or never --
3 I don't remember the meeting verbatim so I wouldn't
4 want to tell you, definitively, that it wasn't.
5          I can tell you, though, that the
6 treatment of this federal court claim was very much
7 compartmentalized. And I think, justifiably. I think
8 there was, probably, unspoken concern about perception.
9 I don't think anybody wanted to be perceived as acting
10 in a retaliatory fashion, because that was nobody's
11 intent in the room, to my knowledge.
12          It was the result of months of analysis
13 by Schultheis & Panettieri. Very serious discussions.
14 And ultimately a finding that the trustees fiduciary
15 obligation mandated that they take reasonable steps to
16 try to recoup the plan's losses.
17          To the extent that
18 Schultheis & Panettieri was able to quantify that the
19 plan lost money, that plan assets were misused, I'll
20 say, as a result of the Gina's work for the coalition
21 and other items, that the trustees had an obligation,
22 under ERISA, to take reasonable steps to pursue that,
23 less they be in violation of their fiduciary
24 responsibilities.

Page 67

Page

1    Q.   Is it your testimony, Mr. Geiman, that
2 the federal lawsuit would have been brought, even if
3 Ms. Alongi had not filed a suit in superior court?
4    A.   It is.
5    Q.   And what is the basis for that belief?
6    A.   My basis for that belief, is that the
7 chronology is this, that you, know, Ms. Alongi was
8 terminated on or about July 21st, I think it was, of
9 2010.
10    Q.   2020?
11    A.   Sorry. 2020. 2020. Thank you. I was
12 offered the job. In the next day or two, I begin the
13 job. Ultimately, I am handed quite the undertaking,
14 not just learning, you know, aspects of a job with
15 which I was somewhat familiar but not completely
16 familiar, and trying to figure all that out.
17          Dealing with a staff that was in some
18 degree of disbelief and upheaval, to put it mildly.
19 And to do all of this during the pandemic, when I
20 didn't have a full staff to rely on in the office, we
21 were working for quite some time just to get our feet
22 under us. And my memory is that the MCAD charge was
23 filed, maybe, five weeks after Gina was terminated. I
24 was still in the process of moving from one office to

Page 68

Page

1 the other when that landed on my desk.
2          So it all happened very quickly, which,
3 you know, Gina and Rose had every right to do. But
4 there was no way that I, in five weeks of trying to
5 figure out the job and figuring out what I didn't know
6 and how to fix things that needed to be fixed, I could
7 have come to the realization that there was other
8 larger issues. For example, it took Laura-Jean Hickey
9 weeks. I couldn't tell you exactly how long, but
10 weeks, to collect all of the coalition materials in the
11 office.
12          You know, when I took over as
13 administrator at the very first thing I did was I went
14 to Laura-Jean and I said, you can't work for the
15 coalition anymore. Moreover, you need to pack up
16 anything in this office. And as I'm sure you've read
17 in the pleadings, I think it was 40 boxes. It
18 necessitated, literally, a moving truck to get it out.
19    Q.   That was over the course of since 2007,
20 correct?
21    A.   Yes, yes. For as long as Gina had the
22 coalition running out of the funds office. I don't
23 know how long it was, necessarily. But it was a
24 collection of items over time. And that it took a

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

---

Page 69

Page

1  while to go through all of that. I was trying to
2  figure out how to work with the bank, with the
3  investment managers, with the custodian, people who
4  didn't know me didn't know when I was. And, you know,
5  trying assuage them all that it was okay to deal with
6  me. And it took a tremendous amount of paperwork and
7  time.
8        Meanwhile, Laura-Jean's doing her piece
9  with regards to the coalition. We were finding out,
10  sort of, other items as we go that were concerns, that
11  we sort of, peripherally, knew about once Gina was
12  terminated. But got a much more fulsome look into them
13  as we were starting to -- you know, started to peel the
14  onion.
15        And so, there is absolutely no way we
16  would have been in a position to undertake a thorough
17  analysis, or even to begin talking about federal court
18  litigation before the MCAD charge was filed.
19     Q.   That was my next question. I think you
20  just said that there had been absolutely no discussion
21  about bringing suit against Gina until after the MCAD
22  complaint had been filed, correct?
23     A.   That is accurate.
24     Q.   I got off track, which is par for the

---

Page 70

Page

1  course for me, so I apologize. So we've talked about
2  the board of trustees that you had in which the
3  litigation of the Alongis were discussed. I think you
4  also testified that you may have had some individual
5  conversations with certain of these trustees as well,
6  correct?
7     A.   Not correct. Not individual
8  conversations, but conversations with individual boards
9  of trustees. That's what I meant. In other words,
10  there were some meetings that were combined boards of
11  trustees special meetings, they call them. And then,
12  just updates provided to each of the boards at their
13  quarterly meetings.
14     Q.   Okay. And it's the latter that we
15  haven't yet talk about, correct?
16     A.   Correct.
17     Q.   Okay. So let's talk about that. What do
18  you recall about those?
19     A.   Those are much more, sort of, wrote. We
20  would meet quarterly. And I felt it was my obligation,
21  on a quarterly basis, and I will say it didn't happen
22  every meeting. There was some meetings that fell
23  during a sort of, fallow period. There really wasn't
24  much going on and not much to update the trustees on.

---

Page 71

Page

1  But if there were items of interest, I would put it on
2  the agenda and update the trustees, very briefly.
3     Q.   And when you say "put it on the agenda,"
4  would this be a written agenda?
5     A.   Yeah. I would put Alongi litigation as
6  the action item, if you will, on the agenda.
7        MR. VAN DYCK:  Okay. Again, I don't
8  believe we received any of these documents. And
9  I would make a request that they be produced to
10  us forthwith.
11     Q.   (By Mr. Van Dyck) As specifically as you
12  can recall, what was discussed at any of these
13  meetings?
14     A.   It would have varied, depending on when
15  the meeting fell. But it was intended, very much, as
16  just a status update. For example, the MCAD charge has
17  been moved into the superior court, or the Alongis
18  filed a motion to stay, or the motion to stay was
19  denied, or whatever -- or we're in discovery right now.
20  Just, sort of, status updates.
21     Q.   A routine update on what was going on in
22  the litigations?
23     A.   Right.
24     Q.   Have I now exhausted your memory about --

---

Page 72

Page

1  I'm going to exhaust you before the day's over, believe
2  me.
3     A.   That's all right.
4     Q.   But have I exhausted your memory about
5  any and all communication about any union employees
6  about the Alongis and/or the litigation?
7     A.   No, because I also had conversation withs
8  Bill McLaughlin outside of his -- outside of his
9  context as chairman of the board of trustees.
10     Q.   Okay. So let's talk about those. How
11  many of those conversations do you recall?
12     A.   I'd have trouble pinning a number on it.
13  They are occasional, generally quick. But the
14  litigation does come up in other meetings that we might
15  have, or even just in passing, if there was an item of
16  note. It's, certainly, been discussed.
17     Q.   Fair enough. Would any of these
18  discussions that you've had with Bill McLaughlin be
19  reduced to any kind of a writing?
20     A.   I don't believe so.
21     Q.   Okay. Again, I'm going to test your
22  memory here. But as specifically as you can recall,
23  what was discussed between you and Mr. McLaughlin
24  during these encounters?

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

Page 169

1      MR. VAN DYCK:  Off the record.
2
3      (A recess was taken)
4
5      MR. VAN DYCK:  Back on.
6   Q.   (By Mr. Van Dyck)  In Exhibit 84, you
7   refer to the work that Gina did for the coalition.
8   What did you understand that work to be?
9      A.   I knew that Gina would go to, I think,
10   quarterly meetings.  I knew she was the executive
11   director and would meet with the board.  I wasn't privy
12   to any of that so I just, sort of, knew in a general
13   sense that she did that.
14      I knew that she would work to -- she
15   would work to convince service providers, investment
16   managers and the like, to become associate members of
17   the coalition.  I knew that they had an annual golf
18   tournament and meeting down at Wequassett in Chatham.
19   And I knew that they had an annual holiday party.
20   That's the extent of what I knew.
21      Q.   And I may have asked this question, and
22   if I did I apologize.  Did you take any issue with the
23   fact that Gina was the executive director for the
24   coalition while she was the administrator of the funds?

Page 170

1      A.   I took no issue with it.  And I also felt
2   that it wasn't my business what my boss did.
3      Q.   All right.  Did you believe that the work
4   that she did for the coalition, in any way, hurt the
5   funds?
6      A.   As I said earlier, I knew that she did
7   work during the day.  I knew that Laura-Jean Hickey and
8   others did coalition work during the day.  But I had no
9   understanding on a day-to-day basis of the breadth of
10   it, until 2020.
11      I had taken exception, on at least a
12   couple of occasions, not with Gina because I would have
13   been wary of doing that, but with Laura-Jean, about
14   work that was being done in the funds office during
15   funds office time for the coalition.
16      Q.   You discussed this with Laura-Jean?
17      A.   My memory is, that it was by e-mail.
18   Laura-Jean and I had a bit of a tenuous relationship so
19   I'm sure I copped out by sending an e-mail.
20      MR. VAN DYCK:  I want to mark this as the
21   next exhibit.
22
23      (Exhibit 85, E-mail Note, marked)
24

Page 171

1      Q.   (By Mr. Van Dyck)  I'm showing you what's
2   marked for identification as Exhibit 85.  Can you
3   identify this for me?
4      A.   Exhibit 85.
5      Q.   Eighty-five?
6      A.   This is an e-mail note that I wrote to
7   myself on May 24th of 2018.
8      Q.   And Mr. Geiman, I'll represent to you
9   that this document was first produced to us this
10   morning, about a half-an-hour before this deposition
11   started.  Do you have any explanation for that?
12      A.   You would have to speak to my counsel
13   about that.
14      Q.   Do you know when you provided it to your
15   counsel?
16      A.   Am I allowed to answer that?
17      Q.   No.  You can answer that.
18      MS. MARKOWSKI:  Actually, conversations,
19   no I don't -- no I don't agree --
20      MR. VAN DYCK:  It's not a why, it's a
21   when.  When did you provide it to your counsel.
22   It's not anything about communications with
23   counsel.  I'm entitled to it.  And I just got
24   this document.

Page 172

1      MS. MARKOWSKI:  I understand you just got
2   it.
3      MR. VAN DYCK:  Do you wish to represent
4   on the record why I'm getting it now?
5      MS. MARKOWSKI:  Sure.  I'm happy to
6   represent to you.
7      MR. VAN DYCK:  Please.
8      MS. MARKOWSKI:  Okay.  We were originally
9   not going to produce this document because it is
10   not a funds document.  Number one, it's an
11   e-mail from his personal e-mail account to his
12   personal e-mail account.
13      And number two, there's privileged --
14   arguably -- privileged communications within
15   this document and the other e-mails we produced,
16   which we referenced in the e-mail that
17   accompanied production this morning.
18      And we've had a lengthy discussion about
19   the issue of attorney-client privilege and the
20   possibility of waiving any claim to
21   attorney-client privilege.  And have determined
22   that, with regard to these e-mails, we're making
23   a limited waiver of the attorney-client
24   privilege relative to what is contained within

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

Page 173

1      the e-mails that were produced today.
2      Q.    (By Mr. Van Dyck)  So when did you become
3  aware of this document?
4          MS. MARKOWSKI:  We can take it up at
5      another time, Tim.
6      Q.    (By Mr. Van Dyck)  You're not going to
7  tell me, are you?
8          MS. MARKOWSKI:  I'm not going to discuss
9      it on the record right now.  If you want to ask
10     the witness questions, you're welcomed to do
11     that.
12     Q.    (By Mr. Van Dyck)  When did you first
13  provide this document to your counsel?
14         MS. MARKOWSKI:  And I'm instructing
15     Attorney Geiman not to get into the back and
16     forth.
17         MR. VAN DYCK:  No.  It's not a back and
18     forth.  It's a simple question of when the
19     document was provided to his counsel.  I'm not
20     asking for the any substance of any
21     communications that Mr. Geiman had with you or
22     any other lawyers.  I'm entitled to that answer.
23         MS. MARKOWSKI:  I disagree.
24         MR. VAN DYCK:  So are you instructing

Page 174

1  Mr. Geiman not to answer the question?
2          MS. MARKOWSKI:  Currently, yes.
3          MR. VAN DYCK:  Okay.  Fair enough.
4      Q.    (By Mr. Van Dyck)  So I take it,
5  Mr. Geiman, that this is a note that you prepared -- an
6  e-mail note that you prepared to yourself on
7  May 24, 2018, correct?
8      A.   It is.
9      Q.    And why did you prepare this document?
10     A.   The period of May 2018 was fraught with a
11  tremendous amount of turmoil at the funds office.  I
12  was very concerned about the things that I was hearing
13  and the things that I was overseeing.  And I felt that
14  it might be wise, for my own purposes, to have some
15  sort of memorialization of what was happening in that
16  time frame.
17     Q.    What, in this document, as far as you
18  know Mr. Geiman, and as an attorney, is remotely
19  privileged?
20         MS. MARKOWSKI:  You're asking him for a
21     legal conclusion, no.
22         MR. VAN DYCK:  You can object.
23         MS. MARKOWSKI:  I'm objecting.  And I'm
24     asking --

Page 175

1          MR. VAN DYCK:  Whoa, whoa, whoa.  Come
2      on.  I'm asking for Mr. Geiman to tell me what
3      in this document he thinks might be protected by
4      privilege.  You can object and state that it
5      calls for a legal conclusion.  But I'm entitled
6      to an answer to my question.
7          MS. MARKOWSKI:  Tim, I think that's
8      exactly what I just did.
9          MR. VAN DYCK:  Okay.  So you're going to
10     let him answer?
11         MS. MARKOWSKI:  He can answer. yeah.
12         MR. VAN DYCK:  I'm sorry if I
13     misunderstood.
14         MS. MARKOWSKI:  Yeah.
15         THE WITNESS:  It was not my determination
16     that there was anything privileged.  And I do
17     not make the argument that there's anything
18     privileged.
19     Q.    (By Mr. Van Dyck)  So do you have any
20  explanation for me, not based upon any conversations
21  you had with your counsel, but do you have any
22  explanation for me as to why the first time I'm seeing
23  this document is today?
24         MS. MARKOWSKI:  You can answer, if you

Page 176

1      can answer without getting into discussions with
2      counsel.
3          THE WITNESS:  Can we go off the record
4      for one second.
5          MR. VAN DYCK:  I'm going to let you go
6      off the record.
7
8          (A recess was taken)
9
10     Q.    (By Mr. Van Dyck)  Can you answer the
11  question?
12     A.   I'm sorry, yes.
13         THE WITNESS:  Are we back on the record,
14     or did we never go off?
15         THE COURT REPORTER:  As soon as he said
16     can you answer the question.  We did go off.
17     But then I -- as soon as he said it I just went
18     back on the record.
19         THE WITNESS:  These documents were
20     produced to my attorneys at around the same time
21     as the superior court complaint was filed by
22     your clients.  A determination was made by my
23     counsel.  And you can understand I won't go into
24     specifics --

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

Page 177

1    Q.   (By Mr. Van Dyck) Yeah.
2    A.   -- that the documents were not to be
3 produced.
4    Q.   So your counsel's been aware of these
5 documents from the time that this superior court case
6 was filed, roughly?
7    A.   That is my understanding.
8    Q.   Okay.  And again, I don't want to get
9 into any communications, at least not yet, about any
10 communications you had with counsel about why they
11 weren't produced.  But do you have an independent
12 understanding for m,e, sitting here today, as to why I
13 received Exhibit 85 for the first time this morning, at
14 9:30?
15    A.   I don't have an independent answer for
16 you.  I don't have an answer that would not infringe on
17 attorney-client privilege.  I'm sorry.
18    Q.   I understand.  And I'm not trying to put
19 you in an awkward position here.
20    A.   I understand.
21    Q.   Let's go to the last paragraph of
22 Exhibit 85.  It states, "On May 18th I ran into Billy
23 in the hallway near the union conference room.  It was
24 the first time I'd spoken with him since the May 1st

Page 178

1 incident.  He had admitted an anger issue."
2    Q.   Does that refresh your recollection about
3 a conversation you had with Billy on or about May 18th
4 concerning the May 1st incident?
5    A.   It does.
6    Q.   And did he, in fact, admit to you at this
7 time that he had an anger issue?
8    A.   I don't remember that he used the term
9 "anger issue."  That might have been my analysis.  But
10 what he did tell me, is that he regretted the way he
11 handled the May 1st incident with Gina.  That he
12 acknowledged that he allowed his temper to get away.
13 And that he reacted angrily, loudly, and
14 inappropriately.
15        And that there was another incident that
16 he brought to my attention, where he had had a -- I
17 guess, an argument or a yelling incident with an
18 ironworker in the union conference room sometime before
19 May 1st of 2018.  So he referenced both of those
20 incidents.  And, sort of, acknowledged, you know, that
21 he had gotten loud in both of those case.
22    Q.   Who was the ironworker that he had had
23 this prior incident with?
24    A.   I have no idea.

Page 179

1    Q.   Do you know, approximately, when, in
2 relation to the May 1st incident, that the incident
3 with the ironworker occurred?
4    A.   I can only surmise it was between
5 August 1st of '17 and May 1st of; '18.  Beyond that I
6 wouldn't know.
7    Q.   Was that incident ever reported to
8 anybody?
9    A.   I don't believe it was a fund side issue.
10 I think it was something that happened within the union
11 hall.  So I was not even aware of it until he mentioned
12 it.
13    Q.   Do you know whether that incident was
14 investigated?
15    A.   I have no idea.
16    Q.   I understand it was union.  Do you know
17 if there were any documents reflecting that incident?
18    A.   Not that I'm aware of.
19    Q.   At least in your e-mail to yourself dated
20 May 24, Exhibit 85, you state "also admitted that he
21 was initial aggressor in May 1 meeting."
22    A.   Yep.
23    Q.   What does that mean?
24    A.   My understanding of what he meant, was

Page 180

1 that he raised his voice first.
2    Q.   And then you state, "I told Gina about my
3 conversation and suggested she might want to speak with
4 Billy to try to resolve."  What does that mean?
5    A.   I think I was heartened by the
6 conversation that I'd had with Billy on May 18th.  It
7 was the first time, I think, that I had seen him since
8 the argument on May 1st.  And I appreciated that he had
9 taken some measure of responsibility for his role.  He
10 said, in essence, that he wanted to resolve things with
11 Gina, get back to normal.  And I thought this might be
12 an opportunity for the two of them to talk and, you
13 know, bring some closure to the issues that they had
14 been having.
15    Q.   And then, it sounds like after that you
16 also told Gina -- you reminded Gina that once she
17 speaks to Kate the Dominoes will fall.  What did you
18 mean, when you said that to Gina?
19    A.   It's hard to recollect exactly what I
20 meant, you know, four years ago.  It's a bit of a vague
21 statement.  I imagine that I was concerned about her
22 meeting with Kate on Monday, May 21st.  I think that my
23 concern was that it's a very -- I understood the
24 seriousness of what she was going to say on Monday,

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

Page 181

1  May 21st, or what she planned to say.
2      I wasn't as confident as I think Gina
3  was, as to the behavior that she was going to bring
4  to Kate as being strong enough or egregious enough to
5  result in some sort of -- to result in the sort of
6  change or the sort of result that Gina was seeking. I
7  was concerned for Gina.
8      Q.    Were you attempting to dissuade her from
9  talking to Kate Shea?
10     A.    Not to dissuade. But to make sure she
11  was fully informed.
12     Q.    And what was the kind of result that Gina
13  was looking for, as far as you know?
14     A.    As we headed into May of 2018, Gina had a
15  number of concerns or gripes, which are laid out here.
16  She was concerned about a perceived lack of respect.
17  She wanted to move her offices, she wanted more
18  control. And I had never once, before sometime in mid
19  April of 2018, heard even the specter from Gina of any
20  subjective -- any offense that she had taken to any
21  inappropriate language or behavior in the office.
22      So when May 1st came around and Gina
23  decided she was going to sit Bill down in her office
24  and discuss these issues, I think, Gina's main frame of

Page 182

1  mind, based on my conversations with her at that point,
2  was she wanted to regain control that she felt she had
3  lost when Bill became the business manager.
4      What I witnessed thereafter -- and this
5  is not to -- you know, this is not to draw any
6  conclusion on what Gina felt or to question Gina's
7  judgment in any way. I felt that after June -- I'm
8  sorry -- after May 1st failed, for lack of a better
9  word, Gina, I think, felt that she was going to sit
10  Bill down and tell him how it is. And that Bill was
11  going to, essentially, roll over and give Gina what she
12  wanted, because I think that's what Gina was used to.
13  And it didn't work that way.
14      And I don't think anybody covered
15  themselves in glory that day, neither Gina nor Bill.
16  But the day came and went and Gina started speaking to
17  me about sexual harassment for the first time, in early
18  May of 2018, after May 1st.
19      I was concerned that Gina not use sexual
20  harassment as a substitute for what she was hoping to
21  gain on May 1st. In other words, it was not something
22  to be trifled with. It was serious. It is a serious
23  allegation. And it's not my call, thankfully, as to
24  whether or not there was severe and pervasive sexual

Page 183

1  harassment to the point that investigation should be
2  done and trustees notified. That was up to fund
3  counsel. But I was very, very, very concerned that
4  Gina's upsetedness about the lack of control that she
5  was experiencing under Bill was taking her down a path
6  that was, ultimately, not going to get her what she
7  wanted, A, and cause all sorts of unintended problems
8  for her, for Bill, for me, selfishly, for the
9  organization. I felt like I was, sort of, witnessing
10  somebody unravel.
11     Q.    You didn't want her to ring the sexual
12  harassment bell, did you?
13      MS. MARKOWSKI: Objection.
14      THE WITNESS: I had no concerns of her
15      ringing, to use your words, the sexual
16      harassment bell. My concern with Gina, which I
17      stated repeatedly, was, if you feel you've been
18      sexually harassed, don't talk to me. Talk to
19      Kate Shea.
20     Q.    (By Mr. Van Dyck) You wanted to stay out
21  of it?
22     A.    Not stay out it. I'm a process person.
23     Q.    But you were also involved in human
24  resources?

Page 184

1      A.    Yes. But it was very clear, according to
2  the employee handbook, which you saw, that any
3  complaints of sexual harassment were to be brought to
4  Gina Alongi or Kate Shea.
5      I have neither the education nor the
6  training, nor, frankly, the objectivity in that
7  position to be making a determination on sexual
8  harassment. I think Gina knew that. I was happy to be
9  a confident for Gina. I think she took comfort in
10  talking to me. I tried to make her feel better, to
11  listen, to opine to the extent I felt I could. But,
12  ultimately, I pushed her to talk to Kate. And she
13  finally did.
14     Q.    You pushed her to talk to Kate or --
15  because -- and again, this may be my confusion. I'm
16  reading this document in realtime right now. But you
17  state -- you remind her again that, once she speak to
18  Kate the Dominoes will fall. And, to me, that suggests
19  that you're telling Gina tread carefully here because,
20  if you use certain words, it could make things very
21  difficult for everybody; is that fair?
22     A.    No. I think if you look -- to your first
23  point -- and I know that you're add at a disadvantage.
24     Q.    It's not your apology to make. Let me be

Case 1:21-cv-10163-FDS   Document 64   Filed 12/13/22   Page 97 of 271
Ginamarie Alongi, et al. vs                                    Gregory Geiman
Iuoe Local 4 Health & Welfare Fund, et al.                      June 13, 2022

Page 185

1 clear on that, Mr. Geiman.  It's not your apology to
2 make.
3       A.   Either way, once you have a chance to
4 read the notes more thoroughly, you'll see that there
5 was a period of time around May 14th, May 15th,
6 May 16th, where Gina was, for lack of a better word,
7 sort of, waffling what to do and how to handle it.
8            She asked me to contact Kate Shea for her
9 and then pulled that back and said, actually don't.
10 And then decided she was going to do it, and then
11 decided no I'm not.  And then, there was a point at
12 which she decided that no, in fact, she hadn't been
13 sexually harassed.  This is just the way people treated
14 her.  She was one of the guys.  It was okay.  And then,
15 she went back on that.
16           She was -- and I felt a great deal of
17 empathy for her because she was floundering.  I felt
18 like, mentally and emotionally, she floundering and
19 didn't know what to do.  I still felt, very strongly,
20 and do to this day, that the floundering was because of
21 that perceived lack of control and how to deal with it.
22           She had a decade or more under
23 Lou Rasetta, where she was, basically, given the keys
24 to a castle.  And they keys were taken away and she was

Page 186

1 having a lot of trouble handling it.  Whether or not
2 she had a colorable sexual harassment claim was not my
3 job to decide.  I wanted her to speak to Kate.  Was
4 there a selfish motivation?  Yes, of course/I wanted
5 that hot potato off of my lap.
6       Q.   Okay.
7       A.   But the right thing to do, regardless was
8 to stalk to Kate Shea.  And I felt and feel strongly
9 about it.
10
11           (Exhibit 86, E-mail Note, marked)
12
13      Q.   (By Mr. Van Dyck)  Before we get to 86,
14 did you review Exhibit 85 before today's deposition?
15      A.   Not immediately before.  I mean, I've
16 seen it before, obviously.  But I didn't review it in
17 preparation for this.
18      Q.   Well, you said you met with your counsel
19 on Friday.  Did you review the document at that time?
20      A.   No.
21      Q.   When's the last time you reviewed
22 Exhibit 85 or 86, as long as we're at it?
23      A.   A few weeks ago.  I did glance at it, I
24 think, before Gina's deposition, perhaps.  So, maybe,

Page 187

1 end of May.
2       Q.   Can you tell me what exhibit -- and just
3 for the record, Exhibit 86 is another document.
4           MR. TOSTI:  Oh sorry.  I gave them --
5 sorry.  I didn't give them 86.  This is what
6 Tim's referring to as 86.
7           THE WITNESS:  We're looking at the same,
8 right?  This is an April -- May 24th.
9           MR. TOSTI:  You are looking at the same
10 thing Tim's looking at.  But everyone else
11 isn't.
12           MS. MARKOWSKI:  So is this 87, then?
13           MR. TOSTI:  What I just give you is 86.
14 And the other may be 87.  I don't know.
15           MR. VAN DYCK:  It probably will be.  You
16 can anticipate that the next one will be 87.
17           MS. MARKOWSKI:  So it's 84900 is 86?
18           MR. VAN DYCK:  Yes, yes.  You are
19 correct, Jennifer.
20      Q.   (By Mr. Van Dyck)  Mr. Geiman, bear with
21 me for a moment.
22      A.   Of course.
23      Q.   I'm showing you marked for identification
24 as Exhibit 86, which, again, is a document that we

Page 188

1 received for the very first time this morning at 9:30,
2 before your deposition.
3           Is this another document that you
4 provided to your counsel on or shortly after the
5 superior court action had been filed?
6       A.   It is.
7       Q.   And when's the last time you reviewed
8 Exhibit 86?
9       A.   Similarly, probably, before Gina's
10 deposition.
11      Q.   Okay.  Please describe for me what
12 Exhibit 86 is?
13      A.   This also represents notes that I had
14 taken to myself.  And just by way of explanation,
15 because this makes me look like a crazy person, I
16 didn't have a Word processer at home.  I had a
17 Chromebook and no way to type anything so that was my
18 IT know-how.  But anyway, this was an e-mail to myself.
19      Q.   So I'd like to draw your -- and why did
20 you write it?
21      A.   Similarly as I did for Exhibit 85.  To
22 ensure that I had some recollection of events during a
23 difficult period.
24      Q.   You wanted this document in place so

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

Page 189

1 that, if needed, it would refresh your memory as to
2 what happened at the time, correct?
3     A.   I think that's fair.  I was also
4 concerned.  I felt that Gina was very upset.  And I was
5 concerned, at that period of time, that she could quit,
6 or there could be other issues that would have to be
7 discussed with the board of trustees.  And I was
8 worried I would not be able to fulfill my job.
9     Q.   Now, is there -- to your knowledge, is
10 there anything in Exhibit 86 that you believe would
11 constitute an attorney-client communication or
12 otherwise fall under some sort of privilege umbrella?
13         MS. MARKOWSKI:  I'll just object to form
14 of the question.
15         THE WITNESS:  I don't believe so.
16     Q.   (By Mr. Van Dyck)  Yeah.  So these are
17 just notes that you made to yourself, right?
18     A.   Yes.
19     Q.   Yeah.  And then, it looks like you
20 forwarded the mailings to yourself, forwarded the
21 May 14th e-mail?
22     A.   Again, this is a function of my IT
23 prowess.  I think what I did here, is I went back to my
24 sent e-mail file, added another note that's something I

Page 190

1 recalled a week or so later.
2     Q.   For the record, you're not alone on that.
3     A.   All right.
4     Q.   So the first paragraph of the long
5 e-mail, it states, on April 2, 2018, H and W trustees
6 meeting, "Gina reported to me that Billy had called her
7 on the phone and told her that she looked so good at
8 the trustees meeting and he had difficulty focusing on
9 the meeting.  Gina said that she quickly changed the
10 subject and was unresponsive to Bill's comments.  This
11 was the first allegation of unwanted sexual comments,
12 advances made by Billy to Gina."  Have I read that
13 paragraph correctly?
14     A.   You have.
15     Q.   Does that refresh your memory about what
16 Gina said to you on or about April 12th?
17     A.   It does.
18     Q.   Does that accurately reflect what she
19 told you on April 12th?
20     A.   Yes.  That is an accurate recording of
21 what Gina told me.
22     Q.   Do you recall anything else about that
23 conversation with Gina on April 12th?
24     A.   I don't.  The only thing I do recall is

Page 191

1 being a bit surprised by Gina's concern, because Gina
2 had always struck me as somebody that was happy to be
3 complimented or flattered.  I don't know if she saw
4 this differently.  But people would often compliment
5 Gina on her appearance, her clothes.  That was, sort
6 of, par for the course.
7     Q.   But, certainly, you felt as though the
8 allegation was important enough that you needed to do a
9 memo to file?
10     A.   Again, not a memo to file.
11     Q.   I'm sorry.  Memo to yourself.
12     A.   Memo to myself.  I felt that Gina's
13 reaction to it was strong enough, or concerning enough,
14 that it raised a flag for me.
15     Q.   The next paragraph states, "Gina had
16 reported earlier sporadic comments to me that Billy had
17 made to her regarding his sex life and women in the
18 office that he found attractive, but never indicated
19 that such talk from Billy was unwanted or made her
20 uncomfortable.  She reported only that she had advised
21 Billy to keep it [his sex life] out of office."
22         Does that paragraph accurately reflect
23 some comments that Gina had made to you about Billy's
24 behavior?

Page 192

1     A.   Yes.  I mean, that would have been my
2 recollection as of May 14, 2018.  My recollection was
3 and remains that Gina reported those in, sort of, a
4 bemused tone.  It was never anything that I perceived
5 as making her uncomfortable or offended.  It was not
6 dissimilar, and probably less so, than things that
7 Lou Rasetta had said to her that she had reported to me
8 as well.  But I did note it because it was something
9 that I remembered as I was writing these notes.
10     Q.   Did you have any reason to think that
11 Gina was making any of this up, at the time that you
12 wrote this memo to your -- this e-mail to yourself?
13     A.   No, I don't.
14     Q.   And same with respect to the first
15 paragraph.  Did you have any reason to think that Gina
16 was making any of that up?
17     A.   No.  I believe that there could have been
18 a conversation that was misinterpreted or
19 misunderstood.  But do I believe that was Gina's
20 interpretation of it, sure.
21     Q.   The third paragraph of Exhibit 86, it
22 looks like it's a summary of at least the first part of
23 what happened on May 1, 2018, right?
24     A.   Mm-hmm.  Yes.

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

---

Page 193

1    Q.   And is the third paragraph, is it your
2  memory of what happened, or is it a combination of your
3  memory plus what Gina's told you, or is it?
4    A.   It's a combination.  It looks like the
5  beginning of it was a recitation of what Gina told me.
6  It looks as though I am reciting Gina's words up until
7  the middle of that paragraph, where I write, "I did
8  hear this outburst from my office."  That's my
9  recollection.  I did hear an outburst.  I heard Billy's
10 voice.  The next sentence is her recitation.  I did not
11 witness that.  The next sentence --
12    Q.   And by the next sentence, what does it
13 start with?
14    A.   I'm sorry, let me be more specific.  The
15 two sentences that begin with "she claims."  The first
16 is she claims that his fists father were up, that was
17 her recitation.  The next sentence, she claims she
18 poked him once in the chest, was also her recitation.
19 It appears as though the next sentence, when I reached
20 her office, is the beginning of my -- what I actually
21 witnessed.
22    Q.   So in terms of what you personally
23 observed -- visually observed -- you reached the
24 office, you saw Rose Marie was already there attempting

---

Page 194

1  to hold Billy back, correct?
2    A.   Yes.  I hesitate only because I don't
3  have any recollection as to whether Rose was physically
4  holding Billy or grabbing his arm.  But for whatever
5  reason that was the term I used, yes.
6    Q.   And then it says, "Gina poked him in the
7  chest once more when I reached the office."  And again,
8  that's something you personally observed?
9    A.   I did observing that.  And I say once
10 more, only because I'm taking Gina earlier at her word
11 that she had poked him.
12    Q.   Right.  But that was the first time you
13 had seen Gina poke him?
14    A.   Correct.  I also think it's important to
15 note that, when I witnessed that they were standing
16 well to the side of Gina's desk.  They were nowhere
17 behind -- Gina was not behind her desk, Bill was not
18 behind her desk.
19       Bill was out in the middle of the office
20 parallel with the doorway.  Rose Marie was to his back.
21 Gina was in front.  And she was poking him in the
22 chest.  Not, necessarily, trying to get him out of her
23 space.  It was -- they were, sort of, in neutral space,
24 if you will.

---

Page 195

1    Q.   And then, your next sentence says,
2  "Although he appeared menacing and said something along
3  the lines of come on, what are you going to do," Billy
4  did not appear to touch Gina."  Have I read that
5  correct?
6    A.   You have.
7    Q.   When you say he appeared menacing, what
8  do you mean by that?
9    A.   He had his chest puffed out, which I took
10 as a instinctual reaction.  And Gina was poking him in
11 the chest so I think it was, sort of, a natural
12 response to what he was -- what he was experiencing.
13    Q.   And when he said something along the
14 lines of "come on what are you going to do" was he
15 yelling that?
16    A.   I don't remember if he was yelling it or
17 just exclaiming it.  It was heated.  I don't think
18 anybody was speaking sotto voce.
19    Q.   Sotto voce.
20    A.   Sorry.  I shouldn't have challenged you
21 on that.  Everybody was quite emotional.  Let me say
22 that.
23    Q.   And then you say, "Becky, Alan, Don, and
24 Amy Boisvert were also present in the office during

---

Page 196

1  this outburst."  So you actually saw them?
2    A.   I don't think I saw them while the
3  incident was happening.  I think I spoke to them
4  afterward.  It was, as Gina and bill both testified to
5  correctly, it was quite loud. and I think anybody that
6  was within the building was aware that something was
7  happening.
8    Q.   You may recall that Mr. McLaughlin
9  testified at his deposition, that, when he was in
10 Gina's office, he looked around to see if anybody could
11 see what was going on in the office.  And he said that
12 nobody would have been able to visually see what
13 happened.  Is that consistent with your memory?
14    A.   It is.  I don't remember, other than
15 Gina, Bill and Rose, seeing anybody else in that
16 moment.
17    Q.   I know Gina had a glass office.  Is it
18 possible that somebody outside looking in could have
19 seen, at least, some of what was going on?
20    A.   I think if somebody stepped out of their
21 office they might have been able to view some or all of
22 that office.  I don't know, offhand.
23    Q.   In your next paragraph you say, "Once
24 things cooled off, Gina and Billy returned to her

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

Page 197

1  office with the door closed and continued speaking.
2  Before this I spoke -- I briefly spoke with Billy and
3  tried to calm him down."  Do you recall doing that?
4      A.   I do.
5      Q.   Do you recall what, if anything, you said
6  to Billy?
7      A.   I think I just told him, essentially, you
8  know, it sounds trite but I believe it's true, this is
9  a place of business.  You guys can't act like this
10  here.  You have to work together.  Just a lot of things
11  just to try to diffuse the situation.
12      Q.   All right.  And then, it looks like,
13  skipping a few lines down, you state, "Later that day
14  Gina told me that Billy had gotten her in a corner of
15  her office, hugged her, and attempted to kiss her on
16  the lips."  Does that refresh your recollection as to
17  whether she said that to you?
18      A.   She did.  I reported that correctly.
19      Q.   Okay.  And then, it says, "She claims
20  that she turned her head and was kissed on the cheek
21  instead."  Do you think you reported that accurately?
22      A.   I believe I did.
23      Q.   And then, she also -- you also state,
24  "She also told me that Billy said she was 'excited' and

Page 198

1  'aroused' during the fight."  Do you think you
2  accurately reported that in your memo?
3      A.   I do.  I believe that's what Gina told
4  me.
5      Q.   All right.  Do you have any reason to
6  believe that Gina would have lied to you when she said
7  any of this to you, at the time she said it?
8      A.   At the time she said it, again, I always
9  give the caveat that things can be misinterpreted.  But
10  no.  I believe this is what Gina interpreted as having
11  happened, yes.
12      Q.   And she literally reports this to you the
13  same day that it happens, correct?
14      A.   That would be my notes, yes.
15      Q.   So it would be pretty fresh in her
16  memory, wouldn't it?
17      A.   Yes.
18      Q.   We're going to get to more of this
19  document later.  I want to get to one more document
20  before we conclude today -- before we suspend.
21
22          (Exhibit 87, Notes, marked)
23
24      Q.   (By Mr. Van Dyck)  I'm showing you now

Page 199

1  what's been marked for identification as Exhibit 87,
2  which appears to be a memo from you, from your personal
3  e-mail address, to your personal e-mail address dated
4  the May 24, 2018.  The subject line is "My personal
5  hell"; have I accurately characterized that document?
6      A.   You have.
7      Q.   Okay.  And I will again represent to you,
8  Mr. Geiman, that this is a document that we have
9  received for the very first time this morning at 9:30.
10  Is this a document that you provided to your counsel on
11  or shortly after the superior court action was filed?
12      A.   It is.
13      Q.   And what is it; what does the document
14  reflect?
15      A.   Again, as with the prior two exhibits it
16  was notes that I took, sort of, contemporaneously with
17  events that I was concerned about.
18      Q.   Why did you make these notes to yourself?
19      A.   The same reason.  To make sure that, if I
20  was ever called to speak before the board of trustees
21  about anything, or if there was ever any need to
22  recount what had happened in May of 2018, that I'd have
23  some ability to recollect what happened.
24      Q.   And any attorney-client communications in

Page 200

1  this document, Exhibit 87?
2      A.   I was concerned about some conversations
3  with Kate Shea and whether those implicated
4  attorney-client communications.  But I relied on my
5  counsel's advice.
6      Q.   And we'll get to what's ever reflected in
7  here, which I haven't read yet.  But other than those,
8  is there anything in this Exhibit 87 that would reflect
9  an attorney-client communication?
10      A.   I don't believe so.
11      Q.   All right.  Thank you.  On page two of
12  Exhibit 87, the penultimate paragraph.  You state, "On
13  May 24th around three o'clock I was returning from the
14  men's room in the lobby and ran into Billy.
15          After some pleasantries and discussion
16  about negotiations, he turned the talk to Gina.  He
17  asked how she was doing.  I said she was down on the
18  Cape but still upset.  He said she needs time.  He
19  reiterated that what happened on May 1 was him
20  "asserting his authority, and that she was not used to
21  having" -- I believe it should be "to answer to
22  someone," correct?
23      A.   Correct.
24      Q.   He said that Lou gave her carte blanche.

