UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| GINA ALONGI, | ) ) |
| Defendant. | ) ) |

Civil Action No. 1:21-cv-10163-FDS

**DEFENDANT GINA ALONGI'S**
**RESPONSES TO PLAINTIFFS' L.R. 56.1 STATEMENT OF MATERIAL FACTS**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, defendant Gina Alongi ("Ms. Alongi"), in Opposition to the Motion for Partial Summary Judgment filed by the plaintiffs (collectively. The "Funds"), submits the following Responses to the Funds' Statement of Material Facts ("RSOF"). In addition to the specific responses set forth herein, Ms. Alongi references and incorporates fully herein her Counterstatement of Material Facts in Opposition to the Funds' Motion for Partial Summary Judgment ("DSOF") filed herewith. Exhibits submitted by the Defendant are attached to the Appendix of Exhibits in Support of Defendant's Opposition to Motion for Partial Summary Judgment ("D.App.") filed herewith. All facts classified as "undisputed" are considered as such for purposes of the Funds' Motion for Partial Summary Judgment only.

I.     **The Parties**

1.     The Pension Fund is a trust fund established in accordance with the requirements of Section 302(c) of the Labor Management Relations Act, 29 U.S.C. §186(c)(5), and is a multiemployer benefit plan, organized under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1102(a), 1002(37), (3), (2), (16), (21). (ECF No. 1, ¶¶ 2, 3; App. 017-25 (Ex. 2)).

**Response No. 1:**      Undisputed.

2.      The Pension Fund was established and is maintained in accordance with, *inter alia*, the Trust Agreement of the International Union of Operating Engineers Local 4 and its Branches Pension Fund ("Pension Fund Trust Agreement") to provide retirement benefits through a defined benefit program to participants who worked under collective bargaining agreements negotiated by IUOE Local 4 ("Local 4") with various employers and employer associations who work within the territorial jurisdiction of Local 4 within Massachusetts, New Hampshire, and Maine. (ECF No. 1, ¶¶ 2, 3; App. 003 (Geiman Decl. ¶ 4); App. 017-25 (Ex. 2)).

**Response No. 2:**      Undisputed.

3.      The Welfare Fund is a trust fund established in accordance with the requirements of Section 302(c) of the Labor Management Relations Act, 29 U.S.C. §186(c)(5), and is a multiemployer benefit plan, organized under the provisions of ERISA. 29 U.S.C. §§1102(a), 1002(37), (3), (1), (16), (21). (ECF No. 1, ¶¶ 6, 7; App. 027-36 (Ex. 3)).

**Response No. 3:**      Undisputed.

4.      The Welfare Fund was established and is maintained in accordance with, *inter alia*, the Trust Agreement of the International Union of Operating Engineers Local 4 and its Branches Health and Welfare Fund ("Welfare Fund Trust Agreement") to provide that provides medical, surgical, hospitalization, prescription drug, dental, vision, hearing, accident and sickness, and death benefits to participants, their eligible beneficiaries, as well as eligible retirees through a program overseen by the Trustees. (ECF No. ¶¶ 6, 7; App. 004-05 (Geiman Decl. ¶ 6); App. 027-36 (Ex. 3)).

2

4882-6790-4831.3

**Response No. 4:**        Undisputed.

5.        The Annuity Fund is a trust fund established in accordance with the requirements of Section 302(c) of the Labor Management Relations Act, 29 U.S.C. §186(c)(5), and is a multiemployer benefit plan, organized under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§1102(a), 1002(37), (3), (2), (16), (21). (ECF No. 1, ¶¶ 2, 3; App. 038-47 (Ex. 4)).

**Response No. 5:**        Undisputed.

6.        The Annuity Fund was established and is maintained in accordance with, *inter alia*, the Trust Agreement of the International Union of Operating Engineers Local 4 and its Branches Annuity Fund ("Annuity Fund Trust Agreement") to provide retirement benefits through a defined benefit program overseen by the Trustees. (ECF No. 1, ¶¶ 2, 3; App. 038-47 (Ex. 4)).

**Response No. 6:**        Undisputed.

7.        The Annuity Fund is a defined contribution pension plan that also has a 401(k) wage deferral option in which participants in the Annuity Fund are immediately vested in both the contribution and wage deferral aspects of the Fund and are provided a menu of options in which to invest their individual benefit accounts. (App. 004 (Geiman Decl. ¶ 5)).

**Response No. 7:**        Undisputed.

8.        The Pension, Welfare, and Annuity Fund's operations are governed by the respective Trust Agreements governing each Fund, each Fund's respective Plan of Benefits, and

3

various policies and procedures adopted by the respective Board of Trustees of each Fund from time to time. (App. 004-05 (Geiman Decl. ¶¶ 4, 5, 6)).

**Response No. 8:**        Undisputed.

9.      The Pension, Welfare, Annuity, and Training Funds are each financed by contributions made by employers who employ operating engineers pursuant to the terms of a written collective bargaining agreement with Local 4, and for each hour worked by such operating engineers, the employers pay a contractually required amount of contributions to the Pension Fund on a monthly basis, filing a remittance report with the Pension, Welfare, Annuity, and Training Funds showing the hours worked by each of its covered employees.. ((ECF No. 1, ¶ 10; App. 004-05 (Geiman Decl. ¶¶ 4, 5, 6, 7)).

**Response No. 9:**        Undisputed.

10.     The Fund Office collects these contributions, deposits them, and records the hours of each such employee in order to grant them appropriate credit towards a possible pension, retirement benefits, or health and welfare eligibility and coverage. (App. 004-05 (Geiman Decl. ¶¶ 4, 5, 6)).

**Response No. 10:**        Undisputed.

11.     As to the Annuity Fund, the employers pay the contributions detailed in Paragraph 9 herein on a monthly basis, and, additionally, covered employees may elect to defer some of their wages to the Annuity Fund's 401(k) component. (App. 004 (Geiman Decl. ¶ 5)).

**Response No. 11:**        Undisputed.

12.     The Fund Office collects these contributions and wage deferrals, deposits them, and records the amounts received on their behalf, which are then forwarded to the Fund's record keeper to be allocated in the investment option chosen by the participants. (App. 004-05 (Geiman Decl. ¶¶ 4, 5, 6)).

**Response No. 12:**     Undisputed.

13.     The Training Fund is a multiemployer plan as that term is defined in ERISA and an employee welfare benefit plan that provides training in the various machinery and processes necessary to perform the job of operating engineer, which includes such things as the operation of cranes, earth moving machines, bulldozers, backhoes, and other equipment. (ECF No. 1, ¶ 10; App. 005-06 (Geiman Decl. ¶ 7)).

**Response No. 13:**     Undisputed.

14.     The Training Fund provides apprenticeship instruction to new entrants in the industry, by which they progress to the rank of journey worker through the completion of a combination of class work, practical skills acquisition, and required on-the-job training. (App. 00506 (Geiman Decl. ¶ 7)).

**Response No. 14:**     Undisputed.

15.     The Training Fund's operations are governed by a Restated Agreement and Declaration of Trust, its Apprenticeship Standards, training curriculum, and various policies and procedures adopted by its Board of Trustees from time to time, as well as its Training Director and Joint Apprenticeship Committee. (App. 005-06 (Geiman Decl. ¶ 7)).

**Response No. 15:**     Undisputed.

4882-6790-4831.3

16.     Fund Office employees record the contributions payable to the Training Fund as detailed in Paragraph 12 herein, which are then made available to the Training Fund for use in educating apprentices and journey workers in the craft of being an operating engineer. (App. 005-06 (Geiman Decl. ¶ 7)).

**Response No. 16:**     Undisputed.

17.     The Pension, Welfare, Annuity, and Training Funds are each governed by a separate Board of Trustees made up of an equal number of representatives by labor and management as required by law. (App. 006 (Geiman Decl. ¶ 8)).

**Response No. 17:**     Undisputed.

18.     The Union Trustees are appointed by Local 4 and the Employer Trustees are appointed by employer associations with whom Local 4 engages in collective bargaining, and the Trustees receive no compensation from the Funds and each has a full time job working for entities other than the Funds. (App. 005-06 (Geiman Decl. ¶ 7)).

**Response No. 18:**     Undisputed.

19.     The Funds are collectively administered by employees retained on behalf of the Trustees to carry out their day-to-day operations, including the collection of employer contributions, the crediting of hours worked by participants, determinations of eligibility for benefits, and the payment of benefits and reasonable administrative expenses. (ECF No. 1, ¶ 11; App. 002 (Geiman Decl. ¶ 2)).

**Response No. 19:**     **Disputed.**  The Pension Fund, Health & Welfare Fund, and Annuity Fund Agreements, all state, at Section 4.1 of each agreement, that "The Fund shall be

6

4882-6790-4831.3

administered by a Board of Trustees. . .the Trustees in their collective capacity shall be the "administrator" and "named fiduciary" as such terms are used in the Act [i.e., ERISA] with respect to the Fund and Plan. *See* Appendix in Support of Plaintiffs' Motion for Partial Summary Judgment ("App.") at App. 018 (Ex. 2), 029 (Ex. 3), and 040 (Ex. 4). Further, those three agreements, at Section 5.1 of each agreement, also state that, "the Board of Trustees shall have the power to administer the Fund and to administer and maintain the [Pension plan or Fund] in effect. . ." *See* App. 019 (Ex. 2), 030 (Ex. 3), 041 (Ex. 4).

20.     The Fund Office employees are employed by the Welfare Fund, but perform work for each of the Funds and other plaintiffs pursuant to the terms of an Amended Agreement to Share Administrative Services and Office Space ("Shared Services Agreement"), which requires each Fund to reimburse the Welfare Fund for its proportionate share of such services. (ECF No. 1, ¶ 11; App. 006-07 (Geiman Decl. ¶ 9); App. 049-53 (Ex. 5)).

**Response No. 20:**     Undisputed that the Fund Office Employees perform work for each of the Funds and other plaintiffs pursuant to the terms of the Shared Services Agreement. **Disputed** that the "Fund Office employees are employed by the Welfare Fund;" that statement is a legal conclusion, not an attested statement of fact, and thus must be disregarded.

21.     The Fund Office employees additionally provide services to Local 4, Local 4's Social Action Committee, and the Local 4 Labor Management Cooperation Trust Fund, which are all charged their proportionate share of Funds Office services under the Shared Services Agreement. (ECF No. 1, ¶ 12; App. 006 (Geiman Decl. ¶ 9); App. 050-52 (Ex. 5)).

**Response No. 21:**     Undisputed.

22.     Fund Office employees work out of an office leased by the Funds from the Union at 16 Trotter Drive, in Medway, Massachusetts 02053. (ECF No. 1, ¶ 13; App. 006 (Geiman Decl. ¶ 9); App. 050-52 (Ex. 5)).

**Response No. 22:**     Undisputed.

23.     The employees who work for the Funds are all employed by the Welfare Fund, which issues their paychecks and W-2s, and provides their employee benefits. (App. 006 (Geiman Decl. ¶ 9)).

**Response No. 23:**     Undisputed that the Welfare Fund issues paychecks, W-2s and provides employee benefits to employees of the Funds.  **Disputed** that the "employees who work for the Funds are all employed by the Welfare Fund," which is a legal conclusion, not an attested statement of fact, and thus must be disregarded.

24.     There are typically about fifteen (15) full time employees employed by the Welfare Fund, many of whom provide services to the other Funds but, by law, each Fund is required to pay for its own expenses and must not subsidize the operations of the other affiliated Funds or related entities. (App. 006 (Geiman Decl. ¶ 9)).

**Response No. 24:**     Undisputed that there are typically about fifteen full-time employees working for the Funds at the office located at 16 Trotter Drive, in Medway, Massachusetts 02053. **Disputed** that the Fund Office employees are "employed by the Welfare Fund," and that "by law, each Fund is required to pay for its own expenses and must not subsidize the operations of the other affiliated Funds or related entities;" these statements are legal conclusions, not attested statements of fact, and thus must be disregarded.

4882-6790-4831.3

25.     The Funds Office maintains normal business hours of 8:00 a.m. to 4:00 p.m., with a one-hour lunch break. (ECF No. 1, ¶ 22; App. 067 (Ex. 6)).

**Response No. 25:**     Undisputed that the Funds Office was normally open between the hours of 8:00 a.m. to 4:00 p.m. and that employees were entitled to a one-hour lunch break.

26.     The "Administrator" is appointed by the respective Boards of Trustees of the Funds and serves as the chief executive officer in charge of the day-to-day operations of the Funds. (ECF No. 1, ¶ 15; App. 002 (Geiman Decl. ¶ 2)).

**Response No. 26:**     Undisputed that the "Administrator" position is appointed by the respective Boards of Trustees of the Funds.   **Disputed** that the "Administrator" is a "chief executive officer" in charge of the day-to-day operations of the Funds. As the Funds' Administrator, Ms. Alongi worked under the direction and control of the Boards of Trustees of the Funds.  See Alongi Aff., ¶ 4 (D.App. 002).   On a day-to-day basis, she reported directly to the Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees of the Funds (positions that were held simultaneously by one individual during Ms. Alongi's tenure as Administrator).   See Alongi Aff., ¶¶ 4-7 (D.App. 002).   Once William McLaughlin became Business Manager of the Union and Chairman of the Boards of Trustees of the Funds in August 2017, he took it upon himself to assume even greater authority and control over the day-to-day operations of the Funds.   *See* Alongi Aff., ¶ 17 (D.App. 004); Exhibit 3, McLaughlin Meeting Notes (D.App. 017-025); Exhibit 4, Deposition of William McLaughlin (Excerpt) ("McLaughlin Dep."), Vol. III, p. 27 (D.App. 042)*; see also* Alongi Aff., ¶ 17 (D.App. 004); *see also* DSOF, ¶¶ 3-8, 17.

4882-6790-4831.3

27.     The Administrator oversees all of the employees who are employed in the day-to-day provision of benefits to the participants and beneficiaries of the Funds and directs and supervises their activities on behalf of the Funds. (App. 002 (Geiman Decl. ¶ 2)).

**Response No. 27:**     **Disputed.**     Between 2015 and 2020, the only employees who reported directly to Ms. Alongi were Assistant Administrator Greg Geiman and Associate Administrator Laura-Jean Hickey.   *See* DSOF, ¶¶ 8-9; *see also* Exhibit 1, Affidavit of Gina Alongi ("Alongi Aff."), ¶ 8 (D.App. 003).

28.     The Administrator also serves as the main liaison between the Funds and the various professionals retained by the Trustees to assist in their operations, including attorneys, actuaries, consultants, and auditors. (App. 002 (Geiman Decl. ¶ 2)).

**Response No. 28:**     Undisputed.

29.     The Administrator also acts as the point of contact for the various service providers retained by the Funds, be it investment managers, various health care providers such as insurers, pharmaceutical benefit managers, as well as dental, vision and hearing care provider organizations, and others. (App. 002 (Geiman Decl. ¶ 2)).

**Response No. 29:**     Undisputed.

30.     The Trustees of each respective Fund meet quarterly (separately) to monitor Fund operations and receive reports from the Administrator, professional advisers, and service providers. (App. 006 (Geiman Decl. ¶ 8)).

**Response No. 30:**     Undisputed.

4882-6790-4831.3

31.     The Administrator organizes the meetings, prepares the agendas for the meetings, and provides and/or coordinates the provision of various reports regarding finances and other matters of interest. (App. 006 (Geiman Decl. ¶ 8)).

**Response No. 31:**     Undisputed.

32.     The job of the Administrator is a demanding, full-time occupation. (App. 003 (Geiman Decl. ¶ 2)).

**Response No. 32:**     Undisputed.

33.     Defendant Alongi served as the Administrator for the Funds during the period 1996 through July 21, 2020. (ECF No. 1, ¶ 14; App. 138 (Ex. 9, p. 27)).

**Response No. 33:**     Undisputed.

34.     As Administrator for the Funds, Defendant Alongi was entrusted with overseeing the day-to-day operations of the Funds in accordance with plan documents and policies adopted by the Trustees, and for fulfilling the duties described in Paragraphs 27 through 32 herein. (ECF No. 1, ¶ 15; App. 002-03 (Geiman Decl. ¶¶ 2, 3)).

**Response No. 34:**     **Disputed** that Ms. Alongi was responsible for fulfilling the duties described in Paragraph 27; between 2015 and 2020, the only employees who reported directly to Ms. Alongi were Assistant Administrator Greg Geiman and Associate Administrator Laura-Jean Hickey.  *See* Response No. 27, *supra*.

35.     Defendant Alongi testified as follows during her deposition in this matter:

> Q.     Okay. Is it correct to say the administrator is in charge of the day-to-
> day operations of the fund?

A.     Yes.

(App. 146 (Ex. 9, p. 9)).

**Response No. 35:**     Undisputed.

36.     During the period relevant to this matter, from January 1, 2015 through July 21, 2020, Defendant Alongi received a substantial annual compensation package from the Funds was worth in excess of $300,000 per year in all years. (ECF No. 1, ¶ 21; App. 013-14 (Geiman Decl. ¶ 30)).

**Response No. 36:**     Undisputed.

37.     For her role as Administrator, Defendant Alongi was also compensated via four weeks of paid vacation per year. (ECF No. 1, ¶ 21; App. 008 (Geiman Decl. ¶ 14); App. 070-71 (Ex. 6)).

1.     **Disputed.**  From 2013 through her termination in 2020, the Funds granted Ms. Alongi six weeks of paid vacation per year.  *See* DSOF, ¶¶ 19-20; *see also See* Alongi Aff., ¶ 18 (D.App. 004); Exhibit 5, Affidavit of Louis Rasetta ("Rasetta Aff."), ¶ 20 (D.App. 055); Exhibit 6, Affidavit of John Shaughnessy ("Shaughnessy Aff."), ¶ 6 (D.App. 059); Exhibit 7, Deposition of John Shaughnessy (Excerpt) ("Shaughnessy Dep."), p. 37 (D. App. 065).

**Response No. 37:**

## II.     The DOL Audit During the Period 2003-2004 and the Shared Services Agreement

38.     The Funds are subject to the legal and regulatory framework found in ERISA and its attendant regulations, and are accordingly subject to periodic review of their operations by both the Internal Revenue Service and the Department of Labor ("DOL"). (ECF No. 1, ¶ 18; App. 078-81 (Ex. 7)).

**Response No. 38:**     Undisputed.

12

39.     The Employee Benefit Security Administration of the DOL, which shares oversight of employee benefit plans like the Funds, along with the Internal Revenue Service, conducted an audit of the Funds in 2003-2004. (ECF No. 1, ¶ 19; App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7)).

**Response No. 39:**     Undisputed.

40.     The audit conducted by the DOL during 2003-2004 investigated the Funds, all Plaintiffs herein, to, *inter alia*, determine whether the Funds properly allocated time and expenses among themselves and other non-ERISA covered entities related to Local 4. (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7)).

**Response No. 40:**     Undisputed.

41.     During the 2003-2004 audit, the DOL expressed dissatisfaction with the scheme by which the collective Funds were allocating administrative costs, due to a fear that some of the Funds were subsidizing the operations of others, and the Department determined that the method the Funds used to allocate expenses – a retrospective time study – was insufficient. (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7)).

**Response No. 41:**     **Disputed**.  In the DOL letter cited at App. 078-81, the DOL does not express any "any fear that some of the Funds were subsidizing the operations of others," nor does it make any "determination that the method the Funds used to allocate expenses – a retrospective time study – was insufficient."  Mr. Geiman's declaration testimony about what the DOL "expressed" and "determined," outside of the letter cited at App. 078-81, must be disregarded pursuant to Fed. R. Civ. P. 56(c)(4) because it is not made on personal knowledge - Mr. Geiman did not begin his employment with the Funds until 2010, *see* App. 003, and there is

13

no other information in his declaration suggesting that he has personal knowledge of the 2003-2004 audit.

42.     In that audit, the DOL uncovered a number of violations related to the administration of the Funds and the allocation of administrative expenses, and it ultimately determined that the Funds failed to properly allocate expenses for the cost of employee time spent working on behalf of each of the Funds to the appropriate Fund. (App. 007 (Geiman Decl. ¶ 10); App. 078-79 (Ex. 7)).

**Response No. 42:**     Undisputed, insofar as the letter from the DOL cited at App. 078-79 speaks for itself.

43.     At the conclusion of the audit it conducted in 2003-2004, the DOL sent the Fund Trustees and Defendant Alongi correspondence on September 16, 2004, in which the Department ultimately ruled as follows:

> As I noted, Senior Investigator Roberta Muench has concluded her investigation of the Plan and of your activities as its Plan Administrator & Trustees. Based on the facts gathered during that investigation it appeared that, as Plan fiduciaries, you violated your fiduciary obligations to the Plan and violated several provisions of ERISA.

(App. 078 (Ex. 7)).

**Response No. 43:**     Undisputed that the DOL sent the Fund Trustees and Ms. Alongi correspondence on September 16, 2005 that contains the text quoted above; the correspondence speaks for itself. **Disputed** that the DOL made any "ruling," which is not stated anywhere in the correspondence cited. *See* App. 078 (Ex. 7).

44.     The findings and data resulting from these Agreed Upon Procedures conducted by the certified public accountants at Schultheis & Panettieri LLP ("Audit"), which is detailed *infra*,

presented to the Boards of Trustees following Defendant Alongi's termination neatly summarized

that DOL audit and the findings thereof as follows:

> In 2004, the former Fund Administrator received correspondence from the U.S.
> Department of Labor which stated that she (as Fund Administrator) and the
> Trustees had violated their fiduciary obligations for failure to properly allocate
> salaries and common expenses.

(App. 087 (Ex. 8)).

**Response No. 44:**     Undisputed that the Audit includes the text quoted above and speaks

for itself.

45.     To resolve the 2003-2004 audit, the DOL required reforms to the manner in which

the Funds allocate shared expenses for, among other things, the cost of each employee. (ECF No.

1, ¶ 19; (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7)).

**Response No. 45:**     **Disputed.**   The DOL does not state anywhere in the letter cited at

App. 078-81 that it "required" any specific reforms.  Instead, it stated that it "understands that the

fiduciaries have taken corrective action regarding the following issues:. . . ".  App. 078.  Mr.

Geiman's declaration testimony about what the DOL "required," to the extent outside of the letter

cited at App. 078-81, must be disregarded pursuant to Fed. R. Civ. P. 56(c)(4) because it is not

made on personal knowledge -  Mr. Geiman did not begin his employment with the Funds until

2010, see App. 003, and there is no other information in his declaration suggesting that he has

personal knowledge of the 2003-2004 audit.

