UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Civil Action No. 1:21-cv-10163-FDS |
| v. | ) ) | |
| GINA ALONGI, | ) ) | |
| Defendant. | ) ) | |

**REPLY BRIEF IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ..................................................................................................... 1

II.     REPLY ARGUMENT ............................................................................................. 1

      A.      The Defendant Has Failed to Controvert Material Facts Established Beyond
            Dispute in the Plaintiffs' Motion for Summary Judgment ..................................... 1

      B.      The Defendant's Unfounded Allegations Regarding Sexual Harassment are Not
            Material to the Motion for Summary Judgment ................................................... 6

      C.      The Defendant Acted in a Fiduciary Capacity while Engaging in the Conduct
            Relevant to the Plaintiffs' Motion for Summary Judgment .................................. 6

      D.      The Defendant Acted as a Fiduciary and Breached her Fiduciary Duties by
            Performing Coalition Work on the Funds' Time ................................................... 7

      E.      The Defendant Acted as a Fiduciary When She Cashed Out Vacation Time to
            Which She was Not Entitled ............................................................................... 11

      F.      The Trustees Were Not Aware of, and Never Approved, the Use of Funds'
            Personnel, Equipment, and Resources for the Coalition...................................... 13

      G.      The Defendant's Coalition Work Did Not Materially Benefit the Funds............ 15

      H.      Plaintiffs do not Need to Address Defendant's Subjective Intent ....................... 16

      I.      The Failure of Alongi to Keep Time Sheets was a Fiduciary Breach ................. 17

      CONCLUSION.................................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................... 2, 6

*Arrington v. United States,* 473 F.3d 329 (D.C.Cir.2006) ............................................................ 2

*Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12 (1st Cir. 1998) ................................................. 7

*Carranza v. Fraas*, 820 F. Supp. 2d 118 (D.D.C. 2011) ............................................................. 2

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ....................................................................... 2, 3

*Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115 (1st Cir. 1995) ................................................. 6

*Greene v. Dalton,* 164 F.3d 671 (D.C.Cir.1999) ......................................................................... 2

*Livick v. Gillette Co.*, 492 F. Supp. 2d 1 (D. Mass. 2007) ......................................................... 9

*Livick v. The Gillette Co.*, 524 F.3d 24 (1st Cir. 2008) ............................................................... 9

*Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5 (1990) .............................................. 3

*Toomey v. Jones*, 855 F. Supp. 19 (D. Mass. 1994) .................................................................... 9

### STATUTES

29 U.S.C. §1002(21)(A) ............................................................................................................... 6

29 U.S.C. §1104(a)(1) ................................................................................................................. 7

29 U.S.C. §1104(a)(1)(D) ............................................................................................................ 7

### RULES

Fed.R.Civ.P. 56(e) ....................................................................................................................... 2

## I.   <u>INTRODUCTION</u>

In response to the Plaintiff Funds' Motion for Partial Summary Judgment, Defendant opts

to lead their opposition brief with an inflammatory quote, utterly irrelevant to the subject motion,

wrenched further from context through the deceptive use of ellipses, tellingly omitting Mr.

Geiman's words "given that they were not actionable" to describe Ms. Alongi's claims.  It is a

shrill, shameful exercise in legal table-pounding, designed to distract and deceive rather than

enlighten the Court. Ultimately, it, and the remaining pages of the Defendant's opposition, do not

negate the fact that Ms. Alongi was a functional fiduciary within the meaning of ERISA and that,

in that capacity, she breached the duties that she owed to the Funds in numerous respects. As a

result, this Court should enter partial summary judgment in favor of the Funds.

## II.   <u>REPLY ARGUMENT</u>

### A.   **The Defendant Has Failed to Controvert Material Facts Established Beyond Dispute in the Plaintiffs' Motion for Summary Judgment**

In support of their Motion, the Plaintiff Funds came forth, pursuant to Local Rule 56, with

a Concise Statement of Material Facts ("CSMF") with record citations in support of the facts

asserted. (ECF No. 53-2). The Defendant has failed to controvert material facts of record that

establish as a matter of law that she breached her fiduciary duty to the Funds. Instead, Defendant

has spent significant portions of her opposition brief and "Counter Statement of Material Facts"

asserting baseless allegations of sexual harassment and retaliation that were entirely debunked

through discovery in this matter.  None of these allegations, even if they were true – and they are

not – bear on the question of whether Ms. Alongi breached her fiduciary duty.

Critically, when "a properly supported motion for summary judgment is made, the adverse

party must set forth specific facts showing that there is a genuine issue for trial." The non-moving

party may not create a genuine issue of material fact or foreclose the granting of summary

judgment by citing to its own self-serving statements, particularly where they are undermined by other evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed.R.Civ.P. 56(e)). Indeed, although "[t]he nonmoving party may defeat summary judgment through factual representations made in a sworn affidavit if that party "support[s] his allegations ... with facts in the record," *Carranza v. Fraas*, 820 F. Supp. 2d 118, 122 (D.D.C. 2011) (quoting *Greene v. Dalton*, 164 F.3d 671, 675 (D.C.Cir.1999)) or provides "direct testimonial evidence." *Id*. (quoting *Arrington v. United States*, 473 F.3d 329, 338 (D.C.Cir.2006)). These requirements are central to the Court's consideration of the Plaintiffs' Motion because "for the court to accept anything less 'would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.'" *Id*. (quoting *Greene,* 164 F.3d at 675). Here, Ms. Alongi's Affidavit is devoid of the necessary record references needed to defeat the Plaintiffs' motion.

