UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, BOARD OF TRUSTEES OF THE IUOE LOCAL 4 ANNUITY & SAVINGS FUND, BOARD OF TRUSTEES OF THE IUOE LOCAL 4 HEALTH AND WELFARE FUND, BOARD OF TRUSTEES OF THE HOISTING AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 4, IUOE LOCAL 4 LABOR-MANAGEMENT CO-OPERATION TRUST, AND IUOE LOCAL 4 SOCIAL ACTION COMMITTEE.<br>                              Plaintiffs,<br><br>IUOE LOCAL 4 PENSION FUND, IUOE LOCAL 4 ANNUITY & SAVINGS FUND, THE IUOE LOCAL 4 HEALTH AND WELFARE FUND, HOISTING AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND, IUOE LOCAL 4 LABOR-MANAGEMENT CO-OPERATION TRUST, WILLIAM D. MCLAUGHLIN, individually and in his capacity as Chairman of the Boards of Trustees,<br>                              Defendants-in-Counterclaims,<br>v.<br>GINA ALONGI,<br>                              Defendant/Plaintiff-in-Counterclaim | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. 1:21-cv-10163-FDS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**[PROPOSED]**
**SECOND AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS**

Defendant Gina Alongi ("Alongi") responds as follows to the numbered paragraphs of the

Complaint for Breach of Fiduciary Duty ("Complaint") filed by plaintiffs Board of Trustees of the

IUOE Local 4 Pension Fund, Board of Trustees of the IUOE Local 4 Annuity & Savings Fund;

Board of Trustees of the IUOE Local 4 Health and Welfare Fund, Board of Trustees of the Hoisting and Portable Engineers Local 4 Apprenticeship & Training Fund, International Union of Operating Engineers Local 4, IUOE Local 4 Labor-Management Co-Operation Trust, and IUOE Local 4 Social Action Committee (together, "Plaintiffs").

## **PARTIES**[1]

1.      Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

2.      This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

3.      This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

4.      This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

5.      This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

6.      This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

---

[1] Certain headings used in the Complaint are repeated in this Answer for the reader's ease of navigation through the documents, but they do not constitute a substantive portion of Alongi's response

7.      This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

8.      This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

9.      This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

10.     Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

11.     The allegations in this paragraph refer to a written document that speaks for itself, and Alongi denies Plaintiffs' characterizations thereof. Alongi is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph, and therefore they are denied.

12.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi states that the allegations in this paragraph refer to a written document that speaks for itself, and Alongi denies Plaintiffs' characterizations thereof. Alongi is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in this paragraph, and therefore they are denied.

13.     Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

14.     Alongi admits the allegations contained in this paragraph.

15.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi admits that as the Administrator for the IUOE Local 4 Pension Fund, IUOE Local 4 Annuity & Savings Fund, IUOE Local 4 Health and Welfare Fund,

and the Hoisting and Portable Engineers Apprenticeship & Training Fund (together, the "Funds"), Alongi oversaw certain day-to-day operations of the Funds in accordance with certain documents and policies adopted by the Trustees of the Funds. Except as so admitted, Alongi denies the allegations contained in this paragraph.

16.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi states that 29 U.S.C. § 1104(a)(1)(A) and (B) speaks for itself, and Alongi denies all remaining allegations contained in this paragraph.

17.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi states that 29 U.S.C. § 1104(a)(1)(D) speaks for itself, and Alongi denies all remaining allegations contained in this paragraph.

18.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

19.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi admits that in 2004, the U.S. Department of Labor ("DOL") concluded an investigation into the Funds' allocation of administrative expenses, and that thereafter, the Funds negotiated an "Administrative Services Sharing Agreement" ("ASSA"), which is a written document that speaks for itself. Alongi denies Plaintiffs' characterizations thereof and denies all remaining allegations contained in this paragraph.

20.     The allegations in this paragraph refer to written documents that speak for themselves. Alongi denies Plaintiffs' characterizations thereof and denies all remaining allegations contained in this paragraph.

21. Alongi admits that immediately prior to her dismissal, she received a salary at an annual rate of approximately $248,745, was entitled to vacation and paid sick time, was permitted to participate in certain employer-financed pension plans, and received medical coverage and an employer-provided automobile. Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph concerning "total employee benefit costs" and the value of her "overall annual compensation package," and therefore they are denied. Alongi denies all remaining allegations contained in this paragraph.

22. Alongi admits that when she was employed as Administrator for the Funds, the position was a full-time job, she was entitled to a one-hour lunch break, and the office where she worked maintained business hours of 8:00 AM to 4:00 PM. Except as so admitted, Alongi denies the allegations contained in this paragraph.

## JURISDICTION

23. This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

24. This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

25. This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

## COUNT I

### (FOR BREACH OF FIDUCIARY DUTY)

26. Alongi repeats her responses to the allegations set forth in paragraphs 1 through 25 as if fully set forth herein.

27.     The allegations in this paragraph refer to a written document that speaks for itself. Alongi denies Plaintiffs' characterizations thereof, and denies all remaining allegations contained in this paragraph.

