UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

——————————————————————— )
BOARD OF TRUSTEES of the IUOE )
LOCAL 4 PENSION FUND, BOARD OF )
TRUSTEES of the IUOE LOCAL 4 )
ANNUITY & SAVINGS FUND, BOARD )
OF TRUSTEES of the IUOE LOCAL 4 )
HEALTH and WELFARE FUND, BOARD )
OF TRUSTEES of the HOISTING and )
PORTABLE ENGINEERS LOCAL 4 )          Civil Action No.
APPRENTICESHIP & TRAINING FUND, )     21-cv-10163-FDS
INTERNATIONAL UNION of )
OPERATING ENGINEERS LOCAL 4, )
IUOE LOCAL 4 LABOR-MANAGEMENT )
COOPERATION TRUST, and IUOE )
LOCAL 4 SOCIAL ACTION )
COMMITTEE, )
 )
 )
        Plaintiffs, )
 )
    v. )
 )
GINA ALONGI, )
 )
        Defendant. )
——————————————————————— )

MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

SAYLOR, C.J.

This is an action arising under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiffs the Board of Trustees of the IUOE Local 4

Pension Fund; the Board of Trustees of the IUOE Local 4 Annuity & Savings Fund; the Board of

Trustees of the IUOE Local 4 Health and Welfare Fund; the Board of Trustees of the Hoisting

and Portable Engineers Local 4 Apprenticeship & Training Fund (collectively, the "Funds"); the

International Union of Operating Engineers Local 4; the IUOE Local 4 Labor-Management Cooperation Trust; and the IUOE Local 4 Social Action Committee allege that defendant Gina Alongi breached her fiduciary duties during her employment as the Administrator for the Funds. In substance, the complaint alleges that Alongi diverted pension-plan assets for her own benefit and the benefit of an entity unrelated to the Funds, neglected her work, and otherwise breached her duties as plan administrator.  Alongi has filed several counterclaims, alleging that her supervisor sexually harassed her, that the Funds refused to accommodate her disability, and that the Funds retaliated against her for reporting the harassment.

Plaintiffs have moved for partial summary judgment with respect to Alongi's liability for breach of her fiduciary duties.  While there is certainly evidence that Alongi did, in fact, exercise discretionary authority over the assets of the Funds, and directed the use of those assets in a manner contrary to law and the interests of plans and their beneficiaries, the underlying facts are sufficiently disputed that the entry of summary judgment is not warranted.  Accordingly, and for the following reasons, plaintiffs' motion for partial summary judgment will be denied.

## I.   **Background**

### A.   **Factual Background**

Except where otherwise noted, the following facts are undisputed.

#### 1.   **Governance of the Funds Generally**

The Funds comprise several multiemployer employee-benefit plans, all of which are subject to the regulatory framework of ERISA.  (Def.'s SMF ¶¶ 1, 3, 5, 13).  Each fund is governed by a Board of Trustees, who in turn employ staff to work for the funds.  (*Id.* ¶¶ 17, 20).

The Administrator is appointed by the Boards of Trustees of the Funds and serves as the main liaison between the Funds and certain employees, professional advisers, and service providers.  (*Id.* ¶¶ 26-30; Geiman Decl. ¶ 2).  The Administrator also organizes regular meetings

to provide various relevant reports to the Funds.  (Def.'s SMF ¶¶ 30-31).  The role is a full-time

occupation.  (*Id.* ¶ 32; Geiman Decl. ¶ 2).

According to the Funds, "the Trustees expected that the Administrator would be present

in the office during the normal business hours and would devote her full working hours to the

operations of the Funds."  (Pls.' Mem. at 4).[1]

### 2.    Gina Alongi's Work as Administrator

Gina Alongi served as Administrator for the Funds from 1996 to July 2020.  (Def.'s SMF

¶ 33; Alongi Dep. Vol. I at 27, Pls.' App'x at 138; Alongi Dep. Vol. III at 9, Pls.' App'x at 146).

She received an annual salary averaging $242,000 during the period from 2016 to 2019.  (Def.'s

SMF ¶ 175; Geiman Decl. ¶ 30).  She received other benefits, including employer-provided

automobiles and contributions to her pension plan.  (Def.'s SMF ¶ 175; Geiman Decl. ¶ 30).  She

was also entitled to several weeks of paid vacation, although the number of weeks is disputed.

(Def.'s SMF ¶ 253; *see* Employee Handbook, Ex. 6, Pls.' App'x at 70-71).  Her total

compensation package averaged $338,658 per year during the period 2016-2019.  (Def.'s SMF

¶¶ 36, 175).

