UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, BOARD OF TRUSTEES OF THE IUOE LOCAL 4 ANNUITY & SAVINGS FUND, BOARD OF TRUSTEES OF THE IUOE LOCAL 4 HEALTH AND WELFARE FUND, BOARD OF TRUSTEES OF THE HOISTING AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 4, IUOE LOCAL 4 LABOR-MANAGEMENT CO-OPERATION TRUST, AND IUOE LOCAL 4 SOCIAL ACTION COMMITTEE. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. 1:21-cv-10163-FDS |
| Plaintiffs, | ) ) | |
| IUOE LOCAL 4 PENSION FUND, IUOE LOCAL 4 ANNUITY & SAVINGS FUND, IUOE LOCAL 4 HEALTH AND WELFARE FUND, HOISTING AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND, IUOE LOCAL 4 LABOR-MANAGEMENT CO-OPERATION TRUST, WILLIAM D. MCLAUGHLIN, individually and in his capacity as Chairman of the Boards of Trustees, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants-in-Counterclaim, | ) ) | |
| v. | ) | |
| GINA ALONGI, | ) | |
| Defendant/Plaintiff-in-Counterclaim | | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS-IN-COUNTERCLAIMS'
MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONENTS**

**TABLE OF AUTHORITIES** ................................................................................................ 2

**CASES** ................................................................................................................................ 2

1

**STATUTES** ...................................................................................................................... 4

**RULES** ............................................................................................................................... 4

   **I.**    **INTRODUCTION** ............................................................................................ 5

   **II.**   **SUMMARY OF FACTS** ................................................................................. 5

   **III.**  **ARGUMENT** ................................................................................................. 13

      **1.**   **Summary Judgment Standard** ................................................................. 13

      **2.**   **Ms. Alongi's Hostile Work Environment Claim Fails as a Matter of Law.** ........... 14

      **3.**   **Ms. Alongi's Quid Pro Quo Sexual Harassment Claim Fails as a Matter of Law Because Mr. McLaughlin did not Condition Her Employment on Her Submission to Sexual Advances.** ....................................................................................... 18

      **4.**   **Ms. Alongi's Retaliation Claim Fails as a Matter of Law.** ...................................... 19

      **5.**   **Ms. Alongi's Failure to Accommodate Claim Fails as a Matter of Law.** ................ 22

      **6.**   **Ms. Alongi's Interference of Rights Claim Fails as a Matter of Law Because the Funds were Obligated to Bring Suit Against Ms. Alongi Pursuant to their Fiduciary Duties.** ..................................................................................................... 26

   **IV.**  **CONCLUSION** ............................................................................................. 27

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..............................13,14

*Cassesso v. Comm'r of Correction*, 390 Mass. 419 (1983)...........................................................13

*Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1 (1st Cir. 2000)....13

*Rogers v. Fair*, 902 F.2d 140 (1st Cir. 1990)...............................................................................14

*Flint v. Boston*, 94 Mass. App. Ct. 298 (2018)............................................................................14

*Everett v. 357 Corp.*, 453 Mass. 585 (2009)...............................................................................15

*Cuddyer v. The Stop & Shop Supermarket Co.*, 434 Mass. 521 (2001).........................15,16,17

*Lucien v. Conlee*, No. 081066, 2009 WL 3085376 (Mass. Super. Ct. Sept. 3, 2009)..............16

*Crowley v. L.L. Bean, Inc.*, 303 F.3d 387 (1st Cir. 2002)...........................................................16

*Bennefield v. Kohl's Dep't Stores, Inc.*, No. 2012 WL 1560407

(Mass. Super. Ct. Feb. 17, 2012)..................................................................................................16

*Henry v. Sterling Collision Centers, Inc.*, 252 F. Supp. 3d 42 (D. Mass. 2017)......................17

*Chamberlain v. 101 Realty, Inc.*, 915 F.2d 777 (1st Cir. 1990)…………………………………17

*Ponte v. Steelcase, Inc.*, 741 F.3d 310 (1st Cir. 2014)…………………………………….17,18

*Cahill v. Silva*, 79 Mass. App. Ct. 1122 (2011)……………………………………………18

*Rodriguez-Vega v. Policlinica la Familia de Toa Alta, Inc.*,

942 F. Supp. 2d 210 (D.P.R. 2013)…………………………………………………..18,19

*Martinelli v. Bancroft Chophouse, LLC*, 357 F. Supp. 3d 95 (D. Mass. 2019)…………………19

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)………………………………...19,22

*Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382 (2016)…...19,20

*Esler v. Sylvia-Reardon*, 473 Mass. 775 (2016)……………………………………………19

*MacCormack v. Boston Edison, Co.*, 423 Mass. 652 (1996)…………………………………20

*Prader v. Leading Edge Prods.*, 39 Mass. App. Ct. 616 (1996)……………………………20

*Mole v. Univ. of Massachusetts*, 442 Mass. 582 (2004)……………………………………20

*Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711 (1st Cir. 2014)…………...20,21

*Calero-Cerezo v. United States*, 355 F.3d 6 (1st Cir. 2004)…………………………………21

*Ahern v. Shinseki*, 629 F.3d 49 (1st Cir. 2010)……………………………………………21

*Beaupre v. Cliff Smith & Associates*, 50 Mass. App. Ct. 480 (2000)…………………………22

*Morrill v. Lowe's Home Centers, LLC*, No. 1984CV01263, 2022 WL 2168479

(Mass. Super. Ct. Apr. 2022) ……………………………………………………………22

*Melo v. City of Somerville*, No. 18-10786, 2020 WL 6945938 (D. Mass. Nov. 2020)…………22

*Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34 (2005)……………………………………22

*Godfrey v. Globe Newspaper Co., Inc.*, 457 Mass. 113 (2010)………………………………23

*Mulloy v. Acushnet Co.*, 460 F.3d 141 (1st Cir. 2006)…………………………………23,24

*Sarkisian v. Austin Preparatory Sch.*, 85 F.4th 670 (1st Cir. 2023)…………………………23,24

*Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672 (2016)………………………………… 23,24,26

*Blare v. Husky Injection Molding System Boston, Inc.*, 419 Mass. 437 (1995)…………………23

*Laurent v. United Parcel Service, Inc.*, 416 F. Supp. 2d 212 (D. Mass. 2006)………………23,25

*Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638 (1st Cir. 2000)………………………23

*Beal v. Selectmen of Hingham,* 419 Mass. 535 (1995)………………………………………24,26

*Psy-Ed Corp. v. Klein*, 459 Mass. 697 (2011)……………………………………………...26

*Sahil v. Bull HN Info. Sys., Inc.*, 437 Mass. 696 (2002)………………………………...26,27

*Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12 (1st Cir. 1998)……………………………27

