UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>GINA ALONGI,<br><br>Defendant. | Civil Action No. 1:21-cv-10163-FDS |

**DEFENDANT GINA ALONGI'S OPPOSITION TO**
**DEFENDANTS-IN-COUNTERCLAIM'S MOTION FOR SUMMARY JUDGMENT**

Armed with nothing more than misstatements of relevant facts and misapplication of relevant law, defendants-in-counterclaim IUOE Local 4 Health and Pension Fund, IUOE Local 4 Annuity and Savings Fund, IUOE Local 4 Health and Welfare Fund, Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund, IUOE Local 4 Labor-Management Co-Operation Trust (collectively, the "Funds"), and William D. McLaughlin (jointly, with the Funds, the "Counterclaim Defendants") ask this Court to dismiss all of plaintiff Gina Alongi's counterclaims against them. But, at a minimum, the record reflects numerous disputes of material fact that doom the Counterclaim Defendants' motion for summary judgment, and indeed raise the specter that the motion itself was not brought in good faith. Try as they might, the Counterclaim Defendants cannot escape the unavoidable: a jury must decide whether Mr. McLaughlin's sexually predatory behavior and his violent and transparently retaliatory reaction to being called out on it create legal liability for him and the Funds. In further support of her Opposition, Ms. Alongi states as follows.

-1-

**Relevant Factual Background**

Ms. Alongi incorporates by reference her responses to Counterclaim Defendants' Statement of Material Facts ("RSOF") as well as her Statement of Additional Facts ("SAF"), filed separately herewith and referenced as appropriate throughout this Opposition.

**Argument**

Summary judgment is appropriate only when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Roach* v. *Green*, 2016 WL 1254236, at *2 (D. Mass. Mar. 29, 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). This Court "must accept the properly documented facts in the light most favorable to the nonmovant, resolving all genuine conflicts in [her] favor." *Ring* v. *Sokolove*, 2014 WL 1117859, at *1 (D. Mass. Mar. 18, 2014) (quoting *Conward* v. *Cambridge Sch. Comm.*, 171 F.3d 12, 18 (1st Cir. 1999)) (internal quotations omitted). Thus, to prevail on their Motion for Summary Judgment, the Counterclaim Defendants would have to demonstrate that their one hundred fifteen (115) alleged statements of fact filed with their Motion are in fact undisputed and that they are otherwise entitled to judgment as a matter of law.

The Counterclaim Defendants fall far short of this standard. Not only are many of the Counterclaim Defendants' alleged "facts" disputed, but also they are demonstrably untrue in many respects. *See generally,* Plaintiff-in-Counterclaim Gina Alongi's Response to Defendants-in-Counterclaims' Concise Statement of Material Facts of Record ("RSOF"). Moreover, the additional facts that Ms. Alongi has submitted with her response further rebuke the Counterclaim Defendants' purported showing. At a minimum, the voluminous record in this matter reflects disputed questions of fact which preclude the Counterclaim Defendants' Motion For Summary

Judgment because "a reasonable jury could return a verdict for" Ms. Alongi on her claims. *Roach*, 2016 WL 1254236, at *2 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986)).

## I.  MS. ALONGI'S HOSTILE WORK ENVIRONMENT CLAIM IS NOT TIME-BARRED.

Contrary to the Funds' assertion, Ms. Alongi's hostile work environment claim is not time-barred. Well settled law confirms that, under the continuing violation theory, "a plaintiff who demonstrates a pattern of sexual harassment that creates a hostile work environment and that includes conduct within the [administrative] statute of limitations, may claim the benefit of the continuing violation doctrine and seek damages for conduct that occurred outside the limitations period." *See Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 539 (2001).

The continuing violation theory applies to Ms. Alongi's hostile work environment claim, and the Counterclaim Defendants simply misstate and misapply the relevant law. Indeed, the Counterclaim Defendants focus on whether Ms. Alongi was "on notice of potentially violative behavior" prior to November 8, 2019. *See* Memorandum at p. 16. But the Supreme Judicial Court expressly rejected such a test in *Cuddyer*. *See id.* at 539-540 (declining to adopt a test that "speaks in terms of a plaintiff's 'awareness' that she was being discriminated against, and would deny a plaintiff damages for unlawful conduct falling outside of the statute of limitations period if, at the time the conduct occurred, she had notice that she had an actionable claim."). Instead, under *Cuddyer*, a plaintiff may invoke the continuing violation theory to recover for acts of sexual harassment occurring outside of the 300-day limitations period "unless the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve, and, thus, a reasonable person in her position would have filed a complaint with the MCAD before the statute ran on that conduct." *Cuddyer*, 434 Mass. at 539.

