# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| BOARD of TRUSTEES of the IUOE LOCAL 4 PENSION FUND; BOARD of TRUSTEES of the IUOE LOCAL 4 ANNUITY & SAVINGS FUND; BOARD of TRUSTEES of the IUOE LOCAL 4 HEALTH and WELFARE FUND; BOARD of TRUSTEES of the HOISTING and PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND; INTERNATIONAL UNION of OPERATING ENGINEERS LOCAL 4; IUOE LOCAL 4 LABOR-MANAGEMENT CO-OPERATION TRUST; and IUOE LOCAL 4 SOCIAL ACTION COMMITTEE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| GINA ALONGI, | ) ) |
| Defendant and Counterclaim/ Third-Party Plaintiff, | ) ) ) ) |
| v. | ) ) |
| IUOE LOCAL 4 PENSION FUND; IUOE LOCAL 4 ANNUITY & SAVINGS FUND, IUOE LOCAL 4 HEALTH AND WELFARE FUND; HOISTING AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND; IUOE LOCAL 4 LABOR-MANAGEMENT CO-OPERATION TRUST; and WILLIAM D. MCLAUGHLIN, individually and in his capacity as Chairman of the Boards of Trustees, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Counterclaim/Third-Party Defendants. | ) ) ) ) |

_____

Civil Action No.
21-cv-10163-FDS

**MEMORANDUM AND ORDER ON**
**COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

SAYLOR, C.J.

This is an action arising under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiffs are the Board of Trustees of the IUOE Local 4

Pension Fund (the "Pension Fund"); the Board of Trustees of the IUOE Local 4 Annuity &

Savings Fund (the "Annuity Fund"); the Board of Trustees of the IUOE Local 4 Health and

Welfare Fund (the "Health and Welfare Fund"); the Board of Trustees of the Hoisting and

Portable Engineers Local 4 Apprenticeship & Training Fund (the "Training Fund"); the

International Union of Operating Engineers Local 4 (the "Local"); the IUOE Local 4 Labor-

Management Co-Operation Trust (the "Trust"); and the IUOE Local 4 Social Action Committee

(the "SAC"). The Pension Fund, the Annuity Fund, the Health and Welfare Fund, and the

Training Fund are multiemployer employee-benefit plans. The complaint alleges that defendant

Gina Alongi breached her fiduciary duties during her employment as the Administrator for the

four funds, and as a provider of administrative services to the Local, the Trust, and the SAC.

Alongi has asserted counterclaims and third-party claims against the Pension Fund, the

Annuity Fund, the Health and Welfare Fund, the Training Fund, the Trust, and William

McLaughlin, the Business Manager of the Local and Chairman of various funds.[1] Those

counterclaims allege, in substance, that McLaughlin engaged in sexually-harassing behavior that

---

[1] The named plaintiffs are the Boards of Trustees of the four funds, the Local, the Trust, and the SAC; Alongi has asserted claims against the four funds themselves (but not the Boards of Trustees), the Trust, and McLaughlin (but not the Local or the SAC). *Cf.* WRIGHT & MILLER, 6 Fed. Prac. & Proc. Civ. § 1435 (3d ed.) ("[A] counterclaim or crossclaim . . . must involve at least one existing party."). For the sake of convenience, and unless the context indicates otherwise, this memorandum and order will refer collectively to all the parties other than Alongi and McLaughlin as "the Funds," and will refer to all claims asserted by Alongi as "counterclaims." In addition, again for the sake of convenience, the Funds, the Trust, and McLaughlin will be referred to as "defendants" and Alongi will be referred to as "plaintiff."

created a hostile work environment, that her employers retaliated against her for reporting his harassment, and that they also refused to accommodate her disability as a Type 1 diabetic.

Defendants have moved for summary judgment as to all counterclaims. For the following reasons, the motion for summary judgment will be denied in part and granted in part.

## I.   Background

### A.   Factual Background

Except where otherwise noted, the following facts are undisputed.[2]

#### 1.   The Parties

The Pension Fund, the Annuity Fund, the Health and Welfare Fund, and the Training Fund are multiemployer employee-benefit plans, all of which are subject to the regulatory framework of ERISA. (ECF No. 106, Statement of Material Facts and Responses ("SMF") ¶¶ 1-4). Each fund is financed by contributions made by employers who employ operating engineers pursuant to the terms of a written collective bargaining agreement with the Local. (*Id.* ¶ 6). Each fund is governed by a separate Board of Trustees, which in turn employ staff to perform work for the funds. (*Id.* ¶¶ 13, 15).

Gina Alongi served as Administrator of the Funds from 1996 to July 2020. (*Id.* ¶ 30). The Administrator is appointed by the Boards of Trustees of the Funds and serves as the chief executive officer in charge of day-to-day operations, including overseeing all employees. (*Id.* ¶¶ 23-24). The Administrator also organizes regular meetings to provide various relevant reports to the Funds. (*Id.* ¶¶ 27-28). The role is a full-time position. (*Id.* ¶ 29). Alongi also provided administrative services to the Local, the Trust, and the SAC. (*Id.* ¶ 17).

---

[2] Further facts relevant to this opinion are described in the Court's memorandum and order on plaintiffs' motion for summary judgment. *See Board of Trustees of IUOE Loc. 4 Pension Fund v. Alongi*, 2023 WL 5984520 (D. Mass. Sept. 14, 2023).

In 2007, while employed full-time by the Funds, Alongi became the executive director of the Massachusetts Coalition of Taft-Hartley Funds ("the Coalition").  (*Id.* ¶ 53).  Her duties included conducting meetings, negotiating with service providers, maintaining records, and filing reports with regulatory agencies.  She delegated some of that work to other employees of the Funds.  (*Id.* ¶ 54).

William McLaughlin has served as the Business Manager for the Local since August 2017.  (*Id.* ¶ 58).  During the same period, he has served as the Chairman of the Board of Trustees of the Health and Welfare Fund, the Pension Fund, and the Annuity Fund.  (*Id.* ¶ 59).[3] The Business Manager supervises business representatives, prepares collective bargaining agreements for members, and upholds the bylaws and constitution of the Local.  (*Id.* ¶¶ 21-22).

### 2.      Allegations of Sexual Misconduct Prior to May 2018

Alongi contends that McLaughlin routinely made highly inappropriate and sexually charged comments in the workplace to her, her twin sister Rosemarie Alongi (who was also an employee of the Funds), and other female employees.  (ECF No. 106, Statement of Additional Facts ("SAF") ¶¶ 14-15).

For the purpose of the summary judgment motion, defendants treat the following allegations as undisputed:  that prior to May 2018, McLaughlin regularly discussed with Alongi his sexual desires and fantasies, including with regard to the women in the office; that more than once he told her that he could not concentrate during a Trustees meeting because she "looked so good," he "wanted" her, and he had "such a crush on her"; that he discussed his need for sex and his belief that his wife was not "taking care of him"; that he made statements to the effect of

---

[3] Each Fund has a separate Board of Trustees; the parties do not allege that McLaughlin serves on the Board of Trustees of the Training Fund.  (SMF ¶¶ 13, 59; Supp. App. 105).

4

"men are pigs" and "all men think about is sex"; that he visited Rosemarie Alongi's office on a regular basis and made sexual comments about women in the office; and that he had an inappropriate sexual relationship with another employee, Assistant Administrator Laura-Jean Hickey.  (Mem. at 14; *see also* SAF ¶¶ 15, 17, 26, 27, 49, 51).

