UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:21-cv-10163-FDS |
| GINA ALONGI, | ) ) | |
| Defendant. | ) ) ) | |

**JOINT PRE-TRIAL MEMORANDUM**

Pursuant to the Court's Order Setting Civil Jury Trial in this case, plaintiffs/defendants-in-counterclaim IUOE Local 4 Health and Pension Fund ("Pension Fund"), IUOE Local 4 Annuity and Savings Fund ("Annuity Fund"), IUOE Local 4 Health and Welfare Fund ("Welfare Fund"), Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund, IUOE Local 4 Labor-Management Co-Operation Trust (collectively, the "Funds"), and William D. McLaughlin, and defendant/plaintiff-in-counterclaim Ms. Gina Alongi submit this Joint Pre-Trial Memorandum.

**I.      Names, Addresses, and Telephone Numbers of Trial Counsel**

For the Funds and Mr. McLaughlin:

> Jennifer L. Markowski
> Jennawe M. Hughes
> Katherine Chenail
> Freeman Mathis & Gary, LLP
> 60 State Street, Suite 600
> Boston, MA 02109
> jmarkowski@fmglaw.com
> jennawe.hughes@fmglaw.com
> kcchenail@fmglaw.com
> (617) 807-8962

> Charles W. Gilligan
> Daniel Keenan
> O'Donoghue & O'Donoghue LLP
> 5301 Wisconsin Avenue, NW, Suite 800

Washington, DC 20015
cgilligan@odonoghuelaw.com
dkeenan@odonoghuelaw.com
(202) 362-0041

For Ms. Alongi:

Timothy P. Van Dyck
Robert G. Young
Bowditch & Dewey LLP
200 Crossing Boulevard
Framingham, MA 01702
tvandyck@bowditch.com
ryoung@bowditch.com
617.757.6536
617.757.6537

## II.     Jury Trial

The parties state that Ms. Alongi's Counterclaims will be tried to a jury. Ms. Alongi further requests that the Court utilize the jury in an advisory capacity for the breach of fiduciary duty claims for the reasons set forth in Defendant Gina Alongi's Supplemental Memorandum Pursuant to Court Order, Docket Entry No. 83.

The Funds request that the Court decline to utilize the jury in an advisory capacity. For the reasons set forth in the Supplemental Brief in Support of Plaintiffs' Motion for Partial Summary Judgment, filed with the Court at ECF No. 82, Ms. Alongi is not entitled to a jury trial on the breach of fiduciary duty claims. While the Court may try an issue with an advisory jury pursuant to Federal Rule of Civil Procedure 39(c)(1), the advisory jury would of course have "no binding legal significance." *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d 538, 563 (4th Cir. 2018). Additionally, "[r]ather than promoting judicial economy, it appears an advisory jury would only prolong proceedings and increase trial cost," because in cases such as the Funds' breach of fiduciary duty claims, "[t]he court's role is to apply the law to Plaintiffs' ERISA claims [, and] [i]ncorporating the community's perspective into this legal matter is unwarranted." *Williams v.*

*Centerra Grp., LLC*, 579 F. Supp. 3d 778, 786 (D.S.C. 2022) (see also *Beesley v. Int'l Paper Co.*, 2009 WL 260782, at *6 (S.D. Ill. Feb. 4, 2009) ("While Plaintiff argues that an advisory jury would incorporate the public's views of morality, it is the job of the Court to decide the legal viability of Plaintiffs' claims and the Court has an extensive and comprehensive statutory and regulatory framework established under ERISA in which to rely."); *Johnson v. Georgia–Pacific Corp.*, 19 F.3d 1184, 1190 (7th Cir. 1994) ("[B]ecause ERISA is a highly technical statute our part is to apply it as precisely as we can, rather than to make adjustments according to a sense of equities in a particular case.")). Finally, "there are significant tactical differences in presenting a case to a court as opposed to a jury, there is a possibility of conflicting findings of fact between the court and jury creating unnecessary confusion, and that an advisory jury increases the costs to the parties." *Id*. The Funds accordingly submit that an advisory jury would unduly complicate the preparation for, and presentation during, the Trial in this matter while providing little to no value, as the breach of fiduciary duty claims revolve exclusively around application of "a highly technical statute" and any findings of such a jury would have "no binding legal significance" whatsoever. *Johnson v. Georgia–Pacific Corp.*, 19 F.3d at 1190; *Hunter v. Town of Mocksville, N. Carolina*, 897 F.3d at 563.

## III.  Concise Summary of the Evidence

###   A.   The Funds' Concise Summary of the Evidence

####    I.   Local 4 and the Local 4 Funds

The International Union of Operating Engineers, Local 4 ("Local 4" or "Union") is a labor organization representing heavy equipment operators and engineers in eastern Massachusetts, New Hampshire, and the state of Maine. The Pension Fund, Welfare Fund, and Annuity Fund are trust funds established in accordance with the requirements of Section 302(c) of the Labor

Management Relations Act, 29 U.S.C. §186(c)(5), and are multiemployer benefit plans, organized under the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Pension, Welfare, and Annuity Funds operate in accordance with the respective Trust Agreements governing each Fund, each Fund's respective Plan of Benefits, and various policies and procedures adopted by the respective Board of Trustees of each Fund from time to time. The Training Fund is also a multiemployer plan as that term is defined in ERISA, and an employee welfare benefit plan that provides training and apprenticeship instruction in the various machinery and processes necessary to perform the job of operating engineer. The Funds are financed by contributions made by employers who employ operating engineers pursuant to the terms of a written collective bargaining agreement with Local 4, and for each hour worked by such operating engineers, the employers pay a contractually required amount of contributions on a monthly basis, filing a remittance report with the Pension, Welfare, Annuity, and Training Funds showing the hours worked by each of its covered employees. The Fund Office collects these contributions, deposits them, and records the hours of each such employee in order to grant them appropriate credit towards a possible pension, retirement benefits, or health and welfare eligibility and coverage.

The Funds are each separate distinct legal entities, and each is governed by a separate Board of Trustees made up of an equal number of representatives by labor and management. The Trustees receive no compensation from the Funds and each has a full time job working for entities other than the Funds. The Funds retain employees to carry out their day-to-day operations, including the collection of employer contributions, the crediting of hours worked by participants, determinations of eligibility for benefits, and the payment of benefits and reasonable administrative expenses. There are typically about fifteen (15) full time employees in the Fund

Office, each of whom is employed by the Welfare Fund, but many of whom provide services to the other related Funds. By law, each Fund is required to pay for its own expenses and must not subsidize the operations of the other affiliated Funds or related entities. The Fund Office employees accordingly perform work for each of the Funds, Local 4, Local 4's Social Action Committee, and the Local 4 Labor Management Cooperation Trust Fund pursuant to the terms of an Amended Agreement to Share Administrative Services and Office Space ("Shared Services Agreement"), which requires each entity to reimburse the Welfare Fund for its proportionate share of such services. Local 4 and the Funds occupy separate sides of a single office building in Medway, Massachusetts, with the Funds leasing office space from the Local 4. The Fund Office maintains normal business hours of 8:00 a.m. to 4:00 p.m., with a one-hour lunch break.

II.      Ms. Alongi's Employment with the Funds

Ms. Alongi began working part-time for the Funds in 1978 after graduating from high school. In 1980, Ms. Alongi was hired as a full-time employee to digitize the Funds' paper records. She was subsequently promoted and worked as the Administrator of the Funds[1] during the period 1996 through July 21, 2020. The Administrator is employed by the Welfare Fund but is retained by each of the respective Boards of Trustees to serve the needs of each of the constituent Local 4 Funds. The Administrator serves as the chief executive officer in charge of the operation of the Funds, including oversight of all of the employees in the Fund Office and direction and supervision of their activities on behalf of the Funds. The Administrator also serves as the main liaison between the Funds and the various professionals retained by the Funds to assist in their operations, as well as the various service providers retained by the Funds, organizes the quarterly Board of Trustee meetings, prepares the agendas for the meetings, provides and/or coordinates the

---

[1] With the exception of the Apprenticeship and Training Fund, which is run by a training coordinator at a different location than the Funds.

provision of various reports regarding finances and other matters of interest, and is entrusted with overseeing the day-to-day operations of the Funds in accordance with plan documents and policies adopted by the Trustees. The job of the Administrator is a demanding, full-time occupation. During the period relevant to this matter, from January 1, 2015 through July 21, 2020, Ms. Alongi received a substantial annual compensation package from the Funds worth in excess of $330,000 per year in all years and was also compensated via four weeks of paid vacation per year and a generous allotment of sick time, as well as being provided with a vehicle. As a highly compensated individual running a substantial operation, it is the expectation of the Trustees that the Administrator will be present in the office during the normal business hours and would devote all of her working hours to the operations of the Funds.

The Funds are subject to the legal and regulatory framework found in ERISA and its attendant regulations, and are accordingly subject to periodic review of their operations by both the Internal Revenue Service and the Department of Labor ("DOL"), the two federal agencies entrusted by Congress with oversight over such plans. The Employee Benefit Security Administration of the DOL conducted an audit of the Funds in 2003-2004, while Ms. Alongi was serving as Administrator, to, *inter alia*, determine whether the Funds properly allocated time and expenses among themselves and other non-ERISA covered entities related to Local 4. In that audit, the DOL uncovered a number of violations related to the administration of the Funds and the allocation of administrative expenses, including that the Funds failed to properly account for the cost of employee time spent working on behalf of each of the Funds to the appropriate Fund. At the conclusion of the audit, the DOL ultimately determined that the Trustees *and* Ms. Alongi "as Plan fiduciaries … violated your fiduciary obligations to the Plan and violated several provisions of ERISA," by, among other things, failing to properly allocate salary and common expenses among the Funds. In order to address the

violations found in the audit, the DOL required reforms to the manner in which the Funds allocated shared expenses for, among other things, the cost of each employee. To achieve that end, the Funds retained a certified public accounting firm to conduct an independent time and function study of the operations of the Fund Office and resolved to do so on a continuous basis prospectively.  Ms. Alongi and counsel retained by the Funds also negotiated with DOL the adoption of the aforementioned Shared Services Agreement governing the manner in which the costs of employees would be allocated among the Funds. Pursuant to this document, each Fund and entity serviced by the Fund Office pays its respective share of the administrative expenses incurred by the Funds Office on a monthly basis. The Trustees of the various Funds and affiliated entities approved and adopted the Shared Services Agreement, which, as a result, constitutes a governing plan document for each of the Funds.

The Funds and DOL agreed and memorialized in the Shared Services Agreement that time sheets would be kept by each Fund employee, accounting for the work that they were doing for any of the specific Funds and related entities throughout their workdays to assure that the allocation of costs between the Funds was accurate and appropriate. Ms. Alongi designed and circulated the model time sheet ultimately implemented to achieve this purpose during the resolution of the DOL audit. As Administrator, she was obligated to track her time so that the cost of her services could be appropriately allocated among the Funds, Local 4, Labor Management Cooperation Trust, and the Social Action Committee. In addition to the Shared Services Agreement, this requirement is contained in the Funds' Employee Handbook. The allocations were and are used to determine a total percentage allocation that applies to expense charges and reimbursements for the following year, and the Shared Services Agreement provides that the Funds turn over the data required to calculate the allocation of expenses applicable to each Fund and entity – including employee timesheets - to

their outside auditor on an annual basis for a calculation of the amount of employee time spent working on each Fund during a specific period in the preceding year, and an attribution of a percentage of each employee's work to each Fund for which that employee performed work and the amount of the employees' salaries and operating expenses that will be paid by each respective Fund. The shared expenses allocation percentages are extremely specific, running to four decimal places.

### III.   The Massachusetts Coalition of Taft-Hartley Trust Funds

The Massachusetts Coalition of Taft-Hartley Funds ("Coalition") is a voluntary organization consisting of multiemployer health and welfare funds in the New England region, organized to utilize the combined purchasing power of its member health plans in the hopes of securing more favorable terms from various health care provider organizations – preferred provider organizations, health insurers, pharmaceutical benefit managers, dental and vision care providers – to reduce the costs of health care benefits to the unions' memberships. The Coalition is a tax-exempt entity under Section 501(c)(3) of the Internal Revenue Code, financed by an annual level dues assessment paid by each of the participating health and welfare plans on the basis of a monthly per capita assessment based on the number of covered participants in the respective member plans. Under Ms. Alongi's leadership, the Coalition also raised money by attracting various Taft-Hartley service providers to become "associate members," a status that afforded them access to Coalition members.

Coalition members may choose to adopt any of the Coalition negotiated arrangements with these providers, but are not compelled to do so, and each of the Coalition's participating plans' Trustees have the responsibility to decide the arrangements that are in the best interests of their participants and beneficiaries. The Coalition is not affiliated with or in any way related to any of the Local 4 Funds or other participating plans. Entitlement to participate in any of the Coalition negotiated arrangements is a result of simply belonging to the Coalition, such that the Welfare Fund could have

taken advantage of any of the negotiated programs by virtue of its membership in the Coalition. Ms. Alongi served as the Executive Director of the Coalition from 2015 through the time she was terminated as Administrator of the Funds. During 2019, the last year for which a Form 990 for the Coalition was publicly available at the time the Complaint in this matter was filed, Ms. Alongi reported and averred, under penalty of perjury, that she performed ten hours of work per week in return for an annual salary of $46,000, and all Form 990s dating back to at least 2013 contain this same averment that she worked ten hours per week for the Coalition.

