UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BOARD OF TRUSTEES OF THE IUOE LOCAL 4 PENSION FUND, BOARD OF TRUSTEES OF THE IUOE LOCAL 4 ANNUITY & SAVINGS FUND, BOARD OF TRUSTEES OF THE IUOE LOCAL 4 HEALTH AND WELFARE FUND, BOARD OF TRUSTEES OF THE HOISTING AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND, INTERNATIONAL UNION OF OPERATING ENGINEERS LOCAL 4, IUOE LOCAL 4 LABOR-MANAGEMENT CO-OPERATION TRUST, AND IUOE LOCAL 4 SOCIAL ACTION COMMITTEE.<br>      Plaintiffs,<br><br>IUOE LOCAL 4 PENSION FUND, IUOE LOCAL 4 ANNUITY & SAVINGS FUND, IUOE LOCAL 4 HEALTH AND WELFARE FUND, HOISTING AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND, IUOE LOCAL 4 LABOR-MANAGEMENT CO-OPERATION TRUST, WILLIAM D. MCLAUGHLIN, individually and in his capacity as Chairman of the Boards of Trustees,<br>      Defendants-in-Counterclaim,<br>v.<br>GINA ALONGI,<br>      Defendant/Plaintiff-in-Counterclaim | Civil Action No. 1:21-cv-10163-FDS |

**DEFENDANTS-IN-COUNTERCLAIMS' RULE 702 MOTION TO EXCLUDE PLAINTIFF'S EXPERT WITNESS FROM TESTIFYING**

Defendants-in-Counterclaim IUOE Local 4 Health and Pension Fund, IUOE Local 4 Annuity and Savings Fund, IUOE Local 4 Health and Welfare Fund, Hoisting and Portable Engineers Local 4 Apprenticeship and Training Fund, IUOE Local 4 Labor-Management Co-

1

Operation Trust (collectively "The Funds"), and William D. McLaughlin ("Mr. McLaughlin") (collectively, the "Funds and Mr. McLaughlin") by and through their undersigned counsel, respectfully move this Court to exclude the testimony of Richard Sbarbaro and Christopher Reece, Plaintiffs-in-Counterclaim's expert witnesses, pursuant to Federal Rule of Evidence 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

## I.     INTRODUCTION

As set forth below, Plaintiff-in-Counterclaim's expert witnesses, Richard Sbarbaro ("Mr. Sbarbaro") and Christopher Reece ("Mr. Reece"), should be excluded from testifying as expert witnesses in this action, and their opinions and conclusions should be excluded. A review of Mr. Sbarbaro's and Mr. Reece's report and of Mr. Reece's deposition testimony reveals that neither is qualified to testify as an expert on the Plaintiff-in-Counterclaim's employability nor her future compensation. The opinions proffered by Mr. Reece and Mr. Sbarbaro will not assist the fact finder in understanding a fact in question and employ no discernible methodology that would satisfy *Daubert*. To the extent the opinions are based on Mr. Reece and Mr. Sbarbaro's experience, Mr. Reece has failed to sufficiently connect his experience to the question of Ms. Alongi's employability. Because neither Mr. Sbarbaro's nor Mr. Reece's opinions meet the basic requirements imposed by *Daubert* and its progeny, as well as Fed. R. Evid. 702, The Funds and Mr. McLaughlin respectfully request that the Court exclude Mr. Sbarbaro and Mr. Reece as experts.

## II.     BRIEF STATEMENT OF FACTS

### A.  Relevant Background of Underlying Claim

The present matter concerns, among other things, the termination of the Plaintiff-in-Counterclaim, Gina Alongi's ("Ms. Alongi") termination from her employment as the

Administrator of The Funds. Ms. Alongi was terminated from her employment with The Funds on July 21, 2020. The Funds terminated Ms. Alongi due to numerous breaches of fiduciary duty, which came to light in the spring and summer of 2020. Ms. Alongi disputes the reason for her termination. At the time Ms. Alongi was terminated, she remained employed as the Executive Director of the Coalition of Taft-Hartley Funds, for which she was compensated between $47,000 and $48,000 per year. While the Funds dispute liability, on the issue of damages Ms. Alongi had a duty to mitigate her damages by taking reasonable steps to find a comparable position. She made no effort to find a new position after her termination from the Funds. Ms. Alongi has retained Mr. Sbarbaro and Mr. Reece[1] to opine on the "lost earnings potential and future employability" of Ms. Alongi following her termination from The Funds, who conclude Ms. Alongi was "unemployable." Presumably, the purpose of the opinion is an attempt to overcome the obvious conclusion that taking no steps whatsoever cannot be deemed "reasonable efforts."

