# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| BOARD OF TRUSTEES of the IUOE LOCAL 4 PENSION FUND, BOARD OF TRUSTEES of the IUOE LOCAL 4 ANNUITY AND SAVINGS FUND, BOARD OF TRUSTEES of the IUOE LOCAL 4 HEALTH AND WELFARE FUND, BOARD OF TRUSTEES of the HOISTING AND PORT-ABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND, INTERNATIONAL UNION of OPERATING ENGINEERS LOCAL 4, IUOE LOCAL LABOR -MANANAGEMENT COOPERATIONN TRUST, and IUOE LOCAL 4 SOCIAL ACTION COMMITTEE | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : Civil Action No. <br> 21-cv-10163-FDS |
| PLAINTIFF | : <br> : |
| v. | : <br> : |
| GINA MARIE ALONGI <br> DEFENDANT | : <br> : <br> : |

---

## EXPERT REPORT OF:

## FORENSIC EMPLOYMENT & COMPENSATION CONSULTANTS, LLC

**1250 Executive Place, Suite 102**   **900 Greendale Ave., Suite 10**
**Geneva, IL 60134**   **Needham, MA 02492**

Forensic Employment &
Compensation Consultants, LLC

**THE ENGAGEMENT**

Forensic Employment & Compensation Consultants, LLC (FECC) and two of its managing partners, Richard Sbarbaro and Christopher Reece, have been retained by Bowditch & Dewey, LLP., and Gina Marie Alongi to opine on the lost earnings potential and future employability of Gina Marie Alongi to a normally accepted retirement age of sixty-five years old following her termination from IUOE on July 21, 2020.

**OUR QUALIFICATIONS**

FECC provides trusted support, research, advice, and expert witness testimony in cases which include but are not limited to:

- Family Law (including Matrimonial)
- Employability
- Earnings Capacity
- Commercial Law (including Shareholder Disputes)
- Compensation
- Employment and Labor Law (including Unlawful Discharge)
- Personal Injury and Wrongful Death (including Medical Malpractice)

In addition, and prior to expert witness work, our partners' backgrounds provide business solutions in executive search and employment issues, compensation, and strategic consulting. This real-world experience is the foundation upon which cases are considered and generates experience-based solutions versus those based on theory or academics.

Founded in 2004, we are a partnership of three management consultants each of whom has more than forty years' experience advising organizations and executives nationally and internationally in the areas of executive recruitment, compensation and earnings capacity, organizational structure, general employment practices, and business

Forensic Employment &
Compensation Consultants, LLC

strategy. Our consulting clients have included Fortune 100 – Fortune 500 organizations, as well as mid-cap companies and privately held companies in a broad range of industries. Other industry segments served include higher education and numerous not-for-profit organizations. The partners have been retained by more than 800 organizations in this capacity and have conducted more than 2,000 executive search assignments and 150+ organizational reviews. FECC has been retained by more than 120 law firms nationwide. Each of our partners has over eighteen years' experience as expert witness consultants.

Our partners have been accepted as experts in both Federal and State courts, Tax Court, and Chancery Court (Delaware). Our testimony has been cited by appellate courts as part of their reason for affirmation. In addition, our partners have served as experts on employability and compensation issues in courts/arbitration hearings in:

- US District Court in District of Columbia
- California
- Connecticut
- Delaware (including Chancery Court)
- Florida
- Georgia
- Illinois
- Massachusetts
- Maine
- New York
- Rhode Island
- Virginia
- Vermont

See Biographies and Resumes of Richard D. Sbarbaro and Christopher S. Reece,

**Exhibits A, B, C**

Forensic Employment *&*
Compensation Consultants, LLC

**DOCUMENTS REVIEWED**

1) IUOE Local 4 Benefits Summary: Pension Plan, dated October 2021
2) IUOE Local 4 2023 Annual Funding Notice with letter dated April 29, 2024
3) Gina M. Alongi IUOE Local 4 Monthly Pension Distribution Form, dated July 23, 2020
4) Gina M. Alongi General Pension Election of Form Payment, signed September 18, 2020
5) Gina M. Alongi Termination Letter from IUOE Local 4, dated July 23, 2020
6) Gina M. Alongi 2020 W-2 and Earnings Summary
7) Job Description – Fund Administrator
8) IUOE Health and Welfare Fund Plan Document – January 2021
9) Gina M. Alongi Tax Returns 2020-2022
10) Gina M. Alongi W-2 and Earnings Summary 2016 – 2020
11) Gina Marie Alongi Resume
12) Memorandum and Order on Plaintiff's Motion For Partial Summary Judgement
13) Gina Marie Alongi LinkedIn Profile
14) IUOE Body Meeting Minutes June 27, 2021
15) Milford Daily News: The union claims she misused $1.5 million. She and her sister are suing for sexual harassment, February 23, 2021

**GINA MARIE ALONGI BACKGROUND AND CAREER HISTORY**

We reviewed the background material noted above and we conducted a 95-minute interview of Ms. Alongi on May 31,2024.

Ms. Alongi was born on February 11, 1960. She is a graduate of Framingham (MA) High School in 1978. Originally, she had aspired to become a Veterinarian, but took part-time positions including one as a clerk for the IUOE where she assisted members filling out claim forms.

Forensic Employment &
Compensation Consultants, LLC

In October 1980, Ms. Alongi was hired on a full-time basis at IUOE.  In her new role she assisted the IUOE install and launch one of the organizations first computer systems (Wang). This system replaced an aging punch card record keeping system for the organization.

Over the next 15 years, Ms. Alongi was promoted to a general bookkeeping position, then to office manager and then to Assistant Administrator.

In 1996, the former Fund Administrator retired and Ms. Alongi was offered this position, which she held until her termination in July 2020.

As Fund Administrator, Ms. Alongi's primary responsibilities included:

- Overseeing all administrative functions of the fund.
- Monitoring the day-to-day operation of the pension, Health & Welfare and Annuity Funds processing functions.
- Overseeing all aspects of the technology used in the administration of the Funds.
- Participating actively with the Board of Trustees in planning and implementing short- and long-term goals and objectives of the plans.
- Attending meetings as directed by the Trustees.
- Communicating with the Board of Trustees, special committees, Union officers, employees, members, participants, professional advisors, and governmental agencies.
- Monitoring, coordinates and assists plan advisors (i.e. attorneys actuaries, consultants, auditors and investment advisors).
- Networking regularly with colleagues in the industry and professional organizations to stay informed as to recent events and other situations that could impact the Funds.

Source: IUOE Fund Administrator Job Description

During her tenure as Fund Administrator, Ms. Alongi indicated that she never received a formal performance evaluation. Ms. Alongi indicated the organization did not have a formal salary/compensation plan. She would have a discussion with the Business

Forensic Employment &
Compensation Consultants, LLC

Manager and certain Trustees and her compensation would be agreed to for the following year. She would also discuss the compensation budget for her department with a similar group and determine the aggregate compensation budget for the following year. Ms. Alongi would apportion it to her staff.

While Fund Administrator, Ms. Alongi managed an overall staff of between 20 to 30 staff.


## GINA ALONGI TERMINATION

Gina Alongi was officially terminated as Administrator of IUOE 4 Benefit Funds on July 21, 2020, in a telephone conversation, followed up with a termination letter dated July 23, 2020 signed by William D. McLaughlin and James Reger, Trustees. Her termination was made without notice or prior warnings. As the termination letter states, "As you were an employee at will, it is not necessary to detail reasons for the Trustees decision."

Following her termination (on the same day as the phone call), her personal belongings were delivered to her home and all electronics owned by the IUOE Local 4  were to be returned immediately, with her cell phone being disconnected on July 24, 2020 and the instruction to return the IUOE Local 4 leased vehicle she had been using by July 31, 2020.

It was later alleged in a lawsuit filed by the Board of Trustees of the IUOE Local 4 Pension Fund on December 7, 2020 that, "Alongi was terminated by the Fund Trustees in July 21, 2020 because she breached her fiduciary duty by diverting plan assets for the benefit of herself and an entity unrelated to the Funds, and because she failed to perform certain services for which she was paid. She maintains that she was unlawfully retaliated against for engaging in protected activity, including reporting sexual harassment and requesting reasonable accommodations for a disability."

See Casetext.com (Part of Thompson Reuters), Civil Action 21-cv-10163-FDS, Bd. Of Trustees. Of the IUOE Local 4 Pension Fund v. Alongi, **Exhibit C**

Forensic Employment &
Compensation Consultants, LLC

A general meeting was held by the IUOE Local 4 rank and file members on June 27, 2021. This was the first in-person meeting following COVID Pandemic. The minutes of the meeting, reflecting  William McLaughlin, then Business Manager of IUOE Local 4 comments were made to the assembled 400 rank and file members:

> Bill then took a moment to mention that last Summer he had learned that the former Funds Administrator was mismanaging the funds office in many ways. Misuse of members money from hard earned contributions to pay herself and her employees to do work for another organization. He said the misuse of your money was to her benefit, she held a position of high trust, and the most important part of her job was to make sure your money was protected and spent in ways that would directly benefit you the members of the local. As chairman of the board of Trustees of the Funds it is an obligation to inform the fellow Trustees of the Administrators wrongdoing. The Health and Welfare, Pension and Annuity and Savings Board of Trustees which contain Union and Employer representatives all voted unanimously to terminate the former Administrator for just cause. It became apparent the former Administrator could not look in the mirror and accept the responsibility for her actions. Instead, she decided to seek vengeance against the Business Manager and this organization the same one that for decades provided her livelihood. She thought that if she fabricated a story about sexual harassment, brought a lawsuit and even worked to publicize it that it would embarrass the Business Manager and Local 4 into a quick and lucrative settlement for herself. He said the Trustees and I will stand up for truth and what is right for those members that have worked hard to build these benefit funds. We are vigorously defending against the former Administrators frivolous lawsuit and the Trustees of these funds have an obligation to recoup the money that was misused. The Trustees have filed a lawsuit in the United States District Court to hold her accountable for nearly $1.5 million in losses that were suffered by our benefit funds under her watch. We will do everything in our power to ensure that the former administrator is forced to take responsibility for her actions whether she wants to or not, we will keep you informed.

See IUOE Local 4 June 27, 2021 Body Meeting Minutes, page 2, **Exhibit D**


Based on the manner in which Ms. Alongi was terminated, including subsequent comments made by Board of Trustees members, and publicity including an article in the **Milford Daily News** (February 23, 2021),

7

Forensic Employment &
Compensation Consultants, LLC

**The union claims she misused $1.5 million. She and her sister are suing for sexual harassment.**

Twin sisters from Westborough are alleging sexual harassment, even as union leadership accuses one of mismanaging nearly $1.5 million.

http://www.milforddaily news.com>news>21/02.2023

the reasons for her termination became widely known to the public and union and Funds executives locally, regionally, and nationally. In essence, it would be widely known that she was terminated for alleged financial malfeasance after a stellar career of more than forty-two years.

We conducted a simple Google search for "IUOE and Gina Alongi" and there were numerous results detailing the IUOE lawsuit and that of Ms. Alongi's.


**HOW EMPLOYERS AND EXECUTIVE SEARCH FIRMS SCREEN CANDIDATES**

Forensic Employment and Compensation Consultants have more than 75 years of combined experience in executive search and organizational consulting. As such, we have conducted tens of thousands of candidate screenings including phone screenings, in-person interviews, video interviews, reference checks, personality and/or leadership assessments, internet and social media screenings, as well as background checks that include federal and state civil and criminal records checks, driving records, education verifications, employment verifications, and credit checks (when appropriate).

An article from **RecruitersLineup.com**, provides an accurate summary of the many steps and tools included in "best practices" by organizations and executive search firms in the candidate screening process.

> *"In today's job market, screening candidates is an essential part of the recruitment process. This process of screening candidates can be time-consuming, and companies are always looking for ways to make it more efficient.*

Forensic Employment *&*
Compensation Consultants, LLC

*With the advancements in technology and an ever-evolving job market, new methods and techniques have emerged for screening candidates."*

**Screening Process Examples**

A screening process is a crucial step in hiring the right candidate for a job. It involves assessing candidates' skills, knowledge, and qualifications to determine if they are suitable for the role. Here are some examples of a screening process:

- **Initial Resume Review:** Employers can filter out unqualified candidates by reviewing resumes and cover letters to verify that they meet the job requirements.
- **Pre-Employment Testing:** Pre-employment tests assess the candidate's knowledge, skills, and abilities, and evaluate their job suitability.
- **Phone Screening:** Employers can conduct a phone interview to verify that the candidate's qualifications match the job requirements.
- **Video Interview:** Conducting a video interview is a great way to assess a candidate's body language, communication skills, and how they present themselves.
- **In-Person Interview:** Employers can assess candidates in-person by conducting a behavioral interview, technical interview, or a combination of both.
- **Background Check:** Employers can conduct a criminal background check, employment verification, and educational verification to ensure that the candidate is trustworthy.
- **Reference Check:** Contacting references is an important part of the screening process, as it helps to verify the candidate's skills, work experience, and character.
- **Job Offer:** Once a candidate successfully completes the screening process, they are given a job offer.

