# EXHIBIT B

**In the Matter Of:**

IUOE LOCAL 4 PENSION FUND vs ALONGI

1:21-cv-10163-FDS

---

# CHRISTOPHER REECE

*September 26, 2024*

---



800.211.DEPO (3376)
EsquireSolutions.com

1                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
2
                  CIVIL ACTON NO. 1:21-cv-10163-FDS
3

4

5

6
    BOARD OF TRUSTEES of the IUOE LOCAL 4 PENSION
7   FUND, et al.,
                  Plaintiff,
8                     vs.

9   GINA MARIE ALONGI,
                  Defendant.
10

11

12

13

14        DEPOSITION OF CHRISTOPHER REECE, taken before

15   June Poirier, Shorthand Reporter and Notary Public,

16   at the offices of Freeman, Mathis & Gary, 60 State

17   Street, Boston, Massachusetts, on Thursday,

18   September 26, 2024, commencing at 9:04 a.m.

19

20

21

22

23

24



 1   APPEARANCES:

 2   JENNIFER L. MARKOWSKI, ESQ.
     KATHERINE C. CHENAIL, ESQ.
 3   Freeman, Mathis & Gary, LLP
     60 State Street, 6th Floor
 4   Boston, MA 02109
     jmarkowski@fmglaw.com
 5       For the Plaintiff

 6

 7   ROBERT G. YOUNG, ESQ.
     Bowditch & Dewey
 8   101 Federal Street, Suite 1405
     Boston, MA 02110
 9   ryoung@bowditch.com
         For the Defendant and Witness
10

11   REMOTE APPEARANCE VIA AUDIOVISUAL:

12   DANIEL KEENAN, ESQ.

13

14

15

16

17

18

19

20

21

22

23

24



```
1                    I N D E X

2    WITNESS                      DIRECT

3    CHRISTOPHER REECE

4          By Ms. Markowski     4

5

6

7                  E X H I B I T S

8      EXHIBIT NO.        DESCRIPTION         PAGE NO.

9        1    Christopher S. Reece Resume.......   13

10       2    Expert Report.....................   13

11       3    Expert Report Supplement..........   13

12       4    Exhibit I.........................  100

13       5    Exhibit I Assumptions.............  100

14       6    Exhibit H.........................  102

15       7    Exhibit H Analysis................  102

16       8    Exhibit F.........................  102

17       9    Exhibit F Revised.................  102

18      10    Exhibit G.........................  103

19      11    Exhibit G Analysis................  103

20

21

22

23       The Stenographer retained the exhibits

24
```



1              PROCEEDINGS

2          (Whereupon the witness was sworn.)

3   DIRECT EXAMINATION BY ATTORNEY MARKOWSKI:

4       Q.   Good morning, Mr. Reece.

5       A.   Good morning.

6       Q.   I know we met earlier this morning but my

7       name is Jennifer Markowski, I represent the

8       funds and Mr. McLaughlin in this case.  You are

9       here to testify today.  Could you state your

10      full name for the record?

11      A.   Christopher S. Reece, R-E-E-C-E.

12      Q.   You've probably already spoken with

13      Attorney Young about it and any of the

14      depositions if you've been involved in any but

15      I would just like to go over just a couple of

16      ground rules and basics for the deposition

17      today.

18             Most importantly, if you need to take

19      a break at any point in time I'm happy to go

20      off the record and take a break, just let me

21      know.  If there is a question pending I would

22      ask you answer the question before we take a

23      break; okay?

24      A.   Sure.



1  about whether or not you would serve as an

2  expert in this case; right?

3  A.   Yes.

4  Q.   What did you understand the scope of your

5  engagement to be?

6  A.   To review Miss Alongi's work experience,

7  the situation behind the termination and what

8  her earnings capacity would be from the time of

9  her termination and compare it to what it would

10  have been had she not been terminated.

11  Q.   Okay.  After that initial phone call with

12  Attorney Van Dyck did you agree to take on the

13  engagement?

14  A.   Yes.

15  Q.   What was your next step in your process?

16  A.   Send an invoice.

17  Q.   And what was your next step after that?

18  A.   Ask for documentation.

19  Q.   Do you recall what you asked for?

20  A.   Resumes, W-2s, tax returns, any

21  documentation -- because it had been a

22  termination any documentation related to that.

23  Q.   When you say any documentation related to

24  her termination, can you be more specific what



1   you were asking for?  Let me ask it

2   differently.  Were you asking for any

3   documentation that reflected the reasons for

4   her termination?

5   A.   No.  I think what we were looking for was

6   the letter of termination.

7   Q.   Okay.  Anything else?

8   A.   I think that was in the initial material

9   we requested.

10  Q.   You're referencing we, was your partner

11  also on this call as well?

12  A.   He was after we got involved in the

13  assignment.

14  Q.   So you took the initial call, agreed to

15  the engagement and got him involved?

