# EXHIBIT 2

# In the Matter of:

*Ginamarie Alongi, et al. vs*

*Iuoe Local 4 Health & Welfare Fund, et al.*

*Jennifer Dow*

*July 06, 2022*

68 Commercial Wharf • Boston, MA 02110
888.825.3376 - 617.399.0130
Global Coverage
court-reporting.com



O&L O'BRIEN & LEVINE COURT REPORTING SOLUTIONS
A MAGNA LEGAL SERVICES COMPANY

Case 1:21-cv-10163-FDS   Document 134-2   Filed 01/03/25   Page 3 of 6

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Jennifer Dow
July 06, 2022

Page 61

 1  it, though.  She could have and -- I don't know.
 2      Q.    And is that something that you may have
 3  said, yourself, and you just don't recall?
 4      A.    I did not say it.
 5      Q.    You're certain of that?
 6      A.    Yes.  Most times, I would walk away when
 7  it was said.
 8      Q.    When it was said by whom?
 9      A.    By Mr. McLaughlin.
10      Q.    Okay.  Do you recall --
11      A.    I just remember one incident where I
12  walked away.
13      Q.    Okay.  You had said most times so -- but
14  you only recall that there was one incident?
15      A.    Yes.  I remember one specific time.
16      Q.    Okay.  And what do you recall about that?
17      A.    I just remember -- actually, I don't know
18  the specific time.  There was a -- he would say, here
19  comes fire crotch, or something along those lines.  And
20  I would just walk away.
21      Q.    And you don't recall when that happened?
22      A.    Not exactly, no.
23      Q.    And you can only -- you only have a
24  memory of it occurring on one occasion?

Page 62

 1      A.    It could have occurred more than one
 2  occasion.
 3      Q.    I'm just asking what your memory is.
 4      A.    That's my memory.
 5      Q.    Only one?
 6      A.    I just remember him saying it.  It could
 7  be more than once.
 8      Q.    Just to be clear for the record, though,
 9  you only have a memory it occurring on one occasion?
10      A.    Yes.
11      Q.    And you don't know what time period that
12  occurred in?
13      A.    No.
14      Q.    Okay.  And did you ever go to anybody
15  internally and say you felt that that comment was
16  inappropriate?
17      A.    No.
18      Q.    Did you ever complain to Gina Alongi
19  about that comment?
20      A.    No.
21      Q.    Did you ever say, to anybody else in the
22  office, that you thought that that comment was
23  inappropriate?
24      A.    No.

Page 63

 1      Q.    Do you recall, in May of 2018, that there
 2  was a -- called a dispute between Mr. McLaughlin and
 3  Gina Alongi?
 4      A.    No.  I was on vacation.
 5      Q.    Do you recall hearing about the dispute
 6  after the fact?
 7      A.    Yes.
 8      Q.    And who told you about it?
 9      A.    I think it might have been Amy that told
10  me, or Jennifer.  I can't remember exactly.  I just
11  remember one of the managers told their staff to stay
12  outside the building because there was an argument
13  going on.  But I was not there.
14      Q.    So you don't have any firsthand knowledge
15  of what occurred that that incident?
16      A.    No.
17      Q.    Sometime after that incident, did
18  Gina Alongi ever come to you and say -- ask you to tell
19  her all the ways in which Mr. McLaughlin was
20  inappropriate, or words to that effect?
21      A.    She asked -- yes.
22      Q.    When did that occur?
23      A.    I can't remember exactly.  Sorry.
24      Q.    What were the circumstances of that

Page 64

 1  conversation?
 2      A.    She just came in and asked if he's ever
 3  inappropriate.
 4      Q.    Is that all?
 5      A.    Yeah.  I can't remember the exact
 6  conversation.
 7      Q.    Did she tell you why she was asking that?
 8      A.    No.
 9      Q.    What did you say to her?
10      A.    I said, not really.  I didn't want to say
11  anything because I didn't want to get in trouble or
12  fired or anything.
13      Q.    And you thought you would get fired?
14      A.    Yes.
15      Q.    If you responded to Gina's question?
16      A.    If it got back to her boss or -- I wasn't
17  sure.  I was just nervous so I didn't want to say
18  anything.
19      Q.    Who else was present for that
20  conversation?
21      A.    Nobody.
22      Q.    How long did the conversation last?
23      A.    I don't remember exactly.
24      Q.    Do you have a rough estimate; was it like