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

---

Page 201

1   He said that he liked Gina and thought she did good
2   work, and would like to move forward here that Gina
3   wasn't ready.  Does that refresh your memory about a
4   conversation you had with Billy on or about May 24th?
5      A.   Yes.
6      Q.   Besides what's contained in that
7   paragraph, do you recall anything else you and I
8   discussed on May 24th concerning Gina?
9      A.   Yes.  It appears, to me anyway, that the
10  second -- I'm sorry -- the ultimate paragraph is the
11  continuation of the conversation that I'd had with
12  Mr. McLaughlin that day.  So yeah, that would also be
13  relevant.
14     Q.   And in the last paragraph, in your e-mail
15  to yourself, Billy apparently says that he was "playful
16  and flirtatious and that was different than sexual
17  harassment."  Do you recall him saying that?
18     A.   I don't specifically recall it.  But I
19  trust my notes.
20     Q.   And then he says, "He said he had never
21  touched anyone in the office or asked them out."  Do
22  you recall that?
23     A.   Again, I trust that my recollection is
24  correct.

---

Page 202

1      Q.   And then, he states, "He compared himself
2   to Lou, who had, apparently, dated a number of women in
3   the funds office.  He said, that, if asked, none of
4   women in this office would claim his behavior to be
5   anything more than funny or flirtatious."  Do you
6   recall him saying that to you?
7      A.   Again, trusting my notes.
8      Q.   Do you think he did?
9      A.   If I wrote it, I'm sure he did.
10     Q.   And then, finally he says, "He said he
11  could have had Gina fired.  He knew that he had
12  Brian McDonald and Michael Foley on his side.  But that
13  he did not want to go there."  Do you recall him saying
14  that to you?
15     A.   I do.
16     Q.   And did he say why he thought he could
17  have Gina fired?
18     A.   I think he was under the belief that,
19  frankly, I think may have been mistaken, that he would
20  only need one employer trustee to vote to terminate
21  Gina, if he, in fact, wanted to terminate Gina.  I
22  think he was using it an example of what he felt like
23  he had the ability to do.  But was using it to point
24  out that he did not want to do that.

---

Page 203

1      Q.   At the very top of page two of
2   Exhibit 87, you state, "Kate told me that Gina did not
3   have the support she thought she had."  What does that
4   mean?
5      A.   I'm not completely certain.  Though, by
6   context, I imagine it means that Gina felt -- and I
7   don't know why Kate knew this.  Perhaps, she had a
8   conversation with Gina about it, that Gina had the
9   backing and support of trustees in a general sense.
10  That they would side with her over Bill in some
11  circumstance.  But I really don't know where that came
12  from, per se.
13     Q.   Well, in the bottom of first page of
14  Exhibit 87, and I'm sorry to be skipping around here.
15     A.   That's okay.
16     Q.   You state, "Kate told me her concern was
17  that, if Gina's accusations were not tamped down, given
18  that they were not actionable, Billy would seek to have
19  her fired for insubordination."  Do you recall having
20  that conversation with Kate?
21     A.   I do.
22     Q.   And do you know what she meant by "tamped
23  down"?
24     A.   I think it was an inartful way to express

---

Page 204

1   what she was trying to express, which was that, you
2   know, based on the totality of what Gina had presented
3   to her, she did not feel that Gina's sexual harassment
4   complaint rose to the level of severe and pervasive,
5   such that she would be obligated to take any sort of
6   action or investigate -- well, perhaps, she felt she
7   needed to investigate.  But that she would not need to
8   take action.
9           And I think the concern then became one
10  of how are Gina and Bill going to be able to continue
11  to work together, and what can we do to fix what has
12  gone awry.
13     Q.   We're almost done for today.  Bear with
14  me.
15     A.   That's all right.
16     Q.   You state at the -- again, at the top of
17  page two of Exhibit 87, "In my mind, Kate had given her
18  opinion that there was no liability as a result of
19  Gina's concerns," correct?
20     A.   Correct.
21     Q.   Did you have an opinion, one way or the
22  other, as to whether there might be liability for the
23  funds at this time?
24     A.   I was concerned about it.  And I was

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

---

Page 205

1  definitely of the mind that, if what Gina reported with
2  regards to April 20th and May 1st were accurate, that
3  those were, certainly, instances that, if I was in my
4  employment discrimination classes in law school, would
5  be examples of sexual harassment.
6          Whether or not they were sufficiently
7  severe and pervasive, or whether the fact that what
8  Gina was reporting, as I understood it, was not things
9  just things that happened to her but to a number of
10  different employees.  I did not feel equipped to make a
11  determination as to whether there was liability or not.
12  Was I concerned, yes.
13          MR. VAN DYCK:  Why don't we suspend here.
14  Thank you very much for your time today.
15          THE WITNESS:  You're welcome.
16          THE COURT REPORTER:  May I just ask
17  counsel, same orders as last time?
18          MR. TOSTI:  Yeah.  Can we get a rough
19  draft?
20          THE COURT REPORTER:  Yes.
21          MR. KEENAN:  We need a rough draft as
22  well.
23          THE COURT REPORTER:  So send it to
24  Mr. Gilligan's office?

---

Page 206

1          MR. GILLIGAN:  Yeah, that's fine.
2          MS. MARKOWSKI:  I'd like a rough draft as
3  well and the same order.
4
5          (Deposition suspended at 4:44 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 207

1          ERRATA SHEET
2          DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
3
4          ERRATA SHEET DISTRIBUTION INFORMATION
5          DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
6  ·The original of the Errata Sheet has been delivered
7  to, Jennifer L. Markowski, Esquire.  When the Errata
8  Sheet has been completed by the deponent and signed, a
9  copy thereof should be delivered to each party of
10  record and the ORIGINAL forwarded to
11  Timothy P. Van Dyck, Esquire, to whom the original
12  deposition transcript was delivered.
13
14          INSTRUCTIONS TO DEPONENT
15      After reading this volume of your deposition,
16  please indicate any corrections or changes to your
17  testimony and the reasons therefor on the Errata Sheet
18  supplied to you and sign it. DO NOT make marks or
19  notations on the transcript volume itself.· Add
20  additional sheets, if necessary.  Please refer to the
21  above instructions for Errata Sheet distribution
22  information.
23
24

---

Page 208

1  PLEASE ATTACH TO THE DEPOSITION OF:  GREGORY GEIMAN
2  CASE:· Ginamarie Alongi and Rosemarie Alongi vs. IUOE
3  Local 4 Health & Welfare Fund, et al
4  DATE TAKEN:  June 13, 2022
5          ERRATA SHEET
6  Please refer to page 207 for errata sheet instructions
7  and distribution instructions.
8  PAGE    LINE      CHANGE    REASON
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16      I have read the foregoing transcript of my
17  deposition, and except for any corrections or changes
18  noted above, I hereby subscribe to the transcript as an
19  accurate record of the statements made by me.
20
21  Executed this _____ day of _____, 2022.
22
23          _____
24          GREGORY GEIMAN

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman
June 13, 2022

Page 209

1   COMMONWEALTH OF MASSACHUSETTS        NORFOLK, SS.
2
3        I, BRENDA M. GINISI, Court Reporter and Notary
    Public duly commissioned and qualified in and for the
4   Commonwealth of Massachusetts, do hereby certify that
    there came before me on the 13th day of June, 2022, at
5   10:22 a.m., the person hereinbefore named,
    GREGORY GEIMAN, who provided satisfactory evidence of
6   identification as prescribed by Executive Order 455
    (03-13) issued by the Governor of the Commonwealth of
7   Massachusetts, was by me duly sworn to testify to the
    truth and nothing but the truth of his knowledge
8   concerning the matters in controversy in this cause;
    that he was thereupon examined upon his oath, and his
9   examination reduced to typewriting under my direction;
    and that this is a true record of the testimony given
10  by the witness to the best of my ability.
         I further certify that I am neither attorney or
11  counsel for, nor related to or employed by, any
    of the parties to the action in which this deposition
12  is taken, and further, that I am not a relative or
    employee of any attorney or counsel employed by the
13  parties hereto or financially interested in the action.
14
15       My Commission Expires:  June 2, 2028
16
17       *Brenda Ginisi*
18       BRENDA M. GINISI, CR
         Notary Public
19
20
21
22
23
24

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Gregory Geiman, Esq.*

*July 07, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman, Esq.
July 07, 2022

---

Page 3

```
 1         COMMONWEALTH OF MASSACHUSETTS
 2   Norfolk, ss.        Superior Court
 3         Civil Action No. 2182CV00125
 4   ***************************************************
 5   GINAMARIE ALONGI AND ROSEMARIE ALONGI,     *
 6    Plaintiffs                               *
 7    vs.                                      *
 8   IUOE LOCAL 4 HEALTH & WELFARE FUND; IUOE LOCAL 4 *
 9   PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS    *
10   FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4   *
11   APPRENTICESHIP & TRAINING FUND; JOINT LABOR-    *
12   MANAGEMENT COOPERATION TRUST; AND WILLIAM D.    *
13   MCLAUGHLIN, INDIVIDUALLY AND IN HIS CAPACITY    *
14   AS CHAIRMAN OF THE BOARDS OF TRUSTEES,          *
15    Defendants                              *
16   ***************************************************
17      DEPOSITION OF:  GREGORY GEIMAN, ESQ.
18          BOWDITCH & DEWEY, LLP
19          200 Crossing Boulevard
20          Framingham, Massachusetts
21          July 7, 2022  10:10 a.m.
22             Volume II
23           Kristen M. Edwards
24             Court Reporter
```

Page 3

```
 1   APPEARANCES (Continued):
 2
 3   Representing the Defendants:
 4       O'DONOGHUE & O'DONOGHUE LLP
 5       5301 Wisconsin Avenue, NW, Suite 800
 6       Washington, DC 20015
 7       BY:  DANIEL KEENAN, ESQ.
 8       (202) 362-0041
 9       E-mail: cgilligan@odonoghuelaw.com
10
11   In Attendance:  Rosemarie Alongi
12          Gina Marie Alongi
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 2

```
 1   APPEARANCES:
 2
 3   Representing the Plaintiffs:
 4       BOWDITCH & DEWEY, LLP
 5       200 Crossing Boulevard, Suite 300
 6       Framingham, MA 01702
 7       BY:  TIMOTHY P. VAN DYCK, ESQ.
 8          JACOB A. TOSTI, ESQ.
 9       (617) 757-6537  fax (508) 929-3137
10       E-mail: tvandyck@bowditch.com
11
12   Representing the Defendants:
13       FREEMAN, MATHIS & GARY LLP
14       60 State Street, Suite 600
15       Boston, MA 02109-1800
16       BY:  JENNIFER L. MARKOWSKI, ESQ.
17          CHRISTOPHER REDD, ESQ.
18       (617) 963-5975
19       E-mail: jmarkowski@fmglaw.com
20
21
22
23
24
```

Page 4

```
 1           I N D E X
 2
 3   WITNESS:          GREGORY GEIMAN, ESQ.
 4
 5   EXAMINATION BY:          PAGE:
 6   Mr. Van Dyck          5
 7
 8
 9   EXHIBITS:             PAGE:
10   Exhibit 121, Schedule A.............................5
11   Exhibit 122, performance review...................40
12   Exhibit 123, evaluation............................45
13   Exhibit 124, handbook............................180
14   Exhibit 125, e-mail..............................214
15   Exhibit 126, text messages.......................223
16   Exhibit 127, control report......................238
17   Exhibit 128, e-mail..............................239
18
19   (Exhibits retained by Attorney Van Dyck)
20
21
22
23
24
```

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman, Esq.
July 07, 2022

Page 29

1 concerned about Laura-Jean, but I saw it as an
2 opportunity at that point in time. I felt like the
3 clock was ticking that it would be harder to make any
4 changes if Gina was right and Laura-Jean and Bill did
5 have a close working relationship and that Bill did
6 favor Laura-Jean that once Bill took office on
7 August 1st, my opportunity to gain any sort of
8 promotion might be estopped, and so I felt the clock
9 ticking. I was concerned. I saw an opportunity of
10 course, and that is the purpose of the letter.
11    **Q.    You testified earlier about what Gina's**
12 **relationship with Mr. Rasetta. Were you aware of the**
13 **fact that they had a relationship outside of the**
14 **office?**
15    A.    I was not specifically aware of it until
16 2018. I had very deep suspicion, but I knew better
17 than to ever ask Gina. It didn't feel like any of my
18 business, and I also would never have brought something
19 like that to Gina.
20    **Q.    So you mentioned that you learned of it**
21 **in 2018. How did you learn of it?**
22    A.    Kate Shea told me in the context of the
23 conversation that she had had with Gina on May 21st of
24 2018.

Page 30

1    **Q.    So Kate Shea told you in that**
2 **conversation that she was aware of the fact that Gina**
3 **had a relationship with Mr. Rasetta outside the office?**
4    A.    She did. And to be fair to Kate, I
5 believe Kate assumed that I knew because it was, I
6 think, sort of an open secret. And though I had
7 suspicions, I never really cared to follow-up on those
8 suspicions. It really wasn't anything of importance to
9 me.
10    **Q.    I'm sorry I'm skipping around but back to**
11 **the Shaughnessy affidavit paragraph eight, second and**
12 **third sentence. He states under oath, "As a direct**
13 **result of Ms. Alongi's work coordinating and overseeing**
14 **the work of the Coalition and by utilizing the**
15 **Coalition's collective bargaining power, the Funds were**
16 **able to reap significant benefits by negotiating more**
17 **favorable contract terms with third party vendors. In**
18 **short, the Funds would not have received the same**
19 **benefits if not for Ms. Alongi's work with the**
20 **Coalition." Do you agree or disagree with that**
21 **statement?**
22       MS. MARKOWSKI: Object to form. You can
23 answer.
24       THE WITNESS: I disagree.

Page 31

1    **Q.    (By Mr. Van Dyck)  Why?**
2    A.    As I mentioned at the last session, I
3 believe that the Local 4 Funds would have reaped the
4 same benefit by virtue of being part of the Coalition
5 if Gina had simply been a due's paying member and not a
6 salary executive director. I think she gives herself
7 too much credit for her negotiating skill. I also
8 think that if you look at the Coalition products that
9 we took advantage of at the Local 4 Funds, we were not
10 taking advantage of the medical program. We were not
11 taking advantage of any pharmaceutical program. We
12 were not taking advantage of any dental program. We
13 were not gaining the advantage of any of those
14 negotiated programs, especially in 2014 when we left
15 the Union Blue product and moved into a product where
16 Blue Cross/Blue Shield was paying the claims directly.
17       If you look at Gina's answer to
18 interrogatories, it may have been her second answers to
19 interrogatories, I forget, she lists all of the
20 advantages that Local 4 obtained as a result of her
21 work for the Coalition, and I didn't go back all the
22 way. I've only been around since 2010, but I did look
23 back to, I think, maybe 2012, 2013 and I was only able
24 to find one instance in which the Local 4 Funds

Page 32

1 benefited from a negotiated Coalition product or
2 discount, and that was a 30-cent per member per month
3 discount that she purportedly negotiated on behalf of
4 the Coalition, which in real dollars for Local 4 meant
5 a $10,000 annual savings.
6       Now, Gina was being paid 40,000 plus to
7 do this work for the Coalition, and she was also
8 utilizing Fund office staff and resources to do that
9 work. So $10,000 is nothing to sneeze at. But did the
10 cost meet the benefit or did the benefit meet the cost,
11 I should say. I don't know. But we were not with
12 Delta Dental. We were not with the Union Blue product.
13       To the extent that there were
14 negotiations for the Coalition that Gina was part of,
15 it's very possible that they were benefiting other
16 funds. I wouldn't know, but they weren't benefiting
17 the Local 4 Funds. The educational piece of it, that's
18 lovely and important. But, again, as a due's paying
19 member, Gina would have gleaned all that same
20 information. So I don't see any advantage to her
21 having been executive director of that coalition.
22    **Q.    I'm going to draw your attention to**
23 **paragraph nine of Mr. Shaughnessy's affidavit. I'm not**
24 **going to read it out loud, because it's somewhat**

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Gregory Geiman, Esq.
July 07, 2022

Page 33

1  lengthy.  If you could just review it to yourself.

2     A.   Sure.  Okay.

3     Q.   Do you agree or disagree with the

4  statements contained in paragraph nine?

5        MS. MARKOWSKI:  Object to form.  You can

6  answer.

7        THE WITNESS:  I'm without knowledge as to

8     that statement.  Gina's negotiation, as I

9     understand it, with Blue Cross/Blue Shield, the

10    so-called Union Blue product was before my time

11    at the Funds office.  So I'm just not really

12    familiar with the history.  I can tell you,

13    though, that when Gina decided to disband or

14    recommend to the board of trustees that she

15    disband the Union Blue product in 2014, it was a

16    cost-saving maneuver.  So there may have been a

17    period of time where the Union Blue product was

18    saving millions of dollars for the Funds, but by

19    2014 that certainly was not the case.

20    Q.   (By Mr. Van Dyck)  Just so I'm clear,

21  you're not in a position to testify one way or the

22  other as to the accuracy as to what's contained in

23  paragraph nine?

24    A.   That is correct.

Page 34

1     Q.   And to be clear, I'm asking you now in

2  your capacity as the Funds 30(b)6 designee your answer

3  stands, correct?

4     A.   My answer stands.

5     Q.   So I'm going to switch topics now, if you

6  don't mind.

7     A.   Sure.

8     Q.   When did you first meet Rose Alongi?

9     A.   I met her on my first day of work in

10  March of 2010.

11    Q.   So she had been working for the Funds

12  before you arrived, correct?

13    A.   Yes.

14    Q.   And how would you describe your

15  relationship with Rose when you first started working

16  there?

17    A.   I don't have a clear memory of my

18  relationship with Rose when I first started working

19  there except to say that I felt like I had a very

20  friendly relationship with everybody at the Fund

21  office.

22    Q.   At some point after you joined the Funds,

23  did you -- she reported to you, correct?

24    A.   Rosemarie?

Page 35

1     Q.   Yes.

2     A.   No.

3     Q.   At no time did she report to you?

4     A.   Not directly, no.

5     Q.   My understanding is that you provided her

6  with some performance evaluations; is that correct?

7     A.   I did it at Gina's behest.

8     Q.   But they were performance evaluations

9  that you did on your own, correct?

10    A.   I did.  Gina had asked Laura-Jean and I,

11  because Gina didn't like doing performance reviews, to

12  review each of Rosemarie and Alan Koufos.  I don't

13  remember why I ended up with Rosemarie and Laura-Jean

14  with Alan.  But suffice it to say, I did and I was put

15  in a particularly uncomfortable position of having to

16  provide a performance review for my boss' sister.

17    Q.   Well, it certainly would have been more

18  awkward for Gina to provide a performance evaluation of

19  her sister, correct?

20    A.   Gina hired her sister, so that's

21  something she should have thought about.

22    Q.   That's your testimony.  Moving on.  We

23  don't need to argue the point.

24        At some point did you become familiar

Page 36

1  with Rose's work performance?

2     A.   I did some work that ran parallel to

3  Rosemarie when Rosemarie -- well, in two ways.  When

4  Rosemarie would engage any new vendors, she would often

5  ask me with Gina's assent to review the contract and

6  make sure that it passed muster under ERISA.  And then

7  in 2015, I believe, I became the HIPAA privacy officer,

8  and so I would work with Rosemarie on certain trainings

9  and sanctions and similar items within the office.

10    Q.   So sounds like as of 2015 you worked a

11  little bit more closely with Rose than you did before

12  then?

13    A.   In certain areas, yes.

14    Q.   Did you have an opportunity to observe

15  her performance as an employee during that time?

16    A.   To some degree, yes.

17    Q.   And based upon what you saw, how would

18  you describe her performance, again, in 2015?

19    A.   I think in 2015 I had no reason to

20  believe that Rosemarie was anything but a competent

21  performer.  You know, one thing that was always clear

22  about Rosemarie and has been borne out in these

23  depositions is that Rosemarie, much like her sister, is

24  not keen on accepting accountability or

# TAB
# 11

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Joyce Mader*

*June 16, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Joyce Mader
June 16, 2022

---

Page 3

```
 1        COMMONWEALTH OF MASSACHUSETTS
 2  NORFOLK, ss.           SUPERIOR COURT
 3        CIVIL ACTION NO. 2182CV00125
 4    ----------------------------
 5  GINAMARIE ALONGI and
    ROSEMARIE ALONGI,
 6        Plaintiffs
 7  vs.
 8  IUOE LOCAL 4 HEALTH & WELFARE FUND;
    IUOE LOCAL 4 PENSION FUND; IUOE
 9  LOCAL 4 ANNUITY & SAVINGS FUND;
    HOISTING AND PORTABLE ENGINEERS
10  LOCAL 4 APPRENTICESHIP & TRAINING
    FUND; JOINT LABOR-MANAGEMENT
11  COOPERATION TRUST; AND WILLIAM D.
    McLAUGHLIN, INDIVIDUALLY AND IN HIS
12  CAPACITY AS CHAIRMAN OF THE BOARDS
    OF TRUSTEES,
13        Defendants
14    ----------------------------
15        DEPOSITION OF JOYCE MADER, a witness
16  called on behalf of the Plaintiffs, taken pursuant
17  to the provisions of the Massachusetts Rules of
18  Civil Procedure, before Shannon Dunigan, a Certified
19  Shorthand Reporter and Notary Public in and for the
20  Commonwealth of Massachusetts, held via Zoom, on
21  Thursday, June 16, 2022, commencing at 1:01 p.m.
22
23
24
```

```
 1  O'Donoghue & O'Donoghue, LLP
 2    Charles W. Gilligan, Esq.
 3    Daniel Keenan, Esq.
 4    5301 Wisconsin Avenue, NW, Suite 800
 5    Washington, DC 20015
 6    Cgilligan@odonoghuelaw.com
 7    Dkeenan@odonoghuelaw.com
 8    Counsel for the Defendant
 9
10  IUOE
11    Greg Geiman
12
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 2

```
 1  APPEARANCES VIA ZOOM:
 2  Bowditch & Dewey
 3    Timothy P. Van Dyck, Esq.
 4    Jacob A. Tosti, Esq.
 5    200 Crossing Boulevard, Suite 300
 6    Framingham, MA 01702
 7    Tvandyck@bowditch.com
 8    Jtosti@bowditch.com
 9    Counsel for the Plaintiffs
10
11  Freeman, Mathis & Gary, LLP
12    Christopher Redd, Esq.
13    60 State Street, Suite 600
14    Boston, MA 02109
15    Christopher.redd@fmglaw.com
16    Counsel for the Defendants
17
18
19
20
21
22
23
24
```

Page 4

```
 1        I N D E X
 2  Deposition of:            Direct
 3  Joyce Mader
 4  By Mr. Tosti.................................6
 5
 6        E X H I B I T S
 7  No.                    Page
 8  Exhibit 92  FUNDS000294 through FUNDS000301.....9
 9  Exhibit 93  FUNDS000302 through FUNDS000322.....11
10  Exhibit 94  FUNDS084905 through FUNDS084906.....15
11
12
13
14
15
16
17
18
19
20
21
22  Exhibits retained by Attorney Tosti.
23
24
```

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Joyce Mader
June 16, 2022

Page 85

1  fail to take action to correct it, they can become
2  liable. So if they had become aware of a breach and
3  they had done nothing to correct it, they could be
4  liable for all the money and losses attributable to
5  her.
6        And we call it the your house or their
7  house rule in our firm because of a little speech I
8  gave to a board of trustees once where some of their
9  compatriots had just been indicted by the Feds for
10 allowing some employers to work off the books. And
11 when they were caught and indicted and they plead
12 guilty and they eventually went to prison, the
13 remaining trustees that were not involved in this
14 were faced with several million dollars in
15 contributions that were still owed by these
16 employers that were now -- the employers were
17 indicted as well. Pretty much out of business.
18        And I said, "You need to sue your former
19 trustees, the collectives, and go after their
20 pensions." And they said, "Oh, really? You know,
21 they don't have anything left. They're in jail.
22 You know, what are we going to get?"
23        And I said, "What do you want? Their
24 house or your house? Because when the Department of

Page 86

1  Labor comes and asks you, what did you do to remedy
2  this and you said, oh, we were sorry for them,
3  they're going to go after you. So it really doesn't
4  matter whether you win or not. What matters is that
5  you tried. So you need to file suit against them
6  for breach of fiduciary duty. And if you win, you
7  win. And if you don't, you don't. But then when
8  the Department of Labor says, okay, trustees, what
9  did you do under your co-fiduciary breach rules to
10 try and remedy this situation, you can say we
11 brought suit against them. And the court will
12 either agree or disagree. And that will protect you
13 trustees from having been liable for someone else's
14 breach."
15        So whether or not she had ever filed any
16 claim against them, I think they need to pursue this
17 to protect themselves.
18 **Q. Okay.**
19    A. And they'll either win or they won't win.
20 But they'll protect themselves from potential
21 liability.
22 **Q. Do you have any opinion on the merits of**
23 **Ms. Alongi's retaliation claim? And by that I mean**
24 **her claim that the Funds federal lawsuit was filed**

Page 87

1  **in retaliation for her asserting her rights under**
2  **Massachusetts discrimination law.**
3    A. I think it's a pile of shit.
4  **Q. Sorry?**
5    A. I think it's a pile of shit. I think that
6  it, frankly, should have been brought whether or not
7  she, you know, sued them for anything. Her actions
8  were appalling. Her actions were irresponsible.
9  **Q. You know, I think we started this**
10 **deposition with you saying that you didn't have any**
11 **opinion on the merits of Ms. Alongi's claims, but**
12 **sounds like we're making some progress.**
13        **On her sexual harassment claim, do you**
14 **have any opinion on that one?**
15    A. I have no idea whether there was any sexual
16 harassment or not.
17 **Q. Okay. Rose Alongi's claim, do you have any**
18 **opinion on her retaliation claim?**
19    A. I have no idea.
20 **Q. I think we've kind of already gone over**
21 **this before. But just so I'm clear -- so I'm on**
22 **page 5 of Exhibit 92 and I'm looking at the section**
23 **Authorizing Expenses Without Trustee Approval;**
24 **Concealing Expenses From the Trustees. And you**

Page 88

1  **write here, "Therefore, Ms. Alongi breached her**
2  **fiduciary duties by improperly exercising control**
3  **over plan assets; responsibilities that had not been**
4  **delegated to her and could not be lawfully delegated**
5  **to her because they're trustee responsibilities**
6  **under ERISA Section 405(c)(3)."**
7    A. Correct.
8  **Q. So I think -- and just tell me, I think you**
9  **said before that the trustees -- that's a**
10 **responsibility that the trustees cannot delegate**
11 **approval --**
12    A. That's correct.
13 **Q. -- of expenses?**
14        **Okay. And the --**
15    A. 405(c)(3) says that control over plan
16 assets can only be exercised by trustees or an
17 investment manager. It can't be delegated to
18 another.
19 **Q. And approval of expenses falls under that**
20 **umbrella?**
21    A. Yes.
22 **Q. Got it.**
23        MR. TOSTI: Do we want to take another
24 short break?

# TAB
# 12



New England MCA — Promoting the Mechanical Construction Industry for over **125** Years

WWW.NEMCA.ORG
617-405-4221

## *New England MCA/MSCA Congratulates*

# *JOHN CANNISTRARO, JR.*

## *Management Award*

### *Along with all the Recipients of*

### *2015 CUSHING –GAVIN AWARDS*

Mechanical Contractors Association
### New England **MCA**



Mechanical Service Contractors Association
New England MSCA



THE LABOR **GUILD**

FORTY-NINTH ANNUAL

**CGA**

CUSHING-GAVIN AWARDS

A SALUTE TO THE LABOR RELATIONS COMMUNITY IN MASSACHUSETTS

**Archdiocese of Boston** | Dec. 4, 2015 | Park Plaza, Boston, Massachusetts

73

CMAR00538

# CGA HISTORY

Considered a major career honor, the CGA was first launched by Guild Chaplain, Father Mortimer (Mort) Gavin, S.J. in 1967. A noted professional mediator, Fr. Mort observed the remarkable contributions of top-notch practitioners. He envisioned an annual Cushing Awards program that would:

- provide well-deserved recognition to individuals for excellence and lifelong service in labor-management affairs
- offer both inspiration and education to the general labor-management community by showcasing outstanding performers
- bring greater visibility to the Guild and all its programs
- contribute critical financial resources supporting the Guild's on-going work and outreach

The Awards were named initially for Boston's highly-popular and respected Richard Cardinal Cushing, the founder of the post-war Guild.

The son of a Boston Elevated Railway blacksmith, Cushing was a forthright advocate of social justice and interfaith relations. He had a long and public record of advocating for a strong, responsible labor movement, while being sensitive to the legitimate needs of the business community. The Cardinal's involvement in the Awards' early days solidified its success, but as essential was the spirit of mutuality he introduced at the very first Awards Dinner.

In 1982, a fourth legal counsel category was added. By 1983, the Cushing-Gavin Awards would also honor Fr. Mort, the CGA's founder. In 2007, the Auxiliary Award was renamed the Boyle Award in honor of the 37 years of extraordinary auxiliary work of another beloved Guild Chaplain, Father Edward F. Boyle, S.J.

## PAST GUILD CHAPLAIN EXECUTIVE SECRETARIES

| | |
|---|---|
| Fr. Francis McDonnell | (1952-1962) |
| Fr. Mortimer Gavin, S.J. | (1962-1984) |
| Fr. Edward F. Boyle, S.J. | (1984-2007) |
| Sr. Mary Priniski, O.P. | (2008-2009) |
| Fr. Patrick Sullivan, C.S.C. | (2009-2012) |
| Fr. Francis Cloherty | (2012-2014) |

## JOIN THE LABOR GUILD



# CONTENTS



2 - CARDINAL O'MALLEY

3 - PROGRAM

4 - THE BOYLE AWARD

5 - MANAGEMENT ATTORNEY AWARD

6 - MANAGEMENT AWARD

7 - LABOR AWARD

8 - SPONSORS

9 - PATRONS

10 - MEET THE LABOR GUILD

12 - CGA DINNER CHAIRS

18 - PAST AWARDEES

37 - 2015 CGA COMMITTEE

"We all tend to live in our own special isolation, building walls about ourselves, and considering only the problems that are closest to each of us individually. Tonight we sit together in a spirit of brotherhood and sisterhood, recognizing that most of our difficulties we share with each other, most of our ideals we pursue together, and most of our progress will be made together or it will not be made at all."

Richard Cardinal Cushing,
First Cushing Award Dinner, 1967

1

CMAi00534

# A LETTER FROM THE CARDINAL

# 2015 PROGRAM



CARDINAL'S OFFICE
66 BROOKS DRIVE
BRAINTREE, MASSACHUSETTS 02184-3839
617-782-2544



December 4, 2015

Brothers and Sisters in the Lord,

Allow me this opportunity to extend my prayerful welcome at the Archdiocese of Boston Labor Guild's 2015 Cushing-Gavin Awards Dinner. I join you in congratulating Gina Alongi, John Cannistraro, Jr., Richard Charette and Diane Patrick, Esq. as they receive the recognition of the labor and management community who have come together for this celebration.

Our society is blessed that, by various measurements, the economy of the United States and of Greater Boston has improved from the serious difficulties of the earlier years of this decade. There are still, however, significant challenges facing workers and businesses as they make strive to keep pace with continuous technological change and provide for the basic needs of individuals and families. At times, unfortunately, the people whose work leads to profitable outcomes can be seen as expenses to be reduced or replaced.

On several occasions Pope Francis has spoken of our responsibility to not lose sight of the persons in the world of work and to include care and concern for their wellbeing in developing public and private policies concerning business and economic planning. The Archdiocese's Labor Guild and the Cushing-Gavin Awards give witness that principles of fairness and consideration can benefit both the men and women of labor and the owners and management of business, that we can work together to build a better future for all.

With the assurance of my prayers for you and all whom you hold dear, I am,

Sincerely yours in Christ,

*+Sean O'Malley*

Archbishop of Boston

**OPENING GREETING**
**Paul F. McCarthy**

**GOD BLESS AMERICA**
**Thérèse DiMuzio**
Officer, Boston Musicians Association Local 9-535 (AFM)

**INVOCATION**
**Reverend J. Bryan Hehir**
Cabinet Secretary for Health Care and Social Services
and Guild Chaplin
Archdiocese of Boston

**WELCOME - DINNER CO-CHAIRS**
**Francis X. Callahan, Jr.**
President
Massachusetts Building Trades Council (MBTC)

**Joel Boone** (CGA '11)
Director of Labor Relations
The Stop & Shop Supermarket Company LLC

**Mark Eric Smith**
Guild President
Treasurer, AFSCME Local 1700

**CITATION AND AWARD PRESENTATIONS**
**Allyson Every**
Labor Guild Executive Director

**AWARDEE RESPONSES**
**Gina M. Alongi** ▪ **Diane B. Patrick, Esq.**
**John C. Cannistraro, Jr.** ▪ **Richard O. Charette**
*Rick Charette is recovering from major surgery.*
*Warren Pyle, Esq. (CGA '92) will accept on his behalf.*

**AFTER-DINNER DRAWING**
**Martin Callaghan** (CGA '09)
Event Logistics Chair

**CLOSING REMARKS**
**Kevin L. Cotter** (CGA '04)
CGA Executive Chairman

**BENEDICTION**
**Father Patrick Sullivan, C.S.C.**
Emeritus Chaplain/Executive Secretary

GMAR00538

# THE BOYLE AWARD

### GINA M. ALONGI

Executive Director, Massachusetts Coalition of Taft-Hartley Trust Funds Administrator, IUOE (Operating Engineers) Local 4 Benefits Funds



Gina Alongi oversees over a billion dollars in assets as the Administrator of the International Union of Operating Engineers Local 4 Benefit Funds. Since 1996, her administrative responsibilities include Local 4's:

- Health & Welfare Plan covering over 9,000 participants and dependents, and delivering a comprehensive slate of medical, dental, hearing, vision, prescription drug benefits, life insurance, short-term disability insurance, and other benefits;

- Defined Benefit (Pension) Plan covering 6,000 participants working for over 500 contributing employers.

- Profit Sharing Plans, as well as many non-ERISA funds.

"Our participants know that we have their back," Gina notes. "Local 4's men and women bring tremendous skill and dedication to their craft. Their hard work builds our skyline, our infrastructure, and our hospitals and schools. They contribute a significant portion of their hard-earned income for the very best health care and a comfortable retirement. That, along with the steady leadership of our Trustees, allows our wonderful team to build, administer and strengthen the foundations of these benefits."

In 2007, Gina was elected Executive Director of the Massachusetts Coalition of Taft-Hartley Trust Funds. Comprised of 21 Taft-Hartley trust funds and 60 associate member organizations, Coalition members can reduce their plan costs by combining collective purchasing power to negotiate with service providers. Gina's Coalition advocacy includes submitting comments to the IRS regarding the upcoming "Cadillac Tax" and facilitating compliance and education sessions with the U.S. Department of Labor.

A respected and talented employee benefits professional, Gina's often invited to speak at educational forums and employee benefit conferences to discuss and educate colleagues on crucial issues. Appointed to a national committee of IUOE Health & Welfare Administrators in Washington D.C., she's testified before the Department of Labor on the Health Care Claims and Appeals regulations, and spent many years on the Board of Directors and the Executive Board of the New England Employee Benefits Council (NEEBC).

Outside of her many professional commitments, Gina can be found riding her horses, gardening, and spoiling her golden retriever.