46.     The DOL noted in the September 16, 2004 correspondence to Defendant Alongi

and certain Funds Trustees that "[t]he Department understands that the fiduciaries have taken

corrective action regarding the following issues," which included the DOL's finding that the Fund

Office failed to properly allocate salary and common expenses. (App. 078-79 (Ex. 7)).

**Response No. 46:**      Undisputed; the correspondence cited at 078-79 speaks for itself.

47.    In the September 16, 2004 correspondence, the DOL described one such "corrective action" as follows:

> We understand that the Fund Office retained the firm of Manzi & Associates, CPA to conduct an independent time and function study of the operations of the Fund Office; resolved to update the time and function study at six month intervals to ensure that the allocation remains objective and accurate; adopted a formal Administrative Services Agreement and requested and received reimbursements from both the SAV an Fair Funds for administrative expenses for the period 1997 to the date that the new time/function study allocation is implemented.

(App. 079 (Ex. 7)).

**Response No. 47:**      Undisputed; the correspondence cited at 078-79 speaks for itself.

48.    The DOL resolved the issues in the audit based on, among other things, an agreement that time sheets would be kept by each Fund employee accounting for the work that they were doing for any of the specific Funds and related entities throughout their workdays. (App.007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7); App. 049-53 (Ex. 5)).

**Response No. 48:**      **Disputed.**   The DOL letter at App. 078-81 says nothing about time sheets, let alone any "agreement" concerning time sheets, and the Shared Services Agreemenet cited at App. 049-53 does not contain any "agreement that time sheets would be kept by each Fund employee. . ."   *See* DSOF, ¶ 98.   In addition, Mr. Geiman's declaration testimony about what the DOL based its decision on to "resolve the issues," to the extent outside of the letter cited at App. 078-81, must be disregarded pursuant to Fed. R. Civ. P. 56(c)(4) because it is not made on personal knowledge -  Mr. Geiman did not begin his employment with the Funds until 2010, see App. 003, and there is no other information in his declaration suggesting that he has personal knowledge of the 2003-2004 audit.

49.     As a result, it was agreed that all Fund employees would track their daily work for each Fund for whom they provided services in order to assure that the allocation of costs between the Funds was accurate and appropriate. (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7); App. 050-52 (Ex. 5)).

**Response No. 49:**     **Disputed.**   The DOL letter at App. 078-81 says nothing about time sheets, let alone any "agreement" concerning time sheets, and the Shared Services Agreemenet cited at App. 049-53 does not contain any "agreement that time sheets would be kept by each Fund employee. . ."  *See* DSOF, ¶ 98.  In addition, Mr. Geiman's declaration testimony about what was agreed to with the DOL, to the extent outside of the letter cited at App. 078-81, must be disregarded pursuant to Fed. R. Civ. P. 56(c)(4) because it is not made on personal knowledge - Mr. Geiman did not begin his employment with the Funds until 2010, see App. 003, and there is no other information in his declaration suggesting that he has personal knowledge of the 2003-2004 audit.

50.     To that end, and to ensure the proper allocation of shared expenses among the Funds and related entities, Defendant Alongi and counsel retained by the Funds negotiated an Agreement to Share Administrative Services and Office Space with the DOL substantially similar to the Shared Services Agreement that remains in effect today. (App. 007 (Geiman Decl. ¶ 10); App. 078-81 (Ex. 7); App. 049-53 (Ex. 5)).

**Response No. 50:**     **Disputed.** The introductory clause "to that end" is **disputed** because the preceding paragraphs nos. 48 and 47 are disputed.  Further, the DOL is not a party to the Shared Services Agreement cited at App. 078-81 and there is no indication in the document that it was "negotiated. . .with the DOL."  In addition, Mr. Geiman's declaration testimony about what was "negotiated" with the DOL must be disregarded pursuant to Fed. R. Civ. P. 56(c)(4) because

4882-6790-4831.3

it is not made on personal knowledge -  Mr. Geiman did not begin his employment with the Funds until 2010, see App. 003, and there is no other information in his declaration suggesting that he has personal knowledge of any 'negotiations' in connection with the 2003-2004 audit.

51.      At all times relevant to this matter, the Shared Services Agreement negotiated with the DOL and still in effect today requires each Funds employee to maintain contemporaneous time records providing an allocation of the time they spend working on behalf of each Fund or Local 4 related entity throughout each day. (App.007 (Geiman Decl. ¶ 10); App. 078-79, 081 (Ex. 7); App. 050-52 (Ex. 5)).

**Response No. 51:**      **Disputed.**  The Shared Services Agreement does not require each Fund employee to maintain contemporaneous time records providing an allocation of the time they spend working on behalf of each Fund or Local 4 related entity throughout each day.  See App. 050-52; DSOF, ¶ 98.  Also, there is no admissible evidence cited by the Funds for the notion that the Agreement was "negotiated with the DOL" – see response to paragraph 49 above.

52.      During the audit process, Defendant Alongi was the primary representative of the Funds in communications with the DOL and the outside professionals retained by the Funds to resolve the audit. Regarding her involvement in the Department of Labor audit conducted during the period 2003 – 2004, Defendant Alongi testified as follows:

> Q.      But from the a Local 4 funds perspective, you were the point person on this, correct?
>
> A.      Yes.

(App. 149 (Ex. 9, p. 77)).

**Response No. 52:**      **Disputed** that Ms. Alongi was the "primary representative of the Funds. . .," the record evidence cited does not support this fact.  Undisputed that Ms. Alongi

testified "Yes" when asked whether "from a Local 4 funds perspective," she was "the point person on this."

53.     Defendant Alongi served as the Administrator for the Funds at the time that the audit was conducted, was the primary representative of the Funds in communications with the Department of Labor and the outside professionals retained by the Funds to resolve the audit, and was well aware that this reform was agreed to with the DOL as a crucial aspect of the resolution of that governmental audit. (ECF No. 1, ¶ 19; App. 007 (Geiman Decl. ¶ 11)).

**Response No. 53:**     Undisputed that Ms. Alongi served as Administrator for the Funds at the time the audit was conducted.  The remainder of paragraph 53 is **disputed;**  it is not supported by any of the record evidence cited.  The Funds' unsworn complaint at ECF No. 1 is not admissible evidence and Mr. Geiman's declaration testimony must be disregarded pursuant to Fed. R. Civ. P. 56(c)(4) because it is not made on personal knowledge - Mr. Geiman did not begin his employment with the Funds until 2010, see App. 003, and there is no other information in his declaration suggesting that he has personal knowledge of what Ms. Alongi was "aware of" in 2003-2004.  Further, **disputed** that Ms. Alongi "was the primary representative of the Funds in communications with the Department of Labor," which is also not supported by the record evidence cited, see response no. 51.

54.     Defendant Alongi testified that she was the Funds' primary contact for the Department of Labor during the 2003 – 2004 audit:

> Q.     (By Mr. Gilligan) In terms of, though, the interaction with the Department of Labor investigator, who would speak to her on the Local 4 funds behalf?

> A.   Other than initially when this was going on, you know, when I was dealing with her, I think what happened was she was interacting with special counsel and Mary Sullivan directly.
>
> Q.   None of the trustees were interacting with her, were they?
>
> A.   No, not at all.
>
> Q.   And Laura-Jean wasn't interacting with them?
>
> A.   No.

(App. 147 (Ex. 9, p. 59-60)).

**Response No. 54:**   **Disputed**.  The testimony speaks for itself and Ms. Alongi does not testify that she was the "Funds' primary contact for the Department of Labor during the 2003-2004 audit" in the testimony cited at App. 147.

55.    On July 25, 2003, Defendant Alongi wrote an email to the Funds' former special counsel Joyce Mader regarding the Department of Labor audit, and copied the Funds' counsel and the Funds' former accountant. The subject line of the July 25, 2003 email was "Allocation Adjustment," and a document including a calculation of administrative expenses allocable to each Funds and related entities serviced out of the Fund Office was attached thereto. (App. 163-65 (Ex. 10)).

**Response No. 55:**    Undisputed; the e-mail and attachment speak for themselves.

56.    In that July 25, 2003 email, Defendant Alongi wrote to former Funds' special counsel Joyce Mader as follows:

> We finished our analysis of the admin allocation adjustment. Attached please find the results, before this is released to [DOL Investigator Roberta Muench] let's talk about it.
>
> Robert was correct in her assumption on day 1 that the pension plan was owed 100K. Sue will check with KPMG on whether we need to file amended 5500's. we will get KPMG opinion in writing.
>
> Joyce does the DOL plan on assessing any penalties for the prohibited transaction? Also, what about excise tax that maybe due?

4882-6790-4831.3

(App. 163 (Ex. 10)).

**Response No. 56:**     Undisputed; the e-mail speaks for itself.

57.     In a subsequent email on July 30, 2003, Defendant Alongi wrote to the Funds' former special counsel Joyce Mader regarding the DOL audit, and copied the Funds' counsel. The subject line of the email was "Allocation Calculations with Interest," and a document including a calculation of administrative expenses misallocated and owed to each of the Funds and related entities serviced out of the Fund Office – with interest – during the years 1997 through 2002 was attached thereto. (App. 167-74 (Ex. 11)).

**Response No. 57:**     Undisputed; the e-mail and attachment speak for themselves.

58.     The calculations, numbers, and totals in the "Allocation Calculations with Interest" document are very specific, and many run to the second decimal point. (App. 167-74 (Ex. 11)).

**Response No. 58:**     The Funds' characterization of the document as "very specific" is **disputed**; the document cited at App. 167-74 speaks for itself.

59.     In an email on July 31, 2003, Defendant Alongi wrote to the Funds' former special counsel Joyce Mader regarding the DOL audit, and copied the Funds' counsel. The subject line of the email was "Admin Calculations," and a document including a calculation of administrative expenses allocable to each of the Funds and related entities serviced out of the Fund Office was attached thereto. (App. 176-80 (Ex. 12)).

**Response No. 59:**     Undisputed; the email and attachment speak for themselves.

60.     The calculations, numbers, and totals in the "Admin Calculations" document include calculations of the principal and interest due to various Funds from other Funds or related entities serviced out of the Fund Office during the years 1997 – 2002. (App. 176-80 (Ex. 12)).

**Response No. 60:**     Undisputed.

61.     Again, the numbers are very specific and run to at least two decimal places and, as Defendant Alongi notes in her cover email, the allocation numbers attributable to each Fund or related entity change "considerably" based on a slight change in the rounding of the numbers, much less a substantial change in the allocation. (App. 176 (Ex. 12)).

**Response No. 61:**     The Funds' characterization of the document as "very specific" and the change in the numbers as "slight change" as opposed to a "substantial change" is **disputed**; the document cited at App. 176 speaks for itself.

62.     Regarding the level of specificity required of the DOL for administrative cost allocations, Defendant Alongi testified as follows:

> Q.     If you look -- let's look at the very first -- where it indicates "unrounded 47.11 percent"; does that look right to you?
> A.     Yes.
> Q.     Okay. And was that something that Department of Labor was insisting upon, that level of precision?
> A.     I believe so.

(App. 147 (Ex. 9, p. 57)).

**Response No. 62:**     Undisputed.

63.     On August 1, 2003, former special Funds' counsel Joyce Mader wrote an email to the Senior Investigator handling the DOL audit and, among other things, noted to her that:

We will be providing you with the results of the reallocation for your review. Gina and Mary are concerned that the allocation does not take into account the considerable time spent on HIPAA compliance for the welfare fund. They want you to see and be comfortable with the results of the reallocation before the assets are transferred.

(App. 182 (Ex. 13)).

**Response No. 63:**      Undisputed; the e-mail speaks for itself.

64.      Regarding the August 1, 2003 email and the concern on her part that Ms. Mader relayed to the DOL, Defendant Alongi testified as follows:

> Q.      Okay. There you go. I'd like to turn your attention to the third paragraph of Ms. Mader's e-mail. And specifically, the second sentence thereof. It says, "Gina and Mary are concerned that the allocation does not take into account the considerable time spent on HIPAA compliance for the welfare fund." Do you know what Ms. Mader's alluding to there?
>
> A.      I don't. I can say that, you know, when HIPAA was enacted, you know, there was a lot of correspondence that we had to send and comply with for the health & welfare fund. So maybe, you know, for that specific period of time that the allocation had to be tinkered with for the health & welfare fund only.
>
> Q.      So you were concerned, is a fair assessment, you were concerned about the possibility that the allocation for the welfare fund was being skewed by regulatory activity like HIPAA compliance?
>
> A.      Yes. Any major change to one of the funds.

(App. 148 (Ex. 9, p. 61)).

**Response No. 64:**      Undisputed.

65.      In an email on August 4, 2003, Defendant Alongi wrote to the Funds' counsel and cced the Funds' former special counsel Joyce Mader regarding the DOL audit, and copied the Funds' counsel. The subject line of the email was "Outstanding Issues from DOL Audit," and among the issues Defendant Alongi lists as "outstanding," the following topics are listed first and

second among a total of fourteen: "1. Admin Allocation (Manzi Time Study)" and "2. Adjustments to Allocation (How often, Timesheets, Etc.)." (App. 184-85 (Ex. 14)).

> **Response No. 65:**      Undisputed; the e-mail speaks for itself.

66.      Defendant Alongi additionally testified that, following the DOL audit in 2003-2004, time sheets were the method by which employee time or activity spent on behalf of a certain Fund or related entity related to a new statue or enactment by the DOL or a regulatory agency:

> Q.      So it would directly correlate to how much employee activity was generated by the given law or regulation?
>
> A.      Yes.
>
> Q.      Okay. And how would that be captured?
>
> A.      In the time sheets.

(App. 148 (Ex. 9, p. 62)).

> **Response No. 66:**      **Disputed**, to the extent paragraph 66 implies that Ms. Along testified that time sheets were the *only* method that could capture employee activity generated by the given law or regulation.   Ms. Alongi also testified that the Funds' own accountants interviewed her annually to determine her time allocations rather than filling out time sheets.   *See* DSOF, ¶¶ 100-104.

67.      An email from Defendant Alongi to the Funds' counsels and former accountant on December 29, 2003 circulated a timesheet for use in the Fund Office. Defendant Alongi described the document as follows:

> Attached please find the proposed time sheet for implementation January 5, 2004 to record our employees time. I would appreciate your comments.

(*sic*) (App. 187 (Ex. 15)).

**Response No. 67:**     Undisputed.

68.     A document attached to the December 29, 2003 email from Defendant Alongi is titled "Local 4 Fund Office Weekly Timesheet By Fund" and includes the following categories for Funds employees' completion: "Name," "Date," "Time in .25 .50 .75 1," "Brief Description," and "Enter code – ALL, HW, PEN, ANN, AT, CO, SAC, FAIR, DUES." (App. 189 (Ex. 15)).

**Response No. 68:**     Undisputed.

69.     A second document attached to the December 29, 2003 email from Ms. Alongi is titled "Proposed Time Sheet Solution Effective January 5, 2004." (App. 190 (Ex. 15)).

**Response No. 69:**     Undisputed.

70.     The document titled "Proposed Time Sheet Solution Effective January 5, 2004" which was attached to the email Defendant Alongi drafted and circulated to the Funds' counsels and former accountant provides that:

> Starting January 5, 2004, all employees that work on more than one fund must account for their time. To make this process east for the employee and to ensure we have accurate data to report to the auditors, the timesheets must be located in a central file.

(ECF No. 1, ¶ 27; App. 190; (Ex. 15)).

**Response No. 70:**     Undisputed.

71.     The document titled "Proposed Time Sheet Solution Effective January 5, 2004" which was attached to the email Defendant Alongi drafted and circulated to the Funds' counsels and former accountant also includes recommendations regarding the implementation of the "Time Sheet Solution" at the Funds Office. (App. 187-90; (Ex. 15)).

**Response No. 71:**     Undisputed.

72.     Defendant Alongi, while employed as Administrator, was a Fund employee and was subject to the same policies as other Fund employees, including the obligation to track her time so that the cost of her services could be appropriately allocated among the Funds, the Union, Labor Management Cooperation Trust, and the Social Action Committee. (ECF No. 1, ¶ 20; App. 050-52 (Ex. 5); App. 063 (Ex. 6)).

**Response No. 72:**     **Disputed** to the extent this paragraph is implying that Ms. Alongi was required to complete daily time 'DOL' time sheets by the Shared Services Agreement; she was not. *See* DSOF, ¶¶ 100-104.

73.     As noted *supra*, the Shared Services Agreement sets forth the manner in which the collective administrative expenses of the Fund Office are allocated, such that the expense of each Fund employee is allocated among the entities who are part of this shared services arrangement. (App. 006-07 (Geiman Decl. ¶ 9); App. 050-52 (Ex. 5); App. 063 (Ex. 6)).

**Response No. 73:**     The agreement speaks for itself – to the extent the Funds assert here that the Shared Services Agreement requires completing daily time sheets, that is **disputed.**   *See* DSOF, ¶ 98.

74.     The Trustees of the various Funds and affiliated entities adopted the Shared Services Agreement, which, as a result, constitutes a governing plan document for each of the Funds. (App. 007 (Geiman Decl. ¶ 10); App. 049-58 (Ex. 5)).

**Response No. 74:**     Undisputed that Trustees of the various Funds and affiliated entities adopted the Shared Services Agreement.   **Disputed** insofar as the Funds' assertion that the

4882-6790-4831.3

Agreement "constitutes a governing plan document" for the purposes of ERISA is a conclusion of law, not an attested statement of fact.

75.     Defendant Alongi, being deeply involved in the discussions with the DOL about how to address these concerns, and was personally aware of the requirement in the Shared Services Agreement that all individuals employed in the Fund office keep track of their time. (App. 007 (Geiman Decl. ¶ 11)).

**Response No. 75:**     **Disputed.** None of the facts set forth in paragraph 75 are supported by the record evidence cited; Mr. Geiman – who did not start working for the Funds until 2010, see App. 003 does not have personal knowledge of Ms. Alongi's "involvement in the discussions with the DOL" in 2003-2004, and Ms. Alongi denies that the Shared Services Agreement required does not require Ms. Alongi or any other individual employee to fill out contemporaneous daily time sheets.  See DSOF, ¶ 98.

76.     The Shared Services Agreement has been amended from time to time, but the terms relevant to this matter have remained unaltered and in full force and effect from the implementation of the Agreement through Defendant Alongi's termination. (App. 049-53 (Ex. 5); App. 063 (Ex. 6)).

**Response No. 76:**     Undisputed; the Agreement at 049-53 speaks for itself.

77.     The Shared Services Agreement requires all employees to keep track of their time and, to the extent that they worked for Funds other than the Welfare Fund, to keep records of the time they devoted to each specific Fund or "Organization" as the Agreement terms it. The Shared Services Agreement provides, in part, that:

> The amount of staff time of employees of the Fund Office devoted
> to each Organization will be used as the basis for determining the

allocable portion of general administrative expenses, staff salary, taxes and benefits, and common overhead expenses, including but not limited to office space, utilities, professional fees and computer costs. The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization be each employee of the Fund Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.

. . .

Each Organization will pay its respective share of shared administrative expenses on a monthly basis as provided in this Agreement.

(ECF No. 1, ¶ 27; App. 050-51, 052 (Ex. 5)).

**Response No. 77:**     **Disputed.**   The Agreement speaks for itself and there is nothing in the Agreement that requires each individual employee to keep track of their own time by filling out timesheets.  See DSOF, ¶ 98.

78.    The Funds' Employee Handbook also includes this requirement. It provides as follows:

**All employees (exempt and non-exempt)** that work under the jurisdiction of more than one (1) Fund must complete a weekly timesheet (located in the Funds Public Drive > TimeSheet) to be turned in every Friday by 4 p.m. Timesheets are used to break down employees' hours (all hours, including overtime), spent on particular Funds. Employees with questions or concerns regarding this policy and procedure should consult with the Accounting Department.

(App. 063 (Ex. 6)) (emphasis added).

**Response No. 78:**     **Disputed.**   As an initial matter, **disputed** that the Shared Services Agreement contains any "requirement" that any individual employee fill out time sheets for themselves, and **disputed**  that Ms. Alongi was required to adhere to the handbook policy quoted above; the Funds', through their own accountants, interviewed Ms. Alongi annually to determine her time allocation.  *See* DSOF, ¶¶ 98-104.

28

79.     Defendant Alongi - like any other Fund employee - was required to personally adhere to the Funds' policies. Accordingly, Defendant Alongi was required to keep a daily time sheet to track her time so the cost of her services could be appropriately allocated among the Funds, the Union, the Labor Management Cooperation Trust, and the Social Action Committee. (App. 050-52 (Ex. 5); App. 063 (Ex. 6)). Regarding this issue, Defendant Alongi testified as follows:

Q.      And am I correct, that it indicates there, under all employees, exempt or nonexempt, that work under the jurisdiction of more than one fund must complete a weekly time sheet located in the fund's public drive.

A.      I see that.

Q.      And that indicates all employees, correct?

A.      Yes.

Q.      Okay. And you were an employee of the Local 4 funds, correct?

A.      Yes.

Q.      And you were an employee who worked for more than one fund, correct?

A.      Yes.

(App. 154 (Ex. 9, pp. 97-98)).

**Response No. 79:**     **Disputed.**  As an initial matter, **disputed** that the Shared Services Agremeent contains any "requirement" that any individual employee fill out time sheets for themselves, and **disputed** that Ms. Alongi was required to adhere to the handbook policy quoted above; the Funds', through their own accountants, interviewed Ms. Alongi annually to determine her time allocation.  *See* DSOF, ¶¶ 98-104.

80.     Defendant Alongi failed to maintain accurate records of her working time despite the requirements of the Shared Services Agreement and despite the fact that she provided at least some services to each of the constituent Funds and related entities serviced in the Fund Office and

that a she was the highest paid, and hence, most expensive employee working for the Funds. (ECF No. 1, ¶ 28; App. 008 (Geiman Decl. ¶ 13)).

**Response No. 80:** **Disputed.** As an initial matter, **disputed** that the Shared Services Agremeent contains any "requirement" that any individual employee fill out time sheets for themselves, and **disputed** that Ms. Alongi failed to maintain accurate records of her working time; the Funds', through their own accountants, interviewed Ms. Alongi annually to determine her time allocation. *See* DSOF, ¶¶ 98-104.

81.     In fact, there is no record in the Fund Office of Defendant Alongi ever keeping such a time sheet, though Defendant Alongi testified under oath that she initially kept timesheets, only to abandon the process at a time she could not specify, but which was prior to the time period covered by this litigation. (App. 007 (Geiman Decl. ¶ 11); App. 155-57 (Ex. 9, pp. 106-17)).