As the Supreme Court has also held, although a court should view the record in the light most favorable to the nonmovant in this context, the Defendant must establish more than "[t]he mere existence of a scintilla of evidence in support" of her position, and "there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202 (1986). The Supreme Court has held that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). To achieve that end, as Supreme Court "ha[s] explained, the burden on the moving party may be discharged by "showing"—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986). As the First Circuit has stated, the "test for summary judgment is steeped in reality."
*Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1990)

The Plaintiffs have come forward with specific material facts, in response to which the
Defendant asserted blanket denials through a bald, post-discovery affidavit lacking *any* factual
support or foundation.   These blanket assertions fail to create a dispute regarding the material facts
outlined in the Plaintiffs Motion and the questions currently pending before the Court. Specifically:

- The Plaintiffs established as undisputed fact through testimony from the Defendant and
  several witnesses, significant numbers of emails and attached documents, Alongi's contract
  with the Coalition, and an Audit that Alongi breached her fiduciary duty by performing
  work for the Coalition during normal business hours, using the Funds' equipment,
  personnel, and resources, while collecting compensation from the Funds despite working
  for the benefit of a third-party entity, as opposed to for the sole and exclusive benefit of the
  Funds and their participants and beneficiaries. (ECF No. 53-1, pp. 17-21; ECF No. 53-2,
  ¶¶ 111, 112, 124, 143-151, 207-223). Plaintiffs have established that the work Alongi
  routinely performed on behalf of the Coalition included: scheduling and participating in
  telephone conferences with Coalition members, prospective members, and vendors (ECF
  No. 53-2, ¶ 147); travelling to and from and attending Coalition general membership and
  Executive Board meetings (ECF No. 53-2, ¶ 146); reviewing documents, correspondence,
  and memos on behalf of the Coalition (ECF No. 53-2, ¶ 148); participating in discussions
  and implementing various surveys of Coalition members (ECF No. 53-2, ¶ 149); and
  actively seeking out new Coalition members and collecting membership applications and
  fees from so-called associate members, entities, particularly investment management firms,
  that performed services within the universe of Taft-Hartley benefit funds and were
  promised access to fund administrators conditioned upon their joining the Coalition (ECF
  No. 53-2 ¶¶ 150, 207-223). Undisputed evidence pending before the Court establishes that
  Alongi performed this work at various times throughout the Funds' regular business hours,
  and *not* during a one-hour lunch break.

As is discussed *infra*, Alongi denied these facts without citing to requisite supporting record
evidence, and instead seeks to avoid the entry of summary judgment by claiming that the Trustees
were aware of the "work," i.e. the extent thereof and the fact that it was being performed on Funds'
time utilizing Funds' assets (ECF No. 62, pp. 14, 16-17); that the Coalition's tax status somehow
indicates that it was appropriate to utilize Funds' assets for the benefit of an entirely distinct and
separate entity (ECF No. 62, pp. 14-15); and that Alongi's fiduciary breach somehow "benefited"

the Funds and was itself a necessary prerequisite to a third party entity's success. (ECF No. 62, pp.

17-18). None of these positions constitutes a defense to Alongi's fiduciary breach. The Plaintiffs

respectfully urge the Court to review their responses to the relevant portions of the DSOF, wherein

the Plaintiffs specifically address each baseless allegation in turn. (ECF No. 75, ¶¶ 23-43).

- The Plaintiffs established as undisputed fact through an Audit and the underlying data reviewed therein, deposition testimony (including Alongi's own admissions), and the Employee Handbook – which Alongi testified she exercised unilateral control over – that Alongi consistently and routinely breached her fiduciary duty by failing to work anything even resembling a full-time schedule during the period January 1, 2015 through December 31, 2019 and routinely arrived to work *hours* after the commencement of the Funds' regular business hours at 8:00 a.m. (ECF No. 53-1, pp. 22-23; ECF No. 53-2, ¶¶ 115-118, 124, 277-280, 294-298).

Again, Alongi denied these facts without citing to requisite supporting record evidence, and

instead seeks to avoid entry of summary judgment by claiming – without any evidence save her

bald assertion – that she "routinely" worked at home late into the night, and by citing affidavits

executed by two former Funds employees, which, at best, establish that Alongi – as she admits –

arrived each day more than one full hour after the commencement of the Funds' workday. (ECF

No. 62, pp. 25-28). The Plaintiffs cite deposition testimony from these former employees in which

the claims concerning their "holding the door" open for Alongi occurred no more than a few times

per year, directly contradicting Alongi's assertions. (ECF No. 62, ¶¶ 286-294). None of these

positions constitutes a defense to her fiduciary breach, as she admits routinely arriving at the Fund

Office at least one hour after the commencement of the business day for the organization she was

paid to run; her quibbles about the reliability of the Audit would at best impact the damages

calculation for this fiduciary breach. Here too, the Plaintiffs respectfully urge the Court to review

their responses to the relevant portions of the DSOF, where the Plaintiffs address each allegation

in turn. (ECF No. 75, ¶¶ 84-92).