28.     Alongi admits that the Funds' accounting firm interviewed Alongi at certain times, regarding Alongi's allocation of working time. Alongi denies all remaining allegations contained in this paragraph.

29.     This paragraph states a legal conclusion to which no response is required. To the extent a response is required, Alongi states that the allegations in this paragraph refer to written documents that speaks for themselves. Alongi denies Plaintiffs' characterizations thereof, and denies all remaining allegations contained in this paragraph.

30.     Alongi admits the allegations contained in this paragraph.

31.     Alongi admits that she served as the Executive Director of the Massachusetts Coalition of Taft-Hartley Funds (the "Coaliation"), which was a part-time position, from 2007 to 2020. Further answering, Alongi states that the allegations in this paragraph refer to written documents that speak for themselves. Alongi denies Plaintiffs' characterizations thereof, and denies all remaining allegations contained in this paragraph.

32.     Alongi denies the allegations contained in this paragraph.

33.     Alongi denies the allegations contained in this paragraph.

34.     Alongi denies that she committed any "transgressions." Except as noted, Alongi is without knowledge or information sufficient to firm a belief as to the truth of the allegations contained in this paragraph, and therefore they are denied.

35.     Alongi is without knowledge or information sufficient to firm a belief as to the truth of the allegations contained in this paragraph concerning what was "found" by the "analysis

by Schultheis & Panettieri LLP," and therefore they are denied. Further answering, the allegations in this paragraph refer to written documents that speak for themselves. Alongi denies Plaintiffs' characterizations thereof, and denies all remaining allegations contained in this paragraph.

36.     Alongi is without knowledge or information sufficient to firm a belief as to the truth of the allegations contained in this paragraph concerning what the "forensic analysis. . .shows," and therefore they are denied. Further answering, the allegations in this paragraph refer to written documents that speak for themselves. Alongi denies Plaintiffs' characterizations thereof, and denies all remaining allegations contained in this paragraph.

37.     The allegations in this paragraph refer to written documents that speak for themselves, and Alongi denies Plaintiffs' characterizations thereof. Alongi is without knowledge or information sufficient to firm a belief as to the truth of the remaining allegations contained in this paragraph, and therefore they are denied.

38.     The allegations in this paragraph refer to written documents that speak for themselves, and Alongi denies Plaintiffs' characterizations thereof. Alongi is without knowledge or information sufficient to firm a belief as to the truth of the remaining allegations contained in this paragraph, and therefore they are denied.

39.     Alongi denies the allegations contained in this paragraph.

40.     Alongi denies the allegations contained in this paragraph.

41.     Alongi is without knowledge or information sufficient to firm a belief as to the truth of the allegations contained in this paragraph concerning the precise amount of "compensation, benefits, and payroll taxes" and "expenses related to her Funds-provided vehicle"

paid on her behalf from January 1, 2015 through July 21, 2020, and therefore they are denied. Alongi denies all remaining allegations contained in this paragraph.

42.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi admits that she paid an elimination of recourse premium at certain times during her employment with the Funds. Alongi denies all remaining allegations contained in this paragraph.

43.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

44.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

45.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

46.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

47.     Alongi denies that "a substantial portion of the Funds' payroll expenses were in fact diverted to the benefit of the Coalition." Alongi is without knowledge or information sufficient to firm a belief as to the truth of the remaining allegations contained in this paragraph, and therefore they are denied.

48.     Alongi is without knowledge or information sufficient to firm a belief as to the truth of the allegations contained in this paragraph concerning the precise number of hours worked by employees other than herself, and therefore they are denied. Further answering, the allegations in this paragraph refer to a written document that speaks for itself, and Alongi denies

Plaintiffs' characterizations thereof. Alongi denies all remaining allegations contained in this paragraph.

49.     Alongi admits that at certain times the Coalition paid rent to the Funds for storage that amounted to approximately $574 annually. Alongi is without knowledge or information sufficient to firm a belief as to the truth of the allegations contained in this paragraph concerning what was "determined via the forensic audit," and therefore they are denied. Alongi denies all remaining allegations contained in this paragraph.

50.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

51.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

52.     Alongi denies the allegations contained in this paragraph.

53.     The allegations in this paragraph refer to a written document that speaks for itself. Alongi denies Plaintiffs' characterizations thereof and denies all remaining allegations contained in this paragraph.

54.     Alongi denies the allegations contained in this paragraph.

55.     Alongi admits that during the period between January 1, 2015 and July 21, 2020, she received payment each year for approximately two weeks of accrued, unused vacation time, as she was permitted to do. Except as noted, Alongi denies the allegations contained in this paragraph.

56.     Alongi admits that during the period between January 1, 2015 and July 21, 2020, she received payment each year for approximately two weeks of accrued, unused vacation time,

as she was permitted to do. Except as noted, Alongi denies the allegations contained in this paragraph.

57.     Alongi admits that during the period between January 1, 2015 and July 21, 2020, she received payment each year for approximately two weeks of accrued, unused vacation time, as she was permitted to do. Except as noted, Alongi denies the allegations contained in this paragraph.

58.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

59.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

60.     Alongi denies the allegations contained in this paragraph.

61.     Alongi admits that she was hired to be a full-time employee and devote at least 35 hours per week to performing her job duties as Administrator for the Funds. Except as so admitted, Alongi denies the allegations contained in this paragraph.