### 3.    The Shared Services Agreement

In December 2003, amended effective July 1, 2006, the Funds entered into a Shared

Services Agreement.  (*See* Shared Services Agreement, Ex. 5, Pls.' App'x at 49).  The purpose of

---

[1] It is not clear that this expectation was an official policy of the Funds.  The Funds cite to paragraphs 265 and 266 of their Concise Statement of Material Facts, but those paragraphs refer to a sexual relationship between Alongi and a member of the Board of Trustees (¶ 265) and the Health Fund Trust Agreement (¶ 266), respectively. (CSMF ¶¶ 265-66).  It appears that William McLaughlin, who became Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees in 2017, expected employees to work in person from 8:00 a.m. to 4:00 p.m., the business hours provided by the Employee Handbook of the IUOE Local 4 Fringe Benefit Funds Office.  (*See* McLaughlin Notes, Ex. 156, Def.'s App'x at 33; Employee Handbook, Ex. 6, Pls.' App'x at 67 (noting that employees of the Funds are expected to "[r]eport to work regularly and on time" and providing that the "regular working hours of the Funds Office are 8:00 a.m. – 4:00 p.m.")).

the Agreement was to ensure that no fund was subsidizing the operating costs of any other fund.

(Alongi Dep. Vol. III at 93, Pls.' App'x at 153).

> The Shared Services Agreement provides:
>
> The amount of staff time of employees of the Fund Office devoted to each Organization will be used as the basis for determining the allocable portion of general administrative expenses, staff salary, taxes and benefits, and common overhead expenses, including but not limited to office space, utilities, professional fees and computer costs.  The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization by each employee of the Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.

(Shared Services Agreement, Ex. 5, Pls.' App'x at 50-51).[2]  Under the Agreement, those records

are used to allocate charges and reimbursements between the Funds for expenses created by

employees.  (Shared Services Agreement, Ex. 5, Pls.' App'x at 51-52).

### 4.   Alongi's Work for the Coalition

From 2007 to 2021, in addition to her position as Administrator of the Funds, Alongi also

served as Executive Director of the Massachusetts Coalition of Taft-Hartley Funds ("the

Coalition").  (Alongi Aff. ¶ 25; Def.'s SMF ¶ 144).  The Coalition is "a membership

organization consisting of different union-sponsored multiemployer health and welfare plans in

the New England area."  (Geiman Decl. ¶ 16; Def.'s SMF ¶ 87).  One of the purposes of the

Coalition is to use the combined purchasing power of its members to secure more favorable

terms from healthcare providers.  (Geiman Decl. ¶ 16; Def.'s SMF ¶ 88).  Until December 31,

---

[2] The Funds Office Employee Handbook also contains a recordkeeping requirement:

> All employees (exempt or non-exempt) that work under the jurisdiction of more than one (1) Fund must complete a weekly timesheet . . . to be turned in every Friday by 4 p.m.  Timesheets are used to break down employees' hours, (all hours, including overtime), spent on particular Funds.

(Employee Handbook at 4, Ex. 6, Pls.' App'x at 63).

2020, the Local 4 Welfare Fund was a member of the Coalition.  (Geiman Decl. ¶ 18; Def.'s

SMF ¶ 183).  According to Alongi, the Coalition "rented office space at the Funds' office"

during her tenure as Executive Director.  (Alongi Aff. ¶ 31).[3]

On behalf of the Coalition, Alongi scheduled and participated in meetings, reviewed

documents, and sought out new vendors on favorable terms.  (*See* Exs. 21-24, Pls.' App'x at

230-318 (numerous e-mail chains)).[4]  According to a 2019 tax form filed by Alongi for the

Coalition, she worked ten hours per week on average for the Coalition, for which she was paid

$46,000 per year.  (Form 990EZ, Ex. 17, Pls.' App'x at 203).

Louis Rasetta and John Shaughnessy, Jr., who served as trustees while Alongi worked as

Administrator of the Funds and Executive Director of the Coalition, have submitted affidavits

stating that they were aware of the services she was performing for the Coalition.  (Rasetta Aff.

¶¶ 2, 8; Shaughnessy Aff. ¶¶ 1, 8).

Other members of Alongi's office at the Funds performed work on behalf of the

Coalition.  Rosemarie Alongi, Alongi's twin sister and a member of the Funds' IT department,

updated the Coalition's website, corresponded with prospective vendors for the Coalition, and

scheduled meetings.  (Def.'s SMF ¶ 199; *See* Exs. 27-29, Pls.' App'x at 327-61).  Laura-Jean

Hickey, an employee of the Funds, maintained the records of the Coalition.  (Alongi Dep. Vol.

---

[3] Alongi asserts that the Funds "were, of course, aware of this use of their own office space," citing to Geiman's deposition.  (Def.'s Counterstatement of Material Facts ¶ 36).  Geiman's deposition testimony is that "[Alongi] had the coalition running out of the funds office" since 2007.  (*See* Geiman Dep. at 68, Def.'s App'x at 88).  The Trustees of the IUOE Health & Welfare Fund also discussed "payment by the Coalition to the Funds [of] a $400 annual 'rent.'"  (Board Minutes, Ex. 16, Pls.' App'x at 193).