**STATUTES**

M.G.L. c. 151B…………………………………………………………………………5

M.G.L. c. 151B, § 1(18)(a)……………………………………………………………18

M.G.L. c. 151B, § 4(4)………………………………………………………………...19

M.G.L. c. 151B, § 4(16)………………………………………………………………22

M.G.L. c. 151B, § 1(16)………………………………………………………………23

M.G.L. c. 151B, § 4(4A)………………………………………………………………26

29 U.S.C. § 1002(21)(A)…………………………………………………………….... 27

29 U.S.C. § 1104(a)(1)(B)……………………………………………………………27

29 U.S.C. § 1104(a)(1)……………………………………………………………...27

**RULES**

Mass. R. Civ. P. 56……………………………………………………………………13

## I.      **INTRODUCTION**

This case involves claims raised by Plaintiff-in-Counterclaim, Ginamarie Alongi, ("Ms. Alongi"), alleging violations of M.G.L. c. 151B against Defendants-in-Counterclaim IUOE Local 4 Health and Pension Fund, IUOE Local 4 Annuity and Savings Fund, IUOE Local 4 Health and Welfare Fund, Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund, IUOE Local 4 Labor-Management Co-Operation Trust, (collectively, the "Funds") and William D. McLaughlin ("Mr. McLaughlin") individually and in his capacity as Chairman of the Boards of Trustees (collectively, the "Funds and Mr. McLaughlin").

## II.     **SUMMARY OF FACTS**

Ms. Alongi began working for the Funds as a part time employee in 1978 after graduating from high school. (Concise Statement of Material Facts ("CSMF") ¶ 32). Ms. Alongi's paychecks and benefits were provided by the Welfare Fund. (CSMF ¶ 35). In 1980, Ms. Alongi was hired as a full-time employee to digitize the Funds' paper records. Ms. Alongi was promoted to Fund Administrator in 1996 and served in that position until July 2020. (CSMF ¶¶ 33,34). As Administrator, Ms. Alongi supervised and directed the operations of the Funds, ensuring they were administered in accordance with the terms of the governing plan documents and the policies adopted by the Boards of Trustees of the Funds. She was responsible for reporting to the Trustees regarding finances and other matters of interest, preparing the agendas for their meetings, and overseeing the other Funds employees. (CSMF ¶¶ 26-28). Between January 15, 2015 and July 21, 2020, Ms. Alongi received an annual compensation package from the Funds worth in excess of $300,000 per year in all years. Ms. Alongi also was entitled to four weeks of paid vacation per year. (CSMF ¶ 38).

Between 2003 and 2004, the Department of Labor ("DOL") conducted an investigation of the Funds ("DOL audit"). (CSMF ¶ 40).  The DOL identified issues with the administration of the Funds, including the allocation of time and expenses among the Funds and other non-ERISA covered entities related to Local 4. The DOL found the Funds' method used for allocating time and expense to be insufficient and required remediation through a Shared Services Agreement, which required Funds employees to complete time sheets to determine a percentage allocation that applies to expenses for each Fund. (CSMF ¶ 40,41). Ms. Alongi was heavily involved in the DOL audit as well as the creation of the Shared Services Agreement. (CSMF ¶ 40). In 2018, she was involved in a re-negotiation of the Shared Services Agreement to include a new national training Fund. (CSMF ¶ 110).

Between 2004 and 2017, Lou Rasetta ("Mr. Rasetta") served as the Business Manager for the Union and Chairman of the Board of Trustees, selected by the Trustees. (CSMF ¶ 44). During that time, there were various periods during which Ms. Alongi and Mr. Rasetta engaged in a romantic relationship, which the two never disclosed to the Trustees. (CSMF ¶ 45). Ms. Alongi benefitted from her relationship with Mr. Rasetta in numerous ways. For example, Funds employees are only entitled to a maximum of four weeks of vacation per year. However, Mr. Rasetta and possibly another Trustee[1], without ratification by the full Board, granted Ms. Alongi an extra two weeks per year, which she was able to "cash out."  (CSMF ¶ 46). Mr. Rasetta also included Ms. Alongi in negotiations and meetings that were not part of her job, including labor contract negotiations, and seemingly took no steps to require Ms. Alongi to arrive at work at 8:00 a.m., when normal business hours for the Funds began. (CSMF ¶ 47,48).

---

[1] Ms. Alongi testified that another Trustee, Jack Shaughnessy, along with Mr. Rasetta granted her the two extra weeks, while Mr. Rasetta testified that he was the sole individual who decided to grant Ms. Alongi the extra weeks.

Mr. Rasetta often behaved inappropriately in the office by engaging in crude sexual banter and jokes. (CSMF ¶ 49). Mr. Rasetta was accused of sexual harassment in 2014 by Laura-Jean Hickey ("Ms. Hickey"), a Funds employee, who alleged that Mr. Rasetta attempted to kiss her and put his foot in her lap during a work dinner. (CSMF ¶ 50). Ms. Hickey testified that due to the close nature of Mr. Rasetta and Ms. Alongi's relationship, she hesitated to report Mr. Rasetta's continuing behavior because she feared retaliation from both Mr. Rasetta and Ms. Alongi, but she ultimately disclosed the behavior to Mr. Geiman. (CSMF ¶ 51).  After Mr. Rasetta found out about Ms. Hickey's allegation, he called Funds counsel, Kathryn Shea ("Attorney Shea") as well as Ms. Alongi repeatedly, demanding Ms. Hickey be fired. (CSMF ¶ 52). In 2016, Mr. Rasetta went so far as to pull his pants down in front of Ms. Hickey and tell her to "kiss it." (CSMF ¶ 50).

In 2007, Ms. Alongi became the Executive Director of the Massachusetts Coalition of Taft-Hartley Funds ("Coalition"), which is a group of Taft-Hartley plans that meets periodically. (CSMF ¶ 53). In her compensated position with the Coalition, Ms. Alongi conducted meetings and negotiated with service providers. (CSMF ¶¶ 54,108). She worked on Coalition matters between 8:00 a.m. and 4:00 p.m., utilizing Funds resources without the knowledge of the Board of Trustees, as evidenced by thousands of email communications regarding Coalition work and membership. (CSMF ¶¶ 56,57).

Ms. Alongi also engaged other Funds employees in Coalition business, including Ms. Hickey, Rebecca Zacardi ("Ms. Zacardi"), Rosemary Ortega ("Ms. Ortega"), and Taylor Ryan ("Ms. Ryan"). (CSMF ¶ 55). Ms. Alongi delegated her record keeping and regulatory report filing responsibilities to Ms. Hickey and Ms. Zacardi. Ms. Ortega and Ms. Ryan assisted with preparing materials for Coalition meetings, and Ms. Ortega regularly calendared upcoming Coalition

meetings for Ms. Alongi. These employees all testified to working on Coalition matters during the Funds workday. (CSMF ¶ 55).