Under this standard, the continuing violation doctrine applies to all of Ms. Alongi's harassment allegations against Mr. McLaughlin, whether occurring before or after November 8, 2019. As set forth below in Section II, Ms. Alongi has demonstrated a pattern of sexual harassment by Mr. McLaughlin that creates a hostile work environment. The Counterclaim Defendants falsely describe Ms. Alongi's deposition testimony when they assert that she did not identify any boorish conduct from Mr. McLaughlin that occurred after May 1, 2018. *See* Memorandum at p. 15. In fact, Ms. Alongi has stated unequivocally that a month or two after Mr. McLaughlin's violent outburst on May 1, 2018, he began to regularly visit her office again and make the same type of inappropriate, harassing comments to her that sparked the May 1 incident; these comments continued "well into 2020." RSOF ¶ 80. Indeed, she further testified that she discussed Mr. McLaughlin's ongoing improper behavior with Mr. Geiman, who responded that Mr. McLaughlin "is never going to learn." RSOF ¶ 80. Taking these facts in the light most favorable to Ms. Alongi, a jury certainly could find that at least one incident contributing toward her hostile work environment occurred on or after November 8, 2019 and thus allow her to recover for Mr. McLaughlin's acts of sexual harassment that occurred prior to that date.

Further, a jury could reasonably find that Ms. Alongi should not have known that her work situation was pervasively hostile and unlikely to improve, given the circumstances at the time she reported Mr. McLaughlin's conduct in 2018. Indeed, when Ms. Alongi brought Mr. McLaughlin's conduct forward, the Funds' own attorney, Ms. Shea, not only (incorrectly and irresponsibly) informed her that Mr. McLaughlin's conduct was not actionable, but also she threatened Ms. Alongi--with McLaughlin himself sitting in the meeting--that the Funds would terminate her employment for insubordination if she continued to pursue her allegations and that Mr. McLaughlin would apologize to her if she stopped pursuing her allegations. *See* Plaintiff-in-

Counterclaim's Statement of Additional Facts That Preclude Summary Judgment ("SAF") ¶¶ 42. Considering the "legal opinion" from Ms. Shea, the express threat of termination, and the hope of a possible apology from Mr. McLaughlin, a jury could reasonably find that Ms. Alongi was "left . . .with the sense that conditions might improve if she kept a low profile," rather than pursuing immediate legal action against the Funds, which is sufficient to invoke the continuing violation doctrine.  *Cuddyer*, 434 Mass. at 540.  Accordingly, at a minimum, there exists a genuine dispute of material fact as to whether the continuing violation doctrine should apply to all of Rose's allegations of conduct by Mr. McLaughlin prior to November 8, 2019.

Indeed, as the Counterclaim Defendants well know, the Massachusetts Superior Court already has rejected their timeliness argument under virtually identical facts. In the action that Ms. Alongi's twin sister, Rosemarie Alongi, filed in Norfolk Superior Court arising out of the same behavior, the Counterclaim Defendants made the identical arguments about timeliness that they make here, and the Court rejected them entirely. *See* Order on Defendants' Motion for Summary Judgment (No. 18), *Alongi* v. *IUOE Local 4 Health & Welfare Fund, et al.,* Norfolk Superior Court No. 2182-CV-00125, attached as Exhibit A (the "State Court Decision"), at p. 1. That the Counterclaim Defendants would make those arguments for a second time, in a different forum, without so much as acknowledging the Norfolk Superior Court's prior ruling, at a minimum, suggests  bad faith litigation tactics designed solely to multiply proceedings and increase Ms. Alongi's litigation costs. The Court should not countenance this vexatious behavior.