### 3.   <u>The May 2018 Incident</u>

On May 1, 2018, Alongi called McLaughlin to a meeting.  Their accounts of that meeting differ.  According to Alongi, she provided McLaughlin with examples of how his behavior made her uncomfortable.  (SMF ¶ 63).  McLaughlin allegedly began to pace in front of her, yell obscenities, and said words to the effect of "you do not respect me, I am the manager!"  (*Id.*).  He allegedly continued to yell and swear at her for approximately ten minutes, to the point where other Funds employees were fearful for her physical safety.  (*Id.*).  One employee, Taylor Ryan, testified at a deposition that she had dialed 911 on her telephone and "had my hand ready to press the button if it was needed."  (Supp. App. at 244).  The fight was reportedly loud enough that employees on the opposite side of the building could hear shouting.  (Supp. App. at 237-38). McLaughlin reportedly stopped when Rosemarie Alongi and Greg Geiman, the Funds' Assistant Administrator, entered Alongi's office and physically separated them.  (SMF ¶¶ 63, 66, 77).

According to Alongi, immediately after the fight, McLaughlin attempted to apologize by hugging her and attempting to kiss her on the lips.  He told her that the fight had gotten him "excited" and sexually "aroused."  (*Id.* ¶ 63).

Defendants contend that both Alongi and McLaughlin became heated during the meeting and that they were swearing at one another.  (*Id.* ¶ 63).  It is undisputed that Alongi told McLaughlin he needed to stop "checking out" women who walked past his office and that she poked him in the chest.  (*Id.* ¶ 64).

### 4.     __The Events After the May 2018 Incident__

The parties further dispute Alongi's actions after the May 1 incident.  Defendants contend that on May 14, 2018, Alongi and Geiman contacted an attorney who had previously worked for the Funds.  (*Id.* ¶ 66; App. 381, 404).  The attorney allegedly opined that McLaughlin's behavior appeared to constitute sexual harassment and suggested that the Funds undertake a third-party investigation.  (*Id.* ¶ 66; App. 381, 404).

It is undisputed that in mid-May 2018, Alongi interviewed several female Funds employees about their experiences with McLaughlin and the ways he made them uncomfortable. (SMF ¶¶ 71; SAF ¶ 25).  Her notes of those interviews indicate that on May 15, 2018, Rosemarie Alongi informed her that McLaughlin would talk about the women with whom he had slept. (SMF ¶ 71).  Another employee allegedly reported that McLaughlin said he was jealous of her ex-boyfriend and called her "sexy."  (*Id.*).  Another said that McLaughlin called her "dear." (*Id.*).  Another allegedly told Alongi that McLaughlin came into her office and gave her massages.  (*Id.*).

On May 21, 2018, Alongi met with Kathryn Shea, outside counsel to the Funds.  (*Id.* ¶¶ 73, 76).  She told Shea that she had been sexually harassed by McLaughlin.  (*Id.* ¶ 73).  She also shared some of the results of her investigation into McLaughlin's treatment of other employees. (*Id.*).

After that meeting, Shea discussed the "zero-tolerance policy" of the Funds with McLaughlin.  (*Id.* ¶ 74).  McLaughlin reportedly indicated that he would behave in a more formal manner moving forward, and that he would refrain from touching employees and avoid informal banter and jokes.  (*Id.*).  According to Shea, she explained to McLaughlin that he could not retaliate against Alongi for reporting him.  (*Id.*).  He expressed no interest in disciplining or firing Alongi, saying she was "a good administrator."  (*Id.*).  According to Alongi, after Shea

spoke with McLaughlin, Geiman came to her office and told her she was going to be fired for insubordination.  (*Id.* ¶ 75).

The parties' accounts of later meetings also diverge.  According to defendants, at a subsequent meeting with Shea and Alongi, McLaughlin stated that "you know I've never sexually harassed anybody in this office . . . or yourself."  Alongi allegedly responded, "I know, Billy, you never did that."  McLaughlin also allegedly assured Alongi that he would not hold the allegations she made against her and that she was a good administrator.  (*Id.* ¶ 77).

According to Alongi, she had a second meeting with McLaughlin and Shea, who informed her that she could be terminated for insubordination and that McLaughlin's conduct did not rise to the level of sexual harassment.  (SAF ¶ 42).  She alleges that Shea told her that if she kept quiet about her allegations of sexual harassment, McLaughlin would apologize, and she would not be terminated.  (*Id.*).

Alongi alleges that after May 2018, McLaughlin continued to regularly visit her office and make unwanted statements about sex and women's bodies.  (*Id.* ¶ 49).  According to Rosemarie Alongi, after May 2018, at least once per week, and sometimes more, McLaughlin would enter her office, stand in front of her desk, and discuss the women in the office, including what they were wearing; tell her that he would like to have sex with the young women in the office; and tell her that those women were "young, hard, and hot."  He also allegedly described sexual acts he performed with previous girlfriends, and stated that he "just cannot behave."  (*Id.* ¶¶ 50-51).

Alongi described an incident in 2019 in which McLaughlin allegedly responded to information that an employee was absent on medical leave for breast cancer by asking "are her tits or boobs any good" and whether Alongi thought "she will show them to me."  (SMF ¶ 81).

He also allegedly discussed "how his wife wasn't taking care of him sexually." (*Id.*). Rosemarie Alongi further alleges that near Christmas 2019, McLaughlin entered her office and stated he would "go to bars at night, meet women, fuck them and then never call them again." (SAF ¶ 52).

### 5.   Alleged Retaliation

#### a.   The Policy Concerning Dogs in the Office

On some occasions during her employment, Alongi and other employees brought dogs to the office. (SMF ¶ 85). In November 2018, the building committee decided that dogs should be precluded from the office due to the odor and at least one incident of a dog scaring a vendor. (*Id.* ¶ 86). On November 9, 2018, a notice went out notifying employees that effective December 1, 2018, pets and other animals would be prohibited from the office. (*Id.* ¶ 87). The notice instructed individuals who required service animals as a reasonable accommodation under the Americans with Disabilities Act to contact McLaughlin. (*Id.*)

Alongi was diagnosed with Type 1 diabetes in 2015. (*Id.* ¶ 89). She contends that her dog was trained to detect different blood-sugar levels, although she acknowledges that it did not go through any kind of training program. (*Id.*). She alleges that she brought her dog to the office only when she was not feeling well or when she was going to Cape Cod after work. (*Id.* ¶ 90). She further alleges that after November 9, 2018, when McLaughlin informed her that her dog would not be permitted in the office, she requested to bring her dog with her to the office on days that she felt ill as an ADA accommodation. (SAF ¶¶ 56-57; Supp. App. 17). She alleges that McLaughlin responded, "no dogs in the office, including yours. I do not care what the law says," or words to that effect. (SAF ¶ 57).

#### b.   The Policy Concerning Arrival Time

In January 2020, during a meeting with Alongi and Shea, McLaughlin requested that Alongi arrive at the office by 8:00 a.m. daily. (SMF ¶ 92). Alongi testified that she requested to

be permitted to arrive at the office at 9:15 a.m., but that McLaughlin denied that request.  (*Id.* ¶ 95).