     IV.    <u>Louis Rasetta as Business Manager</u>

Between 2004 and 2017, Louis Rasetta ("Mr. Rasetta") served as the Local 4 Business Manager as well as Chairman of the Board of Trustees. During that time, there were various periods during which Ms. Alongi and Mr. Rasetta engaged in an intimate relationship, which neither disclosed to the Trustees. Ms. Alongi's special relationship with Mr. Rasetta inured to her benefit in numerous ways.  For example, Mr. Rasetta:

- Determined Ms. Alongi's compensation based upon her own recommendations.

- Granted Ms. Alongi an extra two (2) weeks of vacation that she could "cash out."

- Authorized Ms. Alongi to purchase a new Cadillac Escalade every 2 years (she had previously received an $800 monthly vehicle stipend).

- Permitted Ms. Alongi to arrive at work long after the normal 8:00 a.m. reporting time. While other Fund employees were required to report at 8:00 a.m., during Mr. Rasetta's last three years as Business Manager, Ms. Alongi, on average, arrived after 10:30.  Evidence, including entry key data, computer, email and phone data demonstrate that on most days Ms. Alongi ceased all work activity by or before 4:00 p.m. and performed little to no work outside of regular business hours – including weekends.

- Involved Ms. Alongi in unnecessary Union activities she wished to attend such as negotiations over the Union's collective bargaining agreement.

- Invited Ms. Alongi to travel to overnight Union conferences that he was also attending.

- Gave Ms. Alongi expensive Christmas gifts which included collecting cash from his Business Agents and gifting the money to her.
- Nominated Ms. Alongi for the Cushing Gavin Boyle Award in 2015 for which he served on the selection committee. Notably, he did not disclose his relationship with Ms. Alongi.

The evidence will also show that while visiting the Funds' office space and in the presence of Fund employees, Mr. Rasetta engaged in crude sexual banter and jokes. Ms. Alongi joined in the banter and took no steps to prevent it even though she, as Administrator, was responsible for investigating and addressing workplace sexual harassment. In 2014, Fund employee, Laura Jean Hickey ("Ms. Hickey") accused Mr. Rasetta of sexual harassment.  Mr. Rasetta had attempted to kiss her and put his foot in her lap during a work dinner. Ms. Hickey testified that due to Mr. Rasetta and Ms. Alongi's close relationship, she hesitated to report his continuing behavior because she feared retaliation from both Mr. Rasetta and Ms. Alongi.  Ms. Hickey ultimately disclosed the behavior to Gregory Geiman ("Mr. Geiman"), who reported it to Ms. Alongi. Ms. Alongi was dismissive of Ms. Hickey's complaint, which she disclosed to Mr. Rasetta.  Although Ms. Hickey did not again report Mr. Rasetta's behavior to Ms. Alongi or Mr. Geiman, Mr. Rasetta apparently continued to engage in sexually harassing behavior toward Ms. Hickey.

V.    William McLaughlin as Business Manager and Tension with Ms. Alongi

In August 2017, William McLaughlin ("Mr. McLaughlin") succeeded Mr. Rasetta as Business Manager and Chairman of the Board. Prior to and after becoming Business Manager, Mr. McLaughlin heard from Local 4 Business Agents and members that they were frustrated that Ms. Alongi was not present during regular business hours and appeared to work abbreviated days. The Business Agents needed to speak with Ms. Alongi regarding member concerns at the start of the business day before they assumed their customary duty of visiting various construction sites on which the membership was working, but Ms. Alongi was rarely present to handle their queries. Mr. McLaughlin appreciated and shared their concern.  Nonetheless, before becoming Business

Manager, Mr. McLaughlin and Ms. Alongi had had a cordial relationship. However, when he became Business Manager, Mr. McLaughlin endeavored to manage things differently than his predecessor – Mr. Rasetta. During his first ten (10) months, Mr. McLaughlin established his leadership style in which he endeavored to professionalize the manner in which both Local 4 and the Funds operated.

Ms. Alongi was not happy with Mr. McLaughlin's approach and called him to a meeting in her office on May 1, 2018 to discuss "respect, money, move, contract, confidentiality" with him. The meeting began with Ms. Alongi confronting Mr. McLaughlin about various perceived slights and offenses and demanding to reclaim authority and autonomy. Ms. Alongi told Mr. McLaughlin that he did not respect her enough nor involve her in matters and events in which she had been involved when Mr. Rasetta was Business Manager. Mr. McLaughlin expressed that he was not bound by what Mr. Rasetta had permitted. The meeting devolved into Ms. Alongi and Mr. McLaughlin yelling and swearing at one another. During the altercation, Ms. Alongi stood up from her desk and aggressively poked her finger in Mr. McLaughlin's direction. Her action was so forceful that her finger caught on her necklace and broke it, further enraging her. Ms. Alongi's sister, Rosemarie Alongi ("Rosemarie"), entered the office yelling at Mr. McLaughlin that Ms. Alongi would "ruin" him. After Rosemarie's arrival, Ms. Alongi came around from behind her desk and poked Mr. McLaughlin in the chest. Eventually, the interaction de-escalated and both calmed down. Later that day, Ms. Alongi reported to Mr. Geiman that after the altercation Mr. McLaughlin had pulled her into the corner of the office, hugged her, and attempted to kiss her.

Ms. Alongi changed her mind several times as to whether or not she believed the May 1, 2018 interaction constituted sexual harassment or whether she would report it. She told Mr. Geiman she was going to reach out to Attorney Shea and later told him she did not believe Mr.

McLaughlin had sexually harassed her. She contacted an attorney on May 14, 2018 who advised her to report the behavior to the Trustees, which she declined to do. Beginning May 16, 2018, Ms. Alongi began asking female Fund employees, except Ms. Hickey, to "tell her all the ways Mr. McLaughlin makes [them] feel uncomfortable." Although no employee had previously complained about Mr. McLaughlin's behavior, a few described actions or statements made by Mr. McLaughlin. Notably, some women acknowledge discussing inappropriate topics in the workplace, including sex and the men they found attractive. Fund Office employee Taylor Ryan ("Ms. Ryan") texted an unsolicited video to Mr. McLaughlin of two radio hosts discussing a joke wherein they "imagin[e] what it is like to be little kids having to deal with parents who have a sex slave." Mr. McLaughlin did not ask for the video, and he did not respond to Ms. Ryan's message. Ms. Ryan found this video funny and tried to show it to many people. While four employees described to Ms. Alongi ways in which Mr. McLaughlin "made them uncomfortable," one employee reported only that Ms. McLaughlin called her "dear." Per the Fund Office Employee Handbook, Ms. Alongi was responsible for investigating claims of sexual harassment, yet she had taken no action to investigate Mr. McLaughlin until after May 1, 2018, when Mr. McLaughlin refused to acquiesce to her demands, despite her claim that she had witnessed such behavior prior to May 1, 2018.

On May 21, 2018, twenty days after the May 1, 2018 meeting, Ms. Alongi met with Attorney Shea at a coffee shop. Ms. Alongi told Attorney Shea she believed Mr. McLaughlin had sexually harassed her. She explained that she had asked other employees about his conduct and advised that she wanted to move the Funds' offices. That same day, Attorney Shea met with Mr. McLaughlin and told him about Ms. Alongi's allegations. She reminded him of the Funds' anti-harassment and retaliation policies. At Ms. Alongi's request, Attorney Shea also met with Mr.

Geiman. Thereafter, Attorney Shea, Mr. McLaughlin, and Ms. Alongi met together. During the meeting Ms. Alongi acknowledged that Mr. McLaughlin had not sexually harassed her. Ms. Alongi said she wanted an employment contract. Mr. McLaughlin told her she was "a good administrator," and he "[didn't] want [her] to worry about [her] job." In June 2018, Ms. Alongi requested Mr. McLaughlin provide her with an employment agreement agreeing to employ her until she turned sixty-two (62) years old. After discussing with the senior management trustee, Mr. McLaughlin proposed a one-year contract with a just cause provision to Ms. Alongi. She countered with a proposal for a four-year contract and other altered terms. Because he had been advised that a four (4) year commitment is legally impermissible under ERISA, Mr. McLaughlin rejected Ms. Alongi's request. Ms. Alongi refused to consider anything less.

Except for one alleged comment, there is no evidence of Mr. McLaughlin making any inappropriate sexual remarks after May 1, 2018. Ms. Alongi contends while an employee was receiving treatment for breast cancer, Mr. McLaughlin made a comment about her breasts. The employee's treatment had concluded by August 16, 2019. Thus, at most, Ms. Alongi can recall one comment being made after May 1, 2019 about another employee. Other Fund Office employees – except for Ms. Alongi's sister – Rosemarie – will testify that Mr. McLaughlin did not make remarks of a sexual nature after May 2018.

VI.   Dog Policy

At various times, Ms. Alongi and other employees brought their dogs into the office. The dogs caused problems due to their smell, one employee's allergies, and the aggressive nature of at least one of the dogs in an interaction with a service provider. As a result, in November 2018, the Local 4 Building Committee decided that due to the threat of infection, allergic reactions, and the

safety of visitors and employees, dogs would not be permitted in the office. Employees requiring a reasonable accommodation were instructed to contact Mr. McLaughlin.

At the time the policy changed, Ms. Alongi had a dog named Drambuie who she claims she had personally trained to detect her blood sugar level related to her Type One diabetes diagnosis. Drambuie had not undergone any formal training. Ms. Alongi never identified Drambuie as a service or assistive animal, and Fund employees will testify Ms. Alongi never indicated Drambuie was trained to detect changes in her blood sugar levels. The evidence will show that Ms. Alongi never asked Mr. McLaughlin for an accommodation after the dog policy went into effect. Drambuie did not travel with her nor accompany her to work on a regular basis. When Ms. Alongi was diagnosed with Type One diabetes in 2015, her doctor discussed the option of a continuous glucose monitor, which would alert her to her blood sugar changing. While Ms. Alongi declined the monitor in 2015, she was prescribed one in 2019.

In January 2020, Mr. McLaughlin requested a meeting with Ms. Alongi, which Attorney Shea attended and at which he requested Ms. Alongi to come to work when the office opened at 8:00 a.m. Between 2015 and 2019, Ms. Alongi's average arrival time was never earlier than 9:50 a.m., in 2015 her average arrival time was 10:58 a.m., and in 2017 it was 10:28 a.m. Mr. McLaughlin believed it was important for morale and professionalism for Ms. Alongi to arrive when the rest of the employees whom she supervised arrived. Ms. Alongi initially requested she not be required to come in at 8:00 a.m. because she was "working and on call all the time." However, the evidence shows Ms. Alongi rarely logged into the Funds' VPN to access documents at home and she rarely responded to calls or emails when not physically present in the Funds' office. The credible evidence will show that during the January 2020 meeting, Ms. Alongi never requested to report late to work to accommodate her insulin schedule for diabetes management.

As such, the Funds were not required to engage in an interactive dialogue with her.  In any event, the request itself was not reasonable. According to Ms. Alongi, she injects her basal insulin between 8:00 a.m. and 9:00 a.m. every day. She offers no reason why she could not alter her insulin schedule or take it at work. In fact, when Ms. Alongi started reporting at 8:00 a.m., Ms. Alongi began bringing her basal insulin to work with her. After her meeting with Mr. McLaughlin, Ms. Alongi arrived at work at or close to 8:00 a.m. for all remaining months that she reported to the office.

VII.   <u>Discovery of Violations and Employment Termination</u>

After the Covid-19 pandemic took hold in March 2020, the Trustees closed the Fund Office and allowed employees to work from home. By June of 2020, although some of the Funds' key employees returned to the office, others with significant health concerns were allowed to continue working from home. Many Funds employees fulfill time sensitive functions such as tracking and allocating reports of participant hours worked to determine ongoing benefit eligibility, or determining whether a participant or beneficiary is entitled to a certain pharmaceutical or medical benefit or coverage. Around June 15, 2020, Mr. McLaughlin discussed with Attorney Shea the best way to ensure employees were working productively at home. Attorney Shea suggested employees keep timesheets and submit them to Mr. Geiman for review, except for Ms. Alongi's, which should be submitted directly to Mr. McLaughlin to prevent her subordinate, Mr. Geiman, from having to track his immediate supervisor's productivity and work performance. Mr. McLaughlin subsequently implemented a procedure in which all Fund employees were required to keep a timesheet describing the work performed throughout the day. These timesheets, separate from the timesheets required pursuant to the terms of the Shared Services Agreement and the Employee Handbook, were submitted on a monthly basis.