    **B. Christopher Reece's Methodology and Experience Related to His Opinion on Ms. Alongi's Employability or Future Compensation.**

        **a. Mr. Reece Utilized no Discernible Methodology in Formulating His Opinion Concerning Ms. Alongi's Employability.**

Mr. Reece and Mr. Sbarbaro submitted a report on June 3, 2024, outlining their opinions that Ms. Alongi was unemployable after her termination from The Funds. On September 25, 2024, Mr. Reece and Mr. Sbarbaro submitted a Supplemental Report, which we understand to be the basis of their expected trial testimony. *See* **Exhibit A**, FECC Supplemental Report. The only difference in the two reports is in the calculation of Ms. Alongi's monthly pension. *See* **Exhibit**

---

[1] Ms. Alongi's attorneys have stipulated that Mr. Sbarbaro, despite co-authoring the expert report with Mr. Reece, will not be testifying at trial in this matter. Based on this stipulation, Defendants-in-Counterclaim have only brought this motion with respect to Mr. Reece's testimony. Defendants-in-Counterclaim reserve the right to challenge the testimony of Mr. Sbarbaro should the need arise.

3

**B**, Deposition of Christopher Reece, 100:21-101:13. Therefore, the focus of this motion is solely the Supplemental Report, dated September 25, 2024.

In reaching their conclusion that Ms. Alongi is unemployable, Mr. Reece and Mr. Sbarbaro purport to explain to the reader, "How Employers and Executive Search Firms Screen Candidates." **Exhibit A**. In this section, they rely on a website, "recruiterslineup.com" to state how prospective employers screen employees. Mr. Reece did not read this article in formulating his opinion but rather went and located it to ensure the report had, what he believed was, an authoritative resource saying the same thing as him. **Exhibit B**, 47:10-15. According to Mr. Reece, based on this screening process outlined on this website, the allegations against Ms. Alongi would be discovered by a potential employer, and "no organization or executive search firm would consider" her due to the alleged malfeasance at issue in this lawsuit, making it "impossible" for Ms. Alongi to find employment. **Exhibit A**.

Mr. Reece's methodology for developing his opinion on Ms. Alongi's employability included reviewing documentation, including Ms. Alongi's resume, financial documents, statements made by Mr. McLaughlin at a union member meeting, and letter of termination. **Exhibit A**; **Exhibit B**, 19:20-20:6. On May 31, 2024, three days before the report was submitted, Mr. Reece spoke with Ms. Alongi on a Zoom call. **Exhibit B**, 65:2-12. However, he testified that the conversation was solely to get additional background information on the documentation he had already reviewed and did not impact his opinion. **Exhibit B**, 71:15-21; 75:21-76:1. Additionally, Mr. Reece searched Ms. Alongi's name on the internet and located an article that stated she had been accused of financial malfeasance and had accused her employer of sexual harassment. **Exhibit B**, 72:10-14.

According to Mr. Reece, Ms. Alongi's job search efforts were not part of his consideration in determining that she was unemployable. **Exhibit B**, 81:16-82:10. Mr. Reece did not consider the fact that Ms. Alongi remained employed after her termination from The Funds because, in his opinion, "there are always people available for jobs so why try to present a candidate that has baggage when there are candidates that don't have baggage." **Exhibit B**, 84:10-13. Mr. Reece did not reach out to any organizations, including the organization Ms. Alongi worked for after her termination from The Funds, to determine whether she may have been employable. **Exhibit B**, 96:10-16. The only thing Mr. Reece did to identify jobs that Ms. Alongi may have been qualified for was to type in "fund administrator" on LinkedIn and Indeed. **Exhibit B**, 92:13-23.