See *Methods & Techniques for Screening Candidates in 2023*, **Exhibit E**

Of particular importance relative to Gina Alongi are the sections related to social media screening, reference checking, and background checks.

## 5. Social Media Screening

Social media screening involves analyzing a candidate's social media profiles to get a better sense of their personality, interests, and behavior. This technique can be particularly useful for assessing a candidate's cultural fit and identifying any potential red flags.

However, it's essential to be careful when using social media screening, as it can raise privacy concerns and potential legal issues. Recruiters should only use social media screening as a supplement to other screening techniques and ensure they are not discriminating against candidates based on their social media profiles.

9

Forensic Employment &
Compensation Consultants, LLC

### 7. Reference Checking

Reference checking involves contacting a candidate's previous employers or references to verify their employment history and gain insights into their work performance. This technique can be particularly useful for assessing a candidate's work ethic, reliability, and professionalism.

Recruiters can also use reference checking to ask specific questions related to the job requirements and assess the candidate's ability to perform the job duties effectively.

The article also highlights that:

> *"Candidate screening helps to improve the quality of hires by ensuring that only the most qualified candidates are considered for the job."*

> *"Screening candidates can help to mitigate risk by identifying potential red flags such as criminal records, employments gaps, or inconsistencies in the candidate's application materials. This can help to prevent future legal issues, workplace conflicts, and other problems that can arise from hiring the wrong person."*

The circumstances of Ms. Alongi's termination and alleged financial malfeasance would certainly  be revealed to any prospective employer through one or more of these steps during the candidate screening process.

### EFFECTS OF IUOE LOCAL 4 EMPLOYMENT TERMINATION ON GINA ALONGI'S CAREER

The manner in which Ms. Alongi's termination was conducted, along with statements made at the IUOE Member Meeting and the publication of her alleged malfeasance, has made it impossible for her to find gainful employment as an executive. In essence, her executive career ended on July 21, 2020, with her termination. No organization or executive search firm would consider a candidate accused of significant financial malfeasance. Employers have a fiduciary responsibility to ensure that new hires have acceptable background, references and internet/social media results. Ms. Alongi's

10

Forensic Employment &
Compensation Consultants, LLC

results would certainly raise a "red flag" during her screening process and, therefore, not be considered as acceptable to an organization or executive search firm, especially when other prospective candidates have no "red flags."

## ALONGI PROJECTED COMPENSATION TO RETIREMENT AND TO AGE 87

At the time of her termination, Ms Alongi was 60 years old and had planned to retire at the age of 65 after 45 years of service to the IUOE Local 4.  Her total compensation and perquisites was comprised of several components. These include:

- Base Compensation (salary)
- Discretionary bonus
- Contribution to Annuity
- Other (Automobile and operating expense, mobile phone)

Had she worked in that role until age 65 (her normal retirement), Ms. Alongi's projected compensation and perquisites would have been $1,762,344.  **Exhibit F, H**

Her post-retirement income until the age of 87 would have consisted of:

- Local 4 Pension          $1,709,180
- General Pension          $1,896,234
- Social Security          $1,367,807

Thus, her total compensation from July 2020 through age 87 would have been $6,735,565.  **Exhibit F, I**

According to the Social Security Life Expectancy Calculator, Ms. Alongi's life expectancy is 87 years old.

See: https://www.ssa.gov/OACT/population/longevity.html

## ALONGI PROJECTED INCOME FROM TERMINATION TO AGE 87

11

Forensic Employment &
Compensation Consultants, LLC

As a result of Ms. Alongi's termination in July 2020, she was offered no form of severance compensation, and she was immediately terminated from workplace benefits offered by the IUOE Local 4. She was 60 years old with no substantial income. Therefore, she turned to her accrued Union and Social Security benefits for her living expenses. By accessing the accounts prior to retirement age, she incurred a monetary penalty for early withdrawal. She was able to utilize COBRA for her health insurance for 18 months. But the monthly premiums were still out-of-pocket as opposed to being paid by the Union.

Her post-termination income until the age of 65 (retirement age) consists of:

- Local 4 Pension                    $332,037
- General Pension                    $410,753
- Social Security                    $  88,973
- Less Personally Paid Health        -$ 91,530
  Insurance (replacing Local 4 Insurance)

Thus, her total post termination income from July 2020 to age 65 would have been $739,933.  **Exhibit G, I**

This equates to a loss of income of $1,022,411 during the time period 2020-2025.

Ms. Alongi's post-termination and post-retirement income to age 87 consists of the following elements:

- Local 4 Pension                    $1,267,904
- General Pension                    $1,754,016
- Social Security                    $  748,783

Thus, her total post-termination and post-retirement income from age 66 to age 87 would be $3,770,703.  **Exhibit G, I**

Thus, her total termination income from July 2020 through age 87 would have been $4,510,636.  **Exhibit G, I**

Forensic Employment &
Compensation Consultants, LLC

## COMPENSATION/INCOME DEFERENTIAL RETIREMENT VS TERMINATION

The table below shows the difference between what Ms. Alongi would have received had she retired at age 65 versus what she is projected to receive as a result of her termination in July 2020.

|  | IUOE Retirement | Termination Income |
|---|---|---|
| **Age 60 – 65** | $1,762,344 | $ 739,933 |
| **Age 66 – 87** | $4,973,220 | $3,770,703 |
| **Total** | $6,735,565 | $4,510,636 |
| **Difference** | - $2,224,928 | |

We estimate that the Present Value of her loss to be $1,778,768. We have assumed a 4.610% bond rate.  **Exhibit H, I**

## ESTIMATED FEES TO FORENSIC EMPLOYMENT & COMPENSATION CONSULTANTS, LLC

We estimate the total fees for this assignment will be between $7,500 and $15,000, based on the hours required after the report is submitted.

## SUMMARY AND CONCLUSION

Based on our experience and background as executive search and organizational consultants, as well as "best practices" in hiring, Gina Alongi's termination had devastating impact on her future career potential and income earnings capacity, particularly at the age of 60. She faced insurmountable obstacles to gainful employment which were compounded by the fact that in addition to the alleged malfeasance claims,

Forensic Employment &
Compensation Consultants, LLC

she was involved in a lawsuit with her former employer, which is generally frowned upon by prospective employers and executive search consultants.

## FINANCIAL DAMAGES

In our professional opinion, based on over 70 years of executive search and management consulting experience, our analysis demonstrates that that Ms. Alongi will be deprived of $2,224,928 in total income with a Present Value of $1,778,768 when comparing Ms. Alongi's total compensation/income had she retired from the IUOE until age 87 against the scenario where she is terminated at age 60 and therefore receives reduced income from the Local 4 pension, the General pension and Social Security.

Our review of the material is ongoing. Further information may be obtained which might yield additional facts, and we reserve the right to alter our opinion pending receipt of additional information.

Respectfully submitted,


Christopher Reece                           Richard Sbarbaro
Managing Partner                           Managing Partner


14

Forensic Employment &
Compensation Consultants, LLC

*Expert witness & litigation support*

1250 Executive Place, Suite 102
Geneva, IL 60134
708-531-0100
Fax 708-947-9075
Boston
Tampa
www.forensicecc.com

**The following is a list of cases for which Richard D. Sbarbaro has provided expert witness consultation:**

**Allen-Slattery, Inc.**
Superior Court of the State of California, in and for San Diego County
In RE: The Marriage of Susan F. Ambrose and Donald M. Ambrose

**Berger Schatz**
Chicago, IL
In RE: The Marriage of Krumplys

**Blank Rome, LLP**
New York, NY
In RE: The Marriage of Goldsmith

**Burns & Levinson, LLP**
Boston, MA
In RE: The Marriage of Weigold

**Burns & Levinson, LLP**
Boston, MA
In RE: The Marriage of Gill

**Davis Friedman**
Chicago, IL
In RE: The Marriage of Danilek
1/2011

**Fisher Broyles**
Wellesley, MA
In RE: IYFI v. LLLS

**Kalcheim Schatz & Berger**
Chicago, IL
In RE: The Marriage of Gunnar/Overton

**Kalcheim Schatz & Berger**
Circuit Court of Cook County, Illinois
In RE: The Marriage of Kathleen A. Heron vs. Todd Adam Miller

**Kallen Law Firm**
Family Court of the County of St. Louis, Missouri
In RE: The Marriage of Donald Edward Heck, Jr. vs. Pei-Hsiu Lin

**Law Offices of Beatrice L. Snyder, APC and McDougal, Love, Eckis, Boehmer & Foley**
Superior Court of the State of California, in and for San Diego County (appointed by the court as an impartial expert witness)
In RE: The Marriage of James E. Carne and Susan T. Carne

**Law Offices of Dori-Ellen Feltman**
Westport, CT
In RE: The Marriage of Norbom

**Law Offices of Lee Darst**
Hingham, MA
In RE: The Marriage of Calatayud

**LeClairRyan**
Los Angeles, CA
In RE: Diane Wieser v. Pacific Netsoft, Inc. dba Clairty Consultants, American Arbitration Association

**Levin & Brend, PC**
Circuit Court of Cook County, Illinois
In RE: The Marriage of Linda Ann Siebert Rapoport and Mark Joel Rapoport

**Mattingly & Devlin, LLC**
Plymouth, MA
In RE: The Marriage of Silk

**McCarter & English**
Superior Court of New Jersey
In RE: Flannery v. Flannery

**McLaughlin & Stern, LLP**
New York, NY
In RE: Joseph Ferrarese v. Deutsche Bank Securities, Inc./FINRA case

**Miller and Steele Law Firm**
Superior Court of the State of California, County of San Diego
In RE: Proformance Apparel group, LLC v. Robert Half International

**Plaine & Katz, LLP**
Suffolk County, NY Supreme Court
In RE: Rani Selwanes v. Wendy Selwanes

**Popovitch Law, LLC**
Cambridge, MA
In RE: The Marriage of Stephen C. Flint v. Michelle L. Gilmor

**Steven Rosenberg**
Circuit Court of Cook County, Illinois
In RE: Marilou R. McGirr vs. Continental Casualty Company, an Illinois Company,
Shelly S. Liapes, Diahanna Foster, Margaret Spradau, John Does 1-2

**Schiller Du Canto & Fleck**
Circuit Court of the 19th Judicial District, Lake County, Waukegan, Illinois
In RE: The Marriage of Harvey Fraser

**SNR Denton**
Chicago, IL
In RE: Lefkovitz, et al vs. Wagner, et al, American Arbitration Association Chicago,
Illinois

**Tabet, DiVito & Rothstein LLC**
Circuit Court of Cook County, Illinois
RE: Wallace C. Leyshon v. Diehl Controls North America Inc. and Christoph Weigand

**The Amlong Firm**
Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County, Florida
In RE: Charles E. Brown and Elizabeth A. "Libby" Roodvoets, his wife, vs. Office Depot,
Inc. a Delaware corporation; Neil R. Austrian, in his individual capacity, and Elisa
Garcia, each her individual capacity

**The Prinz Law Firm**
Circuit Court of the 19th Judicial District, Lake County, Illinois
In RE: Angel Estrada, Ph.D. v. Hospira, Inc., and Marwan Fathallah

**Todd & Weld, LLP**
Boston, MA
In RE: The Marriage of Jacqueline Bernat v. Adam Hetnarski

**Todd & Weld, LLP**
Boston, MA
In RE: The Marriage of Cecilia Chao v. Michael Schoenegge

Forensic Employment ↪
Compensation Consultants, LLC

**Ziccardi Law Offices**
American Arbitration Association
In RE: Tyler Norton v. Cigna

Exhibit B

**Forensic Employment &**
**Compensation Consultants, LLC**

___

**Richard D. Sbarbaro**

Richard D. Sbarbaro is a Managing Director of Forensic Employment and Compensation Consultants, LLC.  The firm provides litigation support for attorneys in matters relating to:

- executive compensation
- employability
- executive search
- career/vocational assessment
- outplacement
- earnings capacity

Mr. Sbarbaro has been accepted and testified as an expert in state courts.  He testified in circuit court for the plaintiff in an Illinois employment case of breach and defamation, which resulted in a verdict in excess of $13,000,000.  The award at the time was believed to be one of the largest in U.S. history for this type of case and was subsequently affirmed by the Illinois Appellate Court citing Mr. Sbarbaro's testimony in their opinion. The case was eventually resolved in the Illinois Supreme Court in favor of the plaintiff. Mr. Sbarbaro has opined on numerous cases nationwide regarding compensation, employment, labor law, family law and civil matters.