16  A.   Correct.

17  Q.   You collaborated on what documents should

18  be requested or what information should be

19  reviewed?

20  A.   I think I put together a list and said

21  Dick, does this look like what we need and he

22  said yes.

23  Q.   I understand you are employed as the

24  managing director of Forensic Employment &



1    A.    Executive search, yep.

2    Q.    Was it just you and Mr. Mruk when founded?

3    A.    Yes.

4    Q.    And both of you were focused only on

5    executive search?

6    A.    Correct.

7    Q.    Can you explain a little bit what you mean

8    by executive search?

9    A.    Surely.  Executive search is a form of

10   management consulting.  An executive search

11   consultant is retained by a client that is an

12   organization, for profit, not for profit, and

13   we are asked to identify and recruit candidates

14   for a specific position.  And executive search

15   consultants are paid on a retainer basis.

16   Q.    Okay.  So your client in serving in this

17   capacity is a business or several businesses?

18   A.    Correct.

19   Q.    The business comes to you and says I'm

20   looking for an executive, can you help, or

21   along those lines?

22   A.    Correct.

23   Q.    And the engagement you have with them is

24   on a retainer basis?



```
 1   A.    No, I was -- regrettably I was a

 2   generalist.

 3   Q.    So you worked with -- can you tell me the

 4   various kinds of companies that you worked

 5   with?

 6   A.    Sure.  I worked with a number of nonprofit

 7   museum type organizations, manufacturing

 8   organizations, health care organizations.  Not

 9   much in the way of banking or financial

10   services.

11   Q.    Can you think of any other industries?

12   A.    That would have been the bulk of it.

13   Q.    The name executive search, was your

14   function truly just placing executives or did

15   you work with other individuals as well?

16   A.    I recruited executives.  It's a fine

17   point.

18   Q.    Understood.  Let me ask a better question

19   then.  In terms of the positions which you were

20   looking to find candidates was it just

21   executive level positions or were there others?

22   A.    There were some senior individual

23   contributors.

24   Q.    Like management level?
```



CHRISTOPHER REECE                                   September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                               30

1    A.   All at management level.

2    Q.   Did you do anything to stay on top of

3    industry trends or what your clients were

4    doing?

5    A.   I tended to try to stay on top of what my

6    clients were doing.

7    Q.   How did you go about doing that?

8    A.   Reading about the client, seeing what

9    their -- sort of general stuff, not detailed.

10   Q.   Okay.  No detailed research about the

11   markets themselves that your clients were

12   involved in?

13   A.   No.

14   Q.   Had you ever -- in your history or your

15   career have you ever placed an administrator

16   for ERISA funds?

17   A.   No.

18   Q.   So I take it you never worked with ERISA

19   funds to try to bring in an individual to their

20   organization; is that fair to say?

21   A.   That's correct.

22   Q.   Have you ever done any research on that

23   particular industry at all?

24   A.   No.



1   are considered and generates experienced based

2   solutions versus those based on theory or

3   academics?

4   A.   Correct.

5   Q.   Fair to say you've never take any courses

6   related to executive search or executive

7   placement?

8   A.   As far as I'm aware there are no courses

9   for that.

10  Q.   So, again, on the job training basically

11  and based on your experience in this industry?

12  A.   Correct.

13  Q.   But your opinion is based on your actual

14  experience in the executive search and

15  placement world?

16  A.   Over 40 years of management consulting

17  experience.

18  Q.   All right.  And you have never worked on

19  the side of an employee, right, as a recruiter

20  or head hunter; is that right?

21  A.   I don't understand the question.

22  Q.   Have you ever been retained by an employee

23  to help them find a job?

24  A.   No.



1  Q.   And you would agree or would you agree

2  that not all companies when looking to hire

3  candidates hire an executive placement firm; is

4  that fair to say?

5  A.   That is correct.

6  Q.   Do you have any idea of how often an

7  organization or company actually engages an

8  executive placement firm?

9       MR. YOUNG:  Objection to the form.  You

10  can answer.

11  A.   I'm sorry?

12       MR. YOUNG:  I just objected to the form of

13  the question.  You can answer.

14  A.   30 percent of the time.

15  Q.   What is that based on?

16  A.   So overall industry knowledge, reading

17  about it, reading about -- the EMA Partners

18  belongs to the AESC, which is the Association

19  of Executive Search Consultants, and they

20  publish information and I would say that

21  somewhere in there they would say executive

22  search gets hired about 30 percent of the time.

23  Again, it's a bit of a sliding scale.

24  Q.   Okay.  So based on what you have seen in



1  the majority of instances an executive search

2  firm is not retained to find a placement?

3  A.   If a company is looking for an individual

4  and they don't hire me I have no idea how they

5  get that person, I only know how they get a

6  person if they hire me.

7  Q.   Understood.  Your knowledge base is really

8  based upon the work that you've done within the

9  organizations you've worked for, is that what

10  you're saying?