Case 1:21-cv-10163-FDS   Document 134-2   Filed 01/03/25   Page 4 of 6

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Jennifer Dow
July 06, 2022

Page 65

```
 1  a couple of minutes?  Was it --
 2      A.   Probably, a few minutes.
 3      Q.   -- an hour?
 4      A.   No.  It was not an hour.
 5      Q.   All right.  And as best as you can
 6  recall, she said, meaning Gina, Gina asked you to you
 7  tell you if Bill had ever -- Bill McLaughlin had ever
 8  been inappropriate and you said, not really?
 9      A.   Yes.
10      Q.   And that was the sum total of the
11  conversation?
12      A.   Yes.
13      Q.   So is it your testimony today, that you,
14  when you were having that conversation with her, that
15  you did believe that he had been inappropriate?
16      A.   Yes.
17      Q.   And you did not share that with her?
18      A.   Yes.
19      Q.   And what didn't you share with her?
20      A.   All of the things that happened that I
21  witnessed or him talking about sexual -- stuff I didn't
22  want to -- I just didn't want any part of it so...
23      Q.   Okay.  And when you say the inappropriate
24  behavior, that's everything that you had reduced to
```

Page 66

```
 1  writing in Exhibit 29; is that right?
 2      A.   Yes.
 3      Q.   So if you had said something to her, it
 4  would have been, essentially, what you put into your
 5  affidavit, in Exhibit 29; is that your testimony?
 6      A.   Yes.
 7      Q.   Were you friendly with Gina Alongi at
 8  that time, in 2018?
 9      A.   She was my boss.  But I wasn't friendly
10  outside the office or anything.
11      Q.   You didn't socialize in any way outside
12  the office?
13      A.   No.
14      Q.   Did Gina Alongi ever -- after that first
15  conversation that you had with her, did she ever come
16  back and ask you again about interactions or memories
17  that you had of Mr. McLaughlin's behavior?
18      A.   No.
19      Q.   So was that the only time that you and
20  Gina Alongi ever discussed that issue?
21      A.   Yes.
22      Q.   Are you familiar with the funds sexual
23  harassment policy?
24      A.   Yes.
```

Page 67

```
 1      Q.   Do you receive --
 2      A.   It was a policy, yes.  I don't remember
 3  the exact details of it but yes.
 4      Q.   You were familiar that they -- the funds
 5  had a policy against sexual harassment; is that fair to
 6  say?
 7      A.   Yes.
 8      Q.   You received a copy of the funds
 9  handbook; is that also fair to say?
10      A.   Yes.
11      Q.   And when you received a copy of the
12  handbook, did you review that?
13      A.   Yes.
14
15           (Exhibit 117, Handbook, marked)
16
17      Q.   (By Ms. Markowski)  Ms. Dow, do you
18  recognize Exhibit 117?
19      A.   Yes.
20      Q.   Would you agree with me that that is the
21  employee handbook for the funds?
22      A.   Yes.
23      Q.   All right.  And do you see down in the
24  bottom right-hand corner, there's a date of June 27 of
```

Page 68

```
 1  2016?
 2      A.   Yes.
 3      Q.   Okay.  Did you, occasionally, receive
 4  updates of the handbook?
 5      A.   I'm sure.
 6      Q.   Do you have any reason to think you
 7  didn't receive this handbook?
 8      A.   No.
 9      Q.   And if you look at the second page, the
10  table of contents, you'll see sexual harassment?
11      A.   Yes.
12      Q.   That's on page four; do you see that?
13      A.   I do.
14      Q.   Okay.  If you can just turn to that page
15  with me, please.  And would you agree with me that page
16  four to page five talks about sexual harassment and the
17  funds policy on that; is that right?
18      A.   Yes.
19      Q.   And it states that "It is a goal of the
20  funds to promote a workplace that is free of sexual
21  harassment"; do you see that?
22      A.   Yes.
23      Q.   "Sexual harassment of employees occurring
24  in the workplace or in other settings in which
```