4

# MANAGEMENT ATTORNEY AWARD

### DIANE B. PATRICK, ESQ.

Co-Managing Partner
Ropes & Gray



Diane Bemus Patrick is co-managing partner of Ropes & Gray's Boston office. With over thirty years of experience, she represents employers primarily in the healthcare and higher education sectors.

Growing up in Bedford-Stuyvesant in a politically-active family, Diane taught elementary school for five years, until caught up in the public worker layoffs during New York City's 1976-77 bankruptcy.

Heading west to study at Loyola Law School in Los Angeles, "I was naïve about what actually being a lawyer involved, " Diane notes. "But I discovered labor and employment law, and realized I prefer conciliation to litigation." Her outstanding academic performance won her an American Jurisprudence Award and the Outstanding Graduate Award. Earning her JD in 1980, she was in private practice until taking a position with Harvard's Office of General Counsel before becoming Harvard's Director/ Associate Vice President for Human Resources. In 1995, Diane became a partner at Ropes & Gray.

"I recruited Diane for Ropes & Gray," explains Shelley Kroll (CGA '01), "and she went on to be our first managing partner, an extraordinary achievement.

She is so much more than a fine lawyer. She has meant so much to the firm as a role model, mentor, advisor and counselor to our lawyers and staff workers. She draws people because she is so approachable, warm and wise."

"Over 15 years, I've sat across from Diane Patrick in Wellesley College negotiations with their union dining, custodial, grounds and trades services," says Shelley Kroll (CGA '14) of Segal Roitman. "I've never encountered a more sincere, hard-working or honest management attorney. What is special about Diane is her ability to zealously advocate for her client while showing concern for the union's members. She listens and makes sure workers feel heard."

"In my 35 years (knock on wood), I've never had a strike, " Diane notes. "I've been fortunate to deal with very good clients, employees and labor reps. I can honestly say that I loved every day of my job."

Diane and her husband Deval Patrick, Esq, have two daughters, Sarah and Katherine, and a grandson Gianluca Noah Patrick Morgese, Sarah's 4-year old son.

5

GMAr00536

# MANAGEMENT AWARD

▶ **JOHN CANNISTRARO, JR.**

President
J.C. Cannistraro LLC

An exceptional businessman and employer, John Cannistraro is a leading evangelist for the use of building information modeling (BIM), modular prefabrication, and lean manufacturing that help his clients reduce their building costs.

J.C. Cannistraro is a major, family-owned mechanical construction firm with a unique four trade approach specializing in plumbing, fire protection, heating, ventilation, air conditioning and refrigeration, and sheet metal services for commercial and institutional projects throughout New England. With a company tagline of *Building with Intelligence™*, they manage that way as well.

As President, John provides the company with its overall strategic direction with a focus on pre-construction. John has a passion for combining creativity with design and technology, and believes firmly in the ideals of mentorship and collaboration.

Cannistraro is the only mechanical contractor in the area that's signatory to four trades. Asked if that's complicated, John responds, "It isn't always easy, but we find solutions. Introducing new construction methods or products requires intense teamwork including collaboration between our trades. Our mutual success depends on us being competitive, getting the business and growing our market share."

"With today's need for technical expertise, we're proud and fortunate to have such talented, highly-trained tradespeople. While BIM and fabrication are essential to this next generation of projects, we can't lose the individual *craftsmanship*. Today's trade apprenticeship programs are more demanding than most college degrees, and can't be beat for providing an honorable and lucrative, middle class career and lifestyle."

A Past President of the Massachusetts Building Congress and the Plumbing Heating Cooling Contractors (PHCC) of Greater Boston, John is a volunteer leader for the Artists for Humanity and the Newton Wellesley Hospital Charitable Foundation. Just elected to the Corporation at Wentworth Institute of Technology, he serves as the Chairman of the Board for the American Sanitary Plumbing Museum and holds a Master Plumber's License in Massachusetts. John is a graduate of Tufts University and the Owner/President Management Program at Harvard Business School.

John and his wife Tracy, have five children: Laura, who works in Client Services; Matthew, a systems analyst with Harrington Air Systems; Amy, J.P. and William.

# LABOR AWARD



▶ **RICHARD O. CHARETTE**

Retired President
United Food & Commercial Workers
Local #1445
Chair, Interstate Health
& Welfare Fund

Watching Rick Charette skillfully navigate years of demanding situations, a close colleague noted: "When I look at Rick, what I see is a *lion of labor*."

Rick rose through the ranks to lead UFCW 1445, which represents 15,000 workers across Northeast New England from such diverse sectors as Stop & Shop, Macy's, hospitals, nursing homes, laundries, warehouses, TD Garden, Coca Cola Bottling plants. In 2013, Rick was appointed a UFCW International Vice President.

Rick's labor career began in 1968 as a young member of Boston's Packinghouse Local 616. After a 2-year military leave, including service in Viet Nam, Rick was awarded a Bronze Star with a V device for valor.

Returning to that Boston packinghouse in 1971, Rick became a steward and executive board member. Rick was Local 616's President from 1975 through their 1984 joining with Retail Clerks Union Local 1445. A subsequent 1985 merger gave rise to today's United Food and Commercial Workers Local 1445. Rick was 1445's non-food and warehouse director in the early 1990's, then elected Financial Secretary Treasurer in 1997.

In 2015, Rick stepped down after 14 years as 1445's President, and 45 years

servicing the needs of hard-working men and women and their families. "I loved my job – every day of it," Rick notes. "I loved the work, and helping folks solve real problems large and small, improve their working situations, and secure their rights on the job."

"I've always liked numbers," Rick explained. "From a young age, I was curious why some people had pensions and great healthcare, and others didn't. I always believed that benefits are as important as wages, so I got involved in the financial end and honed my benefits knowledge as a very young officer and kept at it."

Rick was a trustee on the $5 billion UFCW National Multi Employee Pension Fund from 2001 through July 2015. Since 1997 he's been a trustee on the UFCW Multi Employer Interstate Health and Welfare Fund covering 20,000 lives in Massachusetts and Rhode Island. In 2001, Rick became the Chairman of the Fund and continues to chair the Fund today.

Rick and Susan, his wife of 46 years, live in Fall River, and have two children, Kristen and Jason.

6

7

GMA00537

# TAB 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Civil Action No. 1:21-cv-10163-FDS ) |
| GINA ALONGI, | ) ) |
| Defendant. | ) ) |

**DEFENDANT GINA ALONGI'S**
**ANSWERS TO PLAINTIFF'S FIRST SET OF INTEROOGATORIES**

Pursuant to Fed. R. Civ. P. 26 and 33, defendant Gina Alongi ("Ms. Alongi") objects and responds as follows to Plaintiffs' First Set of Interrogatories. Ms. Alongi states that as she has not yet completed discovery in this case, she can answer these interrogatories only on the basis of the information known to her at this time. Ms. Alongi reserves the right to supplement these answers.

**GENERAL OBJECTIONS**

1.      Ms. Alongi objects to the Interrogatories to the extent they seek information protected from disclosure by the attorney-client privilege or the work product doctrine or that otherwise is not discoverable, and Ms. Alongi will not provide such information in answering the Interrogatories.

2.      Ms. Alongi objects to the Interrogatories, including every instruction thereto, to the extent that they attempt or purport to impose requirements or obligations on Alongi beyond those imposed by the Federal Rules of Civil Procedure.

3.      Ms. Alongi objects to the Interrogatories to the extent they seek confidential personnel and other private information about Ms. Alongi, and Ms. Alongi will not produce such information without an appropriate confidentiality agreement or protective order in place.

-1-

DocuSign Envelope ID: 8A52CC5C-9684-429C-A978-107D951FA035

4.     Ms. Alongi objects to the Interrogatories to the extent they request, in effect, a verbatim account of conversations that may be the subject of oral examinations upon deposition.

7.     Ms. Alongi objects to the Interrogatories to the extent that they do not specify a time frame on the ground that such requests are overbroad and not reasonably calculated to lead to the discovery of admissible evidence.

8.     Ms. Alongi objects to the Interrogatories to the extent that they call for legal conclusions, use legal terms of art and/or assume the existence of facts that are in dispute.  Ms. Alongi's answers to the Interrogatories shall not be deemed to be an admission or agreement as to the accuracy or completeness of Plaintiffs' legal conclusions, use of legal terms of art or purported factual assertions.

## **DEFINITION OF SPECIFIC OBJECTIONS**

As used in the specific responses below, the following terms include objections based upon their respective definitions:

A.     "Vague and ambiguous" means that Ms. Alongi objects on the basis that the interrogatory is vague, uncertain or ambiguous and does not describe the information sought with reasonable particularity.

B.     "Overbroad" means that Ms. Alongi objects on the basis that the interrogatory is overbroad, fails to identify the information sought with reasonable particularity, and calls for an expansive potential breadth of information that is unreasonable in scope.

C.     "Calls for irrelevant information" means that Ms. Alongi objects on the basis that the interrogatory is not likely to lead to the discovery of information or materials relevant to the subject matter of the action and is not reasonably calculated to lead to the discovery of admissible evidence.

D. App. 117

D.      "Burdensome" means that Ms. Alongi objects on the basis that the interrogatory is so broad and uncertain that it creates an unreasonable and undue burden upon it.  Burdensome also means that Alongi objects to the interrogatory because the information sought is more readily attainable through other, more convenient, less burdensome and less expensive sources or discovery procedures.

E.      "Calls for confidential information" means that Ms. Alongi objects on the basis the interrogatory seeks confidential personnel and other private information about its former and present employees, or seeks information concerning trade secrets or other confidential research, development or commercial information.

F.      "Calls for privileged information" means that Ms. Alongi objects on the basis that the interrogatory seeks information protected by the attorney/client privilege, the attorney work product privilege, or consists of trial preparation materials and documents containing mental impressions, conclusions, opinions, and legal theories of counsel, and/or requests information which is otherwise protected under the Federal Rules of Civil Procedure or any other valid privilege.

## SPECIFIC OBJECTIONS AND ANSWERS

## INTERROGATORY NO. 1

Describe in detail all facts and the basis supporting your denial of the allegation in Paragraph 15 of the Complaint that Ms. Alongi impermissibly exercised discretion over the use of plan assets and made independent decisions regarding the use of Fund resources in a manner contrary to plan documents and policies.

## ANSWER TO INTERROGATORY NO. 1

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome. Subject to and without waiving any of her objections, Alongi states that she did not impermissibly exercise discretion over the use of plan assets, and did not make any independent decision regarding the use of Fund resources in a manner contrary to plan documents and policies. Accordingly, all facts concerning Ms. Alongi's employment with the Funds in the position of Administrator support her denial of this broad and general allegation in Paragraph 15 of the Complaint, because they prove a negative: that she did not impermissibly exercise discretion over the use of plan assets, and did not make any independent decision regarding the use of Fund resources in a manner contrary to plan documents and policies. Ms. Alongi will not recount all facts concerning her employment with the Funds in response to this interrogatory, but will endeavor here to address certain allegations of the Funds:

Ms. Alongi's allocation of administrative time was supported by the Funds' accountants. In an attempt to dredge up baseless excuses for Ms. Alongi's termination, the Funds have claimed that Ms. Alongi failed to keep DOL timesheets when, in fact, Ms. Alongi allocated her time according to the advice of the Funds' own outside accounting firm. In 2002, the Department of Labor (DOL) began an investigation into the Funds' allocation of administrative expenses charged to each of the trust funds comprising the Local 4 Funds. Prior to the investigation, the Funds' external accounting firm calculated the annual allocation to each Fund. This method predated Ms. Alongi becoming Administrator and was common practice with many other Taft-Hartley Trust Funds. After the DOL investigation concluded in 2004, the Funds negotiated the Administrative Services Sharing Agreement ("ASSA") which dictates the administrative allocation of expenses incurred by each Fund. From that point forward, employees entered time allocations into an electronic database which was then distributed to the accounting firm to calculate the appropriate percentage to allocate to each Fund. Initially, the accounting firm calculated the reallocation every

DocuSign Envelope ID: 8A52CC5C-9684-429C-A972-407D954FA035

six months, retroactively.  However, over the years, the accounting firm determined that the allocation of administrative fees did not change significantly from year to year unless a large project affected  one of the Funds.

After several years, the Trustees voted to move to a prospective annual allocation of time and advised the DOL of this change. Ms. Alongi relied on the advice of the external accountants who informed her that their methods of calculating and allocating her time were appropriate, consistent with common practices of other Taft-Hartley Trust Funds, and acceptable by the DOL. For the Trustees to now claim (again, only after terminating Ms. Alongi's employment) that Ms. Alongi failed to keep accurate timesheets is both fanciful and completely at odds with the Funds' own practice and the advice of their own outside accounting firm.

In addition, Ms. Alongi never directed any employee to falsify their time entries, and never made any effort to conceal from the Trustees any work for the Massachusetts Coalition of Taft Hartley Funds (the "Coalition") performed by Ms. Alongi or any other employee.  Ms. Alongi began performing work for the Coalition in 2007, in a position that benefitted the participants of the Funds through Ms. Alongi's collaboration with administrators of other Taft-Hartley funds and negotiation of collective discounts, and the Trustees were well aware of Ms. Alongi and other Funds employees' work for the Coalition during Ms. Alongi's employment.  Indeed, the Coalition annually hosted a networking holiday event to which Ms. Alongi always invited the Business Manager and President of the IUOE Local 4, and Mr. McLaughlin attended seven of the ten events held from 2010 to 2019.

The Funds' suggestion that they only recently discovered that Ms. Alongi performed work for the Coalition is false.  In fact, the Funds took into account Ms. Alongi's Coalition income as part of an annual determination of her salary.  Moreover, to the extent Ms. Alongi performed any Coalition business during regular business hours, she typically performed it in lieu of taking a

-5-

lunch break or other permissible break during the day.  When Ms. Alongi received the Cushing-Gavin Boyle Award in 2015—which the Trustees were well aware of—it was in recognition of her work with both the Funds as well as the Coalition.  Regarding rent for office space paid by the Coalition to the Funds, the Coalition paid this rent for many years and the Trustees never indicated that they had any issue with the amount of rent paid by the Coalition.

Further, Ms. Alongi did not fail to regularly work full-time hours in her Administrator position.  She not only regularly performed work for the Funds during the Funds' normal business hours, but also regularly performed work for the Funds from home in the evenings and weekends.

In addition, Ms. Alongi never took or cashed out on additional vacation time unilaterally and without authorization.  In or around 2013, then-Senior Management Trustee of the Health & Welfare, Pension, and Annuity & Savings Funds of the IUOE Local 4 Benefit Funds John Shaughnessy, and then-Business Manager Lou Rasetta, informed Ms. Alongi that she was approved for an additional two weeks of vacation time, for Ms. Alongi to use or cash out annually. The Funds never thereafter rescinded this grant of vacation time.  Ms. Alongi used this vacation time and the Trustees never indicated that they had any issue with Ms. Alongi using this time until after she was terminated.

## INTERROGATORY NO. 2

Describe in detail all facts and the basis supporting your denial of the allegation in Paragraph 15 of the Complaint that Ms. Alongi was at all times relevant to this action a fiduciary as defined in ERISA §3(21)(A), 29 U.S.C. §1002(21)(A).

## OBJECTION AND ANSWER TO INTERROGATORY NO. 2

DocuSign Envelope ID: 8A52CC5C-9684-429C-A978-107D951FA025

Ms. Alongi objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, burdensome, and requires Ms. Alongi to draw a legal conclusion.  Subject to and without waiving any of her objections, Ms. Alongi states:  see answer to Interrogatory No. 17.

## INTERROGATORY NO. 3

Describe in detail all facts and the basis supporting your denial of the allegation in Paragraph 22 of the Complaint that it was the expectation of the Trustees that the Administrator would be present in the office during the Fund's regular business hours, or that if permission was granted for her to work shifted hours, that she would provide at least seven hours of daily work and would devote her full working hours to the operations of the Funds and do so in compliance with Fund documents and policies.

## ANSWER TO INTERROGATORY NO. 3

Ms. Alongi states that she denied this allegation because beginning in March 2020, she was directed to—and did—work remotely, and therefore it was not the expectation of the Trustees that Alongi would be present in the office between 8:00am to 4:00pm.

## INTERROGATORY NO. 4

Describe in detail all facts and the basis supporting your denial of the allegation in Paragraph 20 of the Complaint that Ms. Alongi, while employed as the Administrator, was responsible for the oversight of all Fund employees and to assure compliance by them with Fund policies.

## OBJECTION AND ANSWER TO INTERROGATORY NO. 4

Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome. Subject to and without waiving any of her objections, Alongi states that to the extent other Funds

D. App. 122

DocuSign Envelope ID: 8A52CC5C-9684-429C-A972-407D051FA035

office employees had supervisors other than Ms. Alongi, Ms. Alongi was not "responsible for the oversight of all Fund employees."   Between 2015 and 2020, Ms. Alongi's direct reports were Laura-Jean Hickey and Greg Geiman.  All other Funds employees who were managers reported to either Ms. Hickey or Mr. Geiman, and those managers in turn had employees who directly reported to them.

**INTERROGATORY NO. 5**

Describe in detail all times during which Ms. Alongi complied with, or refused to comply with, the requirement in the Amended Agreement to Share Administrative Services and Office Space that she keep a daily time sheet tracking the services rendered and the Health and Welfare Fund or any "Organization" defined therein to which she rendered such services during the period following the audit conducted by the Department of Labor in 2004. If Ms. Alongi contends that she was not required to keep a daily time sheet as described above, describe in detail her basis for that contention as well as all facts supporting that contention.

**OBJECTION AND ANSWER TO INTERROGATORY NO. 5**

Ms. Alongi objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad and burdensome.  Ms. Alongi further objects to this interrogatory to the extent it calls requires Ms. Alongi to draw a legal conclusion.   Subject to and without waiving any of her objections, Ms. Alongi states that the Funds, and its own outside accounting firm, did not require Ms. Alongi to keep a daily time sheet for allocation purposes.  Further answering, see answer to Interrogatory No. 1 and answer to Interrogatory No. 6.

**INTERROGATORY NO. 6**

Describe in detail each and every time Ms. Alongi was interviewed by the Funds' accounting firm regarding the estimate of hours worked for allocations during the period 2015

DocuSign Envelope ID: 8A52CC5C-9584-429C-A972-407D951FA025

through 2020, and describe in detail her basis for doing so as well as the documents, materials, or data brought to, used, referred to, or implemented in those interviews.

## OBJECTION AND ANSWER TO INTERROGATORY NO. 6

Ms. Alongi objects to this interrogatory on the grounds that it is vague and ambiguous. Subject to and without waiving any of her objections, Ms. Alongi states that from 2015 until the end of her employment, Jeanne Mickel, CPA, of Manzi & Associates ("Manzi") annually provided an estimated allocation of hours to Ms. Alongi for Ms. Alongi's review and approval.  Ms. Mickel proposed and approved of this procedure.

The process began with Funds employees entering time records into an Excel spreadsheet. The data from the spreadsheet was collected by the Funds in-house accountant Rebecca Zaccardi. Ms. Zaccardi would use the data to create a spreadsheet with the new calculated allocation percentages.   The "draft" allocation percentages would be sent to Ms. Mickel, to review, and Ms. Mickel would also add an allocation for Ms. Alongi.   Once Ms. Mickel included the Administrator's allocation and finalized the document, Ms. Alongi would receive the final document for approval from Ms. Zaccardi.

Once approved by Ms. Alongi, the information would be presented to the Trustees for their review and approval at the next board meeting.  The Trustees received, reviewed, and approved the time allocation data submitted by Ms. Alongi every year, and never indicated to Ms. Alongi that they had any issue with the way in which her time was recorded and allocated, until after Ms. Alongi filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination against the Funds and William McLaughlin in September 2020.

## INTERROGATORY NO. 7

DocuSign Envelope ID: 8A52CC5C-9584-429C-A972-107D051FA035

Describe in detail all facts and the basis supporting your denial of the allegation in Paragraph 29 of the Complaint that Ms. Alongi omitted those hours of work performed for the Massachusetts Coalition of Taft-Hartley Funds during her normal working hours when she either recorded her working time on a time sheet as required by the Shared Services Agreement or was interviewed by the Funds' accounting firm concerning the allocation of her working time.

## OBJECTION AND ANSWER TO INTERROGATORY NO. 7

Ms. Alongi objects to this interrogatory on the grounds that it is vague and ambiguous, and further objects to the extent it requires Ms. Alongi to draw a legal conclusion.  Subject to and without waiving any of her objections, Ms. Alongi states that she does not know what precisely the Funds are referring to by "those hours of work performed for the Massachusetts Coalition of Taft-Hartley Funds during her normal working hours."   As noted in Alongi's answer to Interrogatory No. 1, to the extent that Ms. Alongi performed Coalition business during regular business hours, she typically performed it in lieu of taking a lunch break or other permissible break during the day.  Further, when Mr. McLaughlin required Ms. Alongi to provide him with work summaries in 2020 containing records of her time, Ms. Alongi accounted for the minimal time spent on Coalition work in those summaries, and made no effort to "omit" anything.

The Trustees were well aware of the work Ms. Alongi performed for the Coalition.  In fact, the Funds took into account Ms. Alongi's Coalition income as part of an annual determination of her salary.  Regarding her allocation of working time, Ms. Alongi followed the advice of the Funds' own accountants, and was never advised by the Funds or their accountants that she was improperly "omitting" anything.

## INTERROGATORY NO. 8

DocuSign Envelope ID: 8A52CC5C-9684-429C-A972-107D951FA035

Describe in detail every benefit, pecuniary or otherwise, the Funds received as a result of Ms. Alongi's service as Executive Director of the Massachusetts Coalition of Taft-Hartley Funds, including for each such benefit:

a.      The date the benefit or advantageous agreement or service contract commenced and concluded;

b.      Ms. Alongi's specific role in securing the benefit or advantageous agreement or service contract;

c.      The substance of the benefit or advantageous agreement or service contract, including where applicable the pecuniary nature of the benefit in terms of dollar value of the savings as compared with the services provided to or agreements with service providers maintained by the Funds immediately prior to the implementation of the benefit;

d.      The identity of any witness(es) to Ms. Alongi's personal involvement in negotiating or securing the benefit or advantageous agreement or service contract, pecuniary or otherwise; and.

e.      Whether the benefit in question was available to all members of the Coalition

## OBJECTION AND ANSWER TO INTERROGATORY NO. 8

Ms. Alongi objects to this interrogatory on the grounds that it is vague and ambiguous, overbroad, and burdensome.  Subject to and without waiving any of her objections, Alongi states as follows:

The following projects provided direct savings to Coalition members, including the Funds, through collective purchasing:

| Date of Coalition Meeting | Topic |
| --- | --- |
| 11-14-2007 | Blue Cross Blue Shield ("BCBS") MA - administrative ("admin") fee reduction |
| 1-10-2008 | BCBS MA - admin fee reduction |
| 3-18-2008 | BCBS MA - admin fee reduction |

| | |
|---|---|
| 1-15-2009 | BCBS MA – admin fee reduction |
| 9-9-2009 | Pharmacy Pricing Analysis – Bid project to 8 Consulting Firms to analyze each funds' RX pricing, for funds to negotiate with RX carrier. |
| 11-18-2009 | EPIC Hearing – negotiated rates |
| 1-13-2010 | BCBS MA – admin fee reduction |
| 3-18-2010 | Davis Vision – Value Advantage Plan |
| 5-18-2011 | Davis Vision – Network Agreement |
| 5-18-2011 | Results of Pharmacy Project performed by Segal Company |
| 8-4-2011 | Davis Vision - contract |
| 9-15-2011 | Updated results of Pharmacy Project by Segal Company |
| 11-17-2011 | MRI and CAT Scan Services – Shields MRI Discounts |
| 1-11-2012 | Delta Dental – dental discounts |
| 9-12-2012 | BCBS MA – admin fee reduction |
| 9-19-2013 | Dependent Eligibility Audit HMS Employer Solutions |
| 3-12-2014 | BCBS MA – Reduction in Fees Fully Insured Groups |
| 2-9-2015 | New York Health Care Alliance – Pharmacy Benefit Program Project – Proskauer, Lead Attorney |
| 6-4-2015 | Comment to IRS – Cadillac Tax, Excise Tax – Slevin and Hart |
| 11-19-2016 | BCBS MA – admin fee reduction 2015-2017 |
| 3-8-2017 | BCBS MA – Bundled Product Discounts – Stop Loss, RX and Dental |
| 9-18-2018 | Emerging Solutions Discounts – Livongo, Hinge Health, and Omada |
| 6-20-19 | Emerging Solution Discounts – Robin Care for Cancer Patients |

The following presentations and/or educational sessions facilitated by the Coalition were made available to Coalition members, including the Funds:

| Date of Meeting | Topic |
|---|---|
| 11-14-2007 | Mass Health Care Reform – Submitted Testimony, Hinkley Allen & Tringale |
| 11-14-2007 | Medicare Supplements – BCBS MA |
| 11-14-2007 | Defense of Marriage Act – Segal Roitman, Mary Sullivan |
| 1-11-2008 | Mass Department of Industrial Boards (Request to Match Data, Loss of Time) |
| 6-26-2008 | Tobacco Control Program – Class Action Lawsuit |
| 9-10-2008 | Minimum Creditable Coverage and Employer Fair Share Contribution – Testimony Submitted with the Mass Building Trades, Frank Callahan |
| 11-12-2008 | Smoking Cessation – Pfizer – Gary Donlin |
| 3-18-2009 | COBRA Premium Assistance Subsidy Program – The Segal Company |
| 3-18-2010 | Standards for protecting personal information for residents in the Commonwealth of MA |
| 5-12-2010 | Collection Procedures – Ironworkers District Council (Hired Greg Geiman 2010) |
| 1-26-2011 | Swift MD – Introduction to Telemedicine |
| 3-16-2011 | Mass All-Payor Claims Database |
| 5-12-2010 | Best Practices – Pensioners Returning to Work |
| 5-12-2010 | Best Practices – Delinquency Policies |
| 9-15-2011 | Medication Therapy – Roland Mueller |
| 3-14-2012 | Center for Medicare and Medicaid Services |
| 7-25-2012 | US Department of Labor – Mary Rosen – "Voluntary Fiduciary Correction Program (VCP)" |

D. App. 127

| | |
|---|---|
| 1-28-2013 | Pension Fund Compliance – Savitz Organization |
| 6-5-2013 | Affordable Care Act – Tringale Health Strategies |
| 9-19-2013 | Mass General Hospital – Diabetes Research Group |
| 11-6-2013 | Webinar – Stop Loss |
| 6-3-2014 | Specialty Drugs "Ask the Experts" |
| 9-18-2014 | US Department of Labor – Mary Rosen – "Hot-Topics" |
| 1-30-2014 | Cyber Liability Insurance – Segal Select Insurance |
| 2-19-2015 | Opioid Prescriptions – BCBS-MA |
| 6-14-2015 | Prescription Drug Litigation – Delzico – Generic Suppression Litigation – Wagstaff and Cartmell, LLP |
| 9-24-2015 | US Department of Labor – Mary Rosen – "ACA Most Common Violations – DOL Priority in the are of 2016" |
| 11-19-2015 | Telehealth – American Well BCBS-MA |
| 1-20-2016 | Marcum – Security Assessments |
| 6-20-2016 | Proposal for RX Audit Project – Healthlinx, J. Graham |
| 9-21-2016 | Pfizer – Immunization Initiative, Smoking Cessation |
| 9-21-2016 | Haynes & Associates – Zoll Wearable Defibrillators |
| 1-11-2017 | Best Doctors – Charlie Gustafon |
| 11-8-2017 | Fraud and Abuse Seminar – BCBS MA |
| 11-8-2017 | Centers for Diagnostic Imaging – Louise Zafirson – Alternative to Sheilds MRI |
| 9-20-2017 | US Department of Labor – Mary Rosen "Enforcement Initiatives and Compliance" |
| 1-10-2018 | Washburn House (Substance Abuse Treatment Center) Jim O'Day |
| 4-10-2018 | Diabetes Management Tool – Livongo – Chris May and Aaryn Pure |
| 4-10-2018 | Class Action lawsuit Opioid Manufacturers – Thornton & Naumes |
| 9-19-2018 | Modern Assistance Programs – Opioid Crisis and Employee Assistance Programs – John Christian and Damien Turini |
| 9-19-2018 | Mass Building Trades – Update Congressman Richard Neal – Multi-Employer Pension Crisis – The Grow Act |
| 11-14-2018 | Allways Health Plans – Vin Capozzi and Jenn St. Thomas – BCBS Competitor – Leverage BCBS Discount. |
| 1-9-2019 | Draft Letter Follow up to 09-19-2018 letter Mass Building Trades signed by All Coalition Members and Mass Building Trades.  Letter sent to all Congressional Leaders and Members of the Joint Select Committee on Solvency of Multi-Employer Pension Plans. |
| 3-6-2019 | Mass Paid Family and Medical Leave Act – Mass Building Trades – Frank Callahan |
| 3-6-2019 | Boston Medical Center – Opioid Epidemic – Michael Botticelli |
| 6-10-2019 | Hinge Health – Emerging Solution – Disease of the Musculoskeletal System – Mike Gorfin |
| 6-10-2019 | Robin Care – Emerging Solution for Cancer – Hugh Ma |
| 1-8-2020 | Cigna – Jay Gobel – Competitor to BCBS MA Leverage Discounts |
| 3-4-2020 | Altus Dental and Chewsi |
| 3-4-2020 | Claim Informatics Presentation/Proposal |

The following wellness events and related benefits were made available to all Coalition members, including the Funds:

| Date of Meeting | Topic |
|---|---|
| 3-1-2008 | Blue Medicare PFFS Advantage Plan – To all Retirees |
| 5-6-2009 | Heart Health Event (June 6, 2009) |
| 5-6-2009 | Self-Help Book "Healthier at Home" Coalition Discount |
| 11-21-2009 | Flu Busters Clinic |
| 9-11-2010 | Wellness Event (Tuffs Health Plan) |
| 3-14-2012 | Wellness Summit Hosted by Tuffs Health Plan – Gillette Stadium |
| 11-20-2012 | Fitness Challenge – BCBS and Virgin Health Miles – 12 Week Kick Challenge.  $5,000 to "Union" winner for a scholarship.  Eff. 01-06-13 |
| 11-18-2017 | Wellness Event - Preliminary Discussion |
| 9-20-2017 | Wellness Event - Venue |
| 1-10-2018 | Wellness Event - Appoint Subcommittee |
| 4-10-2018 | Wellness Event - Approval to Send two people to Midwest to view how they planned event. |
| 6-4-2018 | Wellness Event – Update from Midwest Travel |
| 9-19-2018 | Wellness Event – Hired Event Coordinator Kathy Felber (Planned Midwest Event) |
| 11-14-2018 | Wellness Event - Event Planning, Subcommittee |
| 1-9-2019 | Wellness Event - Preliminary Budget, Location |
| 3-6-2019 | Wellness Event - Budget |
| 6-10-2019 | Wellness Event - Date, Location Secured (Lombardo's) |
| 9-18-2019 | Wellness Event – IRS 501(c)(3) Filing, Communication Material |
| 11-6-2019 | Wellness Event – Letter to Associate Members regarding Sponsorships, Articles of Organization, Bylaws |
| 1-8-2020 | Wellness Event – Sponsorship Commitments, Exhibitors, Task List |
| 3-4-2020 | Wellness Event – IRS Determination Approval Letter, Financial Statements |

Ms. Alongi has produced Coalition meeting minutes and related documents that provide support and additional information regarding all of the above-refenced meetings and benefits in the state court matter at GMA 0001 – 00265.  As Executive Director of the Coalition, Ms. Alongi negotiated on behalf of and represented the Coalition in obtaining the above-referenced benefits and as such was instrumental in obtaining those benefits for the Funds.  In addition, the Coalition funded a $4,000 scholarship (paid out in $1,000 over four years) that was made available to all members, and Local 4 dependents won those scholarships in 2014, 2015, and 2020.

**INTERROGATORY NO. 9**

Describe in detail all facts and the basis supporting your denial of the allegation in Paragraph 33 of the Complaint that Ms. Alongi was regularly performing work for the Massachusetts Coalition of Taft-Hartley Funds during the Funds' standard workday of 8:00 AM to 4:00 PM, a period of time for which she was supposed to be working for the sole and exclusive benefit of the Local 4 Funds and their participants.

**OBJECTION AND ANSWER TO INTERROGATORY NO. 9**

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome. Subject to and without waiving any of her objections, Ms. Alongi states that to the extent Ms. Alongi performed Coalition work during regular business hours, she typically performed it in lieu of taking a lunch break or other permissible break during the day. The Trustees were well aware of the work that Ms. Alongi performed for the Coalition during her employment and never informed her that her work for the Coalition was in any way harmful to the Funds. To the contrary, Ms. Alongi's work for the Coalition benefitted the Funds and their participants.

**INTERROGATORY NO. 10**

Describe in detail all facts and the basis supporting your denial of the allegations in Paragraph 35 of the Complaint regarding Ms. Alongi's average arrival time to the office for the years 2015-2020. If you contend that Ms. Alongi regularly arrived at times other than those specified in Paragraph 35 of the Complaint, describe in detail all facts supporting those contentions

**OBJECTION AND ANSWER TO INTERROGATORY NO. 10**

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome. Subject to and without waiving any of her objections, Alongi states that the "average arrival times" for 2015 through 2019 set forth in Paragraph 35 of the Complaint are incorrect. Ms.

Alongi regularly arrived to work at the Funds office at around 9:15am during those years, after taking her insulin shot at home at around 8:30am.

## INTERROGATORY NO. 11

Describe in detail all facts and the basis supporting your denial that Ms. Alongi unilaterally and in an *ultra vires* fashion diverted plan assets for her own benefit and that of the Massachusetts Coalition of Taft-Hartley Funds during the period 2015 through 2020.

## OBJECTION AND ANSWER TO INTERROGATORY NO. 11

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome. Subject to and without waiving any of her objections, Ms. Alongi states that she did not "unilaterally and in an *ultra vires* fashion diverted plan assets for her own benefit and that of the Massachusetts Coalition of Taft-Hartley Funds during the period 2015 through 2020." Accordingly, all facts concerning Ms. Alongi's employment with the Funds from 2015 through 2020 support her denial of this broad and general allegation, because they prove a negative: that she did not "unilaterally and in an *ultra vires* fashion divert plan assets for her own benefit and that of the Massachusetts Coalition of Taft-Hartley Funds during the period 2015 through 2020." Further answering, see answer to Interrogatory No. 1.

## INTERROGATORY NO. 12

Describe in detail all facts and the basis supporting your denial of the allegation in Paragraph 46 of the Complaint that Ms. Alongi instructed the Fund employees under her supervision, including Rosemarie Alongi, Laura Jean Hickey, Taylor Ryan, Rosemary Ortega, Bettyann Trefry, Terri Berardi, Amy Boisvert, and Rebecca Zaccardi to provide services to the

-16-

Coalition and that she further instructed those employees to falsify their time sheets to disguise the true nature of the work they were performing.

## ANSWER TO INTERROGATORY NO. 12

Ms. Alongi states that she never instructed anyone to falsify their time sheet.  Further answering, Ms. Alongi states that Rosemarie Alongi, Taylor Ryan, Rosemary Ortega, Bettyann Trefry, Terri Berardi, Amy Boisvert, and Rebecca Zaccardi were not "under her supervision" to the extent that those employees did not directly report to Ms. Alongi and had other supervisors that they reported to.  Further, Ms. Alongi never instructed Taylor Ryan, Rosemary Ortega, Bettyann Trefry, Teri Berardi, or Amy Boisvert to provide services to the Coalition.  Ms. Hickey held the position Coalition Coordinator, and as Executive Director of the Coalition, Ms. Alongi asked Ms. Hickey to perform Coalition work on occasion, given that Ms. Hickey was the Coalition Coordinator.   Ms. Zaccardi prepared quarterly financial reports and annual tax forms for the Coalition on her own time using her own financial software, and Rosemarie Alongi occasionally made minor changes to the Coalition's website, as requested by Ms. Hickey, which did not take long when requested and were not made every day.

## INTERROGATORY NO. 13

Describe in detail all facts and the basis supporting your denial of the allegation in the Paragraphs 54 and 55 of the Complaint that Ms. Alongi, starting in 2013, unbeknownst to the Trustees of the Funds and without proper approval from the Trustees, began taking an additional two weeks of vacation over and above the allotment of four to which she was entitled and that, during the period January 1, 2015 through July 21, 2020, Ms. Alongi engaged in a practice of

cashing out this additional two weeks of vacation in the middle of the year, in effect, awarding herself, in a unilateral and ultra vires fashion, an extra two weeks of salary.

## ANSWER TO INTERROGATORY NO 13

Alongi states that in or around 2013, then-Senior Management Trustee of the Funds John J. Shaughnessy, Jr. and then-Business Manager Lou Rasetta informed Ms. Alongi that she was approved to take an additional two weeks of vacation time, for Ms. Alongi to use or cash out annually.  The Funds never thereafter rescinded this grant of vacation time.  Ms. Alongi never awarded herself an extra two weeks of salary "in a unilateral and ultra vires fashion."

## INTERROGATORY NO. 14

Describe in detail all facts and the basis supporting your denial of the allegation in Paragraph 64 of the Complaint that Ms. Alongi did not work past the Funds' closing time of 4:00 P.M. or on the weekends to make up for her routine late arrival to the Funds' Office.

## OBJECTION AND ANSWER TO INTERROGATORY NO. 14

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome.  Subject to and without waiving any of her objections, Ms. Alongi states that she not

D. App. 133

DocuSign Envelope ID: 8A52CC5C-9684-429C-A978-407D951FA925

only regularly performed work for the Funds during the Funds' normal business hours, but also regularly performed work for the Funds from home in the evenings and on weekends.