**Response No. 81:** Undisputed that Ms. Alongi testified that she initially kept time sheets. The remainder is **disputed**; she testified that she ceased completing time sheets in around 2008 and was interviewed annually under the direction of the Funds' own accountants. See DSOF, ¶¶ 99-104.

82.     As noted *supra* herein, each of the Funds is governed by the terms of its applicable Trust Agreement. Each of the respective Trust Agreements, including that of the Welfare Fund, the employer of the Fund Office employees, provides that any action by the Fund can only be undertaken upon approval of a majority of the Trustees present at a meeting and that there must be at least four Trustees voting in order to constitute a quorum to take binding action. (App. 007-08 (Geiman Decl. ¶ 12); App. 021-22 (Ex. 2); App. 032-33 (Ex. 3)).

**Response No. 82:** **Disputed** that the Welfare Fund is the sole "employer of the Fund Office employees," which is a legal conclusion, not an attested statement of fact. The Trust Agreements cited speak for themselves.

83.     At no time did a requisite quorum of Welfare Fund Trustees ever decide that Defendant Alongi was exempt from the time keeping requirement of the Shared Services Agreement. (App. 008 (Geiman Decl. ¶ 13)).

**Response No. 83:** **Disputed.** As an initial matter, **disputed** that the Shared Services Agreemeent contains any "requirement" that any individual employee fill out time sheets for themselves, and **disputed** that Ms. Alongi failed to maintain accurate records of her working time; the Funds', through their own accountants, interviewed Ms. Alongi annually to determine her time allocation. *See* DSOF, ¶¶ 98-104. Accordingly, disputed that any "quorum of Welfare Fund Trustees" was required to decide that Ms. Alongi "was exempt" from filling out daily timesheets.

84.     Accurate reporting of work performed on behalf of each Fund by each employee through submission of the required timesheets, and the timesheets themselves, provide the basis for the Funds to allocate expenses attributable to each specific Fund in accordance with the explicit requirements of the Shared Services Agreement. (App. 050-52 (Ex. 5)).

**Response No. 84:** **Disputed.** As an initial matter, **disputed** that the Shared Services Agreemeent contains any "requirement" that any individual employee fill out time sheets for themselves. Further, disputed that it was solely "the timesheets themselves" that the Funds used to provide the basis for the Funds to allocate expenses; the Funds, and their own accountants, interviewed Ms. Alongi to determine her allocation of expenses. *See* DSOF, ¶¶ 98-104.

4882-6790-4831.3

85.     In accordance with the terms of the Shared Services Agreement, the allocations are ultimately used to determine a total percentage allocation that applies to expense charges and reimbursements for the next following year. (App. 050-52 (Ex. 5)).

**Response No. 85:**     Undisputed.

86.     Instead of filling out the required daily time sheets, Defendant Alongi simply recycled from year to year earlier allocations of time that she had spent working for each Fund. (ECF No. 1, ¶ 28; App. 210-12 (Ex. 18)).

**Response No. 86:**     **Disputed.**   As an initial matter, **disputed** that the Shared Services Agreeent contains any "requirement" that any individual employee fill out time sheets for themselves.  Further, disputed that she "recycled" time allocations "from year to year"; her time allocations for year in question were determined by Ms. Alongi and the Funds' own in-house accountants based on the work performed by Ms. Alongi in a given year. *See* DSOF, ¶¶ 98-104.

### III. Defendant Alongi's Termination and the Schultheis & Panettieri LLP Audit

87.     The Massachusetts Coalition of Taft-Hartley Funds ("Coalition") is an organization consisting of multiemployer health and welfare funds in the New England region. (ECF No. 1, ¶ 30; App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 87:**     Undisputed. .

88.     The Coalition was organized to find ways to bring the combined purchasing power of its member health plans in the hopes of securing more favorable terms from various health care provider organizations – preferred provider organizations, health insurers, pharmaceutical benefit managers ("PBM"), dental and vision care providers – to combat the increasing cost of

4882-6790-4831.3

funding health care benefits to the unions' memberships. (ECF No. 1, ¶ 30; App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 88:**     Undisputed, **with qualification**.     The Coalition benefitted its member funds through combined purchasing power, but also was organized to advance the commit benefit of its member funds in other ways.   to the Coalition's by-laws, its specific objectives are:

> (a) To educate the Governor, General Court and agencies, subdivisions, instrumentalities and officers of the Commonwealth of Massachusetts (collectively, the "State Government"), the President, Congress and agencies and officers of the United States of America (collectively the "Federal Government"), the general public and the Coalition's members and participants, as to the crises and developments affecting Taft-Hartley Trust Funds including, but not limited to, health and welfare and pension issues;

> (b) To secure, analyze and disseminate statistical data and information regarding the health care and pension industry to the federal and state government, the general public, and the Coalition's members;

> (c) To develop and propose better methods of providing and paying for health care;

> (d) To promote harmonious relations with the health care industry and other industries affecting Taft-Hartley Funds; and

> (e) To promote the financially sound continued long term survival of Taft-Hartley Trust Funds.

*See* DSOF, ¶ 23.

89.     The Coalition is financed by an annual level dues assessment paid by each of the participating health and welfare plans on the basis of a monthly per capita assessment levied on the basis of the number of covered participants in the respective member plans, as well as the health vendors, consultants, and investment managers that also pay an annual assessment for access to the Coalition. (ECF No. 1, ¶ 30; App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 89:**     Undisputed.  However, the annual fees paid by the health vendors, consultants and other "associate members" were used by the Coalition to pay for expenses for those members' attendance at Coalition events; the dues were not used to pay Ms. Alongi's salary and she received no personal benefit of any kind from dues paid by such "associate members." Alongi Aff. ¶ 39 (D. App. 007).

90.     The Coalition is a tax-exempt entity under Section 501(c)(3) of the Internal Revenue Code and is run by a Board of Directors and its Executive Director. (App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 90:**     Undisputed that the Coalition is run by a Board of Directors and its Executive Director.  The remainder is **disputed** that the Coalition is a tax-exempt entity under Section 501(c)(6), not 501(c)(3).  *See* DSOF, ¶ 22; *see also* Alongi Aff., ¶¶ 21, 22 (D. App. 005); Coalition By-Laws, at Art. I, Sec. 2; Art. 2, Secs. 1-2 (D.App. 069).

91.     It is not affiliated with or in any way related to the Welfare Fund or any of the other Funds that are the Plaintiffs in the instant case; the only relationship between the Funds and the Coalition is that for a period of time the Welfare Fund was a dues paying member. App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 91:     Disputed.**     The Funds benefitted from Ms. Alongi's work as Executive Director for the Coalition while she was Administrator of the Funds, which benefits were made available to the Funds because of their status as a dues paying member.  See DSOF, ¶¶ 37-42.  Further, during Ms. Alongi's entire 13-year tenure as Executive Director of the Coalition – from 2007 through 2020 - the Coalition rented office space at the Funds' office.  See Alongi Aff., ¶ 31 (D.App. 006); DSOF, ¶ 36.

92.     Defendant Alongi served as the Executive Director of the Coalition during all times relevant to this matter, 2015 through July 21, 2020. (ECF No. 1, ¶ 31; App. 138 (Ex. 9, p. 27)).

**Response No. 92:**     Undisputed, **with qualification**.  Ms. Alongi served as Executive Director of the Coalition from 2007 through July 21, 2020.  *See* DSOF, ¶ 27.

93.     Coalition members may choose to adopt any of the Coalition negotiated arrangements with the classes of providers above noted but are not compelled to do so. (App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 93:**     Undisputed.

94.     Each of the Coalition's participating plans' Trustees have the responsibility to decide whether such provider arrangements are in the best interests of their participants and beneficiaries. (App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 94:**     Undisputed.

30.     Entitlement to participate in any of the Coalition negotiated arrangements is a function of belonging to the Coalition, such that the Welfare Fund could have taken advantage of any of the negotiated programs by virtue of its membership in the Coalition, not because Defendant Alongi served as the Executive Director of the Coalition. (App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 95:**     **Disputed**.  It is undisputed that Welfare Fund could have taken advantage of any of the programs negotiated by the Coalition by virtue of its membership in the Coalition.  However, Ms. Alongi personally was involved in negotiating such programs as Executive Director, so its incorrect to suggest that Ms. Alongi's work for the Coalition was unrelated to the availability of benefits for the Funds.

4882-6790-4831.3

95.     After the Covid-19 pandemic took hold in March 2020, the Trustees closed the Funds Office and allowed employees to work from home. (App. 192 (Ex. 16); App. 503 (Ex. 48, p. 8)).

**Response No. 96:**     Undisputed.

97.     By June of 2020, however, some of the Funds' key employees returned to the office, while others with significant health concerns, such as Defendant Alongi, were allowed to continue working from home. (App. 503 (Ex. 48, p. 8)).

**Response No. 97:**     Undisputed.

98.     Although the employees were working at home, many employees fulfill time sensitive functions such as tracking and allocating reports of participant hours worked generated and submitted by employers to determine ongoing benefit eligibility, or determining whether a participant or beneficiary is entitled to a certain pharmaceutical or medical benefit or coverage.

**Response No. 98:**     Undisputed.

99.     William McLaughlin, the Business Manager of Local 4 and Chairman of the various Boards of Trustees, implemented a procedure in which all Fund employees were required to keep a timesheet describing the work performed throughout the day. (App. 192 (Ex. 16); App. 503 (Ex. 48, p. 8)).

**Response No. 99:**     Undisputed, **with qualification**.   The Fund Office employees (including Ms. Alongi) began working remotely in March 2020, but Mr. McLaughlin did not ask Ms. Alongi to track her time until June 2020, and shortly thereafter terminated her employment in July 2020, which suggests that Mr. McLaughlin required that Ms. Alongi account for her time in 15-minute increments for the purpose of finding a pretext to terminate Ms. Alongi's employment due to her opposition to Mr. McLaughlin's inappropriate conduct.  *See* DSOF, ¶ 80.

100.    These timesheets, which were similar to but separate from the timesheets required pursuant to the terms of the Shared Services Agreement and the Employee Handbook, were submitted on a monthly basis to Assistant Administrator Greg Geiman for review. (App. 192 (Ex. 16); App. 503 (Ex. 48, p. 8)).

**Response No. 100:**    **Disputed** that the Shared Services Agreement contains any "requirement" that any individual employee fill out time sheets for themselves, and **disputed** that Ms. Alongi was required to adhere to the handbook policy quoted above; the Funds', through their own accountants, interviewed Ms. Alongi annually to determine her time allocation. *See* DSOF, ¶¶ 98-104.   In addition, as acknowledged by the Funds in para. 101 below, Mr. McLaughlin required Ms. Alongi to submit her timesheets directly to him, not to Mr. Geiman.

101.    Due to her position as Administrator, however, Defendant Alongi's timesheets were submitted directly to Mr. McLaughlin to prevent her subordinate, Mr. Geiman, from having to track his immediate supervisor's productivity and work performance. (App. 192 (Ex. 16); App. 503 (Ex. 48, p. 8)).

**Response No. 101:**    **Disputed.**   Mr. McLaughlin asked for Ms. Alongi's timesheets directly for the purpose of finding a pretext to terminate her employment due to her opposition to his inappropriate conduct. See DSOF, ¶ 80.   The excuse that Mr. McLaughlin did not want Mr. Geiman having to "track his immediate supervisor's productivity and work performance" is blatantly pretextual and contradicted by the fact that at this same time, Mr. McLaughlin also personally instructed Mr. Geiman to go on a "fact-finding mission" to 'investigate' Ms. Alongi in a misguided effort to try to manufacture false and pretextual reasons to terminate Ms. Alongi's employment.   *See* McLaughlin Dep., Vol. III., pp. 82-84 (D.App. 053).   As such, he had no real concern about Mr. Geiman 'tracking' Ms. Alongi's work.

102.   In early July 2020, Defendant Alongi submitted her timesheets to Mr. McLaughlin. He reviewed those timesheets and noted that in several entries Defendant Alongi logged work performed either on behalf of the Coalition or with individuals whom Mr. McLaughlin did not recognize or knew to be individuals associated with benefit funds other than the Funds or the Coalition. (App. 192 (Ex. 16); App. 503-04 (Ex. 48)).

**Response No. 102:** **Disputed,** to the extent this paragraph suggests that Mr. McLaughlin was unaware of the nature of Ms. Alongi's work as Executive Director for the Coalition; he was aware that she performed that work, and his feigned ignorance was a pretext used to terminate her employment in retaliation for opposing his inappropriate conduct. *See* DSOF, ¶¶ 29-35, 71-81.

103.   Mr. McLaughlin was taken aback that the Funds Administrator was detailing work performed on behalf of a third-party entity during the Funds' regular business hours, and he asked Mr. Geiman for clarification or more context. Mr. McLaughlin and Mr. Geiman also shared this concern with Fund Counsel Kate Shea. (App. 192-93 (Ex. 16); App. 503-06 (Ex. 48)).

**Response No. 103:** **Disputed** to the extent that Mr. McLaughlin was unaware of the nature of Ms. Alongi's work as Executive Director for the Coalition; he was aware that she performed that work, and his feigned ignorance was a pretext used to terminate her employment in retaliation for opposing his inappropriate conduct. *See* DSOF, ¶¶ 29-35, 71-81. The remainder is undisputed, **with qualification**; , Mr. McLaughlin also personally instructed Mr. Geiman to go on a "fact-finding mission" to 'investigate' Ms. Alongi in a misguided effort to try to manufacture false and pretextual reasons to terminate Ms. Alongi's employment. *See* McLaughlin Dep., Vol. III., pp. 82-84 (D.App. 053); see response to paragraph 101 above.

38

104.    Mr. Geiman spoke with fellow Assistant Administrator Laura-Jean Hickey, who served as Coalition Coordinator under Defendant Alongi's supervision. In addition to providing clarification on the amount of work that had been performed by herself and other Fund employees during the workday, Ms. Hickey confirmed that Defendant Alongi had unilaterally promised a $30,000 wellness credit that the Welfare Fund received from Blue Cross Blue Shield, for the benefit of Local 4's participants and beneficiaries, to the Coalition for use at its wellness fair. In the end, the fair was cancelled due to Covid-19, and the promised transfer of the Fund's asset to the Coalition was never consummated. (App. 193 (Ex. 16); App. 507 (Ex. 48, p. 24)).

**Response No. 104:**    **Disputed.**   Ms. Alongi never "unilaterally promised a $30,000 wellness credit" and there was no "promised transfer of the Fund's asset."   As part of the wellness fair event in question, the Coalition explored the possibility of member funds donating wellness credits to the event to help defray the costs of biometric health screenings for Local 4 members.  The event was still in early planning stages when it was cancelled due to the pandemic. Had the event been more fully planned, Ms. Alongi would have approached the Boards of Trustees of the Funds with a proposal to donate the $30,000-worth of wellness credits to the event, specifically for use by Local 4 members, in a a manner consistent with previous uses of similar wellness credits.  *See* Exhibit 31, MCAD Rebuttal (verified by Ms. Alongi), pp. 4-5 (D.App. 242-243).

105.    Attorney Shea opined that best course of action in determining how much Coalition work Defendant Alongi performed during the workday would be to cross reference the entries of concern with Defendant Alongi's separate, DOL timesheets. When Rebecca Zaccardi, the Funds' inhouse accountant, was asked for those timesheets, she advised Mr. Geiman that Defendant

Alongi did not keep or submit DOL timesheets. (App. 508-09 (Ex. 48, pp. 28-29); App. 007 (Geiman Decl. ¶ 11)).

**Response No. 105:**   **Disputed**.  The investigation undertaken by Attorney Shea and Mr. Geiman was undertaken for the purpose of gathering information to 'support' the pretextual and retaliatory termination of Ms. Alongi's employment, not to "determine how much Coalition work [Ms. Alongi] performed during the workday."   Moreover, it makes no sense to cross-reference DOL

106.    This revelation set off a chain of events – the Trustees had to grapple with the fact that the Funds' chief executive had not been complying with an important policy, that Fund resources and employee time had been improperly diverted to the Coalition, a stranger entity that was not compensating the Funds at all for the use of these resources, and that the Funds' allocation of shared expenses was now known to be inaccurate since the most highly compensated individual working for the Funds had been revealed to have not kept required time records and was, in fact, devoting a substantial amount of her time to an entity outside of the Local 4 family of benefit Funds. (App. 192-95 (Ex. 16); App. 503-09 (Ex. 48)).

**Response No. 106:**   **Disputed.**  Ms. Alongi's work for the Coalition was well known to the Trustees, and benefitted the Funds, Ms. Alongi kept time records as required and advised by the Funds' own accountants, and was not devoting a substantial amount of her time to any entity outside of the Funds.  Her termination was pretextual.  *See* MCAD Sur-Reply, pp. 1-8 (D. App. 242-248); see also DSOF, ¶¶ 29-83.

4882-6790-4831.3

107.    The revelations described in Paragraphs 102-106 were brought to the attention of all of the Funds' Trustees, all of whom were unaware that these things were occurring. (App. 192-95 (Ex. 16); App. 503-510 (Ex. 48)).

**Response No. 107:**    **Disputed.**  Ms. Alongi's work for the Coalition was well known to the Trustees, and benefitted the Funds, Ms. Alongi kept time records as required and advised by the Funds' own accountants, and was not devoting a substantial amount of her time to any entity outside of the Funds.  Her termination was pretextual.  *See* MCAD Sur-Reply, pp. 1-8 (D. App. 242-248); see also DSOF, ¶¶ 29-83, 97-104.

108.    On July 21, 2020, Special Meetings of the respective Boards of Trustees of the Pension Fund, Health and Welfare Fund, and Annuity Fund were held, and the Boards voted unanimously to terminate Defendant Alongi's employment due to the egregious nature of the failure to maintain DOL time sheets and the inappropriate and unauthorized diversion of Fund assets to the Coalition. (ECF No. 1, ¶ 34; App. 192-95 (Ex. 16)).

**Response No. 108:**    **Disputed.**  Ms. Alongi's work for the Coalition was well known to the Trustees, and benefitted the Funds, Ms. Alongi kept time records as required and advised by the Funds' own accountants, and was not devoting a substantial amount of her time to any entity outside of the Funds.  Her termination was pretextual.  *See* MCAD Sur-Reply, pp. 1-8 (D. App. 242-248); see also DSOF, ¶¶ 29-83, 97-104.

109.    The Trustees additionally engaged the accounting firm Schultheis & Panettieri LLP to conduct the Audit of the time that Defendant Alongi was actively working during the period January 1, 2015 through July 21, 2020 to determine the degree to which Defendant Alongi may

have damaged the Funds due to her failure to properly allocate her time and her diversion of plan assets for the benefit of the Coalition. (App. 083-134 (Ex. 8)).

**Response No. 109:**   Undisputed that the Trustees engaged the accounting firm Schultheis & Panettieri LLP to conduct the Audit.   **Disputed** that the Trustees engaged Schultheis & Panettieri LLP "to determine the degree to which Defendant Alongi may have damaged the Funds due to her failure to properly allocate her time and her diversion of plan assets for the benefit of the Coalition."   The Trustees engaged Schultheis only after Ms. Alongi filed her MCAD complaint against the Funds, to gin up after-the-fact 'support' for her pretextual termination and to retaliate against her for asserting her rights under M.G.L. c. 151B.   *See* MCAD Sur-Reply, pp. 1-8 (D. App. 242-248); *see also* DSOF, ¶ 92.

110.   The Audit of Defendant Alongi's work activities included a review of her arrival times at the office by means of ascertaining when she entered the Fund Office via electronic key fob, her email activity on her Fund-provided email account, and call activity on both her office landline and Fund-provided cellular phone. (ECF No. 1, ¶ 34; App. 089, 127-31 (Ex. 8)).

**Response No. 110:**   Undisputed.   However, it is **disputed** that the Audit's conclusions are accurate.   *See* DSOF, ¶¶ 86-92.

111.   The Audit found that, at the Fund Office while Defendant Alongi served as Administrator, there were "significant weaknesses in controls surrounding cost allocations to the Coalition, where the former Fund Administrator also served as the Executive Director." (App. 087 (Ex. 8)).

**Response No. 111:**   Undisputed that the Audit contains the text quoted above.

42

112.   Based on the certified public accountants' review of the documents and data in this matter, as well as interviews with Funds employees, the Audit further determined as follows:

> We noted that it appears the Funds have an adequate system to track and request reimbursement for postage (for which identifying code is entered in the postage machine whenever mail is processed on behalf of the Coalition); however, the Funds do not have an adequate system to track labor, related taxes, and benefit costs incurred on behalf of the Coalition. In fact, timesheets were designed in a manner in which Fund Office employees were unable to allocate time to the Coalition. Furthermore, Fund Office employees were tacitly directed not to allocate time to the Coalition. Finally, the former Fund Administrator, whose allocation would be most significant and most sensitive, did not maintain a timesheet as required of all other employees.

(App. 087 (Ex. 8)).

**Response No. 112:**   **Disputed** that Ms. Alongi ever directed any employee not to track their time for the Coalition and **disputed** that Ms. Alongi had anything to do with designing timesheets in a manner in which Fund Office employees were unable to allocate time to the Coalition or otherwise instructing any employee to falsify their time sheet.  *See* Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 132).  **Disputed** to the extent it is suggested that the Shared Services Agreement requires any employee to track time allocated to the Coalition; it does not, and only applies to the sharing of services and office space between the Funds entities listed as parties to the agreement (identified as the "Organizations").  *See* App. 049 – 053.  Disputed that Ms. Alongi was required to maintain a timesheet.  See DSOF, ¶¶ 97-104.

113.   The certified public accountants that conducted the Audit analyzed a number of sets of data to determine whether Defendant Alongi's work on behalf of the Coalition occurred during regular Funds' business hours without making that time up by working for the benefit of the Funds outside of normal business hours:

> To evaluate if these efforts were performed during normal business hours (for which she received compensation and benefits from the Funds with no reimbursement from the Coalition) or outside of normal business hours, we

analyzed incoming and outgoing calls from the former Fund Administrator's office phone, entry times from the former Fund Administrator's key fob noting time she entered the Fund Office, and cell phone calls from February 11, 2020 through July 23, 2020. Based on the following analyses, it appears the former Fund Administrator worked significantly less than the required seven hours per day and performed her duties as Executive Director of the Coalition during the reduced hours she was at the Fund Office.

(App. 088 (Ex. 8)).

**Response No. 113:**   Undisputed that the Audit contains the text quoted above.  **Disputed** that the Schultheis Report draws a credible conclusion regarding Ms. Alongi's work time based on the data it evaluated.  *See* DSOF, ¶¶ 86-91.