- The Plaintiffs established as undisputed fact through testimony from Alongi and several witnesses, significant numbers of emails and attached documents, Alongi's contract with the Coalition, and an Audit that Alongi breached her fiduciary duty by directing Fund employees to perform work for the Coalition during the Funds normal business hours, utilizing the Funds' equipment and resources, while they were compensated by the Funds despite working for the benefit of a third-party entity, as opposed to for the sole and exclusive benefit of the Funds and their participants and beneficiaries. (ECF No. 53-1, pp. 23-32; ECF No. 53-2, ¶¶ 187-251).

Alongi admits assigning Coalition work to Fund employees Laura-Jean Hickey and Rebecca Zaccardi but denies most of these facts by asserting that she – as Administrator and the Executive Director of the Coalition – was entirely unaware that Laura-Jean Hickey, one of two supposedly "direct reports" of Alongi was assigning significant amounts of Coalition work to Fund employees. (ECF No. 62, pp. 28-29). Alongi admits that the performance of this work was her individual responsibility pursuant to her contract with the Coalition, but she claims, despite email evidence to the contrary, that she did not assign this work directly or through Ms. Hickey. (ECF No. 62, pp. 28-29).  Alongi further attempts to avoid entry of summary judgment by claiming against all evidence that this work "resulted in millions of dollars of direct financial benefit" or because of the Coalition's basis for a tax exemption the subsidizing of its operations was somehow appropriate. These claims constitute no defense as to whether she breached her fiduciary duties. Plaintiffs address each allegation in turn in their responses to the DSOF. (ECF No. 75,  ¶¶ 73-41).

- The Plaintiffs established as undisputed fact through testimony from Alongi (including her own admissions) and several witnesses, the Health Fund's Trust Agreement, an Audit, and the Employee Handbook - which Alongi testified she exercised unilateral control over – that Alongi breached her fiduciary duties by cashing out unearned and unapproved compensation on a subsequent annual basis without Trustee approval, exercising discretionary control over these Funds' assets when instructing Fund staff to issue the payments, as well as untimely vacation buyout payments to her twin sister Rosemarie, outside of the timeframe permitted for such buyouts to which Funds employees were actually entitled. (ECF No. 53-1, pp. 32-34; ECF No. 53-2, ¶¶ 254-263, 266-272).

Alongi admits to cashing out this vacation time, but asserts against all undisputed facts in evidence, the explicit terms of the Health Funds Trust Agreement, and applicable law that she was

entitled to do so because "both Messrs. Rasetta and Shaughnessy affirmed under oath that they jointly approved" this additional compensation to which she was not entitled. (ECF No. 62, pp. 11-12, 29). As set forth in Section E of this brief, this is not an accurate description of what Messrs. Rasetta and Shaughnessy have testified to in their depositions. (ECF No. 53-2, ¶¶ 252-272; ECF No. 75, ¶¶ 19-20).

### B.     The Defendant's Unfounded Allegations Regarding Sexual Harassment are Not Material to the Motion for Summary Judgment

Here, the Defendant has not raised a single *material* factual dispute. As the Supreme Court has long held, "[a]s to materiality, the substantive law will identify which facts are material[,]" and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*see also Coll v. PB Diagnostic Sys., Inc.*, 50 F.3d 1115, 1121 (1st Cir. 1995)). Thus, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id*. Accordingly, the allegations regarding sexual harassment that the Defendant relies upon to distract the Court from the *relevant* and *necessary* facts that entitle the Plaintiffs to an entry of summary judgment must "not be counted" *Id*. as they have no place in the analysis currently pending before this Court.

### C.     The Defendant Acted in a Fiduciary Capacity while Engaging in the Conduct Relevant to the Plaintiffs' Motion for Summary Judgment

ERISA provides that "a person is a fiduciary with respect to a plan to the extent" that individual exercises any discretionary authority or discretionary control "respecting management or disposition of [plan] assets," or "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. §1002(21)(A). As the First Circuit has recognized, an ERISA fiduciary "must employ within the defined domain 'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and

6

familiar with such matters would use.'" *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (1st Cir. 1998) *citing* 29 U.S.C. §1104(a)(1)(B). As such, "[t]he fiduciary should act 'solely in the interest of the participants and beneficiaries,'" *Id.*, *citing* 29 U.S.C. §1104(a)(1), and is additionally responsible for conducting themselves in accordance with the documents and instruments governing the fund's operations, including written policies and practices adopted by the Trustees. 29 U.S.C. §1104(a)(1)(D). One need not be a named fiduciary to be legally held to have acted as one, provided she exercised discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets. *Beddall*, 137 F.3d at 18; (ECF No. 53-1, pp. 8-10).