62.     Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph concerning what the "forensic audit conducted by Schultheis & Panettieri LLP shows," and therefore they are denied. Alongi denies all remaining allegations contained in this paragraph.

63.     Alongi denies the allegations contained in this paragraph.

64.     Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph concerning what "all records indicate," and therefore they are denied. Alongi denies all remaining allegations contained in this paragraph.

65.     Alongi is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in this paragraph concerning what the "report prepared by Schultheis & Panettieri LLP indicates,' and therefore they are denied. Alongi denies all remaining allegations contained in this paragraph.

66.     Alongi denies the allegations contained in this paragraph.

67.     Alongi denies the allegations contained in this paragraph.

68.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi denies the allegations contained in this paragraph.

69.     Alongi admits the allegations contained in this paragraph.

70.     This paragraph states legal conclusions to which no response is required. To the extent a response is required, Alongi states that 29 U.S.C. § 1056(d)(4) speaks for itself. Alongi denies Plaintiffs' characterizations thereof and denies all remaining allegations contained in this paragraph.

71.     Alongi denies the allegations contained in this paragraph.

Alongi denies the allegations in the "Wherefore" clause following Paragraph 71 of the Complaint, denies that she is liable to Plaintiffs in any way, and denies that Plaintiffs are entitled to any of the relief that they seek.

## **AFFIRMATIVE DEFENSES**

Without admitting any allegations asserted in the Complaint, Alongi asserts the following general and affirmative defenses. Nothing stated in any of these defenses constitutes a concession that Alongi bears any burden of proof regarding any issue on which she would not otherwise bear.

### **First Defense**

The Complaint fails to state a claim upon which relief can be granted.

### Second Defense

Plaintiffs' claims are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, laches, and/or unclean hands.

### Third Defense

Plaintiffs' claims are barred, in whole or part, by the applicable statute of limitations.

### Fourth Defense

At all times pertinent to this action, Alongi's actions were in accordance with the laws of the United States of America.

### Fifth Defense

To the extent Alongi had any duty or obligation to Plaintiffs, Alongi performed and satisfied such duty or obligation.

### Sixth Defense

Plaintiff's claims fail, in whole or in part, because the relevant actions of Alongi were not undertaken in a fiduciary capacity.

### Seventh Defense

Plaintiffs have not suffered any damages as a result of any of Alongi's actions.

### Eighth Defense

Without admitting that Plaintiffs suffered any harm or damages, Plaintiffs failed to mitigate any harm or damage that they allegedly suffered.

### Ninth Defense

Without admitting that Plaintiffs suffered any harm or damage, any damages that Plaintiffs have suffered were caused in whole or in part by their own conduct.

### Tenth Defense

Plaintiffs' claims are barred by Plaintiffs' own bad faith and conduct

4891-8162-1073.2
4891-8162-1073.3

**Eleventh Defense**

This Complaint is frivolous and is not advanced in good faith, and has been filed for an improper purpose.

**Twelfth Defense**

Alongi reserves the right to amend this Answer and assert additional defenses as they become known and apparent.

**PRAYER FOR RELIEF**

WHEREFORE, Alongi respectfully requests that the Court:

1.      Dismiss the Complaint with prejudice; and

2.      Grant Alongi such further relief as the Court deems just.

**COUNTERCLAIMS AND JURY DEMAND**

**INTRODUCTION**

This is an action by former employee, Gina Alongi ("Gina"), for damages, both compensatory and punitive, against the International Union of Operating Engineers Local 4 Fringe Benefit Funds (the "Funds") and its Trustee William D. McLaughlin ("Mr. McLaughlin"). Mr. McLaughlin, the Chairman of the Boards of Trustees for the Funds, is a sexual predator. He has engaged in highly inappropriate sexual conduct towards Gina and other Funds employees, conduct well known by the Funds' outside counsel. Such conduct created a blatantly hostile workplace environment.

As a direct result of such conduct, Gina Alongi confronted Mr. McLaughlin in an attempt to protect both herself and her employees and to prevent such conduct from continuing into the future. Her efforts were met with a verbal attack by Mr. McLaughlin, an assault so vicious that she (and other Funds employees) feared for Gina's physical safety. Following this assault, the

harassment continued but was now further exacerbated by the fact that Gina feared for her physical safety. Shortly after that verbal attack, Gina was so traumatized by this assault that she sought advice from the Funds' outside counsel about how to respond. She was informed at this time that Mr. McLaughlin's conduct was neither severe nor pervasive enough to constitute either harassment or a hostile work environment.

The Trustees never even conducted an investigation into either the assault or Mr. McLaughlin's conduct towards the Funds' female employees. Gina was also informed that she would lose her job if she reported what had happened to her. Moreover, both Defendants thereafter engaged in a concerted effort to retaliate against Gina for having attempted to confront Mr. McLaughlin about his behavior by, among other things, taking away a number of reasonable accommodations previously granted to her for her disability (Diabetes), and micromanaging her job performance. She was then summarily dismissed on July 22, 2020 after a forty-two (42) year unblemished record of service working at the Funds. In her termination letter, the Funds provided no explanation for her termination, stating rather, that "[a]s you were an employee at will, it is not necessary to detail reasons for the Trustees' decision" and that "[w]e ... trust that our separation with be courteous and respectful." Two weeks after Gina's termination, Rosemarie, Gina's twin sister, a seventeen (17) year employee with an unblemished employment record working at the Funds, was summarily dismissed by the Funds as well. Her termination letter used the same language that was contained in Gina's letter.