[4] The Funds characterize Alongi's Coalition work as a "blatant and distasteful 'pay to play' scheme."  (Pls.' Mem. at 18).  They assert that one objective of Alongi's work was "to collect an ever-increasing number of fees" and to "tie[] manager and vendor opportunities to present to the Coalition to becoming associate members [of the Coalition]."  (*Id.* at 18-19).  Here, however, it appears the Funds' primary contention is that this activity came at the cost of time that Alongi should have been using to perform work for the Funds, not that Alongi's business practices on behalf of the Coalition were exploitative of prospective Coalition members.  (*See id.* at 19).

III at 130, Pls.' App'x at 158).  She also sent e-mails about Coalition matters, corresponding with and taking instructions from Alongi.  (*See, e.g.*, Ex. 22-24, Pls.' App'x at 251-318).  Taylor Ryan was a Funds employee.  (Schultheis Report, Ex. 8, Pls.' App'x at 91).  Ryan reviewed the zip codes for participants of other multiemployer employee-benefit funds.  (Exs. 34-35, Pls.' App'x at 395-416).  According to Ryan, this work likely took her more than a week to complete.  (Ryan Dep. at 145, Pls.' App'x at 420).  Rosemary Ortega was a Funds employee.  (Schultheis Report, Ex. 8, Pls.' App'x at 91).  Ortega prepared Coalition materials, arranged Coalition lunches, and scheduled Coalition events.  (Ex. 37, Pls.' App'x at 422-33).

It appears that Funds employees performed this Coalition work directly for Alongi or at Hickey's direction on behalf of Alongi.  (*See, e.g.*, *id.* at 433 (Hickey instructing Ortega to "print a few pages of the menu for [Alongi] to pick out items for the Coalition's reception"); Ex. 24, Pls.' App'x at 291 (Alongi telling an IT vendor that "I will also have [Hickey] send you our address"); Ex. 28, Pls.' App'x at 347 (Alongi telling Rosemarie that "[a prospective vendor]'s very nice.  Maybe you can meet with her.")).  Hickey and Alongi sometimes sent e-mails directing employees to perform Coalition work between 8:00 a.m. and 4:00 p.m.  (*E.g.*, Ex. 37, Pls.' App'x at 433).  According to Alongi, she directly supervised only Hickey and Geiman (who was then Assistant Administrator and in-house counsel) in her capacity as Administrator of the Funds.  (Alongi Aff. ¶ 8).

### 5.    Alongi's Termination

On July 21, 2020, the Boards of Trustees of the Funds met and terminated Alongi as Administrator.  (Board Minutes, Ex. 16, Pls.' App'x at 192, 195).  According to the minutes of the meeting, the trustees discussed Alongi's weekly work reports that included work for the Coalition; her lack of daily time sheets; and a $30,000 commitment of a credit of $30,000 belonging to the Local 4 Health Plan to an anticipated expense of the Coalition, among other

issues.  (*Id.* at 192-93).

The minutes reflect that the trustees terminated Alongi for several reasons:  "work performance," "waste and potential waste of [p]lan assets," "mismanagement of the Fund Office," "breach of confidentiality," and "withholding information from Trustees."  (*Id.* at 195).

### 6.      **The Schultheis Report**

The Boards retained Schultheis & Panettieri LLP, an accounting firm, to perform an audit of Alongi's work from January 2017 through June 2020.  (*See* Schultheis Report, Ex. 8, Pls.' App'x at 85).  The report, dated April 21, 2021, indicated that Alongi frequently sent e-mails about Coalition activity during Funds business hours.  (*See* Schultheis Report, Ex. 8, Pls.' App'x at 89-90; *see, e.g.*, Ex. 22, Pls.' App'x at 267 (asking the Coalition's executive board for authorization to send two people to a Minnesota industry fair with "hundreds of participants from the various participating Funds")).

According to the report, Alongi frequently arrived at the Funds Office later than 9:30 a.m. from September 2015 to March 2020.  (Schultheis Report, Ex. 8, Pls.' App'x at 127).  According to Alongi, she typically arrived at the office between 9:00 a.m. and 10:00 a.m. and regularly performed work outside of the period between 8:00 a.m. to 4:00 p.m.  (Def.'s SMF ¶ 278; Alongi Aff. ¶ 66).

The report also stated that Alongi began taking additional weeks of vacation per year in 2013.  (Schultheis Report, Ex. 8, Pls.' App'x at 85; Def.'s SMF ¶ 255).  From 2015 through 2019, payments were directed to Alongi and her twin sister for partial vacation buyouts during the year, rather than at the end of the calendar year when other employees' vacation buyouts were processed.  (*Id.* at 85-86).  Between 2015 and 2020, Alongi took 40 to 80 hours of vacation time that was bought out before the end of the year each year.  (*Id.* at 95).  According to Rasetta, "[i]n or around 2013, [he] suggested giving [Alongi] an additional two weeks of vacation time to

use or cash out annually because of her dedication, work ethic and her performance." (Rasetta Aff. ¶ 20).[5] Shaughnessy "specifically recall[ed]" that he and Rasetta "approved an additional two weeks of vacation time for [Alongi] to use or cash out annually." (Shaughnessy Aff. ¶ 6).