In 2017, Mr. McLaughlin succeeded Mr. Rasetta as Business Manager and Chairman of the Board. (CSMF ¶ 58). Prior to becoming Business Manager, Mr. McLaughlin had heard from colleagues that they were frustrated that Ms. Alongi arrived to work at 10 a.m. and left around 3 p.m. Although they were required to arrive at 8:00 a.m., and often earlier, they had to wait until Ms. Alongi arrived for the day to discuss concerns or issues with her. (CSMF ¶ 60). Despite having a fine relationship prior to Mr. McLaughlin becoming Business Manager, Ms. Alongi was not happy with the way Mr. McLaughlin carried out his role as Business Manager. (CSMF ¶¶ 58,62). To that end, she called Mr. McLaughlin to a meeting in her office on May 1, 2018 to discuss "respect, money, move, contract, confidentiality" with him. (CSMF ¶ 62). The meeting turned into an altercation, with both Ms. Alongi and Mr. McLaughlin yelling and swearing at one another. During the altercation, Ms. Alongi poked Mr. McLaughlin in the chest. (CSMF ¶ 63).

On May 14, 2018, Ms. Alongi contacted an attorney who had previously done work for the Funds and provided her account of the May 1, 2018 altercation. (CSMF ¶ 66). The attorney told her that what she described constituted sexual harassment or hostile workplace behavior. Ms. Alongi reached out to Gregory Geiman ("Mr. Geiman"), the Associate Administrator (her subordinate), to report what she believed to be sexual harassment. (CSMF ¶ 66). The two decided that Mr. Geiman would reach out to Attorney Shea, in accordance with the Employee Handbook. However, later that same day, Ms. Alongi reached out to Mr. Geiman and told him Mr. McLaughlin's actions were not sexual harassment but rather part of her treatment by the agents as "one of the guys." (CSMF ¶ 66). Ms. Alongi also noted that no other employees had come forward with allegations against Mr. McLaughlin. (CSMF ¶ 66).

Beginning May 16, 2018, Ms. Alongi began asking female employees, except Ms. Hickey, to "tell her all the ways Mr. McLaughlin makes [them] feel uncomfortable." (CSMF ¶ 67). Some employees made statements concerning Mr. McLaughlin's behavior in response to Ms. Alongi's questioning. (CSMF ¶ 71). No employee had previously complained about Mr. McLaughlin's behavior. (CSMF ¶ 68). Per the Handbook, Ms. Alongi was responsible for investigating claims of sexual harassment, yet she had taken no action to investigate Mr. McLaughlin until after May 1, 2018. (CSMF ¶ 69,70).

On May 21, 2018, twenty days after the May 1, 2018 meeting, Ms. Alongi met with Attorney Shea at a coffee shop. (CSMF ¶ 73). Ms. Alongi told Attorney Shea she believed Mr. McLaughlin had sexually harassed her, she had asked other employees about his conduct, and she wanted to move the Funds' offices. (CSMF ¶ 73). That same day, Attorney Shea met with Mr. McLaughlin and told him about Ms. Alongi's allegations and told him about the Funds' zero tolerance policy, and the two decided Mr. McLaughlin would cease touching and informal banter. (CSMF ¶ 73). At Ms. Alongi's request, Attorney Shea also met with Mr. Geiman. Ms. Alongi testified Mr. Geiman told her Mr. McLaughlin was upset and planned to fire her for insubordination.[2] (CSMF ¶¶ 74, 75).

Later on May 21, 2018, Attorney Shea met with Mr. McLaughlin, Ms. Alongi, and Mr. Geiman. During that meeting, Mr. McLaughlin said, "Gina you know I don't sexually harass people." Ms. Alongi replied, "I know, Billy." Mr. McLaughlin went on to assure Ms. Alongi he would not hold the allegations she made had against her and said, "You're a good administrator, and I don't want you to worry about your job." (CSMF ¶ 77). Neither Ms. Alongi nor the Funds

---

[2] Ms. Alongi testified to contacting a second attorney in Rhode Island in the Summer of 2018. (CSMF ¶ 82).

employees could recall Mr. McLaughlin making an inappropriate comment after May 1, 2018. (CSMF ¶¶ 79, 80).

In June 2018, Ms. Alongi requested Mr. McLaughlin provide her with an employment agreement agreeing to employ her until she turned sixty-two (62) years old. (CSMF ¶ 83). After discussing with the senior management trustee, Mr. McLaughlin offered Ms. Alongi a one-year contract with a just cause clause. She countered with a four-year contract and other major changes. Attorney Shea advised against a four-year contract for an ERISA fund. Mr. McLaughlin would have agreed to two years, but Ms. Alongi wanted four years, which was impermissible for an ERISA fund. (CSMF ¶ 84).

During this time, Ms. Alongi and other employees brought their dogs into the office. (CSMF ¶ 85). The dogs caused problems due to their smell, one employee's allergies, and the aggressive nature of at least one of the dogs. (CSMF ¶¶ 86,88). As a result, in November 2018, the building committee decided due to the threat of infection, allergic reactions, and the safety of visitors and employees, dogs would not be permitted in the office. Employees requiring a reasonable accommodation were instructed to contact Mr. McLaughlin. (CSMF ¶ 87).

At the time the policy changed, Ms. Alongi had a dog that she claimed she had trained to detect her blood sugar level, as she was diagnosed with Type One diabetes. (CSMF ¶ 89). However, Ms. Alongi did not have any documentation regarding her dog's status as a service dog, did not identify the dog as a service dog, and did not tell Mr. McLaughlin she required an accommodation related to the dog. (CSMF ¶ 90). Additionally, Ms. Alongi testified that her dog did not travel with her or accompany her to work every day; rather, he came if she was having a bad day or if she planned to go to the Cape after work. (CSMF ¶ 90). When Ms. Alongi was diagnosed with Type One diabetes in 2015, her doctor discussed the option of a continuous glucose

monitor, which would alert her to her blood sugar changing. While Ms. Alongi declined the monitor in 2015, she eventually was prescribed one in 2019. (CSMF ¶ 91).

In January 2020, Mr. McLaughlin requested a meeting with Ms. Alongi, which Attorney Shea attended. During this meeting, Mr. McLaughlin explained he would like Ms. Alongi to come to work when the office opens at 8:00 a.m. (CSMF ¶ 92). Mr. McLaughlin's request stemmed from the Business Agents' frustration regarding when Ms. Alongi arrived at work and the importance of Ms. Alongi being present to supervise her employees. (CSMF ¶ 94). Between 2015 and 2019, Ms. Alongi's average arrival time was never earlier than 9:50 a.m., and one year her average arrival time was 10:58 a.m. (CSMF ¶ 98). Mr. McLaughlin believed it was important for morale and professionalism for Ms. Alongi to arrive when the rest of the employees whom she supervised arrived. (CSMF ¶ 93).