## II. MR. MCLAUGHLIN'S BEHAVIOR CREATED A SEXUALLY HOSTILE WORK ENVIRONMENT.

There is also more than ample evidence that Mr. McLaughlin[1] and the Funds subjected Ms. Alongi to severe and pervasive harassment sufficient to sustain a hostile work environment claim. An actionable hostile work environment is one "that is pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace." *Cuddyer*, 434 Mass. at 532. The record, viewed in the light most favorable to Ms. Alongi, demonstrates that Mr. McLaughlin sexually harassed female employees from the time he assumed the role of Chairman until the day that Funds staff were instructed to work from home due to COVID-19.  Mr. McLaughlin would frequently visit with Ms. Alongi, and other female employees, making sexual comments, commenting on their bodies, their appearance, their clothing and, at times, various sexual acts and positions. Among Mr. McLaughlin's sexually predatory actions are the following:

- Mr. McLaughlin would routinely enter Ms. Alongi's office, and the offices of other women (including her twin sister, Rose), to discuss women in the office he thought were sexually attractive, sexual acts he performed with previous girlfriends, sexual encounters with women he met on the road or in bars, and sexual positions that he liked, and to complain about his sexual relationship with his wife, SAF ¶¶ 15, 17, 26, 27, 49, 51;

- Mr. McLaughlin would routinely make comments about Ms. Alongi's, and other women's outfits and body, SAF ¶ 15;

- Immediately following his verbal (and nearly physical) assault against Ms. Alongi on May 1, 2018, Mr. McLaughlin attempted to apologize to Ms. Alongi by hugging her and attempting to kiss her on the lips. He also told

---

[1] Ms. Alongi is pursuing her claims under G.L. c. 151B against Mr. McLaughlin, individually, as well as against the Funds. Except with respect to the failure to accommodate claim, Memorandum at p. 22, the Counterclaim Defendants make no argument that Mr. McLaughlin's liability is not co-extensive with the Funds'. Moreover, on the facts viewed in the light most favorable to Ms. Alongi, Mr. McLaughlin can be personally liable for interfering with Ms. Alongi's right to a reasonable accommodation. *See Kleya* v. *Karl Storz Endovision, Inc.*, 385 F. Supp. 3d 99, 105, n. 3 (D. Mass. 2019) (noting that an individual may be liable under G.L. c. 151B, § 4(4A) for interfering with an employee's right to an accommodation).

- her that the fight had gotten him "excited" and sexually "aroused." SAF ¶ 23; and

- Other employees complained to Ms. Alongi about Mr. McLaughlin's sexually-offensive behavior, and they have described Mr. McLaughlin's sexually inappropriate behavior both to Ms. Alongi in real-time and in sworn testimony as part of this lawsuit. SAF ¶¶ 25-27.

Without question, Mr. McLaughin's conduct directed at other female employees and contemporaneously known to Ms. Alongi contributed to her hostile work environment claim. In *Cuddyer*, the Supreme Judicial Court provided that:

> In addition to the conduct directed at the plaintiff, which has been described, other conduct in her workplace may be presented to the jury. . . . acts of sexual harassment directed against others that were known to the plaintiff, and the defendant's failure to discipline anyone for the acts, or effectively to remedy them, may be considered part of the environment in which the plaintiff worked.

*Cuddyer*, 434 Mass. 521 at 541 (internal citation omitted). Here, the acts of sexual harassment directed against others that were known to Ms. Alongi, and the Funds' failure to discipline anyone for the acts or effectively remedy them are eminently relevant. As set forth above, Mr. McLaughlin's harassment of Ms. Alongi's twin sister, Rose, and other female employees—and Attorney Shea's refusal to investigate the same—was discussed and contemporaneously documented by Mr. Geiman in his own notes. *See* RSOF ¶¶ 63, 70; SAF ¶¶ 16, 24. Mr. Geiman's own words contained in these notes establish that the Funds made <u>no effort</u> to ensure a workplace free of Mr. McLaughlin's unwanted sexual comments and advances. *See* SAF ¶¶ 16, 24. In summary, Mr. McLaughlin's sexual harassment – known to Ms. Alongi – of herself and numerous female staff, including her twin sister Rose, was severe, pervasive, constant, and continuous. Indeed, the Norfolk Superior Court concluded—again under virtually identical facts—that "[a] reasonable factfinder who believes [the plaintiff's] allegations could find this conduct sufficiently severe and pervasive to comprise a hostile work environment." State Court

Decision at p. 1. In the instant case as well, a jury must decide Mr. McLaughlin's, and the Funds', legal responsibility for this behavior.