According to Alongi, she needed to inject her insulin between 8:00 a.m. and 9:00 a.m. (*Id.*).  There is no evidence that Alongi's physician instructed her to do so, or that it was necessary to manage her diabetes; however, there is also no evidence that the Funds requested a letter from her physician.

Prior to the January 2020 meeting, Alongi typically did not arrive at the office by 8:00 a.m.  (*Id.* ¶ 97).  She testified that it was not necessary for her to arrive at that time when she was "working and on call all the time."  (*Id.*).  After the meeting, in January 2020, Alongi testified that she did arrive at the office at 8:00 a.m., but that she often forgot to take her insulin during that period.  (*Id.* ¶ 100).  She testified she did not struggle to remember her insulin when she traveled for vacation or business.  (*Id.* ¶ 102).

### c.    The Ransomware Incident

In March 2020, the offices of the Funds closed due to the COVID-19 pandemic.  (*Id.* ¶ 103).  In May 2020, the Funds were the target of a ransomware attack.  (*Id.* ¶ 104).  They paid a ransom to regain control of their computer system, but apparently no data was compromised. (*Id.*).  It is disputed whether Rosemarie Alongi was acting as IT Director at the time of that incident.  (*Id.* ¶ 105).  It is further disputed whether Alongi had any responsibility for the ransomware attack because of her failure to oversee the IT department and whether she improperly spoke externally about the attack.  (*Id.* ¶ 113; SAF ¶ 84; App. Ex. 33).

### d.    The Inquiry into Alongi's Performance

In mid-June 2020, Funds staff began keeping timesheets to track the hours they worked remotely.  (SMF ¶ 106).  Alongi alleges that McLaughlin reviewed her timesheets, and Geiman reviewed the timesheets of all other staff.  (*Id.*).  According to defendants, Shea recommended

9

that Alongi submit her timesheets to McLaughlin because Geiman was her subordinate.  (*Id.*).

According to defendants, McLaughlin asked Geiman in July 2020 about some of Alongi's work reports and discovered that she was logging Coalition work during her working hours.  (*Id.* ¶ 107).  Alongi disputes that characterization; she contends that since beginning to work for the Coalition in 2007 she made no effort to hide that work.  (*Id.*).  Shortly afterward, Shea allegedly discovered that Alongi had not been completing Department of Labor timesheets.  (*Id.* ¶ 109).  Alongi alleges that she followed Funds' accountants' advice concerning her timesheets.  (*Id.* ¶ 110).

The Funds then conducted an inquiry.  (*Id.* ¶ 112).  On July 21, 2020, the Trustees of the Health and Welfare Fund reviewed Alongi's work performance and concluded that it was unsatisfactory.  (App. Ex. 31).  According to the minutes of the meeting, which were written by Shea, the trustees discussed Alongi's weekly work reports that included work for the Coalition; her lack of daily time sheets; the fact that she improperly committed a credit of $30,000 that belonged to the Local 4 Health Plan to an anticipated expense of the Coalition; and information about the May 2020 ransomware attack she had shared externally, among other issues.  (*Id.*).[4]

### e.    The Termination of Alongi

The Board of Trustees voted to terminate Alongi at the meeting on July 21, 2020.  The minutes of that meeting reflect that the trustees terminated Alongi for several reasons:  "work performance," "waste and potential waste of [p]lan assets," "mismanagement of the Fund Office," "breach of confidentiality," and "withholding information from Trustees."  (*Id.*).  Alongi was terminated that same day.  (App. Ex. 31).

---

[4] Whether Alongi worked for the Coalition during the Funds' normal business hours, rather than working for the sole and exclusive benefit of the Funds, is part of the basis of their complaint against her for breach of fiduciary duty.  *See Board of Trustees of IUOE Loc. 4 Pension Fund v. Alongi*, 2023 WL 5984520, at *10-11 (D. Mass. Sept. 14, 2023).

### f.   The Termination of Rosemarie Alongi

According to Alongi, on July 27, 2020, Geiman began preparing a memorandum concerning Rosemarie Alongi's employment and discussing termination because of the ransomware incident that had occurred in May 2020.  (SAF ¶ 87).  Rosemarie was eventually fired on August 5, 2020.  (Supp. App. 102).  Alongi contends that their alleged performance deficiencies were never raised with either herself or Rosemarie at any time during their employment, nor were they disclosed at the time each was terminated.  (SAF ¶ 88).

### B.   Procedural Background

The Funds filed the complaint in this case on January 29, 2021.  The complaint alleges that Alongi breached her fiduciary duty to the Funds in violation of ERISA, 29 U.S.C. §§ 1101-1114.

Before the Funds filed that complaint, Alongi had filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") on September 3, 2020.  She subsequently withdrew the MCAD complaint pursuant to Mass. Gen. Laws ch. 151B, § 9, and on February 10, 2021, filed a complaint against the Funds, the Trust, and McLaughlin in the Massachusetts Superior Court.

On August 9, 2021, the Court denied Alongi's motion to stay this case pending resolution of her state-court matter.

On January 26, 2023, Alongi filed the counterclaims against the Funds and McLaughlin in this matter.[5]  She amended her counterclaims on April 7, 2023.  The counterclaims assert five counts:  hostile work environment in violation of Mass. Gen. Laws ch. 151B; sexual harassment

---

[5] Again, this memorandum and order uses the term "counterclaims" to refer to the claims asserted by Alongi, some of which are third-party claims against different parties.

in violation of Mass. Gen. Laws ch. 151B; retaliation in violation of Mass. Gen. Laws ch. 151B, § 4(4); failure to accommodate her chronic health condition; and interference with her rights under Mass. Gen. Laws ch. 151B, § 4(4A).[6]

Defendants have moved for summary judgment with respect to each count of the counterclaims.

## II.    <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.*

---

[6] The counterclaim for failure to accommodate does not specify the section pursuant to which it is asserted. (Counterclaims ¶¶ 85-91). As discussed below, that ambiguity may be due to the different sections of Chapter 151B applicable to employer and individual liability. The Court will analyze each count according to the authority cited by the parties. *See Kenney v. Head*, 2011 WL 116856, at *1 n.1 (D.R.I. Jan. 13, 2011) (relying "on the parties' motion papers to limn the claims made in each count.").

at 256-57.

III.    **Analysis**

A.      **Claim for Hostile Work Environment under Mass. Gen. Laws ch. 151B (Count 1)**

1.      **Statute of Limitations**

In Massachusetts, a party alleging discrimination under Chapter 151B "may maintain a civil action only if she has previously filed a timely complaint with the [MCAD]." *Christo v. Edward G. Boyle Ins. Agency*, 402 Mass. 815, 816 (1988). Massachusetts law requires that such a complaint be filed with the MCAD "within 300 days after the alleged unlawful conduct." 804 Mass. Code Regs. 1.04(3).

Plaintiff filed a complaint with the MCAD on September 3, 2020. There is no question that any claim that she may have arising out of events occurring after November 8, 2019—that is, 300 days before the filing of her MCAD complaint—is timely. (Mem. at 14).

a.      **The "Continuing Violation" Doctrine**

Whether plaintiff's claims arising out of events occurring before November 8, 2019, are timely depends on the applicability of the "continuing violation" doctrine.

> The continuing violation doctrine is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors the earlier claims. This ensures that these plaintiffs' claims are not foreclosed merely because the plaintiffs needed to see a pattern of repeated acts before they realized that the individual acts were discriminatory.