In early July 2020, Ms. Alongi submitted her timesheets to Mr. McLaughlin. Upon review, he discovered that in several entries Ms. Alongi logged work performed on behalf of the Coalition or with individuals whom Mr. McLaughlin did not recognize or knew to be individuals associated with multiemployer benefit funds other than the Funds. Mr. McLaughlin approached Mr. Geiman to ask about items contained in Ms. Alongi's work records, as they did not seem to reflect work for the Funds. It appeared, and was determined, that she was actually conducting Coalition business during regular Fund Office business hours. Mr. McLaughlin and Mr. Geiman also shared this concern with Attorney Shea, and Mr. McLaughlin delegated a fact-finding inquiry to Mr. Geiman and other Funds employees to determine the extent of the problem. Mr. Geiman spoke with fellow Assistant Administrator Laura-Jean Hickey, who served as Coalition Coordinator under Ms. Alongi's supervision. In addition to providing clarification on the amount of work that had been performed by herself and other Fund employees for the Coalition during the Fund Office workday, Ms. Hickey confirmed that Ms. Alongi had unilaterally promised a $30,000 wellness credit that the Welfare Fund received from Blue Cross Blue Shield, for the benefit of Local 4's participants and beneficiaries, to the Coalition for use at its wellness fair. Attorney Shea opined that best course of action in determining how much Coalition work Ms. Alongi performed during the workday would be to cross reference the entries of concern with Ms. Alongi's separate, DOL timesheets.

When Rebecca Zaccardi, the Funds' inhouse accountant, was asked for those timesheets, however, she advised that Ms. Alongi did not keep or submit DOL timesheets. The Trustees accordingly became aware that the Funds' chief executive had not been complying with an important policy, that Funds' resources and employee time had been improperly diverted to the Coalition, a stranger entity that was not compensating the Funds at all for the use of these

resources, and that the Funds' allocation of shared expenses was now known to be inaccurate because the most highly compensated individual working for the Funds had been revealed to have not kept required time records and was, in fact, devoting a substantial amount of her time to an entity outside of the Funds. When Ms. Alongi and Attorney Shea negotiated a new Shared Services Agreement in 2018-2019, Ms. Alongi failed to disclose to Attorney Shea or the IUOE National Training Fund that she had not been completing DOL timesheets as required by the original Shared Services Agreement and the DOL.  Because she was not properly tracking her time, Ms. Alongi provided a time study with false information, and Attorney Shea accordingly provided the study to the DOL in relation to negotiations, not knowing it was fraudulent. Around that same time, the following additional issues came to light:

- Attorney Shea also learned that Ms. Alongi had failed to produce check registers to the Trustees, despite representing to Attorney Shea and federal regulators since 2012 that she was doing so on a quarterly basis. These check registers detail payments by the Funds to service providers and vendors and are essential to the Trustees being able to determine that Fund assets are being used for proper purposes only.

- Ms. Alongi disclosed to an acquaintance highly confidential information about a ransomware attack the Funds suffered shortly after employees were required to work from home.

- The ransomware attack was, in part, due to a change in the security system that Rosemarie recommended and Ms. Alongi authorized.

- Ms. Alongi had attempted to divert $30,000 the Funds received as a "wellness credit" from Blue Cross Blue Shield for a Coalition event without seeking the required Board of Trustees approval *prior* to committing the Funds' credits to the Coalition.

These issues and serious missteps were brought to the attention of each of the Funds' respective Trustees, Special Meetings of the respective Boards of Trustees of the Pension Fund, Welfare Fund, and Annuity Fund were held on July, 21, 2020, and each of the Boards voted unanimously to terminate Ms. Alongi's employment. The Funds retained Joyce A. Mader to complete a report

for the Trustees, in which she determined Ms. Alongi breached her fiduciary duties to the Funds, and the Trustees acted appropriately in exercising their fiduciary duties to the Funds when they terminated Ms. Alongi's employment. The Trustees additionally engaged the accounting firm Schultheis & Panettieri LLP to conduct an audit of the time that Ms. Alongi was actively working during the period January 1, 2015 through July 21, 2020 to determine, among other things, the degree to which she may have damaged the Funds due to her failure to properly allocate her time and her diversion of plan assets for the benefit of the Coalition ("Audit").

The Audit of Ms. Alongi's work activities included a review of her arrival times at the office, her email activity on her Fund-provided email account, and call activity on both her office landline and Fund-provided cellular phone. The Audit found that Ms. Alongi and various employees in the Fund Office routinely performed work for the Coalition during the Fund Office's normal business hours, while utilizing Funds resources and equipment, all while being paid *by the Funds* to perform services *for the Funds*. Through the Audit, it was further determined that Ms. Alongi simply directed the Funds' inhouse accountant to advise the Funds' outside accountant that her time allocation had not changed because her duties vis a vis each of the Funds allegedly remained completely and entirely consistent. Thus, Ms. Alongi was having her services and compensation attributable to one Fund subsidized by one or several separate Funds and entities. The shared expense allocations for each and every Fund employee – with the exception of Ms. Alongi – experience shifts from year to year during the years 2015, 2016, and 2017 down to the fourth decimal point, and are derived from each respective employee's daily timesheets. During the years 2015 through 2019 however, Ms. Alongi's shared expenses allocations remained *exactly the same*, save in 2016, when 10.0000% of her time was reallocated from the Welfare Fund to the Pension Fund. Ms. Alongi's shared expenses allocation percentage of work on behalf of seven

separate entities – down to the fourth decimal point – remained *exactly* the same in 2016 and 2017, with *one* exception for 2015. Ms. Alongi testified that these allocations were in fact accurate, because the tasks she performed on behalf of these Funds and entities resulted in her performing the *exact* same number of hours of work for each of those Funds and entities – *to the fourth decimal point* – year in and year out, including testimony that she did not spend *one hour* more working on matters for the Welfare Fund in the years following the passage of the Affordable Care Act and its implementing regulations than she had in prior years. Ms. Alongi finalized and executed the Forms 5500 on behalf of the Funds, thereby averring to the federal government these false allocations.

The Audit also concluded that Ms. Alongi worked significantly less than the required seven hours per day and performed her duties as Executive Director of the Coalition during the reduced hours she was at the Fund Office. During the period January 1, 2015 through July 21, 2020, Ms. Alongi was rarely at the Funds office when it opened at 8:00 a.m. and routinely arrived hours after the established start of the workday, including an average arrival time of 10:58 a.m. in 2015. What is more, the forensic analysis of Ms. Alongi's computer, emails, and land and cellular phones demonstrated that on the vast majority of days, her work activities ceased at or around 4:00 p.m., and that she performed little or no work during weekends or after normal business hours during this time period. Based on the results of the Audit, if Ms. Alongi was performing ten (10) hours of work per week for the Coalition as she reported under penalty of perjury on the Form 990s filed by the Coalition, she was spending in excess of 25% of her work time performing work for the Coalition rather than the Funds. In so doing, Ms. Alongi unilaterally and in an *ultra vires* fashion diverted plan assets for her own benefit and that of a party unrelated to the Funds by whom she was employed.

While investigating the events and improprieties related to Ms. Alongi's termination, the Funds and Schultheis & Panetierri LLP uncovered additional evidence which established that Ms. Alongi breached the fiduciary duties she owed to the Funds. These breaches included causing plan assets, in this case Fund personnel and resources, to be deployed to benefit the Coalition, a third-party whose interests were adverse to the Funds, while personally benefitting from ever increasing compensation that she was receiving from the Coalition, as well as cashing out vacation leave to which she was not entitled and by failing to work the requisite hours upon which her compensation was based.

VIII.    Ms. Alongi's Breaches of Fiduciary Duty

First, Ms. Alongi was regularly performing work for the Coalition during the Funds' standard workday of 8:00 a.m. to 4:00 p.m., a period for which she was supposed to be working for the sole and exclusive benefit of the Funds and their participants and beneficiaries and for which she was receiving total compensation in excess of $300,000 per year. She was party to a series of employment contracts titled "Agreement Executive Director Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." which explicitly defined her responsibilities as the Executive Director of the Coalition. Emails and other evidence reviewed by Schultheis & Panetierri LLP establish that the work Ms. Alongi routinely performed on behalf of the Coalition included travelling to and from and attending Coalition general membership and Executive Board meetings; scheduling and participating in telephone conferences and in-person meetings with Coalition members, prospective members, and vendors; reviewing documents, correspondence, and memos on behalf of the Coalition; implementing various surveys of Coalition members and vendors; and actively seeking out new Coalition members and collecting membership applications and fees from so-called associate members and entities, particularly investment management firms, that

performed services within the universe of Taft-Hartley multiemployer benefit funds and were promised access to fund administrators conditioned upon their payment of associate member dues to the Coalition, with "a very large majority" of this work occurring during Fund Office business hours, utilizing Fund Office resources. According to the Audit, the Fund Office suffered "significant weaknesses in controls surrounding cost allocations to the Coalition, where the former Fund Administrator also served as the Executive Director." Based on the certified public accountants' review of the documents and data in this matter, as well as interviews with Funds employees, the Audit further determined that the Funds did not have an adequate system to track labor, related taxes, and benefit costs incurred on behalf of the Coalition, and that Fund Office employees were tacitly directed not to allocate time to the Coalition.

Ms. Alongi thus knowingly diverted her time to the benefit of a third-party entity unrelated to the Funds, utilizing Funds' resources, while being paid by the Funds to perform critical work as Administrator for the Funds, thereby depriving the Funds of the expected value of her services and improperly diverting plan assets in a manner other than for the sole and exclusive benefit of the participants and beneficiaries of the Funds, in explicit violation of ERISA. While so doing, Ms. Alongi acted as an ERISA fiduciary because as Administrator she was responsible for overseeing all work performed in the Fund Office, including, of course, her own work.

Alongi has attempted to justify her unilateral diversion of Funds resources for the benefit of the Coalition with the erroneous premise that the Welfare Fund received substantial benefits by means of various Coalition-negotiated arrangements for which she takes sole credit. However, the Funds received no more benefit from Alongi serving as Executive Director of the Coalition than they would have received had she simply been an unpaid participant at the Coalition's meetings. Indeed, all other Coalition member funds were able to receive these benefits without having to

make similar commitments of their personnel and resources, and it has been many years since the Funds derived any discernible pecuniary benefit from the Coalition's agreements as the Welfare Fund ceased using many of the Coalition's preferred vendors and products. Throughout the entire period at issue in this litigation, the Welfare Fund did not use the Coalition sponsored Union Blue insurance product touted by Ms. Alongi, as the Fund ceased using that product in 2014, at her recommendation, because it was no longer cost-effective. During the period 2016 – 2019, the only Coalition-negotiated benefit providers utilized by the Welfare Fund was for vision and hearing benefits. The costs associated with these benefits are miniscule. By way of example, Coalition-negotiated benefit providers were responsible for the payment of just 0.92% of the Welfare Fund's overall claims costs in 2016, just 0.75% of the overall claims costs in 2017, just 0.74% of the Fund's overall claims costs in 2018, and just 0.79% of the Fund's overall claims costs in 2019. The Pension, Annuity, and Training Funds, all of which share costs with the Welfare Fund, received no benefit whatsoever from paying for employees to work for the Coalition. Ms. Alongi has additionally incorrectly asserted that she was engaged in other Coalition activities that somehow benefitted the Funds, such as a time-consuming project (that was thus expensive for the Funds) with the New York Health Care Alliance on its pharmaceutical benefit manager project that in no way affected the Funds' relationship with its own Pharmaceutical benefit manager, which was provided through Local 4's parent Union, the IUOE. In fact, the Welfare Fund ceased being a Coalition member as of December 31, 2020, and in 2021 the Welfare Fund terminated its relationship with the Coalition-negotiated vision provider and entered a new relationship with a different provider that resulted in an equivalent cost to the Fund and a much larger network of vision care centers for the participants and beneficiaries to use.

Second, the respective Boards of Trustees hired Ms. Alongi to be a full-time employee and to be present at the Fund Office to devote at least 35 hours per week to overseeing the operations of the Funds and to supervise its employees in the performance of their tasks for the participants and beneficiaries of the Funds. The Funds' Employee Handbook provides that "[t]he regular working hours of the Funds Office are 8:00 a.m. – 4:00 p.m." The Audit uncovered that, in addition to the time impermissibly spent on Coalition business, Ms. Alongi routinely failed to work anything like a full-time schedule during the period January 1, 2015 through December 31, 2019; it was only after the Chairman of the Boards of Trustees directed Ms. Alongi to be in the office by the start of the regular business day in January 2020, that Ms. Alongi commenced working closer to full days for the Funds. In fact, the Audit uncovered that "[t]here is no record of the former Fund Administrator entering the Fund Office prior to 8:00AM from 2015 through 2019," and that Ms. Alongi did not make up for this late arrival by either working past the closing time of 4:00 p.m. or on weekends. Instead, Ms. Alongi worked an average of the following hours per day, during the requisite years listed below: 2015: 5.25; 2016: 5.5; 2017: 5.75; 2018: 6.25; 2019: 6.25, and these total hours include the two (2) hours per day that she averred, under penalty of perjury in the Form 990s, to have worked for the Coalition during those years. Thus, Ms. Alongi deprived the Funds of their reasonably expected hours of service, leading to her being substantially overpaid for the limited time that she actually spent on her job as Administrator. By virtue of so doing, she received excess compensation in the amount of $282,152 during the period January 1, 2015 through December 31, 2019.