Mr. Reece testified that he conducted no data-driven research in forming his opinion. **Exhibit B**, 88:6-20. Instead, Mr. Reece's opinion regarding Ms. Alongi's employability and compensation is based on his "[o]ver 40 years of management consulting experience." **Exhibit B**, 38:13-17.

### b. Mr. Reece's Experience is Not Sufficiently Connected to His Opinion That Ms. Alongi was Unemployable After Her Termination.

As stated above, Mr. Reece has based his opinion concerning Ms. Alongi's employability *solely* on his experience as an executive search consultant. *See* **Exhibit B**, 80:8-23. According to Mr. Reece, "[a]n executive search consultant is retained by a client that is an organization…and…asked to identify and recruit candidates for a specific position." **Exhibit B**, 25:10-15. While Mr. Reece's practice does not focus on a specific industry, he testified that his work has included "[n]ot much in the way of banking or financial services." **Exhibit B**, 29:1-10. Mr. Reece has never placed an Administrator for ERISA funds, has never worked with an ERISA fund to recruit an individual to their organization, and has never researched the ERISA fund

5

industry. **Exhibit B**, 30:14-24. Mr. Reece has never been retained by an employee to assist them in finding a job. **Exhibit B**, 38:22-24.

Furthermore, Mr. Reece testified that many companies do not hire an executive search firm when looking to hire candidates. In fact, Mr. Reece testified that in his estimation, only thirty percent of companies hire executive search firms. **Exhibit B**, 39:1-14. When asked how he arrived at his estimation that thirty percent of companies hire executive search firms, Mr. Reece stated:

> So overall industry knowledge, reading about it, reading about -- the EMA Partners belongs to the AESC, which is the Association of Executive Search Consultants, and they publish information and I would say that somewhere in there they would say executive search gets hired about 30 percent of the time.

**Exhibit B**, 39:16-23. He further testified that the thirty percent number was not based on any data. **Exhibit B**, 40:15-41:4.

Understanding that, in Mr. Reece's opinion, seventy percent of companies do their hiring without utilizing an executive search firm, Mr. Reece acknowledged that "[i]f a company is looking for an individual and they don't hire [him, he has] no idea how they get that person, [he] only know[s] how they get a person if they hire [him]." **Exhibit B**, 40:3-6. Mr. Reece testified to his general process for identifying candidates for an executive position, which includes starting with 100 to 200 resumes of potential candidates and narrowing the pool before submitting the top candidates to the employer. **Exhibit B**, 41:11-42:20; 60:12-18. In Mr. Reece's experience in the search business, consultants like Mr. Reece are looking for reasons to reject candidates. **Exhibit B**, 60:17-18. Mr. Reece acknowledged that it was not his opinion that an employee who files a lawsuit against his or her employer, is sued by his or her employer, or been accused of crimes, is automatically unemployable. **Exhibit B**, 89:2-90:21.

### c. Mr. Reece Employed No Discernible Methodology for Calculating Ms. Alongi's Future Compensation and Cannot Rely on His Own Experience.

In formulating his opinion of Ms. Alongi's projected compensation had her employment not been terminated, Mr. Reece reviewed her financial documents and the relevant benefit plan documents. **Exhibit A**. Mr. Reece assumed Ms. Alongi would have worked until the end of 2025, despite turning sixty five (65) years old in February 2025, which may have affected his calculation by up to $200,000 if she had retired when she turned sixty five (65) years old. **Exhibit B**, 118:9-24. Additionally, in calculating her benefits while working at The Funds, Mr. Reece assumed a $17,500 annual car lease, $7,000 annually for car operating costs, and $480 annually for a cellphone plan. **Exhibit A, at Ex. I**.[2] Each of these numbers was a complete assumption, backed up by no data or evidence. Mr. Reece did not verify the $17,500 annual car lease – he simply took Ms. Alongi's word for it. **Exhibit B**, 131:12-17. Mr. Reece did try to verify the $7,000 in car operating cost Ms. Alongi reported to him. He did this by looking at his own insurance premium and the amount of money he spends on gas in a year. **Exhibit B**, 127:14-16; 129:8-10. Mr. Reece had no answer for why he verified one number provided by Ms. Alongi and not the other, much larger number. **Exhibit B**, 131:15-20. To evaluate Ms. Alongi's cellphone cost, Mr. Reece looked at his own cellphone plan. **Exhibit B**, 132:8-15. Additionally, despite Ms. Alongi earning close to $50,000 at the Coalition, Mr. Reece testified that he did not consider that money relevant to their analysis, as it was not enough to live on. **Exhibit B**, 134:1-17.