Mr. Sbarbaro is Chairman of Lauer, Sbarbaro Associates/EMA Partners Chicago, and currently US Practice Leader and former Chairman of EMA Partners International.  The firm provides consulting services to clients nationally and internationally.  Services to senior management include executive search, organization strategy, executive compensation, management assessment, executive mentoring, in addition to other industry or organization specific projects.  Clients include the spectrum from Fortune 100 organizations to small privately held companies.  The firm also assists clients in higher education, as well as in not-for-profit.  As a generalist firm, client organizations include a broad range of industries such as consumer products, direct marketing, financial services, healthcare, insurance, law, manufacturing, publishing, retail, venture capital and others. Mr. Sbarbaro has supervised and conducted over 1,800 assignments for over 600 organizations, ranging in size from start-ups to multi-billion-dollar, global entities. Mr. Sbarbaro has also conducted over 100 organizational reviews and compensation studies.

Under his direction, the firm has obtained a widely recognized national and local reputation in executive search and organizational consulting.  The firm has been named repeatedly as one of the top executive search organizations in the world by *Executive Search Review*.  Mr. Sbarbaro has been named as one of the top 150 executive search recruiters in "The Career Makers" published by HarperCollins and is the primary consultant listed for EMA Partners International in *Hunt Scanlon's Global 40* top executive search organizations worldwide.

Prior to joining Lauer, Sbarbaro Associates in 1979, Mr. Sbarbaro was a principal with Booz, Allen and Hamilton and a Senior Vice President of the Chicago Stock Exchange (formerly the Midwest Stock Exchange) and its subsidiaries located in Chicago.

Mr. Sbarbaro has been a resident of the Chicagoland area all his life, having received a Bachelor of Science degree in Commerce and a master's degree in Business Administration from DePaul University in Chicago.  Over the years, he has remained active with DePaul University, serving on a variety of boards including the Athletic Board (13 years), the President's Club Board and the Special Gifts Committee.  In 1982, he received the DePaul University Distinguished Alumni Award and the Beta Gamma Sigma Alumni Award in 1989.  He served as a member of the Graduate School of Management Advisory Council and has been an adjunct professor in the Graduate School of Business.  He also served for four years on the Association of Executive Search Consultants' board of directors as an executive committee member.

Forensic Employment &
Compensation Consultants, LLC

**CURRICULUM
VITAE OF:**          **RICHARD D. SBARBARO**

Office:
1250 Executive Place, Suite 102
Geneva, IL 60134
(708) 531-0100

**EDUCATION**:          DePaul University – B.S.C., Marketing 1967
DePaul University – M.B.A., Marketing 1971

**EXPERIENCE**:

2005 – Present          **FORENSIC EMPLOYMENT AND COMPENSATION CONSULTANTS, LLC**

**MANAGING DIRECTOR**
Consultancy providing litigation support and expert testimony to law and accounting firms nationally.  Provide expertise in matters of executive search, employability, and earnings capacity.  Accepted and testified as an expert in state courts.

1979 – Present          **LAUER, SBARBARO ASSOCIATES/EMA PARTNERS CHICAGO**
Management Consultants

**CHAIRMAN**
Provide management consulting services to clients nationally and internationally including executive search, organization strategy, executive compensation, management assessment, executive mentoring, and other specific projects.

Current US Practice Leader and prior Chairman of EMA Partners International, a global executive search organization ranked in the top 40 worldwide

Supervised and conducted over 1,800 senior level assignments in industry, education, and not-for-profit sectors.

1978 – 1979          **BOOZ, ALLEN & HAMILTON**
Management Consultants

**PRINCIPAL**
Managed the Midwest region's technology consulting practice.  Responsible for a broad range of client assignments including Fortune 100 organizations.

1971 – 1978          **MIDWEST STOCK EXCHANGE (renamed Chicago Stock Exchange)**

**SENIOR VICE PRESIDENT**
Responsible for the management and direction of various exchange subsidiaries including for-profit divisions servicing brokerage and banking organizations nationwide.  Managed P&L, technology, marketing and sales for trading systems, back-office accounting, stock transfer and exchange services.

Forensic Employment &
Compensation Consultants, LLC

1969 – 1971        **FRY CONSULTANTS**
Management Consultants

**SENIOR CONSULTANT**
Managed and assisted in the conduct of various technology consulting
assignments for clients in a broad range of industries nationally.

1967 – 1969        **ILLINOIS BELL TELEPHONE COMPANY**

**SALES MANAGER**
Responsible for sales and installation coordination of medium and large-scale
business communications systems.

**DIRECTORSHIPS**:

**EMA Partners International**
Past Chairman and Director

**PROFESSIONAL ACTIVITIES**:

**DePaul University**
Intercollegiate Athletic Board—Prior Member, 13 years
Management Advisory Board—Prior Member
President's Club Board—Prior Member
Adjunct Professor, Graduate School of Business—Recruitment and
Selection
Distinguished Alumni Award Recipient
Beta Gamma Sigma Alumni Award Recipient
Graduate School of Business Management Advisory Council—Prior
Member

**Association of Executive Search Consultants**
Past Board Member/Treasurer/Executive Committee Member

**Illinois Executive Recruiters Association**
Past President

**National Association of Corporate and Professional Recruiters**
Past Member

**Primary Partner contact in *Hunt Scanlon Global 40* Executive Search
Organizations**

**Named one of the top 150 executive search recruiters in *The Career
Makers,* published by HarperCollins**

casetext
Part of Thomson Reuters

Search all cases and statutes...                    JX        Sign In

Opinion    Case details

From Casetext: Smarter Legal Research

# Bd. of Trs. of the IUOE Local 4 Pension Fund v. Alongi

United States District Court, D. Massachusetts

Sep 14, 2023

Civil Action 21-cv-10163-FDS (D. Mass. Sep. 14, 2023)        Copy Citation

⬇ Download PDF        🚩 Check Treatment



**Rethink the way you litigate with CoCounsel: AI for research, discovery, depositions, and so much more.**

Try CoCounsel free ›

Civil Action 21-cv-10163-FDS

09-14-2023

BOARD OF TRUSTEES of the IUOE LOCAL 4 PENSION FUND, BOARD OF TRUSTEES of the IUOE LOCAL 4 ANNUITY & SAVINGS FUND, BOARD OF TRUSTEES of the IUOE LOCAL 4 HEALTH and WELFARE FUND, BOARD OF TRUSTEES of the HOISTING and PORTABLE ENGINEERS LOCAL 4 APPRENTICESHIP & TRAINING FUND, INTERNATIONAL UNION of OPERATING ENGINEERS LOCAL 4, IUOE LOCAL 4 LABOR-MANAGEMENT COOPERATION TRUST, and IUOE LOCAL 4 SOCIAL ACTION COMMITTEE, Plaintiffs, v. GINA ALONGI, Defendant.

F. DENNIS SAYLOR IV, CHIEF JUDGE

**MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

F. DENNIS SAYLOR IV, CHIEF JUDGE

This is an action arising under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.* Plaintiffs the Board of Trustees of the IUOE Local 4 Pension Fund; the Board of Trustees of the IUOE Local 4 Annuity & Savings Fund; the Board of Trustees of the IUOE Local 4 Health and Welfare Fund; the Board of Trustees of the Hoisting and Portable Engineers Local 4 Apprenticeship & Training Fund (collectively, the "Funds"); the *2 International Union of Operating Engineers Local 4; the IUOE Local 4 Labor-Management Cooperation Trust; and the IUOE



Opinion    Case details

Funds, neglected her work, and otherwise breached her duties as plan administrator. Alongi has filed several counterclaims, alleging that her supervisor sexually harassed her, that the Funds refused to accommodate her disability, and that the Funds retaliated against her for reporting the harassment.

Plaintiffs have moved for partial summary judgment with respect to Alongi's liability for breach of her fiduciary duties. While there is certainly evidence that Alongi did, in fact, exercise discretionary authority over the assets of the Funds, and directed the use of those assets in a manner contrary to law and the interests of plans and their beneficiaries, the underlying facts are sufficiently disputed that the entry of summary judgment is not warranted. Accordingly, and for the following reasons, plaintiffs' motion for partial summary judgment will be denied.

## I. *Background*

### A. *Factual Background*

Except where otherwise noted, the following facts are undisputed.

#### 1. *Governance of the Funds Generally*

The Funds comprise several multiemployer employee-benefit plans, all of which are subject to the regulatory framework of ERISA. (Def.'s SMF ¶¶ 1, 3, 5, 13). Each fund is governed by a Board of Trustees, who in turn employ staff to work for the funds. (*Id.* ¶¶ 17, 20).

The Administrator is appointed by the Boards of Trustees of the Funds and serves as the main liaison between the Funds and certain employees, professional advisers, and service providers. (*Id.* ¶¶ 26-30; Geiman Decl. ¶ 2). The Administrator also organizes regular meetings *3 to provide various relevant reports to the Funds. (Def.'s SMF ¶¶ 30-31). The role is a full-time occupation. (*Id.* ¶ 32; Geiman Decl. ¶ 2).

According to the Funds, "the Trustees expected that the Administrator would be present in the office during the normal business hours and would devote her full working hours to the operations of the Funds." (Pls.' Mem. at 4).[1]

---

[1]  It is not clear that this expectation was an official policy of the Funds. The Funds cite to paragraphs 265 and 266 of their Concise Statement of Material Facts, but those paragraphs refer to a sexual relationship between Alongi and a member of the Board of Trustees (¶ 265) and the Health Fund Trust Agreement (¶ 266), respectively. (CSMF ¶¶ 265-66). It appears that William McLaughlin, who became Business Manager of the IUOE Local 4 Union and Chairman of the Boards of Trustees in 2017, expected employees to work in person from 8:00 a.m. to 4:00 p.m., the business hours provided by the Employee Handbook of the IUOE Local 4 Fringe Benefit Funds Office. (*See* McLaughlin Notes, Ex. 156, Def.'s App'x at 33; Employee Handbook, Ex. 6, Pls.' App'x at 67 (noting that employees of the Funds are expected to "[r]eport to work regularly and on time" and providing that the "regular working hours of the Funds Office are 8:00 a.m. - 4:00 p.m.")).



III at 9, Pls.' App'x at 146). She received an annual salary averaging $242,000 during the period from 2016 to 2019. (Def.'s SMF ¶ 175; Geiman Decl. ¶ 30). She received other benefits, including employer-provided automobiles and contributions to her pension plan. (Def.'s SMF ¶ 175; Geiman Decl. ¶ 30). She was also entitled to several weeks of paid vacation, although the number of weeks is disputed. (Def.'s SMF ¶ 253; *see* Employee Handbook, Ex. 6, Pls.' App'x at 70-71). Her total compensation package averaged $338,658 per year during the period 2016-2019. (Def.'s SMF ¶¶ 36, 175).

### 3. *The Shared Services Agreement*

In December 2003, amended effective July 1, 2006, the Funds entered into a Shared Services Agreement. (*See* Shared Services Agreement, Ex. 5, Pls.' App'x at 49). The purpose of *4 the Agreement was to ensure that no fund was subsidizing the operating costs of any other fund. (Alongi Dep. Vol. III at 93, Pls.' App'x at 153).

The Shared Services Agreement provides:

> The amount of staff time of employees of the Fund Office devoted to each Organization will be used as the basis for determining the allocable portion of general administrative expenses, staff salary, taxes and benefits, and common overhead expenses, including but not limited to office space, utilities, professional fees and computer costs. The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization by each employee of the Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.

(Shared Services Agreement, Ex. 5, Pls.' App'x at 50-51).[2] Under the Agreement, those records are used to allocate charges and reimbursements between the Funds for expenses created by employees. (Shared Services Agreement, Ex. 5, Pls.' App'x at 51-52).

> [2]   The Funds Office Employee Handbook also contains a recordkeeping requirement:
>
> > All employees (exempt or non-exempt) that work under the jurisdiction of more than one (1) Fund must complete a weekly timesheet . . . to be turned in every Friday by 4 p.m. Timesheets are used to break down employees' hours, (all hours, including overtime), spent on particular Funds.
>
> (Employee Handbook at 4, Ex. 6, Pls.' App'x at 63).