11  A.   Correct.

12  Q.   So you couldn't speak to how often

13  organizations in general actually retain a firm

14  such as yours?

15  A.   No, but I believe you'll find it's

16  30 percent.

17  Q.   Okay.  That's based upon -- I mean, is it

18  fair to say that's sort of a guess as to how

19  often that happens?

20       MR. YOUNG:  Object to the form.  You can

21  answer.

22  A.   Very informed, yes.

23  Q.   You've not looked at any data that would

24  support that 30 percent data?



CHRISTOPHER REECE                                    September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                                  41

1    A.    I don't think there is any data that

2    really supports that, it's all --

3    Q.    If there were you're not aware of it?

4    A.    That is correct.

5    Q.    Okay.  So when you talk about -- when a

6    firm retains your company and asks you to help

7    them find somebody for one of their positions

8    what is the general understanding about what

9    you're going to do, what are you retained to

10   do, basically?

11   A.    We are retained to work with the

12   organization to determine a position

13   description, determine whatever -- lack of a

14   better term -- marketing material is needed so

15   that we can -- we try and immerse ourself in

16   the company so we know about the organization

17   and the culture of the company.  Then we start

18   doing research, and that's trying to identify

19   individuals who might have the background what

20   we're looking for.  Then we start the process

21   of candidate development, that's where we

22   actually start going -- using the research to

23   reach out to specific individuals, request

24   resumes, start doing preliminary background



CHRISTOPHER REECE                                September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                          42

1    kinds of research.  We would then as -- it

2    looks a little bit like a funnel, you start

3    with a lot of people up here and kept getting

4    smaller and smaller.  Then when it gets to --

5    you might start out with a couple hundred of

6    people that you're talking to.  For whatever

7    reason you move it down to 100, then to 50,

8    then to 20.  And make some determination, get

9    it from 20 to 10, then that level you might

10   start introducing those candidates to the

11   client.  The client would have a phone

12   interview, again, get weaned down to a few more

13   or few less people and then those final

14   candidates would then have an in-person

15   interview, one or two, maybe three in-person

16   interviews, and the client would make a

17   decision.  Then executive search consultant

18   would get involved in presenting -- working

19   with the client on a compensation package and

20   then presenting a compensation offer.

21   Q.   And how do you find the prospective

22   candidates?

23   A.   That's the secret sauce.  There is any

24   number of ways, depends a lot on the



1   came across recruiterslineup.  It did a nice

2   job summarizing the various steps in the

3   recruiting process.

4   Q.   Got it.  I was going to ask you if this

5   article you reference in your report was

6   something you had seen before you were involved

7   in this, but it sounds like you researched and

8   came across this after you were engaged in this

9   case; is that right?

10  A.   Yes.  Because I think my thinking was I

11  could write down kind of what I believe the

12  steps are and then, you know, I also thought it

13  would be important to have another source

14  saying the same types of things that I would

15  say.

16  Q.   On the issue of the source I come back to

17  what is recruiterslineup.com?

18  A.   It's an on-line resource for people who

19  are interested in learning how to change jobs.

20  Q.   So for employees that are looking to

21  change jobs?

22  A.   Yeah.  Individuals, yes.

23  Q.   Is it not a website for recruiters to

24  join?



1  Q.   At least in your experience and for the

2  clients you work with that's a category of

3  people that's highly unlikely to ever get hired

4  by your clients?

5  A.   Correct.

6  Q.   Would you counsel against hiring someone

7  that has been terminated?

8       MR. YOUNG:   Object to the form.

9  A.   Yes.

10 Q.   In fact, do you counsel against hiring

11 somebody who has been terminated?

12 A.   Generally the candidate doesn't get that

13 far.  If I found out that they've been

14 terminated I'll put that resume aside as early

15 on in the process as I can.  My goal is to get

16 from 100 to 200 resumes down to manageable

17 numbers.  In the search business you're almost

18 looking for a reason for rejection.

19 Q.   So other than termination what are the

20 other reasons to reject candidates before they

21 get their foot in the door for an interview?

22 A.   You've discovered their compensation is

23 too high or way too low.  They don't have

24 the -- upon reading the resume and looking at



1   that you have worked for; right?

2   A.   Correct.

3   Q.   These are very specific assignments that

4   you get; right?

5   A.   Correct.

6   Q.   And from one organization to another the

7   culture can be very different; right?

8   A.   Correct.

9   Q.   And the things that are important from one

10  to the other can also be very different?

11  A.   Correct.

12  Q.   That's an important part of the process,

13  to understand what is important to a

14  prospective employer when they're looking for a

15  candidate; right?

16  A.   Yes.

17  Q.   Before you would ever make a

18  determination, form an opinion whether an

19  organization would hire a particular candidate

20  you need to speak with that organization first

21  to understand what they're actually looking

22  for?