Page 69

1  employees may find themselves in connection with their
2  employment is unlawful and will not be tolerated by the
3  organization"; do you see that?
4      A.   Yes.
5      Q.   And, ultimately, who was in charge of the
6  funds office?
7      A.   The funds office?
8      Q.   Yes.
9      A.   Gina Alongi.
10     Q.   Okay.  And if you could, turn to the next
11 page, page five, that then talks about what to do if
12 somebody has a complaint of sexual harassment; do you
13 see that?
14     A.   Yes.
15     Q.   And do you see that it says, "If any of
16 the funds employees believes that he or she has been
17 subjected to sexual harassment, the employee has the
18 right to file a complaint with the IUOE Local 4 fringe
19 benefit funds office."
20     A.   Yes.
21     Q.   And to whom does the policy direct you to
22 file that complaint with?
23     A.   To Gina Alongi.
24     Q.   Okay.  And is --

Page 70

1           MR. TOSTI:  Objection.  Sorry objecting
2  after she answered but...
3      Q.   (By Ms. Markowski)  And then after
4  identifying Gina Alongi, is there somebody else as well
5  that you can contact?
6      A.   Looks like Katherine Shea.
7      Q.   Okay.  Do you know who Katherine Shea is?
8      A.   Yes.
9      Q.   Okay.
10     A.   I know who -- yes.
11     Q.   All right.  And would you agree she's an
12 attorney for the funds?
13     A.   Yes.
14     Q.   And have you ever contacted
15 Katherine Shea about a complaint of sexual harassment?
16     A.   No.
17     Q.   Okay.  And how about Gina Alongi, if you
18 had a complaint of sexual harassment, did you feel
19 comfortable going to Gina Alongi to discuss that?
20     A.   No.
21     Q.   **You didn't feel comfortable reporting it**
22 **to Gina Alongi?**
23     A.   **I didn't report anything to Gina Alongi.**
24     Q.   I'm saying, if you did, if you had a

Page 71

1  complaint of sexual harassment that you felt needed
2  attention, would you have felt comfortable with
3  bringing that to Gina Alongi's attention?
4      A.   No.  Not while I was working there.
5      Q.   Why not?
6      A.   Because I didn't want to get in trouble
7  or be fired.
8      Q.   But, ultimately, wasn't it Gina who was
9  in charge of the funds?
10     A.   Well, ultimately, Mr. McLaughlin's her
11 boss so...
12     Q.   And what is that statement based on?
13     A.   That he was in charge of her.
14     Q.   And why do you think the relationship
15 between Mr. McLaughlin and Ms. Alongi would impact what
16 Ms. Alongi would do with regard to your complaint of
17 sexual harassment?
18     A.   I just didn't want to complain and have
19 it -- I wasn't sure.  I just didn't want to complain
20 about anything.  I wanted to do my job and --
21     Q.   So my question to you is just generic.
22 If you had a complaint of sexual harassment.  I'm not
23 talking about any particular individual.
24     A.   Yeah.

Page 72

1      Q.   But if you had a complaint of sexual
2  harassment, would you have felt comfortable going to
3  Gina Alongi about that?
4      A.   No.
5      Q.   And why not?
6      A.   Because I didn't want to be fired.
7      Q.   So you think, if you made a complaint
8  about anybody or any complaint of sexual harassment,
9  that you were in danger of being fired so that's why
10 you didn't do it, even though the policy specifically
11 says that that's not the case?
12     A.   Yes.
13     Q.   Okay.  And just to be clear, any -- this
14 is any behavior or any actions that occurred in the
15 workplace.  If you believe that they rose to the level
16 of sexual harassment, you would not have gone to
17 Gina Alongi or Katherine Shea about your complaints?
18     A.   No.
19     Q.   No, you wouldn't or have gone --
20     A.   No, I wouldn't.
21     Q.   Okay.  And you didn't engage in any
22 banter around the office of a sexual nature?
23     A.   No.
24     Q.   Never?