## INTERROGATORY NO. 15

Describe in detail all facts and the basis supporting your denial of the allegation of Paragraph 67 of the Complaint that Ms. Alongi received excess compensation in the amount of $282,152 during the period 2015 through 2019.

## ANSWER TO INTERROGATORY NO. 15

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome.  Subject to and without waiving any of her objections, Ms. Alongi states that she is not aware of any occasion where she received "excess compensation."  During her employment with the Funds, she received compensation from the Funds for the work that she performed for the Funds in connection with employment the Funds, which was promised to her by the Funds and owed to her.  Moreover, the Funds' allegation that Ms. Alongi received this "excess compensation" appears to be based on the false allegations that Ms. Alongi "worked substantially less than a 7 hour day" and "routinely failed to work anything like a full time schedule."  Ms. Alongi denies these allegations.  Ms. Alongi worked a full time schedule for the Funds, and not only regularly

performed work for the Funds during the Funds' normal business hours, but also regularly performed work for the Funds from home in the evenings and weekends.

**INTERROGATORY NO. 16**

Describe in detail all facts supporting your Third Defense raised in your Answer to the Complaint that "Plaintiffs' claims are barred, in whole or part, by the applicable statute of limitations."

**OBJECTION ANSWER TO INTERROGATORY NO. 16**

Ms. Alongi objects to this interrogatory to the extent that it overbroad and burdensome. Ms. Alongi further objects to this interrogatory to the extent it requires Ms Alongi to draw a legal conclusion, seeks privileged information, and/or impermissibly seeks to invade the mental impressions and trial strategy of Ms, Alongi or her counsel.  Subject to and without waiving any of her objections, Ms. Alongi states that she was employed by the Funds in the position of Administrator since 1996, and she began working for the Coalition in 2007. During her employment as Administrator, the Funds were well aware of the work Ms. Alongi performed for both the Funds and the Coalition.

**INTERROGATORY NO. 17**

Describe in detail all facts supporting your Sixth Defense raised in your Answer to the Complaint that "Plaintiffs' claims fail, in whole or in part, because the relevant actions of Alongi were not undertaken in a fiduciary capacity."

**OBJECTION AND ANSWER TO INTERROGATORY NO. 17**

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome.  Ms. Alongi further objects to this interrogatory to the extent that it requires Ms

-20-

DocuSign Envelope ID: 8A52CC5C-9684-429C-A978-407D051FA025

Alongi to draw a legal conclusion, seeks privileged information, and/or impermissibly seeks to invade the mental impressions and trial strategy of Ms, Alongi or her counsel.  Subject to and without waiving any of her objections, Ms. Alongi states that on many occasions during her long employment with the Funds, she performed ministerial tasks or acted under the direction or with the approval of the Trustees, such as when she used vacation time that had been approved for her to use.

## INTERROGATORY NO. 18

Describe in detail all facts supporting your Ninth Defense raised in your Answer to the Complaint that "Without admitting that Plaintiffs suffered any harm or damage, any damages that Plaintiffs have suffered were caused in whole or in part by their own conduct."

## OBJECTION AND ANSWER TO INTERROGATORY NO. 18

`        Ms. Alongi objects to this interrogatory to the extent that it is overbroad and burdensome. Ms. Alongi further objects to this interrogatory to the extent it requires Ms. Alongi to draw a legal conclusion, seeks privileged information, and/or impermissibly seeks to invade the mental impressions and trial strategy of Ms, Alongi or her counsel.  Subject to and without waiving any of her objections, Ms. Alongi states that the Funds were well aware of the work that Ms. Alongi performed for both the Funds and the Coalition during her employment with the Funds.  Moreover, in or around 2013, then-Senior Management Trustee of the Funds John J. Shaughnessy, Jr. and then-Business Manager Lou Rasetta informed Ms. Alongi that she was approved to take an

D. App. 136

additional two weeks of vacation time, for Ms. Alongi to use or cash out annually.  The Funds never thereafter rescinded this grant of vacation time.

## INTERROGATORY NO. 19

Identify each and every communication you have had with the Plaintiffs or any third party that you believe supports your contention that Ms. Alongi did not breach her fiduciary duty to the Plaintiffs, including for each such communication:

    a.      The date of the communication

    b.      The identity of the individuals who engaged in the communications;

    c.      The substance of the communication;

    d.      The method of communication (e.g., in-person communication, telephone conversation, e-mail, etc.);

    e.      The identity of any witness(es) to the communication.

## OBJECTION AND ANSWER TO INTERROGATORY NO. 19

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome.  Ms. Alongi further objects to this interrogatory to the extent that it requires Ms Alongi to draw a legal conclusion, seeks privileged information, and/or impermissibly seeks to

invade the mental impressions and trial strategy of Ms, Alongi or her counsel.  Subject to and without waiving any of her objections, Ms. Alongi states: see answer to Interrogatory No. .1.

**INTERROGATORY NO. 20**

Identify each and every document that you contend indicates or supports your contention that Ms. Alongi did not breach her fiduciary duty to the Plaintiffs.

**OBJECTION AND ANSWER TO INTERROGATORY NO. 20**

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome.  Ms. Alongi further objects to this interrogatory to the extent that it requires Ms Alongi to draw a legal conclusion, seeks privileged information, and/or impermissibly seeks to invade the mental impressions and trial strategy of Ms, Alongi or her counsel.  Subject to and without waiving any of her objections, Ms. Alongi states:  see answer to Interogatory No. 1 and the document productions made by all parties in this matter and the state court matter.

**INTERROGATORY NO. 21**

Identify each and every person from whom you or representative have taken formal or informal statements (including but not limited to oral statements, notes, affidavits, or declarations) concerning this case, the allegations included in the Complaint, or the denials and Defenses

-23-

asserted in your Answer, including the name, address and telephone number of each such person and the date(s) on which the statements were taken.

## OBJECTION AND ANSWER TO INTERROGATORY NO. 21

Ms. Alongi objects to this interrogatory on the grounds that it vague and ambiguous, overbroad, and burdensome.  Subject to and without waiving any of her objections, Ms. Alongi states as follows:

- Jennifer Dow – affidavit produced in state court matter at GMA 00418-419

- Jennifer Vachon – affidavit produced in state court matter at GMA 00420-00421

- Rosemary Ortega – handwritten statement produced in state court matter at GMA 0422-00425

- Taylor Ryan – handwritten statement produced in state court matter at GMA 00426-00429

- John J. Shaughnessy, Jr, - affidavit produced in state court matter at GMA 00430-00432

- Louis G. Rasetta – affidavit produced in state court matter at GMA 00433-00436.

## INTERROGATORY NO. 22

Identify each and every communication wherein Ms. Alongi instructed any employee under her supervision to perform work on behalf of the Massachusetts Coalition of Taft-Hartley

Funds using the Funds' email system or address, office telephones, or cellular phones during the period 2015 through 2020.

## OBJECTION TO INTERROGATORY NO. 22

Ms. Alongi objects to this interrogatory on the grounds that it is overbroad and burdensome.

## INTERROGATORY NO. 23

In the event that you objected to the production of any document, data, or communication in your response to the Plaintiffs' Requests for Production of Documents on the ground that the document, data, or communication is not within your possession, custody or control, identify such document or thing individually and:

    a.     identify the author or maker of the document, data, or communication;

    b.     identify the recipient of the document, data, or communication;

    c.     identify the sender of the document, data, or communication;

    d.     state the date of the document, data, or communication; and

    f.     state the present location of the document or thing, or the date on which the document, data or communication was destroyed, lost or otherwise disposed of.

## ANSWER TO INTERROGATORY NO. 23

Not applicable.

Signed under the pains and penalties of perjury, this 29th day of April, 2022.

DocuSigned by:

*Gina Alongi*

7EE19BF7E4654B9...

_____

Gina Alongi

As to objections:

GINA ALONGI,
By her attorneys,

/s/ Jacob A. Tosti
Timothy P. Van Dyck (BBO # 548347)
Douglas T. Radigan (BBO # 657938)
Jacob A. Tosti (BBO # 704007)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard
Framingham, MA 01702
Telephone: 617.757.6537
Facsimile: 508.929.3137
tvandyck@bowditch.com
dradigan@bowditch.com
jtosti@bowditch.com

Date: April 29, 2022

CERTIFICATE OF SERVICE

I hereby certify that I served a copy of this document on counsel for all other parties via electronic mail on April 29, 2022

/s/ Jacob A. Tosti

_____

# TAB 14

---------- Forwarded message ---------
From: **Greg Geiman** <greggeiman4@gmail.com>
Date: Thu, May 24, 2018 at 5:20 PM
Subject: Fwd: Note to file
To: Greg Geiman <greggeiman4@gmail.com>


Re the May 1 meeting. Gina told me via phone the morning of the meeting that she was going to sit down with Billy about her concerns and "don't try to talk me out of it."

---------- Forwarded message ---------
From: Greg Geiman <greggeiman4@gmail.com>
Date: Mon, May 14, 2018 at 9:48 PM
Subject: Note to file
To: <greggeiman4@gmail.com>


After the April 12, 2018 H&W Trustees meeting, Gina reported to me that Billy had called her on the phone and told her that she looked so good at the Trustees meeting that he had difficulty focusing on the meeting.  Gina said that she quickly changed the subject and was unresponsive to Billy's comments.  This was the first allegation of unwanted sexual comments/advances made by Billy to Gina.

Gina had reported earlier sporadic comments to me that Billy had made to her regarding his sex life and women in the office that he found attractive, but never indicated that such talk from Billy was unwanted or made her uncomfortable.  She reported only that she had advised Billy to "keep it [his sex life] out of the office."

On May 1, 2018, Gina asked Billy to come to her office to discuss a list of grievances; specifically, items on which she had not been included or treated fairly in her estimation.  Gina reports that Billy reacted angrily.  Upon mention of John Gaffny being at a meeting with a newly-organized company instead of her, and that she ran a billion-dollar benefit fund and should have been included, she reports that Billy stood up, moved aggressively toward her and yelled, "Fuck you!  You don't run anything.  I run these funds."  I did hear this outburst from my office.  She claims that his fists were up in a fighting position, and that she yelled back at him, "Fuck you!  Get out of my fucking office!"  She claims she poked him once in the chest to move him back out of her space.  When I reached her office, Rosemarie was already there, attempting to hold Billy back.  Gina poked him in the chest once more when I reached the office.  Although he appeared menacing, and said something along the lines of "Come on!  What are you going to do?" Billy did not appear to touch Gina.  Becky, Alan, Don, and Amy Boisvert were also present in the office during this outburst.

Once things cooled off, Gina and Billy returned to her office with the door closed and continued speaking.  Before this, I briefly spoke with Billy and tried to calm him down.  When Gina returned, I spoke with them both and pleaded with them to work together.  When they emerged some time later, I was standing in the lagoon with Mike Bowes, and Billy and Gina appeared agreeable and to have calmed down.  Later that day, Gina told me that Billy had gotten her in a

1

**D. App. 145**

corner of her office, hugged her, and attempted to kiss her on the lips.  She claims that she turned her head and was kissed on the cheek, instead.  She also told me that Billy said he was "excited" and "aroused" during the fight.

During the week of May 7, 2018, especially during car rides to and from the Harvard Medical School conference we attended together, Gina discussed with me her belief that she had been sexually harassed by Billy.  I confirmed for her that the incidents she had described did rise to the level of sexual harassment, as I understood it.  I also confirmed that, based on her description, Billy had assaulted her during the May 1 incident. On May 12, Gina texted me that she wanted to speak with Jack Shaughnessy and make him aware of the May 1 incident and the ongoing sexual harassment.  On May 14, Gina reiterated that desire, but also mentioned that she'd like to speak with Attorney Jeff Endick to see if he had any recommendations.  During the 4:00 phone call, Jeff told Gina that there was definite sexual harassment and hostile workplace issues and recommended that she advise the Trustees and have an investigator hired to file a report to the Trustees on the incidents.

After the call, Gina and I spoke by phone.  She expressed great hesitance about going to the Trustees with these claims, concerned that she and I could be fired.  She suggested that she could speak to just Jack, but realized that this would eventually mean going to the full Board.  She suggested that could speak to Kate, but had concerns that Kate would go to Billy and Billy would be angry that Gina had gone behind his back.  Kate had also shown an unwillingness in the past to seriously pursue similar allegations.  We eventually decided that I would contact Kate on May 15, in accordance with the Employee Handbook, to report Gina's allegations to her and to give Kate the opportunity to determine a resolution.

Later on May 14, around 9:00, Gina and I spoke again by phone,  She was now having second thoughts about moving forward in any respect.  She decided that Billy's actions and language were not sexual harassment, but rather, just part of her years-long treatment by the Agents as "one of the guys."  She wanted to make sure that others in the office (specifically Taylor and Danielle, about whom Billy had expressed sexual interest in the past to Gina) had not been victimized in any way; barring any such developments, Gina did not believe any further allegation of sexual harassment was warranted  She also noted that nobody else in the Funds Office had come forward with any allegation against Billy.  She was also concerned that she had not kept contemporaneous notes of past incidents with Billy, as Jeff had asked.  She pledged that she would do so going forward, and that if similar incidents occurred in the future that she might decide that the overall behavior rose to the level of sexual harassment.  She maintains that she wants to move out of the office, however,

I had set up a call with Kate on May 15, but Gina has asked that I not pursue the call at this time.

Greg Geiman 5/14/18 9:45 pm

D. App. 146

CONFIDENTIAL                                                                                                                              FUNDS084901

# TAB 15



May 17, 2017

Dear Gina,

I am writing because I feel as though the Funds Office has reached a crossroads. As you know, Lou will be departing shortly and Billy's emergence as Business Manager will create uncertainty and opportunities for disruption or insubordination by members of your office staff that may have alternative agendas. Now is the time to shore up your staff and to ensure that the lines of authority and communication are clear to those within and without the office. I believe that it is important for such a transition to be finalized while Lou is still in office because Billy's loyalties and priorities remain unclear.

It is important to me that you, as Administrator, are treated with the respect and deference that you have earned. I hope that my commitment to the Funds and my loyalty to you are beyond question. You have provided me with a dynamic career and a strong foundation for my family. I have proudly served as your assistant for over six years. In that time you have provided me with the opportunity and trust to learn and become involved in all aspects of the Funds. I have helped with the oversight and implementation of Health and Welfare plans, tackled difficult Pension Plan issues, reviewed contracts, worked on the benefits software RFP, served as Privacy Officer, and helped with longstanding projects such as withdrawal liability and the owner/operator matter.

It has been, and remains, the honor of my professional life to learn from you and to serve you and the Funds in this capacity. However, given the uncertainties from the upcoming Union transition and my own progress as your assistant, I am hopeful that you may agree that now is the right time to transition the office for the next few years. I hope to continue my work as collections counsel for as long as you and the Trustees will allow me, but I am ready and willing to take on any additional tasks that you may provide me as your assistant.

Laura-Jean is an important asset to this office and serves an important role for you. I understand and respect that. However, I do not believe that she is able to serve you in the same substantive manner as I do, and she has provided ample cause over the years for her loyalties and her intentions to be questioned. After six years of observing our abilities and our production, and in light of the recent concerns about Laura-Jean's association with Billy and the resulting lack of deference and communication with you, I respectfully ask that you "promote" me as your sole assistant and reassign Laura-Jean.

GMA_FED00074
D. App. 148

As your assistant, I would largely continue serving you in
the capacities in which I currently serve, although I would hope
to take a more active role in overseeing the matters of Pension
and Annuity Plan compliance that Alice has handled, once she
retires.   I can assure you that you would never need to worry
about my loyalties or my intentions, and the lines of communication
and authority would be cleared up.   I would ensure, as always,
that everything goes through you and that your authority is
paramount.   I would never overstep my bounds or impede on the
strong working relationship that I hope you and Billy will create.
I would exist to serve you, to learn from you, and to make your
life at the office less stressful.   Period.

Laura-Jean has the skill set and the work ethic to become
a strong office manager for you.   It is a role she already largely
serves.   She could continue organizing your files, helping to
transfer funds, dealing with H.R. issues, and anything else that
would help the office - or you - to function smoothly.   Of
course, she would also continue her work for you at the Coalition.
In effect, nothing very dramatic would change in the office.   But
such a transition would serve a number of vital purposes.   First,
as stated, it would clear up lines of authority and communication.
Second, it would resolve concerns regarding Laura-Jean's
association with Billy.   Third, it would solve the longstanding
problem of managing expectations as to what matters I should be
involved in versus what matters Laura-Jean should be involved in.
Finally, it would put me in a position to continue learning and
to better serve you in the years to come without constant fear
of "stepping on toes" or reprisals from Laura-Jean.

I have additional thoughts about how staff could be reassigned
to best help you, and pieces of Laura-Jean's current role that
could be retained in order to ease the transition, but I will save
those thoughts for a future conversation.

I hope you understand my concerns and know that I am
approaching you with only the best of intentions and after a
tremendous amount of thought.   I know that reassigning Laura-Jean
would be difficult for you, but I truly believe that it is the
best thing for this office and for you (and me), and that now
is the right time to do it.   I fear that the window will soon
be closed and the current situation will go unchanged.

Thank you, Gina.

Yours respectfully,

Greg Geiman

GMA_FED00075

# TAB
# 16

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Rosemary Ann Ortega*

*July 08, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Case 1:21-cv-10163-FDS   Document 64   Filed 12/13/22   Page 155 of 271

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Rosemary Ann Ortega
July 08, 2022

Page 3

1      COMMONWEALTH OF MASSACHUSETTS

2  Norfolk, ss.     Superior Court

3      Civil Action No. 2182CV00125

4  *************************************************

5  GINAMARIE ALONGI AND ROSEMARIE ALONGI,    *

6   Plaintiffs                 *

7  vs.                    *

8  IUOE LOCAL 4 HEALTH & WELFARE FUND; IUOE LOCAL 4 *

9  PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS   *

10  FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4  *

11  APPRENTICESHIP & TRAINING FUND; JOINT LABOR-   *

12  MANAGEMENT COOPERATION TRUST; AND WILLIAM D.   *

13  MCLAUGHLIN, INDIVIDUALLY AND IN HIS CAPACITY  *

14  AS CHAIRMAN OF THE BOARDS OF TRUSTEES,    *

15   Defendants                 *

16  *************************************************

17    DEPOSITION OF:  ROSEMARY ANN ORTEGA

18       BOWDITCH & DEWEY, LLP

19      200 Crossing Boulevard

20      Framingham, Massachusetts

21      July 8, 2022  9:15 a.m.

22

23      Kristen M. Edwards

24      Court Reporter

Page 3

1  APPEARANCES (Continued):

2

3  Representing the Defendants:

4    O'DONOGHUE & O'DONOGHUE LLP

5    5301 Wisconsin Avenue, NW, Suite 800

6    Washington, DC 20015

7    BY:  DANIEL KEENAN, ESQ.

8    (202) 362-0041

9    E-mail: cgilligan@odonoghuelaw.com

10

11  In Attendance:  Rosemarie Alongi

12     Gina Marie Alongi

13     Greg Geiman

14

15

16

17

18

19

20

21

22

23

24

Page 2

1  APPEARANCES:

2

3  Representing the Plaintiffs:

4    BOWDITCH & DEWEY, LLP

5    200 Crossing Boulevard, Suite 300

6    Framingham, MA 01702

7    BY:  TIMOTHY P. VAN DYCK, ESQ.

8     JACOB A. TOSTI, ESQ.

9    (617) 757-6537  fax (508) 929-3137

10    E-mail: tvandyck@bowditch.com

11

12  Representing the Defendants:

13    FREEMAN, MATHIS & GARY LLP

14    60 State Street, Suite 600

15    Boston, MA 02109-1800

16    BY:  JENNIFER L. MARKOWSKI, ESQ.

17     CHRISTOPHER REDD, ESQ.

18    (617) 963-5975

19    E-mail: jmarkowski@fmglaw.com

20

21

22

23

24

Page 4

1      I N D E X

2

3  WITNESS:          ROSEMARY ANN ORTEGA

4

5  EXAMINATION BY:        PAGE:

6  Ms. Markowski         5

7  Mr. Keenan        111

8  Mr. Tosti        168

9  EXHIBITS:         PAGE:

10  Exhibits 129 and 130, subpoenas....................39

11  Exhibit 131, e-mail..............126

12  Exhibit 132, e-mail..............130

13  Exhibit 133, e-mail..............131

14  Exhibit 134, e-mail..............133

15  Exhibit 135, e-mail..............137

16  Exhibit 136, e-mail..............140

17  Exhibit 137, e-mail..............143

18  Exhibit 138, e-mail..............145

19  Exhibit 139, e-mail..............147

20  Exhibit 140, e-mail..............148

21  Exhibit 141, e-mail..............150

22  Exhibit 142, e-mail..............152

23  Exhibit 143, e-mail..............154

24  (Exhibits retained by Attorney Markowski)

Ginamarie Alongi, et al. vs                                    Rosemary Ann Ortega
Iuoe Local 4 Health & Welfare Fund, et al.                            July 08, 2022

Page 25

1 either/or.

2   Q.   So there are two entrances at the Funds
3 office, correct?

4   A.   Yes.

5   Q.   You have the front door and the back
6 door?

7   A.   Yes.

8   Q.   And sometimes Gina Alongi came in the
9 front door, sometimes she came in the back door; is
10 that your testimony?

11   A.   Yes.

12   Q.   Did you ever see her using one or the
13 other entrance more often?

14   A.   Yes.

15   Q.   Which entrance?

16   A.   The back door.

17   Q.   And how often would you say that was --

18   A.   Often.

19   Q.   How often would you actually see her
20 arriving at the office?  I understand you didn't see
21 her everyday come into the office.  But would you
22 typically see her coming into the office?

23   A.   I typically would see her.

24   Q.   And when you would see her coming into

Page 26

1 the office, what would you do; would you get up to help
2 her?

3   A.   If I saw that she was struggling with all
4 of her briefcases, yes, I would help her.

5   Q.   With all of her briefcases.  So how many
6 briefcases did Gina Alongi carry with her typically?

7   A.   Well, it depended on what she was taking
8 home to work on or what she took home to work on.
9 Usually she would just have her briefcase and purse,
10 but there were times when she would have a couple of
11 briefcases full of papers, because I would help her
12 carry them in.

13   Q.   So usually she just had a briefcase and a
14 purse; is that right?

15   A.   Yes.

16   Q.   And on those days when she just had a
17 briefcase and a purse, you would not assist her,
18 correct?

19   A.   No.

20   Q.   Sometimes you say she would come in with
21 more than just a briefcase and a purse.

22   A.   Yes.

23   Q.   How often, to your memory, did that
24 occur?

Page 27

1   A.   I couldn't say.  I don't know.  I mean, I
2 wasn't watching her so...

3   Q.   Would you agree with me that it wasn't a
4 frequent occurrence?

5   A.   It was more frequent when it was trustee
6 meeting time, because she had meeting material that she
7 would review.

8   Q.   Would you agree with me trustee meetings
9 occurred quarterly?

10   A.   Yes.

11   Q.   These were the times when you saw Ms.
12 Alongi with potentially more than her briefcase and her
13 purse?

14   A.   Yes.

15   Q.   And to the best of your memory, those are
16 the only times you would see her coming in with more
17 than a briefcase and a purse?

18   A.   Yes.

19   Q.   Did you ever see anybody else help Ms.
20 Alongi carry anything into the office?

21   A.   Anybody that saw her or anybody else that
22 was coming into the office that needed help, if
23 somebody was there, they would just hold the door open
24 for them.

Page 28

1   Q.   And that's true of anybody coming into
2 the office if somebody needed help?

3   A.   Yes.

4   Q.   And if you were walking by the door and
5 somebody was coming in, you might open the door for
6 them?

7   A.   Absolutely.

8   Q.   That wasn't specific to Gina Alongi?

9   A.   Correct.

10   Q.   But your desk, you would agree, or your
11 cubical was not close enough to the door that you would
12 hop up and open the door for anyone coming in; is that
13 right?

14   A.   No.  I mean, unless they needed help I
15 would help them.  But if they didn't need help, no.
16 And if I was looking, yes.

17   Q.   But other than the instances where it
18 appeared that someone needed help because they were
19 carrying things, you wouldn't hop up to open the door
20 for someone?

21   A.   Yes, correct.

22   Q.   And the trustee meetings you testified
23 about, those meetings lasted a day, correct, they
24 occurred in one day?

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Rosemary Ann Ortega
July 08, 2022

Page 45

1 or six years ago?

2    A.    Yes.

3    Q.    How about the time that you played at
4 Gina's house on the Cape?

5    A.    I was there with my friend from Arizona
6 and Gina was at the Cape with her sister Rose, and we
7 decided to have pizza and play poker.

8    Q.    When did that happen?

9    A.    Three years ago, four years ago.

10   Q.    So while the Alongies were still working
11 at the Funds?

12   A.    Yes.

13   Q.    And you said that they also had a
14 retirement lunch with you?

15   A.    Yes.

16   Q.    And did you retire in December of 2021?

17   A.    Yes.

18   Q.    And was it just the three of you for that
19 lunch?

20   A.    Yes.

21   Q.    Where was that?

22   A.    At Gina's house.

23   Q.    Did you discuss this case at all when you
24 were there?

Page 46

1    A.    No.

2    Q.    And to the best of your memory, those are
3 the only times that you socialized with Gina and Rose
4 Alongi outside of the office?

5    A.    Yes.

6    Q.    And how about phone calls with Gina and
7 Rose about this lawsuit? I know you talked about the
8 call you had with Gina concerning the deposition. Have
9 you spoken with them on the phone about this lawsuit?

10   A.    No.

11   Q.    Did I hear you say after you looked up
12 the complaint that you spoke with Gina?

13   A.    Yes.

14   Q.    Right. And you apologized. You felt
15 badly that she had been let go from the Funds?

16   A.    Yes.

17   Q.    Did you talk about any of the
18 allegations, specific allegations in the complaint?

19   A.    I mean, we just, you know -- no. Well...

20   Q.    I mean, you knew that she had identified
21 you, correct?

22   A.    Yes. I was surprised at some of the
23 things that I read about what was in the lawsuit, and
24 she just didn't want to talk about it.

Page 47

1    Q.    What were you surprised about?

2    A.    I was surprised that at some of the
3 things that Bill had said or what was said in the
4 lawsuit about Bill and what he said.

5    Q.    Right. You understand that what's in the
6 lawsuit, those are allegations, right?

7    A.    Yes.

8    Q.    There were -- and so they are not facts.
9 They are allegations.

10   A.    Yes, yes.

11   Q.    So there were certain things in there you
12 had never heard before?

13   A.    Yes, that's correct.

14   Q.    And certain things that you had not ever
15 witnessed or seen; is that fair to say?

16   A.    Correct.

17   Q.    Do you recall any of the specific
18 allegations in the complaint that came as a surprise to
19 you?

20   A.    Yes, the part where Bill made a reference
21 to Jen having cancer, breast cancer.

22   Q.    That was not an allegation that you had
23 ever previously heard?

24   A.    No.

Page 48

1    Q.    Was there anything else that was new or
2 surprising to you that you recall?

3    A.    No, no.

4    Q.    You say that Gina had said to you she
5 didn't want to talk about the lawsuit?

6    A.    Correct.

7    Q.    So I just want to switch topics a little
8 bit. Do you recall there being an incident between
9 Gina Alongi and William McLaughlin on or about May 1st
10 of 2018?

11   A.    Yes. The incident in her office?

12   Q.    Correct.

13   A.    Yes.

14   Q.    Where were you when that incident
15 occurred; were you in the kitchen?

16   A.    I was in the kitchen.

17   Q.    Can you describe how far away the kitchen
18 is from Gina Alongi's office?

19   A.    I'm not very good at feet. So from, you
20 know, one side of the building to the middle of the
21 other side of the building, so I don't know.

22   Q.    In between the kitchen and Gina Alongi's
23 office, is there some other offices in there as well?

24   A.    Yes.

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Rosemary Ann Ortega
July 08, 2022

Page 49

1   Q.   There's also that area --
2   A.   My cubicle, the back door.
3   Q.   You were eating lunch in the office in
4   the kitchen?
5   A.   Yes.
6   Q.   And did you hear anything with regard to
7   that interaction?
8   A.   I heard noise coming from, I guess, you
9   know, above.  And one of the girls that we worked with
10  came running in and said that her supervisor had told
11  her to go into the kitchen so that she would not -- so
12  she wouldn't hear what was going on, and she told us
13  that Gina and Bill were having an argument in Gina's
14  office.
15  Q.   Who was that that came into the kitchen?
16  A.   Amy.
17  Q.   Amy Boisvert?
18  A.   Yes.
19  Q.   And you said that her supervisor had told
20  her to go into the kitchen?
21  A.   Yes.
22  Q.   Who was that, who was the supervisor?
23  A.   Rebecca Sacaddi (phonetic).
24  Q.   Did you talk any more with her about what

Page 50

1   was going on in Gina Alongi's office?
2   A.   No.  She just said there was yelling, a
3   lot of yelling going on.
4   Q.   And you said you could hear something but
5   you couldn't go in there?
6   A.   Yes, you couldn't make out what was being
7   said.  You just could hear noise.
8   Q.   Sounded like voices?
9   A.   Yes.
10  Q.   And a couple of voices?
11  A.   Voices.
12  Q.   So fair to say you did not see the
13  interaction between Gina Alongi and Mr. McLaughlin on
14  May 1st, 2018?
15  A.   No, I saw it.
16  Q.   Tell me what you saw.
17  A.   So my lunchtime was over and I went back
18  to my cubicle, which had a clear view of Gina's office.
19  Gina's office was all glass.  My office, my cubicle is
20  glass.  The door was shut.  And although I couldn't
21  hear what was going on, I could see and I could see
22  Gina sitting at her chair at one point with her head
23  down and Bill standing over her making gestures with
24  his arms almost like King Kong, and then Gina getting

Page 51

1   up and going to the other side of her office where he
2   would follow her.  Again, her head was down and he
3   was -- his arms were like, you know, just he was
4   talking with his hands.
5   Q.   Talking with his hands, okay.
6   A.   Yes.
7   Q.   And you couldn't hear what the two of
8   them were saying?
9   A.   I could not, no.  I mean, I could hear
10  him yelling or I could hear the tone of his voice was
11  loud.  I don't know what they were saying.
12  Q.   You said you observed Gina to be sitting
13  with her head down?
14  A.   Yes.
15  Q.   And was she saying anything; could you
16  see her talking?
17  A.   I think that she was, yes, I think she
18  was trying to talk and she just had her head down, and
19  he was standing over her.
20  Q.   When you say "she was trying," what do
21  you mean she was trying to talk?
22  A.   I think they both were speaking to one
23  another but she was speaking from a position where she
24  was sitting down in the chair and, I mean, her lips

Page 52

1   appeared to be moving.  I don't know what she was
2   saying.
3   Q.   Fair to say you don't know what either
4   one of them were saying?
5   A.   No.
6   Q.   And it appeared to be they were both
7   saying something.
8   A.   Yes.
9   Q.   At one point you say she was sitting in
10  her chair?
11  A.   Yes.
12  Q.   And at another point, she was up and in
13  the middle of her office?
14  A.   She went to the far end of the office
15  almost to get away from him, and he followed her.
16  Q.   Fair to say you don't know why Gina went
17  from one place in her office to another place?
18  A.   No, that's fair to say.
19  Q.   All you could see is she got up and
20  moved, correct?
21  A.   Yes.
22  Q.   Who else was in the office at that point
23  in time?
24  A.   I don't recall who was there.  I believe

# TAB 17

---------- Forwarded message ---------
From: **Greg Geiman** <greggeiman4@gmail.com>
Date: Thu, May 24, 2018 at 10:01 PM
Subject: Note to file
To: Greg Geiman <greggeiman4@gmail.com>


On May 1, Gina requested that I draft notes for her meeting with Billy based upon her conversation with me on the phone that morning (the 5 points she wanted to make - respect, money, move, contract, confidentiality).  On the phone that morning, she started the conversation with "I have a plan. Don't try to change my mind."

On or about May 16, Gina requested that I draft an outline for her meeting woth Kate. She outlined what she wanted to address - Kate should have handled harassment issues after prior incident, she owns some of the problem, she needs to fix it and identify if there is liability that should be presented to Trustees. She also asked me to speak with Rosemary re: sexual harassment allegations. She also asked me to follow up with Danielle who was concerned after Gina's discussion with her the prior day.

On Friday, May 18, I ran into Billy in the hallway near the Union conference room. It was the first time I'd spoken with him since the May 1 incident.  He admitted an anger issue. Noted the Gina incident and a prior incident in conference room with iron worker. Stated desire to resolve issues with Gina and get back to normal.  Noted that he hadn't spoken to her since May 1 but claimed he was very busy. Also admitted that he was initial aggressor in May 1 meeting. I told Gina about my conversation and suggested she might want to speak with Billy and try to resolve. Reminded her again that once she speaks to Kate that dominoes will fall.  She didn't want to hear it.

Greg GEIMAN 5/24/18

**D. App. 157**

CONFIDENTIAL

FUNDS084904

# TAB
# 18

---------- Forwarded message ---------
From: **Greg Geiman** <greggeiman4@gmail.com>
Date: Thu, May 24, 2018 at 4:19 PM
Subject: My personal hell
To: Greg Geiman <greggeiman4@gmail.com>


Last Monday May 14 Gina decided she wanted a legal opinion on whether her treatment by Billy from April 12 to present, including the May 1 fight, constituted sexual harassment and/or hostile workplace behavior. She arranged a call with Jeff Endick of Slevin & Hart, who had represented the Pension Plan during the Suspension of Benefits VCP, and asked me to join. Gina told Jeff the story (the May 1 fight and general sexual harassment information) and asked for his opinion. He told her that this was a classic case of sexual harassment and predatory behavior by Billy and that Gina was obliged to go to the Trustees because of potential liability. He said that she would need to establish a Joint Board and that a third-party investigator would have to make a determination for the Trustees as to what had happened. Gina explained to Jeff that she did not want to use Fund counsel (Kate) on this assignment because she did not trust her judgment or impartiality after the way she handled the Lou-LJ incident of 2014.

Gina got cold feet on going to the Trustees and reporting sexual harassment. Instead, later on May 14, she decided I should call Kate and disclose these incidents to Kate. She then changed her mind and decided she wanted to sit down with Kate herself, which she did on May 21.

I was not present at the May 21 meeting. However, on her way back from the breakfast meeting, Gina called me and told me that Kate wanted to talk to me. She told me that Kate took Billy's side and did not believe that anything Billy had done, as Gina told it, was actionable and/or raised liability issues for the Trustees.

I was informed that Kate had arrived in the lobby, but when I went to meet her I was informed by the receptionist that Billy had already come out and grabbed Kate. Gina was in her office when I came back in from the lobby. She looked crushed and was convinced she would be fired that day. We began a meeting with Nancy Smith regarding benefit break issues. When we finished, Kate came over to Gina's office and asked if she could speak with me. Kate and I went into my office.

Kate told me that Billy was very angry about the accusations that Gina had made against him. She recounted her breakfast conversation with Gina and reiterated for me her belief that Billy's behavior was not actionable. She told me that she had spoken with Billy and was confident that similar language or actions would not occur again within the Funds office; that, if he came into our office at all, he would likely be much more formal. Kate told me that Gina wanted to move to a new office, which Kate said would not happen. Kate said she told Gina that if a claim was filed that her behavior would also be scrutinized; Kate disclosed to me that Gina had a romantic relationship in the past with her superior (Lou).

Kate told me her concern was that if Gina's accusations were not "tamped down," given that they were not actionable, Billy would seek to have her fired for insubordination. (It's not clear if the alleged insubordinate behavior was from May

CONFIDENTIAL

**D. App. 159**

FUNDS084902

1 or May 21). Kate told me that Gina did not have the support she thought she had. Gina told me that the H&W employer Trustees might be in her corner, but that she did not have the Pension Trustees. And, she added, Billy only needed one employer trustee to vote with him in order to win. I told Kate that I did not want to see Gina's career at Local 4 end like this. I asked her how we could fix this. In my mind, Kate had given her opinion that there was no liability as a result of Gina's concerns. If there was no liability, then there was no reason to go to the Trustees. Given Billy's anger and the implicit threats of Gina getting fired, my goal became to save Gina's job.

Kate suggested that I go talk to Gina while she spoke to Billy. I convinced Gina that it was in her best interest to speak to Billy and try to resolve this, that she shouldn't end her career like this. She hesitantly agreed but first asked that I ask Billy and Kate to give her a contract. She still felt like she would be fired. Kate seemed receptive, Billy less so. When Gina came over with me to Billy's office, Billy apologized for his behavior on May 1. Gina accepted the apology. Billy said to Gina that she knew that he would never sexually harass anyone. Gina said, "I know, Billy."  She was very dejected and quiet. There was more general discussion about working together as a team. The meeting ended.

I spoke to Kate by telephone on May 22. She expressed relief that the matter had been resolved. I told her Gina was still upset. She told me she was concerned that Gina dropped her sexual harassment concerns because she was worried about being fired, which Kate admitted was in contravention of the law. I told Kate that Gina was not one to be quiet; if she still had concerns that they would surely be raised. I told Gina about this conversation on the morning of May 23.

Gina called me in the late afternoon on May 23 to report a conversation with Kate via telephone. She told me that Kate had admitted that the information presented by Gina to her on May 21 was likely actionable. Gina expressed that she might not be willing to continue working at Local 4 under the current circumstances. She told Kate that she would think over the long weekend about how to proceed.