114.   The analysis by Schultheis & Panettieri LLP found that during the period January 1, 2015 through July 21, 2020, Defendant Alongi was seldom at the Funds office when it opened at 8:00 a.m. and routinely arrived hours after the established start of the workday. (ECF No. 1, ¶ 35; App. 089, 127-31 (Ex. 8)).

**Response No. 114:**   **Disputed.**   Undisputed that the Schultheis Report came to that conclusion, but this 'finding' is inaccurate. See DSOF, ¶¶ 90-91.  The Report's data concerning Ms. Alongi's supposed office entry times (which show an average entry time of 10:30 a.m. or later for some years), is directly contradicted by not only Ms. Alongi's testimony, but by the deposition testimony of several of her co-workers, who testified that prior to 2020 (when she started to come  into the office at 8:00 am at the insistence of Mr. McLaughlin) Ms. Alongi typically arrived at the office between 9:00am and 10:00am.  See Alongi Aff. ¶ 59 (D. App. 011); Alongi Dep., Vol. I, pp. 111-118 (D.App. 018-021); Exhibit 26, Deposition of Jennifer Vachon ("Vachon Dep."), pp. 70-72 (D.App. 192-193); Exhibit 27, Deposition of Jennifer Dow ("Dow Dep."), pp.. 86-88 (D. App. 196-197); Vachon Aff., ¶ 13 (D.App. 163); Dow Aff.. ¶ 6 (D.App. 165).

Additional evidence also calls the office entry data into question:  several of Ms. Alongi's co-workers testified that they would open the office door for her on occasion without her using her office pass), which of course would incorrectly lead to a conclusion that Ms. Alongi arrived at times later than she actually arrived.  Vachon Aff., ¶ 13 (D.App. 166); Dow Aff.. ¶ 6 (D.App. 162); Ortega Dep., pp. 24-27 (D.App. 153).

Moreover, Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.  Alongi Aff. ¶ 66 (D. App. 012). Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   Id.

115.   Defendant Alongi's average arrival time to the Funds Office for the years in question were as follows: 2015: 10:58 a.m.; 2016: a.m.; 2017: 10:28 a.m.; 2018: 9:55 a.m.; 2019: 9:50 a.m.; and 2020: 8:19 a.m. (ECF No. 1, ¶ 35; App. 089, 127-31 (Ex. 8)). A chart derived from the Fund Office entry key data demonstrating Defendant Alongi's arrival times is included in the Audit. (ECF No. 4; App. 127-31 (Ex. 8)).

**Response No. 115:**     **Disputed.**   The Report's data concerning Ms. Alongi's supposed office entry times (which show an average entry time of 10:30 a.m. or later for some years), is directly contradicted by not only Ms. Alongi's testimony, but by the deposition testimony of several of her co-workers, who testified that prior to 2020 (when she started to come  into the office at 8:00 am at the insistence of Mr. McLaughlin) Ms. Alongi typically arrived at the office between 9:00am and 10:00am.  See Alongi Aff. ¶ 59 (D. App. 011); Alongi Dep., Vol. I, pp. 111-118 (D.App. 018-021); Exhibit 26, Deposition of Jennifer Vachon ("Vachon Dep."), pp. 70-72

(D.App. 192-193); Exhibit 27, Deposition of Jennifer Dow ("Dow Dep."), pp.. 86-88 (D. App. 196-197); Vachon Aff., ¶ 13 (D.App. 163); Dow Aff.. ¶ 6 (D.App. 165).

Additional evidence also calls the office entry data into question:  several of Ms. Alongi's co-workers testified that they would open the office door for her on occasion without her using her office pass), which of course would incorrectly lead to a conclusion that Ms. Alongi arrived at times later than she actually arrived.  Vachon Aff., ¶ 13 (D.App. 166); Dow Aff.. ¶ 6 (D.App. 162); Ortega Dep., pp. 24-27 (D.App. 153).

Moreover, Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.  Alongi Aff. ¶ 66 (D. App. 012). Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   Id.

116.   The forensic analysis of Defendant Alongi's computer, emails, and land and cellular phones shows that on the vast majority of days, her work activities ceased at or around 4:00 p.m. (ECF No. 1, ¶ 36; App. 088-89, 127-31 (Ex. 8)). A chart derived from Defendant Alongi's office phone data demonstrating and a chart derived from Defendant Alongi's cell phone data demonstrating this fact are included in the Audit. (ECF No. 4; App. 127-31 (Ex. 8)).

**Response No. 116:**    **Disputed.** See DSOF, ¶¶ 86-88.  The Schultheis Report relies on the misguided assumption that Ms. Alongi only performed work for the Funds when she was either sending e-mails, or her work office phone, or on her cell phone, and relies on that data to somehow conclude that she rarely worked outside of business hours.  *See* ECF Docket No. 54, Funds Exhibit 8, Schultheis Report, App. 086.

However, as even the Schultheis Report's author admitted at his deposition, the fact that Ms. Alongi was not sending e-mails or calling someone on her phone does not mean that she was not working.  *See* Exhibit 25, Deposition of James Heinzman (Excerpt) ("Heinzman Dep."), pp. 20, 113 (D.App. 187-188).   Ms. Alongi's position as Administrator required her to perform countless tasks that could be completed after-hours, which would not require the use of e-mail or a cell phone call.  For example, she was responsible for preparing and presenting separate reports to each individual Board of Trustees on a quarterly basis for Trustee board meetings, and in connection with that duty Ms. Alongi routinely analyzed reports prepared by the Funds' consultants and in-house accountants, including financial statements, expense reports, payroll reports, investment reports, and other general healthcare and pension-related material.   Alongi Aff. ¶ 66 (D. App. 012-013).

Ms. Alongi performed much of this work after business hours, when she had time to read, process, and prepare this information undisturbed, and also often performed tasks such as drafting letters and reviewing proposed budgets during non-business hours; she often spent her time during business hours communicating with members, Union employers, and her direct reports at the Fund Office.  The e-mail and cell-phone data used by Schultheis to try to recreate Ms. Alongi's work hours obviously (and incorrectly) leads to a 'conclusion' that she only worked during business hours, because those are the hours during which Ms. Alongi -- and most office workers generally -- communicated by e-mail or phone.  Alongi Aff. ¶ 66 (D. App. 012-013).

117.   Further analysis of Defendant Alongi's email and phone activity during the period in question demonstrate that she performed little or no work during weekends or after normal business hours during this time period. (ECF No. 1, ¶ 36; App. 088-89, 127-31 (Ex. 8)).

**Response No. 117:**   **Disputed.** See DSOF, ¶¶ 84, 86-88.   Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.  Alongi Aff. ¶ 66 (D. App. 012).   Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   *Id.*  As noted above and in DSOF, ¶¶ 86-88, looking at Ms. Alongi's email and phone activity does not 'demonstrate' that she performed little to no work whatsoever; the data speaks only to her work that would involve e-nailing or calling others. But Ms. Alongi did not perform "little or no work" outside business hours, and (quite reasonably) the work that Ms. Alongi performed outside business hours did not typically involve e-mailing or calling others.

118.   There were very few outgoing calls made from Defendant Alongi's office phone after 4:00 p.m. (ECF No. 1, ¶ 36; App. 089, 127-31 (Ex. 8)).

**Response No. 118:**   **Disputed.** See DSOF, ¶¶ 84, 86-88.   Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.  Alongi Aff. ¶ 66 (D. App. 012).   Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   *Id.*  As noted above and in DSOF, ¶¶ 86-88, looking at Ms. Alongi's email and phone activity does not 'demonstrate' that she performed little to no work whatsoever; the data speaks only to her work that would involve e-nailing or calling others. But Ms. Alongi did not perform "little or no work" outside business hours, and (quite reasonably) the work that Ms. Alongi performed outside business hours did not typically involve e-mailing or calling others.

4882-6790-4831.3

119.     During the pandemic between March and July 2020, when Defendant Alongi did not have access to her office phone, the vast majority of calls made after 4:00 p.m. on her work-issued cell phone were to family or friends. (ECF No. 1, ¶ 37; App. 089, 127-31 (Ex. 8)).

**Response No. 119:**     **Disputed.** See DSOF, ¶¶ 84, 86-88.   Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.   Alongi Aff. ¶ 66 (D. App. 012).   Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.    Id.  As noted above and in DSOF, ¶¶ 86-88, looking at Ms. Alongi's email and phone activity does not 'demonstrate' that she performed little to no work whatsoever; the data speaks only to her work that would involve e-nailing or calling others. But Ms. Alongi did not perform "little or no work" outside business hours, and (quite reasonably) the work that Ms. Alongi performed outside business hours did not typically involve e-mailing or calling others.

In addition, the Report's conclusions regarding her work time between the years of 2015 through 2020 based on her cell-phone activity during a world-wide pandemic is blatantly speculative. *See* DSOF, ¶ 89.

120.     Over 95% of Defendant Alongi's emails during the period January 1, 2015 through July 21, 2020 were sent between the hours of 9:30 a.m. and 4:30 p.m. (ECF No. 1, ¶ 38; App. 089, 127-31 (Ex. 8)).

**Response No. 120:**     **Disputed.** See DSOF, ¶¶ 84, 86-88.   Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.   Alongi Aff. ¶ 66 (D. App. 012).   Her position as Administrator required her to

4882-6790-4831.3

perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   Id.   As noted above and in DSOF, ¶¶ 86-88, looking at Ms. Alongi's email and phone activity does not 'demonstrate' that she performed little to no work whatsoever; the data speaks only to her work that would involve e-nailing or calling others. But Ms. Alongi did not perform "little or no work" outside business hours, and (quite reasonably) the work that Ms. Alongi performed outside business hours did not typically involve e-mailing or calling others.

121.   Of the emails referenced in Paragraph 120, many were personal and Coalition-related emails sent from her Funds email account. (ECF No. 1, ¶ 38; App. 089, 127-31 (Ex. 8)).

**Response No. 121:**   **Disputed.** See DSOF, ¶¶ 84, 85-88.   Ms. Alongi primarily only performed Coalition work during Funds' work hours during the one-hour break period afforded to her each day pursuant to the Funds' policy.  And the Funds' conclusory characterization that there were "many" Coalition e-mails sent over the period of five years is unsupported by the record evidence cited.

122.   Of the total 22,000 emails sent during the period January 1, 2015 through July 21, 2020, only 523 were sent prior to 9:30 a.m. (roughly 2% of the total), and of those 523, 348 were sent in 2020 when she was largely working from home. (ECF No. 1, ¶ 38; App. 089, 127-31 (Ex. 8)).

**Response No. 122:**   **Disputed.** See DSOF, ¶¶ 84, 86-88.   Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.  Alongi Aff. ¶ 66 (D. App. 012).   Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   Id.   As noted above and in DSOF, ¶¶ 86-88, looking at Ms. Alongi's email and phone activity does not 'demonstrate' that she performed little to no work whatsoever; the data speaks only to her work

that would involve e-nailing or calling others. But Ms. Alongi did not perform "little or no work" outside business hours, and (quite reasonably) the work that Ms. Alongi performed outside business hours did not typically involve e-mailing or calling others.

123.   Defendant Alongi's email activity on weekends during the period January 1, 2015 through July 21, 2020 was even more scant, with only 69 emails sent, most of which appeared to be personal in nature. (ECF No. 1, ¶ 38; App. 089, 127-31 (Ex. 8)).

**Response No. 123:**   **Disputed.** See DSOF, ¶¶ 84, 86-88.   Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.   Alongi Aff. ¶ 66 (D. App. 012).   Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   Id.   As noted above and in DSOF, ¶¶ 86-88, looking at Ms. Alongi's email and phone activity does not 'demonstrate' that she performed little to no work whatsoever; the data speaks only to her work that would involve e-nailing or calling others. But Ms. Alongi did not perform "little or no work" outside business hours, and (quite reasonably) the work that Ms. Alongi performed outside business hours did not typically involve e-mailing or calling others.

124.   If Defendant Alongi was performing ten (10) hours of work per week for the Coalition as she reported under penalty of perjury on the Form 990s, Defendant Alongi was spending in excess of 25% of her work time performing work for the Coalition rather than the Funds. (ECF No. 1, ¶ 39; App. 197-208 (Ex. 17)).

**Response No. 124:**   **Disputed.**   This 'fact' would only be correct if it were assumed that Ms. Alongi only worked 40 hours per week for the Funds and that all 10 of the hours she worked

– on average – for the Coalition per week as reflected on the Form 990 were worked during Fund business hours.  But  all of those facts are disputed. See DSOF, ¶¶ 84-98.

As an initial matter, Ms. Alongi did not report on her Form 990s that she performed an average of 10 hours per week for the Coalition exclusively during Fund business hours; she only stated that she performed an average of 10 hours per week total.  App. 197-208.  The Report (and the Funds) have no basis whatsoever to presume that all 10 of those hours were always spent working for the Coalition during Fund business hours.  And to the contrary, Ms. Alongi primarily only performed Coalition work during Funds' work hours during the one-hour break period afforded to her each day pursuant to the Funds' policy.  Alongi Aff. ¶ 67 (D. App. 012).

Moreover, as already noted above, Ms. Alongi regularly performed more than 40 hours per week for the Funds as Administrator.  See DSOF, ¶¶ 84-88.

125.   Defendant Alongi unilaterally and in an *ultra vires* fashion diverted plan assets for her own benefit and that of a party unrelated to the Funds by whom she was employed. (ECF No. 1, ¶ 40; App. 085-134 (Ex. 8); App. 197-208 (Ex. 17)).

**Response No. 125:**   **Disputed.**   See DSOF, ¶¶ 84-92, and see responses to paras. 109 - 125.

IV.   **Defendant Alongi's Failure to Keep Timesheets Rendered the Funds' Annual Expense Allocations Inaccurate, in Violation of Federal Law and the Funds' Governing Documents, Policies, and Procedures**

126.   The Shared Services Agreement provides that the Funds turn the data required to calculate the allocation of expenses applicable to each Fund and entity – including employee timesheets - over to their outside accountant on an annual basis. (App. 050-52 (Ex. 5)).

**Response No. 126:**   **Disputed.**   The Agreement is ambiguous regarding whether data must be turned over to an accountant on an annual basis.  It states that para. 4.D. (App. 051) that The Fund Office Payroll percentage will initially be determined by an independent analysis conducted by a certified public accountant, which would be construed to mean that only one (not an annual) outside analysis is called for by the Agreement.

127.   The accountant calculates the amount of employee time spent working on each Fund during a specific period in the preceding year, and attributes a percentage of each employee's work to each Fund for which that employee performed work. (App. 050-52 (Ex. 5)); App. 210-12 (Ex. 18)).

**Response No. 127:**   Undisputed.

128.   Those percentages are used to calculate the amount of the employees' salaries that will be paid by each respective Fund over a twelve-month period. (App. 050-52 (Ex. 5; App. 21012 (Ex. 18)).

**Response No. 128:**   Undisputed.

129.   For example, a time study conducted covering work performed during the months September 2014 through November 2014 was used to calculate the employee expense allocations for the period January 2015 through December 2015. (App. 050-52 (Ex. 5); App. 210-12 (Ex. 18)).

**Response No. 129:**   Undisputed.

130.   The shared expenses allocations are extremely specific, running to four decimal places. (App. 210-12 (Ex. 18)).

**Response No. 130:**   The Funds' characterization of the numbers is **disputed**; the document cited at App. 210-12 speaks for itself.

131.   The shared expenses allocations for each and every Fund employee – with the exception of Defendant Alongi – applicable to each requisite Fund or entity experience shifts from year to year during the years 2015, 2016, and 2017 down to the fourth decimal point. (App. 21012 (Ex. 18)).

**Response No. 131:**   Undisputed.

132.   Every Funds employees' percentage allocation – save Defendant Alongi's – is derived from each respective employee's daily timesheets. (App. 156 (Ex. 9, p. 115); App. 050-52 (Ex. 5); App. 063 (Ex. 6); App. 210-12 (Ex. 18)).

**Response No. 132:**   Undisputed.

133.   During the years 2015 through 2019 however, Defendant Alongi's shared expenses allocations remained exactly the same, save in 2016, when 10.0000% of her time was reallocated from the Health Fund to the Pension Fund. (App. 210-12 (Ex. 18)).

**Response No. 133:**   Undisputed.

134.   Accordingly, Defendant Alongi's shared expenses allocation percentage of work on behalf of seven separate entities – down to the fourth decimal point – remained *exactly* the same in 2016 and 2017, with *one* exception for 2015. (App. 210-12 (Ex. 18)).

**Response No. 134:**   Undisputed.

135.   Upon further investigation after Defendant Alongi's work on behalf of the Coalition during regular Fund Office business hours came to light, it was determined that Defendant Alongi simply directed the Funds' inhouse accountant to advise Manzi & Associates, the Funds' outside accountant responsible for producing the allocation, that her

54

time allocation had not changed because her duties vis a vis each of the Funds remained consistent. (App. 156-57 (Ex. 9, pp. 11620)).

**Response No. 135:**      **Disputed.**    See DSOF, ¶¶ 100-103.  Ms. Alongi testified that she did initially fill out daily time sheets, but in or around 2008, the Funds' own accountants at Manzi & Asssociates ("Manzi") determined and informed her that since 2004, based on the data Manzi reviewed from Ms. Alongi's and other employees' time sheets, there was no significant change in fund percentage allocations from year to year.  See Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, p.81-98 (D.App. 024-028).

Accordingly, since that time, in lieu of recording her time on a daily basis, a representative of Manzi would meet and interview Ms. Alongi at the end of each calendar year to estimate Ms. Alongi's time allocation.  See Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

As Ms. Alongi testified, her job duties and time allocation did not generally vary over the course of a typical year unless there was some significant change to the Funds' operations in that given year.  See Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028)

In the event that there was a significant change – such as in 2015 when the Trustees dismantled the Health & Welfare Fund claims adjudication system – Manzi did alter Ms. Alongi's allocation after conferring with her, as demonstrated by the relevant data.  See Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

4882-6790-4831.3

However, absent any such significant changes, Ms. Alongi's allocation -- as determined and approved by the Funds' own outside accounting firm -- would remain static for the simple reason that her job duties with respect to each Fund remained largely unchanged.  See Alongi Aff. ¶¶ 69-70 (D. App. 013); Alongi Dep., Vol. III, pp.81-98 (D.App. 024-028).

136.   Defendant Alongi, the most highly compensated Funds employee, by far – was having her services and compensation attributable to one Fund subsidized by another. (App. 04952 (Ex. 5); App. 063 (Ex. 6); App. 210-12 (Ex. 18)).

**Response No. 136:**     **Disputed.**   See DSOF, ¶¶ 100-103 and response to para. 135 above.

137.   Defendant Alongi's supposed allocations to each of the Funds and related entities for work performed during the period 2015 through 2017 were as follows:

| Year | H&W | Pension | Annuity | A&T | Coop | SAC | Dues | Total |
|------|-----|---------|---------|-----|------|-----|------|-------|
| 2015 | 29.0000% | 48.7776% | 12.4667% | 4.3686% | 4.2457% | 0.0440% | 1.0974% | 100.0000% |
| 2016 | 19.000% | 58.7776% | 12.4667% | 3.0919% | 4.2457% | 0.4440% | 1.0974% | 100.0000% |
| 2017 | 19.0000% | 58.7776% | 12.4667% | 3.0919% | 4.2457% | 0.440% | 1.9741% | 100.0000% |

(App. 210-12 (Ex. 18)).

**Response No. 137:** Undisputed that Ms. Alongi's allocations are listed above.

138.   Defendant Alongi testified that these allocations were in fact accurate, because the tasks she performed on behalf of these Funds and entities resulted in her performing the *exact* same number of hours of work for each of those Funds and entities – *to the fourth decimal point* – year in and year out. (App. 150-54 (Ex. 9, pp. 82-98)).

**Response No. 138:**     **Disputed.**     That is not what Ms. Alongi testified.   The cited testimony is copied here:

Q.· · ·Okay.· In the absence of time sheets, how was your costs to the various funds going to be allocated? ·

A. ·Because my job consisted of, basically, doing the same thing, you know, every day.· With ·respect to these funds, you know, I knew -- okay, with ··the health & welfare fund, how much time, you know, was  allocated. ·I had a whole claims operation that was doing the majority of the work.· So my role was somewhat limited to, you know, the trustees and preparing for trustees meetings.   You know, for the pension fund, you know, was a little bit more involved with respect, you know, there was a whole host of investment managers.· And the annuity fund somewhat limited. And the dues and the SAC, same thing, issuing a check monthly.

139.   Defendant Alongi testified that she did not spend *one hour* more working on matters for the Health Fund in the years following the passage of the Affordable Care Act and its implementing regulations than she had in prior years. (App. 150-54 (Ex. 9, pp. 82-98)).

**Response No. 139:**   **Disputed.**   That is not what she testified.   In the cited testimony, Ms. Alongi explained that relative to the Affordable Care Act, the Funds had a compliance attorney and two in-house attorneys that worked on compliance issues (so that work did not require any particularly different time commitment from Ms. Alongi), and that the Trustees paid consultants to advise them on any changes to eligibility and changes to benefits that would come with the Affordable Care Act (so that work also did not require any particularly different time commitment from Ms. Alongi). The only remaining work discussed relative to the Affordable Care Act in the deposition were routine clerical tasks such as sending along mailings and correspondence from consultants to others.   See App. 151.

140.   Defendant Alongi finalized and executed the Forms 5500 on behalf of the Funds, thereby averring to the federal government these false allocations. (App. 025 (Ex. 2)).

4882-6790-4831.3

**Response No. 140:**   **Disputed.**  That Ms. Alongi "averred" to any "false allocation."  Ms Alongi's allocations were not 'false,' they reflected the work she performed over the course of the year and, moreover, were supported by the Funds' own accountants.  See responses to paras. 135-139 above and DSOF, ¶¶ 98-104.

## V.   <u>Defendant Alongi's Work for the Coalition</u>

141.   During 2019, the last year for which a Form 990 for the Coalition was publicly available at the time the Complaint in this matter was filed, Defendant Alongi was paid $46,000 per year for her work for the Coalition, and she reported and averred that she performed ten hours of work per week in return for this compensation. (ECF No. 1, ¶ 31; App. 197-208 (Ex. 17)).

**Response No. 141:**   Undisputed.

142.   All Form 990s dating back to at least 2013 contain this same report and averment that she worked ten hours per week for the Coalition. (ECF No. 1, ¶ 31; App. 197-208 (Ex. 17)).