### D.    The Defendant Acted as a Fiduciary and Breached her Fiduciary Duties by Performing Coalition Work on the Funds' Time

The Plaintiffs have established beyond dispute that the Defendant had a great deal of control over all aspects of Fund operations on a day-to-day basis.  In an effort to stave off summary judgment, the Defendant claims that only two out of fifteen Fund Office employees "reported directly" to her, and that she did not directly supervise the work of a majority of Fund Office employees. (ECF No. 62, p. 8). Citing *Beddall*, the Defendant asserts that in supervising the work of the Fund Office she was engaged in "mechanical administrative responsibilities." (*Id.*). This is not so.  The Defendant had the authority to hire, fire, promote, and demote Fund employees *without Trustee input or approval*, and the Defendant testified that she did so at least three times during her time as Administrator. (ECF No. 53-2, ¶ 193; ECF No. 75, ¶¶ 3, 8-10). The Defendant additionally testified that she, and not the Trustees, unilaterally approved the Fund Office Employee Handbook that governs, *inter alia*, Fund employee responsibilities and requirement. (ECF No. 75, ¶ 3).

Lastly, undisputed evidence – including the Defendant's own sworn testimony – establishes that she was ultimately responsible as Administrator for the work of all Fund

employees. (ECF No. 53-2, ¶ 274). The Plaintiffs have also established that Alongi directly assigned Coalition work to Fund Office employees. (ECF No. 53-2, ¶¶ 144-145, 226, 249-251; ECF No. 55, App. 399-400; ECF No. 75, ¶¶ 95, 96).

Despite the Defendant's attempts to cloud the clear record, it is she, not the Plaintiffs, who "grossly mischaracterize[s] the nature" of her work as Administrator. The Plaintiffs do not contend that the Defendant "was a fiduciary of the Funds with respect to all work performed by all Fund employees (including herself), during Fund business hours." (ECF No. 62, p. 8). Instead, the Funds assert that Alongi was a fiduciary with respect to the work she performed – and directed Fund Office employees to perform – for a third-party entity when she had unilateral discretion over the Fund employees and was fully aware that doing so violated, *inter alia*, the Funds' respective Agreements and Declarations of Trust, the Administrative Shared Services Agreement, and the Employee Handbook. Alongi's assertion that "courts repeatedly have found that plan administrators are not functional fiduciaries under ERISA when they perform administrative functions within a framework of policies," does not rebut the reality that Alongi's behavior in this regard constitutes a fiduciary breach as a matter of law. The cases cited by Defendant do not involve any multiemployer benefit plans but are limited to single employer plans who have contracted with outside or third-party administrators to perform claims payments or other mechanical, circumscribed tasks. That is simply not the case here. In Alongi's own words when describing her authority to make the unilateral decision to terminate a vendor of the Funds:

> Mr. Gilligan: Okay. Let me ask you a couple of follow ups. You reference that [the termination of Rapid7] as a minor item; is that correct?
>
> Ms. Alongi:  Well at the time it was. **It was a minor expenditure compared to the billion-dollar organizations that I was running and all of the executive decisions I was making over 42 years.  Yes, this was pretty minor to me.  I'm not suggesting minor with respect to the capability and what they were doing.   I'm suggesting that it was a minor expenditure of plan assets.**

8

> Mr. Gilligan: And you testified that you were ultimately responsible for all service providers. Does that mean you had the power to hire and fire service providers?
>
> Ms. Alongi: Some of them, yes.

(ECF No. 75, ¶¶ 10-12). In further describing the scope of authority that she deemed to possess in this regard, Alongi testified as follows:

> "I was ultimately responsible for all of the service providers. Paying for – authorizing payment for every invoice, doing an analysis of every new provider. When I went to the trustees in the beginning, when we hired Rapid 7, I wanted them – I went to them for approval because it was a new type of expenditure, you know, for technology. And I wanted them to know -- I was actually proud to be able to say okay we're going to have the network monitored. So these are all the things Rapid 7 does. We'll be the first trust fund to have our network monitored. And that was why I went to them for approval. **Otherwise, unless it is a -- you know, a very large expenditure, or if it was bringing on a new service provider, not something as minor as this, I made all of the decisions myself. And the board gave me the -- board never questioned anything, at anytime, that I did.**"

(*Id*.) Thus, the cases she cites in support of her position such as *Livick v. Gillette Co*., 492 F. Supp. 2d 1, 8 (D. Mass. 2007), *aff'd sub nom. Livick v. The Gillette Co*., 524 F.3d 24 (1st Cir. 2008) and *Toomey v. Jones*, 855 F. Supp. 19, 21-24 (D. Mass. 1994), which involve third parties engaged to perform mechanical tasks such as claims processing, communications with employees and calculation of benefits" are inapposite to the case at bar. Alongi's duties were nothing like these third-party service providers operating under constraints imposed by contract. Rather, she possessed substantial discretion and authority with respect to day-to-day operations of the Funds, including the ability to terminate some outside professionals. (ECF No. 53-2, 28, 52-54; ECF No. 75, ¶¶ 10-12).

The Defendant asserts, in direct contradiction of substantial record evidence, that Alongi presented information to the Trustees at quarterly board meetings and made decisions with respect to plan administration, subject to their review and approval[.]" (ECF No. 62, p. 9). The only support Alongi cites for this premise is her post-discovery Affidavit, but the "Minutes of Special

Meeting of Trustees" ("Special Meeting Minutes") held on July 21, 2020 – prior to the Defendant's termination – provide as follows:

> The Trustees discussed that their meeting materials did not include the check register which the Administrator had represented was submitted to the Board at each Trustees' meeting. Administrator Alongi did submit certain expenses to the Trustees for approval, but upon inquiry it appears that not all expenses were submitted to the Trustees for approval.