Following their unfounded terminations, Gina and Rosemarie asserted their statutory rights under M.G.L. c. 151B by filing a complaint at the Massachusetts Commission Against Discrimination ("MCAD") on September 3, 2020. Not willing to countenance Gina's decision to stand up for her legal rights, the Funds have unleashed a baseless filing against her in federal

court, replete with factual and legal errors, and brought only after Gina announced her intent to file suit in Superior Court. The timing and the utter lack of merit in the Funds' federal filing confirms that it is nothing more than an effort to further punish Gina for having the temerity to call out the Funds' unlawful behavior.

### PARTIES AND VENUE

1.      Defendant/Plaintiff-in-Counterclaim Gina Alongi ("Gina") is a Massachusetts resident who resides in Westborough, MA 01581.

2.      Defendant-in-Counterclaim the International Union of Operating Engineers Local 4 Health and Welfare Fund (the "Health and Welfare" Fund) is an "employee welfare benefit plan" within the meaning of §3(3) of ERISA, 29 U.S.C. §1002(3). The Fund provides health, dental and prescription benefits and life insurance, accident insurance, and disability pay to participants. The Fund is administered at 16 Trotter Drive, Medway, Massachusetts.

3.      Defendant-in-Counterclaim the International Union of Operating Engineers Local 4 Pension Fund (the "Pension" Fund) is  an "employee pension benefit plan" within the meaning of §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A). The Fund provides participants with a defined pension benefit. The Fund is administered at 16 Trotter Drive, Medway, Massachusetts.

4.      Defendant-in-Counterclaim the International Union of Operating Engineers Local 4 Annuity and Savings Fund (the "Annuity and Savings" Fund) is  a Fund that provides participant directed individual accounts including a 401(k). The International Union of Operating Engineers Local 4 Annuity and Savings Fund is an

"employee pension benefit plan" within the meaning of §3(2)(A) of ERISA, 29 U.S.C. §1002(2)(A). The Fund is administered at 16 Trotter Drive, Medway, Massachusetts.

5.      Defendant-in-Counterclaim the Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund (the "Apprenticeship and Training" Fund) is a Fund that trains apprentices and journey workers on the construction industry. The Apprenticeship and Training Fund is an "employee welfare benefit plan" within the meaning of §3(1) of ERISA, 29 U.S.C. §1002(1). The Fund is administered at One Engineers Way, Canton, Massachusetts.

6.      Defendant-in-Counterclaim the IUOE Local 4 Labor-Management Co-Operation Trust is established pursuant to §302(c)(9) of the National Labor Relations Act, as amended, 29 U.S.C. §186(c)(9). The Trust is administered at 16 Trotter Drive, Medway, Massachusetts.

7.      The Health and Welfare, Pension, Annuity and Savings, Apprenticeship and Training, and Labor Management Cooperation Trust Funds  are hereinafter collectively referred to as the "International Union of Operating Engineers Local 4 Fringe Benefit Funds," or the "Funds."

8.      Defendant-in-Counterclaim William D. McLaughlin is an individual who, upon information and belief, resides in Norton, Massachusetts. He is also the Chairman of the Boards of Trustees of the Funds and, at all relevant times, had supervisory authority over Gina.

9.      Gina has previously filed with the Massachusetts Commission Against Discrimination and have fulfilled her administrative prerequisites before filing this action.

## FACTUAL BACKGROUND

### Gina's Employment History

10.     Gina began her employment with the Funds in 1978 in a clerical position and was promoted throughout the years.

11.     Throughout her employment, Gina was an exemplary employee.

12.     In 1996, Gina was promoted to the position of Administrator of the Funds. In this role, Gina was responsible for all aspects of management, strategic planning, business and financial operations, and organizational administration as determined by the Boards of Trustees. She oversaw each of the individual trust funds comprising the Funds in accordance with respective trust agreements and plan documents adopted by the Boards of Trustees.

13.     As the Funds' Administrator, Gina worked under the direction and control of the Boards of Trustees of the Funds and, beginning in 2017, she reported directly to Mr. McLaughlin.

14.     Gina was extremely well-respected in the industry and served on numerous boards and committees related to her work including the New England Employee Benefits Council.

15.     Gina also served as the Executive Director of the Massachusetts Coalition of Taft-Hartley Plans which represents over 150,000 individuals through its twenty-six member funds. In her role as Executive Director, she was responsible for developing better methods of providing and paying for health care. Gina negotiated favorable discounts which directly and positively impacted the financial position of the Funds.

16.     The Funds were well aware of Gina's work for the Coalition from the beginning and the Business Manager would ask Gina about her Coalition work as part of an annual

determination of her Funds salary. Gina made no efforts to hide her Coalition work from the Funds.