### 7.   Alongi's Allegations of Sexual Harassment and Retaliation

According to Alongi, she was terminated in retaliation for reporting sexual harassment by William McLaughlin, the Business Manager and Chairman of the Board of the Funds. (Def.'s SMF ¶ 102).

Alongi alleges that McLaughlin created a hostile work environment by engaging in inappropriate sexual conduct toward Alongi, her sister, and other female employees between August 2017 and 2020. (Alongi Aff. ¶¶ 40-52, 57).

In May 2018, according to Alongi, she confronted McLaughlin directly about his behavior. (Alongi Aff. ¶ 46). She alleges that he responded with a loud verbal attack, which was audible to others in the office. (Alongi Aff. ¶¶ 46-49; Ortega Dep. at 48-52, Def.'s App'x at 154-155). She sought advice from the Funds' outside counsel about how to respond; counsel allegedly encouraged her to "tamp[] down" her sexual harassment allegations to avoid termination for "insubordination." (Alongi Aff. ¶ 55; Geiman Dep. 203-204, Def.'s App'x at 98).

Alongi alleges several instances of retaliation after that incident. She has Type I diabetes; she alleges that on November 9, 2018, McLaughlin refused to allow her service dog, which was trained to detect low blood-sugar levels, to be present in the office. (Alongi Aff. ¶ 58). She further alleges that in January 2020, McLaughlin instructed that she should report to

---

[5] However, during his deposition, Rasetta testified that Alongi received only "[o]ne two-week vacation" and that he did not discuss granting her vacation time with anyone else. (Rasetta Dep. at 154, Pls.' App'x at 451).

work by 8 a.m. daily and refused to accommodate her work schedule requested to allow her to

schedule insulin shots and change her continuous glucose monitor.  (Alongi Aff. ¶¶ 59-60).

In September 2020, following their terminations, Alongi and her sister filed a complaint

with the Massachusetts Commission Against Discrimination alleging a hostile work

environment, sexual harassment, retaliation, and failure to accommodate her chronic health

condition.  (Alongi Aff. ¶ 65; Dkt. 8, Ex. A).  This lawsuit was instituted in January 2021,

allegedly in retaliation for that filing.  (Compl.; Dkt. 79 ¶ 93).

### B.   <u>Procedural Background</u>

The Funds filed the complaint in this case on January 29, 2021.  The complaint asserts

that Alongi breached her fiduciary duty to the funds in violation of ERISA, 29 U.S.C. §§ 1101-

1114.  Before the Funds filed that complaint, Alongi had filed her complaint with MCAD.

Alongi subsequently withdrew her MCAD complaint pursuant to Mass. Gen. Laws ch.

151B, § 9, and on February 10, 2021, filed a complaint against the Funds in the Massachusetts

Superior Court.

On August 9, 2021, the Court denied Alongi's motion to stay this case pending resolution

of her state-court matter.

On January 26, 2023, Alongi filed a counterclaim against the Funds in this matter.  The

counterclaim asserts five counts:  hostile work environment in violation of Mass. Gen. Laws ch.

151B, sexual harassment in violation of Mass. Gen. Laws ch. 151B, retaliation in violation of

Mass. Gen. Laws ch. 151B, failure to accommodate her chronic health condition, and

interference with her rights under Mass. Gen. Laws ch. 151B.  She amended her counterclaim on

April 7, 2023.

The Funds have moved for partial summary judgment with respect to Alongi's liability

for breach of her fiduciary duties under 29 U.S.C. § 1104 and 29 U.S.C. § 1106.

## II.    Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

## III.    Analysis

The Funds argue that they are entitled to partial summary judgment because (1) Alongi was a functional fiduciary of the Funds and (2) she violated her fiduciary duties under ERISA while acting as a functional fiduciary.

### A.    Alongi as a Functional Fiduciary

Under ERISA, fiduciaries of employee benefit plans must adhere to certain statutory duties.  Among other things, the statute provides that "a fiduciary shall discharge [her] duties

with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C.

§1104(a)(1), and prohibits various forms of self-dealing:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

A person who is not a named fiduciary of a plan may nonetheless qualify as an ERISA

fiduciary if

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The First Circuit recently addressed the interpretation of the phrase "authority or

discretionary control respecting . . . management or disposition of [plan] assets."  *See Mass.*

*Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307, 323-328

(1st Cir. 2023).  The court joined "[e]very circuit to have directly addressed the issue" and

"conclud[ed] that 'discretionary' control or authority is not required with respect to the

management or disposition of plan assets."  *Id.* at 324 (citations omitted).  Rather, "even

nondiscretionary control or authority over plan assets suffices to render a person a fiduciary."  *Id.*

at 325.  However, the court also reaffirmed that "the mere exercise of physical control or the

performance of mechanical administrative tasks generally is insufficient to confer fiduciary status," and that "a degree of 'meaningful control' is required." *Id.* (quoting *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (1st Cir. 1998)).