Ms. Alongi initially requested she not be required to come in at 8:00 a.m. because she did not believe it was important for her to come in at 8:00 a.m. because she was "working and on call all the time." (CSMF ¶ 97). However, Ms. Alongi also conceded that she rarely logged into the Funds' VPN to access documents at home. Although Ms. Alongi testified she monitored calls and emails from home, email and telephone records show she rarely made or received work-related emails or telephone calls when not physically present in the Funds' office. (CSMF ¶ 97).

Ms. Alongi testified that during the January 2020 meeting, she requested an accommodation allowing her to come in at 9:15 a.m. to accommodate her insulin schedule for her diabetes management.[3] (CSMF ¶ 95). According to Ms. Alongi, she requires two different types of insulin, including basal insulin, which she injects once per day. Ms. Alongi injects her basal insulin between 8:00 a.m. and 9:00 a.m. every day. (CSMF ¶ 96). When Mr. McLaughlin told Ms.

---

[3] Mr. McLaughlin and the Funds deny Ms. Alongi requested an accommodation, but the allegation is viewed as undisputed for the sole purpose of this summary judgment motion.

Alongi she was expected to arrive at 8:00 a.m. every day, she began bringing her basal insulin to work with her. However, she testified she had difficulty remembering to take her insulin at work because her job involves meetings, calls, and people coming into her office. (CSMF ¶ 100). Ms. Alongi testified that she did not have difficulty remembering to take her basal insulin when she traveled for vacation or business. (CSMF ¶ 102). After her meeting with Mr. McLaughlin, Ms. Alongi arrived at work at or close to 8:00 a.m. for all remaining months that she reported to the office. (CSMF ¶ 98).

In March 2020, the Funds offices closed as a result of the Commonwealth's COVID-19 restrictions and employees began working remotely. (CSMF ¶ 103). Around June 15, 2020, Mr. McLaughlin discussed with Attorney Shea the best way to ensure employees were working at home. (CSMF ¶ 106). Attorney Shea suggested employees keep timesheets and submit them to Mr. Geiman for review. Because Mr. Geiman was Ms. Alongi's subordinate, Attorney Shea suggested Ms. Alongi submit her work records to Mr. McLaughlin for review. (CSMF ¶ 106). In early July 2020, Mr. McLaughlin approached Mr. Geiman to ask about items contained in Ms. Alongi's work records, as they did not seem to record work for the Funds. (CSMF ¶ 107).

After learning that Ms. Alongi was conducting Coalition business on Funds' time, Mr. McLaughlin delegated a fact-finding inquiry to Mr. Geiman and other Funds employees to determine the extent of the problem. (CSMF ¶ 107). The Coalition was compensating Ms. Alongi between $47,000 and $48,000 per year in 2020. (CSMF ¶ 108). Attorney Shea suggested Mr. McLaughlin review Ms. Alongi's Department of Labor timesheets ("DOL timesheets"), which she was required to complete, including designating the entities for which work was completed. (CSMF ¶ 109). When Ms. Alongi and Attorney Shea negotiated the new Shared Services Agreement in 2018-2019, Ms. Alongi failed to disclose to Attorney Shea or the national training

fund that she had not been following the original the agreement and therefore her cost, the highest in the office, was not properly allocated among the funds. (CSMF ¶ 110).

Attorney Shea was informed Ms. Alongi had not been keeping any DOL timesheets and had failed to produce check registers to the Trustees, despite representing to Attorney Shea and to federal regulators since 2012 that she was doing so on a quarterly basis. (CSMF ¶ 109,111). At this time, it came to light that Ms. Alongi had also disclosed confidential information about a recent ransomware attack the Funds suffered, and that she had not been speaking to the Funds' IT consultant (her sister) for many months prior to the ransomware attack. (CSMF ¶ 113). As a result of these breaches of her fiduciary duty to the Funds, the Boards of Trustees of the Health, Pension, and Annuity Funds voted unanimously to terminate Ms. Alongi's employment. (CSMF ¶ 114).

### III.   <u>ARGUMENT</u>

#### 1. **Summary Judgment Standard**

The purpose of summary judgment is to "pierce the pleadings and to access the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations and citations omitted). Pursuant to Mass. R. Civ. P. 56(c), summary judgment should be granted when there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. *See Cassesso v. Comm'r of Correction*, 390 Mass. 419, 422 (1983). "Even in employment discrimination cases, where elusive concepts such as motive or intent are at issue, this standard compels summary judgment if the non-moving party rests merely on conclusory allegations, improbable inferences, and unsupported speculation." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) (internal quotations and citations omitted). To defeat a summary judgment motion, the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co*., 475 U.S. at 586. Instead, the non-moving party must set out "sufficient evidence favoring [it] for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir. 1990) (quotation omitted)

### 2. Ms. Alongi's Hostile Work Environment Claim Fails as a Matter of Law.

#### a. Ms. Alongi's Hostile Work Environment Claim is Barred by the Statute of Limitations.

Summary judgment is proper for Ms. Alongi's hostile work environment claim where Ms. Alongi failed to file a Charge of Discrimination ("Charge") with the Massachusetts Commission Against Discrimination ("MCAD") within 300 days after the alleged act of discrimination. *See Flint v. Boston*, 94 Mass. App. Ct. 298, 303 (2018). Any claims concerning events that occurred prior to November 8, 2019, which was 300 days prior to when Ms. Alongi filed her MCAD Charge, are time barred. In support of her hostile work environment claim, Ms. Alongi asserts the following untimely allegations:[4]

- Mr. McLaughlin regularly discussed with Ms. Alongi his sexual desires and fantasies and what he would like to do to the women in the office sexually.
- Mr. McLaughlin, more than once, told Ms. Alongi he could not concentrate during a Trustees meeting because she "looked so good," he "wanted" her, and he had "such a crush on her."
- Mr. McLaughlin discussed his need for sex and his belief that his wife was not "taking care of him."
- Mr. McLaughlin made statements to the effect of "men are pigs" and "all men think about is sex."
- Mr. McLaughlin visited Rosemarie's office on a regular basis and made sexual comments about women in the office.
- Mr. McLaughlin had an inappropriate sexual relationship with Ms. Hickey.[5]
- Mr. McLaughlin hugged Ms. Alongi and tried to kiss her on the lips after the altercation on May 1, 2018. He told her their fight had gotten him "excited," and he was close to getting an erection.