### III. MR. MCLAUGHLIN'S CONDUCT, AND MS. SHEA'S EXPRESS THREAT OF TERMINATION, ALSO CONSTITUTES QUID PRO QUO SEXUAL HARASSMENT.

As the Counterclaim Defendants readily acknowledge, *quid pro quo* sexual harassment under G.L. c. 151B, § 1(18)(a) "occurs when a supervisor makes sexual advances . . . and other verbal or physical conduct of a sexual nature . . . either explicitly or implicitly a term or condition of employment or . . . a basis for employment decisions." Motion at p. 18 (quoting *Cahill* v. *Silva*, 79 Mass. App. Ct. 1122, at *2 (2011)). But then the Counterclaim Defendants utterly fail to apply that standard of law to the facts of this case. Ms. Alongi met with Mr. McLaughlin and Ms. Shea in the wake of Mr. McLaughlin's violent outburst on May 1, 2018 and Ms. Alongi's subsequent complaint to Ms. Shea about his behavior. SAF ¶ 42. In this meeting, Ms. Shea (wrongly) informed Ms. Alongi that she could be terminated for insubordination but that the Funds would hold off on such an (illegal) action if Ms. Alongi simply would keep quiet about her allegations of sexual harassment. SAF ¶ 42. In other words, <u>Ms. Shea expressly conditioned Ms. Alongi's continued employment to her acceptance of Mr. McLaughlin's continued lecherous behavior.</u> That is the *sine qua non* of a *quid pro quo* harassment claim. As with Ms. Alongi's hostile work environment claim, it is for the jury to decide the Counterclaim Defendants' legal responsibility for Mr. McLaughlin's continued sexually-abusive conduct.

### IV. MR. MCLAUGHLIN RETALIATED AGAINST MS. ALONGI AFTER SHE CALLED HIM OUT ON HIS SEXUALLY PREDATORY BEHAVIOR.

To succeed on her claim for retaliation under Chapter 151B, Ms. Alongi must prove three elements: (1) she engaged in activity protected by the statute; (2) she sustained an adverse employment action; and (3) a causal connection existed between the protected activity and the

adverse employment action. *See Green* v. *Harvard Vanguard Med. Assocs., Inc.*, 79 Mass. App. Ct. 1, 14, (2011).  Under Massachusetts law, a plaintiff can establish causation by showing that "the employer's articulated justification [for the termination] is not true but a pretext." *Bulwer* v. *Mount Auburn Hosp.*, 473 Mass. 672, 681 (2016).

Here, Ms. Alongi engaged in protected activity including, but not limited to: requesting Mr. McLaughlin cease his inappropriate behavior; reporting the harassment she faced to Attorney Shea; conducting her own investigation when the Funds would not help her; requesting a reasonable accommodation to bring her medical service dog to the office; and requesting a reasonable schedule accommodation to maintain a regular insulin schedule; and filing claims of discrimination with the MCAD and in Superior Court. *See* Memorandum at p. 21; SAF ¶ 97. The Funds knew of Ms. Alongi's protected activity and acted adversely against her when, among other things, Mr. McLaughlin prohibited Gina from bringing her service animal to the office, altered Gina's schedule despite her request for an accommodation for her disability, requested that she account for her time in 15-minute increments, ultimately terminated her employment, and then filed the meritless federal court suit against her.  These adverse actions were in direct response to Gina's protected activity.

The Counterclaim Defendants argue that the span of time between Ms. Alongi's protected activity and the multiple adverse actions taken against her somehow negate an inference of retaliatory causation. *See* Memorandum at p. 20-22. But, again, the Counterclaim Defendants ignore  binding Massachusetts precedent. The Supreme Judicial Court has found that an employee may establish a retaliation claim, particularly for purposes of summary judgment, where a "pattern of retaliatory conduct [began] soon after [the protected activity] and only culminate[d] later in actual adverse action," even if that adverse action occurs *years* after the

protected activity (indeed, in *Verdrager* itself, the protected activity occurred three years prior to the adverse action). *See Verdrager*, 474 Mass. at 407 (internal quotations omitted, alterations in original).