*O'Rourke v. City of Providence*, 235 F.3d 713, 732 (1st Cir. 2001) (internal quotations and citations omitted).

Under Massachusetts law, a plaintiff can establish a continuing violation by showing that (1) at least one discriminatory act occurred within the limitation period, (2) the alleged timely

discriminatory acts have a substantial relationship to the alleged untimely discriminatory acts, and (3) earlier violations outside the limitations period did not trigger the plaintiff's "awareness and duty" to assert her rights. *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 642-43 (2004); *see Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 533 (2001) (stating that under Massachusetts law, if conduct that occurred within the statutory period is substantially related to earlier incidents of abuse and substantially contributes to the continuation of a hostile-work-environment, it may constitute an "anchoring" act to make "the entirety of the claim for discriminatory conduct timely").

The continuing violation doctrine may have particular force in the context of a claim alleging a hostile work environment. *Connolly v. Woburn Pub. Sch.*, 659 F. Supp. 3d 92, 121 (D. Mass. 2023). "A hostile work environment constitutes a *pattern of sexual harassment* (these are operative words) that, by its very nature, often is apparent only in hindsight." *Cuddyer*, 434 Mass. at 538. When a plaintiff brings a claim based on an alleged hostile work environment, the limitation period begins to run when "the plaintiff knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve." *Cuddyer*, 434 Mass. at 539. "A plaintiff may be unable to appreciate that [she] is being discriminated against until [she] has lived through a series of acts and is thereby able to perceive the overall discriminatory pattern." *O'Rourke*, 235 F.3d at 732 (internal quotations and citations omitted).

### b.   Whether the Alleged Discriminatory Conduct Continued Past November 2019

Plaintiff contends that the continuing violation doctrine applies because "a month or two after the fight on May 1, 2018, McLaughlin began to regularly visit her office again and make the same type of inappropriate, harassing comments to her that sparked the May 1 incident," and that his "continuous, sexually charged comments continued 'well into 2020.'" (SMF ¶ 80).

Defendants respond that (1) plaintiff fails to allege a specific instance of discriminatory conduct that occurred within the limitations period and (2) earlier allegations alerted her of potentially violative behavior, which triggered the running of the limitations period.  (Mem. 15-16).

Whether a specific act of discrimination occurred within the 300-day time period that is substantially related to prior incidents is disputed.  Plaintiff alleges that certain incidents occurred after May 2018, including (1) sexual advances by McLaughlin toward another employee, including asking her what "[sexual] positions did [she] like"; and (2) sexually charged and inappropriate comments by McLaughlin about an employee on medical leave for breast cancer.  (SMF ¶¶ 79-81; Supp. Aff. 255-56).  It is at least possible, based on the record evidence, that some of that behavior occurred after November 2019.

In addition, Rosemarie Alongi alleged that close to Christmas 2019 (and therefore likely after November 8, 2019), McLaughlin told her that he would "go to bars at night, meet women, fuck them and then never call them again."  (*Id.* ¶ 52).  Such conduct, even though directed at another employee, may be found to be substantially related to the alleged earlier discriminatory acts.  *See Romero v. McCormick & Schmick Rest. Corp.*, 448 F. Supp. 3d 1, 5 (D. Mass. 2020) ("The court finds no requirement in the statutory scheme, case law, or common sense that would preclude a hostile work environment claim because sexual conduct and statements were directed at co-workers only.").

Furthermore, termination or other retaliatory conduct may qualify as an "anchoring act" for purposes of assessing whether a claim is timely.  *See Brader v. Biogen Inc.*, 983 F.3d 39, 64 (1st Cir. 2020) (discussing termination occurring within the statutory period as an anchoring act); *Navarro v. U.S. Tsubaki, Inc.*, 577 F. Supp. 2d 487, 506 (D. Mass. 2008) (determining that plaintiff could "arguably anchor his hostile work environment claim with any of the failure to

promote or transfer allegations that occurred after March 27, 2003"); *Diaz v. Jiten Hotel Mgmt., Inc.*, 671 F.3d 78, 86 (1st Cir. 2012); *Shervin v. Partners Healthcare Sys., Inc.*, 2 F. Supp. 3d 50, 68 (D. Mass. 2014), *aff'd*, 804 F.3d 23 (1st Cir. 2015) ("[T]he paradigm [is] wh[en] plaintiff suffers a number of indignities, the discriminatory animus of which is not clear until a series of such events continue over time or culminate in a discriminatory or retaliatory act for which the plaintiff then seeks relief"). Here, most of the alleged retaliatory conduct, including plaintiff's termination, occurred after November 8, 2019. (SMF ¶¶ 92, 106, 114).

Plaintiff has, at a minimum, raised a genuine issue of material fact regarding whether there was at least one act within the limitations period that was substantially related to earlier events and substantially contributed to the continuation of a hostile-work environment. *See Hussey v. E. Coast Slurry Co., LLC*, 2022 WL 617568, at *7 (D. Mass. Mar. 1, 2022); *Cuddyer*, 434 Mass. 541-42; *Pelletier v. Town of Somerset*, 458 Mass. 504, 520-21 (2010) ("In *Cuddyer*, we emphasized that it is the role of the jury to make critical factual determinations whether events constitute elements of a continuing violation."). Under the circumstances, summary judgment will not be granted to defendants on the ground that no wrongful conduct occurred within the limitations period.

### c.   Whether Plaintiff's Delay in Filing Was Unreasonable

Defendants further contend that the continuing violation doctrine does not apply because plaintiff was on notice of the alleged wrongful acts long before November 8, 2019. (Mem. 15-16). Specifically, defendants contend she should have been on notice of a possible claim no later than 2018, when she told McLaughlin his behavior was inappropriate, discussed his behavior with other employees, and spoke to Shea and another lawyer. (SMF ¶¶ 64, 66).

Under Massachusetts law, a plaintiff who knew, or reasonably should have known, more than 300 days prior to her MCAD filing that "her work situation was pervasively hostile and

unlikely to improve" may not assert a claim for that earlier conduct if "a reasonable person in her position, armed with her knowledge, would have filed a seasonable complaint with the MCAD." *Cuddyer*, 434 Mass. at 541; *Clifton v. Massachusetts Bay Transp. Auth.*, 445 Mass. 611, 619 (2005) (quoting same).

Under Massachusetts law, mere notice or awareness of a possible claim is not sufficient to trigger the running of the limitations period for a hostile-work-environment claim. *Cuddyer*, 434 Mass. at 535-36.[7] Instead, the Massachusetts standard "focuses on the plaintiff's knowledge of the hopelessness of her work environment, and allows her to litigate alleged, otherwise time-barred, acts of sexual harassment unless her delay in initiating the lawsuit, considered under an objective standard, was unreasonable." *Id.* at 537-40. That standard seeks to avoid unfairness to the employee, who otherwise "may be forced prematurely to choose litigation as a remedy," and the employer, who "has a legitimate interest in attempting to resolve allegations of harassment short of time-consuming and expensive litigation." *Id.*, 434 Mass. at 538.