The Audit further found that Ms. Alongi did not work hours on behalf of the Funds at home during the mornings or evenings or over the weekends to make up for this lost time: "For the period September 2016 through July 2020, incoming and outgoing calls to and from the former Fund

Administrator's office phone were commonly between the hours of 9:30AM and 4:00PM until January 2020 at which time they occurred between 8:00AM and 4:00PM," and that in the roughly six-month period prior to her termination, very few business calls were made to or from Ms. Alongi's cell phone, and that "a large majority of business calls made and received by the former Fund Administrator were most commonly during normal business hours." What is more, the Audit found that "[f]or the period September 2015 through July 2020, the former Fund Administrator's outgoing email activity followed a similar pattern as the outgoing phone calls whereby most of the activity occurred between 10:00AM and 4:00PM," and that Ms. Alongi's entry times at the Funds Office corresponded to her phone and email activity, "thereby validating the data used in the analysis." The data also revealed patterns that were "consistent with representations made during discussions with other Fund Office employees."

Third, Ms. Alongi directed various Fund employees to perform work and provide services to the Coalition while being compensated by the Funds, while working within the Fund Office, and using Funds resources and equipment. Interviews with Fund Office employees conducted by Schultheis & Panetierri LLP and an analysis by the auditors of how these employees spent their time show that a substantial portion of the Funds' payroll expenses were in fact diverted to the benefit of the Coalition. All such work done on behalf of the Coalition was at the behest of and direction of Ms. Alongi, not at the direction of the Funds' Trustees, and the Funds received no compensation for the use of their personnel for Coalition business. Ms. Alongi further directed Ms. Hickey to participate in directing Funds staff to perform work for the Coalition during normal business hours. The Audit concluded that "it is apparent that the Coalition's operations were tightly integrated with the Fund Office and many of the Fund Office employees performed duties for the Coalition with no reimbursement," and that a substantial portion of the Funds' overall payroll

expenses were diverted for the benefit of the Coalition. Indeed, the Audit concluded that "hundreds of emails documenting Coalition work performed by various persons during normal Fund Office business hours" were uncovered, and the work performed included actively recruiting prospective Coalition members, "scheduling and planning all Coalition events and meetings, preparing all meeting materials, performing surveys on behalf of the Coalition, maintaining the books and records of the Coalition, maintaining the Coalition's website and continuously updating service provider and membership data, and orchestrating the inaugural Wellness Fair." The following Fund Office employees provided services to the Coalition at Ms. Alongi's direction and devoted the noted estimated percentage of their time to such activities during the time covered by the Audit, rather than for the sole benefit of the Funds, their participants and beneficiaries, during the Funds' regular business hours, utilizing the Funds' resources: Rosemarie Alongi: 30%; Laura Jean Hickey: 30%; Taylor Ryan: 38%; Rosemary Ortega: 12.5%; Bettyann Trefry: 4%; Terri Berardi: 1%; Amy Boisvert: 1%; Rebecca Zaccardi: 1%. No records were kept of time devoted to Coalition work during normal business hours at Ms. Alongi's explicit or implicit direction.

Rosemarie, Ms. Alongi's twin sister, worked in the Funds' IT Department, and designed, routinely updated and maintained the Coalition's website. Rosemarie's timesheets kept in accordance with the Shared Services Agreement and the Funds' Employee Handbook result in calculation of a full day's work but do not include reference to or a time deduction for the work performed for the Coalition, despite the fact that emails establish that she was performing that work during the Funds' normal business hours. At Ms. Alongi's direction, Rosemarie also applied pressure on prospective IT service providers to join the Coalition and submit membership fees. All of this work on behalf of the Coalition occurred during the Funds' regular business hours and utilizing the Funds' resources.

Ms. Hickey served as Assistant Administrator of the Funds under Ms. Alongi, and served as "Coordinator" for the Coalition, a position created by Ms. Alongi, at Ms. Alongi's request. For serving as Coordinator, Ms. Hickey received compensation at a rate of $25 to $30 per hour during the period January 1, 2015 through July 21, 2020, and was required to complete all work assigned by Ms. Alongi, while being instructed to not to exceed twenty hours of work per month. Ms. Alongi was fully aware of the work Ms. Hickey was performing and, as her immediate supervisor, she was further aware that Hickey was performing work on behalf of the Coalition at the Funds office during regular business hours, and she was directing her to do so. Ms. Alongi admitted in sworn testimony that she assigned Ms. Hickey the work she performed on behalf of the Coalition. Ms. Hickey estimated to Schultheis & Panettieri LLP that 30% of her efforts for the Coalition occurred during normal business hours for which she received compensation and benefits from the Funds, and the work included drafting, reviewing, and finalizing Coalition meeting and event agendas; organizing and maintaining various documents and materials; coordinating surveys among Coalition members and vendors; scheduling and facilitating telephone conferences during regular business hours with Coalition members, prospective members, and service providers; contacting event vendors and prospective venues and generally planning and attending Coalition events, Wellness Fairs, and holiday parties; and directing other Funds employees to perform administrative work on behalf of the Coalition. Unlike Ms. Alongi, Ms. Hickey did not have a written agreement or contract with the Coalition, and no document places responsibility for these tasks on her shoulders. Instead, responsibility for completing the work on behalf of the Coalition listed in the "Agreement Executive Director Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." started, stopped, and ended with Ms. Alongi.

Ms. Ryan was tasked with seeking and analyzing product information from various vendors and rental services for purposes of preparing for Coalition events and the Coalition's Health Fair and with tracking address and contact information for, and sending various communications to, Coalition members and service providers on behalf of the Coalition. Additionally, Ms. Alongi assigned Ms. Ryan comprehensive, time-consuming projects for the Coalition, such as reviewing the zip codes for thousands of participants and beneficiaries of other New England multiemployer fringe benefit funds. All of this work on behalf of the Coalition occurred during the Funds' regular business hours and utilizing the Funds' resources.

Fund Office employee Rosemary Ortega was tasked with purchasing materials on behalf of the Coalition at Ms. Alongi's direction, as well as reviewing, compiling, organizing, preparing binders of materials for Coalition meetings and mailings; leaving the Fund office during the Funds' normal business hours to pick up and arrange lunches required for Coalition meetings; and inputting Coalition tasks, meetings, and events into Ms. Alongi's calendar. All of this work on behalf of the Coalition occurred during the Funds' regular business hours and utilizing the Funds' resources.

In assigning this work, Ms. Alongi knowingly directed and permitted Fund Office staff to perform work for an unrelated third-party entity utilizing Funds' resources while the Funds were contemporaneously paying those same employees to perform work *for the Funds*. In so doing, Ms. Alongi breached her fiduciary duty to the Funds by unlawfully depriving the Funds of the expected value of these employees' service and improperly diverting plan assets in a manner other than for the sole and exclusive benefit of Fund participants. While so doing, Ms. Alongi acted as an ERISA fiduciary because, as she admitted under oath, as Administrator, she was responsible for overseeing all work performed in the Fund Office and had unliteral authority to

hire, fire, promote and demote employees.

Fourth, the terms and conditions of employment of Fund employees are set forth in the Welfare Fund's Employee Handbook, which delineates that Ms. Alongi was entitled to four weeks of paid vacation each year, the "maximum vacation time allowable." Starting in 2013, unbeknownst to the Trustees and without proper approval from them, Ms. Alongi began cashing out an additional two weeks of vacation over and above the allotment of four to which she was entitled, in the middle of the year as opposed to after the year has concluded and vacation time can be tallied and processed. In effect, awarding herself, in a unilateral and *ultra vires* fashion, an extra two weeks of salary. The Audit uncovered that "[c]ommencing in 2013, the former Fund Administrator received an additional two weeks' vacation per year for which we were unable to obtain documented Trustee approval." The Health Fund Trust Agreement, the document that serves to establish and govern the Welfare Fund, provides, in pertinent part, that at least four (4) Trustees are required to constitute a quorum, and Trustees are forbidden from "tak[ing] any action or mak[ing] any decision on any matter coming before it or presented to it for consideration" without such a quorum.

In 2015, 2017, 2018, 2019, and 2020, Ms. Alongi received an additional 80 hours of compensation each year in this fashion, with an additional 64 hours of compensation in 2016, for a total cost to the Funds of $49,849.20. Despite written testimony to the contrary in an Affidavit, former Union Business Manager and Chairman of the Boards of Trustees Louis Rasetta testified under oath that he *unilaterally* granted this unearned compensation to Ms. Alongi, and that the compensation was granted *on a one-time basis* in 2013, without communicating with anyone else about it. For his part, John J. Shaughnessy, Jr., a former management Trustee of the Health and Welfare, Pension, and Annuity Funds testified under oath in his deposition that the Board of

Trustees were never presented with, and never approved, this grant of additional compensation to Ms. Alongi. Both Rasetta and Ms. Alongi admitted in deposition testimony that, during a period of disputed or uncertain length prior to 2013, they engaged in a sexual relationship, and Shaughnessy testified under oath that he was not aware of the fact that Rasetta and Ms. Alongi engaged in a sexual relationship. A review of Fund records shows no action by a required quorum of Trustees to approve paid vacation in excess of the aforementioned four-week allotment provided for in the Employee Handbook. Ms. Alongi knew the amounts were not approved by the Trustees, and she exercised discretionary control over the Funds' assets when she instructed Funds' staff to issue the untimely payments in violation of the Funds' Employee Handbook, as well as untimely vacation buyout payments to her twin sister Rosemarie. By so doing, Ms. Alongi acted as an ERISA fiduciary, and by diverting plan assets for her own benefit without proper notification to or authorization from the Trustees, she breached her fiduciary duty.

Lastly, the Coalition paid nominal annual rent to the Funds of $574 for limited storage of documents related to its operations, but a substantial portion of the workforce employed within the Fund Office devoted significant portions of their time to Coalition business. Thus, at the time of Ms. Alongi's termination, the Funds were forced to hire movers to ship at least 40 large boxes of Coalition documents from the Funds Office premises. The fair market value of the office space used for Coalition business based on 1.43 full time employees occupying 7.15% of the office space as determined via the Audit was estimated to have been $27,614 during the period January 1, 2015 through July 21, 2020, rather than the $3,157 actually paid for the Coalition, resulting in the Funds being shortchanged by $24,457 for the office space provided to the Coalition as a result of Ms. Alongi's unilateral and *ultra vires* actions.

      B.     <u>Ms. Alongi's Concise Summary of the Evidence</u>

Ms. Alongi began her employment with the Funds in 1978 in a clerical position. She was an exemplary employee throughout the entirety of her 42-year-long employment and was promoted several times, culminating in a 1996 promotion to the position of "Administrator" of the Funds. Ms. Alongi held the Administrator position for 24 years, from 1996 until her abrupt termination in 2020. In this role, she was responsible for all aspects of management, strategic planning, business and financial operations, and organizational administration as determined by the Boards of Trustees. She oversaw each of the individual trust funds in accordance with respective trust agreements and plan documents adopted by the Boards of Trustees. As the Funds' Administrator, Ms. Alongi worked under the direction and control of the Boards of Trustees of the Funds. From August 2017 until the end of her employment, Ms. Alongi reported to Mr. McLaughlin, who was elected "Business Manager" of the Local 4 union and Chairman of the Boards of Trustees of the Funds in 2017.

Ms. Alongi was extremely well-respected in the industry and served on numerous boards and committees related to her work, including the New England Employee Benefits Council. From 2007 to 2021, she also served as the Executive Director of the Massachusetts Coalition of Taft-Hartley Trust Funds, Inc. (the "Coalition"), which represents over 150,000 individuals through its twenty-six member funds. In her role as Executive Director of the Coalition, Ms. Alongi was responsible for developing better methods of providing and paying for health care for all members, including for the Funds. She negotiated favorable discounts which directly and positively impacted the financial position of the Funds, as attested by multiple members of the Boards of Trustees of the Funds. The Trustees were well aware of Ms. Alongi's work for the Coalition from the beginning. In fact, the Local 4 union's Business Manager would ask Ms. Alongi about her Coalition work as part of an annual determination of her Funds salary.

Ms. Alongi frequently attended and presented at local and national conferences relating to health care benefits and worked closely with the U.S. Department of Labor to educate administrators of other Taft Hartley Trust Funds on ERISA compliance.  In 2015, she was selected as a recipient of the Cushing-Gavin Boyle Award in recognition of her excellence and dedication to public service, in her role as both Administrator of the Funds and Executive Director of the Coalition.

On or about August 1, 2017, Mr. McLaughlin was appointed Business Manager of the IUOE Local 4 Union and automatically served as Chairman of the Boards of Trustees of the Funds. In this capacity, Mr. McLaughlin had direct control and influence over the terms and conditions of Ms. Alongi's employment.

From the beginning of his tenure as Chairman, Mr. McLaughlin routinely made highly inappropriate and sexually charged comments in the workplace to both Ms. Alongi and to her twin sister, Rose (who worked in the Funds' IT Department), and to many other female employees.  For example, Mr. McLaughlin routinely visited Ms. Alongi's office to discuss his sexual desires and fantasies, how he felt about the women in the office, and what he would like to do to them sexually. Mr. McLaughlin also told Ms. Alongi that he could not concentrate during a Trustees meeting because he could not take his eyes off her and that Ms. Alongi "looked so hot" and that he "wanted" her and had "such a crush" on her.  Ms. Alongi told Mr. Geiman about these unwanted and inappropriate comments, and Mr. Geiman made contemporaneous notes confirming that he received this information from her.  When Mr. McLaughlin engaged in this conduct, Ms. Alongi told Mr. McLaughlin to stop and stated that he was going to get in trouble. Ms. Alongi informed Mr. McLaughlin several times that if his wife ever found out about his behavior she would divorce him. Mr. McLaughlin laughed and stated that he was "the boss" and that therefore he could "get

away with it." Mr. McLaughlin also frequently told Ms. Alongi about his "need for sex," and stated that his wife was not "taking care of" him. Mr. McLaughlin made statements to the effect that: he was a "pig" and that "all men are pigs," and that "all men think about is sex."