### III.    ARGUMENT

**A. Legal Standard**

The ultimate purpose of expert witness testimony is to assist the jury in resolving a fact at issue in the case. *See Earley Info. Science, Inc. v. Omega Engineering, Inc.*, 575 F. Supp. 3d 242,

---

[2] Exhibit I in the Supplemental Report does not include the assumptions related to Ms. Alongi's other benefits from her employment with the Funds, but Mr. Reece testified that it was simply a mistake that he left that column out of his Supplemental Report. **Exhibit B**, 114:17-115:4. We have included both versions of Exhibit I for reference. **Exhibit A, at Ex. I**.

7

245 (D. Mass. 2021). Upon a challenge to expert testimony, the proponent of such testimony must demonstrate by a preponderance of the evidence that the testimony is admissible. *See Liberty Mutual Insurance Co. v. Broan-NuTone LLC*, No. 21-cv-11986-DLC, 2024 WL 1836526, at *3 (D. Mass. Apr. 26, 2024).

The admissibility of expert witness testimony is governed by Fed. R. Evid. 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert*, 509 U.S. 579, 589 (1993), the Supreme Court reviewed Rule 702 and imposed upon trial courts a gatekeeping role to ensure that expert testimony is both relevant and reliable. *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "The Court's vigilant exercise of this gatekeeper role is critical because of the latitude given to expert witnesses to express their opinions on matters about which they have no firsthand knowledge, and because an expert's testimony may be given greater weight by the jury due to the expert's background and approach." *See U.S. v. Monteiro*, 407 F. Supp. 2d 351, 359 (D. Mass. 2006).

With respect to the reliability element, "'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. In *Daubert*, the Supreme Court outlined the following nonexclusive factors for determining reliability of expert testimony: "(1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level

of the theory or technique's acceptance within the relevant discipline." *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 14 (1st Cir. 2011) (quotation omitted).

In *Kumho Tire*, the Court clarified that the *Daubert* standard applies to "technical" or "other specialized" knowledge as well as "scientific" knowledge. *See Kumho Tire*, 526 U.S. at 148-49. While *Daubert* factors are not applied rigidly in instances of non-scientific testimony, *see Milward*, 639 F.3d at 15, the court still may consider them in evaluating reliability of non-scientific testimony, *see U.S. v. Fabrizio*, 445 F. Supp. 2d 152, 164 (D. Mass. 2006). In evaluating non-scientific expert testimony, the underlying focus of a trial judge's evaluation is "to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field," *see Kumho Tire*, 526 U.S. at 152. A reliable expert report does not rely on assumptions that are incapable of validation. *See Saia v. Sears Roebuck and Co., Inc.*, 47 F. Supp. 2d 141, 146 (D. Mass 1999).

Importantly, an expert witness, regardless of how qualified that person may be, cannot be permitted to present evidence based solely on his "say so." *See U.S. v. Zolot*, 968 F. Supp. 2d 411, 429 (D. Mass. 2013). Although an expert may testify based on his own experience, "if the [expert] witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Id*. at 430 (quotation omitted, alteration in original). The court may reject expert testimony when there is too great a gap between the underlying data and the opinion given by the purported expert. *See Gonzalez-Arroyo v. Doctors' Center Hosp. Bayamon, Inc.*, 54 F.4th 7, 14 (1st Cir. 2022). At bottom, the gatekeeping

function militates that the court do more than simply "tak[e] the expert's word for it." *See Fabrizio*, 455 F. Supp, 2d at 163.

### B. Mr. Reece's Testimony Concerning Employability Should Be Excluded Because He Fails to Establish Any Clear Methodology for Formation of His Opinion, His Conclusions are Not Sufficiently Tied to His Own Experience, and His Opinions Will Not Aid the Fact Finder.

#### i. Mr. Reece Employed No Methodology That the Court Can Analyze to Determine Reliability of His Opinion Concerning Ms. Alongi's Employability.