### 4. *Alongi's Work for the Coalition*

From 2007 to 2021, in addition to her position as Administrator of the Funds, Alongi also served as Executive Director of the Massachusetts Coalition of Taft-Hartley Funds ("the Coalition"). (Alongi Aff. ¶ 25; Def.'s SMF ¶ 144). The Coalition is "a membership organization consisting of different union-sponsored multiemployer health and welfare plans in the New England area." (Geiman Decl. ¶ 16; Def.'s SMF ¶ 87). One of the


Opinion    Case details

SMF ¶ 183). According to Alongi, the Coalition "rented office space at the Funds' office" during her tenure as Executive Director. (Alongi Aff. ¶ 31).[3]

> 3  Alongi asserts that the Funds "were, of course, aware of this use of their own office space," citing to Geiman's deposition. (Def.'s Counterstatement of Material Facts ¶ 36). Geiman's deposition testimony is that "[Alongi] had the coalition running out of the funds office" since 2007. (See Geiman Dep. at 68, Def.'s App'x at 88). The Trustees of the IUOE Health & Welfare Fund also discussed "payment by the Coalition to the Funds [of] a $400 annual 'rent.'" (Board Minutes, Ex. 16, Pls.' App'x at 193).

On behalf of the Coalition, Alongi scheduled and participated in meetings, reviewed documents, and sought out new vendors on favorable terms. (See Exs. 21-24, Pls.' App'x at 230-318 (numerous e-mail chains)).[4] According to a 2019 tax form filed by Alongi for the Coalition, she worked ten hours per week on average for the Coalition, for which she was paid $46,000 per year. (Form 990EZ, Ex. 17, Pls.' App'x at 203).

> 4  The Funds characterize Alongi's Coalition work as a "blatant and distasteful 'pay to play' scheme." (Pls.' Mem. at 18). They assert that one objective of Alongi's work was "to collect an ever-increasing number of fees" and to "tie[] manager and vendor opportunities to present to the Coalition to becoming associate members [of the Coalition]." (Id. at 18-19). Here, however, it appears the Funds' primary contention is that this activity came at the cost of time that Alongi should have been using to perform work for the Funds, not that Alongi's business practices on behalf of the Coalition were exploitative of prospective Coalition members. (See id. at 19).

Louis Rasetta and John Shaughnessy, Jr., who served as trustees while Alongi worked as Administrator of the Funds and Executive Director of the Coalition, have submitted affidavits stating that they were aware of the services she was performing for the Coalition. (Rasetta Aff. ¶¶ 2, 8; Shaughnessy Aff. ¶¶ 1, 8).

Other members of Alongi's office at the Funds performed work on behalf of the Coalition. Rosemarie Alongi, Alongi's twin sister and a member of the Funds' IT department, updated the Coalition's website, corresponded with prospective vendors for the Coalition, and scheduled meetings. (Def.'s SMF ¶ 199; See Exs. 27-29, Pls.' App'x at 327-61). Laura-Jean Hickey, an employee of the Funds, maintained the records of the Coalition. (Alongi Dep. Vol. III at 130, Pls.' App'x at 158). She also sent e-mails about Coalition matters, corresponding with and taking instructions from Alongi. (See, e.g., Ex. 22-24, Pls.' App'x at 251-318). Taylor Ryan was a Funds employee. (Schultheis Report, Ex. 8, Pls.' App'x at 91). Ryan reviewed the zip codes for participants of other multiemployer employee-benefit funds. (Exs. 34-35, Pls.' App'x at 395-416). According to Ryan, this work likely took her more than a week to complete. (Ryan Dep. at 145, Pls.' App'x at 420). Rosemary Ortega was a Funds employee. (Schultheis Report, Ex. 8, Pls.' App'x at 91). Ortega prepared Coalition materials, arranged Coalition lunches, and scheduled Coalition events. (Ex. 37, Pls.' App'x at 422-33).

It appears that Funds employees performed this Coalition work directly for Alongi or at Hickey's direction on behalf of Alongi. (See, e.g., id. at 433

6                                                                    *6



Opinion   Case details

prospective vendor]'s very nice. Maybe you can meet with her.")). Hickey and Alongi sometimes sent e-mails directing employees to perform Coalition work between 8:00 a.m. and 4:00 p.m. (*E.g.*, Ex. 37, Pls.' App'x at 433). According to Alongi, she directly supervised only Hickey and Geiman (who was then Assistant Administrator and in-house counsel) in her capacity as Administrator of the Funds. (Alongi Aff. ¶ 8).

### 5. *Alongi's Termination*

On July 21, 2020, the Boards of Trustees of the Funds met and terminated Alongi as Administrator. (Board Minutes, Ex. 16, Pls.' App'x at 192, 195). According to the minutes of the meeting, the trustees discussed Alongi's weekly work reports that included work for the Coalition; her lack of daily time sheets; and a $30,000 commitment of a credit of $30,000 belonging to the Local 4 Health Plan to an anticipated expense of the Coalition, among other *7 issues. (*Id.* at 192-93).

The minutes reflect that the trustees terminated Alongi for several reasons: "work performance," "waste and potential waste of [p]lan assets," "mismanagement of the Fund Office," "breach of confidentiality," and "withholding information from Trustees." (*Id.* at 195).

### 6. *The Schultheis Report*

The Boards retained Schultheis & Panettieri LLP, an accounting firm, to perform an audit of Alongi's work from January 2017 through June 2020. (*See* Schultheis Report, Ex. 8, Pls.' App'x at 85). The report, dated April 21, 2021, indicated that Alongi frequently sent e-mails about Coalition activity during Funds business hours. (*See* Schultheis Report, Ex. 8, Pls.' App'x at 89-90; *see, e.g.*, Ex. 22, Pls.' App'x at 267 (asking the Coalition's executive board for authorization to send two people to a Minnesota industry fair with "hundreds of participants from the various participating Funds")).

According to the report, Alongi frequently arrived at the Funds Office later than 9:30 a.m. from September 2015 to March 2020. (Schultheis Report, Ex. 8, Pls.' App'x at 127). According to Alongi, she typically arrived at the office between 9:00 a.m. and 10:00 a.m. and regularly performed work outside of the period between 8:00 a.m. to 4:00 p.m. (Def.'s SMF ¶ 278; Alongi Aff. ¶ 66).

The report also stated that Alongi began taking additional weeks of vacation per year in 2013. (Schultheis Report, Ex. 8, Pls.' App'x at 85; Def.'s SMF ¶ 255). From 2015 through 2019, payments were directed to Alongi and her twin sister for partial vacation buyouts during the year, rather than at the end of the calendar year when other employees' vacation buyouts were processed. (*Id.* at 85-86). Between 2015 and 2020, Alongi took 40 to 80 hours of vacation time that was bought out before the end of the year each year. (*Id.* at 95). According to Rasetta, "[i]n or around 2013, [he] suggested giving [Alongi] an additional two weeks of vacation time to *8 use or cash out annually because of her dedication, work ethic and her performance." (Rasetta Aff. ¶ 20).[5] Shaughnessy "specifically recall[ed]" that he and Rasetta



[o]he two-week vacation" and that he did not discuss granting her vacation time with anyone else. (Rasetta Dep. at 154, Pls.' App'x at 451).

**7. *Alongi's Allegations of Sexual Harassment and Retaliation***

According to Alongi, she was terminated in retaliation for reporting sexual harassment by William McLaughlin, the Business Manager and Chairman of the Board of the Funds. (Def.'s SMF ¶ 102).

Alongi alleges that McLaughlin created a hostile work environment by engaging in inappropriate sexual conduct toward Alongi, her sister, and other female employees between August 2017 and 2020. (Alongi Aff. ¶¶ 40-52, 57).

In May 2018, according to Alongi, she confronted McLaughlin directly about his behavior. (Alongi Aff. ¶ 46). She alleges that he responded with a loud verbal attack, which was audible to others in the office. (Alongi Aff. ¶¶ 46-49; Ortega Dep. at 48-52, Def.'s App'x at 154-155). She sought advice from the Funds' outside counsel about how to respond; counsel allegedly encouraged her to "tamp[] down" her sexual harassment allegations to avoid termination for "insubordination." (Alongi Aff. ¶ 55; Geiman Dep. 203-204, Def.'s App'x at 98).

Alongi alleges several instances of retaliation after that incident. She has Type I diabetes; she alleges that on November 9, 2018, McLaughlin refused to allow her service dog, which was trained to detect low blood-sugar levels, to be present in the office. (Alongi Aff. ¶ 58). She further alleges that in January 2020, McLaughlin instructed that she should report to work by 8 a.m. daily and refused to accommodate her work schedule requested to allow her to schedule insulin shots and change her continuous glucose monitor. (Alongi Aff. ¶¶ 59-60).

In September 2020, following their terminations, Alongi and her sister filed a complaint with the Massachusetts Commission Against Discrimination alleging a hostile work environment, sexual harassment, retaliation, and failure to accommodate her chronic health condition. (Alongi Aff. ¶ 65; Dkt. 8, Ex. A). This lawsuit was instituted in January 2021, allegedly in retaliation for that filing. (Compl.; Dkt. 79 ¶ 93).

**B. *Procedural Background***

The Funds filed the complaint in this case on January 29, 2021. The complaint asserts that Alongi breached her fiduciary duty to the funds in violation of ERISA, 29 U.S.C. §§ 11011114. Before the Funds filed that complaint, Alongi had filed her complaint with MCAD.

Alongi subsequently withdrew her MCAD complaint pursuant to Mass. Gen. Laws ch. 151B, § 9, and on February 10, 2021, filed a complaint against the Funds in the Massachusetts Superior Court.

On August 9, 2021, the Court denied Alongi's motion to stay this case pending resolution of her state-court matter.



Opinion    Case details

151B, failure to accommodate her chronic health condition, and interference with her rights under Mass. Gen. Laws ch. 151B. She amended her counterclaim on April 7, 2023.

The Funds have moved for partial summary judgment with respect to Alongi's liability *10 for breach of her fiduciary duties under 29 U.S.C. § 1104 and 29 U.S.C. § 1106.

## II. *Standard of Review*

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. *Analysis*

The Funds argue that they are entitled to partial summary judgment because (1) Alongi was a functional fiduciary of the Funds and (2) she violated her fiduciary duties under ERISA while acting as a functional fiduciary.

### A. *Alongi as a Functional Fiduciary*

Under ERISA, fiduciaries of employee benefit plans must adhere to certain statutory duties. Among other things, the statute provides that "a fiduciary shall discharge [her] duties *11 with respect to a plan solely in the interest of the participants and beneficiaries," 29 U.S.C. §1104(a)(1), and prohibits various forms of self-dealing:

A fiduciary with respect to a plan shall not

> (1) deal with the assets of the plan in his own interest or for his own account,

> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or



29 U.S.C. § 1106(b).

A person who is not a named fiduciary of a plan may nonetheless qualify as an ERISA fiduciary if

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

The First Circuit recently addressed the interpretation of the phrase "authority or discretionary control respecting . . . management or disposition of [plan] assets." *See Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 66 F.4th 307, 323-328 (1st Cir. 2023). The court joined "[e]very circuit to have directly addressed the issue" and "conclud[ed] that 'discretionary' control or authority is not required with respect to the management or disposition of plan assets." *Id.* at 324 (citations omitted). Rather, "even nondiscretionary control or authority over plan assets suffices to render a person a fiduciary." *Id.* at 325. However, the court also reaffirmed that "the mere exercise of physical control or the

12    *12  performance of mechanical administrative tasks generally is insufficient to confer fiduciary status," and that "a degree of 'meaningful control' is required." *Id.* (quoting *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 18 (1st Cir. 1998)).

The court also ruled that those principles only address whether plaintiff "act[ed] as a fiduciary . . . when taking the action subject to the complaint." *Id.* (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)). Even if a defendant was a functional fiduciary with respect to certain actions, that is not sufficient to show that she was a functional fiduciary as to a specifically alleged action. *See Pegram*, 530 U.S. at 226 ("In every case charging breach of ERISA fiduciary duty, then, the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary . . . when taking the action subject to complaint.").

The Funds contend that Alongi was a functional fiduciary because "throughout her tenure as Administrator, [she] exercised discretionary authority and control with respect to management of Fund assets in manners both known and unknown to the Trustees." (Pls.' Mem. at 9).[6] They also contend that she was identified as a fiduciary in the DOL's 2003-2004 audit, and thus she was a fiduciary during the events that are alleged to have

13    constituted breaches. (*Id.* at 10-14).[7] *13  The Funds have not provided a copy of her employment agreement, or any other document that specifically identifies her job responsibilities and powers with the Funds, other than Geiman's declaration.