23      MR. YOUNG:   Object to the form.  You can

24  answer.



```
 1    A.    Yes.

 2    Q.    In terms of Miss Alongi the report

 3    indicates that you, or Forensic really, doesn't

 4    identify who specifically, but there was a

 5    discussion with Miss Alongi on May 31st; is

 6    that accurate?

 7    A.    Yes.

 8    Q.    I think it says the discussion lasted for

 9    95 minutes; is that right?

10    A.    Something like that, yes.

11    Q.    Was this discussion in person or --

12    A.    Zoom.

13    Q.    Who attended that discussion?

14    A.    Myself, Dick Sbarbaro, Bob Young, Tim Van

15    Dyck, and Gina Alongi.

16    Q.    Anybody else?

17    A.    Maybe -- I think Rose Marie was there.

18    Q.    Gina's sister?

19    A.    Gina's sister.

20    Q.    Did you take any notes during the course

21    of that interview?

22    A.    I don't believe so, no.

23    Q.    Are you certain you didn't take any notes?

24    A.    I'm not certain I didn't take any notes.
```



1   relevant in your opinion on employability?

2        MR. YOUNG:   Objection.   You can answer

3   again.

4   A.   Yes, it was relevant.

5   Q.   Okay.   You asked -- specifically asked her

6   questions and got information about that; is

7   that fair to say?

8   A.   Prior to that conversation I already had

9   documentation that indicated the reason for the

10  termination.

11  Q.   I'm not asking you about the

12  documentation, I'm asking you about you

13  specifically asked her questions during the

14  course of this meeting; right?

15  A.   They were sort of -- I'd seen

16  documentation, and I asked questions about --

17  some of the questions I might have asked her

18  were, you know, relevant to the documentation I

19  had already read about.   I had already seen and

20  had a good idea so I was just getting maybe

21  some further background on it.

22  Q.   And what documentation did you have about

23  the circumstance of her departure from the

24  funds?



1    A.   I would have had a copy of her termination

2    letter.

3    Q.   What did that tell you about the

4    circumstances of her departure?

5    A.   Well, as I recall it said that since she

6    was an employee at will they didn't have to

7    give any reason.

8    Q.   Okay.  What else did you have regarding

9    the circumstances of her departure?

10   A.   Dong some Google searches and other things

11   like that we learned that there was a -- that

12   she had been charged with -- accused of

13   financial malfeasance on one side and she had

14   discussed sexual harassment on her side.

15   Q.   Did you discuss with Gina Alongi her view

16   of the contents of that article?

17   A.   No.

18   Q.   But she did tell you her view of the

19   circumstances surrounding her departure; right?

20   A.   I guess in general terms, yeah.

21   Q.   What other documents did you look at prior

22   to concerning her departure prior to your

23   interview?

24   A.   Oh we had seen this article from the



1  Q.   You can speak to your own experience as an

2  executive search consultant?

3  A.   Correct.

4  Q.   You can't speak to other executive search

5  consultants and their practice and processes;

6  is that fair to say?

7  A.   Other than the people in my own firm, no.

8  Q.   Fair to say you can't speak to the

9  processes and practices in place of the

10  organizations that conduct their own searches

11  for candidates; right?

12  A.   No, they may have a different standard.

13  Q.   And you've never been a headhunter; right?

14  Or a recruiter.  You defined recruiter as

15  something different than an executive search?

16  A.   Correct.

17  Q.   And you can't speak to those practices and

18  procedures that are implemented by folks in

19  their positions; is that fair to say?

20  A.   Can't speak to those, no.

21  Q.   So did the information that Gina gave to

22  you verbally during that 95-minute telephone

23  call with her, did that in any way impact your

24  opinion in this case?



1   A.    I do not believe so.

2   Q.    And why not?

3   A.    Because I had documentation about her

4   background, I had documentation about her

5   termination, and I had documentation about her

6   compensation, and I had 40 years of executive

7   search experience knowing what I would do with

8   a candidate that had a background like Gina's.

9   Q.    I guess I'm trying to understand what

10  information you had about the termination

11  itself.  You pointed to the termination letter,

12  it didn't speak to the reasons for termination,

13  you're an at-will employee, we don't have to

14  explain the reasons; is that right?

15       MR. YOUNG:  Objection.  You can answer.

16  A.    I believe.  Without rereading it, yes,

17  just it was that.

18  Q.    Then you referenced the news article, the

19  Milford Daily News article; right?

20  A.    Yes.

21  Q.    What did that say about her termination?

22  A.    It talks about, you know, financial

23  malfeasance.

24  Q.    All right.  Did Gina say -- agree that the



1   Q.   So you had sort of carte blanche to ask

2   her whatever you thought was appropriate?

3   A.   Yeah.  We talked about the Cape, we talked

4   about dogs, a variety of different things.

5   Q.   Fair to say in this case you have offered

6   the opinion that Gina Alongi is unemployable?