Case 1:21-cv-10163-FDS   Document 134-2   Filed 01/03/25   Page 6 of 6

Ginamarie Alongi, et al. vs
Iuoe Local 4 Health & Welfare Fund, et al.

Jennifer Dow
July 06, 2022

Page 157

1   A.   Probably going forward -- I mean, that's
2   the year I got married so I've been going there since
3   then. So I don't know the exact specific year. But he
4   said it every year pretty much -- he said it often
5   around that time.
6       Q.   Okay. But when was the -- when was the
7   last year he made that comment to you?
8       A.   Probably the last time I went, when I was
9   in the office.
10      Q.   Are you guessing? You used the word
11  "probably." Probably the last time you were in the
12  office?
13      A.   Yes.
14      Q.   Okay. You were guessing that it
15  occurred?
16      A.   I don't know the exact date.
17      Q.   And the last time that you would have
18  gone to Aruba was what, May of 2019, before the office
19  shut down for COVID?
20      A.   The last time I went to Aruba?
21      Q.   Yes.
22      A.   Of this year.
23      Q.   Before COVID. The last time you went to
24  Aruba before COVID, was that 2019?

Page 158

1   A.   Yes.
2   **Q.   And did you ever report to Gina Alongi,**
3   **these comments that you say Mr. McLaughlin made?**
4   **A.   No.**
5       Q.   Did you ever report them to
6   Katherine Shea?
7       A.   No.
8       Q.   Okay. You sort of made a face when
9   you --
10      A.   Yeah. I wouldn't -- no, I did not.
11      Q.   And did you ever volunteer that you were
12  not eating sweets at the office because you were trying
13  to fit into your two-piece bathing suit for the trip to
14  Aruba?
15      A.   No.
16      Q.   Okay. That's not a comment that you ever
17  made?
18      A.   No.
19      Q.   Okay. All right. And then, paragraph
20  13, you say, "On many occasions, Mr. McLaughlin would
21  talk to me about other people's sexual activity in
22  graphic detail." When did he make those comments to
23  you?
24      A.   I don't know the exact time frame.

Page 159

1       Q.   Okay. Do you have any estimate of the
2   time frame in which they were made?
3       A.   I don't.
4       Q.   Okay. To the best of your memory, when
5   did he make the last comment of that nature?
6       A.   I don't remember.
7       Q.   Who was he talking about, when he made
8   those comments; whose sexual activity did he talk
9   about?
10      A.   Lou Rasetta's.
11      Q.   Who else? Anybody?
12      A.   Just, mainly, his with other people.
13  With other women. Lou Rasetta's.
14      Q.   Lou Rasetta's with other women?
15      A.   Yes.
16      Q.   And you say, in this affidavit, that you
17  were very offended by Mr. McLaughlin's comments?
18      A.   Yes.
19      Q.   And if Lou Rasetta made the comments that
20  Mr. McLaughlin attributed to him -- excuse me. Strike
21  that. Did you report to Gina Alongi --
22      A.   No.
23      Q.   -- any of these comments?
24      A.   No.

Page 160

1       Q.   And you didn't report to Kate Shea any of
2   these comments either?
3       A.   No.
4       Q.   How many comments -- how many of these
5   conversations did you have with Mr. McLaughlin?
6       A.   I don't remember exactly how many times.
7   Just most of the time I would walk away when things
8   were said.
9       Q.   All right. And you don't recall the last
10  time any one of these conversations occurred?
11      A.   No. I don't recall a specific date.
12      Q.   And were these conversations between you
13  and Mr. McLaughlin alone, or were there other
14  individuals there?
15      A.   Other individuals.
16      Q.   Was Gina Alongi ever present?
17      A.   No.
18      Q.   Quite certain of that?
19      A.   Yes.
20      Q.   Who do you think was present for the
21  conversation?
22      A.   I don't know exactly. But some of the
23  staff.
24      Q.   And in terms of rubbing Ms. Vachon's