On the morning of May 24, Gina called me and told me that she was back "in the driver's seat" and that she intended to push Kate and Billy for a move out of this building as well as a contract that would provide her with job security until age 62. She asked me to tell Kate, if we spoke, that she had recently been in touch with Boston Globe writers about a separate story. She told me to otherwise not discuss the matter any further with Kate but to rather refer Kate to Gina.

On May 24, around 3:00, I was returning from the men's room in the lobby and ran into Billy. After some pleasantries and discussion about negotiations he turned the talk to Gina. He asked how she was doing. I said she was down on the Cape but still upset. He said she needs time. He reiterated that what happened on May 1 was him "asserting his authority" and that she was not used to having answer to someone. He said that Lou gave her carte blanche. He said that he liked Gina and thought she did good work and would like to move forward but knew that Gina wasn't ready.

He reiterated that he had not sexually harassed anyone, and stated that Gina had agreed as such during the May 21 meeting. He said that he was playful and flirtatious and that was different than sexual harassment. He said he had never touched anyone in the office or asked them out. He compared himself to Lou, who had apparently dated a number of women in the Funds office. He said that if asked, none of the women in this office would claim his behavior to be anything more than funny or flirtatious. He said that he could have had Gina fired - he knew he had Brian McDonald and Michael Foley on his side- but that he did not want to go there.

Greg GEIMAN 5/24/18

D. App. 160

CONFIDENTIAL

FUNDS084903

# TAB 19

**AFFIDAVIT OF JENNIFER DOW**

I, Jennifer Dow, on oath, depose and state as follows:

1. I am a former employee of the IUOE Local 4 Benefit Funds (the "Funds").

2. I began working for the Funds in 1997 as receptionist and was consistently promoted. In or around 2016, I was promoted to Health & Welfare Department Manager, a managerial position. On December 17, 2020, during my day off, Greg Geiman demoted me to Eligibility Coordinator.

3. My regular hours of employment since the office relocated from Lexington to Medway in 2005 were from 7 am to 3 pm. On or about April 1st, 2021, Mr. Geiman promised me that I could maintain my altered work hours when I stopped working remotely.

4. On or about June 2nd, 2021, I met with Mr. Geiman, Laura-Jean Hickey and Rebecca Zaccardi to discuss my work schedule. At that meeting, I reiterated my request for an accommodation to continue working my pre-pandemic schedule to accommodate my health. Mr. Geiman asked me many questions about my medical condition, treatment, and prognosis that made me feel so uncomfortable I started to cry. He ultimately denied my request.

5. I resigned my position with the Funds on or about June 2nd, 2021.

6. During my time working for the Funds, I typically arrived at the office around 7 am. On most mornings, I observed Gina Alongi arrive at the office around 9:15 am. Jennifer Vachon, Rosemary Ortega, and I would each routinely open the door for her on a because she often arrived carrying briefcases, boxes, or other work materials.

7. During his tenure, IUOE Local 4 Business Manager, William McLaughlin, made many statements in the workplace which offended me or made me feel uncomfortable.

8. For example, several years ago, I was in the office kitchen with Jennifer Vachon when Mr. McLaughlin told her to "fuck off" and stuck his middle finger in her face because she brought up the incent when he called us "peons" in font of Louis Rasetta.

9. In addition, just before the Funds' 2019 Christmas party, Mr. McLaughlin came to my office doorway and told me that "Gina [Alongi] is a selfish fucking bitch."

10. I also frequently observed Mr. McLaughlin make statements and engage in conduct which I felt was inappropriate and/or sexual in nature.

11. For example, I have taken an annual trip to Aruba the first week in May since approximately 2006. On multiple occasions around that time of year, Mr. McLaughlin asked me whether I wore a one-piece bathing suit or a two-piece bathing suit. When this happened, I told

Mr. McLaughlin that it was none of his business and walked away. I felt uncomfortable each time Mr. McLaughlin made these statements to me.

12. Mr. McLaughlin also told me that when he worked with my husband on a job around 2004, he saw my husband, a member of the Carpenters Union, "checking out" women on the job site. I was very offended by Mr. McLaughlin's comments.

13. On many occasions, Mr. McLaughlin would talk to me about other people's sexual activity in graphic detail. I felt uncomfortable each time this happened and would say "I don't want to know" and walk away if I could.

14. On more than one occasion, I observed Mr. McLaughlin rubbing Jennifer Vachon's shoulders. Each time, Ms. Vachon responded by telling Mr. McLaughlin to get away or physically pushing him away from her.

15. I frequently overheard Mr. McLaughlin refer to Ms. Hickey as "fire crotch" because she has red hair.

16. All statements contained in this affidavit are made of my own personal knowledge.

Sworn to under the pains and penalties of perjury this _23_ day of June, 2021.

Jennifer Dow

# TAB
# 20

# AFFIDAVIT OF JENNIFER VACHON

I, Jennifer Vachon, on oath, depose and state as follows:

1. I was an employee at IUOE Local 4 Benefit Funds (the "Funds") for 23 years until my termination on April 1, 2021.

2. The last position I held at the Funds was Eligibility Analyst, reporting directly to Laura Jean Hickey.

3. During my time at the Funds, I had frequent interactions with William "Billy" McLaughlin ("Billy") Business Manager of the Local 4 Union (the "Union").

4. The Funds and the Union have separate offices within the same building. Typically, most Funds employees did not go to the Union side and vice versa.

5. However, I frequently observed Billy in the Funds office multiple times a week, often before 8 am. On numerous occasions, I observed Billy watch the female Funds employees as they arrived at the office in a way that seemed inappropriate to me. I also observed Billy being flirtatious with the young women in the office.

6. I also personally experienced inappropriate conduct from Billy on a routine basis.

7. For example, Billy would regularly touch my arm or attempt to give me neck and back massages without my consent in a way that made me feel uncomfortable.

8. In addition, Billy would come over to my desk and ask for hand cream or hand sanitizer. When I gave it to him, he would put some on his hand and ask me to rub it into his hands for him in an attempt to get me to touch him. While I did not want to comply with these requests, I only did because felt that I had to because Billy was the boss. I felt very uncomfortable having to do this.

9. Billy also made what I considered to be sexually-charged statements to me such as asking whether I wear a one-piece or two-piece bathing suit, whether I found certain women in the office attractive, and telling me that I "smell good."

10. I did not feel that I could say no to Billy because he was the boss.

11. Sometime in 2017, I recall that Billy had called me and another woman "peons." I brought this issue up to Billy a few days later and Billy told me to "fuck off." Lou Rasetta was in the area and had heard Billy say this to me; he later apologized to me for Billy's behavior.

12. In or around May 2018, I witnessed Billy get into a fight with Gina in her office. I could not hear what they were saying, but I saw Billy standing over Gina, red in the face. No one asked me what I saw or witnessed after that incident.

13. I typically arrived at the office around 7 a.m.   My office was located near the center of the main office space (and near Gina's office).   I witnessed Gina arrive at the office approximately 9:15 on a regular basis. I would frequently open the Funds door for Gina when she arrived because she had her arms full.

14. Due to the pandemic, I along with other Funds' employees, worked remotely from about mid-March 2020 thru until my last day of employment, April 1st, 2021.  To the best of my recollection, the Funds requested that I, along with other employees, begin filling out timesheets in or around April or May of 2020.

15. The Funds did not provide any instructions on how to fill out the timesheets. I filled out my timesheets to the best of my ability in a timely and accurate manner.

16. On March 31, 2021 Greg Geiman and Laura Jean Hickey informed me that I falsified my 15 minute interval timesheet and that I would have until the following morning to submit emails regarding the timesheets that were under review, or that I would get written up. On the morning of April 1st, I submitted several emails, but they were apparently found to be unacceptable.  I was then given a written warning and within a few hours after that, I was fired.

17. I had never been written up or otherwise penalized at work prior to my termination.

18. All statements contained in this affidavit are made of my own personal knowledge.

Sworn to under the pains and penalties of perjury this ___ day of April, 2021.


Jennifer Vachon
Jennifer Vachon

4830-0187-9013.3

# TAB 21

To Whom It May Concern,

My first interactions with Billy were very positive. He came over to the front desk, introduced himself to me, and made me feel very welcome. Whenever he was in the front area, he would stop by, ask me how things were going, and chat for a few minutes. I saw it as a display of good leadership that the "big boss" took it upon himself to make sure that all of his employees, even the receptionist, were doing well and happy in their position.

It didn't take too long for me to realize that I had probably given him too much credit. I didn't like the way he talked about women, nor did I appreciate the way he tried to veil his objectification of women with flattery. He would talk about women being hot, about women being his weakness, and made it sound like he couldn't help himself, like he was blameless because we are just so "great."

I was indignant when Rosemary once told Billy that she needed him, and Billy made a suggestive sound and said something about liking hearing that. He then called to me and whispered loudly that she was too old for him. I was angry on Rosemary's behalf and uncomfortable with the fact that he had felt the need to say that to me. But what could I do? He was the boss, and it didn't seem like enough to warrant a complaint. That was the problem: all of the remarks that portrayed an utter lack of respect for women were subtle and insidious, never being "bad" or blatant enough to report without coming across as overly sensitive or dramatic or attention-seeking.

There were several instances when Billy made comments about my appearance in the same subtle, careful way, and they gradually

D. App. 00426

became more blatant. I remember a specific instance where he noted that I had my hair down. I cannot remember his exact words, but he made it very clear that he liked what he saw. I felt he was starting to cross the line, and even told him so as kindly as I could.

I remember an instance where Billy, Danielle, and I were talking, and Billy asked if we thought that age difference matters when it comes to love. Though I have no proof of this, I got a strong sense that he was trying to feel out the situation, to see if he had options. He mentioned that his friend who was married had been seeing someone else and the girl got attached, and he asked our thoughts about it. I tried to make it very clear that I had no interest by telling him that his friend was an idiot and that he deserved whatever trouble he got for cheating on his wife. I wanted to be sure he knew that it would never happen, though I also knew that if I were to say anything outright, he would deny that he ever had such intentions.

Apparently, he didn't get the hint, because some time later, Billy asked me if I was a Pats fan (the superbowl was coming up). I admitted that I was actually a Seahawks fan, and when he asked why, I explained that I had been involved with one of their linebackers, and that we are still friends and I still support him. Billy responded that he was jealous of my ex. I didn't know how to respond, so I pretty much gave him the smile and nod. He then added that it wasn't "just because he is a professional football player" that made him jealous.

D. App. 369A 00427

A few days later, Billy came up and told me that he had looked my ex up, and mentioned again that he was jealous of him, and mentioned again that it wasn't just because he was a professional football player.

I do not know what the "right" way to handle these situations would have been. Perhaps I should have not been kind, but I truly believe that there is good in everyone, and the truth is that I felt sorry for Billy (and still do, somewhat). I pity him because he does not know the meaning of love. He cannot possibly know when he talks about women the way he does, when he tells me a story of being with his wife at the doctor's office and thinks the doctor is gorgeous and wonders aloud "why he couldn't have met a woman like that – beautiful, smart, successful." I have always tried to be careful to remain friendly without giving him the impression that I would be interested in anything other than a professional relationship. My fear was always that he would mistake my kindness for interest, but I was never afraid of him personally, until I heard the fight.

I was covering the front desk for Debi while she was at lunch (as a side note: I noticed that once I changed roles, and Debi was up front, Billy never even looked at the front desk area). Suddenly, I heard Billy roaring at Gina, yelling things like "I am your boss, you need to realize that," with so much rage in his voice that I dialed 911 on my cell phone and left my thumb hovering over the "send" button and stood, trembling, watching to be sure he didn't start acting violently. After seeing that side of Billy, and

knowing that he carried that much rage inside of him, I found myself wondering, if he ever were to make a move on me and I rejected him, would he become violent? I was very afraid, and resolved to create more distance between us. I explained to him that I didn't feel comfortable greeting him with a fist bump anymore after hearing the shouting match. He tried to explain it away, that it was just a disagreement between two passionate people, and that he had sensed a tension in the office afterward, but felt that people should just move on from it, that he shouldn't have to explain himself. While I didn't mention to him that, actually, he absolutely should have to address the issue, especially when his actions generated fear in at least one of us, I did insist on maintaining a boundary of not fist bumping anymore, which he eventually consented to stop doing, although he did not seem to understand my reasons. He made it sound like it was just something we would stop for a while so that others didn't see us acting chummy while there was all this tension.

I was glad to have achieved this distance from Billy, but the work environment has not felt the same. It's a scary thing to speak out against the boss, especially when I didn't know if I would be supported or shushed. I didn't know what to do, or how to handle the situation, but I had wished for something to be done. I want it to be made clear to Billy that his behavior is not okay, and that he needs to seek help from a professional to learn how to work through his issues.

D. App. CMA 00429

# **TAB**

# **22**

①           Rosemary Ortega
5/2018

any conversation with
Bill McLoughlin leads
to a sexual tone.
TV Shows or movie's
focuss on women.
He has always talking
about Mad Men and how
he wessed it was that
time era. He was
always talley about
the Red-haired secretary
with the big bust.

We both watched Game of
Thrones and would
discuss the show. He
always wanted to talk
about sex scenes.
I would point out
the other amazing
scenes when he went
in that direction.

D. App. GMA 00422

2

Bell McLaughlin refers
to himself as the
Boss and things will
be done his way or
no way. He used to
come into the funds'
office every morning and
talk to some of the
women. Since taking
over as chairman
his complaint has against
his assistant who was
constantly questioned him
as she worked for previous
Chairman.

If he come in and
you did not give
him your attention, he
would make comments
(to me) that the more
I ignored him, the more
he wanted me.

D. App. GMA 00423

3

When any of the young girls walked by he would look them over and make a comment (not to them) but to me, what he could do to them. I told him he was fresh and sick and to be very careful.

He once referred to the Funds staff as a Lower Level to the Union Staff. When the story was repeated to his boss at the time Bill gave the girl the middle finger.

Bill once shared a very confidential incident between his boss and

4

   my boss.


Gina and Bill had
words in Gina's office.
The office door was shut.
We could hear voices screaming
Through The vent in
The kitchen.
When lunch was over
I returned to my office
where I could see in
Gina's office. I saw
Gina and Bill standing
up, pacing back and
forth. It looked like
whatever Gina was standing
Bell was very close and
Gina's head was down.
It did not look Right

# TAB

# 23



INTERNATIONAL UNION OF OPERATING ENGINEERS
**LOCAL 4**
**Health and Welfare, Pension, and Annuity Funds**

July 23, 2020

By Hand

Gina M. Alongi
4 Orchard Hill Drive
Westborough, MA 01581

Dear Gina:

This letter is intended to follow our telephone call regarding the termination of your employment at the International Union of Operating Engineers Local 4 Fringe Benefit Funds ("Funds"). As we said on the phone, the Boards of Trustees of the Health & Welfare, Pension, and Annuity & Savings Funds voted to terminate your employment as Administrator. As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision.

You have held a position of high trust and confidence, and all business of the Funds to which you have been privy remains confidential to the Funds. We would like to express the Trustees' appreciation for the work you have done over the course of your career at the Funds and trust that our separation will be courteous and respectful.

You will receive your accrued vacation pay by direct deposit on or about July 29, 2020, and you will remain eligible on the Basic Health Plan through February of 2021. You continue to be a participant in the Funds with access to your individual Annuity & Savings account at MassMutual.

Upon receipt of this letter, you are expected to return all Funds' laptops, tablets, or other computers that are in your possession. The service to your cell phones will be disconnected on Friday, July 24, 2020 and should thereafter be returned. Please return your vehicle and any other equipment or property of the Funds before Friday, July 31, 2020.

Thank you.

Sincerely,

William D. McLaughlin

James Reger

cc:     Trustees

      Gregory A. Geiman, Esq.

16 Trotter Drive
P.O. Box 680
Medway, MA 02053-0680

TEL (508) 533-1400
FAX (508) 533-1425
1-888-486-3524

www.local4funds.org

**D. App. 178**

# TAB
# 24



INTERNATIONAL UNION OF OPERATING ENGINEERS
**LOCAL 4**
**Health and Welfare, Pension, and Annuity Funds**

August 5, 2020

By Hand

Rosemarie Alongi
23 Kay Street
Westborough, MA 01581

Dear Rosemarie:

We do not have your current contact information except for your address, so we will not have a chance to talk before you receive this letter.

Your employment at the Funds Office as Security Officer and Director of the I.T. Department will be terminated effective today. As you were an employee at will, it is not necessary to detail reasons for the decision. If you would like to contact me about this, please give me a call on the office number, 508-533-1400, extension 140.

You will received your remaining accrued vacation pay by direct deposit on or about August 11, 2020. You will remain eligible on the Basic Health Plan through February of 2021. You continue to be a participant in the Funds with access to your individual Annuity & Savings account at MassMutual.

If you continue to hold any remaining property of the Funds such as paper or electronic files, or your IPhone, please return them to the Funds Office in Medway before Friday, August 7, 2020. Also, please provide us with the credentials for access to the Funds' website, which were deleted from the Funds' laptop that was returned two weeks ago.

Thank you.

Sincerely,

Gregory A. Geiman, Esq.
Fund Administrator

16 Trotter Drive
P.O. Box 680
Medway, MA 02053-0680

TEL (508) 533-1400
FAX (508) 533-1425
1-888-486-3524

www.local4funds.org
D. App. 0002

# TAB
# 25

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

*James M. Heinzman*

*July 29, 2022*

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

James M. Heinzman
July 29, 2022

Page 3

```
1       COMMONWEALTH OF MASSACHUSETTS
2  NORFOLK, SS      SUPERIOR COURT
3         CIVIL ACTION NO. 2182-CV-00125
4  _____X
5  GINAMARIE ALONGI AND
6  ROSEMARIE ALONGI,
7           Plaintiffs,
8       vs.
9  IUOE LOCAL 4 HEALTH & WELFARE FUND;
10 IUOE LOCAL 4 PENSION FUND; IUOE
11 LOCAL 4 ANNUITY & SAVINGS FUND; HOISTING
12 AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP
13 & TRAINING FUND; JOINT LABOR-MANAGEMENT
14 CORPORATION TRUST; AND WILLIAM D.
15 MCLAUGHLIN, INDIVIDUALLY AND IN HIS
16 CAPACITY AS CHAIRMAN OF THE BOARDS
17 OF TRUSTEES,
18           Defendants.
19 _____X
20      REMOTE DEPOSITION OF JAMES M. HEINZMAN
21         450 Wireless Boulevard
22         Hauppauge, New York
23 Friday, July 29, 2022         9:17 a.m.
24
```

Page 3

```
1  APPEARANCES:
2
3  Representing the Defendants:
4     O'Donoghue & O'Donoghue, LLP
5     CHARLES W. GILLIGAN, ESQ.
6     DANIEL KEENAN, ESQ.
7     5301 Wisconsin Avenue, NW
8     Suite 800
9     Washington, DC  20015
10    202-362-0041
11    cgilligan@odonoghuelaw.com
12    dkeenan@odonoghuelaw.com
13
14 Also Present:  Ginamarie Alongi
15         Greg Geiman
16
17
18
19
20
21
22
23
24
```

Page 2

```
1  APPEARANCES:
2
3  Representing the Plaintiffs:
4     Bowditch & Dewey, LLP
5     TIMOTHY P. VAN DYCK, ESQ.
6     JACOB TOSTI, ESQ.
7     200 Crossing Boulevard
8     Suite 300
9     Framingham, Massachusetts  01702
10    617-757-6536
11    tvandyck@bowditch.com
12    jtosti@bowditch.com
13
14 Representing the Defendants:
15    Freeman Mathis & Gary, LLP
16    CHRISTOPHER REDD, ESQ.
17    60 State Street, Suite 600
18    Boston, Massachusetts  02109
19    617-963-5975
20    christopher.redd@fmglaw.com
21
22
23
24
```

Page 4

```
1           I N D E X
2  WITNESS:    DIRECT  CROSS  REDIRECT  RECROSS
3  James M. Heinzman
4  (by Mr. Tosti)  6
5         _____
6         (NO EXHIBITS)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Case 1:21-cv-10163-FDS   Document 64   Filed 12/13/22   Page 187 of 271
Ginamarie Alongi, et al. vs                                    James M. Heinzman
Iuoe Local 4 Health & Welfare Fund, et al.                          July 29, 2022

Page 5

1        P R O C E E D I N G S
2        THE STENOGRAPHER:  This is Valerie
3   Johnston.  I am a Registered Professional Reporter,
4   and I am a Notary Public in the Commonwealth of
5   Massachusetts.
6        This deposition is being taken remotely.
7   This witness is appearing remotely from 450 Wireless
8   Boulevard, Hauppauge, New York.
9        The attorneys participating in this
10  proceeding acknowledge their understanding that I am
11  not physically present in the proceeding room, nor
12  am I physically present with the witness, and that I
13  will be reporting this proceeding remotely.
14        They further acknowledge that, in lieu of
15  an oath administered in person, the witness will
16  verbally declare his testimony in this matter under
17  the pains and penalties of perjury.  The parties and
18  their counsel consent to the arrangement and waive
19  any objections to this manner of proceeding.
20        Please indicate your agreement by stating
21  your name and your agreement on the record, after
22  which I will swear in the witness and we may begin.
23        MR. GILLIGAN:  This is Charles Gilligan.
24  We consent to this arrangement.

Page 6

1        MR. TOSTI:  Jacob Tosti, Bowditch & Dewey.
2   I agree to the arrangement.
3        MR. REDD:  Christopher Redd, Freeman Mathis
4   & Gary.  I agree.
5        MR. KEENAN:  Daniel Keenan, O'Donoghue &
6   O'Donoghe.  I agree.
7        _____
8        JAMES M. HEINZMAN,
9   having been satisfactorily identified, and duly
10  sworn by the Notary Public, was examined and
11  testified as follows:
12
13        MR. TOSTI:  Before we get started, Chuck,
14  are you okay with the stipulations that we've been
15  using for all the other depositions --
16        MR. GILLIGAN:  Yes.  Yes.  Absolutely.
17        MR. TOSTI:  Yeah.  So all objections,
18  except as to form, will be reserved until the time
19  of trial.  The witness will have 30 days to read and
20  sign the transcript, and we'll waive any
21  notarization requirement.
22        DIRECT EXAMINATION
23  BY MR. TOSTI:
24  **Q.  Good morning, Mr. Heinzman.**

Page 7

1        A.  Good morning.
2   **Q.  My name is Jacob Tosti.  I'm an attorney**
3   **with the law firm of Bowditch & Dewey.  I represent**
4   **Ginamarie Alongi in pending Superior Court**
5   **litigation and Rosemarie Alongi in that same**
6   **litigation and, also, Ginamarie Alongi in pending**
7   **Federal Court litigation in the District of**
8   **Massachusetts, and this -- this deposition relates**
9   **to that litigation.**
10       **Mr. Heinzman, have you ever been deposed**
11  **before?**
12       A.  I have.
13  **Q.  Okay.  So I'm going to skip the ground**
14  **rules and I'm just going go -- go right ahead.**
15  **Okay.**
16       **Mr. Heinzman, can you tell me what your job**
17  **title is.**
18       A.  I'm a partner at Schultheis & Panettieri.
19  **Q.  And how long have you held that position?**
20       A.  Since 2003.
21  **Q.  And can you tell me generally what the**
22  **firm, Schultheis & Panettieri, does for business.**
23       A.  Schultheis & Panettieri is an accounting
24  firm that specializes in audits of employee benefit

Page 8

1   funds and labor unions.
2   **Q.  And, Mr. Heinzman, do you have any**
3   **education credentials beyond an undergraduate**
4   **degree?**
5        A.  I have a certification as a certified
6   public accountant and as a certified fraud examiner.
7   **Q.  Uh-huh.  And your certified public**
8   **accountant certification, where did you obtain that**
9   **from?**
10       A.  New York State.
11  **Q.  Uh-huh.  And -- and when?**
12       A.  On or about 1995 or '96, probably.
13  **Q.  Uh-huh.  And the forensic certification, is**
14  **that from New York State as well?**
15       A.  I'm not positive it's New York State
16  related.  It may be broader.
17  **Q.  And -- and do you recall when you obtained**
18  **that?**
19       A.  Approximately, four years ago, five years
20  ago, maybe.  Probably, four.
21  **Q.  I'm going to attempt to share my screen**
22  **here.  Can everyone see the screen that I'm**
23  **sharing?**
24       A.  Yes.

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

James M. Heinzman
July 29, 2022

Page 9

1    Q. Mr. Heinzman, you in particular, can you --
2  can you see that clearly?
3    A. I can.
4    Q. Very good.
5       So what -- for the record, what I've pulled
6  up on my screen is a document that's been premarked
7  in this matter as Exhibit 164.  Mr. Heinzman, I can
8  scroll through this document if you'd like me to.
9  But could you tell me whether you recognize what
10 this document is.
11   A. I do.
12   Q. Uh-huh.  And could you describe for me what
13 it is.
14   A. This is our report to the Local 4 Benefit
15 Funds regarding allocations for Ms. Alongi.
16   Q. Uh-huh.  And I'm going to scroll all the
17 way to not the very last page of the exhibit but the
18 very last page of the report, which is Page 6 and
19 Bates labeled 31.  And, Mr. Heinzman, do you see the
20 date, April 1st, 2021, on this page?
21   A. I do.
22   Q. Uh-huh.  And is -- that's the date that
23 this report was completed?
24   A. I believe so.

Page 10

1    Q. Uh-huh.  Can you tell me when Schultheis &
2  Panettieri was engaged -- well, was Schultheis &
3  Panettieri engaged by the Board of Trustees to -- of
4  the Local 4 Funds to complete this report?
5    A. Yes.
6    Q. Uh-huh.  And can you tell me when that
7  engagement occurred.
8    A. I do not know the exact date.
9    Q. Uh-huh.
10   A. On or about December 2020 if I...
11   Q. And at the time, is -- is there an
12 engagement letter regarding that engagement?
13   A. Yes.
14   Q. Okay.  Is Schultheis & Panettieri currently
15 engaged to perform any work for any entity
16 associated with the IUOE Local 4?
17   A. Yes.
18   Q. And can you describe for me the nature of
19 that work that your -- Schultheis & Panettieri is
20 currently engaged for.
21   A. We are currently the financial statement
22 auditors.
23   Q. Uh-huh.  And just at a very high level,
24 could you explain what -- what type of work is

Page 11

1  involved in -- in that engagement.
2    A. Once a year, as auditors, we would come
3  into the Fund office and audit the financial
4  statements for each Fund, issue financial
5  statements, 5500s and 990s, and file those
6  accordingly with applicable agencies.
7    Q. Uh-huh.  And -- and this engagement to
8  become the Local 4's financial statement auditors,
9  when did that engagement commence?
10   A. I do not know exactly.  At some point last
11 year.
12   Q. So at some point in 2021?
13   A. I believe so.
14   Q. Prior to the engagement to -- to provide
15 the report regarding Gina Alongi, did Schultheis &
16 Panettieri perform any work for any entity connected
17 with the IUOE Local 4?
18   A. We did.
19   Q. And can you describe for me all -- all such
20 work.
21   A. We have been the financial statement
22 auditors for the Local 4 union for many years.
23   Q. Uh-huh.  And do you know when Schultheis &
24 Panettieri first became the financial statement

Page 12

1  auditors for the Local 4 union?
2    A. I honestly do not.  Many, many years.
3    Q. Other than that engagement, have -- have
4  there been any other engagements to perform any
5  other kind of work prior to the engagement to
6  produce the report on Gina Alongi?
7    A. Not to my knowledge.
8    Q. Have you personally been involved in -- in
9  performing work regarding financial statement audits
10 for the IUOE Local 4 union?
11   A. No.
12   Q. Okay.  And have you been personally
13 involved in -- in performing work in connection with
14 the financial statement audits for the IUOE Local 4
15 Funds?
16   A. I have not.
17   Q. You referenced an engagement letter
18 regarding the engagement to produce the report about
19 Gina Alongi.  Do you know whether this engagement
20 letter contains terms regarding compensation?
21   A. I believe it does.
22   Q. Okay.  And do you recall what those terms
23 are?
24   A. Hourly.

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

James M. Heinzman
July 29, 2022

---

Page 13

1    Q. Okay.  So hourly rates are -- are provided
2 in the engagement letter?
3    A. I believe so.
4    Q. Okay.  And hourly rates for whom?
5    A. Anybody who would work on the engagement.
6    Q. And the individuals who would work on the
7 engagement -- well, let's strike that.
8       Are there any individuals identified in the
9 engagement letter who would work on the engagement?
10    A. I'm not -- I'm not sure.  I believe -- I
11 don't know which  -- usually, they reference two
12 partners in the engagement letter.  I don't recall
13 exactly who was on it, if it was myself and Vincent
14 Panettieri or myself and Gary Waldren, but that does
15 not indicate that those are the only individuals who
16 would perform services.  That is just the
17 individuals responsible.
18    Q. I appreciate the clarification.
19       Do you recall what your hourly -- well,
20 let's back up.
21       Did you personally perform work in
22 connection with the report concerning Gina Alongi?
23    A. I did.
24    Q. Uh-huh.  And you were compensated hourly

---

Page 14

1 for that work, is that right?
2    A. I was.
3    Q. Uh-huh.  And do you recall what your hourly
4 rate was?
5    A. Approximately, $270 an hour.
6    Q. And other than yourself, who else at
7 Schultheis & Panettieri performed work in connection
8 with the report concerning Gina Alongi?
9    A. Significant work was performed by myself
10 and my partners, Gary Waldren and Vincent
11 Panettieri.  There may be have been other staff
12 members who performed ancillary services, and
13 certainly, there was clerical work.
14    Q. Uh-huh.  The staff who performed ancillary
15 services, are -- are you aware of any names of any
16 individuals who may have performed those services?
17    A. I do not recall at this time.
18    Q. And I'm sorry.  I don't know -- I don't
19 think I heard you.  Could you repeat Vincent's last
20 name.
21    A. Panettieri.
22    Q. Panettieri.  Okay.  What's Gary Waldren's
23 position at Schultheis & Panettieri?
24    A. Gary is a partner.

---

Page 15

1    Q. And what is Vincent Panettieri's position
2 at Schultheis & Panettieri?
3    A. He is a partner.  He is our managing --
4 co-managing partner.
5    Q. And are you aware of the hourly -- well,
6 are you aware of the hourly rate that Gary Waldren
7 billed in connection with the report concerning Gina
8 Alongi?
9    A. I am.
10    Q. And what would that be?
11    A. Consistent with mine.
12    Q. Approximately, 270 per hour?
13    A. Yes.
14    Q. Okay.  And what about the hourly rate of
15 Mr. Panettieri?
16    A. Similar to mine.
17    Q. Okay.  So, approximately, 270 an hour?
18    A. Correct.
19    Q. And do you know the total dollar amount
20 billed by Schultheis & Panettieri in connection with
21 the preparation of the report concerning Gina
22 Alongi?
23    A. I do not know the total number.
24    Q. Do you have -- can you ballpark the figure

---

Page 16

1 at all?
2    A. I know if -- I'd rather not.  I can get
3 that information if it's necessary.
4    Q. I would appreciate it if you could.
5    A. Sure.
6    Q. Uh-huh.  Do you know how many hours you
7 spent performing work in connection with the report
8 concerning Gina Alongi?
9    A. I do not know that number off the top of my
10 head.
11    Q. And would you be able to provide an
12 estimate sitting here today?
13    A. Not without reviewing the files.
14    Q. Okay.  What about the number of hours that
15 Mr. Waldren spent?
16    A. I cannot estimate that --
17    Q. Uh-huh.
18    A. -- here right now.
19    Q. What bout Mr. Panettieri?
20    A. I cannot estimate that here and now.
21    Q. Uh-huh.  Are you aware of how much money
22 the Funds have paid Schultheis & Panettieri in
23 connection with performing financial statement
24 audits?

---

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

James M. Heinzman
July 29, 2022

Page 17

1     A. I'm sorry.  Can you repeat that question.
2     Q. Yes.  Are you aware of the amount of money
3  paid by the Local 4 Funds to Schultheis & Panettieri
4  in connection with preparation of financial
5  statement audits?
6     A. I know we do the financial statement
7  audits.  I do not know the retainers off the top of
8  my head.
9     Q. Uh-huh.  And would you be able to tell me
10  the amount of money paid by the IUOE Local 4 union
11  to Schultheis & Panettieri in connection with the
12  preparation of financial statement audits?
13     A. Not off the top of my head I cannot.
14     Q. Mr. Heinzman, I've scrolled down to Page 1
15  of the document that's been marked as Exhibit 164,
16  and I note that the report appears to be addressed
17  to the Board of Trustees of the IUOE Local 4 Benefit
18  Funds.  Do you see that?
19     A. I do.
20     Q. Did you speak with any members of the board
21  of trustees of the IUOE Local 4 Benefit Funds in
22  the -- while you were in the process of preparing
23  this report?
24     A. In connection with the engagement or while

Page 18

1  preparing the report; can you be specific?
2     Q. Yeah.  Well, let's start with in connection
3  with the engagement.
4     A. Yes.
5     Q. Okay.  And with whom did you speak?
6     A. I spoke with the whole Board of Trustees.
7     Q. Uh-huh.  And on one occasion or more than
8  one occasion?
9     A. More than once occasion.
10     Q. Okay.  Do you recall how many occasions?
11     A. I do not.  At least two.
12     Q. And did you speak with them in person or by
13  some other means?
14     A. By some other means.
15     Q. And what were those other means?
16     A. Zoom.
17     Q. And did you speak with them on Zoom during
18  a Board of Trustees meeting?
19     A. Yes.  Whether it was a special meeting or a
20  regular meeting I'm not positive, but there was a
21  definite Board of Trustee meeting that we
22  participate in.
23     Q. Understood.  And the -- the first time when
24  you spoke to the Board of Trustees via Zoom

Page 19

1  regarding this engagement, do you remember when that
2  was?
3     A. I do not remember specifically when I
4  initially spoke with them.
5     Q. Do you know whether it was before or after
6  the completion of the report marked as 164?
7     A. We would have reviewed the report with them
8  prior to finalizing it no matter what.
9     Q. Do you recall whether any part of the
10  report had been drafted as of the first time you
11  spoke with the Board of Trustees over Zoom?
12     A. I do not know what status the report was in
13  the first time I spoke with them.
14     Q. Do you recall whether you had performed any
15  kind of investigation into the -- well, strike that.
16        Do you know whether you've performed -- you
17  performed any work concerning the engagement as of
18  the first time you spoke with the Board of Trustees?
19     A. I'm sorry.  Can you just repeat that for
20  me, please.
21     Q. Well, yes, but let me ask another question.
22  I think it might clear things up.
23        Can you describe for me the nature of the
24  work that you personally performed in connection

Page 20

1  with this engagement?
2     A. I helped oversee this engagement, I
3  personally interviewed the individuals involved, and
4  I personally put the report together.
5     Q. Okay.  And so, when you say you personally
6  put the report together, did you draft this
7  report?
8     A. I did.
9     Q. Uh-huh.  Did anyone else, other than you,
10  draft this report or assist with the drafting of
11  this report?
12     A. Yes.
13     Q. Okay.  And who would that be?
14     A. Gary Waldren and Vincent Panettieri.
15     Q. Okay.  Anyone else?
16     A. Not to my knowledge.
17     Q. And you mentioned that you personally
18  interviewed individuals included in this report.  Do
19  you recall who you interviewed?
20     A. I do.
21     Q. And can you identify those individuals for
22  me.
23     A. Laura-Jean Hickey, Rosemarie Ortega, and
24  Rebecca Zaccardi.

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

James M. Heinzman
July 29, 2022

Page 113

1    A. Yes.

2    Q. Okay. Does this data apply to both

3  entrances, do you know?

4    A. I don't know that it does. I'm not sure.

5  I asked for it all. I believe if -- if -- whenever

6  entrance she came in would be logged here. I'm

7  not -- I'm not positive, but if we saw

8  inconsistencies in this data -- if you flip forward

9  a couple of pages, right there, can you stay

10  there.

11    Q. For the record, we're on G4. Yeah.

12    A. There was no phone activity or email

13  activity prior to those entrance times; so, while it

14  is possible there's another door and, maybe, on

15  occasion we came in that door, the bulk of the work

16  clearly from this chart happened after those

17  entrance times.

18    Q. Right. And, of course, it would be

19  possible for her to perform work for the Funds or

20  the coalition without calling someone or sending an

21  email, right?

22    A. Of course.

23    Q. Yeah. Mr. Heinzman, I pulled up the

24  Schultheis report again, and now I'm on the last

Page 114

1  page of the report itself which is Page 6, and I'd

2  like to draw your attention to the top paragraph on

3  that page, and I note that says in part, "...it

4  appears there was an entire office being used by the

5  Coalition...." Do you know how you obtained that

6  information?

7    A. Through discussions with the Fund office.

8    Q. Do you know who -- discussions with whom?

9    A. I don't recall exactly who.

10    Q. Do you recall at what -- well, did you --

11  did you determine how large this office was that was

12  allegedly -- allegedly used entirely for the

13  coalition?

14    A. I did, and I think it's shown on Exhibit

15  G8.

16    Q. Uh-huh. Let's go there.

17    A. I think -- you know, my understanding is

18  there was an office that had coalition materials in

19  it, and if I recall correctly, I put some square

20  footage in here.

21      Let me just see. Can you blow that up for

22  me a little bit, please.

23    Q. Yeah. Absolutely.

24      MR. TOSTI: So, yeah, for the record, we're

Page 115

1  on Exhibit G8 of the report.

2    A. Total rent attributed, rent paid. Scroll

3  down for a second, please. There you go. You have

4  you have dimensions right there. Spare office 12 by

5  11. See it on the bottom?

6    Q. Sorry. Now -- but I --

7    A. Right in the middle of the page under

8  Rebecca Zaccardi. Hold still. Hold still. Look at

9  the employee names.

10    Q. Uh-huh.

11    A. And you go down under Rebecca Zaccardi, and

12  you have spare office for storage 12 by 11 feet, 132

13  square feet, 100 percent attributable to the

14  coalition.

15    Q. Got it. Got it.

16      Okay. And do you -- again, can you recall

17  who provided the information to you that the

18  dimensions of the spare office were 11 by 12 feet?

19    A. I honestly don't remember specifically who

20  told me.

21    Q. And I note that in this chart, which is --

22  just for the record the title is, "Rent Analysis

23  Based on Square Feet" -- there is dimensions that

24  appear to be square -- measurement dimensions listed

Page 116

1  next to the name of each employee. Do you see that,

2  Mr. Heinzman?

3    A. I do.

4    Q. So what are those -- do those dimensions

5  represent the size of the -- each employee's

6  individual office?

7    A. That's the intent, yes.

8    Q. Okay. So -- so can you explain for me,

9  this -- is this chart assuming that 25 percent of

10  Gina's office is applicable to the coalition?

11    A. Right. Exactly. So, remember, we -- if we

12  assume that 25 percent of payroll taxes and benefits

13  were attributable to the coalition, it would hold

14  true that 25 percent of the rent should be

15  attributable to the coalition, which is common in an

16  expense study.

17    Q. Okay. You're assuming that; so, 25 percent

18  of the -- the rent of Gina's office is attributable

19  to the coalition?

20    A. Correct.

21    Q. Okay. And that's the same for all the

22  other employees listed here for --

23    A. Correct. Those are the same percentages

24  consistently applied.

# TAB
# 26

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

*Jennifer A. Vachon*

*July 28, 2022*

*68 Commercial Wharf* • *Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Case 1:21-cv-10163-FDS   Document 64   Filed 12/13/22   Page 194 of 271

Ginamarie Alongi, et al. vs                                    Jennifer A. Vachon
Iuoe Local 4 Health & Welfare Fund, et al.                     July 28, 2022

Page 3

1        COMMONWEALTH OF MASSACHUSETTS

2   NORFOLK, SS        SUPERIOR COURT

3        CIVIL ACTION NO. 2182-CV-00125

4   _____X

5   GINAMARIE ALONGI AND

6   ROSEMARIE ALONGI,

7        Plaintiffs,

8        vs.

9   IUOE LOCAL 4 HEALTH & WELFARE FUND;

10  IUOE LOCAL 4 PENSION FUND; IUOE

11  LOCAL 4 ANNUITY & SAVINGS FUND; HOISTING

12  AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP

13  & TRAINING FUND; JOINT LABOR-MANAGEMENT

14  CORPORATION TRUST; AND WILLIAM D.

15  MCLAUGHLIN, INDIVIDUALLY AND IN HIS

16  CAPACITY AS CHAIRMAN OF THE BOARDS

17  OF TRUSTEES,

18        Defendants.

19  _____X

20        DEPOSITION OF JENNIFER A. VACHON

21        Thursday, July 28, 2022

22        1:07 p.m.

23

24

Page 2

1        DEPOSITION OF JENNIFER A. VACHON, a witness

2   called on behalf of the Defendants, taken pursuant to

3   the applicable provisions of the Massachusetts Rules

4   of Civil Procedure, before Valerie R. Johnston,

5   Registered Professional Reporter and Notary Public in

6   and for the Commonwealth of Massachusetts, at the

7   Offices of Freeman, Mathis & Gary, LLP, at 60 State

8   Street, Suite 600, Boston, Massachusetts, on

9   Thursday, July 28, 2022, commencing at 1:07 p.m.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 3

1   APPEARANCES:

2

3   Representing the Plaintiffs:

4        Bowditch & Dewey, LLP

5        TIMOTHY P. VAN DYCK, ESQ.

6        JACOB TOSTI, ESQ.

7        200 Crossing Boulevard

8        Suite 300

9        Framingham, Massachusetts  01702

10       617-757-6536

11       tvandyck@bowditch.com

12       jtosti@bowditch.com

13

14  Representing the Defendants:

15       Freeman Mathis & Gary, LLP

16       JENNIFER L. MARKOWSKI, ESQ.

17       60 State Street, Suite 600

18       Boston, Massachusetts  02109

19       617-963-5975

20       jmarkowski@fmglaw.com

21

22

23

24

Page 4

1   APPEARANCES (CONTINUED):

2

3   Representing the Defendants:

4        O'Donoghue & O'Donoghue, LLP

5        CHARLES W. GILLIGAN, ESQ.

6        5301 Wisconsin Avenue, NW

7        Suite 800

8        Washington, DC  20015

9        202-362-0041

10       cgilligan@odonoghuelaw.com

11

12  Also Present:  Gregory A. Geiman

13

14

15

16

17

18

19

20

21

22

23

24

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Jennifer A. Vachon
July 28, 2022

---

Page 69

1      **Q.** All right. And how so?

2      **A.** He wouldn't come in as often.

3      **Q.** Okay. How about the nature of your
4      communications with him; did that change?

5      **A.** No.

6      **Q.** All right. So in Paragraph No. 12 of your
7      affidavit you say that in or around May 2018 you
8      witnessed Billy get into a fight with Gina in her
9      office. You didn't really witness them get into a
10     fight, though, isn't that fair to say?

11     **A.** No.

12     **Q.** Okay. In fact, nothing about what you
13     observed appeared to be them in a fight, right?

14     **A.** Just the closeness of them 12 inches apart.

15     **Q.** Okay. But there were no --

16     **A.** That's it.

17     **Q.** -- raised voices, no yelling?

18     **A.** I didn't hear that, no. It was just
19     hearsay around the office.

20     **Q.** Okay. So would you agree with me that --
21     that in terms of witnessing them in a fight in her
22     office, that's not really an accurate statement?

23     **A.** Correct.

24     **Q.** Okay. In Paragraph 13, you say that -- in

---

Page 70

1      the third sentence, (as read) "I witnessed Gina
2      arrive at the office approximately 9" -- I
3      think there supposed to be an at there, maybe -- "I
4      witnessed Gina arrive at the office at approximately
5      9:15 on a regular basis." Do you see that?

6      **A.** Approximately, yes.

7      **Q.** Okay. By the phrase, "regular basis," what
8      did you mean when you wrote that, "regular basis"?

9      **A.** From what I recall.

10     **Q.** But is it a daily basis? What does
11     "regular basis" mean to you?

12     **A.** There could have been times she was at
13     meetings, on vacation.

14     **Q.** Okay. But on a regular workday, is that
15     what you're saying, on most workdays, she would
16     arrive --

17     **A.** That's correct.

18     **Q.** Okay. And you say, "approximately 9:15."
19     What does "approximately" mean to you?

20     **A.** It could have been 9:16 on one day and
21     9:15 -- I didn't look at the clock every time she
22     came in.

23     **Q.** Okay. Could it have been, like, 10:00?

24     **A.** It could have been. I can't recall.

---

Page 71

1      **Q.** Okay. So it could have been as much as 45
2      minutes later than 9:15?

3      **A.** On a regular basis, I would say no.

4      **Q.** All right. Well, that's what I'm trying to
5      get at. You're saying approximately 9:15. Did
6      you -- did you notice a pattern where she regularly
7      arrived at the office at 9:15?

8      **A.** Around 9:15, approximately, yes.

9      **Q.** Okay. And so when you say,
10     "approximately," what is your --

11     **A.** It could have been 9:30. It could have
12     been 9:35.

13     **Q.** All right.

14     **A.** It could have been earlier.

15     **Q.** So that's what I'm trying -- I'm trying to
16     understand is sort of margin of error. When we're
17     approximating something, we're not saying it was
18     precisely this time but --

19     **A.** Right.

20     **Q.** So you're saying it could have been five
21     minutes earlier or five minutes later?

22     **A.** Right.

23     **Q.** 20 --

24     **A.** She never arrived at 9:15 every day from

---

Page 72

1      what I recall.

2      **Q.** Okay. And that's -- so when -- these
3      are -- this is your statement; so, I'm just trying
4      to understand by -- what you're saying by the words,
5      "approximately 9:15." Are you saying within five
6      minutes of 9:15, a within a half an hour of 9:15?

7      **A.** Within a half an hour.

8      **Q.** Okay. So it could have been around 9:45
9      even?

10     **A.** Right. Or 8:45.

11     **Q.** Okay. All right. And you would agree that
12     the Fund -- and actually, before I ask you that,
13     the -- what time period are you talking about?

14     **A.** What do you mean?

15     **Q.** Well, you just say, (as read) "I witnessed
16     Gina arrive at the office at approximately 9:15 on a
17     regular basis." When did that occur, during the
18     entire time that you worked at the Funds office?

19     **A.** I can't recall. I worked with her for 23
20     years. I can't recall.

21     **Q.** So these are -- again, this is your
22     affidavit. This is information that you're
23     providing. What -- what time period are you talking
24     about? Is this --

---

Ginamarie Alongi, et al. vs                                                    Jennifer A. Vachon
Iuoe Local 4 Health & Welfare Fund, et al.                                     July 28, 2022

Page 73

1    A. Right. That's why it says,
2  "approximately."
3    Q. Well, that's the time that you're referring
4  to.
5    A. Right.
6    Q. You're saying approximately 9:15. You say,
7  (as read) "I witnessed Gina arrive" -- you talk
8  about the time that you arrived, where your office
9  was located, and that you witnessed her arrive at
10  the time. What year are you even referring to in
11  this affidavit?
12    A. I can't recall.
13    Q. All right. So you don't know if it's one
14  year?
15    A. It could have been 23 years. It could have
16  been two years. I'm not sure.
17    Q. So --
18    A. I did not know her time schedule, like,
19  what her hours were; whereas, mine were seven to
20  three every day. I'm not sure what her schedule
21  was.
22    Q. Right. But you're signing -- under oath,
23  you're attesting to what your observations were, and
24  you're saying that, on regular basis, you saw her

Page 74

1  arrive at 9:15.
2    A. Approximately, yes.
3    Q. Right. So during what time period?
4    A. The last ten years.
5    Q. Okay. Do you recall that there was a
6  period of time where Gina Alongi actually started
7  coming into the office around eight o'clock in the
8  morning?
9    A. No. I can't recall.
10    Q. You don't recall that.
11      If I were to tell you that there was a time
12  period in 2020 where that occurred, does that
13  refresh your memory?
14    A. I mean, I probably saw her a few times,
15  maybe, at 8:00. I can't recall. I was never told
16  Gina was going to be there at eight o'clock for a
17  period of time. I can't -- I can't say yes to that.
18    Q. Okay. When -- you say that your office was
19  located in the 2018 time period outside of Gina's
20  office, is that right?
21    A. Yup.
22    Q. Okay. So you could see Gina's comings and
23  goings, is that right?
24    A. Yeah. If I -- if I watched her the whole

Page 75

1  time and not do my work. I mean, my chair was
2  sideways. My desk was in the corner. Like, my
3  computer was kitty-corner.
4    Q. So if you were working at your computer,
5  you were facing your computer --
6    A. It would be to the wall, and then if I turn
7  my head, right across would be Gina's office.
8    Q. All right. So you would have to turn to
9  see Gina, right?
10    A. Just tilt my head --
11    Q. Okay.
12    A. -- to the left.
13    Q. But if you were doing work, you wouldn't
14  necessarily see Gina arrive at the office?
15    A. Right.
16    Q. Okay. And by 9:15 in the morning, you had
17  been working for about a little over two hours, is
18  that right?
19    A. Correct.
20    Q. Okay.
21    A. If I would have to go to the restroom or
22  what have you, sometimes I would see her come in, or
23  go to the kitchen. That was near the back door
24  where she would arrive.

Page 76

1    Q. Okay. So fair to say on a day-to-day
2  basis, you did not see Gina arrive at the office,
3  correct?
4    A. Not five days a week, no.
5    Q. Okay.
6    A. I'd say two out of the five.
7    Q. Okay. So the majority of the days you
8  don't know when Gina arrived at the office,
9  correct?
10    A. Correct, not unless Rosemarie Ortega
11  mentioned it.
12    Q. Well, you --
13    A. She sat at my office, outside.
14    Q. Okay. Well, let me put it differently,
15  then. On the majority of the days of the week, you
16  did not observe Gina arriving at her desk?
17    A. No. I didn't look out my -- I didn't look
18  to see if she was there at 9:15.
19      (Recess, 2:46 p.m. - 2:55 p.m.)
20  BY MS. MARKOWSKI:
21    Q. Okay. Ms. Vachon, I think just before the
22  break I was asking you about what you observed about
23  Gina's comings and goings at the office.
24      You also mentioned in your affidavit -- in

# **TAB**
# *27*

D. App. 194

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Jennifer Dow*

*July 06, 2022*

---

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Jennifer Dow
July 06, 2022

---

Page 3