**Response No. 142:**   Undisputed.

143.   Defendant Alongi was regularly performing work for the Coalition during the Funds' standard workday of 8:00 a.m. to 4:00 p.m., a period of time for which she was supposed to be working for the sole and exclusive benefit of the Funds and their participants and beneficiaries and for which she was receiving total compensation in excess of $300,000 per year. (ECF No. 1, ¶ 33; App. 087-89 (Ex. 8)).

**Response No. 143:**   **Disputed.**  Ms. Alongi primarily only performed Coalition work during Funds' work hours during the one-hour break period afforded to her each day pursuant to

the Funds' policy.  See DSOF, ¶ 85.  Moreover, her work for the Coalition was not only known to and approved by the Trustees, but also did benefit the Funds.  See DSOF,  ¶¶ 29-43.

144.    During the time Defendant Alongi served as the Executive Director of the Coalition, she was party to a series of employment contracts titled "Agreement Executive Director Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." (App. 214-224 (Ex. 19)).

**Response No. 144:**    Undisputed.

145.    The Agreement executed in October 2012 defines Defendant Alongi's responsibilities as the Executive Director. They include the following:

a.    Prepare an agenda of the meetings of the Executive Board and Regular Meeting;

b.    Advise the members of the Coalition of legislation, events and issues of importance to them;

d.    To educate legislative and executive federal and state governments on matters of importance to the Coalition members;

e.    Arrange for the schedule of speakers to discuss topics of interest to Coalition members;

f.    Represent the Coalition on all matters requested by the Executive Board;

g.    Maintain the records of the Coalition;

h.    File require reports with regulatory agencies;

i.    To develop and propose better methods of providing and paying for health care, including investigation of possible arrangements with providers and other groups with a view to negotiating favorable rats for the Coalition members for such provider services or insurance and evaluate and develop the same for defined benefit and defined contribution plans.

(App. 221 (Ex. 19)) (*sic*).

**Response No. 145:**    Undisputed.

146.    Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi travelling to and from and attending Coalition general membership and Executive Board meetings. (App. 226-29 (Ex. 20)). The Audit established that Defendant Alongi did not take paid time off from the Funds when she was engaged in travel for the Coalition, thereby getting paid by both organizations at the same time. (App. 085-90 (Ex. 8)).

**Response No. 146:    Disputed.**  Ms. Alongi's work for the Coalition was not only known to and approved by the Trustees, but also did benefit the Funds.  See DSOF,  ¶¶ 29-43.

147.    Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi scheduling and participating in telephone conferences and in-person meetings with Coalition members, prospective members, and vendors during Fund Office business hours, utilizing Fund Office resources. (App. 231-49 (Ex. 21)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Defendant Alongi's actions outlined in this Paragraph.

**Response No. 147:    Disputed.**  Ms. Alongi's work for the Coalition was not only known to and approved by the Trustees, but also did benefit the Funds.  See DSOF,  ¶¶ 29-43.

148.    Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi reviewing documents, correspondence, and memos on behalf of the Coalition. (App. 251-84 (Ex. 22)). In several of the attached emails, Defendant Alongi

forwards information, tasks, or work to Ms. Hickey for completion. (App. 251, 253, 260, 262, 276, 282-84 (Ex. 22)). In one attached email, Defendant Alongi also forwards Coalition work to Fund Office employee Rebecca Zaccardi for completion. (App. 281 (Ex. 22)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Defendant Alongi's actions outlined in this Paragraph.

**Response No. 148:**    **Disputed.**  Ms. Alongi's work for the Coalition was not only known to and approved by the Trustees, but also did benefit the Funds.  See DSOF,  ¶¶ 29-43.

149.    Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi participating in discussions and implementing various surveys of Coalition members and vendors. (App. 286-87 (Ex. 23); App. 402-06 (Ex. 35)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Defendant Alongi's actions outlined in this Paragraph.

**Response No. 149:**    **Disputed.**  Ms. Alongi's work for the Coalition was not only known to and approved by the Trustees, but also did benefit the Funds.  See DSOF,  ¶¶ 29-43.

150.    Emails and other evidence reviewed by Schultheis & Panetierri LLP and produced in discovery in this matter establish that the work Defendant Alongi routinely performed on behalf of the Coalition included Defendant Alongi actively seeking out new Coalition members and collecting membership applications and fees from so-called associate members and entities, particularly investment management firms, that performed services within the universe of Taft-Hartley benefit funds and were promised access to fund administrators conditioned upon their

payment of associate member dues to the Coalition. (App. 289-318 (Ex. 24)). The emails attached

hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in

discovery in this matter which evidence Defendant Alongi's actions outlined in this Paragraph,

and these emails also include illustrative examples of Defendant Alongi directing Ms. Hickey to

perform work on behalf of the Coalition. The individual email chains are marked due to their use

in depositions in this matter. (App. 289-318 (Ex. 24)).

  **Response No. 150:**  **Disputed.** Ms. Alongi's work for the Coalition was not only known

to and approved by the Trustees, but also did benefit the Funds.  See DSOF,  ¶¶ 29-43.  Further,

Ms. Alongi specifically denies soliciting "associate" members Alongi Aff. ¶ 39 (D. App. 007).

and did not receive any personal benefit from Coalition "associate members."   The Coalition used

the dues paid by its "associate members" to pay for expenses for those members' attendance at

Coalition events; the dues were not used to pay Ms. Alongi's salary and she received no personal

benefit of any kind.   See DSOF, ¶ 43.

  151.  The Audit found that Defendant Alongi sent these emails and performed this work on

behalf of the Coalition utilizing the Funds' resources during Fund Office normal business hours:

> Our analysis also revealed numerous emails during that time with a subject line
> referencing the Coalition, a very large majority of which occurred during times
> when the former Fund Administrator was receiving compensation from the Funds.

(App. 089 (Ex. 8)).

  **Response No. 151:**  **Disputed.** See DSOF, ¶¶ 84, 85-88.    Ms. Alongi primarily only

performed Coalition work during Funds' work hours during the one-hour break period afforded to

her each day pursuant to the Funds' policy.  And the Funds' conclusory characterization that there

were "numerous" Coalition e-mails sent over the period of five years is unsupported by the record

evidence cited by the Funds.

152.    Defendant Alongi has throughout these proceedings attempted to justify her unilateral diversion of Funds-financed resources for the benefit of the Coalition based on the erroneous premise that the Welfare Fund received substantial benefits by means of the various Coalition-negotiated arrangements for which she takes sole credit. (App. 321-24 (Ex. 25); App. 010 (Geiman Decl. ¶ 21)).

**Response No. 152:**    **Disputed.**   that this is an "erroneous premise."  See DSOF, ¶¶ 38-41.  Multiple Fund Trustees have testified unequivocally that Ms. Alongi's work for the Coalition saved the Funds underlined millions of dollars.  *See* Alongi Aff., ¶ 33 (D.App. 006); Shaughnessy Aff., ¶ 9 (D.App. 061); Rasetta Aff., ¶¶ 24-25 (D.App. 057).

153.    The Funds received no more benefit from Defendant Alongi serving as Executive Director of the Coalition than they would have received had she simply been an unpaid participant at the Coalition's meetings because the Fund was entitled to receive any such benefits by virtue of its membership in the Coalition and the payment of its dues thereto. (ECF No. 1, ¶ 32; App. 010 (Geiman Decl. ¶ 22)).

**Response No. 153:**    **Disputed.**  For this 'fact' to be true it would have to be assumed that Ms. Alongi's work as Executive Director of the Coalition had nothing to do with the benefits that the Coalition negotiated for its members. But nothing could be further from the truth – there is unequivocal testimony from the Funds' own Trustees (among other evidence) that as Executive Director for the Coalition, Ms. Alongi was instrumental in negotiating and obtaining benefits that inured to the Coalition's member Funds, and Ms. Alongi herself has provided numerous additional examples of such work in her Answers to Interrogatories (Answer No. 8).  *See* DSOF, ¶¶ 38-41.

The Funds have adduced no evidence whatsoever that any other Executive Director (in lieu of Ms. Alongi) would have negotiated and obtained these same benefits that inured to the Funds and other Coalition members.

154.   All other Coalition member funds were able to receive these benefits without having to make similar commitments of their personnel and resources. (App. 010 (Geiman Decl. ¶ 22)).

**Response No. 154:**     **Disputed.**   Ms. Alongi, through her service on an International Union of Operating Engineers committee, was able to provide a direct benefit to the Funds by using comparator data from the Coalition to help the committee's negotiation of prescription coverage; this benefit would not have been available to all other Coalition member funds but was available to the Funds due to Ms. Alongi's service on the International Union of Operating Engineers committee.  See DSOF, ¶ 40.

155.   It has been many years since the Funds derived any discernible pecuniary benefit from the Coalition's agreements as the Welfare Fund ceased using many of the Coalition's preferred vendors and products. (ECF No. 1, ¶ 32; App. 010 (Geiman Decl. ¶ 21)).

**Response No. 155:**     **Disputed.**   *See* DSOF, ¶¶ 38-41.

156.   More crucially, for the entirety of the time period relevant to this lawsuit, the Welfare Fund did not use the Coalition sponsored Union Blue insurance product touted by the Defendant in various filings with the Court as justifying her diversion of Fund resources; that product was discontinued by the Funds in 2014, at Defendant Alongi's recommendation, because it was cost prohibitive. (App. 010-11 (Geiman Decl. ¶ 23)).

**Response No. 156:**     Undisputed that the Funds stopped using the Union Blue product in 2014. However, the fact remains that there is unequivocal testimony that Ms. Alongi's work

relative to the Union Blue product through the Coalition resulted in millions of dollars of savings to the Funds, which was well known to the Trustees.  See DSOF, . ¶ 39.

157.   After the Funds discontinued the Union Blue insurance product in 2014, the Welfare Fund had its own arrangement with Blue Cross Blue Shield of Massachusetts to provide medical, surgical, and hospitalization benefits to its participants. (App. 010-11 (Geiman Decl. ¶ 23)).

**Response No. 157:**   Undisputed.

158.   Moreover, at no time has the Welfare Fund used the pharmaceutical benefit manager arrangement negotiated by the Coalition to furnish prescription drug benefits to its participants, opting instead to obtain such coverage via an arrangement initially negotiated by the International Union of Operating Engineers, AFL-CIO, the parent union of IUOE Local 4. (App. 010-11 (Geiman Decl. ¶ 23)).

**Response No. 158:**   Undisputed.  However, the Funds still benefitted from Ms. Alongi's Coalition work relative to the prescription drug coverage negotiated by the Internaitonal (as noted above and in DSOF 40, Ms. Alongi served on a committee for the International that was involved with that coverage and used comparator data collected by the Coalition to verify that the Union was getting the best pricing for prescription drugs).  See DSOF, ¶ 40.

159.   The arrangements outlined in Paragraphs 155-158 -- the provision of medical, surgical, and hospitalization costs and for those associated with the cost of providing prescription drugs – account for nearly all benefit costs borne by the Welfare Fund. (App. 010-11 (Geiman Decl. ¶ 23)).

**Response No. 159:**   **Disputed** to the extent that paragraph 155 is disputed.

160. In 2016, the Welfare Fund had total claims expenses of $44,296,420, which were comprised of the following:

- o $33,530,710, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield;

- o $6,971,162 in prescription drug claims paid through its PBM;

- o $2,886,054 in dental claims;

- o $364,243 for vision benefit;

- o $44,200 for hearing benefits; and

- o $429,651 for disability and death benefit claims.

(App. 011 (Geiman Decl. ¶ 24)).

   **Response No. 160:**   Undisputed.

161.   Of all of the classes of claims outlined in Paragraph 160, the only ones for which the Welfare Fund participants received coverage via a Coalition-negotiated provider was for vision and hearing. (App. 011 (Geiman Decl. ¶ 24)).

   **Response No. 161:**   Undisputed.

162.   Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.92% of the Fund's overall claims costs in 2016. (App. 011 (Geiman Decl. ¶ 24)).
   **Response No. 162:**   Undisputed.

163.   In 2017, the Welfare Fund had total claims expenses of $53,032,811, which were comprised of the following:

- o $41,233,554, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield;

- o $7,510,098 in prescription drug claims paid through its PBM;

4882-6790-4831.3

- o $3,360,207 in dental claims;
- o $380,228 for vision benefits;

- o $16,536 for haring benefits; and

- o $465,423 for disability and death benefit claims.

(App. 011-12 (Geiman Decl. ¶ 25)).

**Response No. 163:**   Undisputed.

164.    Of all of these classes of claims outlined in Paragraph 163, the only ones for which the Welfare Fund participants received coverage via a Coalition-negotiated provider was for vision and hearing. (App. 011-12 (Geiman Decl. ¶ 25)).

**Response No. 164:**   Undisputed.

165.    Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.75% of the Welfare Fund's overall claims costs in 2017. (App. 011-12 (Geiman Decl. ¶ 25)).

**Response No. 165:**   Undisputed.

166.    In 2018, the Welfare Fund had total claims expenses of $57,346,599, which were comprised of the following:

- o $44,989,792, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield;

- o $7,304,380 in prescription drug claims paid through its PBM;

- o $3,402,358 in dental claims;

- o $375,885 for vision benefits;

- o $48,194 for hearing benefits; and

    o   $480,703 for disability and death benefit claims.

(App. 012 (Geiman Decl. ¶ 26)).

     **Response No. 166:**   Undisputed.

167.   Of all of these classes of claims, the only ones for which the Welfare Fund participant received coverage via a Coalition-negotiated provider was for vision and hearing. (App. 012 (Geiman Decl. ¶ 26)).

     **Response No. 167:**   Undisputed.

168.   Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.74% of the Fund's overall claims costs in 2018. (App. 012 (Geiman Decl. ¶ 26)).

     **Response No. 168:**   Undisputed.

169. In 2019, the Welfare Fund had total claims expenses of $53,230,171, which were comprised of the following:

    o   $43,332,746, were attributable to the medical, surgical, and hospitalization benefits provided through its own arrangement with Blue Cross Blue Shield;

    o   $5,381,702 in prescription drug claims paid through its PBM;

    o   $2,563,721 in dental claims;

    o   $395,697 for vision benefits;

    o   $27,297 for hearing benefits; and

    o   $503,408 for disability and death benefit claims.

(App. 012-13 (Geiman Decl. ¶ 27)).

**Response No. 169:**     Undisputed.

170.   Of all of these classes of claims, the only ones for which the Welfare Fund participants received coverage via a Coalition-negotiated provider was for vision and hearing. (App. 012-13 (Geiman Decl. ¶ 27)).

**Response No. 170:**     Undisputed.

171.   Thus, such Coalition-negotiated benefit providers were responsible for the payment of just 0.79% of the Fund's overall claims costs in 2019. (App. 012-13 (Geiman Decl. ¶ 27)).

**Response No. 171:**     Undisputed.

172.   In her Answers to the Plaintiffs' Interrogatories, Defendant Alongi, at Answer No. 8, listed a number of projects that she claimed "provided direct savings to Coalition members, including the Funds...." (App. 321-24 (Ex. 25); App. 013 (Geiman Decl. ¶ 29)).

**Response No. 172:**     Undisputed.

173.   Of the projects listed at Answer No. 8 for the relevant time period, only one item was negotiated through the Coalition and inured to the benefit of the Funds – a $.30 per member per month administrative fee reduction in 2015-2017. (App. 321-24 (Ex. 25); App. 013 (Geiman Decl. ¶ 29)).

**Response No. 173:**     **Disputed.**   The $.30 per member per month admin fee reduction as only one of many benefits received by the Funds as a direct result of Ms. Alongi's Coalition work. See DSOF, ¶ 40.

174.   In real dollars, that would represent a savings to the Funds of approximately $10,000 (3,000 participants x 12 months x $.30) each year. (App. 013 (Geiman Decl. ¶ 29)).

**Response No. 174:**   Undisputed.

175.  In the years 2016-2019, the Funds paid Defendant Alongi a total average compensation costs per year of cost per year of $338,658, which was comprised of the following averages:

- o  An average salary of $242,000;

- o  Contributions to two different defined benefit pension plans for her at an average cost each year of $31,815;

- o  Contributed to a defined contribution pension plan for her at a cost each year of $15,080;

- o  Fully employer-paid health insurance at a cost each year of $10,400; and

- o  An employer-provided Cadillac Escalade, and later a fully-loaded Ford Explorer, at an average cost each year of $39,363.

(ECF No. 1, ¶ 21; App. 013-14 (Geiman Decl. ¶ 30)).

**Response No. 175:**   Undisputed.

176.   Thus, just the diversion of 3 percent of Defendant Alongi's time for the Funds to the Coalition would wipe out any of these purported savings she allegedly delivered by her work for the Coalition. (App. 013-14 (Geiman Decl. ¶ 30)).

**Response No. 176:**   **Disputed.**   The $.30 per member per month admin fee reduction as only one of many benefits received by the Funds as a direct result of Ms. Alongi's Coalition work. See DSOF, ¶ 40.  Further, this 'calculation' fails to take into account the undisputed testimony that Ms. Alongi – through her work with the Union Blue product for the Coalition – saved the Funds' millions of dollars.  See DSOF, ¶ 39.

70

177.    In her Answers to the Plaintiffs' Interrogatories, Defendant Alongi additionally asserts that she was engaged in other Coalition activities that somehow benefitted the Funds. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

**Response No. 177:**    Undisputed, although the activities actually benefitted the Funds, not "somehow" benefitted the Funds.

178.    In February 2015, Defendant Alongi was involved in a time-consuming project (that was thus expensive for the Funds) with the New York Health Care Alliance on its PBM project that in no way affected the Funds' relationship with its PBM through the IUOE. (App. 32124 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

**Response No. 178:**    **Disputed.**  Ms. Alongi used the data gained from this project for her work on the International committee that was reviewing prescription drug pricing for the Union - Her work for the Coalition benefitted the Funds, because she and the committee were able to use the Coalition data to verify that the Union was getting the best pricing for prescription drugs.   See DSOF, ¶ 40.

179.    The March 8, 2017 bundled product discount that Defendant Alongi cites in her Answers to the Plaintiffs' Interrogatories was provided by Blue Cross to the Funds directly and had nothing to do with the Coalition. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

**Response No. 179:**    **Disputed**.  The list is taken directly from topics covered at Coalition meetings,  See . App. 321-322 (identifying "date of Coalition meeting" and "topic").

180.   Her assertion that the Fund received its prescription drug benefits through Blue Cross is incorrect. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

**Response No. 180:**   **Disputed**, to the extent that Ms. Alongi does not assert that the Funds received its prescription drug benefits through Blue Cross.

181.   The claimed emerging solutions "discounts" from September 8, 2018 and June 20, 2019 that Defendant Alongi cites in her Answers to the Plaintiffs' Interrogatories were in fact *additional* costs to the Fund for health solutions that were sold to Defendant Alongi, and then presented by her to the Coalition, that largely ended as expensive failures for the Welfare Fund. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

**Response No. 181:**   **Disputed** – these discounts provided direct savings to Coalition members, including the Funds specifically, and as such were not "expensive failures."   See . App. 321-322

182.   Of the four programs listed in Defendant Alongi's Answers to Interrogatories, the Fund only maintains a relationship to this day with Hinge Health. (App. 321-24 (Ex. 25); App. 014-15 (Geiman Decl. ¶ 34)).

**Response No. 182:**   Undisputed.

183.   The Welfare Fund ceased being a Coalition member as of December 31, 2020. (App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 183:**   Undisputed.

184.   In 2021 the Welfare Fund terminated its relationship with the Coalition-negotiated vision provider and entered a new relationship with a different provider that resulted in an equivalent cost to the Fund and a much larger network of vision care centers for the participants and beneficiaries to use. (App. 013 (Geiman Decl. ¶ 28)).

**Response No. 184:**   Undisputed.

185.   A new hearing provider was retained in 2022, resulting in a cost savings to the Fund and the same level of benefits for participants and beneficiaries. (App. 013 (Geiman Decl. ¶ 28)).

**Response No. 185:**   Undisputed.

186.   The Pension, Annuity, and Training Funds, all of which share costs with the Welfare Fund, received no benefit whatsoever from paying for employees to work for the Coalition. (App. 010-11 (Geiman Decl. ¶ 23)).

**Response No. 186:**   **Disputed.**  The Pension, Annuity, and Training Funds did not "pay for employees to work for the Coalition;" the Trustees knew and approved of Ms. Alongi's Coalition work, and her Coalition work provided direct pecuniary benefit to the Funds.  See DSOF, ¶¶ 29-43.

**VI.**   **Defendant Alongi's Direction of Certain Funds Office Staff to Work for the Coalition**

187.   Defendant Alongi directed Fund employees to perform work and provide services to the Coalition while being compensated by the Funds, while working within the Funds Office, using Fund resources and equipment. (ECF No. 1, ¶ 45; App. 087-89 (Ex. 8)).

**Response No. 187:**   **Disputed**, to the extent that Ms. Alongi never instructed Taylor Ryan, Rosemary Ortega, Bettyann Trefry, Teri Berardi, or Amy Boisvert to provide services to the Coalition.  Funds employee Laura-Jean Hickey was also employed by the Coalition and held the position of Coalition Coordinator, and as Executive Director of the Coalition, Ms. Alongi asked Ms. Hickey to perform Coalition work on occasion, given that Ms. Hickey was the Coalition Coordinator.   Funds employee Rebecca Zaccardi prepared quarterly financial reports and annual tax forms for the Coalition on her own time using her own financial software (and was compensated by the Coalition for her work), and Rosemarie Alongi occasionally made minor changes to the Coalition's website, as requested by Ms. Hickey, which did not take long when requested and were not made every day (and was compensated by the Coalition for her work.  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

188.    Interviews with Fund employees conducted by certified public accountants at Schultheis & Panetierri LLP and an analysis by the auditors of how these employees spent their time show that a substantial portion of the Funds' payroll expenses were in fact diverted to the benefit of the Coalition. (ECF No. 1, ¶ 47; App. 088-89 (Ex. 8)).

**Response No. 188:**   **Disputed.**   .  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).  Further, there is undisputed testimony that  the Funds' work for the Coalition resulted in millions in dollars in direct financial benefit – not harm – to the Funds.  See DSOF, ¶¶ 37-41.

189.    All such work done on behalf of the Coalition was at the behest of and direction of Defendant Alongi, not at the direction of the Funds' Trustees. (App. 014 (Geiman Decl. ¶ 33); App. 231-32, 234, 241 (Ex. 21); App. 251, 253, 260, 262, 276, 281, 282-84 (Ex. 22); App. 286-87 (Ex. 23); App. 289-318 (Ex. 24)).