(ECF No. 54, App. 193). Thus, one of the bases for the Defendant's termination was the fact that she did not present necessary information to the Trustees at quarterly meetings. What is more, undisputed evidence establishes that the Defendant routinely disregarded relevant policies, rules, practices, and procedures including, personally disregarding the Funds' normal business hours (ECF No. 53-2, ¶¶ 273-298); cashing out unauthorized vacation time for both herself and her sister (ECF No. 53-2, ¶¶ 252-272); and failing to keep timesheets in accordance with the ASSA and the Fund Employee Handbook. (ECF No. 53-2, ¶¶ 126-140).

In this same vein, despite the Defendant's assertions in her Affidavit, the Defendant did shape and circumscribe the options presented to the Trustees regarding "essential matters as benefit changes and beneficiary appeals" to conform to her wishes for how an appeal be handled rather than present them with a full array of remedies. (ECF No. 54, App. 194-195; ECF No. 75, ¶¶ 10, 12). Again, Defendant asserts against clear record evidence that she had no authority to make any "decision regarding the Funds' engagement or termination of investment managers or healthcare providers," and insists those decisions were made "solely by the Trustees." (ECF No. 62, pp. 9-10). However, the Defendant's own testimony in this matter establishes that she unilaterally, and without Trustee knowledge, much less approval, terminated Rapid7, the Funds' IT service provider.  (ECF No. 54, App. 193-194); (ECF No. 75, ¶¶ 10, 12).

The Plaintiffs have not ignored "the requirement that they identify a specific nexus between the alleged ERISA violation (*i.e.* Alongi's Coalition work) and the supposed actions or functions that allegedly created her fiduciary status. (ECF No. 62, p. 11). To the contrary, the Plaintiffs have done so explicitly, and in so doing have relied on material facts that the Defendant has not, and cannot, dispute.

### E.   The Defendant Acted as a Fiduciary When She Cashed Out Vacation Time to Which She was Not Entitled

In response to the Plaintiffs' claim that Alongi cashed out vacation time to which she was not entitled the Defendant has disregarded deposition testimony and other record evidence in an effort to avoid the entry of summary judgement on this issue. In her Opposition, the Defendant argues that "[i]n 2013, Business Manager/Chairman Louis Rasetta and Senior Management Trustee Shaughnessy jointly approved an additional two weeks of vacation time for Ms. Alongi to use or cash out annually; they have stated this under oath." (ECF No. 62, p. 11). In fact, they have not stated this under oath.  As set forth in the Plaintiffs' Motion, Messrs. Rasetta and Shaughnessy were not able to, and did not, "grant[] two additional weeks of vacation time for the Defendant to use each year or cash out annually." At no point in time did those two individuals possess bilateral authority to make such decisions on behalf of the Trustees. Rather, the operative Trust Agreement requires a quorum to decide such questions. (ECF No. 53-2, ¶ 266; ECF No. 54, App. 027-33 (Ex. 3)). In his Affidavit, Mr. Rasetta claimed under oath that he *unilaterally* – without the involvement of Mr. Shaughnessy - granted this unearned compensation to Alongi (ECF No. 64, D. App. 056, ¶ 20). However, in his deposition, he testified that the compensation was granted *on a one-time basis* in 2013:

> Q.   So it wasn't in lieu of cash. She was given two weeks' vacation. She could either take two extra weeks of vacation that she could either take as vacation or take as cash, right?
>
> A.   Right.
>
> Q.   You didn't seek any board approval for doing that?

A.      No.

Q.      And you didn't discuss that with anyone else?

A.      No.

Q.      So, she just started getting an extra two weeks of vacation?

A.      One two-week vacation.

Q.      Just in the year 2013?

A.      Yes.

(ECF No. 53-2, ¶ 268; ECF No. 75, ¶ 19). Mr. Shaughnessy testified that, even if he and Mr.

Rasetta actually "jointly granted" this additional compensation, it was done in violation of the

explicit terms of the governing Trust document and without Trustee approval:

A.      It's because that's how -- that's how these items were handled. And, typically, with
        the business agent and the senior management trustee, which was me, because I
        was the only one to serve on both funds. And then, typically, these decisions would
        have been shared with the entire board.

Q.      Well, would they have been shared with the entire board, or would the entire board
        have to vote upon --

A.      I don't know.

Q.      Looking at Section 6.3 –

A.      Yep.

Q.      It indicates --

A.      I see it.

Q.      And so, the two of you would not constitute a quorum, for purposes of transacting
        business for the fund; isn't that true?

A.      According to Section 6.3, that would be correct.

12

Q.     And the discussion that you had with Mr. Rasetta and Ms. Alongi, about additional vacation time, did that occur in the course of an ordinary meeting, or was it between meetings?

A.     It would not have been in an ordinary meeting. At an ordinary meeting, all the other trustees would have been there.

(ECF No. 75, ¶ 19). Thus, the undisputed facts establish that when Alongi cashed out unapproved vacation, she was exercising discretionary control over Funds assets and thus acting in a fiduciary capacity. (ECF No. 53-2, ¶¶ 259-261, 270-272).