17.     Gina frequently attended and presented at local and national conferences relating to health care benefits and worked closely with the U.S. Department of Labor to educate Administrators of other Taft Hartley Trust Funds on ERISA compliance.

18.     In 2015, Gina was selected as a recipient of the Cushing-Gavin Boyle Award in recognition of her excellence and dedication to public service. This prestigious award was recognized by President Barack Obama.

Rosemarie Alongi's Employment History

19.     Gina's twin sister, Rosemarie Alongi ("Rosemarie"), began her employment with the Funds in 2003 working in the Information Technology Department.

20.     Throughout the course of her employment, Rosemarie received excellent performance reviews.

21.     Rosemarie worked alongside Alan Koufos, Manager of the IT Department, and reported directly to then Assistant Administrator Greg Geiman. Upon Mr. Koufos' retirement in January 2020, Rosemarie assumed the role of Acting Director of the IT department. Rosemarie did not receive a formal promotion or any increase in compensation.

22.     On or about August 1, 2017, Mr. McLaughlin was appointed Business Manager of the IUOE Local 4 Union and automatically served as Chairman of the Boards of Trustees of the Funds. As Chairman, Mr. McLaughlin had the authority to make final decisions regarding the terms and conditions of Gina and Rosemarie's employment.

23.     From the beginning of his tenure as Chairman, Mr. McLaughlin routinely made highly inappropriate and sexually charged comments in the workplace to Gina, Rosemarie, and other female employees.

24.     For example, Mr. McLaughlin routinely visited Gina's office to discuss his sexual desires and fantasies, how he felt about the women in the office, and what he would like to do to them sexually.

25.     On more than one occasion, Mr. McLaughlin also stated to Gina that he could not concentrate during a Trustees meeting because he could not take his eyes off her and that Gina "looked so good" and that he "wanted" her and had "such a crush" on her.

26.     When Mr. McLaughlin engaged in this conduct, Gina told Mr. McLaughlin to stop and stated that he was going to get in trouble. Gina informed Mr. McLaughlin several times that if his wife ever found out about his behavior that she would divorce him. Mr. McLaughlin laughed and stated that he was "the boss" and that therefore he could "get away with it."

27.     Mr. McLaughlin also frequently told Gina about his "need for sex," and stated that his wife was not "taking care of" him. Mr. McLaughlin made statements to the effect that he was a "pig" and that "all men are pigs," and that "all men think about is sex."

28.     Similarly, Mr. McLaughlin would visit Rosemarie's office on a regular basis, making sexual comments about the women in the office, discussing his sexual desires, and stating that he was unhappy being married.

29.     On one occasion, Rosemarie reminded Mr. McLaughlin that he was married, and that his behavior was inappropriate. Mr. McLaughlin replied that he could not help himself around women.

30.     Indeed, upon information and belief, Mr. McLaughlin has had at least one inappropriate sexual relationship with another Funds employee, a fact well known to the Defendants as evidenced by a May 17, 2017 letter from the then Assistant Administrator, Mr. Greg Geiman, to Gina in which he references "recent concerns [he has] about Laura-Jean's association with [Mr. McLaughlin] and the resulting lack of deference and communication with you,...".

31.     A true and accurate copy of this letter is attached hereto as <u>Exhibit A</u>.

The May 1st Incident

32.     On May 1, 2018, Gina requested that Mr. McLaughlin meet with her in her office to discuss, among other things, Mr. McLaughlin's inappropriate conduct and comments in the workplace as well as ways in which he had been passing up Gina in favor of male employees.

33.     As Gina began providing Mr. McLaughlin some examples of how his behavior had made her uncomfortable, Mr. McLaughlin started to pace in front of Gina and yell obscenities and words to the effect of "you do not respect me, I am the manager!" Mr. McLaughlin continued to yell and swear at Gina for approximately 10 minutes to the point where other Funds employees were fearful for Gina's physical safety; indeed, one Funds employee had already dialed in 911 on her phone and was ready to call the police. Mr. McLaughlin was so loud that employees having lunch in the Funds kitchen (on the opposite side of the building) could hear him shouting. Mr. McLaughlin only stopped when Rosemarie and Mr. Geiman entered Gina's office and physically extricated Mr. McLaughlin from Gina.

34.     Immediately following this verbal assault, Mr. McLaughlin attempted to apologize to Gina by hugging her and attempting to kiss her on the lips. He also told her that the

fight had gotten him "excited" and that he had come close to getting an erection as a result of the attack.

35.     A few weeks after the altercation, in mid-May 2018, Gina interviewed several female Funds staff members regarding their experiences with Mr. McLaughlin. Each reported feeling uncomfortable with the way that Mr. McLaughlin looked at, talked to, or touched them. In particular, one employee reported that Mr. McLaughlin regularly entered her office to give her unprompted massages which made her uncomfortable, but she did not feel she could ask him to stop as he was the boss. Another employee stated that Mr. McLaughlin called her "sexy" on more than one occasion and would make comments to the effect that he wanted her sexually.