The court also ruled that those principles only address whether plaintiff "act[ed] as a fiduciary . . . when taking the action subject to the complaint." *Id.* (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)). Even if a defendant was a functional fiduciary with respect to certain actions, that is not sufficient to show that she was a functional fiduciary as to a specifically alleged action. *See Pegram*, 530 U.S. at 226 ("In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary . . . when taking the action subject to complaint.").

The Funds contend that Alongi was a functional fiduciary because "throughout her tenure as Administrator, [she] exercised discretionary authority and control with respect to management of Fund assets in manners both known and unknown to the Trustees." (Pls.' Mem. at 9).[6] They also contend that she was identified as a fiduciary in the DOL's 2003-2004 audit, and thus was a fiduciary during the events that are alleged to have constituted breaches. (*Id.* at 10-14).[7]

---

[6] In her deposition, Alongi testified that she was in charge of the day-to-day operations of the Funds, and that she was ultimately responsible for the work of the Funds employees. (Alongi Dep. Vol. III at 9-10, Pls.' App'x at 146). She testified that her responsibilities to the Boards of Trustees were "[t]o report to them. You know, financial status of the plan, any issues with service providers, any recommendations that I had." (*Id.* at 10). She testified that she was "running" a "billion-dollar organization" and had the authority to hire and fire service providers for "smaller ancillary benefits." (Alongi Dep. Vol. IV at 51-52, Pls.' Supp. App'x at 30). She also testified that she had authority to make hiring recommendations, to decide not to hire, discipline, and fire employees. (Alongi Dep. Vol. II at 134-36, Pls.' Supp. App'x at 15).

[7] The September 16, 2004 letter is addressed to the "Plan Fiduciaries" and sent to the attention of six trustees and Alongi. (DOL Letter, Ex. 7, Pls.' App'x at 78). The letter reads in part: "Senior Investigator Muench has concluded her investigation of the Plan and of your activities as its Plan Administrator & Trustees. Based on the facts gathered during that investigation it appeared that, as Plan fiduciaries, you violated your fiduciary obligations to the Plan and violated several provisions of ERISA." (*Id.*).

The Funds have not provided a copy of her employment agreement, or any other document that specifically identifies her job responsibilities and powers with the Funds, other than Geiman's declaration.

Alongi contends that her responsibilities were limited. According to her, she "did not directly supervise the work of any other Fund Office employees," and other employees "performed administrative functions . . . within a framework of policies, interpretations, rules, and practices approved by the Trustees, not [by her]." (Alongi Aff. ¶¶ 8-9). "[E]mployee compensation was set exclusively by the Trustees." (*Id.* ¶ 12). As Administrator, she asserts that she made recommendations to the Trustees as to plan administration, subject to their review and approval. (*Id.* ¶ 10). She further asserts that she had "no authority to make – and never made – any decisions on . . . benefit changes and beneficiary appeals for the Health & Welfare, Pension Funds, and Annuity and Savings Funds, and decisions regarding the Funds' engagement or termination of investment managers or healthcare providers." (*Id.* ¶ 11).

To determine whether Alongi's actions violated her duties under ERISA, the court must first determine whether she was acting as a fiduciary when she allegedly (1) failed to complete certain timesheets; (2) performed work on behalf of the Coalition; (3) failed to work certain hours for which she was compensated by the Funds; (4) directed Funds office staff to work for the Coalition; and (5) took vacation time to which she was not entitled (the actions specifically alleged as breaches of fiduciary duty by plaintiffs in their motion for partial summary judgment). The court must then determine whether her actions violated the fiduciary duties provided by 29 U.S.C. § 1104 and 29 U.S.C. § 1106.[8]

---

[8] The First Circuit has described Section 1106 as a "'supplement[]' [to] the general duty of loyalty." *Brotherston v. Putnam Invs.*, 907 F.3d 17, 40 (1st Cir. 2018) (citing *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000)).

Resolution of those issues raises the question of how to define "plan assets."  Plaintiffs argue that defendant violated 29 U.S.C. §§ 1106(b)(1)-(3) "by causing plan assets, in this case Fund personnel and resources, to be deployed to benefit the Coalition."  (Pls.' Mem. at 9-10; *see also* Pls.' Reply at 16).  "ERISA nowhere contains a comprehensive definition of what constitutes 'plan assets,'" but "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-ERISA law."  *Merrimon v. Unum Life Ins. Co. of Am.*, 758 F.3d 46, 56 (1st Cir. 2014) (first quoting *John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 89 (1993); and then quoting U.S. Dep't of Labor, Advisory Op. No. 93–14A, 1993 WL 188473, at *4 (May 5, 1993)).

It is unclear whether the services of Fund personnel can be characterized as "plan assets." "[T]he text [of ERISA] says nothing about employees, let alone anything about fiduciary duties owed in the course of managing employees."  *Acosta v. Brain*, 910 F.3d 502, 519-520 (9th Cir. 2018) (holding that a trustee was not a functional fiduciary when he placed a fund employee on leave).  An individual's workplace decisions may, of course, harm the plan (or plan participants and beneficiaries), but that alone does not satisfy the threshold question of whether that person was acting as a fiduciary.  *Id.* at 520; *Pegram*, 530 U.S. at 225 ("Employers, for example, can be ERISA fiduciaries and still take actions to the disadvantage of employee beneficiaries . . . (e.g., firing a beneficiary for reasons unrelated to the ERISA plan), or even as plan sponsors (e.g., modifying the terms of a plan as allowed by ERISA to provide less generous benefits).").