---

[4] Mr. McLaughlin and the Funds deny Ms. Alongi's allegations, but the allegations are viewed as undisputed for the sole purpose of this summary judgment motion.
[5] There is no evidence substantiating this claim, and both Mr. McLaughlin and Ms. Hickey deny they engaged in any form of relationship.

**b. The Continuing Violation Doctrine is Inapplicable.**

The continuing violation doctrine, "generally permits a plaintiff to [recover] on earlier discriminatory conduct where a later and timely filed charge arises from, or is sufficiently related to, a previous, but otherwise untimely, discriminatory act." *Everett v. 357 Corp.*, 453 Mass. 585, 604 n.24 (2009). The continuing violation doctrine does not apply when a plaintiff knew or reasonably should have known a work environment was "pervasively hostile and unlikely to improve." *Cuddyer v. The Stop & Shop Supermarket Co.*, 434 Mass. 521, 539 (2001). To save her claim from the statute of limitations, Ms. Alongi asserts the following allegations:

- Mr. McLaughlin continued to subject employees to frequent sexual comments well into 2020.
- Mr. McLaughlin continued to visit Ms. Alongi's office and make statements about sex and women's bodies.
- In the last quarter of 2019, in response to Ms. Alongi saying an employee was out due to breast cancer treatment, Mr. McLaughlin said words to the effect of, "are her boobs any good?" and "do you think she'll show me them?"

These allegations fail to save her claim for multiple reasons. First, deposition testimony from Funds employees demonstrates a lack of veracity in the conclusory allegation that Mr. McLaughlin subjected "employees" to sexual comments well into 2020. (CSMF ¶ 79). Multiple employees testified Mr. McLaughlin stopped coming to the Funds office regularly after May 1, 2018 and no individual recalled any inappropriate conduct occurring after that date. Ms. Alongi herself testified she could not recall inappropriate conduct after May 1, 2018, defeating her claim that he continued to visit her office and make sexual comments after May 1, 2018. (CSMF ¶ 80). Second, the employee who underwent treatment for breast cancer in 2019 underwent a procedure in June 2019 and was out of work, but she had returned to work by November 2019. Where Ms. Alongi claims Mr. McLaughlin asked why an employee *was out on leave* before making a crude

comment, and that employee's timesheets indicate she did not take any sick days within the statute of limitations, this allegation does not save Ms. Alongi's untimely claims. (CSMF, ¶ 81).

Furthermore, the earlier allegations put her on notice of potentially violative behavior, as she testified she started the May 1, 2018 meeting by telling Mr. McLaughlin that his behavior was inappropriate, and she investigated his behavior in May 2018.  (CSMF ¶ 64). She alleges several staff members told her Mr. McLaughlin's behavior made them uncomfortable. Additionally, on May 14, 2018, she spoke with a lawyer who told her she had a claim for hostile work environment. (CSMF ¶ 66). After speaking to the lawyer, and prior to speaking with Attorney Shea on May 21, 2018, Ms. Alongi told Mr. Geiman she did not believe the conduct arose to sexual harassment but that she was simply being treated as "one of the guys."  (CSMF ¶ 66). Therefore, she is not entitled to the benefit of the continuing violation doctrine based on one statement she alleges occurred. *See Cuddyer*, 434 Mass. at 541; *see also Lucien v. Conlee*, No. 081066, 2009 WL 3085376, at *3 (Mass. Super. Ct. Sept. 3, 2009) ("If [plaintiff] knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve, she may not claim the benefit of the continuing violation doctrine" [internal quotation omitted]).

### c.  Ms. Alongi's Claim Fails Because She Cannot Demonstrate that the Alleged Harassment was Severe and Pervasive.

Even if Ms. Alongi's claim survives the statute of limitations, which it does not, she has failed to demonstrate that the alleged harassment was severe and pervasive enough to constitute a hostile work environment. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 395 (1st Cir. 2002). A hostile work environment claim is dependent upon a finding that the environment is "pervaded by harassment or abuse," which "result[s] [in] intimidation, humiliation, and stigmatization," such that it poses "a formidable barrier" to an individual's full participation in the workplace. *Bennefield v. Kohl's Dep't Stores, Inc.*, No. 2012 WL 1560407, at *3 (Mass. Super. Ct. Feb. 17, 2012) (citing

*Cuddyer*, 434 Mass. at 532). Courts employ a totality of the circumstances approach to assessing whether a hostile work environment exists, including the frequency and severity of the discriminatory conduct; whether the conduct includes physical threats or humiliation, as opposed to an offensive remark; and whether the conduct unreasonably interferes with the plaintiff's work performance. *See Henry v. Sterling Collision Centers, Inc*., 252 F. Supp. 3d 42, 50 (D. Mass. 2017).

Sporadic comments of a sexual nature are insufficient as a matter of law to establish a hostile work environment, even when an employee is subjected to multiple comments. *See Chamberlain v. 101 Realty, Inc*., 915 F.2d 777, 783 (1st Cir. 1990) (no hostile work environment created by supervisor's five sexual advances toward plaintiff). Additionally, isolated moments of inappropriate touching are insufficient to establish a hostile work environment. *See Ponte v. Steelcase, Inc*., 741 F.3d 310, 320-21 (1st Cir. 2014) (no hostile work environment when supervisor put arm around female subordinate multiple times for up to twenty minutes while driving her, at his insistence, back to his hotel room).

Ms. Alongi's description of alleged conduct falls short of the kinds of actions that support a claim of hostile work environment. She alleges only a few specific, sporadic comments made by Mr. McLaughlin to her, including telling her after one Board meeting that she looked "looked so good" and he "wanted her," and telling her the fight they had got him "excited." These comments do not rise to the level of a hostile work environment. *See Chamberlain*, 915 F.2d at 783. Ms. Alongi's investigation into Mr. McLaughlin's conduct revealed only a few sporadic comments made to other employees. Furthermore, only two employees disclosed physical contact with Mr. McLaughlin, with one describing non-sexual "fist pumps" and the other describing shoulder massages from Mr. McLaughlin. (CSMF ¶ 71).

Taking all the evidence of alleged inappropriate conduct together, it still does not rise to the level of a workplace "pervaded by harassment or abuse." *See Ponte*, 741 F.3d at 320-21. This is particularly true where the previous Business Manager, Mr. Rasetta engaged in inappropriate conduct in the workplace, and Ms. Alongi had a sexual relationship with him and participated in his jokes. (CSMF ¶ 49). As part of this culture, the other women in the office discussed sex and the appearances of men, including men in the office, and Ms. Ryan sent Mr. McLaughlin a video of radio hosts discussing a joke about a sex slave, which was unsolicited and to which he did not respond. (CSMF ¶ 72). Where Ms. Alongi participated in creating the culture at the Funds while Mr. Rasetta was business manager, and the women at the office engaged in inappropriate discussions among themselves and with their male coworkers, her hostile work environment claim fails.