The instant case falls squarely within the lessons of *Verdrager*. Without question, Mr. McLaughlin harbored a retaliatory animus against Ms. Alongi as a result of her confronting him about his lecherous behavior. The best evidence of this retaliatory animus is Mr. McLaughlin's <u>unhinged and physically violent reaction during the May 1, 2018 meeting</u>. *See* SAF at ¶ 20. His immediate reaction was to ball his fists in Ms. Alongi's face and begin shouting at Ms. Alongi about her purported failure to "respect" him. *See* SAF at ¶ 20. Indeed, Mr. McLaughlin's behavior was so volatile and violent during this meeting that other staff considered requesting police intervention. *See* SAF at ¶ 21.

And that was not the only example of the Counterclaim Defendants' explicit retaliatory animus. Shortly after Ms. Alongi informed Ms. Shea of her concerns, Ms. Shea convened a meeting among herself, Mr. McLaughlin, and Ms. Alongi. In this meeting, Ms. Shea <u>expressly threatened Ms. Alongi with termination if she did not stop making allegations of sexual harassment</u> as Mr. McLaughlin sat idly by. *See* SAF at ¶ 42.

Over the ensuing months, Mr. McLaughlin contrived numerous ways to punish Ms. Alongi for daring to stop him from treating the women in the Funds' office as objects. In November 2018, he abruptly—and with no explanation—denied Ms. Alongi the ability to bring her service animal into the office, even after Ms. Alongi specifically requested this as an accommodation; indeed, Mr. McLaughlin's response to Ms. Alongi's request was "I don't care what the law says," or words to that effect. *See* SAF at ¶ 57. In early 2020, Mr. McLaughlin required Ms. Alongi to report to the office each day by 8am, a significant change in her schedule

that impacted her ability to manage her diabetes. *See* SAF at ¶ 58. By June of that year, Mr. McLaughlin was requiring Ms. Alongi to report her time worked in 15-minute increments. *See* SAF at ¶ 67. And, ultimately, on July 22, 2020, Mr. McLaughlin got his final revenge as he orchestrated the termination of Ms. Alongi's employment following a sub rosa internal investigation led by her successor, Mr. Geiman, that she was not even made aware of until after she commenced suit. On top of that – and for good measure -- the Funds summarily terminated the employment of Ms. Alongi's twin sister, Rose, only a few weeks later. *See* SAF at ¶ 87. From this pattern of conduct, a reasonable jury could infer that the Counterclaim Defendants hatched a plan of retaliation beginning on May 1, 2018 and ending with Ms. Alongi's termination (and that of her sister). *See Verdrager*, 474 Mass. at 407.

As detailed below, the justifications offered by the Funds for Ms. Alongi's termination are transparently pretextual. Ms. Alongi was praised for her work for the Funds during her tenure of over four decades, and there is no record of her receiving any discipline or negative performance feedback concerning any of the job performance matters raised by the Funds in the July 21, 2020 meeting minutes. *See* SAF at ¶ 78. The "performance issues" raised by the Counterclaim Defendants (which they communicated to Ms. Alongi only *after* she filed an MCAD Charge in the wake of her termination) are fabricated and contradictory.

1. The Funds Were Well Aware of Gina's Coalition Work

Counterclaim Defendants' assertion that Gina somehow acted wrongfully by working for the Coalition during business hours is specious. Indeed, it is contradicted by the Funds' own open endorsement and appreciation of Ms. Alongi's work for the Coalition during her employment. The Trustees were well aware of and approved of Gina's 13 years of work for the Coalition. SAF ¶ 5. In fact, Mr. Rasetta stated that he would take into account Gina's Coalition

income every year as part of an annual determination of her salary during his tenure as Business Manager. SAF ¶ 5.