Here, a reasonable jury could conclude that plaintiff was attempting to resolve the issue and avoid "choos[ing] litigation as a remedy" prematurely. *Id.* Plaintiff contacted an attorney about the sexual harassment on May 14, 2018, but then decided to report the conduct to Shea, who allegedly informed her that McLaughlin's conduct did not rise to the level of sexual harassment. (SAF ¶¶ 42, 66). It is undisputed that the employee handbook of the Funds states that "if an employee would like to file a complaint, they may do so by either notifying Gina M. Alongi, Administrator . . . or by contacting Ms. Kathryn S. Shea." (SMF ¶ 69; App. Ex. 3). On

---

[7] The Massachusetts standard is "more favorable to a plaintiff" than the federal standard. *Cuddyer*, 434 Mass. at 540. The federal test "speaks in terms of a plaintiff's 'awareness' that she was being discriminated against and would deny a plaintiff damages for unlawful conduct falling outside of the statute of limitations period if, at the time the conduct occurred, she had notice that she had an actionable claim." *Id.* at 539-40.

May 21, 2018, plaintiff met with Shea and advised her of McLaughlin's allegedly sexually harassing behavior toward herself and other employees.  (SMF ¶ 73).  Shea then met with McLaughlin to discuss the "zero tolerance policy" for sexual harassment and to warn him to engage in appropriate workplace behavior.  (SMF ¶ 74).

In short, a reasonable jury could conclude, under the Massachusetts standard, that plaintiff acted reasonably and hoped that there might be a non-litigation response to resolve the sexually harassing behavior.  *See, e.g.*, *Cuddyer*, 434 Mass. at 540 (finding plaintiff "entitled to the benefit of the continuing violation doctrine to defeat the defendant's motion for summary judgment[ because a] jury could reasonably find that, in 1991 after Arce was fired, the plaintiff might have felt that her problems would cease."); *Brissette v. Franklin Cnty. Sheriff's Off.*, 235 F. Supp. 2d 63, 88-89 (D. Mass. 2003) (finding "plaintiffs could not fairly be said to have been on notice of the 'hopelessness' of their situation before the spring of 1997.  It is undisputed that, even within the generally hostile environment, some positive changes were beginning to take place.").  Plaintiff's behavior during that period may reasonably be thought to reflect behavior by someone who "thought it likely that her discriminatory treatment would cease."  *Shervin v. Partners Healthcare Sys., Inc.*, 804 F.3d 23, 35-36 (1st Cir. 2015).  The "'awareness and duty' to bring suit arises only when the person has good reason to believe that her 'problems would [not] cease.'"  *Id.* (citing *Ocean Spray*, 441 Mass. at 643 then *Cuddyer*, 434 Mass. at 540).

Moreover, "[i]n most instances, the question when a plaintiff knew or should have known of the existence of a cause of action is one of fact that will be decided by the trier of fact."  *Silvestris v. Tantasqua Reg'l Sch. Dist.*, 446 Mass. 756, 767 (2006).  This case is such an instance.  Accordingly, summary judgment will not be granted as to the claim alleging a hostile-work environment on the ground that the claim is untimely.

2.    **Hostile Work Environment**

To prove a claim of hostile work environment, a plaintiff must establish

(1) that she (or he) is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

*O'Rourke*, 235 F.3d at 728.  Defendants contend that plaintiff here has failed to demonstrate that the alleged harassment was severe or pervasive enough to constitute a hostile work environment. (Mem. at 16).

A plaintiff may recover on a theory of hostile work environment when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Noviello v. City of Bos.*, 398 F.3d 76, 84 (1st Cir. 2005).  The harassment must be "objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so."  *Id.* at 92.  Courts must consider the totality of the circumstances, including the frequency, severity, and nature of the conduct and whether it interferes with an employee's work performance, to determine whether the conduct is violative or merely unpleasant in an ordinary way.  *Id.*

Here, a jury could reasonably conclude that plaintiff was subjected to severe or pervasive harassment that, when viewed objectively, was sufficient to interfere unreasonably with her work performance.  *See, e.g.*, *Billings v. Town of Grafton*, 515 F.3d 39, 47-50 (1st Cir. 2008) (reversing summary judgment grant on a hostile work environment claim where a supervisor repeatedly stared at a female employee's breasts); *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 19

19

(1st Cir. 2002) (affirming jury finding of a hostile work environment where plaintiff was "harass[ed] on a daily basis, including humiliating sexual remarks and innuendos," for more than a year); *O'Rourke*, 235 F.3d at 718-20 (reinstating a hostile work environment verdict where one coworker "constantly discussed sexual positions and oral sex," and another made physical contact numerous times, among other things).[8]  Summary judgment as to the claim for hostile work environment will not be granted on the basis that it was not "severe or pervasive."

> **B.    Claim of *Quid Pro Quo* Sexual Harassment under Mass. Gen. Laws ch. 151B (Count 2)**

Count 2 alleges a violation of Mass. Gen. Laws ch. 151B, § 4 for *quid pro quo* sexual harassment.  Chapter 151B defines *quid pro quo* sexual harassment as "when a supervisor makes sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when . . . submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions."  *Cahill v. Silva*, 79 Mass. App. Ct. 1122, at *2 (2011) (quoting Mass. Gen. Laws ch. 151B, §1(18)(a)).

Plaintiff contends that *quid pro quo* harassment occurred when Shea told her that she could be terminated for insubordination, but that the Funds would not pursue such action if she kept quiet about her sexual-harassment allegations.  (Opp. at 8; SAF ¶ 42; Counterclaims ¶ 80).

According to plaintiff, that comment expressly conditioned her continued employment on her acceptance of McLaughlin's continued sexual behavior.  (Opp. at 8; SAF ¶ 42).  Defendants contend that plaintiff has not established a *quid pro quo* claim as a matter of law because her claim is that she was told *not to report* claims of past sexual harassment in exchange for her job,

---

[8] Furthermore, the jury may consider how the conduct directed at other employees and plaintiff's twin sister may have impacted plaintiff.  *Romero*, 448 F. Supp. 3d at 5.

rather than alleging her employment was conditioned on *submitting to* continued sexual advances by McLaughlin.  (Mem. at 19).  However, a reasonable jury could find (1) that Shea explicitly conditioned plaintiff's employment on not reporting past sexual conduct, and (2) that her statement could be reasonably construed as an implied condition of employment to submit to future misconduct without complaint.  *See Cahill*, 79 Mass. App. Ct., at *3; *Valentin-Almeyda v. Municipality of Aguadilla*, 447 F.3d 85, 96 (1st Cir. 2006) (discussing compliance with demands as a condition of avoiding punishment at work).  If proved, that is sufficient to establish a claim for *quid pro quo* sexual harassment under Mass. Gen. Laws ch. 151B, § 4.[9]

In any event, the facts at issue are largely credibility questions for the jury.  Therefore, defendants' motion for summary judgment as to the claim of *quid pro quo* sexual harassment will be denied.

## C.    Claim for Retaliation (Count 3)

Alongi further alleges that defendants took several actions in retaliation for protected activity.  Specifically, she alleges that after she reported the sexual harassment, defendants acted adversely against her by (1) prohibiting her from bringing her dog to the office, (2) altering her work schedule, (3) requiring that she account for her time in 15-minute increments, and (4) terminating her employment.  (Counterclaims ¶¶ 82-83).

Chapter 151B defines the following as "unlawful practice[s]":

For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

---

[9] Defendants further contend that the claim fails because Shea instructed McLaughlin to discontinue his sexual behavior and that he did so.  (Mem. at 19).  At a minimum, whether McLaughlin's sexual behavior at the office actually stopped is genuinely disputed.  (*See* SMF ¶ 78).