Similarly, Mr. McLaughlin would visit Rose's office on a regular basis, making sexual comments about the women in the office, discussing his sexual desires, and stating that he was unhappy being married. On one occasion, Rose reminded Mr. McLaughlin that he was married, and that his behavior was inappropriate. Mr. McLaughlin replied that he could not help himself around women. Indeed, it appears that Mr. McLaughlin has had at least one inappropriate relationship with another Funds employee, Assistant Fund Administrator Laura-Jean Hickey, a fact well known to the Funds as evidenced by a May 17, 2017 letter from Mr. Geiman, to Ms. Alongi in which he references "recent concerns [he has] about Laura-Jean's association with [Mr. McLaughlin] and the resulting lack of deference and communication with you...", and also by the sworn testimony of Senior Management Trustee John Shaughnessy, who states that he "observed that Mr. McLaughlin and Laura-Jean Hickey were flirtatious with each other and interacted with each other in a manner that did not appear to be completely professional," and that "[b]oth Ms. Alongi and Mr. Greg Geiman informed [him] separately that Mr. McLaughlin was having an inappropriate relationship with Ms. Hickey."

On May 1, 2018, Ms. Alongi requested that Mr. McLaughlin meet with her in her office to discuss, among other things, Mr. McLaughlin's inappropriate conduct and comments in the workplace as well as ways in which he had been passing up Ms. Alongi in favor of male employees. As Ms. Alongi began providing Mr. McLaughlin some examples of how his behavior had made her uncomfortable, Mr. McLaughlin started to pace in front of Ms. Alongi and yell obscenities and words to the effect of "you do not respect me, I am the manager!" He continued to yell and swear

at Ms. Alongi for approximately 10 minutes to the point where other Funds employees were fearful

for Ms. Alongi's physical safety.   Indeed, one Funds employee—Taylor Ryan—had already dialed

in 911 on her phone and was ready to call the police.  Mr. McLaughlin was so loud that employees

having lunch in the Funds kitchen (on the opposite side of the building) could hear him shouting.

He only stopped when Rose and Mr. Geiman entered Ms. Alongi's office and physically extricated

Mr. McLaughlin from Ms. Alongi.

Immediately following this verbal assault, Mr. McLaughlin attempted to apologize to Ms.

Alongi by hugging her and attempting to kiss her on the lips. He also told her that the fight had

gotten him "excited" and sexually "aroused."

Mr. Geiman made detailed contemporaneous notes of his own observations and

information he received from others regarding the "May 1 incident" and its aftermath, in the form

of three e-mails to himself in May 2018.  In these e-mails, Mr. Geiman notes that he heard Mr.

McLaughlin yell "Fuck you!  You don't run anything. I run these funds," in an "outburst" directed

at Ms. Alongi. Mr. Geiman also recorded a follow-up conversation he had with Mr. McLaughlin

on May 18 where Mr. McLaughlin "admitted an anger issue" and "admitted that he was the initial

aggressor" during the May 1 incident.

A few weeks after the altercation, in mid-May 2018, Ms. Alongi interviewed several

female Funds staff members regarding their experiences with Mr. McLaughlin and made notes of

these interviews. Each reported feeling uncomfortable with the way that Mr. McLaughlin looked

at, talked to, or touched them. For example, one employee reported that Mr. McLaughlin regularly

entered her office to give her unprompted massages which made her uncomfortable, but she did

not feel she could ask him to stop as he was the boss. Another employee stated that Mr.

McLaughlin called her "sexy" on more than one occasion and would make comments to the effect

that he wanted her sexually.  Indeed, in addition to Ms. Alongi and Rose, four other women have testified under oath that Mr. McLaughlin subjected them to unwanted sexually-charged conduct and comments in the workplace on numerous occasions.

Further, on May 16, 2018, Mr. Geiman interviewed Rosemary Ortega, another female employee in the Funds' office, regarding Mr. McLaughlin's unwanted and inappropriate conduct in the office and recorded the results of his interview in a May 16 e-mail to Ms. Alongi.  In that e-mail, Mr. Geiman stated, among other things, that "[Ms. Ortega] told me that [Mr. McLaughlin] comes into the office and speaks inappropriately to her [and others]. Will speak about women he's slept with on the road, sexual positions he likes."

In response to these events during and leading up to May 2018, Ms. Alongi requested to meet with Ms. Kate Shea, a partner at Segal Roitman and outside counsel to the Funds, and did so on or about May 21, 2018.  Attorney Shea is designated in the Funds Employee Handbook (along with Ms. Alongi) as the Funds' point of contact for sexual harassment complaints.  Ms. Alongi told Attorney Shea about the May 1 incident and detailed Mr. McLaughlin's severe and constant bullying and sexual harassment of Ms. Alongi and other Fund employees.  Attorney Shea informed Ms. Alongi that this conduct did not rise to the level of sexual harassment and that in order to claim sexual harassment, the conduct would have to be pervasive or "widespread." Attorney Shea told Ms. Alongi that she had "no case."   Attorney Shea rendered this opinion without conducting any investigation into Ms. Alongi's allegations—other than speaking with Ms. Alongi on this one occasion.  Ms. Shea made no effort to speak with any witnesses identified by Ms. Alongi. Further, Attorney Shea did not even ask to review Ms. Alongi's detailed notes concerning several conversations Ms. Alongi already had with those witnesses that detailed inappropriate conduct by Mr. McLaughlin.

Later in the day on May 21, after speaking with Ms. Alongi, Attorney Shea met with Mr. McLaughlin alone for approximately one to two hours. While Attorney Shea claims that Mr. McLaughlin broadly denied engaging in any wrongful conduct, she admits that she made no effort to ask him to confirm or deny any of the specific allegations of unwanted sexual conduct and advances relayed to her by Ms. Alongi.

Attorney Shea also had multiple conversations with Mr. Geiman regarding this matter in May of 2018, which Mr. Geiman recorded in his above-mentioned contemporaneous e-mails to himself.  In those notes, Mr. Geiman states that—just as she had done with Ms. Alongi—Attorney Shea also "reiterated. . .her belief that [Mr. McLaughlin's] conduct was not actionable."  Further, Attorney Shea told Mr. Geiman that if Ms. Alongi filed a claim for sexual harassment, Ms. Alongi's "behavior would also be scrutinized," while referring to romantic relationship that Ms. Alongi had with Mr. McLaughlin's predecessor (which had no relevance to Ms. Alongi's complaints about Mr. McLaughlin).   Ms. Shea also stated to Mr. Geiman that Mr. McLaughlin was "very angry about the allegations Ms. Alongi made against him," that Ms. Alongi "did not have the support she thought she had," and that if Ms. Alongi's allegations were not "tamped down," Mr. McLaughlin "would seek to have her fired for insubordination."

Following Ms. Shea's meeting with Mr. McLaughlin and conversations with Mr. Geiman, Ms. Alongi was then instructed to meet with Attorney Shea and Mr. McLaughlin in his office. Attorney Shea, on behalf of the Funds, informed Ms. Alongi during this meeting that she could she terminated for insubordination. Attorney Shea stated again to Ms. Alongi that Mr. McLaughlin's conduct did not rise to the level of sexual harassment and that if Ms. Alongi kept quiet about her allegations of sexual harassment, Mr. McLaughlin would apologize, and Ms. Alongi would not be terminated.  Although Ms. Alongi continued to feel that Mr. McLaughlin's

actions were wrong, the combination of Attorney Shea's purported legal assessment that she did not have a viable sexual harassment claim, the specter of an apology from Mr. McLaughlin, and Ms. Alongi's fear that she would be terminated if she did file one induced Ms. Alongi not to file a complaint at that time.

Following these meetings with Attorney Shea, Mr. McLaughlin continued to subject Ms. Alongi, Rose, and other female employees to frequent sexual comments well into 2020. Mr. McLaughlin continued to visit Ms. Alongi's office, each time to make statements about sex and women's bodies. On one such occasion in the last quarter of 2019, Mr. McLaughlin entered Ms. Alongi's office and told Ms. Alongi that he knew about one of Ms. Alongi's younger employees who was struggling with breast cancer. Mr. McLaughlin asked Ms. Alongi "are her boobs any good?" and "do you think she will show me them?" or words to that effect.  Afterwards, Ms. Alongi told Mr. Geiman. about Mr. McLaughlin's comments, and Mr. Geiman responded with words to the effect of, "I'm so sorry you have to deal with all of this." When Mr. McLaughlin said something inappropriate to Ms. Alongi, Ms. Alongi would frequently tell Mr. Geiman who would respond that Mr. McLaughlin "is never going to learn," that Attorney Shea did not do a good job with him, and that Mr. McLaughlin was "the boss" so he can get away with it because no one was doing anything about it.

Mr. McLaughlin also specifically began to retaliate against Ms. Alongi because of her prior attempt to get him to stop harassing her and other female employees.  For example, on or around November 9, 2018, Mr. McLaughlin informed Ms. Alongi that her service animal, who was trained to detect Ms. Alongi's low blood sugar levels, would no longer be permitted in the office. When Ms. Alongi requested an ADA accommodation in order to bring her service dog with her to the office on days that she felt ill, Mr. McLaughlin stated "no dogs in the office, including yours. I do

not care what the law says" or words to that effect.  He provided Ms. Alongi with no explanation for the change in the policy.

Further, in or around early January 2020, Ms. Alongi was once again called into a meeting with Mr. McLaughlin, this time with Attorney Shea present. At that meeting, Mr. McLaughlin instructed Ms. Alongi that from that point forward, he expected Ms. Alongi would report to work by 8:00 am every day.  Prior to Mr. McLaughlin's request, Ms. Alongi would take the first of her two types of daily insulin shots at 8:30 am and be at work by 9:15 am. Ms. Alongi would then skip lunch or stay later during the day and often worked on weekends.  Ms. Alongi reminded Mr. McLaughlin of her Type I Diabetes and explained that her current work schedule allowed her to take insulin and change her continuous glucose monitor at specific and uniform times of the day as required. Ms. Alongi requested that Mr. McLaughlin grant her an accommodation and permit her to continue working on her usual work schedule to allow her to manage her health condition. Mr. McLaughlin replied "no accommodation is granted" or words to that effect. Attorney Shea said nothing at this meeting and kept her head down.

After 42 years of loyal and dedicated service to the Funds, Ms. Alongi was summarily terminated on July 22, 2020. In that four decades of service, she had never once received any kind of performance evaluation, nor had she received any kind of warning that her job might be in jeopardy.  Her termination letter provided her with no explanation whatsoever for why she was fired, but simply stated, in part: "As you were an employee at will, it is not necessary to detail reasons for the Trustees' decision.  We trust that our separation will be courteous and respectful." At that same time the Funds terminated Ms. Alongi's employment, it placed her twin sister Rose on a paid leave for two weeks, and then summarily terminated her employment, after seventeen

(17) years of loyal and dedicated service to the Funds, on August 5, 2020, without receiving any prior notice or reasoning from the Funds.

Mr. McLaughlin orchestrated the retaliatory terminations of Ms. Alongi and Rose in the summer of 2020, with assistance from Mr. Geiman and Attorney Shea.   This final push to terminate Ms. Alongi and Rose began approximately one month before their terminations, in June 2020.  By way of background, in June 2020, Mr. McLaughlin asked Ms. Alongi to begin preparing and submitting weekly timesheets directly to him, in which she was required to break down her daily activities into 15-minute increments.   Since March 2020, Ms. Alongi had been working remotely (with approval from Mr. McLaughlin and the Funds) due to the COVID-19 pandemic, considering her age and preexisting health conditions (including her diabetes).   Mr. McLaughlin made this request for timesheets under the pretense of wanting to monitor and hold Ms. Alongi accountable for the time she was working remotely, even though she had already been working remotely for more than three months at the time Mr. McLaughlin made his request.

During her 13-year tenure as Executive Director of the Coalition, Ms. Alongi occasionally performed work for the Coalition during normal business hours (in addition to early mornings, nights, and weekends), typically in lieu of the 1-hour of daily lunch and rest breach time allowed to all Funds employees per the Employee Handbook.   When Ms. Alongi performed this Coalition work during the business day, she reported it on her timesheets that she submitted to Mr. McLaughlin.   The timesheets demonstrate that Ms. Alongi spent a very small fraction of her total time during the business day performing Coalition work; out of more than 300 total time entries provided by Ms. Alongi to Mr. McLaughlin between June and her termination in July, only four entries even mention the word "Coalition."   Moreover, as noted above, the Trustees were well aware that Ms. Alongi worked as the Executive Director of the Coalition for her entire 13-year

tenure as Executive Director, and were also aware that her work for the Coalition benefitted the Funds.