While the court does not need to use the *Daubert* factors to evaluate Mr. Reece's non-scientific testimony, it is worth noting that Mr. Reece's testimony does not satisfy a single *Daubert* factor. This is because Mr. Reece employed no real methodology besides determining that he, personally, having reviewed documentation concerning Ms. Alongi's termination and searched her name on the internet, would not have suggested Ms. Alongi as a candidate to a client in a situation where there were hundreds of other candidates available. **Exhibit B**, 80:7-17. This is not a theory or methodology that can be tested or peer reviewed because it is entirely subjective, as Mr. Reece acknowledged. **Exhibit B**, 98:12-15. *See Milward*, 639 F.3d at 14. Despite acknowledging that hiring is entirely subjective, Mr. Reece did not undertake to speak to anyone in the ERISA field about Ms. Alongi's potential employment, including the entity that continued to employ Ms. Alongi *after her termination*. **Exhibit B**, 96:10-16. Mr. Reece did not undertake to evaluate Ms. Alongi's relevant skills, or research in earnest available positions for someone with Ms. Alongi's skills. **Exhibit B**, 92:13-23.

Mr. Reece cannot escape the fact that his opinion regarding Ms. Alongi's employability is based solely on his own subjective belief, which is insufficient to establish reliable expert testimony. *See Daubert*, 509 U.S. at 590 ("'knowledge connotes more than subjective belief or unsupported speculation.") If Mr. Reece's personal opinion were considered methodologically

reliable testimony, anyone who had made a hiring decision could present evidence to a jury that an individual was unemployable.

> ii. **Mr. Reece's Testimony on Employability Should be Excluded Because He Fails to Establish the Basis of His Conclusion Using His Own Experience.**

As explained above, because Mr. Reece is not offering scientific testimony, the *Daubert* factors do not need to be applied rigidly. However, even setting aside the *Daubert* factors, Mr. Reece's opinion falls far short of the intellectual rigor required of an expert in his field. *See Kumho Tire*, 526 U.S. at 152. Mr. Reece's testimony should be excluded because he is asking the court to take his word for it that Ms. Alongi was unemployable after her termination. Mr. Reece has failed to establish that his experience as an executive search consultant is a sufficient basis for his opinion that Ms. Alongi was unemployable or that he applied his experience reliably to the facts in this case. *See Zolot*, 968 F. Supp. 2d at 430.

While Mr. Reece certainly has many years of experience in a niche area of hiring, he admittedly has no idea how seventy percent (70%) of employers hire candidates, an admittedly *very subjective* process that varies between organizations. **Exhibit B**, 39:1-16; 40:3-6; 64:9-16; 98:12-15. Furthermore, in Mr. Reece's experience, he begins with between 100 and 200 resumes for potential candidates, and "there are always people available for jobs." **Exhibit B**, 84:10-11. Therefore, he has the luxury of crossing off the list any potential employee which he determines has "baggage," which could include the malfeasance Ms. Alongi has been accused of but could also include a candidate whose compensation is too high or too low. **Exhibit B**, 60:22-23. Mr. Reece's opinion does nothing to establish that the roles Ms. Alongi would apply for would use an executive search recruiter or screen candidates in this manner. Mr. Reece has no experience hiring for ERISA funds and limited experience in the finance industry at all. **Exhibit B**, 29:8-10; 30:14-24. Mr. Reece, and his belief that "hiring is hiring," **Exhibit B**, 99:9, asks this court to simply take

11

his word for it that Ms. Alongi was unemployable after her termination. The court's gatekeeper role requires that this testimony not be permitted to reach the jury.

Furthermore, in assessing Ms. Alongi's employability, Mr. Reece impermissibly relies on multiple assumptions – that Ms. Alongi's prospective employers would have numerous candidates to choose from and that Ms. Alongi's perspective employers would follow Mr. Reece's hiring preferences – which are incapable of validation. *See Saia*, 47 F. Supp. 2d at 146.