"[t]o report to them. You know, financial status of the plan, any issues with service providers, any recommendations that I had." (*Id.* at 10). She testified that she was "running" a "billion-dollar organization" and had the authority to hire and fire service providers for "smaller ancillary benefits." (Alongi Dep. Vol. IV at 51-52, Pls.' Supp. App'x at 30). She also testified that she had authority to make hiring recommendations, to decide not to hire, discipline, and fire employees. (Alongi Dep. Vol. II at 134-36, Pls.' Supp. App'x at 15).

7   The September 16, 2004 letter is addressed to the "Plan Fiduciaries" and sent to the attention of six trustees and Alongi. (DOL Letter, Ex. 7, Pls.' App'x at 78). The letter reads in part: "Senior Investigator Muench has concluded her investigation of the Plan and of your activities as its Plan Administrator & Trustees. Based on the facts gathered during that investigation it appeared that, as Plan fiduciaries, you violated your fiduciary obligations to the Plan and violated several provisions of ERISA." (*Id.*).

Alongi contends that her responsibilities were limited. According to her, she "did not directly supervise the work of any other Fund Office employees," and other employees "performed administrative functions . . . within a framework of policies, interpretations, rules, and practices approved by the Trustees, not [by her]." (Alongi Aff. ¶¶ 8-9). "[E]mployee compensation was set exclusively by the Trustees." (*Id.* ¶ 12). As Administrator, she asserts that she made recommendations to the Trustees as to plan administration, subject to their review and approval. (*Id.* ¶ 10). She further asserts that she had "no authority to make - and never made -any decisions on . . . benefit changes and beneficiary appeals for the Health & Welfare, Pension Funds, and Annuity and Savings Funds, and decisions regarding the Funds' engagement or termination of investment managers or healthcare providers." (*Id.* ¶ 11).

To determine whether Alongi's actions violated her duties under ERISA, the court must first determine whether she was acting as a fiduciary when she allegedly (1) failed to complete certain timesheets; (2) performed work on behalf of the Coalition; (3) failed to work certain hours for which she was compensated by the Funds; (4) directed Funds office staff to work for the Coalition; and (5) took vacation time to which she was not entitled (the actions specifically alleged as breaches of fiduciary duty by plaintiffs in their motion for partial summary judgment). The court must then determine whether her actions violated the fiduciary duties provided by 29 U.S.C. §

14   1104 and 29 U.S.C. § 1106.[8] *14

8   The First Circuit has described Section 1106 as a "'supplement[]' [to] the general duty of loyalty." *Brotherston v. Putnam Invs.*, 907 F.3d 17, 40 (1st Cir. 2018) (citing *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241-42 (2000)).

Resolution of those issues raises the question of how to define "plan assets." Plaintiffs argue that defendant violated 29 U.S.C. §§ 1106(b)(1)-(3) "by causing plan assets, in this case Fund personnel and resources, to be deployed to benefit the Coalition." (Pls.' Mem. at 9-10; *see also* Pls.' Reply at 16). "ERISA nowhere contains a comprehensive definition of what constitutes 'plan assets,'" but "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights under non-



Opinion   Case details

It is unclear whether the services of Fund personnel can be characterized as
"plan assets." "[T]he text [of ERISA] says nothing about employees, let
alone anything about fiduciary duties owed in the course of managing
employees." *Acosta v. Brain*, 910 F.3d 502, 519-520 (9th Cir. 2018) (holding
that a trustee was not a functional fiduciary when he placed a fund employee
on leave). An individual's workplace decisions may, of course, harm the plan
(or plan participants and beneficiaries), but that alone does not satisfy the
threshold question of whether that person was acting as a fiduciary. *Id.* at
520; *Pegram*, 530 U.S. at 225 ("Employers, for example, can be ERISA
fiduciaries and still take actions to the disadvantage of employee
beneficiaries . . . (e.g., firing a beneficiary for reasons unrelated to the ERISA
plan), or even as plan sponsors (e.g., modifying the terms of a plan as
allowed by ERISA to provide less generous benefits).").

It is certainly plausible that the Fund resources that Alongi used, including
the time of employees, are "plan assets," and that she exercised authority
and control over them. However, the parties have not briefed the issue of
how "plan assets" should be defined. Furthermore, and as discussed below,
there is a genuine dispute of material fact as to whether Alongi acted as a *15
fiduciary in using those resources, or whether she used those resources at
all. And it could be the case that some decisions concerning employee
resources involve the exercise of fiduciary duties, while others involve mere
"business decisions." For example, the specific hours that a particular
employee might be required to work on a particular day may be plausibly
characterized as a "business decision" rather than "management or
administration of the plan." *See In re Luna*, 406 F.3d 1192, 1207 (10th Cir.
2005) ("Because virtually every business decision an employer makes can
have an adverse impact on an employee benefit plan" courts must "'examine
the conduct at issue to determine whether it constitutes management or
administration of the plan, giving rise to fiduciary concerns, or merely a
business decision that has an effect on an ERISA plan not subject to
fiduciary duties.'" (quoting *COB Clearinghouse Corp. v. Aetna U.S. Healthcare,
Inc.*, 362 F.3d 877, 881 (6th Cir.2004))).

In any event, at a minimum resolution of the legal issue requires the
resolution of disputed issues of material fact. Summary judgment will
therefore be denied as to the question of whether defendant acted as a
functional fiduciary in all respects as to the disputed activities.

**B. *Alongi's Alleged Fiduciary Breaches***

Under ERISA, a fiduciary must "discharge his duties with respect to a plan
solely in the interest of the participants and beneficiaries" and "for the
exclusive purpose of . . . providing benefits to participants and their
beneficiaries" and "defraying reasonable expenses of administering the
plan." 29 U.S.C. § 1104(a)(1)(A). A fiduciary must act "in accordance with the
documents and instruments governing the plan insofar as such documents
and instruments are consistent with the provisions of [29 U.S.C. ch. 18,
Subch. I, III]." *Id.* § 1104(a)(1)(D).



Opinion    Case details

of the plan or the interests of its participants or beneficiaries," or (3) "receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." *Id.* § 1106(b).

The Funds contend that Alongi violated § 1104, by failing to complete certain timesheets in accordance with plan documents and instruments, and § 1106, by (1) performing work on behalf of the Coalition; (2) failing to work certain hours for which she was compensated by the Funds; (3) directing Funds Office staff to work for the Coalition; and (4) taking vacation time to which she was not entitled. Assuming, without deciding, that she acted as a functional fiduciary to each alleged breach, there is a genuine dispute of material fact as to each of those issues.

### 1. *Timekeeping*

The Funds contend that Alongi was required to keep a daily time sheet to track the amount of time she spent working for each Fund so that the cost of her services could be appropriately allocated. (Pls.' Mem. at 13). They argue that her failure to do so is a breach of her fiduciary duty both to "discharge [her] duties with respect to a plan solely in the interest of the participants and beneficiaries and in accordance with the documents and instruments governing the plan" under 29 U.S.C. § 1104(a)(1)(D) and to avoid prohibited transactions under 29 U.S.C. § 1106, read in conjunction with the Department of Labor's Prohibited Transaction Exemption 77-10. (*See* Pls.' Mem. at 14-15).

The Funds allege, without citation, that "[t]he Shared Services Agreement is considered a 'plan document' under ERISA since it constitutes an adopted plan procedure." (Pls.' Mem. at 15). The definition of "plan documents" for the purposes of 29 U.S.C. § 1104(a)(1)(D) is unsettled. *See Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 304 (2009) (declining to decide whether the category of documents and instruments described in § 1104(a)(1)(D) included beneficiary designation forms); *Becker v. Williams*, 777 F.3d 1035, 1039 *17 (9th Cir. 2015) (holding only documents that "provide information as to 'where [the participant] stands with respect to the plan,' such as an SPD or trust agreement might, could qualify as governing documents with which a plan administrator must comply in awarding benefits under § 1104(a)(1)(D)." (citations omitted)).

Even assuming that the Shared Services Agreement is a plan document, it requires, in relevant part, as follows:

> The Fund Office Staff will maintain records of the amount of salary during each pay period charged to each Organization by each employee of the Fund Office and the amount of time spent by Fund Office Staff who perform work for more than one Organization on the work performed for each organization.

(Shared Services Agreement, Ex. 5, Pls.' App'x at 51). The Funds contend that the Shared Services Agreement, along with the Funds' Employee Handbook, memorializes a requirement that all employees, including Alongi, maintain a


Opinion    Case details

<sup>9</sup> Under the heading "Weekly Timesheet," the Employee Handbook reads:

> All employees (exempt and non-exempt) that work under the jurisdiction of more than one (1) Fund must complete a weekly timesheet (located in the Funds Public Drive > TimeSheet) to be turned in every Friday by 4 p.m. Timesheets are used to break down employees' hours (all hours, including overtime), spent on particular Funds. Employees with questions or concerns regarding this policy and procedure should consult with the Accounting Department.

(Employee Handbook, Ex. 6, Pls.' App'x at 63).

The Funds also appear to argue that by failing to follow the recordkeeping procedure set forth in the Shared Services Agreement, Alongi failed to follow the requirements of DOL Prohibited Transaction Class Exemption 76-1, as amended by Exemption 77-10. (Pls.' Mem. at 12-14). Prohibited Transaction Class Exemption 77-10 requires that "[w]ith respect to the sharing of office space, administrative services and goods, the costs of securing such space, *18 services and goods are assessed and paid on a prorat[ed] basis with respect to each party's use of such [s]pace, services and goods" and that records are maintained to enable people to determine whether that condition has been met. Employee Benefit Plans, 42 Fed.Reg. 33918-19, PROHIBITED TRANSACTION CLASS EXEMPTION 77-10 Sec. I(a), (d).[10]

[10] The Funds do not cite to Prohibited Transaction Class Exemption 77-10 Sec. I(d), which requires that "[a]ny plan which shares office space . . . maintain☐ or causes to be maintained . . . such records as are necessary to enable to the persons . . . to determine whether the conditions of this exemption have been met," but also states that "such participating employee organization . . . shall not be subject to the civil penalty which may be assessed under section 502(i) of the Act if such records are not maintained." *Id.*

Alongi disputes that any plan document required her to maintain daily time sheets, and contends that in any event she complied with the Shared Services Agreement. (Def.'s Opp. at 30). She testified that she initially completed time sheets, but, at some point, stopped after the firm's accountants, Manzi & Associates, determined there was no significant change in fund percentage allocation from year to year. (Alongi Dep. Vol. III at 81-82, Def.'s App'x at 24).

Jeannie Mickel, the managing partner of Manzi & Associates, LLC, who performed accounting services to the Funds in 2004, declared that Alongi was the only Funds Office employee who did not fill out daily time sheets. (Mickel Decl., Ex. 2, Supp. App'x at 32-33). According to Mickel, Alongi repeatedly represented that her hours did not change year to year. (*Id.* at 33). Mickel further asserted "I never advised or told Ms. Alongi that she was neither required to nor not required to keep timesheets." (*Id.* at 34).

Under the circumstances, and viewing the facts in the light most favorable to Alongi, there is a genuine dispute of material fact as to whether any ERISA plan document required the Administrator to complete daily



Opinion    Case details

paid on a sufficiently prorated basis.

### 2. *Performance of Work for the Coalition*

The Funds contend that Alongi's work for the Coalition benefitted a third party whose interests were adverse to the funds. (Pls.' Mem. at 10). They contend that she breached her fiduciary duty by performing work for the Coalition during the Funds normal business hours rather than working for the sole and exclusive benefit of the Funds. (*Id.* at 17-18).

Alongi contends that her work for the Coalition significantly benefitted the Funds. She testified that, as Executive Director of the Coalition, she negotiated with service providers that the funds ultimately used, saving the Funds money. (Alongi Aff. ¶¶ 32-36). She further testified that she provided presentations and educational programming for employees of the Funds through the Coalition. (*Id.* ¶ 37). The affidavits of Rasetta and Shaughnessy support her account. (*See* Rasetta Aff. ¶¶ 9-13; Shaughnessy Aff. ¶¶ 8-9). According to Alongi, her motivation was to "advance and promote the common interest of the Funds and the Coalition's other multi-employer fund." (Alongi Aff. ¶ 38).

The Funds rely principally on Geiman's affidavit. According to Geiman, Coalition member funds were entitled to Coalition-negotiated arrangements with service providers because of their membership, not because of any action by Alongi. (Geiman Aff. ¶ 22). Geiman also disputes whether her work truly benefitted the Funds, testifying that the Funds received "miniscule" benefit from using Coalition-negotiated service providers or that it would be "impossible to quantify" the benefit. (*Id.* ¶¶ 23-34).