7   A.   Correct.

8   Q.   And that's based upon your experience,

9   again, in the roles that you have served in the

10  executive search function; is that right?

11  A.   That is correct.

12  Q.   That's not based on any training you've

13  had?

14       MR. YOUNG:  Object to the form.  You can

15  answer.

16  A.   It's based on 40 years of executive search

17  experience.

18  Q.   On the job experience?

19  A.   On the job experience.

20  Q.   And it's not based upon any independent

21  research that you've conducted; is that fair to

22  say?

23  A.   It's based on 40 years of experience.

24  Q.   Okay.  Outside of your executive search



1  function are you aware of the ways that

2  candidates actually go about getting jobs when

3  they're not working with a firm such as yours?

4      MR. YOUNG:  Object to the form.  You can

5  answer.

6  A.    The answer to the question is yes.

7  Q.    Okay.  You agree that sometimes candidates

8  can get jobs through networking?

9  A.    Yes.

10  Q.    And that networking can actually be a

11  pretty important part of a candidate's ability

12  to find a new position?

13  A.    Yes.

14      MR. YOUNG:  Object to the form.  You can

15  answer.

16  Q.    What did you do to determine what efforts

17  Gina Alongi had made to find a new job?

18  A.    I think during the course of that

19  conversation one of the subjects we discussed

20  was what efforts she had made.

21  Q.    Why did you ask that question?

22  A.    Because it would be a normal question that

23  I would ask any assignment.

24  Q.    Would it be a question that would go to



```
 1   the issue of her employability?
 2   A.    Not so much it would go -- no.
 3   Q.    So that's not something that you would
 4   consider and it's not something you did
 5   consider in determining that she was
 6   unemployable?
 7   A.    Not really.
 8   Q.    What do you mean by not really?
 9   A.    I know she made some effort to look for a
10   job, she was unsuccessful.
11   Q.    Tell me about what you understand to have
12   been her job search efforts.
13   A.    I know she tried to contact I believe a
14   couple of other unions looking at a similar
15   position.
16   Q.    What unions?
17   A.    I don't recall.
18   Q.    How did you learn that information?
19   A.    She told me.
20   Q.    In the course of that conversation?
21   A.    Yes.
22   Q.    She told you that she tried to contact a
23   couple of unions?
24   A.    Yes.
```



1   from the funds to be evidence that perhaps she

2   was employable?

3   A.   Not necessarily.

4   Q.   Did you or didn't you consider it?

5   A.   I didn't consider it.

6   Q.   And why not?

7   A.   Because of what was -- these red flags out

8   there of her lawsuit and the local's lawsuit

9   against her were out there and would be --

10  there are always people available -- there are

11  always people available for jobs so why try to

12  present a candidate that has baggage when there

13  are candidates that don't have baggage.  And

14  the same reason would go to an employer who is,

15  again, risk adverse, why pursue a candidate

16  that has baggage when I've got other candidates

17  that don't.

18  Q.   Did you consider that some employers would

19  not Google a candidate before hiring them?

20  A.   I can't believe that would happen for a

21  senior position.

22  Q.   Understanding you can't believe that would

23  happen, do you have some data or something you

24  can point to to support your belief that every



CHRISTOPHER REECE                                    September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                              88

```
 1   rendering your opinions in this case?
 2        MR. YOUNG:  Object to the form.  You can
 3   answer.
 4   A.   Can you be specific about the data driven,
 5   what part of the data driven?
 6   Q.   Can you tell me what data driven research
 7   you have done to support your opinion?
 8        MR. YOUNG:  Object to the form.  You can
 9   answer.
10   A.   Data driven was probably -- I would say
11   probably on the compensation.
12   Q.   Just on employability.
13   A.   Employability, again, experience and the
14   articles that we read and Dick's experience as
15   well.
16   Q.   Okay.  Would you agree with me none of
17   which is data driven?
18        MR. YOUNG:  Object to the form.  You can
19   answer.
20   A.   Probably.
21   Q.   You talked about how an employee filing a
22   lawsuit against an organization is something
23   that would be a red flag for you and you would
24   pull that candidate out of the pool; right?
```



1    A.    Correct.

2    Q.    It's not your testimony that anybody who

3    has ever filed a lawsuit against an employer is

4    thereafter -- no employee who has done that has

5    ever been employed again; right?

6    A.    Correct.

7    Q.    You would agree with me that there are

8    lots of employees out there who have sued their

9    employer and also found subsequent employment;

10   right?

11   A.    That's likely.

12   Q.    I didn't --

13   A.    That's likely.

14   Q.    Likely, right.  It's a certainty there are

15   employees out there?

16       MR. YOUNG:  Object to the form.  You can

17   answer again.

18   A.    I can agree to that.

19   Q.    Okay.  And you can also imagine that there

20   are employees, or can you agree that there are

21   employees out there who have been the subject

22   of a lawsuit who have been sued who also

23   thereafter have found employment; is that fair

24   to say?