```
1          COMMONWEALTH OF MASSACHUSETTS

2  NORFOLK, SS.          SUPERIOR COURT

3          CIVIL ACTION NO.: 2182CV00125

4

5  ************************************************

6  GINAMARIE ALONGI AND ROSEMARIE ALONGI,      *

7          Plaintiffs        *

8  vs.                       *

9  IUOE LOCAL 4 HEALTH & WELFARE FUND, et al,  *

10         Defendants        *

11 ************************************************

12

13

14

15      DEPOSITION OF: JENNIFER DOW

16      FREEMAN MATHIS & GARY LLP

17      60 State Street, Suite 600

18      Boston, Massachusetts  02109

19      July 6, 2022    1:04 p.m.

20

21

22

23      Brenda M. Ginisi

24      Court Reporter
```

```
1  APPEARANCES CONT'D:

2  Also present:

3      Christopher J. Redd, Esq.

4      Gregory Geiman, Esq.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

Page 2

```
1  APPEARANCES:

2  Representing the Plaintiffs:

3      BOWDITCH & DEWEY, LLP

4      200 Crossing Boulevard

5      Framingham, Massachusetts  010702

6      BY:  JACOB A. TOSTI, ESQ.

7      (617) 757-6536

8      E-mail: jtosti@bowditch.com

9  Representing the Defendants:

10     FREEMAN MATHIS & GARY LLP

11     60 State Street, Suite 600

12     Boston, Massachusetts  02109

13     BY: JENNIFER L. MARKOWSKI, ESQ.

14     (617) 963-5975

15     E-mail: jmarkowski@fmglaw.com

16 Representing the IUOE LOCAL 4:

17     O'DONOGHUE & O'DONOGHUE LLP

18     5301 Wisconsin Avenue, NW, Suite 800

19     Washington, DC  20015

20     BY:  DANIEL KEENAN, ESQ.

21     (202) 362-0041

22     E-mail: dkeenan@odonoghuelaw.com

23         cgilligan@odonoghuelaw.com

24
```

Page 4

```
1          I N D E X

2

3  WITNESS:          JENNIFER DOW

4

5  EXAMINATION BY:          PAGE:

6  Ms. Markowski          5

7  Mr. Keenan            123

8  Mr. Tosti            149

9

10 FURTHER EXAMINATION BY:          PAGE:

11 Ms. Markowski          155

12

13 EXHIBITS:          PAGE:

14 Exhibit 115, Subpoena................8

15 Exhibit 116, Subpoena................8

16 Exhibit 117, Handbook...............67

17 Exhibit 118, Service of Complaint.........109

18 Exhibit 119, Complaint and Jury Demand..........109

19 Exhibit 120, Time Sheets..................131

20

21 (Exhibits retained by Ms. Markowski)

22

23

24
```

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Jennifer Dow
July 06, 2022

Page 85

Page

1 to understand if that's a over the course of your time
2 there or within the last couple of --
3      A.   Sure.  I mean, I don't want to lie so I
4 don't really know.  But if you want to put it --
5      Q.   No, no.  I just want an estimate.
6      A.   Yeah.
7      Q.   I don't want you to --
8      A.   I don't recall.
9      Q.   -- make anything up.  Okay.  Would you
10 agree it was not a daily occurrence?
11      A.   Would I agree -- I'm sorry?
12      Q.   Would you agree that you did not see
13 Rosemary Ortega carrying Gina Alongi's things on a
14 daily basis?
15      A.   I would agree, yes.
16      Q.   Would you agree you did not see that
17 occur on a weekly basis?
18      A.   Yes.
19      Q.   Okay.  And would you agree you did not
20 see that occur on a monthly basis?
21      A.   No.
22      Q.   So it's possible it might have occurred
23 once a month?
24      A.   It could have occurred once a month.  I

Page 86

Page

1 didn't see always see her, like I said.  It wasn't all
2 the time so I'm not sure exactly of --
3      Q.   Understood.  And I'm just, you know,
4 trying to get a sense of what you saw.
5      A.   Yes.
6      Q.   Your memory of what you saw.
7      A.   Yes.
8      Q.   Okay.  And how did you know that Rosemary
9 was carrying Gina Alongi's things?
10      A.   Because she walked into her office.
11      Q.   And what, you saw her leave the --
12 whatever she had -- in Gina Alongi's office?
13      A.   Yes.
14      Q.   You say that on most mornings you
15 observed Gina Alongi arrive at the office around
16 9:15 a.m.; do you see that?
17      A.   Yes.
18      Q.   And were you -- from your office could
19 you see Gina Alongi's office?
20      A.   When I was sitting in my office?
21      Q.   Yes.
22      A.   I could not.  I could see her office --
23 outside -- at the doorway I could see her office.
24      Q.   So if you were up and about you could see

Page 87

Page

1 her office?
2      A.   Yes.
3      Q.   But if you were sitting in your office,
4 you couldn't see Gina's office?
5      A.   No.
6      Q.   Okay.  So weren't there times when
7 Gina Alongi would arrive at the office and you were in
8 your office?
9      A.   Yes.
10      Q.   Okay.  And on those --
11      A.   It would only be the times -- like I
12 said, I gave the estimate because between nine and 10 I
13 would go into the kitchen and get my yogurt, or any
14 time I was walking by to go to the bathroom.
15      Q.   Okay.  I'm just trying to understand the
16 terminology because you say on most mornings.  Should
17 that say on most morning when you were up and walking
18 near --
19      A.   Yes.  And I could hear her come in too.
20 You could hear the back door shut.  And you can, you
21 know, hear a cough or -- you know, everybody would know
22 when somebody usually came into the office, if you
23 heard them.  But I could have been on the phone and had
24 no idea that she was there.

Page 88

Page

1      Q.   Okay.  What you put in your affidavit,
2 was that on most mornings you observed Gina Alongi
3 arrive at the office --
4      A.   Yes.
5      Q.   -- around 9:15 a.m.  But it sounds like
6 you didn't -- if I'm understanding you correctly, there
7 were mornings where you were in your office and
8 wouldn't observe anything about Gina Alongi's comings
9 and goings, fair to say?
10      A.   Correct?
11      Q.   And fair to say, that, that happened
12 regularly, when you were in your office working when
13 Gina Alongi would arrive at the office?
14      A.   I was in my office.  But like I said,
15 between those times when she came in I would open the
16 door, just like if anybody else came to the back door
17 when I walked by.
18      Q.   So again, the phrase "on most mornings"
19 should really be on most mornings when you were up and
20 about and near the entrance and holding the door for
21 her, that's when you saw her?
22      A.   Yes.
23      Q.   Okay.  And you think that the times that
24 you held the door for her she was coming in around

# TAB
# 28

THE COMMONWEALTH OF MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION
One Ashburton Place, Boston, MA 02108
Phone:  (617) 994-6000 Fax:  (617) 994-6024

Date: 10/6/2020

Sherelle Wu, Esq.
Bowditch & Dewey, LLP
200 Crossing Boulevard, Suite 300
Framingham, MA 01702

**RE: Ginamarie Alongi vs. International Union
of Operating Engineers Local 4, William D.
McLaughlin
MCAD Docket Number: 20BEM01708
EEOC/HUD Number: 16C-2020-01968**

SERVICE OF COMPLAINT

Dear Complainant:

Please be advised that the Massachusetts Commission Against Discrimination (MCAD)
has assigned a member of its investigative staff to conduct an impartial investigation of the
allegations in the above referenced complaint of discrimination.  A copy of your complaint
is enclosed. The Commission's Investigator will review the allegations in the Complaint
and will keep the parties informed of developments arising from the investigation.

**You must preserve all information and documents that may be (or lead to) evidence
relevant to the charge of discrimination, as required by MCAD regulations found at
804 CMR 1.05(1) (2020).**

The Respondent has been advised that it must provide you with a copy of its position
statement.  You are strongly encouraged to submit a rebuttal to the position statement, and
if you wish to do so, you must  submit your rebuttal to the Commission within 21 days
after you receive the position statement, in accordance with 804 CMR 1.05(9)(b)(1)
(2020).

If you have any questions pertaining to the investigation, please contact Candice
Carrington at 617-994-6094.

Sincerely,

Candice Carrington
Investigator

MCAD Docket Number 20BEM01708, Serve Complainant – Without Investigative Conference

**D. App. 199**

## U.S. Equal Employment Opportunity Commission

Boston Area Office
JFK Federal Building, Room 475
Boston, MA 02203
Phone: (617) 565-3200
TDD: (617) 565-3204
Fax: (617) 565-3196

EEOC Charge No: 16C-2020-01968

NOTICE
This office has been sent a copy of the Complaint of employment discrimination you filed with the
Massachusetts Commission Against Discrimination (MCAD), and in order to preserve your federal rights
the above referenced charge number has been assigned.

YOUR FEDERAL RIGHTS AND EEOC PROCEDURAL REGULATIONS
( ) Title VII of the Civil Rights Act of 1964, as amended (Title VII)-
If you wish to file a private lawsuit in Federal District Court with your own private attorney, prior
to the MCAD's completion of its investigation, you may do so by requesting a NOTICE OF
RIGHT TO SUE from the EEOC.  Once this request for you to file a private lawsuit is granted,
your EEOC charge and possibly the MCAD complaint will be closed.  When you receive the
NOTICE OF RIGHT TO SUE, it is only valid for ninety (90) days.

( ) The age discrimination in employment act of 1967, as amended (ADEA)-
If you filed your complaint within 300 days of the alleged act of discrimination you can file a
private lawsuit under the ADEA any time 60 days after the date you filed your complaint, or
within 90 days of your receipt of notice that the EEOC has completed action on your complaint.

( ) The Americans with Disabilities Act of 1990 - Same as Title VII.

The Massachusetts Commission Against Discrimination will investigate and resolve your complaint. If you
have any questions regarding the status of your complaint, contact the MCAD location where you filed the
complaint.  If you want EEOC to conduct a review of the MCAD's Final Determination and Order, you
must make this request in writing to the above address within 15 days of the MCAD's final determination,
otherwise, we will accept the MCAD's final action as our own.  EEOC's regulations require that you inform
us and the state agency, in writing, of any change in or prolonged absence from your current address.

If you do not wish to file a private lawsuit on your own, and wish the Massachusetts Commission Against
Discrimination to continue with its investigation of your complaint, there is no need for you to take any
action now.  The MCAD will in the near future inform you of their findings.

EEOC Charge Number 16C-2020-01968, EEOC Transmittal Letter to Complainant

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone:  (617) 994-6000 Fax:  (617) 994-6024**

---

MCAD DOCKET NUMBER:  20BEM01708      EEOC/HUD CHARGE NUMBER: 16C-2020-01968
FILING DATE:  09/03/20                VIOLATION DATE:  07/22/20

-------------------------------------------------------------------------------------------------------------

Name of Aggrieved Person or Organization:
Ginamarie Alongi
c/o Bowditch & Dewey LLP
200 Crossing Boulevard, Suite 300
Framingham, MA 01702
Primary Phone: (617)757-6536 ext. ____

-------------------------------------------------------------------------------------------------------------

Named is the employer, labor organization, employment agency, state/local government agency, or other entity who
discriminated against me:
International Union of Operating Engineers Local 4
Fringe Benefit Funds
16 Trotter Drive
Medway, MA 02053
Primary Phone: (508)533-1433 ext. ____

William D. McLaughlin
c/o IUOE Local 4
16 Trotter Drive
Medway, MA 02053
Primary Phone: (508)533-1433 ext. ____

No. of Employees:         25+

Work Location: Medway, MA

-------------------------------------------------------------------------------------------------------------

Cause of Discrimination based on:
Sex, Sex discrimination / Sexual Harassment; Disability; Retaliation.

-------------------------------------------------------------------------------------------------------------

**The particulars are:**
I, Ginamarie Alongi, the Complainant believe that I was discriminated against by International Union of Operating
Engineers Local 4, William D. McLaughlin, on the basis of Sex, Disability, Retaliation. This is in violation of M.G.L. c.
151B Section 4 Paragraph 1, 4, 16, 16A and Title VII, ADA.

Please see attached.

-------------------------------------------------------------------------------------------------------------

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein
are true to the best of my knowledge.

_____
(Signature of Complainant)

MCAD Docket Number 20BEM01708, Complaint

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

| | |
|---|---|
| GINAMARIE ALONGI AND ROSEMARIE ALONGI,<br><br>    Complainants,<br><br>v.<br><br>IUOE LOCAL 4 FRINGE BENEFIT FUNDS AND WILLIAM D. MCLAUGHLIN, INDIVIDUALLY AND IN HIS CAPACITY AS TRUSTEE,<br><br>    Respondents. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  MCAD DOCKET NO.<br>  EEOC/HUD NO. |

## NOTICE OF APPEARANCE

Please enter the appearance of Timothy P. Van Dyck, Robert G. Young, and Sherelle Wu of Bowditch & Dewey, LLP as counsel for Complainants, Ginamarie Alongi and Rosemarie Alongi, in the above-captioned matter.

Respectfully submitted,

*[signature]*

Timothy P. Van Dyck (BBO #548347)
Robert Young (BBO #650541)
Sherelle Wu (BBO #706007)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard
Suite 300
Framingham, MA  01702
Telephone:  617-757-6536
Facsimile:  508-929-3136
E-mail:  tvandyck@bowditch.com
E-mail:  ryoung@bowditch.com
E-mail:  swu@bowditch.com

Date:  September 3, 2020

4813-2142-3818.1

I.    INTRODUCTION

This is an action by two former employees, Ginamarie Alongi and Rosemarie Alongi, twin sisters, for damages, both compensatory and punitive, against Respondents International Union of Operating Engineers Local 4 Fringe Benefit Funds (the "Funds") and William D. McLaughlin ("Mr. McLaughlin"), both individually and in his capacity as Trustee.   Mr. McLaughlin, the Chairman of the Board of Trustees for the Funds, is a sexual predator.  He has engaged in highly inappropriate sexual conduct towards Complainants and other Funds employees, conduct well known by the Funds' outside counsel.  Such conduct created a blatantly hostile workplace environment.  As a direct result of such conduct, Complainant Gina Alongi confronted Mr. McLaughlin in an attempt to protect both herself and her employees and to prevent such conduct from continuing into the future.  Her efforts were met with a verbal attack by Mr. McLaughlin, an assault so vicious that she (and other Funds employees) feared for Gina's physical safety.   Following this assault, the harassment continued but was now further exacerbated by the fact that Gina feared for her physical safety.  Shortly after that verbal attack, Gina was then informed that she would lose her job if she reported what had happened to her. Gina was so traumatized by this assault that she sought advice from the Funds' outside counsel about how to respond.  She was informed at this time that Mr. McLaughlin's conduct was neither severe nor pervasive enough to constitute either harassment or a hostile work environment. Upon information and belief, the Trustees never even conducted an investigation into either the assault or Mr. McLaughlin's conduct towards the Funds' female employees. Moreover, both Respondents thereafter engaged in a concerted effort to retaliate against Gina for having attempted to confront Mr. McLaughlin about his behavior by, among other things, taking away a number of reasonable accommodations previously granted to her for her disability (Diabetes),

and micromanaging her job performance.  She was then summarily dismissed on July 22, 2020 after a forty-two (42) year unblemished record of service working at the Funds.  In her termination letter, the Funds provided no explanation for her termination, stating rather, that "[a]s you were an employee at will, it is not necessary to detail reasons for the Trustees' decision" and that "[w]e … trust that our separation with be courteous and respectful." Two weeks after Gina's termination, Rosemarie, Gina's twin sister, a seventeen (17) year employee with an unblemished employment record working at the Funds, was summarily dismissed by the Funds as well, in direct retaliation for her association as Gina's twin sister.  Her termination letter used the same language that was contained in Gina's letter.

## II.    PARTIES

1. Gina M. Alongi ("Gina") is a Massachusetts resident who resides in Westborough, MA 01581.

2. Rosemarie Alongi ("Rosemarie") is a Massachusetts resident who resides in Westborough, MA 01581.

3. Gina and Rosemarie are twin sisters.

4. Respondent, The International Union of Operating Engineers Local 4 Fringe Benefit Funds, (the "Funds") is located at 16 Trotter Drive, Medway, Massachusetts.

5. Respondent William D. McLaughlin is an individual who, upon information and belief, resides in Norton, Massachusetts. He is also the Chairman of the Funds and, at all relevant times, had supervisory authority over Complainants.

## III.    FACTUAL BACKGROUND

6. Gina began her employment with the Funds in 1978 in a clerical position and was promoted throughout the years to Assistant Administrator.

-2-

7. Throughout her employment, Gina was an exemplary employee.

8. In 1996, Gina was promoted to the position of Administrator of the Funds. In this role, Gina was responsible for all aspects of management, strategic planning, business and financial operations, and organizational administration as determined by the Board of Trustees.   She oversaw each of the individual trust funds comprising the Funds in accordance with respective trust agreements and plan documents adopted by the Board of Trustees.

9. As the Funds' Administrator, Gina worked under the direction and control of the Board of Trustees of the Funds and she reported directly to Mr. McLaughlin.

10. Gina was extremely well-respected in the industry and served on numerous boards and committees related to her work including the New England Employee Benefits Council.

11. Gina also served as the Executive Director of the Massachusetts Coalition of Taft-Hartley Plans which represents over 150,000 individuals through its twenty-six member funds. In her role as Executive Director, she was responsible for developing better methods of providing and paying for health care.  Gina negotiated favorable discounts which directly and positively impacted the financial position of the Funds.

12. Gina frequently attended and presented at local and national conferences relating to health care benefits and worked closely with the U.S. Department of Labor to educate other funds Administrators on ERISA compliance.

13. In 2015, Gina was selected as a recipient of the Cushing-Gavin Boyle Award in recognition of her excellence and dedication to public service. This prestigious award was recognized by President Barack Obama.

14. Rosemarie began her employment with the Funds in 2003 as Security Officer in the Information Technology Department.

15. Throughout the course of her employment, Rosemarie received excellent performance reviews.

16. Rosemarie worked alongside Alan Koufos, Manager of the IT Department, and reported directly to then Assistant Administrator Greg Geiman. Upon Mr. Koufos' retirement in January 2020, Rosemarie assumed the role of Acting Director of the IT department.

17. On or about August 1, 2017, Mr. McLaughlin was appointed Business Manager of the IUOE Local 4 Union and thereafter appointed Chairman of the Board of Trustees of the Funds. As Chairman, Mr. McLaughlin had the authority to make final decisions regarding the terms and conditions of Complainants' employment.

18. From the beginning of his tenure as Chairman, Mr. McLaughlin routinely made highly inappropriate and sexually charged comments in the workplace to both Complainants and to other female employees.

19. For example, Mr. McLaughlin routinely visited Gina's office to discuss his sexual desires and fantasies, how he felt about the women in the office, and what he would like to do to them sexually.

20. On more than one occasion, Mr. McLaughlin also stated to Gina that he could not concentrate during a Trustees meeting because he could not take his eyes off her and that Gina "looked so good" and that he "wanted" her and had "such a crush" on her.

21. When Mr. McLaughlin engaged in this conduct, Gina told Mr. McLaughlin to stop and stated that he was going to get in trouble. Gina informed Mr. McLaughlin several times that if his wife ever found out about his behavior that she would divorce him. Mr.

-4-

McLaughlin laughed and stated that he was "the boss" and that therefore he could "get away with it."

22. Mr. McLaughlin also frequently told Gina about his "need for sex," and stated that his wife was not "taking care of" him. Mr. McLaughlin made statements to the effect that he was a "pig" and that "all men are pigs," and that "all men think about is sex."

23. Similarly, Mr. McLaughlin would visit Rosemarie's office on a regular basis, making sexual comments about the women in the office, discussing his sexual desires, and stating that he was unhappy being married.

24. On one occasion, Rosemarie reminded Mr. McLaughlin that he was married, and that his behavior was inappropriate. Mr. McLaughlin replied that he could not help himself around women.

25. Indeed, upon information and belief, Mr. McLaughlin has had at least one inappropriate sexual relationship with another Funds employee, a fact well known to the Respondents as evidenced by a May 17, 2017 letter from the then Assistant Administrator, Mr. Greg Geiman, to Gina in which he references "recent concerns [he has] about Laura-Jean's association with [Mr. McLaughlin] and the resulting lack of deference and communication with you,…".

26. A true and accurate copy of this letter is attached hereto as Exhibit A.

<u>The May 1st Incident</u>

27. On May 1, 2018, Gina requested that Mr. McLaughlin meet with her in her office to discuss, among other things, Mr. McLaughlin's inappropriate conduct and comments in the workplace as well as ways in which he had been passing up Gina in favor of male employees.

28. As Gina began providing Mr. McLaughlin some examples of how his behavior had made her uncomfortable, Mr. McLaughlin started to pace in front of Gina and yell obscenities and words to the effect of "you do not respect me, I am the manager!" Mr. McLaughlin continued to yell and swear at Gina for approximately 10 minutes to the point where other Funds employees were fearful for Gina's physical safety; indeed, upon information and belief, one Funds employee had already dialed in 911 on her phone and was ready to call the police. Mr. McLaughlin was so loud that employees having lunch in the Funds kitchen (on the opposite side of the building) could hear him shouting. Mr. McLaughlin only stopped when Rosemarie and Mr. Geiman entered Gina's office and physically extricated Mr. McLaughlin from Gina.

29. Immediately following this verbal assault, Mr. McLaughlin attempted to apologize to Gina by hugging her and attempting to kiss her on the lips. He also told her that the fight had gotten him "excited" and that he had come close to getting an erection as a result of the attack.

30. A few weeks after the altercation, in mid-May 2018, Gina interviewed several female Funds staff members regarding their experiences with Mr. McLaughlin. Each reported feeling uncomfortable with the way that Mr. McLaughlin looked at, talked to, or touched them. In particular, one employee reported that Mr. McLaughlin regularly entered her office to give her unprompted massages which made her uncomfortable, but she did not feel she could ask him to stop as he was the boss. Another employee stated that Mr. McLaughlin called her "sexy" on more than one occasion and would make comments to the effect that he wanted her sexually.

31. In response to these events, Gina requested to meet with Ms. Kate Shea, a partner at Segal Roitman and outside counsel to the Funds, and did so on or about May 21, 2018. Gina told Attorney Shea about the May 1st incident and about how severe Mr. McLaughlin's constant bullying and sexual harassment was. Attorney Shea informed Gina that this conduct did not rise to the level of sexual harassment and that in order to claim sexual harassment, the conduct would have to be pervasive or "widespread." Attorney Shea told Gina that she had "no case."

32. Mr. Greg Geiman, then Assistant Administrator for the Funds (and now Gina's replacement), apparently disagreed with Attorney Shea's assessment. One May 16th, 2018 (5 days earlier), Mr. Geiman wrote an email to Gina which stated, in part:

> "5.    Inappropriate language and discussion … and unwanted touching….
> [Attorney Shea] needs to make a determination as to whether this constitutes
> sexual harassment for which there may be liability and whether the Trustees
> should be notified and a Joint Board Meeting held.
> 6.  Gina was assaulted.  People in the office are uncomfortable and feel unsafe.
> 'There was violence in [Mr. McLaughlin's] voice.' … [Attorney Shea] also needs
> to decide whether this information should be shared with the Joint Board."

33. A true and accurate copy of this May 16, 2018 email from Mr. Geiman to Gina is attached hereto as Exhibit B.

34. Mr. Geiman also forwarded another email to Gina that same day detailing inappropriate communications that Mr. McLaughlin had had with another Funds employee, Rosemary Ortega.  In that email, Mr. Geiman stated, among other things, that "[Ms. Ortega] told me that [Mr. McLaughlin] comes into the office and speaks inappropriately to her [and others].   Will speak about women he's slept with on the road, sexual positions he likes…."

35. A true and accurate copy of this email from Mr. Geiman is attached hereto as Exhibit C.

36. In mid-May, 2018, Attorney Shea met with Mr. McLaughlin and then with Mr. Geiman. Gina was then instructed to meet with Attorney Shea and Mr. McLaughlin in his office. Attorney Shea, on behalf of the Funds, informed Gina that she could be terminated for insubordination. Attorney Shea stated again to Gina that Mr. McLaughlin's conduct did not rise to the level of sexual harassment and that if Gina kept quiet about her allegations of sexual harassment, Mr. McLaughlin would apologize, and Gina would not be terminated.

37. Although Gina continued to feel that Mr. McLaughlin's actions were wrong, the combination of Attorney Shea's purported legal assessment that she did not have a viable sexual harassment claim, the specter of an apology from Mr. McLaughlin, and Gina's fear that she would be terminated if she did file one induced Gina not to file a complaint at that time.

<u>Mr. McLaughlin Continues to Harass and Retaliate Against Complainants</u>

38. Following these meetings with Attorney Shea, Mr. McLaughlin continued to subject Gina, Rosemarie, and other female employees to frequent sexual comments well into 2020.

39. Mr. McLaughlin continued to visit Gina's office, each time to make statements about sex and women's bodies. On one such occasion in the last quarter of 2019, Mr. McLaughlin entered Gina's office and told Gina that he knew about one of Gina's younger employees who was struggling with breast cancer.  Mr. McLaughlin asked Gina "are her boobs any good?" and "do you think she will show me them?" or words to that effect. Afterwards, Gina told Mr. Geiman about Mr. McLaughlin's comments.   Mr. Geiman responded with words to the effect, "I'm so sorry you have to deal with all of this." When Mr.