**Response No. 189:**    **Disputed.**   Ms. Alongi never instructed Taylor Ryan, Rosemary Ortega, Bettyann Trefry, Teri Berardi, or Amy Boisvert to provide services to the Coalition. Funds employee Laura-Jean Hickey was also employed by the Coalition and held the position of Coalition Coordinator, and as Executive Director of the Coalition, Ms. Alongi asked Ms. Hickey to perform Coalition work on occasion, given that Ms. Hickey was the Coalition Coordinator. Funds employee Rebecca Zaccardi prepared quarterly financial reports and annual tax forms for the Coalition on her own time using her own financial software (and was compensated by the Coalition for her work), and Rosemarie Alongi occasionally made minor changes to the Coalition's website, as requested by Ms. Hickey, which did not take long when requested and were not made every day (and was compensated by the Coalition for her work.  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

190.    The Funds received no compensation for the use of its personnel for Coalition business. (App. 088-90 (Ex. 8); App. 008-09 (Geiman Decl. ¶ 16)).

**Response No. 190:**    **Disputed.**   There is undisputed testimony that  the Funds' work for the Coalition resulted in millions in dollars in direct financial benefit – not harm – to the Funds. See DSOF, ¶¶ 37-41.

191.    In the Audit, the certified public accountants at Schultheis & Panettieri, LLP found as follows regarding this issue:

> Based on our interviews and analysis of Fund Office employees; email, it is apparent that the Coalition's operations were tightly integrated with the Fund Office and many of the Fund Office employees performed duties for the Coalition with no reimbursement. It appears Fund Office employees' Coalition efforts increased gradually to 2020, at which time significant Fund Office resources were being directed to the Coalition's inaugural "Wellness Fair" for which no time was tracked, allocated, or invoiced to the Coalition.

(App. 088 (Ex. 8)).

**Response No. 191:**    Undisputed that the Audit contains the text quoted above.  **Disputed** to the extent Ms. Alongi never instructed Taylor Ryan, Rosemary Ortega, Bettyann Trefry, Teri Berardi, or Amy Boisvert to provide services to the Coalition.  Funds employee Laura-Jean Hickey was also employed by the Coalition and held the position of Coalition Coordinator, and as Executive Director of the Coalition, Ms. Alongi asked Ms. Hickey to perform Coalition work on occasion, given that Ms. Hickey was the Coalition Coordinator.   Funds employee Rebecca Zaccardi prepared quarterly financial reports and annual tax forms for the Coalition on her own time using her own financial software (and was compensated by the Coalition for her work), and Rosemarie Alongi occasionally made minor changes to the Coalition's website, as requested by Ms. Hickey, which did not take long when requested and were not made every day (and was compensated by the Coalition for her work.  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

192.    In addition to Defendant Alongi directing Funds staff to perform work for the Coalition during normal business hours, she further directed Laura-Jean Hickey, the Funds' Assistant Administrator, to do the same and participate in directing Funds staff to perform work for the Coalition during normal business hours. (App. 014 (Geiman Decl. ¶ 33); App. 231-32, 234, 241 (Ex. 21); App. 251, 253, 260, 262, 276, 282-84 (Ex. 22); App. 286-87 (Ex. 23); App. 289-318 (Ex. 24); App. 326 (Ex. 26)).

**Response No. 192:**    **Disputed.**  Funds employee Laura-Jean Hickey was also employed by the Coalition and held the position of Coalition Coordinator, and as Executive Director of the Coalition, Ms. Alongi asked Ms. Hickey to perform Coalition work on occasion, given that Ms.

Hickey was the Coalition Coordinator.   See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

193.   Defendant Alongi, as Administrator, had the authority to hire, fire, promote, and demote Fund office employees. (App. 139 (Ex. 9, pp. 77-78)).

**Response No. 193:**   **Disputed.**   The record evidence cited by the Funds does not support the notion that Ms. Alongi had unilateral authority to hire, fire, promote, and demote Fund office employees.   The record evidence cited demonstrates only that Ms. Alongi fired one single employee – Christie Walsh, who is not at issue regarding any of the Funds' claims or allegations in this case.  See App. 139.

194.   Defendant Alongi testified that during her tenure as Administrator she recommended the allocation of wage or salary raises to specific Funds office employees at her discretion. (App. 140 (Ex. 9, p. 99)).

**Response No. 194:**   **Disputed.**   Ms. Alongi did recommend raises, but did not approve them. During Ms. Alongi's tenure as Administrator, employee compensation was set exclusively by the Trustees.  In particular. the Trustees established a subcommittee consisting of the Chairman and the Senior Management Trustee (the "Subcommittee") and the Subcommittee made decisions on behalf of the Trustees concerning Funds' office employee compensation.  See Alongi Aff., ¶ 12 (D.App. 003). Ms. Alongi made recommendations regarding employee compensation to the Business Manager/Chairman, but had no authority to (and never did) make any binding decision regarding employee compensation.  See Alongi Aff., ¶ 16 (D.App. 004).

195.   The Audit determined that a substantial portion of the Funds' overall payroll expenses were diverted for the benefit of the Coalition; the Audit concluded as follows:

We reviewed hundreds of emails documenting Coalition work performed by various persons during normal Fund Office business hours. Work performed included scheduling and planning all Coalition events and meetings, preparing all meeting materials, performing surveys on behalf of the Coalition, maintaining the books and records of the Coalition, maintaining the Coalition's website and continuously updating service provider and membership data, and orchestrating the inaugural Wellness Fair. Additionally, we interviewed several Fund Office employees who validated our findings.

(App. 089 (Ex. 8)).

**Response No. 195:**   **Disputed.**   .  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).  Further, there is undisputed testimony that  the Funds' work for the Coalition resulted in millions in dollars in direct financial benefit – not harm – to the Funds.  See DSOF, ¶¶ 37-41.

196.   The following Fund Office employees provided services to the Coalition at Defendant Alongi's direction and devoted the noted estimated percentage of their time to such activities during the time covered by the Audit, rather than for the sole benefit of the Funds, their participants and beneficiaries, during the Funds' regular business hours, utilizing the Funds' resources: Rosemarie Alongi: 30%; Laura Jean Hickey: 30%; Taylor Ryan: 38%; Rosemary Ortega: 12.5%; Bettyann Trefry: 4%; Terri Berardi: 1%; Amy Boisvert: 1%; Rebecca Zaccardi: 1%. (ECF No. 1, ¶ 48; App. 088-89, 132-33 (Ex. 8)).

**Response No. 196:**   **Disputed.**   Ms. Alongi never instructed Taylor Ryan, Rosemary Ortega, Bettyann Trefry, Teri Berardi, or Amy Boisvert to provide services to the Coalition. Funds employee Laura-Jean Hickey was also employed by the Coalition and held the position of Coalition Coordinator, and as Executive Director of the Coalition, Ms. Alongi asked Ms. Hickey to perform Coalition work on occasion, given that Ms. Hickey was the Coalition Coordinator. Funds employee Rebecca Zaccardi prepared quarterly financial reports and annual tax forms for

the Coalition on her own time using her own financial software (and was compensated by the Coalition for her work), See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

197.   Notwithstanding the fact that all Fund Office employees were required to track how they spent their workdays on time sheets, no records were kept of time devoted to Coalition work during normal business hours at the explicit or implicit direction of Defendant Alongi. (App. 087 (Ex. 8); App. 010 (Geiman Decl. ¶ 20)).

**Response No. 197:**   **Disputed.**   Ms. Alongi never instructed anyone to falsify their time sheet.   See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132). Moreover, Laura-Jean Hickey kept extensive records of her time devoted to Coalition work.

198.   As a result, the Funds have had to try to reconstruct the economic losses suffered by them resulting from this impermissible use of its personnel. (App. 084-90, 132-33 (Ex. 8); App. 010 (Geiman Decl. ¶ 20)).

**Response No. 198:**   **Disputed** that there was an "impermissible use of its personnel," there is evidence that the Trustees were aware of the Coalition work performed in the Fund office by Fund office employees other than Ms. Alongi, including Ms. Hickey.  See Rasetta Aff., ¶ 18 (D.App. 56)

199.   Rosemarie Alongi, Defendant Alongi's twin sister, worked in the Funds' IT Department. (App. 088 (Ex. 8)).

**Response No. 199:**   Undisputed.

200.   Emails reviewed by Schultheis & Panettieri, LLP and produced in discovery in this matter establish that Rosemarie Alongi routinely updated and maintained the Coalition's website during the Funds' regular business hours, utilizing the Funds' resources, while being paid by the Funds. (App. 088 (Ex. 8)).

**Response No. 200:**   **Disputed.**   Rosemarie Alongi occasionally made minor changes to the Coalition's website, as requested by Ms. Hickey, which did not take long when requested and were not made every day (and was compensated by the Coalition for her work).  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

201.   In the Audit, the certified public accountants at Schultheis & Panettieri, LLP uncovered the following:

> During our analysis of documents included in emails, we noted monthly payments of $500 from the Coalition to 'Alongi Associates' for 'Web Maintenance' and noted correspondence indicating these services were performed during normal business hours. During our interviews, we verified that these were, in fact, payments to Rosemarie Alongi for IT services which appear to have been performed during normal business hours for which she received compensation and benefits from the Funds with no reimbursement from the Coalition.

(App. 088 (Ex. 8)).

**Response No. 201:**   **Disputed.**   Rosemarie Alongi occasionally made minor changes to the Coalition's website, as requested by Ms. Hickey, which did not take long when requested and were not made every day (and was compensated by the Coalition for her work).  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

202.        In January 2015, Rosemarie Alongi designed the Coalition's website utilizing Fund resources. (App. 328 (Ex. 27)). Rosemarie Alongi, from her Funds provided email account,

emailed an image of the Coalition's website to Defendant Alongi on her own Funds provided email account at 3:10 p.m. on Thursday, January 15, 2015. (App. 328 (Ex. 27)).

**Response No. 202:**    **Disputed** that Rosemarie Alongi "designed the Coalition's website utilizing Fund resources" ; that is not supported by the record evidence cited (which is just a single e-mail from Rosemarie to Gina with a screenshot of the Coalition's website).

203.    In the subject line of that email, Rosemarie Alongi asks Defendant Alongi: "do you like it so far?" (App. 328 (Ex. 27)).

**Response No. 203:**    Undisputed.

204.    Defendant Alongi subsequently replied that the Coalition's website designed by Funds employee Rosemarie Alongi, which was sent to her during Funds Office regular business hours from a Funds provided email account "Looks good". (App. 328 (Ex. 27)).

**Response No. 204:**    Undisputed.

205.    Significant numbers of subsequent emails that demonstrate Rosemarie's performance of work on behalf of the Coalition during the Funds' regular business hours – along with contemporaneous DOL timesheets concealing that work – were uncovered by the Audit and in discovery in this matter. The work Rosemarie Alongi performed for the Coalition during the Funds' regular business hours and utilizing the Funds' resources included maintaining and updating the Coalition's website and adding new members, events, or announcements. (App. 330-49 (Ex. 28)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Rosemarie Alongi's actions outlined in this Paragraph. The individual email chains, and accompanying DOL timesheets that result in calculation of a full day's work but do not include reference to or a time

4882-6790-4831.3

deduction for the work performed for the Coalition, are marked due to their use in depositions in this matter. (App. 330-49 (Ex. 28)).

      **Response No. 205:**   **Disputed** – the record evidence cited does not support paragraph 205**.** Every single one of the e-mails cited by the Funds at App. 330-49 except one involves communications between Ms. Hickey and Rosemarie Alongi, not the Alongi sisters. App. 330-49. Further, there is no evidence anywhere in the record cited by the Funds at App. 330-49 that there are "significant numbers of. . . emails that demonstrate Rosemarie's performance of work on behalf of the Coalition during the Funds' regular business hours." See App. 330-49.

      206.    Notably, Rosemarie Alongi never listed time worked on behalf of the Coalition on the timesheets she was required to keep in accordance with the Shared Services Agreement and the Funds' Employee Handbook, despite the fact that emails establish that she was performing that work during the Funds' normal business hours. (App. 330-49 (Ex. 28)).

      **Response No. 206:**   **Disputed.** There is no requirement in the Shared Services Agreement (or the Fund Employee Handbook) to list time worked on behalf of the Coalition.  The Shared Services Agreement only applies to the sharing of services and office space between the Funds entities listed as parties to the agreement (identified as the "Organizations").  *See* App. 049 – 053.  The Handbook states: timesheets are used to break down employees' hours (all hours, including overtime), ***spent on particular Funds***, not spent performing Coalition work.  App. 063.

      207.    Emails reviewed by Schultheis & Panettieri, LLP and produced in discovery in this matter further established that, at Defendant Alongi's direction, Rosemarie applied pressure on prospective IT service providers to join the Coalition and submit membership fees during the Funds' regular business hours and utilizing the Funds' resources. (App. 351-60 (Ex. 29)). The individual email chains are marked due to their use in depositions in this matter.

**Response No. 207:**   **Disputed.**   The Funds' accusation that Ms. Alongi somehow personally benefitted from service providers signing up as "associate members" of the Coalition is specious.   There was no personal benefit:  the Coalition used the dues paid by its "associate members" to pay for expenses for those members' attendance at Coalition events; the dues were not used to pay Ms. Alongi's salary and she received no personal benefit of any kind.   Alongi Aff. ¶ 39 (D. App. 007).

208.    The Senior Director of CMIT Solutions, an IT service provider, emailed Defendant Alongi and, after noting that CMIT Solutions had "been active with members of the Coalition ensuring their IT Infrastructure support for workstation, servers, and more," asserted that she wanted to "circle back with you specifically to see if perhaps it is timely for Local 4 to look at CMIT's IT support for your infrastructure." (App. 352 (Ex. 29)).

**Response No. 208:**   Undisputed.

209.    To that end, the Senior Director of CMIT Solutions asks "[m]ight there be an opportunity to schedule a call to check in on your current needs?" (App. 352 (Ex. 29)).

**Response No. 209:**   Undisputed.

210.    In response, Defendant Alongi forwarded the email to Rosemarie Alongi, and asked Rosemarie whether she "[w]ould be willing to call her?" (App. 352 (Ex. 29)).

**Response No. 210:**   Undisputed.

211.    Rosemarie responded that she would do so, but she noted that "the services they offer we already have in place throughout the infrastructure." (App. 353 (Ex. 29)).

**Response No. 211:**     Undisputed.

212.     Nonetheless, and without providing any basis or detail, Defendant Alongi responded to Rosemarie Alongi as thus: "She's very nice. Maybe you can meet with her." (App. 353 (Ex. 29)).

**Response No. 212:**     **Disputed** that Ms. Alongi provides no "basis or detail;" she states that the person is "very nice," and says that maybe her sister can meet her.   App. 353

213.     During the period prior to and for about a year following August 24, 2018, a company named Rapid 7 provided IT services to the Funds. On Friday, August 24, 2018, at 1:40 p.m., Rosemarie Alongi sent an email form her Funds provided email account to Rapid 7 and conveyed the following information and request:

> Gina asked me if Rapid 7 would have interest in becoming an associate member with the Mass. Coalition. There is an opening to present in September at the Carpenters Union and it would be a great opportunity for Rapid 7 to pick up some other Fund Offices.
>
> The cost is 1500 annually –> [hyperlink provided]
>
> More information –> [hyperlink provided]
>
> Let me know asap if you have interest so Gina can schedule you for the meeting.

(App. 356 (Ex. 29)).

**Response No. 213:**     Undisputed.

214.     Later that same day, an individual from Rapid 7 responded to Rosemarie Alongi's email as follows:

> Thanks for passing this along! That's an impressive list of associate members. I sent this information to my Director and will let you know if it's something that we can do.

(App. 356 (Ex. 29)).

**Response No. 214:**    Undisputed.

215.    The same individual from Rapid 7 sent a follow up email in which he observed and asked the following:

> There are a ton of really good names on the list of members. Question for you (and maybe Gina/Greg?) – if we were to present our Managed Detection & Response service to thar audience, would it be interesting/impactful to them? Typically what title of folks attend those meetings? (ie CEO, CFO, CISO, CTO, General Counsel etc).

(App. 355 (Ex. 29)).

**Response No. 215:**    Undisputed.

216.    Rosemarie Alongi subsequently emailed Defendant Alongi on Monday, August 27, 2018 at 10:03 a.m. from her Funds provided email account and asked: "Did you respond to [the individual from Rapid 7]?" Defendant Alongi responded that same day, Monday, August 27, 2018 at 10:59 a.m. – from her Funds provided email account via iPhone – and said, "[n]ot yet can we call him?" (App. 355 (Ex. 29)).

**Response No. 216:**    Undisputed.

217.    Rosemarie Alongi responded, again from her Funds provided email account during the Funds' regular working hours, that "I would send him an email and ask to see that time he is available." (App. 354 (Ex. 29)).

**Response No. 217:**    Undisputed.

218.    Defendant Alongi responded shortly thereafter, again during the Funds' normal business hours and from her Funds provided email account, this time on a computer, and instructed

Rosemarie Alongi to do so herself. She wrote: "Can you see if he's available at 11:30". (*sic*) (App. 354 (Ex. 29)). Rosemarie complied with Defendant Alongi's directive. (App. 354 (Ex. 29)).

    **<u>Response No. 218:</u>**    Undisputed.

    219.    Rosemarie Alongi emailed the individual from Rapid 7 that same day, during the Funds' normal business hours and from her Funds provided email account, and asked whether the individual was "available for at 11:30 for a quick call with Gina?" (App. 358 (Ex. 29)). The individual from Rapid 7 responded that he was unavailable at the requested time, but that he could be available later that same week for a telephone conference with Defendant Alongi. (App. 358 (Ex. 29)).

    **<u>Response No. 219:</u>**    Undisputed.

    220.    Rosemarie Alongi responded to that email as follows:

> Let me check with Gina regarding Wednesday. By the way, I received an invoice from Rapid 7 today and they charged us tax on the invoice. I sent an email to the person it came from and he said he would make an adjustment and never received another invoice?

(App. 358 (Ex. 29)).

    **<u>Response No. 220:</u>**    Undisputed.

    221.    On Friday, September 7, 2018 at 2:00 p.m., Rosemarie Alongi sent the same individual from Rapid 7 an email during the Funds' normal business hours, utilizing her Funds provided email account. The subject line of the email was "Follow up" and Rosemarie's email read: "Gina asked me if I heard from you regarding the Coalition she is trying to finalize the agenda." (App. 360 (Ex. 29)). On September 11, 2018 at 11:42 a.m., Rosemarie Alongi sent the same individual from Rapid 7 an email during the Funds' normal business hours, utilizing her Funds provided email account. The email forwarded the previously sent September 7, 2018 email

86

and provided the following in bold:

> Good morning!
>
> I hope you are doing well [emoji] can you please respond to the below email so we know if Rapid 7 has interest.
>
> Thank you.

(*sic*) (App. 359 (Ex. 29)).

**Response No. 221:**    Undisputed.

222.    The individual from Rapid 7 sent a responsive email shortly thereafter on that same day, and advised Rosemarie Alongi as follows:

> Hi Rosemarie – thanks for reaching out! I spoke with my management and unfortunately our marketing dollars have already been spent for the year. They've made a note to try to include it in next years budget.

(*sic*) (App. 359 (Ex. 29)).

**Response No. 222:**    Undisputed.

223.    Rosemarie Alongi responded to the same individual from Rapid 7 during the Funds' normal business hours, utilizing her Funds provided email account, and notified the individual that she would "inform Gina so she can finalize the agenda." (App. 359 (Ex. 29)).

**Response No. 223:**    Undisputed.

224.    Laura-Jean Hickey served as Assistant Administrator of the Funds under Ms. Alongi. In addition to working for the Funds, Ms. Hickey served as "Coordinator" for the Coalition at Defendant Alongi's request. (App. 158 (Ex. 9, pp. 130-31)).

**Response No. 224:**   Undisputed that Ms. Hickey served as "Coordinator" for the Coalition;  **disputed** that it was at Ms. Alongi's "request," there is no support for that fact in the deposition testimony cited.

225.   For serving as Coordinator, Ms. Hickey received compensation at a rate of $25 to $30 per hour during the period January 1, 2015 through July 21, 2020, and was required to complete all work assigned by Defendant Alongi, while being instructed to not to exceed twenty hours of work per month. (App. 088 (Ex. 8)).

**Response No. 225:**   Undisputed.

226.   Defendant Alongi, as Executive Director of the Coalition, was fully aware of the work Ms. Hickey was performing and, as her immediate supervisor, she was further aware that Ms. Hickey was performing work on behalf of the Coalition at the Funds office during regular business hours, and she was directing her to do so. (App. 014 (Geiman Decl. ¶ 33); App. 231-32, 234, 241 (Ex. 21); App. 251, 253, 260, 262, 276, 282-84 (Ex. 22); App. 286-87 (Ex. 23); App. 289-318 (Ex. 24)). Defendant Alongi admitted in sworn testimony that she assigned Ms. Hickey the work she performed on behalf of the Coalition:

Q.   Did you maintain the records of the coalition; did you do that?

A.   Laura-Jean did that.

Q.   Laura-Jean did that. Did the coalition have an agreement with Laura-Jean?

A.   No.

Q.   So is it fair to say, you're the one who assigned that work to Laura-Jean?

A.   Yes.

(App. 158 (Ex. 9, pp. 130-31)).

**Response No. 226:**   **Disputed** to the extent the Funds assert that Ms. Alongi assigned Ms. Hickey all work she performed for the Coalition; that is not supported by the record evidence

cited.  Ms. Alongi testified only that Ms. Hickey maintained the records of the Coalition.  App. 158

227.    Ms. Hickey advised the certified public accountants at Schultheis & Panettieri LLP conducting the Audit that, although she "used her best efforts to make up any time performing Coalition duties during lunch and before or after normal business hours (8:00AM to 4:00PM) she estimated that 30% of her efforts for the Coalition occurred during normal business hours for which she received compensation and benefits from the Funds." (App. 088 (Ex. 8)).\

**Response No. 227:**    Undisputed that the Schultheis Report contains the text quoted above. .

228.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included drafting, reviewing, and finalizing Coalition meeting and event agendas and organizing and maintaining various Coalition documents and materials. (App. 362-70 (Ex. 30)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

**Response No. 228:**    Undisputed.   In addition, Ms. Hickey's work for the Coalition was known to the Trustees, including Mr. Rasetta and Mr. McLaughlin.  See See Rasetta Aff., ¶ 18 (D.App. 56); Exhibit 29, Hickey Coalition Poster E-Mails, (D.App. 232).

229.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included coordinating surveys among Coalition members and vendors. (App. 372 (Ex.