**F.     The Trustees Were Not Aware of, and Never Approved, the Use of Funds' Personnel, Equipment, and Resources for the Coalition**

In her Opposition, the Defendant claims that the "Funds" were aware of her work for the Coalition, and that that work "positively impacted the financial position of the Funds." (ECF No. 62, p. 16). In support of this position, the Defendant cited to her Counter Statement of Material Facts, and the Plaintiffs have rebutted each and every alleged "fact" that the Defendant cites in pages 16 through 18 in their response thereto. (ECF No. 75, ¶¶ 37-40). That said, certain misstatements of fact in the Defendant's Opposition warrant specific attention.

The Health Fund, which is the employer of all of the Local 4 Fund Office staff, explicitly requires a quorum of "at least two (2) Union Trustees and two (2) Employer Trustees" to "take any action or make any decision on any matter[.]" (ECF No. 54, App. 027-33). The record is *devoid* of evidence of *any kind* that the requisite number of Trustees were ever aware of or approved Alongi or other Fund staff performing work for the Coalition at the expense of the Local 4 Funds. (ECF No. 75, ¶¶ 29-32). Instead, the Defendant asserts that the "Funds" knew of the Defendant's work for the Coalition and approved her working for that entity while being paid a substantial salary to run the Fund Office on a full-time basis. (ECF No. 62, p. 6). The Defendant contends that former Trustees Rasetta and Shaughnessy "knew that Ms. Alongi was employed as the Executive

Director of the Coalition" and that Trustee William McLaughlin "acknowledged that he knew that Alongi was employed as the Executive Director of the Coalition." (ECF No. 62, p. 16).

Unfortunately for the Defendant, these individuals' "awareness" of Alongi holding a title in a separate organization does not indicate that they were aware that she was performing work for the Coalition on the Funds' time, while being compensated by and using Funds' resources, including personnel. In fact, Mr. Rasetta testified that the Trustees were *not* informed of Alongi's work as the Executive Director of the Coalition, and that the Defendant never informed him regarding when she planned to do work for the Coalition. (ECF No. 75, ¶¶ 29-32). He additionally testified that he was very much *unaware* of the volume of the work Alongi was performing on behalf of the Coalition, indicating that he "never really considered that she would spend a sizeable amount of time on that[,] I thought it would be minimal and inconsequential." (ECF No. 75, ¶ 29). Mr. Rasetta further testified as follows in this regard:

> Q.     Okay. So, if she did ten hours of work on coalition time in a particular week, she had to do that over and above the time she was expected to be working for the funds, right?
>
> A.     If I may say so, I never thought that she would be doing ten hours' worth of work for the coalition. I never thought it would reach that amount of time.

(ECF No. 75, ¶ 29). It is undisputed that Alongi averred, under penalty of perjury, that she performed ten hours of work per week on behalf of the Coalition. (ECF No. 53-2, ¶¶ 282-283). Mr. Rasetta further testified there were no checks in place to prevent her from unilaterally diverting Funds resources to a separate third party or make the Trustees aware of the same. (ECF No. 75, ¶¶ 29-32). Mr. Shaughnessy testified that he had no personal knowledge of the amount of time Defendant Alongi worked on behalf of the Coalition:

> If you told me, it was two hours a week or 20 hours a week, I couldn't tell you which one was closer to the truth.

(ECF No. 75, ¶ 30). Lastly, Mr. McLaughlin testified that he believed that Alongi performed work for the Coalition on nights and weekends, not during regular Fund Office business hours, utilizing Fund Office personnel, equipment, and resources to do so: "I was aware of that, but she wasn't supposed to be doing them during Local 4 work hours between eight to four." (ECF No. 75, ¶ 29, 32).

### G.    The Defendant's Coalition Work Did Not Materially Benefit the Funds

The Defendant assertion that her work for the Coalition resulted in "savings" of an entirely unspecified "millions" of dollars is refuted by uncontroverted material facts.  (ECF No. 62, pp. 17-18). As set forth in detail in the Declaration of Gregory Geiman, the Local 4 Health Fund does not and has not used the Blue Cross product touted in Defendant's brief since 2014 for its medical and surgical benefits, has never used the Coalition's pharmaceutical benefit manager, by far the two largest expense areas for any health plan. During the period 2015-2020, the Fund used only the Coalition's recommended vision and hearing aid providers, resulting in small savings to which they were entitled by virtue of their membership.  The Fund jettisoned those two providers in 2021 and 2022, saving money in the process, thereby suggesting that even those two minor arrangements were not particularly favorable. (ECF No. 75, ¶ 40). Defendant's unsupported claims that the Coalition provided millions in savings to the Fund do not constitute a material fact in dispute as the Geiman Declaration definitively and conclusively proves.  Moreover, any alleged benefits from Coalition membership are not synonymous with the Local 4 Funds having to have provided a subsidized workforce for the Coalition. No other Coalition member was so burdened and yet each was entitled to receive whatever limited benefits membership provided simply by joining. In sum, Defendant's justification for the diversion of Fund assets for the benefit of the Coalition are both factually and legally unavailing.