36.     In response to these events, Gina requested to meet with Ms. Kate Shea, a partner at Segal Roitman and outside counsel to the Funds, and did so on or about May 21, 2018. Gina told Attorney Shea about the May 1st incident and about how severe Mr. McLaughlin's constant bullying and sexual harassment was. Attorney Shea informed Gina that this conduct did not rise to the level of sexual harassment and that in order to claim sexual harassment, the conduct would have to be pervasive or "widespread." Attorney Shea told Gina that she had "no case."

37.     Mr. Greg Geiman, then Assistant Administrator for the Funds (and now Gina's replacement), apparently disagreed with Attorney Shea's assessment. One May 16th, 2018 (5 days earlier), Mr. Geiman wrote an email to Gina which stated, in part:

"5. Inappropriate language and discussion ... and unwanted touching.... [Attorney Shea] needs to make a determination as to whether this constitutes sexual harassment for which there may be liability and whether the Trustees should be notified and a Joint Board Meeting held.

6. Gina was assaulted. People in the office are uncomfortable and feel unsafe. 'There was violence in [Mr. McLaughlin's] voice.' ... [Attorney Shea] also needs to decide whether this information      should      be      shared      with      the      Joint      Board."

38.     A true and accurate copy of this May 16, 2018 email from Mr. Geiman to Gina is attached hereto as <u>Exhibit B</u>.

39.     Mr. Geiman also forwarded another email to Gina that same day detailing inappropriate communications that Mr. McLaughlin had had with another Funds employee, Rosemary Ortega. In that email, Mr. Geiman stated, among other things, that "[Ms. Ortega] told me that [Mr. McLaughlin] comes into the office and speaks inappropriately to her [and others]. Will speak about women he's slept with on the road, sexual positions he likes...."

40.     A true and accurate copy of this email from Mr. Geiman is attached hereto as Exhibit C.

41.     In mid-May, 2018, Attorney Shea met with Mr. McLaughlin and then with Mr. Geiman. Gina was then instructed to meet with Attorney Shea and Mr. McLaughlin in his office. Attorney Shea, on behalf of the Funds, informed Gina that she could be terminated for insubordination. Attorney Shea stated again to Gina that Mr. McLaughlin's conduct did not rise to the level of sexual harassment and that if Gina kept quiet about her allegations of sexual harassment, Mr. McLaughlin would apologize, and Gina would not be terminated.

42.     Although Gina continued to feel that Mr. McLaughlin's actions were wrong, the combination of Attorney Shea's purported legal assessment that she did not have a viable sexual harassment claim, the specter of an apology from Mr. McLaughlin, and Gina's fear that she would be terminated if she did file one induced Gina not to file a complaint at that time.

### Mr. McLaughlin Continues to Harass and Retaliate Against Gina

43.     Following these meetings with Attorney Shea, Mr. McLaughlin continued to subject Gina, Rosemarie, and other female employees to frequent sexual comments well into 2020.

44.     Mr. McLaughlin continued to visit Gina's office, each time to make statements about sex and women's bodies. On one such occasion in the last quarter of 2019, Mr.

McLaughlin entered Gina's office and told Gina that he knew about one of Gina's younger employees who was struggling with breast cancer. Mr. McLaughlin asked Gina "are her boobs any good?" and "do you think she will show me them?" or words to that effect. Afterwards, Gina told Mr. Geiman about Mr. McLaughlin's comments. Mr. Geiman responded with words to the effect, "I'm so sorry you have to deal with all of this." When Mr. McLaughlin said something inappropriate to Gina, Gina would frequently tell Mr. Geiman who would respond that Mr. McLaughlin "is never going to learn," that Attorney Shea did not do a good job with him, and that Mr. McLaughlin was "the boss" so he can get away with it because no one was doing anything about it.

45.     Mr. McLaughlin also specifically began to retaliate against Gina because of her prior attempt to get him to stop harassing her and other female employees.

46.     For example, on or around November 9, 2018, Mr. McLaughlin informed Gina that her service animal, who was trained to detect Gina's low blood sugar levels, would no longer be permitted in the office. When Gina requested an ADA accommodation in order to bring her service dog with her to the office on days that she felt ill, Mr. McLaughlin stated "no dogs in the office, including yours. I do not care what the law says" or words to that effect. He provided Gina with no explanation for the change in the policy.

47.     In or around early January 2020, Gina was once again called into a meeting with Mr. McLaughlin, this time with Attorney Shea present. At that meeting, Mr. McLaughlin instructed Gina that from that point forward, he expected Gina would report to work by 8 am every day.

48.     Prior to Mr. McLaughlin's request, Gina would take the first of her two types of daily insulin shots at 8:30 am and be at work by 9:15 am. Gina would then skip lunch or stay later during the day and often worked on weekends.

49.     Gina reminded Mr. McLaughlin of her Type 1 Diabetes and explained that her current work schedule allowed her to take insulin and change her continuous glucose monitor at specific and uniform times of the day as required. Gina requested that Mr. McLaughlin grant her an accommodation and permit her to continue working on her usual work schedule to allow her to manage her health condition. Mr. McLaughlin replied "no accommodation is granted" or words to that effect. Attorney Shea said nothing at this meeting and kept her head down.