It is certainly plausible that the Fund resources that Alongi used, including the time of employees, are "plan assets," and that she exercised authority and control over them.  However, the parties have not briefed the issue of how "plan assets" should be defined.  Furthermore, and as discussed below, there is a genuine dispute of material fact as to whether Alongi acted as a

14

fiduciary in using those resources, or whether she used those resources at all.  And it could be the case that some decisions concerning employee resources involve the exercise of fiduciary duties, while others involve mere "business decisions."  For example, the specific hours that a particular employee might be required to work on a particular day may be plausibly characterized as a "business decision" rather than "management or administration of the plan."  *See In re Luna*, 406 F.3d 1192, 1207 (10th Cir. 2005) ("Because virtually every business decision an employer makes can have an adverse impact on an employee benefit plan" courts must "'examine the conduct at issue to determine whether it constitutes management or administration of the plan, giving rise to fiduciary concerns, or merely a business decision that has an effect on an ERISA plan not subject to fiduciary duties.'" (quoting *COB Clearinghouse Corp. v. Aetna U.S. Healthcare, Inc.*, 362 F.3d 877, 881 (6th Cir.2004))).

In any event, at a minimum resolution of the legal issue requires the resolution of disputed issues of material fact.  Summary judgment will therefore be denied as to the question of whether defendant acted as a functional fiduciary in all respects as to the disputed activities.

**B.**     **Alongi's Alleged Fiduciary Breaches**

Under ERISA, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of . . . providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1)(A).  A fiduciary must act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [29 U.S.C. ch. 18, Subch. I, III]."  *Id.* § 1104(a)(1)(D).

A fiduciary "with respect to a plan" may not (1) "deal with the assets of the plan in his own interest or for his own account," (2) "in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are

adverse to the interests of the plan or the interests of its participants or beneficiaries," or (3) "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." *Id.* § 1106(b).

The Funds contend that Alongi violated § 1104, by failing to complete certain timesheets in accordance with plan documents and instruments, and § 1106, by (1) performing work on behalf of the Coalition; (2) failing to work certain hours for which she was compensated by the Funds; (3) directing Funds Office staff to work for the Coalition; and (4) taking vacation time to which she was not entitled.  Assuming, without deciding, that she acted as a functional fiduciary to each alleged breach, there is a genuine dispute of material fact as to each of those issues.

### 1.   Timekeeping

The Funds contend that Alongi was required to keep a daily time sheet to track the amount of time she spent working for each Fund so that the cost of her services could be appropriately allocated.  (Pls.' Mem. at 13).  They argue that her failure to do so is a breach of her fiduciary duty both to "discharge [her] duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with the documents and instruments governing the plan" under 29 U.S.C. § 1104(a)(1)(D) and to avoid prohibited transactions under 29 U.S.C. § 1106, read in conjunction with the Department of Labor's Prohibited Transaction Exemption 77-10.  (*See* Pls.' Mem. at 14-15).

The Funds allege, without citation, that "[t]he Shared Services Agreement is considered a 'plan document' under ERISA since it constitutes an adopted plan procedure."  (Pls.' Mem. at 15).  The definition of "plan documents" for the purposes of 29 U.S.C. § 1104(a)(1)(D) is unsettled.  *See Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 304 (2009) (declining to decide whether the category of documents and instruments described in § 1104(a)(1)(D) included beneficiary designation forms); *Becker v. Williams*, 777 F.3d 1035, 1039

16

(9th Cir. 2015) (holding only documents that "provide information as to 'where [the participant] stands with respect to the plan,' such as an SPD or trust agreement might, could qualify as governing documents with which a plan administrator must comply in awarding benefits under § 1104(a)(1)(D)." (citations omitted)).

Even assuming that the Shared Services Agreement is a plan document, it requires, in relevant part, as follows:

> The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization by each employee of the Fund Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.

(Shared Services Agreement, Ex. 5, Pls.' App'x at 51).  The Funds contend that the Shared Services Agreement, along with the Funds' Employee Handbook, memorializes a requirement that all employees, including Alongi, maintain a daily time sheet.[9]  However, the Funds do not allege the Employee Handbook itself is a plan document, nor have they suggested that it is incorporated by reference into any plan document.

The Funds also appear to argue that by failing to follow the recordkeeping procedure set forth in the Shared Services Agreement, Alongi failed to follow the requirements of DOL Prohibited Transaction Class Exemption 76-1, as amended by Exemption 77-10.  (Pls.' Mem. at 12-14).  Prohibited Transaction Class Exemption 77-10 requires that "[w]ith respect to the sharing of office space, administrative services and goods, the costs of securing such space,

---

[9] Under the heading "Weekly Timesheet," the Employee Handbook reads:

All employees (exempt and non-exempt) that work under the jurisdiction of more than one (1) Fund must complete a weekly timesheet (located in the Funds Public Drive > TimeSheet) to be turned in every Friday by 4 p.m.  Timesheets are used to break down employees' hours (all hours, including overtime), spent on particular Funds.  Employees with questions or concerns regarding this policy and procedure should consult with the Accounting Department.