### 3. Ms. Alongi's Quid Pro Quo Sexual Harassment Claim Fails as a Matter of Law Because Mr. McLaughlin did not Condition Her Employment on Her Submission to Sexual Advances.

Quid pro quo sexual harassment under M.G.L. c. 151B, § 1(18)(a) "occurs when a supervisor makes sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when ... submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions." *Cahill v. Silva*, 79 Mass. App. Ct. 1122, at *2 (2011) (quoting M.G.L. c. 151B, §1(18)(a)). To establish a *prima facie* claim for quid pro quo sexual harassment, a plaintiff must show that a supervisor either stated or insinuated that the continuance of the plaintiff's employment hinged on whether the supervisor could continue making sexual advances toward the plaintiff, *see Rodriguez-Vega v. Policlinica la Familia de Toa Alta, Inc*., 942 F. Supp. 2d 210, 230 (D.P.R. 2013), or threatened to punish the plaintiff or withhold a benefit from the plaintiff should the

plaintiff refuse to have sex with the supervisor, *see Martinelli v. Bancroft Chophouse, LLC*, 357 F. Supp. 3d 95, 104 (D. Mass. 2019).

Here, Ms. Alongi has not properly plead a quid pro quo sexual harassment claim. Her claim, in essence, is that she was told not to *report* claims of sexual harassment in exchange for her job. She does not allege her employment was conditioned on submitting to sexual advances by Mr. McLaughlin or continuing to allow Mr. McLaughlin to make sexual advances. *See Rodriquez-Vega*, 942 F. Supp. 2d at 230. To the contrary, Attorney Shea told Mr. McLaughlin he needed to stop making sexual comments at work, and he did stop, as Ms. Alongi herself testified she could not recall Mr. McLaughlin making sexual comments toward her after May 2018. (CSMF ¶ 75,80). Therefore, her claim for quid pro quo sexual harassment fails as a matter of law. *See Rodriguez-Vega*, 942 F. Supp. 2d at 230.

### 4.  Ms. Alongi's Retaliation Claim Fails as a Matter of Law.

Under M. G. L. c. 151B, § 4 (4), it is an unlawful practice, "[f]or any person, employer . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter . . . . "  In considering retaliation claims which lack direct evidence of forbidden motive, the burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) generally governs the analysis. *See Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382, 406 (2016).

If an employee is able to establish a *prima facie* case for retaliation, the employer can rebut the presumption created by the *prima facie* case by "articulat[ing] a legitimate, non[retaliatory] reason for" its employment decision. *Verdrager*, 474 Mass. at 406 (quoting *Esler v. Sylvia-Reardon*, 473 Mass. 775, 780 n.7 (2016)). Finally, at the third stage, the burden of production reverts to the

employee, requiring her to provide evidence that the employer's "'stated reason for [its adverse action] was pretext for retaliating against [her] on account of [her]' protected activity." *Id.*

Ms. Alongi raises numerous actions that do not constitute adverse employment actions.[6] Her employment termination was an adverse action, however it was not based on discriminatory animus. A claim for retaliation requires a causal link between protected conduct and an adverse employment action. *See MacCormack v. Boston Edison, Co*., 423 Mass. 652, 662 n.11 (1996). "The mere fact that one event followed another is not sufficient to make out a causal link." *Id.* (citing *Prader v. Leading Edge Prods*., 39 Mass. App. Ct. 616, 617 (1996)). When a long period of time elapses between the alleged protected activity and the adverse action, the inference of retaliation weakens until it eventually collapses. *See Mole v. Univ. of Massachusetts*, 442 Mass. 582, 595 (2004). Additionally, bad motive cannot be inferred from temporal proximity alone, "especially if the surrounding circumstances undermine any claim of causation." *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 720 (1st Cir. 2014).

Ms. Alongi alleges she engaged in the following protected activity: requesting Mr. McLaughlin cease his inappropriate behavior, reporting the harassment she experienced to Attorney Shea, conducting her own investigation when the Funds would not help her[7], requesting

---

[6] Ms. Alongi alleges adverse actions including a prohibition on bringing her service animal to the office and an alteration of her schedule despite her request for an accommodation. Both allegations are discrimination claims plead incorrectly as retaliation claims. *See Verdrager*, 474 Mass. at 405 ("A claim of retaliation is separate and distinct from a claim of discrimination. An employee bringing a retaliation claim is not complaining of discriminatory treatment as such, but rather of treatment that punishes her for complaining of or otherwise opposing such discriminatory treatment." [internal citations and quotations omitted]). Ms. Alongi's claims regarding her schedule are addressed in Section 4 *infra* regarding allegations of failure to accommodate. Ms. Alongi also alleges the requirement to account for her time in fifteen-minute increments was an adverse action. Where all Funds employees were required to complete the timesheets, Ms. Alongi was supposed to be completing similar timesheets for the DOL, and the timesheet requirement did not affect her salary, grade, or other objective terms and conditions of her employment, there was no adverse action. *See MacCormack v. Boston Edison Co.*, 423 Mass. 652, 663 (1996)

[7] Deposition testimony demonstrates Ms. Alongi conducted her own investigation before she spoke to Attorney Shea about the alleged sexual harassment. (CSMF ¶¶ 73,82).

a reasonable accommodation to bring her medical service dog to the office, and requesting a reasonable schedule accommodation to maintain a regular insulin schedule.

Ms. Alongi's request that Mr. McLaughlin cease his behavior and her investigation into his behavior both occurred in May 2018, which was over two years before her employment termination. (CSMF ¶ 67). Additionally, her alleged request for an accommodation to bring her dog to the office occurred in November 2018, which was well over a year and a half before her employment was terminated. The large gaps in time between these alleged protected activities and Ms. Alongi's employment termination belie a causal connection between the protected activity and the adverse employment action. *See Calero-Cerezo v. United States*, 355 F.3d 6, 25 (1st Cir. 2004*)*. Ms. Alongi's alleged request for an accommodation to come to work late, while closer in time, still occurred over six months before her employment termination. *See Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010) ("[w]ithout some corroborating evidence of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action").