Moreover, as detailed above, Ms. Alongi's work for the Coalition benefitted the Funds through her collaboration with other administrators and negotiations of collective discounts, and the Trustees openly acknowledged Ms. Alongi for her contributions to the Funds through her work for the Coalition during her employment. SAF ¶ 71. Further, Gina's work for the Coalition during the business day was typically performed in lieu of the 1-hour break allowed to employees. SAF ¶ 68. Neither Mr. McLaughlin nor anyone else ever indicated to Gina that they had any issue with her—or any other Fund employees—performing work for the Coalition, during the 13 years when this work was being performed in the Fund office. SAF ¶ 73. Mr. McLaughlin's feigned concern about Gina's minimal Coalition work entries on her June and July 2020 time sheets simply is a fabrication invented to cover up the real retaliatory motivation behind her termination.

> 2. Gina's Allocation of Administrative Time Was Supported by the Funds' Accountants.

In yet another desperate attempt to dredge up baseless excuses for Gina's termination, the Funds claim that they terminated Gina for her failure to keep "DOL timesheets" when, in fact, Gina allocated her time according to the advice of the Funds' own outside accounting firm.

By way of background, in 2002, the Department of Labor (DOL) began an investigation into the Funds' allocation of administrative expenses charged to each of the trust funds comprising the Local 4 Funds. *See* SAF at ¶ 80. Prior to the investigation, the Funds' external accounting firm calculated the annual allocation to each Fund; this method predated Gina becoming Administrator and was common practice with many other Taft-Hartley Trust Funds. *See* SAF at ¶ 81. After the DOL investigation concluded in 2004, the Funds negotiated the

Administrative Services Sharing Agreement ("ASSA") which dictated the administrative allocation of expenses incurred by each Fund. *See* SAF at ¶ 81. From that point forward, employees entered daily time allocations into an electronic database which was then distributed to the accounting firm to calculate the appropriate percentage to allocate to each Fund. *See* SAF at ¶¶ 81-82. The accounting firm also calculated Gina's time by interviewing her. *See* SAF at ¶ 81. Initially, the accounting firm calculated the reallocation every six months, retroactively. *See* SAF at ¶ 81. However, over the years, the accounting firm determined that the allocation of administrative fees did not change significantly from year to year unless a large project affected one of the Funds.[2] *See* SAF at ¶ 81. After several years, the Boards of Trustees voted to move to a prospective annual allocation of time and advised the DOL of this change. *See* SAF at ¶ 81.

Ms. Alongi relied on the advice of the external accountants who informed her that their methods of calculating and allocating her time were appropriate, consistent with common practices of other Taft-Hartley Trust Funds, and acceptable by the DOL. *See* SAF at ¶ 82. For the Funds to claim Gina failed to keep accurate timesheets is both fanciful and completely at odds with the advice of their own outside accounting firm.

### 3. Gina Fully Disclosed Financial Records to the Trustees.

The Funds also claim that Ms. Alongi falsified the financial records by failing to submit "check registers" to the Trustees during board meetings. This is yet another obvious effort to invent reasons for her termination after the fact. Ms. Alongi prepared and printed agendas for each of the Trustees' meetings which included financial statements completed by the Funds' in-house accountant. *See* SAF at ¶ 85. These financial statements consisted of a balance sheet, income statement, detailed list of all administrative expenses, and references to the relevant

---

[2] For example, in 2014, Gina spent significant time working on dismantling the claims operation for the Health and Welfare Fund, resulting in an increased allocation for the Health and Welfare Fund.

check register numbers. *See* SAF at ¶ 85. Ms. Alongi did not provide copies of these check registers as it would have generated significant paper that the Trustees did not wish to review. *See* SAF at ¶ 85. However, Ms. Alongi made clear to the Trustees that if they wanted to see any or all of the check registers, she would immediately make them available. *See* SAF at ¶ 85. In over twenty years of Ms. Alongi providing these financial summaries, none of the Trustees ever asked to see any of the check registers. *See* SAF at ¶ 85.

Similarly, at no point did Attorney Shea request to view the check registers or ask Ms. Alongi about them. *See* SAF at ¶ 86. Attorney Shea was present and took minutes at each meeting of the Trustees. *See* SAF at ¶ 86. If Attorney Shea had ever requested to see the check registers, Ms. Alongi immediately would have provided them, but Attorney Shea never asked. Again, the Funds obviously are trying to cobble together an after-the-fact justification for Ms. Alongi's termination that simply does not fit the facts of her actual employment.