. . .

> For any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter, or to coerce, intimidate, threaten or interfere with such other person for having aided or encouraged any other person in the exercise or enjoyment of any such right granted or protected by this chapter.

Mass. Gen. Laws. ch. 151B, § 4(4), (4A); *see Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, 474 Mass. 382, 405 n.33 (2016).

To establish a claim of retaliation under chapter 151B, a plaintiff must show that (1) she engaged in protected conduct, (2) she endured some adverse employment action, and (3) the protected conduct and the adverse action were causally linked.  *See Xiaoyan v. Citizens Bank, N.A.*, 821 F. 3d 206, 218-19 (1st Cir. 2016); *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 707 (2011); *see also Verdrager*, 474 Mass. at 405-07 (describing test as (1) reasonably believing employer engaged in wrongful discrimination, (2) protected activity, (3) adverse action, and (4) evidence that the adverse action was a response to the protected activity).  "To defeat summary judgment, the plaintiff need not prove retaliation by a preponderance of the evidence."  *Planadeball v. Wyndham Vacation Resorts, Inc.*, 793 F.3d 169, 175 (1st Cir. 2015).  "All a plaintiff has to do is raise a genuine issue of fact as to whether [retaliation] motivated the adverse employment action."  *Collazo v. Bristol-Myers Squib Mfg., Inc.*, 617 F.3d 39, 50 (1st Cir. 2010) (alteration in original) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 433 (1st Cir. 2000)).

When assessing allegations of retaliation based on circumstantial evidence, Massachusetts courts employ the *McDonnell Douglas* burden-shifting framework.  *Verdrager*, 474 Mass. at 406; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  Under that framework, to establish a *prima facie* case, a plaintiff must produce evidence that she engaged in protected conduct, suffered an adverse action, and there is a causal connection between the protected conduct and the adverse action.  *See Verdrager*, 474 Mass. at 406.  The

burden then shifts to the employer to state a legitimate, non-retaliatory reason for the adverse

action. *Id.* If the employer meets that burden, the employee must produce evidence that the

employer's "stated reason for [acting against] her was a pretext for retaliating against her"

because of her protected activity. *Esler v. Sylvia-Reardon*, 473 Mass. 775, 780 n.7 (2016). "The

combination of a *prima facie* case of retaliation with a showing of pretext allows a jury to infer

that there was no legitimate explanation for the adverse [employment] decision and that the

employer's true motivation was retaliatory." *Verdrager*, 474 Mass. at 406 (alteration in original)

(quotation marks omitted).

Defendants do not appear to contest that Alongi engaged in protected conduct. (Mem. at

19-22). *See Jacquet v. City of Somerville*, 2020 WL 3545535, at *4 (D. Mass. June 30, 2020)

("Protected activity includes not only the filing of formal charges of discrimination but also

'informal protests of discriminatory employment practices, including making complaints to

management'" (quoting *Fantini v. Salem State Coll.*, 557 F.3d 22, 32 (1st Cir. 2009))). Rather,

they contend (1) that Alongi points to various actions that do not constitute adverse employment

actions and (2) that her termination, although undoubtedly an adverse action, was not based on

discriminatory animus. (Mem. at 20). *See McInerney v. United Air Lines, Inc.*, 463 Fed. Appx.

709, 716 (10th Cir. 2011) ("Termination of employment is clearly an adverse employment

action."); *Osborne-Trussell v. Children's Hosp. Corp.*, 488 Mass. 248, 260, 172 n.12 (2021)

(quoting same).

Defendants' first objection is inapposite. Plaintiff alleges that defendants engaged in a

pattern of retaliatory conduct, rather than a claim that each action itself is a cause of action to be

considered independently. (*See* Opp. at 8-16). As for the second objection, plaintiff must show

that her termination was causally connected to her alleged protected activities. Defendants

23

contend that she has not produced sufficient evidence of that causal connection because of the lengthy period of time between the alleged protected activities and the adverse actions and the surrounding circumstances of her termination.

When a plaintiff presents evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action, a jury may infer that the pattern of retaliatory conduct that began soon after the protected activity and culminated later in actual adverse action demonstrates a causal connection. *Verdrager*, 474 Mass. at 407; *Che v. Massachusetts Bay Transp. Auth.*, 342 F.3d 31, 38 (1st Cir. 2003). The plaintiff in *Verdrager* first engaged in protected conduct two-and-a-half years prior to the adverse action at issue. During that time, there was evidence that plaintiff was "treated differently from similarly-situated male colleagues, that her evaluators may have judged her through the lens of a stereotype, and that Cohen, her boss, tried to undermine her." *Verdrager*, 474 Mass. at 407; *see also Che*, 342 F.3d at 38 (discussing evidence of "disparate and discriminatory treatment" that could ground a causal inference).

Here, the evidence, although disputed, is sufficient to suggest such a pattern when viewed in the light most favorable to plaintiff. The time period between plaintiff's May 2018 activities and the July 2020 termination is slightly less than two-and-a-half years. She alleges that shortly after reporting McLaughlin's behavior to Shea, Shea suggested that she could be terminated for insubordination and met with her to discuss those allegations with McLaughlin present in the room. (SAF ¶¶ 42, 47). Six months later, McLaughlin allegedly told her, "No dogs in the office, including yours. I don't care what the law says," or similar, in response to a requested accommodation. (*Id.* ¶¶ 56-57). Twenty months later, he altered her schedule, also allegedly refusing to engage with a requested accommodation. (*Id.* ¶ 58). Twenty-six months later, he

allegedly reviewed her reported time specifically, and was not interested in reviewing other employees' timesheets.  (SMF ¶ 106; SAF ¶ 67).  Finally, he was an integral part of the decision to terminate her in July 2020.  (SAF ¶ 72).  There is also disputed evidence that McLaughlin continued to make sexual comments to Alongi, her twin sister, and other female employees between May 2018 and July 2020.  (SMF ¶¶ 78, 79, 80, 81; SAF ¶¶ 49-53).

"When examining such evidence, [courts] keep in mind that the *prima facie* case is 'a small showing that is not onerous and is easily made.'"  *Che*, 342 F.3d at 38 (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003)).  The pervasiveness of the alleged discriminatory conduct would allow a jury to infer that a "pattern of retaliatory conduct began soon after the protected activity and only culminated later in actual adverse action."  *Verdrager*, 474 Mass. at 407.

Accordingly, the burden shifts to defendants to provide a lawful explanation for the termination.  Here, they have clearly done so, alleging numerous, non-frivolous breaches of plaintiff's fiduciary duty, such as working on Coalition matters during Funds time; directing Funds employees to perform such work; failing to keep mandatory Department of Labor timesheets; and otherwise failing to fulfill her obligations as Administrator.  (SMF ¶¶ 111, 113). *See generally*, *Alongi*, 2023 WL 5984520.