Nevertheless, Mr. McLaughlin claims that he had no idea Ms. Alongi ever performed any Coalition work during the business day until he reviewed her timesheets in June and July of 2020, and that he thought all work she had ever performed for the Coalition as Executive Director was either performed on weekends or outside of the hours of 8:00am to 4:00pm during weekdays. Mr. McLaughlin testified that after he reviewed Ms. Alongi's timesheets in June 2020 and noticed her small fraction of Coalition time entries, he began a secret "fact-finding mission" with the assistance of Mr. Geiman, to gather information to support his eventual decision to terminate Ms. Alongi's employment. Notably, despite his purported concern about Ms. Alongi's time entries, neither he nor Mr. Geiman once spoke with Ms. Alongi about those time entries, and never indicated to her that they took any issue with them. Ms. Shea also "became involved" in this secret investigation into Ms. Alongi at some point between June and July, and "was asking questions" to Mr. Geiman concerning Ms. Alongi's job performance. Mr. McLaughlin, Mr. Geiman, and Ms. Shea undertook this purported "fact-finding mission" without notifying or seeking any approval from the Boards of Trustees of the Funds.

This secret "fact-finding mission" culminated in Mr. Geiman drafting a document for Mr. McLaughlin and Ms. Shea in July 2020, which described several purported job performance issues, none of which anyone had discussed with Ms. Alongi at any time during her employment. Mr. Geiman did all of the "legwork" to surreptitiously gather the 'facts' used against Ms. Alongi in support of her termination. Thus, the person who "led the charge" on this secret investigation against Ms. Alongi (i.e., Mr. Geiman) was the same person who took Ms. Alongi's job immediately after she was fired, which of course raises serious issues regarding the propriety and

bias of the investigation (and its results). Indeed, the entire project, including writing up his memo, took Mr. Geiman all of five to eight hours to complete.

According to the Funds, Ms. Alongi's alleged performance deficiencies which resulted in her termination are described in the July 21, 2020 minutes of the special meeting of the Trustees where Ms. Alongi's employment was terminated. The minutes reflect the following five purported bases for Ms. Alongi's termination (all of which are transparently pretextual):

- Performing Coalition work during the business day (despite the fact that the Trustees were aware of—and supported—Ms. Alongi's work for the Coalition for 13 years);

- Failure to compete so-called "DOL Timesheets," which would allocate her time as among the various funds for purposes of inter-fund reimbursements (despite the fact that Ms. Alongi cleared the practice with the Funds' independent accountants for more than a decade given that, after having completed them for several years, the accountants concluded that her time allocations did not materially change from year-to-year);

- Purported improper use of a $30,000 "wellness credit" in connection with a Coalition event that ended up being canceled due to COVID-19 and thus, Ms. Alongi never used the "wellness credit" (and had the event actually occurred, Ms. Alongi would have secured the Trustees' approval for use of the wellness credit at the event – a point Mr. McLaughlin never bothered to ask her about in his rush to terminate her employment);

- Purported failure to appropriately provide "check registers" to the Trustees at meetings throughout her tenure as Administrator (when, in fact, Ms. Alongi provided the Trustees with financial statements for each meeting which included a balance sheet, income statement, detailed list of expenses, and references to relevant check register numbers; Ms. Alongi offered to provide the actual check registers if any Trustee wished to review them (which would have generated a considerable amount of additional paper), but for over 20 years no Trustee ever asked to see them);

- Ms. Alongi's (and Rose's) handling of a cyber-security incident in May 2020 which did not result in a data breach or any other material harm to the Funds (despite the fact that Mr. Geiman was responsible for overseeing the Funds' IT Department – a fact conveniently omitted from Mr. Geiman's summary memo); and

- A disagreement between Ms. Alongi and Mr. McLaughlin regarding the appropriate way to handle a union member's request for a plan amendment in March 2020 (the individual required medical insurance coverage several days before he would be eligible under the terms of the plan; Ms. Alongi suggested to the Trustees that they require the individual to purchase COBRA coverage to fill the gap rather than amend the plan itself, as amending the plan could create a slippery slope with respect to future requests to modify eligibility requirements, but the Trustees ultimately decided to amend the plan, as they knew they could do all along and had done in the past).

But these alleged "performance issues" were all pretextual, and critically, Mr. McLaughlin never even attempted to raise any of these purported issues with Ms. Alongi prior to terminating her employment.

In November 2020, months after the Funds had already terminated Ms. Alongi, the Funds hired a self-proclaimed "expert," Joyce Mader, to create a patina of legitimacy to the terminations. Attorney Mader did not conduct an independent investigation into the termination of Ms. Alongi's employment, but rather gathered her "facts" based only on discussions with her law partner and the Funds outside litigation counsel in this action, Chuck Gilligan, and a review of the Funds' 4-page July 21, 2020 meeting minutes, prepared by Attorney Shea.

Prior to Ms. Alongi filing her MCAD complaint, the Funds never once indicated they thought Ms. Alongi had ever breached any fiduciary duty, or that they had any intention of filing suit against her; indeed, even in her termination letter the Funds thanked Ms. Alongi for her decades of service. Nevertheless, in January 2021, the Funds initiated a complaint in federal district court against Ms. Alongi. Meeting minutes and speaking notes from a June 2021 Local 4 Union meeting show a direct a causal connection between Ms. Alongi's decision to pursue discrimination claims against the Funds and the Funds' decision to file the federal suit against Ms. Alongi. In particular, Mr. McLaughlin announced to the entire Local 4 Union membership (with roughly 400 members in attendance) that the Funds filed suit against Ms. Alongi *after* it "became apparent [to

them that Ms. Alongi] could not look in the mirror and accept the responsibility for her actions," following her termination, and that "[i]nstead, she decided to seek vengeance against [Mr. McLaughlin and the Funds]" by "fabricat[ing] a story about sexual harassment."    Mr. McLaughlin's words make it abundantly clear that the federal suit was brought for one reason and one reason only:  to retaliate against – and to try to intimidate – Ms. Alongi. Just as the "facts" fail to support the termination of her employment, so too they fail to support any of the Funds' claims of breach of fiduciary duty.

### IV.   Statement of Facts To Be Submitted To the Jury By Admission or Stipulation

The parties submit the following facts to be submitted to the jury by admission or stipulation:

1.     Gina Alongi began working for the Funds in 1978.

2.     In 1996, the Funds promoted Ms. Alongi to the position of Administrator.

3.     Ms. Alongi held the position of Administrator from 1996 until the Funds terminated her employment in July 2020.

4.     Ms. Alongi never received any disciplinary action from the Funds during her employment.

### V.   Contested Issues of Fact

The parties submit the following contested issues of fact:

1.   Whether the Funds, and Mr. McLaughlin, subjected Ms. Alongi to a sexually hostile work environment.

2.   Whether Ms. Alongi's hostile work environment claim is barred by the statute of limitations.

3.  Whether the Funds, and Mr. McLaughlin, subjected Ms. Alongi to *quid pro quo* sexual harassment.

4.  Whether the Funds failed to reasonably accommodate Ms. Alongi's known disability.

5.  Whether Mr. McLaughlin interfered with Ms. Alongi's rights under G. L. c. 151B.

6.  Whether the Funds, and Mr. McLaughlin, retaliated against Ms. Alongi for having complained of Mr. McLaughlin's sexual harassment.

7.  Whether the Funds, and Mr. McLaughlin, engaged in behavior so egregious as to warrant an award of punitive damages.

8.  Whether Ms. Alongi breached any fiduciary duty owed to the Funds.

**VI.   Jurisdictional Questions**

 The parties submit that there are no jurisdictional questions.

**VII.  Issues of Law, Including Evidentiary Issues**

A. <u>Issues Identified by the Funds and Mr. McLaughlin</u>

1.  <u>Whether the Expert Report of Forensic Employment & Compensation Consultants, LLC should be excluded</u>. Before it accepts expert testimony, the court must determine the qualifications of the witness to ensure he or she is qualified to testify as an expert through knowledge, skill, experience, training, or education. *See United States v. Vargas*, 471 F.3d 255, 262 (1st Cir. 2006). The Expert Report provided by Ms. Alongi's counsel on June 6, 2024, identifies two purported expert witnesses.  The first, Richard Sbarbaro, has a degree in Marketing and has been employed throughout his career as a management consultant. The Report did not include the qualifications of the other, Christopher Reece. There is nothing that indicates either individual is qualified

to testify concerning Ms. Alongi's lost compensation, which is a primary subject of the report. The report includes no methodology for the calculation of this alleged lost compensation. *See Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012). Therefore, it, and the testimony of these individuals should be excluded.

2.    <u>What constitutes "Plan Assets."</u> As has been made abundantly clear by the Department of Labor's admonition to Ms. Alongi and the Funds in its letter of September 16, 2004, the labor of Fund employees and the payment made to them for such work constitute plan assets that must be accounted for in order to assure that no plan is subsidizing the operation of another, be it another related plan or the sponsoring union or related organizations. Indeed, it is for this reason that the DOL required the adoption of more precise time tracking of Fund employees to determine the appropriate allocation of expenses between those entities. While it is true that ERISA does not explicitly define what constitutes "assets of the plan," "ERISA's legislative history makes clear that 'the crucible of congressional concern was misuse and mismanagement of plan assets by plan administrators and that ERISA was designed to prevent these abuses in the future.'" *Acosta v. Pac. Enterprises*, 950 F.2d 611, 620 (9th Cir. 1991), *as amended on reh'g* (Jan. 23, 1992) (citing *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 140 n. 8 (1985)). The requirement that employees who work for multiple Funds out of the Fund Office track their time on a daily basis was mandated by the DOL to assure that the respective employee benefit plans pay their fair share for the cost of these employees. Clearly then, this labor and

the remuneration received by Fund employees must be deemed a "plan asset." See *LaScala v. Scrufari*, 330 F. Supp. 2d 236, 254 (W.D.N.Y. 2004), *as amended on reconsideration* (July 23, 2004) ("[T]he preponderance of the evidence at trial establishes that Scrufari clearly dealt with Plan assets in his own interest in violation of section 406(b)(1) by causing the Plan to pay him four hours of weekly overtime for almost four years, and by causing the Plan to pay him weighted fringe benefits retroactively without Trustee authorization."). This is especially true in applying ERISA to the facts at issue here, as "[i]n light of Congress' overriding concern with the protection of plan participants and beneficiaries, courts have generally construed the protective provisions of § 406(b) broadly." *Acosta v. Pac. Enterprises*, 950 F.2d at 620 (citing *Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1213 (2d Cir.1987); *Leigh v. Engle,* 727 F.2d 113, 126 (7th Cir.1984)).

3. <u>Whether Ms. Alongi was a "fiduciary" of the Funds, and thus owed fiduciary duties.</u> Ms. Alongi was acting as a functional fiduciary when she (1) failed to complete certain timesheets; (2) performed work on behalf of the Coalition; (3) failed to work certain hours for which she was compensated by the Funds; (4) directed Funds office staff to work for the Coalition; and (5) took vacation time to which she was not entitled. The Funds submit that Ms. Alongi acted as a fiduciary in her role as the Administrator of the Funds while taking each of the actions described above. "A person can be a fiduciary under ERISA in two ways … First, a person is a 'named fiduciary' if identified as such in a plan instrument or pursuant to a procedure specified in the plan." *Mass. Laborers' Health and*

*Welfare Fund v. Blue Cross Blue Shield*, 66 F. 4th 307, 316 (1st Cir. 2023) (citing 29 U.S.C. § 1102(a)). "Second, a person can become a 'functional fiduciary' by 'performing at least one of several enumerated functions with respect to a plan.'" *Id.* (quoting *Beddall v. State St. Bank & Tr. Co.*, 137 F. 3d 12, 18 (1st Cir. 1998)). As relevant here, "a person is a functional fiduciary 'with respect to a plan *to the extent* (i) he exercises … any authority or control respecting management or disposition of its assets." *In re Fidelity ERISA Fee Litigation*, 990 F. 3d 50, 55 (1st Cir. 2021) (quoting 29 U.S.C. § 1002(21)(A)) (alteration in original). In other words, functional fiduciary status, as alleged, has two elements: (1) *any* authority or control over (2) management or disposition of plan assets. *See id.* Ms. Alongi's work in all relevant respects satisfied both elements. The First Circuit holds that "[a] person or entity can be a fiduciary of a plan for some purposes and not for others" such that "[i]n every case charging breach of ERISA fiduciary duty ... the threshold question is ... whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Id.* (citing *Pegram v. Herdrich,* 530 U.S. 211, 225 (2000)). First, Ms. Alongi determined to increase her compensation by taking $50,000 of plan assets to which she was not entitled, and she directed Fund Office employees to disburse those amounts to her (and similar amounts to her twin sister) from Funds assets in the middle of the year, as opposed to at year end as was the case for all other eligible employees. *See United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 470 (S.D.N.Y. 2014) ("A party becomes a fiduciary if it exercises any authority

or control over plan assets. If a contractor to an ERISA plan retains control over factors that determine its compensation, the contractor becomes a fiduciary as to that compensation."). This compensation was not in her contract, was not approved by the Trustees, and came at the expense of Funds beneficiaries. Ms. Alongi therefore acted as a fiduciary in directing the disbursement of Funds assets for this purpose. Second, Ms. Alongi exercised control over plan assets when she diverted Fund staff resources (including her own time and the time of other staff) to benefit a third-party, the Coalition, which paid no compensation to the Funds for the services that it received. As is established above, Fund Office employee time and compensation constitute "plan assets" as defined by ERISA, and Ms. Alongi's discretionary use of Fund Office employee time and resources to provide services to a third party entity accordingly constituted discretionary control over those assets, as she testified that she was in charge of the day-to-day operations of the Fund Office, that she was ultimately responsible for the work of the Funds employees, and that she had the authority to make hiring recommendations, to decide not to hire, discipline and fire employees.