### iii. Mr. Reece's Testimony Should be Excluded Because it Will Not Assist the Fact Finder.

Finally, Mr. Reece's testimony should be excluded because it does nothing to assist the trier of fact in understanding evidence or determining a fact in issue. *See* Fed. R. Evid. 702. Mr. Reece's testimony is essentially that, in general, accusations of malfeasance make it more difficult for an individual to find a job. This is not novel information that the jury needs to know to evaluate Ms. Alongi's alleged damages. *See Earley Info. Science, Inc.*, 575 F. Supp. 3d at 245. Therefore, the court should exclude Mr. Reece's testimony, as there is no need for Mr. Reece to testify to assist the jurors in understanding how one's past affects one's future employment opportunities.

### C. Mr. Reece's Testimony Concerning Ms. Alongi's Compensation Damages Should be Excluded Because His Opinions Are Based on Unreliable Methodology and Will Not Assist a Trier of Fact.

Mr. Reece's opinions related to Ms. Alongi's projected compensation are fundamentally flawed and unreliable and thus must be excluded, primarily because they are based on assumptions incapable of validation. *See Saia*, 47 F. Supp. 2d at 146. First, Mr. Reece assumed Ms. Alongi would continue to work over ten months after her sixty fifth birthday until the end of 2025. **Exhibit B**, 117:6-18. Additionally, Mr. Reece's opinion includes a large number of benefits he opines Ms. Alongi would have continued to be entitled to had she remained employed, including a leased car, car maintenance costs, and her cellphone. *See* **Exhibit A**, **at Ex. I**. Mr. Reece's approach to

developing the numbers for these benefits demonstrates his lack of any kind of methodology, let alone a reliable methodology. First, Mr. Reece inexplicably chose to verify the $7,000 Ms. Alongi claimed in car maintenance expenses but did not choose to verify the $17,500 in the car lease expense. **Exhibit B**, 131:12-17. However, in verifying the $7,000 in maintenance costs, as well as the cell phone cost, Mr. Reece's methodology was to look to his own spending habits. **Exhibit B**, 127:14-16; 129:8-10. He did no outside research to determine the actual cost of the benefits claimed by Ms. Alongi. His haphazard evaluation is not the work of an expert, which would aid the jury in understanding Ms. Alongi's compensation. *See Kumho Tire*, 526 U.S. at 152.

## IV.     CONCLUSION

For the reasons outlined above, this court should exclude Mr. Reece's testimony, as he has failed to present a reliable methodology, his opinions are based entirely on his own subjective beliefs untethered to the facts of this case, and because his opinion would not assist the jury in understanding any facts material to the case.

        Defendants-in-Counterclaim,

        IUOE LOCAL 4 HEALTH AND WELFARE FUND, IUOE LOCAL 4 PENSION FUND, IUOE LOCAL 4 ANNUITY AND SAVINGS, HOISTING AND PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP AND TRAINING FUND, JOINT LABOR-MANAGEMENT COOPERATION TRUST, and WILLIAM D. MCLAUGHLIN

        By their attorneys,

        */s/ Jennifer L. Markowski*
Jennifer L. Markowski, BBO# 655927
Jennawe M. Hughes, BBO# 698667
Katherine C. Chenail, BBO# 710835
**Freeman Mathis & Gary, LLP**
60 State Street. Suite 600
Boston, MA 02109
Tel:  (617) 963-5975
*jmarkowski@fmglaw.com*
*jhughes@fmglaw.com*
*kcchenail@fmglaw.com*

        */s/ Charles W. Gilligan*
Charles W. Gilligan, pro hac vice
Daniel Keenan, pro hac vice
**O'DONOGHUE & O'DONOGHUE**
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
Tel:  (202) 362-0041
*cgilligan@odonoghuelaw.com*
*dkeenan@odonoghuelaw.com*

Dated: October 25, 2024

**CERTIFICATE OF SERVICE**

      I, Jennifer L. Markowski, hereby certify that I have, on this 25th day of October 2024, served a copy of the foregoing document, by causing a copy thereof, to be sent electronically, through the ECF system, to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF).

      /s/ *Jennifer L. Markowski*
      Jennifer L. Markowski

**CERTIFICATE OF SERVICE**

I, Katherine C. Chenail hereby certify that I have, on this 25th day of October 2024, served a copy of the foregoing document, by causing a copy thereof, to be sent electronically, through the ECF system, to the registered participants in this case, as identified on the Notice of Electronic Filing (NEF).

/s/ *Katherine C. Chenail*

Katherine C. Chenail