Viewing the facts in the light most favorable to Alongi, there is a genuine dispute of material fact as to whether she breached a fiduciary duty by working for the Coalition. Employees of the Funds have sharply differing views as to whether her work benefitted the Funds. And the Funds have not cited any undisputed facts showing that the Coalition's interests \*20 were adverse to the Funds.[11]

> [11] The Funds assert that the Coalition's interests were adverse to the Funds in their memorandum in support of summary judgment. (*See* Pls.' Mem. at 10). However, they cite no facts in support of that assertion, and their statement of material facts likewise does not provide record support.

### 3. *Failure to Work Certain Hours*

The Funds next contend that Alongi deprived them of the expected value of her services by working for the Coalition during Funds regular business hours and working "substantially less than the required 7 hours per day." (Pls.' Mem. at 22).

The Funds rely on the Schultheis report to support their argument. However, the Schultheis report concludes that Alongi "apparently fail[ed] to work seven-hour days" on the basis of her office entry times, telephone records, and e-mails. (Schultheis Report, Ex. 8, Pls.' App'x at 89, 127-131).



Opinion    Case details

work sufficient hours on behalf of the Funds.

#### 4. *Direction of Funds Office Staff to Work for the Coalition*

The Funds further contend that Alongi directed several Funds Office employees to perform tasks for the Coalition. As noted, Funds Office employees undisputedly performed work for the Coalition during normal work hours. For present purposes, the Court will assume that she acted as a fiduciary when directing employees to perform tasks-that is, that personnel time is a "plan asset."

Alongi contends that she is not liable for breach of her fiduciary duties for that work. She asserts that Laura-Jean Hickey, not her, assigned Coalition work to Funds Office employees. Certainly, Alongi directly assigned Coalition work to Hickey. (*See, e.g.*, Ex. 23, Pls.' App'x at 286 *21 (defendant telling Hickey, "I left my changes [to a Coalition questionnaire] on your desk" at 2:50pm).[12] But there are also instances where she directly assigned Coalition work to other Funds Office employees. (*See, e.g.*, Ex. 22, Pls.' App'x at 281 (defendant asking Zaccardi questions in e-mail with subject line: "Mass Coalition Investment Statement").

> [12] It is not clear from that e-mail chain whether Alongi expected Hickey to implement her changes during the business hours of the Funds Office.

Alongi also contends that the Coalition work performed by Funds Office employees actually benefitted the Funds. As noted, there is a genuine dispute of material fact as to that issue. In addition, she contends that the Funds have not shown beyond dispute that she acted with an improper motive in directing Funds employees to perform Coalition work. (Def.'s Opp. at 12-13, 29). The Funds respond that they need not address her subjective intent and that "good intentions are not a defense to a fiduciary breach of this kind." (Pls.' Reply at 16-17.) They also imply that she was truly motivated by her Coalition salary. (*Id.* at 17.)

Parsing a fiduciary's mixed motives is an "abstract discussion." *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1, 6 (1st Cir. 2018). However, the First Circuit has, "in reviewing ERISA duty of loyalty claims, . . . asked whether the fiduciary's 'operative motive was to further its own interests." *Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 40 (1st Cir. 2018) (quoting *Ellis*, 883 F.3d at 6). As the Funds note, that question arose in a series of cases involving investment decisions made by plan fiduciaries that were not *per se* unlawful, but created conflicts of interest that cast doubt on whether they were made for the sole benefit of plan participants. (Pls.' Reply at 16.)

Here, rather than self-dealing when selecting plan investments, Alongi asked Fund employees to perform tasks that are alleged to have assisted her work for the Coalition, which *22 (she argues) ultimately benefitted the Funds. Her affidavit and deposition provide some support for her claim that she was motivated to benefit the Funds.

Viewing the facts in the light most favorable to Alongi, there is a genuine dispute of material fact as to whether she directed Funds Office employees to perform Coalition work during the Funds Office business hours, whether



Opinion    Case details

Finally, the Funds contend that Alongi breached her fiduciary duty by taking or cashing out two weeks of vacation time annually to which she was not entitled. (Pls.' Mem. at 32).

It is undisputed that beginning in 2013, Alongi began taking or cashing out up to two weeks of vacation time annually. She contends that the weeks were approved by Rasetta and Shaughnessy, who served on the Boards of Trustees. Rasetta and Shaughnessy both testified that they granted her two weeks of extra annual vacation time, although their accounts are somewhat inconsistent and qualified.[13] And Alongi has testified in an affidavit that Shaughnessy and Rasetta acted as a subcommittee of the Board with the power to set employee compensation (which, she contends, includes vacation time). (Alongi Aff. ¶¶ 13-15, 18-19).

> [13] *E.g.,* Rasetta Dep. at 154, Pls.' App'x at 451; Shaughnessy Dep. at 40-41, Pls.' App'x at 455-56.

Certainly the record creates substantial doubt as to how much vacation time Shaughnessy and Rasetta approved for Alongi, or whether they acted in accordance with trust policies in doing so. However, viewing the facts in the light most favorable to Alongi, a genuine dispute of material fact exists as to whether she was entitled to the extra vacation time.

* * *

In sum, there is a genuine dispute of material fact as to each alleged breach of fiduciary [*23] duty, even assuming that Alongi acted as a functional fiduciary in all relevant respects. Accordingly, the Court will deny the motion for partial summary judgment.

**IV. *Conclusion***

For the foregoing reasons, plaintiffs' motion for partial summary judgment will be DENIED.

**So Ordered.**

About us

Jobs

News

Twitter

Facebook

LinkedIn

Instagram

Help articles


Opinion   Case details

Do Not Sell or Share My Personal Information/Limit the Use of My Sensitive Personal Information

Privacy

Terms

© 2024 Casetext Inc.

Casetext, Inc. and Casetext are not a law firm and do not provide legal advice.

EXHIBIT
McLaughlin
167
7/13/23 GD

Body Meeting                                                                                  June 27, 2021

The meeting was called to order at 8:00am present were William McLaughlin, Mike Bowes, David Shea, Christopher Fogarty, David Fantini, Paul DiMinico, Christopher Carey, David Dobson, Patrick Hunt, William McGuinness, John Rossi, Michael Simoncini, Peter Ventresco, James Marenghi, and Ryan Mancini.

President Mike Bowes took a moment to remind everyone with respect to Covid 19, if you are not vaccinated, please use hand sanitizer, and put a mask on. This is for your protection.

President Bowes then made a motion and was seconded to approve the presence of Funds Administrator Greg Geiman along with Jeff Hall, Vishakha Mathur and Jose Rodriguez of 617 Media for Technical assistance. Motion Carried

Mike then took a moment to remind everyone they can pay their dues online using EZ-Pay and that if you sign up for our mobile news network you will be eligible to win Red Sox Tickets. Also, he announced that 2 sets of Worcester Woo Sox tickets would be given away at the end of the meeting.

**Business Managers Report:** Billy opened the meeting by welcoming everyone back after 16 months of restrictions due to COVID-19.

Bill then asked for a moment of silence for all of the Operating Engineers that had passed away due to the Corona Virus.

He then spoke of why we chose to conduct a special meeting after sixteen months, the sheer number of minutes for all that time would be impossible to do on a Wednesday evening. Please be patient with the length of the minutes and the reports, there is a lot of important information in them. Our constitution would not allow to conduct business by virtual zoom meetings for this and in person is the only way. The minutes will reflect that Local 4 and our Trustees had made amendments to our Health and Welfare Plan, Pension, and Annuity Plans, for those that are impacted by this deadly disease, adjustments provided assistance for our members in need.

Bill then gave examples such as if you were laid off due to Covid or not called back to work due to Covid, from March 20 to June 30 you were eligible for 30hrs a week of Health & Welfare and Pension Credit and a one-time distribution from your annuity.

He moved on to speak of the changes that have taken place in the last 16 months since our last meeting in February of 2020. We have elected a new President of the United States that you will find is the most pro union president of all time. Capital development, job creation, putting Americans to work, organized labor and union apprenticeship programs are what he speaks of all the time. His infrastructure plan is to build better roads and bridges across the United States especially here in the Northeast where we have some of the worst. President Biden's push to pass the Pro Act which protects the right to organize along with the American Rescue Plan that protects union pension plans such as ours, make him good for us and all unions as well.

Bill then introduced our new Training Coordinator Michael Carey, Mike is a graduate of our apprenticeship program and has earned his strips as a crane operator in the field as well as a

1

training instructor in our program, Bill said he is confident Mike will put education and training first.

He then introduced our new Health & Welfare administrator Attorney Greg Geiman. Greg has been with us for over a decade as a true professional with intellect and a strong work ethic that will put our funds office back to where it needs to be as a leader in the Taft Hartley world of benefits. Bill then took a moment to mention that last Summer he had learned that the former Funds Administrator was mismanaging the funds office in many ways. Misuse of members money from hard earned contributions to pay herself and her employees to do work for another organization. He said the misuse of your money was to her benefit, she held a position of high trust, and the most important part of her job was to make sure your money was protected and spent in ways that would directly benefit you the members of the local. As chairman of the board of Trustees of the Funds it is an obligation to inform the fellow Trustees of the Administrators wrongdoing. The Health and Welfare, Pension and Annuity and Savings Board of Trustees which contain Union and Employer representatives all voted unanimously to terminate the former Administrator for just cause. It became apparent the former Administrator could not look in the mirror and accept the responsibility for her actions. Instead, she decided to seek vengeance against the Business Manager and this organization the same one that for decades provided her livelihood. She thought that if she fabricated a story about sexual harassment, brought a lawsuit and even worked to publicize it that it would embarrass the Business Manager and Local 4 into a quick and lucrative settlement for herself. He said the Trustees and I will stand up for truth and what is right for those members that have worked hard to build these benefit funds. We are vigorously defending against the former Administrators frivolous lawsuit and the Trustees of these funds have an obligation to recoup the money that was misused. The Trustees have filed a lawsuit in the United States District Court to hold her accountable for nearly $1.5 million in losses that were suffered by our benefit funds under her watch. We will do everything in our power to ensure that the former administrator is forced to take responsibility for her actions whether she wants to or not, we will keep you informed.

Bill moved on to speak of the recent fight against "Right to Work" in New Hampshire that we won, it was defeated with help from us and other labor organizations. This effort took several months and hundreds of thousands of dollars to fight and was a direct result of labor coming together to fight off our enemies. Right to Work is nothing more than an attack on Labor Unions and the working class, this fight drew national attention and was defeated with standouts, rallies, and phone calls to legislators in New Hampshire. Thank you to all that attended, this was the key to our victory and special thanks to Paul DiMinico, Bob Burr, Chris Carey and the rest of my staff, great job.

The next subject Bill spoke of was the organizing pursuit of two decades and several months of negotiating, Local 4 now has a collective bargaining agreement with Astro Crane. A monumental achievement that will improve our market share with the crane rental business. They were the largest non-union crane rental company in our jurisdiction and now they are union, if you see them in the field, please welcome them to Local 4. He then recognized Chris Carey and Dave Shea for a job well done.

Bill then spoke of the world of alternative energy that the Massachusetts Building Trades and Southeastern Building Trades had reached an agreement with Vineyard Wind. It will be the first

2

large scale wind to energy project in the United States to be done under a PLA which will be 100% Union. The 84 wind turbines will be constructed 15 miles off the coast of Marthas Vineyard. This is a 3-billion-dollar project that will power 400k homes in Massachusetts and provide a multitude of jobs for this Local Union. Also, in the State of Maine we have just finished working with legislators on the construction of a similar wind project with Diamond Offshore Wind for thirteen turbines. It has passed the Senate 24-10 vote and in the House of Representatives 101-38 and Friday Governor Janet Mills is expected to sign this bill into law, which means any and all offshore wind projects in Maine will be done under a PLA. This was not easy to get done, we needed support on both sides of the aisle for bipartisan support and to convince them it was good for Maine. This project will provide to its citizens employment with good wages, conditions and benefits, good job Business Agent Bob Burr.

Covid 19 had surprised all of us and no one could have predicted what our future held, we as a Local are coming out of this pandemic stronger than ever. The Pension is 106 percent funded to make us well into the green zone in funding status with over a billion dollars in assets there and the Annuity and Savings has over a half a billion assets which are both newly achieved milestones. The Health and Welfare Plan has over a hundred million dollars in assets with about 14 months in reserve that is very good. With all of this good news it is predicted that we could potentially see benefit improvements with an accrual increase to the pension plan and restoring the thirteenth check to the pensionaries. Bill lastly reminded the body of the Operating Engineers 4th annual golf tournament outing on Sunday, September 19th at Stow Acres Country Club. There are still spots open and they are going fast, so register now. He said you don't have to be a golfer to participate you can register for lunch and a golf shirt, this year's outing will support the fight against cancer.

President Bowes then made a motion and was seconded in the interest of time to approve by voice vote the seventeen transfers to the parent body since March of 2020. Motion carried.