CHRISTOPHER REECE                                      September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                                   90

1          MR. YOUNG:   Object to the form.   You can

2     answer.

3     A.   Yes.

4     Q.   Would you also agree there are employees

5     out there who have been accused of crimes and

6     have found employment thereafter?

7          MR. YOUNG:   Object to the form.   You can

8     answer.

9     A.   Yes.

10    Q.   And can you also agree that there are

11    employees out there that have been convicted of

12    a crime and have been thereafter employed?

13         MR. YOUNG:   Object to the form.   You can

14    answer.

15    A.   Yes.

16    Q.   And even employees in top levels of

17    companies have been convicted of crimes and

18    found employment after?

19         MR. YOUNG:   Object to the form.   You can

20    answer.

21    A.   Yes.

22    Q.   So the fact that there is a news article

23    accusing somebody of something you would agree

24    with me that there is data out there that that



CHRISTOPHER REECE                                    September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                              92

1    A.    Jobs that are available is a snapshot in

2    time.   If I went to see what was available

3    on -- via LinkedIn or Indeed or speaking to

4    some of my colleagues who are in the search

5    business I could only find out what positions

6    are available at that moment in time and I

7    could research those to see if there were jobs

8    that would by appropriate for Gina to apply to

9    based on her experience.

10   Q.    And did you do that?

11   A.    Yes.

12   Q.    What did you do?

13   A.    I researched -- I went to LinkedIn --

14   primarily I went to LinkedIn and Indeed, typed

15   in fund administrator.

16   Q.    Why is that not in your report?

17   A.    Just didn't put it in.

18   Q.    Is that because it's not part of your

19   opinion?

20   A.    It wasn't part of my opinion.  I mean, I

21   looked to see if there were jobs that came up

22   that were -- that looked appropriate, I did not

23   find them so I didn't put it in the report.

24   Q.    When did you do these job searches?



1  for jobs, before you spoke to Gina or after you

2  spoke to Gina?

3  A.   It was probably before.  Again, it was

4  quite a short timeline.

5  Q.   So you started to search, spoke with Gina,

6  formed your opinion she was unemployable and

7  searched no more because your opinion was she

8  was unemployable?

9  A.   Correct.

10  Q.   You didn't talk with anybody in the

11  industry, fair to say, about whether Gina is

12  somebody that they would have hired; right?

13  A.   No.

14  Q.   Didn't reach out to the Coalition of

15  Taft-Hartley Funds, anybody there?

16  A.   No.

17  Q.   Obviously you are aware that folks have --

18  employers can certainly make that decision to

19  hire somebody and regardless of what

20  information might be out there?  What might be

21  a red flag for you might not be a red flag for

22  somebody else, are you aware of that?

23      MR. YOUNG:  Object to the form.  You can

24  answer.



1  of the story; is that fair to say?

2      MR. YOUNG:  Object to the form.  You can

3  answer.

4  A.   I would assume so.

5  Q.   Certainly the fact these lawsuits are out

6  there would not be a bar for an employer to

7  decide to go hire her because they believe her

8  position?

9      MR. YOUNG:  Object to the form.  You can

10  answer.

11  A.   That I can't answer.

12  Q.   You don't know because it's very

13  subjective, right, in employers' hiring

14  decisions?

15  A.   Yes.

16  Q.   So it is certainly possible that an

17  employer could have hired Gina Alongi?

18      MR. YOUNG:  Object to the form.

19  A.   I find it highly unlikely.

20  Q.   But possible?

21  A.   But unlikely.

22  Q.   And that's based upon having no experience

23  whatsoever in the particular industry in which

24  Gina Alongi works with?



CHRISTOPHER REECE                               September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                            99

1        MR. YOUNG:  Object to the form.

2   A.    I don't think it's an industry specific

3   issue.

4   Q.    Okay.  But you would agree you don't know

5   the industry itself or the network in this

6   industry; right?

7        MR. YOUNG:  Object to the form.  You can

8   answer.

9   A.    I don't know them but hiring is hiring.

10       MS. MARKOWSKI:  (Off the record at 11:42

11  a.m.)

12       MS. MARKOWSKI:  (On the record at 11:56

13  a.m.)

14  Q.    Turning back to the expert report, we

15  talked a lot about Exhibit 2, not as much about

16  your supplemental expert report.  I want a

17  little background on the record about this.

18  Exhibit No. 3 is your supplemental report;

19  correct?

20  A.    Correct.

21  Q.    Why was the supplemental report created?

22  A.    Very simply because when we put together

23  the financial side of it we were working on a

24  set of assumptions and after we submitted the



1    report we were informed that there was an

2    updated set of assumptions on one of the

3    pensions and so we revised it to reflect that.