-8-

McLaughlin said something inappropriate to Gina, Gina would frequently tell Mr. Geiman who would respond that Mr. McLaughlin "is never going to learn," that Attorney Shea did not do a good job with him, and that Mr. McLaughlin was "the boss" so he can get away with it because no one was doing anything about it.

40. Mr. McLaughlin also specifically began to retaliate against Gina because of her prior attempt to get him to stop harassing her and other female employees.

41. For example, on or around November 9, 2018, Mr. McLaughlin informed Gina that her service animal, who was trained to detect Gina's low blood sugar levels, would no longer be permitted in the office. When Gina requested an ADA accommodation in order to bring her service dog with her to the office on days that she felt ill, Mr. McLaughlin stated "no dogs in the office, including yours. I do not care what the law says" or words to that effect.  He provided Gina with no explanation for the change in the policy.

42. In or around early January 2020, Gina was once again called into a meeting with Mr. McLaughlin, this time with Attorney Shea present. At that meeting, Mr. McLaughlin instructed Gina that from that point forward, he expected Gina would report to work by 8 am every day. Prior to Mr. McLaughlin's request, Gina would take the first of her two types of daily insulin shots at 8:30 am and be at work by 9:15 am. Gina would then skip lunch or stay later during the day and often worked on weekends. Gina reminded Mr. McLaughlin of her Type 1 Diabetes and explained that her current work schedule allowed her to take insulin and change her continuous glucose monitor at specific and uniform times of the day as required. Gina requested that Mr. McLaughlin grant her an accommodation and permit her to continue working on her usual work schedule to allow her to manage her health condition. Mr. McLaughlin replied "no accommodation is

granted" or words to that effect. Attorney Shea said nothing at this meeting and kept her head down. Following this meeting, Gina immediately began reporting to work beginning at 8 am which caused her to be off her insulin schedule, thereby causing her to experience serious health issues.

43. In addition, after Gina's attempt to get Mr. McLaughlin to stop his harassing behavior, the Business Agents who had previously called Gina for assistance no longer contacted her and instead called Mr. Geiman if they had questions.

44. Mr. McLaughlin's inappropriate sexual behavior continued throughout   Complainants' employment. Towards the end of 2019, Rosemarie observed that he would continue to visit female employees' offices on a regular basis to discuss which women in the office he found particularly attractive.

45. In March 2020, the Funds permitted its employees over the age of 65 or affected with a health condition to work from home due to the global COVID-19 pandemic. Although Gina was permitted to work remotely due to her diabetes, Mr. McLaughlin continued to alter the terms and conditions of her employment.

46. In late April 2020, Mr. McLaughlin stated to Mr. Geiman in the Funds hallway that "Gina should be in the office" and that he did not care about her medical condition.

47. By June 2020, Mr. McLaughlin required that Gina account for her time in 15-minute increments for the sole purpose of finding a pretext to terminate Gina's employment. Gina began tracking her time in this manner on June 15, 2020 and submitted these timesheets directly to Mr. McLaughlin at his request. No such requirement had ever been imposed on Gina prior to that time. On June 26, 2020, Mr. Geiman stated to Gina that

Mr. McLaughlin "came in today and said he was not interested in anyone's timesheet other than yours and that he's waiting for it."

48. Gina asked Mr. Geiman repeatedly whether Mr. McLaughlin met with him to discuss the summary of the staff's timesheets. Mr. Geiman consistently stated that Mr. McLaughlin never discussed any other employee's timesheet.

<u>The Virtually Simultaneous and Retaliatory Terminations of Complainants</u>

49. After 42 years of loyal and dedicated service to the Funds, Gina was summarily terminated on July 22, 2020. Her July 23rd termination letter provided her with no explanation whatsoever for why she was fired, but simply stated, in part: "As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision…. We …. trust that our separation will be courteous and respectful."

50. A true and accurate copy of Gina's termination letter is attached hereto as Exhibit D.

51. Also on July 22, 2020, Rosemarie, Gina's twin sister, was placed on a two-week paid suspension.

52. After seventeen (17) years of loyal and dedicated service to the Funds, Rosemarie was summarily terminated on August 5, 2020, without receiving any prior notice or reasoning from the Funds.

53. In addition, she received a very similar termination letter as did her twin sister, Gina, which provided no explanation whatsoever for why she was terminated.

54. A true and accurate copy of Rosemarie's termination letter is attached hereto as Exhibit E.

IV.   CLAIMS FOR RELIEF

COUNT I

(Hostile Work Environment; M.G.L. c. 151B)

55. Complainants repeat and reallege each of the allegations contained in paragraphs 1 through 55 of this Complaint as though separately set forth herein.

56. Throughout the course of Mr. McLaughlin's tenure as Chairman, Mr. McLaughlin regularly subjected Complainants to highly inappropriate and sexually offensive remarks in the workplace, and also engaged in unwanted touching.

57. Mr. McLaughlin's sexual comments and unwanted touching were unsolicited and unwelcome. At separate times, Complainants each asked Mr. McLaughlin to stop his inappropriate behavior.

58. Mr. McLaughlin's behavior created an intimidating, hostile, humiliating, or sexually offensive work environment for Complainants.

59. Mr. McLaughlin's behavior unreasonably interfered with Complainants' work performance and altered the terms and conditions of their employment.

60. Mr. McLaughlin's inappropriate behavior consisted of ongoing and continued violations throughout his tenure as Chairman.

61. The Funds is liable for the conduct of Mr. McLaughlin as a person with supervisory authority over Complainants and because the Funds knew or should have known of Mr. McLaughlin's conduct and failed to remedy it.

## COUNT II

### (Quid Pro Quo Sexual Harassment; M.G.L. c. 151B)

62. Complainants repeat and reallege each of the allegations contained in paragraphs 1 through 55 of this Complaint as though separately set forth herein.

63. Mr. McLaughlin made regular sexual advances towards Gina, for example, stating that he could not concentrate the entire Trustees meeting because he could not take his eyes off her and that Gina "looked so good" and that he "wanted" her and had "such a crush" on her.

64. Mr. McLaughlin would also state to Rosemarie that Gina "looks hot."

65. Mr. McLaughlin's comments and advances were unwelcome.

66. Gina regularly rejected Mr. McLaughlin's advances and asked Mr. McLaughlin to stop his behavior.

67. Attorney Shea, on behalf of the Funds, and Mr. McLaughlin expressly instructed Gina to keep her sexual harassment allegations to herself in exchange for keeping her job.

## COUNT III

### (Retaliation; M.G.L. c. 151B, § 4(4))

68. Complainants repeat and reallege each of the allegations contained in paragraphs 1 through 55 of this Complaint as though separately set forth herein.

69. Gina engaged in protected activity including, but not limited to: requesting Mr. McLaughlin cease his inappropriate behavior; reporting the harassment she faced to Attorney Shea; conducting her own investigation when the Funds would not help her; requesting a reasonable accommodation to bring her medical service dog to the office;

-13-

and requesting a reasonable schedule accommodation to maintain a regular insulin schedule.

70. The Funds knew of Gina's protected activity and acted adversely against her when, among other things, Mr. McLaughlin prohibited Gina from bringing her service animal to the office, altered Gina's schedule despite her request for an accommodation for her disability, requested that she account for her time in 15-minute increments, and ultimately terminated her employment.

71. These adverse actions were in direct response to Gina's protected activity.

72. The timing of Rosemarie's suspension and ultimate termination, immediately following Gina's termination, shows that Rosemarie was terminated unlawfully solely because of her close familial association with Gina.

### COUNT IV

### (Failure to Accommodate)

73. Complainants repeat and reallege each of the allegations contained in paragraphs 1 through 55 of this Complaint as though separately set forth herein.

74. Gina has Type 1 diabetes, a chronic health condition which requires consistent daily management.

75. On January 3, 2020, Mr. McLaughlin requested that Gina meet with him and Attorney Shea for an unscheduled meeting. At this meeting, Mr. McLaughlin informed Gina that he was altering Gina's work schedule, "effective immediately," to require that Gina be in the office by 8 am every morning.

76. Gina reminded Mr. McLaughlin of her medical condition and explained that she needed to take insulin and change her continuous glucose monitor at specific and uniform times

of the day. Throughout the course of her employment, Gina would take her morning insulin shot at 8:30 am and be at work by 9:15 am. Gina would then skip lunch or stay later during the day and often worked on weekends.

77. Gina requested that Mr. McLaughlin permit her to continue working on her usual work schedule to allow her to manage her health condition.

78. Mr. McLaughlin, in the presence of Attorney Shea, refused to accommodate Gina's reasonable request, and provided no explanation for why he was refusing it.

79. Following this meeting, Gina immediately began reporting to work beginning at 8 am which caused her to be off her insulin schedule, causing serious health issues.


WHEREFORE, Complainants respectfully request that this Commission grant the following relief:

1.  Enter judgment against Respondents, jointly and individually;

2.  Attorneys' fees and costs;

3.  Compensatory damages for emotional distress;

4.  Punitive damages pursuant to M. G. L. c. 151B, § 9;

5.  Pre-Judgment and Post-Judgment Interest; and

6.  Such other relief as the Court deems just and fair.


I swear under the pains and penalties of perjury that I have read this complaint and that, as to those facts that pertain to me, it is true and accurate to the best of my knowledge, information, and belief.

GINAMARIE ALONGI

ROSEMARIE ALONGI

-15-

By Their Attorneys,

_____

Timothy P. Van Dyck (BBO #548347)
Robert Young (BBO # 650541)
Sherelle Wu (BBO #706007)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard
Suite 300
Framingham, MA 01702
Telephone:  617-757-6536
Facsimile:  508-929-3136
Email: tvandyck@bowditch.com
ryoung@bowditch.com
swu@bowditch.com

Date:  September 3, 2020

# Exhibit A

May 17, 2017

Dear Gina,

I am writing because I feel as though the Funds Office has reached a crossroads.  As you know, Lou will be departing shortly and Billy's emergence as Business Manager will create uncertainty and opportunities for disruption or insubordination by members of your office staff that may have alternative agendas.  Now is the time to shore up your staff and to ensure that the lines of authority and communication are clear to those within and without the office. I believe that it is important for such a transition to be finalized while Lou is still in office because Billy's loyalties and priorities remain unclear.

It is important to me that you, as Administrator, are treated with the respect and deference that you have earned.  I hope that my commitment to the Funds and my loyalty to you are beyond question.  You have provided me with a dynamic career and a strong foundation for my family.  I have proudly served as your assistant for over six years.  In that time you have provided me with the opportunity and trust to learn and become involved in all aspects of the Funds.  I have helped with the oversight and implementation of Health and Welfare plans, tackled difficult Pension Plan issues, reviewed contracts, worked on the benefits software RFP, served as Privacy Officer, and helped with longstanding projects such as withdrawal liability and the owner/operator matter.

It has been, and remains, the honor of my professional life to learn from you and to serve you and the Funds in this capacity. However, given the uncertainties from the upcoming Union transition and my own progress as your assistant, I am hopeful that you may agree that now is the right time to transition the office for the next few years.  I hope to continue my work as collections counsel for as long as you and the Trustees will allow me, but I am ready and willing to take on any additional tasks that you may provide me as your assistant.

Laura-Jean is an important asset to this office and serves an important role for you.  I understand and respect that.  However, I do not believe that she is able to serve you in the same substantive manner as I do, and she has provided ample cause over the years for her loyalties and her intentions to be questioned. After six years of observing our abilities and our production, and in light of the recent concerns about Laura-Jean's association with Billy and the resulting lack of deference and communication with you, I respectfully ask that you "promote" me as your sole assistant and reassign Laura-Jean.

As your assistant, I would largely continue serving you in the capacities in which I currently serve, although I would hope to take a more active role in overseeing the matters of Pension and Annuity Plan compliance that Alice has handled, once she retires.  I can assure you that you would never need to worry about my loyalties or my intentions, and the lines of communication and authority would be cleared up.  I would ensure, as always, that everything goes through you and that your authority is paramount.  I would never overstep my bounds or impede on the strong working relationship that I hope you and Billy will create. I would exist to serve you, to learn from you, and to make your life at the office less stressful.  Period.

Laura-Jean has the skill set and the work ethic to become a strong office manager for you.  It is a role she already largely serves.  She could continue organizing your files, helping to transfer funds, dealing with H.R. issues, and anything else that would help the office - or you - to function smoothly.  Of course, she would also continue her work for you at the Coalition. In effect, nothing very dramatic would change in the office.  But such a transition would serve a number of vital purposes.  First, as stated, it would clear up lines of authority and communication. Second, it would resolve concerns regarding Laura-Jean's association with Billy.  Third, it would solve the longstanding problem of managing expectations as to what matters I should be involved in versus what matters Laura-Jean should be involved in. Finally, it would put me in a position to continue learning and to better serve you in the years to come without constant fear of "stepping on toes" or reprisals from Laura-Jean.

I have additional thoughts about how staff could be reassigned to best help you, and pieces of Laura-Jean's current role that could be retained in order to ease the transition, but I will save those thoughts for a future conversation.

I hope you understand my concerns and know that I am approaching you with only the best of intentions and after a tremendous amount of thought.  I know that reassigning Laura-Jean would be difficult for you, but I truly believe that it is the best thing for this office and for you (and me), and that now is the right time to do it.  I fear that the window will soon be closed and the current situation will go unchanged.

Thank you, Gina.

Yours respectfully,

Greg

Greg Geiman

# Exhibit B

**Gina Alongi**

| | |
|---|---|
| **From:** | Gregory A. Geiman |
| **Sent:** | Wednesday, May 16, 2018 10:30 PM |
| **To:** | Gina Alongi |
| **Subject:** | Fwd: Gina |

Sent from my iPhone

Begin forwarded message:

> **From:** Greg Geiman <greggeiman4@gmail.com>
> **Date:** May 16, 2018 at 9:52:50 PM EDT
> **To:** ggeiman@local4funds.org
> **Subject: Gina**
>
> 1. Kate knows the history. We trusted her advice after the 2014 allegation and did not bring the matter to the Trustees. However, she took no action to ensure that similar behavior would not occur in the future, such as by conducting training.
>
> 2. Not only was the Union not trained until four years later, the Funds Office was never trained (not only to not engage in sexual harassment, but also to be able to recognize when it was happening),
>
> 3. By not taking action after the 2014 allegations, it was akin to condoning this type of behavior. It was given additional room to grow, and Billy is the result.
>
> 4. The past is done, and there have been no specific allegations of sexual harassment to date (since 2014). But we know that there is a climate of inappropriate language and actions that at least border on sexual harassment (if not worse) and could create liability.
>
> 5. Inappropriate language and discussion (Gina, Rose, Taylor, Rosemary, Jenn D, Jenn V, Amy, Danielle) and unwanted touching (Gina, Jenn V). Kate needs to make a determination as to whether this constitutes sexual harassment for which there may be liability and whether the Trustees should be notified and a Joint Board meeting held.
>
> 6. Gina was assaulted. People in the office are uncomfortable and feel unsafe. "There was violence in his voice." Multiple people were concerned that Billy would strike Gina and were close to calling 911. Second incident of which we are aware that an innocent conversation devolved quickly into extreme anger by Billy. Such incidents can also create liability for the Funds. Kate also needs to decide whether this information should be shared with the Joint Board.
>
> 7. Extreme tension between Union and Funds. Necessary work is not getting done and the stress is terrible. Gina has an illness and this level of stress is unhealthy for her.

1

8. Kate owns this.  Kate needs to fix it.  The problems have all been related to the close proximity between the Union and Funds.  Separation is needed to end the harassment and the hostility and to secure Gina's health and the emotional well-being of her staff.

9. The answer for the future is that the Funds must move to a new office location.  Kate's assistance is needed as Funds counsel to negotiate the breaking of our lease with the Union and to assist in our relocation as needed.

2

# Exhibit C

**Gina Alongi**

| | |
|---|---|
| **From:** | Greg Geiman <greggeiman4@gmail.com> |
| **Sent:** | Sunday, May 20, 2018 5:58 PM |
| **To:** | Gina Alongi |
| **Subject:** | Fwd: 5/16 conversation with Rosemary Ortega |

---------- Forwarded message ---------
From: Greg Geiman <greggeiman4@gmail.com>
Date: Wed, May 16, 2018 at 11:45 AM
Subject: 5/16 conversation with Rosemary Ortega
To: Greg Geiman <greggeiman4@gmail.com>

Rosemary told me that Billy comes into the office and speaks inappropriately to her, Amy, Jennifer D, Jennifer V, and Danielle. Will speak about women he's slept with on the road, sexual positions he likes. Will make jokes; when asked "What's up?" will respond with sexual double entendres. Such as, "You know what's up. You want me to show you?"

Rosemary said that sometimes the women are willing participants in the talk but other times she thinks it's more a matter of being afraid to tell the boss that he's going too far.

Rosemary also told me that she has spoken with Billy and told him that he's going to get in trouble with the way he speaks to women in the office. He has responded that she's right, that he knows, but his behavior has not changed.

# Exhibit D



INTERNATIONAL UNION OF OPERATING ENGINEERS
**LOCAL 4**
**Health and Welfare, Pension, and Annuity Funds**

July 23, 2020

By Hand

Gina M. Alongi
4 Orchard Hill Drive
Westborough, MA 01581

Dear Gina:

This letter is intended to follow our telephone call regarding the termination of your employment at the International Union of Operating Engineers Local 4 Fringe Benefit Funds ("Funds"). As we said on the phone, the Boards of Trustees of the Health & Welfare, Pension, and Annuity & Savings Funds voted to terminate your employment as Administrator. As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision.

You have held a position of high trust and confidence, and all business of the Funds to which you have been privy remains confidential to the Funds. We would like to express the Trustees' appreciation for the work you have done over the course of your career at the Funds and trust that our separation will be courteous and respectful.

You will receive your accrued vacation pay by direct deposit on or about July 29, 2020, and you will remain eligible on the Basic Health Plan through February of 2021. You continue to be a participant in the Funds with access to your individual Annuity & Savings account at MassMutual.

Upon receipt of this letter, you are expected to return all Funds' laptops, tablets, or other computers that are in your possession. The service to your cell phones will be disconnected on Friday, July 24, 2020 and should thereafter be returned. Please return your vehicle and any other equipment or property of the Funds before Friday, July 31, 2020.

Thank you.

Sincerely,

William D. McLaughlin

James Reger / GG

cc:    Trustees

Gregory A. Geiman, Esq.

16 Trotter Drive
P.O. Box 680
Medway, MA 02053-0680

TEL (508) 533-1400
FAX (508) 533-1425
1-888-486-3524

www.local4funds.org
**D. App. 228**

# Exhibit E



INTERNATIONAL UNION OF OPERATING ENGINEERS
**LOCAL 4**
Health and Welfare, Pension, and Annuity Funds

August 5, 2020

By Hand

Rosemarie Alongi
23 Kay Street
Westborough, MA  01581

Dear Rosemarie:

We do not have your current contact information except for your address, so we will not have a chance to talk before you receive this letter.

Your employment at the Funds Office as Security Officer and Director of the I.T. Department will be terminated effective today.  As you were an employee at will, it is not necessary to detail reasons for the decision.  If you would like to contact me about this, please give me a call on the office number, 508-533-1400, extension 140.

You will received your remaining accrued vacation pay by direct deposit on or about August 11, 2020.  You will remain eligible on the Basic Health Plan through February of 2021. You continue to be a participant in the Funds with access to your individual Annuity & Savings account at MassMutual.

If you continue to hold any remaining property of the Funds such as paper or electronic files, or your IPhone, please return them to the Funds Office in Medway before Friday, August 7, 2020. Also, please provide us with the credentials for access to the Funds' website, which were deleted from the Funds' laptop that was returned two weeks ago.

Thank you.

Sincerely,

Gregory A. Geiman, Esq.
Fund Administrator

16 Trotter Drive
P.O. Box 680
Medway, MA 02053-0680

TEL (508) 533-1400
FAX (508) 533-1425
1-888-486-3524

www.local4funds.org

**D. App. 230**

# TAB
# 29

Message

| | |
|---|---|
| **From:** | Laura-Jean Hickey [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=7E79E0A81AB44203A2E69E5177A75CC7-LAURA-JEAN] |
| **Sent:** | 1/20/2020 2:28:20 PM |
| **To:** | 'Amy SmithMattie' [a.smithmattie@iuoelocal4.org]; William McLaughlin [w.mclaughlin@iuoelocal4.org] |
| **Subject:** | RE: Mass. Coalition Scholarship Applications are available now! |

Thank you kindly! 

Laura-Jean

**From:** Amy SmithMattie <a.smithmattie@iuoelocal4.org>
**Sent:** Friday, January 17, 2020 1:09 PM
**To:** Laura-Jean Hickey <LHickey@local4funds.org>; William McLaughlin <w.mclaughlin@iuoelocal4.org>
**Subject:** RE: Mass. Coalition Scholarship Applications are available now!

**Warning**: External Sender

Thanks Laura-Jean, a couple in the day room I do not believe would hurt anything 😊

Amy

**From:** Laura-Jean Hickey <LHickey@local4funds.org>
**Sent:** Friday, January 17, 2020 9:43 AM
**To:** William McLaughlin <w.mclaughlin@iuoelocal4.org>; Amy SmithMattie <a.smithmattie@iuoelocal4.org>
**Subject:** Mass. Coalition Scholarship Applications are available now!

FYI – see flyer that I made to advertise the 2 scholarships that the Coalition offers. I've left a few up front (our desk and the 2 day rooms). If you'd prefer that I don't put in the day rooms please let me know? Thank you!
They will be posted on the Coalition website soon as well as a link on the Funds website.

Laura-Jean
Confidentiality Requirement: This email message, including any attachment(s), is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is strictly prohibited. If you are not the intended recipient, please immediately contact the sender by email and delete the message from your system.

CONFIDENTIAL

# TAB
# 30

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

---

*Taylor Ryan*

*July 08, 2022*

---

*68 Commercial Wharf • Boston, MA 02110*
*888.825.3376 - 617.399.0130*
*Global Coverage*
*court-reporting.com*



Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Taylor Ryan
July 08, 2022

Page 3

1 COMMONWEALTH OF MASSACHUSETTS
2 Norfolk, ss. Superior Court
3  Civil Action No. 2182CV00125
4 ***************************************************
5 GINAMARIE ALONGI AND ROSEMARIE ALONGI, *
6  Plaintiffs *
7  vs. *
8 IUOE LOCAL 4 HEALTH & WELFARE FUND; IUOE LOCAL 4 *
9 PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS *
10 FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4 *
11 APPRENTICESHIP & TRAINING FUND; JOINT LABOR- *
12 MANAGEMENT COOPERATION TRUST; AND WILLIAM D. *
13 MCLAUGHLAN, INDIVIDUALLY AND IN HIS CAPACITY *
14 AS CHAIRMAN OF THE BOARDS OF TRUSTEES, *
15  Defendants *
16 ***************************************************
17  DEPOSITION OF:  TAYLOR RYAN
18   BOWDITCH & DEWEY, LLP
19   200 Crossing Boulevard
20   Framingham, Massachusetts
21   July 8, 2022  1:53 p.m.
22
23  Kristen M. Edwards
24  Court Reporter

Page 3

1 APPEARANCES (Continued):
2
3 Representing the Defendants:
4  O'DONOGHUE & O'DONOGHUE LLP
5  5301 Wisconsin Avenue, NW, Suite 800
6  Washington, DC 20015
7  BY:  DANIEL KEENAN, ESQ.
8  (202) 362-0041
9  E-mail: cgilligan@odonoghuelaw.com
10
11 In Attendance:  Rosemarie Alongi
12  Gina Marie Alongi
13  Greg Geiman
14
15
16
17
18
19
20
21
22
23
24

Page 2

1 APPEARANCES:
2
3 Representing the Plaintiffs:
4  BOWDITCH & DEWEY, LLP
5  200 Crossing Boulevard, Suite 300
6  Framingham, MA 01702
7  BY:  TIMOTHY P. VAN DYCK, ESQ.
8   JACOB A. TOSTI, ESQ.
9  (617) 757-6537  fax (508) 929-3137
10  E-mail: tvandyck@bowditch.com
11
12 Representing the Defendants:
13  FREEMAN, MATHIS & GARY LLP
14  60 State Street, Suite 600
15  Boston, MA 02109-1800
16  BY:  JENNIFER L. MARKOWSKI, ESQ.
17   CHRISTOPHER REDD, ESQ.
18  (617) 963-5975
19  E-mail: jmarkowski@fmglaw.com
20
21
22
23
24

Page 4

1  I N D E X
2
3 WITNESS: TAYLOR RYAN
4
5 EXAMINATION BY: PAGE:
6 Ms. Markowski 5
7 Mr. Keenan 123
8 Mr. Van Dyck 150
9
10 EXHIBITS: PAGE:
11 Exhibit 144, letter................................71
12 Exhibits 145-147, e-mails.........................71
13 Exhibit 148, statement............................71
14 Exhibit 149, text messages........................72
15 Exhibit 150, e-mail..............................134
16 Exhibit 151, e-mail..............................135
17 Exhibit 152, e-mail..............................137
18 Exhibit 153, e-mail..............................138
19 Exhibit 154, e-mails.............................139
20 Exhibit 155, e-mails.............................145
21
22 (Exhibits retained by Attorney Markowski)
23
24

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Taylor Ryan
July 08, 2022

Page 153

1  harassment training you recall?
2      A.   No.
3      Q.   Do you know -- so you think it was online
4  training.  Do you recall how long the training took?
5      A.   I think it was just a day.
6      Q.   A full day?
7      A.   I don't remember it.  I don't remember it
8  taking a full day.  I don't remember it not taking a
9  full day.  I don't remember the length of time.
10     Q.   I think you testified earlier, please
11 correct me if I am wrong, I think you testified earlier
12 that you're fairly confident that the sexual harassment
13 training that you received was in response to the
14 concerns that you had about Mr. Burns, correct?
15     A.   Yes, it certainly seemed that way.
16     Q.   Is that based solely on the timing or
17 anything else?
18     A.   I would say it was based on the timing,
19 and the fact that Greg and Gina seemed to really take
20 it very seriously what was going on.
21     Q.   And why is it that you went to Mr. Geiman
22 with respect to your concerns about Mr. Burns?
23     A.   I think partly because going to Gina
24 would have been too official, and it wasn't there in my

Page 154

1  mind yet and, also, because Greg is the lawyer.  He is
2  the rule guy, so that's kind of who I would look to for
3  any guidance on whether rules were being broken.
4      Q.   Including rules regarding employment,
5  correct?
6      A.   What do you mean?
7      Q.   For example, if there had been a
8  harassment or retaliation or inappropriate conduct in
9  the workplace, Mr. Geiman would have been an
10 appropriate person to speak to regarding those issues?
11     A.   Yes.
12     Q.   You understood Mr. Geiman played some
13 sort of an HR function at the Funds?
14     A.   Yes.
15     Q.   You were asked some questions by
16 Mr. Keenan about Coalition work that you did.  Do you
17 recall that?
18     A.   Yes.
19     Q.   Would it be fair to say with respect to
20 the Coalition work you did that most of it was given to
21 you by Ms. Hickey?
22     A.   Yes.
23     Q.   And do you know for a fact whether Ms.
24 Alongi was aware of all of the work that you were doing

Page 155

1  for the Coalition?
2      A.   No, I wouldn't have thought.
3      Q.   You mentioned about spending a fair
4  amount of time with respect to sorting out ZIP codes on
5  one project?
6      A.   Yes.
7      Q.   And, I think, you testified that it may
8  have taken you a week?
9      A.   I mean, I'm sure it took me at least a
10 week.
11     Q.   Was that full days or was it -- when you
12 say a full week, I mean, was it several hours during
13 the day each day for a week or was it eight-hours a day
14 for the full week?
15     A.   I don't remember -- I mean, I'm sure it
16 couldn't have been all day, because I always had to
17 take some time to cover the front.  There were probably
18 some days where I worked on it more than others.  Like,
19 if I had nothing else to do, I'm sure I would have
20 spent a little more time on that.  So I don't remember
21 specifically how much time I spent, but it wasn't like
22 a get up and do this all day as best as I remember.  I
23 don't think it was a full eight hours of the ZIP codes.
24     Q.   This was work that Ms. Hickey had given

Page 156

1  you to do?
2      A.   Yes, apparently seeing these e-mails.
3      Q.   Do you believe that your work for the
4  Funds suffered at all as a result of any work you did
5  for the Coalition?
6          MS. MARKOWSKI:  Objection to form.
7          THE WITNESS:  I don't think I can really
8  answer that.  I mean, it's I have to believe
9  that they would never -- Laura-Jean and Gina
10 would never have asked me to do anything when
11 something needed to be done for the Funds but I,
12 you know, I don't remember specifically doing
13 work for the Coalition, so it's hard to say one
14 way or another.
15     Q.   (By Mr. Van Dyck)  Understood.  I'd like
16 to draw your attention to Exhibit 149, which is in
17 front of you.
18     A.   Yes.
19     Q.   You recall Ms. Markowski asked you a
20 series of questions regarding some of those texts but
21 not all of them, right?
22     A.   She went through most of them.
23     Q.   Well, there are a few she skipped over
24 and I would like to talk to you about them, if you

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Taylor Ryan
July 08, 2022

Page 157

1  don't mind.  If you go to the very last page of Exhibit
2  149.
3        A.   Sure.
4        Q.   I believe at the middle of the page you
5  state, "I remember Rosemarie saying to Billy on
6  multiple occasions that he was being inappropriate."
7  Do you see that?
8        A.   That was Danielle saying that.
9        Q.   That was Danielle saying that to you?
10       A.   Yes.
11       Q.   And the Rosemarie there, do you remember
12  that to be Rosemarie Alongi?
13       A.   It would have been her because, yes,
14  because she spells it I-E whereas Rosemary was no I.
15       Q.   And do you ever recall Rose saying this
16  to Billy?
17       A.   Not specifically.
18       Q.   I think I understood from your earlier
19  testimony that you and Danielle didn't talk about this
20  by phone.  It was simply by text?
21       A.   Correct.
22       Q.   If you go to the very last page of
23  Exhibit 149, I guess it's Danielle saying to you he,
24  being Billy, has without a doubt used his status to

Page 158

1  coerce women into having relations with him.  I don't
2  see LJ being that person.  Have I read that correctly?
3        A.   Yes.
4        Q.   Did you and she ever discuss that?
5        A.   No, that was pretty much the extent of
6  the conversation.
7        Q.   Did you agree with that statement,
8  disagree with that statement or just not know or were
9  agnostic?
10       MS. MARKOWSKI:  Objection.
11       THE WITNESS:  I would -- I mean, because
12  I certainly don't know it to be true for a fact,
13  I couldn't say that I agree but, I guess, I
14  could say agnostic.
15       Q.   (By Mr. Van Dyck)  Fair enough.  Now I'd
16  like to go to your witness statement.
17       A.   Okay.
18       Q.   And, I think, I speak on behalf of
19  everyone in this room when I say you have really good
20  handwriting.
21       A.   Thank you.
22       Q.   And we appreciate that.  Again, you were
23  asked some questions about your witness statement but
24  there were several portions of your witness statement

Page 159

1  that you were not asked about, and I would like to ask
2  you about some additional things you said in here.
3        First of all, I think you testified that
4  you wrote this witness statement close in time to the
5  fight, right?
6        A.   Yes.
7        Q.   And, I think, we can all agree the fight
8  occurred on May 1st, 2018?
9        A.   Yes.
10       Q.   Do you recall approximately how close in
11  time to May 1st it occurred?
12       A.   In my memory it feels like almost
13  immediately.
14       Q.   Like within a day or so?
15       A.   Yes, probably.
16       Q.   Did you write this witness statement on
17  your own?
18       A.   Do you mean unprompted or like unguided?
19       Q.   Good question.  I understand that Gina
20  asked you to write something, correct?
21       A.   Yes.
22       Q.   But these are your words, correct?
23       A.   Yes.
24       Q.   Completely your own words?

Page 160

1        A.   You know, when I read it over, there was
2  one thing at the very end where I said it's a scary
3  thing to speak out against the boss, especially if I
4  didn't know if I would be supported or shushed, that
5  was perhaps a little bit suggested to me by Gina, truth
6  be told, but I also would not have written it down had
7  it not felt accurate.
8        Q.   Fair enough.  Other than that, that's
9  completely your own?
10       A.   Yes.
11       Q.   And about how long did it take you to
12  write this witness statement?
13       A.   I don't know.  Maybe, I could be
14  overestimating myself, but like half an hour or so,
15  maybe an hour.
16       Q.   On the first -- I think you also
17  testified that when you wrote this witness statement
18  you wanted to be sure to be very accurate is what you
19  said.
20       A.   Yes.
21       Q.   I will represent to you, given your
22  testimony today, you are probably trying to be more
23  accurate with respect to your words than most people so
24  --

# TAB
# 31



Bowditch & Dewey, LLP

200 Crossing Boulevard | Suite 300 | Framingham, MA 01702

508-879-5700 | bowditch.com

**Timothy P. Van Dyck**
Direct telephone: 617-757-6536
Direct facsimile: 508-929-3136
Email: tvandyck@bowditch.com

December 18, 2020

**VIA EMAIL**

Tania Taveras
Administrative Assistant
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, MA 02108

*Re:*     ***Ginamarie Alongi v. Int'l Union of Operating Engineers (IUOE) Local 4 Fringe Benefit Funds, et al.; MCAD Docket No. 20BEM01708***
         ***Rosemarie Alongi v. IUOE Local 4 Fringe Benefit Funds, et al.; MCAD Docket No. 20BEM01709***

Dear Ms. Taveras:

This letter constitutes the Rebuttal of Complainants Ginamarie Alongi ("Gina") and Rosemarie Alongi ("Rosemarie") (jointly "Complainants") in the above-captioned matters. The Position Statement filed by Respondents International Union of Operating Engineers Local 4 Fringe Benefit Funds (the "Funds")[1] and William McLaughlin ("Mr. McLaughlin") (jointly, "Respondents") is unmoored from both fact and law in a desperate attempt to defend the indefensible. Among the more blatant examples of Respondents' departure from reality are the following:

- Despite the fact that Complainants had worked for the Funds for decades, the very first time they learned of their purported performance issues was upon reading Respondents' recently filed position statement. In real time, the Funds (including Mr. McLaughlin personally) routinely praised Gina and Rosemarie for their work ethic and their ability to get the job done while they worked there. Only now, after they have come forward with their serious allegations of sexual harassment and retaliation, have Respondents cobbled together a litany of alleged workplace transgressions – some of them dating back over fifteen (15) years – in an ill-fated attempt to try to create a fig-leaf of legitimacy for their retaliatory decision to show the Complainants the door.

- Respondents' understandable concern about the severity of the allegations the Complainants have brought forward has manifested itself in a not-so-veiled threat of

---

[1] The Funds encompasses all of the associated Local 4 Trust Funds.



criminal wrongdoing on the part Gina, which itself stands as an independent violation of G.L. c. 151B.[2]

- The Funds, in a transparent act of desperation, gin up a hired gun, who they then seek to clothe in the garb of an "expert," to opine on why Complainants' terminations were justified. Of course, this "expert" opinion comes only after the fact and is based solely on the Funds' own recitation of events.

Respondents' pretextual actions and animus here are obvious. The position statement – signed under oath - makes them glaring.

**I.      Mr. McLaughlin's Sexual Harassment of Female Funds Employees Was Frequent and Continuous.**

Contrary to Respondents' Position Statement, Mr. McLaughlin sexually harassed female employees from the time he assumed the role of Business Manager of the Union until the day that Funds staff were instructed to work from home due to COVID-19. Mr. McLaughlin would frequently visit with female employees, making sexual comments, commenting on their bodies, their appearance, their clothing and, at times,  various sexual acts and positions. Although Mr. McLaughlin temporarily avoided entering Gina's office after the May 1st, 2018 incident, within a few weeks, he resumed regular visits to Gina's office and continued to make inappropriate comments about women, including female employees and Gina herself.

While the Funds chose not to investigate or notify the various Boards of Trustees, Gina herself was able to secure witness statements from a number of other female employees who were made to feel uncomfortable by Mr. McLaughlin's crude behavior. Taylor Ryan, for example, stated that she was uncomfortable with the inappropriate comments that Mr. McLaughlin made about her appearance and other women, the way that he looked at her, and the way he constantly tried to make physical contact with her in the form of "fist bumps." *See*  Tab A. Ms. Ryan expressed fear in reporting Mr. McLaughlin's harassment because he was "the boss." *Id.* Another employee, Jennifer Vachon, stated that Mr. McLaughlin regularly gave her massages and although she was uncomfortable with Mr. McLaughlin touching her, she feared saying anything because he was "the boss." Rosemary Ortega stated that when any of the young girls walked by Mr. McLaughlin in the office, he would look them over and comment to Rosemary about "what he could do to them." *See* Tab B. Gina relayed all of these comments (and more) to Attorney Kate Shea, outside counsel to the Funds, during their meeting on May 21, 2018 and, at no point during that meeting (or at any time thereafter) did Gina recant her allegations of sexual harassment.

---

[2] G.L. c. 151B § 4(4A) states that it is an unlawful practice for any person to threaten another person in the exercise of any right granted by the state Fair Employment Practices Act. Yet this is exactly what Respondents attempt to do here with their allusions to purported criminal penalties.