31)). The email attached hereto is just an example of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

**Response No. 229:**   Undisputed.   In addition, Ms. Hickey's work for the Coalition was known to the Trustees, including Mr. Rasetta and Mr. McLaughlin.  See See Rasetta Aff., ¶ 18 (D.App. 56); Exhibit 29, Hickey Coalition Poster E-Mails, (D.App. 232)

230.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included scheduling and facilitating telephone conferences during regular business hours with Coalition members, prospective members, and service providers. (App. 374 (Ex. 32)). The email attached hereto is just an example of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

**Response No. 230:**   Undisputed.   In addition, Ms. Hickey's work for the Coalition was known to the Trustees, including Mr. Rasetta and Mr. McLaughlin.  See See Rasetta Aff., ¶ 18 (D.App. 56); Exhibit 29, Hickey Coalition Poster E-Mails, (D.App. 232).

231.    The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included contacting event vendors and prospective venues and generally planning and attending Coalition events, Wellness Fairs, and holiday parties. (App. 376-94 (Ex. 33)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP

and produced in discovery in this matter which evidence Ms. Hickey's actions outlined in this Paragraph.

**Response No. 231:**   Undisputed.   In addition, Ms. Hickey's work for the Coalition was known to the Trustees, including Mr. Rasetta and Mr. McLaughlin.  See See Rasetta Aff., ¶ 18 (D.App. 56); Exhibit 29, Hickey Coalition Poster E-Mails, (D.App. 232)

232.   The work Defendant Alongi directed Ms. Hickey to perform on behalf of the Coalition included Ms. Hickey's directing other Funds employees to perform administrative work on behalf of the Coalition. (App. 326 (Ex. 26)). The email attached hereto is just an example of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in

**Response No. 232:**   **Disputed.**   Ms. Alongi was not aware of every instance when Ms. Hickey instructed others to perform work for the Coalition; by way of example,  Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project" referenced in the Funds' Motion during business hours, and it is undisputed that Ms. Hickey (who the Funds have not fired despite her Coalition work) directly assigned this work to Ms. Ryan.  See Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt) ("Ryan Dep."), pp. 155-156 (D.App. 236-237).

4882-6790-4831.3

233.    Although Ms. Hickey served as the Coalition "Coordinator" at Defendant Alongi's request, unlike Defendant Alongi, Ms. Hickey did not have a written agreement or contract with the Coalition. (App. 214-24 (Ex. 19); App. 158 (Ex. 9, pp. 130-31)).


**Response No. 233:**    Undisputed.

234.    Ms. Hickey is not a party to any contract with the Coalition, and no document places responsibility for these tasks on her shoulders. (App. 214-24 (Ex. 19)).

**Response No. 234:**    **Disputed,** to the extent that it's undisputed that Ms. Hickey was an employee of the Coalition as it's "Coordinator," and an employment relationship is a contractual relationship.  App. 214-24.

235.    Responsibility for completing the work on behalf of the Coalition listed in the "Agreement Executive Director Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." started, stopped, and ended with Defendant Alongi. (App. 221-23 (Ex. 19); App. 158 (Ex. 9, pp. 130-31)).

**Response No. 235:**    **Disputed.**  The fact that Ms. Alongi's employment with the Coalition was pursuant to a written agreement and Ms. Hickey was also employed but not pursuant to a written agreement is not evidence that the work specified in the written agreement "started, stopped and ended" with Ms. Alongi.  And to the contrary, Ms. Alongi specifically testified that, for example, Ms. Hickey was responsible for maintaining records for the Coalition. App. 158

4882-6790-4831.3

236.    Funds employee Taylor Ryan was tasked with seeking and analyzing product information from various vendors and rental services for purposes of preparing for Coalition events and the Coalition's Health Fair and with tracking address and contact information for, and sending various communications to, Coalition members and service providers on behalf of the Coalition. (App. 396-400 (Ex. 34)). Additionally, Defendant Alongi assigns Coalition work to Ms. Ryan by forwarding the same to Ms. Ryan, without comment or a subject line in the email, and Ms. Ryan completes the same. (App. 396-400 (Ex. 34)). The emails attached hereto are just a portion of the emails uncovered by Schultheis & Panetierri LLP and produced in discovery in this matter which evidence Ms. Ryan's actions outlined in this Paragraph.

**Response No. 236:**    **Disputed.**  Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project" referenced in the Funds' Motion during business hours, and it is undisputed that Ms. Hickey (who the Funds have *not* fired despite her Coalition work) directly assigned this work to Ms. Ryan.  *See* Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt) ("Ryan Dep."), pp. 155-156 (D.App. 236-237).   Further, there is no evidence at App. 400 or any of the other record evidence cited by the Funds that Ms. Alongi "assigned Ms. Ryan work" by sending her a blank e-mail with no text and no subject line.

237.    In addition to routinely providing administrative services for the Coalition as described above, Ms. Ryan was also tasked comprehensive, time-consuming projects. (App. 402-16 (Ex. 35)).

**Response No. 237:**    **Disputed.**  Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project" referenced in the Funds' citation above during business hours, and it is undisputed that Ms. Hickey (who the Funds have *not* fired despite her Coalition work)

directly assigned this work to Ms. Ryan.  *See* Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt) ("Ryan Dep."), pp. 155-156 (D.App. 236-237).

238.    Ms. Ryan was instructed to review the zip codes for thousands of participants and beneficiaries of other New England multiemployer fringe benefit funds for purposes of advising the appropriate members of Congress regarding a lobbying effort undertaken by the Coalition that participants and beneficiaries of Coalition member funds could be adversely impacted by proposed regulations pending before the federal government. (App. 402-16 (Ex. 35)). The hundreds of pages of .excel data including thousands of zip codes are omitted for ease of reference, but pertinent emails and an example of the format of the zip code data are included in the attached Appendix at Exhibit 35. (App. 402-16 (Ex. 35)).

**Response No. 238:**    **Disputed.**  Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project" referenced in the Funds' citation above during business hours, and it is undisputed that Ms. Hickey (who the Funds have *not* fired despite her Coalition work) directly assigned this work to Ms. Ryan.  *See* Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt) ("Ryan Dep."), pp. 155-156 (D.App. 236-237).

239.    The emails establish that Ms. Ryan was reviewing thousands of zip codes and compiling data regarding the same for separate multiemployer fringe benefit funds affiliated with the following local unions located in New England: the "Massachusetts Laborers", Local Union 223, affiliated with the International Brotherhood of Electrical Workers, and a local union affiliated with the "Iron Workers" during the Funds' regular business hours, utilizing the Funds' resources. (App. 402-16 (Ex. 35)).

**Response No. 239:**    **Disputed.**   Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project" referenced in the Funds' citation above during business hours, and it is undisputed that Ms. Hickey (who the Funds have *not* fired despite her Coalition work) directly assigned this work to Ms. Ryan.  *See* Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt) ("Ryan Dep."), pp. 155-156 (D.App. 236-237).

240.    As Ms. Ryan testified during deposition testimony, this "Zip Code Project" was "a big thing ... [l]ike a big time-consuming project." (App. 420 (Ex. 36, p. 148)).

**Response No. 240:**    Undisputed that Ms. Ryan so testified, but **Disputed**  to the extent that Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project" referenced in the Funds' citation above during business hours, and it is undisputed that Ms. Hickey (who the Funds have *not* fired despite her Coalition work) directly assigned this work to Ms. Ryan.  *See* Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt) ("Ryan Dep."), pp. 155-156 (D.App. 236-237).

241.    Ms. Ryan testified as follows regarding the amount of time she worked on behalf of the Coalition on the Funds' time, utilizing Funds resources:

A.    I've told you as much as I remember. I remember doing a spreadsheet performing some tasks pertaining to ZIP codes while at Local 4.

Q.    Do you remember how long it took?

A.    A very long time.

Q.    More than a day?

A.    Yes.

Q.    More than a week?

4882-6790-4831.3

A.      Probably

Q.      More than a month?

A.      Maybe. I don't remember.


Q.      But it took more than a week?

A.      Yes.

(App. 420 (Ex. 36, p. 145)).


**Response No. 241:**      Undisputed that Ms. Ryan so testified, but **Disputed** to the extent

that Ms. Alongi denies knowing that Ms. Ryan was asked to work on the "zip-code project"

referenced in the Funds' citation above during business hours, and it is undisputed that Ms.

Hickey (who the Funds have *not* fired despite her Coalition work) directly assigned this work to

Ms. Ryan.  *See* Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt)

("Ryan Dep."), pp. 155-156 (D.App. 236-237).


242.    All of this work occurred during time that Ms. Ryan was being paid by the Funds,

to perform work on behalf of the Funds. (App. 402-16 (Ex. 35); App. 420 (Ex. 36)).


**Response No. 242:**      **Disputed.**  The record material cited by the Funds does not suggest

that all work Ms. Ryan performed on the "zip-code" project occurred during time she was being

paid by the Funds to perform work on behalf of the Funds. App. 402-16; App. 420. In fact, to the

contrary, Ms. Ryan testified at her deposition that she would work more on the zip-code project

when she had "nothing else to do," and also that she doesn't think she ever spent "a full eight

hours" on the "zip-code project" on any one day.  See Ryan Dep, p. 155 (D.App. 236).  Further,

**Disputed** to the extent that Ms. Alongi denies knowing that Ms. Ryan was asked to work on the

"zip-code project" referenced in the Funds' citation above during business hours, and it is

undisputed that Ms. Hickey (who the Funds have *not* fired despite her Coalition work) directly

4882-6790-4831.3

assigned this work to Ms. Ryan.  *See* Alongi Aff. ¶ 68 (D. App. 013); Exhibit 30, Deposition of Taylor Ryan (Excerpt) ("Ryan Dep."), pp. 155-156 (D.App. 236-237)

243.    Funds employee Rosemary Ortega was tasked with purchasing materials on behalf of the Coalition at Defendant Alongi's direction, during the Funds' normal business hours, while being paid to work for the Funds. (App. 422-33 (Ex. 37)).

**Response No. 243:    Disputed.**   Every single one of the e-mails cited by the Funds concerns work given to Ms. Ortega by Laura-Jean Hickey, not Ms. Alongi. App. 422-33.  Further, Ms. Alongi stated in her Answers to Interrogatories that she never instructed Rosemary Ortega to provide services to the Coalition.  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

244.    Ms. Ortega was also tasked with reviewing, compiling, organizing, preparing binders of materials for Coalition meetings and mailings at Defendant Alongi's direction, during the Funds' normal business hours, while being paid to work for the Funds. (App. 422-33 (Ex. 37)).

**Response No. 244:    Disputed.**   Every single one of the e-mails cited by the Funds concerns work given to Ms. Ortega by Laura-Jean Hickey, not Ms. Alongi. App. 422-33.  Further, Ms. Alongi never instructed Rosemary Ortega to provide services to the Coalition.   See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

245.    Ms. Ortega was also tasked with leaving the Fund office during the Funds' normal business hours to pick up and arrange lunches required for Coalition meetings. (App. 425 (Ex. 37)).

**Response No. 245:    Disputed.**   Every single one of the e-mails cited by the Funds concerns work given to Ms. Ortega by Laura-Jean Hickey, not Ms. Alongi. App. 422-33.  Further,

Ms. Alongi stated in her Answers to Interrogatories that she never instructed Rosemary Ortega to provide services to the Coalition.  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

246.    Ms. Ortega was also tasked with inputting Coalition tasks, meetings, and events into Defendant Alongi's calendar during the Funds' normal business hours, while being paid to work for the Funds. (App. 422-33 (Ex. 37)).

**Response No. 246:**    **Disputed.**   Every single one of the e-mails cited by the Funds concerns work given to Ms. Ortega by Laura-Jean Hickey, not Ms. Alongi. App. 422-33.  Further, Ms. Alongi stated in her Answers to Interrogatories that she never instructed Rosemary Ortega to provide services to the Coalition.  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

247.    This work on behalf of the Coalition was performed at Defendant Alongi's direction and with her knowledge. (App. 326 (Ex. 26)).

**Response No. 247:**    **Disputed.**   The record evidence does not support the Funds' assertion; the Funds point to a single e-mail in 2015 where Ms. Alongi asks Ms. Hickey if she could have Ms. Ortega print scholarships for Ms. Alongi to read after Funds business hours; this does not support that all work on behalf of the Coalition by Ms. Ortega was performed at Ms. Alongi's direction and with her knowledge.   Ms. Alongi stated in her Answers to Interrogatories that she never instructed Rosemary Ortega to provide services to the Coalition.  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

248.     On June 9, 2015, Ms. Hickey sent an email to the Coalition's "Scholarship Committee Members," which included Defendant Alongi, and forward a number of documents related to scholarship applications received by the Coalition. (App. 326 (Ex. 26)).

**Response No. 248:**     Undisputed.

249.     Defendant Alongi replied to Ms. Hickey on Wednesday, June 17, 2015 at 11:17 a.m., during the Funds' normal business hours, and instructed as follows:

> Can you have Rosemary print all the scholarships for me to read this evening.
>
> Thank you.

(*sic*) (App. 326 (Ex. 26)).

**Response No. 249:**     Undisputed.

250.     Ms. Hickey responded as follows:

> I'll have Terri do it since Rosemary is on book duty. You'll have a binder made up for your reading pleasure!

(App. 326 (Ex. 26)).

**Response No. 250:**     Undisputed.

251.     When Ms. Ortega was presented with exhibit after exhibit demonstrating the frequency of her work on behalf of the Coalition, she testified as follows when asked "[w]ell, sitting here today, would you say that your performed a lot of work for Laura-Jean as assigned by Gina?":

A.     Well, sir, I didn't initially. But now after seeing all these emails, yes, I did.

Q.     So Gina is ultimately assigning this Coalition work?

A.    I think that she is dealing with Laura-Jean to get the work done, and Laura-Jean is dealing with me to help her get the work done.

Q.    Based on the e-mails, you would say that Gina was aware of that, wouldn't you?

A.    Yes.

(App. 438 (Ex. 38, p. 159)).

**Response No. 251:**    **Disputed**.  Ms. Ortega's speculation about Ms. Alongi's awareness of work that Ms. Hickey assigned to Ms. Ortega  does not demonstrate that Ms. Alongi was aware and/or "ultimately assigned" all Coalition performed by Ms. Ortega.   .  Ms. Alongi stated in her Answers to Interrogatories that she never instructed Rosemary Ortega to provide services to the Coalition.  See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

## VII. Cashing Out Vacation Time without Authorization by Trustees

252.    The terms and conditions of employment of Fund employees are set forth in the Welfare Fund's Employee Handbook, which, among other things, delineates the amount of paid vacation to which employees, including the Fund Administrator, are entitled. (App. 070-71 (Ex. 6); App. 008 (Geiman Decl. ¶ 14)).

**Response No. 252:**    **Disputed.**    Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

253.    As part of her compensation package, Defendant Alongi was permitted to take four weeks of paid vacation each year. (ECF No. 1, ¶ 53; App. 070-71 (Ex. 6); App. 008 (Geiman Decl. ¶ 14)).

**Response No. 253:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

254.   Pursuant to the Funds' Employee Handbook, four weeks of paid vacation constitutes the "maximum vacation time allowable." (ECF No. 1, ¶ 53; App. 071 (Ex. 6)).

**Response No. 254:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

255.   Starting in 2013, unbeknownst to the Trustees and without proper approval from them, Defendant Alongi began taking an additional two weeks of vacation over and above the allotment of four to which she was entitled. (ECF No. 1, ¶ 54; App. 085-86, 096-98 (Ex. 8)).

**Response No. 255:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

256.   During the period January 1, 2015 through July 21, 2020, Defendant Alongi engaged in a practice of cashing out this additional two weeks of vacation in the middle of the year, in effect, awarding herself, in a unilateral and *ultra vires* fashion, an extra two weeks of salary. (ECF No. 1, ¶ 55; App. 085-86, 096-98 (Ex. 8)).

**Response No. 256:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

257.   In the Audit, the certified public accountants at Schultheis & Panettieri LLP uncovered that "[c]ommencing in 2013, the former Fund Administrator received an additional two

weeks' vacation per year for which we were unable to obtain documented Trustee approval."
(App. 085-86 (Ex. 8)).

**Response No. 257:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of
vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

258.     During the period January 1, 2015 through July 21, 2020, Defendant Alongi
engaged in the practice of "cashing out" this additional two weeks of vacation *in the middle of*
*the year*, in effect awarding herself, in an *ultra vires* fashion, an extra two weeks of salary. In
the Audit, the certified public accountants at Schultheis & Panettieri LLP determined as follows:

> The Fund Office Employee Handbook states that unused vacation days will be
> bought back annually. From 2015 through 2020, we noted ten (10) instances where
> partial vacation buyouts to the former Fund Administrator and her sister were paid
> during the year, rather than at the end of the calendar year when other Fund office
> employees' vacation buyouts were processed. It is our understanding that these
> payments were directed by the former Fund Administrator and only the former
> Fund Administrator and her sister were granted this opportunity.

(App. 085-86 (Ex. 8)).

**Response No. 258:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of
vacation time by the Trustees.  See DSOF, ¶¶ 19-20.  Further, the statement that "unused vacation
days will be bought back annually" does not prevent one from receiving a buy-back in the middle
of the year.  The term "annually," obviously, merely means "once a year," not any specific time of
year.

259.     In 2015, 2017, 2018, 2019, and 2020, Defendant Alongi received an additional 80
hours each year, of compensation in this fashion. (ECF No. 1, ¶ 56; App. 085-86, 096-98 (Ex. 8)).

**Response No. 259:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

260.    In 2016, Defendant Alongi received an additional 64 hours of compensation in this fashion. (ECF No. 1, ¶ 56; App. 085-86, 096-98 (Ex. 8)).

**Response No. 260:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

261.    Defendant Alongi ordered Fund Office staff to issue her a check for these vacation hours without withholding for taxes in each of the years 2015, 2016, 2017, 2018, 2019, and 2020 at a total cost to the Funds of $49,849.20. (ECF No. 1, ¶ 57; App. 085-86, 096-98 (Ex. 8)).

**Response No. 261:**   **Disputed.**   Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

262.    John J. Shaughnessy, Jr., a former management Trustee of the Health and Welfare, Pension, and Annuity & Savings Funds executed an Affidavit in support of Defendant Alongi in which he asserted that "[i]n or around 2013, I specifically recall that then Business Manager Lou Rasetta and I approve an additional two weeks of vacation time for Ms. Alongi to use or cash out annually." (App. 440 (Ex. 39)).

**Response No. 262:**   Undisputed.

263.     Former Union Business Manager and Chairman of the Boards of Trustees Louis Rasetta executed a substantially similar Affidavit in which he claimed that "[i]n or around 2013, I suggested giving Defendant Alongi an additional two weeks of vacation time to use or cash out annually because of her dedication, work ethic and her performance as Administrator for the Funds." (App. 443-45 (Ex. 40)).

**Response No. 263:**     Undisputed.

264.     Both Mr. Rasetta and Defendant Alongi admitted in deposition testimony that, during a period of disputed or uncertain length prior to 2013, they engaged in a sexual relationship. (App. 161 (Ex. 9, pp. 71-72); App. 449-50 (Ex. 41, pp. 36-37)).

**Response No. 264:**     Undisputed.

265.     Mr. Shaughnessy testified under oath that he was not aware of the fact that Mr. Rasetta and Defendant Alongi engaged in a sexual relationship. (App. 457 (Ex. 42, 67-68)).

**Response No. 265:**     Undisputed.

266.     The Health Fund Trust Agreement, the document that serves to establish and govern the Welfare Fund, provides, in pertinent part, as follows:

Section 4.1 The Fund shall be administrated by a Board of Trustees which shall consist of three (3) trustees designated by the Union and three (3) trustees designated by the Association (one (1) by each Employer Organization).

Section 5.1 The Board of Trustees shall have the power to administer the Fund and to administer and maintain the Health and Welfare Plan in effect, having and performing all powers and duties reasonably necessary to maintain and operate the Plan in such a way to accomplish its objectives.

Section 5.8 (C) Without limitation of the provisions of Section 5.1 of this Article, the Board of Trustees shall have the power: [t]o employ such executive, consultant, actuarial, administrative, clerical, secretarial and legal counsel (who may be counsel

for the Union, Association or Employer) and other employees and assistants, as may be necessary in connection with the administration of the Fund and the Plan and to pay or cause to be paid, out of the Fund, the compensation and necessary expenses of such personnel and assistants and the cost of office space, furnishing and supplies and other essentials required in such administration.

Section 6.2 The Board shall keep Minutes of all meetings but such minutes need not be verbatim. Copies of the minutes shall be sent to all Trustees.

Section 6.3 To constitute a quorum for the transaction of business not less than two (2) Employer Trustees and two (2) Union Trustees shall be present in person. The Board shall not take any action or make any decision on any matter coming before it or presented to it for consideration or exercise any power or right given or reserve to it or conferred upon it by this Trust Agreement except upon the concurrence of at least two (2) Union Trustees and two (2) Employer Trustees.

(App. 027-33 (Ex. 3)).


**Response No. 266:**   Undisputed; the Agreement speaks for itself.


267.   Thus, at least four (4) Trustees are required to constitute a quorum, and Trustees are forbidden from "tak[ing] any action or mak[ing] any decision on any matter coming before it or presented to it for consideration" without such a quorum. (App. 027-33 (Ex. 3)).


**Response No. 267:   Disputed.**   See DSOF, ¶ 13.   During Ms. Alongi's tenure as Administrator, employee compensation was set exclusively by the Trustees.   In particular. the Trustees established a subcommittee consisting of the Chairman and the Senior Management Trustee (the "Subcommittee") and the Subcommittee made decisions on behalf of the Trustees concerning Funds' office employee compensation.   See Alongi Aff., ¶ 12 (D.App. 003).   Messrs. Shaughnessy and Rasetta formed this "Subcommittee" established by the Trustees at the time they granted Ms. Alongi her vacation time.   See DSOF, ¶¶ 14, 19-20.


268.   Despite his written testimony in his Affidavit, Mr. Rasetta testified under oath that he unilaterally granted this unearned compensation to Defendant Alongi, and that the compensation was granted *on a one-time basis* in 2013:

Q.:     So it wasn't in lieu of cash. She was given two weeks vacation. She could either take two extra weeks of vacation that she could either take as vacation or take as cash, right?

A.:     Right.

Q.:     You didn't seek any board approval for doing that?

A.:     No.

Q.:     And you didn't discuss that with anyone else?

A.:     No.

Q.:     So she just started getting an extra two weeks of vacation?

A.:     One two-week vacation.

Q.:     Just in the year 2013?

A.:     Yes.

(App. 451 (Ex. 41, p. 154)).