### H.        Plaintiffs do not Need to Address Defendant's Subjective Intent

Defendant incorrectly claims that in order to prevail here, the Plaintiffs must consider the subjective motivations that drove Alongi to divert Local 4 Funds resources for the benefit of the Coalition. In support of this proposition, Defendant cites a series of cases that involve various investment decisions made by plan fiduciaries that were not unlawful *per se* but in which there were arguable conflicts of interest that cast doubt on whether such decisions were made in the exclusive interest of participants. These cases are inapposite to that presented herein, in which Fund assets in the form of Local 4 Fund personnel and resources were devoted to the operations of a stranger entity. The fact that the Coalition may have performed useful work for its membership does not change this fact.[1]

This proposition is illustrated rather simply by the fact that the Department of Labor required the Local 4 Fund office to track and account for the time that its employees spent on behalf of each constituent Local 4 Fund in settlement of the 2003-04 audit.  Notwithstanding the fact that the Local 4 Pension, Health, and Annuity Funds largely have the same participants and beneficiaries, they are nonetheless separate and distinct legal entities required to bear their own costs, hence the requirement that they adopt the Administrative Shared Services Agreement.  If it came to pass that, for example, the Health Fund was struggling financially, it would not be permissible for a well-meaning fiduciary to decide to alter the allocation of personnel costs in a manner that would alleviate some of the Health Fund's burdens by placing them on the Pension and Annuity Funds, even if the latter Funds were in a position to absorb these additional costs. Similarly, the Trustees could not decide that because the sponsoring Union in this case, IUOE Local 4, provides the income essential to maintain the Funds via its collective bargaining

---

[1] Again, the benefits of membership in the Coalition (however limited) were just that – something that all of its dues-paying members were entitled to.  No other Coalition member Fund was expected to donate personnel to it in order to receive benefits.

agreements, that the Funds should subsidize the collection and allocation of union dues and assessments by Local 4 Fund personnel, which is why Local 4 is a signatory as well to the cost-sharing ASSA. Simply put, good intentions are not a defense to a fiduciary breach of this kind.

Additionally, it should be noted that Alongi was not engaged in some sort of selfless act by her work for the Coalition, but rather, was paid an increasing amount of money year after year in her Executive Director role, with compensation going from $34,999.92 in 2015 to $46,000 in 2019, an increase of 31.4% over that five-year period. (ECF No. 75, ¶ 42). It is a fair inference to be drawn that Alongi's persistent efforts at garnering new "associate members" of the Coalition during Fund office hours was consistent with her self-interest.   Regardless of motive, the diversion of Fund assets to the Coalition violated the sole and exclusive benefit rule and, thus, a fiduciary breach.

## I.      The Failure of Alongi to Keep Time Sheets was a Fiduciary Breach

ERISA fiduciaries, must conduct themselves in accordance with the documents and instruments governing the Funds' operations, including written policies and practices adopted by the respective Trustees.   In this case, the Administrative Shared Services Agreement, the product of negotiation between the Funds and the Department of Labor following its 2003-04 audit of the Funds, made clear that each employee who worked for more than one of the Funds would have to track their time daily in order to accurately allocate the cost of shared personnel between the Funds so that no individual Fund would be subsidizing the operations of another.  Ms. Alongi, as the prime representative of the Funds other than counsel in these discussions with the Department of Labor, was familiar with these requirements as she readily admitted during her deposition:

> Mr. Gilligan: And isn't it true that the Administrative Shared Services Agreement required that each employee account for their time across Funds?
>
> Ms. Alongi: Yes.

(ECF No. 75-1, Supp. App. 025).  The time sheet requirement was not, as Defendant would have it, some sort of ministerial or mechanical act. Rather, it was a vital element in making sure that the Funds were compliant with explicit direction by DOL to make sure that the costs of personnel were being allocated properly from Fund to Fund, entity to entity, to ensure that no one Fund was subsidizing the operations of another as required under ERISA.  Alongi was acutely aware of this requirement and the reasons for it. For her then to unilaterally disregard the requirement to track her time for years thereafter was a remarkably cavalier failure to follow written Fund policies, a clear breach of the requirements set forth in ERISA Section 404.

Again, this was a profound breach of fiduciary duty, not some inadvertent or meaningless omission on Alongi's part. It was a willful failure to abide by the terms of an explicit agreement reached with the DOL regarding the way in which the Funds needed to operate, as well as a violation of governing documents adopted by the Trustees in the wake of the DOL audit. As a result of this failure, the Funds cannot say with any confidence that the expense allocations between the Funds over the ensuing years have been accurate, meaning that the Trustees, unbeknownst to them, have continuously failed to fulfill the obligations entered into with DOL nearly twenty years ago. (ECF No. 75-1, Supp. App. 045, pp. 193-196). Amazingly enough, almost immediately after being involved in these negotiations with DOL and engaging in the discussions that led to the resolution of the matter, Alongi chose not to fill out timesheets, not in 2008 as she maintains. The Fund has no record of her filling out time sheets from at least June 2004 according to the attached Declaration of Rebecca Zaccardi, the employee responsible for compiling Fund Office time sheets.  (ECF No. 75, ¶¶ 100-104).[2]  As a result, the Trustees are in the difficult position of having to prove the extent to which Alongi spent her time on Coalition work and the degree to

---

[2] Ms. Zaccardi also notes that she was periodically assigned work for the Coalition by Alongi and that there was no way to account for such time on the Funds' time sheets. Zaccardi Dc. ¶5.

which she simply did not work at all.  Alongi's misfeasance should not inure to her benefit in this litigation and the Court should take notice that any proof problems that the Funds have regarding damages in the case are the product of her unclean hands.