50.     Following this meeting, Gina immediately began reporting to work beginning at 8 am which caused her to be off her insulin schedule, thereby causing her to experience serious health issues.

51.     In addition, after Gina's attempt to get Mr. McLaughlin to stop his harassing behavior, the Business Agents who had previously called Gina for assistance no longer contacted her and instead called Mr. Geiman if they had questions.

52.     Mr. McLaughlin's inappropriate sexual behavior continued throughout Gina's employment. Rosemarie observed that he would continue to visit female employees' offices on a regular basis to discuss which women in the office he found particularly attractive. Mr. McLaughlin only ceased this behavior when Funds employees began to work remotely due to the COVID-19 pandemic.

53.     In March 2020, the Funds permitted its employees over the age of 65 or affected with a health condition to work from home due to the global COVID-19 pandemic. Although

Gina was permitted to work remotely due to her diabetes, Mr. McLaughlin continued to alter the terms and conditions of her employment.

54.     In late April 2020, Mr. McLaughlin stated to Mr. Geiman in the Funds hallway that "Gina should be in the office" and that he did not care about her medical condition.

55.     By June 2020, Mr. McLaughlin required that Gina account for her time in 15-minute increments for the sole purpose of finding a pretext to terminate Gina's employment. Gina began tracking her time in this manner on June 15, 2020 and submitted these timesheets directly to Mr. McLaughlin at his request. No such requirement had ever been imposed on Gina prior to that time. On June 26, 2020, Mr. Geiman stated to Gina that Mr. McLaughlin "came in today and said he was not interested in anyone's timesheet other than yours and that he's waiting for it."

56.     Gina asked Mr. Geiman repeatedly whether Mr. McLaughlin met with him to discuss the summary of the staff's timesheets. Mr. Geiman consistently stated that Mr. McLaughlin never discussed any other employee's timesheet.

<u>The Virtually Simultaneous and Retaliatory Terminations of Gina and Rosemarie Alongi</u>

57.     After 42 years of loyal and dedicated service to the Funds, Gina was summarily terminated on July 22, 2020. Her July 23rd termination letter provided her with no explanation whatsoever for why she was fired, but simply stated, in part: "As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision.... We .... trust that our separation will be courteous and respectful."

58.     A true and accurate copy of Gina's termination letter is attached hereto as <u>Exhibit</u> D.

59.     Also on July 22, 2020, Rosemarie, Gina's twin sister, was placed on a two-week paid suspension.

60.     After seventeen (17) years of loyal and dedicated service to the Funds, Rosemarie was summarily terminated on August 5, 2020, without receiving any prior notice or reasoning from the Funds.

61.     In addition, she received a very similar termination letter as did her twin sister, Gina, which provided no explanation whatsoever for why she was terminated.

62.     A true and accurate copy of Rosemarie's termination letter is attached hereto as Exhibit E.

63.     Despite the fact that Gina and Rosemarie had worked for the Funds for decades, the very first time they learned of their purported "performance issues" was after filing their complaint at the Massachusetts Commission Against Discrimination ("MCAD").

<u>The Funds Continue to Intimidate and Retaliate Against Gina</u>

64.     After their terminations, Gina and Rosemarie asserted their statutory rights under M.G.L. c. 151B by filing a complaint at the MCAD on September 3, 2020.

65.     In November 2020, months after the Funds had already terminated Gina and Rosemarie, the Funds hired an "expert," Joyce Mader, to create an air of legitimacy to the terminations. Attorney Mader did not conduct an independent investigation into the terminations of Gina and Rosemarie's employment, but rather formed her opinion based only on a review of the Funds' notes regarding the terminations well after the fact.

66.     In December 2020, Gina and Rosemarie informed the Funds that they intended to withdraw their complaint from the MCAD and file a complaint in state court.

67.     On January 29, 2021, the Funds filed a baseless complaint in federal court against Gina for purported breach of fiduciary duty in a transparent attempt to intimidate Gina out of pursuing her claims.

### CLAIMS FOR RELIEF

### COUNT I

### (Hostile Work Environment; M.G.L. c. 151B)

68.     Gina repeats and realleges each of the allegations contained in paragraphs 1 through 67 of the Counterclaims as though separately set forth herein.

69.     Throughout the course of Mr. McLaughlin's tenure as Chairman, Mr. McLaughlin regularly subjected Gina to highly inappropriate and sexually offensive remarks in the workplace, and also engaged in unwanted touching.

70.     Mr. McLaughlin's sexual comments and unwanted touching were unsolicited and unwelcome. Gina asked Mr. McLaughlin to stop his inappropriate behavior.

71.     Mr. McLaughlin's behavior created an intimidating, hostile, humiliating, or sexually offensive work environment for Gina.

72.     Mr. McLaughlin's behavior unreasonably interfered with Gina's work performance and altered the terms and conditions of her employment.

73.     Mr. McLaughlin's inappropriate behavior consisted of ongoing and continued violations throughout his tenure as Chairman.

74.     The Funds is liable for the conduct of Mr. McLaughlin as a person with supervisory authority over Gina and because the Funds knew or should have known of Mr. McLaughlin's conduct and failed to remedy it.