(Employee Handbook, Ex. 6, Pls.' App'x at 63).

services and goods are assessed and paid on a prorat[ed] basis with respect to each party's use of such [s]pace, services and goods" and that records are maintained to enable people to determine whether that condition has been met.  Employee Benefit Plans, 42 Fed. Reg. 33918-19, PROHIBITED TRANSACTION CLASS EXEMPTION 77-10 Sec. I(a), (d).[10]

Alongi disputes that any plan document required her to maintain daily time sheets, and contends that in any event she complied with the Shared Services Agreement.  (Def.'s Opp. at 30).  She testified that she initially completed time sheets, but, at some point, stopped after the firm's accountants, Manzi & Associates, determined there was no significant change in fund percentage allocation from year to year.  (Alongi Dep. Vol. III at 81-82, Def.'s App'x at 24).

Jeannie Mickel, the managing partner of Manzi & Associates, LLC, who performed accounting services to the Funds in 2004, declared that Alongi was the only Funds Office employee who did not fill out daily time sheets.  (Mickel Decl., Ex. 2, Supp. App'x at 32-33).  According to Mickel, Alongi repeatedly represented that her hours did not change year to year.  (*Id.* at 33).  Mickel further asserted "I never advised or told Ms. Alongi that she was neither required to nor not required to keep timesheets."  (*Id.* at 34).

Under the circumstances, and viewing the facts in the light most favorable to Alongi, there is a genuine dispute of material fact as to whether any ERISA plan document required the Administrator to complete daily timesheets and thus whether Alongi breached her duty to act in accordance with the documents and instruments governing the plan.  There is similarly a genuine dispute whether the method of record keeping employed by the Funds would have prevented the

---

[10] The Funds do not cite to Prohibited Transaction Class Exemption 77-10 Sec. I(d), which requires that "[a]ny plan which shares office space . . . maintain[] or causes to be maintained . . . such records as are necessary to enable the persons . . . to determine whether the conditions of this exemption have been met," but also states that "such participating employee organization . . . shall not be subject to the civil penalty which may be assessed under section 502(i) of the Act if such records are not maintained."  *Id.*

sharing of administrative costs to be paid on a sufficiently prorated basis.

###    2.    Performance of Work for the Coalition

The Funds contend that Alongi's work for the Coalition benefitted a third party whose interests were adverse to the funds.  (Pls.' Mem. at 10).  They contend that she breached her fiduciary duty by performing work for the Coalition during the Funds normal business hours rather than working for the sole and exclusive benefit of the Funds.  (*Id.* at 17-18).

Alongi contends that her work for the Coalition significantly benefitted the Funds.  She testified that, as Executive Director of the Coalition, she negotiated with service providers that the funds ultimately used, saving the Funds money.  (Alongi Aff. ¶¶ 32-36).  She further testified that she provided presentations and educational programming for employees of the Funds through the Coalition.  (*Id.* ¶ 37).  The affidavits of Rasetta and Shaughnessy support her account.  (*See* Rasetta Aff. ¶¶ 9-13; Shaughnessy Aff. ¶¶ 8-9).  According to Alongi, her motivation was to "advance and promote the common interest of the Funds and the Coalition's other multi-employer fund."  (Alongi Aff. ¶ 38).

The Funds rely principally on Geiman's affidavit.  According to Geiman, Coalition member funds were entitled to Coalition-negotiated arrangements with service providers because of their membership, not because of any action by Alongi.  (Geiman Aff. ¶ 22).  Geiman also disputes whether her work truly benefitted the Funds, testifying that the Funds received "miniscule" benefit from using Coalition-negotiated service providers or that it would be "impossible to quantify" the benefit.  (*Id.* ¶¶ 23-34).

Viewing the facts in the light most favorable to Alongi, there is a genuine dispute of material fact as to whether she breached a fiduciary duty by working for the Coalition. Employees of the Funds have sharply differing views as to whether her work benefitted the Funds.  And the Funds have not cited any undisputed facts showing that the Coalition's interests

were adverse to the Funds.[11]

### 3.      Failure to Work Certain Hours

The Funds next contend that Alongi deprived them of the expected value of her services by working for the Coalition during Funds regular business hours and working "substantially less than the required 7 hours per day."  (Pls.' Mem. at 22).

The Funds rely on the Schultheis report to support their argument.  However, the Schultheis report concludes that Alongi "apparently fail[ed] to work seven-hour days" on the basis of her office entry times, telephone records, and e-mails.  (Schultheis Report, Ex. 8, Pls.' App'x at 89, 127-131).  That is not necessarily inconsistent with her assertion that she worked at home for many hours each week, including activities such as reading and analyzing reports for Funds matters.  (See Alongi Aff. ¶ 66).  A genuine dispute of material fact therefore exists as to whether she actually failed to work sufficient hours on behalf of the Funds.