Furthermore, the surrounding circumstances of Ms. Alongi's employment termination clearly undermine her claim of causation. *See Carrero-Ojeda*, 755 F.3d at 720. After her request allegedly was denied, she reported to work on time. Therefore, it is illogical that she would have been terminated for simply making an alleged request six months prior.  In the wake of May 2018, Mr. McLaughlin and the senior management trustee were willing to provide her with a contract that had a just cause clause, indicating a willingness to continue her employment. (CSMF ¶ 84). Notwithstanding Mr. McLaughlin's ongoing support after May 2018, at the time her employment was terminated, the Funds had discovered numerous breaches of Ms. Alongi's fiduciary duty. (CSMF ¶ 113). All contemporaneous communication during that time, and all deposition

testimony clearly indicate the Board was singularly focused on Ms. Alongi's wrongdoing in her role and bore no veiled intent to discriminate. (CSMF ¶ 114). Where there is a significant time gap between protected activity and employment termination, and the surrounding circumstances do not support an inference of retaliation, her retaliation claim fails.

5. **Ms. Alongi's Failure to Accommodate Claim Fails as a Matter of Law.**
   a. **Ms. Alongi's Failure to Accommodate Claim Against Mr. McLaughlin Fails as a Matter of Law Because the Failure to Accommodate Provision of M.G.L. c. 151B Does not Provide for Individual Liability.**

Some provisions, but not all, of M.G.L. c. 151B provide for individual personal liability. *See Beaupre v. Cliff Smith & Associates*, 50 Mass. App. Ct. 480, 491, 491 n.16 (2000). Failure to accommodate claims arise under M. G. L. c. 151B, 4 (16), which does not provide for individual personal liability. *See Morrill v. Lowe's Home Centers, LLC*, No. 1984CV01263, 2022 WL 2168479, *8 (Mass. Super. Ct. Apr. 2022). *See also Melo v. City of Somerville*, No. 18-10786, 2020 WL 6945938, *3 (D. Mass. Nov. 2020) (granting summary judgment on claim of individual liability under 151B, § 4 (16), which does not provide individual liability). Ms. Alongi's failure to accommodate claim against Mr. McLaughlin in his individual capacity fails as a matter of law where M.G.L. c. 151B, § 4 (16) does not provide for individual personal liability.

b. **Ms. Alongi's Disability Discrimination Claim Fails as a Matter of Law.**

In a claim of discrimination where there is no direct evidence of discriminatory intent, the burden-shifting framework discussed in Section 4, *supra*, applies. *See McDonnell Douglas Corp.*, 411 U.S. at 802-05. Under the framework, first, the plaintiff must establish a *prima facie* case of discrimination, as set forth above. *See Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 40 (2005). To state a *prima facie* case of disability discrimination under M. G. L. c. 151B, § 4 (16) based upon a termination due to handicap, the plaintiff must show that (1) she is a 'handicapped;' (2) that she is a 'qualified handicapped person,' meaning she is capable of performing the essential

22

functions of her position with or without reasonable accommodation; and (3) that she suffered an adverse employment action due to her handicap. *See Godfrey v. Globe Newspaper Co., Inc*., 457 Mass. 113, 120 (2010). A "qualified handicapped person" is a "handicapped person who is capable of performing the essential functions of a particular job, or who would be capable of performing the essential functions of a particular job with a reasonable accommodation to [her] handicap." M.G.L. c. 151B § 1 (16). It is the employee's initial burden to produce evidence that a reasonable accommodation exists that would allow her to perform the essential functions of her position. *See Godfrey*, *supra*. As a preliminary matter, "[n]either elimination of an essential duty from a position nor assignment to an unrelated position are reasonable accommodations within the meaning of G.L.c. 151B, § 1." *Id*. at 113. Where regular attendance is necessary for continuity and stability, it constitutes an essential function, *see Sarkisian v. Austin Preparatory Sch*., 85 F.4th 670, 674 (1st Cir. 2023), and a proposed accommodation involving a remote work schedule is not a reasonable accommodation, *see Mulloy v. Acushnet Co*., 460 F.3d 141, 153 (1st Cir. 2006).

The employer then, at the second stage, "can rebut the presumption created by the *prima facie* case by articulating a legitimate, nondiscriminatory reason for its [employment] decision." *Bulwer v. Mount Auburn Hosp*., 473 Mass. 672, 681 (2016) (quoting *Blare v. Husky Injection Molding System Boston, Inc.*, 419 Mass. 437, 441 (1995)). The employer may refute a *prima facie* case for handicap discrimination by showing that the reasonable accommodation identified by the employee would cause an undue hardship. *See Laurent v. United Parcel Service, Inc*., 416 F. Supp. 2d 212, 222 (D. Mass. 2006). "Undue hardships include financial hardships as well as 'accommodations that are unduly extensive, substantially disruptive, or that would fundamentally alter the nature or operation of the business.'" *Id*. at 223 (quoting *Garcia-Ayala v. Lederle Parenterals, Inc*., 212 F.3d 638, 650 (1st Cir. 2000)). An employer may refuse to provide an

accommodation where it "necessitates the substantial modification of employment standards." *Beal v. Selectmen of Hingham,* 419 Mass. 535, 541-42 (1995). Finally, in the third stage, the burden of production reverts to the plaintiff, requiring her to provide evidence that "the [defendant]'s facially proper reasons for its action against [her] were not the real reasons for that action." *Bulwer*, 473 Mass. at 682 (quotation omitted)).

> **i. Ms. Alongi's Disability Discrimination Claim Fails as a Matter of Law Because her Preferred Arrival Time was neither Necessary nor Reasonable.**

Ms. Alongi's failure to accommodate claim fails as a matter of law because she provided no reasonable accommodation to the Funds, and even if she did, the proposed accommodation posed an undue hardship to the Funds. As a preliminary matter, Ms. Alongi's claim that "throughout the course of her employment, [she] would take her morning insulin shot at 8:30 a.m. and be at work by 9:15 a.m." is belied by the records demonstrating that prior to 2020, her average arrival time was never earlier than 9:50 a.m. and in 2015, it was as late as 10:58 a.m. (CSMF ¶ 98).

Ms. Alongi's request to work from home was not a reasonable accommodation where the essential functions of her job required her to be in the office to interface with the employees and union members who might need to speak with her. *See Mulloy v. Acushnet Co.*, 460 F.3d 141, 153 (1st Cir. 2006); *see also Sarkisian*, 85 F.4th at 674. The employees of the Funds Office worked 8 a.m. until 4 p.m., so it was imperative that Ms. Alongi be at work during those times. (CSMF ¶ 92,93). To that end, Mr. McLaughlin believed it was important for the employees working on job sites to see that the requirement to arrive at work on time applied to office workers as well as them, to create a good culture at the union. (CSMF ¶ 93). Ms. Alongi herself testified that her job entailed meetings, calls, people coming into her office. In her own words, her role was "like a job of a

firefighter," which is not conducive to remote work, indicating if she is not present, she is not fulfilling the essential functions of her job. (CSMF ¶ 101). Additionally, the proffered accommodation meant losing more than an hour of the workday, because Ms. Alongi did not have access to the Funds' VPN, so she could not even work on Funds' business at home. (CSMF ¶ 99). A review conducted of Ms. Alongi's email activity between October 20, 2015 until July 22, 2020 shows that Ms. Alongi conducted ninety-one percent (91%) of her email activity between 9:30 a.m. and 3:59 p.m. (CSMF ¶ 97). By her own admission, Ms. Alongi did not access the VPN at home to perform any work on Fund materials, and her lack of email activity before 9:30 a.m. further establishes that she was not working while at home between 8:00 a.m. and 9:15 a.m., as she claimed she had been doing. (CSMF ¶¶ 97,99). Finally, Ms. Alongi failed to show her alleged request for accommodation was necessary, as she did not forget her insulin when she traveled, and in 2020 she began coming to work far closer to 8:00 a.m. (CSMF ¶ 98). Where Ms. Alongi's role required her to be present, and she presented no evidence she was fulfilling her responsibilities during the hours she spent at home, she fails to state a *prima facie* case for discrimination.