    4. <u>The Trustees Had Full Information To Amend the Plan In The Event Of a Member's Medical Emergency.</u>

The July 21, 2020 minutes also reference an incident in March 2020 regarding a member asking for a plan amendment. In short, the Funds in this instance are attempting to find fault with Ms. Alongi for doing her job in carefully considering the administration of the Funds. Ms. Alongi had been employed by the Funds for 42 years and understood well the rules and regulations of the Funds' plan. Over the course of Ms. Alongi's tenure as Administrator, many participants requested that the Funds make an exception to the eligibility rules for a variety of reasons. *See* RSOF at ¶ 113. The Funds now identify a single instance during the COVID-19 pandemic in which Ms. Alongi attempted to find an alternative to amending the plan. When a participant's daughter needed surgery scheduled for five days before he was eligible for benefits, Ms. Alongi was concerned that amending the plan would create a slippery slope for future plan

amendments. *See* RSOF at ¶ 113. She contacted Attorney Lili Sloane at Segal Roitman who shared Ms. Alongi's concerns. *See* RSOF at ¶ 113. Ms. Alongi suggested that one option would be to require the participant to purchase a temporary COBRA plan to cover the period before he became eligible for benefits, but she never stated that this was required by law. *See* RSOF at ¶ 113. The Trustees ultimately ended up disregarding Ms. Alongi's suggestion and amending the plan. *See* RSOF at ¶ 113. As with all of the other "performance issues" raised in the July 21, 2020 minutes, this "issue" also was not raised with Ms. Alongi until after her termination.

### 5. Mr. Geiman Was Responsible For Supervision of the IT Department.

In the July 21, 2020 minutes, the Funds also attempt to blame Gina for a cyber-security incident that occurred in May 2020 (and which, according to the Funds, did not result in any data breach). However, the Funds are well aware that Ms. Alongi did not provide day to day oversight of the IT Department, and that she was not responsible for that as Fund Administrator. *See* SAF at ¶ 84.

As Administrator, Gina had a myriad of duties and responsibilities and delegated responsibilities to Mr. Geiman, the Associate Administrator, including the supervision and evaluation of IT Department employees. *See* SAF at ¶ 84. Due to Mr. Geiman's role as HIPAA Privacy Officer, it made the most sense for Mr. Geiman to work with and supervise the IT Department. *See* SAF at ¶ 84. Ms. Alongi expected that Mr. Geiman would use appropriate judgment and inform her of any significant issues or developments arising from the IT Department. *See* SAF at ¶ 84. The Funds' effort to lay blame for the cybersecurity incident at Ms. Alongi's feet—even going so far as to use it to try to justify her termination—simply reeks of pretext.

For all of the foregoing reasons, Ms. Alongi is entitled to take her retaliation claim to a jury.

## V. THE FUNDS DISCRIMINATED AGAINST MS. ALONGI ON THE BASIS OF HER DISABILITY AND UNLAWFULLY REFUSED HER REQUESTS FOR REASONABLE ACCOMMODATION.

It is undisputed that Gina has diabetes—a chronic health condition which requires daily management—and that the Funds were aware of her condition. Nevertheless, in late 2018, Mr. McLaughlin informed Gina that her service dog would no longer be permitted in the office. *See* SAF at ¶ 57. When Gina requested an accommodation to bring her service dog with her to the office on days that she felt ill, Mr. McLaughlin stated "no dogs in the office, including yours. I do not care what the law says" or words to that effect. *See* SAF at ¶ 57. He provided Gina with no explanation for the change in the policy. *See* SAF at ¶ 57.

Similarly, Mr. McLaughlin unreasonably denied Gina's January 2020 request to continue working on her usual work schedule, which involved taking the first of her two types of daily insulin shots at 8:30 am and arriving at work by 9:15 am. *See* SAF at ¶ 58. Gina specifically requested an accommodation for her diabetes and explained to Mr. McLaughlin how this schedule allowed her to take insulin and change her continuous glucose monitor at specific and uniform times of the day as required. *See* SAF at ¶ 58. Mr. McLaughlin summarily dismissed her request on the spot, without providing any explanation or even attempting to engage in the interactive process. *See* SAF at ¶ 58.