The burden then shifts back to plaintiff to put forth evidence that those explanations are pretextual.  She has presented evidence that the trustees of the Funds were aware that she was the executive director of the Coalition during her 13-year tenure and that the Coalition work benefitted the Funds.  (SAF ¶ 71).  She alleges that she won a professional award in recognition of her work for both the Funds and the Coalition.  (Supp. App. 6).  She further alleges that she relied on the advice of external accountants to calculate and allocate her time acceptably.  (SAF

¶¶ 80-82).  She alleges her timekeeping was consistent for many years, not questioned by the trustees, nor discussed with her prior to her termination.  (SAF ¶¶ 73, 81-83).  And she disputes defendants' additional allegations of misconduct.  (*See, e.g.*, *id.* ¶¶ 85-86).

That evidence would permit a reasonable inference that defendants' stated reasons for firing plaintiff were pretextual.  Therefore, summary judgment on this claim will be denied.

### D.    Claim for Interference with Protected Rights (Count 5)

Count 5 alleges a violation of Mass. Gen. Laws ch. 151B, § 4(4A) for interference with protected rights.  Under that section, it is unlawful for "any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter."  Mass. Gen. Laws ch. 151B, § 4(4A).

Plaintiff contends that the Funds retaliated against her by filing a claim in federal court on January 29, 2021, after receiving notice of the filing of state-court claims in December 2020. (Counterclaims ¶¶ 92-98).  The Supreme Judicial Court has indicated that the filing of a lawsuit may constitute interference with rights under § 4(4A) under some circumstances.  *Sahli v. Bull HN Info. Sys., Inc.*, 437 Mass. 696, 704-05 (2002).  However, if an employer's "lawsuit has a legitimate basis in law and fact, the employer does not violate the provisions of either § 4(4) or § 4(4A), absent evidence that the employer's purpose is other than to stop conduct it reasonably believes violates the terms of the contract."  *Id.*

There is a "dividing line between 'baseless' or 'sham' litigation, which is not protected by the First Amendment . . . , and those 'reasonably based but unsuccessful lawsuits' that are constitutionally protected and so cannot constitute a violation of § 4(4) or (4A)."  *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 710 (2011).  Here, the Funds' lawsuit for breach of fiduciary duty appears to have a reasonable basis in law and fact.  *See generally*, *Alongi*, 2023 WL 5984520. As a fiduciary, plaintiff was required to act "solely in the interest of the participants and . . . for

26

the exclusive purpose of providing benefits to participants and their beneficiaries." *See* 29 U.S.C. § 1104(a)(1).  The Funds have marshalled sufficient evidence to the case to proceed to a trial on that claim.

Moreover, plaintiff's evidence that the lawsuit was brought for an improper purpose is not sufficient to avoid summary judgment.  (*See* Opp. at 18).  Plaintiff points to evidence that at a union meeting, McLaughlin described her lawsuit and then stated that "these funds have an obligation to recuperate for your benefit the money that former administrator had misused.  That is why the trustees filed a lawsuit in United States District Court to h[o]ld her accountable for nearly·$1.5 million in losses that were suffered by our benefit funds under her watch," or something to that effect.  (Supp. App. at 235).  That does not constitute direct or indirect evidence that the Funds brought an unreasonable lawsuit "because of [plaintiff's] reasonable efforts at MCAD."  *Psy-Ed Corp.*, 459 Mass. at 712.

In short, the filing of the lawsuit by defendants is protected by the First Amendment.  *See also Sahli*, 437 Mass. at 702 (noting that the Supreme Court "has held that the First Amendment protects '[t]he filing and prosecution of a well-founded lawsuit [from being] enjoined as an unfair labor practice, even if it would not have been commenced but for the plaintiff's desire to retaliate against the defendant for exercising rights protected by the [NLRA].'" (quoting *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983)).  Therefore, defendants' motion for summary judgment as to interference with rights will be granted.

### E.   Claim for Failure to Accommodate (Count 4)

Count Four alleges a claim for failure to accommodate in violation of Mass. Gen. Laws ch. 151B.  Under Massachusetts law, it is unlawful for an employer

> to dismiss from employment or refuse to hire, rehire or advance in employment or
> otherwise discriminate against, because of his handicap, any person alleging to be
> a qualified handicapped person, capable of performing the essential functions of

the position involved with reasonable accommodation, unless the employer can demonstrate that the accommodation required to be made to the physical or mental limitations of the person would impose an undue hardship to the employer's business.

Mass. Gen. Laws ch. 151B, § 4(16). "Chapter 151B is considered the 'Massachusetts analogue' to the [ADA]." *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009). Massachusetts courts therefore "look to the federal cases decided under the ADA as a guide to the interpretation of [chapter] 151B." *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 451 n.6 (2002). A claim for failure to accommodate generally requires a plaintiff to show that "(1) she is a handicapped person within the meaning of the statute; (2) she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the employer knew of her disability but did not reasonably accommodate it upon a request." *Henry v. United Bank*, 686 F.3d 50, 59-60 (1st Cir. 2012).[10]

It is undisputed that plaintiff was diagnosed with Type 1 diabetes in 2015. (SMF ¶ 89). Under some circumstances, at least, that condition can qualify as a "handicap" under Massachusetts law.[11]

---

[10] *See also* Massachusetts Commission Against Discrimination, *MCAD Guidelines: Employment Discrimination on the Basis of Handicap*, 16-17 https://www.mass.gov/doc/mcad-guidelines-on-disability-discrimination-in-employment/download:

> The Complainant must prove that (1) s/he was a qualified handicapped individual; (2) s/he needed a reasonable accommodation due to her handicap to perform her job; (3) the employer was aware of the handicap, and was aware that the employee needed reasonable accommodation to perform her job; (4) the employer was aware of a means to reasonably accommodate the handicap, or the employer breached a duty, if any, to undertake reasonable investigation of a means to reasonably accommodate the handicap; and (5) the employer failed to provide the employee the reasonable accommodation.

*Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009) ("The guidelines represent the MCAD's interpretation of [Chapter] 151B, and are entitled to substantial deference, even though they do not carry the force of law.").

[11] "The analysis of when and under what conditions diabetes is considered a disability for ADA purposes is a matter of degree." *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 34 (1st Cir. 2010). In that case, there was evidence that "even when taking insulin, [the plaintiff's] ability to regulate his blood sugar and metabolize food is difficult, erratic, and substantially limited." *Id.* (quoting *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 924 (7th Cir.

28

Plaintiff alleges that on January 3, 2020, McLaughlin and Shea met with her to inform her that her schedule would be altered to require an 8:00 a.m. start time. (SAF ¶ 58). She contends that she reminded McLaughlin of her medical condition, explained that she needed to take insulin at specific, uniform times, and requested to continue working on her usual, later work schedule to allow management of her health condition. (*Id.*). She alleges that McLaughlin refused to accommodate that request, stating, "no accommodation is granted," or words to that effect, while Shea kept her head down and was silent. (*Id.*). Although there is some ambiguity in the record, it appears that McLaughlin refused to discuss the matter further. Alongi testified that she complied with the new schedule, which caused her to forget to take her insulin several times. (SMF ¶ 100).[12]

Defendants contend that plaintiff's claim fails as a matter of law because her preferred arrival time was neither necessary nor reasonable, and, even if it was, it posed an undue hardship on the Funds. (Opp. at 24).