4.    <u>Whether Ms. Alongi Breached Fiduciary Duties Owed to the Funds</u>. In failing to keep a daily time sheet to enable an accurate allocation of the expenses associated with her time as an employee, Ms. Alongi disregarded the requirements of an adopted plan procedure, which constitutes a "plan document" as defined in ERISA. 29 U.S.C. § 1104(a)(1)(D). Her disregard of that obligation clearly rendered the Funds' allocation of administrative costs to

the respective Funds incorrect which, in the words of the DOL, must be "objective and accurate." Ms. Alongi's failure to keep the required timesheets violates ERISA, 29 U.S.C. §§ 1104(a)(1)(A), 1104(a)(1)(D), because it indisputably led to a scenario in which Funds were subsidizing the costs associated with Ms. Alongi's work on behalf of other Funds, as well as on behalf of the Coalition, an entirely unrelated third-party entity. In performing work on behalf of the Coalition, failing to work hours for which she was compensated, assigning Fund Office employees to performed work for the Coalition during normal Fund Office business hours and utilizing Funds resources, and in cashing out vacation time to which she was not entitled, Ms. Alongi violated ERISA, 29 U.S.C. §§ 1002(21)(A), 1104(a)(1)(A), (B), 1106(b). As the DOL found, the previous failure to accurately allocate the expenses associated with *that very same work* amongst the Funds serviced out the Fund Office constituted a fiduciary breach – that type of breach occurred again some years later, and this time also included improper, unreported allocations of time to the Coalition. Ms. Alongi's decision to do so and her unilateral implementation of a subsidized workforce for the Coalition at the Funds' direct expense is the embodiment of exercising fiduciary discretion and acting in a manner contrary to law. Unlike in the single employer benefit plan context, where the assets of a sponsoring company often support and augment the operation of its employee benefits programs, in the case of multiemployer funds there simply are no other assets to pay benefits and conduct fund operations other than the assets of the trust. Thus, *any expenditure* of fund resources for the benefit of an outside entity – or

for Ms. Alongi herself without proper approval - is an impermissible diversion of plan assets in contravention of ERISA's cardinal rule that such assets may be used for the exclusive purpose of providing benefits and defraying reasonable expenses of the fund. *LaScala v. Scrufari*, 479 F.3d 213, 220 (2d Cir. 2007). Whether Ms. Alongi's activities on behalf of the Coalition benefitted the Funds – they did not – is entirely *irrelevant* to the analysis. "[T]he duty of loyalty as codified in ERISA Section 406(b)… gives notice to fiduciaries that they must either avoid the transactions described in Section 406(b) or cease serving in their capacity as fiduciaries, no matter how sincerely they may believe that such transactions will benefit the plan." *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). What is more, "[s]uch protection of beneficiaries and notice to fiduciaries [provided in Section 406(b)] requires that Section 406(b) be broadly construed, and that liability be imposed even where there is 'no taint of scandal, no hint of self-dealing, no trace of bad faith,' hardly the circumstances in the present case." *Id.* (internal citation omitted) (quoting *Cutaiar v. Marshall*, 590 F.2d 523, 528 (3d Cir.1979)). This is also true regarding Ms. Alongi's position that there was no fiduciary breach due to her allegations that certain trustees were aware of her work on behalf of the Coalition. See *LaScala v. Scrufari*, 479 F.3d at 220 ("But the fact that the trustees knew, or should have known, that Scrufari was being compensated at the same rate as Sanoian is irrelevant to whether Scrufari breached his fiduciary duties.").

The Funds and Mr. McLaughlin will need to depose Messrs. Sbararo and Reece, but anticipate moving to exclude them under Fed. R. E. 702.  Further, the Funds and Mr. McLaughlin intend to designate their own rebuttal experts. The Funds and Mr. McLaughlin reserve the right to file motions in limine addressing these topics in more detail in advance of trial. The Funds and Mr. McLaughlin also reserve the right to file additional motions in limine in advance of trial.

B.   Issues Identified by Ms. Alongi

1.   Whether Ms. Alongi was a "fiduciary" of the Funds, and thus owed fiduciary duties.  A claim for breach of fiduciary duty under ERISA, of course, lies only against an individual or entity that qualifies as an ERISA fiduciary.  *See Pegram* v. *Herdrich*, 530 U.S. 211, 226 (2000).  "Nonfiduciaries acting unilaterally and even negligently are not liable under [ERISA.]"  *Spalding* v. *Reliance Standard Life Ins. Co.*, 835 F. Supp. 23, 32 (D. Mass. 1993).  The Funds concede, as they must, that Ms. Alongi is not a named fiduciary of any of the Funds. Consequently, the Funds must prove that Ms. Alongi was a *functional* fiduciary of the Funds. *See* 29 U.S.C. § 1002(21). A functional fiduciary of an ERISA plan is one who "exercises any discretionary authority or discretionary control respecting management of such plan" or "has any discretionary authority or discretionary responsibility in the administration of such plan."  *Livick* v. *Gillette Co.*, 492 F. Supp. 2d 1, 7 (D. Mass. 2007), *aff'd sub nom.*, 524 F.3d 24 (1st Cir. 2008) (quoting 29 U.S.C. § 1002(21)(A)).  Importantly, a person is a functional fiduciary "only 'to the extent' that he possesses or exercises the requisite discretion or control." *Beddall* v. *State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (emphasis added).  "Because the definition's 'to the extent' limitation

requires some nexus between the alleged ERISA violation and the actions or functions that have created fiduciary status, fiduciary liability arises in specific increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad, general terms." *Golden Star, Inc.* v. *Mass Mut. Life Ins. Co.*, 22 F. Supp. 3d 72, 79 (D. Mass. 2014) (quoting *Beddall*, 137 F.3d at 18) (internal quotation marks omitted). Simply put, Ms. Alongi's role as Administrator of the Funds did not meet this standard.

2.     What constitutes a "plan asset" for purposes of the Funds' breach of fiduciary duty claim. Most, if not all, of the Funds' claims against Ms. Alongi involve their allegations of how she spent her working day and/or how she allegedly directed the work of others. In the context of ERISA breach of fiduciary duty claims, however, an employee's time is not a "plan asset" subject to ERISA fiduciary duties. To the contrary, an employee's time, and how that time is spent, is a business decision that falls outside the scope of ERISA fiduciary duties. *See In re Luna*, 406 F.3d 1192, 1207 (10th Cir. 2005) (business decisions that have an effect on an ERISA plan but that do not constitute management or administration of the plan are not subject to ERISA fiduciary liabilities); *Phillips* v. *Amoco Oil Co.*, 799 F.2d 1464, 1471 (11th Cir. 1986) ("ERISA does not prohibit an employer from acting in according with its interests as an employer when not administering the plan or investing its assets").

Ms. Alongi reserves the right to file motions in limine addressing these topics in more detail in advance of trial. Ms. Alongi also reserves the right to file additional motions in limine in advance of trial.

**VIII.   Requested Amendments to Pleadings**

The parties do not request any amendments to the pleadings.

**IX.   Additional Matters to Aid in the Disposition of the Action**

The parties have submitted supplemental memoranda on the issue of whether Ms. Alongi is entitled to a jury for the Funds' breach of fiduciary duty claims, and Ms. Alongi asserts that the jury empaneled to hear her Counterclaims can and should act in an advisory capacity on the Funds' breach of fiduciary claim.  The parties do not have any additional matters to raise that may aid in the disposition of the action.

**X.   Probable Length of Trial**

The Funds and Mr. McLaughlin estimate that the trial of this matter will last approximately three weeks, assuming 9am – 1pm trial days.  Ms. Alongi estimates that the trial of this matter will last approximately two weeks, assuming 9am – 1pm trial days.

**XI.   Witnesses**

A.   The Funds' and Mr. McLaughlin's Proposed Witnesses

1.   Gina Alongi

2.   Rosemarie Alongi, c/o Ms. Alongi's Counsel

3.   William McLaughlin, c/o Funds' Counsel

4.   Greg Geiman, c/o Funds' Counsel

5.   Kathryn Shea, c/o Funds' Counsel

6.   James Burns, c/o Funds' Counsel

7.   James Reger, c/o Funds' Counsel

8.   Michael Bowes, c/o Funds' Counsel

9.   David Fantini, c/o Funds' Counsel

10. Paul Diminico, c/o Funds' Counsel

11. David Marr, Jr. c/o Funds' Counsel

12. Christopher T. Fogarty, c/o Funds' Counsel

13. Michael M. Foley, c/o Funds' Counsel

14. David F. Shea, c/o Funds' Counsel

15. James Heinzman, c/o Schultheis & Panettieri, LLP, 450 Wireless Boulevard, Hauppauge, NY 11788

16. Gary Waldren, c/o Schultheis & Panettieri, LLP, 450 Wireless Boulevard, Hauppauge, NY 11788

17. Laura-Jean Hickey, c/o Funds' Counsel

18. Jeanie Mickel, Manzi & Associates, L.L.C., 855 Turnpike Street, North Andover, MA 01845

19. Jennifer Dow, 10 Garfield Terrace, Lynn, MA 01905

20. Rosemary Ortega, 16 Marion Street, Uxbridge, MA 01569

21. Taylor Ryan, 2 Church Street, Auburn, MA 01501; P.O. Box 87, Woods Hole, MA 02543

22. Jennifer Vachon, 9 Hourihan Street, Peabody, MA 01960

23. Louis Rasetta, 10 Bridle Path, Holliston, MA 01746

24. John J. Shaughnessy, c/o Law Offices of Robert Philip Hilson, 175 Derby Street, Hingham, MA 02043

25. Joyce A. Mader, 3580 Loftland Drive, Earlysville, VA 22936

26. Monique Albert

27. Rebecca Zacardi, c/o Funds' Counsel

B. Ms. Alongi's Proposed Witnesses

1. Gina Alongi

2. Rosemarie Alongi

3.      James Burns, c/o Funds' counsel

4.      Jennifer Dow, 10 Garfield Terrace, Lynn, MA 01905

5.      Greg Geiman, c/o Funds' counsel

6.      Laura Jean Hickey, c/o Funds' counsel

7.      William McLaughlin, c/o Funds' counsel

8.      Rosemary Ortega, 16 Marion Street, Uxbridge, MA 01569

9.      Louis Rasetta, 10 Bridle Path, Holliston, MA 01746

10.     Taylor Ryan, P.O. Box 87, Woods Hole, MA 02543

11.     John J. Shaughnessy, c/o Law Offices of Robert Philip Hilson, 175 Derby Street, Hingham, MA 02043

12.     Kathryn Shea, c/o Funds counsel

13.     Jennifer Vachon, 9 Hourihan Street, Peabody, MA 01960

14.     Christopher Reece, Managing Partner, Forensic Employment and Compensation Consultants, LLC

All of the parties' proposed witnesses can be reached through respective undersigned counsel, except as noted. On June 3, 2024, Ms. Alongi disclosed the "Expert Report of Forensic Employment & Compensation Consultants, LLC" along with exhibits thereto. The parties are in the process of scheduling additional discovery related to this disclosure, and the Funds and Mr. McLaughlin reserve the right to designate an expert witness in accordance with the Federal Rules of Civil Procedure. The parties also reserve the right to call any witness identified by the opposing parties, and further reserve the right to call rebuttal witnesses if and as necessary.

## XII.    Deposition Excerpts and Interrogatory Answers to be Submitted

Neither the Funds and Mr. McLaughlin nor Ms. Alongi propose entering any deposition excerpts or interrogatory answers in their case-in-chief.  Both parties reserve the right, however, to use and/or introduce deposition excerpts and interrogatory answers for impeachment purposes.