A motion was made and seconded to in the interest of time to approve the reading of the Quarterly Treasurers reports since March 2020 and the Annual Treasurers report. Motion carried.

A motion was made and seconded to in the interest of time to approve the reading of the Quarterly Per Capita reports since March 2020 and the Annual Per Capita report. Motion carried.

A motion was made and seconded to in the interest of time to approve the reading of the Dearly Departed along with the Sick and Death Fund Quarterly reports since March 2020 and the Sick and Death Fund Annual Report. Motion carried.

The Recording Secretary Christopher Fogarty by video read the minutes of the Body meeting of February 19, 2020.

A motion was made and seconded to accept the minutes as read. Motion carried.

3

The minutes by video of the February 26, 2020, Executive Board meeting were read.

A motion was made and seconded to segregate the minutes of the February 26, 2020, Executive board meeting and have Chairman of the By-Law committee David Fantini clarify the amendments to the current By-Laws for approval. Motion carried

A motion was made and seconded to accept the minutes as read. Motion carried.

The minutes by video of the April 22, 2020he Executive Board meeting were read.

A motion was made and seconded to accept the minutes as read. Motion carried.

The minutes by video of the May 22, 2020, Executive Board meeting were read.

A motion was made and seconded to accept the minutes as read. Motion carried.

The minutes by video of the June 24, 2020, Executive Board meeting were read.

A motion was made and seconded to accept the minutes as read. Motion carried.

The minutes by video of the July 22, 2020, Executive Board meeting were read.

A motion was made and seconded to accept the minutes as read. Motion carried.

Brother Ricky Allard was recognized from the floor by President Bowes.

Brother Allard made a motion and was seconded from the floor to accept in the interest of time all of the video minutes from August 26th, 2020, to June 21st, 2021. Motion carried.

A motion was made and seconded to transfer all 17, 4R to straight 4 Members the members are: Henry D. Banks, Thomas J, Bonome, Tyler E. Bowes, Mark W. Caughey, Mathew W. Caughey, Kareem H. Chaplin, Ryan T. Cormier, Sean F. Flaherty, Brendan J. Healy, Leon Hussey, Mathew Levins, Andrew J. Luneau, Michael McCarthy, Jr., Jason K. Moore, Taylor D. Pires, Keith A. Richardson, Brian L. Williams. Motion Carried.

Treasurer David Fantini read the Quarterly Treasurers Reports since March 2020 and the Annual Treasurer's report.

4

A motion was made and seconded to accept the minutes as read and refer to the auditor. Motion carried.

Financial Secretary Paul DiMinico read the Quarterly Reports since March 2020 and the Annual report.

A motion was made and seconded to accept the minutes as read and refer to the auditor. Motion carried.

Sick and Death Benefit Chairman Christopher Fogarty read the Quarterly Reports since March 2020 and the Annual report.

A motion was made and seconded to accept the minutes as read and refer to the auditor. Motion carried.

Sick and Death Benefit Chairman Chritopher Fogarty then asked for a moment of silence for the dearly departed.

President Bowes then asked if there was any new business and recognized Training Coordinator Mike Carey from the floor.

Brother Carey Thanked the Business Manager for the opportunity to serve to the best of his abilities as coordinator of the Training Center.

President Bowes asked if there was any other new business, seeing none he asked if there was any old business.

President Bowles then asked to have body members in attendance to check under their seats for 2 sets of 4 Woo Sox tickets.

Business Manager Bill McLaughlin then extended to anyone interested in attending a Woo Sox game with food and non-alcoholic beverages at a Hospitality event on July 15th to celebrate the partnership of the Operating Engineers and Woo Sox. 100 tickets are available and to see Worcester Business Agent Dave Dobson if interested.

Meeting adjourned 11:45 am
Recording Secretary Christopher T. Fogarty

5

Exhibit E

 RECRUITERS LINEUP

State ⌄    Industry ⌄    General Recruiting    Recruiting Tools

◄                                                                                                    ►

Recruiters LineUp  >  Resource Center  >  General Recruiting  >  Methods & Techniques for Screening Candidates in 2023

# Methods & Techniques for Screening Candidates in 2023



In today's job market, screening candidates is an essential part of the recruitment process. The process of screening candidates can be time-consuming, and companies are always looking for ways to make it more efficient. With the advancements in technology and an ever-evolving job market, new methods and techniques have emerged for screening candidates. In this article, we will discuss some of the most effective methods and techniques for screening candidates in 2023.

**What is Candidate Screening?**

Candidate screening is the process of evaluating job applicants to determine if they have the necessary qualifications, skills, and experience to succeed in a particular role. This process typically involves reviewing resumes, conducting phone or video interviews, and administering assessments or tests. The goal of candidate screening is to identify the most promising candidates and narrow down the applicant pool for further consideration. Effective screening can help organizations save time and resources by ensuring that only the most qualified candidates move forward in the hiring process. Additionally, it can help ensure that the selected candidates are a good fit for the company culture and job requirements.

**What are the Techniques Used for Screening Candidates in 2023?**

## 1. AI and Machine Learning

Artificial intelligence (AI) and machine learning have transformed the recruitment process by automating tasks such as resume screening and candidate matching. AI algorithms can analyze resumes and job descriptions, match keywords, and identify the most qualified candidates for the job.

Machine learning algorithms can also learn from previous hiring decisions and provide valuable insights into candidate screening. This can help recruiters make more informed decisions and improve the overall efficiency of the recruitment process.

## 2. Video Interviewing

Video interviewing has become increasingly popular in recent years, and it has only gained more traction since the COVID-19 pandemic began. Video interviewing allows recruiters to get a better sense of a candidate's personality and communication skills, as well as their qualifications.

Recruiters can also conduct video interviews with candidates from anywhere in the world, making it easier to find the right candidate regardless of their location. This technology has been improved with the introduction of artificial intelligence, which can analyze facial expressions, tone of voice, and other nonverbal cues to better understand candidates.

## 3. Gamification

Gamification is a technique that uses game design elements in non-game contexts to engage and motivate people. In recruitment, gamification can be used to assess candidates' skills, knowledge, and problem-solving abilities.

Recruiters can create games or simulations that simulate real-life situations and see how candidates perform. This technique can be particularly useful for assessing technical skills, as it provides a more practical and interactive way to evaluate candidates.

## 4. Personality Assessments

Personality assessments have been used in recruitment for many years, but they have evolved to become more sophisticated and accurate. These assessments can provide valuable insights into a candidate's personality, including their values, motivation, and work style.

Recruiters can use personality assessments to identify candidates who are a good fit for the company culture and the job requirements. Some of the popular personality assessments used today include the Myers-Briggs Type Indicator (MBTI), the Big Five Personality Traits, and the DISC assessment.

## 5. Social Media Screening

Social media screening involves analyzing a candidate's social media profiles to get a better sense of their personality, interests, and behavior. This technique can be particularly useful for assessing a candidate's cultural fit and identifying any potential red flags.

However, it's essential to be careful when using social media screening, as it can raise privacy concerns and potential legal issues. Recruiters should only use social media screening as a supplement to other screening techniques and ensure they are not discriminating against candidates based on their social media profiles.

## 6. Skills Testing

Skills testing is a technique that involves assessing a candidate's abilities in a particular skill or area. This technique can be particularly useful for technical roles, where specific skills are required.

Recruiters can create tests or simulations that evaluate a candidate's knowledge and ability in areas such as programming, data analysis, or design. This technique can also be used to assess soft skills, such as teamwork and communication.

## 7. Reference Checking

Reference checking involves contacting a candidate's previous employers or references to verify their employment history and gain insights into their work performance. This technique can be particularly useful for assessing a candidate's work ethic, reliability, and professionalism.

Recruiters can also use reference checking to ask specific questions related to the job requirements and assess the candidate's ability to perform the job duties effectively.

**Why is Candidate Screening Important?**

Here are some reasons why candidate screening is so important:

### • Saves Time and Resources

By screening candidates, employers can quickly eliminate those who do not meet the minimum qualifications for the job, reducing the number of applicants to be interviewed. This can save time and resources in the hiring process and help to identify the most qualified candidates efficiently.

### • Reduces Hiring Costs

Screening candidates helps to reduce hiring costs by limiting the number of applicants who require an interview. This can save money on travel expenses, accommodations, and other costs associated with conducting interviews.

### • Improves the Quality of Hires

Candidate screening helps to improve the quality of hires by ensuring that only the most qualified candidates are considered for the job. This can lead to better job performance, higher productivity, and lower turnover rates.

- ## **Mitigates Risk**

Screening candidates can help to mitigate risk by identifying potential red flags such as criminal records, employment gaps, or inconsistencies in the candidate's application materials. This can help to prevent future legal issues, workplace conflicts, and other problems that can arise from hiring the wrong person.

- ## **Enhances Employer Branding**

A strong candidate screening process can enhance an employer's branding by demonstrating that the company is committed to hiring the best candidates. This can help to attract top talent and position the company as a desirable place to work.

### Screening Process Examples

A screening process is a crucial step in hiring the right candidate for a job. It involves assessing candidates' skills, knowledge, and qualifications to determine if they are suitable for the role. Here are some examples of a screening process:

- **Initial Resume Review:** Employers can filter out unqualified candidates by reviewing resumes and cover letters to verify that they meet the job requirements.
- **Pre-Employment Testing:** Pre-employment tests assess the candidate's knowledge, skills, and abilities, and evaluate their job suitability.
- **Phone Screening:** Employers can conduct a phone interview to verify that the candidate's qualifications match the job requirements.
- **Video Interview:** Conducting a video interview is a great way to assess a candidate's body language, communication skills, and how they present themselves.
- **In-Person Interview:** Employers can assess candidates in-person by conducting a behavioral interview, technical interview, or a combination of both.
- **Background Check:** Employers can conduct a criminal background check, employment verification, and educational verification to ensure that the candidate is trustworthy.
- **Reference Check:** Contacting references is an important part of the screening process, as it helps to verify the candidate's skills, work experience, and character.
- **Job Offer:** Once a candidate successfully completes the screening process, they are given a job offer.

In conclusion, candidate screening is a crucial step in the hiring process that helps companies to identify the most qualified candidates while saving time and resources, reducing hiring costs, improving the quality of hires, mitigating risk, and enhancing employer branding. Employers who prioritize candidate screening are more likely to make better hiring decisions that lead to long-term success for their organizations.

## Find the right Recruiters, Everywhere

I need a recruitment firm specializing in

| 💼  Select industries |

Located in

| 📍  Select states |

Find Firms

## Share this article

   

## Related Articles



### Guide to Hiring Employees in Ghana

Hiring employees in any country requires a clear understanding of the local labor laws, customs, and practices. Ghana, situated in West Africa, is a country with a diverse economy and a growing workforce. Whether you're a local business owner or an international company looking to expand into Ghana, navigating the process of hiring employees can ......



### Six Tips for Hiring the Right Staffing Agency

The decision to hire a staffing agency is usually an easy one.  Saving time and money on your recruiting and staffing needs is not a hard decision to make. But when it comes to choosing the right agency, the decision might be a little tougher. What things should you look for in an agency? What ... Continued



## Automobile Headhunters New Mexico

New Mexico Automobile Headhunters New Mexico is a highly populated state, with a population of 2, 085, 109, which is increasing every year. Majority of people in this state were born there and only 37.9% were born in other states in the country. 19.8% of the population of New Mexico lives in poverty and the ... Continued

**Find a Firm**

**About**

**Resources Center**

Articles by Industry
Articles by State
General Recruiting Articles
Executive Recruiting Articles

**Add My Firm**

**Contact Us**

**Popular Articles**

Recruiting Firms in the USA: How to Find the Best Companies With a Quick Search

Best 10 Employer of Record Services 2023

Recruitment Fee Agreement Full Guide

Hedge Fund Recruiters: Who are the Top?