4    Q.   What were the assumptions?

5    A.   It's easier for me to do is point it out

6    to you if you show me the exhibit.  Both

7    Exhibit Is and there is also -- it's in the

8    assumptions, that's what I need.

9    Q.   I'm going to give you the original one and

10   then the updated one.  So the original will be

11   4.

12  (Whereupon the Stenographer marked as

13   Exhibit No. 4 - Exhibit I.)

14  (Whereupon the Stenographer marked as

15   Exhibit No. 5 - Exhibit I Assumptions.)

16   Q.   Mr. Reece, you said it would be helpful if

17   you saw the exhibit so we placed in front of

18   you Exhibit No. 4 with the original Exhibit I

19   to your report.  Exhibit No. 5 is the Exhibit I

20   to your supplemental report.

21   A.   So the only thing that changed in the

22   report was basically where you go down on the

23   left-hand side on both exhibits it talks about

24   Local 4 contribution, Local 4 pension, I should



CHRISTOPHER REECE                                    September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                               101

1   say.   In the original it was monthly pension of

2   $85 times 12.5 years and $150 times 13.9 years.

3   And then the revised one it was 85 times 12.5

4   years and 170 times 31.83 years.

5   Q.   Okay.  How did this come to your attention

6   that there was a change, if you will, that

7   needs to be made?

8   A.   I think it was communicated to us through

9   Bowditch & Dewey and probably came from

10   Alongi -- Gina Alongi that we had not taken

11   into account a change in the Local 4 pension

12   that raised the years from 150 times the number

13   of years to 170 times the numbers of years.

14   Q.   All right.  Where can that change be

15   found?

16   A.   That change can be found in one -- in the

17   other exhibits which would be -- so there's F,

18   G, H, and I.  So the changes can be -- H would

19   be -- H would be where it's summarized.

20   Q.   H; okay.

21   A.   H is the summary of the analysis.

22   Q.   I've got the original and then new Exhibit

23   H.

24   A.   Is that all the exhibits?



CHRISTOPHER REECE
IUOE LOCAL 4 PENSION FUND vs ALONGI

September 26, 2024
117

1    Q.   But if she told you she was going to

2    retire at 65 why would you stick with the end

3    of the year if that's not consistent with what

4    she told you?

5        MR. YOUNG:   Objection.   You can answer.

6    A.   She was retiring in her 65th year, that's

7    how we did it.

8    Q.   That's not what she was saying to you, she

9    was telling you she was retiring at age 65;

10    right?

11        MR. YOUNG:   Objection.   You can answer.

12    A.   Perhaps.

13    Q.   So this report has more than 10 months of

14    income in it that she wouldn't have earned if

15    she retired at age 65; right?

16        MR. YOUNG:   Objection.   You can answer.

17    A.   Perhaps.   I can't be assured that she was

18    going to retire --

19    Q.   I'm asking you to go based on this

20    assumption, you said she told you she was

21    retiring at 65, so if she actually retired at

22    age 65 in February of 2025 then there are more

23    than 10 months of compensation or income

24    attributed to her that shouldn't be; right?



1         MR. YOUNG:  Objection.  You can answer.

2    A.   I'm not going to agree or disagree with

3    that.

4    Q.   You can't say one way or the other?

5    A.   No.

6    Q.   If Gina Alongi said to you I'm retiring on

7    February 11th, 2025 --

8    A.   She didn't say that.

9    Q.   That was her birthday.  So I'm asking you

10   to assume this, I'm not asking you to agree

11   with me on it.  I'm asking you to assume she

12   says I'm retiring on February 11th of 2025 and

13   that would make the income that is identified

14   in this for 2025 to be higher than it should

15   be, right, it's not accurate assuming that

16   assumption?

17        MR. YOUNG:  Objection.

18   A.   If you assume that assumption, yes.

19   Q.   Okay.  And can you tell looking at this

20   how that would have impacted your analysis?

21   Can you look at this right now and come up with

22   the alternative numbers that would --

23   A.   I can't right off the top of my head but

24   it would have been maybe $200,000.  I can't do



1    what Gina told you?

2    A.    Correct.

3    Q.    Car operating cost you attribute $7,000 to

4    that?

5    A.    Correct.

6    Q.    What is that comprised of?

7    A.    I think we did a -- Gina may have alluded

8    to a number and we tried to make sure it was a

9    decent number and we looked at insurance costs,

10   and some money for gasoline.

11   Q.    Gina provided the number to you?

12   A.    Yes, and then we tried to verify that.

13   Q.    How did you try to verify?

14   A.    Going on-line looking at insurance costs

15   basing it something -- maybe I looked at my

16   insurance premium for my automobile was.

17   Q.    Other than insurance premiums what make up

18   that $7,000?

19   A.    I think there was some money in there

20   for -- estimated money for repairs and

21   gasoline.  I think the bulk of the number was

22   insurance.

23   Q.    Did Gina tell you that the funds were

24   paying for her gas?