Mr. McLaughlin's sexual harassment of numerous female staff, including both Complainants, was constant and continuous, occurring well within the 300-day statute of limitations ascribed by G.L. 151B. The only reprieve from Mr. McLaughlin's harassment was when he was not in the office or when staff were working remotely and no longer physically working near Mr. McLaughlin due to the COVID-19 pandemic.

Mr. McLaughlin's harassment of female employees was well-known and documented by Mr. Geiman who routinely maintained his own records of workplace harassment. *See* Tab C. Remarkably, Respondents attempt to distance themselves from Mr. Geiman's own immutable words by claiming that somehow it was Gina who instructed Mr. Geiman – an attorney who has now taken Gina's place -- to "draft and send her an email that reflected back her own talking points." *See* Position Statement, p. 12.  There is nothing in this email, drafted after hours using Mr. Geiman's own personal email account, which even remotely suggests that it was drafted for Gina's benefit or at Gina's insistence.  Simply put,  Mr. Geiman owns the words contained in it. Nor did Gina direct Mr. Geiman to draft the email summary of his meeting with Rosemary Ortega. *See* Complaint Exhibit C. Indeed, Gina was not even present at that meeting and had no knowledge of what was in the email until Mr. Geiman forwarded it to her several days later.[3]

## II.    Respondents' Stated Reason for Gina's Termination Is Pretextual.

Complainants need only present evidence from which a reasonable jury could infer that "the respondent's facially proper reasons given for its action against [her] were not the real reasons for that action." *Bulwer v. Mount Auburn Hospital*, 473 Mass. 672 (2016). In a transparent attempt to discredit Gina's decades-long career, Respondents now claim that Gina's work performance was deficient. Gina's long tenure at the Funds evidences that Respondents' newly-concocted justification her termination is transparently pretextual. In forty-two (42) years of working for the Funds in several positions, Gina's personnel file is scant and contains no record of any discipline or any negative feedback (indeed, the Funds reviewed her performance only once, in 1995). Moreover, in her decades of work at the Funds Gina routinely received praise for the work that she did on behalf of the Funds. *See* Tab D. By Respondents' own version of events, Mr. McLaughlin told Gina that "she was a good administrator" and that "he valued her work." *See* Position Statement p. 14.

Recognizing that their current position does not match the decades of Gina's strong performance, Respondents attempt to use an "expert" report, prepared by Attorney Joyce Mader, to justify their purported reasons for terminating Gina. But Attorney Mader's report merely summarized the minutes from the July 21st, 2020 Special Meeting of the Trustees. She did not conduct an independent investigation into the underlying events nor opine on whether it was likely they occurred or not. Rather, in a desperate attempt to justify their own actions

---

[3] Contrary to Respondents' assertions, Gina and Rosemarie, while friendly with Ms. Ortega, are not friends with Ms. Ortega and did not socialize with her outside of work except for one occasion when Ms. Ortega was visiting a relative on Cape Cod and visited with Gina and Rosemarie for a short period.



after the fact, Respondents apparently purchased a draft report from Attorney Mader which relies solely on the Funds' own version of events. Notably, the report was not completed until November 25, 2020, long after Complainants filed their Charge, and thus it could not have formed the basis of the Funds' decision to terminate Complainants.[4]

### a.  Respondents Were Well Aware of Gina's Coalition Work

Gina began working part-time for the Massachusetts Coalition of Taft Hartley Funds (the "Coalition") thirteen years ago, back in 2007, a position that benefitted the participants of the Benefit Funds through Gina's collaboration with administrators of other Taft Hartley Trust Funds and negotiation of collective discounts. Respondents' suggestion that they only recently discovered Gina held a second job is false. Both the Boards of Trustees and the Funds were well aware of Gina's and other Funds employees' work for the Coalition.[5] Respondents claim that Mr. McLaughlin discovered that Gina performed significant work for the Coalition based on timesheets required by all staff while working remotely.[6] That Gina accounted for the minimal time spent on Coalition work on her work from home summaries shows that the Funds were well aware of her Coalition work and Gina made no effort to hide it.  To the extent that Gina performed any Coalition business during regular business hours, she performed it in lieu of taking a lunch break or other permissible break during the day.[7] In fact, the Funds Chairman would take into account Gina's Coalition income every year as part of an annual determination of her salary. When Gina received the Cushing-Gavin Boyle Award in 2015, it was in recognition of her work with both the Funds as well as the Coalition.

### b.  Gina Properly Managed Funds Credits for the Sole Benefit of Funds Participants.

At no point did Gina "divert" or "embezzle" Funds resources for the benefit of the Coalition. As Administrator of the Funds, Gina negotiated annual "wellness credits" from Blue Cross Blue

---

[4] Respondents trumpet the unanimous votes of the Boards of Trustees as somehow conferring an imprimatur of independence on the decision to terminate Gina's employment.  However, although each trustee has his own vote, it is common practice for the Chairman of the Boards of Trustees to control the vote of all the Trustees, including the Management Trustees. That the vote to terminate Gina's employment was unanimous merely confirms the pattern and practice of trustees voting in lockstep with the Chairman, Mr. McLaughlin.

[5] Contrary to Respondents' assertion that no other Funds employees were also employed by the Coalition, Laura Jean Hickey, Rosemarie, and the Funds' in-house accountant were all compensated for work performed for the Coalition.

[6] Funds staff began working remotely in March 2020, the new requirement that employees account for their time in 15-minute increments was not created until June 2020, after the ransomware attack and its investigation were fully resolved. Gina's timesheets revealed that over the course of the seventeen days when she was required to complete work from home timesheets, she spent a total of four (4) hours and forty-six (46) minutes on Coalition business or an average of twenty-six minutes per day.

[7] Gina regularly performed work for the Funds from home in the evenings and weekends in order to stay on top of all of the work as Administrator, well over ten hours per week outside of regular business hours.



Shield. Wellness credits are not assets of the Funds and cannot be redeemed in cash. Rather, the Funds typically applied these credits towards the costs of hosting health challenges at Local 4 events. These events were not usually well attended and therefore the credits were not fully utilized. The Coalition was planning a large wellness event for March 22, 2020 which would have been open to members of many different Taft-Hartley Funds including Local 4 Funds. Since the event would have been much larger, Gina hoped that more Local 4 members would participate. As part of the event, the Coalition explored the possibility of member funds donating wellness credits to the event to help defray the costs of biometric health screenings for Local 4 members. The event was still in early planning stages when it was cancelled due to the pandemic. Had the event been more fully planned, Gina would have certainly approached the Boards of Trustees with a proposal to donate the $30,000-worth of wellness credits to the event, specifically for use by Local 4 members, in a manner consistent with previous uses of similar wellness credits.

c. Gina's Allocation of Administrative Time Was Supported by the Funds' Accountants.

In another desperate attempt to dredge up baseless excuses for Gina's termination, Respondents now claim that Gina failed to keep DOL timesheets when, in fact, Gina allocated her time according to the advice of the Funds' own outside accounting firm. In 2002, the Department of Labor (DOL) began an investigation into the Funds' allocation of administrative expenses charged to each of the trust funds comprising the Local 4 Funds. Prior to the investigation, the Funds' external accounting firm calculated the annual allocation to each Fund. This method predated Gina becoming Administrator and was common practice with many other Taft-Hartley Trust Funds. After the DOL investigation concluded in 2004, the Funds negotiated the Administrative Services Sharing Agreement ("ASSA") which dictates the administrative allocation of expenses incurred by each Fund. From that point forward, employees entered daily time allocations into an electronic database which was then distributed to the accounting firm to calculate the appropriate percentage to allocate to each Fund. The accounting firm also calculated Gina's time by interviewing her. Initially, the accounting firm calculated the reallocation every six months, retroactively.  However, over the years, the accounting firm determined that the allocation of administrative fees did not change significantly from year to year unless a large project affected  one of the Funds.[8] After several years, the Boards of Trustees voted to move to a prospective annual allocation of time and advised the DOL of this change. Gina relied on the advice of the external accountants who informed her that their methods of calculating and allocating her time were appropriate, consistent with common practices of other Taft-Hartley Trust Funds, and acceptable by the DOL.  For Respondents to now claim (again, for the first time, and only after terminating Gina's

---

[8] For example, in 2014, Gina spent significant time working on dismantling the claims operation for the Health and Welfare Fund, resulting in an increased allocation for the Health and Welfare Fund.



employment) that Gina failed to keep accurate timesheets is both fanciful and completely at odds with the advice of their own outside accounting firm.

      d.  <u>Gina Fully Disclosed Financial Records to the Trustees.</u>

Respondents' claim that Gina falsified the financial records of the Funds is yet another obvious effort to invent reasons for Gina's termination after the fact. Gina prepared and printed agendas for each of the Trustees' meetings which included financial statements completed by the Funds' in-house accountant. These financial statements consisted of a balance sheet, income statement, detailed list of all administrative expenses, and references to the relevant check register numbers. Gina did not provide copies of these check registers as it would have generated significant paper that the Trustees did not wish to review. However, Gina made clear to the Trustees that if they wanted to see any or all of the check registers, she would immediately make them available. In over twenty years of Gina providing these financial summaries, none of the Trustees ever asked to see any of the check registers.

Similarly, at no point did Attorney Shea request to view the check registers or ask Gina about them. Attorney Shea was present and took minutes at each meeting of the Trustees.  At some point, Attorney Shea did ask Gina about the Delinquency Minutes (notes of outstanding collections) and Gina informed her that those minutes were only shared with Trustees due to the potential conflict of interest that outside counsel may have working with multiple Taft-Hartley Trust Funds. If Attorney Shea had ever requested to see the check registers, Gina would have immediately provided them.  She never did. It is inconceivable that the Trustees only recently realized that the check registers were not provided in full and that this omission formed the basis of Gina's termination when Attorney Shea allegedly asked Gina about the check registers in 2012 and, despite her experience working with numerous Trust Funds, took no action.

      e.  <u>Gina Received Approval for Funds Expenses.</u>

The evening of the 2015 Cushing-Gavin Boyle award ceremony, Gina expensed three hotel rooms at the Park Plaza for herself, Ms. Hickey, and then-Business Manager of the Local 4 Union Lou Rasetta for the evening of the 2015 Cushing-Gavin Boyle award ceremony. Mr. Rasetta himself (who, like Mr. McLaughlin, also served as Chairman of the Boards of Trustees for the Funds) approved the expense as did Senior Management Trustee Jack Shaughnessy. Five years later, Respondents now attempt to use this single example of alleged improper spending as evidence that Gina mismanaged the Funds' resources. That Mr. Rasetta himself had a hotel room contradicts any suggestion that the Funds were unaware of these expenses.

      f.  <u>The Trustees Had Full Information To Amend the Plan In The Event Of a Member's Medical Emergency.</u>



Respondents apparently now find fault with Gina for doing her job in carefully considering the administration of the Funds. Over the course of Gina's tenure as Administrator, many participants requested that the Funds make an exception to the eligibility rules for a variety of reasons. The Funds now identify a single instance during the COVID-19 pandemic in which Gina attempted to find an alternative to amending the plan. When a participant's daughter needed surgery scheduled for five days before he was eligible for benefits, Gina was concerned that amending the plan would create a slippery slope for future plan amendments. Gina contacted Attorney Lili Sloane at Segal Roitman who shared her concerns. Gina suggested that one option would be to require the participant to purchase a temporary COBRA plan to cover the period before he became eligible for benefits. However, she never stated that it was legally required. The Trustees were fully aware that they had the discretion to amend the plan at any time as they had done many times in the past.

g.   Mr. Geiman Was Responsible For Supervision of the IT Department.

Gina did not provide day to day oversight of the IT Department. As Administrator, Gina had a myriad of duties and responsibilities and delegated responsibilities to Mr. Geiman, the Associate Administrator. Due to Mr. Geiman's role as HIPAA Privacy Officer, it made the most sense for Mr. Geiman to work with and supervise the IT Department. Gina expected that Mr. Geiman would use appropriate judgment and inform her of any significant issues or developments arising from the IT Department.

h.   Respondents Failed To Accommodate Gina's Type 1 Diabetes.

Respondents attempt to minimize the management required by Gina's disability for which she requested an accommodation in front of Attorney Shea. Gina wears a Continuous Glucose Monitor (CGM) and takes two types of insulin to manage her Type 1 Diabetes. The CGM takes her glucose measurements at regular intervals and alerts her if her blood glucose levels are outside of normal range. If Gina's blood glucose levels are too far outside of a normal range, Gina can experience physical side effects which can take hours to subside. Therefore, careful management is extremely important and often time-sensitive. On some days, Gina may need to take 5 or more shots of insulin in a single day. Typically, Gina injects insulin in her stomach. However, Mr. Geiman was frequently in Gina's office and would not leave to allow her the privacy to inject her insulin shot. Therefore, on several occasions, Gina reluctantly injected insulin in her thigh while Mr. Geiman was present. Although Gina was able to inject insulin at work, in order to maintain her CGM, Gina is required to remove, replace, and test the device at certain times. This is an involved medical procedure which requires, in part, inserting a needle deep into the skin. This process could cause significant bleeding and could not safely be performed at the Funds offices.

In addition to the CGM, which measures Gina's blood sugar levels at specific intervals, Gina's service dog was trained to sniff out low blood sugar drops. Often, the dog can alert her before her CGM can identify a problem. She would often bring her service dog to the office on Fridays,



but also on other days when her energy was particularly low. Gina's service dog is well trained and does not require a muzzle. Under the Americans with Disabilities Act, an employer cannot prohibit an individual with a disability from having a service animal in the workplace who is trained to do work for the individual even if another employee has an allergy. 42 U.S.C.A. §§ 12101 et seq.

### III.     Respondents' Stated Reason for Rosemarie's Termination Is Also Pretextual.

Respondents similarly attempt to discredit Rosemarie by alleging, for the first time, deficient performance. Rosemarie has a wide range of technological expertise from working in the technology sector for over forty-two years, including seventeen (17) years at the Funds and regularly received glowing performance reviews from Mr. Geiman.

An associational retaliation claim is appropriate here where Gina and Rosemarie have a very close familial relationship as twins and the reasons for Rosemarie's termination were purely pretextual. *Thompson v. North American Stainless, LP* 562 U.S. 170 (2011).[9] Respondents' reliance on *Flagg* misstates the Court's ruling which explicitly declined to define boundaries of what relationships could create the basis of an associational claim. *Flagg v. AliMed, Inc.*, 466 Mass. 23, 30 n.15 (2013).

> a. Respondents Inappropriately Blame Rosemarie for Technology Decisions that were not Hers to Make.

Rosemarie began working for the Funds in 2002 as a consultant and assumed a position as a full-time employee in 2003 as the HIPAA Security Officer, safeguarding the protected health information of Funds participants. Since 1978, the Funds IT Department had been managed by Alan Koufos and relied primarily on outside contractors to maintain its network. For most of her tenure at the Funds, Rosemarie worked alongside Alan Koufos, Manager of the IT Department until his retirement. Both of them reported directly to Mr. Geiman. Mr. Geiman was the Funds' HIPAA Privacy Officer and Rosemarie worked closely with him to ensure the Funds' network was HIPAA compliant. During Mr. Koufos' tenure as Manager, Rosemarie developed the Funds' website and monitored the Funds' network security while Mr. Koufos managed the Funds' hardware, devices, and built the network and disaster recovery protocol.[10]

---

[9] Although *Thompson* addresses associational retaliation claims in the Title VII context, the federal and state statutes "share substantial common ground" with one another and the Commission should look to the federal law for guidance in its broad interpretation of G.L. c. 151B's remedial purpose.

[10] When it became clear in 2019 that Mr. Koufos was about to retire, Rosemarie solicited Jim Burns, a contractor who had worked on the Funds' network with Mr. Koufos, to join the IT Department around August 2019. Rosemarie did not have the technical skills to make changes to the network and assumed that Mr. Burns had knowledge of the Funds' network due to his work with Mr. Koufos. When Mr. Burns began working for the Funds as Network Engineer, he reported to Rosemarie, but Mr. Koufos remained the manager of the IT Department until his retirement at the end of December 2019.



The Funds' stated reason to terminate Rosemarie are factually inaccurate and based on omissions that existed long before Rosemarie's informal assumption of managerial duties. Mr. Koufos, not Rosemarie, was responsible for maintaining outdated Firewall and Virtual Private Network (VPN) devices despite the risk to the network. On several occasions, Rosemarie brought up concerns about Mr. Koufos' failure to update the Funds' devices, change passwords, create backups, and maintain a practical disaster recovery plan, but Mr. Geiman would simply laugh and tell Rosemarie not to worry and that Mr. Koufos would get it done.

Despite Respondents' claims that Rosemarie unilaterally and inappropriately switched the Funds' network monitoring, the IT Department made the recommendation collectively with input from Mr. Geiman just as Rosemarie and Mr. Koufos made a joint recommendation to engage Rapid 7's services in 2016. At the time the Funds engaged Rapid 7's services, it was a small company which analyzed daily threats, trends, and vulnerabilities in the Funds network. As Rapid 7 grew, the structure of its services provided changed and were less friendly to an organization like the Funds.[11] Therefore, at the end of 2019, Mr. Koufos, Mr. Burns, Mr. Geiman, and Rosemarie worked together to identify an alternative threat monitoring service which would provide similar services at a more appropriate scale for the Funds. The committee identified Connections' Managed Engine platform and Network Operations Center services as an appropriate replacement.[12] Once the committee identified a replacement for Rapid 7, Mr. Geiman reviewed the agreement and the Statement of Work and advised Gina to sign the documents.

On January 1, 2020, upon Mr. Koufos' retirement, Rosemarie informally assumed the role of "Acting IT Manager," but did not receive any increase in pay or formal promotion. Rosemarie was able to fill in based on her extensive experience in the technology sector and specific knowledge of the Funds network from working with Mr. Koufos for 17 years.  However, the network, as left by Mr. Koufos, needed a complete overhaul. The existing physical firewall and VPN were so outdated that they did not support multifactor authentication. Rosemarie's first priority was to replace these outdated devices with modern, updated versions. Rosemarie directed Mr. Burns to install and configure the new firewall. When the firewall was fully in place in early February 2020, Rosemarie contracted an outside technology security firm, Blum

---

[11] In particular, Rapid 7 began charging for a minimum of 500 endpoints (devices connected to the network such as physical and virtual servers, desktops and laptops). In 2019, the Funds had only 75 endpoints.

[12] Managed Engine had all the capabilities of the Rapid 7 service as well as additional monitoring of the network hardware (for example, Managed Engine would call when a computer or server failed). In addition, Managed Engine's support could be tailored toward the individual organization's needs while Rapid7 was not as customizable.



Shapiro, to test the security of the new firewall. Blum Shapiro did not identify any issues or vulnerabilities with the new firewall.[13]

Around this time, with the COVID-19 pandemic looming, Mr. Geiman directed Rosemarie and Mr. Burns to prioritize setting up remote work capabilities for Funds employees. Because Mr. Koufos had not maintained up-to-date devices during his tenure as Manager of the IT Department, Rosemarie spent significant time purchasing new devices with full security capabilities, setting up the equipment, training employees on security protocols, and testing it remotely. There was insufficient time at that point to configure multifactor authentication to the new VPN while also preparing for a fully remote work force. For several decades under Mr. Koufos' management, the network had not had the capability to enable multifactor authentication, so this was not a change specifically implemented by Rosemarie. Indeed, Rosemarie had identified this issue to Mr. Geiman numerous times throughout the years, but he took no action.

Respondents' professed justification for terminating Rosemarie's employment rests on a ransomware attack the Funds network experienced in May 2020. Respondents' version of events related to this attack is illogical  and flatly contradicts the findings of the investigation performed at that time by outside experts, Kroll. Many other organizations experienced similar security violations during the COVID-19 pandemic despite robust security protocols. The Kroll investigation found that the threat actor did not access the network through an employee's computer. Rather, the threat actor was able to access the network directly through the firewall itself. Therefore, multifactor authentication at the user-level would not have protected the Funds network from the ransomware attack it faced in May 2020. The firewall itself had been tested by Blum Shapiro and found safe when it was configured and no changes were made except for Mr. Burns opening a port in the firewall without informing Rosemarie, Mr. Geiman, or anyone else until well after the ransomware attack on the network. If Rosemarie had been aware of Mr. Burns' attempt to resolve networking issues by opening a port at the time it occurred, she would have scheduled another test of the firewall. Furthermore, neither Managed Engine or Rapid 7 service would have alerted the Funds of a problem because Mr. Burns opened the port on the firewall using an administrator's profile. Therefore, Rosemarie was not in any way responsible for the attack. The investigation, which in fact concluded that no one was at fault, was completed by June 2020, yet Rosemarie was not terminated until August 5th, a mere two weeks after Gina's termination.

## CONCLUSION

---

[13] On several occasions, Rosemarie reminded Mr. Burns not to change any settings or open any ports on the firewall under any circumstances. Without any such changes, there was no reason to continually test the firewall.



For the reasons stated herein and in their Complaint, Respondents' stated reasons for termination are merely pretextual and the Commission should issue a finding of probable cause.

Very truly yours,

Timothy P. Van Dyck

TPV:sw

cc:     James Shaw, Esq. (by email) (with attachments)
        Robert G. Young, Esq.
        Sherelle Wu, Esq.

BOWDITCH

## CERTIFICATION

I swear under the pains and penalties of perjury that I have carefully reviewed this document and, as to those facts that pertain to me, it is true and accurate to the best of my knowledge, information, and belief.

_____
Ginamarie Alongi



## <u>CERTIFICATION</u>

I swear under the pains and penalties of perjury that I have carefully reviewed this document and, as to those facts that pertain to me, it is true and accurate to the best of my knowledge, information, and belief.

_____
Rosemarie Alongi

# Tab A

To Whom It May Concern,

My first interactions with Billy were very positive. He came over to the front desk, introduced himself to me, and made me feel very welcome. Whenever he was in the front area, he would stop by, ask me how things were going, and chat for a few minutes. I saw it as a display of good leadership that the "big boss" took it upon himself to make sure that all of his employees, even the receptionist, were doing well and happy in their position.

It didn't take too long for me to realize that I had probably given him too much credit. I didn't like the way he talked about women, nor did I appreciate the way he tried to veil his objectification of women with flattery. He would talk about women being hot, about women being his weakness, and made it sound like he couldn't help himself, like he was blameless because we are just so "great."

I was indignant when Rosemary once told Billy that she needed him, and Billy made a suggestive sound and said something about liking hearing that. He then called to me and whispered loudly that she was too old for him. I was angry on Rosemary's behalf and uncomfortable with the fact that he had felt the need to say that to me. But what could I do? He was the boss, and it didn't seem like enough to warrant a complaint. That was the problem: all of the remarks that portrayed an utter lack of respect for women were subtle and insidious, never being "bad" or blatant enough to report without coming across as overly sensitive or dramatic or attention-seeking.

There were several instances when Billy made comments about my appearance in the same subtle, careful way, and they gradually

became more blatant. I remember a specific instance where he noted that I had my hair down. I cannot remember his exact words, but he made it very clear that he liked what he saw. I felt he was starting to cross the line, and even told him so as kindly as I could.

I remember an instance where Billy, Danielle, and I were talking, and Billy asked if we thought that age difference matters when it comes to love. Though I have no proof of this, I got a strong sense that he was trying to feel out the situation, to see if he had options. He mentioned that his friend who was married had been seeing someone else and the girl got attached, and he asked our thoughts about it. I tried to make it very clear that I had no interest by telling him that his friend was an idiot and that he deserved whatever trouble he got for cheating on his wife. I wanted to be sure he knew that it would never happen, though I also knew that if I were to say anything outright, he would deny that he ever had such intentions.

Apparently, he didn't get the hint, because some time later, Billy asked me if I was a Pats fan (the superbowl was coming up). I admitted that I was actually a Seahawks fan, and when he asked why, I explained that I had been involved with one of their linebackers, and that we are still friends and I still support him. Billy responded that he was jealous of my ex. I didn't know how to respond, so I pretty much gave him the smile and nod. He then added that it wasn't "just because he is a professional football player" that made him jealous.

A few days later, Billy came up and told me that he had looked my ex up, and mentioned again that he was jealous of him, and mentioned again that it wasn't just because he was a professional football player.

I do not know what the "right" way to handle these situations would have been. Perhaps I should have not been kind, but I truly believe that there is good in everyone, and the truth is that I felt sorry for Billy (and still do, somewhat). I pity him because he does not know the meaning of love. He cannot possibly know when he talks about women the way he does, when he tells me a story of being with his wife at the doctor's office and thinks the doctor is gorgeous and wonders aloud "why he couldn't have met a woman like that - beautiful, smart, successful." I have always tried to be careful to remain friendly without giving him the impression that I would be interested in anything other than a professional relationship. My fear was always that he would mistake my kindness for interest, but I was never afraid of him personally, until I heard the fight.

I was covering the front desk for Debi while she was at lunch (as a side note: I noticed that once I changed roles, and Debi was up front, Billy never even looked at the front desk area). Suddenly, I heard Billy roaring at Gina, yelling things like "I am your boss, you need to realize that," with so much rage in his voice that I dialed 911 on my cell phone and left my thumb hovering over the "send" button and stood, trembling, watching to be sure he didn't start acting violently. After seeing that side of Billy, and

knowing that he carried that much rage inside of him, I found myself wondering, if he ever were to make a move on me and I rejected him, would he become violent? I was very afraid, and resolved to create more distance between us. I explained to him that I didn't feel comfortable greeting him with a fist bump anymore after hearing the shouting match. He tried to explain it away, that it was just a disagreement between two passionate people, and that he had sensed a tension in the office afterward, but felt that people should just move on from it, that he shouldn't have to explain himself. While I didn't mention to him that, actually, he absolutely should have to address the issue, especially when his actions generated fear in at least one of us, I did insist on maintaining a boundary of not fist bumping anymore, which he eventually consented to stop doing, although he did not seem to understand my reasons. He made it sound like it was just something we would stop for a while so that others didn't see us acting chummy while there was all this tension.

I was glad to have achieved this distance from Billy, but the work environment has not felt the same. It's a scary thing to speak out against the boss, especially when I didn't know if I would be supported or shushed. I didn't know what to do, or how to handle the situation, but I had wished for something to be done. I want it to be made clear to Billy that his behavior is not okay, and that he needs to seek help from a professional to learn how to work through his issues.

# Tab B

(1)

Rosemary Ortega
5/2018

any conversation with
Bill McLoughlin leads
to a sexual tone.
TV shows or movie's
focus on women.
He was always talking
about Mad Men and how
he wished it was that
time era. He was
always talking about
the Red-haired secretary
with the big bust.

We both watched Game of
Thrones and would
discuss the show. He
always wanted to talk
about sex scenes.
I would point out
the other amazing
scenes when he went
in that direction.

2

Bell Mc Laughlin refers
to himself as the
Boss and things will
be done his way or
no way. He used to
come into the funds'
office every morning and
talk to some of the
women. Since taking
over as Chairman
his complaint was against
his assistant who was
constantly questioned him
as she worked for previous
Chairman.

If he come in and
you did not give
him your attention, he
would make comments
(to me) that the more
I ignored him, the more
he wanted me.

3

When any of the young girls walked by he would look them over and make a comment (not to them) but to me, what he could do to them. I told him he was fresh and sick and to be very careful.

He once referred to the Funds staff as a lower level to the Union Staff. When the story was repeated to his boss at the time Bill gave the girl the middle finger.

Bill once shared a very confidential incident between his boss and

4    my boss

Gina and Bill had
words in Gina's office.
The office door was shut.
We could hear voices screaming
Through The vent in
The Kitchen.
When lunch was over
I returned to my office
where I could see in
Gina's office. I saw
Gina and Bill standing
up, pacing back and
forth. It looked like
whenever Gina was standing
Bell was very close and
Gina's head was down.
It did not look Right

# Tab C

**CONFIDENTIAL**

**To:**   Gina M. Alongi
**From:** Greg Geiman
**Date:** January 24, 2014, updated February 10, 2014
**Re:**   Human Resources

The purpose of this document is to memorialize events that transpired regarding allegations of sexual harassment by Funds' Assistant Administrator Laura-Jean Hickey against Local 4 Business Manager Louis G. Rasetta.

On January 14, 2014, at approximately 5:30 p.m., Ms. Hickey began a conversation with me by asking whether I was aware if Mr. Rasetta was upset with her, because he had been "cold" to her that day.  I responded that I had no knowledge of any reason he would be upset.  She proceeded to tell me that she had informed her husband and other third parties on December 31, 2013 that she had been subject to past unwanted inappropriate advances by Mr. Rasetta.  She told me that the alleged advances came up as part of a general conversation she, her husband, and friends were having that evening about sexual advances as a means of "getting ahead" in the workplace.  To the best of my recollection, she at no times used the term "sexual harassment" in describing the alleged advances themselves or the general conversation she was engaged in that evening.

She told me that she was not interested in taking any steps to allege any improper behavior by Mr. Rasetta at this time, but might consider additional steps if such behavior was to occur again in the future.

The alleged incidents of unwanted inappropriate advances by Mr. Rasetta, as described by Ms. Hickey, and to the best of my knowledge, are as follows:

- At a holiday party between 2010 and 2012, Mr. Rasetta allegedly asked Ms. Hickey for a copy of a picture of her in a figure skating outfit. She had voluntarily shown this picture to Mr. Rasetta at some time before then, she claimed.  According to Ms. Hickey, Mr. Rasetta made several demands for a copy of the picture in the parking lot after the party, which Ms. Hickey claims she has not provided him to date.

- At a holiday party in 2013, Ms. Hickey alleges that she attempted to kiss Mr. Rasetta on the cheek and Mr. Rasetta turned his head to kiss Ms. Hickey on the lips.  Ms. Hickey further alleged that Mr. Rasetta placed his hand on her buttocks or upper outer thigh at some time before or after the kiss.

- Ms. Hickey had alleged that Mr. Rasetta initiated foot-to-foot contact under a restaurant table at a Local 4 event (which she termed "playing footsies").

I spoke with you on the morning of January 15, 2014 and told you about my conversation from the previous evening.  Ms. Hickey had not made a formal complaint of sexual harassment to me, nor had she followed the protocol for sexual harassment complaints outlined in the Employee Handbook that she helped to draft.  Regardless, after some consideration, I told you that I felt

that the tone and substance of Ms. Hickey's conversation could be construed as a verbal complaint under the Employee Handbook that, while not made to the appropriate person, might constitute placing the employer on notice of an employee's concerns, thereby warranting further action and giving the Plan exposure to liability.

As a first step, I went and spoke with Ms. Hickey again about the prior evening's conversation. Ms. Hickey told me in very clear terms that she was not making a complaint, did not want me to speak with anyone about these incidents, and had spoken to me only because she felt the need to talk with someone, with no expectation that I would take any additional action or talk to anyone else about the allegations.

We then spoke with Attorney Kate Shea and told her the broad outlines of my conversations with Ms. Hickey and sought her advice.  It was decided that I should speak with Mr. Rasetta and inform him of the allegations being made to me by Ms. Hickey.

I went and spoke with Mr. Rasetta, and you joined the meeting after a few minutes.  Mr. Rasetta denied Ms. Hickey's specific allegations.  He confirmed that Ms. Hickey had shown him a picture that she kept on her office computer of her wearing a figure skating outfit, and claimed that she asked him at the time if he would like to have a copy of it.  Mr. Rasetta said that he rejected the offer and did not recall any additional incident in which he sought a copy of the picture.  He did note, however, that she had produced that picture and offered him a copy in the first instance.

As to the 2013 holiday party, Mr. Rasetta denied kissing Ms. Hickey on the lips. He stated that he did not remember interacting with Ms. Hickey at the event, except for a quick greeting when she entered.  He also stated that such a kiss would have been impossible because he was surrounded by people at all times, including his assistant Barbara Paine, who had confirmed for him that the only kiss she had witnessed was a quick kiss on the cheek at the conclusion of the event.  Ms. Alongi, who sat alongside Mr. Rasetta for much of the event, also confirmed that she had not viewed any kiss on the lips.

Mr. Rasetta then recounted additional instances in which he felt that Ms. Hickey was inappropriate toward him, including one incident in the office in which Ms. Hickey allegedly invited Mr. Rasetta on an out-of-town figure skating trip with her (and without her family) and offered that he could stay in her hotel room, and a second incident at a Pension Plan retreat on Cape Cod in which Ms. Hickey allegedly propositioned Mr. Rasetta in his hotel room late at night. Mr. Rasetta noted that he rejected each proposed overture.

Mr. Rasetta also recounted a meeting he had held with Ms. Hickey sometime just after the New Year, in which he had provided what he termed a "pep talk."  He told her that she needed to take on more responsibility to help administer the Funds, and that since he had assigned both she and I as Assistant Administrators, I had far outpaced her.  He also insinuated that at least some of the Trustees were not pleased with her work.  Mr. Rasetta wondered whether the timing of Ms. Hickey's conversation with me was purposeful based on her potential to fear losing her job after the conversation with Mr. Rasetta.

Administrator Alongi and I discussed the importance with Mr. Rasetta of not treating Ms. Hickey in any way that could be deemed retaliatory as a result of these allegations.  The meeting ended.

I spoke with Attorney Shea again after our meeting with Mr. Rasetta on January 15.  She told me that she felt that between my conversation with Ms. Hickey in which she expressly declined to make a complaint against Mr. Rasetta, and our conversation in which we recounted the allegations to Mr. Rasetta, we had performed all necessary steps required of us, for the time being, under the Employee Handbook.

On January 16, 2014, Mr. Rasetta requested that a meeting be coordinated with Attorney Shea, which occurred on January 17, 2014.  At that meeting, Mr. Rasetta and Attorney Shea spoke at length before inviting Administrator Alongi and myself into the meeting.  Attorney Shea reiterated that the incidents as described by Mr. Rasetta and myself to her, even if assumed to be true, were sporadic and did not appear to rise to the level of sexual harassment.  She assured Administrator Alongi and myself that the situation had been handled appropriately.  She also advised Mr. Rasetta that he and his Business Agents must avoid any specter of retaliatory action and suggested that the best way to avoid any potential liability is to simply treat Ms. Hickey with customary courtesy and not treat her any differently.  Mr. Rasetta agreed that he would do so and would advise his Business Agents of such.  The meeting ended.

On February 8, 2014, I received a telephone call from Local 4 President William McLaughlin. Mr. McLaughlin told me that he had some information regarding Ms. Hickey that he wished to share.  Mr. McLaughlin told me that the purpose of his call was to set the record straight and to defend Mr. Rasetta, but that he wished for the conversation to be confidential and did not want any of the information to be relayed to Ms. Hickey.  Mr. McLaughlin proceeded to relay two incidents that had occurred in the Local 4 office cafeteria.  In the first, Ms. Hickey had told Mr. McLaughlin about a website on which people that are married can sign up to cheat on their spouses.  In the second incident, Ms. Hickey had told Mr. McLaughlin that she and her husband have a list they term the "Fabulous Five," in which they choose five celebrities with whom they are permitted to cheat on each other.  Mr. McLaughlin reiterated that, in light of Ms. Hickey's allegations against Mr. Rasetta, he wanted to demonstrate that Ms. Hickey had engaged in "innuendo about sexual behavior" and was not as "innocent" as she appeared.  I told Mr. McLaughlin that his notes would be added to the file and shared with Attorney Shea.

# Tab D

## Gina Alongi

**From:** WmPRyan@aol.com
**Sent:** Tuesday, March 04, 2003 6:19 PM
**To:** Gina Alongi
**Subject:** (no subject)

Gina:

It is distressing to learn of your treatment at the hands of the government inquisitor. When you think if the amount of money the auditor is questioning involved, when your office handles nearly $100 million a year, is truly strange. And for the auditor to suggest that the aim was to enrich the Local is stranger still when you think of the financial position of the Union.

You have been a great servant to the men and women we represent. Your work ethic, professionalism and integrity are above reproach.

You are valued by the Local and the people you work with. I consider myself fortunate to have your help is wrestling with the many difficult choices we have been forced to make to keep our Plans intact for our member.

I have absolute confidence in you and your abilities, and am proud to have you as a friend.

Bill

**Gina Alongi**

---

**From:**      William P. Ryan [wmpryan@erols.com]
**Sent:**       Wednesday, March 05, 2003 10:07 AM
**To:**          Gina Alongi; mtsandfam@aol.com
**Subject:**   The Inquisition

Mary and Gina:

After another restless night with little sleep (but probably more than Gina) I'd offer the following early morning thoughts.

The investigator has more than implied to Gina that the Local and its SAC Fund have been unjustly enriched at the expense of the Health & Welfare Fund.

This is the same Local that made an unrestricted gift of $2 million to the H&W Fund from its General Fund;

The same Local that has sponsored the Annual Health Fairs, a legitimate expense that should have been borne by the H&W Fund, but was funded by the members SAC Fund;

The same Local that sponsored the Women's Health Events, another legitimate expense that should have been a H&W expense, but was funded by the members SAC Fund;

The same Local that had twenty hours of clerical work, just in January, to coordinate with the H&W Fund on the "Looking for Work Rule" an expense attributable to maintaining the H&W Fund;

The same Local that donated the Crane Training Simulator ($100,000) to the Apprenticeship; and

The same Local that is buying the membership a new facility to give them back the excesses of an excellent run of work.

I'm deeply offended that the conduct and motives of the Union have been called into question. I'm more offended at the treatment Gina and her staff have been subjected to (dangling participle). I am not opposed to a prospective reallocation of common funds, but would have to then question the continued generosity of the Local and the SAC Fund.

I am opposed to making any expiatory gesture and repaying any amount from any source. It implies impropriety and some sense of wrongdoing either by the Local or the Fund office. Neither of which is true or appropriate.

The DOL should be told that our folks in Lexington have had enough. They should submit their report and suggestions in writing. Such report will be forwarded to our Auditors, Accountants and Attorneys for an appropriate response.

Bill