**Response No. 268:**     Undisputed.   However, he also earlier provided written testimony that he and Mr. Shaughnessy jointly granted Ms. Alongi two additional weeks of vacation for her to use each year or cash out annually.   Rasetta Aff., ¶ 20 (D.App. 056), and Mr. Shaughnessy testified that Mr. Rasetta's deposition testimony was not consistent with his own recollection – with respect to both the 'one time basis' and 'unilateral' aspects.   See Fund Exhibit 42, pp. 42-43 App. 456.

269.    Mr. Shaughnessy testified under oath in his deposition that the Board of Trustees were never presented with, and never approved, this grant of additional compensation to Defendant Alongi. (App. 455-56 (Ex. 42)).

**Response No. 269:**     **Disputed.** No, he did not.   Nowhere in the deposition testimony cited by the Funds at App. 455-56 did Mr. Shaughnessy say the the Board of Trustees were never

presented with, and never approved, this grant of vacation time.  To the contrary, he testified that "typically" such a decision would have been shared with the Board.  Id.

270.   A review of Fund records shows no action by a required quorum of Trustees to approve paid vacation in excess of the aforementioned four-week allotment provided for in the Employee Handbook. (App. 008 (Geiman Decl. ¶ 15)).

**Response No. 270:**   **Disputed**, but only to the extent that the Funds cite no evidence as to what was involved in this purported "review of Fund records," (i.e., who reviewed those records and how) nor what "records" were reviewed.

271.   Defendant Alongi subsequently cashed out this unearned and unapproved compensation on a subsequent annual basis. (App. 085-86, 096-98 (Ex. 8); App. 008 (Geiman Decl. ¶ 15)).

**Response No. 271:**   **Disputed.**  Ms. Alongi did cash out this time, but she was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.

272.   Defendant Alongi knew the amounts were not approved by the Trustees, and she exercised discretionary control over the Funds' assets when she instructed Funds' staff to issue the untimely payments in violation of the Funds' Employee Handbook, as well as untimely vacation buyout payments to her twin sister Rosemarie. (App. 070-71 (Ex. 6); App. 085-86, 096-98 (Ex. 8)).

**Response No. 272:**   **Disputed.**  Ms. Alongi was granted an additional two weeks of vacation time by the Trustees.  See DSOF, ¶¶ 19-20.  Further, a single buyout of vacation time during one year, where the policy permits annual buyouts, is not an "untimely buyout;"  annual, of course, means once per year, not any specific time during the year.  The Funds' Handbook does

not specify any particular time of year that is required for buy-out payments, only that "unused vacation days (in excess of five) will be bought back annually.   App. 070-71.

## VIII. **Defendant Alongi's Failure to Work Hours for Which She was Compensated**

273.    As befits a highly compensated executive, the Trustees hired Defendant Alongi to be a full-time employee and to be present at the Fund office and devote at least 35 hours per week to overseeing the operations of the Funds and to supervise its employees in the performance of their tasks for the participants and beneficiaries of the Funds. (ECF No. 1, ¶ 61; App. 146 (Ex. 9, p. 12); App. 002 (Geiman Decl. ¶ 2)).

**Response No. 273:**    Undisputed that Ms. Alongi was expected to devote at least 35 hours per week for her full-time Administrator position, but **disputed** that the Trustees expected Ms. Alongi to be present at the Fund office at all times beginning at 8:00am and ending at 4:00pm every business day, prior to Mr. McLaughlin telling Ms. Alongi that she had to come in at 8:00am despite her request for an accommodation due to her disability (Diabetes).  See DSOF, ¶¶ 74-78.

274.    The respective Boards of Trustees employed Defendant Alongi to be a full-time employee and to be present at the Funds office to oversee the operations of the Funds and to supervise the Funds employees in the performance of their tasks for the participants and beneficiaries. (App. 002 (Geiman Decl. ¶ 2)). Defendant Alongi testified as follows during her deposition:

Q.    Would you say, though, that you, as the administrator, were ultimately responsible for the work of all the employees?

A.    Ultimately, yes.

(App. 146 (Ex. 9, p. 10)).

**Response No. 274:**    Undisputed that Ms. Alongi so testified, but the remainder is **Disputed**; the cited testimony does not demonstrate that the Funds employed Ms. Alongi to be

present at all times at the Funds' office.  Moreover, Ms. Alongi also testified that between 2015 and 2020, the only employees who reported directly to Ms. Alongi were Assistant Administrator Greg Geiman and Associate Administrator Laura-Jean Hickey.  *See* DSOF, ¶¶ 8-9; *see also* Exhibit 1, Affidavit of Gina Alongi ("Alongi Aff."), ¶ 8 (D.App. 003).

275.    The Audit conducted by Schultheis & Panettieri LLP shows that, in addition to the time impermissibly spent on Coalition business, Defendant Alongi routinely failed to work anything like a full-time schedule during the period January 1, 2015 through December 31, 2019. (ECF No. 1, ¶ 62; App. 089, 127-31 (Ex. 8))..

**Response No. 275:    Disputed   .**See DSOF, ¶¶ 84-91.  Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.  Alongi Aff. ¶ 66 (D. App. 012).   Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   Id.

Ms. Alongi primarily only performed Coalition work during Funds' work hours during the one-hour break period afforded to her each day pursuant to the Funds' policy.  Alongi Aff. ¶ 67 (D. App. 012).

The Schultheis Report relies on the misguided assumption that Ms. Alongi only performed work for the Funds when she was either sending e-mails, or her work office phone, or on her cell phone, and relies on that data to somehow conclude that she rarely worked outside of business hours.  See ECF Docket No. 54, Funds Exhibit 8, Schultheis Report, App. 086.

However, as even the Schultheis Report's author admitted at his deposition, the fact that Ms. Alongi was not sending e-mails or calling someone on her phone does not mean that she was not working. See Exhibit 25, Deposition of James Heinzman (Excerpt) ("Heinzman Dep."), pp. 20, 113 (D.App. 187-188). Ms. Alongi's position as Administrator required her to perform countless tasks that could be completed after-hours, which would not require the use of e-mail or a cell phone call. For example, she was responsible for preparing and presenting separate reports to each individual Board of Trustees on a quarterly basis for Trustee board meetings, and in connection with that duty Ms. Alongi routinely analyzed reports prepared by the Funds' consultants and in-house accountants, including financial statements, expense reports, payroll reports, investment reports, and other general healthcare and pension-related material. Alongi Aff. ¶ 66 (D. App. 012-013).

Ms. Alongi performed much of this work after business hours, when she had time to read, process, and prepare this information undisturbed, and also often performed tasks such as drafting letters and reviewing proposed budgets during non-business hours; she often spent her time during business hours communicating with members, Union employers, and her direct reports at the Fund Office. The e-mail and cell-phone data used by Schultheis to try to recreate Ms. Alongi's work hours obviously (and incorrectly) leads to a 'conclusion' that she only worked during business hours, because those are the hours during which Ms. Alongi -- and most office workers generally -- communicated by e-mail or phone. Alongi Aff. ¶ 66 (D. App. 012-013).

276.    Only after the Chairman of the Boards of Trustees directed Defendant Alongi to be in the office by the start of the business day in January 2020, did Defendant Alongi commence working closer to full days for the Funds. (ECF No. 1, ¶ 62; App. 089, 127-31 (Ex. 8); App. 143 (Ex. 9, p. 183)).

**Response No. 276:**     **Disputed**. See DSOF, ¶¶ 84-91 and response to para. 275 above.

277.     The Funds' Employee Handbook provides that "[t]he regular working hours of the Funds Office are 8:00 a.m. – 4:00 p.m." (App. 067 (Ex. 6)).

**Response No. 277:**     Undisputed.

278.     As established in Paragraph 115 herein, Defendant Alongi routinely arrived to work hours after the Funds' 8:00 AM business hours commenced. (ECF No. 1, ¶ 63; App. 089, 127-31 (Ex. 8)).

**Response No. 278:**     **Disputed**.   Paragraph 115 is disputed (see response to para. 115). The Report's data concerning Ms. Alongi's supposed office entry times set forth in Paragrapg 115 (which show an average entry time of 10:30 a.m. or later for some years), is directly contradicted by not only Ms. Alongi's testimony, but by the deposition testimony of several of her co-workers, who testified that prior to 2020 (when she started to come  into the office at 8:00 am at the insistence of Mr. McLaughlin) Ms. Alongi typically arrived at the office between 9:00am and 10:00am.  See Alongi Aff. ¶ 59 (D. App. 011); Alongi Dep., Vol. I, pp. 111-118 (D.App. 018-021); Exhibit 26, Deposition of Jennifer Vachon ("Vachon Dep."), pp. 70-72 (D.App. 192-193); Exhibit 27, Deposition of Jennifer Dow ("Dow Dep."), pp.. 86-88 (D. App. 196-197); Vachon Aff., ¶ 13 (D.App. 163); Dow Aff.. ¶ 6 (D.App. 165).

Additional evidence also calls the office entry data into question:  several of Ms. Alongi's co-workers testified that they would open the office door for her on occasion without her using her office pass), which of course would incorrectly lead to a conclusion that Ms. Alongi arrived at

times later than she actually arrived.   Vachon Aff., ¶ 13 (D.App. 166); Dow Aff.. ¶ 6 (D.App. 162); Ortega Dep., pp. 24-27 (D.App. 153).

Moreover, Ms. Alongi regularly worked more than 40 hours per week for the Funds during her tenure as Administrator for the Funds – and indeed, throughout her whole career at the Funds – including working early mornings, late nights, and weekends.   Alongi Aff. ¶ 66 (D. App. 012). Her position as Administrator required her to perform many tasks that she regularly completed outside the hours of 8:00am to 4:00pm.   Id.

279.   In the Audit, the certified public accountants at Schultheis & Panettieri LLP uncovered that "[t]here is no record of the former Fund Administrator entering the Fund Office prior to 8:00AM from 2015 through 2019." (App. 089, 127-31 (Ex. 8)).

**Response No. 279:**   Undisputed that the Schultheis Report contains that quoted text. However, the Schultheis Report does not conclude that Ms. Alongi never performed work for the Funds prior to 8:00 am.  App. 085-090

280.   Defendant Alongi did not make up for this late arrival by either working past the closing time of 4:00 p.m. or on weekends; all records indicate that she simply worked an abbreviated day on top of performing the ten (10) hours of work for the Coalition during the week. (ECF No. 1, ¶ 64; App. 089, 127-31 (Ex. 8)).

**Response No. 280:**   **Disputed**.  See DSOF, ¶¶ 84-91.  Moreover, the Schultheis Report's conclusion that Ms. Alongi spent 10 hours per week performing Coalition work during Funds business hours exclusively is erroneous and unsupported as set forth in the response to para. 124 above.

112

281.    The Audit conducted by Schultheis & Panettieri LLP provides that during the period January 1, 2015 through December 31, 2019, Defendant Alongi worked substantially less than a seven (7) hour day. (ECF No. 1, ¶ 65; App. 089, 127-31 (Ex. 8)).

**Response No. 281:**    **Disputed**. See DSOF, ¶¶ 84-91 and response to para. 275 above.

282.    Instead, Defendant Alongi worked an average of the following hours per day, during the requisite years listed below: 2015: 5.25; 2016: 5.5; 2017: 5.75; 2018: 6.25; 2019: 6.25. (ECF No. 1, ¶ 65; App. 089, 127-31 (Ex. 8)).

**Response No. 282:**    **Disputed**. See DSOF, ¶¶ 84-91 and response to para. 275 above.

283.    The total hours per day outlined in Paragraph 274 include the two (2) hours per day that Defendant Alongi averred, under penalty of perjury in the Form 990s, to have worked for the Coalition during those years. (ECF No. 1, ¶ 65; App. 089, 127-31 (Ex. 8); App. 197-208 (Ex. 17)).

**Response No. 283:**    **Disputed**.  See DSOF, ¶¶ 84-91 and response to para. 275 above. Further, Ms. Alongi did not "aver, under penalty of perjury" that she worked two hours per day for the Coalition – she stated in her Form 990 that she worked, on average, 10 hours per week for the Coalition.   App.  197-208.  She did not state in her Form 990 that all hours she worked for the Coalition were during Fund business hours; that is unsupported as set forth in the response to para. 124 above.

284.    Defendant Alongi deprived the Funds of their reasonably expected hours of service, leading to her being substantially overpaid for the limited time that she actually spent on her job as Administrator. (ECF No. 1, ¶ 66; App. 089-135 (Ex. 8)).

**Response No. 284:** **Disputed**. See DSOF, ¶¶ 84-91 and response to para. 275 above.

285.    By virtue of so doing, Defendant Alongi received excess compensation in the amount of $282,152 during the period January 1, 2015 through December 31, 2019. (ECF No. 1, ¶ 67; App. App. 089-135 (Ex. 8)).

**Response No. 285:** **Disputed**. See DSOF, ¶¶ 84-91 and response to para. 275 above.

286.    Former Funds employee Jennifer Vachon signed an Affidavit in support of Defendant Alongi in which she provided that she would:

> [T]ypically arrive at the office around 7 a.m. My office was located near the center of the main office space (and near Gina's office). I witnessed Gina arrive at the office approximately 9:15 on a regular basis. I would frequently open the Funds door for Gina when she arrived because she had her arms full.

(App. 460 (Ex. 43)).

**Response No. 286:** Undisputed.

287.    9:15 a.m. is one and a quarter hour after the commencement of the Funds' regular business hours and the time at which the Fund Office opened for business. (App. 067 (Ex. 6)).

**Response No. 287:** Undisputed.

288.    When asked during deposition testimony, however, Ms. Vachon testified as follows:

Q.:    Okay. What do you mean by, "frequently"?

A.:    If I was going to the ladies' room and I saw her coming to the door, I would let her in.

Q.:     Okay. How often did that occur that you happened to be passing by the door and Gina was coming in at the same time so you'd let her in?

A.      I'd say four times a year.

(App. 465 (Ex. 44, p. 77)).

**Response No. 288:**     Undisputed that Ms. Vachon so testified.

289.    Ms. Vachon further testified that she only saw Defendant Alongi enter the office, at most, two times per week. (App. 464 (Ex. 44, p. 76)).

**Response No. 289:**     **Disputed.**  She did not say "at most, two times per week" anywhere in her testimony.   She did say it was fair to say that she saw Ms. Alongi arrive at the office two out of five days per week, which amounts to more than 100 days per year.   App. 464 (Ex. 44, p. 76)).

290.    Former Funds employee Jennifer Dow also signed an Affidavit in support of Defendant Alongi, in which Ms. Dow provided that she:

> [T]ypically arrived at the office around 7 am. On most mornings, I observed Gina Alongi arrive at the office around 9:15 am. Jennifer Vachon, Rosemary Ortega, and I would each routinely open the door for her on a because she often arrived carrying briefcases, boxes, or other work materials.

(*sic*) (App. 467 (Ex. 45)).

**Response No. 290:**     Undisputed.

291.    When asked during deposition testimony, however, Ms. Dow testified that she may have opened the door for Defendant Alongi a handful of times throughout Ms. Dow's years of employment at the Funds Office, and that she and other Funds employees did that for any number of individuals – not just Defendant Alongi. (App. 472 (Ex. 46, pp. 81-83)).

4882-6790-4831.3

**Response No. 291:**     **Disputed**.  Ms. Dow testified that she could not recall how many times she opened the door for Ms. Alongi.  App. 472-473.


292.    Ms. Dow further testified during her deposition testimony that she never saw Ms. Alongi "arrive[] carrying briefcases, boxes, or other work materials." (App. 474 (Ex. 46, pp. 90-92)).


**Response No. 292:**     **Disputed.**     Ms. Dow testified that she saw Ms. Ortega carrying briefcases, boxes or other work materials for Ms. Alongi in the morning.  App. 474 (Ex. 46, pp. 90-92.

293.    Instead, Ms. Dow testified as follows:

Q.:     Okay. So just based on what you were observing. So Gina Alongi comes in

and you – you didn't ever assist her with carrying things?

A.:     No.

Q.:     And you said it didn't ever appear that she needed assistance carrying

        things; is that right?

A.:     That's correct.

(App. 474 (Ex. 46, p. 92)).


**Response No. 293:**     **Disputed**, - Ms. Dow did so testify, but the Funds have intentionally quoted her here out of context.  In her testimony,  Ms. Dow state that she opened the door for Ms. Alongi while Ms. Ortega was carrying Ms. Alongi's things; the material fact is that Ms. Dow opened the door for Ms. Alongi, and so Ms. Alongi would swipe in with her office key card.  See App. 474 (Ex. 46, p. 92).

294.    The certified public accountants at Schultheis & Panetierri LLP that conducted the Audit found that Defendant Alongi did not work hours on behalf of the Funds at home during the mornings or evenings or over the weekends to make up for this lost time:

> For the period September 2016 through July 2020, incoming and outgoing calls to and from the former Fund Administrator's office phone were commonly between the hours of 9:30AM and 4:00PM until January 2020 at which time they occurred between 8:00AM and 4:00PM.

(App. 089 (Ex. 8)).

**Response No. 294:**    **Disputed.**  See DSOF, ¶¶ 84-91 and response to para. 275 above.

295.    The certified public accountants at Schultheis & Panetierri LLP had access to Defendant Alongi's cell phone data in the roughly six-month period prior to her termination, and a review of that data uncovered that very few business calls were made to or from Defendant Alongi's cell phone, and that "a large majority of business calls made and received by the former Fund Administrator were most commonly during normal business hours." (App. 089 (Ex. 8)).

**Response No. 295:**    **Disputed,** to the extent that Schultheis purports to make conclusions about Ms. Alongi's work hours over the period of five years based on 6-months of cell phone data during the COVID-19 pandemic and purports to make conclusions about her work hours during non-business hours based on her phone and e-mail activity.  See DSOF, ¶¶ 84-91.

296.    The certified public accountants at Schulthies & Panetierri LLP determined in the Audit that:

> For the period September 2015 through July 2020, the former Fund Administrator's outgoing email activity followed a similar pattern as the outgoing phone calls whereby most of the activity occurred between 10:00AM and 4:00PM.

(App. 089 (Ex. 8)).

**Response No. 296:**   **Disputed,** to the extent that Schultheis purports to make conclusions about her work hours during non-business hours based on her phone and e-mail activity.  See DSOF, ¶¶ 84-91.

297.   The certified public accountants at Schultheis & Panetierri LLP determined in the Audit that Defendant Alongi's entry times at the Funds Office corresponded to her phone and email activity, "thereby validating the data used in the analysis." (App. 089 (Ex. 8)).

**Response No. 297:**   **Disputed**.  See DSOF, ¶¶ 84-91 and response to para. 275 above.

298.   In the Audit, the certified public accountants at Schultheis & Panetierri LLP noted that the findings regarding the hours Defendant Alongi worked on behalf of the Funds were also "consistent with representations made during discussions with other Fund Office employees." (App. 089 (Ex. 8)).

**Response No. 298:**   Undisputed.

## IX.   **Rent Attributable to the Coalition**

299.   The Coalition paid nominal annual rent to the Funds of $574 for limited storage of documents related to its operations. (ECF No. 1, ¶ 49; App. 090 (Ex. 8)).

**Response No. 299:**   Undisputed that the Coalition paid annual rent to the Funds of $574 for storage of documents related to its operations.  The Funds' characterization of the rent as "nominal" is disputed.

300.   A substantial portion of the workforce employed within the Fund Office devoted significant portions of their time to Coalition business. (ECF No. 1, ¶ 49; App. 088-90 (Ex. 8)).

**Response No. 300:**   **Disputed,** to the extent that Ms. Alongi never instructed Taylor Ryan, Rosemary Ortega, Bettyann Trefry, Teri Berardi, or Amy Boisvert to provide services to the Coalition.  Funds employee Laura-Jean Hickey was also employed by the Coalition and held the

118

position of Coalition Coordinator, and as Executive Director of the Coalition, Ms. Alongi asked Ms. Hickey to perform Coalition work on occasion, given that Ms. Hickey was the Coalition Coordinator.   Funds employee Rebecca Zaccardi prepared quarterly financial reports and annual tax forms for the Coalition on her own time using her own financial software (and was compensated by the Coalition for her work), and Rosemarie Alongi occasionally made minor changes to the Coalition's website, as requested by Ms. Hickey, which did not take long when requested and were not made every day (and was compensated by the Coalition for her work). See Defendant's Answers to Interrogatories (Answer No. 12) (D. App. 131-132).

301.    At the time of Defendant Alongi's termination, the Funds were forced to hire movers to ship at least 40 large boxes of Coalition documents from the Funds Office premises. (ECF No. 1, ¶ 49; App. 477-99 (Ex. 47)).

**Response No. 301:**    **Disputed,**   The record evidence cited by the Funds does not support the notion the Funds were "forced to hire movers" due to any action taken by Ms. Alongi. See App. 477-99

302.    The fair market value of the office space used for Coalition business based on 1.43 full time employees occupying 7.15% of the office space as determined via the Audit was estimated to have been $27,614 during the period January 1, 2015 through July 21, 2020, rather than the $3,157 actually paid for the Coalition. (ECF No. 1, ¶ 49; App. 090, 134 (Ex. 8)).

**Response No. 302:**    Undisputed that the Schulthis Report stated as much.

303.    The Funds were shortchanged by $24,457 for the office space provided to the Coalition as a result of Defendant Alongi's unilateral and *ultra vires* actions. (ECF No. 1, ¶ 49; App. 090, 134 (Ex. 8)).

**Response No. 303:**    **Disputed.**   See DSOF, ¶ 36.  During Ms. Alongi's entire 13-year tenure as Executive Director of the Coalition – from 2007 through 2020 - the Coalition rented office space at the Funds' office.  See Alongi Aff., ¶ 31 (D.App. 006).    The Funds were, of

course, aware of this use of their own office space, as confirmed by their 30(b)(6) representative Mr. Geiman at his deposition.    See Exhibit 10 Deposition of Gregory Geiman (Excerpt) ("Geiman Dep."), Vol. I. pp. 6, 68-69 (D.App. 086-089).  There is no record evidence – and the Funds cite to none – suggesting that Ms. Alongi's use of the Fund Office space for storing Coalition materials was 'unilateral and ultra vires,' and to the contrary, there is evidence that the Trustees were aware of and approved of Ms. Alongi's Coalition work

GINA ALONGI
By Her Attorneys,


/s/ Jacob A. Tosti
Timothy P. Van Dyck (BBO #548347)
Jacob A. Tosti (BBO #704007)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard, Suite 300
Framingham, MA  01702
(617) 757-6537
tvandyck@bowditch.com
jtosti@bowditch.com

December 13, 2022

CERTIFICATE OF SERVICE
I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jacob A. Tosti

120

4882-6790-4831.3