Alongi's claim that she did initially keep time sheets but ceased doing so in 2008 is both untrue and irrelevant.   She claims to have ceased keeping time sheets in 2008 at the direction of Jeannie Mickel, a certified public accountant, who worked for the Funds' outside auditors at the time.  Ms. Mickel had no authority to instruct Alongi to disregard Trustee policy or the agreement with DOL.  Indeed, Ms. Mickel worked for the Funds at the pleasure of Ms. Alongi.  Despite their role as Fund auditors, neither Ms. Mickel nor any of her other colleagues were ever permitted by Ms. Alongi to present their annual audits to the Trustees or discussed the periodic management letters that they issued to the Funds. Instead, Ms. Alongi took it on herself to present the audits and management letters to the Trustees without the auditors being present, another sign of her powerful day-to-day role in shaping what the Boards were allowed to know. (ECF No. 75, ¶ 3).

Ms. Mickel has submitted a Declaration explaining just how circumscribed her role was in conducting the time studies that formed the basis of the allocation of personnel expenses among the Local 4 Funds.  Ms. Mickel avers that the time studies were what is described in the accounting profession as an "agreed upon procedure" in contrast to an audit. (ECF No. 75, ¶¶ 100-104).  In an "agreed upon procedure" an accountant performs certain operations that a client requests and does so relying upon the factual representations made by the client. (ECF No. 75, ¶¶ 100-104).

In the case of the time studies, Ms. Mickel avers that she "relied upon data provided by the Funds' in-house accountant, Rebecca Zaccardi, who furnished data in spreadsheet format to her regarding the activities of Fund employees captured on time sheets in which they detailed their daily activities." (ECF No. 75, ¶¶ 100-104). She further indicates that she:

19

> [W]ould also have a brief conversation with Gina Alongi, usually on the telephone, regarding the allocation of her time to the various Local 4 Funds and related entities. I engaged in these discussions with Ms. Alongi since, unlike other Local 4 Fund employees, she did not complete daily time sheets. In these discussions, Ms. Alongi represented to me year after year that her activities for the various Local 4 Funds remained unchanged. As a result, from 2015-2019 the allocation to each of the Local 4 Funds and related entities for Ms. Alongi's time remained identical, with the exception of 2015.

(ECF No. 75, ¶¶ 100-104). The allocation percentages included in the time studies track the percentage of employee time applicable to each respective Fund or entity to two decimal places. Ms. Mickel testifies that: "[i]n 2016, Ms. Alongi directed me to allocate an additional 10.0000% of her time from the IUOE Local 4 Health and Welfare to the IUOE Local 4 Pension Fund. Subsequently, the percentages of Ms. Alongi's time allocated to each Fund or entity remained unchanged through her time as Administrator of the Local 4 Funds." (ECF No. 75, ¶¶ 100-104). Ms. Zaccardi confirms this description of the manner in which Alongi accounted for her time to the respective Funds. (ECF No. 75, ¶¶ 100-104).

In sum, Defendant unilaterally disregarded her obligation to fill out daily times sheets, unilaterally determined how to allocate her time among the various Funds, and asserted, in absurd fashion, that the time she spent working for each of the Funds was identical to the second decimal place on a year after year basis.[3]

## CONCLUSION

For the reasons set forth above, the Funds are entitled to an award of summary judgment finding that Alongi acted as a fiduciary and breached her fiduciary duty owed to the Fund.

---

[3] The three largest Local 4 Funds are a defined benefit pension plan, a defined contribution/401(k) plan, and a health plan. These Funds have all been the subject of significant legislative and regulatory actions during the years in which Ms. Alongi served as Administrator, including the Pension Protection Act of 2006, the Affordable Care Act, the SECURE Act, and the slew of regulations issued in their wake prescribing the manner in which the Funds must implement them. It is self-evident that compliance work for one of these major legislative or regulatory initiatives that apply to only one type of Fund is going to result in the administrator having to focus more on one entity than another in such a year. The idea of a completely static work allocation for multiple funds on a year after year basis is not credible.

Respectfully submitted,

Date: December 30, 2022

s/ Jennifer L. Markowski
Jennifer L. Markowski
**FREEMAN, MATHIS & GARY LLP**
60 State Street, Suite 600
Boston, Massachusetts 02109-1800
Telephone (617) 963-5975
jmarkowski@fmglaw.com
BBO# 655927

s/ Charles W. Gilligan
Charles W. Gilligan (admitted pro hac vice)
Daniel Keenan (admitted pro hac vice)
**O'DONOGHUE & O'DONOGHUE LLP**
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Telephone (202) 362-0041
Facsimile (202) 362-2640
cgilligan@odonoghuelaw.com
dkeenan@odonoghuelaw.com