## COUNT II

## (Quid Pro Quo Sexual Harassment; M.G.L. c. 151B)

75.     Gina repeats and realleges each of the allegations contained in paragraphs 1 through 74 of the Counterclaims as though separately set forth herein.

76.     Mr. McLaughlin made regular sexual advances towards Gina, for example, stating that he could not concentrate the entire Trustees meeting because he could not take his eyes off her and that Gina "looked so good" and that he "wanted" her and had "such a crush" on her.

77.     Mr. McLaughlin would also state to Rosemarie that Gina "looks hot."

78.     Mr. McLaughlin's comments and advances were unwelcome.

79.     Gina regularly rejected Mr. McLaughlin's advances and asked Mr. McLaughlin to stop his behavior.

80.     Attorney Shea, on behalf of the Funds, and Mr. McLaughlin expressly instructed Gina to keep her sexual harassment allegations to herself in exchange for keeping her job.

## COUNT III

## (Retaliation; M.G.L. c. 151B, § 4(4))

81.     Gina repeats and realleges each of the allegations contained in paragraphs 1 through 80 of this Counterclaims as though separately set forth herein.

82.     Gina engaged in protected activity including, but not limited to: requesting Mr. McLaughlin cease his inappropriate behavior; reporting the harassment she faced to Attorney Shea; conducting her own investigation when the Funds would not help her; requesting a reasonable accommodation to bring her medical service dog to the office; and requesting a reasonable schedule accommodation to maintain a regular insulin schedule.

83.     The Funds knew of Gina's protected activity and acted adversely against her when, among other things, Mr. McLaughlin prohibited Gina from bringing her service animal to

the office, altered Gina's schedule despite her request for an accommodation for her disability, requested that she account for her time in 15-minute increments, and ultimately terminated her employment.

84.     These adverse actions were in direct response to Gina's protected activity.

## COUNT IV

### (Failure to Accommodate)

85.     Gina repeats and realleges each of the allegations contained in paragraphs 1 through 84 of the Counterclaims as though separately set forth herein.

86.     Gina has Type 1 diabetes, a chronic health condition which requires consistent daily management.

87.     On January 3, 2020, Mr. McLaughlin requested that Gina meet with him and Attorney Shea for an unscheduled meeting. At this meeting, Mr. McLaughlin informed Gina that he was altering Gina's work schedule, "effective immediately," to require that Gina be in the office by 8 am every morning.

88.     Gina reminded Mr. McLaughlin of her medical condition and explained that she needed to take insulin and change her continuous glucose monitor at specific and uniform times of the day. Throughout the course of her employment, Gina would take her morning insulin shot at 8:30 am and be at work by 9:15 am. Gina would then skip lunch or stay later during the day and often worked on weekends.

89.     Gina requested that Mr. McLaughlin permit her to continue working on her usual work schedule to allow her to manage her health condition.

90.     Mr. McLaughlin, in the presence of Attorney Shea, refused to accommodate Gina's reasonable request, and provided no explanation for why he was refusing it.

91.    Following this meeting, Gina immediately began reporting to work beginning at 8 am which caused her to be off her insulin schedule, causing serious health issues.

## COUNT V

### (Interference with Rights; M.G.L. c. 151B, § 4(4A))

92.    Gina repeats and realleges each of the allegations contained in paragraphs 1 through 91 of the Counterclaims as though separately set forth herein.

93.    The Funds further retaliated against Gina by filing a federal court claim against her in direct response to notice that Gina and Rosemarie were planning to assert their statutorily protected rights in state court.

94.    Throughout her tenure as Administrator of the Funds, Gina was an exemplary employee and was never given any notice of any performance issues.

95.    The Funds were aware of the purported "performance issues" that allegedly formed the basis of Gina's termination since at least July 22, 2020.

96.    Gina filed her Charge of Discrimination at the MCAD on September 3, 2020.

97.    In December 2020, Gina informed the Funds that she intended to remove her complaint to state court.

98.    The Funds waited until January 29, 2021 to file their meritless complaint against Gina in federal court for conduct dating back decades only after Gina gave notice of her intent to file in this Court.

**GINA ALONGI REQUESTS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

WHEREFORE, Gina Alongi respectfully request that the Court grant the following relief:

1.    Enter judgment against all Defendants-in-Counterclaims, jointly and individually;

2.    Attorneys' fees and costs;

3.    Compensatory damages for emotional distress;

4.  Punitive damages pursuant to M. G. L. c. 151B, § 9;

5.  Pre-Judgment and Post-Judgment Interest; and

6.  Such other relief as the Court deems just and fair.


Respectfully Submitted,


GINA ALONGI,
By her attorneys,

/s/ Jacob A. Tosti
Timothy P. Van Dyck (BBO # 548347)
Douglas T. Radigan (BBO # 657938)
Jacob A. Tosti (BBO # 704007)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard
Framingham, MA 01702
Telephone: 617.757.6537
Facsimile: 508.929.3137
tvandyck@bowditch.com
dradigan@bowditch.com
jtosti@bowditch.com

Date:  March 23, 2023


CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).


/s/ Jacob A. Tosti

4891-8162-1073.2
4891-8162-1073.3