### 4.      Direction of Funds Office Staff to Work for the Coalition

The Funds further contend that Alongi directed several Funds Office employees to perform tasks for the Coalition.  As noted, Funds Office employees undisputedly performed work for the Coalition during normal work hours.  For present purposes, the Court will assume that she acted as a fiduciary when directing employees to perform tasks—that is, that personnel time is a "plan asset."

Alongi contends that she is not liable for breach of her fiduciary duties for that work.  She asserts that Laura-Jean Hickey, not her, assigned Coalition work to Funds Office employees. Certainly, Alongi directly assigned Coalition work to Hickey.  (See, e.g., Ex. 23, Pls.' App'x at

---

[11] The Funds assert that the Coalition's interests were adverse to the Funds in their memorandum in support of summary judgment.  (See Pls.' Mem. at 10).  However, they cite no facts in support of that assertion, and their statement of material facts likewise does not provide record support.

286 (defendant telling Hickey, "I left my changes [to a Coalition questionnaire] on your desk" at 2:50pm).[12]  But there are also instances where she directly assigned Coalition work to other Funds Office employees.  (*See, e.g.*, Ex. 22, Pls.' App'x at 281 (defendant asking Zaccardi questions in e-mail with subject line:  "Mass Coalition Investment Statement").

Alongi also contends that the Coalition work performed by Funds Office employees actually benefitted the Funds.  As noted, there is a genuine dispute of material fact as to that issue.  In addition, she contends that the Funds have not shown beyond dispute that she acted with an improper motive in directing Funds employees to perform Coalition work.  (Def.'s Opp. at 12-13, 29).  The Funds respond that they need not address her subjective intent and that "good intentions are not a defense to a fiduciary breach of this kind."  (Pls.' Reply at 16-17).  They also imply that she was truly motivated by her Coalition salary.  (*Id.* at 17).

Parsing a fiduciary's mixed motives is an "abstract discussion."  *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 6 (1st Cir. 2018).  However, the First Circuit has, "in reviewing ERISA duty of loyalty claims, . . . asked whether the fiduciary's 'operative motive was to further its own interests."  *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018) (quoting *Ellis*, 883 F.3d at 6).  As the Funds note, that question arose in a series of cases involving investment decisions made by plan fiduciaries that were not *per se* unlawful, but created conflicts of interest that cast doubt on whether they were made for the sole benefit of plan participants.  (Pls.' Reply at 16).

Here, rather than self-dealing when selecting plan investments, Alongi asked Fund employees to perform tasks that are alleged to have assisted her work for the Coalition, which

---

[12] It is not clear from that e-mail chain whether Alongi expected Hickey to implement her changes during the business hours of the Funds Office.

(she argues) ultimately benefitted the Funds.  Her affidavit and deposition provide some support

for her claim that she was motivated to benefit the Funds.

Viewing the facts in the light most favorable to Alongi, there is a genuine dispute of

material fact as to whether she directed Funds Office employees to perform Coalition work

during the Funds Office business hours, whether that work benefitted the Funds, and whether

those acts constituted a breach of her fiduciary duty.

### 5. <u>Vacation Time</u>

Finally, the Funds contend that Alongi breached her fiduciary duty by taking or cashing

out two weeks of vacation time annually to which she was not entitled.  (Pls.' Mem. at 32).

It is undisputed that beginning in 2013, Alongi began taking or cashing out up to two

weeks of vacation time annually.  She contends that the weeks were approved by Rasetta and

Shaughnessy, who served on the Boards of Trustees.  Rasetta and Shaughnessy both testified that

they granted her two weeks of extra annual vacation time, although their accounts are somewhat

inconsistent and qualified.[13]  And Alongi has testified in an affidavit that Shaughnessy and

Rasetta acted as a subcommittee of the Board with the power to set employee compensation

(which, she contends, includes vacation time).  (Alongi Aff. ¶¶ 13-15, 18-19).

Certainly the record creates substantial doubt as to how much vacation time Shaughnessy

and Rasetta approved for Alongi, or whether they acted in accordance with trust policies in doing

so.  However, viewing the facts in the light most favorable to Alongi, a genuine dispute of

material fact exists as to whether she was entitled to the extra vacation time.

\*     \*     \*

In sum, there is a genuine dispute of material fact as to each alleged breach of fiduciary

---

[13] *E.g.*, Rasetta Dep. at 154, Pls.' App'x at 451; Shaughnessy Dep. at 40-41, Pls.' App'x at 455-56.

duty, even assuming that Alongi acted as a functional fiduciary in all relevant respects.

Accordingly, the Court will deny the motion for partial summary judgment.

**IV.**    <u>**Conclusion**</u>

For the foregoing reasons, plaintiffs' motion for partial summary judgment will be

DENIED.

**So Ordered.**

<u>/s/ F. Dennis Saylor IV</u>
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  September 14, 2023