### ii. Ms. Alongi's Disability Discrimination Claim Fails as a Matter of Law Because Her Requested Accommodation Posed an Undue Hardship to the Funds.

Even if Ms. Alongi's request to arrive at work at 9:15 a.m. were considered a necessary and reasonable accommodation, the Funds were not required to grant it because it posed an undue hardship to their operations for their Administrator to arrive late each day. Where the nature and operation of the Funds business were to provide information and assistance to the Fund and Union employees, it would fundamentally alter that operation to allow the Funds Administrator to not be present during the critical morning hours. *See Laurent*, 416 F. Supp. 2d at 223. Allowing Ms. Alongi to work an abbreviated schedule would have constituted a substantial modification of the

Funds' employment standards, posing an undue hardship to the operation of the business. *See Beal*, 419 Mass. at 541-42. Also, Ms. Alongi demonstrated from January 2020 until the COVID lockdown in March 2020 that she could and did arrive on time. Finally, Ms. Alongi's claim principally fails because she cannot demonstrate that her employment termination was driven by discriminatory animus. *See Bulwer*, 473 Mass. at 682. Ms. Alongi has put forward no evidence to meet her burden of showing discriminatory animus. To the contrary, as discussed above, contemporaneous communication and deposition testimony shows Ms. Alongi's termination was based on her numerous breaches of fiduciary duty. (CSMF ¶ 113-115).

6. **Ms. Alongi's Interference of Rights Claim Fails as a Matter of Law Because the Funds were Obligated to Bring Suit Against Ms. Alongi Pursuant to their Fiduciary Duties.**

To establish a claim for interference of rights pursuant to M.G.L. c. 151B, § 4 (4A), Ms. Alongi is required to show the defendants coerced, intimidated, threatened, or interfered with her exercise or enjoyment of a right provided by M.G.L. c. 151B. "Where the alleged retaliatory act is the filing of a lawsuit, however, the scope of § 4(4) and 4(4A) are bounded by State and Federal constitutional rights to seek judicial resolution of disputes." *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 709 (2011). A lawsuit against an employee who seeks a remedy under c. 151B is constitutionally protected so long as it is based in law and fact.  *See Sahil v. Bull HN Info. Sys., Inc.*, 437 Mass. 696, 704-05 (2002). In *Sahill*, the Court opined that "although the interest in remedying discrimination is weighty, it is not so weighty as to justify what amounts to an absolute restriction on an employer's right to petition the courts."  *Id*. at 702.

The Employee Retirement Income Security Act of 1974 ("ERISA") provides that:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority to control respecting management or disposition of

its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). An ERISA fiduciary "must employ within the defined domain 'the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use.'" *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 18 (1st Cir. 1998), *citing* 29 U.S.C. § 1104(a)(1)(B). As a fiduciary, Ms. Alongi was also required to act "solely in the interest of the participants and . . . for the exclusive purpose of providing benefits to the participants and their beneficiaries." *See* 29 U.S.C. § 1104 (a) (1).

Where the Funds' suit against Ms. Alongi has a legitimate basis in law and fact, her claim for interference of rights fails as a matter of law. *See Sahil*, 437 Mass. at 704-05. Ms. Alongi committed numerous breaches of fiduciary duty, which are documented through deposition testimony and discovery responses. Without reiterating each breach, Ms. Alongi's most glaring breach of fiduciary duty was the work she completed, and required other Funds employees to complete, for the Coalition during her working hours, thus diverting Funds' assets to the Coalition. (CSMF ¶ 113-115). The Funds do not need to prove Ms. Alongi breached her fiduciary duty to defeat her claim for interference of rights. *See Sahil*, 437 Mass. at 704. Rather, Ms. Alongi's claim fails because the Funds' suit had a legitimate basis in fact and law due to her violations of various ERISA provisions and the remedies provided by ERISA. *See id.* at 704-05. The legitimacy of the Funds' suit is evidenced by the fact that Ms. Alongi was unable to even seek dismissal under Rules 12 or 56 of the Federal Rules of Civil Procedure.

## IV.   <u>CONCLUSION</u>

The Funds and Mr. McLaughlin respectfully submit that the undisputed facts established herein show that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law on all claims.

Respectfully submitted,
Defendants-in-Counterclaim,

IUOE LOCAL 4 HEALTH AND
WELFARE FUND, IUOE LOCAL 4
PENSION FUND, IUOE LOCAL 4
ANNUITY AND SAVINGS, HOISTING
AND PORTABLE ENGINEERS LOCAL 4
APPRENTICESHIP AND TRAINING
FUND, JOINT LABOR-MANAGEMENT
COOPERATION TRUST, and WILLIAM
D. MCLAUGHLIN

By their attorneys,

*/s/ Jennifer L. Markowski*
Jennifer L. Markowski, BBO# 655927
Katherine C. Chenail, BBO#710835
**FREEMAN MATHIS & GARY, LLP**
60 State Street. Suite 600
Boston, MA 02109
Tel:  (617) 963-5975
*jmarkowski@fmglaw.com*
*kcchenail@fmglaw.com*

*/s/ Charles W. Gilligan*
Charles W. Gilligan, pro hac vice
Jennifer Simon, pro hac vice
Daniel Keenan, pro hac vice
**O'DONOGHUE & O'DONOGHUE**
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Tel:  (202) 362-0041
*cgilligan@odonoghuelaw.com*
*jsimon@odonoghuelaw.com*
*dkeenan@odonoghuelaw.com*

Dated: December 8, 2023

## <u>CERTIFICATE OF SERVICE</u>

I, Katherine C. Chenail hereby certify that I have, on this 8th day of December 2023, served a copy of the foregoing document, by causing a copy thereof, to be sent electronically, through the ECF system, to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF).


/s/ *Katherine C. Chenail*
Katherine C. Chenail