These incidents are violations of the Funds' duty to reasonably accommodate Gina's disability in the workplace. "[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one." *Russell* v. *Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002) (internal quotations omitted). "Once a qualified individual with a disability has requested provision of a reasonable

accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. . .through a flexible, interactive process that involves both the employer and the qualified individual with a disability." *Id.* Mr. McLaughlin made no attempt to engage in an interactive process whatsoever, and unreasonably denied Gina's requests without any basis. The Counterclaim Defendants mere incantation in their Memorandum that Ms. Alongi's requests would have posed an "undue burden" simply is not sufficient to carry their burden of showing that they engaged in an interactive process in good faith. In fact, there was <u>no</u> interactive process from Mr. McLaughlin – he simply denied each of Ms. Alongi's requests for accommodation on the spot and without any explanation. The interactive process requires much more than that, and therefore this Court should deny the Counterclaim Defendants' motion for summary judgment on Ms. Alongi's disability discrimination claims.

### VI. A JURY MUST DECIDE WHETHER MS. ALONGI'S INTERFERENCE CLAIM AGAINST THE FUNDS IS VALID.

As with their attempts to dismiss Ms. Alongi's other claims, the Funds simply misstate the law with respect to her interference claim based on the Funds' transparently retaliatory decision to file a lawsuit against her. Here, the timing is undisputed: the Funds waited *months* after Ms. Alongi's termination to initiate their lawsuit, and they did so only *after* Ms. Alongi had filed a lawsuit against the Funds and Mr. McLaughlin. SAF ¶ 97. In response, the Funds initiated a lawsuit in federal court against Ms. Alongi, raising the same counter-factual arguments they mustered, post-hoc, to try to justify their retaliatory termination of her employment. Transparently, the Funds' lawsuit was an attempt to bully Ms. Alongi into foregoing her valid claims against them and Mr. McLaughlin.

The Funds are correct that, in certain cases, the First Amendment may provide a shield against liability for lawsuits filed in retaliation for an employee's protected activity. *See Sahil* v.

*Bull HN Info. Sys., Inc.*, 437 Mass. 696, 704-05 (2002). To warrant such a shield, however, any such lawsuit must have a "legitimate basis in law and fact." *Id.* In turn, to determine whether a lawsuit has a legitimate basis in fact requires an inquiry into whether a litigant "reasonably" could believe that the facts supported a legal claim asserted. *See id.* at p. 707. The reasonableness of the Funds' purported belief is a quintessential jury question. This Court already decided that numerous disputes of material fact precluded the Funds' attempt to secure summary judgment on their claims against Ms. Alongi. *See* Docket No. 91. Moreover, Mr. McLaughlin's own description of the Funds' litigation strategy smacks of retaliatory intent. In a June 2021 Local 4 Union meeting, Mr. McLaughlin (falsely) described Ms. Alongi's lawsuit against him and the Funds as an act of "vengeance" against them, and in the very next breath announced that the Funds had filed its own lawsuit against Ms. Alongi. *See* SAF ¶ 97. It is rare to find a more direct admission of retaliatory intent. At trial, a reasonable jury may, in fact, reject <u>all</u> of the Funds' factual assertions with respect to their claims against Ms. Alongi and decide that the Funds' lawsuit against Ms. Alongi is precisely the type of "sham" litigation that receives no First Amendment protection. *Sahli*, 437 Mass. at 702. This Court should deny summary judgment on this claim as well.

## Conclusion

For the reasons set forth above, this Court should deny the Counterclaim Defendants' Motion in its entirety.

          Respectfully submitted,
          GINA ALONGI,
          By her attorneys,

          /s/ Robert G. Young
          Timothy P. Van Dyck (BBO # 548347)
          Douglas T. Radigan (BBO # 657938)
          Robert G. Young (BBO # 650541)
          BOWDITCH & DEWEY, LLP
          200 Crossing Boulevard
          Framingham, MA 01702
          Telephone: 617.757.6537
          Facsimile: 508.929.3137
          tvandyck@bowditch.com
          dradigan@bowditch.com
          ryoung@bowditch.com

Date:   January 16, 2024

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

          /s/ Robert G. Young