Plaintiff's claimed need for the specific disputed accommodation—to arrive at work at 9:15 a.m. rather than 8:00 a.m.—is certainly dubious. She has provided no medical evidence that such an accommodation was reasonable or necessary, and it is not obvious why she could not simply set her alarm clock an hour earlier. But it does not appear that the Funds requested that

---

2001)). Here, even if taking insulin substantially or entirely mitigates plaintiff's condition, that does not prevent her from qualifying as "handicapped" under Chapter 151B. *See Miller v. Verizon Commc'ns, Inc.*, 474 F. Supp. 2d 187, 198 (D. Mass. 2007) ("That [mitigating measures] limitation does not exist under chapter 151 B."); *Dahill v. Police Dep't of Boston*, 748 N.E.2d 956, 963-64 (Mass. 2001) ("Determining 'handicap' with reference to mitigating measures might produce anomalous results.").

[12] It is unclear if plaintiff attempts to assert a failure to accommodate claim as to the exclusion of her dog from the office, which allegedly occurred in November of 2018. (*Compare* Counterclaims ¶¶ 85-91 *with* Opp. at 18). To the extent that she does, she has not established that such untimely conduct may comprise a claim. *See Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 130 (1st Cir. 2009) ("By contrast, the denial of a disabled employee's request for accommodation starts the clock running on the day it occurs. As we have noted, such a denial is a discrete discriminatory act that . . . does not require repeated conduct to establish an actionable claim.").

she provide any medical documentation in support of her request.  (SMF ¶ 89).  *Cf. Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 813 (6th Cir. 2020) ("An employee might not always need to show his accommodation is medically necessary to win a failure to accommodate claim. But he must do so when asked by his employer.").

Furthermore, the facts of this case are somewhat unusual; rather than requesting a new accommodation, plaintiff sought to keep a previously performed schedule as an accommodation. The Funds had been operating for many years with that schedule.  Thus, a jury could find that plaintiff made "at least a facial showing that reasonable accommodation is possible." *Godfrey v. Globe Newspaper Co.*, 457 Mass. 113, 120 (2010).

"Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation . . . through a flexible, interactive process that involves both the employer and the qualified individual with a disability." *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 457 (2002).  An employee's initial request for an accommodation "triggers the employer's obligation to participate in the 'interactive process' of determining one." *Id.*  "The refusal of an employer to participate in that process once initiated, or to make a reasonable accommodation once it has been identified, is a violation of [Massachusetts] discrimination laws." *Ocean Spray Cranberries, Inc. v. Massachusetts Comm'n Against Discrimination*, 441 Mass. 632, 644 (2004).

Again, plaintiff alleges that she orally requested the accommodation from McLaughlin, and that he replied that no accommodation would be granted.  (SAF ¶ 58).  Defendants do not contend that there was a more formal request process that plaintiff failed to follow.[13]  Thus, she

---

[13] Moreover, that process is consistent with another alleged requested accommodation on the record, where a formal notice disallowing animals in the office stated, "If you require a reasonable accommodation per the Americans With Disabilities Act, please contact Business Manager, Bill McLaughlin."  (App. 463).

appears to have requested an accommodation and accordingly triggered the obligation to participate if her request was reasonable.

"A careful, individualized review of an accommodation request in light of the specific facts of the case is needed to determine whether the request was reasonable." *Calero-Cerezo v. U.S. Dep't of Just.*, 355 F.3d 6, 23 (1st Cir. 2004). Chapter 151B specifically provides that a "'[r]easonable accommodation', may include, but shall not be limited to: . . . (ix) a modified work schedule." *See* Mass. Gen. Laws Ann. ch. 151B, § 4; *Kvorjak v. Maine*, 259 F.3d 48, 52 (1st Cir. 2001). Furthermore, as noted, plaintiff's suggested schedule was based on her past practice. At minimum, there is a dispute as to whether the request was reasonable, and whether the Funds had an obligation to engage with her further in an interactive process to determine whether it was in fact a reasonable accommodation or to request additional evidence that such accommodation was reasonably medically necessary.

Accordingly, defendants' motion for summary judgment will be denied as to the failure to accommodate claims.

### 1.    McLaughlin's Individual Liability

Certain "provisions of Section 4 state that individuals, *qua* individuals, and not merely *qua* employer, may be found liable if they engage in practices which are unlawful under [Mass. Gen. Laws, ch.] 151B." *Ruffino v. State St. Bank & Tr. Co.*, 908 F. Supp. 1019, 1048 (D. Mass. 1995). Section 4(16) applies, on its face, to employers, not individual employees. *See id.*; *Melo v. City of Somerville*, 2020 WL 6945938, at *3 (D. Mass. Nov. 25, 2020); *Beaupre v. Cliff Smith & Assocs.*, 50 Mass. App. Ct. 480, 491 n.16 (2000). Plaintiff does not cite authority to the contrary. (*See* Opp. at 6 n.1). *Cf. Morrill v. Lowe's Home Ctrs., LLC*, 2022 WL 2168479, at *8 (Mass. Super. Apr. 19, 2022). Accordingly, McLaughlin cannot be held liable for failure to accommodate under § 4(16).

However, McLaughlin can be held individually liable for interfering with plaintiff's right to a reasonable accommodation under § 4(4A). *See Kleya v. Karl Storz Endovision, Inc.*, 385 F. Supp. 3d 99, 105, n.3 (D. Mass. 2019) (noting that an individual may be liable under Chapter 151B, § 4(4A) for interfering with an employee's right to an accommodation); *Bendell v. Lemax, Inc.*, 2000 WL 33665429 (MCAD July 31, 2000). That is apparently plaintiff's claim. (Opp. at 6 n.1).[14]

In reply, defendants contend that this court recently held in a summary judgment decision that the failure to accommodation section of Chapter 151B does not provide for individual liability. (Reply at 6-7). *See Melo v. City of Somerville*, 2020 WL 6945938, at *3 (D. Mass. Nov. 25, 2020). That case held that § 4(16), specifically, does not provide for individual liability, and did not make the negative point as to § 4(4A), perhaps because plaintiff had not stated a claim under § 4(4A). *Id.* Here, as in *Kleya*, plaintiff moved for relief under § 4(4A). Supp. 3d 99 at 105, n.3. Plaintiff also incorporated the factual allegations regarding McLaughlin's failure to accommodate by reference into that claim. (Counterclaims ¶ 92).

Most importantly, plaintiff has put forth sufficient facts to create a genuine dispute as to whether McLaughlin interfered with plaintiff's exercise or enjoyment of her right to work free of unlawful discrimination. (SMF ¶¶ 86-96; SAF ¶¶ 56-58). *See Bendell*, 2000 WL 33665429, at *8-9. Accordingly, summary judgment will be granted as to McLaughlin to the extent plaintiff claims individual liability for failure to accommodate pursuant to § 4(16) and will be denied as to the claim for interference with the right to reasonable accommodation pursuant to § 4(4A).

---

[14] As referenced above, it is also notable that plaintiff did not cite a specific section in her failure to accommodate counterclaim, perhaps previewing, if obliquely, this oddity in Chapter 151B. (*See* Counterclaims at ¶¶ 85-91).

**IV.**     <u>**Conclusion**</u>

For the foregoing reasons, defendants' motion for summary judgment is GRANTED to

the extent the counterclaims seek to hold William McLaughlin individually liable under 151B,

§ 4(16) (Count 4, in part) and as to the claim for interference with rights concerning the present

litigation (Count 5), and otherwise DENIED.


**So Ordered.**


                                                      /s/ F. Dennis Saylor IV
                                                      F. Dennis Saylor IV
Dated:  May 3, 2024                                   Chief Judge, United States District Court