XIII.   **Proposed Exhibits**

    A.   <u>Exhibits Proposed by the Funds and Mr. McLaughlin</u>

        1.      Trust Agreement International Union of Operating Engineers Local 4 and Its Branches Pension Fund (Excerpts) (ECF No. 54, Ex. 2)

        2.      Trust Agreement International Union of Operating Engineers Local 4 and Its Branches Health and Welfare Fund (Excerpts) (ECF No. 54, Ex. 3)

        3.      Trust Agreement International Union of Operating Engineers Local 4 and Its Branches Annuity Fund (Excerpts) (ECF No. 54, Ex. 4)

        4.      September 16, 2004 Correspondence from DOL (ECF No. 54, Ex. 7)

        5.      July 25, 2003 Email from Defendant Alongi concerning DOL Audit (ECF No. 54, Ex. 10)

        6.      July 30, 2003 Email from Defendant Alongi concerning DOL Audit (ECF No. 54, Ex. 11)

        7.      July 31, 2003 Email from Defendant Alongi concerning DOL Audit (ECF No. 54, Ex. 12)

        8.      August 1, 2003 Email from Funds Counsel concerning DOL Audit (ECF No. 54, Ex. 13)

        9.      August 4, 2003 Email from Defendant Alongi concerning DOL Audit (ECF No. 54, Ex. 14)

        10.    December 29, 2003 Email from Defendant Alongi circulating Time Sheet (ECF No. 54, Ex. 15)

        11.    Shared Services Agreement (ECF No. 54, Ex. 5) (FUNDS000250-000259)

        12.    International Union of Operating Engineers Local 4 Fringe Benefit Funds Office Employee Handbook (June 27, 2016) (FUNDS000073-000089)

        13.    International Union of Operating Engineers Local 4 Fringe Benefit Funds Office Employee Handbook (February 2019) (FUNDS000090-000106)

        14.    International Union of Operating Engineers Local 4 Fringe Benefit Funds Office Employee Handbook (August 2020) (FUNDS000107-000123)

        15.    Administrator Job Description (FUNDS082742-082748)

16. 2018 Pet Policy (FUNDS000345)

17. Gregory Geiman My personal hell (May 24, 2018) (FUNDS084902-084903)

18. Gregory Geiman Note to File (May 24, 2018) (FUNDS084904)

19. Gregory Geiman FWD: Note to File (May 24, 2018) (FUNDS084900-084901)

20. Gregory Geiman Email (May 14, 2018) (FUNDS084880-084881)

21. Gina Alongi Interview Notes (GMA00268-00272)

22. Schultheis & Panettieri LLP Forensic Audit (ECF No. 54, Ex. 8)

23. Gregory Geiman Memo to File re: Rosemarie Alongi (July 27, 2020) (FUNDS084412)

24. Minutes of Special Meeting of Trustees I.U.O.E. Local 4 Health and Welfare Fund, July 21, 2020 (ECF No. 54, Ex. 16)

25. Minutes of Special Meeting of Trustees of IUOE Local 4 Pension Fund (July 21, 2020) (FUNDS084788-084791)

26. Minutes of Special Meeting of Trustees of IUOE Local 4 Annuity and Savings Fund (July 21, 2020) (FUNDS084784-084787)

27. Gina Alongi Termination Letter (FUNDS000054)

28. Rosemarie Alongi Termination Letter (FUNDS000001)

29. Joyce A. Mader Report (FUNDS000294-000322)

30. Email from William McLaughlin to Gina Alongi (June 15, 2020) (FUNDS084452-084453)

31. Email from Gregory Geiman to Funds' Employees (June 16, 2020) (FUNDS084578-084580)

32. Draft Employment Agreement (June 27, 2018) (FUNDS084976-084977)

33. Email from Gina Alongi to William McLaughlin and Jack Shaughnessy (July 24, 2018) (FUNDS082739)

34. Email from Gina Alongi to Amanda Cronin (February 18, 2020) (FUNDS000356)

35.     Email chain between Gregory Geiman, Rosemarie Alongi, and Gina Alongi (November 15, 2019 – November 18, 2019) (FUNDS000360-000361)

36.     Email from Gina Alongi to Monique Albert (September 21, 2017) (FUNDS000363)

37.     Email from Gina Alongi to Monique Albert (April 26, 2017) (FUNDS000365)

38.     Jennifer Dow 2019 Time Reports (IUOE4 FED 1047-1066)

39.     Affidavit of Jennifer Dow (GMA00418-00419)

40.     Affidavit of Jennifer Vachon (GMA00420-00421)

41.     Gregory Geiman Declaration

42.     Coalition 2016 and 2019 IRS Form 990EZ Filing (ECF No. 54, Ex. 17)

43.     Time Study Results and Common Expense Allocations, 2015-2017 (ECF No. 54, Ex. 18)

44.     Ms. Alongi's "Agreement Executive Director Massachusetts Coalition of Taft-Hartley Trust Funds, Inc." (ECF No. 54, Ex. 19)

45.     Schedules of Coalition Meetings, 2017-2020 (ECF No. 54, Ex. 20)

46.     Emails Establishing that Ms. Alongi participated in telephone conferences and in-person meetings with Coalition members, prospective members, and vendors during Fund Office business hours, utilizing Fund Office resource (ECF No. 54, Ex. 21)

47.     Emails Establishing that Ms. Alongi reviewed documents, correspondence, and memos on behalf of the Coalition during Fund Office business hours, utilizing Fund Office resources (ECF No. 54, Ex. 22)

48.     Emails Establishing that Ms. Alongi participated in discussions and implemented surveys of Coalition members and vendors during Fund Office business hours, utilizing Fund Office resources (ECF No. 54, Ex. 23)

49.     Emails Establishing that Ms. Alongi actively sought out new members to collect membership applications and fees from associate members and entities on behalf of the Coalition during Fund Office business hours, utilizing Fund Office resources (ECF No. 54, Ex. 24)

50.     Ms. Alongi's Answers to Plaintiffs First Set of Interrogatories (Excerpts) (ECF No. 54, Ex. 25)

51.    Email Establishing that Ms. Alongi directed Laura-Jean Hickey to assign Coalition work to Fund Office Employees (ECF No. 54, Ex. 26)

52.    January 15, 2015 Email Establishing that Rosemarie Alongi designed the Coalition's website utilizing Funds resources (ECF No. 54, Ex. 27)

53.    Emails and corresponding timesheets establishing that Rosemaire Alongi regularly performed work on behalf of the Coalition during the Funds' regular business hours, utilizing Funds resources, while concealing that work (ECF No. 54, Ex. 28)

54.    Emails establishing that, at Ms. Alongi's direction, Rosemarie Alongi applied pressure on prospective IT service providers to join the Coalition and submit membership fees during the Funds' regular business hours and utilizing the Funds' resources (ECF No. 54, Ex. 29)

55.    Email establishing that, at Ms. Alongi's direction, work Ms. Hickey performed on behalf of the Coalition included drafting, reviewing, and finalizing Coalition meeting and event agendas and organizing and maintaining various Coalition documents and materials (ECF No. 54, Ex. 30)

56.    Email establishing that, at Ms. Alongi's direction, work Ms. Hickey performed on behalf of the Coalition included coordinating surveys among Coalition members and vendors (ECF No. 54, Ex. 31)

57.    Email establishing that, at Ms. Alongi's direction, work Ms. Hickey performed on behalf of the Coalition included scheduling and facilitating telephone conferences during regular business hours with Coalition members, prospective members, and service providers (ECF No. 54, Ex. 32)

58.    Emails establishing that, at Ms. Alongi's direction, work Ms. Hickey performed on behalf of the Coalition included contacting event vendors and prospective venues and generally planning and attending Coalition events, Wellness Fairs, and holiday parties (ECF No. 54, Ex. 33)

59.    Emails establishing that, at Ms. Alongi's direction, work Ms. Ryan performed on behalf of the Coalition included seeking and analyzing product information from vendors for Coalition events and tracking address and contact information for Coalition members and service providers (ECF No. 54, Ex. 34)

60.    Emails establishing that, at Ms. Alongi's direction, work Ms. Ryan performed on behalf of the Coalition included comprehensive, time-consuming projects (ECF No. 54, Ex. 35)

61.    Emails establishing that, at Ms. Alongi's direction, Ms. Ortega performed on work behalf of the Coalition (ECF No. 54, Ex. 37)

62.    Photographs of Coalition property and material removed from the Fund Office following Ms. Alongi's termination (ECF No. 54, Ex. 47)

The Funds and Mr. McLaughlin reserve the right to supplement this list of exhibits. The Funds and Mr. McLaughlin additionally reserve the right to introduce any and all exhibits identified by any other party.

B.   Exhibits Proposed by Ms. Alongi

1.    Rose Alongi Leave Letter (Deposition Ex. 4)

2.    Rose Alongi Termination Letter (Deposition Ex. 5)

3.    Taylor Ryan Interview Notes (Deposition Exhibit 9)

4.    Gina Alongi notes regarding William McLaughlin comments (Deposition Exhibit 11)

5.    Taylor Ryan Letter (Deposition Exhibit 12)

6.    Rosemary Ortega Notes (Deposition Ex. 13)

7.    7.24.18 Email from Gina Alongi requesting employment contract through 2022 (Deposition Ex. 14)

8.    Gina Alongi Notes from May 2018 (Deposition Exhibit 17)

9.    5.17.17 Letter from Gregory Geiman (Deposition Exhibit 25)

10.   5.16.18 Email from Gregory Geiman regarding conversation with Rosemary Ortega (Deposition Ex. 30)

11.   5.16.18 Email from Gregory Geiman re talking points for meeting with Kate Shea (Deposition Ex. 31)

12.   7.21.20 Minutes of Special Meeting of Trustees of Health and Welfare Fund (Deposition Ex. 33)

13.   11.2.18 Email regarding pets in the workplace/reasonable accommodation (Deposition Ex. 34)

14.   11.2.18 Email from/to William McLaughlin regarding pets in the workplace/reasonable accommodation (Deposition Ex. 35)

15.     11.9.18 Notice regarding Pets in the Workplace (Deposition Ex. 36)

16.     10.5.15 Email from Gregory Geiman praising Gina Alongi in support of award nomination (Deposition Exhibit 84)

17.     5.24.18 Gregory Geiman email to self (Deposition Exhibit 85)

18.     5.14.18 Gregory Geiman email to self (Deposition Exhibit 86)

19.     5.24.18 Gregory Geiman email to self (Deposition Exhibit 87)

20.     Kroll Report (Deposition Exhibit 127)

21.     Gina Alongi Timesheet, 7.20.20 (Deposition Exhibit 159)

22.     Gina Alongi Termination Letter (Deposition Exhibit 162)

23.     Minutes from Union meeting with William McLaughlin comments (Deposition Exhibit 167)

24.     William McLaughlin Notes for Union meeting (Deposition Exhibit 168)

25.     Kate Shea email to James Shaw regarding pet accommodation (Deposition Exhibit 188)

26.     Yearly Time Allocation form for Laura Jean Hickey(Deposition Exhibit 190)

27.     Laura Jean Hickey interview notes (Deposition Exhibit 192)

28.     Laura Jean Hickey Coalition timesheet (Deposition Exhibit 193)

29.     Expert Report of Forensic Employment and Compensation Consultants, LLC

30.     Ad book from the 49th Annual Cushing-Gavin Awards

Ms. Alongi reserves the right to supplement this list of exhibits. Ms. Alongi additionally reserves the right to introduce any and all exhibits identified by any other party.


## XIV.   Damages

### A.   Funds' Statement of Damages

The Funds calculate their damages for the breach of fiduciary duty claims as follows:

- o Work for the Massachusetts Coalition of Taft-Hartley Trust Funds by Ms. Alongi: $460,704, plus all sums she received from the Coalition for work performed at the Funds' expense during the period January 1, 2015 through July 21, 2020;

- o Work for the Massachusetts Coalition of Taft-Hartley Funds by Other Fund Employees as directed by Ms. Alongi: $688,173.00, as well as rent totaling an additional $24,457.00;

- o Cashing out vacation time without authorization by Trustees: $49,849.20;

- o Ms. Alongi's failure to work hours for which she was compensated: $282,152.00; and

- o An order permitting the Pension and Annuity Funds to offset benefits payable to Ms. Alongi to satisfy any judgment entered in this case.

With respect to Ms. Alongi's counterclaims, the Funds and Mr. McLaughlin submit that Ms. Alongi cannot recover any damages in this action.

B. Ms. Alongi's Statement of Damages

Ms. Alongi submits that the Funds cannot recover any damages in this action because she did not violate any fiduciary duty owed to the Funds. With respect to her counterclaims, Ms. Alongi calculates her damages as follows:

Economic Damages: $1,721,386

Emotional Distress Damages: To be determined by the Jury

Punitive Damages: To be determined by the Jury

Attorneys' Fees: To be determined by the Court following the Jury's verdict.

Interest: Pursuant to Massachusetts law

Respectfully submitted,

Dated: June 12, 2024

s/ Jennifer Markowski
Jennifer L. Markowski, BBO # 655927
FREEMAN, MATHIS & GARY LLP
60 State Street, Suite 600
Boston, Massachusetts 02109-1800
Telephone: (617) 963-5975
jmarkowski@fmglaw.com

s/ Charles W. Gilligan
Charles W. Gilligan, pro hac vice
Jennifer Simon, pro hac vice
Daniel Keenan, pro hac vice
O'DONOGHUE & O'DONOGHUE LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Telephone: (202) 362-0041
Facsimile: (202) 362-2640
cgilligan@odonoghuelaw.com
jsimon@odonoghuelaw.com
dkeenan@odonoghuelaw.com

/s Timothy P. Van Dyck
Timothy P. Van Dyck (BBO # 548347)
Douglas T. Radigan (BBO #657938)
Robert G. Young (BBO # 650541)
BOWDITCH & DEWEY, LLP
200 Crossing Boulevard
Framingham, Massachusetts 01702
Telephone:  617.757.6537
Facsimile:  508.929.3137
tvandyck@bowditch.com
dradigan@bowditch.com
ryoung@bowditch.com

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Robert G. Young