More Articles

Design: Epic Branding    Code: Ety Hadar



© 2024, All rights reserved

Privacy Policy

**IUOE Local 4, et al**
**v.**
**A.M. Alongi**

EXHIBIT F

| Year | Age | Salary | Bonus | Annuity (Company Contribution) | Local 4 Pension | General Pension | Social Security | Health Benefits | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Compensation & Benefits if Not Terminated on 7/22/2020 | | | | | | |
| 2020 (after 7/22/2020) | 60 | 110,022 | 4,783 | 6,960 | | | | | 9,034 | **130,799** |
| 2021 | 61 | 268,266 | 4,903 | 15,080 | | | | | 22,207 | **310,456** |
| 2022 | 62 | 274,972 | 5,026 | 15,080 | | | | | 23,095 | **318,174** |
| 2023 | 63 | 281,847 | 5,151 | 15,080 | | | | | 24,019 | **326,097** |
| 2024 | 64 | 288,893 | 5,280 | 15,080 | | | | | 24,980 | **334,233** |
| 2025 | 65 | 296,115 | 5,412 | 15,080 | | | | | 25,979 | **342,586** |
| **Sub total 2021 to 2025** | | **1,520,114** | **30,555** | **82,360** | **-** | **-** | **-** | **-** | **129,315** | **1,762,344** |
| 2026 | 66 | | | | 77,690 | 86,192 | 43,785 | | | **207,668** |
| 2027 | 67 | | | | 77,690 | 86,192 | 45,186 | | | **209,069** |
| 2028 | 68 | | | | 77,690 | 86,192 | 46,632 | | | **210,515** |
| 2029 | 69 | | | | 77,690 | 86,192 | 48,125 | | | **212,007** |
| 2030 | 70 | | | | 77,690 | 86,192 | 49,665 | | | **213,547** |
| 2031 | 71 | | | | 77,690 | 86,192 | 51,254 | | | **215,136** |
| 2032 | 72 | | | | 77,690 | 86,192 | 52,894 | | | **216,776** |
| 2033 | 73 | | | | 77,690 | 86,192 | 54,587 | | | **218,469** |
| 2034 | 74 | | | | 77,690 | 86,192 | 56,333 | | | **220,216** |
| 2035 | 75 | | | | 77,690 | 86,192 | 58,136 | | | **222,018** |
| 2036 | 76 | | | | 77,690 | 86,192 | 59,996 | | | **223,879** |
| 2037 | 77 | | | | 77,690 | 86,192 | 61,916 | | | **225,799** |
| 2038 | 78 | | | | 77,690 | 86,192 | 63,898 | | | **227,780** |
| 2039 | 79 | | | | 77,690 | 86,192 | 65,942 | | | **229,825** |
| 2040 | 80 | | | | 77,690 | 86,192 | 68,052 | | | **231,935** |
| 2041 | 81 | | | | 77,690 | 86,192 | 70,230 | | | **234,113** |
| 2042 | 82 | | | | 77,690 | 86,192 | 72,477 | | | **236,360** |
| 2043 | 83 | | | | 77,690 | 86,192 | 74,797 | | | **238,679** |
| 2044 | 84 | | | | 77,690 | 86,192 | 77,190 | | | **241,073** |
| 2045 | 85 | | | | 77,690 | 86,192 | 79,660 | | | **243,543** |
| 2046 | 86 | | | | 77,690 | 86,192 | 82,209 | | | **246,092** |
| 2047 | 87 | | | | 77,690 | 86,192 | 84,840 | | | **248,723** |
| **Subtotal 2025 to 2047** | | **-** | **-** | **-** | **1,709,180** | **1,896,234** | **1,367,807** | **-** | **-** | **4,973,220** |
| **Total 2021 to 2047** | | **1,520,114** | **30,555** | **82,360** | **1,709,180** | **1,896,234** | **1,367,807** | **-** | **129,315** | **6,735,565** |

**IUOE Local 4, et al**
**v.**
**A.M. Alongi**
**Analysis – Terminated**

EXHIBIT G

| Year | Age | Salary | Bonus | Annuity | Local 4 Pension | General Pension | Social Security | Health Benefits | Other | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Compensation & Benefits After Terminated on 7/22/2020 | | | | | |
| 2020 (after 7/22/2020) | 60 | | | | 43,877 | 19,932 | | | | **63,809** |
| 2021 | 61 | | | | 57,632 | 78,319 | | (13,549) | | **122,402** |
| 2022 | 62 | | | | 57,632 | 73,318 | 21,132 | (17,608) | | **134,474** |
| 2023 | 63 | | | | 57,632 | 79,728 | 21,808 | (19,069) | | **140,099** |
| 2024 | 64 | | | | 57,632 | 79,728 | 22,506 | (20,652) | | **139,214** |
| 2025 | 65 | | | | 57,632 | 79,728 | 23,226 | (20,652) | | **139,934** |
| **Sub total 2021 to 2025** | | - | - | - | **332,037** | **410,753** | **88,673** | **(91,530)** | - | **739,933** |
| 2026 | 66 | | | | 57,632 | 79,728 | 23,970 | | | **161,330** |
| 2027 | 67 | | | | 57,632 | 79,728 | 24,737 | | | **162,097** |
| 2028 | 68 | | | | 57,632 | 79,728 | 25,528 | | | **162,888** |
| 2029 | 69 | | | | 57,632 | 79,728 | 26,345 | | | **163,705** |
| 2030 | 70 | | | | 57,632 | 79,728 | 27,188 | | | **164,548** |
| 2031 | 71 | | | | 57,632 | 79,728 | 28,058 | | | **165,418** |
| 2032 | 72 | | | | 57,632 | 79,728 | 28,956 | | | **166,316** |
| 2033 | 73 | | | | 57,632 | 79,728 | 29,883 | | | **167,243** |
| 2034 | 74 | | | | 57,632 | 79,728 | 30,839 | | | **168,199** |
| 2035 | 75 | | | | 57,632 | 79,728 | 31,826 | | | **169,186** |
| 2036 | 76 | | | | 57,632 | 79,728 | 32,844 | | | **170,204** |
| 2037 | 77 | | | | 57,632 | 79,728 | 33,895 | | | **171,255** |
| 2038 | 78 | | | | 57,632 | 79,728 | 34,980 | | | **172,340** |
| 2039 | 79 | | | | 57,632 | 79,728 | 36,099 | | | **173,459** |
| 2040 | 80 | | | | 57,632 | 79,728 | 37,254 | | | **174,614** |
| 2041 | 81 | | | | 57,632 | 79,728 | 38,446 | | | **175,806** |
| 2042 | 82 | | | | 57,632 | 79,728 | 39,677 | | | **177,037** |
| 2043 | 83 | | | | 57,632 | 79,728 | 40,946 | | | **178,306** |
| 2044 | 84 | | | | 57,632 | 79,728 | 42,257 | | | **179,617** |
| 2045 | 85 | | | | 57,632 | 79,728 | 43,609 | | | **180,969** |
| 2046 | 86 | | | | 57,632 | 79,728 | 45,004 | | | **182,364** |
| 2047 | 87 | | | | 57,632 | 79,728 | 46,444 | | | **183,804** |
| **Subtotal 2025 to 2047** | | - | - | - | **1,267,904** | **1,754,016** | **748,783** | - | - | **3,770,703** |
| **Total 2021 to 2047** | | - | - | - | **1,599,941** | **2,164,769** | **837,456** | **(91,530)** | - | **4,510,636** |

EXHIBIT G

**IUOE Local 4, et al**

**v.**

**A.M. Alongi**

**Analysis – Comparison Not Terminated v. Terminated**

EXHIBIT H

| Year | Age | Compensation & Benefits if Not Terminated on 7/22/2020 Total | Compensation & Benefits After Terminated on 7/22/2020 Total | | Total Loss in Income | PV assuming 4.61 10 year bond rate |
|---|---|---|---|---|---|---|
| 2020 (after 7/22/2020) | 60 | 130,799 | 63,809 | | 66,990 | 79,917 |
| 2021 | 61 | 310,456 | 122,402 | | 188,053 | 214,662 |
| 2022 | 62 | 318,174 | 134,474 | | 183,700 | 200,643 |
| 2023 | 63 | 326,097 | 140,099 | | 185,998 | 194,386 |
| 2024 | 64 | 334,233 | 139,214 | | 195,019 | 195,019 |
| 2025 | 65 | 342,586 | 139,934 | | 202,652 | 193,907 |
| Sub total 2021 to 2025 | | 1,762,344 | 739,933 | | 1,022,411 | 1,078,534 |
| 2026 | 66 | 207,668 | 161,330 | | 46,338 | 42,425 |
| 2027 | 67 | 209,069 | 162,097 | | 46,972 | 41,150 |
| 2028 | 68 | 210,515 | 162,888 | | 47,627 | 39,923 |
| 2029 | 69 | 212,007 | 163,705 | | 48,302 | 38,741 |
| 2030 | 70 | 213,547 | 164,548 | | 48,999 | 37,604 |
| 2031 | 71 | 215,136 | 165,418 | | 49,718 | 36,510 |
| 2032 | 72 | 216,776 | 166,316 | | 50,460 | 35,456 |
| 2033 | 73 | 218,469 | 167,243 | | 51,226 | 34,441 |
| 2034 | 74 | 220,216 | 168,199 | | 52,017 | 33,463 |
| 2035 | 75 | 222,018 | 169,186 | | 52,833 | 32,521 |
| 2036 | 76 | 223,879 | 170,204 | | 53,675 | 31,614 |
| 2037 | 77 | 225,799 | 171,255 | | 54,544 | 30,739 |
| 2038 | 78 | 227,780 | 172,340 | | 55,440 | 29,896 |
| 2039 | 79 | 229,825 | 173,459 | | 56,366 | 29,084 |
| 2040 | 80 | 231,935 | 174,614 | | 57,321 | 28,300 |
| 2041 | 81 | 234,113 | 175,806 | | 58,306 | 27,544 |
| 2042 | 82 | 236,360 | 177,037 | | 59,323 | 26,815 |
| 2043 | 83 | 238,679 | 178,306 | | 60,373 | 26,112 |
| 2044 | 84 | 241,073 | 179,617 | | 61,456 | 25,434 |
| 2045 | 85 | 243,543 | 180,969 | | 62,574 | 24,779 |
| 2046 | 86 | 246,092 | 182,364 | | 63,728 | 24,147 |
| 2047 | 87 | 248,723 | 183,804 | | 64,918 | 23,536 |
| Subtotal 2025 to 2047 | | 4,973,220 | 3,770,703 | - | 1,202,517 | 700,234 |
| Total 2021 to 2047 | | 6,735,565 | 4,510,636 | | 2,224,928 | 1,778,768 |

**IUOE Local 4, et al**
**v.**
**A.M. Alongi**
**Assumptions**

EXHIBIT I

|  | Work to age 65 | Terminated at age 60 |
|---|---|---|
| Salary | Final salary increasing at 2.5% per year | None |
|  | 2020 Salary after July 23 |  |
|  | 110,728.80 |  |
|  | Annualized 2020 Salary |  |
|  | 261,722.62 |  |
| Bonus | Provided by client | None |
| Employer 401(k) contributions | None | None |
| Local 4 Pension | Monthly pension of $85 times 12.5 (years) and $170 times 31.83 (years) | Provided by client |
| General Pension Plan | Actual Age 60 Pension adjusted for age 65 Pension by Local 4 acturial adjustment of .125% per month . | Provided by client |
| Social Security | Maximum 2024 Pension increased by 3.2% per year | Social Security income from tax returns (2021) increased by Social Security COLA factor.  Assumed to be 3.2% after 2024.  Client would have actual amounts in Tax Return |
| Health Benefits | Assumed to be 100% paid by client including retiree health which would mean client would not need supplemental Medicare plan | Assumes client would have to pay for private insurance totaling $1,721 ( 2024 cost) starting in February 2021 to cover what she had when she was employed adjusted for  8.3% inflation in healt care costs.  Client may have BCBS cost for years 2020 to 2024.  Assumes client will have to pay for supplemental Medicare insurance at $130 per month in 2024 once she is eligible for medicare.  Note net effect is shown as a negative number in the termination column. |

IUOE Local 4, et al
v.
A. M. Alongi

EXHIBIT I

| | Work to age 65 | Terminated at age 60 |
|---|---|---|
| Salary | Final salary increasing at 2.5% per year after July 33, 2020 | None |
| Bonus | Provided by client | None |
| Employer 401(k) contributions | None | None |
| Local 4 Pension | Monthly pension of $85 times 12.5 and $150 times 33.9 | Provided by client and Tax return |
| General Pension Plan | Actual Age 60 Pension adjusted for age 65 Pension by Local 4 acturial adjustment of .125% per month . Doesn't reflect loss of additional years of service  after 2020 | Provided by client and Tax return |
| Social Security | Maximum age 65 (2024) Pension increased by 3.2% per year | Social Security income from tax returns (2021) increased by Social Security COLA factor.  Assumed to be 3.2% after 2024.  Client would have actual amounts in Tax Return |
| Health Benefits | Assumed to be 100% paid by client until retirement -- No retiree health insurance | Assumes client would have to pay for private insurance totaling $1,721 (2024 cost) starting in February 2021 to cover what she had when she was employed adjusted for  8.3% inflation in health care costs. |
| Other | Car Lease -- $17,500<br>Car Operating cost -- $ 7,000<br>Annual cell phone cost --  $480<br>Total -- $$24980 | None |