1  pay on gas in a year and some number that I pay

2  on repair on my car, insurance, that would have

3  been a way to doublecheck for reasonableness,

4  that's all.

5  Q.   You used your own spending as a barometer

6  to check that information Gina gave to you?

7  A.   Correct.

8  Q.   You went and you looked at the amount of

9  money you spend on gas per year; is that right?

10 A.   Correct.

11 Q.   Your assumption was the funds were paying

12 for Gina's gas for the year?

13 A.   That was the assumption, yes.

14 Q.   That's based on her telling you that?

15 A.   Correct.

16 Q.   And did she give you a specific figure?

17 A.   No.

18 Q.   What were you checking then?  I'm trying

19 to understand.

20 A.   I think she said, you know, roughly I

21 spend X on insurance, Y on gas, and then some

22 repairs, then I checked it against my own

23 spending plus sort of general I could go to gas

24 and say what's -- Google how many miles



CHRISTOPHER REECE                                September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                          131

1   A.    I believe it was a Cadillac Escalade.

2   Q.    When she said that -- she said that that

3   was the yearly lease payment for a Cadillac

4   Escalade?

5   A.    Correct.

6   Q.    Did she tell you that was the car she had

7   at the time she was terminated?

8   A.    I can't answer that.  She told me she

9   leased a Cadillac Escalade.  When she was

10  terminated she had to turn in the car.  I can't

11  answer it was the same car or not.

12  Q.    Did you do anything to verify the 17,500

13  figure she gave you?

14  A.    It was based on her.

15  Q.    You verified the $7,000 and not the

16  17,500?

17  A.    Yeah.

18  Q.    Is there a reason you verified one and not

19  the other?

20  A.    No.

21  Q.    That would have been a pretty easy thing

22  to verify if you wanted to look up how much

23  does it cost to lease a Cadillac Escalade?

24  A.    Yes, but in the scheme of things it's a



1  relatively small number.

2  Q.   The 7,000 was quite a bit smaller than the

3  17,500; right?

4  A.   Yeah, but I didn't verify it, I assumed

5  that was the number.

6  Q.   What about the annual cell phone cost, did

7  that number come from Gina?

8  A.   No, I think that's a number that we --

9  that I calculated.

10 Q.   Based on what?

11 A.   Based on the four cell phones in my own

12 plan.

13 Q.   You looked to your own plan to figure out

14 the value of the benefit to Gina?

15 A.   Yeah.

16 Q.   All right.  Did you ask Gina?  Is there a

17 reason you didn't look to Gina to give you the

18 number?

19 A.    I don't remember Gina giving me the number

20 and I don't recall whether or not I asked.  I

21 know I looked at my cell phone bill, four

22 lines, and took less than a quarter of that.

23 Q.   That number you did arrive at from your

24 own personal cell phone bill?



CHRISTOPHER REECE                                September 26, 2024
IUOE LOCAL 4 PENSION FUND vs ALONGI                           134

1  Q.   You note in the report on page 12 that --

2  and I think you testified to this too that Gina

3  had no substantial income when she was

4  terminated; right?

5  A.   Correct.

6  Q.   Did Gina tell you about the money she was

7  receiving from the coalition at the time of her

8  termination?

9  A.   Yes.

10 Q.   What did you understand to be her income?

11 A.   I can't remember.  From what I recall it

12 was not enough to live on.

13 Q.   It was not enough to live on?

14 A.   Correct.

15 Q.   Do you have a ballpark of how much that

16 was?

17 A.   No.

18 Q.   If I were to tell you it was in the range

19 of 50,000 does that refresh your memory?

20 A.   No.  I would have to go back and look.

21 That was completely separate from -- in my

22 calculations that was over here and we were

23 asked to look at this piece.

24 Q.   You say in the report she had no



1            Commonwealth of Massachusetts

2

3        I, June N. Poirier, Notary Public in
     and for the Commonwealth of Massachusetts, do hereby
     certify that there came before me on the 26th day of
4    September, 2024, the deponent herein, who was duly
     sworn by me; that the ensuing examination upon oath
5    of the said deponent was reported stenographically
     by me and transcribed into typewritten form under my
6    direction and control; and that the within
     transcript is a true record of the questions asked
7    and the answers given at said deposition, to the
     best of my knowledge, skill and ability.

8

9        I FURTHER CERTIFY that I am neither
     attorney nor counsel for, nor related to or employed
     by any of the parties to the action in which this
10   deposition is taken; and, further, that I am not a
     relative or employee of any attorney or financially
11   interested in the outcome of the action.

12       IN WITNESS WHEREOF I have hereunto set

13   my hand and affixed my seal of office this

14   10th day of October, 2024.

15

16           _____
             June N. Poirier, Notary Public
17           Commonwealth of Massachusetts
             My Commission Expires:
18           May 25, 2025

19

20

21

22

23

24

